# NO. 22-1721

In The

# United States Court Of Appeals

### For The Fourth Circuit

**MAXWELL KADEL; JASON FLECK; CONNOR THONEN-FLECK; JULIA MCKEOWN; MICHAEL D. BUNTING, JR.; C.B., by his next friends and parents; SAM SILVAINE; DANA CARAWAY,**

*Plaintiffs – Appellees,*

v.

**DALE FOLWELL, in his official capacity as State Treasurer of N.C.; DEE JONES, in her official capacity as executive Administrator of the N.C. State Health Plan for Teachers and State Employees,**

*Defendants – Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA AT GREENSBORO

––––––––––––––––

## JOINT APPENDIX
## Volume I of IX
## (Pages: 1 – 607)

––––––––––––––––

Mark A. Jones
Kevin G. Williams
BELL, DAVIS & PITT, P.A.
100 N. Cherry Street
Suite 600
Winston-Salem, NC 27101
(336) 722-3700

*Counsel for Appellants*

John G. Knepper
LAW OFFICE OF
JOHN G. KNEPPER, LLC
P. O. Box 1512
Cheyenne, WY 82003
(307) 632-2842

*Counsel for Appellants*

Tara L. Borelli
LAMBDA LEGAL DEFENSE
& EDUCATION FUND, INC.
1 West Court Square
Suite 105
Decatur, GA 30030
(470) 225-5341

*Counsel for Appellees*

David P. Brown
Ezra U. Cukor
TRANSGENDER LEGAL DEFENSE
& EDUCATION FUND, INC.
520 8th Avenue
Suite 2204
New York, NY 10018
(646) 993-1675

*Counsel for Appellees*

Omar F. Gonzalez-Pagan
LAMBDA LEGAL DEFENSE
& EDUCATION FUND, INC.
120 Wall Street
19th Floor
New York, NY 10005
(212) 809-8585

*Counsel for Appellees*

Warren Haskel
Dmitriy Tishyevich
MCDERMOTT WILL
& EMERY LLP
One Vanderbilt Avenue
New York, NY 10017
(212) 547-5400

*Counsel for Appellees*

Michael W. Weaver
MCDERMOTT WILL
& EMERY LLP
444 West Lake Street
Suite 4000
Chicago, IL 60606
(312) 984-5820

*Counsel for Appellees*

Amy E. Richardson
Lauren Snyder
HWG LLP
1919 M Street, NW
8th Floor
Washington, DC 20036
(202) 730-1300

*Counsel for Appellees*

# TABLE OF CONTENTS
## Joint Appendix - Volume I of IX

Page:

Docket Entries. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **JA1**

**First Amended Complaint**
        filed March 9, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **JA47**

*Amici Curiae*'s Motion for Leave to File Brief in Support of Plaintiffs
        filed November 30, 2021.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **JA95**

**State Health Plan Defendants'**
**Motion for Partial Summary Judgment**
        filed November 30, 2021.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **JA106**

**State Health Plan Defendants' Memorandum**
**In Support of Partial Summary Judgment,**
**With Exhibits,**
        filed November 30, 2021.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **JA110**

        **Exhibits:**

        1.    **Deposition of Dale Folwell**
                    taken on August 12, 2021. . . . . . . . . . . . . . . . . . . . . . .  **JA150**

        2.    **Deposition of Dee Jones**
                    taken on August 3, 2021. . . . . . . . . . . . . . . . . . . . . . . .  **JA157**

        3.    **80/20 and 70/30 Plans - 2021 Recommendation**. . . . . . . . .  **JA177**

<u>Exhibits</u> to
State Health Plan Defendants' Memorandum
In Support of Partial Summary Judgment
     filed November 30, 2021, Continued:

4.      Declaration of BCBSNC,
      With Attachments,
          sworn November 30, 2021. . . . . . . . . . . . . . . . . . . . . . . JA183

5.      Prior Authorization and Utilization Management
      Concepts in Managed Care Pharmacy
          Vol. 25, No. 6 June 2019 JMCP. . . . . . . . . . . . . . . . . . JA197

6.      Deposition of Dan H. Karasic, M.D.
          taken on September 20, 2021. . . . . . . . . . . . . . . . . . . JA201

7.      Deposition of Randi C. Ettner, Ph.D.
          taken on October 15, 2021. . . . . . . . . . . . . . . . . . . . . JA206

8.      Deposition of Stephen B. Levine, M.D.
          taken on September 10, 2021. . . . . . . . . . . . . . . . . . . JA208

9.      Deposition of George R. Brown, M.D.
          taken on September 23, 2021. . . . . . . . . . . . . . . . . . . JA212

10.    Affidavit of Alina Neuberger MD, MBA
          sworn September 29, 2021. . . . . . . . . . . . . . . . . . . . . JA214

11.    Affidavit of Adam Korn
          sworn September 29, 2021. . . . . . . . . . . . . . . . . . . . . JA224

**Exhibits to**
**State Health Plan Defendants' Memorandum**
**In Support of Partial Summary Judgment**
> **filed November 30, 2021, Continued:**

12. **Deposition of Sergeant Dana Caraway,**
    **With Attachments,**
    > taken on September 17, 2021. . . . . . . . . . . . . . . . . . . **JA226**

13. **Deposition of Becki Johnson**
    > taken on  September 15, 2021. . . . . . . . . . . . . . . . . . . **JA258**

**Plaintiffs' Motion for Summary Judgment**
> filed December 20, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA278**

**Plaintiffs' Memorandum in Support of Summary Judgment,**
**With Exhibits,**
> filed December 20, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA282**

**Exhibits:**

1. **Declaration of Maxwell Kadel**
   > sworn November 24, 2021. . . . . . . . . . . . . . . . . . . . . . . **JA323**

2. **Declaration of Connor Thonen-fleck**
   > sworn November 15, 2021. . . . . . . . . . . . . . . . . . . . . . . **JA341**

3. **Declaration of Jason Fleck**
   > sworn November 11, 2021. . . . . . . . . . . . . . . . . . . . . . . **JA348**

4. **Declaration of Julia McKeown**
   > sworn November 19, 2021. . . . . . . . . . . . . . . . . . . . . . . **JA375**

Exhibits to
Plaintiffs' Memorandum in Support of Summary Judgment
        filed December 20, 2021, Continued:

5.      Declaration of C.B.
                sworn November 24, 2021. . . . . . . . . . . . . . . . . . . . . . . JA388

6.      Declaration of Michael D. Bunting, Jr.
                sworn November 22, 2021. . . . . . . . . . . . . . . . . . . . . . . JA394

7.      Declaration of Sam Silvaine
                sworn November 22, 2021. . . . . . . . . . . . . . . . . . . . . . . JA402

8.      Declaration of Shelley K. Bunting
                sworn November 24, 2021. . . . . . . . . . . . . . . . . . . . . . . JA408

9.      Declaration of Dana Caraway
                sworn November 15, 2021. . . . . . . . . . . . . . . . . . . . . . . JA449

Plan Defendants' Response in Opposition to
Motion for Leave to File Brief of *Amici Curiae*
        filed December 20, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA466

Plaintiffs' Opposition to State Health Plan Defendants'
Motion for Partial Summary Judgment,
With Attachment,
        filed December 30, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA480

        Attachment:

        Supplemental Declaration of Amy Richardson,
        With Exhibits,
                sworn December 30, 2021. . . . . . . . . . . . . . . . . . . . . . . JA509

**Reply Brief of *Amici Curiae***
      filed January 3, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA532**

**Reply in Support of State Health Plan Defendants'**
**Motion for Partial Summary Judgment**
      filed January 13, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA544**

**State Health Plan Defendants' Response in Opposition**
**To Plaintiffs' Motion for Summary Judgment,**
**With Attachments,**
      filed January 19, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA561**

# TABLE OF CONTENTS
## Joint Appendix - Volume II of IX

**Attachments to**
**State Health Plan Defendants' Response in Opposition**
**To Plaintiffs' Motion for Summary Judgment,**
**With Attachments, Continued:**

1.    **Deposition Transcript Excerpt of Defendant Dee Jones,**
             sworn August 3, 2020 1.. . . . . . . . . . . . . . . . . . . . . . . . **JA608**

2..   **Declaration of Dr. Stephen B. Levine, M.D.,**
      **With Exhibits,**
             sworn April 28, 2021. . . . . . . . . . . . . . . . . . . . . . . . . **JA622**

3.    **Declaration of Dr. Paul W. Hruz, PhD.**
             sworn April 30, 2021. . . . . . . . . . . . . . . . . . . . . . . . . **JA735**

4.    **Declaration of Dr. Paul R. McHugh, M.D.,**
      **With Exhibit A**
             sworn May 1, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . **JA850**

5.       **Declaration of Dr. Patrick W. Lappert, M.D.**
               sworn May 1, 2021. . . . . . . . . . . . . . . . . . . . . . . . **JA897**

6.       **Study by Branstrom and Pachankis.**. . . . . . . . . . . . . . **JA953**

7.    **Deposition Excerpt of Dr. Paul W. Hruz,**
             sworn Sept. 29, 2021. . . . . . . . . . . . . . . . . . . . . . . . . **JA970**

8.    **Article: Mental Healthcare Utilization of**
      **Transgender Youth Before and**
      **After Affirming Treatment.** . . . . . . . . . . . . . . . . . . . . . . . . **JA976**

**Attachments to**
**State Health Plan Defendants' Response in Opposition**
**To Plaintiffs' Motion for Summary Judgment,**
**With Attachments, Continued:**

9.    **Prescription Medicine Prior Authorization Criteria.** . . . . . . **JA987**

10.   **Prescription Medicine Specialty**
      **Guideline Management - Supprelin LA.** . . . . . . . . . . . . . . **JA991**

11.   **Deposition Excerpt of Dr. George R. Brown, M.D.,**
      **taken Sept. 23, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . **JA1001**

12.   **Deposition Excerpt of Plaintiff Michael D. Bunting,**
      **taken August 9, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . **JA1005**

13.   **Deposition Excerpt of Dr. George R. Brown, M.D.,**
      **taken Sept. 23, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . **JA1007**

14.   **Declaration of Blue Cross Blue Shield of North Carolina,**
      **With Exhibits,**
      **sworn November 30, 2021.** . . . . . . . . . . . . . . . . . . . . . . **JA1011**

15.   **Deposition Excerpt of Fr. Peter Robie, M.D.**
      **taken September 22, 2021.** . . . . . . . . . . . . . . . . . . . . . . **JA1025**

16.   **Deposition Excerpt of Dr. Randi C. Ettner, PhD.,**
      **taken October 15, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . **JA1029**

17.   **Deposition Excerpt of Dr. Stephen B. Levine, M.D.**
      **taken September 100, 2021.** . . . . . . . . . . . . . . . . . . . . . . **JA1031**

18.   **Deposition Excerpt of Dr. Dan H. Karasic, M.D.,**
      **taken September 20, 2021.** . . . . . . . . . . . . . . . . . . . . . . **JA1035**

# TABLE OF CONTENTS
## Joint Appendix Volume III of IX

Page:

Plan Plaintiffs' Reply in Support of Motion for Summary Judgment,
With Attachment,
    filed February 2, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA1038

    <u>Attachment</u>:

    Third Supplemental Declaration of Amy Richardson,
    With Exhibits,
        sworn February 2, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA1060

Plaintiffs' Motion to Exclude Expert Testimony of Dr. Peter Robie
    filed February 2, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA1092

Plaintiffs' Memorandum of Law in Support of
Motion to Exclude Expert Testimony of Dr. Peter Robie.
With Attachment,
    filed February 2, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA1096

    <u>Attachment</u>:

    Declaration of Deepika H. Ravi,
    With Exhibits,
        sworn February 2, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . JA1119

Plaintiffs' Motion to Exclude
Expert Testimony of Dr. Paul W. Hruz
    filed February 2, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA1188

**Plaintiffs' Memorandum of Law in Support of Motion to
Exclude Expert Testimony of Dr. Paul W. Hruz,
With Attachment,**

      filed February 2, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA1192

    <u>**Attachment:**</u>

    **Declaration of Omar Gonzalez-Pagan,
    With Exhibits,**

        sworn February 2, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . JA1221

**Plaintiffs' Motion to Exclude
Expert Testimony of Dr. Paul R. McHugh**

      filed February 2, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA1593

# TABLE OF CONTENTS
## Joint Appendix Volume IV of IX

**Page:**

**Plaintiffs' Memorandum of Law in Support of Motion to
Exclude Expert Testimony of Dr. Paul R. McHugh,
With Attachment,**

      filed February 2, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **JA1597**

**Attachment:**

      **Declaration of Omar Gonzalez-Pagan,
      With Exhibits,**

          sworn February 2, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . .  **JA1627**

**Plaintiffs' Motion to Exclude Expert
Testimony of Dr. Patrick W. Lappert**

      filed February 2, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **JA1899**

## TABLE OF CONTENTS
### Joint Appendix Volume V of IX

Page:

Plaintiffs' Memorandum of Law in Support of Motion
To Exclude Expert Testimony of Dr. Patrick W. Lappert,
With Attachment,
     filed February 2, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  JA1902

Attachment:

Declaration of Dmitriy Tishyevich,
With Exhibits,
     sworn February 2, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . .  JA1929

# TABLE OF CONTENTS
## Joint Appendix Volume VI of IX

Page:

Plaintiffs' Memorandum of Law in Support of Motion
To Exclude Expert Testimony of Dr. Patrick W. Lappert,
With Attachment,
    filed February 2, 2022, Continued:

    Attachment:

        Declaration of Dmitriy Tishyevich,
        With Exhibits,
            sworn February 2, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA2582

Plaintiffs' Motion to Exclude
Expert Testimony of Stephen B. Levine, M.D.
    filed February 2, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA2881

Plaintiffs' Memorandum of Law in Support of Motion to
Exclude Expert Testimony of Stephen B. Levine, M.D.,
With Attachment,
    filed February 2, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA2884

    Attachment:

        Declaration of Carl S. Charles,
        With Exhibits,
            sworn February 2, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . JA2912

# TABLE OF CONTENTS
## Joint Appendix Volume VII of IX

Page:

State Health Plan Defendants' Response in Opposition
To Plaintiffs' Motions to Exclude Expert Testimony,
With Attachments,
    filed February 23, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA3130

**Attachments:**

Declaration of Stephen B. Levine, M.D.
    sworn April 28, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA3167

Expert Witness Declaration of Paul R. McHugh, MD
    sworn May 1, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA3280

Expert Witness Declaration of Paul W. Hruz, M.D., Ph.D.
    sworn April 30, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA3327

Declaration of Patrick W. Lappert, MD
    sworn May 1, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA3442

Statement of State Health Plan
Coverage of Sex Change Operation
    dated October 24, 2018. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA3498

Disclosure of Expert Witness Peter W. Robie, M.D., FACP
    dated May 1, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA3499

Deposition of Stephen B. Levine, M.D.
    taken on September 10, 2021.. . . . . . . . . . . . . . . . . . . . . . . . . JA3501

**Plaintiffs' Reply in Support of Motions to
Exclude Expert Testimony,
With Attachment,**
    filed March 9, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA3504

    <u>Attachment</u>:

    **Supplemental Declaration of Omar Gonzalez-Pagan,
    With Exhibit,**
        sworn March 9, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA3521

**Memorandum Opinion and Order**
    filed April 7, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA3535

**Brief of *Amici Curiae***
    filed April 11, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA3539

**Exhibit F - Expert Rebuttal Disclosure Report of
George Richard Brown, M.D., DFAPA**
    dated June 10, 2021
    filed June 2, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA3563

**Memorandum Opinion and Order**
    filed June 10, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA3569

**Notice of Interlocutory Appeal**
    filed July 1, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA3642

**Motion to Correct Memorandum Opinion and Order**
    filed July 7, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA3645

**State Health Plan Defendant's Memorandum in Support of
Motion to Correct Memorandum Opinion and Order**
    filed July 7, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA3649

**Notice of Non-Opposition to State Health Plan's Motion to Correct**
      filed July 15, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA3655

**Notice of Intent to Correct and Clarify**
**Memorandum Opinion and Order**
      filed July 18, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA3658

**Order**
      filed August 10, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA3661

**Corrected Memorandum Opinion and Order**
      filed August 10, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA3663

# TABLE OF CONTENTS
## Joint Appendix Volume VIII of IX - Under Seal

**Page:**

Memorandum in Support of Plaintiffs'
Motion for Summary Judgment
     filed December 20, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA3736

Declaration of Amy Richardson,
With Exhibits,
     filed December 20, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA3777

Exhibits:

1.    Excerpt of Objs. and Resps. of Defs.
    Dale Powell and Dee Jones to Pls.' First Set of Inteerrogs.
       dated September 3, 2020. . . . . . . . . . . . . . . . . . . . . . . . JA3785

2.    Am. Objs. and Resps. of Defs. Dale Folwell and
    Dee Jones to Pls.' Am. First Set of Requests for Admis.
       dated September 29, 2020. . . . . . . . . . . . . . . . . . . . . . . JA3789

3.    Excerpt of Am. Resps. and Objs. of Defs.
    Dale Folwell and Dee Jones to Pls.' First Set of Interrogs.
       dated October 9, 2020. . . . . . . . . . . . . . . . . . . . . . . . . . JA3795

4.    Excerpt of Objs. and Resps. of Defs. Dale Folwell and
    Dee Jones to University Defs' First Set of
    Reqs. for Admis. and Interrogs.
       dated February 10, 2021. . . . . . . . . . . . . . . . . . . . . . . . JA3803

<u>Exhibits</u> to

**Declaration of Amy Richardson**
     **filed December 20, 2021, Continued:**

5.      **Excerpt of Objs. and Resps. of Def. North Carolina State Health Plan for the Teachers and State Employees to Pls.' First Reqs. for Admis., Inteerrogs., and Reqs. for Produc. of Docs. and Things**
      **dated July 9, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA3808**

6.      **Excerpt of Def. North Carolina Department of Public Safety's Resp. to Pls'. First Set of Interrogs.**
      **dated June 18, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . **JA3824**

7.      **Excerpt of Def. North Carolina Department of Public Safety's Resp. to Pls'. First Set of Req. for Admis.**
      **dated June 18, 20211.** . . . . . . . . . . . . . . . . . . . . . . . . . . **JA3829**

8.      **Composite of Excerpts from 70/30 PPO Plan Benefits Booklets, 2016-2021, with yellow highlighting applied to relevant portions.** . . . . . . . . . . . . **JA3832**

9.      **Composite of excerpts from 80/20 PPO Plan Benefits Booklets, 2016-2021, with yellow highlighting applied to relevant portions.** . . . . . . . . . . . . . . . . . . . . . . . **JA3858**

10.    **Disclosure of Expert Witnesses Who Do Not Provide a Written Report Pursuant to Fed. R. Civ. P. 26(a)(2) by Defs. Dale Folwell, Dee Jones and the North Carolina State Health Plan for Teachers and State Employees**
      **dated May 1, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA3881**

11.    **Excerpt of Dep. Tr. of Dale Folwell.** . . . . . . . . . . . . . . . . . **JA3891**

<u>**Exhibits**</u> **to**

**Declaration of Amy Richardson**
     **filed December 20, 2021, Continued:**

     **11(a). Excerpt of Ex. 14 to Dep. Tr. of Dale Folwell,**
           **"Financials Update,"**
              **dated October 22, 2018,**
              **PLANDEF0154431,0154481-82.** . . . . . . . . . . . . . . . . **JA3915**

     **12.**     **Excerpt of Dep. Tr. of Dee Jones,**
           **Rule 30(b)(6) Designee of NCSHP.**. . . . . . . . . . . . . . . . . **JA3919**

     **13.**     **Excerpt of Dep. Tr. of Dr. Peter Robie, M.D.**.. . . . . . . . . **JA3961**

     **14.**     **Excerpt of Dep. Tr. of Becki Johnson, Rule 30(b)(6)**
           **Designee of N.C. Dept. of Public Safety.** . . . . . . . . . . . . **JA3971**

     **15.**     **Excerpt of Dep. Tr. of Pltf. Maxwell Kadel.** . . . . . . . . . . **JA4002**

     **16.**     **Excerpt of Dep. Tr. of Pltf. Connor Thonen-Fleck.** . . . . **JA4007**

     **17.**     **Excerpt of Dep. Tr. of Pltf. Jason Fleck.**.. . . . . . . . . . . . . **JA4015**

     **18.**     **Excerpt of Dep. Tr. of Pltf. Julia McKeown.**. . . . . . . . . . **JA4021**

     **19.**     **Excerpt of Dep. Tr. of Pltf. C.B.**. . . . . . . . . . . . . . . . . . . . **JA4027**

     **20.**     **Excerpt of Dep. Tr. of Pltf. Michael D. Bunting, Jr.**. . . . **JA4032**

     **21.**     **Excerpt of Dep. Tr. of Pltf. Sam Silvaine.** . . . . . . . . . . . . **JA4040**

     **22.**     **Excerpt of Dep. Tr. of Pltf. Dana Caraway.**.. . . . . . . . . . **JA4050**

     **23.**     **Excerpt of Dep. Tr. of Dr. George R. Brown, M.D.**.. . . . **JA4063**

<u>Exhibits</u> to

**Declaration of Amy Richardson**
    **filed December 20, 2021, Continued:**

23(a). Expert Report of Dr. George R. Brown, M.D., DFAPA. . . JA4074

23(b). Bibliography to Expert Report of
    Dr. George R. Brown, M.D., DFAPA.. . . . . . . . . . . . . . JA4107

23(c). Supp. Expert Report of
    Dr. George R. Brown, M.D., DFAPA.. . . . . . . . . . . . . . JA4116

23(d). Expert Rebuttal Report of
    Dr. George R. Brown, M.D., DFAPA.. . . . . . . . . . . . . . JA4124

23(e). C.V. of Dr. George R. Brown, M.D., DFAPA. . . . . . . . . JA4179

23(f). Corrected bibliography to Dr. Brown's
    expert rebuttal report, served on Defendants
        dated July 1, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . JA4223

24.    Excerpt of Dep. Tr. of Dr. Loren S. Schechter, M.D.. . . JA4238

24(a) Expert Repo1t of Dr. Loren S. Schechter, M.D.
    (including attached bibliography).. . . . . . . . . . . . . . . . . JA4255

24(b). Expert Rebuttal Report of Dr. Loren S. Schechter, M.D.
    (including attached bibliography).. . . . . . . . . . . . . . . . . JA4272

24(c). C.V. of Dr. Loren S. Schechter. . . . . . . . . . . . . . . . . . . . JA4311

25.    Excerpt of Dep. Tr. of Dr. Randi C. Ettner, Ph.D.. . . . . . JA4370

25(a). Expert Rebuttal Report of Dr. Randi C. Ettner, Ph.D... JA4377

-xix-

# TABLE OF CONTENTS
## Joint Appendix Volume IX of IX - Under Seal

Page:

**Exhibits** to
**Declaration of Amy Richardson**
**filed December 20, 2021, Continued:**

25(b). C.V. of Dr. Randi C. Ettner, Ph.D... . . . . . . . . . . . . . . . . . . JA4421

25(c). Bibliography to Dr. Ettner's expert rebuttal report. . . . JA4433

26. Excerpt of Dep. Tr. of
Dr. Johanna Olson-Kennedy, M.D., M.S.. . . . . . . . . . . . . JA4445

26(a). Expert Rebuttal Report of
Dr. Johanna Olson-Kennedy, M.D., M.S... . . . . . . . . . . . JA4456

26(b). C.V. of Dr. Johanna Olson-Kennedy, M.D., M.S.. . . . . JA4503

26(c). Corrected bibliography to Dr. Olson-Kennedy's expert
rebuttal report, served on Defendants
dated September 24, 2021. . . . . . . . . . . . . . . . . . . . . JA4524

27. Excerpt of Dep. Tr. of Dr. Dan H. Karasic, M.D.. . . . . . JA4530

27(a). Expert Rebuttal Report of Dr. Dan H. Karasic, M.D.. . JA4537

27(b). C.V. of Dr. Dan H. Karasic, M.D.. . . . . . . . . . . . . . . . . JA4564

27(c). Corrected bibliography to Dr. Karasic's expert
rebuttal report, served on Defendants
dated September 24, 2021. . . . . . . . . . . . . . . . . . . . . JA4585

-xx-

<u>**Exhibits**</u> **to**

**Declaration of Amy Richardson**
　　　**filed December 20, 2021, Continued:**

28.　　Excerpt of Dep. Tr. of Patrick Lappert, M.D... . . . . . . . . .　JA4590

29.　　National Academies of Sciences, Engineering, and
　　　Medicine, Understanding the Well-Being of
　　　LGBTQI+ Populations (2020). . . . . . . . . . . . . . . . . . . . . . .　JA4610

30.　　Email chain re: "time to talk on Tuesday?,"
　　　　　dated May 27, 2016, PLANDEFO 136562-63. . . . .　JA4617

31.　　Email from Lotta Crabtree
　　　re: "Coverage for gender dysphoria,"
　　　　　dated July 5, 2016, PLANDEF00007 6540-41. . . . .　JA4620

32.　　Email chain re: "1557,"
　　　　　dated July 14, 2016, KADEL00152143-44. . . . . . . .　JA4623

33.　　"DST POLICIES AND PROCEDURES,
　　　Section 1557 Grievance Procedure,"
　　　　　dated July 15, 2016, PLANDEF0012787-92. . . . . . .　JA4626

34.　　Email chain re: "Bullet points for the BOT,"
　　　With attachment titled, "Affordable Care Act- Section
　　　1557 Final Rule," KADEL00136650
　　　　　dated July 27, 2016, KADEL00136645-46. . . . . . . . .　JA4633

35.　　Letter of Agreement with the Segal Company for
　　　assistance related to compliance with Sect. 1557
　　　　　dated November 1, 2016, PLANDEF0008908-10. . . .　JA4637

<u>Exhibits</u> **to**

**Declaration of Amy Richardson**
    **filed December 20, 2021, Continued:**

36.    **Memo. to Mona Moon from Segal Consulting**
    **re: "Transgender Cost Estimate,"**
        **dated November 29, 2016, PLANDEF0006964-65.** . . . . JA4641

37.    **Email chain re: "1557 draft statement"**
        **dated November 29, 2016, PLANDEF0016424-26.** . . . . JA4644

38.    **Email chain re: "Inclusion of Sex Change Surgery on Plan?,"**
        **dated December 1, 2016, PLANDEF0007946-48.** . . . . . . . JA4648

39.    **Slides presented to Board of Trustees entitled, "**
    **Affordable Care Act -Section 1557 Requirements,**
    **Coverage for Gender Dysphoria,"**
        **dated December 2, 2016, PLANDEF0006966-89.** . . . . . . . JA4653

40.    **Minutes for meeting of Board of Trustees**
        **dated December 1-2, 2016, PLANDEF0012810-22.** . . . . JA4678

41.    **Email chain re: "State Health Plan board to**
    **cover gender reassignment surgery,"**
        **dated December 6, 2016, PLANDEF0007133-40.** . . . . . . . JA4692

42.    **Email chain re: "WUNC: Gender Dysphoria**
    **Coverage (noon deadline),"**
        **dated December 8, 2016, PLANDEF0029555-57.** . . . . . . . JA4701

43.    **BlueCross BlueShield of North Carolina**
    **Corporate Medical Policy, "Gender Affirmation**
    **Surgery and Hormone Therapy,"**
        **dated January 1, 2017, PLANDEF0008644-52.** . . . . . . . . JA4705

<u>Exhibits</u> to

**Declaration of Amy Richardson**
     **filed December 20, 2021, Continued:**

44.    Email from Chris Almberg re: "ACA Section 1557
         Compliance Questionnaire,"with attachment,
              dated March 30, 2017, KADEL00223708-13.  . . . . . . . . . JA4715

45.    Email chain re: "Hold Harmless,"
              dated August 4, 2017, PLANDEF0069016. . . . . . . . . . . . JA4722

46.    Email chain re: "Medical Policy Development,"
              dated September 28, 2017, PLANDEF0073378-81.  . . . . JA4724

47.    Email chain re: "Gender Transition Services Amendment,"
         attachment, "Amendment to Third Party
         Administration Services Contract," PLANDEF0030342
              dated December 6, 2017, PLANDEF0071731-32. . . . . . . JA4729

48.    Email from Lonaine Munk
         re: "Message from Treasurer Folwell,"
              dated October 25, 2018, PLANDEF0028665-66. . . . . . . . JA4733

49.    Email from Susan Munay re: "Pharmacy appeals
         related to gender dysphoria or transgender services,"
              dated October 25, 2018, PLANDEF0120919-20. . . . . . . . JA4736

**Exhibits to**
**Declaration of Amy Richardson**
    **filed December 20, 2021, Continued:**

    **50.**    **BlueCross BlueShield of North Carolina**
        **Corporate Medical Policy, "Gender**
        **Affirmation Surgery and Hormone Therapy,"**
           **dated June 2021, KADEL00316786-96**............... **JA4739**

**Exhibit to**
**Plaintiffs' Memorandum to Exclude Expert**
**Testimony of Dr. Patrick W. Lappert**
    **filed February 2, 2022:**

    **1.**    **Declaration of Patrick W. Lappert, MD**
           **sworn May 1, 2021.**.......................... **JA4752**

18BB,MASTER,MEDIATION,TRIAL

## U.S. District Court
## North Carolina Middle District (NCMD)
## CIVIL DOCKET FOR CASE #: 1:19–cv–00272–LCB–LPA

KADEL et al v. FOLWELL et al
Assigned to: JUDGE LORETTA C. BIGGS
Referred to: MAG/JUDGE L. PATRICK AULD
Case in other court:  Fourth Circuit, 20–01409
                      22–01721
                      22–01730
Cause: 42:1983

Date Filed: 03/11/2019
Jury Demand: Defendant
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**MAXWELL KADEL**                    represented by  **DEEPIKA H. RAVI**
                                                    HWG LLP
                                                    1919 M ST. NW
                                                    STE 800
                                                    WASHINGTON, DC 20036
                                                    202–730–1353
                                                    Email: dravi@hwglaw.com
                                                    *LEAD ATTORNEY*

                                                    **MEREDITH T. BROWN**
                                                    LAMBDA LEGAL DEFENSE AND
                                                    EDUCATION FUND, INC.
                                                    730 PEACHTREE ST., NE, STE. 1070
                                                    SUITE 640
                                                    ATLANTA, GA 30308
                                                    404–897–1880
                                                    Fax: 404–897–1884
                                                    Email: tbrown@lambdalegal.org
                                                    *TERMINATED: 02/28/2020*
                                                    *LEAD ATTORNEY*

                                                    **NOAH E. LEWIS**
                                                    TRANSGENDER LEGAL DEFENSE &
                                                    EDUCATION FUND, INC.
                                                    20 WEST 20TH STREET, SUITE 705
                                                    NEW YORK, NY 10011
                                                    646–862–9396
                                                    Fax: 646–930–5654
                                                    Email: nlewis@transgenderlegal.org
                                                    *TERMINATED: 09/28/2021*
                                                    *LEAD ATTORNEY*

                                                    **OMAR F. GONZALEZ–PAGAN**
                                                    LAMBDA LEGAL DEFENSE AND
                                                    EDUCATION FUND, INC.
                                                    120 WALL STREET
                                                    19TH FLOOR
                                                    NEW YORK, NY 10005
                                                    212–809–8585
                                                    Fax: 212–809–0055
                                                    Email: ogonzalez–pagan@lambdalegal.org
                                                    *LEAD ATTORNEY*

                                                    **TARA L. BORELLI**
                                                    LAMBDA LEGAL DEFENSE AND
                                                    EDUCATION FUND, INC.
                                                    1 WEST COURT SQUARE
                                                    SUITE 105

**JA1**

DECATUR, GA 30030
470–225–5341
Fax: 404–506–9320
Email: tborelli@lambdalegal.org
*LEAD ATTORNEY*

**ADAM M. SAFER**
MCDERMOTT WILL & EMERY LLP
444 WEST LAKE STREET
CHICAGO, IL 60606
312–984–7744
Email: asafer@mwe.com
*ATTORNEY TO BE NOTICED*

**ALEJANDRA L. CARABALLO**
TRANSGENDER LEGAL DEFENSE
AND EDUCATION FUND
520 8TH AVE.
STE 2204
NEW YORK, NY 10018
646–993–1676
Fax: 646–993–1686
Email: acaraballo@transgenderlegal.org
*TERMINATED: 08/17/2021*
*ATTORNEY TO BE NOTICED*

**CARL S. CHARLES**
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
1 WEST COURT SQUARE
SUITE 105
DECATUR, GA 30030
404–897–1880
Email: ccharles@lambdalegal.org
*ATTORNEY TO BE NOTICED*

**DAVID BROWN**
TRANSGENDER LEGAL DEFENSE
AND EDUCATION FUND
520 8TH AVE.
STE 2204
NEW YORK, NY 10018
646–993–1675
Fax: 646–993–1686
Email: dbrown@transgenderlegal.org
*ATTORNEY TO BE NOTICED*

**DMITRIY G. TISHYEVICH**
MCDERMOTT WILL & EMERY LLP
ONE VANDERBILT AVENUE
NEW YORK, NY 10017
212–547–5534
Fax: 212–547–5444
Email: dtishyevich@mwe.com
*ATTORNEY TO BE NOTICED*

**EVAN R. MAROLF**
HARRIS, WILTSHIRE & GRANNIS LLP
1919 M ST. NW
EIGHTH FLOOR
WASHINGTON, DC 20036
202–796–0985
Email: emarolf@hwglaw.com
*TERMINATED: 11/29/2021*
*ATTORNEY TO BE NOTICED*

**JA2**

**EZRA U. CUKOR**
TRANSGENDER LEGAL DEFENSE
AND EDUCATION FUND
520 8TH AVE.
STE 2204
NEW YORK, NY 10018
646–993–1676
Email: ecukor@transgenderlegal.org
*ATTORNEY TO BE NOTICED*

**GRACE H. WYNN**
HARRIS, WILTSHIRE & GRANNIS LLP
1919 M ST. NW
EIGHTH FLOOR
WASHINGTON, DC 20036
202–796–0602
Fax: 202–730–1301
Email: gwynn@hwglaw.com
*ATTORNEY TO BE NOTICED*

**LAUREN H. EVANS**
MCDERMOTT WILL & EMERY LLP
500 N. CAPITOL ST., NW
WASHINGTON, DC 20001
202–756–8864
Fax: 202–591–2900
Email: levans@mwe.com
*ATTORNEY TO BE NOTICED*

**LAUREN E. SNYDER**
HARRIS, WILTSHIRE & GRANNIS LLP
1033 WADE AVE.
SUITE 100
RALEIGH, NC 27605–1155
919–504–9823
Fax: 202–730–1301
Email: lsnyder@hwglaw.com
*ATTORNEY TO BE NOTICED*

**MICHAEL W. WEAVER**
MCDERMOTT WILL & EMERY LLP
444 WEST LAKE STREET
SUITE 4000
CHICAGO, IL 60606
312–984–5820
Fax: 312–984–7700
Email: mweaver@mwe.com
*ATTORNEY TO BE NOTICED*

**WARREN HASKEL**
MCDERMOTT WILL & EMERY LLP
ONE VANDERBILT AVENUE
NEW YORK, NY 10017
212–547–5533
Fax: 212–547–5444
Email: whaskel@mwe.com
*ATTORNEY TO BE NOTICED*

**AMY E. RICHARDSON**
HWG LLP
1919 M ST. NW
STE 800
WASHINGTON, DC 20036
202–730–1329

**JA3**

Fax: 202–730–1301
Email: arichardson@hwglaw.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JASON FLECK**                represented by    **ADAM M. SAFER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**ALEJANDRA L. CARABALLO**
(See above for address)
*TERMINATED: 08/17/2021*
*ATTORNEY TO BE NOTICED*

**CARL S. CHARLES**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DAVID BROWN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DEEPIKA H. RAVI**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DMITRIY G. TISHYEVICH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**EVAN R. MAROLF**
(See above for address)
*TERMINATED: 11/29/2021*
*ATTORNEY TO BE NOTICED*

**EZRA U. CUKOR**
(See above for address)
*ATTORNEY TO BE NOTICED*

**GRACE H. WYNN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**LAUREN H. EVANS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**LAUREN E. SNYDER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEREDITH T. BROWN**
(See above for address)
*TERMINATED: 02/28/2020*
*ATTORNEY TO BE NOTICED*

**MICHAEL W. WEAVER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**NOAH E. LEWIS**
(See above for address)
*TERMINATED: 09/28/2021*
*ATTORNEY TO BE NOTICED*

**OMAR F. GONZALEZ–PAGAN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**TARA L. BORELLI**
(See above for address)
*ATTORNEY TO BE NOTICED*

**WARREN HASKEL**
(See above for address)
*ATTORNEY TO BE NOTICED*

**AMY E. RICHARDSON**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**CONNOR THONEN–FLECK**          represented by   **ADAM M. SAFER**
*BY HIS NEXT FRIENDS AND PARENTS*                 (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

                                                  **ALEJANDRA L. CARABALLO**
                                                  (See above for address)
                                                  *TERMINATED: 08/17/2021*
                                                  *ATTORNEY TO BE NOTICED*

                                                  **CARL S. CHARLES**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

                                                  **DAVID BROWN**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

                                                  **DEEPIKA H. RAVI**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

                                                  **DMITRIY G. TISHYEVICH**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

                                                  **EVAN R. MAROLF**
                                                  (See above for address)
                                                  *TERMINATED: 11/29/2021*
                                                  *ATTORNEY TO BE NOTICED*

                                                  **EZRA U. CUKOR**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

                                                  **GRACE H. WYNN**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

                                                  **LAUREN H. EVANS**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

                                                  **LAUREN E. SNYDER**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

JA5

**MEREDITH T. BROWN**
(See above for address)
*TERMINATED: 02/28/2020*
*ATTORNEY TO BE NOTICED*

**MICHAEL W. WEAVER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**NOAH E. LEWIS**
(See above for address)
*TERMINATED: 09/28/2021*
*ATTORNEY TO BE NOTICED*

**OMAR F. GONZALEZ–PAGAN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**TARA L. BORELLI**
(See above for address)
*ATTORNEY TO BE NOTICED*

**WARREN HASKEL**
(See above for address)
*ATTORNEY TO BE NOTICED*

**AMY E. RICHARDSON**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JULIA MCKEOWN**                    represented by    **ADAM M. SAFER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**ALEJANDRA L. CARABALLO**
(See above for address)
*TERMINATED: 08/17/2021*
*ATTORNEY TO BE NOTICED*

**CARL S. CHARLES**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DAVID BROWN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DEEPIKA H. RAVI**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DMITRIY G. TISHYEVICH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**EVAN R. MAROLF**
(See above for address)
*TERMINATED: 11/29/2021*
*ATTORNEY TO BE NOTICED*

**EZRA U. CUKOR**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JA6**

**GRACE H. WYNN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**LAUREN H. EVANS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**LAUREN E. SNYDER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEREDITH T. BROWN**
(See above for address)
*TERMINATED: 02/28/2020*
*ATTORNEY TO BE NOTICED*

**MICHAEL W. WEAVER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**NOAH E. LEWIS**
(See above for address)
*TERMINATED: 09/28/2021*
*ATTORNEY TO BE NOTICED*

**OMAR F. GONZALEZ–PAGAN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**TARA L. BORELLI**
(See above for address)
*ATTORNEY TO BE NOTICED*

**WARREN HASKEL**
(See above for address)
*ATTORNEY TO BE NOTICED*

**AMY E. RICHARDSON**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MICHAEL D. BUNTING, JR.**          represented by   **ADAM M. SAFER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**ALEJANDRA L. CARABALLO**
(See above for address)
*TERMINATED: 08/17/2021*
*ATTORNEY TO BE NOTICED*

**CARL S. CHARLES**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DAVID BROWN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DEEPIKA H. RAVI**
(See above for address)
*ATTORNEY TO BE NOTICED*

JA7

**DMITRIY G. TISHYEVICH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**EVAN R. MAROLF**
(See above for address)
*TERMINATED: 11/29/2021*
*ATTORNEY TO BE NOTICED*

**EZRA U. CUKOR**
(See above for address)
*ATTORNEY TO BE NOTICED*

**GRACE H. WYNN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**LAUREN H. EVANS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**LAUREN E. SNYDER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEREDITH T. BROWN**
(See above for address)
*TERMINATED: 02/28/2020*
*ATTORNEY TO BE NOTICED*

**MICHAEL W. WEAVER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**NOAH E. LEWIS**
(See above for address)
*TERMINATED: 09/28/2021*
*ATTORNEY TO BE NOTICED*

**OMAR F. GONZALEZ–PAGAN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**TARA L. BORELLI**
(See above for address)
*ATTORNEY TO BE NOTICED*

**WARREN HASKEL**
(See above for address)
*ATTORNEY TO BE NOTICED*

**AMY E. RICHARDSON**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**C.B.**        represented by   **ADAM M. SAFER**
*BY HIS NEXT FRIENDS AND PARENTS*    (See above for address)
*ATTORNEY TO BE NOTICED*

**ALEJANDRA L. CARABALLO**
(See above for address)
*TERMINATED: 08/17/2021*

**JA8**

*ATTORNEY TO BE NOTICED*

**CARL S. CHARLES**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DAVID BROWN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DEEPIKA H. RAVI**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DMITRIY G. TISHYEVICH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**EVAN R. MAROLF**
(See above for address)
*TERMINATED: 11/29/2021*
*ATTORNEY TO BE NOTICED*

**EZRA U. CUKOR**
(See above for address)
*ATTORNEY TO BE NOTICED*

**GRACE H. WYNN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**LAUREN H. EVANS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**LAUREN E. SNYDER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEREDITH T. BROWN**
(See above for address)
*TERMINATED: 02/28/2020*
*ATTORNEY TO BE NOTICED*

**MICHAEL W. WEAVER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**NOAH E. LEWIS**
(See above for address)
*TERMINATED: 09/28/2021*
*ATTORNEY TO BE NOTICED*

**OMAR F. GONZALEZ–PAGAN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**TARA L. BORELLI**
(See above for address)
*ATTORNEY TO BE NOTICED*

**WARREN HASKEL**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JA9**

**AMY E. RICHARDSON**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**SAM SILVANIE**                    represented by    **ADAM M. SAFER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**ALEJANDRA L. CARABALLO**
(See above for address)
*TERMINATED: 08/17/2021*
*ATTORNEY TO BE NOTICED*

**CARL S. CHARLES**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DAVID BROWN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DEEPIKA H. RAVI**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DMITRIY G. TISHYEVICH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**EVAN R. MAROLF**
(See above for address)
*TERMINATED: 11/29/2021*
*ATTORNEY TO BE NOTICED*

**EZRA U. CUKOR**
(See above for address)
*ATTORNEY TO BE NOTICED*

**GRACE H. WYNN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**LAUREN H. EVANS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**LAUREN E. SNYDER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEREDITH T. BROWN**
(See above for address)
*TERMINATED: 02/28/2020*
*ATTORNEY TO BE NOTICED*

**MICHAEL W. WEAVER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**NOAH E. LEWIS**
(See above for address)
*TERMINATED: 09/28/2021*
*ATTORNEY TO BE NOTICED*

JA10

**OMAR F. GONZALEZ–PAGAN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**TARA L. BORELLI**
(See above for address)
*ATTORNEY TO BE NOTICED*

**WARREN HASKEL**
(See above for address)
*ATTORNEY TO BE NOTICED*

**AMY E. RICHARDSON**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**DANA CARAWAY**                  represented by  **AMY E. RICHARDSON**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**ADAM M. SAFER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**CARL S. CHARLES**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DAVID BROWN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DEEPIKA H. RAVI**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DMITRIY G. TISHYEVICH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**EVAN R. MAROLF**
(See above for address)
*TERMINATED: 11/29/2021*
*ATTORNEY TO BE NOTICED*

**EZRA U. CUKOR**
(See above for address)
*ATTORNEY TO BE NOTICED*

**GRACE H. WYNN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**LAUREN H. EVANS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**LAUREN E. SNYDER**
(See above for address)
*ATTORNEY TO BE NOTICED*

JA11

**MICHAEL W. WEAVER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**OMAR F. GONZALEZ–PAGAN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**TARA L. BORELLI**
(See above for address)
*ATTORNEY TO BE NOTICED*

**WARREN HASKEL**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**DALE FOLWELL**
*IN HIS OFFICIAL CAPACITY AS STATE*
*TREASURER OF NORTH CAROLINA*

represented by **JOHN G. KNEPPER**
LAW OFFICE OF JOHN G. KNEPPER,
LLC
P.O. BOX 1512
CHEYENNE, WY 82003
307–632–2842
Fax: 307–432–0310
Email: John@KnepperLLC.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**OLGA E. VYSOTSKAYA DE BRITO**
NORTH CAROLINA DEPARTMENT OF
JUSTICE
POST OFFICE BOX 629
RALEIGH, NC 27602
919–716–0185
Fax: 919–716–6759
Email: ovysotskaya@ncdoj.gov
*TERMINATED: 07/04/2019*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JAMES BENJAMIN GARNER**
NORTH CAROLINA DEPARTMENT OF
STATE TREASURER
3200 ATLANTIC AVENUE
RALEIGH, NC 27604
919–814–4000
Fax: 919–855–5805
Email: Ben.Garner@nctreasurer.com
*ATTORNEY TO BE NOTICED*

**KEVIN GUY WILLIAMS**
BELL DAVIS & PITT, P.A.
POB 21029
WINSTON–SALEM, NC 27120–1029
336–714–4150
Fax: 336–722–8153
Email: kwilliams@belldavispitt.com
*ATTORNEY TO BE NOTICED*

**MARK A. JONES**
BELL DAVIS & PITT, P.A.
POB 21029

**JA12**

WINSTON–SALEM, NC 27120–1029
336–714–4122
Fax: 336–714–4101
Email: mjones@belldavispitt.com
*ATTORNEY TO BE NOTICED*

**SAM M. HAYES**
N. C. DEPARTMENT OF STATE
TREASURER
3200 ATLANTIC AVE.
RALEIGH, NC 27604
919–814–3818
Email: sam.hayes@nctreasurer.com
*TERMINATED: 04/24/2020*
*ATTORNEY TO BE NOTICED*

**Defendant**

**UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL**
*TERMINATED: 08/24/2021*

represented by **CATHERINE F. JORDAN**
N. C. DEPARTMENT OF JUSTICE
POB 629
RALEIGH, NC 27602–0629
919–716–6723
Fax: 919–716–6764
Email: cjordan@ncdoj.gov
*TERMINATED: 04/22/2020*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**NORA F. SULLIVAN**
N. C. DEPARTMENT OF JUSTICE
POB 629
RALEIGH, NC 27602–0629
919–716–6659
Fax: 919–716–6764
Email: nsullivan@ncdoj.gov
*TERMINATED: 12/08/2020*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**ZACHARY A. PADGET**
N. C. DEPARTMENT OF JUSTICE
PUBLIC SAFETY SECTION
114 W. EDENTON STREET
RALEIGH, NC 27603
919–716–6928
Fax: 919–716–6764
Email: zpadget@ncdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**KIMBERLY D. POTTER**
N. C. DEPARTMENT OF JUSTICE
EDUCATION SECTION
P.O. Box 629
RALEIGH, NC 27602
919–716–6920
Fax: 919–716–6764
Email: kpotter@ncdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**NORTH CAROLINA STATE UNIVERSITY**
*TERMINATED: 08/24/2021*

represented by **CATHERINE F. JORDAN**
(See above for address)
*TERMINATED: 04/22/2020*

**JA13**

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**NORA F. SULLIVAN**
(See above for address)
*TERMINATED: 12/08/2020*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**ZACHARY A. PADGET**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**KIMBERLY D. POTTER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**DEE JONES**
*IN HER OFFICIAL CAPACITY AS*
*EXECUTIVE ADMINISTRATOR OF*
*THE NORTH CAORLINA STATE*
*HEALTH PLAN FOR TEACHERS AND*
*STATE EMPLOYEES*

represented by **JOHN G. KNEPPER**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**OLGA E. VYSOTSKAYA DE BRITO**
(See above for address)
*TERMINATED: 07/04/2019*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JAMES BENJAMIN GARNER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**KEVIN GUY WILLIAMS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MARK A. JONES**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**UNIVERSITY OF NORTH**
**CAROLINA AT GREENSBORO**
*TERMINATED: 08/24/2021*

represented by **CATHERINE F. JORDAN**
(See above for address)
*TERMINATED: 04/22/2020*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**NORA F. SULLIVAN**
(See above for address)
*TERMINATED: 12/08/2020*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**ZACHARY A. PADGET**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**KIMBERLY D. POTTER**
(See above for address)
*ATTORNEY TO BE NOTICED*

JA14

**Defendant**

**NORTH CAROLINA STATE**    represented by  **JOHN G. KNEPPER**
**HEALTH PLAN FOR TEACHERS**    (See above for address)
**AND STATE EMPLOYEES**    *LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**OLGA E. VYSOTSKAYA DE BRITO**
(See above for address)
*TERMINATED: 07/04/2019*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JAMES BENJAMIN GARNER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**KEVIN GUY WILLIAMS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MARK A. JONES**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**STATE OF NORTH CAROLINA**    represented by  **ALEX R. WILLIAMS**
**DEPARTMENT OF PUBLIC**    NORTH CAROLINA DEPARTMENT OF
**SAFETY**    JUSTICE
144 W. EDENTON STREET
RALEIGH, NC 27603
919–716–6528
Fax: 919–716–6761
Email: awilliams@ncdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**ALAN D. MCINNES**
NORTH CAROLINA DEPARTMENT OF
JUSTICE
114 W. EDENTON ST.
RALEIGH, NC 27601
919–716–6529
Email: amcinnes@ncdoj.gov
*TERMINATED: 11/10/2021*
*ATTORNEY TO BE NOTICED*

**JAMES B. TRACHTMAN**
N. C. DEPARTMENT OF JUSTICE
PUBLIC SAFETY SECTION
114 W. EDENTON STREET
RALEIGH, NC 27603
919–716–6943
Fax: 919–716–6761
Email: jtrachtman@ncdoj.gov
*TERMINATED: 05/13/2022*
*ATTORNEY TO BE NOTICED*

**Amicus**

**AMERICAN MEDICAL**    represented by  **SARAH M. SAINT**
**ASSOCIATION**    BROOKS, PIERCE, MCLENDON,
HUMPHREY & LEONARD
230 NORTH ELM STREET, SUITE 2000

**JA15**

GREENSBORO, NC 27401
336–271–3197
Fax: 336–232–9197
Email: ssaint@brookspierce.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**SHANA L. FULTON**
BROOKS, PIERCE, MCLENDON,
HUMPHREY & LEONARD, LLP
150 FAYETTEVILLE ST.
1700 WELLS FARGO CAPITOL
CENTER
RALEIGH, NC 27601
919–839–0300
Fax: 919=839=0304
Email: sfulton@brookspierce.com
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**AMERICAN ACADEMY OF
PEDIATRICS**        represented by   **SARAH M. SAINT**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**SHANA L. FULTON**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**AMERICAN COLLEGE OF
OBSTETRICIANS AND
GYNECOLOGISTS**        represented by   **SARAH M. SAINT**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**SHANA L. FULTON**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**AMERICAN PSYCHIATRIC
ASSOCIATION**        represented by   **SARAH M. SAINT**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**SHANA L. FULTON**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**ENDOCRINE SOCIETY**        represented by   **SARAH M. SAINT**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**SHANA L. FULTON**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**NORTH AMERICAN SOCIETY FOR
PEDIATRIC AND ADOLESCENT**        represented by   **SARAH M. SAINT**
(See above for address)

**JA16**

**GYNECOLOGY**

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**SHANA L. FULTON**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**NATIONAL ASSOCIATION OF NURSE PRACTITIONERS IN WOMEN'S HEALTH**

represented by **SARAH M. SAINT**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**SHANA L. FULTON**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**SOCIETY OF OB/GYN HOSPITALISTS**

represented by **SARAH M. SAINT**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**SHANA L. FULTON**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/11/2019 | 1 | COMPLAINT against All Defendants ( Filing fee $ 400 receipt number 0418–2527770.), filed by C.B., Connor Thonen–Fleck, Sam Silvaine, Jason Fleck, Maxwell Kadel, Julia McKeown, Michael D Bunting Jr..(RICHARDSON, AMY) (Entered: 03/11/2019) |
| 03/11/2019 | | CASE REFERRED to Mediation pursuant to Local Rule 83.9b of the Rules of Practice and Procedure of this Court. Please go to our website under Attorney Information for a list of mediators which must be served on all parties. (Coyne, Michelle) (Entered: 03/11/2019) |
| 03/11/2019 | 2 | NOTICE of Appearance by attorney TARA L. BORELLI on behalf of Plaintiffs MICHAEL D. BUNTING, JR, C.B., JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK (BORELLI, TARA) (Entered: 03/11/2019) |
| 03/11/2019 | 3 | NOTICE of Appearance by attorney NOAH E. LEWIS on behalf of Plaintiffs MICHAEL D. BUNTING, JR, C.B., JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK (LEWIS, NOAH) (Entered: 03/11/2019) |
| 03/11/2019 | 4 | NOTICE of Appearance by attorney MEREDITH T. BROWN on behalf of Plaintiffs MICHAEL D. BUNTING, JR, C.B., JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK (BROWN, MEREDITH) (Entered: 03/11/2019) |
| 03/11/2019 | 5 | NOTICE of Appearance by attorney OMAR F. GONZALEZ–PAGAN on behalf of Plaintiffs MICHAEL D. BUNTING, JR, C.B., JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK (GONZALEZ–PAGAN, OMAR) (Entered: 03/11/2019) |
| 03/11/2019 | | Case ASSIGNED to JUDGE LORETTA C. BIGGS and MAGISTRATE JUDGE L. PATRICK AULD. (Coyne, Michelle) (Entered: 03/11/2019) |
| 03/11/2019 | 6 | Summons Issued as to All Defendants. (Coyne, Michelle) (Entered: 03/11/2019) |

**JA17**

| 03/11/2019 | 7 | Notice of Right to Consent. Counsel shall serve the attached form on all parties. (Attachments: # 1 Consent Form)(Coyne, Michelle) (Entered: 03/11/2019) |
|---|---|---|
| 03/12/2019 | 8 | NOTICE of Appearance by attorney DEEPIKA H. RAVI on behalf of Plaintiffs MICHAEL D. BUNTING, JR, C.B., JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK (RAVI, DEEPIKA) (Entered: 03/12/2019) |
| 03/14/2019 | 9 | WAIVER OF SERVICE Returned Executed by C.B., CONNOR THONEN–FLECK, SAM SILVANIE, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, MICHAEL D. BUNTING, JR. DALE FOLWELL waiver sent on 3/13/2019, answer due 5/13/2019. (RICHARDSON, AMY) (Entered: 03/14/2019) |
| 03/14/2019 | 10 | WAIVER OF SERVICE of SUMMONS by C.B., CONNOR THONEN–FLECK, SAM SILVANIE, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, MICHAEL D. BUNTING, JR. DEE JONES waiver sent on 3/13/2019, answer due 5/13/2019. (RICHARDSON, AMY) (Entered: 03/14/2019) |
| 03/14/2019 | 11 | WAIVER OF SERVICE of SUMMONS by C.B., CONNOR THONEN–FLECK, SAM SILVANIE, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, MICHAEL D. BUNTING, JR. NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES waiver sent on 3/13/2019, answer due 5/13/2019. (RICHARDSON, AMY) (Entered: 03/14/2019) |
| 03/22/2019 | 12 | WAIVER OF SERVICE of SUMMONS by C.B., CONNOR THONEN–FLECK, SAM SILVANIE, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, MICHAEL D. BUNTING, JR. UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL waiver sent on 3/14/2019, answer due 5/13/2019. (RICHARDSON, AMY) (Entered: 03/22/2019) |
| 03/22/2019 | 13 | WAIVER OF SERVICE of SUMMONS by C.B., CONNOR THONEN–FLECK, SAM SILVANIE, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, MICHAEL D. BUNTING, JR. UNIVERSITY OF NORTH CAROLINA AT GREENSBORO waiver sent on 3/14/2019, answer due 5/13/2019. (RICHARDSON, AMY) (Entered: 03/22/2019) |
| 03/22/2019 | 14 | WAIVER OF SERVICE of SUMMONS by C.B., CONNOR THONEN–FLECK, SAM SILVANIE, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, MICHAEL D. BUNTING, JR. NORTH CAROLINA STATE UNIVERSITY waiver sent on 3/14/2019, answer due 5/13/2019. (RICHARDSON, AMY) (Entered: 03/22/2019) |
| 03/26/2019 | 15 | NOTICE of Appearance by attorney CATHERINE F. JORDAN on behalf of Defendants NORTH CAROLINA STATE UNIVERSITY, UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, UNIVERSITY OF NORTH CAROLINA AT GREENSBORO (JORDAN, CATHERINE) (Entered: 03/26/2019) |
| 03/26/2019 | 16 | Corporate Disclosure Statement by UNIVERSITY OF NORTH CAROLINA AT GREENSBORO. (JORDAN, CATHERINE) (Entered: 03/26/2019) |
| 03/26/2019 | 17 | Corporate Disclosure Statement by NORTH CAROLINA STATE UNIVERSITY. (JORDAN, CATHERINE) (Entered: 03/26/2019) |
| 03/26/2019 | 18 | Corporate Disclosure Statement by UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL. (JORDAN, CATHERINE) (Entered: 03/26/2019) |
| 05/06/2019 | 19 | NOTICE of Appearance by attorney OLGA E. VYSOTSKAYA DE BRITO on behalf of Defendants DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES (VYSOTSKAYA DE BRITO, OLGA) (Entered: 05/06/2019) |
| 05/06/2019 | 20 | Consent MOTION for Extension of Time to File Answer re 1 Complaint by DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES. (Attachments: # 1 Text of Proposed Order)(VYSOTSKAYA DE BRITO, OLGA) (Entered: 05/06/2019) |
| 05/06/2019 | | **ORDER** granting 20 Motion for Extension of Time to Answer for DALE FOLWELL; DEE JONES; and NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES. Answer due by 6/12/2019. Signed by John Brubaker, |

| | | |
|---|---|---|
| | | Clerk of Court, on 5/6/2019. (Brubaker, John) (Entered: 05/06/2019) |
| 05/07/2019 | 21 | MOTION for Extension of Time to File Answer re 1 Complaint by NORTH CAROLINA STATE UNIVERSITY, UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, UNIVERSITY OF NORTH CAROLINA AT GREENSBORO. (Attachments: # 1 Text of Proposed Order Granting Extension of Time)(JORDAN, CATHERINE) (Entered: 05/07/2019) |
| 05/08/2019 | | ORDER granting 21 Motion for Extension of Time to Answer for UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL and UNIVERSITY OF NORTH CAROLINA AT GREENSBORO. Answer due by 6/12/2019. Signed by John Brubaker, Clerk of Court, on 5/8/2019. (Brubaker, John) (Entered: 05/08/2019) |
| 06/07/2019 | 22 | NOTICE of Appearance by attorney MARK A. JONES on behalf of Defendants DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES (JONES, MARK) (Entered: 06/07/2019) |
| 06/07/2019 | 23 | NOTICE of Appearance by attorney KEVIN GUY WILLIAMS on behalf of Defendants DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES (WILLIAMS, KEVIN) (Entered: 06/07/2019) |
| 06/07/2019 | 24 | MOTION for Extension of Time to File Answer *or Appropriate Responsive Pleading* by DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES. (Attachments: # 1 Text of Proposed Order)(JONES, MARK) (Entered: 06/07/2019) |
| 06/10/2019 | 25 | Joint MOTION for Extension of Time to File Answer re 1 Complaint by NORTH CAROLINA STATE UNIVERSITY, UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, UNIVERSITY OF NORTH CAROLINA AT GREENSBORO. (Attachments: # 1 Text of Proposed Order Granting Extension of Time)(JORDAN, CATHERINE) (Entered: 06/10/2019) |
| 06/10/2019 | | Motions Referred: RE: 24 MOTION for Extension of Time to File Answer *or Appropriate Responsive Pleading*, 25 Joint MOTION for Extension of Time to File Answer re 1 Complaint , to MAG/JUDGE L. PATRICK AULD. (Blay, Debbie) (Entered: 06/10/2019) |
| 06/11/2019 | | TEXT ORDER finding as moot 24 Motion for Extension of Time and granting 25 Motion for Extension of Time. Defendants shall answer or otherwise respond by 07/08/2019. Plaintiffs shall file any response to any timely file motion to dismiss by 08/05/2019 and Defendants shall file any reply by 08/19/2019. Issued by MAG/JUDGE L. PATRICK AULD on 06/11/2019. (AULD, L.) (Entered: 06/11/2019) |
| 06/17/2019 | 26 | NOTICE of Appearance by attorney JOHN G. KNEPPER on behalf of Defendants DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES (KNEPPER, JOHN) (Entered: 06/17/2019) |
| 07/03/2019 | 27 | MOTION to Withdraw as Attorney OLGA E. VYSOTSKAYA DE BRITO by on behalf of DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES. (Attachments: # 1 Text of Proposed Order Draft Proposed Order Allowing a Motion to Withdraw)(VYSOTSKAYA DE BRITO, OLGA) (Entered: 07/03/2019) |
| 07/03/2019 | | Motion Referred: RE: 27 MOTION to Withdraw as Attorney OLGA E. VYSOTSKAYA DE BRITO , to MAG/JUDGE L. PATRICK AULD. (Blay, Debbie) (Entered: 07/03/2019) |
| 07/04/2019 | | TEXT ORDER granting 27 Motion for Leave to Withdraw. Attorney OLGA E. VYSOTSKAYA DE BRITO is terminated as counsel of record for Defendants Dale Folwell, Dee Jones, and the North Carolina State Health Plan. Issued by MAG/JUDGE L. PATRICK AULD on 07/04/2019. (AULD, L.) (Entered: 07/04/2019) |
| 07/05/2019 | 28 | NOTICE of Appearance by attorney SAM M. HAYES on behalf of Defendant DALE FOLWELL (HAYES, SAM) (Entered: 07/05/2019) |

| 07/08/2019 | 29 | NOTICE of Appearance by attorney KIMBERLY D. POTTER on behalf of Defendants NORTH CAROLINA STATE UNIVERSITY, UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, UNIVERSITY OF NORTH CAROLINA AT GREENSBORO (POTTER, KIMBERLY) (Entered: 07/08/2019) |
|---|---|---|
| 07/08/2019 | 30 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by NORTH CAROLINA STATE UNIVERSITY, UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, UNIVERSITY OF NORTH CAROLINA AT GREENSBORO. Response to Motion due by 7/29/2019 (POTTER, KIMBERLY) (Entered: 07/08/2019) |
| 07/08/2019 | 31 | MEMORANDUM filed by Defendants NORTH CAROLINA STATE UNIVERSITY, UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, UNIVERSITY OF NORTH CAROLINA AT GREENSBORO re 30 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by NORTH CAROLINA STATE UNIVERSITY, UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, UNIVERSITY OF NORTH CAROLINA AT GREENSBORO. (Attachments: # 1 Exhibit A March 20, 2019 Advisory Letter, # 2 Exhibit B June 20, 2013 Advisory Letter)(POTTER, KIMBERLY) (Entered: 07/08/2019) |
| 07/08/2019 | 32 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES. Response to Motion due by 7/29/2019 (WILLIAMS, KEVIN) (Entered: 07/08/2019) |
| 07/08/2019 | 33 | MEMORANDUM filed by Defendants DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES re 32 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES. (WILLIAMS, KEVIN) (Entered: 07/08/2019) |
| 08/05/2019 | 34 | RESPONSE in Opposition re 32 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by DALE FOLWELL, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES, DEE JONES filed by MICHAEL D. BUNTING, JR, C.B., JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. Replies due by 8/19/2019 (RICHARDSON, AMY) (Entered: 08/05/2019) |
| 08/05/2019 | 35 | RESPONSE in Opposition re 30 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, UNIVERSITY OF NORTH CAROLINA AT GREENSBORO, NORTH CAROLINA STATE UNIVERSITY filed by MICHAEL D. BUNTING, JR, C.B., JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. Replies due by 8/19/2019 (RICHARDSON, AMY) (Entered: 08/05/2019) |
| 08/14/2019 | 36 | MOTION for Extension of Time to File Response/Reply as to 35 Response in Opposition to Motion, by NORTH CAROLINA STATE UNIVERSITY, UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, UNIVERSITY OF NORTH CAROLINA AT GREENSBORO. (Attachments: # 1 Text of Proposed Order Granting Extension of Time)(JORDAN, CATHERINE) (Entered: 08/14/2019) |
| 08/14/2019 | | Motion Referred: RE: 36 MOTION for Extension of Time to File Response/Reply as to 35 Response in Opposition to Motion, to MAG/JUDGE L. PATRICK AULD. (Blay, Debbie) (Entered: 08/14/2019) |
| 08/14/2019 | | TEXT ORDER granting 36 Motion for Extension of Time. Defendants University of North Carolina at Chapel Hill, North Carolina State University, and University of North Carolina at Greensboro shall file any reply to 35 Response by 09/18/2019. Issued by MAG/JUDGE L. PATRICK AULD on 08/14/2019. (AULD, L.) (Entered: 08/14/2019) |
| 08/19/2019 | 37 | REPLY Memorandum filed by Defendants DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES re 32 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES. (WILLIAMS, KEVIN) Modified on 8/20/2019 to correctly reflect pleading title. (Garland, Leah) (Entered: |

| | | 08/19/2019) |
|---|---|---|
| 08/22/2019 | 38 | Suggestion of Subsequently Decided Authority by Plaintiffs MICHAEL D. BUNTING, JR, C.B., JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. (RICHARDSON, AMY) (Entered: 08/22/2019) |
| 09/18/2019 | 39 | REPLY, filed by Defendants NORTH CAROLINA STATE UNIVERSITY, UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, UNIVERSITY OF NORTH CAROLINA AT GREENSBORO, to Response to 30 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by NORTH CAROLINA STATE UNIVERSITY, UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, UNIVERSITY OF NORTH CAROLINA AT GREENSBORO. (JORDAN, CATHERINE) (Entered: 09/18/2019) |
| 09/23/2019 | | Motions Submitted: 30 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 32 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM to JUDGE LORETTA C. BIGGS. (Blay, Debbie) (Entered: 09/23/2019) |
| 01/02/2020 | 40 | Suggestion of Subsequently Decided Authority re 34 Response in Opposition to Motion, 35 Response in Opposition to Motion, by Plaintiffs MICHAEL D. BUNTING, JR, C.B., JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. (RICHARDSON, AMY) (Entered: 01/02/2020) |
| 02/21/2020 | 41 | MOTION for Entry of Tolling Stipulation (Unopposed) by MICHAEL D. BUNTING, JR, C.B., JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. (RICHARDSON, AMY) (Entered: 02/21/2020) |
| 02/21/2020 | 42 | MEMORANDUM filed by Plaintiffs MICHAEL D. BUNTING, JR, C.B., JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK re 41 MOTION for Entry of Tolling Stipulation (Unopposed) filed by MICHAEL D. BUNTING, JR, C.B., JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. (Attachments: # 1 Exhibit A, # 2 Text of Proposed Order)(RICHARDSON, AMY) (Entered: 02/21/2020) |
| 02/21/2020 | | Motion Submitted: 41 MOTION for Entry of Tolling Stipulation (Unopposed) to JUDGE LORETTA C. BIGGS. (Blay, Debbie) (Entered: 02/21/2020) |
| 02/26/2020 | 43 | ORDER signed by JUDGE LORETTA C. BIGGS on 02/26/2020, that the motion for approval and entry of the Tolling Stipulation is GRANTED. The Tolling Stipulation, entered on the docket as ECF No. 42 –1, shall be deemed filed as of the date of this order. (Garland, Leah) (Entered: 02/26/2020) |
| 02/28/2020 | 44 | NOTICE OF WITHDRAWAL AND SUBSTITUTION OF COUNSEL on behalf of Plaintiffs MICHAEL D. BUNTING, JR, C.B., JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. AMY E. RICHARDSON is substituted as counsel for Plaintiffs. Attorney MEREDITH T. BROWN terminated. (RICHARDSON, AMY) (Entered: 02/28/2020) |
| 03/11/2020 | 45 | MEMORANDUM OPINION AND ORDER signed by JUDGE LORETTA C. BIGGS on 03/10/2020, that University Defendants' Motion to Dismiss, (ECF No. 30 ), and State Defendants' Motion to Dismiss, (ECF No. 32 ), are each DENIED in their entirety. (Garland, Leah) (Entered: 03/11/2020) |
| 03/19/2020 | 46 | MOTION for Extension of Time to File Answer re 1 Complaint by NORTH CAROLINA STATE UNIVERSITY, UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, UNIVERSITY OF NORTH CAROLINA AT GREENSBORO. (Attachments: # 1 Text of Proposed Order Proposed Order on Motion for Extension of Time)(JORDAN, CATHERINE) (Entered: 03/19/2020) |
| 03/20/2020 | | ORDER granting 46 Motion for Extension of Time to Answer for NORTH CAROLINA STATE UNIVERSITY; UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL; and UNIVERSITY OF NORTH CAROLINA AT GREENSBORO. Answer due by 4/24/2020. Signed by John Brubaker, Clerk of Court, on 3/20/2020. (Brubaker, John) (Entered: 03/20/2020) |

| | | |
|---|---|---|
| 03/20/2020 | 47 | Consent MOTION for Extension of Time to File Answer *until April 24, 2020* by DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES. (Attachments: # 1 Text of Proposed Order)(WILLIAMS, KEVIN) (Entered: 03/20/2020) |
| 03/23/2020 | | Motion Referred: RE: 47 Consent MOTION for Extension of Time to File Answer *until April 24, 2020*, to MAG/JUDGE L. PATRICK AULD. (Blay, Debbie) (Entered: 03/23/2020) |
| 03/23/2020 | | **TEXT ORDER** granting 47 Motion for Extension of Time. Defendants DALE FOLWELL, DEE JONES, and NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES shall answer or otherwise respond by 04/24/2020. Issued by MAG/JUDGE L. PATRICK AULD on 03/23/2020. (AULD, L.) (Entered: 03/23/2020) |
| 04/08/2020 | 48 | NOTICE of Appearance by attorney DAVID BROWN on behalf of Plaintiffs MICHAEL D. BUNTING, JR, C.B., JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK (BROWN, DAVID) (Entered: 04/08/2020) |
| 04/08/2020 | 49 | NOTICE of Appearance by attorney ALEJANDRA L. CARABALLO on behalf of Plaintiffs MICHAEL D. BUNTING, JR., C.B., JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK (CARABALLO, ALEJANDRA) (Entered: 04/08/2020) |
| 04/08/2020 | 50 | NOTICE OF INTERLOCUTORY APPEAL as to 45 Memorandum Opinion and Order, by NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES. Filing fee $ 505, receipt number 0418–2785530. (JONES, MARK) (Entered: 04/08/2020) |
| 04/09/2020 | 51 | Electronic Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re: 50 Notice of Interlocutory Appeal. (Garland, Leah) (Entered: 04/09/2020) |
| 04/09/2020 | 52 | NOTICE of Docketing Record on Appeal from USCA re 50 Notice of Interlocutory Appeal filed by NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES. USCA Case Manager is Cathy Poulsen. USCA Case Number 20–1409. (Garland, Leah) (Entered: 04/09/2020) |
| 04/22/2020 | 53 | NOTICE OF WITHDRAWAL AND SUBSTITUTION OF COUNSEL on behalf of Defendants NORTH CAROLINA STATE UNIVERSITY, UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, UNIVERSITY OF NORTH CAROLINA AT GREENSBORO. NORA F. SULLIVAN is substituted as counsel for Defendants. Attorney CATHERINE F. JORDAN terminated. (SULLIVAN, NORA) (Entered: 04/22/2020) |
| 04/22/2020 | 54 | Consent MOTION for Extension of Time to File Answer re 1 Complaint by NORTH CAROLINA STATE UNIVERSITY, UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, UNIVERSITY OF NORTH CAROLINA AT GREENSBORO. (Attachments: # 1 Text of Proposed Order Consent Motion for Second Extension of Time to Answer)(SULLIVAN, NORA) (Entered: 04/22/2020) |
| 04/22/2020 | | Motion Referred: RE: 54 Consent MOTION for Extension of Time to File Answer re 1 Complaint , to MAG/JUDGE L. PATRICK AULD. (Blay, Debbie) (Entered: 04/22/2020) |
| 04/23/2020 | | **TEXT ORDER** granting 54 Consent Motion for Second Extension of Time. Defendants NORTH CAROLINA STATE UNIVERSITY, UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, and UNIVERSITY OF NORTH CAROLINA AT GREENSBORO shall answer or otherwise respond by 05/26/2020. Issued by MAG/JUDGE L. PATRICK AULD on 04/23/2020. (AULD, L.) (Entered: 04/23/2020) |
| 04/24/2020 | 55 | NOTICE OF WITHDRAWAL AND SUBSTITUTION OF COUNSEL on behalf of Defendants DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES. JAMES BENJAMIN GARNER is substituted as counsel for Defendants. Attorney SAM M. HAYES terminated. (GARNER, JAMES) (Entered: 04/24/2020) |

| 04/24/2020 | 56 | ANSWER to 1 Complaint with Jury Demand by DALE FOLWELL, DEE JONES. (JONES, MARK) (Entered: 04/24/2020) |
|---|---|---|
| 05/20/2020 | 57 | NOTICE of Appearance by attorney ZACHARY A. PADGET on behalf of Defendants NORTH CAROLINA STATE UNIVERSITY, UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, UNIVERSITY OF NORTH CAROLINA AT GREENSBORO (PADGET, ZACHARY) (Entered: 05/20/2020) |
| 05/20/2020 | 58 | Consent MOTION for Extension of Time to File Answer re 1 Complaint by NORTH CAROLINA STATE UNIVERSITY, UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, UNIVERSITY OF NORTH CAROLINA AT GREENSBORO. (Attachments: # 1 Text of Proposed Order Consent Motion for Third Extension of Time to Answer)(SULLIVAN, NORA) (Entered: 05/20/2020) |
| 05/21/2020 | | TEXT ORDER granting 58 Consent Motion for Third Extension of Time. Defendants NORTH CAROLINA STATE UNIVERSITY, UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, and UNIVERSITY OF NORTH CAROLINA AT GREENSBORO shall answer or otherwise respond by 06/09/2020. Issued by MAG/JUDGE L. PATRICK AULD on 05/21/2020. (AULD, L.) (Entered: 05/21/2020) |
| 06/09/2020 | 59 | ANSWER to 1 Complaint with Jury Demand by NORTH CAROLINA STATE UNIVERSITY, UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, UNIVERSITY OF NORTH CAROLINA AT GREENSBORO. (SULLIVAN, NORA) (Entered: 06/09/2020) |
| 06/10/2020 | 60 | NOTICE of Initial Pretrial Conference Hearing: Initial Pretrial Conference Hearing set for 8/3/2020 09:30 AM in Greensboro Courtroom #1A before MAG/JUDGE L. PATRICK AULD. (Garrett, Kim) (Entered: 06/10/2020) |
| 07/29/2020 | 61 | Rule 26(f) Report (Joint) filed by all parties by MICHAEL D. BUNTING, JR, C.B., JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK.(RICHARDSON, AMY) (Entered: 07/29/2020) |
| 07/30/2020 | | Motions Referred: RE: 61 Rule 26(f) Report (Joint) filed by all parties, to MAG/JUDGE L. PATRICK AULD (Garrett, Kim) (Entered: 07/30/2020) |
| 08/03/2020 | 62 | MOTION to Amend 1 Complaint by MAXWELL KADEL. Response to Motion due by 8/24/2020 (Attachments: # 1 Exhibit A – Amended Complaint, # 2 Text of Proposed Order)(RICHARDSON, AMY) (Entered: 08/03/2020) |
| 08/13/2020 | | TEXT ORDER adopting 61 Joint Report pursuant to Federal Rule of Civil Procedure 26(f). Issued by MAG/JUDGE L. PATRICK AULD on 08/13/2020. (AULD, L.) (Entered: 08/13/2020) |
| 08/14/2020 | | Set Scheduling Order Deadlines: Discovery shall be established as Exceptional. Mediation should be conducted midway in the discovery period, the exact date to be set by the mediator after consultation with the parties. The parties agree that the mediator shall be Jon Harkavy. The parties do not consent to trial before a Magistrate Judge. Trial is expected to take approximately five (5) days. Plaintiff's have demanded a jury trial. Plaintiff's Amended Pleadings due by 10/1/2020. Defendant's Amended Pleadings due by 12/1/2020. Discovery due by 5/31/2021. Joinder of Parties for Plaintiff due by 10/1/2020. Joinder of Parties for Defendant due by 12/1/2020. (Garland, Leah) (Entered: 08/14/2020) |
| 08/17/2020 | | MEDIATION SCHEDULING ORDER; Mediation due by 1/15/2021.(Kemp, Donita) (Entered: 08/17/2020) |
| 08/17/2020 | 63 | ORDER Appointing JONATHAN R. HARKAVY, as the Mediator pursuant to LR 83.9d(a). Signed by John S. Brubaker, Clerk of Court. (Kemp, Donita) Modified on 10/23/2020 – RESCINDED pursuant to 66 order. (Gammon, Cheryl). (Entered: 08/17/2020) |
| 08/24/2020 | 64 | RESPONSE in Opposition re 62 MOTION to Amend 1 Complaint filed by MAXWELL KADEL filed by DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES. Replies due by 9/8/2020 (WILLIAMS, KEVIN) (Entered: 08/24/2020) |

| 09/08/2020 | 65 | REPLY, filed by Plaintiff MAXWELL KADEL, to Response to 62 MOTION to Amend 1 Complaint filed by MAXWELL KADEL. (Attachments: # 1 Appendix A)(RICHARDSON, AMY) (Entered: 09/08/2020) |
| 09/09/2020 | | Motion Referred: RE: 62 MOTION to Amend 1 Complaint , to MAG/JUDGE L. PATRICK AULD. (Blay, Debbie) (Entered: 09/09/2020) |
| 10/23/2020 | 66 | ORDER appointing Kenneth P. Carlson, Jr. as the mediator. The order of 8/17/2020 appointing Jonathan Harkavy is hereby rescinded. (Gammon, Cheryl) (Entered: 10/23/2020) |
| 12/08/2020 | 67 | MOTION to Withdraw as Attorney NORA F. SULLIVAN by on behalf of NORTH CAROLINA STATE UNIVERSITY, UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, UNIVERSITY OF NORTH CAROLINA AT GREENSBORO. Responses due by 12/29/2020 (Attachments: # 1 Text of Proposed Order)(SULLIVAN, NORA) (Entered: 12/08/2020) |
| 12/08/2020 | | Motion Referred: RE: 67 MOTION to Withdraw as Attorney NORA F. SULLIVAN , to MAG/JUDGE L. PATRICK AULD. (Blay, Debbie) (Entered: 12/08/2020) |
| 12/08/2020 | | TEXT ORDER granting 67 Motion to Withdraw as Counsel. Attorney NORA F. SULLIVAN is terminated as counsel for Defendants University of North Carolina at Chapel Hill, North Carolina State University, and University of North Carolina at Greensboro. Issued by MAG/JUDGE L. PATRICK AULD on 12/08/2020. (AULD, L.) (Entered: 12/08/2020) |
| 12/09/2020 | 68 | NOTICE of Attorney Appearance by attorney LAUREN E. SNYDER on behalf of Plaintiffs MICHAEL D. BUNTING, JR, C.B., JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK (SNYDER, LAUREN) (Entered: 12/09/2020) |
| 01/19/2021 | 69 | Joint MOTION for Protective Order by MICHAEL D. BUNTING, JR, C.B., JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. Response to Motion due by 2/2/2021 (Attachments: # 1 Exhibit Protective Order, # 2 Text of Proposed Order)(RICHARDSON, AMY) (Entered: 01/19/2021) |
| 01/19/2021 | | Motion Referred: RE: 69 Joint MOTION for Protective Order , to MAG/JUDGE L. PATRICK AULD. (Blay, Debbie) (Entered: 01/19/2021) |
| 01/19/2021 | 70 | STIPULATED PROTECTIVE ORDER signed by MAG/JUDGE L. PATRICK AULD on 01/19/2021, as set out herein. (Garland, Leah) (Entered: 01/19/2021) |
| 01/20/2021 | | TEXT ORDER clarifying 70 Stipulated Protective Order, in that, notwithstanding the language in Paragraph 17, 70 Stipulated Protective Order does not obligate any judge conducting an open–court proceeding to accept evidence via in camera submission simply because a party has designated such evidence as confidential under 70 Stipulated Protective Order. Issued by MAG/JUDGE L. PATRICK AULD on 01/20/2021. (AULD, L.) (Entered: 01/20/2021) |
| 01/22/2021 | 71 | USCA ORDER: The court grants the motion to relieve Samuel Robert Bagenstos as counsel from further representation on appeal. (USCA Case number: 20–1409) (Garland, Leah) (Entered: 01/22/2021) |
| 01/27/2021 | 72 | INTERIM REPORT OF MEDIATOR from Kenneth B. Carlson, Jr. – Mediation held on 12/11/2020 and is being continued pending scheduling of a continued mediated settlement conference which is expected to occur by the end of February 2021. (Recess – Mediation to be resumed at a later date)(Bond, Melisa) (Entered: 01/27/2021) |
| 02/17/2021 | 73 | MOTION for Extension of Time to Complete Discovery *Unopposed* by MICHAEL D. BUNTING, JR, C.B., JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. (Attachments: # 1 Text of Proposed Order)(RICHARDSON, AMY) (Entered: 02/17/2021) |
| 02/18/2021 | | Motion Referred: RE: 73 MOTION for Extension of Time to Complete Discovery *Unopposed*, to MAG/JUDGE L. PATRICK AULD. (Blay, Debbie) (Entered: 02/18/2021) |

| 02/25/2021 | | **TEXT ORDER** denying 73 Unopposed Motion to Extend Discovery Deadlines. Via Text Order dated 08/13/2020, the Court adopted the parties' 61 Joint Report, thereby establishing the scheduling order for this case, including a deadline of 03/01/2021 for Plaintiffs to serve their expert reports and 05/31/2021 for the conclusion of all discovery. In 73 Unopposed Motion (filed on 02/17/2021), Plaintiffs now ask the Court to extend all unexpired scheduling order deadlines by 90+ days. As support for that request, 73 Unopposed Motion asserts that Plaintiffs have diligently pursued discovery, but nonetheless cannot meet the existing deadlines. In particular, 73 Unopposed Motion states that (A) Plaintiffs "issued discovery requests, including document requests, to [] Defendants," (B) some Defendants have produced a large volume of documents, but "additional material remains to be provided," and (C) "due to delays related to the creation of a protective order, [other] Defendants have not yet provided responsive documents to Plaintiffs." That showing does not establish "good cause" within the meaning of Federal Rule of Civil Procedure 16(b)(4), because it does not reveal (A) when Plaintiffs served document requests, (B) what additional documents remain unproduced from Defendants who have produced a large volume of documents (and/or why), and (C) why the parties delayed in preparing a proposed protective order. Further, the statement, in 73 Unopposed Motion, that, "[g]iven the current status of production, Plaintiffs may be required to designate experts or secure information for additional issues," constitutes too speculative a basis for sweeping extensions of all pending scheduling order deadlines. Finally, 73 Unopposed Motion cites the pendency of 62 Motion for Leave to File an Amended Complaint and declares that its resolution "will affect the content of at least one expert's report," as well as Plaintiffs' production of documents from a proposed new plaintiff (which supposedly cannot occur yet because said proposed plaintiff "is not a party to the protective order"). As to the latter matter, the Court does not see how the parties' failure to address production of documents from non–parties either in their proposed protective order or otherwise creates good cause for an extension of scheduling order deadlines. Likewise, the Court does not view the prospect of one expert having to alter a report in an unexplained fashion depending on an unresolved motion to amend a pleading as an adequate ground for across–the–board alteration of scheduling order deadlines. Issued by MAG/JUDGE L. PATRICK AULD on 02/25/2021. (AULD, L.) (Entered: 02/25/2021) |
| 03/05/2021 | 74 | **MEMORANDUM OPINION AND ORDER** signed by MAG/JUDGE L. PATRICK AULD on 03/05/2021, that the Motion to Amend (Docket Entry 62 ) is GRANTED. FURTHER ORDERED that Plaintiffs shall file their amended complaint in the form of Exhibit A (Docket Entry 62 –1) by March 12, 2021. (Garland, Leah) (Entered: 03/05/2021) |
| 03/09/2021 | 75 | First AMENDED COMPLAINT against All Defendants, filed by C.B., CONNOR THONEN–FLECK, SAM SILVANIE, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, MICHAEL D. BUNTING, JR., and DANA CARAWAY. (RICHARDSON, AMY) Modified on 3/10/2021 to correct docket text. (Garland, Leah) (Entered: 03/09/2021) |
| 03/09/2021 | 76 | Summons Issued as to STATE OF NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY. (Sheets, Jamie) (Entered: 03/09/2021) |
| 03/09/2021 | 77 | NOTICE of Attorney Appearance by attorney CARL S. CHARLES on behalf of Plaintiffs MICHAEL D. BUNTING, JR, C.B., JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK (CHARLES, CARL) (Entered: 03/09/2021) |
| 03/16/2021 | 78 | AFFIDAVIT OF SERVICE by Summons as to STATE OF NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY served on 3/11/2021, answer due 4/1/2021. (RICHARDSON, AMY) (Entered: 03/16/2021) |
| 03/17/2021 | 79 | MOTION for Extension of Time to File Answer re 75 Amended Complaint, by NORTH CAROLINA STATE UNIVERSITY, UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, UNIVERSITY OF NORTH CAROLINA AT GREENSBORO. (Attachments: # 1 Text of Proposed Order)(PADGET, ZACHARY) (Entered: 03/17/2021) |
| 03/17/2021 | | **ORDER** granting 79 Motion for Extension of Time to Answer filed by NORTH CAROLINA STATE UNIVERSITY; UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL; and UNIVERSITY OF NORTH CAROLINA AT GREENSBORO. |

| | | Answer due by 4/6/2021. Signed by John Brubaker, Clerk of Court, on 3/17/2021. (Brubaker, John) (Entered: 03/17/2021) |
|---|---|---|
| 03/18/2021 | 80 | NOTICE of Attorney Appearance by attorney ALAN D. MCINNES on behalf of Defendant STATE OF NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY (MCINNES, ALAN) (Entered: 03/18/2021) |
| 03/23/2021 | 81 | NOTICE of Special Appearance by attorney TARA L. BORELLI on behalf of Plaintiff DANA CARAWAY ( Filing fee $ 25 receipt number 0418–3013785.) (BORELLI, TARA) (Entered: 03/23/2021) |
| 03/23/2021 | 82 | NOTICE of Attorney Appearance by attorney AMY E. RICHARDSON on behalf of Plaintiff DANA CARAWAY (RICHARDSON, AMY) (Entered: 03/23/2021) |
| 03/23/2021 | 83 | NOTICE of Special Appearance by attorney CARL S. CHARLES on behalf of Plaintiff DANA CARAWAY ( Filing fee $ 25 receipt number 0418–3013834.) (CHARLES, CARL) (Entered: 03/23/2021) |
| 03/23/2021 | 84 | NOTICE of Special Appearance by attorney DEEPIKA H. RAVI on behalf of Plaintiff DANA CARAWAY ( Filing fee $ 25 receipt number 0418–3013915.) (RAVI, DEEPIKA) (Entered: 03/23/2021) |
| 03/23/2021 | 85 | ANSWER to Amended Complaint by DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES. (WILLIAMS, KEVIN) (Entered: 03/23/2021) |
| 03/23/2021 | 86 | NOTICE of Attorney Appearance by attorney DAVID BROWN on behalf of Plaintiff DANA CARAWAY (BROWN, DAVID) (Entered: 03/23/2021) |
| 03/24/2021 | 87 | MOTION for Extension of Time to Complete Discovery by NORTH CAROLINA STATE UNIVERSITY, UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, UNIVERSITY OF NORTH CAROLINA AT GREENSBORO. (Attachments: # 1 Text of Proposed Order)(PADGET, ZACHARY) (Entered: 03/24/2021) |
| 03/24/2021 | 88 | NOTICE of Special Appearance by attorney OMAR F. GONZALEZ–PAGAN on behalf of Plaintiff DANA CARAWAY ( Filing fee $ 25 receipt number 0418–3014409.) (GONZALEZ–PAGAN, OMAR) (Entered: 03/24/2021) |
| 03/24/2021 | 89 | NOTICE of Attorney Appearance by attorney LAUREN E. SNYDER on behalf of Plaintiff DANA CARAWAY (SNYDER, LAUREN) (Entered: 03/24/2021) |
| 03/25/2021 | | Motion Referred: RE: 87 MOTION for Extension of Time to Complete Discovery , to MAG/JUDGE L. PATRICK AULD. (Blay, Debbie) (Entered: 03/25/2021) |
| 03/25/2021 | 90 | **ORDER** signed by MAG/JUDGE L. PATRICK AULD on 03/25/2021, that the motion is GRANTED. FURTHER ORDERED that the deadlines for discovery in this case shall be amended as follows: 1. Defendants' affirmative and rebuttal expert reports due by May 1, 2021; 2. Plaintiff's rebuttal experts due by June 1, 2021; 3. Expert depositions between May 1, 2021, and June 30, 2021; 4. All discovery to be completed by June 30, 2021. (Garland, Leah) (Entered: 03/25/2021) |
| 04/01/2021 | 91 | MOTION for Extension of Time to File Answer re 75 Amended Complaint, by STATE OF NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY. (Attachments: # 1 Text of Proposed Order)(MCINNES, ALAN) (Entered: 04/01/2021) |
| 04/01/2021 | 92 | **USCA ORDER**. The court grants the motion to withdraw from further representation on appeal. USCA Case Number 20–1409. (Sheets, Jamie) (Entered: 04/01/2021) |
| 04/01/2021 | | **ORDER** granting 91 Motion for Extension of Time to Answer for STATE OF NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY. Answer due by 4/16/2021. Signed by John Brubaker, Clerk of Court, on 4/1/2021. (Brubaker, John) (Entered: 04/01/2021) |
| 04/06/2021 | 93 | ANSWER to Amended Complaint by NORTH CAROLINA STATE UNIVERSITY, UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, UNIVERSITY OF NORTH CAROLINA AT GREENSBORO. (PADGET, ZACHARY) (Entered: 04/06/2021) |

**JA26**

| 04/13/2021 | 94 | NOTICE of Special Appearance by attorney MICHAEL W. WEAVER on behalf of Plaintiffs MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK ( Filing fee $ 25 receipt number 0418–3028100.) (WEAVER, MICHAEL) (Entered: 04/13/2021) |
| --- | --- | --- |
| 04/14/2021 | 95 | STIPULATION re 70 Protective Order by MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. (RICHARDSON, AMY) (Entered: 04/14/2021) |
| 04/15/2021 | | **TEXT ORDER** adopting 95 Stipulation, amending 70 Stipulated Protective Order to include Plaintiff Dana Caraway and Defendant North Carolina Department of Public Safety as parties to 70 Stipulated Protective Order. Issued by MAG/JUDGE L. PATRICK AULD on 04/15/2021. (AULD, L.) (Entered: 04/15/2021) |
| 04/16/2021 | 96 | ANSWER to Amended Complaint by STATE OF NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY. (MCINNES, ALAN) (Entered: 04/16/2021) |
| 05/07/2021 | 97 | MOTION for Extension of Time to Complete Discovery *(Unopposed)* by STATE OF NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY. (MCINNES, ALAN) (Entered: 05/07/2021) |
| 05/11/2021 | | Motion Referred: RE: 97 MOTION for Extension of Time to Complete Discovery *(Unopposed)*, to MAG/JUDGE L. PATRICK AULD. (Blay, Debbie) (Entered: 05/11/2021) |
| 05/11/2021 | 98 | **ORDER** signed by MAG/JUDGE L. PATRICK AULD on 05/11/2021, that the Motion is GRANTED. It is FURTHER ORDERED that the deadlines in this case shall be amended as follows: a. June 1, 2021: Plaintiffs' current June 1 deadline to serve supplemental expert reports, per Docket Entry No. 90 , remains the same; b. June 15, 2021: Deadline for NCDPS to file leave to amend its pleadings; c. July 1, 2021: NCDPS's affirmative and rebuttal expert reports; d. July 31, 2021: Plaintiffs rebuttal expert reports; e. July 1, 2021, through September 30, 2021: Expert depositions. f. September 30, 2021: Close of discovery. (Garland, Leah) (Entered: 05/11/2021) |
| 05/11/2021 | 99 | Rule 26(f) Report (Joint) filed by all parties by MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK.(RICHARDSON, AMY) (Entered: 05/11/2021) |
| 05/11/2021 | 100 | MOTION for Extension of Time *for Expert Rebuttal (Unopposed)* by MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. (Attachments: # 1 Text of Proposed Order)(RICHARDSON, AMY) (Entered: 05/11/2021) |
| 05/12/2021 | | Motion Referred: RE: 100 MOTION for Extension of Time *for Expert Rebuttal (Unopposed)*, to MAG/JUDGE L. PATRICK AULD. (Blay, Debbie) (Entered: 05/12/2021) |
| 05/12/2021 | | **TEXT ORDER** adopting 99 Joint Report with the following clarification: the Clerk shall set the trial date based on the standard considerations (which do not guarantee the parties a ruling on dispositive motions any particular time in advance of the trial date). Issued by MAG/JUDGE L. PATRICK AULD on 05/12/2021. (AULD, L.) (Entered: 05/12/2021) |
| 05/12/2021 | 101 | **ORDER** signed by MAG/JUDGE L. PATRICK AULD on 05/12/2021, that the motion is GRANTED. It is FURTHER ORDERED that the deadlines for discovery in this case shall be amended as follows: 1. The deadline for production of Plaintiffs' expert rebuttal reports by Dr. George Brown and Dr. Randi C. Ettner is extended by 10 days to June 11, 2021. (Garland, Leah) (Entered: 05/12/2021) |
| 05/28/2021 | 102 | REPORT OF MEDIATOR from Kenneth P. Carlson, Jr. – Mediation Held on 12/11/2020 and continued through 05/24/2021. (IMPASSE) (Bond, Melisa) (Entered: 05/28/2021) |
| 07/01/2021 | 103 | MOTION for Extension of Time *to Submit Expert Disclosures* by STATE OF NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY. (Attachments: # 1 Text of |

| | | |
|---|---|---|
| | | Proposed Order)(MCINNES, ALAN) (Entered: 07/01/2021) |
| 07/02/2021 | | Motion Referred: RE: 103 MOTION for Extension of Time *to Submit Expert Disclosures*, to MAG/JUDGE L. PATRICK AULD. (Blay, Debbie) (Entered: 07/02/2021) |
| 07/02/2021 | | **TEXT ORDER** granting 103 Motion to Extend Expert Disclosure Deadline. Defendant North Carolina Department of Public Safety shall serve its expert disclosures under Federal Rule of Civil Procedure 26(a)(2)(B) and (C) by 07/12/2021. Issued by MAG/JUDGE L. PATRICK AULD on 07/02/2021. (AULD, L.) (Entered: 07/02/2021) |
| 07/08/2021 | 104 | JOINT MOTION *for Entry of Stipulation* by MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. (Attachments: # 1 Exhibit A: Joint Stipulation, # 2 Text of Proposed Order)(RICHARDSON, AMY) (Entered: 07/08/2021) |
| 07/09/2021 | | Motion Referred: RE: 104 JOINT MOTION *for Entry of Stipulation*, to MAG/JUDGE L. PATRICK AULD. (Blay, Debbie) (Entered: 07/09/2021) |
| 07/12/2021 | 105 | **ORDER** signed by MAG/JUDGE L. PATRICK AULD on 07/12/2021, that the motion for approval and entry of the Stipulation is GRANTED. The Stipulation, entered on the docket as ECF No. 104 −1, shall be deemed filed as of the date of this Order. (Garland, Leah) (Entered: 07/12/2021) |
| 08/11/2021 | 106 | NOTICE of Special Appearance by attorney EVAN R. MAROLF on behalf of Plaintiffs MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK ( Filing fee $ 25 receipt number 0418–3110461.) (MAROLF, EVAN) (Entered: 08/11/2021) |
| 08/13/2021 | 107 | MOTION to Withdraw as Attorney AMY E. RICHARDSON by on behalf of MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. Responses due by 9/3/2021 (Attachments: # 1 Text of Proposed Order)(RICHARDSON, AMY) (Entered: 08/13/2021) |
| 08/16/2021 | | Motion Referred: RE: 107 MOTION to Withdraw as Attorney AMY E. RICHARDSON , to MAG/JUDGE L. PATRICK AULD. (Blay, Debbie) (Entered: 08/16/2021) |
| 08/17/2021 | | **TEXT ORDER** granting 107 Motion to Withdraw as Counsel. Attorney ALEJANDRA L. CARABALLO is terminated as counsel of record for Plaintiffs. Issued by MAG/JUDGE L. PATRICK AULD on 08/17/2021. (AULD, L.) (Entered: 08/17/2021) |
| 08/17/2021 | 108 | NOTICE of Special Appearance by attorney GRACE H. WYNN on behalf of Plaintiffs MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK ( Filing fee $ 25 receipt number 0418–3114217.) (WYNN, GRACE) (Entered: 08/17/2021) |
| 08/20/2021 | 109 | NOTICE of Special Appearance by attorney ADAM M. SAFER on behalf of Plaintiffs MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK ( Filing fee $ 25 receipt number 0418–3117066.) (SAFER, ADAM) (Entered: 08/20/2021) |
| 08/23/2021 | 110 | Joint MOTION to Dismiss *Claims Against University Defendants* by MICHAEL D. BUNTING, JR, C.B., JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. Response to Motion due by 9/13/2021 (Attachments: # 1 Text of Proposed Order)(RICHARDSON, AMY) (Entered: 08/23/2021) |
| 08/23/2021 | 111 | NOTICE of Special Appearance by attorney DMITRIY G. TISHYEVICH on behalf of Plaintiffs MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR |

**JA28**

| | | |
|---|---|---|
| | | THONEN–FLECK ( Filing fee $ 25 receipt number 0418–3117927.) (TISHYEVICH, DMITRIY) (Entered: 08/23/2021) |
| 08/23/2021 | | Motion Submitted: 110 Joint MOTION to Dismiss *Claims Against University Defendants* to JUDGE LORETTA C. BIGGS. (Blay, Debbie) (Entered: 08/23/2021) |
| 08/24/2021 | 112 | **ORDER** signed by JUDGE LORETTA C. BIGGS on 8/24/21, that the motion is GRANTED. Plaintiffs' claims against the University Defendants under Title IX and Title VII are DISMISSED WITH PREJUDICE. Each party will bear its own attorneys fees and costs, with the exception of the attorney's fees and costs paid as part of the parties' settlement. (Butler, Carol) (Entered: 08/24/2021) |
| 09/01/2021 | 113 | USCA OPINION as set out herein. 20–1409 (Butler, Carol) (Entered: 09/07/2021) |
| 09/01/2021 | 114 | USCA JUDGMENT as to 50 Notice of Interlocutory Appeal filed by NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES, that in accordance with the decision of this court, the judgment of the district court is affirmed. This judgment shall take effect upon issuance of this court's mandate in accordance with Fed. R. App. P. 41. No. 20–1409. (Attachments: # 1 USCA Notice)(Butler, Carol) (Entered: 09/07/2021) |
| 09/08/2021 | 115 | NOTICE of Hearing: Master Trial Calendar: JULY Jury Trial set for 7/5/2022 at 09:30 AM in Unassigned Courtroom. Trial briefs, etc. deadline set for 6/13/2022.(Blay, Debbie) (Entered: 09/08/2021) |
| 09/08/2021 | 116 | NOTICE of Special Appearance by attorney LAUREN H. EVANS on behalf of Plaintiffs MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK ( Filing fee $ 25 receipt number 0418–3128675.) (EVANS, LAUREN) (Entered: 09/08/2021) |
| 09/13/2021 | 117 | NOTICE of Special Appearance by attorney WARREN HASKEL on behalf of Plaintiffs MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK ( Filing fee $ 25 receipt number 0418–3131373.) (HASKEL, WARREN) (Entered: 09/13/2021) |
| 09/23/2021 | 118 | MANDATE of USCA as to 50 Notice of Interlocutory Appeal filed by NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES, that the judgment of this court, entered September 1, 2021, takes effect today. This constitutes the formal mandate of this court issued pursuant to Rule 41 (a) of the Federal Rules of Appellate Procedure. No. 20–1409 (Butler, Carol) (Entered: 09/23/2021) |
| 09/27/2021 | 119 | MOTION to Withdraw as Attorney DAVID BROWN by on behalf of MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. Responses due by 10/18/2021 (Attachments: # 1 Text of Proposed Order)(BROWN, DAVID) (Entered: 09/27/2021) |
| 09/27/2021 | 120 | Consent MOTION for Extension of Time to Complete Discovery *(Taking of Two Expert–Witness Depositions)* by DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES. (Attachments: # 1 Text of Proposed Order)(JONES, MARK) (Entered: 09/27/2021) |
| 09/28/2021 | | Motions Referred: RE: 120 Consent MOTION for Extension of Time to Complete Discovery *(Taking of Two Expert–Witness Depositions)*, 119 MOTION to Withdraw as Attorney DAVID BROWN , to MAG/JUDGE L. PATRICK AULD. (Blay, Debbie) (Entered: 09/28/2021) |
| 09/28/2021 | | **TEXT ORDER** granting 119 Motion to Withdraw as Counsel. Attorney NOAH E. LEWIS is terminated as counsel of record for Plaintiffs. Issued by MAG/JUDGE L. PATRICK AULD on 09/28/2021. (AULD, L.) (Entered: 09/28/2021) |
| 09/28/2021 | | **TEXT ORDER** granting 120 Consent Motion to Extend Two Pretrial Scheduling Order Deadlines. The parties may take the deposition of Dr. Randi Ettner on or before 10/22/2021, and the parties may complete the deposition of Dr. Paul McHugh on or |

| | | |
|---|---|---|
| | | before 10/15/2021. These allowances do not constitute a general extension of the discovery deadline and do not alter any other deadlines in the case. The Court wishes Drs. Ettner and McHugh the best for their recoveries. Issued by MAG/JUDGE L. PATRICK AULD on 09/28/2021. (AULD, L.) (Entered: 09/28/2021) |
| 10/06/2021 | 121 | Joint MOTION for Extension of Time To File Motion for DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES Dispositive Motions *(with the Consent of all Parties)* until December 15, 2021 by DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES. (Attachments: # 1 Text of Proposed Order)(JONES, MARK) (Entered: 10/06/2021) |
| 10/06/2021 | | Motions Referred: RE: 121 Joint MOTION for Extension of Time To File Motion for DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES Dispositive Motions *(with the Consent of all Parties)* until December 15, 2021, to MAG/JUDGE L. PATRICK AULD. (Blay, Debbie) (Entered: 10/06/2021) |
| 10/06/2021 | | **TEXT ORDER** granting in part 121 Joint–Consent Motion to Extend Deadlines, in that that parties shall file any dispositive motions by 11/30/2021, the parties shall file any responses to any such timely filed dispositive motions by 12/30/2021, and the parties shall file any replies to any such timely filed responses by 01/13/2021. The parties should not anticipate any further extensions of these deadlines. Issued by MAG/JUDGE L. PATRICK AULD on 10/06/2021. (AULD, L.) (Entered: 10/06/2021) |
| 10/08/2021 | | Reset Scheduling Order Deadlines: Dispositive Motions due by 11/30/2021. (Sheets, Jamie) (Entered: 10/08/2021) |
| 10/08/2021 | 122 | Consent MOTION for Extension of Time *to Complete Deposition of Dr. McHugh* by DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES. (Attachments: # 1 Text of Proposed Order)(JONES, MARK) (Entered: 10/08/2021) |
| 10/08/2021 | | Motion Referred: RE: 122 Consent MOTION for Extension of Time *to Complete Deposition of Dr. McHugh*, to MAG/JUDGE L. PATRICK AULD. (Blay, Debbie) (Entered: 10/08/2021) |
| 10/08/2021 | | **TEXT ORDER** granting 122 Consent Motion to Extend Pretrial Scheduling Order Deadlines. The parties may complete the deposition of Dr. Paul McHugh on or before 11/01/2021. This allowance does not constitute a general extension of the discovery deadline and does not alter any other deadlines in the case. Issued by MAG/JUDGE L. PATRICK AULD on 10/08/2021. (AULD, L.) (Entered: 10/08/2021) |
| 10/12/2021 | 123 | NOTICE of Intent to File Dispositive Motions by Plaintiffs MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK (RICHARDSON, AMY) (Entered: 10/12/2021) |
| 10/13/2021 | 124 | NOTICE of Intent to File Dispositive Motions by Defendants DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES (WILLIAMS, KEVIN) (Entered: 10/13/2021) |
| 10/13/2021 | 125 | NOTICE of Intent to File Dispositive Motions by Defendant STATE OF NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY (MCINNES, ALAN) (Entered: 10/13/2021) |
| 11/05/2021 | 126 | MOTION for Leave to File Excess Pages by MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. Responses due by 11/19/2021 (Attachments: # 1 Text of Proposed Order)(RICHARDSON, AMY) (Entered: 11/05/2021) |
| 11/05/2021 | | Motion Submitted: 126 MOTION for Leave to File Excess Pages to JUDGE LORETTA C. BIGGS. (Blay, Debbie) (Entered: 11/05/2021) |
| 11/08/2021 | 127 | Supreme Court of the United States Notice that the petition for a writ of certiorari in the above entitled case was filed on November 2, 2021 and placed on the docket November 5, 2021 as No. 21–674. (USCA Case Number 20–1409) (Butler, Carol) |

## JA30

| | | |
|---|---|---|
| | | Modified on 11/9/2021 to add 4th circuit appeal number. (Sheets, Jamie) (Entered: 11/08/2021) |
| 11/10/2021 | 128 | NOTICE OF WITHDRAWAL AND SUBSTITUTION OF COUNSEL on behalf of Defendant STATE OF NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY. JAMES B. TRACHTMAN is substituted as counsel for Defendant. Attorney ALAN D. MCINNES terminated. (TRACHTMAN, JAMES) (Entered: 11/10/2021) |
| 11/12/2021 | 129 | **ORDER** re 126 Motion for Leave to File Excess Pages, signed by JUDGE LORETTA C. BIGGS on 11/10/21, that the motion is DENIED.(Butler, Carol) (Entered: 11/12/2021) |
| 11/24/2021 | 130 | MOTION to Withdraw as Attorney EVAN R. MAROLF by on behalf of MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. Responses due by 12/8/2021 (Attachments: # 1 Text of Proposed Order)(MAROLF, EVAN) (Entered: 11/24/2021) |
| 11/29/2021 | | Motion Referred: RE: 130 MOTION to Withdraw as Attorney EVAN R. MAROLF , to MAG/JUDGE L. PATRICK AULD. (Blay, Debbie) (Entered: 11/29/2021) |
| 11/29/2021 | | **TEXT ORDER** granting 130 Motion to Withdraw as Counsel. Attorney EVAN R. MAROLF is terminated as counsel of record for Plaintiffs. Issued by MAG/JUDGE L. PATRICK AULD on 11/29/2021. (AULD, L.) (Entered: 11/29/2021) |
| 11/30/2021 | 131 | MOTION for Leave to File by AMERICAN MEDICAL ASSOCIATION, AMERICAN ACADEMY OF PEDIATRICS, AMERICAN COLLEGE OF OBSTETRICIANS AND GYNECOLOGISTS, AMERICAN PSYCHIATRIC ASSOCIATION, ENDOCRINE SOCIETY, NORTH AMERICAN SOCIETY FOR PEDIATRIC AND ADOLESCENT GYNECOLOGY, NATIONAL ASSOCIATION OF NURSE PRACTITIONERS IN WOMEN'S HEALTH, SOCIETY OF OB/GYN HOSPITALISTS. Response to Motion due by 12/21/2021 (Attachments: # 1 Text of Proposed Order, # 2 Proposed Amicus Brief)(SAINT, SARAH) (Entered: 11/30/2021) |
| 11/30/2021 | 132 | MOTION for Summary Judgment by STATE OF NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY. Response to Motion due by 12/30/2021 (TRACHTMAN, JAMES) (Entered: 11/30/2021) |
| 11/30/2021 | 133 | MEMORANDUM filed by Defendant STATE OF NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY re 132 MOTION for Summary Judgment filed by STATE OF NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY. (TRACHTMAN, JAMES) (Entered: 11/30/2021) |
| 11/30/2021 | 134 | APPENDIX re 133 Memorandum *in Support of Motion for Summary Judgment* by Defendant STATE OF NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY. (Attachments: # 1 Exhibit 1––Plaintiff's Objections and Responses to DPS's First Set of Interrogatories, Request for Admissions and Request for Production, # 2 Exhibit 2––Deposition of Dee Jones, # 3 Exhibit 3––Plaintiffs' First Set of Requests for Production to DPS, # 4 Exhibit 4––Declaration of George Wayne Goodwin, # 5 Exhibit 4A––Expert Report of George Wayne Goodwin, # 6 Exhibit 5––Expert Report of Jamison Green, Ph.D., # 7 Exhibit 6––DPS's Responses to Plaintiffs' First Set of Interrogatories, # 8 Exhibit 7––Copy of Boyden v. Conlin (unpublished))(TRACHTMAN, JAMES) (Entered: 11/30/2021) |
| 11/30/2021 | 135 | NOTICE of Attorney Appearance by attorney SHANA L. FULTON on behalf of Amicus Parties AMERICAN ACADEMY OF PEDIATRICS, AMERICAN COLLEGE OF OBSTETRICIANS AND GYNECOLOGISTS, AMERICAN MEDICAL ASSOCIATION, AMERICAN PSYCHIATRIC ASSOCIATION, ENDOCRINE SOCIETY, NATIONAL ASSOCIATION OF NURSE PRACTITIONERS IN WOMEN'S HEALTH, NORTH AMERICAN SOCIETY FOR PEDIATRIC AND ADOLESCENT GYNECOLOGY, SOCIETY OF OB/GYN HOSPITALISTS (FULTON, SHANA) (Entered: 11/30/2021) |
| 11/30/2021 | 136 | MOTION for Partial Summary Judgment by DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES. Response to Motion due by 12/30/2021 (JONES, MARK) (Entered: 11/30/2021) |

| | | |
|---|---|---|
| 11/30/2021 | 137 | MEMORANDUM filed by Defendants DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES re 136 MOTION for Partial Summary Judgment filed by DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES. (Attachments: # 1 Exhibit Folwell Deposition, # 2 Exhibit Jones Deposition, # 3 Exhibit Plan Defendant Documents, # 4 Exhibit Declaration of Blue Cross/Blue Shield of North Carolina, # 5 Exhibit Wilkins Prior Authorization Article, # 6 Exhibit Karasic Deposition, # 7 Exhibit Ettner Deposition, # 8 Exhibit Levine Deposition, # 9 Exhibit Brown Deposition, # 10 Exhibit CVS.Neuberger.Declaration, # 11 Exhibit CVS.Korn.Declarations, # 12 Exhibit Caraway Deposition and Deposition Exhibit, # 13 Exhibit DPS Deposition)(JONES, MARK) (Entered: 11/30/2021) |
| 11/30/2021 | 138 | **STRICKEN** MOTION for Summary Judgment by MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, CONNOR THONEN–FLECK. Response to Motion due by 12/30/2021 (RICHARDSON, AMY) Modified on 12/10/2021 to mark stricken per 176 Order. (Sheets, Jamie) (Entered: 11/30/2021) |
| 11/30/2021 | 139 | **STRICKEN** MEMORANDUM filed by Plaintiffs MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, CONNOR THONEN–FLECK re 138 MOTION for Summary Judgment filed by MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, CONNOR THONEN–FLECK. (Attachments: # 1 Affidavit Kadel Decl., # 2 Affidavit Thonen–Fleck Decl., # 3 Affidavit Fleck Decl., # 4 Affidavit McKeown Decl., # 5 Affidavit C.B. Decl., # 6 Affidavit M. Bunting Decl.)(RICHARDSON, AMY) Modified on 12/10/2021 to mark stricken per 176 Order. (Sheets, Jamie) (Entered: 11/30/2021) |
| 11/30/2021 | 140 | **STRICKEN** Additional Attachments to Main Document re 139 Memorandum,, . (Attachments: # 1 Affidavit S. Bunting Decl., # 2 Affidavit Caraway Decl.)(RICHARDSON, AMY) Modified on 12/10/2021 to mark stricken per 176 Order. (Sheets, Jamie) (Entered: 11/30/2021) |
| 11/30/2021 | 141 | **STRICKEN** Additional Attachments to Main Document re 139 Memorandum,, *Richardson Declaration Part One*. (RICHARDSON, AMY) Modified on 12/10/2021 to mark stricken per 176 Order. (Sheets, Jamie) (Entered: 11/30/2021) |
| 11/30/2021 | 142 | **STRICKEN** Additional Attachments to Main Document re 139 Memorandum,, *Richardson Declaration Part Two*. (RICHARDSON, AMY) Modified on 12/10/2021 to mark stricken per 176 Order. (Sheets, Jamie) (Entered: 11/30/2021) |
| 11/30/2021 | 143 | **STRICKEN** Additional Attachments to Main Document re 139 Memorandum,, *Richardson Declaration Part Three*. (RICHARDSON, AMY) Modified on 12/10/2021 to mark stricken per 176 Order. (Sheets, Jamie) (Entered: 11/30/2021) |
| 11/30/2021 | 144 | **STRICKEN** Additional Attachments to Main Document re 139 Memorandum,, *Richardson Declaration Part Four*. (RICHARDSON, AMY) Modified on 12/10/2021 to mark stricken per 176 Order. (Sheets, Jamie) (Entered: 11/30/2021) |
| 11/30/2021 | 145 | MOTION to Seal *Exhibits to Plaintiffs' Motion for Summary Judgment on Their Constitutional Claims* [If the party filing this motion is not the party claiming confidentiality, the party claiming confidentiality must file a response within 14 days that includes the materials required by L.R. 5.4(c)(3).] by MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, CONNOR THONEN–FLECK. Response to Motion due by 12/14/2021 (Attachments: # 1 Text of Proposed Order)(RICHARDSON, AMY) (Entered: 11/30/2021) |
| 11/30/2021 | 146 | **STRICKEN** SEALED UNREDACTED DOCUMENTS *Memorandum in Support of Plaintiffs' Motion for Summary Judgment on Their Constitutional Claims* filed by Plaintiffs MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK re 145 Motion to Seal,,. (Attachments: # 1 Affidavit Kadel Decl., # 2 Affidavit Thonen–Fleck Decl., # 3 Affidavit Fleck Decl., # 4 Affidavit McKeown Decl., # 5 Affidavit C.B. Decl., # 6 Affidavit M. Bunting Decl.)(RICHARDSON, AMY) Modified on 12/10/2021 to mark stricken per 176 Order. (Sheets, Jamie) |

| | | |
|---|---|---|
| | | (Entered: 11/30/2021) |
| 11/30/2021 | 147 | **STRICKEN** SEALED UNREDACTED DOCUMENTS *Additional Declarations of Bunting and Caraway* filed by Plaintiffs MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK re 145 Motion to Seal,,. (Attachments: # 1 Affidavit S. Bunting Decl., # 2 Affidavit Caraway Decl.)(RICHARDSON, AMY) Modified on 12/10/2021 to mark stricken per 176 Order. (Sheets, Jamie) (Entered: 11/30/2021) |
| 11/30/2021 | 148 | **STRICKEN** SEALED UNREDACTED DOCUMENTS *Richardson Declaration Part One* filed by Plaintiffs MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK re 145 Motion to Seal,,. (RICHARDSON, AMY) Modified on 12/10/2021 to mark stricken per 176 Order. (Sheets, Jamie) (Entered: 11/30/2021) |
| 11/30/2021 | 149 | **STRICKEN** SEALED UNREDACTED DOCUMENTS *Richardson Declaration Part Two* filed by Plaintiffs MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK re 145 Motion to Seal. (RICHARDSON, AMY) Modified on 12/10/2021 to mark stricken per 176 Order. (Sheets, Jamie) (Entered: 11/30/2021) |
| 11/30/2021 | 150 | **STRICKEN** SEALED UNREDACTED DOCUMENTS *Richardson Declaration Part Three* filed by Plaintiffs MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK re 145 Motion to Seal. (RICHARDSON, AMY) Modified on 12/10/2021 to mark stricken per 176 Order. (Sheets, Jamie) (Entered: 11/30/2021) |
| 11/30/2021 | 151 | **STRICKEN** SEALED UNREDACTED DOCUMENTS *Richardson Declaration Part Four* filed by Plaintiffs MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK re 145 Motion to Seal. (RICHARDSON, AMY) Modified on 12/10/2021 to mark stricken per 176 Order. (Sheets, Jamie) (Entered: 11/30/2021) |
| 11/30/2021 | 152 | **STRICKEN** MOTION for Partial Summary Judgment *on Their Statutory Claims* by MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. Response to Motion due by 12/30/2021 (RICHARDSON, AMY) Modified on 12/10/2021 to mark stricken per 176 Order. (Sheets, Jamie) (Entered: 11/30/2021) |
| 11/30/2021 | 153 | **STRICKEN** MEMORANDUM filed by Plaintiffs MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK re 152 MOTION for Partial Summary Judgment *on Their Statutory Claims* filed by MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. (Attachments: # 1 Affidavit Kadel Decl., # 2 Affidavit Thonen–Fleck Decl., # 3 Affidavit Fleck Decl., # 4 Affidavit McKeown Decl., # 5 Affidavit C.B. Decl., # 6 Affidavit M. Bunting Decl., # 7 Affidavit Silvaine Decl.)(RICHARDSON, AMY) Modified on 12/10/2021 to mark stricken per 176 Order. (Sheets, Jamie) (Entered: 11/30/2021) |
| 11/30/2021 | 154 | **STRICKEN** Additional Attachments to Main Document re 153 Memorandum,, . (Attachments: # 1 Affidavit S. Bunting Decl., # 2 Affidavit Caraway Decl.)(RICHARDSON, AMY) Modified on 12/10/2021 to mark stricken per 176 Order. (Sheets, Jamie) (Entered: 11/30/2021) |
| 11/30/2021 | 155 | **STRICKEN** Additional Attachments to Main Document re 153 Memorandum *Richardson Declaration Part One*. (RICHARDSON, AMY) Modified on 12/10/2021 to mark stricken per 176 Order. (Sheets, Jamie) (Entered: 11/30/2021) |
| 11/30/2021 | 156 | **STRICKEN** Additional Attachments to Main Document re 153 Memorandum,, *Richardson Declaration Part Two*. (RICHARDSON, AMY) Modified on 12/10/2021 |

| | | |
|---|---|---|
| | | to mark stricken per <u>176</u> Order. (Sheets, Jamie) (Entered: 11/30/2021) |
| 11/30/2021 | <u>157</u> | **\*\*STRICKEN\*\*** Additional Attachments to Main Document re <u>153</u> Memorandum,, *Richardson Declaration Part Three*. (RICHARDSON, AMY) Modified on 12/10/2021 to mark stricken per <u>176</u> Order. (Sheets, Jamie) (Entered: 11/30/2021) |
| 11/30/2021 | <u>158</u> | **\*\*STRICKEN\*\*** Additional Attachments to Main Document re <u>153</u> Memorandum,, *Richardson Declaration Part Four*. (RICHARDSON, AMY) Modified on 12/10/2021 to mark stricken per <u>176</u> Order. (Sheets, Jamie) (Entered: 11/30/2021) |
| 11/30/2021 | <u>159</u> | MOTION to Seal *Exhibits to Plaintiffs' Motion for Summary Judgment on Their Statutory Claims* [If the party filing this motion is not the party claiming confidentiality, the party claiming confidentiality must file a response within 14 days that includes the materials required by L.R. 5.4(c)(3).] by MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. Response to Motion due by 12/14/2021 (Attachments: # <u>1</u> Text of Proposed Order)(RICHARDSON, AMY) (Entered: 11/30/2021) |
| 11/30/2021 | <u>160</u> | **\*\*STRICKEN\*\*** SEALED UNREDACTED DOCUMENTS *Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment on Their Statutory Claims* filed by Plaintiffs MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK re <u>159</u> Motion to Seal,,. (Attachments: # <u>1</u> Affidavit Kadel Decl., # <u>2</u> Affidavit Thonen–Fleck Decl., # <u>3</u> Affidavit Fleck Decl., # <u>4</u> Affidavit McKeown Decl., # <u>5</u> Affidavit C.B. Decl., # <u>6</u> Affidavit M. Bunting Decl., # <u>7</u> Affidavit Silvaine Decl.)(RICHARDSON, AMY) Modified on 12/10/2021 to mark stricken per <u>176</u> Order. (Sheets, Jamie) (Entered: 11/30/2021) |
| 11/30/2021 | <u>161</u> | **\*\*STRICKEN\*\*** SEALED UNREDACTED DOCUMENTS *Additional Declarations of Bunting and Caraway* filed by Plaintiffs MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK re <u>159</u> Motion to Seal,,. (Attachments: # <u>1</u> Affidavit S. Bunting Decl., # <u>2</u> Affidavit Caraway Decl.)(RICHARDSON, AMY) Modified on 12/10/2021 to mark stricken per <u>176</u> Order. (Sheets, Jamie) (Entered: 11/30/2021) |
| 11/30/2021 | <u>162</u> | **\*\*STRICKEN\*\*** SEALED UNREDACTED DOCUMENTS *Richardson Declaration Part One* filed by Plaintiffs MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK re <u>159</u> Motion to Seal,,. (RICHARDSON, AMY) Modified on 12/10/2021 to mark stricken per <u>176</u> Order. (Sheets, Jamie) (Entered: 11/30/2021) |
| 11/30/2021 | <u>163</u> | **\*\*STRICKEN\*\*** SEALED UNREDACTED DOCUMENTS *Richardson Declaration Part Two* filed by Plaintiffs MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK re <u>159</u> Motion to Seal,,. (RICHARDSON, AMY) Modified on 12/10/2021 to mark stricken per <u>176</u> Order. (Sheets, Jamie) (Entered: 11/30/2021) |
| 11/30/2021 | <u>164</u> | **\*\*STRICKEN\*\*** SEALED UNREDACTED DOCUMENTS *Richardson Declaration Part Three* filed by Plaintiffs MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK re <u>159</u> Motion to Seal,,. (RICHARDSON, AMY) Modified on 12/10/2021 to mark stricken per <u>176</u> Order. (Sheets, Jamie) (Entered: 11/30/2021) |
| 11/30/2021 | <u>165</u> | **\*\*STRICKEN\*\*** SEALED UNREDACTED DOCUMENTS *Richardson Declaration Part Four* filed by Plaintiffs MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK re <u>159</u> Motion to Seal,,. (RICHARDSON, AMY) Modified on 12/10/2021 to mark stricken per <u>176</u> Order. (Sheets, Jamie) (Entered: 11/30/2021) |
| 12/02/2021 | <u>166</u> | **USCA ORDER**. The Court amends its opinion filed on September 1, 2021, as follows: On the last line of page 30, the first "to" is changed to "for." On the first line |

<div align="center">

**JA34**

</div>

| | | |
|---|---|---|
| | | of page 37, the word "is" is deleted between "this" and "case." USCA Case Number 20–1409. (Sheets, Jamie) (Entered: 12/02/2021) |
| 12/02/2021 | 167 | USCA AMENDED OPINION affirming by published opinion. USCA Case Number 20–1409. (Sheets, Jamie) (Entered: 12/02/2021) |
| 12/06/2021 | 168 | MOTION to Strike 161 SEALED Unredacted Documents (LR 5.4), 157 Additional Attachments to Main Document, 160 SEALED Unredacted Documents (LR 5.4),, 154 Additional Attachments to Main Document, 142 Additional Attachments to Main Document, 152 MOTION for Partial Summary Judgment *on Their Statutory Claims*, 153 Memorandum,, 138 MOTION for Summary Judgment , 146 SEALED Unredacted Documents (LR 5.4),, 164 SEALED Unredacted Documents (LR 5.4), 151 SEALED Unredacted Documents (LR 5.4), 141 Additional Attachments to Main Document, 147 SEALED Unredacted Documents (LR 5.4), 144 Additional Attachments to Main Document, 165 SEALED Unredacted Documents (LR 5.4), 158 Additional Attachments to Main Document, 156 Additional Attachments to Main Document, 150 SEALED Unredacted Documents (LR 5.4), 148 SEALED Unredacted Documents (LR 5.4), 162 SEALED Unredacted Documents (LR 5.4), 140 Additional Attachments to Main Document, 143 Additional Attachments to Main Document, 139 Memorandum,, 149 SEALED Unredacted Documents (LR 5.4), 155 Additional Attachments to Main Document, 163 SEALED Unredacted Documents (LR 5.4), *for failure to Comply with Local Rules 7.3(d)(1) and 56.1(c)* by DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES. Response to Motion due by 12/27/2021 (Attachments: # 1 Text of Proposed Order)(WILLIAMS, KEVIN) (Entered: 12/06/2021) |
| 12/06/2021 | 169 | MEMORANDUM filed by Defendants DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES re 168 MOTION to Strike 161 SEALED Unredacted Documents (LR 5.4), 157 Additional Attachments to Main Document, 160 SEALED Unredacted Documents (LR 5.4),, 154 Additional Attachments to Main Document, 142 Additional Attachments to Main Document filed by DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES. (WILLIAMS, KEVIN) (Entered: 12/06/2021) |
| 12/06/2021 | 170 | MOTION to Expedite *Consideration of Plan Defendants' Motion to Strike (Doc. No. 168)* by DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES. (WILLIAMS, KEVIN) (Entered: 12/06/2021) |
| 12/07/2021 | 171 | AMENDED MEMORANDUM re 168 MOTION to Strike 161 SEALED Unredacted Documents (LR 5.4), 157 Additional Attachments to Main Document, 160 SEALED Unredacted Documents (LR 5.4),, 154 Additional Attachments to Main Document, 142 Additional Attachments to Main Document *(AMENDED MEMORANDUM)* by Defendants DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES. (JONES, MARK) (Main Document 171 replaced on 12/7/2021 with correct pdf document) (Taylor, Abby). (Entered: 12/07/2021) |
| 12/08/2021 | 172 | RESPONSE in Opposition re 168 MOTION to Strike 161 SEALED Unredacted Documents (LR 5.4), 157 Additional Attachments to Main Document, 160 SEALED Unredacted Documents (LR 5.4),, 154 Additional Attachments to Main Document, 142 Additional Attachments to Main Document filed by DALE FOLWELL, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES, DEE JONES filed by MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. Replies due by 12/22/2021 (RICHARDSON, AMY) (Entered: 12/08/2021) |
| 12/08/2021 | 173 | NOTICE by MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK re 172 Response in Opposition to Motion,, *Certificate of Word Count* (RICHARDSON, AMY) (Entered: 12/08/2021) |
| 12/08/2021 | 174 | REPLY, filed by Defendants DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES, to Response to 168 MOTION to Strike 161 SEALED Unredacted Documents (LR 5.4), |

**JA35**

| | | |
|---|---|---|
| | | 157 Additional Attachments to Main Document, 160 SEALED Unredacted Documents (LR 5.4),, 154 Additional Attachments to Main Document, 142 Additional Attachments to Main Document filed by DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES. (JONES, MARK) (Entered: 12/08/2021) |
| 12/09/2021 | | Motions Submitted: 168 MOTION to Strike, 170 MOTION to Expedite *Consideration of Plan Defendants' Motion to Strike (Doc. No. 168)*, to JUDGE LORETTA C. BIGGS. (Blay, Debbie) (Entered: 12/09/2021) |
| 12/10/2021 | 175 | L.R. 5.5 Report–Joint filed by all parties by MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK.(RICHARDSON, AMY) (Entered: 12/10/2021) |
| 12/10/2021 | 176 | **ORDER** signed by JUDGE LORETTA C. BIGGS on 12/10/2021; that the Plan Defendants Motion to Expedite consideration, ECF No. 170 , is GRANTED. FURTHER that Defendant's Motion to Strike, ECF No. 168 , is GRANTED and the following submissions of the Plaintiffs are HEREBY STRICKEN: ECF Nos. 138, 139, 140, 141, 142, 143, 144, 146, 147, 148, 149, 150, 151, 152, 153, 154, 155, 156, 157, 158, 160, 161, 162, 163, 164, 165. FURTHER that Plaintiffs' Motions to Seal, ECF Nos. 145 and 159 , are HEREBY DENIED as moot. If refiled these motions shall be filed in conformity with this Court's Local Rules, specifically Local Rules 5.4 and 5.5. FURTHER that Plaintiffs shall be allowed to file a single dispositive motion, and an accompanying memorandum/brief with an enlarged word count not to exceed 9,000 words, within ten days of the entry of this Order. FURTHER that Plan Defendants shall likewise be allowed an enlarged word count not to exceed 9,000 words for its Response Brief. FURTHER that all other filings and deadlines shall be in compliance with all prior orders of this Court and its Local Rules. (Sheets, Jamie) (Entered: 12/10/2021) |
| 12/15/2021 | 177 | NOTICE of Special Appearance by attorney EZRA U. CUKOR on behalf of Plaintiffs MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK ( Filing fee $ 25 receipt number 0418–3194413.) (CUKOR, EZRA) (Entered: 12/15/2021) |
| 12/20/2021 | 178 | MOTION for Summary Judgment by MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. Response to Motion due by 1/19/2022 (RICHARDSON, AMY) (Entered: 12/20/2021) |
| 12/20/2021 | 179 | MEMORANDUM filed by Plaintiffs MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK re 178 MOTION for Summary Judgment filed by MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. (Attachments: # 1 Affidavit Kadel Decl., # 2 Affidavit Thonen–Fleck Decl., # 3 Affidavit Fleck Decl., # 4 Affidavit McKeown Decl., # 5 Affidavit C.B. Decl., # 6 Affidavit M. Bunting Decl., # 7 Affidavit Silvaine Decl., # 8 Affidavit S. Bunting Decl., # 9 Affidavit Caraway Decl.)(RICHARDSON, AMY) (Entered: 12/20/2021) |
| 12/20/2021 | 180 | Additional Attachments to Main Document re 179 Memorandum,, *Richardson Declaration Part One*. (RICHARDSON, AMY) (Entered: 12/20/2021) |
| 12/20/2021 | 181 | Additional Attachments to Main Document re 179 Memorandum,, . (Attachments: # 1 Affidavit Richardson Declaration Part Two, # 2 Affidavit Richardson Declaration Part Three)(RICHARDSON, AMY) (Entered: 12/20/2021) |
| 12/20/2021 | 182 | MOTION to Seal *Exhibits to Plaintiffs' Motion for Summary Judgment* [If the party filing this motion is not the party claiming confidentiality, the party claiming confidentiality must file a response within 14 days that includes the materials required by L.R. 5.4(c)(3).] by MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. Response to Motion due by 1/3/2022 (Attachments: # 1 Text of Proposed Order)(RICHARDSON, AMY) (Entered: 12/20/2021) |

| 12/20/2021 | 183 | SEALED UNREDACTED DOCUMENTS *Memorandum in Support of Plaintiffs' Motion for Summary Judgment* filed by Plaintiffs MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK re 182 Motion to Seal,,. (Attachments: # 1 Affidavit Kadel Decl., # 2 Affidavit Thonen–Fleck Decl., # 3 Affidavit Fleck Decl., # 4 Affidavit McKeown Decl., # 5 Affidavit C.B. Decl., # 6 Affidavit M. Bunting Decl., # 7 Affidavit Silvaine Decl., # 8 Affidavit S. Bunting Decl., # 9 Affidavit Caraway Decl.)(RICHARDSON, AMY) (Entered: 12/20/2021) |
|---|---|---|
| 12/20/2021 | 184 | SEALED UNREDACTED DOCUMENTS *Richardson Declaration Part One* filed by Plaintiffs MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK re 182 Motion to Seal,,. (RICHARDSON, AMY) (Entered: 12/20/2021) |
| 12/20/2021 | 185 | SEALED UNREDACTED DOCUMENTS filed by Plaintiffs MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK re 182 Motion to Seal,,. (Attachments: # 1 Affidavit Richardson Declaration Part Two, # 2 Affidavit Richardson Declaration Part Three)(RICHARDSON, AMY) (Entered: 12/20/2021) |
| 12/20/2021 | 186 | RESPONSE in Opposition re 131 MOTION for Leave to File filed by NORTH AMERICAN SOCIETY FOR PEDIATRIC AND ADOLESCENT GYNECOLOGY, AMERICAN PSYCHIATRIC ASSOCIATION, SOCIETY OF OB/GYN HOSPITALISTS, ENDOCRINE SOCIETY, AMERICAN COLLEGE OF OBSTETRICIANS AND GYNECOLOGISTS, AMERICAN MEDICAL ASSOCIATION, AMERICAN ACADEMY OF PEDIATRICS, NATIONAL ASSOCIATION OF NURSE PRACTITIONERS IN WOMEN'S HEALTH filed by DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES. Replies due by 1/3/2022 (JONES, MARK) (Entered: 12/20/2021) |
| 12/30/2021 | 187 | RESPONSE in Opposition re 132 MOTION for Summary Judgment filed by STATE OF NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY filed by DANA CARAWAY. Replies due by 1/13/2022 (Attachments: # 1 Affidavit Supplemental Richardson Declaration)(RICHARDSON, AMY) (Entered: 12/30/2021) |
| 12/30/2021 | 188 | RESPONSE in Opposition re 136 MOTION for Partial Summary Judgment filed by DALE FOLWELL, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES, DEE JONES filed by MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. Replies due by 1/13/2022 (Attachments: # 1 Affidavit Supplemental Richardson Declaration)(RICHARDSON, AMY) (Entered: 12/30/2021) |
| 01/03/2022 | 189 | REPLY, filed by Amicus Parties AMERICAN ACADEMY OF PEDIATRICS, AMERICAN COLLEGE OF OBSTETRICIANS AND GYNECOLOGISTS, AMERICAN MEDICAL ASSOCIATION, AMERICAN PSYCHIATRIC ASSOCIATION, ENDOCRINE SOCIETY, NATIONAL ASSOCIATION OF NURSE PRACTITIONERS IN WOMEN'S HEALTH, NORTH AMERICAN SOCIETY FOR PEDIATRIC AND ADOLESCENT GYNECOLOGY, SOCIETY OF OB/GYN HOSPITALISTS, to Response to 131 MOTION for Leave to File filed by AMERICAN ACADEMY OF PEDIATRICS, AMERICAN COLLEGE OF OBSTETRICIANS AND GYNECOLOGISTS, AMERICAN MEDICAL ASSOCIATION, AMERICAN PSYCHIATRIC ASSOCIATION, ENDOCRINE SOCIETY, NATIONAL ASSOCIATION OF NURSE PRACTITIONERS IN WOMEN'S HEALTH, NORTH AMERICAN SOCIETY FOR PEDIATRIC AND ADOLESCENT GYNECOLOGY, SOCIETY OF OB/GYN HOSPITALISTS. (SAINT, SARAH) (Entered: 01/03/2022) |
| 01/03/2022 | 190 | RESPONSE *to Plaintiffs' Motion to Seal* filed by Defendants DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES re 182 MOTION to Seal *Exhibits to Plaintiffs' Motion for Summary Judgment* [If the party filing this motion is not the party claiming confidentiality, the party claiming confidentiality must file a response within 14 days that includes the materials required by L.R. 5.4(c)(3).] filed by CONNOR THONEN–FLECK, SAM SILVANIE, MICHAEL D. BUNTING, JR., JASON |

**JA37**

| | | |
|---|---|---|
| | | FLECK, C.B., DANA CARAWAY, JULIA MCKEOWN, MAXWELL KADEL filed by DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES. (Attachments: # 1 Exhibit A) (WILLIAMS, KEVIN) (Entered: 01/03/2022) |
| 01/04/2022 | 191 | NOTICE by DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES re 190 Response to Motion, *Certificate of Word Count* (WILLIAMS, KEVIN) (Entered: 01/04/2022) |
| 01/13/2022 | 192 | Consent MOTION for Extension of Time to File Response/Reply as to 187 Response in Opposition to Motion, by STATE OF NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY. (Attachments: # 1 Text of Proposed Order Granting Motion)(TRACHTMAN, JAMES) (Entered: 01/13/2022) |
| 01/13/2022 | | Motion Referred: RE: 192 Consent MOTION for Extension of Time to File Response/Reply as to 187 Response in Opposition to Motion, , to MAG/JUDGE L. PATRICK AULD. (Blay, Debbie) (Entered: 01/13/2022) |
| 01/13/2022 | 193 | REPLY, filed by Defendants DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES, to Response to 136 MOTION for Partial Summary Judgment filed by DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES. (JONES, MARK) (Entered: 01/13/2022) |
| 01/14/2022 | | **TEXT ORDER** granting 192 Consent Motion for Extension of Time. Defendant North Carolina Department of Public Safety shall file any reply to 187 Response by 01/19/2022. Issued by MAG/JUDGE L. PATRICK AULD on 01/14/2022. (AULD, L.) (Entered: 01/14/2022) |
| 01/18/2022 | 194 | REPLY, filed by Plaintiffs MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK, to Response to 182 MOTION to Seal *Exhibits to Plaintiffs' Motion for Summary Judgment* [If the party filing this motion is not the party claiming confidentiality, the party claiming confidentiality must file a response within 14 days that inc filed by MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. (RICHARDSON, AMY) (Entered: 01/18/2022) |
| 01/18/2022 | 195 | **SUPREME COURT REMARK** Petition for Writ of Certiorari denied. USCA 20–1409. (Hicks, Samantha) (Entered: 01/18/2022) |
| 01/18/2022 | 196 | RESPONSE in Opposition re 178 MOTION for Summary Judgment filed by CONNOR THONEN–FLECK, SAM SILVANIE, MICHAEL D. BUNTING, JR., JASON FLECK, C.B., DANA CARAWAY, JULIA MCKEOWN, MAXWELL KADEL *and REPLY to Response 187* filed by STATE OF NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY. Replies due by 2/1/2022 (TRACHTMAN, JAMES) (Entered: 01/18/2022) |
| 01/19/2022 | 197 | RESPONSE in Opposition re 178 MOTION for Summary Judgment filed by CONNOR THONEN–FLECK, SAM SILVANIE, MICHAEL D. BUNTING, JR., JASON FLECK, C.B., DANA CARAWAY, JULIA MCKEOWN, MAXWELL KADEL filed by DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit, # 17 Exhibit, # 18 Exhibit)(JONES, MARK) (Entered: 01/19/2022) |
| 01/25/2022 | 198 | MOTION for Leave to File Excess Pages by MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. Responses due by 2/8/2022 (Attachments: # 1 Text of Proposed Order)(RICHARDSON, AMY) (Entered: 01/25/2022) |
| 01/25/2022 | 199 | MOTION to Expedite *Consideration of Plaintiffs' Motion for Leave to File Excess Pages* by MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, |

**JA38**

| | | |
|---|---|---|
| | | MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. (RICHARDSON, AMY) (Entered: 01/25/2022) |
| 01/26/2022 | | Motions Submitted: 198 MOTION for Leave to File Excess Pages , 199 MOTION to Expedite *Consideration of Plaintiffs' Motion for Leave to File Excess Pages* to JUDGE LORETTA C. BIGGS. (Blay, Debbie) (Entered: 01/26/2022) |
| 01/27/2022 | 200 | **ORDER** signed by JUDGE LORETTA C. BIGGS on 1/27/2022; that the motion (ECF No. 198 ) is GRANTED. Plaintiffs may file a reply brief limited to 4,625 words. (Sheets, Jamie) (Entered: 01/27/2022) |
| 02/02/2022 | 201 | REPLY, filed by Plaintiffs MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK, to Response to 178 MOTION for Summary Judgment filed by MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. (Attachments: # 1 Affidavit Third Supplemental Declaration of Amy Richardson)(RICHARDSON, AMY) (Entered: 02/02/2022) |
| 02/02/2022 | 202 | MOTION to Exclude *Expert Testimony of Dr. Peter Robie* by MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. Response to Motion due by 2/23/2022 (RAVI, DEEPIKA) (Entered: 02/02/2022) |
| 02/02/2022 | 203 | MEMORANDUM filed by Plaintiffs MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK re 202 MOTION to Exclude *Expert Testimony of Dr. Peter Robie* filed by MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. (Attachments: # 1 Affidavit Declaration of Deepika Ravi, # 2 Text of Proposed Order)(RAVI, DEEPIKA) (Entered: 02/02/2022) |
| 02/02/2022 | 204 | MOTION to Exclude *Expert Testimony of Dr. Paul W. Hruz* by MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. Response to Motion due by 2/23/2022 (Attachments: # 1 Text of Proposed Order)(GONZALEZ–PAGAN, OMAR) (Entered: 02/02/2022) |
| 02/02/2022 | 205 | MEMORANDUM filed by Plaintiffs MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK re 204 MOTION to Exclude *Expert Testimony of Dr. Paul W. Hruz* filed by MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. (Attachments: # 1 Affidavit Declaration of Omar Gonzalez–Pagan, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K, # 13 Exhibit L, # 14 Exhibit M)(GONZALEZ–PAGAN, OMAR) (Entered: 02/02/2022) |
| 02/02/2022 | 206 | MOTION to Exclude *Expert Testimony of Dr. Paul R. McHugh* by MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. Response to Motion due by 2/23/2022 (Attachments: # 1 Text of Proposed Order)(GONZALEZ–PAGAN, OMAR) (Entered: 02/02/2022) |
| 02/02/2022 | 207 | MEMORANDUM filed by Plaintiffs MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK re 206 MOTION to Exclude *Expert Testimony of Dr. Paul R. McHugh* filed by MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. (Attachments: # 1 Affidavit Declaration of Omar Gonzalez–Pagan, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J)(GONZALEZ–PAGAN, OMAR) (Entered: 02/02/2022) |

**JA39**

| 02/02/2022 | 208 | MOTION to Exclude *Expert Testimony of Dr. Patrick W. Lappert* by MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. Response to Motion due by 2/23/2022 (Attachments: # 1 Text of Proposed Order)(TISHYEVICH, DMITRIY) (Entered: 02/02/2022) |
|---|---|---|
| 02/02/2022 | 209 | MEMORANDUM filed by Plaintiffs MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK re 208 MOTION to Exclude *Expert Testimony of Dr. Patrick W. Lappert* filed by MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. (Attachments: # 1 Declaration of Dmitriy Tishyevich, # 2 Exhibit 1 [Redacted], # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17)(TISHYEVICH, DMITRIY) (Entered: 02/02/2022) |
| 02/02/2022 | 210 | MOTION to Seal *[ECF No. 209–2] Exhibit 1 to Plaintiffs' Memorandum to Exclude Expert Testimony of Dr. Patrick W. Lappert* [If the party filing this motion is not the party claiming confidentiality, the party claiming confidentiality must file a response within 14 days that includes the materials required by L.R. 5.4(c)(3).] by MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. Response to Motion due by 2/16/2022 (Attachments: # 1 Text of Proposed Order)(TISHYEVICH, DMITRIY) (Entered: 02/02/2022) |
| 02/02/2022 | 211 | SEALED UNREDACTED DOCUMENTS *Plaintiffs' Memorandum to Exclude Expert Testimony of Dr. Patrick W. Lappert* filed by Plaintiffs MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK, Defendants DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES, NORTH CAROLINA STATE UNIVERSITY, STATE OF NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY re 210 Motion to Seal,,. (Attachments: # 1 Declaration of Dmitriy Tishyevich, # 2 Exhibit 1 [Unredacted], # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17)(TISHYEVICH, DMITRIY) (Entered: 02/02/2022) |
| 02/02/2022 | 212 | MOTION to Exclude *Expert Testimony of Stephen B. Levine, M.D.* by MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. Response to Motion due by 2/23/2022 (Attachments: # 1 Text of Proposed Order)(CHARLES, CARL) (Entered: 02/02/2022) |
| 02/02/2022 | 213 | MEMORANDUM filed by Plaintiffs MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK re 212 MOTION to Exclude *Expert Testimony of Stephen B. Levine, M.D.* filed by MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. (Attachments: # 1 Affidavit Declaration of Carl S. Charles, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K, # 13 Exhibit L, # 14 Exhibit M, # 15 Exhibit N)(CHARLES, CARL) (Entered: 02/02/2022) |
| 02/03/2022 | | Motions Submitted: 131 MOTION for Leave to File , 132 MOTION for Summary Judgment , 136 MOTION for Partial Summary Judgment , 178 MOTION for Summary Judgment , 182 MOTION to Seal *Exhibits to Plaintiffs' Motion for Summary Judgment,* to JUDGE LORETTA C. BIGGS. (Blay, Debbie) (Entered: 02/03/2022) |
| 02/16/2022 | 214 | RESPONSE re 210 MOTION to Seal *[ECF No. 209–2] Exhibit 1 to Plaintiffs' Memorandum to Exclude Expert Testimony of Dr. Patrick W. Lappert* [If the party filing this motion is not the party claiming confidentiality, the party claiming confidentiality must file a response within 14 days that includes the materials required by L.R. 5.4(c)(3).] filed by DALE FOLWELL, DEE JONES, NORTH CAROLINA |

| | | |
|---|---|---|
| | | STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES. Replies due by 3/2/2022 (JONES, MARK) (Entered: 02/16/2022) |
| 02/23/2022 | 215 | RESPONSE in Opposition re 212 MOTION to Exclude *Expert Testimony of Stephen B. Levine, M.D.* filed by CONNOR THONEN–FLECK, SAM SILVANIE, MICHAEL D. BUNTING, JR., JASON FLECK, C.B., DANA CARAWAY, JULIA MCKEOWN, MAXWELL KADEL, 204 MOTION to Exclude *Expert Testimony of Dr. Paul W. Hruz* filed by CONNOR THONEN–FLECK, SAM SILVANIE, MICHAEL D. BUNTING, JR., JASON FLECK, DANA CARAWAY, C.B., JULIA MCKEOWN, MAXWELL KADEL, 208 MOTION to Exclude *Expert Testimony of Dr. Patrick W. Lappert* filed by CONNOR THONEN–FLECK, SAM SILVANIE, MICHAEL D. BUNTING, JR., JASON FLECK, DANA CARAWAY, C.B., JULIA MCKEOWN, MAXWELL KADEL, 206 MOTION to Exclude *Expert Testimony of Dr. Paul R. McHugh* filed by CONNOR THONEN–FLECK, SAM SILVANIE, MICHAEL D. BUNTING, JR., JASON FLECK, DANA CARAWAY, C.B., JULIA MCKEOWN, MAXWELL KADEL, 202 MOTION to Exclude *Expert Testimony of Dr. Peter Robie* filed by CONNOR THONEN–FLECK, SAM SILVANIE, MICHAEL D. BUNTING, JR., JASON FLECK, DANA CARAWAY, C.B., JULIA MCKEOWN, MAXWELL KADEL filed by DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES. Replies due by 3/9/2022 (Attachments: # 1 Exhibit Dr. Levine Report, # 2 Exhibit Dr. McHugh Report, # 3 Exhibit Dr. Hruz Report, # 4 Exhibit Dr. Lappert Report, # 5 Exhibit Dr. Robie Disclosure, # 6 Exhibit, # 7 Exhibit Levine Deposition)(JONES, MARK) (Entered: 02/23/2022) |
| 03/01/2022 | 216 | REPLY, filed by Plaintiffs MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK, to Response to 210 MOTION to Seal *[ECF No. 209–2] Exhibit 1 to Plaintiffs' Memorandum to Exclude Expert Testimony of Dr. Patrick W. Lappert* [If the party filing this motion is not the party claiming confidentiality, the party claiming confidentiality must file a response within 14 days that includes the materials required by L.R. 5.4(c)(3).] filed by MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. (RICHARDSON, AMY) (Entered: 03/01/2022) |
| 03/09/2022 | 217 | REPLY, filed by Plaintiffs MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK, to Response to 208 MOTION to Exclude *Expert Testimony of Dr. Patrick W. Lappert*, 206 MOTION to Exclude *Expert Testimony of Dr. Paul R. McHugh*, 212 MOTION to Exclude *Expert Testimony of Stephen B. Levine, M.D.*, 204 MOTION to Exclude *Expert Testimony of Dr. Paul W. Hruz*, 202 MOTION to Exclude *Expert Testimony of Dr. Peter Robie* filed by MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. (Attachments: # 1 Affidavit Supplemental Declaration of Omar Gonzalez–Pagan, # 2 Exhibit A – HHS Information Memorandum)(GONZALEZ–PAGAN, OMAR) (Entered: 03/09/2022) |
| 03/10/2022 | | Motions Submitted: 202 MOTION to Exclude *Expert Testimony of Dr. Peter Robie*, 204 MOTION to Exclude *Expert Testimony of Dr. Paul W. Hruz*, 206 MOTION to Exclude *Expert Testimony of Dr. Paul R. McHugh* 208 MOTION to Exclude *Expert Testimony of Dr. Patrick W. Lappert*, 210 MOTION to Seal *[ECF No. 209–2] Exhibit 1 to Plaintiffs' Memorandum to Exclude Expert Testimony of Dr. Patrick W. Lappert*, 212 MOTION to Exclude *Expert Testimony of Stephen B. Levine, M.D.*, to JUDGE LORETTA C. BIGGS– (Blay, Debbie) (Entered: 03/10/2022) |
| 04/07/2022 | 218 | **MEMORANDUM OPINION AND ORDER** signed by JUDGE LORETTA C. BIGGS on 4/7/2022; that the Motion for Leave to File Brief of *Amici Curiae* the American Medical Association and Seven Additional Health Care Organizations in Support of Plaintiffs, (ECF No. 131 ), is GRANTED. FURTHER that Proposed Amici shall file their amicus brief in the form of ECF No. 131 –2 within seven days of entry of this Order. (Sheets, Jamie) (Entered: 04/07/2022) |
| 04/11/2022 | 219 | *Amicus Curiae* BRIEF re 218 Memorandum Opinion and Order, . (SAINT, SARAH) (Entered: 04/11/2022) |

| 05/05/2022 | 220 | Suggestion of Subsequently Decided Authority by Plaintiffs MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. (RICHARDSON, AMY) (Entered: 05/05/2022) |
| 05/13/2022 | 221 | NOTICE OF WITHDRAWAL AND SUBSTITUTION OF COUNSEL on behalf of Defendant STATE OF NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY. ALEX R. WILLIAMS is substituted as counsel for Defendant. Attorney JAMES B. TRACHTMAN terminated. (WILLIAMS, ALEX) (Entered: 05/13/2022) |
| 05/13/2022 | 222 | NOTICE of Trial Calendar Jury Trial set for 7/5/2022 09:30 AM in Winston–Salem Courtroom #4 before JUDGE LORETTA C. BIGGS. (Williamson, Wanda) (Entered: 05/13/2022) |
| 05/16/2022 | 223 | Suggestion of Subsequently Decided Authority by Plaintiffs MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. (RICHARDSON, AMY) (Entered: 05/16/2022) |
| 05/17/2022 | 224 | Suggestion of Subsequently Decided Authority by Defendants DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES. (JONES, MARK) (Entered: 05/17/2022) |
| 05/19/2022 | 225 | Joint MOTION to Reset Trial Date *to Allow 8–10 Days for Proceedings* by MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. Response to Motion due by 6/9/2022 (Attachments: # 1 Text of Proposed Order)(RICHARDSON, AMY) (Entered: 05/19/2022) |
| 05/20/2022 | | Motion Submitted: 225 Joint MOTION to Reset Trial Date *to Allow 8–10 Days for Proceedings* to JUDGE LORETTA C. BIGGS. (Blay, Debbie) (Entered: 05/20/2022) |
| 06/02/2022 | 226 | Additional Attachments to Main Document re 213 Memorandum,, *Amended Exhibit F*. (RICHARDSON, AMY) (Entered: 06/02/2022) |
| 06/03/2022 | 227 | PRETRIAL DISCLOSURES by MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK.(RICHARDSON, AMY) (Entered: 06/03/2022) |
| 06/03/2022 | 228 | PRETRIAL DISCLOSURES by STATE OF NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY.(WILLIAMS, ALEX) (Entered: 06/03/2022) |
| 06/03/2022 | 229 | FINAL PRETRIAL DISCLOSURES by DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES. (Attachments: # 1 Exhibit 1 – Plan's Witness List, # 2 Exhibit 2 – Plan's Ex. List)(WILLIAMS, KEVIN) Modified on 6/6/2022 to remove duplicate text in attachment titles. (Sheets, Jamie) (Entered: 06/03/2022) |
| 06/10/2022 | 230 | MOTION in Limine *To Exclude Experts* by DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES. Response to Motion due by 6/17/2022 (WILLIAMS, KEVIN) (Entered: 06/10/2022) |
| 06/10/2022 | 231 | MEMORANDUM filed by Defendants DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES re 230 MOTION in Limine *To Exclude Experts* filed by DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES. (WILLIAMS, KEVIN) (Entered: 06/10/2022) |
| 06/10/2022 | 232 | MOTION in Limine *to Exclude Emotional Distress Evidence* by DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES. Response to Motion due by 6/17/2022 (WILLIAMS, KEVIN) (Entered: 06/10/2022) |
| 06/10/2022 | 233 | MEMORANDUM filed by Defendants DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES re 232 MOTION in Limine *to Exclude Emotional Distress Evidence* |

| | | |
|---|---|---|
| | | filed by DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES. (WILLIAMS, KEVIN) (Entered: 06/10/2022) |
| 06/10/2022 | 234 | **MEMORANDUM OPINION AND ORDER** signed by JUDGE LORETTA C. BIGGS on 6/10/2022; that DPS's Motion for Summary Judgment, (ECF No. 132 ), is DENIED. FURTHER that Plan Defendants' Partial Summary Judgment, (ECF No. 136 ), is GRANTED in part and JUDGMENT IS RESERVED in part, as set out. FURTHER that Plaintiffs' Motion for Summary Judgment, (ECF No. 178 ), is GRANTED in part, DENIED in part, and JUDGMENT IS RESERVED in part as set out. Defendants are PERMANENTLY ENJOINED from enforcing the Plan's exclusion and are ORDERED to reinstate coverage for "medically necessary services for the treatment of gender dysphoria." The issue of damages is reserved for trial. FURTHER that Plaintiffs' Motion to Seal Exhibits to Plaintiffs' Motion for Summary Judgment, (ECF No. 182 ), is GRANTED. FURTHER that Plaintiffs' Motion to Exclude Expert Testimony of Dr. Peter Robie, (ECF No. 202 ), is GRANTED. FURTHER that Plaintiffs' Motion to Exclude Expert Testimony of Dr. Paul W. Hruz, (ECF No. 204 ), is GRANTED in part and DENIED in part in accordance with this Memorandum Opinion and Order. FURTHER that Plaintiffs' Motion to Exclude Expert Testimony of Dr. Paul R. McHugh, (ECF No. 206 ), is GRANTED in part and DENIED in part in accordance with this Memorandum Opinion and Order. FURTHER that Plaintiffs' Motion to Exclude Expert Testimony of Dr. Patrick W. Lappert, (ECF No. 208 ), is GRANTED in part and DENIED in part in accordance with this Memorandum Opinion and Order. FURTHER that Plaintiff's Motion to Seal portions of Dr. Lappert's report, (ECF No. 210 ), is GRANTED. FURTHER that Plaintiffs' Motion to Exclude Expert Testimony of Stephen B. Levine, M.D., (ECF No. 212 ), is GRANTED in part and DENIED in part in accordance with this Memorandum Opinion and Order. (Sheets, Jamie) (Entered: 06/10/2022) |
| 06/10/2022 | 235 | MOTION in Limine *to Exclude the Testimony of Wayne Goodman* by MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. Response to Motion due by 7/1/2022 (RICHARDSON, AMY) (Entered: 06/10/2022) |
| 06/10/2022 | 236 | MEMORANDUM filed by Plaintiffs MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK re 235 MOTION in Limine *to Exclude the Testimony of Wayne Goodman* filed by MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. (Attachments: # 1 Affidavit of Dmitriy Tishyevich)(RICHARDSON, AMY) (Entered: 06/10/2022) |
| 06/10/2022 | 237 | MOTION in Limine *to Exclude Evidence of Plaintiffs' Other Claims or Lawsuits* by MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. Response to Motion due by 7/1/2022 (RICHARDSON, AMY) (Entered: 06/10/2022) |
| 06/10/2022 | 238 | MEMORANDUM filed by Plaintiffs MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK re 237 MOTION in Limine *to Exclude Evidence of Plaintiffs' Other Claims or Lawsuits* filed by MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. (RICHARDSON, AMY) (Entered: 06/10/2022) |
| 06/10/2022 | 239 | MOTION in Limine *to Exclude Rebuttal Experts* by DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES. Response to Motion due by 6/17/2022 (WILLIAMS, KEVIN) (Entered: 06/10/2022) |
| 06/10/2022 | 240 | MEMORANDUM filed by Defendants DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES re 239 MOTION in Limine *to Exclude Rebuttal Experts* filed by DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES. (WILLIAMS, KEVIN) (Entered: |

**JA43**

| | | 06/10/2022) |
|---|---|---|
| 06/10/2022 | 241 | MOTION in Limine *regarding pronoun usage and misgendering* by MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. Response to Motion due by 6/17/2022 (GONZALEZ–PAGAN, OMAR) (Entered: 06/10/2022) |
| 06/10/2022 | 242 | MEMORANDUM filed by Plaintiffs MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK re 241 MOTION in Limine *regarding pronoun usage and misgendering* filed by MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. (Attachments: # 1 Affidavit Declaration of Omar Gonzalez–Pagan, # 2 Exhibit 1 – Letter Order in Eller v. Prince George's County Public Schools, # 3 Exhibit 2 – Order in United States v. Manning)(GONZALEZ–PAGAN, OMAR) (Entered: 06/10/2022) |
| 06/14/2022 | 243 | NOTICE of Hearing: Telephonic Status Conference set for 6/17/2022 at 11:00 AM before JUDGE LORETTA C. BIGGS. (Blay, Debbie) (Entered: 06/14/2022) |
| 06/17/2022 | | Minute Entry for proceedings held before JUDGE LORETTA C. BIGGS: Telephonic Status Conference held on 6/17/2022. Attorneys Michael Weaver, Lauren Snyder, Deepika Ravi, Grace Wynn, Tara Borelli, Omar Gonzalez–Pagan, David Brown, Ezra Cukor, Dmitriy Tishyevich, and Lauren Evans appeared via telephone on behalf of the Plaintiffs. Attorneys Mark Jones, John Knepper, and Kevin Williams appeared via telephone on behalf of NC State Health Care Plan. Attorney Alex Williams appeared via telephone on behalf of the Department of Public Safety. This matter will be removed from the July 2022 Civil Master Calendar and a new trial date will be set. (Court Reporter Michelle Maar.) (Blay, Debbie) (Entered: 06/17/2022) |
| 06/17/2022 | 244 | NOTICE of Hearing: Jury Trial set for 12/5/2022 at 09:30 AM in Winston–Salem Courtroom #4 before JUDGE LORETTA C. BIGGS. The parties shall comply in all respects with Fed. R. Civ. P. 26(a)(3) regarding final pretrial disclosure, including the time requirements set therein. Unless the court orders otherwise, pretrial disclosures must be made no later than November 7, 2022. Motions in limine must be filed no later than November 14, 2022. Any objections to pretrial disclosures and responses to motions in limine must be served and promptly filed no later than November 21, 2022. Each party shall file a trial brief, along with proposed jury instructions on the issues no later than November 16, 2022. (Blay, Debbie) (Entered: 06/17/2022) |
| 07/01/2022 | 245 | NOTICE OF INTERLOCUTORY APPEAL as to 234 Memorandum Opinion and Order, by DALE FOLWELL, DEE JONES. Filing fee $ 505, receipt number ANCMDC–3331247. (JONES, MARK) (Entered: 07/01/2022) |
| 07/05/2022 | 246 | Electronic Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 245 Notice of Interlocutory Appeal. (Sheets, Jamie) (Entered: 07/05/2022) |
| 07/07/2022 | 247 | MOTION to Correct *Memorandum Opinion and Order pursuant to Rule 60(a)* 234 by NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES. (Attachments: # 1 Text of Proposed Order)(JONES, MARK) Modified on 7/8/2022 to link to pleading. (Sheets, Jamie) (Entered: 07/07/2022) |
| 07/07/2022 | 248 | MEMORANDUM filed by Defendant NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES re 247 MOTION to Correct *Memorandum Opinion and Order pursuant to Rule 60(a)* filed by NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES. (JONES, MARK) (Entered: 07/07/2022) |
| 07/08/2022 | | Motion Submitted: 247 MOTION to Correct *Memorandum Opinion and Order pursuant to Rule 60(a)* to JUDGE LORETTA C. BIGGS. (Blay, Debbie) (Entered: 07/08/2022) |
| 07/08/2022 | 249 | NOTICE of Docketing Record on Appeal from USCA re 245 Notice of Interlocutory Appeal filed by DALE FOLWELL, DEE JONES. USCA Case Manager: Rachel J. Lee. USCA Case Number 22–1721. (Sheets, Jamie) (Entered: 07/08/2022) |

| 07/11/2022 | 250 | NOTICE OF INTERLOCUTORY APPEAL as to 234 Memorandum Opinion and Order, by NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES. Filing fee $ 505, receipt number ANCMDC–3335788. (JONES, MARK) (Entered: 07/11/2022) |
| --- | --- | --- |
| 07/12/2022 | 251 | Electronic Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 250 Notice of Interlocutory Appeal. (Sheets, Jamie) (Entered: 07/12/2022) |
| 07/12/2022 | 252 | NOTICE of Docketing Record on Appeal from USCA re 250 Notice of Interlocutory Appeal filed by NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES. USCA Case Manager: Rachel J. Lee. USCA Case Number 22–1730. (Sheets, Jamie) (Entered: 07/12/2022) |
| 07/12/2022 | 253 | USCA ORDER The court consolidates Case No. 22–1721 (L) and Case No. 22–1730. Entry of appearance forms and disclosure statements filed by counsel and parties to the lead case are deemed filed in the secondary case. (Sheets, Jamie) (Entered: 07/12/2022) |
| 07/15/2022 | 254 | NOTICE by MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK re 247 MOTION to Correct *Memorandum Opinion and Order pursuant to Rule 60(a)* (RICHARDSON, AMY) (Entered: 07/15/2022) |
| 07/18/2022 | 255 | NOTICE OF INTENT TO CORRECT AND CLARIFY MEMORANDUM OPINION AND ORDER 234 , signed by JUDGE LORETTA C. BIGGS on 7/18/2022; that if the Fourth Circuit remanded the above captioned matter for the purpose of allowing this Court to address NCSHP's motion (ECF No. 247 ), this Court would grant the motion and (1) correct its Memorandum Opinion on page 67, and (2) clarify its Order on page 72, as stated herein. Pursuant to Rule 62.1(b), this Court instructs Defendant NCSHP to "promptly notify the circuit clerk" of this Notice. Fed. R. Civ. P. 62.1(b); *see* Fed. R. App. P. 12.1(a). (Sheets, Jamie) (Entered: 07/18/2022) |
| 07/27/2022 | 256 | MOTION to Stay *Injunction Pending Appeal* by DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES. Response to Motion due by 8/17/2022 (Attachments: # 1 Text of Proposed Order)(JONES, MARK) (Entered: 07/27/2022) |
| 07/27/2022 | 257 | MEMORANDUM filed by Defendants DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES re 256 MOTION to Stay *Injunction Pending Appeal* filed by DALE FOLWELL, DEE JONES, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES. (JONES, MARK) (Entered: 07/27/2022) |
| 08/02/2022 | 258 | USCA ORDER the court deconsolidates case No. 22–1721, *Maxwell Kadel v. Dale Folwell* from No. 22–1730, *Maxwell Kadel v. North Carolina State Health Plan for Teachers*, and remands No. 22–1730, *Maxwell Kadel v. North Carolina State Health Plan for Teachers*, to the district court for the limited purpose of correcting portions of its Memorandum Opinion and Order. (Attachments: # 1 USCA Motion) (Sheets, Jamie) (Entered: 08/03/2022) |
| 08/03/2022 | | CASE REFERRED RE: 258 Order to JUDGE LORETTA C. BIGGS. (Marsh, Keah) (Entered: 08/03/2022) |
| 08/04/2022 | 259 | Transcript of Proceedings held on 6/17/2022, before Judge Loretta C. Biggs. Court Reporter Michelle Maar. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. **NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have 5 business days to file a Notice of Intent to Request Redaction and 21 calendar days to file a Redaction Request. If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the court reporter before the 90 day deadline. After that date it may be obtained through PACER.** Redaction Request due 8/29/2022. Redacted Transcript Deadline set for 9/9/2022. Release of Transcript Restriction set for 11/7/2022. (Marsh, Keah) (Entered: 08/04/2022) |

| 08/10/2022 | 260 | **ORDER** signed by JUDGE LORETTA C. BIGGS on 8/10/2022; For the reasons stated in this Court's Notice of Intent to Correct and Clarify Memorandum Opinion and Order, entered on July 18, 2022, (ECF No. 255 ), Defendant NCSHP's unopposed Motion Memorandum Opinion and Order, (ECF no. 247 ), is hereby GRANTED. A corrected version of this Court's Memorandum Opinion and Order, originally entered on June 10, 2022, (ECF No. 234 ), will be filed simultaneously with this Order. The filing of this Order and the corrected Memorandum Opinion and Order completes this Court's proceedings related to the Fourth Circuit Court of Appeal's limited remand. (Hicks, Samantha) (Entered: 08/10/2022) |
|---|---|---|
| 08/10/2022 | 261 | **MEMORANDUM OPINION AND ORDER (CORRECTED VERSION)** signed by JUDGE LORETTA C. BIGGS on 8/10/2022; that DPS's Motion for Summary Judgment, (ECF No. 132 ), is DENIED. FURTHER ORDERED that Plan Defendants' Partial Summary Judgment, (ECF No. 136 ), is GRANTED in part and JUDGMENT IS RESERVED in part. It is GRANTED as to Plaintiff Caraway's claim arising under Title VII against NCSHP. JUDGMENT IS RESERVED regarding Plaintiffs' claims arising under the ACA pending further Order from this Court. FURTHER ORDERED that Plaintiffs' Motion for Summary Judgment, (ECF No. 178 ), is GRANTED in part, DENIED in part, and JUDGMENT IS RESERVED in part. It is GRANTED with respect to Plaintiffs' claims arising under the Equal Protection Clause and Plaintiff Caraway's claim arising under Title VII against DPS. Defendants Folwell and Jones, in their official capacities, are PERMANENTLY ENJOINED from enforcing the Plan's exclusion and are ORDERED to reinstate coverage for "medically necessary services for the treatment of gender dysphoria." The motion is DENIED as to Caraway's Title VII claim against NCSHP. JUDGMENT IS RESERVED regarding Plaintiffs' claims arising under the ACA pending further Order from this Court. The issue of damages is reserved for trial. FURTHER ORDERED that Plaintiffs' Motion to Seal Exhibits to Plaintiffs' Motion for Summary Judgment, (ECF No. 182 ), is GRANTED. FURTHER ORDERED that Plaintiffs' Motion to Exclude Expert Testimony of Dr. Peter Robie, (ECF No. 202 ), is GRANTED. FURTHER ORDERED that Plaintiffs' Motion to Exclude Expert Testimony of Dr. Paul W. Hruz, (ECF No. 204 ), is GRANTED in part and DENIED in part in accordance with this Memorandum Opinion and Order. FURTHER ORDERED that Plaintiffs' Motion to Exclude Expert Testimony of Dr. Paul R. McHugh, (ECF No. 206 ), is GRANTED in part and DENIED in part in accordance with this Memorandum Opinion and Order. FURTHER ORDERED that Plaintiffs' Motion to Exclude Expert Testimony of Dr. Patrick W. Lappert, (ECF No. 208 ), is GRANTED in part and DENIED in part in accordance with this Memorandum Opinion and Order. FURTHER ORDERED that Plaintiff's Motion to Seal portions of Dr. Lappert's report, (ECF No. 210 ), is GRANTED. FURTHER ORDERED that Plaintiffs' Motion to Exclude Expert Testimony of Stephen B. Levine, M.D., (ECF No. 212 ), is GRANTED in part and DENIED in part in accordance with this Memorandum Opinion and Order. (Hicks, Samantha) (Entered: 08/10/2022) |
| 08/10/2022 | | Transmission of Update Item to USCA to US Court of Appeals re 261 Memorandum Opinion and Order, 260 Order. (Hicks, Samantha) (Entered: 08/10/2022) |
| 08/11/2022 | 262 | **USCA ORDER** Upon consideration of the stipulated motion to voluntarily dismiss, the court dismisses this appeal, upon such terms as have been agreed to by the parties, pursuant to Rule 42(b) of the Federal Rules of Appellate Procedure. USCA 22–1730. (Hicks, Samantha) (Entered: 08/11/2022) |
| 08/11/2022 | 263 | RULE 42(b) MANDATE of USCA as to 245 Notice of Interlocutory Appeal filed by DALE FOLWELL, DEE JONES; This court's order dismissing this appeal pursuant to Local Rule 42(b) takes effect today. This constitutes the formal mandate of this court issued pursuant to Rule 41(a) of the Federal Rules of Appellate Procedure. USCA 22–1730. (Hicks, Samantha) (Entered: 08/11/2022) |
| 08/16/2022 | 264 | NOTICE by MAXWELL KADEL et al. (RICHARDSON, AMY) (Entered: 08/16/2022) |
| 08/17/2022 | 265 | RESPONSE in Opposition re 256 MOTION to Stay *Injunction Pending Appeal* filed by DALE FOLWELL, NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES, DEE JONES filed by MICHAEL D. BUNTING, JR, C.B., DANA CARAWAY, JASON FLECK, MAXWELL KADEL, JULIA MCKEOWN, SAM SILVANIE, CONNOR THONEN–FLECK. Replies due by 8/31/2022 (RICHARDSON, AMY) (Entered: 08/17/2022) |

**JA46**

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| MAXWELL KADEL; JASON FLECK; CONNOR THONEN-FLECK; JULIA MCKEOWN; MICHAEL D. BUNTING, JR.; C.B., by his next friends and parents, MICHAEL D. BUNTING, JR. and SHELLEY K. BUNTING; SAM SILVAINE; and DANA CARAWAY, | No. 1:19-cv-00272-LCB-LPA |
| *Plaintiffs*, | **FIRST AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF** |
| v. | |
| DALE FOLWELL, in his official capacity as State Treasurer of North Carolina; DEE JONES, in her official capacity as Executive Administrator of the North Carolina State Health Plan for Teachers and State Employees; UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL; NORTH CAROLINA STATE UNIVERSITY; UNIVERSITY OF NORTH CAROLINA AT GREENSBORO; and NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES; and STATE OF NORTH CAROLINA, DEPARTMENT OF PUBLIC SAFETY; | |
| *Defendants*. | |

**INTRODUCTION**

1.     Plaintiffs are current or former enrollees in the North Carolina State Health

Plan for Teachers and State Employees ("NCSHP").    As part of compensation for

employment, the State of North Carolina provides its employees with health care coverage

1

for them and their dependents through the NCSHP, a self-funded plan. However, by categorically depriving transgender enrollees of coverage for the treatment of gender dysphoria—the clinically significant distress that can result from the dissonance between an individual's gender identity and sex assigned at birth—Defendants unlawfully discriminate against people like Plaintiffs, who either are transgender or have transgender family members who depend on them for health care coverage. In doing so, Defendants deny equal compensation for equal work to employees who are transgender or have transgender dependents, as well as harm employees' transgender family members who depend on them for health care coverage.

2.      The sweeping exclusion contained within the NCSHP denies coverage for health care, including counseling, hormone therapy, surgical care, and any other health care provided in relation to a person's transgender status and/or gender transition. This exclusion contravenes the well-established medical consensus that gender-confirming health care can be medically necessary and even life-saving. Other NCSHP enrollees who are not transgender do not face a categorical exclusion barring coverage for health care that is medically necessary for them based on their sex and receive coverage for the same care that is denied to transgender enrollees.

3.      Plaintiffs have all been denied coverage for medically necessary gender-confirming health care because they or their dependents are transgender, based on the categorical exclusion of gender-confirming health care in the NCSHP. Some Plaintiffs have forgone medically necessary gender-confirming health care, while others have been

2

forced to incur financial hardship without the financial protection afforded by coverage through the NCSHP. Plaintiffs have also suffered emotional distress, stigmatization, humiliation, and a loss of dignity because of the NCSHP's targeted discrimination against transgender enrollees, which wrongly deems their health care needs as unworthy of equal coverage.

4.     The NCSHP covers more than 720,000 teachers, state employees, retirees, current and former lawmakers, state university and community college personnel, state hospital staff members, and their dependents. The NCSHP's mission is "to improve the health and health care of North Carolina teachers, state employees, retirees, and their dependents, in a financially sustainable manner, thereby serving as a model to the people of North Carolina for improving their health and well-being"—but when it comes to transgender enrollees, the NCSHP is not fulfilling that mission.

5.     This targeted discrimination against transgender people violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, Title IX of the Education Amendments of 1972 ("Title IX"), Section 1557 of the Patient Protection and Affordable Care Act (the "ACA"), and Title VII of the Civil Rights Act of 1964 ("Title VII").

6.     Plaintiffs bring this lawsuit to challenge the categorical exclusion of gender-confirming health care contained within the NCSHP, to obtain a judgment to redress their individual injuries, and to have the exclusion declared unlawful, thereby preventing its enforcement.

3

## PARTIES

**A.    Plaintiffs**

7.     Plaintiff Maxwell Kadel is a 37-year-old transgender man. Mr. Kadel was formerly employed by the University of North Carolina at Chapel Hill from October 2016 to November 2019.  Mr. Kadel lives in Carrboro, North Carolina.

8.     Plaintiff Jason Fleck is the father of Plaintiff Connor Thonen-Fleck ("Connor"), an 18-year-old transgender young man. Mr. Fleck is an employee of the University of North Carolina at Greensboro, and Connor receives health coverage as a dependent of Mr. Fleck.  Mr. Fleck and Connor live in High Point, North Carolina.

9.     Plaintiff Julia McKeown is a 44-year-old transgender woman. Ms. McKeown is employed by North Carolina State University. Ms. McKeown lives in Apex, North Carolina.

10.     Plaintiff Michael D. Bunting, Jr. is the father of C.B., a 15-year-old transgender boy. Mr. Bunting was a long-term employee of the University of North Carolina at Chapel Hill. He continues to receive health coverage as a retiree, and C.B. receives health coverage as a dependent of Mr. Bunting. Shelley K. Bunting is C.B.'s mother. C.B. sues pursuant to Federal Rule of Civil Procedure 17(c) by and through his next friends and parents, Mr. Bunting and Ms. Bunting. Mr. Bunting, Ms. Bunting, and C.B. all live in Chapel Hill, North Carolina.

11.     Plaintiff Sam Silvaine is 31 years old, transgender, and has a male affirmed sex. Mr. Silvaine was formerly employed by the North Carolina State University

4

Counseling Center from August 2016 until July 2018. Mr. Silvaine resides in Raleigh, North Carolina.

12.    Plaintiff Dana Caraway is a 50-year-old transgender woman. Ms. Caraway is employed by the State of North Carolina, Department of Public Safety. Ms. Caraway lives in Morganton, North Carolina.

### B.    Defendants

13.    Defendant Dale Folwell is sued in his official capacity as the North Carolina State Treasurer. As Treasurer, Mr. Folwell serves as Chair of the Board of Trustees of the State Health Plan for Teacher and State Employees and is responsible for designing, operating, and/or administering the NCSHP. Pursuant to N.C. Gen. Stat. § 135-48.30, the State Treasurer has the power and duty to: administer and operate the NCSHP and to set benefits, subject to approval by the majority of the Board of Trustees; design and implement coordination of benefits policies; and set administrative and medical policies. N.C. Gen. Stat. § 135-48.30 provides that the State Treasurer may delegate his powers and duties under this section to the Executive Administrator, the Board of Trustees, and employees of the Plan, but nonetheless maintains responsibility for the performance of those powers or duties. Additionally, as described below, Mr. Folwell has publicly announced that until he is ordered or required to do otherwise, he will maintain the discriminatory exclusion in the NCSHP. Mr. Folwell is a "person" within the meaning of 42 U.S.C. § 1983 and is, and was, acting under the color of state law at all times relevant to this Complaint.

5

14.    Defendant Dee Jones is sued in her official capacity as Executive Administrator of the NCSHP. As Executive Administrator, Ms. Jones is statutorily authorized to negotiate, renegotiate, and execute contracts with third parties in the performance of her duties and responsibilities, pursuant to N.C. Gen. Stat. § 135-48.23. Ms. Jones is a "person" within the meaning of 42 U.S.C. § 1983 and is, and was, acting under the color of state law at all times relevant to this Complaint.

15.    Defendant University of North Carolina at Chapel Hill ("UNC") is the flagship institution for the University of North Carolina system. UNC is an education program or activity receiving federal financial assistance.  UNC also is an employer within the meaning of Title VII because as a university, UNC is engaged in an industry affecting commerce and has 15 or more employees. As an employer, UNC provides health care coverage to its employees through the NCSHP.

16.    Defendant University of North Carolina at Greensboro ("UNCG") is a constituent institution of the University of North Carolina.  UNCG is an education program or activity receiving federal financial assistance.

17.    Defendant North Carolina State University ("NCSU") is a constituent institution of the University of North Carolina. NCSU is an education program or activity receiving federal financial assistance. NCSU also is an employer within the meaning of Title VII because as a university, NCSU is engaged in an industry affecting commerce, and has 15 or more employees. As an employer, NCSU provides health care coverage to its employees through the NCSHP.

6

18.     Defendant State of North Carolina, Department of Public Safety (also, the "Department of Public Safety") is an employer within the meaning of Title VII because as a government law enforcement agency, the Department of Public Safety is engaged in an industry affecting commerce and has 15 or more employees. As an employer, the Department of Public Safety provides health care coverage to its employees through the NCSHP.

19.     Defendant NCSHP, a corporation, administers comprehensive group health insurance to eligible teachers and other North Carolina state employees, pursuant to N.C. Gen. Stat. § 135-48.2. The NCSHP is self-funded and empowered to determine, define, adopt, and remove health care benefits and exclusions, such as the categorical exclusion of gender-confirming health care that targets transgender enrollees for discriminatory treatment. Defendant NCSHP has knowingly and intentionally offered health care coverage to Plaintiffs that discriminates on the basis of sex.

20.     In establishing the scope of health insurance coverage for state employees, the NCSHP acts as an agent for North Carolina government employers who participate in NCSHP, including but not limited to the Department of Public Safety, for purposes of determining components of state employees' "compensation, terms, conditions, or privileges of employment" under Title VII. The NCSHP exists solely so that participating employers can delegate responsibility for the benefits provided to their employees, as its enacting statute makes clear. N.C. Gen. Stat. Ann. § 135-48.2(a) provides for creation of the NCSHP "exclusively for the benefit of" state employees, retirees, and eligible

7

dependents, to "administer one or more group health plans that are comprehensive in coverage." Government employers that participate in the NCSHP, including the Department of Public Safety, delegate significant control over employee health benefits to the NCSHP.

21.    The NCSHP also acts as an agent of participating government employers, including the Department of Public Safety, because it provides benefits in the form of health care coverage to those employees and thus exercises control over an important aspect of Plaintiffs' employment, their health benefits. The NCSHP exercises this control by, for example, choosing whether to include or exclude gender-confirming health care. The NCSHP's discriminatory denial of access to gender-confirming health care has thus significantly affected Plaintiffs' access to equal employment opportunities.

22.    Additionally, the NCSHP is a joint employer with participating government employers under Title VII. Those government employers contract with NCSHP for the provision of health coverage to the employees and, by determining whether to exclude gender-confirming health care, the NCSHP shares responsibility for essential terms and conditions of employment for those employees. The NCSHP thus exercises significant control over the same employees who are employed by state agencies, such as the Department of Public Safety, by determining components of those employees' "compensation, terms, conditions, or privileges of employment" under Title VII, including but not limited to determining their access to gender-confirming health care.

23.     Defendants, through their respective duties and obligations, are responsible for the discriminatory exclusion of gender-confirming health care in the NCSHP. Each Defendant, and those subject to their direction, supervision, or control, has or intentionally will perform, participate in, aid and/or abet in some manner the acts alleged in this complaint, has or will proximately cause the harm alleged herein, and has or will continue to injure the plaintiffs irreparably if not enjoined. Accordingly, the relief requested herein is sought against each Defendant and their successors, as well as all persons under their supervision, direction, or control, including, but not limited to, their officers, employees, and agents.

## JURISDICTION AND VENUE

24.     This action arises under 42 U.S.C. § 1983 to redress the deprivation under color of state law of rights secured by the United States Constitution, under Title IX, 20 U.S.C. § 1681, *et seq.*, under Section 1557 of the ACA, 42 U.S.C. § 18116, and under Title VII, 42 U.S.C. § 2000e, *et seq*.

25.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because the matters in controversy arise under the Constitution and laws of the United States; and pursuant to 28 U.S.C. § 1343(a)(3) and (4) because the action is brought to redress deprivations, under color of state authority, or rights, privileges, and immunities secured by the U.S. Constitution and seeks to secure damages and equitable relief under an Act of Congress, specifically 42 U.S.C. § 1983, which provides a cause of action for the protection of civil rights.

9

26.     Declaratory relief is authorized by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by 28 U.S.C. §§ 2201 and 2202.

27.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) and (2) because Defendants UNC and UNCG reside within the District, and all Defendants reside within the State of North Carolina; and because a substantial part of the events that gave rise to Plaintiffs' claims took place within the District.

28.     This Court has personal jurisdiction over Defendants because they are all domiciled in the State of North Carolina.

## FACTUAL ALLEGATIONS

### A.     Sex, Gender Identity, and Gender Dysphoria

29.     Gender identity refers to an individual's fundamental, internal sense of being a particular gender. It is an essential element of human identity that everyone possesses. Gender identity is innate, has biological underpinnings, and is fixed at an early age.

30.     An individual's sex is generally assigned solely on the basis of external genitalia at the time of birth. External genitalia are but one of several sex-related characteristics and are not always indicative of a person's sex. Other sex-related characteristics, such as chromosomes, hormone levels, internal reproductive organs, secondary sex characteristics, and gender identity, are typically not assessed or considered during the assignment of sex at birth.

31.     Where an individual's gender identity does not match that individual's sex assigned at birth, gender identity is the critical determinant of sex. A scientific consensus

10

recognizes that attempts to change an individual's gender identity to bring it into alignment with the sex assigned at birth are ineffective and harmful.

32.    For transgender people, an incongruence between gender identity and the body's other sex characteristics can result in gender dysphoria—i.e., a feeling of clinically significant stress and discomfort born out of experiencing that something is fundamentally wrong. Gender dysphoria is a medical condition recognized in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition; the World Health Organization's International Classification of Diseases, which is the diagnostic and coding compendia for medical professionals; and by other leading medical and mental health professional groups, including the American Medical Association ("AMA") and the American Psychological Association ("APA").

33.    In addition to clinically significant distress, gender dysphoria can also result in severe anxiety, depression, and suicidal ideation or suicide without adequate treatment.

34.    Untreated gender dysphoria often intensifies with time. The longer an individual goes without adequate treatment, the greater the risk of severe harms to the individual's health.

35.    Gender dysphoria can be treated in accordance with internationally recognized Standards of Care formulated by the World Professional Association for Transgender Health ("WPATH").  These Standards of Care are recognized as authoritative by national medical and behavioral health organizations such as the AMA and APA, which have called for an end to exclusions of gender-confirming care from health insurance plans.

11

36.     The process by which transgender individuals come to live in a manner consistent with their gender identity, rather than the sex they were designated at birth, is known as gender transition. The ability to live in a manner consistent with one's gender identity is critical to the health and well-being of transgender individuals and is a key aspect in the treatment of gender dysphoria.

37.     The steps that transgender individuals take to transition are individualized, but typically include social, legal, and medical transition.

38.     Social transition entails a transgender individual living in accordance with their gender identity in all aspects of life. For example, for a man who is transgender (designated female at birth), social transition can include wearing typically male attire, using male pronouns, and otherwise living openly as a man in all aspects of everyday life.

39.     Legal transition involves steps to formally align a transgender individual's legal identity with their gender identity, such as legally changing one's name and updating the name and gender marker on their driver's license, birth certificate, and other forms of identification.

40.     Medical transition, a critical part of transitioning for many transgender individuals, includes treatments that bring the sex-specific characteristics of a transgender individual's body into alignment with their gender identity, such as counseling to obtain a diagnosis of gender dysphoria, hormone replacement therapy, or surgical care.

41.     Hormone replacement therapy involves taking hormones for the purpose of bringing one's secondary sex characteristics into typical alignment with one's gender

12

identity.  Secondary sex characteristics are bodily features not associated with external and internal reproductive genitalia (primary sex characteristics). Secondary sex characteristics include, for example, hair growth patterns, body fat distribution, and muscle mass development. Hormone replacement therapy can have significant masculinizing or feminizing effects and can assist in bringing a transgender individual's secondary sex characteristics into alignment with their true sex, as determined by their gender identity, and therefore is medically necessary care for transgender people who need it to treat their gender dysphoria.

42.    Gender-confirming surgical care or treatment—also known as gender confirmation surgery or "sex reassignment" surgery—refers to any surgical procedure undergone by a transgender individual to better align their primary or secondary sex characteristics with their gender identity. Such surgical care can include but is not limited to vaginoplasty, phalloplasty, hysterectomy, gonadectomy, mammoplasty, and mastectomy. These treatments deliberately change sex characteristics for the purpose of treating gender dysphoria.

43.    Surgical care is medically necessary for transgender people who need it to treat their gender dysphoria.

44.    An established body of medical research demonstrates the effectiveness and medical necessity of gender dysphoria treatment, including counseling, hormone therapy, and surgical treatment. Health care experts have recognized that such treatments are not

13

"cosmetic," "elective," or "experimental." Rather, they are safe, effective, and medically necessary treatments for a serious health condition.

45.    For example, WPATH has explained that, like hormone therapy and other gender-confirming treatments, "[t]he medical procedures attendant to gender affirming/confirming surgeries are not 'cosmetic' or 'elective' or 'for the mere convenience of the patient.' These reconstructive procedures are not optional in any meaningful sense, but are understood to be medically necessary for the treatment of the diagnosed condition. In some cases, such surgery is the only effective treatment for the condition, and for some people genital surgery is essential and life-saving."

46.    Similarly, in 2014, the federal Department of Health and Human Services Departmental Appeals Board confirmed that surgical treatment is safe and effective treatment for gender dysphoria. After reviewing expert medical testimony and published studies, the Appeals Board concluded that the Medicare program's then-existing exclusion of such treatment from coverage was "not reasonable."

47.    These various components associated with transition—social, legal, and medical transition—do not change an individual's gender, as that is already established by gender identity, but instead bring the individual's appearance, legal identity, and sex-related characteristics into greater typical alignment with the individual's gender identity and lived experience.

**B.    The State's Targeted and Discriminatory Exclusion of Gender-Confirming Health Care**

48.    The NCSHP offers three health care plans to eligible state employees: the (1)

14

80/20 PPO Plan, the (2) 70/30 PPO Plan, and the (3) High Deductible Health Plan (collectively referred to as the "Health Plans"). Across all three plans, Blue Cross and Blue Shield of North Carolina ("BCBSNC") serves as the claims administrator, and CVS Caremark ("CVS") administers pharmacy benefits.

49.    Covered services under the NCSHP include medically necessary pharmacy benefits, mental health benefits, and medical care such as surgical benefits at inpatient and outpatient facilities.

50.    The NCSHP Health Plans are distinguished primarily by coverage ratios, deductible amounts, and general costs to the insured employee and their dependent-enrollees. The Health Plans do however have at least one feature in common. At all relevant times, the Health Plans have contained a categorical exclusion of coverage for transition-related health care, with the exception of the 2017 plan year.

51.    Because the only people who require treatments related to gender-confirming health care are transgender people, denying coverage for such health care necessarily discriminates against transgender people. As a result of the exclusion in the Health Plans, non-transgender enrollees receive coverage for medically necessary mental health, prescription drug, and surgical needs that, because of their sex, transgender enrollees do not.

52.    The medical consensus recognizes that discriminatory exclusions of gender-confirming health care in health insurance plans have no basis in medical science.

15

Preeminent medical and behavioral health organizations, such as the AMA and the APA, have called for an end to these exclusions.

53.    In keeping with such medical consensus, BCBSNC has maintained a Corporate Medical Policy on Gender Confirmation Surgery and Hormone Therapy that acknowledges the general medical necessity of this care since 2011, and CVS similarly maintains coverage criteria policies for hormone replacement therapy as it pertains to the treatment of gender dysphoria.

54.    Absent a categorical plan exclusion, claims for gender-confirming care would be evaluated under the BCBSNC and CVS criteria for individual medical necessity and covered under the plan in the same manner any other claims for medical, mental health, or pharmacy benefits.

55.    In 2016–2017, the North Carolina State Treasurer's Office ("Treasurer's Office") and the NCSHP Board of Trustees seemingly came to the same conclusion as many other states. Documents obtained through public records requests show that the NCSHP's staff was aware at least as early as summer 2016 that the plan would need to be amended to comply with the ACA.

56.    In late 2016, the then-North Carolina State Treasurer and a majority of the NCSHP Board of Trustees voted to remove the exclusion of gender-confirming health care for the 2017 Health Plans. A "Board of Trustees December 2016 Meeting Preview" prepared by the NCSHP staff advised that under the ACA, the NCSHP "[c]annot categorically exclude all health services related to gender identity," and "[c]annot

categorically exclude all health services related to gender transition." That document warned that individuals aggrieved by violations of the ACA "have a private right of action to sue" for such violations.

57.     Minutes from the Board of Trustees' proceedings to eliminate the exclusion indicate that it was advised by legal counsel that "[i]f the Plan continues to receive federal funding without including coverage for the treatment of gender dysphoria, the Plan will be considered non-compliant [with the ACA] as of January 1, 2017. This could result in the suspension or termination of the [federal Retiree Drug Subsidy] funding and/or the possibility of civil action by someone challenging the violation."

58.     In an email about the vote to remove the exclusion, then-Press Secretary for the Treasurer's Office Brad Young explained, "If the [Health] Plan[s] did not take action to comply with federal law and federal regulation, the [Health] Plan[s] would have risked losing millions of dollars in federal funding and faced discrimination lawsuits for non-compliance." The resolution that removed the exclusion was only applicable to the 2017 Health Plans.

59.     Prior to the removal of the categorical exclusion, the Treasurer's Office engaged a consulting firm to analyze the applicability of Section 1557 of the ACA to the NCSHP, and to estimate the fiscal impact of removing the gender-confirming health care exclusion. The consulting firm's November 2016 analysis concluded that the NCSHP is likely a covered entity within the meaning of the ACA and thus needed to comply with the statute's non-discrimination provisions.

17

60.    Ultimately the report concluded that, "[b]ased on approximately $3.2 billion of premiums, the cost for the NCSHP is estimated to be between .011% and .027% of premium." Accordingly, the cost of removing the exclusion of gender-confirming health care in the NCSHP would be minimal.

61.    Defendant Dale Folwell, Treasurer-elect at the time and now Treasurer of North Carolina, and Defendant Dee Jones, nevertheless failed to take any action to block the reinstatement of the exclusion of gender-confirming health care in the 2018 Health Plans, and negotiated contracts to ensure the NCSHP would be administered to exclude coverage of such medical care. Defendants Folwell and Jones took the same steps for the 2019 and 2020 Health Plans, which continue to exclude coverage for gender-confirming health care. At a NCSHP Board of Trustees meeting, affected state employees and their dependents testified about the devastating impact the loss of gender-confirming health care benefits has had on them and their families.

62.    In a public statement, Treasurer Folwell stated, "Until the court system, a legislative body or voters tell us that we 'have to,' 'when to,' and 'how to' spend taxpayers' money on sex change operations, I will not make a decision" to treat gender-confirming health care equally in the NCSHP.

63.    Accordingly, the 2018, 2019, and 2020 Health Plans categorically exclude coverage for all gender-confirming health care for the purpose of treating gender dysphoria. Specifically, the 2018, 2019, and 2020 Health Plans exclude "[p]sychological assessment and psychotherapy treatment in conjunction with proposed gender transformation" and

18

"[t]reatment or studies leading to or in connection with sex changes or modifications and related care" (hereinafter, the "Exclusion").

64.     Upon information and belief, each year after the NCSHP reinstated the Exclusion, it has been required to execute an agreement indemnifying BCBSNC for any liability BCBSNC incurs in connection with the Exclusion.

65.     As a result of this sweeping Exclusion of medically necessary health care coverage, the Health Plans single out employees who are transgender, or who have transgender dependents, for unequal treatment by excluding coverage of medically necessary care for the treatment of gender dysphoria.

### C.    The State's Denial of Medically Necessary Care to Plaintiffs

#### 1.    Plaintiff Maxwell Kadel

66.     Plaintiff Maxwell Kadel ("Max") is a transgender man.  Max was designated female at birth but has a male gender identity.  Max lives all aspects of his life in accordance with his male gender identity. Originally born in Nebraska, Max grew up in New Jersey and attended college in Indiana.  Max moved to North Carolina almost eight years ago.

67.     Max is a former employee of the UNC School of Government. Max began working at UNC in August of 2014 through a temporary job placement agency. Max obtained a permanent position with the UNC School of Government in October 2016, where he worked as an Administrative Support Associate until he accepted another job opportunity outside of state government in November 2019.

19

68.    As a North Carolina state employee, Max was enrolled in the NCSHP, and received health care benefits from this plan as part of his compensation. He contributed each month to the plan via a paycheck deduction.

69.    Max was a model employee, even winning a 2018 "Star Heel Award" for his job performance.  This annual award program allows departments across UNC to recognize and reward employee excellence.

70.    While Max did his best to excel in his position at UNC, Max lives with significant distress caused by gender dysphoria. Max has struggled with gender dysphoria since childhood and was formally diagnosed with gender dysphoria at the age of 33. As part of his prescribed treatment, Max began hormone therapy in June 2016.

71.    Max has also obtained a legal name change and has corrected his name and gender marker on his North Carolina state driver's license, Social Security Card, and U.S. Passport.

72.    In 2017, Max considered pursuing chest surgery to create a more typically masculine chest, but he decided to wait and see whether hormone therapy would be sufficient to relieve his gender dysphoria.

73.    In 2018, Max, in consultation with his health care providers, determined that chest surgery was necessary to alleviate his gender dysphoria, and he was ready to move forward with further consultations leading to surgery. Max then discovered that the NCSHP had reinstated its categorical Exclusion of gender-confirming health care, effectiveJanuary 1, 2018, in all of its Health Plans.

20

74. After the Exclusion was reinstated in 2018, Max was deprived of insurance coverage for medically necessary hormone therapy and gender-confirming surgical care. Max paid out-of-pocket for hormone therapy. During that time, to lessen the financial burden of paying out-of-pocket for testosterone every month, Max often rationed and used vials of testosterone past the expiration date.

75. Max also had to forgo chest surgery, which caused him to experience significant gender dysphoria-related distress on a daily basis. Max wears a binder to compress his chest, but it causes him physical discomfort and breathing difficulties. Max also has asthma, which is exacerbated by having to bind his chest because he could not obtain a permanent medically necessary solution through surgery.

### 2. Plaintiffs Jason Fleck and Connor Thonen-Fleck

76. Jason Fleck has been employed by UNCG since 1997 and currently works as a Business Application Analyst. Connor Thonen-Fleck ("Connor"), his son, is a transgender young man. Connor was designated female at birth but has a male gender identity.

77. Connor has long excelled academically and is a college freshman. In addition to his rigorous academic responsibilities, Connor also works at a veterinary clinic. Connor is passionate about veterinary medicine and plans to pursue studies and a career in the veterinary field.

78. Connor struggled with gender dysphoria since childhood. His parents realized that Connor demonstrated stereotypically masculine tendencies and characteristics

21

from a young age. But until Connor began to transition, he was in serious and increasing distress.  Ultimately, Connor came out as transgender to his parents and explained his need to transition.

79.    Connor and his family developed a plan to secure treatment for his gender dysphoria. Connor initially began seeing a psychiatrist and therapist. By the time he was 15 years old, he had socially transitioned and was living in his authentic male gender identity in all aspects of his life.

80.    In January of 2018, Connor began hormone therapy as part of treatment for his gender dysphoria.  In March of 2018, Connor obtained a legal name and gender marker change and subsequently obtained a corrected birth certificate and driver's license.

81.    Counseling, hormone therapy, and social transition significantly improved Connor's quality of life by reducing his gender dysphoria. However, Connor still experienced significant gender dysphoria on a daily basis because he is a male and had a typically female chest.

82.    As part of treatment for his gender dysphoria, Connor's health care providers recommended chest surgery that would give Connor a more typical male chest. This surgery was medically necessary, including to bring Connor's body into better alignment with his gender identity and lived experience and further reduce his gender dysphoria.

83.    As a North Carolina state employee, Plaintiff Jason Fleck is enrolled in the NCSHP and receives health care benefits from this plan as part of his compensation.  As a

22

dependent of Mr. Fleck, Connor is also enrolled in the NCSHP. Mr. Fleck contributes each month to the plan via a paycheck deduction.

84. In 2017, Connor was enrolled in the 80/20 Health Plan. His visits with his psychiatrist and therapist were covered then because the categorical Exclusion of gender-confirming health care had been removed from the plan. During the fall of 2017, Connor's father re-enrolled himself and Connor in the 80/20 plan for the 2018 plan year.

85. Mr. Fleck and Connor struggled after that point to obtain coverage of Connor's required office visits to his endocrinologist, who prescribes and monitors Connor's masculinizing hormone therapy. Because Connor has received that care in connection with his gender dysphoria, insurance coverage for those visits has been inconsistent, and in some instances denied. Where coverage has been denied, Mr. Fleck and Connor have been left with full financial responsibility for the cost of the care.

86. On April 9, 2018, CVS issued a Notice of Determination ("ND") denying prior authorization for coverage of Connor's testosterone prescription. The ND explained that the diagnosis code submitted, F64.0 "Transsexualism," was not a covered diagnosis code for prescription testosterone under the NCSHP covering Connor. The ND explained that the prescription would be covered for males with "primary or hypogonadotropic hypogonadism," but not for Connor.

87. Like any person with a medical condition, Connor and his family have done their best to access medically necessary health care. Paying out-of-pocket for health care that has been denied under the plan has been an emotional and financial burden on Connor

23

and his parents. This became even more acute after the family had to pay out-of-pocket for chest reconstructive surgery for Connor, since living indefinitely without it had become unbearable for him.

88.    Before obtaining that surgery, Connor lived with daily distress caused by having a typically female chest, and urgently required gender-confirming surgery to treat his gender dysphoria.  Connor and his parents could not easily afford to pay for the surgery out of pocket, as it imposed a financial hardship on his family. Indeed, notwithstanding his full academic workload, Connor worked during high school in an effort to earn and save money so that he could contribute to the out-of-pocket costs for his surgery.

89.    Connor's parents witnessed his daily distress due to his inability to access health insurance coverage for medically necessary care and were worried about the effects his untreated gender dysphoria had on his mental and physical health, his education, and his future plans. They finally saved enough for Connor to undergo surgery on May 28, 2018. Although shouldering that expense was stressful for Connor and his family, the relief the surgery provided Connor from his gender dysphoria was critical for his ongoing development and functioning as a young adult.

### 3.    Plaintiff Julia McKeown

90.    Plaintiff Julia McKeown ("Julia") is a transgender woman. Julia was designated male at birth, but her gender identity is female. Julia lives in accordance with her female gender identity in all aspects of her life.

24

91.    Originally from Florida, Julia has struggled with gender dysphoria since childhood. Julia had to suppress her gender identity for much of her early life into adulthood. During her time in Florida, Julia completed her higher education, including a bachelor's degree, two master's degrees, and a doctoral degree.  During this time, Julia was also battling severe, untreated gender dysphoria.

92.    After completing her doctorate, Julia reached the point in 2010 where she could no longer suppress who she really was. Julia made the life-saving decision to live authentically, in accordance with her gender identity.  In 2013, Julia began the medical part of her transition and started hormone therapy. Between 2010 and 2016, Julia was progressing in her career, life, and transition.

93.    In 2016, Julia accepted a position with NCSU and moved to North Carolina from Florida. Since 2016, Julia has been employed by NCSU as a Teaching Assistant Professor in the Teaching Education and Learning Design Department of the NCSU College of Education. She currently teaches in the Learning, Design, and Technology Program. Julia also serves as the Graduate Coordinator for the Learning, Design, and Technology Program.

94.    As a North Carolina state employee, Julia is enrolled in the NCSHP, and receives health care benefits from this plan as part of her compensation. She contributes each month to the plan via a paycheck deduction.

95.    While hormone therapy and social transition have been important aspects of Julia's transition, Julia was still dealing with significant distress related to gender

25

dysphoria. By 2017-2018, Julia's medical provider referred her for vaginoplasty, as part of treatment for her gender dysphoria. After consulting with a surgeon, Julia and her surgeon requested preauthorization for vaginoplasty in or around July 2018. Towards theend of July, the preauthorization was denied because of the reinstatement of the Exclusionof gender-confirming health care in the NCSHP.

96.    Julia appealed that decision to BCBSNC, but was informed that they only administer the plan and could not resolve the issue. Julia also filed a grievance with the NCSHP Section 1557 Coordinator after the denial of preauthorization. The grievance was denied in or around August 2018.

97.    At that point in her life, Julia could no longer wait for surgery. Left with no other options, Julia made the difficult decision to withdraw funds from her retirement and savings accounts, in order to pay for her medically necessary surgery.  Julia's surgical costs totaled over $14,000.00.

98.    Julia is also prescribed hormone therapy as part of treatment for her gender dysphoria, which is also excluded under the NCSHP. The Exclusion also prohibits Julia from seeking future medically necessary gender-confirming health care.

### 4.    Plaintiffs Michael D. Bunting, Jr. and C.B.

99.    Michael D. Bunting, Jr. was employed by UNC beginning in 1990 until his retirement nearly 30 years later. C.B., his son, is a transgender boy. C.B. was designated female at birth but has a male gender identity. C.B.'s mother, Shelley K. Bunting, is a

nurse practitioner in private practice. Mr. Bunting and Ms. Bunting bring this suit on their son's behalf.

100.    C.B. is a high school student. He likes swimming, skateboarding, and playing video games. His favorite subjects in school are math and science.

101.    Ever since he was a young child, C.B. would reject stereotypically female clothing and would dress in a more masculine manner. Beginning at a young age, C.B. would refuse to wear stereotypically female swimming suits, opting instead for board shorts and a shirt. In late 2016, he began wearing a short, typically masculine haircut.

102.    Though C.B. always got along with people and has many friends, he exhibited high levels of anxiety, which his parents later came to understand was associated with his untreated gender dysphoria.

103.    In early 2017, C.B. informed his parents that he was transgender. Soon after, C.B. and his parents met with a therapist in April 2017. After consultation with his family and therapist, C.B. asked to be placed on treatment to delay female puberty.

104.    In April of 2017, C.B. and his parents sought an appointment with the Duke Child and Adolescent Gender Care Clinic ("Duke"), ultimately scheduled for August 2017.

105.    During the summer of 2017, C.B. socially transitioned to living as his true self, informing friends and family of his male gender identity, wearing more masculine clothes, and living openly as the boy he is. However, as his breasts began to develop during the summer, C.B. began to experience additional anxiety.

27

106.    As a result of the distress associated with his birth-designated sex (female), C.B. was diagnosed with gender dysphoria. In August 2017, C.B. began obtaining care from medical and mental health professionals and was prescribed puberty-delaying treatment, in the form of an implant, as part of his treatment for gender dysphoria.

107.    Following the beginning of C.B.'s treatment, C.B.'s parents noticed that the anxiety he had been experiencing diminished and that he was now a happy, outgoing, and personable teenage boy.

108.    C.B. is treated and known as a boy at school and in all other aspects of his life.  He legally changed his name to a more typically male name in the Spring of 2018.

109.    Plaintiff Michael D. Bunting, Jr. enrolled in the NCSHP as a North Carolina state employee, and he remains enrolled and continues to receive health care benefits as a retiree.  As a dependent of Mr. Bunting, C.B. is also enrolled in the NCSHP.  Mr. Bunting contributes a premium each month to the plan.

110.    Because in 2017 the NCSHP did not contain an Exclusion for gender-confirming health care, C.B.'s puberty-delaying treatment was covered by the NCSHP.

111.    C.B.'s puberty-delaying implant only lasted 12 to 18 months. Accordingly, C.B. needed the implant to be removed and replaced in early 2019.

112.    However, in mid-2018, Ms. Bunting learned of the reinstitution of the Exclusion of gender-confirming care within the NCSHP.

113.    Worried that they could not afford out-of-pocket the puberty-delaying treatment that C.B. needed, Mr. Bunting and Ms. Bunting communicated with the NCSHP

28

Board of Trustees, urging them to once again eliminate the Exclusion of gender-confirming health care within the NCSHP, with no success.

114.   In mid-December 2018, following the lack of action by the NCSHP Board of Trustees at their December 2018 meeting to eliminate the Exclusion, Mr. Bunting and Ms. Bunting decided to purchase an additional health insurance plan that would cover puberty-delaying treatment for C.B. Through the federally-run ACA health care exchange they purchased an insurance plan from BCBSNC.  Though Mr. Bunting and C.B. remained enrolled in the NCSHP and will continue to do so, purchasing additional coverage for C.B. was necessary in order for the Bunting family to be able to afford C.B.'s gender-confirming care.  As a result, Mr. Bunting and Ms. Bunting had to pay an additional monthly premium and a $6,750.00 deductible for C.B., separate and apart from C.B.'s existing coverage under the NCSHP.

115.   In early 2019, C.B. began obtaining puberty-delaying treatment via injection, rather than a longer-lasting implant, because that was the only puberty-delaying treatment on the formulary of the additional health insurance purchased to supplement the coverage under the NCSHP.

116.   The additional costs associated with C.B.'s gender-confirming care and the lack of coverage under the NCSHP due to the discriminatory Exclusion contributed to Mr. Bunting's decision in early January 2019 to retire from UNC.  By the date of his retirement, Mr. Bunting had dedicated nearly 30 years of service to UNC and the North Carolina Tar Heels.

29

117. Mr. Bunting and C.B. remain enrolled in the NCSHP as a retiree and dependent, respectively, following Mr. Bunting's retirement on April 1, 2019. C.B. now receives masculinizing hormone therapy as part of his gender-confirming care. While the family no longer purchases separate ACA coverage, C.B.'s hormone therapy is not covered by NCSHP and they must pay for that care out-of-pocket.

118. The Exclusion stigmatizes C.B. as a transgender person and has caused pain, anger, and distress to C.B., Mr. Bunting, and the rest of the Bunting family.

### 5. Plaintiff Sam Silvaine

119. Plaintiff Sam Silvaine ("Sam") is transgender. Sam was designated female at birth but has a male affirmed sex.  Sam lives all aspect of his life in accordance with his gender identity.

120. Sam moved to North Carolina in 2012 to pursue a master's degree. After obtaining his master's degree, Sam accepted a two-year fellowship with NCSU as a post-master's counseling fellow and was an employee of NCSU.

121. As a North Carolina state employee, Sam was enrolled in the NCSHP, and received health care benefits from this plan as part of his compensation.  Sam was enrolled in the 80/20 NCSHP for plan years 2016, 2017, and 2018.

122. In January 2017, Sam began therapy as treatment for his gender dysphoria. Sam began hormone therapy in April 2017. Hormone therapy masculinized Sam's voice, some of his secondary sex characteristics, and physical appearance. As his body became more masculine and in greater alignment with his gender identity, his typically female chest

30

began to be even more noticeable to Sam. The marked incongruence increased Sam's gender dysphoria.

123.    Sam used a binder daily to compress his chest. While binding lessened his gender dysphoria to an extent, it was not a permanent solution and caused Sam physical discomfort and restricted his physical activities. Sam's ability to do the things he loved, like hiking, backpacking, and climbing, were limited because of the need to wear the binder. The appearance of Sam's chest also presented a safety issue for Sam. Sam lives and is generally recognized as male in all aspects of his life. Being visibly male with a typically female chest invited undesired, invasive, and dangerous attention.

124.    Eventually Sam, in consultation with and support from his health care providers, made the decision to seek chest surgery as part of treatment for his gender dysphoria.

125.    In 2017, Sam's NCSHP plan did not contain a categorical Exclusion for gender-confirming health care. Sam's counseling and hormone therapy were covered. In August 2017, Sam and his surgeon sought prior authorization for reconstructive chest surgery. The prior authorization process took until October 2017 and at that time, the earliest available surgery date that Sam could obtain was in March 2018. Sam accepted the March 2018 date in order to avoid an even greater delay in the treatment he required.

126.    After the categorical Exclusion of gender-confirming care was reinstated on January 1, 2018, the prior authorization for Sam's surgery was rendered invalid.

31

127.    When Sam found out that his health insurance was no longer going to cover the surgery he desperately needed, he was devastated mentally and emotionally.  Like other transgender North Carolina state employees who suddenly found themselves without health insurance coverage for their medically necessary health care, Sam was placed in a difficult position.

128.    Sam was living with severe gender dysphoria and ultimately, he could not delay the surgery.  Sam paid for the surgery out of pocket and underwent chest surgery on March 1, 2018.

129.    The surgery proved life-changing for Sam and has significantly reduced the distress caused by his gender dysphoria. Sam has not been reimbursed by Defendants for his surgery costs or other out-of-pocket costs he incurred due to the Exclusion of gender-confirming health care in the 2018 plan.

### 6.    Plaintiff Dana Caraway

130.    Plaintiff Dana Caraway ("Dana") is a transgender woman. Dana was designated male at birth, but her gender identity is female. Dana lives in accordance with her female gender identity in all aspects of her life.

131.    Dana is in the process of seeking a court-ordered change of name to ensure that her government identity documents and records accurately reflect the name she assumed as part of her social transition, but that process has been delayed due to the COVID-19 pandemic.[1]

---

[1] Ms. Caraway's employee records thus still reflect her former name of Dowd Caraway.

132.   Dana is employed by the State of North Carolina, Department of Public Safety, where she has worked as an officer since 1994.  When she began her employment, the agency was called the Department of Correction; it was merged with several other agencies to make up the current Department of Public Safety in 2012. She has been very successful in her position. She was promoted to the position of supervisor in the Division of Adult Correction and Juvenile Justice, and currently holds the rank of Sergeant.

133.   As a North Carolina state employee, Dana is enrolled in the NCSHP, and receives health care benefits from this plan as part of her compensation. She contributes each month to the plan via a paycheck deduction.

134.   Dana was diagnosed with gender dysphoria in 2017, and began a process of social, legal, and medical transition. As part of her treatment, she has received hormone replacement therapy for several years, which feminized her appearance, up to a point.

135.   As Dana's appearance has changed, it has caused her more distress to continue to have a typically male chest, genitalia, and voice. It also creates a safety issue to appear female but to have a typically male-sounding voice, especially given the prison environment in which Dana works.

136.   To treat her gender dysphoria, Dana urgently requires gender reassignment surgery for her chest, genitalia, face, and voice. Dana is currently scheduled to have gender-confirming chest and genital surgery this year, as well as voice feminization surgery.  She expects to have facial gender transition surgery next year.  Because of the

33

Exclusion, Dana will have no choice but to pay out-of-pocket for these surgeries, which will impose financial hardship on her.

137.    Dana's surgeon sought preauthorization for Dana's upcoming chest and genital surgeries. On June 19, 2020, BCBSNC denied coverage, for the stated reason that "the requested service is not a covered benefit" because of the Exclusion for "treatments … in connection with sex changes or modifications."

138.    Because of the Exclusion of gender-confirming health care from the Health Plans, all Plaintiffs have suffered emotional distress, humiliation, degradation, embarrassment, emotional pain and anguish, violation of their dignity, loss of enjoyment of life, and other compensatory damages, in an amount to be established at trial.

## CLAIMS FOR RELIEF

### COUNT I
### Deprivation of Equal Protection
### U.S. Const. Amend. XIV

**(All Plaintiffs Against Defendants Dale Folwell and Dee Jones)**

139.    Plaintiffs re-allege and incorporate by reference each allegation of the prior paragraphs as though fully set forth herein.

140.    The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.

141.    Plaintiffs state this cause of action against Defendants Dale Folwell and Dee Jones, in their official capacities, for purposes of seeking declaratory and injunctive relief,

34

and challenge their adoption and enforcement of the discriminatory sex-based classifications in the NCSHP Health Plans both facially and as applied to Plaintiffs.

142.    Each Defendant is a person acting under color of state law for purposes of 42 U.S.C. § 1983 and has acted intentionally in denying Plaintiffs equal protection of the law.

### A.    Discrimination on the Basis of Sex

143.    Under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, discrimination based on sex is presumptively unconstitutional and subject to heightened scrutiny.

144.    Discrimination on the basis of sex characteristics, gender, gender identity, nonconformity with sex stereotypes, transgender status, and gender transition is discrimination on the basis of sex.

145.    By categorically excluding, "[p]sychological assessment and psychotherapy treatment in conjunction with proposed gender transformation," and "[t]reatments or studies to or in connection with sex changes and modifications and related care," Defendants are engaging in constitutionally impermissible sex-based discrimination.

146.    Through their duties and actions to design, negotiate, administer, and implement the NCSHP's categorical Exclusion, Defendants Folwell and Jones have unlawfully discriminated—and continue to unlawfully discriminate—against Plaintiffs based on sex-related considerations.

147.    The NCSHP's categorical Exclusion treats Plaintiffs differently from other persons who are similarly situated.

35

148.    Under the NCSHP's categorical Exclusion, health plan participants who require gender-confirming care, or whose dependents require gender-confirming care, are denied coverage for that medically necessary care, while other health plan participants can access the same care as long as it is not required for gender transition.

**B.    Discrimination on the Basis of Transgender Status**

149.    By categorically excluding coverage for gender-confirming health care in the NCSHP Health Plans, Defendants are engaging in constitutionally impermissible discrimination on the basis of transgender status.

150.    Under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on transgender status is presumptively unconstitutional and subject to strict, or at least heightened, scrutiny.

     a.    Transgender people have suffered a long history of discrimination in North Carolina and across the country, and continue to suffer such discrimination to this day.

     b.    Transgender people are a discrete and insular group and lack the political power to protect their rights through the legislative process. Transgender people have largely been unable to secure explicit state and federal protections to protect them against discrimination.

     c.    A person's transgender status bears no relation to a person's ability to contribute to society.

36

d.    Gender identity is a core, defining trait and is so fundamental to one's identity and conscience that a person cannot be required to abandon it as a condition of equal treatment.

e.    Gender identity generally is fixed at an early age and highly resistant to change through intervention.

151.   Because the NCSHP's categorical Exclusion on its face and as applied to Plaintiffs deprives transgender enrollees of their right to equal dignity, liberty, and autonomy by stigmatizing them and branding them as second-class citizens, it denies transgender persons equal protection of the laws, in violation of the Equal Protection Clause of the Fourteenth Amendment. The NCSHP's categorical Exclusion similarly serves to stigmatize NCSHP enrollees whose dependents are transgender; it brands them as second-class citizens and deprives them of their equal treatment and dignity.

152.   Defendants' discriminatory Exclusion of gender-confirming care is not narrowly tailored or substantially related to any compelling or important government interest. Indeed, it is not even rationally related to any legitimate government interest.

153.   Without injunctive relief from Defendants' discriminatory Exclusion of coverage for gender-confirming care, Plaintiffs will continue to suffer irreparable harm in the future.

### COUNT II
### Violation of Title IX of the Education Amendments of 1972
### 20 U.S.C. § 1681, *et seq.*

**(Plaintiffs Maxwell Kadel, Michael D. Bunting, Jr., and C.B. against Defendant University of North Carolina at Chapel Hill; Plaintiffs Julia McKeown and Sam**

37

**Silvaine against Defendant North Carolina State University; Plaintiffs Jason Fleck and Connor Thonen-Fleck against Defendant University of North Carolina at Greensboro)**

154.    Plaintiffs re-allege and incorporate by reference each allegation of the prior paragraphs as though fully set forth herein.

155.    Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681.

156.    Under Title IX, discrimination on the basis of sex includes, but is not limited to, discrimination based on sex characteristics, gender, nonconformity with sex stereotypes, transgender status, and gender transition.

157.    Defendants UNC, NCSU, and UNCG are recipients of federal financial assistance from the Department of Health and Human Services, the Department of Agriculture, and the Department of Education, and are therefore subject to Title IX.

158.    By offering Health Plans to their employees with categorical exclusions for gender-confirming care, Defendants UNC, NCSU, and UNCG have and continue to discriminate on the basis of sex against NCSHP enrollees who require gender-confirming care, or whose dependents require gender-confirming care.

159.    In offering Health Plans that categorically exclude coverage of gender-confirming health care on the basis of sex, Defendants UNC, NCSU, and UNCG deny enrollees who require gender-confirming care, or whose dependents require gender-

confirming care, the benefits of and subject them to discrimination in educational programs and activities. This impermissible discrimination based on sex, including sex characteristics, nonconformity with sex stereotypes, transgender status, and gender transition, violates Title IX.

160. By knowingly and intentionally offering health insurance that denies coverage to Plaintiffs on the basis of sex, Defendants UNC, NCSU, and UNCG harm Plaintiffs by: stigmatizing them; treating them as a secondary class compared to other non-transgender enrollees who have access to the same care for themselves or their non-transgender dependents; and causing the transgender health plan participants mental and physical health complications due to their inability to access medically necessary health care.

161. By knowingly and intentionally offering a compensation package that denies fringe benefits to Plaintiffs on the basis of sex, Defendants UNC, NCSU, and UNCG have intentionally violated Title IX, for which Plaintiffs are entitled to compensatory damages, including but not limited to out-of-pocket damages, and consequential damages.

162. Defendants UNC, NCSU, and UNCG fund the health plans offered through the NCSHP by making direct financial contributions for covered employees.

163. As "employing units," Defendants UNC, NCSU, and UNCG play an active role in collecting payments owed to the NCSHP, N.C. Gen. Stat. § 135-48.37A(b), and in settling claims regarding health benefits, *id.* § 135-48.46.

39

164. Without injunctive relief from Defendants' discriminatory Exclusion of coverage for gender-confirming care, Plaintiffs will continue to suffer irreparable harm in the future.

## COUNT III
### Violation of the Patient Protection and Affordable Care Act
### 42 U.S.C. § 18116

### (All Plaintiffs Against Defendant North Carolina State Health Plan for Teachers and State Employees)

165. Plaintiffs re-allege and incorporate by reference each allegation of the prior paragraphs as though fully set forth herein.

166. Section 1557 of the ACA, 42 U.S.C. § 18116, provides, in relevant part that, "an individual shall not, on the ground prohibited under … title IX of the Education Amendments of 1972 (20 U.S.C. §§ 1681, et seq.)"—which prohibits discrimination "on the basis of sex"—"be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance."

167. Discrimination on the basis of sex characteristics, gender, nonconformity with sex stereotypes, transgender status, and gender transition are all encompassed by the prohibition of discrimination on the basis of sex under Section 1557.

168. Upon information and belief, Defendant NCSHP receives federal financial assistance such that it is a "covered entity" for purposes of Section 1557 of the ACA. Indeed, Defendant NCSHP has acknowledged in its publicly available Policies and Procedures, effective July 15, 2016, that it "receives funding from the [federal] Department

40

of Health and Human Services" and "is subject to Section 1557 of the Affordable Care Act (42 U.S.C. [§] 18116) and its implementing regulations at 45 CFR Part 92."

169.    A covered entity, such as Defendant NCSHP, cannot provide or administer health care insurance coverage which contains a categorical Exclusion from coverage for gender-confirming health care, or otherwise impose limitations or restrictions on coverage for specific health services related to gender transition if such limitation or restriction results in discrimination against a transgender individual.

170.    Because Defendant NCSHP receives federal funding that flows to health programs or activities, Plaintiffs have a right under Section 1557 to receive health insurance through the NCSHP free from discrimination on the basis of sex, sex characteristics, gender, nonconformity with sex stereotypes, transgender status, or gender transition.

171.    Defendant NCSHP has discriminated against Plaintiffs on the basis of sex in violation of Section 1557 and has thereby denied Plaintiffs the full and equal participation in, benefits of, and right to be free from discrimination in a health program or activity.

172.    By categorically excluding all coverage for medically necessary "[p]sychological assessment and psychotherapy treatment in conjunction with proposed gender transformation," and "[t]reatments or studies to or in connection with sex changes or modifications and related care," Defendant NCSHP has drawn a classification that has unlawfully discriminated—and continues to discriminate—against Plaintiffs based on sex, in violation of Section 1557.

41

173.    As a result of the Exclusion, Plaintiffs have suffered harm, including but not limited to financial harm.  By knowingly and intentionally offering health care coverage to Plaintiffs that discriminates on the basis of sex, Defendant NCSHP has intentionally violated the ACA, for which Plaintiffs are entitled to compensatory damages, including but not limited to out-of-pocket damages, and consequential damages.

174.    Without injunctive relief from Defendants' discriminatory Exclusion of coverage for gender-confirming care, Plaintiffs will continue to suffer irreparable harm in the future.

## COUNT IV
### Violation of Title VII of the Civil Rights Act of 1964
### 42 U.S.C. § 2000e, *et seq.*

**(Plaintiff Maxwell Kadel against Defendant University of North Carolina at Chapel Hill; Plaintiffs Julia McKeown and Sam Silvaine against Defendant North Carolina State University; Plaintiff Dana Caraway against Defendant State of North Carolina, Department of Public Safety; Plaintiff Dana Caraway against Defendant North Carolina State Health Plan for Teachers and State Employees)**

175.    Plaintiffs re-allege and incorporate by reference each allegation of the prior paragraphs as though fully set forth herein

176.    Title VII provides that it is "an unlawful employment practice for an employer" to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's … sex" or to "limit, segregate, or classify [its] employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise

42

adversely affect his status as an employee, because of such individual's … sex." 42 U.S.C. § 2000e-2(a).

177. Plaintiffs Kadel, McKeown, Silvaine, and Caraway are, or were, each an "employee" within the meaning of Title VII. Plaintiffs Kadel, McKeown, Silvaine, and Caraway timely bring this claim after exhausting administrative remedies with the U.S. Equal Employment Opportunity Commission and receiving notices of their right to sue.

178. Defendants University of North Carolina at Chapel Hill; North Carolina State University; and State of North Carolina, Department of Public Safety are each an "employer" within the meaning of Title VII.

179. Government entities that participate in the NCSHP, including the Department of Public Safety, have delegated significant control over employee health benefits to the NCSHP.

180. In establishing the scope of insurance coverage and administering that coverage, the NCSHP is an agent of all employers under Title VII who participate in NCSHP, including but not limited to the Department of Public Safety.

181. Additionally, the NCSHP is a joint employer with participating government employers under Title VII, including but not limited to the Department of Public Safety. Those government employers contract with NCSHP for the provision of health coverage to their employees. By determining whether to exclude gender-confirming health care, the NCSHP shares responsibility for essential terms and conditions of employment for those employees, and exercises significant control over those employees by determining

43

**JA89**

components of their "compensation, terms, conditions, or privileges of employment" under Title VII.

182.    An employer-sponsored health plan is part of the "compensation, terms, conditions, or privileges of employment."  42 U.S.C. § 2000e-2(a)(1).

183.    The denial of medically necessary health care coverage also "adversely affects [one's] status as an employee." 42 U.S.C. § 2000e-2(a)(2).

184.    Under Title VII, discrimination "because of … sex" includes discrimination on the basis of transgender status, gender nonconformity, gender identity, and gender transition.

185.    Plaintiffs have a right under Title VII to compensation, terms, conditions, or privileges of employment, including an employer-sponsored health plan, free from discrimination because of their sex, transgender status, gender nonconformity, gender identity, or gender transition.

186.    By offering coverage that excludes "[p]sychological assessment and psychotherapy treatment in conjunction with proposed gender transformation" and "[t]reatment or studies leading to or in connection with sex changes or modifications and related care," Defendants subject Plaintiffs to discrimination because of their sex in the compensation, terms, conditions, and privileges of their employment.

187.    As a result of the Exclusion, Plaintiffs have suffered harm, including but not limited to financial and emotional harm. By knowingly and intentionally offering health care coverage to Plaintiffs that discriminates because of their sex, Defendants have

44

intentionally violated Title VII, for which Plaintiffs are entitled to compensatory damages, including but not limited to out-of-pocket damages, and consequential damages.

188.   Without injunctive relief from Defendants' discriminatory Exclusion of coverage for gender-confirming care, Plaintiffs who continue to receive health coverage through NCSHP will continue to suffer irreparable harm in the future.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants on all claims, as follows:

A.   Enter a declaratory judgement that Defendants, including through enforcement of the North Carolina State Health Plan for Teachers and State Employees' categorical Exclusion of treatment for gender-confirming care, violated Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment, Title IX, the ACA, and Title VII; and that the North Carolina State Health Plan for Teachers and State Employees' categorical Exclusion of gender-confirming health care discriminates on its face and as applied against transgender state employees and enrollees because of sex and transgender status in violation of the Equal Protection Clause of the Fourteenth Amendment, and on the basis of sex in violation of Title IX, the ACA, and Title VII;

B.   Preliminarily and permanently enjoin Defendants, their agents, employees, successors, and all others acting in concert with them, from administering or offering health coverage that categorically excludes coverage for gender-confirming health care;

45

C.      Award compensatory and consequential damages in an amount that would fully compensate Plaintiffs for their financial harm, emotional distress and suffering, embarrassment, humiliation, pain and anguish, violations of their dignity, and other damages that have been caused by Defendant's conduct in violation of Title IX, the ACA, and Title VII;

D.      Award pre- and post-judgement interest;

E.      Award of Plaintiffs' costs, expenses, and reasonable attorneys' fees incurred in this action pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 2000e-5(k), and any other applicable laws;

F.      Other legal and equitable or injunctive relief as this Court deems just and appropriate; and

G.      The declaratory relief requested in this action is also sought against Defendants' officers, agents, servants, employees, and attorneys, as well as any other persons who are in active concert or participation with them.

* * *

46

Dated: March 9, 2021

Respectfully submitted,

/s/ Amy E. Richardson
Amy E. Richardson
N.C. State Bar No. 28768
HARRIS, WILTSHIRE & GRANNIS LLP
1033 Wade Avenue, Suite 100
Raleigh, NC 27605-1155
Telephone: 919-429-7386
Facsimile: 202-730-1301
arichardson@hwglaw.com

Deepika H. Ravi*
HARRIS, WILTSHIRE & GRANNIS LLP
1919 M Street N.W., 8th
Floor,Washington, D.C.
20036
Telephone: 202-730-1300
Facsimile: 202-730-1301
dravi@hwglaw.com

David Brown*
Alejandra Caraballo*
Noah E. Lewis*
TRANSGENDER LEGAL DEFENSE
   AND EDUCATION FUND, INC.
520 8th Ave, Ste. 2204
New York, NY 10018
Telephone: 646-993-1680
Facsimile: 646-993-1686
dbrown@transgenderlegal.org

Tara Borelli*
LAMBDA LEGAL DEFENSE AND
   EDUCATION FUND, INC.
730 Peachtree Street NE, Suite 640
Atlanta, GA 30318-1210
Telephone: 404-897-1880
Facsimile: 404-897-1884
tborelli@lambdalegal.org

Omar Gonzalez-Pagan*
LAMBDA LEGAL DEFENSE AND
   EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
Telephone: 212-809-8585
Facsimile: 212-809-0055
ogonzalez-pagan@lambdalegal.org

*Counsel for Plaintiffs*

* Appearing by special appearance pursuant to L.R. 83.1(d).

47

## CERTIFICATE OF SERVICE

I certify that the foregoing document was filed electronically with the Clerk of Court

using the CM/ECF system which will send notification of such filing to all registered users.

Dated: March 9, 2021

/s/ Amy E. Richardson
Amy E. Richardson
N.C. State Bar No. 28768
Harris, Wiltshire & Grannis LLP
1033 Wade Avenue, Suite 100
Raleigh, NC 27605-1155
Telephone: 919-429-7386
Facsimile: 202-730-1301
arichardson@hwglaw.com

*Counsel for Plaintiffs*

48

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MAXWELL KADEL, *et al.*;

        *Plaintiffs*,

      v.

DALE FOLWELL, in his official capacity
as State Treasurer of North Carolina, *et al.*,

        *Defendants*.

1:19-cv-00272-LCB-LPA

---

### MOTION FOR LEAVE TO FILE BRIEF OF *AMICI CURIAE* THE AMERICAN MEDICAL ASSOCIATION AND SEVEN ADDITIONAL HEALTH CARE ORGANIZATIONS IN SUPPORT OF PLAINTIFFS

Pursuant to LR 7.5(b), *Amici Curiae* seek leave to file an *amicus curiae* brief in support of Plaintiffs' Motion for Summary Judgment against Defendants Dale Folwell, *et al*. Proposed *Amici Curiae* are eight leading medical organizations: the American Academy of Pediatrics, American College of Obstetricians and Gynecologists, the American Medical Association, American Psychiatric Association, the Endocrine Society, the North American Society for Pediatric and Adolescent Gynecology, National Association of Nurse Practitioners in Women's Health, and the Society of OB/GYN Hospitalists.

### IDENTITY OF AMICI CURIAE

*Amici curiae* are eight leading medical, mental health, and other health care organizations. Collectively, *amici* represent hundreds of thousands of physicians and

1

mental-health professionals, including specialists in family medicine, mental health treatment, internal medicine, endocrinology, obstetrics and gynecology, and thousands of nurses.

*Amicus* the American Academy of Pediatrics ("AAP") represents 67,000 primary care pediatricians, pediatric medical subspecialists, and surgical specialists who are committed to the attainment of optimal physical, mental, and social health and well-being for all infants, children, adolescents, and young adults. In its dedication to the health of all children, the AAP strives to improve health care access and eliminate disparities for children and teenagers who identify as lesbian, gay, bisexual, transgender, or for those questioning their sexual or gender identity.

*Amicus* the American College of Obstetricians and Gynecologists ("ACOG") is a national organization of more than 62,000 women's health care physicians and medical professionals. ACOG's membership represents more than 90 percent of all board-certified obstetrician-gynecologists (ob-gyns) in the United States. ACOG advocates for quality health care for women, maintains the highest standards of clinical practice and continuing education of its members, promotes patient education, and increases awareness among its members and the public of the changing issues facing women's health care. ACOG has appeared as amicus curiae in courts throughout the country. ACOG's briefs and medical practice guidelines have been cited by numerous authorities, including the U.S. Supreme Court.

2

*Amicus* the American Medical Association ("AMA") is the largest professional association of physicians, residents, and medical students in the United States. Additionally, through state and specialty medical societies and other physician groups seated in its House of Delegates, substantially all physicians, residents, and medical students in the United States are represented in the AMA's policy-making process. The AMA was founded in 1847 to promote the art and science of medicine and the betterment of public health, and these remain its core purposes. AMA members practice in every medical specialty and in every state, including North Carolina.

*Amicus* American Psychiatric Association ("APA"), with more than 37,400 members, is the Nation's leading organization of physicians who specialize in psychiatry. The American Psychiatric Association has participated in numerous cases in the Supreme Court and in the United States Courts of Appeals. The American Psychiatric Association opposes all public and private discrimination against transgender and gender-diverse individuals, including in health care. *See* Jack Drescher *et al.*, Am. Psychiatric Ass'n, *Position Statement on Discrimination Against Transgender and Gender Diverse Individuals* 1 (2018), https://www.psychiatry.org/File%20Library/About-APA/Organization-Documents -Policies/Policies/Position-2018-Discrimination-Against-Transgender-and-Gender-

3

Diverse-Individuals.pdf [hereinafter "Am. Psychiatric Ass'n, *Position Statement on Discrimination*"].

*Amicus* the Endocrine Society is the oldest and largest global professional membership organization representing the field of endocrinology. The Endocrine Society's more than 18,000 members care for patients and are dedicated to advancing hormone research and excellence in the clinical practice of endocrinology, focusing on diabetes, obesity, osteoporosis, infertility, rare cancers, and thyroid conditions.

*Amicus* the North American Society for Pediatric and Adolescent Gynecology ("NASPAG") is dedicated to providing multidisciplinary leadership in education, research and gynecologic care to improve the reproductive health of youth. Its focus is to serve and be recognized as the lead provider in PAG education, research and clinical care, conduct and encourage multidisciplinary and inter-professional programs of medical education and research in the field of PAG, and advocate for the reproductive well-being of children and adolescents and the provision of unrestricted, unbiased and evidence based practice of PAG.

*Amicus* the National Association of Nurse Practitioners in Women's Health ("NPWH") is a national professional membership organization. NPWH is the nation's leading voice for courageous conversations about women's health. NPWH represents nearly 12,000 certified women's health nurse practitioners in the United

States. In its clinics and in its culture, women's health nurse practitioners champion state-of-the-science healthcare that holistically addresses the unique needs of women across their lifetimes. NPWH elevates the health issues others overlook and compel attention on women's health from providers, policymakers, and researchers.

Other advanced practice registered nurses rely on NPWH for authoritative resources and education that improve women's health and wellness through evidence-based practice. NPWH pioneers policies to address gender disparities and forges strategic partnerships that advance health equity and holistic models of care. NPWH's mission is to ensure the provision of quality primary and specialty healthcare to women of all ages by women's health and women's health-focused nurse practitioners and includes protecting and promoting a woman's right to make her own choices regarding her health within the context of her personal, religious, cultural, and family beliefs.

Since its inception in 1980, NPWH has been a trusted source of information on nurse practitioner education, practice, and women's health issues. NPWH works with a wide range of individuals and groups within nursing, medicine, the healthcare industry, and the women's health community.

*Amicus* the Society of OB/GYN Hospitalists ("SOGH") is a national organization of more than 1,500 women's healthcare physicians and medical professionals and is the only national medical subspecialty organization whose

5

members specialize in inpatient obstetrics and gynecologic care. The SOGH is committed to improving outcomes for hospitalized women and to patient safety and quality care for all women. As frontline, hospital-based providers of women's healthcare, the SOGH is uniquely positioned to advocate for justice and tolerance through evidence-based care, research, and policy development. The SOGH rejects discriminatory practices that jeopardize patient care.

## INTEREST OF AMICI CURIAE

All *amici* share a commitment to improving the physical and mental health of all Americans—regardless of gender identity—and to informing and educating lawmakers, the judiciary, and the public regarding the public-health impacts of laws and policies. *Amici* submit this brief to inform the Court of the medical consensus regarding what it means to be transgender; the protocols for the treatment of gender dysphoria, which include living in accordance with one's gender identity in all aspects of life; and the predictable harms to the health and well-being of transgender individuals who are denied access to necessary medical treatments to do so.

## <u>SERVICE TO THE COURT</u>

*Amici* feel a responsibility to inform this Court about the nearly-universally agreed upon best practices when treating transgender individuals for gender dysphoria and providing gender-conforming care. *Amici*, as leading healthcare providers both within the State of North Carolina and beyond, are in a unique

6

position to inform the Court about the proper treatments for people experiencing gender dysphoria, the negative health outcomes when gender dysphoria is left untreated, and other health concerns that could arise from lack of coverage by State health care plans. *Amici* believe that the information contained in their proposed brief will assist the Court in its deliberations on the present motion by presenting a complete and accurate description of the medical conditions and treatments at issue in the pending case.

Proposed *Amici Curiae* therefore respectfully request that the Court grant them permission to file an *amicus curiae* brief in support of Plaintiffs, Mr. Maxwell Kadel, *et al*., in support of their motion for summary Judgment against Defendants Folwell, *et al*. A proposed order is attached.

Counsel for *Amici Curiae* reached out to the parties to seek consent to file this motion. Counsel for Plaintiffs consented to the filing of the amicus brief, and counsel for the Defendants did not.

Respectfully submitted, this the 30th day of November, 2021.

/s/ Sarah M. Saint
Shana L. Fulton
NC State Bar No. 27836
sfulton@brookspierce.com
Sarah M. Saint
NC State Bar No. 52586
ssaint@brookspierce.com
BROOKS PIERCE McLENDON
HUMPHREY & LEONARD, LLP
Suite 2000 Renaissance Plaza

7

230 North Elm Street (27401)
Post Office Box 26000
Greensboro, NC 27420-6000
Telephone: 336-373-8850
Fax: 336-378-1001

Matthew D. Cipolla
  JENNER & BLOCK LLP
919 Third Avenue
New York, NY 10022
(212) 891-1600

Howard S. Suskin
D. Matthew Feldhaus
Connor S.W. Rubin
Scott M. De Nardo
  JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
(312) 222-9350

Illyana A. Green
  JENNER & BLOCK LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001
(202) 639-6000

*Counsel for Amici Curiae*

8

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this date, the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's Electronic Filing System to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

Respectfully submitted, this the 30th day of November, 2021.

/s/ Sarah M. Saint

Sarah M. Saint
  N.C. State Bar No. 52586
  ssaint@brookspierce.com
BROOKS PIERCE McLENDON
  HUMPHREY & LEONARD, LLP
Suite 2000 Renaissance Plaza
230 North Elm Street (27401)
Post Office Box 26000
Greensboro, NC 27420-6000
Telephone: 336-373-8850
Fax: 336-378-1001

*Counsel for Amici Curiae*

9

## CORPORATE DISCLOSURE STATEMENT

Pursuant to LR 7.5(e) I certify that all *amici curiae* are non-profit

organizations. They do not have parent corporations and do not issue stock.

Dated: November 30, 2021

/s/ Sarah M. Saint

Shana L. Fulton
NC State Bar No. 27836
sfulton@brookspierce.com
Sarah M. Saint
NC State Bar No. 52586
ssaint@brookspierce.com
  BROOKS PIERCE McLENDON
HUMPHREY & LEONARD, LLP
Suite 2000 Renaissance Plaza
230 North Elm Street (27401)
Post Office Box 26000
Greensboro, NC 27420-6000
Telephone: 336-373-8850
Fax: 336-378-1001

Matthew D. Cipolla
  JENNER & BLOCK LLP
919 Third Avenue
New York, NY 10022
(212) 891-1600

Howard S. Suskin
D. Matthew Feldhaus
Connor S.W. Rubin
Scott M. De Nardo
  JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
(312) 222-9350

Illyana A. Green
  JENNER & BLOCK LLP
1099 New York Avenue NW

10

Suite 900
Washington, DC 20001
(202) 639-6000

*Counsel for Amici Curiae*

11

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No. 1:19-cv-272-LCB

|  |  |
|---|---|
| MAXWELL KADEL; JASON FLECK; CONNOR THONEN-FLECK; JULIA MCKEOWN; MICHAEL D. BUNTING, JR.; C.B., *by his next friends and parents*, MICHAEL D. BUNTING, JR. and SHELLEY K. BUNTING; SAM SILVAINE, and DANA CARAWAY. | ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| DALE FOLWELL, *in his official capacity as State Treasurer of North Carolina*; DEE JONES, *in her official capacity as Executive Administrator of the North Carolina State Health Plan for Teachers and State Employees*; NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES; NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY. | ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

**STATE HEALTH PLAN DEFENDANTS'
MOTION FOR PARTIAL SUMMARY JUDGMENT**
(ORAL ARGUMENT REQUESTED)

Defendants, the North Carolina State Health Plan for Teachers and

State Employees ("the State Health Plan"), Dale Folwell (*in his official capacity*

*as State Treasurer of North Carolina*); and Dee Jones (*in her official capacity as Executive Administrator of the State Health Plan*), by and through undersigned counsel, do hereby move for partial summary judgment on Count III (the Affordable Care Act claim) and Count IV (the Title VII claim) on the grounds that there are no genuine issues of material fact as to these Counts and Defendants are therefore entitled to judgment as a matter of law.

In support of this motion, the State Health Plan Defendants rely on their memoranda of law and the declarations, deposition testimony, and exhibits filed herewith.

WHEREFORE, The State Health Plan Defendants respectfully request that this Court Grant its motion for partial summary judgment and enter judgment for Defendant State Health Plan regarding Count III (the Affordable Care Act claim) and Count IV (the Title VII claim).

The State Health Plan Defendants believe that oral argument is warranted in this case and would be helpful to the Court and therefore respectfully request, pursuant to L.R. 7.3(c), the opportunity to present oral arguments on this Motion.

Respectfully submitted, this the 30th day of November,2021.

/s/ John G. Knepper
John G. Knepper
Wyo. Bar No. 7-4608
Law Office of John G. Knepper, LLC
1720 Carey Avenue, Suite 590
Cheyenne, WY 82001
Telephone: (307) 632-2842
John@KnepperLLC.com

/s/ Kevin G. Williams
Kevin G. Williams
N.C. Bar No. 25760

/s/ Mark A. Jones
N.C. Bar No. 36215
BELL, DAVIS & PITT, P.A
100 N. Cherry St., Suite 600
Winston-Salem, NC 27101
T(336)722-3700;F 722-8153
kwilliams@belldavispitt.com
mjones@belldavispitt.com

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will provide electronic notification to all counsel of records in this matter.

This the 30th day of November, 2021.

/s/ John G. Knepper
John G. Knepper
Wyo. Bar No. 7-4608
Law Office of John G. Knepper, LLC
1720 Carey Avenue, Suite 590
Cheyenne, WY 82001
Telephone: (307) 632-2842
John@KnepperLLC.com

/s/ Kevin G. Williams
Kevin G. Williams
N.C. Bar No. 25760

/s/ Mark A. Jones
N.C. Bar No. 36215
BELL, DAVIS & PITT, P.A
100 N. Cherry St., Suite 600
Winston-Salem, NC 27101
T(336)722-3700;F 722-8153
kwilliams@belldavispitt.com
mjones@belldavispitt.com

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No. 1:19-cv-00272

|  |  |
|---|---|
| MAXWELL KADEL; JASON FLECK; CONNOR THONEN-FLECK; JULIA MCKEOWN; MICHAEL D. BUNTING, JR.; C.B., *by his next friends and parents*, MICHAEL D. BUNTING, JR. and SHELLEY K. BUNTING; SAM SILVAINE, and DANA CARAWAY. | ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| DALE FOLWELL*, in his official capacity as State Treasurer of North Carolina*; DEE JONES, *in her official capacity as Executive Administrator of the North Carolina State Health Plan for Teachers and State Employees*; NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES; NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

**STATE HEALTH PLAN DEFENDANTS' MEMORANDUM
IN SUPPORT OF PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

NATURE OF THE MATTER BEFORE THIS COURT ................................... 1

FACTS IN EVIDENCE.................................................................... 4

    1.  The State Health Plan................................................................ 4

    2.  Plan Implementation................................................................ 5

        A.  Plan Benefits.................................................................... 5

        B.  Gender Dysphoria............................................................ 7

        C.  Plan Exclusions............................................................... 8

        D.  Plan Exclusions in Practice................................................ 9

    3.  Dana Caraway's Title VII Claim ............................................. 13

STANDARD OF REVIEW ............................................................. 19

ARGUMENT ............................................................................ 20

    1.  The State Health Plan is Not Liable as Plaintiff Caraway's "Employer" under the Fourth Circuit's Agency and Control Test................................... 20

        A.  The State Health Plan can only be liable to Caraway under Title VII if the Plan and DPS are "joint employers."...................................... 20

        B.  Caraway has failed to show that DPS and the Plan are "joint employers" under the Fourth Circuit's hybrid test.................................... 21

    2.  The State Health Plan is not liable under Section 1557 of the Affordable Care Act because it is explicitly excluded from Section 1557 liability by the current U.S. Department of Health and Human Services Regulation. ....... 28

CONCLUSION............................................................................ 32

CERTIFICATE OF WORD COUNT ................................................. 34

*- ii -*

# TABLE OF AUTHORITIES

<u>CASES</u>

Birkbeck v. Marvel Lighting Corp.,
  30 F.3d 507 (4th Cir. 1994) ........................................................................ 21

Boston All. of Gay, Lesbian, Bisexual & Transgender Youth v. U.S. Dep't of
  Health & Hum. Servs.,
  No.20-11297-PBS, 2021 WL 3667760 (D.Mass. Aug. 18, 2021) ................... 29

Bray v. Alexandria Women's Health Clinic,
  506 U.S. 263 (1993) .................................................................................... 1

Butler v. Drive Auto. Indus. of Am.,
  793 F.3d 404 (4th Cir. 2015) ........................................................... passim

Callum v. CVS Health Corp.,
  137 F.Supp.3d 817 (D.S.C. 2015) ............................................................ 30

Chevron v. NRDC,
  467 U.S. 837 (1984) ........................................................................ 30, 31

Crowder v. Fieldcrest Mills Inc.,
  569 F. Supp 825 (M.D.N.C. 1983) ........................................................... 22

Currie v. Grp. Ins. Comm'n,
  290 F.3d 1 (1st Cir. 2002) ...................................................................... 31

Fain v. Crouch,
  No. CV 3:20-740,2021 WL 2657274 (S.D.W.Va. June 28, 2021) ................. 30

Geduldig v. Aiello,
  417 U.S. 484 (1974) ............................................................................. 1, 3

Jacobs v. N.C. Administrative Office of the Courts,
  780 F.3d 562 (4th Cir. 2015) .................................................................. 19

Lange v. Houston Cnty.,
  499 F.Supp.3d 1258 (M.D.Ga. 2020) ....................................................... 2

*- iii -*

Lissau v. Southern Food Service, Inc.,
   159 F.3d 177 (4th Cir. 1998) ...................................................................... 20, 21

Nat'l Collegiate Athletic Ass'n v. Smith,
   525 U.S. 459 (1999) ...................................................................................... 31

New York v. U.S. Dep't of Health & Hum. Servs.,
   No.1:20-cv-05583 (S.D.N.Y. Doc. No. 145, Aug. 23. 2021) ........................... 30

Othi v. Holder,
   734 F.3d 259 (4th Cir. 2013) ........................................................................ 30

Religious Sisters of Mercy v. Azar,
   513 F.Supp.3d 1113 (D.N.D.2021) ................................................................ 30

Schafer v. Astrue,
   641 F.3d 49  (4th Cir. 2011) ......................................................................... 30

Union Pac. R.R. Employment Practices Litig.,
   479 F.3d 936 (8th Cir. 2007) .......................................................................... 3

Victim Rts. L. Ctr. v. Cardona,
   2021 WL 3185743 (CV 20-11104, D.Mass. July 28, 2021) ........................... 31

Walker v. Azar,
   No.20-cv-2834, 2020 WL 6363970  (E.D.N.Y. Oct. 29, 2020) ........................ 29

Wash. v. U.S. Dep't of Health & Hum. Servs.,
   482 F.Supp.3d 1104 (W.D.Wash. 2020) ........................................................ 29

Whitman-Walker Clinic v. U.S. Dep't of Health & Hum. Servs.,
   485 F.Supp.3d 1 (D.D.C.2020) ..................................................................... 29

Williams v. Griffin,
   952 F.2d 820 (4th Cir. 1991) .......................................................................... 4

Williams v. Hansen,
   326 F.3d 569 (4th Cir. 2003) .......................................................................... 3

*- iv -*

S<small>TATUTES</small>

42 U.S.C. §18116 (§1557 of the Affordable Care Act) .................................. 2, 28

42 U.S.C. §18116(c) (§1557 of the Affordable Care Act) ........................... 28, 31

42 U.S.C. §2000e(b)(Title VII).............................................................................. 20

42 U.S.C. §2000e-2(a)(1)(Title VII) ................................................................... 20

O<small>THER</small> A<small>UTHORITIES</small>

F<small>EDERAL</small> T<small>RADE</small> C<small>OMMISSION,</small> P<small>HARMACY</small> B<small>ENEFIT</small> M<small>ANAGERS:</small> O<small>WNERSHIP OF</small>
    M<small>AIL</small>-O<small>RDER</small> P<small>HARMACIES</small> (2005) at (i), available at https://bit.ly/3d2fIGE .. 6

Tricia Lee Wilkins, Prior Authorization and Utilization Management
    Concepts in Managed Care Pharmacy, 25 J. M<small>ANAGED</small> C<small>ARE</small> & S<small>PECIALTY</small>
    P<small>HARMACY</small> 641, 641 (2019) ................................................................................ 6

R<small>EGULATIONS</small>

§1557. 85 Fed. Reg. 37172-74.............................................................................. 31

45 C.F.R. §92.3(b),(c) (2021) ......................................................................... 2, 29

85 Fed. Reg. 37160 (June 19, 2020) Nondiscrimination in Health and Health
    Education Programs or Activities, Delegation of Authority ......................... 29

81 Fed. Reg. 31376, 31467 (May 18, 2016Nondiscrimination in Health
    Programs and Activities) ............................................................................... 28

## NATURE OF THE MATTER BEFORE THIS COURT

The Equal Protection Clause does not allow individuals to sue for more generous state-sponsored insurance. State-run benefit programs must protect all members against the same risks. But the "asserted underinclusiveness of the set of risks that the State has selected to insure," *Geduldig v. Aiello*, 417 U.S. 484, 494 (1974), does not violate equal protection even when an excluded risk falls disproportionately upon a protected class, *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 271-72 & n.3(1993)(discussing *Aiello*). To prove a constitutional violation, plaintiffs must show a "[d]iscriminatory purpose" underlying the program's operation. *Bray*, 506 U.S. at 271-72.

The North Carolina State Health Plan (the "Plan") Defendants seek partial summary judgment, dismissing two of Plaintiffs' claims. First, Title VII claims may only be brought against a plaintiff's employer. Acts by an employer's agent can create liability for the employer, but relief is generally not available against the agent. A plaintiff can sue multiple defendants under Title VII only when they are 'joint employers.' The Fourth Circuit applies its 'hybrid test' in such circumstances. Plaintiff Dana Caraway, a 27-year employee of the Department of Public Safety ("DPS"), provides no evidence to satisfy the Fourth Circuit's 'hybrid test' for joint employers. Under this test,

*- 1 -*

the State Health Plan is not Caraway's joint employer and her Title VII claim should be dismissed.

Second, Plaintiffs' claims under §1557 of the Affordable Care Act, 42 U.S.C. §18116, should be dismissed because the federal rule interpreting §1557 explicitly excludes the State Health Plan from the provision's scope. In 2020, the U.S. Department of Health and Human Services ("HHS") concluded §1557 *does not* reach "an entity principally or otherwise engaged in the business *of providing health insurance.*" 45 C.F.R. §92.3(c)(2021) (emphasis added). Although the 2020 rule has been challenged in court, and other provisions of the rule are enjoined, this specific portion of the rule remains in effect. The Court should defer to HHS's interpretation and dismiss Plaintiffs' §1557 claim.

In contrast, Plaintiffs' equal protection claims remain for trial. The Plan protects against the risk of certain medical conditions, but it is not required to and has chosen not to protect against the risk of every medical condition. That the Plaintiffs seek treatment that is outside of the Plan's coverage does not constitute discrimination. The lack of facial discrimination remains true even if one assumes, incorrectly, that only transgender individuals suffer from gender dysphoria. Plaintiffs cannot prevail only with assertions that gender dysphoria disproportionately affects members of a protected class. *See Lange v. Houston Cnty.*, 499 F.Supp.3d 1258, 1275-77 (M.D.Ga.2020) (insurance

*- 2 -*

exclusion for gender dysphoria not facially discriminatory). The Supreme Court held in *Aiello* that the exclusion of pregnancy from a state insurance program was not a "sex-based" classification even though only natal females can become pregnant. 417 U.S. at 496 n.20. "The proper comparator is the provision of the medical benefit in question," not each beneficiary's medical needs. *In re Union Pac. R.R. Employment Practices Litig.*, 479 F.3d 936,944 (8th Cir.2007).

Plaintiffs could still prevail by showing that the "facially neutral" benefits plan, even "neutrally applied," is motivated by "discriminatory animus." *Williams v. Hansen*, 326 F.3d 569,584 (4th Cir.2003). But the Plan's coverage decisions result from changing federal regulations. When a 2016 federal rule required the Plan to expand benefits, the Plan did so. When the 2016 rule was enjoined nationwide, the Plan allowed the federally-required coverage to lapse. Plaintiffs allege that this lapse stemmed from discriminatory animus against transgender individuals. The Plan Defendants are confident that the factfinder will conclude otherwise. Nevertheless, summary judgment "is seldom appropriate in cases wherein particular states of mind are decisive

*- 3 -*

as elements of a claim or defense," *Williams v. Griffin*, 952 F.2d 820, 826 (4th Cir.1991), so Plaintiffs' claim should proceed to trial.[1]

## FACTS IN EVIDENCE

1.  <u>The State Health Plan</u>

The Plan is the largest purchaser of healthcare and pharmaceuticals in North Carolina, (Ex.1.Folwell.Dep.35:9-12), funding healthcare for more than 740,000 teachers, legislators, state and local government employees, retirees, and their dependents. (Ex.2.Jones.Dep.74:3-5;16:24-17:9). Until 2018, Plan members paid *no* premiums for their own health coverage, and enacting the current premium scheme "was a herculean effort." (Ex.2.Jones.105:25-106:5). The North Carolina General Assembly appropriates money for the remaining costs, but the appropriation currently increases by only 4% per year while healthcare costs rise 7% per year. (Ex.2.Jones.102:22-24).

Members can purchase coverage for spouses and children, but this benefit is not subsidized by the General Assembly. For the 80/20 Plan, adding children raises the premium to $305/month, adding a spouse costs $700/month,

---

[1]   The Count I claims of Maxwell Kadel and Sam Silvaine must be dismissed. Count I seeks prospective relief only and these Plaintiffs have left State employment. Amd.Comp.¶¶7,11. Neither has presented evidence of future plans to be a state employee or participate in the State Health Plan. These individuals therefore lack standing to assert Count I.

*- 4 -*

and adding a spouse and children costs $720/month. (Ex.3.PLANDEF.154817). For the 70/30 Plan, adding children costs $218/month, adding a spouse is $590/month, and adding a spouse and children costs $598/month. *Id.* For employees who elect family coverage, "a whole lot of" them must "work one week out of a month just to cover their Health Plan for their family." (Ex.2.Jones.105:22-24).

2.    Plan Implementation

A.    Plan Benefits

The Plan does not cover every medically necessary procedure, and no law has ever required the Plan to do so. (Ex.2.Jones.58:6-7;72:4-6). For each Plan coverage option, a benefit booklet describes the covered and non-covered services. (Ex.2.Jones.104:7-8). For services covered by the Plan, Blue Cross/Blue Shield of North Carolina ("BCBS")—the Plan's Third-Party Administrator—implements the booklet using the national billing practices and medical coding system of the healthcare industry. (Ex.4.BCBS.Decl.¶¶6-7,11).

Every provider submits a claim using a standardized form, which requires at least one diagnosis code, at least one procedure code, the insured's name, the provider's name, and the patient's age and sex. A diagnosis code identifies the reason for medical treatment. (Ex.4.BCBS.Decl.¶7).

International Classification of Diseases ("ICD") diagnosis codes used by BCBS are uniform across the healthcare industry. Each medical service or procedure also has a unique Current Procedural Terminology ("CPT") code. When BCBS receives a claim, it reviews whether the claim is for a Plan member with a covered diagnosis and covered procedure. If so, Blue Cross pays for the treatment. If a claim does not include a covered ICD code and a covered CPT code, or one code is missing entirely, the claim is denied. (Ex.4.BCBS.Decl.¶9).

CVS/Caremark is the Plan's pharmacy benefit manager ("PBM"). (Ex.1.Folwell.119:9-10). PBMs manage prescription drug benefits. FEDERAL TRADE COMMISSION, PHARMACY BENEFIT MANAGERS: OWNERSHIP OF MAIL-ORDER PHARMACIES (2005) at (i), *available at* https://bit.ly/3d2fIGE. PBMs reduce costs by using networks of retail pharmacies, identifying which drugs will be used to treat each medical condition, and providing incentives to use specific drugs. *Id.* PBMs also offer prior authorization and other protocols to manage and potentially reduce use of unnecessary high-risk or high-cost drugs. Tricia Lee Wilkins, *Prior Authorization and Utilization Management Concepts in Managed Care Pharmacy*, 25 J. MANAGED CARE & SPECIALTY PHARMACY 641, 641 (2019) (noting that prior authorization helps "optimiz[e] patient outcomes and reduc[e] waste, error, unnecessary drug use, and cost")(Ex.5).

B.    Gender Dysphoria

Plaintiffs allege that the Plan denies "coverage for treatment of gender dysphoria—the clinically significant distress that can result from the dissonance between an individual's gender identity and sex assigned at birth," and that the failure to provide this coverage is unlawful discrimination. Amd.Comp.¶1. According to the Plaintiffs' expert testimony, medical professionals distinguish between gender dysphoria as a symptom and the diagnosed psychiatric illness of gender dysphoria. (Ex.6.Karasic.Dep.18:5-15). The medical diagnosis of the psychiatric illness requires not only the symptom of 'gender dysphoria' ("distress about the difference between one's identified or lived gender and one's assigned gender") but also the provider's conclusion that this symptom causes "impairment of social occupational functioning or clinically significant distress." (Ex.6.Karasic.18:19-19:2).

Critically, not all transgender individuals suffer from gender dysphoria. (Ex.7.Ettner.Dep.28:11-13;Ex.8.Levine.Dep.241:24-242:14). In addition, "there may be people who have symptoms of gender dysphoria, but they personally don't identify as transgender." (Ex.6.Karasic.27:25-28:17;Ex.8.Levine.242:15-243:20). Plaintiffs have not provided any evidence that would allow a factfinder to determine what proportion of transgender individuals suffer from gender

- 7 -

dysphoria: "no one knows the answer to that [question]." (Ex.9.Brown.Dep.92:17-25).

>        C.    Plan Exclusions

The Plan does not and is not required to cover all medical treatments. The benefit booklet accordingly alerts and advises participants that the Plan does not cover "[a]nything specifically listed in this benefits booklet as not covered or excluded, regardless of medical necessity." *See*, *e.g.*, 2020 Booklet for 80/20 Plan (Ex.3.PLANDEF-120625). The Plan excludes coverage in four circumstances that potentially affect treatment for gender dysphoria. (Ex.2.Jones.15:20-16:9;117:10-118:5).

> Cosmetic services, which include the removal of excess skin from the abdomen, arms or thighs, skin tag excisions, cryotherapy or chemical exfoliation for active acne scarring, superficial dermabrasion, injection of dermal fillers, services for hair transplants, electrolysis and surgery for psychological or emotional reasons, except as specifically covered by the *Plan*. (Ex.3.PLANDEF-120627).

> Psychological assessment and psychotherapy treatment in conjunction with proposed gender transformation. (Ex.3.PLANDEF-120632).[2]

---

[2]    While the benefit booklets indicate that the Plan does not cover counseling related to gender dysphoria, the Plan's behavioral health program does not consider a patient's diagnosis. Therefore, since at least 1990, this language in the booklet has had no effect on the benefits actually available to Plan participants. (Ex.4.BCBS.Decl.¶27). The Board of Trustees of the State Health Plan has eliminated this language from Plan benefit booklets, effective January 1, 2022.

- *8* -

Treatment or studies leading to or in connection with sex changes or modifications and related care. (Ex.3.PLANDEF-120636).

The following drugs or medications: … *Experimental* medication or any medication or device not approved by the Food and Drug Administration (FDA) for the applicable diagnosis or treatment. (Ex.3.PLANDEF-120628).[3]

D.    Plan Exclusions in Practice.

1.    Surgical Claims

Neither the Plan nor BCBS identifies whether a participant is transgender. (Ex.2.Jones.87:20-22;Ex.4.BCBS.Decl.¶¶14,28). The Plan asks each member whether he or she is male or female, but that person decides what information to provide and can change his or her sex at any time. (Ex.2.Jones 85:10-87:22). When a claim is submitted to BCBS, the provider submits only the name of the plan participant, the name of the provider, the age and sex of the participant, the ICD diagnosis code, and the CPT procedure code. BCBS does not consider a patient's sex when reviewing claims connected to gender dysphoria, and BCBS does not code or track whether a Plan participant is transgender, cisgender, non-binary or otherwise. (Ex.4.BCBS.Decl.¶¶22,28). BCBS identifies the following procedures as not covered by the Plan, regardless

---

[3]    The fourth limitation does not apply to (1) prescription medication used in covered clinical trials or (2) medication approved by the FDA for cancer treatment when prescribed to treat a different form of cancer than that approved by FDA. (Ex.3.PLANDEF-120628).

of diagnosis code, because industry coding indicates these procedures are used only for treatment of gender dysphoria:

| CPT Code | Description of Surgery |
|---|---|
| 55970 | Intersex Surgery, Male to Female |
| 55980 | Intersex Surgery, Female to Male |
| 57335 | Vaginoplasty for Intersex State |
| 56805 | Clitoroplasty for Intersex State |

(Ex.4.BCBS.Decl.¶20). The following CPT codes are not covered when their procedures are performed to treat one of two diagnosis codes: F64.0 (Transsexualism) or Z87.890 (Personal history of sex reassignment). These ICD codes are not created by the Plan, and BCBS identifies them as the diagnosis codes for treatment of the psychiatric diagnosis of gender dysphoria.

**CPT Code and Description of Surgery**

| | |
|---|---|
| 54400 | Insertion of Penile Prosthesis; non-inflatable (semi-rigid) |
| C1813 | Prosthesis, Penile, Inflatable |
| 54401 | Insertion of Penile Prosthesis; inflatable (self-contained) |
| 54405 | Insertion of multi-component, inflatable penile prosthesis, including placement of pump, cylinders, and reservoir |
| 54406 | Removal of multi-component Inflatable Penile |

| 54408 | Repair Components(s) multi-component, Inflatable Penile |
| 54410 | Removal and replacement of all components(s) of a multi-component, inflatable penile prosthesis at the same operative session |
| 54411 | Removal and replacement of all components of a multi-component inflatable penile prosthesis through an infected field at the same operative session, including irrigation and debridement of infected tissue |
| 54415 | Removal non-inflatable (semi-rigid) /inflatable |
| 54416 | Removal and replacement of non-inflatable (semi-rigid) or inflatable (self-contained) penile prosthesis at the same operative session |
| 54417 | Removal and replacement of a non-inflatable (semi-rigid) or inflatable (self-contained) penile prosthesis through an infected field at the same operative session, including irrigation and debridement of infected tissue |
| 54660 | Insertion of Testicular Prosthesis (separate procedure) |
| 55175 | Scrotoplasty (simple) |
| 55180 | Scrotoplasty (complicated) |
| 56800 | Plastic Repair of Introitus |
| 57291 | Construction of artificial vagina (without graft) |
| 57292 | Construction of artificial vagina (with graft) |
| 19316 | Mastopexy |
| 19318 | Breast Reduction |

*- 11 -*

| 57295 | Revision (including removal) of prosthetic vaginal graft |
|-------|---------------------------------------------------------|
| 57296 | Revision (including removal) of prosthetic vagina graft |
| 19325 | Breast Augmentation with implant |
| 17380 | Electrolysis Epilation, each .5 hour |

(Ex.4.BCBS.Decl.¶21). If an otherwise proper claim included either diagnosis code above with a different CPT code, the Plan would pay it. The Plan's exclusion of certain surgeries that Plaintiffs might seek is based on diagnosis and medical coding and not transgender identity. (Ex.4.BCBS.Decl.¶28). Further, BCBS does not approve cosmetic procedures for any Plan participant, regardless of diagnostic code. (Ex.4.BCBS.Decl.¶25).

## 2.    Prescription Medication

For prescription drugs, CVS/Caremark reviews claims on the Plan's behalf. When a prescription drug is not subject to prior authorization, CVS reviews four questions: whether the beneficiary is an eligible Plan participant, whether the drug is covered for any purpose in the Plan formulary, whether the pharmacy is in-network, and whether the prescription is within quantity limits. CVS never inquires, for any participant, whether the individual is transgender. If a drug is not subject to prior authorization, CVS never learns the patient's diagnosis. (Ex.10.Korn Decl.¶¶ 4-5;PLANDEF-205466-67). CVS

and the Plan do not know whether a prescription is to treat gender dysphoria or another condition and accordingly, some medications Plaintiffs seek (*e.g.* estrogen or spironolactone) are covered by the Plan.

Some medications, however, are expensive or subject to abuse. For these medicines, CVS requires prior approval before filling a prescription. The treating physician must initiate the prior authorization process, and CVS approval is based on the diagnosis that justifies the prescription. Seven medications used for treatment of gender dysphoria require prior authorization. None of the medications are FDA-approved for treatment of gender dysphoria, and CVS denies coverage for these medications when prescribed for this purpose. (Ex.11.Neuberger.Decl.¶¶4-5;PLANDEF-205468).

3.    <u>Dana Caraway's Title VII Claim</u>

In 1994, Caraway applied to be a corrections officer at Marion Correctional Institute, a Department of Public Safety facility. (Ex.12.Caraway.Dep.90:15-21). Caraway interviewed with multiple DPS employees, including an administrative assistant, the assistant warden, and the warden. (Ex.12.Caraway.91:9-13). These DPS employees "were in charge of the facility" and "seeing that it was employed and staffed." (Ex.12.Caraway.91:14-18). Within DPS, the "hiring process is handled by each individual DPS facility[,]" (Ex.13.DPS.Dep.39:16-18), and each prison facility

*- 13 -*

has a regional employment office where it submits its hiring paperwork. (Ex.13.DPS.40:1-4). The regional DPS employment offices report to DPS's Central Human Resources department. (Ex.13.DPS.40:5-14).

Exhibit 4 to Caraway's deposition includes documents related to her DPS onboarding, including her acknowledgment of the DPS policy on secondary employment; tax forms; acknowledgment of DPS memoranda titled "Conditions of Continued Employment" and "Department of Corrections Disciplinary and Grievance Policy and Procedure;" and acknowledgment that DPS prohibits employees from soliciting donations or receiving gifts or favors. (Ex.12.Caraway.Dep.Ex.4).

Caraway served as a Corrections Officer ("CO") at Marion Correctional for five years. (Ex.12.Caraway.19:18-21:2). DPS then employed Caraway as a CO at its Western Youth Institute. (Ex.12.Caraway.21:3-8). In 2006, DPS promoted Caraway to Correctional Sergeant and transferred her to Alexander Correctional Institute. (Ex.12.Caraway.22:7-10). In 2010, Caraway returned to Western Youth until DPS closed the facility in 2013, at which point she served again at Alexander Correctional. (Ex.12.Caraway.27:8-19, 28:12-14). In 2014, DPS transferred Caraway to Foothills CI, where she is currently employed. (Ex.12.Caraway.28:19-21).

- 14 -

All DPS "employees are expected to participate in" mandatory DPS training—which is conducted at DPS facilities—or face discipline. (Ex.13.DPS.37:12-23;48:8-13; Ex.12.Caraway.97:13-25). Caraway has received more than a thousand hours of DPS training in her career, (Ex.12.Caraway.98:21-99:6), but has not identified any training she has received from the State Health Plan.

As of 2021, Mr. Badgett, a DPS "[c]orrectional housing unit manager," monitors and supervises Caraway's job performance. (Ex.12.Caraway.99:25-100:14). DPS employee discipline is handled by DPS's "investigation process." (Ex.12.Caraway.101:6-10). "If there's wrongdoing," Caraway's DPS supervisor "could actually give you a coaching session or something within those guidelines, but with actual disciplinary action, it would go to our facility head, to region, then to DPS headquarters in Raleigh." (Ex.12.Caraway.101:13-21). The disciplinary process involves DPS employees exclusively; the Plan has no role in DPS discipline. (Ex.12.Caraway.101:22-102:11).

The decision to fire a DPS employee starts with the employee's DPS supervisor and "then go[es] up through the chain of command through the warden and superintendent." (Ex.13.DPS.34:4-8). Final approval for a termination comes from the Employee Relations Section of DPS's Central Human Resources. (Ex.13.DPS.34:1-24).

"Post orders" list specific duties that each DPS employee is "expected to carry out on a daily basis in your position." (Ex.12.Caraway.103:22-104:4). Post orders are established by DPS correctional management (*e.g.*, warden or assistant warden) and failure to follow post orders "could be a basis for discipline." (Ex.12.Caraway.104:6-15.) Since 2014, Caraway has followed the post orders describing her "responsibilities as a sergeant at Foothills Correctional Institution." (Ex.12.Caraway.104:21-24). Caraway has not identified any orders or directives that she has received from the State Health Plan.

If Caraway experiences an issue with her paycheck, which has happened "several times in [her] career," she contacts the DPS "personnel in human resources in our facility." (Ex.12.Caraway.107:3-12). Her pay stubs reflect employment by DPS. (Ex.12.Caraway.109:6-14).

Correctional Sergeants and COs must wear DPS uniforms, which are issued by and are the property of DPS. (Ex.13.DPS.44:23-45:8;Ex.12.Caraway.110:23-111:3). Correctional Sergeants and COs must also use DPS equipment: handcuffs, handcuff holster, pepper spray, pepper spray holster, baton, baton holster … firearm, firearm holster, ammunition." (Ex.13.DPS.45:9-23). (Ex.12.Caraway.111:4-14). DPS supplies Caraway's

equipment; she is not allowed to use equipment from other sources. (Ex.12.Caraway.111:16-23).

DPS provides health coverage to approximately 90% of its employees through the State Health Plan. (Ex.13.DPS.9:20-11:2). DPS employees choose whether to sign-up for coverage. They are not required to do so, and some employees are ineligible. (Ex.13.DPS.17:15-17,10:19-24). The Plan determines the amount it charges per employee each year, and the Office of the State Comptroller pays that amount. (Ex.13.DPS.10:4-11:8). DPS does not determine the health risks that the Plan will protect against or the benefits available to those who elect to participate. (Ex.13.DPS.29:22-24). DPS has had no "communications with the State Health Plan regarding" exclusion of certain gender dysphoria treatments. (Ex.13.DPS.30:14-17).

DPS requires its employees to obtain pre-approval before accepting secondary employment, and failure to do so can result in discipline. (Ex.13.DPS.51:9-22) Caraway confirmed that she understands this policy and has followed it since 1994. (Ex.12.Caraway.93:7-16). Caraway testified that, other than a recent secondary job with a clothing store, "[t]he only employer I worked for in the last 27 was … the Department of Corrections, Department of Public Safety." (Ex.12.Caraway.93:7-16). DPS further testified about the degree of control the State Health Plan exercises over Caraway:

*- 17 -*

Q.    Does the Department of Public Safety employ Sergeant Caraway?

A.    Yes -- to my knowledge.

Q.    Does the State Health Plan employ Sergeant Caraway?

A.    Not that I'm aware of.

Q.    Does the State Health Plan have the authority to hire or fire Sergeant Caraway?

A.    Not that I'm aware of.

Q.    Does the State Health Plan have the authority to supervise Sergeant Caraway?

A.    Not that I'm aware of.

Q.    Does the State Health Plan have the authority to discipline Sergeant Caraway?

A.    Not that I'm aware of.

Q.    Does the State Health Plan furnish the equipment or the place of work for Sergeant Caraway?

A.    Not that I'm aware of.

Q.    Does the State Health Plan have custody over Sergeant Caraway's personnel file?

A.    No. Not that I'm aware of.

        …

Q.    Does DPS provide corrections officers with formal and informal training?

A.    Yes.

        …

*- 18 -*

Q.    And to the best of your knowledge, Sergeant Caraway only
provides services to the Department of Public Safety?

A.    Yes -- to the best of my knowledge.

Q.    And if Sergeant Caraway provided, had a second employer,
the department's policy is that she needed to get that
approved prior to assuming that second task or second job?

A.    Yes. That's correct.

Q.    And a failure to do so is a basis for discipline by the
Department of Public Safety?

A.    Yes. That's correct.

(Ex.13.DPS.63:12-66:7).

## STANDARD OF REVIEW

"A district court 'shall grant summary judgment if the movant shows
that there is no genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law.'" *Jacobs v. N.C. Administrative Office
of the Courts*, 780 F.3d 562,568 (4th Cir.2015)(quoting Fed.R.Civ.P.56(a)). "A
dispute is genuine if a [factfinder] could return a verdict for the nonmoving
party. A fact is material if it might affect the outcome of the suit under the
governing law." *Id.* (citations and quotations omitted).

## ARGUMENT

1. <u>The State Health Plan is Not Liable as Plaintiff Caraway's "Employer"</u>
   <u>under the Fourth Circuit's Agency and Control Test.</u>

Title VII, 42 U.S.C. §2000e-2(a)(1), provides that "[i]t shall be an unlawful employment practice for an employer … to discriminate against any individual with respect to … compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." Title VII defines an "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person." 42 U.S.C. §2000e(b). "The statute[, however,] does not define the term 'agent.'" *Lissau v. Southern Food Service, Inc.*, 159 F.3d 177,180 (4th Cir.1998).

   A.    The State Health Plan can only be liable to Caraway under Title
         VII if the Plan and DPS are "joint employers."

The State Health Plan is not independently and individually liable as an "agent" of DPS. In the Fourth Circuit, agents do not incur Title VII liability because "an entity can be held liable in a Title VII action **only if it is an 'employer' of the complainant**." *Butler v. Drive Auto. Indus. of Am.*, 793 F.3d 404,408 (4th Cir.2015) (emphasis added). This unequivocal holding is in accord with the Fourth Circuit's prior decisions in *Lissau v. Southern Food*

*- 20 -*

*Service, Inc.*, 159 F.3d 177 (4th Cir.1998) and *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507,510 (4th Cir.1994).

In *Birkbeck*, the Fourth Circuit interpreted an ADEA provision that is identical to the relevant Title VII language and explicitly rejected liability for an agent of an employer. Rather, the reference to 'agent' in the Title VII definition of employer is "an unremarkable expression of *respondeat superior*— that discriminatory personnel actions taken by an employer's agent may create liability **for the employer**." *Birkbeck*, 30 F.3d at 510 (emphasis added).

In *Lissau*, the Fourth Circuit applied *Birkbeck* to reject efforts to hold "agents" separately and independently liable under Title VII. *Lissau*, 159 F.3d at 180-81. Congress's inclusion of the word "agent" in Title VII's definition of "employer" did not signal an intent to make the agent separately liable. Rather, the word was included "simply to establish a limit on an employer's liability for its employees' actions." *Lissau*, 30 F.3d at 180 (quoting *Birkbeck*, 30 F.3d at 510-11). *Lissau* reiterated that "Congress only intended **employers** to be liable for Title VII violations." *Id.* at 181 (emphasis added).

B.    Caraway has failed to show that DPS and the Plan are "joint employers" under the Fourth Circuit's hybrid test.

In *Butler*, the Fourth Circuit observed that "[o]ther courts have found that two parties can be considered joint employers and therefore both be liable

- *21* -

under Title VII if they share or co-determine those matters governing the essential terms and conditions of employment." *Butler*, 793 F.3d at 408 (quotation omitted). The "joint employment doctrine captures instances in which multiple entities control an employee." *Id.* at 409. "Given Title VII's remedial intent, employers should not be able to avoid Title VII by affixing a label to a person that does not capture the substance of the employment relationship[,]" and "[t]he joint employment doctrine thus prevents those who effectively employ a worker from evading liability by hiding behind another entity." *Id.* at 410 (punctuation omitted). *Butler* conclusively established that "the joint employment doctrine is the law of this Circuit" and "the doctrine's emphasis on determining which entities actually exercise control over an employee is consistent with Supreme Court precedent interpreting Title VII's definitions. The "the common law element of control, drawn from the law of agency, is the principal guidepost."[4] *Id.* at 409 (citations and quotations omitted).[5]

---

[4] Whether DPS is independently liable under Title VII is irrelevant.

[5] This Court's nearly forty-year-old decision in *Crowder v. Fieldcrest Mills Inc.,* 569 F. Supp 825,827-29 (M.D.N.C.1983) considered, in dicta, the hypothetical application of the economic realities test to an insurance provider. *Butler* subsequently merged the "economic realities test" with the "control test" to form the "hybrid test," and thus *Crowder* is inapplicable. Nor are cases from circuits without the "hybrid test."

*- 22 -*

Courts within the Fourth Circuit apply the *Butler* test when, as here, it is alleged that multiple entities "exercise significant control over the same employees." *Butler*, 793 F.3d at 408; *see* Amd.Comp.¶¶178-81. To analyze when an agency relationship creates Title VII liability as a "joint employer," the Fourth Circuit combined the "control test" with the "economic realities test," instructing district courts to use a "hybrid test." *Id.* at 412-14. The hybrid test factors for the district court to consider in this case are:

> (1) Whether the State Health Plan has "authority to hire and fire [Caraway];"
>
> (2) Whether the State Health Plan has "day-to-day supervision of [Caraway]including employee discipline;"
>
> (3) "[W]hether the putative employer [the State Health Plan] furnishes the equipment used and the place of work;"
>
> (4) Whether the State Health Plan has "possession of and responsibility over [Caraway's] employment records, including payroll, insurance, and taxes;"
>
> (5) "[T]he length of time during which [Caraway] has worked for the putative employer [the State Health Plan];"
>
> (6) "[W]hether the putative employer [the State Health Plan] provides [Caraway] with formal or informal training;
>
> (7) "[W]hether [Caraway's] duties are akin to" the regular duties of a State Health Plan employee;
>
> (8) "[W]hether [Caraway] is assigned solely to [work for the State Health Plan];" and finally,

*- 23 -*

(9) "[W]hether [Caraway] and [the State Health Plan] intended to enter into an employment relationship."

*Butler*, 793 F.3d at 414. Though "none of these factors are dispositive" and "the common-law element of control remains the principal guidepost in the analysis," the first three factors are the "most important." *Id.*

Caraway, a 27-year veteran of DPS, presents no facts to suggest she has ever been employed by the Plan.

First, Caraway has no evidence the Plan has ever had authority to hire or fire her. As both she and DPS testified, Caraway was hired by DPS after interviewing with the warden and assistant warden at Marion Correctional Institute (two DPS employees). (Ex.12.Caraway.91:9-13;Ex.13.DPS.39:16-18). The Plan played no role in hiring, and Caraway presents no evidence the Plan could have a role in her termination if that ever were to happen. (Ex.13.DPS.34:4-21). As the Fourth Circuit explained, "which entity or entities have the power to hire and fire the putative employee, is important to determining ultimate control." *Butler*, 793 F.3d at 414. The State Health Plan exercises no control over whether DPS hires, retains, promotes, demotes, or fires Caraway. The absence of any evidence to prove this "important" hybrid-test factor demonstrates that the Plan does not exercise sufficient control over Caraway's employment. *Id.*

- 24 -

Second, Caraway has no evidence the Plan exercises control over her employment by supervising her in any way. Caraway's "post orders" describe the duties she "is expected to carry out on a daily basis," and these are issued by DPS managers (*e.g.* the warden or assistant warden). (Ex.12.Caraway.104:1-11;105:20-25). There is no evidence Caraway has ever been supervised by, or reported to, anyone at the State Health Plan. Further, Caraway testified that failure to follow DPS "post orders" "could be a basis for discipline." (Ex.12.Caraway.104:12-15). Yet she offered no evidence suggesting the Plan plays any role in DPS discipline. (Ex.12.Caraway.101:22-102:11) Discipline is handled by DPS's "investigation process." (Ex.12.Caraway.101:6-10). The second factor—"to what extent [Caraway] is supervised [by the State Health Plan—]is useful for determining the day-to-day, practical control of the employee." *Butler*, 793 F.3d at 414-15. The absence of any evidence for this second "important" hybrid-test factor further demonstrates the Plan does not significantly control Caraway's employment and is not her "employer," joint or otherwise.

Third, Caraway has no evidence that she ever performed work at the Plan offices, nor has she used Plan equipment to accomplish her job duties as a Correctional Sergeant. To the contrary, Caraway testified: "I don't work in Raleigh. I just work in my facility." (Ex.12.Caraway.102:9-10). Nor did she

*- 25 -*

identify any resource furnished by the Plan that she has ever used to perform her job duties. At each facility, DPS supplies her uniform and equipment. (Ex.12.Caraway.111:4-23;Ex.12.DPS.45:9-23). "The third factor, where and how the work takes place, is valuable for determining how similar the work functions are compared to those of an ordinary employee." *Butler*, 793 F.3d at 414-15. Caraway's failure to produce evidence of this "important" hybrid-test factor further proves the State Health Plan does not have "ultimate control" over Caraway and is thus not her "employer," joint or otherwise. *Id.* at 414.

Though *Butler* holds the first "[t]hree factors are the most important" in the hybrid test, *id.,* and Caraway has no evidence in support of any of them, the remaining six *Butler* factors reinforce that Caraway is not, and never has been, employed by the Plan. There is no evidence the Plan possesses any of Caraway' employment records nor that it has ever provided her job training. (Ex.12.Caraway.95:22-96:7;99:21-24;Ex.13.DPS.48:8-13;37:12-23).   Caraway thus has no evidence to support the fourth and sixth hybrid-test factor.

Regarding the seventh hybrid-test factor, Caraway offers no evidence that her duties are similar to the duties of actual Plan employee. Caraway follows "post orders" prepared by the warden and management of her correctional facility. (Ex.12.Caraway104:6-11;105:20-25). In contrast, Plan employees manage implementation of the State Health Plan.

(Ex.2.Jones.69:23-25). None of Caraway's orders, nor anything she does while at work, benefits the State Health Plan. This factor weighs in favor of the Plan.

Regarding the eighth hybrid-test factor, Caraway has never been assigned to perform work for the Plan. (Ex.12.Caraway.93:7-16). There is no evidence that Caraway ever performed work to help the State Health Plan accomplish its mission of providing specific and defined health benefits to mitigate against certain health risks. This hybrid-test factor weighs against Caraway.

Finally, there is no evidence the Plan or Caraway "intended to enter into an employment relationship." *Butler*, 793 F.3d at 414. None of Caraway's initial employment documents refer to the Plan. (Ex.12.Caraway.19:15-17;89:21-25). Her monthly salary statement only shows employment with DPS. (Ex.12.Caraway.109:9-11). DPS has no evidence, regarding the fifth and ninth hybrid-test factors, that Caraway is now, or has been, employed by the Plan. (Ex.13.DPS.63:12-66:7). As Caraway explained, other than a secondary job with a clothing store, "[t]he only employer I worked for in the last 27 years was…the Department of Corrections, Department of Public Safety." (Ex.12.Caraway.93:7-16.)

Caraway fails to offer any evidence that would satisfy the Fourth Circuit's hybrid test and show that the State Health Plan exercises sufficient

control over her employment such that the Plan could be liable as a "joint employer" under Title VII. Instead, Caraway asserts that DPS has delegated "significant control over [DPS] employee health benefits" to the Plan, and the Plan's exercise of "significant control over those employees by determining" Plan benefits creates Title VII liability. Amd.Comp.¶¶178-81. This is not the law in the Fourth Circuit. Under controlling precedent, summary judgment should be granted for the Plan, and Caraway's Title VII claim should be dismissed.

2.  <u>The State Health Plan is not liable under Section 1557 of the Affordable Care Act because it is explicitly excluded from Section 1557 liability by the current U.S. Department of Health and Human Services Regulation.</u>

When Plaintiffs brought suit in 2019, the U.S. Department of Health and Human Services (HHS) interpreted the statutory term "health program or activity" in §1557 to include third-party health care payors, such as the State Health Plan. *Nondiscrimination in Health Programs and Activities*, 81 Fed. Reg. 31376, 31467 (May 18, 2016) (promulgating 45 C.F.R. §92.4). HHS has authority to promulgate regulations to implement §1557, *see* 42 U.S.C. §18116(c), and the 2016 definition included all operations of an entity "principally engaged" in "the provision or administration of … health-related coverage." 81 Fed. Reg. 31467.

*- 28 -*

In June 2020, the Department revised its rules, effective August 18, 2020. *Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority*, 85 Fed. Reg. 37160 (June 19, 2020). The Department re-defined "health program or activity" to explicitly exclude entities such as the State Health Plan. The phrase "health care program or activity" currently includes only those entities "engaged in the business of providing healthcare" and, further, "an entity principally or otherwise engaged in the business of providing health insurance **shall not**, by virtue of such provision, be considered to be principally engaged in the business of providing healthcare." 45 C.F.R. §92.3(b),(c)(2021)(emphasis added).

While the 2020 rule has been challenged in five federal district courts, and other provisions of that have been enjoined, **this provision remains in effect.** Of the district courts considering the 2020 rule, three courts concluded the plaintiffs lacked standing to challenge this portion of the regulation. *Whitman-Walker Clinic v. U.S. Dep't of Health & Hum. Servs.*, 485 F.Supp.3d 1,31-33 (D.D.C.2020); *Walker v. Azar*, No.20-cv-2834, 2020 WL 6363970, at *3 (E.D.N.Y. Oct. 29, 2020); *Wash. v. U.S. Dep't of Health & Hum. Servs.*, 482 F.Supp.3d 1104,1121 (W.D.Wash.2020). Two courts have allowed a challenge, but neither court has issued an injunction and both cases are stayed. *Boston All. of Gay, Lesbian, Bisexual & Transgender Youth v. U.S. Dep't of Health &*

*Hum. Servs.*, No.20-11297-PBS, 2021 WL 3667760, at *9 (D.Mass. Aug. 18, 2021); *Boston Alliance v. HHS*, No.20-11297-PBS (Oct. 29, 2021) (denying Motion to Remand but staying further proceedings). *See also New York v. U.S. Dep't of Health & Hum. Servs.*, No.1:20-cv-05583 (S.D.N.Y. Doc. No.145, Aug. 23, 2021). *But see Religious Sisters of Mercy v. Azar*, 513 F.Supp.3d 1113,1149 (D.N.D.2021) (granting injunction to *prevent* changes to 2020 rule that are irrelevant here).

The interpretation in the HHS rule is entitled to deference under the familiar *Chevron* test. *Chevron v. NRDC*, 467 U.S. 837 (1984). Under *Chevron* step one, this court must determine whether Congress "has directly spoken to the precise question at issue" or whether, instead, the statutory term is ambiguous. *Othi v. Holder,* 734 F.3d 259,265 n.4 (4th Cir.2013). When a statutory phrase is ambiguous, *Chevron* step two asks only whether the interpretation "is based on a permissible construction of the statute." *Schafer v. Astrue,* 641 F.3d 49,54 (4th Cir.2011).

Section 1557 does not define "health program or activity," and two district courts in the Fourth Circuit have reached differing conclusions. *Compare Callum v. CVS Health Corp.*, 137 F.Supp.3d 817,849-50 (D.S.C.2015)(ambiguous) *with Fain v. Crouch*, No. CV 3:20-740,2021 WL 2657274, at *2-4 (S.D.W.Va. June 28, 2021)(unambiguous). This disagreement

*- 30 -*

alone demonstrates the term's ambiguity. Moreover, other courts have deferred to agency interpretations that define the term 'program or activity' in other civil rights statutes. *See Victim Rts. L. Ctr. v. Cardona*, CV 20-11104, 2021 WL 3185743, at *12 (D.Mass. July 28, 2021)(agency has authority to interpret "education program or activity" under Title IX); *Nat'l Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459,467-68 (1999)(citing regulations defining scope of Title IX).[6]

Noting the complexity of the health insurance market, and recognizing the agency's distinction elsewhere between "health insurance" and "healthcare," HHS concluded in 2020 that entities like the Plan are not subject to §1557. 85 Fed. Reg. 37172-74. Under *Chevron,* "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Id.* at 844. Section 1557 explicitly gave authority to HHS to "promulgate regulations to implement this section," 42 U.S.C.

---

[6]  A court cannot find the same statutory term ambiguous in one case and not another. If this Court concludes "health program or activity" is unambiguous, it is also holding that HHS can never interpret that phrase, and the agency was wrong to do so in both 2016 and 2020. Moreover, any future rulemaking on the subject would be invalid. Agency regulations can limit the reach of a statute, as here, but they can also expand the statutory scheme. *Currie v. Grp. Ins. Comm'n*, 290 F.3d 1,6-7 (1st Cir.2002) (DOJ rule extending Title II of the ADA to include employment within the scope of "public services, programs, activities").

*- 31 -*

§18116(c), and this Court should defer to the current regulation and grant summary judgment, dismissing Plaintiffs' §1557 claims.

## CONCLUSION

The Fourth Circuit has repeatedly and conclusively held that Title VII claims can only be brought against a plaintiff's employer, though multiple entities can be liable as joint employers. Here, however, there is no genuine dispute as to any material fact when the Fourth Circuit's hybrid test is applied, and summary judgment for the State Health Plan on Count IV is required. Further, the current and controlling rule from the U.S. Department of Health and Human Services explicitly excludes the State Health Plan from liability under §1557. Summary judgment and the dismissal of Count III is therefore required.

*- 32 -*

Respectfully submitted, this the 30th day of November, 2021.

/s/ John G. Knepper
John G. Knepper
Wyo. Bar No. 7-4608
Law Office of John G. Knepper, LLC
1720 Carey Avenue, Suite 590
Cheyenne, WY 82001
Telephone: (307) 632-2842
John@KnepperLLC.com

/s/ Kevin G. Williams
Kevin G. Williams
N.C. Bar No. 25760

/s/ Mark A. Jones
N.C. Bar No. 36215
BELL, DAVIS & PITT, P.A
100 N. Cherry St., Suite 600
Winston-Salem, NC 27101
T(336)722-3700;F 722-8153
kwilliams@belldavispitt.com
mjones@belldavispitt.com

*- 33 -*

## CERTIFICATE OF WORD COUNT

Pursuant to L.R. 7.3(d)(1), the undersigned certifies that this Brief complies with the Court's word limit as calculated using the word count feature of the word processing software. Specifically, this Brief contains less than 6,250 words. This count includes the body of the brief and headings, but does not include the caption, signature lines, this certificate or the certificate of service.

This the 30th day of November, 2021.

/s/ John G. Knepper
John G. Knepper
Wyo. Bar No. 7-4608
Law Office of John G. Knepper, LLC
1720 Carey Avenue, Suite 590
Cheyenne, WY 82001
Telephone: (307) 632-2842
John@KnepperLLC.com

/s/ Kevin G. Williams
Kevin G. Williams
N.C. Bar No. 25760

/s/ Mark A. Jones
N.C. Bar No. 36215
BELL, DAVIS & PITT, P.A
100 N. Cherry St., Suite 600
Winston-Salem, NC 27101
T(336)722-3700;F 722-8153
kwilliams@belldavispitt.com
mjones@belldavispitt.com

mjones@belldavispitt.com

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will provide electronic notification to all counsel of records in this matter.

This the 30th day of November, 2021.

/s/ John G. Knepper
John G. Knepper
Wyo. Bar No. 7-4608
Law Office of John G. Knepper, LLC
1720 Carey Avenue, Suite 590
Cheyenne, WY 82001
Telephone: (307) 632-2842
John@KnepperLLC.com

/s/ Kevin G. Williams
Kevin G. Williams
N.C. Bar No. 25760

/s/ Mark A. Jones
N.C. Bar No. 36215
BELL, DAVIS & PITT, P.A
100 N. Cherry St., Suite 600
Winston-Salem, NC 27101
T(336)722-3700;F 722-8153
kwilliams@belldavispitt.com
mjones@belldavispitt.com

*- 35 -*

Page 1

1                IN THE UNITED STATES DISTRICT COURT FOR

2                THE MIDDLE DISTRICT OF NORTH CAROLINA

3

4

5      MAXWELL KADEL, et al.,        )
                                     )
6                  Plaintiffs,       )
                                     )    No. 1:19-cv-272-LCB-LPA
7             V.                     )
                                     )
8      DALE FOLWELL, et al.,         )
                                     )
9                  Defendants.       )
       _____     )

10

11

12

                             DEPOSITION
13                               OF
                            DALE FOLWELL

14

15                       AUGUST 12, 2021

16

17            THIS TRANSCRIPT IS NOT COMPLETE
            PORTIONS OF THIS TRANSCRIPT AND/OR EXHIBITS
18     MAY BE DESIGNATED CONFIDENTIAL/ATTORNEYS EYES ONLY
       AFTER REVIEW OF TRANSCRIPT BY ATTORNEYS WITHIN 30
19      DAYS OF DATE OF DEPOSITION PER PROTECTIVE ORDER

20

21

22            NORTH CAROLINA STATE HEALTH PLAN
              3200 Atlantic Avenue, First Floor
23                 Raleigh, North Carolina

24

25     Reported by: Michelle Maar, RDR, RMR, FCRR

# DEPOSITION OF DALE FOLWELL

Page 32

```
 1         Q.   What are your responsibilities as Treasurer?

 2         A.   Well, there are lots.

 3         Q.   Let me rephrase that because I understand -- what

 4    are your main responsibilities?

 5         A.   To put this in context, the, the State

 6    Treasurer's Office of North Carolina, as of this week, is,

 7    manages nearly a quarter of a trillion dollars.  That's

 8    almost 250 million billion dollars.  And just the Pension

 9    Plan is the 26th largest pool of public money in the entire

10    world.

11             So I'm sometimes asked if I signed the one dollar

12    bill.  That's where people see the word treasurer.  And it's

13    an obvious question.  But I don't do that.  But we manage

14    one of the largest pools of that, those in the world.

15             And to put that in context, that is 10 times

16    larger than the state budget that's being debated as we sit

17    here.

18             So I would be glad to go down and answer your

19    question if I may.

20         Q.   Please do.

21         A.   Okay.  I would say that, that it includes the

22    State Pension Plan, which manages the pension assets for

23    nearly 1 out of 10 adult North Carolinians, those that

24    teach, protect, and otherwise serve, with nearly 900,000

25    participants.
```

## DEPOSITION OF DALE FOLWELL

1    That Pension Plan is considered one of the

2    best-funded pension plans in the United States.  I'm not

3    sure where you're from, but I can probably compare ours to

4    wherever you are from.

5    And the Pension Plan has, as well-funded as it is,

6    which should give you a little bit of fear of how some of

7    these other pension plans are doing, as well-funded as we

8    are, it has tremendous headwinds.

9    And most of these headwinds that I'll mention to

10    you are blessings.  Zero interest rates is a blessing when

11    you're investing in your life or buying a house or buying a

12    car or starting a business.  It's not a blessing for pension

13    plans.

14    Increased life expectancies, that's obviously a

15    blessing on the face of it.

16    When I was in high school in 1977, there were

17    about 300 people over the age of 90 who were getting a

18    pension check.  Last week, it was 7000 people over the age

19    of 90.

20    And then somewhere along the way of the last 35

21    years, the minimum retirement age was taken out of the

22    Pension Plan.

23    So this is not political or emotional, it's

24    mathematical -- especially for the certain life

25    expectancies.  We're now in the situation that, because

## DEPOSITION OF DALE FOLWELL

Page 34

1    people can retire when they're 50 years old, we have the

2    majority of our members who are going to be receiving more

3    retirement checks than paychecks.  And the plan was never

4    really designed for that.

5              So all of our focus and the number one

6    responsibility has to do with my pledge to the participants

7    in these plans because of my fiduciary responsibility, which

8    includes being loyal and exercising a duty of care to

9    preserve, strengthen, but figure out how to sustain this

10   plan for this and the next generation of public service

11   workers.

12             The Plan is paying out nearly 550 million dollars

13   gross every 30 days.  The amount of gross dollars leaving

14   the plan is twice as high as the state debt.  So it's kind

15   of a big deal and a big responsibility.

16             The second is the Defined Contribution Plan, which

17   has over 15 billion dollars in it today.  Just this week, we

18   received two national awards.

19             Both of these plans have recently been designated

20   being in the zero percentile -- which is where I spent most

21   of my school career, which is not a good thing.

22             But when it comes to scoring it, the efficiency of

23   a Pension Plan, it's a great thing.

24             And so the Defined Benefit Plan, as well as the

25   Defined Contribution Plan have, are getting national

## DEPOSITION OF DALE FOLWELL

Page 35

1     accolades for what we've tried to do to simplify these plans

2     and to cut expenses.

3            The Defined Contribution Plan is made up of a 401,

4     457, and a 403.  And it, I think the 457 Plan is not as

5     large in total dollars as the California plan is, but it has

6     more enrollees.

7            So when you go from the Pension Plan, the Defined

8     Contribution Plan, then the next level would be the State

9     Health Plan, which is the largest purchaser of healthcare in

10    North Carolina, and the State Pharmaceutical Plan, which is,

11    for public service workers, also the largest in North

12    Carolina.

13            When I was sworn in as keeper of the public purse,

14    that was, I inherited a broke and broken State Health Plan.

15            And the broke part is something that was brought

16    to my attention in 1993 actually, before -- if you can

17    believe it's been that long.

18            And I'll be glad to explain why if you like.

19    Q.   Please do.

20    A.   A person that is considered by most around these

21    parts to be possibly the best banker in history is a fellow

22    by the name of John Medlin.

23            Now, I'm sure I've cleaned John Medlin's toilets

24    at a gas station or I've pumped gas in his car or cooked

25    food for him at Mayberry's.  But I didn't know who he was.

## DEPOSITION OF DALE FOLWELL

Page 118

```
 1          A.   The most important person in the whole place.

 2          Q.   I will agree with you generally because most

 3     executive assistants are.

 4               And we already know who Ms. Crabtree is, right?

 5     We've talked about her.

 6          A.   I don't dispute this timeline or this time stamp.

 7     I'm just surprised that Sam Hayes was working here in

 8     February of 2017, but that's what it says.

 9               I thought Blake stayed here until April or May of

10     that year.

11               It's not here nor there -- I'm just -- I thought

12     Blake was here for several months as the interim General

13     Counsel, which means Sam would not have been working here.

14          Q.   Right.  And it may have been habit, I know people

15     type in e-mails after they --

16          A.   This person didn't even work for -- anyway,

17     mental curiosity.

18          Q.   Getting back to Exhibit 7 -- so Ms. Moon is

19     e-mailing you.

20          A.   Yes.

21          Q.   And the first line says you've asked several

22     times for a list of requirements associated with the Plan's

23     participation in the federal Retiree Drug Subsidy (RDS)

24     Program.

25               Do you see that?
```

## DEPOSITION OF DALE FOLWELL

1      A.   I do.

2      Q.   Why were you asking for a list of requirements

3   associated with the Plan's participation in the RDS

4   Program?

5      A.   I believe I was asking regarding matters that had

6   nothing to do with the basis of this case.

7           That is, that, at that point, the previous

8   treasurer had flipped the PBM, prescription drug benefit

9   manager, on January 1, 2017 from Express Scripts to CVS

10  Caremark.

11          So as you can imagine, when people have been,

12  retirees especially, have been on Express Script for many,

13  many years, that when they're flipping over to a new

14  manager, there's different tiering, there's different this,

15  there's different formulas, there's different all these

16  things that none of us like regarding drug costs or

17  figuring out what they pay for.

18          I was asking this question specifically in

19  relation to a notion that I got -- was the State Health

20  Plan participating in what we, I think is known as the 40B

21  Program.

22          The 40B Program, it's my understanding, is a

23  program that allows the, other governmental entities to get

24  the same drug prescription rates as the Federal Government

25  negotiates through CMS and EA.

```
                                                      Page 1

 1              IN THE UNITED STATES DISTRICT COURT FOR
 2               THE MIDDLE DISTRICT OF NORTH CAROLINA
 3

 4
 5      MAXWELL KADEL, et al.,        )
                                      )
 6                  Plaintiffs,       )
                                      )   No. 1:19-cv-272-LCB-LPA
 7             V.                     )
                                      )
 8      DALE FOLWELL, et al.,         )
                                      )
 9                  Defendants.       )
        _____  )
10
11
12
                         DEPOSITION
13                           OF
                         DEE JONES
14
                 IN HER INDIVIDUAL CAPACITY
15                          and
            30(b)(6) DESIGNEE FOR NC STATE HEALTH PLAN
16
                     AUGUST 3, 2021
17
18            THIS TRANSCRIPT IS NOT COMPLETE
          PORTIONS OF THIS TRANSCRIPT AND/OR EXHIBITS
19      MAY BE DESIGNATED CONFIDENTIAL/ATTORNEYS EYES ONLY
        AFTER REVIEW OF TRANSCRIPT BY ATTORNEYS WITHIN 30
20       DAYS OF DATE OF DEPOSITION PER PROTECTIVE ORDER
21
22
                    PNC PLAZA DOWNTOWN
23          301 Fayetteville Street, Suite 1700
                    Raleigh, North Carolina
24
25      Reported by: Michelle Maar, RDR, RMR, FCRR
```

# DEPOSITION OF DEE JONES

Page 15

1       Q.   And in 2016, did the Plan's benefits coverage

2   provide for blanket exclusions for treatment of gender

3   dysphoria?

4       A.   Yes.

5       Q.   I would like to show you what I'm marking as

6   Plaintiffs' Exhibit 1.

7            (Exhibit 1 is marked for identification.)

8            MS. RAVI:  I'll give you a moment to review the

9   document.  I know it's lengthy.

10           MR. RULEY:  You've seen it before.

11           THE WITNESS:  I've seen it once or twice.

12   BY MS. RAVI:

13       Q.   Do you recognize this document?

14       A.   I do.

15       Q.   What is this?

16       A.   It is the 80/20 PPO Plan Benefits Booklet for the

17   period January 1 through December 31 of 2016.

18       Q.   Would you turn to the page marked as PLAN

19   DEF2711.

20           In the 2016 Plan Year, did the Plan exclude from

21   coverage treatment or studies leading to or in connection

22   with sex changes or modifications and related care?

23       A.   Yes.

24       Q.   If you could turn to the page marked PLAN

25   DEF2699.

## DEPOSITION OF DEE JONES

1    In the 2016 Plan Year, did the Plan exclude from

2    coverage psychological assessment and psychotherapy

3    treatment in conjunction with proposed gender

4    transformation?

5        A.    Yes.

6        Q.    If I refer to these two exclusions from coverage

7    today as the exclusions, will you know what I'm talking

8    about?

9        A.    Yes.

10       Q.    All right.  When was this exclusion language

11   added to the Plan documents?

12       A.    As I understand it, back into the '90s in some

13   capacity.

14       Q.    And with the exception of Plan Year 2017, has the

15   exclusion been in place continuously since it was

16   introduced?

17       A.    As I understand it, yes.

18       Q.    And is that correct for the 80/20 PPO Plan?

19       A.    Yes.

20       Q.    Is that also correct for the 70/30 PPO Plan?

21       A.    Yes.

22       Q.    And for the High-Deductible Health Plan?

23       A.    Yes.

24       Q.    Who is eligible to enroll in the State Health

25   Plan?

# DEPOSITION OF DEE JONES

1    A.    State employees, teachers, public school

2    teachers, employees of the University Systems of North

3    Carolina, employees of the Community College System,

4    lawmakers, and former lawmakers, some charter schools, some

5    municipalities, and, of course, state agencies.

6    Q.    Okay.  And by that, you mean employees of charter

7    schools, municipalities, and state agencies?

8    A.    Yes.

9    Q.    Anyone else?

10    A.    No.

11    Q.    And what is the plan year?

12    A.    January 1 through December 31st.

13    Q.    All right.  Can you generally describe the

14    process by which the Plan determines benefits for a

15    subsequent plan year?

16    A.    We start with the existing benefits.  And unless

17    there are any material, or changes that the Plan has

18    decided to add, it will be the same booklet or same

19    benefits going forward.

20    Q.    How does the Plan decide whether to make changes

21    going forward?

22    A.    Starting with the overarching goal of providing

23    healthcare for its members, and recognizing that we are a

24    government plan, and recognizing that we have limited

25    funding all provided by taxpayers, we start with that.

## DEPOSITION OF DEE JONES

Page 58

1      Q.   Did you discuss this recommendation with the

2   State Treasurer?

3      A.   No.

4      Q.   Is it correct that care must be medically

5   necessary to be covered by your Plan?

6      A.   Yes.  But the Plan does not cover all medically

7   necessary treatment.

8      Q.   At the time of this draft resolution, was it the

9   Plan's position that gender transition services were

10  medically necessary care?

11          MR. RULEY:  Objection, form.

12          THE WITNESS:  Again, a lot of things are

13  medically necessary that the Plan doesn't cover.  And a lot

14  is not, it's maybe a little bit of a loaded word.  But that

15  is what it says here.

16  BY MS. RAVI:

17      Q.   I'm sorry -- could you clarify when you say that

18  is what it says here?

19      A.   It says here in the resolution that the board

20  approve medically necessary coverage.

21      Q.   Medically necessary coverage of gender transition

22  services?

23      A.   Yes.

24      Q.   Regarding the position on whether or not gender

25  transition services are medically necessary coverage, has

## DEPOSITION OF DEE JONES

Page 69

1          A.    That is correct.

2          Q.    What was the basis for that reference?

3          A.    This is the Treasurer's words.  I'm not aware of

4     what he was referring to.  I don't disagree with it.  But

5     these are his words.

6          Q.    All right.  Are you aware of the Treasurer's

7     basis for this statement?

8          A.    No.

9          Q.    Does the Plan believe the treatment for gender

10    dysphoria is medically uncertain?

11         A.    Yes.

12         Q.    When did this view develop?

13         A.    Please repeat.

14         Q.    When did this view develop?

15         A.    I would say over several years.  In 2016, it's

16    very clear that while the presentations had a lot of

17    supporting documentation, the basis of the sunsetting or

18    the removal of the exclusion was based on the 1557 Rule and

19    the need to keep the federal funding.

20               And the Plan at the time, the staff used and put

21    forth all sorts of other information when we just went

22    through.

23               But since that time, we have new staff, we have a

24    small staff, we manage contracts, and we have limited

25    clinical staff.

## DEPOSITION OF DEE JONES

1          But the people we work with, and as I already

2     mentioned the journals or whatever that I have reviewed and

3     discussions we've had with current and former board

4     members, there's a lot of uncertainty on whether or not the

5     treatments are effective.  And in some cases, maybe they

6     are.  But there's discussion in the space of the, more the

7     psychological effects and how much it's important there

8     versus the surgery, the transition surgery.

9          Q.   And what was the basis for Treasurer Folwell's

10    statement regarding the medical uncertainty?

11               MR. RULEY:  Objection, form.

12               THE WITNESS:  I don't know.

13    BY MS. RAVI:

14          Q.   Did Treasurer Folwell discuss this statement with

15    you?

16          A.   No.

17          Q.   Did Treasurer Folwell discuss this statement with

18    anyone at the Plan?

19          A.   I'm not aware of any conversations he had with

20    anybody at the Plan.

21          Q.   And does this statement from October 25th reflect

22    the views of the State Health Plan?

23          A.   Parts of it might, such as the legal and medical

24    uncertainty.

25               The Franciscan Alliance opinion came out in

## DEPOSITION OF DEE JONES

Page 71

1    December of 2016.  And we know there were various cases in

2    Texas I believe.

3              So, again, I think there's legal uncertainty.  I

4    think there's medical uncertainty.  And our thoughts kind

5    of went down that direction.

6              Plus the fact that this is such, as we already

7    went through, the Blue Cross spreadsheet that was part of

8    the record, where it's such a small part of the Plan

9    membership that this benefit would apply to.  It's a niche.

10   I call that a niche, a small population of people.

11             And the Plan can't cover every requested benefit

12   for every single niche that comes forward, niche

13   population.  It happens all the time.

14             You know, I have to turn down parents who want a

15   special feeding benefit for their infant children who can't

16   process food normally.

17             I have to turn down hearing aids for a much

18   larger population of people because they're so expensive.

19   There's plenty of efficacy there, right?  It helps people

20   hear.  But the fact that they have to change hearing aids

21   every five to six years or more frequently, I can't afford

22   that as a Plan.

23             Because if I -- I have to serve a whole entire

24   population with a very finite amount of money.  And so the

25   only thing I can really cover is the current state of

## DEPOSITION OF DEE JONES

Page 72

1    benefits and any benefits that might apply to a broad swath

2    of the population with a not guaranteed but a strong

3    proponent of lower costs in the future.

4          And so that's where legal and medical uncertainty

5    -- I don't have to cover medically necessary treatment.  We

6    cover a lot of it.  But in this case, we don't.

7          Q.   Prior to this statement coming out on October 25,

8    2018, did Plan staff discuss the legal uncertainty that's

9    referenced here?

10          A.   Yes.

11          Q.   Did Plan staff discuss the medical uncertainty

12    that's referenced here?

13          A.   Yes.

14          Q.   Let's turn back to Exhibit 5.  And if you can

15    turn to Page 10 of this document.

16          Plaintiffs' Interrogatory Number 3 asks the Plan

17    to discuss the factual basis for each governmental interest

18    that the Plan contends supports the exclusion.

19          Is that right?

20          A.   Yes.

21          Q.   And is it correct, turning to the next page, the

22    Plan states that the Plan has not identified any valid,

23    reliable, peer-reviewed longitudinal studies that support

24    the efficacy of the plaintiffs' desired treatment?

25          A.   I'm sorry -- where are you?

## DEPOSITION OF DEE JONES

Page 73

1      Q.    I am at the bottom of Page 11, last paragraph.

2      A.    Okay.

3            That would be true.

4      Q.    Is a peer-reviewed, longitudinal study that

5      supports the efficacy of treatment a prerequisite for the

6      Plan to cover a proposed benefit?

7      A.    Not necessarily.  When we evaluate, as I think we

8      said earlier, it's a holistic review.  There's no single

9      pathway to coverage.  It has to be a broad swath of

10     membership, that there's a benefit for multiple people.

11           There's a cost component to it.  There's a

12     downstream cost component to it.  There's got to be some

13     common -- not experimental for sure.

14           There's got to be some common understanding in

15     the medical community that it is a treatment that will

16     produce a downstream effect that's positive.

17           So, you know, it's very difficult to come back

18     and say well, peer-reviewed, longitudinal studies -- I'm

19     not a clinician and I'm not a researcher, so it's, you

20     know -- but to the extent that we have not found any real

21     evidence that it's absolutely black and white, this

22     particular issue.

23           You know, I think it goes, well, it should go

24     without saying this is not a personal issue for me.  I

25     don't get, I have no personal opinion about this.

## DEPOSITION OF DEE JONES

Page 74

1      Because I walk through the front door at the

2    office, and I'm a fiduciary.  This is all about the cost

3    and maintaining this benefit for 740,000 people who expect

4    it every single day and the retirees that have an

5    expectation of the benefit when they retire.

6      And so every decision I make -- and I'm speaking

7    for myself -- is about that.  It's all about that every

8    day.

9      It breaks my heart 9 times out of 10 when I have

10   to decline a benefit, 9 times out of 10.

11     When I see people that need hearing aids, I would

12   love to give them a hearing aid, I would love to.

13     I have nothing against transgender people.  I

14   would be more than happy to provide the benefit.  But it's

15   not my decision.  I'm a fiduciary first.  And I'm

16   responsible for 740,000 people.  This is not personal.

17   This is all about money very simply put.

18     I've been charged with reducing the costs of the

19   Plan to operate since the day I started.  And we have done

20   just that.

21     You know, there's some discussions about how much

22   money the Plan has saved.  Well, it's because we've worked

23   really hard to do that.  We've taken out all extraneous

24   benefits.

25     We used to cover benefits for a small population

## DEPOSITION OF DEE JONES

Page 85

1      A.   Yes.

2      Q.   So looking at all enrollees in the Plan, 15

3 percent of those enrollees account for 85 percent of the

4 cost of treatment?

5      A.   Correct.

6      Q.   Can an individual enrolled in the State Health

7 Plan request that the State Health Plan change the pronoun

8 associated with that enrollee?

9      A.   Please rephrase.

10     Q.   Can an individual that's enrolled in the State

11 Health Plan request that the Plan change in its records the

12 pronoun that's associated with that individual?

13     A.   The member can change his or her own pronoun.

14     Q.   How does that process occur?

15     A.   The member logs in to eBenefits or calls into the

16 call center, benefit-focused call center, and either

17 changes it him or herself, or requests that it be changed.

18     Q.   Okay.

19     A.   It's not validated.

20     Q.   What does that mean for it not to be validated?

21     A.   You could put in whatever you want.  There's two

22 options, male or female.

23        And if I were female and put in female, I could

24 do that.  Or if I wanted to put in male, I can do that.  If

25 I make an error, I can do that too.

## DEPOSITION OF DEE JONES

Page 86

1      Q.  And you said an individual can either log in and

2  change that themselves or they can make a request that the

3  Plan make that change?

4      A.  No.  They call into the call center, talk to a

5  call center rep who will record the call.  And then they

6  can be requested to make that change.

7      Q.  To whom is that request made?

8      A.  The call center rep.

9      Q.  If a call center rep gets that kind of request,

10  what happens next?

11      A.  They comply with the request.

12      Q.  And how does that process occur?

13      A.  They go into the system and check yes or no or

14  male or female or exactly -- I guess it's male or female.

15      Q.  And prior to going into the system, is any

16  validation requested?

17      A.  Absolutely.  Whatever -- like the member would

18  call in, and there would be validation questions from the

19  call center rep back to the member to confirm any number of

20  demographic statistics.

21      Q.  What are those validation questions?

22      A.  I don't know them specifically.  But it's

23  something that would be similar to what we all do, which is

24  your address, your full name, possibly your Social Security

25  number, you know, phone numbers, whatever, to try to --

## DEPOSITION OF DEE JONES

Page 87

1  they're a vendor.  I don't tell them how to do their job.

2  I just tell them they have to validate it.  It's not my

3  obligation how to exactly do it.

4      Q.    So is it fair to say that validation is with

5  respect to making sure that the person calling in and

6  making this request is who they say they are?

7      A.    Yes.

8      Q.    Does the Plan require proof of any enrollee's

9  chromosomes before it goes into the system and complies

10  with that question?

11      A.    No.

12      Q.    Does it require proof of an enrollee's anatomy?

13      A.    No.

14      Q.    And does it require proof of an enrollee's DNA?

15      A.    No.

16      Q.    Everything we just talked about with regard to

17  changing the pronoun in the system, does that also apply to

18  a request to change an individual enrollee's gender marker

19  in the system?

20      A.    We don't track gender markers in the system other

21  than male or female.  We only have but two options right

22  now.

23      Q.    Is participation in the Plan required for state

24  agency employees?

25      A.    No.  They have a choice.  I mean the benefit

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

# DEPOSITION OF DEE JONES

Page 102

1    role, but I would say we have two people, we have a real

2    actuary, Charles Seifert. And we have a financial analyst,

3    Tamera McNeal.

4        Q.    And you said it's a different perspective with

5    regard to how issues are approached with current Plan

6    staff --

7        A.    Uh-huh.

8        Q.    -- as opposed to Plan staff in 2016.

9        A.    Uh-huh.

10       Q.    Can you clarify that?

11       A.    In 2016, there was Mona and Lotta and Caroline.

12   And they seemed to make all the decisions and were

13   supported by staff and maybe some of the clinical

14   perspective that -- they actually had more clinicians back

15   in those days.

16           Today, we are a flatter staff. And we have a very

17   diverse group of experience and background and skill sets.

18   And so we bring them all to the table.

19           And we work through -- again, our focus, at the

20   direction of the Treasurer, is about making sure the Plan is

21   in existence tomorrow, in five years, in ten years.

22           And that's really hard to do when we're being

23   funded at a 4 percent or better or less level, and our trend

24   rates are at 7 percent. The math just doesn't work.

25       Q.    With regard to the Plan's current staff, is there

# DEPOSITION OF DEE JONES

Page 104

1    not personal.  This is not something that I get to make a

2    choice about.  Because if I had every single group that

3    comes in to ask for a benefit, if I covered that, then I

4    would be completely, completely avoiding my fiduciary

5    responsibility to cover basic health.  That's what the Plan

6    Benefits Booklet says, right?

7             The Plan Benefits Booklet identifies every single

8    thing I cover.  And it provides healthcare.  We want every

9    member of the Plan to have good healthcare.  We want the --

10   and the reality is we have a lot of members who have

11   diabetes.  We have a lot of members who have orthopedic

12   issues.  We have a lot of members who have RA.  We have

13   really a lot of members who have cancer.  And they want to

14   be, they want to be covered.

15            And so it's really difficult for me to just say,

16   you know, I can take this group of 25 and this group of 10

17   and these -- if you add all that up -- I'll, I'll totally

18   admit that the cost of this benefit is not going to break

19   the Plan, never was, never will.

20            But it -- I can't do it for that group and not do

21   it for the group that wants it for their infants, for, you

22   know, for a certain feeding formula for that infant group,

23   and I can't do it for the hearing aid group, and I can't do

24   it for the group that really wants acupuncture.

25            Because once you start adding those, then I have

## DEPOSITION OF DEE JONES

Page 105

1  to keep going.  Everybody who comes in and wants a benefit,

2  I'll have to do it because I can't discriminate.

3          I'm not discriminating.  This is about what the

4  Plan can afford in the environment that we're in today --

5  which is I have a General Assembly that's funding me at 4

6  percent when my trend rate is 7 plus.  And that's not even

7  absolutely certain.

8          I have a 28.8 billion unfunded liability for

9  retiree healthcare that I, myself, am ready to have in a few

10  years.

11          And so, you know, this is all about being a

12  government plan.  And I don't get to, I don't get to pick

13  and choose.  I'm not a commercial plan.

14          So let's start with that.  A commercial plan, they

15  have revenues, right?  You go out and sell widgets, and you

16  sell a lot of widgets, and then you decide how much you want

17  to put into the benefit.  And you can have your member, your

18  staff, your employees pay.

19          I would bet most employers -- I was paying 100

20  bucks when I was at Time Warner.  I was paying for the

21  family, and I wasn't fully subsidized.

22          At the State Health Plan, we've got people who, a

23  whole lot of employees have to work one week out of a month

24  just to cover their Health Plan for their family.

25          And the effort to just institute a 25 dollar

## DEPOSITION OF DEE JONES

Page 106

1    premium for the 70/30 Plan and a 50 dollar premium for the

2    80/20 Plan was a herculean effort.  They had never paid

3    anything until 2018.  Employees had never paid anything

4    until 2018 -- which is crazy.  I mean I get that.

5              But we can't just keep adding costs to the Plan.

6              And the General Assembly, in the 2016 budget, I

7    think it's 2016-94, something like that, said you got to

8    stop, you've got to control your costs, you're not getting

9    more than 4 percent, and you can't go over.

10             So what happens when I spend more than I've got?

11   I've got to charge employees.  And I got to charge employees

12   who, you know, read the, you know employees don't make

13   market rates.  They just don't.

14             And so it is a very tight -- I mean I live in a

15   box.  And there's not a lot of room in the box to move

16   because I have the General Assembly describing what I can

17   do.  You know, it's all -- eligibility, it's all in statute.

18   My funding is all in statute, in the budget bill.  And

19   that's one box.

20             I work with vendors who I have to make them work

21   together.  And, quite frankly, as big as we are, I got at

22   least one vendor that's not real cooperative.  And it's

23   really annoying.  But it doesn't matter -- apparently, to

24   some vendors, it doesn't matter that we're the biggest

25   Health Plan, you know, one of the biggest in the nation.

# DEPOSITION OF DEE JONES

1      -- if that's okay.

2              MS. RAVI:  Alan, I think we're taking another 5

3      to 10 minute break, and then we'll be back.

4              (Off the record)

5              MR. RULEY:  I have just a few follow-up questions

6      for you.

7

8                      EXAMINATION

9      BY MR. RULEY:

10         Q.   Would you find Exhibit 1 please.  Would you turn

11     to Page 50 please.

12              Page 50 is titled What Is Not Covered?  Is that

13     right?

14         A.   That is correct.

15         Q.   And are these basically exclusions, a list of

16     exclusions?

17         A.   Yes.

18         Q.   And would you look at the fourth bullet point.

19         A.   Yes.

20         Q.   What is that exclusion?

21         A.   Any experimental drug or any drug or device not

22     approved by the Food and Drug Administration (FDA) for the

23     applicable diagnosis or treatment.

24         Q.   Then turning the page to Page 51, the fourth

25     bullet point from the bottom, what is that exclusion?

## DEPOSITION OF DEE JONES

Page 118

1          A.   Surgical procedures for psychological or

2     emotional reasons.

3          Q.   And would those exclusions also potentially apply

4     to coverage for gender dysphoria?

5          A.   Yes.

6          Q.   Earlier, you mentioned HBRs.  What are they again

7     please?

8          A.   Health Benefit Representatives.  They are

9     actually defined in statute.  And they work at the various

10    employing units.  I mentioned there are 408.  They are

11    liaisons to the Plan.  So the Plan teaches them, keeps them

12    apprised of the benefits being offered.  But they're

13    responsible for their employer's employees and getting them

14    enrolled and making sure they understand the processes.

15         Q.   So are they employed by the State Health Plan or

16    by others?

17         A.   By the others.

18         Q.   All right.  Thank you.

19              On costs -- would you get Exhibits 6 and 7 please.

20              Looking at Exhibit 6, for example, look at the

21    first e-mail on Exhibit 6, Page DEF61647, the January 22,

22    2017 e-mail.

23         A.   Yes.

24         Q.   And that reports, as of 1-21, a total paid of

25    287.57.

# 80/20 and 70/30 Plans

## 2021 Recommendation

- **Base Premiums:**
  - Base premiums would not change for 2021.
  - Tobacco Attestation wellness surcharge kept flat at $60.
- **Dependent Tiers:**
  - Premiums for the dependent tiers would not change for 2021.
  - The "Subscriber + Family" and "Subscriber + Children" tiers are frozen at the same level since 2018.

| Coverage & Tiers | 2020 Rates | 2021 Rates |
|---|---|---|
| **80/20 Employees \*** | | |
| Subscriber Only | $50.00 | **$50.00** |
| Subscriber + Child(ren) | $305.00 | **$305.00** |
| Subscriber + Spouse | $700.00 | **$700.00** |
| Subscriber + Family | $720.00 | **$720.00** |
| **80/20 Retirees / Non-Med Dependents** | | |
| Subscriber Only | $50.00 | **$50.00** |
| Subscriber + Child(ren) | $305.00 | **$305.00** |
| Subscriber + Spouse | $700.00 | **$700.00** |
| Subscriber + Family | $720.00 | **$720.00** |

\*Assumes "Yes" completion of tobacco attestation

| Actuarial Value | |
|---|---|
| 80/20 Active & Non-Medicare Plans | 82.2% |
| 70/30 Active & Non-Medicare Plans | 77.7% |
| 70/30 Medicare Plan | 86.6% |

| Coverage & Tiers | 2020 Rates | 2021 Rates |
|---|---|---|
| **70/30 Employees \*** | | |
| Subscriber Only | $25.00 | **$25.00** |
| Subscriber + Child(ren) | $218.00 | **$218.00** |
| Subscriber + Spouse | $590.00 | **$590.00** |
| Subscriber + Family | $598.00 | **$598.00** |
| **70/30 Retirees/Non-Med Dependents** | | |
| Subscriber Only | $0.00 | **$0.00** |
| Subscriber + Child(ren) | $218.00 | **$218.00** |
| Subscriber + Spouse | $590.00 | **$590.00** |
| Subscriber + Family | $598.00 | **$598.00** |
| **70/30 Retirees/Med Dependents** | | |
| Subscriber Only | $0.00 | **$0.00** |
| Subscriber + Child(ren) | $155.00 | **$155.00** |
| Subscriber + Spouse | $425.00 | **$425.00** |
| Subscriber + Family | $444.00 | **$444.00** |

\*Assumes "Yes" completion of tobacco attestation

*North Carolina*
**State Health Plan**
FOR TEACHERS AND STATE EMPLOYEES

A Division of the Department of State Treasurer



# WHAT IS NOT COVERED?

Exclusions for a specific type of service are stated along with the benefit description in "*Covered Services*." Exclusions that apply to many services are listed in this section, starting with general exclusions and then the remaining exclusions are listed in alphabetical order.  To understand all of the exclusions that apply, read "*Covered Services*," "Summary of Benefits" and "What Is Not Covered?" The *Plan* does not cover services, supplies, medications or charges for:

- Anything specifically listed in this benefits booklet as not covered or excluded, regardless of *medical necessity.*
- Any condition, disease, ailment, injury, or diagnostic service to the extent that benefits are provided or persons are eligible for coverage under Title XVIII of the Social Security Act of 1965, including amendments, except as otherwise required by federal law.
- Conditions that federal, state or local law requires to be treated in a public facility.
- Any condition, disease, illness, or injury that occurs in the course of employment, if the *member*, employer or carrier is liable or responsible for the specific medical charge (1) according to a final adjudication of the claim under a state's workers' compensation laws, or (2) by an order of a state Industrial Commission or other applicable regulatory agency approving a settlement agreement.
- Basic life or work-related or medical disability examinations.
- Benefits that are provided by any governmental unit except as required by law.
- Services that are ordered by a court that are otherwise excluded from benefits under this Plan.
- Any condition suffered as a result of any act of war or while on active or reserve military duty.
- Services in excess of any *benefit period maximum* or *lifetime maximum.*
- Received prior to the *member's effective date.*
- Received after the coverage termination date, regardless of when the treated condition occurred, and regardless of whether the care is a continuation of care received prior to the termination.
- Received from a dental or medical department maintained by or on behalf of an employer, a mutual benefit association, labor union, trust or similar person or group.
- Services provided at request of patient in a location other than physician's office which are normally provided in the physician's office.
- Day care services, chore services, attendant care services, homemaker services, companion care services, foster care services.
- Hair analysis, excluding arsenic.
- Transportation of portable X-ray equipment and personnel to home or nursing home, transportation of portable EKG to facility or other location.
- *Emergency* response systems.
- *Alternative medicine* services, which are unproven preventive or treatment modalities, also described as alternative, integrative, or complementary medicine, whether performed by a physician or any *other provider.*

**In addition, the *Plan* does not cover the following services, supplies, medications or charges:**

 **A**

- **Acupuncture** and **acupressure.**
- **Administrative** charges billed by a *provider*, including, but not limited to charges for failure to keep a scheduled visit, completion of a claim form, obtaining medical records, late payments, shipping and handling, taxes and telephone charges.
- Costs in excess of the ***allowed amount*** for services usually provided by one *doctor*, when those services are provided by multiple *doctors* or *medical care* provided by more than one *doctor* for treatment of the same condition.

Return to Table of Contents

PLAN DEF0120625

**JA178**

*incurred*, except in the absence of legal capacity of the *member*.

**Clinical Trials** exclusions include:
- o  Non-health care services, such as services provided for data collection and analysis.
- o  Early feasibility, safety and pilot states of device trials
- o  CMS Investigational Device Exemption (IDE) Category A devices
- o  *Investigational* medications and devices and services that are not for the direct clinical management of the patient.

- Side effects and **complications** of non-*covered services*, except for *emergency services* in the case of an *emergency*.

- **Convenience** items such as, but not limited to, devices and equipment used for environmental control, urinary incontinence devices (including bed wetting devices) and equipment, heating pads, hot water bottles, ice packs and personal hygiene items.

- *Cosmetic* services, which include the removal of excess skin from the abdomen, arms or thighs, skin tag excisions, skin tone enhancements, cryotherapy or chemical exfoliation for active acne scarring, superficial dermabrasion, injection of dermal fillers, services for hair *transplants*, electrolysis and *surgery* for psychological or emotional reasons, except as specifically covered by the *Plan*.

- Services received either before or after the *coverage* period of the Plan, regardless of when the treated condition occurred, and regardless of whether the care is a continuation of care received prior to the termination.

- *Custodial care* designed essentially to assist an individual with activities of daily living, with or without routine nursing care and the supervisory care of a *doctor*. While some skilled nursing services may be provided, the patient does not require continuing skill services 24 hours daily.  The individual is not under specific medical, surgical, or psychiatric treatment to reduce a physical or mental disability to the extent necessary to enable the patient to live outside either the institution or the home setting with substantial assistance and supervision, nor is there reasonable likelihood that the disability will be reduced to that level even with treatment. *Custodial care* includes, but is not limited to, help in walking, bathing, dressing, feeding, preparation of special diets and supervision over medications that could otherwise be self-administered.  Such services and supplies are custodial as determined by the *Plan* without regard to the place of service or the *provider* prescribing or providing the services.

- **Camisoles**, or other clothing, post-mastectomy.

- **Communication** boards or alternative communication devices.

- **Contraception** for males

 **D**
- **Dental services**

  - provided in a *hospital*, except as specifically covered by the *Plan*.

  - *Treatment for the following conditions:*
    - ▪  Injury related to chewing or biting.
    - ▪  Preventive dental care, diagnosis or treatment of or related to teeth or gums.
  - Periodontal disease or cavities and disease due to infection or tumor.

Return to Table of Contents

- Primary treatment of a psychiatric disorder in a *residential treatment center* (RTC) unless the RTC is licensed as a psychiatric RTC.
- Primary treatment of a *substance abuse* or *substance abuse* disorder in a *residential treatment center* (RTC) unless the RTC is licensed as a *substance abuse* or substance abuse RTC.
- Services by *providers* not currently licensed in the state in which services are provided.
- Psychotherapy as part of artificial means of conception.
- Psychological assessment and psychotherapy treatment in conjunction with proposed gender transformation.
- Psychological testing for those persons with a *substance abuse* diagnosis until 30 consecutive days of abstinence are obtained.
- Therapeutic boarding schools as a psychiatric residential treatment center (RTC) unless the program is licensed for psychiatric RTC in the state in which services are provided, has *registered nurses* who are present on-site 24-hours per day, and holds current national accreditation by a national health care accrediting body approved by the *Mental Health Case Manager.*
- Therapeutic boarding schools as a *substance abuse* or *substance abuse* residential treatment center (RTC) unless the program is licensed as a *substance abuse* RTC in the state in which services are provided and has licensed supervision of all residents 24 hours per day, seven days per week.
- Wilderness camps, wilderness "step-down" components of a residential program, and stand-alone outdoor treatment programs or outdoor "step-down" components of a residential program are not covered as a psychiatric RTC unless the program is licensed for psychiatric residential treatment in the state in which services are provided, has *registered nurse*s who are present on-site 24-hours per day, and holds current national accreditation by a national health care accrediting body approved by the *Mental Health Case Manager.*
- Wilderness camps and stand-along outdoor treatment programs are not covered as *substance abuse* or *substance abuse* RTC programs.
- Academic education during *residential treatment* when charged separately.
- Administrative psychiatric services (e.g., expert testimony, report writing, medical records review and maintenance, case management or case coordination, chart review, etc.)
- Consultation with a mental health professional for adjudication of marital, child support, and custody cases.
- Evaluations, consultations, testing or therapy for educational, professional training, or for investigation purposes relating to employment, insurance, judicial or administrative proceedings.
- Training analysis.
- Treatment for personal or professional growth, development, training or professional *certification.*
- Aversive Treatment.
- Treatment programs based solely on the 12-step Model.
- Erhard Seminar Training (EST) or similar motivational services.
- Bioenergetic, carbon dioxide, confrontational, hyperbaric or normobaric oxygen, marathon, megavitamin, orthomolecular, primal, rebirthing, or sleep therapies.
- Expressive therapies (art, poetry, movement, psychodrama), guided imagery, or stress and relaxation therapy when billed separately.

Return to Table of Contents

PLAN DEF0120632

**JA180**



- Occlusal (bite) adjustments.
- Extractions.

- The following types of **therapy:**
  - Applied Behavior Analysis (ABA) therapy except as specifically identified by the *Plan.*
  - Music therapy, recreational or activity therapy, and all types of animal therapy. Remedial reading and all forms of special education and supplies or equipment used similarly, except as specifically covered by the *Plan.*
  - Massage therapy.
  - Alternative therapy.
  - Hypothermia therapy.
  - Cognitive therapy.
  - Speech therapy for stammering, stuttering, or developmental delay.
  - Treatment of speech, language, voice, communication and/or auditory processing disorder.
  - Pulmonary rehabilitation group sessions.
  - Peripheral arterial disease rehabilitation.
  - Community or work integration training, work hardening or conditioning.

- **Thermography** or **thermograph** examination.
- **Transplant** exclusions include:
  - The purchase price of the organ or tissue if any organ or tissue is sold rather than donated to the recipient *member.*
  - The procurement of organs, tissue, bone marrow or peripheral blood stem cells or any other donor services if the recipient is not a *member.*
  - *Transplants,* including high dose chemotherapy, considered *experimental* or *investigational.*
  - Services for or related to the transplantation of animal or artificial organs or tissues.

- **Travel,** whether or not recommended or prescribed by a *doctor* or other licensed health care professional, except as specifically covered by the *Plan.*
- ==**Treatment** or studies leading to or in connection with sex changes or modifications and related care.==



- The following **vision** services:
  - Radial keratotomy and other refractive eye *surgery,* and related services to correct vision except for surgical correction of an eye injury. Also excluded are premium intraocular lenses or the services related to the insertion of premium lenses beyond what is required for insertion of conventional intraocular lenses, which are small, lightweight, clear disks that replace the distance-focusing power of the eye's natural crystalline lens.
  - Routine eye examination services except as specifically covered by the *Plan.*
  - Eyeglasses or contact lenses, except as specifically covered in "*Prosthetic appliances.*"
  - Orthoptics, vision training, and low vision aids.

- For over-the-counter and non-federal legend **Vitamins,** food supplements or replacements, nutritional or dietary supplements, formulas, or special foods of any

- And except as specifically stated as covered:
  - Dental implants or root canals
  - Dentures
  - Dental appliances except when medically necessary for the treatment of temporomandibular joint disease or obstructive sleep apnea
  - Orthodontic braces or devices.
  - Palatal expanders
  - Removal of teeth and intrabony cysts.
  - Procedures performed for the preparation of the mouth for dentures.
  - Crowns, bridges, dentures or in-mouth appliances.
- Evaluation and treatment of *developmental dysfunction* and/or learning disability.
- *Diabetes* related services including:
  - *Di*abetic shoes, including accessories, fittings, and associated services and supplies.
  - Glasses.
- The following drugs or medications:
  - Injections by a health care professional of injectable *prescription medications* which can be self-administered, unless medical supervision is required.
  - Medications associated with conception by artificial means.
  - For prescribed *sexual dysfunction* medications.
  - Take home medications furnished by a *hospital* or *non-hospital facility*.
  - *Experimental* medication or any medication or device not approved by the Food and Drug Administration (FDA) for the applicable diagnosis or treatment. However, this exclusion does not apply to *prescription medications* used in covered phases I, II, III and IV clinical trials, or medications approved by the FDA for treatment of cancer, if prescribed for the treatment of any type of cancer for which the medication has been approved as effective and accepted in any one of the following nationally recognized medication reference guides:
    - The American Medical Association Drug Evaluations;
    - The American *Hospital Formulary* Service Drug Information;
    - The United States Pharmacopoeia Drug Information;
    - The National Comprehensive Cancer Network Drugs & Biologics Compendium;
    - The Thomson Micromedex DrugDex;
    - The Elsevier Gold Standard's Clinical Pharmacology; or
    - Any other authoritative compendia as recognized periodically by the United States Secretary of Health and Human Services.
- *Durable Medical Equipment* including:
  - Appliances or devices that serve no medical purpose or that are primarily for comfort or convenience.
  - Repair or replacement of equipment due to abuse or desire for new equipment.
  - Heel or elbow protectors.
  - Batteries, except as required for operation of *medically necessary* equipment prescribed by a *provider*.

45

Return to Table of Contents

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| **MAXWELL KADEL**, *et al.*, <br><br> Plaintiffs, <br><br> **v.** <br><br> **DALE FOLWELL**, in his official capacity as State Treasurer of North Carolina; **DEE JONES,** in her official capacity as Executive Administrator of the North Carolina State Health Plan for Teachers and State Employees; **NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES**; and **STATE OF NORTH CAROLINA, DEPARTMENT OF PUBLIC SAFETY,** <br><br> Defendants. | No. 1:19-cv-272-LCB |

## DECLARATION OF BLUE CROSS BLUE SHIELD OF NORTH CAROLINA

I, AIMEE FOREHAND, on behalf of Blue Cross and Blue Shield of North Carolina ("BCBSNC"), state that to the best of my knowledge and based on a review of BCBSNC's records, the following is true and accurate:

1. BCBSNC is a non-profit medical services corporation, which is organized and existing under the laws of the State of North Carolina.  BCBSNC is headquartered in Durham, North Carolina.

2. BCBSNC is the Third-Party Administrator ("TPA") of the North Carolina State Health Plan for Teacher and State Employees (the "State Health Plan" or the "Plan").

Page **1** of **10**

3. The State Health Plan is a self-funded customer of BCBSNC, which means that, in addition to deciding what benefits the Plan will provide to Plan participants each year, the Plan is also solely responsible for paying for all the benefits it has agreed to provide.

4. As TPA for the Plan, BCBSNC has a contract with the Plan to provide administrative services on behalf of the Plan. More specifically, after a participating, in-network healthcare provider provides a medical service to a Plan participant, the medical provider submits a claim to BCBSNC which processes the claim according to the terms of Plan and determines the amount of reimbursement that the healthcare provider will receive by the Plan for that service based on the terms of the Plan and the network participation agreement between BCBSNC and the participating provider.

5. The contract between the Plan and BCBSNC is an Administrative Services Only (hereafter "ASO") contract, which means that BCBSNC provides only administrative services that relate to the processing of the claims. BCBSNC has provided these services to the Plan for more than 30 years.

6. In addition to serving as a TPA for the Plan and other customers, BCBSNC also sells private health insurance to groups and individuals. BCBSNC uses its claims processing system and standards in the same manner for both its private health insurance business and its work as the TPA for the Plan. In both

Page **2** of **10**

circumstances, the BCBSNC operates in the manner accepted as the industry standard for the provision of healthcare benefits.

7. In accordance with industry practice, BCBSNC uses industry-standard procedural codes and diagnostic codes to determine whether a claim submitted to it by a healthcare provider for a specific medical treatment is compensable by the Plan. These diagnostic and procedural codes are not created by BCBSNC, but are uniform across the American health care, health benefits plan, and health insurance industries. Diagnostic codes are classification of diseases as provided by the ICD ("International Classification of Diseases"). Medical services and procedures are identified by a distinctive alphanumeric code known as CPT code ("Current Procedural Terminology"). Every medical service has its own unique CPT Code.

8. In order to request reimbursement for the medical service provided to a Plan participant, an in-network health care provider submits a claim to BCBSNC on an established industry form (either a CMS-1500 or UB-04 form depending on the type of provider; copies attached) or through an electronic billing agreement which requires the same information.

9. To receive reimbursement, a healthcare provider must submit a claim that contains both a diagnostic code and a corresponding procedural code (or, for facilities, a revenue code rather than a procedural code), among other information. This is the standard requirement across the national health insurance industry. Failure to submit both a diagnostic code and a corresponding procedural code results in denial of the claim.

<div align="center">Page **3** of **10**</div>

10. When BCBSNC receives a claim for reimbursement from a provider, BCBSNC's automated claims systems reviews the claim to determine whether it is for a benefit covered by the Plan. If the medical treatment is a covered treatment, BCBSNC authorizes reimbursement to the healthcare provider by the Plan.

11. Each year, the State Health Plan creates a benefits booklet, which describes the benefits and reimbursement levels offered to eligible Plan participants. As TPA, BCBSNC receives and reviews the final Plan benefit booklet each year. BCBSNC is responsible for implementation of the benefits outlined in the benefit booklet. Because the benefits booklet does not contain or identify either procedural or diagnostic codes, BCBSNC—in consultation with the Plan staff—implements the coding for the benefits covered by the Plan.

12. When a healthcare provider performs a service for a Plan participant, the provider submits a claim to BCBSNC for reimbursement (as a benefit provided by the Plan). For more than 90% of claims submitted to BCBSNC for Plan beneficiaries, the process is automated, meaning it is processed electronically without being separately reviewed by a person.

13. As part of the claim submission, BCBSNC receives the name of the Plan participant, the name of the healthcare provider, the age and sex of the Plan participant, the ICD diagnostic code, and the CPT procedural Code, among other information. This is the industry-standard information required for claims submitted to insurance providers for reimbursement of expenses for medical services, and this information is submitted by the physician or other healthcare provider where the

Page **4** of **10**

physician or healthcare provider is a participating, in-network provider. BCBSNC has a publicly available manual for healthcare providers that advises them on what information must accompany a claim, and how to properly submit a claim.

14. As part of the claim submission process, BCBSNC does not request or require that the healthcare provider identify the transgender status of any person seeking medical care. The BCBSNC claim submission process does not include any method for the healthcare provider to submit this information, and the transgender status of any person is not recorded within the BCBSNC databases.

15. Certain claims require approval by BCBSNC before the medical service is provided to the Plan participant. BCBSNC and the State Health Plan jointly decide which claims will be subject to this preauthorization requirement. All inpatient surgical procedures require preauthorization. There is no separate or unique preauthorization requirement for claims submitted on behalf of individuals who identify as transgender.

16. Further, in determining whether to approve or deny a claim, BCBSNC does not consider whether the Plan participant identifies as transgender. More specifically, BCBSNC does not track whether any specific Plan participant identifies as transgender, cisgender, gender non-binary, etc. Thus, the transgender status of any person—or whether any person identifies as transgender—is not a fact that BCBSNC uses at any time to determine whether BCBSNC will approve a claim for benefits for State Health Plan participants.

17. BCBSNC processes claims for medical services provided to an individual who identifies as transgender in the exact same manner as BCBSNC processes claims for medical services provided to an individual who does not identify as transgender. BCBSNC process claims for medical services for gender non-binary individuals in the exact same manner as BCBSNC processes claims for medical services for an individual who identifies as neither transgender nor gender non-binary.

18. As noted above, in excess of 90% of submitted claims are approved by BCBSNC's claims-processing software. Claims not approved in this fashion because, for example, the software has identified a potential duplicate bill, are manually processed by BCBSNC employees. After this employee review, claims are approved or denied. Reasons to deny a claim include: incorrect coding (diagnosis or procedure), duplicative billing, failure to obtain prior authorization when required, or other reasons.

19. BCBSNC will not approve a claim, or preauthorization, for a service not covered by the Plan.

20. To the best of my knowledge, prior to January 1, 2017, in its implementation of the Plan Benefit Booklet, BCBSNC denied preauthorization for 4 specific surgeries, regardless of the diagnostic code.

Table 1

| CPT Code | Description of Surgery |
|---|---|
| 55970 | Intersex Surgery, Male to Female |
| 55980 | Intersex Surgery, Female to Male |

Page **6** of **10**

| 57335 | Vaginoplasty for Intersex State |
|-------|--------------------------------|
| 56805 | Clitoroplasty for Intersex State |

21. To best of my knowledge, prior to January 1, 2017, BCBSNC either denied preauthorization or reimbursement for claims for the following procedures when the procedural code is for treatment of one of two diagnostic codes: F64.0 (Transsexualism) or Z87.890 (Personal history of sex reassignment):

Table 2

| CPT Code | Description of Surgery |
|----------|------------------------|
| 54400 | Insertion of Penile Prosthesis; non-inflatable (semi-rigid) |
| C1813 | Prosthesis, Penile, Inflatable |
| 54401 | Insertion of Penile Prosthesis; inflatable (self-contained) |
| 54405 | Insertion of multi-component, inflatable penile prosthesis, including placement of pump, cylinders, and reservoir |
| 54406 | Removal of multi-component Inflatable Penile |
| 54408 | Repair Components(s) multi-component, Inflatable Penile |
| 54410 | Removal and replacement of all components(s) of a multi-component, inflatable penile prosthesis at the same operative session |
| 54411 | Removal and replacement of all components of a multi-component inflatable penile prosthesis through an infected field at the same operative session, including irrigation and debridement of infected tissue |
| 54415 | Removal non-inflatable (semi-rigid) /inflatable |
| 54416 | Removal and replacement of non-inflatable (semi-rigid) or inflatable (self-contained) penile prosthesis at the same operative session |
| 54417 | Removal and replacement of a non-inflatable (semi-rigid) or inflatable (self-contained) penile prosthesis through an infected field at the same operative session, including irrigation and debridement of infected tissue |
| 54660 | Insertion of Testicular Prosthesis (separate procedure) |
| 55175 | Scrotoplasty (simple) |
| 55180 | Scrotoplasty (complicated) |
| 56800 | Plastic Repair of Introitus |
| 57291 | Construction of artificial vagina (without graft) |
| 57292 | Construction of artificial vagina (with graft) |
| 19316 | Mastopexy |
| 19318 | Breast Reduction |
| 57295 | Revision (including removal) of prosthetic vaginal graft |

Page **7** of **10**

| 57296 | Revision (including removal) of prosthetic vagina graft |
| 19325 | Breast Augmentation with implant |
| 17380 | Electrolysis Epilation, each .5 hour |

22. Although the industry-standard medical claim form requires a healthcare provider to identify the sex of the Plan participant, BCBSNC does not use the sex of the Plan participant to evaluate whether claims for the benefits identified above are covered by the Plan. This is true whether the claim is processed automatically or manually. Approval or denial of a claim is based solely on the procedural and diagnostic codes identified above.

23. Beginning on January 1, 2017, the Plan directed BCBSNC to approve claims when submitted with the procedures listed in Table 1—without regard to the diagnostic code—and in Table 2, when submitted with the two identified diagnostic codes.

24. Beginning on January 1, 2018, at the direction of the Plan, BCBSNC returned to its 1990-2016 claims processing rules, and thereafter denied claims for the above-referenced procedures because they were not included as benefits provided by the Plan.

25. BCBSNC would not approve a claim for cosmetic procedures for any Plan participant, regardless of the diagnostic code. The State Health Plan benefit booklet defines cosmetic services as not covered, and the Plan does not cover cosmetic surgeries. Accordingly, the following procedures, which, under the 1990-2016 claims processing rules described above, are considered cosmetic procedures, are not covered: shoulder shaping, chin contouring and implants, face lifts (unless as a

Page **8** of **10**

medically necessary part of other facial procedures), facial bone osteoplasty, forehead reduction and contouring, mandible reduction, mandible contouring or mandible augmentation, and chondrolaryngoplasty (tracheal shave).

26. BCBSNC does not process claims for the vast majority of pharmaceuticals or hormones, although it does process claims for the administration of some pharmaceuticals, e.g. intravenous infusions.

27. BCBSNC has never implemented the portion of the Plan's benefit booklets that excludes "surgery for psychological or emotion reasons." More specifically, BCBSNC does not have diagnostic codes or procedural codes connected to this language from the Plan's benefits book that would prevent any claim from being approved, without regard to whether the Plan participant identified as cisgender, transgender, gender non-binary, or otherwise.

28. BCBSNC processes all claims for behavioral health treatment to be potentially reimbursed by the Plan. For behavioral health treatment, healthcare provider payment requests are not screened by diagnosis. Rather, notwithstanding the language contained in the Plan's benefits book, BCBSNC authorizes payment for all behavioral health services, if they are otherwise within the Plan's benefits, regardless of the submitted diagnosis code. This has been true since at least 1990. BCBSNC claims processing does not distinguish between an individual diagnosed with gender dysphoria or another psychiatric diagnosis. Plan participants with claims for behavioral health treatment are not denied because the submitted claim identified gender dysphoria as the diagnosis.

Page **9** of **10**

29. BCBSNC, as TPA of the State Health Plan does not code or track whether Plan participants identify as transgender, cisgender, gender non-binary, or otherwise, and BCBSNC's implements the benefit booklets of the State Health Plan without denying coverage for any healthcare service on the basis of a Plan participant's identification as transgender, cisgender, gender non-binary, or otherwise.

I declare and verify under penalty of perjury that the foregoing is true and correct. Executed on November __30__, 2021.

Aimee Forehand (Nov 30, 2021 12:14 EST)

Aimee Forehand
Director, State Health Plan
Blue Cross and Blue Shield of North Carolina

CARRIER

# HEALTH INSURANCE CLAIM FORM

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

PICA            PICA

1. MEDICARE   MEDICAID   TRICARE   CHAMPVA   GROUP HEALTH PLAN   FECA BLK LUNG   OTHER     1a. INSURED'S I.D. NUMBER     (For Program in Item 1)

(Medicare#)   (Medicaid#)   (ID#/DoD#)   (Member ID#)   (ID#)   (ID#)   (ID#)

2. PATIENT'S NAME (Last Name, First Name, Middle Initial)

3. PATIENT'S BIRTH DATE MM DD YY   SEX   M   F

4. INSURED'S NAME (Last Name, First Name, Middle Initial)

5. PATIENT'S ADDRESS (No., Street)

6. PATIENT RELATIONSHIP TO INSURED   Self   Spouse   Child   Other

7. INSURED'S ADDRESS (No., Street)

CITY     STATE

8. RESERVED FOR NUCC USE

CITY     STATE

ZIP CODE   TELEPHONE (Include Area Code)

ZIP CODE   TELEPHONE (Include Area Code)

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)

10. IS PATIENT'S CONDITION RELATED TO:

11. INSURED'S POLICY GROUP OR FECA NUMBER

a. OTHER INSURED'S POLICY OR GROUP NUMBER

a. EMPLOYMENT? (Current or Previous)   YES   NO

a. INSURED'S DATE OF BIRTH MM DD YY   SEX   M   F

b. RESERVED FOR NUCC USE

b. AUTO ACCIDENT?   YES   NO   PLACE (State)

b. OTHER CLAIM ID (Designated by NUCC)

c. RESERVED FOR NUCC USE

c. OTHER ACCIDENT?   YES   NO

c. INSURANCE PLAN NAME OR PROGRAM NAME

d. INSURANCE PLAN NAME OR PROGRAM NAME

10d. CLAIM CODES (Designated by NUCC)

d. IS THERE ANOTHER HEALTH BENEFIT PLAN?   YES   NO   If yes, complete items 9, 9a, and 9d.

**READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.**

12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE  I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED _____ DATE _____

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE  I authorize payment of medical benefits to the undersigned physician or supplier for services described below

SIGNED _____

PATIENT AND INSURED INFORMATION

14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP) MM DD YY   QUAL.

15. OTHER DATE   QUAL.   MM DD YY

16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION   FROM MM DD YY   TO MM DD YY

17. NAME OF REFERRING PROVIDER OR OTHER SOURCE   17a.   17b. NPI

18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES   FROM MM DD YY   TO MM DD YY

19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC)

20. OUTSIDE LAB?   YES   NO   $ CHARGES

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY  Relate A-L to service line below (24E)   ICD Ind. ____

A. ____ B. ____ C. ____ D. ____
E. ____ F. ____ G. ____ H. ____
I. ____ J. ____ K. ____ L. ____

22. RESUBMISSION CODE   ORIGINAL REF. NO.

23. PRIOR AUTHORIZATION NUMBER

| 24. A. DATE(S) OF SERVICE From MM DD YY To MM DD YY | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID QUAL | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | NPI |
| 2 | | | | | | | | | NPI |
| 3 | | | | | | | | | NPI |
| 4 | | | | | | | | | NPI |
| 5 | | | | | | | | | NPI |
| 6 | | | | | | | | | NPI |

PHYSICIAN OR SUPPLIER INFORMATION

25. FEDERAL TAX I.D. NUMBER   SSN EIN

26. PATIENT'S ACCOUNT NO.

27. ACCEPT ASSIGNMENT? (For govt. claims, see back)   YES   NO

28. TOTAL CHARGE   $

29. AMOUNT PAID   $

30. Rsvd for NUCC Use

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)

SIGNED _____ DATE _____

32. SERVICE FACILITY LOCATION INFORMATION   a.   b.

33. BILLING PROVIDER INFO & PH # (    )   a.   b.

NUCC Instruction Manual available at: www.nucc.org     **PLEASE PRINT OR TYPE**     APPROVED OMB-0938-1197 FORM 1500 (02-12)

BECAUSE THIS FORM IS USED BY VARIOUS GOVERNMENT AND PRIVATE HEALTH PROGRAMS, SEE SEPARATE INSTRUCTIONS ISSUED BY APPLICABLE PROGRAMS.

NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

### REFERS TO GOVERNMENT PROGRAMS ONLY

MEDICARE AND TRICARE PAYMENTS: A patient's signature requests that payment be made and authorizes release of any information necessary to process the claim and certifies that the information provided in Blocks 1 through 12 is true, accurate and complete. In the case of a Medicare claim, the patient's signature authorizes any entity to release to Medicare medical and nonmedical information and whether the person has employer group health insurance, liability, no-fault, worker's compensation or other insurance which is responsible to pay for the services for which the Medicare claim is made. See 42 CFR 411.24(a). If item 9 is completed, the patient's signature authorizes release of the information to the health plan or agency shown. In Medicare assigned or TRICARE participation cases, the physician agrees to accept the charge determination of the Medicare carrier or TRICARE fiscal intermediary as the full charge and the patient is responsible only for the deductible, coinsurance and non-covered services. Coinsurance and the deductible are based upon the charge determination of the Medicare carrier or TRICARE fiscal intermediary if this is less than the charge submitted. TRICARE is not a health insurance program but makes payment for health benefits provided through certain affiliations with the Uniformed Services. Information on the patient's sponsor should be provided in those items captioned in "Insured", i.e., items 1a, 4, 6, 7, 9 and 11.

### BLACK LUNG AND FECA CLAIMS

The provider agrees to accept the amount paid by the Government as payment in full. See Black Lung and FECA instructions regarding required procedure and diagnosis coding systems.

### SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE, TRICARE, FECA AND BLACK LUNG)

In submitting this claim for payment from federal funds, I certify that: 1) the information on this form is true, accurate and complete, 2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law), 5) the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE; 6) for each service included incident to my professional service, the identity (legal name and NPI license #, or SSN) of the primary individual rendering each service is reported in the designated section. For services to be considered "incident to" a physician's professional services 1) they must be rendered under the physician's direct supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of non-physicians must be included on the physician's bills.

For TRICARE claims, I further certify that I (or any employee) who rendered services are not on active duty member of the Uniformed Services or a civilian employee of the United States Government or a contract employee of the United States Government, either civilian or military (refer to 5 USC 5536). For Black-Lung claims, I further certify that the services performed were for a Black Lung-related disorder.

No Part B Medicare benefits may be paid unless this form is received as required by existing law and regulations (42 CFR 424.32).

NOTICE: Anyone who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

### NOTICE TO PATIENT ABOUT THE COLLECTION AND USE OF MEDICARE, TRICARE, FECA, AND BLACK LUNG INFORMATION (PRIVACY ACT STATEMENT)

We are authorized by CMS, TRICARE and OWCP to ask you for information needed in the administration of the Medicare, TRICARE, FECA, and Black Lung programs. Authority to collect information is in section 205(a), 1862, 1872 and 1874 of the Social Security Act as amended, 42 CFR 411.24(a) and 424.5(a) (6), and 44 USC 3101,41 CFR 101 et seq and 10 USC 1079 and 1086; 5 USC B101 et seq; and 30 USC 901 et seq; 38 USC 613; E.O. 9397.

The information we obtain to complete claims under these programs is used to identify you and to determine your eligibility. It is also used to decide if the services and supplies you received are covered by these programs and to insure that proper payment is made.

The information may also be given to other providers of services, carriers, intermediaries, medical review boards, health plans, and other organizations or Federal agencies, for the effective administration of Federal provisions that require other third parties payers to pay primary to Federal program, and as otherwise necessary to administer these programs. For example, it may be necessary to disclose information about the benefits you have used to a hospital or doctor. Additional disclosures are made through routine uses for information contained in systems of records.

FOR MEDICARE CLAIMS: See the notice modifying system No. 09-70-0501, titled, 'Carrier Medicare Claims Record,' published in the Federal Register, Vol. 55 No. 177, page 37549, Wed. Sept. 12, 1990, or as updated and republished.

FOR OWCP CLAIMS: Department of Labor, Privacy Act of 1974, "Republication of Notice of Systems of Records," Federal Register Vol. 55 No. 40, Wed Feb. 28, 1990, See ESA-5, ESA-6, ESA-12, ESA-13, ESA-30, or as updated and republished.

FOR TRICARE CLAIMS: PRINCIPLE PURPOSE(S): To evaluate eligibility for medical care provided by civilian sources and to issue payment upon establishment of eligibility and determination that the services/supplies received are authorized by law

ROUTINE USE(S): Information from claims and related documents may be given to the Dept. of Veterans Affairs, the Dept. of Health and Human Services and/or the Dept. of Transportation consistent with their statutory administrative responsibilities under TRICARE/CHAMPVA; to the Dept. of Justice for representation of the Secretary of Defense in civil actions; to the Internal Revenue Service, private collection agencies, and consumer reporting agencies in connection with recoupment claims; and to Congressional Offices in response to inquiries made at the request of the person to whom a record pertains. Appropriate disclosures may be made to other federal, state, local, foreign government agencies, private business entities, and individual providers of care, on matters relating to entitlement, claims adjudication, fraud, program abuse, utilization review, quality assurance, peer review, program integrity, third party liability, coordination of benefits, and civil and criminal litigation related to the operation of TRICARE.

DISCLOSURES: Voluntary; however, failure to provide information will result in delay in payment or may result in denial of claim. With the one exception discussed below, there are no penalties under these programs for refusing to supply information. However, failure to furnish information regarding the medical services rendered or the amount charged would prevent payment of claims under these programs. Failure to furnish any other information, such as name or claim number, would delay payment of the claim. Failure to provide medical information under FECA could be deemed an obstruction.

It is mandatory that you tell us if you know that another party is responsible for paying for your treatment. Section 1128B of the Social Security Act and 31 USC 3801-3812 provide penalties for withholding this information.

You should be aware that P.L. 100-503, the "Computer Matching and Privacy Protection Act of 1988", permits the government to verify information by way of computer matches.

### MEDICAID PAYMENTS (PROVIDER CERTIFICATION)

I hereby agree to keep such records as are necessary to disclose fully the extent of services provided to individuals under the State's Title XIX plan and to furnish information regarding any payments claimed for providing such services as the State Agency or Dept. of Health and Human Services may request.

I further agree to accept, as payment in full, the amount paid by the Medicaid program for those claims submitted for payment under that program, with the exception of authorized deductible, coinsurance, co-payment or similar cost-sharing charge.

SIGNATURE OF PHYSICIAN (OR SUPPLIER): I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction

NOTICE: This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-1197. The time required to complete this information collection is estimated to average 10 minutes per response, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have any comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, 7500 Security Boulevard, Attn: PRA Reports Clearance Officer, Mail Stop C4-26-05, Baltimore, Maryland 21244-1850. This address is for comments and/or suggestions only. DO NOT MAIL COMPLETED CLAIM FORMS TO THIS ADDRESS.

| 1 | | 2 | | | 3a PAT. CNTL # | | | | 4 TYPE OF BILL |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | b. MED. REC. # | | | | |
| | | | | | 5 FED. TAX NO. | | 6 STATEMENT COVERS PERIOD FROM   THROUGH | | 7 |

| 8 PATIENT NAME | a | | 9 PATIENT ADDRESS | a | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| b | | | | b | | | c | d | e |

| 10 BIRTHDATE | 11 SEX | 12 DATE | ADMISSION 13 HR | 14 TYPE | 15 SRC | 16 DHR | 17 STAT | 18 19 20 21 CONDITION CODES 22 23 24 25 26 27 28 | 29 ACDT STATE | 30 |

| 31 OCCURRENCE CODE   DATE | 32 OCCURRENCE CODE   DATE | 33 OCCURRENCE CODE   DATE | 34 OCCURRENCE CODE   DATE | 35 OCCURRENCE SPAN CODE   FROM   THROUGH | 36 OCCURRENCE SPAN CODE   FROM   THROUGH | 37 |
|---|---|---|---|---|---|---|
| a | | | | | | |
| b | | | | | | |

| 38 | | 39 CODE VALUE CODES AMOUNT | 40 CODE VALUE CODES AMOUNT | 41 CODE VALUE CODES AMOUNT |
|---|---|---|---|---|
| | | a | | |
| | | b | | |
| | | c | | |
| | | d | | |

| 42 REV. CD. | 43 DESCRIPTION | 44 HCPCS / RATE / HIPPS CODE | 45 SERV. DATE | 46 SERV. UNITS | 47 TOTAL CHARGES | 48 NON-COVERED CHARGES | 49 |
|---|---|---|---|---|---|---|---|
| 1 | | | | | | | 1 |
| 2 | | | | | | | 2 |
| 3 | | | | | | | 3 |
| 4 | | | | | | | 4 |
| 5 | | | | | | | 5 |
| 6 | | | | | | | 6 |
| 7 | | | | | | | 7 |
| 8 | | | | | | | 8 |
| 9 | | | | | | | 9 |
| 10 | | | | | | | 10 |
| 11 | | | | | | | 11 |
| 12 | | | | | | | 12 |
| 13 | | | | | | | 13 |
| 14 | | | | | | | 14 |
| 15 | | | | | | | 15 |
| 16 | | | | | | | 16 |
| 17 | | | | | | | 17 |
| 18 | | | | | | | 18 |
| 19 | | | | | | | 19 |
| 20 | | | | | | | 20 |
| 21 | | | | | | | 21 |
| 22 | | | | | | | 22 |
| 23 | PAGE ___ OF ___ | CREATION DATE | TOTALS ▶ | | | | 23 |

| 50 PAYER NAME | 51 HEALTH PLAN ID | 52 REL INFO | 53 ASG BEN. | 54 PRIOR PAYMENTS | 55 EST. AMOUNT DUE | 56 NPI | |
|---|---|---|---|---|---|---|---|
| A | | | | | | | A |
| B | | | | | | 57 OTHER | B |
| C | | | | | | PRV ID | C |

| 58 INSURED'S NAME | 59 P.REL | 60 INSURED'S UNIQUE ID | 61 GROUP NAME | 62 INSURANCE GROUP NO. | |
|---|---|---|---|---|---|
| A | | | | | A |
| B | | | | | B |
| C | | | | | C |

| 63 TREATMENT AUTHORIZATION CODES | 64 DOCUMENT CONTROL NUMBER | 65 EMPLOYER NAME | |
|---|---|---|---|
| A | | | A |
| B | | | B |
| C | | | C |

| 66 DX | 67 A B C D E F G H | 68 |
|---|---|---|
| | I J K L M N O P Q | |

| 69 ADMIT DX | 70 PATIENT REASON DX a b c | 71 PPS CODE | 72 ECI a b c | 73 |
|---|---|---|---|---|

| 74 PRINCIPAL PROCEDURE CODE   DATE | a. OTHER PROCEDURE CODE   DATE | b. OTHER PROCEDURE CODE   DATE | 75 | 76 ATTENDING NPI   QUAL |
|---|---|---|---|---|
| | | | | LAST   FIRST |
| c. OTHER PROCEDURE CODE   DATE | d. OTHER PROCEDURE CODE   DATE | e. OTHER PROCEDURE CODE   DATE | | 77 OPERATING NPI   QUAL |
| | | | | LAST   FIRST |
| 80 REMARKS | | 81CC a | 78 OTHER NPI   QUAL |
| | | b | LAST   FIRST |
| | | c | 79 OTHER NPI   QUAL |
| | | d | LAST   FIRST |

UB-04 CMS-1450          APPROVED OMB NO. 0938-0997          NUBC National Uniform Billing Committee          THE CERTIFICATIONS ON THE REVERSE APPLY TO THIS BILL AND ARE MADE A PART HEREOF.

UB-04 NOTICE:    THE SUBMITTER OF THIS FORM UNDERSTANDS THAT MISREPRESENTATION OR FALSIFICATION OF ESSENTIAL INFORMATION AS REQUESTED BY THIS FORM, MAY SERVE AS THE BASIS FOR CIVIL MONETARY PENALTIES AND ASSESSMENTS AND MAY UPON CONVICTION INCLUDE FINES AND/OR IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW(S).

Submission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete. That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts. The following certifications or verifications apply where pertinent to this Bill:

1. If third party benefits are indicated, the appropriate assignments by the insured /beneficiary and signature of the patient or parent or a legal guardian covering authorization to release information are on file. Determinations as to the release of medical and financial information should be guided by the patient or the patient's legal representative.

2. If patient occupied a private room or required private nursing for medical necessity, any required certifications are on file.

3. Physician's certifications and re-certifications, if required by contract or Federal regulations, are on file.

4. For Religious Non-Medical facilities, verifications and if necessary re-certifications of the patient's need for services are on file.

5. Signature of patient or his representative on certifications, authorization to release information, and payment request, as required by Federal Law and Regulations (42 USC 1935f, 42 CFR 424.36, 10 USC 1071 through 1086, 32 CFR 199) and any other applicable contract regulations, is on file.

6. The provider of care submitter acknowledges that the bill is in conformance with the Civil Rights Act of 1964 as amended. Records adequately describing services will be maintained and necessary information will be furnished to such governmental agencies as required by applicable law.

7. For Medicare Purposes: If the patient has indicated that other health insurance or a state medical assistance agency will pay part of his/her medical expenses and he/she wants information about his/her claim released to them upon request, necessary authorization is on file. The patient's signature on the provider's request to bill Medicare medical and non-medical information, including employment status, and whether the person has employer group health insurance which is responsible to pay for the services for which this Medicare claim is made.

8. For Medicaid purposes: The submitter understands that because payment and satisfaction of this claim will be from Federal and State funds, any false statements, documents, or concealment of a material fact are subject to prosecution under applicable Federal or State Laws.

9. For TRICARE Purposes:

(a) The information on the face of this claim is true, accurate and complete to the best of the submitter's knowledge and belief, and services were medically necessary and appropriate for the health of the patient;

(b) The patient has represented that by a reported residential address outside a military medical treatment facility catchment area he or she does not live within the catchment area of a U.S. military medical treatment facility, or if the patient resides within a catchment area of such a facility, a copy of Non-Availability Statement (DD Form 1251) is on file, or the physician has certified to a medical emergency in any instance where a copy of a Non-Availability Statement is not on file;

(c) The patient or the patient's parent or guardian has responded directly to the provider's request to identify all health insurance coverage, and that all such coverage is identified on the face of the claim except that coverage which is exclusively supplemental payments to TRICARE-determined benefits;

(d) The amount billed to TRICARE has been billed after all such coverage have been billed and paid excluding Medicaid, and the amount billed to TRICARE is that remaining claimed against TRICARE benefits;

(e) The beneficiary's cost share has not been waived by consent or failure to exercise generally accepted billing and collection efforts; and,

(f) Any hospital-based physician under contract, the cost of whose services are allocated in the charges included in this bill, is not an employee or member of the Uniformed Services. For purposes of this certification, an employee of the Uniformed Services is an employee, appointed in civil service (refer to 5 USC 2105), including part-time or intermittent employees, but excluding contract surgeons or other personal service contracts. Similarly, member of the Uniformed Services does not apply to reserve members of the Uniformed Services not on active duty.

(g) Based on 42 United States Code 1395cc(a)(1)(j) all providers participating in Medicare must also participate in TRICARE for inpatient hospital services provided pursuant to admissions to hospitals occurring on or after January 1, 1987; and

(h) If TRICARE benefits are to be paid in a participating status, the submitter of this claim agrees to submit this claim to the appropriate TRICARE claims processor. The provider of care submitter also agrees to accept the TRICARE determined reasonable charge as the total charge for the medical services or supplies listed on the claim form. The provider of care will accept the TRICARE-determined reasonable charge even if it is less than the billed amount, and also agrees to accept the amount paid by TRICARE combined with the cost-share amount and deductible amount, if any, paid by or on behalf of the patient as full payment for the listed medical services or supplies. The provider of care submitter will not attempt to collect from the patient (or his or her parent or guardian) amounts over the TRICARE determined reasonable charge. TRICARE will make any benefits payable directly to the provider of care, if the provider of care is a participating provider.

SEE  http://www.nubc.org/  FOR MORE INFORMATION ON UB-04 DATA ELEMENT AND PRINTING SPECIFICATIONS

**PROCEEDINGS**

# Prior Authorization and Utilization Management Concepts in Managed Care Pharmacy

## SUMMARY

Formularies that include prior authorization and utilization management are widely used by managed care organizations (MCOs), including health plans and pharmacy benefit management companies. Utilization management criteria are essential to optimizing patient outcomes and reducing waste, error, unnecessary drug use, and cost. The Academy of Managed Care Pharmacy (AMCP) Professional Practice Committee has developed the following 9 specific concepts for effective prior authorization practices by MCOs: (1) patient safety and appropriate medication use, (2) clinical decision making, (3) evidence-based review criteria, (4) automated decision support, (5) transparency and advanced notice, (6) emergency access, (7) provider collaboration, (8) need for timeliness and avoiding disruptions in therapy, and (9) cost-effectiveness and value. AMCP supports these concepts to allow for further collaboration between prescribers and payers in order to ensure that patients receive appropriate and timely access to drugs, devices, and other therapeutic agents.

*J Manag Care Spec Pharm.* 2019;25(6):641-44

Copyright © 2019, Academy of Managed Care Pharmacy. All rights reserved.

Formularies that include prior authorization and utilization management are widely used by managed care organizations (MCOs), including health plans and pharmacy benefit management companies. Utilization management criteria are essential to optimizing patient outcomes and reducing waste, error, unnecessary drug use, and cost. The safety and clinical appropriateness of medication therapy selection for a covered population is the primary goal of formularies. A thorough review of clinical evidence is the cornerstone of managed care formulary decisions.[1,2] For individuals who require medications and treatments not included on formularies, prescribers and health plans can work together through exceptions and appeals processes to provide appropriate access to therapy. Health plans, employers, and government-sponsored health care programs focus on optimizing patient outcomes through the use of medications that have established evidence of efficacy and safety, while providing the highest value. Prior authorization (PA) is a utilization management tool that enables plans to implement patient-focused goals of safe and appropriate medication use. Also known as coverage determinations in the Medicare Part D program, PA coverage criteria are centered on patients' clinical needs and therapeutic rationale.

The Academy of Managed Care Pharmacy (AMCP) Professional Practice Committee has developed the following 9 specific concepts for effective PA practices by MCOs. AMCP supports these concepts to allow for further collaboration between prescribers and payers in order to ensure that patients receive appropriate and timely access to drugs, devices, and other therapeutic agents. Additionally, these concepts are timely, given recent attention and proposed reforms to PA.[3]

### Concept 1: Patient Safety and Appropriate Medication Use

Using clinically sound, evidence-based principles, PA guides safe and appropriate medication therapy for patients. MCOs work with prescribers to ensure that treatment goals are met, while considering the health plan benefit design and all statutory and regulatory requirements. For example, PA can be used to support careful patient selection and manage ongoing medication use for medications with a high potential for misuse or abuse, or those with unknown long-term safety or durability of effect.

### Concept 2: Clinical Decision Making

PA guidelines are designed by MCOs to efficiently improve the use of clinically appropriate, affordable medications and therapies. This is especially useful for classes of medications that include multiple agents of varying effectiveness, for which PAs are an additional way to encourage the use of appropriate formulary alternatives. MCOs should regularly confirm that agents on the formulary provide appropriate care across the membership of a plan and that the plan's coverage requirements align with standards of relevant accreditation bodies and quality organizations.

### Concept 3: Evidence-Based Review Criteria

Medication utilization management criteria based on an evaluation of clinical trials, peer-reviewed literature, and consensus guidelines are a common part of PA programs. These criteria are developed by a pharmacy and therapeutics (P&T) committee that includes health care providers (e.g., pharmacists, nurses, and physicians) and administrators, quality-improvement managers, and others involved with the medication use process.[4] The P&T committee reviews the safety and efficacy evidence of a medication in comparison with therapeutic alternatives to render a clinical determination for drug formulary placement.[4,5] Furthermore, the P&T committee considers subgroups or special populations of patients for whom the evidence indicates a drug may have differing effectiveness or adverse effect incidence. The P&T committee evaluates all pertinent, accessible medication trial data when making formulary decisions. While cost is an evaluated component, it is used as a comparator when the alternative is therapeutically equivalent or shown to produce similar results. In order of priority, formulary decisions are derived first from safety and efficacy, followed by cost considerations.[4,5]

The intent of a formulary and utilization management is to encourage the use of medically appropriate and cost-effective drug-related products that meet the needs of patient populations.[4] Formularies and utilization management criteria should be updated regularly to keep pace with changes in clinical practice, clinical guidelines, new drugs, evolving health plan designs, and the reality that patients may change health plan coverage.[4,5]

### ■ Concept 4: Automated Decision Support

Provider burden and/or dissatisfaction with approval processes has been documented in the literature.[6,7] Health information technology solutions should be used to reduce paperwork and waste, standardize data and processes for utilization management, and improve the patient and clinician experience.[8] For example, adoption of electronic PA (ePA) allows for secure, electronic transmission of patient information to complete a PA review, thus, decreasing the administrative burden for prescribers and MCOs and improving the turnaround time for the benefit of patients.[9-11] According to a national ePA technology vendor, providers who use electronic solutions spend an average of 2.5 fewer hours on PA per week.[12] Best practice guidelines or state regulations should be followed as the industry continues to develop uniform, national industry standards for the electronic exchange of health information. An effective ePA process includes automation at the point of care, point of sale, or any point where a PA originates. To support the decision-making process for patients and providers, the patient's financial responsibility, as well as any potential less costly therapeutic alternatives, should be displayed at the point of care.

### ■ Concept 5: Transparency and Advanced Notice

MCOs should provide advanced notice of formulary changes to the provider and patient. Advanced notice is vital to avoid disruptions in care.

MCOs should make current formulary and utilization management requirements available and transparent in a manner that is easily accessible and understandable to patients. Members and providers should be able to easily identify a particular formulary and any changes made, as well as search for drug-utilizing tools such as medication search tools and formulary guides. Details of utilization management criteria should be presented, including required documentation that supports the request for authorization or a formulary exception, the volume of requests, and the approval and denial rates.

### ■ Concept 6: Emergency Access

In emergency situations, access to medication therapy without impediments is imperative. This includes situations in which care is sought outside of standard business hours. PA criteria are not applied to medications used in inpatient or emergency care settings. Utilization management tools should not cause delay of care or have an effect on medical treatment during emergency care situations. MCOs should avoid broad or inflexible PA requirements for drug therapies commonly used as part of emergency care.

### ■ Concept 7: Provider Collaboration

MCOs should collaborate and communicate clearly with providers throughout the PA process. Utilization reviews should provide detailed explanations for PA denials, including an indication of any missing information. The PA process should support health plan transparency and multidisciplinary collaboration to obtain the best outcomes for the member/patient and the best value for the health care system. Additionally, PA criteria should be subject to continuous improvement, revisions, and, where necessary, removal. This requires dynamic discussion and partnership with providers to ensure that patients are receiving appropriate care without unnecessary hurdles. All PA denials should include the clinical rationale for each determination (e.g., national medical specialty society guidelines and peer-reviewed clinical literature), provide the plan's covered alternative treatment, and detail the appeal process.

In cases where different providers are not aware of all the medications or treatments a patient is receiving, the MCO may act as the care coordinator when reviewing medication regimens or PAs. Ensuring that all providers are aware of the medications being prescribed to a patient can lead to discontinuation of duplicate medications or modifications that optimize the medication regimen. MCOs need to continue bridging any gaps in medication coordination between providers.

MCOs should monitor utilization of medications across the medical and pharmacy benefit, including those administered in a physician's office or outpatient treatment facility. Coverage of medical and pharmacy benefit drugs, devices, or therapies should be coordinated to enable more cost-effective therapy selection and streamlined medication management.

### ■ Concept 8: Need for Timeliness and Avoiding Disruptions in Therapy

MCOs should allow for timely PA approval for medically necessary exceptions and for timely handling of denial appeals. When requesting nonurgent care, PAs should be reviewed and acted upon promptly and within statutory and regulatory timelines and accreditation standards. When a provider and the MCO do not agree on the utilization management criteria used for approval of a therapy or a coverage decision for a member, a provider should have access to a peer-to-peer clinical discussion to resolve the matter.

Patients newly enrolled in plans who are stabilized on therapy should be allowed sufficient time for therapy continuation during the PA review process, sometimes referred to as a grandfathering or transition period. Transitional coverage promotes coordinated care and prevents unnecessary therapy changes or gaps in care.

### Concept 9: Cost-Effectiveness and Value

As MCOs and providers enter into risk-based arrangements, use of PA as a tool to ensure delivery of affordable, high-quality, patient-centered care must evolve to facilitate shared decision making. When there is shared risk involved in contracts between providers and payers, PA can be a tool to ensure alignment of providers around evidence-based care. The evolution of PA should be a partnership between payers, providers, and administrators of health care contracts to include alignment of incentives, clinical approach, and operational capabilities. As noted in the American Medical Association Reform Principles,[3] collaboration among stakeholders is necessary to achieve cost-effective and value-based care.[13,14]

### Conclusions

MCOs should focus on ensuring access to appropriate, evidence-based, and cost-effective medications for their members. These concepts provide a framework to ensure that PA and utilization management are timely, transparent, and collaborative, which is ultimately synonymous with patient-centered care. MCOs have the responsibility and opportunity to incorporate clinical and technology advancements into these processes with a constant goal of improving health outcomes and cost-effectiveness.

### 2018-2019 AMCP Pharmacy Professional Practice Committee

*KEVIN RIDDERHOFF, PharmD, MHA, FACHE, Chair, Professional Practice Committee 2018-2019 and Mid-Central Region Director of Operations, Coram CVS Specialty Infusion Services; ANN M. SCHUSTER, PharmD, Vice Chair, Professional Practice Committee 2018-2019; MICHAEL BRODEUR, RPh, MBA, Director, Clinical Drug Assessment, Aetna Pharmacy Management; ELIZABETH L. BRUSIG, PharmD, MBA, Clinical Pharmacy Specialist, Optima Health Plan; CHRIS GUINTHER, PharmD, RPh, System Director, Pharmacy Benefits, Mercy Health; POLINA KOGAN, RPh, PharmD, Chief Pharmacy Officer, EmpiRx Health; KIMBERLY LENZ, PharmD, Clinical Pharmacy Manager, Office of Clinical Affairs, UMass Medical School's Commonwealth Medicine Division; MARK O'BRIEN, PharmD, MPH, Health Informatics Graduate Student, University of Illinois at Chicago; JANN RIGELL, RPh, MBA, Principal, Enterprise Specialty Programs, MedImpact Health Care Systems; MARISSA SCHLAIFER, MS, RPh, AMCP Board Liaison to the Professional Practice Committee 2018-2019 and Vice President, Policy and Regulatory Affairs, OptumRx; MARK A. SHELBY, RPh, MCR, Director, Pharmacy Performance, CVS Caremark; MICHAEL J. TOCCO, RPh, MEd, President, Integrated Pharmacy Solutions; MICHAEL WASCOVICH, SR., Director, Pharmacy, Premier Healthcare Solutions; KAT WOLF KHACHATOURIAN, PharmD, MBA, Vice President, Pharmacy Services, Catholic Health Initiatives; and TRICIA LEE WILKINS, PharmD, MS, PhD, Director of Pharmacy Affairs, Academy of Managed Care Pharmacy and Staff Liaison to the Professional Practice Committee 2018-2019.*

*AUTHOR CORRESPONDENCE: Tricia Lee Wilkins, PharmD, MS, PhD, Director of Pharmacy Affairs, Academy of Managed Care Pharmacy, 675 N. Washington St., Alexandria, VA 22314. Tel.: 703.684.2641; E-mail: tlwilkins@amcp.org.*

### DISCLOSURES

No funding was received for the conceptualizing, writing, and/or editing of this manuscript. The Professional Practice Committee is composed of volunteers selected from current Academy of Managed Care Pharmacy members in good standing. Concepts discussed in this document were developed by request of the Academy of Managed Care Pharmacy and are not intended to represent the views of committee members' employers or affiliated organizations.

### ACKNOWLEDGMENTS

The 2018-2019 AMCP Professional Practice Committee acknowledges the following members of the Prior Authorization Task Group who were instrumental in providing thought leadership and direction for the concepts outlined in this document: Kimberly Lenz (lead), Elizabeth Brusig (co-lead), Michael Brodeur, Polina Kogan, Mark Shelby, and Michael Tocco.

### REFERENCES

1. Navarro RP. *Managed Care Pharmacy Practice.* 2nd ed. Sudbury, MA: Jones and Bartlett Publishers; 2009.

2. Academy of Managed Care Pharmacy. Formulary management. November 2009. Available at: http://www.amcp.org/WorkArea/DownloadAsset.aspx?id=9298. Accessed March 22, 2019.

3. American Medical Association, American Academy of Child and Adolescent Psychiatry, American Academy of Dermatology, et al. Prior authorization and utilization management reform principles. January 25, 2017. Available at: https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/principles-with-signatory-page-for-slsc.pdf. Accessed March 22, 2019.

4. American Society of Health-System Pharmacists. ASHP statement on the pharmacy and therapeutics committee and the formulary system. *Am J Health Syst Pharm.* 2008;65:2384-86. Available at: https://www.ashp.org/-/media/assets/policy-guidelines/docs/statements/pharmacy-and-therapeutics-committee-and-formulary-system.ashx. Accessed April 4, 2019.

5. The Coalition Working Group. Principles of a sound drug formulary system. October 2000. Available at: http://amcp.org/WorkArea/DownloadAsset.aspx?id=9280. Accessed March 22, 2019.

6. Casalino LP, Nicholson S, Gans DN, et al. What does it cost physician practices to interact with health insurance plans? *Health Aff (Millwood).* 2009:28(4):w533-43.

7. Morley CP, Badolato DJ, Hickner J, Epling JW. The impact of prior authorization requirements on primary care physicians' offices: report of two parallel network studies. *J Am Board Fam Med.* 2013;26(1):93-95.

8. AMCP Electronic Prior Authorization Work Group. Proceedings of the AMCP Partnership Forum: NCPDP electronic prior authorization standards-building a managed care implementation plan. *J Manag Care Spec Pharm.* 2015;21(7):545-50. Available at: https://www.jmcp.org/doi/10.18553/jmcp.2015.21.7.545.

9. National Council for Prescription Drug Programs. NCPDP SCRIPT standard supports electronic prior authorization (ePA): fact sheet. January 2015. Available at: https://www.ncpdp.org/NCPDP/media/pdf/NCPDP_ePA_Fact_Sheet.doc. Accessed March 22, 2019.

10. Beaton T. How payers can streamline prior authorization for prescriptions. HealthPayer Intelligence. January 2, 2018. Available at: https://health-payerintelligence.com/news/how-payers-can-streamline-prior-authorization-for-prescriptions. Accessed March 22, 2019.

11. Newcomer LN, Weininger R, Carlson RW. Transforming prior authorization to decision support. *J Oncol Pract*. 2017;13(1):e57-e61.

12. CoverMyMeds. 2019 ePA national adoption scorecard. Available at: https://www.covermymeds.com/main/insights/scorecard. Accessed April 4, 2019.

13. LaPointe J. AHA, AMA, and others offer 5 prior authorization reform strategies. RevCycleIntelligence. January 18, 2018. Available at: https://rev-cycleintelligence.com/news/aha-ama-and-others-offer-5-prior-authorization-reform-strategies. Accessed March 22, 2019.

14. Mehrabian N. Reinventing utilization management (UM) to bring value to the point of care. HealthcareIT News. September 18, 2017. Available at: https://www.healthcareitnews.com/news/reinventing-utilization-management-um-bring-value-point-care. Accessed March 22, 2019.

Case 1:19-cv-00272-LCB-LPA   Document 137-5   Filed 11/30/21   Page 4 of 4

JA200

```
 1              IN THE UNITED STATES DISTRICT COURT
 2            FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
 3                 Civil Action No. 1:19-cv-00272
 4
      MAXWELL KADEL, et al.,              )
 5                                        )
                             Plaintiffs,  )
 6                                        )
            vs.                           )
 7                                        )
      DALE FOLWELL, in his official       )
 8    capacity as State Treasurer of      )
      North Carolina, et al.,             )
 9                                        )
                             Defendants,  )
10    _____   )
11
12              DEPOSITION OF DAN H. KARASIC, M.D.
13                            Remote
                        September 20, 2021
14                      9:00 a.m. Pacific Time
15
16
17
18
19    Prepared by:
      Vicki L. O'Ceallaigh Champion, CR
20    Certificate No. 50534
21
22
23    Prepared for:
24
25    (Certified copy)
```

## DEPOSITION OF DAN H. KARASIC, M.D.

Page 18

1　　A.　No.

2　　Q.　Have you served as a principal investigator

3　on any private grants?

4　　A.　No.

5　　Q.　Dr. Karasic, what is gender dysphoria?

6　　MR. HASKEL:　Objection to the form.

7　　A.　So gender dysphoria -- well, first of all,

8　there are a couple gender dysphorias.　There is the

9　gender dysphoria, the symptom.　You might say small

10　letter "G," small letter "D."

11　　There is also gender dysphoria, capital "G,"

12　capital "D," the DSM-5 diagnosis.　If for gender

13　dysphoria the symptom, it is distress about the

14　difference between one's identified or lived gender

15　and one's assigned gender.

16　BY MR. KNEPPER:

17　　Q.　Okay.　And then what is the diagnosis of

18　gender dysphoria?

19　　A.　So the diagnosis of gender dysphoria is a

20　diagnosis that the American Psychiatric Association

21　has put in DSM-5.　That includes the presence of

22　persistent gender dysphoria along with -- well, it

23　lists various manifestations of that, but it also --

24　as potential symptoms and also has that the symptoms

25　cause social or occupational -- impairment of social

## DEPOSITION OF DAN H. KARASIC, M.D.

Page 19

1  occupational functioning or clinically significant

2  distress.

3      Q.   Is it clinically significant distress?

4      A.   Distress.

5      Q.   And how is that distinguished from the

6  distress identified as a symptom?  You described it

7  as little-G-little-D dysphoria.

8          MR. HASKEL:  Object to form.

9      A.   So the gender dysphoria as a symptom was --

10 or has been something that has been described in

11 people long before there was -- the DSM-5 came out

12 in 2013, but for example, WPATH Standards of Care 7

13 refers to gender dysphoria, not capitalized, and not

14 as -- not as an APA diagnosis, but as this symptom

15 of distress.

16 BY MR. KNEPPER:

17     Q.   So what -- let me just -- if an

18 individual -- and this is what I'm trying to

19 understand:  If an individual suffers from gender

20 dysphoria, little-G-little-D, does that mean that

21 they suffer from gender dysphoria, the psychiatric

22 diagnosis?

23         MR. HASKEL:  Objection to form, foundation.

24 You can answer.

25     A.   Not necessarily.  I would say very often

## DEPOSITION OF DAN H. KARASIC, M.D.

Page 27

1   actually a question.  I think you were

2   characterizing his testimony, which I don't know if

3   that's a question or you were going to ask a

4   question after --

5           MR. KNEPPER:  Hold on.  Hold on.  I stopped,

6   because I wanted to let Dr. Karasic speak.

7           MR. HASKEL:  Okay.

8           MR. KNEPPER:  I absolutely will finish my

9   question, but I want to give the Witness -- when he

10  raised his finger and said he wanted to say

11  something, I wanted to give him an opportunity to

12  make sure that I was saying something correctly.

13  BY MR. KNEPPER:

14      Q.   So go ahead, Dr. Karasic.

15      A.   So on that last answer, I was saying in the

16  example I was giving was a "no" to the question of

17  do all transgender people also have a diagnosis of

18  gender dysphoria, and I was giving an example that

19  related to the difference between gender dysphoria

20  and gender incongruence of ICD-11, so just to

21  clarify my answer --

22      Q.   Thank you.  That does -- that does clarify

23  for me.

24           I'm going to ask you the converse question

25  now.  Do all individuals -- are all individuals who

## DEPOSITION OF DAN H. KARASIC, M.D.

Page 28

1  suffer from gender dysphoria, the psychiatric DSM-5

2  diagnosis, transgender?

3          MR. HASKEL:  Objection to form,

4  foundation.

5      A.    So being transgender is an identity.  So

6  there are -- you know, there are different ways to

7  define it.  I think we tend to think about people

8  who identify as transgender and then to look at

9  that, you know, another -- if we are looking at

10  differences between the term "transgender" and

11  "gender dysphoria," that gender dysphoria is a

12  symptom or a diagnosis.  Transgender is a

13  diagnosis -- I mean, an identity.  I'm sorry -- an

14  identity.

15          And so there may be people who have symptoms

16  of gender dysphoria, but they personally don't

17  identify as transgender.  Similarly, to give an

18  example, there can be people who have same-sex

19  attraction, but don't identify as either lesbian or

20  bisexual.

21  BY MR. KNEPPER:

22      Q.    Are there any peer reviewed studies that

23  attempt to quantify that distinction between the

24  number of individuals who suffer from gender

25  dysphoria and the number of individuals who claim a

Page 1

```
1          IN THE UNITED STATES DISTRICT COURT
        FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

2

3

4    MAXWELL KADEL, et al.,            )
                                       )
5            Plaintiffs,               )
                                       )
6        -vs-                          ) Civil Action No.
                                       )  1:19-cv-00272
7    DALE FOLWELL, in his official     )
     capacity as State Treasurer of    )
8    North Carolina, et al.,           )
                                       )
9            Defendants.               )

10

11

12

13              The videotaped videoconference deposition

14    of RANDI C. ETTNER, Ph.D., reported remotely by

15    JUNE M. FUNKHOUSER, CSR, RMR, and Notary Public,

16    pursuant to the Federal Rules of Civil Procedure

17    for the United States District Courts pertaining to

18    the taking of depositions, commencing at 9:35 a.m.

19    on October 15, 2021.

20

21

22

23

24
```

## DEPOSITION OF RANDI C. ETTNER, Ph.D

1  dysphoria?

2      A    First I'd like to correct the statement

3  that the specific study done at the University of

4  Minnesota is upcoming.

5      Q    Okay.

6      A    It's already been published.  It was

7  actually spoken about on Good Morning America.  I'm

8  not an epidemiologist, so I cannot really give an

9  answer about prevalence or incidence of any medical

10  condition.

11      Q    Do all transgender individuals suffer

12  from gender dysphoria?

13      A    No.

14      Q    Are all individuals suffering from gender

15  dysphoria transgender?

16      A    Yes.

17      Q    Is there an article that you would cite

18  to support that conclusion?

19      A    Well, gender dysphoria by definition

20  includes a portion of the transgender or

21  gender-nonconforming population.

22      Q    So we've used a couple of terms, and I

23  just would like you to define them as you used

24  them.  So what does it mean to be -- the

```
 1          IN THE UNITED STATES DISTRICT COURT
         FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
 2
               ~~~~~~~~~~~~~~~~~~~~~
 3
     MAXWELL KADEL, et al.,
 4
 5              Plaintiffs,
 6
          vs.           Case No. 1:19-cv-272-LCB-LPA
 7
 8   DALE FOLWELL, in his official
     capacity as State Treasurer of
 9   North Carolina, et al.,
10
                Defendants.
11
12             ~~~~~~~~~~~~~~~~~~~~~
13             Video Deposition of
               STEPHEN B. LEVINE, M.D.
14
15             September 10, 2021
                    9:05 a.m.
16
17                  Taken at:
             Veritext Legal Solutions
18             1100 Superior Avenue
                 Cleveland, Ohio
19
20             Tracy Morse, RPR
21
22
23
24
25
```

## DEPOSITION OF STEPHEN B. LEVINE, M.D.

ATTORNEYS EYES ONLY

Page 241

1    substance abuse, they didn't distinguish

2    between trans and -- statistically, but other

3    studies have indicated that everything else,

4    like suicide in the last thirty days, thinking

5    about suicide in the last thirty days, making a

6    suicide attempt, substance abuse, it's all

7    higher in the trans community.

8         It's not low in sexual minority

9    communities.  Either is domestic violence in

10   either of those communities, but it's much less

11   in the trans -- in the lesbian and gay

12   community than it is in the straight -- in the

13   trans community.  And it's even less in the

14   straight community, but obviously we have these

15   same problems in the straight community, the

16   cis gender community.

17        Q.    Return to the question.  Do you

18   consider surgery for the treatment of gender

19   dysphoria to be experimental?

20             MR. CHARLES:  I object to form.

21        A.    I have the same answer that I had

22   to the hormonal question and for the same

23   reasons.

24        Q.    Do all transgender people suffer

25   from a gender dysphoria?

# DEPOSITION OF STEPHEN B. LEVINE, M.D.

### ATTORNEYS EYES ONLY

Page 242

1      A.      No.

2      Q.      Are there any studies or

3  scientifically valid research that indicates

4  what percentage of transgender people suffer

5  from gender dysphoria?

6           MR. CHARLES:  Object to form.

7      A.      What percentage of transgender

8  people suffer from gender dysphoria?  I don't

9  think -- I can't recall a study that asks that

10 question and use -- and had numbers to explain

11 the answer.  People like myself get to see

12 individuals who are transgender but not

13 dysphoric or who are dysphoric but not

14 transgender.

15     Q.      That was going to be my followup

16 question.  Are there people who are dysphoric

17 who are not transgender?

18     A.     Oh, yes.  Oh, yes.  Many years ago,

19 before I ever got involved with any lawyer

20 about these issues, I remember recommending to

21 a group of alcohol specialists that they ought

22 to look at the gender identity -- they ought to

23 ask questions about the sexual identity of the

24 people being treated for substance abuse and

25 alcoholism.  Because in my limited clinical

# DEPOSITION OF STEPHEN B. LEVINE, M.D.

## ATTORNEYS EYES ONLY

Page 243

1    experience, I've run into -- I keep running

2    into people who presented with substance abuse

3    and really dangerous degrees of substance abuse

4    that would get them hospitalized.

5          And then when I talked to them, they tell

6    me stories about their hidden gender dysphoria

7    or their struggles about -- let me just take a

8    man, for example -- the struggles about the

9    sense that they have that they're feminine and

10   they can't -- they have feminine interests,

11   they have feminine interests but social -- and

12   they have a sense of themselves as more

13   feminine than masculine and yet they are too

14   afraid to show it and then they drink

15   themselves into hepatitis or whatever.

16          Q.   But you would not consider those

17   individuals to be transgender?

18          A.   Well, they don't call themselves

19   transgender.  They present themselves as cis

20   gender people.

21          MR. KNEPPER:  That's all I have.

22   Carl, do you have any follow up?

23          MR. CHARLES:  What time is your

24   flight?

25          MR. KNEPPER:  7:15.

Page 1

1             UNITED STATES DISTRICT COURT
              NORTH CAROLINA MIDDLE DISTRICT

2    _____

3    MAXWELL KADEL, et al.,

4                    Plaintiffs,

5          vs.           Case No. 1:19-cv-00272-LCB-LPA

6    DALE FOLWELL, et al.,

7                    Defendants.

     _____

8

         THE DEPOSITION OF GEORGE R. BROWN, M.D.

9              September 23, 2021

10

11

12        **PORTIONS ATTORNEYS' EYES ONLY**

13

14

15

16

17

18

19   Reported by:

20   PATRICIA A. NILSEN, RMR, CRR, CRC
     Licensed Court Reporter 717 for the State of
21   Tennessee

22

23

24

25

## DEPOSITION OF GEORGE R. BROWN, M.D.

Page 92

1     Foundation.  Object to the extent it's outside the

2     scope of Dr. Brown's opinions.

3     A.      So the short answer is no, but I also want

4     to point out that the presence of symptoms is --

5     also has to be considered at a particular -- in a

6     particular time frame.  So it's not just a simple

7     matter of, does the person experience gender

8     dysphoria if they have transgender identity.  They

9     could have last year; they might have it next year;

10    they don't have it today.  It depends on where they

11    are in time, and a variety of other parameters

12    specific to the individual.

13          But it is true that there are transgender

14    people who, sitting here today, if they were

15    sitting here today, do not have gender dysphoria

16    with little G, little D or big G, big D.

17    Q.      Are there studies that identify the

18    portion of -- the portion, prevalence, ratio of

19    gender dysphoria, the diagnosis in transgender

20    individuals?

21          MR. TISHYEVICH:  Objection, to the

22    extent it's beyond the scope of Dr. Brown's

23    opinions.

24    A.      The answer to that is, no one knows the

25    answer to that.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

|  |  |  |
|---|---|---|
| MAXWELL KADEL, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. |
| v. | ) | 1:19-cv-272-LCB-LPA |
| | ) | |
| DALE FOLWELL, in his official | ) | |
| capacity as State Treasurer of | ) | |
| North Carolina, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF ALINA NEUBERGER MD, MBA

I, Alina Neuberger, of full age, and pursuant to 28 U.S.C. § 1746, hereby state
as follows:

1.     I have personal knowledge of the facts set forth in this Affidavit.

2.     I am currently a Senior Medical Director in Medical Affairs for
CaremarkPCS Health, L.L.C, including CVS Health and its corporate affiliates
(collectively "Caremark").

3.     I have been employed by Caremark for approximately 5 years.

4.    I am familiar with the FDA-approved indications for the testosterone products and hormonal therapies listed in the December 1, 2017 Clinical Plan Management document marked as "**Exhibit A**".

5.    None of these products and therapies are FDA approved for the treatment of gender dysphoria.

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.

Executed this __29th__ day of September, 2021 at Chatham, New Jersey.

Alina Neuberger, MD, MBA

# Exhibit A



**Clinical Plan Management**

The undersigned ("Client") and [CaremarkPCS Health, L.L.C. ("Caremark")] are parties to a Prescription Benefit Services Agreement, as amended from time to time ("Agreement"), pursuant to which Client has retained Caremark to provide certain prescription benefit management and related services with respect to Client's health benefit plan(s). Initially capitalized terms used herein and not expressly defined herein shall have the meanings given to such terms in the Agreement.

Included in the Services that may be provided by Caremark under the Agreement are certain core clinical services and programs and enhanced clinical programs and Services ("Clinical Services"). By executing and returning this Clinical Program Selection Form ("CPM"), Client confirms its election to have Caremark provide Clinical Services under the Agreement in accordance with this CPM.

This CPM is hereby incorporated by reference into the Agreement and shall form part of the Plan Design Document, defined by the Agreement and the prescription drug benefit under Client's applicable health benefit plan(s).

All Clinical Services shall be performed in accordance with the applicable criteria for such Clinical Service ("Criteria"). Unless Client elects below to use custom Criteria for one or more Clinical Services by so indicating on this CPM form, Caremark will provide each Clinical Service in accordance with its standard Criteria as in effect from time to time. Certain clinical services may only be used with standard criteria. The use of standard Criteria is part of the terms and conditions under which Caremark agrees to provide Clinical Services. Subject to the confidentiality provisions of the Agreement, such standard Criteria are proprietary and confidential information of Caremark. Such standard Criteria are not part of Client's health plan or the Plan Design Document. Caremark reserves the right to modify any such standard criteria at any time and from time to time. Modifications of Criteria will not be routinely shared with Client.

To the extent that Client elects to use custom Criteria with respect to one or more Clinical Services, client shall provide Caremark with a copy of such Criteria in writing and Caremark will provide the related Clinical Services in accordance with such written Criteria. In support of custom Criteria derived from plan benefit design or other sources available to Client, Caremark shall work with Client, when requested, in a consultative manner to review clinically-based custom Criteria for consistency with current standards of care. Client shall maintain custom Criteria to ensure alignment with plan benefit design, recommendations from other sources, and standards of care. Clients shall submit custom Criteria to Caremark for review and implementation. Frequency and timing of custom Criteria submission will be at Client's discretion. For clients that wish to implement custom UM edit(s) that have already been developed for another line of business, please indicate this within the following sections of this form.
- Special Instructions/Notes section
- Client Request-Custom section at the end of each UM edit type area

Within these sections, please indicate the following: [ENTER SPECIFIC XYZ Plan List NAME] for each of the custom edits to be implemented.

Client may elect to discontinue provision of any Clinical Service through written notice to Caremark.

By signing below, Client hereby accepts and adopts as its own the Criteria, as administered by Caremark. In the event Client elects to implement its own criteria, Client acknowledges Caremark will not evaluate and update such custom criteria for safety or efficacy and Client shall be responsible to notify Caremark of any changes to such criteria.

| I have reviewed the attached documentation and conclude all information to be correct. (All signatures below are required) | |
|---|---|
| Client (Company) Name: North Carolina State Health Plan | Version |
| Client Signature: | Date: 12/06/17 |
| Signatory Name: Client Does Not Sign CPM Form – Refer to Approval Email | |
| Signatory Title: | |

Revised December 1, 2017

© 2011 Caremark Inc.

1

PLAN_DEF0205471



| **RxClaim Only** | |
|---|---|
| **Client hierarchy for utilization management appropriateness and SGM programs** | |
| Carrier: 0274 and 0275 | |
| Carrier – Account: | |
| Carrier – Account – Group: | |
| Do the selected clinical programs apply to all members or specific groups of members? | |
| ☒ All members  ☐ Specific groups (specified below) | |
| Please specify details here: | |

*Note:  **Not all dosage forms will accumulate across the entire class.**

| **RxClaim Only** |
|---|
| **Client hierarchy for Formulary Alternatives program exclusion** |
| Formulary Alternatives provides alternatives via preferred product fields of claim response sent to pharmacies, and Real Time Benefits EHR transactions, shared with prescribers. Opting the client out will exclude the communication of alternatives through both of these communication channels. |
| Opt out client ☐ |
| List Carrier – Account – Group for opt out (available at any level of CAG): |
| Please specify details here: |

| **Caremark Internal Only – UM and SGM and PDPD** | DO NOT DELETE THIS TABLE! This is required information. |
|---|---|
| **Additional Client Details and Caremark contacts** | |
| Client FAF ID: | Client Rebate ID: |
| Client Type: ☒  Employer  ☐  Stand Alone Specialty Client  ☐  Health Plan  ☐  TPA | |
| -To ensure notifications from the Prior Authorization and Appeals department do not violate HIPAA or other privacy regulations, it is important to determine if the client or vendor is sending the member's Social Security Number (SSN) on the eligibility file. The standard process when generating notifications is to retrieve the member identification number from the Cross Walk ID on the eligibility file. If the Cross Walk ID contains the SSN, the Prior Authorization and Appeals department will need to ensure that the Member ID is on the eligibility file is being used for notifications. If the Member ID or Crosswalk ID field contains a SSN, the other field must contain a member Identification number to generate on notifications. Please ask the account manager or Eligibility Administrator the following questions.<br><br>Is the client or vendor sending the member's SSN on the eligibility file: Yes ☒ No ☐<br><br>If yes, which field will the SSN be stored? Crosswalk ID ☒, Member ID ☐ | |
| Standard Formulary Status: ☐ Opt-in with NDC Block   ☒ Opt-in with PA Option   ☐ Opt-out | |
| As of 10/15/2015, Opt-in with NDC Block will require that clients provide an exception pathway for members so please note that the option to select that offering has been removed from the CPM form. | |
| Client Company Name: North Carolina State Health Plan | |
| (Please list client name as it should appear on PA and Appeal letters and fax forms.) | |
| Client Address:3200 Atlantic Avenue          City: Raleigh          State: NC          Zip: 27604 | |
| Total # of Plan Members* : 550,000 | |
| Clinical Advisor: Renee Jarnigan/Stephanie Morrison | SAE: Brian Hemreck |
| Account Manager: Bree Nelson/Karyn Donohoe/Jim Loveday | Account Executive: |
| Specialty-CRU: | Implementation Manager: |
| Benefits Relationship Manager (BRM)**: Drew Anderson | |
| Benefits Consultation Center (BCC)**:  ☒  BCC RxClaim | ☐  BCC Recap |
| Specialty Account Executive: | CRU Implementation Specialist: |
| Customer Care Provided by: ☒ Caremark   ☐ Client | Customer Care Phone Number: |
| * Please provide Total # of Plan Members if known - this is used to project PA call volume | |

**\*\* Clinical Advisor must either list a BRM contact or select a BCC mailbox before routing this CPM form**

© 2011 Caremark Inc.

PLAN DEF0205472



## For NON-Grandfathered Plans (80/20 and CDHP):

| Applicable Laws – UM and SGM and PDPD   DO NOT DELETE THIS TABLE! This is required information for the PA & Appeals department. |
|---|
| **1.  What line of business is your client?**<br>☒ Commercial, HP Commercial, Self-Insured Employer Group, Third Party Administrator (TPA) or Coalitions ➡ Go to #2<br>☐ Exchange, Small Business Health Option Program (SHOP), or Fully-Insured, Individual, or Small Group Plans (Off-Exchange) ➡ Go to #6<br>☐ Managed Medicaid, HP Dual Demo ➡ Go to #7<br>☐ Medicare, EGWP ➡ No further information is needed |
| **2.  Is your client grandfathered or a retiree-only plan?**<br>☐ Yes ➡ Go to #3<br>☒ No ➡ Go to #4 |
| **3.  If grandfathered or retiree-only, what laws are they subject to?**<br>☐ ERISA ONLY (e.g. Self-Insured Employer Plans, ASO [Administrative Services Only], Retiree-Only Self-Insured Employer Plans, Self-Insured Union Plans) ➡ Done<br>☐ State Law ONLY (e.g. Fully-Insured Health Plan, Certain Self-Insured Government Plans) ➡ Go to #5<br>☐ ERISA & State Law (e.g. Fully-Insured Employer Plans, Retiree-Only Fully-Insured Employer Plans) ➡ Go to #5<br>☐ Other (e.g. Self-Insured Government Plans and Self-Insured Church Plans) ➡ Specify what requirements your client is subject to,  including any contractual provisions relating to utilization review, prior authorization, appeals, external review: _____ ➡ Done |
| **4.  If not grandfathered, what laws are they subject to?**<br>☐  ACA requirements applicable to non-grandfathered plans & ERISA (e.g. Self- Insured Employer Plan, ASO [Administrative Services Only], Self-Insured Union Plan) ➡ Done<br>☐  ACA requirements applicable to non-grandfathered plans & State law (e.g. Fully- Insured Health Plan [including Fully-Insured Government and Church Plans] Certain Self-Insured Government Plans, Exchange Plans, Individual Off- Exchange Plans and Small Group Off-Exchange Plans) ➡ Go to #5<br>☐  ACA requirements applicable to non-grandfathered plans, ERISA, & State Law (e.g. Fully-Insured Employer Plans, Fully-Insured Union Plans) ➡ Go to #5<br>☐  ACA requirements applicable to non-grandfathered plans ONLY (e.g. Self- Insured Government and Self-Insured Church Plan). ➡ Done<br>☒  ACA requirements applicable to non-grandfathered plans & Other (e.g. Self- Insured Government and Self-Insured Church Plan). ➡ Specify what laws your client is subject to,  including any contractual provisions relating to utilization review, prior authorization, appeals, external review: _____North Carolina_____ ➡ Done |
| **5.  Is your client a fully-insured health plan that operates in multiple states and subject to State of Precedence (SOP) requirements?**<br>☐ Yes: Contract state. Please type state abbreviation(s): _____ ➡ Go To #7<br>☒ No ➡ Go To #7<br><br>** If Question #5 is answered "YES", then contact with Eligibility or the account team that handles eligibility will need to be notified as additional fields will need to be added to the members group profile information. This information will need to be obtained from the client and loaded into Rxclaim.** |
| **6.  Is your client a multi-state plan regulated by Office of Personnel Management (OPM)?**<br>☐ Yes ➡ Go to #7<br>☒ No ➡ Go to #7 |
| **7.   What state law does your client follow?**<br>☒ Please type state abbreviation: _____NC_____ ➡ Go to #8 |
| **8.   Within the state law that was indicated above, does your client follow?**<br>☒ State Insurance Laws (e.g. Insure or PPO) ➡ Done<br>☐ Managed Health Care Laws (e.g. HMO) ➡ Done |

Revised December 1, 2017                                                                                 3

© 2011 Caremark Inc.



| ☐ | Managed Medicaid Requirements (e.g. State model contracts) ➡ Done |
|---|---|
| ☐ | Medicare Medicaid Plan/Dual demonstrations Plans (e.g. Three way contract between CMS, state, and plan) ➡ Done |
| ☐ | Other ➡ Done. If other, please specify what laws your client is subject to: _____ |

## For Grandfathered Plans (70/30 and 70/30 MA):

| **Applicable Laws – UM and SGM and PDPD**    DO NOT DELETE THIS TABLE!  This is required information for the PA & Appeals department. |
|---|
| **1. What line of business is your client?**<br>☒ Commercial, HP Commercial, Self-Insured Employer Group, Third Party Administrator (TPA) or Coalitions ➡ Go to #2<br>☐ Exchange, Small Business Health Option Program (SHOP), or Fully-Insured, Individual, or Small Group Plans (Off-Exchange) ➡ Go to #6<br>☐ Managed Medicaid, HP Dual Demo ➡ Go to #7<br>☐ Medicare, EGWP ➡ No further information is needed |
| **2. Is your client grandfathered or a retiree-only plan?**<br>☒ Yes ➡ Go to #3<br>☐ No ➡ Go to #4 |
| **3. If grandfathered or retiree-only, what laws are they subject to?**<br>☐ ERISA ONLY (e.g. Self-Insured Employer Plans, ASO [Administrative Services Only], Retiree-Only Self-Insured Employer Plans, Self-Insured Union Plans) ➡ Done<br>☐ State Law ONLY (e.g. Fully-Insured Health Plan, Certain Self-Insured Government Plans) ➡ Go to #5<br>☐ ERISA & State Law (e.g. Fully-Insured Employer Plans, Retiree-Only Fully-Insured Employer Plans) ➡ Go to #5<br>☒ Other (e.g. Self-Insured Government Plans and Self-Insured Church Plans) ➡ Specify what requirements your client is subject to,  including any contractual provisions relating to utilization review, prior authorization, appeals, external review: ___North Carolina_____ ➡ Done |
| **4. If not grandfathered, what laws are they subject to?**<br>☐ ACA requirements applicable to non-grandfathered plans & ERISA (e.g. Self- Insured Employer Plan, ASO [Administrative Services Only], Self-Insured Union Plan) ➡ Done<br>☐ ACA requirements applicable to non-grandfathered plans & State law (e.g. Fully- Insured Health Plan [including Fully-Insured Government and Church Plans] Certain Self-Insured Government Plans, Exchange Plans, Individual Off- Exchange Plans and Small Group Off-Exchange Plans) ➡ Go to #5<br>☐ ACA requirements applicable to non-grandfathered plans, ERISA, & State Law (e.g. Fully-Insured Employer Plans, Fully-Insured Union Plans) ➡ Go to #5<br>☐ ACA requirements applicable to non-grandfathered plans ONLY (e.g. Self- Insured Government and Self-Insured Church Plan). ➡ Done<br>☒ ACA requirements applicable to non-grandfathered plans & Other (e.g. Self- Insured Government and Self-Insured Church Plan). ➡ Specify what laws your client is subject to,  including any contractual provisions relating to utilization review, prior authorization, appeals, external review: _____North Carolina_____ ➡ Done |
| **5.  Is your client a fully-insured health plan that operates in multiple states and subject to State of Precedence (SOP) requirements?**<br>☐ Yes: Contract state. Please type state abbreviation(s): _____ ➡ Go To #7<br>☒ No ➡ Go To #7<br><br>** If Question #5 is answered "YES", then contact with Eligibility or the account team that handles eligibility will need to be notified as additional fields will need to be added to the members group profile information. This information will need to be obtained from the client and loaded into Rxclaim.** |
| **6. Is your client a multi-state plan regulated by Office of Personnel Management (OPM)?**<br>☐ Yes ➡ Go to #7<br>☒ No ➡ Go to #7 |

Revised December 1, 2017                                            4

© 2011 Caremark Inc.

PLAN_DEF0205474



**7. What state law does your client follow?**
☒ Please type state abbreviation: _____NC_____     ➡ Go to #8

**8. Within the state law that was indicated above, does your client follow?**
☒ State Insurance Laws (e.g. Insure or PPO) ➡ Done
☐ Managed Health Care Laws (e.g. HMO) ➡ Done
☐ Managed Medicaid Requirements (e.g. State model contracts) ➡ Done
☐ Medicare Medicaid Plan/Dual demonstrations Plans (e.g. Three way contract between CMS, state, and plan) ➡ Done
☐ Other ➡ Done. If other, please specify what laws your client is subject to: _____

---

**For clients that wish to implement custom UM edit(s) that have already been developed for another line of business, please indicate this within the following sections of this form.**
- Special Instructions/Notes section below.
- Client Requested-Custom section at the end of each UM edit type area

**Within these sections, please indicate the following: [ENTER SPECIFIC XYZ Plan List NAME] for each of the custom edits to be implemented.**

**Special Instructions/Notes**

The purpose of this CPM is to (1) remove PA for testosterone products for transgender care, (2) add PA to testosterone products for non-transgender care, (3) exclude transgender care diagnoses for Hormonal Therapies SGM (Eligard, Luron Depot, Trelstar Dep/LA/Mix, Vantas, Zoladex, Supprelin LA), (4) change NC SHP custom SGM criteria for Lupron/leuprolide to exclude transgender care/gender dysphoria effective 1/1/18.

Revised December 1, 2017

© 2011 Caremark Inc.

5

PLAN DEF0205475

**CVS CAREMARK**

| Prior Authorization Non-Specialty (Standard, Featured) *continued* | | |
|---|---|---|
| **Category** | **Action** | **PA Renewal Notification** | **Criteria** |

**Testosterone Products – Transgender Care Approvable**

Select either 12-month or 36-month approval duration option.
Note: Oral testosterone agents are not approvable for transgender care. If PA on oral testosterone agents is desired, select either the 12-month or 36-month oral testosterone PA under the "Testosterone Products – No Coverage for Transgender Care" section.

**36-month approval duration**

| | Action | PA Renewal Notification | Criteria |
|---|---|---|---|
| **Testosterone Products (Brand and Generic)** | ☐ Add<br>☒ Delete<br>☐ Change | ☐ Accept<br>☐ Decline | ☒ Testosterone Products TGC 1210-A (36-month DoA) |
| | Target Drugs: Enanthate injection, Cypionate injection, topical gel, topical cream, topical ointment, topical solution, transdermal patch, nasal gel, mucoadhesive buccal system, propionate implant pellets | | |

**Testosterone Products – No Coverage for Transgender Care**

Select either 12-month or 36-month approval duration option.

**36-month approval duration**

| | Action | PA Renewal Notification | Criteria |
|---|---|---|---|
| **Testosterone Products (Brand and Generic)** | ☒ Add<br>☐ Delete<br>☐ Change | ☐ Accept<br>☐ Decline | ☒ Testosterone Products Non-TGC 1215-A (36-month DoA) |
| | Target Drugs: Enanthate injection, Cypionate injection, topical gel, topical cream, topical ointment, topical solution, transdermal patch, nasal gel, mucoadhesive buccal system, propionate implant pellets | | |

Revised December 1, 2017

6

© 2011 Caremark Inc.

PLAN-DEF0205476

**CVS CAREMARK**

### SGM Program Therapies (Standard)

| Therapy | Drug | Total # of Existing patients | Add | Delete | Drug | Total # of Existing patients | Add | Delete |
|---|---|---|---|---|---|---|---|---|
| Hormonal Therapies | Select All | | ☐ | ☐ | Previous PA with CMK or other vendor | | ☐Yes | ☐No |
| | Aveed | | ☐ | ☐ | Trelstar Dep/LA/Mix | | ☐ | ☐ |
| | Eligard | | ☐ | ☐ | Vantas | | ☐ | ☐ |
| | Firmagon | | ☐ | ☐ | Zoladex | | ☐ | ☐ |
| | Natpara | | ☐ | ☐ | Supprelin LA | | ☐ | ☐ |
| | Leuprolide acetate | | ☐ | ☐ | Lupaneta | | ☐ | ☐ |
| | Lupron Depot | | ☐ | ☐ | TRIPTODUR | | ☐ | ☐ |

☒ Exclude these products for transgender care diagnoses: Eligard (Eff 07/03/2016), Lupron Depot, Trelstar Dep/LA/Mix (Eff 07/03/2016) , Vantas (Eff 07/03/2016), Zoladex (Eff 07/03/2016), Supprelin LA (Eff 07/03/2016).

Comments:

### SGM Program Therapies (Client requested - Custom)

| Lupron Depot Endometriosis-Fibroids NCSHP SGN 12-2016 | **Action:** ☐ Add    ☐ Delete    ☒ Change |
|---|---|
| | **Drugs In Class:** Lupron Depot/Leuprolide |
| | **Criteria:** Custom SGM program for NCSHP – Update criteria to EXCLUDE coverage of TGC/gender dysphoria diagnoses. |

Revised December 1, 2017                                                                 7

© 2011 Caremark Inc.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MAXWELL KADEL, *et al.*,    )
                            )
          Plaintiffs,       )
                            )       Civil Action No.
          v.                )       1:19-cv-272-LCB-LPA
                            )
DALE FOLWELL, in his official )
capacity as State Treasurer of )
North Carolina, *et al.*,   )
                            )
          Defendants.       )

## AFFIDAVIT OF ADAM KORN

I, Adam Korn, of full age, and pursuant to 28 U.S.C. § 1746, hereby state as follows:

1. I have personal knowledge of the facts set forth in this Affidavit.

2. I am currently a Vice President of Client Services for CaremarkPCS Health, L.L.C, including CVS Health and its corporate affiliates (collectively "Caremark").

3. I have been employed by Caremark for approximately 4 years.

4. A discreet range of information is generally submitted to the Caremark PBM by retail pharmacies when filling prescriptions. Pharmacies should provide the PBM the same pieces of information, regardless of

PLAN DEF0205466
**JA224**

whether or not the drug at issue is subject to a prior authorization requirement.

5.   Caremark will automatically adjudicate pharmacy claims without additional interventions where the drug has no PA requirement, or where the PA requirement and all other plan provisions are satisfied (including eligibility, covered drug, pharmacy network and quantity limits).

6.   Where a claim for a particular drug carries no PA requirement and meets the other criteria above, that claim will be paid or otherwise fully adjudicated as appropriate. Caremark will reject a drug claim despite all plan provisions being satisfied where a drug requires a valid Prior Authorization, but none exists.

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.

Executed this __29th__ day of September, 2021 at Scottsdale, Arizona.

_____
Adam Korn

CONFIDENTIAL ATTORNEY EYES ONLY

Page 1

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
2    Civil Action No. 1:19-cv-00272
3
4    MAXWELL KADEL, et al.,
5                  Plaintiffs,
6         vs.
7    DALE FOLWELL, in his official
     capacity as State Treasurer of
8    North Carolina, et al.,
9                  Defendants.
10
11
12
13
              * CONFIDENTIAL ATTORNEY EYES ONLY *
14
15          VIRTUAL ZOOM VIDEOTAPED DEPOSITION OF
                   SERGEANT DANA CARAWAY
16              (Taken by Defendants)
17            Morganton, North Carolina
18           Friday, September 17, 2021
19
20
21
22
23    Reported by Andrea L. Kingsley, RPR
24
25

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

# DEPOSITION OF SERGEANT DANA CARAWAY

CONFIDENTIAL ATTORNEY EYES ONLY
* Confidential - Attorneys Eyes Only

Page 19

```
1         Q.    What were you studying at Piedmont
2    Community College?
3         A.    Business law.
4         Q.    You mentioned odd jobs.  Just can you
5    describe those generally?
6         A.    I worked for MDI Merchant Distributors,
7    Incorporated, filled orders for grocery stores.
8    Valdese Manufacturing and Lowes Hardware.
9         Q.    When did you decide to apply to be a
10   correctional officer?
11        A.    Sometime in 1993 I started applying.
12        Q.    Why did you start applying?
13        A.    For a career job.
14        Q.    Do you know when you were hired?
15        A.    My first day on duty was November 8,
16   1994.  So it would have been retroactive dated back
17   to -- official hire date would be November 1, 1994.
18        Q.    What was your first duty assignment as a
19   correctional officer?
20        A.    Marion Correctional Institution, 3730 F
21   unit, second shift.
22        Q.    What is F unit?
23        A.    It was a housing unit for regular
24   population and a DART unit.
25        Q.    DART, what is that?
```

# DEPOSITION OF SERGEANT DANA CARAWAY

CONFIDENTIAL ATTORNEY EYES ONLY
* Confidential - Attorneys Eyes Only

Page 21

```
 1        A.     My last assignment at Marion would have
 2   been on segregation, restrictive housing.
 3        Q.     Where were you assigned after being
 4   assigned to Marion?
 5        A.     Lateral transfer to Western Youth
 6   Institution.
 7        Q.     Western what?
 8        A.     Western Youth Institution.
 9        Q.     Which I assume housed youth offenders?
10        A.     We had youthful offenders from 14 and
11   inmates up to 24, 25 years old.
12        Q.     What did you do there?
13        A.     Correctional officer.
14        Q.     Were you assigned to a particular unit?
15        A.     Over my five plus, six years there,
16   there wasn't much that I didn't do.  I've done from
17   regular housing to gang floors, new processing,
18   segregation, intake and processing of new inmates,
19   transportation.  Everything.  Western taught us to
20   do everything.  And worked as an acting sergeant
21   when they was short on supervisors.
22        Q.     Is it safe to say that at Western Youth
23   Institution there were not quite as defined roles
24   for correctional officers as at other facilities?
25        A.     You had defined roles as being assigned
```

# DEPOSITION OF SERGEANT DANA CARAWAY

CONFIDENTIAL ATTORNEY EYES ONLY
* Confidential - Attorneys Eyes Only

Page 22

```
 1    to floors.  It's been so long I couldn't tell you
 2    how long I spent on each floor, but I can tell you
 3    there was not too many posts at that facility that
 4    I did not work.
 5         Q.    How long did you work at Western Youth
 6    Institution?
 7         A.    I left Western Youth in January of 2006.
 8         Q.    Why did you leave?
 9         A.    I was promoted to correctional sergeant
10    and transferred to Alexander Correctional.
11         Q.    Where were you assigned at Alexander
12    Correctional?
13         A.    I started on first shift blue unit.
14         Q.    What is blue unit?
15         A.    It was housing for close maximum custody
16    inmates and we had physically handicapped inmates
17    on part of the units that had wheelchairs or
18    physical disabilities or ailments.
19         Q.    Can you describe generally how your
20    duties changed from being a correctional officer to
21    being a sergeant?
22         A.    I went from correctional officer of
23    following state policy and procedures,
24    institutional standard operating procedures and
25    post assignment post orders to supervising inmates
```

# DEPOSITION OF SERGEANT DANA CARAWAY

CONFIDENTIAL ATTORNEY EYES ONLY
* Confidential - Attorneys Eyes Only

Page 27

```
1          A.    I transferred to green unit.
2          Q.    What is green unit?
3          A.    It housed our woodworking inmates,
4     Alexander has a woodworking factory that builds
5     furniture for state industry and facilities and
6     kitchen workers.
7          Q.    How long did you do that?
8          A.    Until I transferred out in May or June,
9     April, May, June of 2010.
10         Q.    Where did you go when you transferred
11    out?
12         A.    I transferred back to Western Youth
13    Institution as a sergeant, just lateral.
14         Q.    How long were you at Western Youth
15    Institution?
16         A.    Until it's closure in 2013.
17         Q.    Then what did you do?
18         A.    When it closed, I was rifted back to
19    Alexander.
20         Q.    When you say rifted, your position was
21    terminated as a part of a reduction in force; is
22    that correct?
23         A.    No, sir.  The facility was closed and I
24    was rifted, I kept the same position and was
25    transferred into a position of same rank at
```

# DEPOSITION OF SERGEANT DANA CARAWAY

CONFIDENTIAL ATTORNEY EYES ONLY
* Confidential - Attorneys Eyes Only

Page 28

1    Alexander and given my rift rights.

2            Q.    What were your rift rights --

3            A.    Rift rights was there wasn't a job

4    closer to my home and I had one year to use the

5    rift rights so that if a position would become

6    available, I could use the rift rights and I would

7    be given first priority to have a chance at the

8    position -- facility of my choosing.

9            Q.    Was there ever a period that you were

10   not employed by DPS?

11           A.    No.

12           Q.    So in 2013 you went back to Alexander;

13   correct?

14           A.    In 2013, yes.

15           Q.    Where were you assigned when you were

16   assigned to Alexander?

17           A.    I went back to red unit.

18           Q.    How long were you in red unit?

19           A.    I was on red unit until I used my rift

20   rights in July of 2014 and transferred to

21   Foothills.

22           Q.    Why did you transfer to Foothills?

23           A.    Foothills was a mile and a half from my

24   home.

25           Q.    What position were you assigned to at

# DEPOSITION OF SERGEANT DANA CARAWAY

CONFIDENTIAL ATTORNEY EYES ONLY
* Confidential - Attorneys Eyes Only

Page 89

1    you let me know?

2         A.    I'm sorry, one more time?

3         Q.    If you see a document with someone with

4    the last name Caraway that you believe does not

5    refer to you, to a relative or someone else, will

6    you let me know?

7         A.    I will.

8         Q.    The question I have, if you look down

9    here where my cursor is, it says September 23, 1994.

10        A.    Yes.

11        Q.    Other records indicate you began your

12   service as a correctional officer in November 1994,

13   and I guess I'm curious why you would sign paperwork

14   in September of that year.

15        A.    Can you roll back to the top?

16        Q.    Um-hmm.

17        A.    If you go back to the bottom.

18        Q.    Sure.

19        A.    I'm not sure.  We was opening a new

20   prison, and I was getting hired on at Marion

21   Correctional Institution and -- I don't know if

22   there's a conditional alter that I signed, but I do

23   know that my initial employment date, even within

24   the state system, shows November 8 which was

25   retroactivate back to November 1, that is to my

# DEPOSITION OF SERGEANT DANA CARAWAY

CONFIDENTIAL ATTORNEY EYES ONLY
* Confidential - Attorneys Eyes Only

Page 90

```
1    understanding.  I would say that this has something
2    to do when we're going through all the processing
3    paperwork for the months that it took or year that
4    it took to get on with the department at that time.
5         Q.    Could you describe that hiring process?
6    That was going to be my next question.  Because it
7    sounds like you -- there were meetings and the like
8    prior to your November 1994 start date.  Is that
9    correct?
10        A.    Yes.
11        Q.    So how did you find out that there were
12   positions available with the Department of Public
13   Safety?
14        A.    The department's always had vacancies.
15   That would be the easiest thing.  But I was working
16   a job and I had been trying to get on with the
17   department, and a lady by the name of Jean Walker
18   had came into the business I was working at and we
19   began talking and I found out her husband was
20   Warden Walker at Marion Correctional -- was going
21   to be Warden Walker.  And so I applied at Marion.
22   And some months later I got called up and they
23   scheduled an interview and then I got an interview,
24   and then an executive interview, and then later on
25   I was called and advised I got hired and got a job
```

# DEPOSITION OF SERGEANT DANA CARAWAY

CONFIDENTIAL ATTORNEY EYES ONLY
* Confidential - Attorneys Eyes Only

Page 91

```
 1    within the department.
 2         Q.    You said you had an interview.  Was the
 3    interview with employees of Department of
 4    Corrections?
 5         A.    With the Department of Corrections, yes.
 6         Q.    Then it was the Department of
 7    Corrections.  Was the executive interview with the
 8    Department of Corrections?
 9         A.    The first interview was probably with an
10    administrative assistant who I don't know.  And
11    then we got an executive interview with who was
12    going to be the assistant warden, Mr. Ricky
13    Anderson, and the warden Mr. Dean Walker.
14         Q.    Were those two individuals in charge of
15    supervising the Marion Correctional Institute?
16         A.    They were in charge of the facility and
17    opening it, seeing that it was employed and
18    staffed.
19         Q.    There are some other documents here.
20    This is -- is that your signature on this page 2 of
21    this exhibit Sergeant Caraway?
22         A.    Yes.
23         Q.    Is your signature dated September 23,
24    1994?
25         A.    That would be.
```

# DEPOSITION OF SERGEANT DANA CARAWAY

CONFIDENTIAL ATTORNEY EYES ONLY
* Confidential - Attorneys Eyes Only

Page 93

```
1          Q.    Where is Torrid located?
2          A.    My store is located in Hickory, North
3    Carolina, Valley Hills Mall.
4          Q.    Have you long have you worked at Torrid?
5          A.    Roughly a year and a half.  Maybe a
6    little longer.
7          Q.    Do you have any other employers that you
8    have reported to the Department of Public Safety?
9          A.    I have no other employers that you work
10   for, no.
11         Q.    Prior to your employment at Torrid, did
12   you have another employer that you reported to the
13   Department of Public Safety?
14         A.    The only employer I worked for in the
15   last 27 years other than Torrid was the Department
16   of Corrections, Department of Public Safety.
17         Q.    I will ask you again to look at the
18   exhibit or another document that appears to have
19   been signed by you on September 23, 1994.  Is that
20   correct?
21         A.    I see that, yes.
22         Q.    It acknowledges receipt of an
23   administrative memorandum entitled, "Conditions of
24   continued employment."  Do you know what memorandum
25   that refers to?
```

# DEPOSITION OF SERGEANT DANA CARAWAY

CONFIDENTIAL ATTORNEY EYES ONLY
* Confidential - Attorneys Eyes Only

Page 95

1    haven't looked at an updated policy for years.  I

2    just know that I don't take favors, honorariums,

3    donations or gifts of any type because I work with

4    the prison system.

5        Q.    I'm going to try to show you another

6    document.  I'm going to ask if you can explain this

7    document to me and its purpose.

8                (SHP Exhibit 5, Salary Adjustment

9        Request, marked for identification, as of this

10       date.)

11       Q.    Sergeant Caraway, is this a document

12   that reflects an increase in pay for you?

13       A.    Can you scroll down please.

14       Q.    Absolutely.

15       A.    I don't know.  I don't see any increase

16   in pay on there at all so I'm not sure.

17       Q.    Do you see the language of salary

18   adjustment request?

19       A.    I see a request.  I'm not sure whether I

20   got any money out of it or not.  That may be a

21   request but that doesn't mean I got anything.

22       Q.    As a corrections officer, Sergeant

23   Caraway, are you required to maintain certification

24   with the State of North Carolina?

25       A.    Yes.

# DEPOSITION OF SERGEANT DANA CARAWAY

CONFIDENTIAL ATTORNEY EYES ONLY
* Confidential - Attorneys Eyes Only

Page 96

1      Q.    What's the agency that certifies you?

2      A.    Criminal Justice Standard Commissions.

3      Q.    Do you understand that that

4   certification from the Criminal Justice Standards

5   Commission is a requirement with the Department of

6   Public Safety?

7      A.    Absolutely.

8      Q.    Does that have an annual training

9   requirement?

10     A.    It's supposed to, yes.

11     Q.    You said it's supposed to.  What does

12  that mean?

13     A.    So we actually have a leeway of two

14  years, and with COVID, the Criminal Justice

15  Standard Commission gave everybody a waiver.  So

16  there will be people that go up to three years

17  possibly without having been to their annual

18  training.  But in normal years, yes, you're

19  supposed to go yearly.

20     Q.    Who provides that training?

21     A.    The department supplies the training and

22  it's overseen in our facility by Mr. Avery, and he

23  schedules your training yearly, and then the

24  training is conducted by OSDT and our local college

25  system and they supply instructors.

# DEPOSITION OF SERGEANT DANA CARAWAY

CONFIDENTIAL ATTORNEY EYES ONLY
* Confidential - Attorneys Eyes Only

Page 97

```
1           Q.    And you participate in this training,
2      Sergeant Caraway, is that correct?
3           A.    I'm required to, yes.
4           Q.    Let's see if I can find the document I
5      want to show you next.
6                      (SHP Exhibit 6, STS History Report,
7           marked for identification, as of this date.)
8           Q.    Sergeant Caraway, can you see the
9      document on your screen marked Exhibit 6?
10          A.    Yes.  It's all real tiny.
11          Q.    I will zoom in.
12          A.    I do know what the form is, yes.
13          Q.    What is this form?
14          A.    That's a history of my training and
15     education record.
16          Q.    These are the training that we were just
17     speaking of; is that correct?
18          A.    Correct.
19          Q.    So you are required as a member -- as a
20     corrections officer in the State of North Carolina
21     to attend training; is that correct?
22          A.    I was required as a correctional officer
23     and I'm still required as a correctional sergeant
24     and front line supervisor to attend annual
25     training, yes.
```

# DEPOSITION OF SERGEANT DANA CARAWAY

CONFIDENTIAL ATTORNEY EYES ONLY
* Confidential - Attorneys Eyes Only

Page 98

1    Q.    So these are training from 2013.  But

2    these -- you testified these would have been

3    trainings arranged and provided through the

4    leadership at the institution you were at at the

5    time?

6    A.    They would have been scheduled by the

7    institution, yes, but supplied by the officer of

8    staff development training.

9    Q.    Did you have to pay for these training?

10    A.    No.  The department pays for this stuff.

11    Q.    This record, the department keeps track

12    of these trainings?

13    A.    Yes.  There should be a record all the

14    way back to 1994 to currently.

15    Q.    This record I can get as far back as --

16    1994.  So it appears your first training was blood

17    borne pathogens.

18    A.    That would have been my very first day

19    on November 8, 1994, at the incubation training

20    unit at Marion correctional.

21    Q.    That identifies -- this document which

22    only goes through 2013 identifies over a thousand

23    hours of training provided by the Department of

24    Public Safety; is that correct?

25    A.    Well, the one above it would have

# DEPOSITION OF SERGEANT DANA CARAWAY

CONFIDENTIAL ATTORNEY EYES ONLY
* Confidential - Attorneys Eyes Only

Page 99

1    covered -- up through 2013, I would have

2    received -- whatever date that was on the very

3    first would have been 1,075, but that particular

4    blood borne, I received three hours of certified

5    training for.  But that 1,075 would have ended on

6    March 21, 2013, yes.

7        Q.    Sergeant Caraway, do you recognize this

8    record?

9        A.    Could you enlarge it please?  Okay, hold

10   up there.  Yeah, that would have been on training

11   that would have been completed towards the end of

12   May.

13       Q.    Would this include additional training

14   that you received that was not reflected on the

15   prior exhibit?

16       A.    Yes.

17       Q.    Again, these are trainings provided by

18   the Department of Public Safety at no expense to

19   you?

20       A.    Yes.

21       Q.    And these are requirements of

22   maintaining your employment at the Department of

23   Public Safety?

24       A.    Correct.

25       Q.    Sergeant Caraway, who is your

# DEPOSITION OF SERGEANT DANA CARAWAY

CONFIDENTIAL ATTORNEY EYES ONLY
* Confidential - Attorneys Eyes Only

1      supervisor?

2            A.      Phillip Badgett.

3            Q.      What is Mr. Badgett's title?

4            A.      Correctional housing unit manager number

5      2.

6            Q.      Does Mr. Badgett provide you with an

7      annual performance evaluation?

8            A.      He's supposed to be placing in monthly

9      entries and every six months making an evaluation

10     and yearly evaluations, yes.

11           Q.      You said he's supposed to.  Has he been

12     doing that?

13           A.      I'm sure you've got my records from my

14     evaluations.  So probably not.

15           Q.      Is anybody else responsible for doing

16     performance evaluations?

17           A.      His supervisor above him is required to

18     see that he does his job.

19           Q.      If you were to be recommended for an

20     increase in pay, Sergeant Caraway, would Mr. Badgett

21     have to sign off on that?

22           A.      We haven't been given the merit-based

23     pay raises in year so the pay raises that we

24     receive would be given to us from the general

25     assembly or across the board.  Unless I have a

# DEPOSITION OF SERGEANT DANA CARAWAY

CONFIDENTIAL ATTORNEY EYES ONLY
* Confidential - Attorneys Eyes Only

Page 101

1    negative rating overall, I don't know if it would

2    affect my pay or not, but to the best of my

3    recollection, Mr. Badgett has made one or two total

4    monthly entries in my evaluations in the last three

5    years.

6        Q.    Does the Department of Public Safety

7    have a process to discipline employees?

8        A.    They do.

9        Q.    What is that process called?

10       A.    There is an investigation process.

11       Q.    What is Mr. Badgett's role in the

12   investigation process?

13       A.    If there's wrongdoing, he's supposed to

14   report it up.  He could actually give you a

15   coaching session or something within those

16   guidelines, but with actual disciplinary action, it

17   would go to our facility head, to region, then to

18   DPS headquarters in Raleigh, and then come back

19   down the chain and everybody would have to be in

20   agreement that that was a just punishment handed

21   out.

22       Q.    You mentioned a number of individuals or

23   institutions involved in that decision.  Are all the

24   individuals involved in that decision employees of

25   the Department of Public Safety?

# DEPOSITION OF SERGEANT DANA CARAWAY

CONFIDENTIAL ATTORNEY EYES ONLY
* Confidential - Attorneys Eyes Only

Page 102

1      A.    Absolutely.

2      Q.    Does anyone at the State Health Plan

3    have any role in that disciplinary process?

4      A.    I don't know.

5      Q.    Do you have any reason to believe that

6    someone at the State Health Plan does have a role in

7    that process?

8      A.    I'm going to be honest with you, I don't

9    have no idea.  I don't work in Raleigh.  I just

10   work in my facility.  So I just don't know if

11   anybody does.

12     Q.    Who is LaDonna Browning?

13     A.    She is our current Western Regional

14   manager.

15     Q.    What does LaDonna Browning do in that

16   role?

17     A.    She's over all the facilities in the

18   western half of the state.

19     Q.    So is she the supervisor of the wardens

20   for the facilities in the western half of the state?

21     A.    She is over it all.

22     Q.    Has she been in that position since

23   2014?

24     A.    No.

25     Q.    What were her prior positions?

# DEPOSITION OF SERGEANT DANA CARAWAY

CONFIDENTIAL ATTORNEY EYES ONLY
* Confidential - Attorneys Eyes Only

Page 103

1   A.   She was warden at Foothills Correctional

2   where I'm located at currently.

3   Q.   Was she the warden when you were

4   transferred to Foothills Correctional Institution?

5   A.   She was.

6   Q.   Does she make the final decision about

7   whether to recommend that you be transferred to

8   Foothills?

9   A.   She would have had input into whether or

10   not I was allowed to the come to the facility, but

11   I did have rift rights so I think I would have got

12   to come regardless.

13   Q.   Sergeant Caraway, what are post orders?

14   A.   Post orders are if -- I have an officer

15   assigned to work a control room, there's certain

16   responsibilities that that staff member would carry

17   out in that one post and those orders in that

18   specific post, each post would have different

19   orders so that specific post for that control room,

20   he would have orders for that spot, that's a post

21   order.

22   Q.   Do you have post orders for your

23   position?

24   A.   Yes.

25   Q.   Those are -- I want to see if I can make

# DEPOSITION OF SERGEANT DANA CARAWAY

CONFIDENTIAL ATTORNEY EYES ONLY
* Confidential - Attorneys Eyes Only

Page 104

1    sure I understand.  Those are the duties that you
2    are expected to carry out on a daily basis in your
3    position?
4            A.    Right.
5            Q.    Who issues post orders?
6            A.    They're set forth by the facility.  So
7    unit management would be involved, facility
8    management would be involved, and it would all have
9    to fall in guidelines with institutional standard
10   operating procedures, departmental policy and
11   procedures and state and federal laws.
12           Q.    Is failure to follow post orders a basis
13   for discipline?
14           A.    It could be a basis for discipline, it
15   could be.
16           Q.    Sergeant Caraway, can you see my screen?
17           A.    I do.
18           Q.    Is this the post order that applies to
19   your position at the Department of Public Safety?
20           A.    It appears so, yes.
21           Q.    Your testimony is that this document
22   describes your responsibilities as a sergeant at
23   Foothills Correctional Institution; is that correct?
24           A.    Correct.
25           Q.    This document is -- as you can see up

# DEPOSITION OF SERGEANT DANA CARAWAY

CONFIDENTIAL ATTORNEY EYES ONLY
* Confidential - Attorneys Eyes Only

Page 105

```
 1      there, it has an issue date of July 21, 2020?

 2           A.    I do see that, yes.

 3           Q.    Do you believe that's the most current

 4      post order?

 5           A.    I'm not sure, I'm going to be honest, I

 6      don't know if there's been an update since then or

 7      not.

 8           Q.    But that's updated by the Department of

 9      Public Safety; is that correct?

10           A.    No.  If you will scroll up all the way

11      to the bottom, that would have been signed off by

12      our current warden Theresa Jordan.  So she signed

13      that one off at 7/21.  So that post order would

14      have been written in-house and had to have followed

15      all the other procedures and then signed off by our

16      institutional warden.

17           Q.    So the final signature on a post order

18      is the warden of the institution?

19           A.    At that level for that post order, yes.

20           Q.    For a post order that applies to your

21      position, it has to be signed off on by the warden?

22           A.    And it could be it was the assistant

23      warden.  I have occasionally seen assistant

24      wardens, it just depends who they're designated to

25      at the time.  But this one appears Ms. Jordan, that
```

# DEPOSITION OF SERGEANT DANA CARAWAY

CONFIDENTIAL ATTORNEY EYES ONLY
* Confidential - Attorneys Eyes Only

Page 107

1      Q.    How about the letters HBR?

2      A.    No.  Not that I can recall.

3      Q.    Sergeant Caraway, have you ever had a

4  circumstance in which there was an error in your

5  pay?

6      A.    I'm sure that's happened several times

7  in my career.

8      Q.    If there were an error in your pay

9  today, who would be the person you would go to about

10 that?

11     A.    Our personnel in human resources in our

12 facility.

13     Q.    Is there a specific person in that job?

14     A.    Well, there's four people involved.  The

15 supervisor would be Mary Carter, but she has been

16 out with -- on medical leave.  So in her place it's

17 been Ginger Murphy and maybe Bertie Bland which

18 would be her assistant.

19     Q.    What was it --

20     A.    B-E-R-T-I-E B-L-A-N-D.  And Virginia

21 Murphy would be the proper name.

22     Q.    If you had questions about whether you

23 had been paid for the hours you worked, you would

24 speak with one of those three individuals?

25     A.    Yes.

# DEPOSITION OF SERGEANT DANA CARAWAY

CONFIDENTIAL ATTORNEY EYES ONLY
* Confidential - Attorneys Eyes Only

Page 109

1    break because I think we've been going for quite a

2    while.

3                    (SHP Exhibit 7, Caraway Payment

4            Advice, marked for identification, as of this

5            date.)

6            Q.    Sergeant Caraway, have you seen a

7    document like this before?

8            A.    Yes.

9            Q.    Would you refer to this as your pay

10   advice?

11           A.    That would be a monthly pay stub, yes.

12           Q.    Does that include various deductions for

13   benefits; is that correct?

14           A.    Correct.

15           Q.    You mentioned SEANC dues.  Is that one

16   of the deductions there?

17           A.    That is one of the deductions.

18           Q.    It looks like at the top there is says

19   BYUP 8020 PT.  Is that the deduction for the State

20   Health Plan?

21           A.    No.  That is my monthly out-of-pocket

22   expense for the State Health Plan.

23           Q.    The deduction from your pay for the cost

24   of the State Health Plan?

25           A.    Yes.

# DEPOSITION OF SERGEANT DANA CARAWAY

CONFIDENTIAL ATTORNEY EYES ONLY
* Confidential - Attorneys Eyes Only

Page 110

1      Q.    SEANC insurance, what is that?

2      A.    I think I have dental insurance or

3  something through SEANC, I can't rightly remember,

4  but I have some insurance through SEANC or dental

5  or vision or something, I don't remember.

6      Q.    There is American Heritage Insurance

7  Company.  Do you know what that is, Sergeant

8  Caraway?

9      A.    I will be honest with you, I don't know

10  what that is.  I did sign up for it but I don't

11  remember what it is.

12            MR. MCINNES:  David, I think

13        Sergeant Caraway needs a break, I need a

14        break.  Should we --

15            MR. KNEPPER:  How long would you

16        like the break to be, Sergeant Caraway?  Come

17        back at 2:45?

18            THE VIDEOGRAPHER:  We're off the

19        record at 2:33 p.m.

20          (Recess taken.)

21            THE VIDEOGRAPHER:  Back on the

22        record at 2:45 p.m.

23      Q.    Sergeant Caraway, are you required to

24  wear a uniform during the performance of your duties

25  for the Department of Public Safety?

Page 111

1     A.     Yes.

2     Q.     Do you provide that uniform yourself?

3     A.     No, the department provides it.

4     Q.     Is there equipment that you are required

5  to possess as an officer with the Department of

6  Public Safety?

7     A.     Yes.

8     Q.     What is that equipment?

9     A.     Handcuffs, they give me a belt --

10  handcuffs, handcuff holster, pepper spray, pepper

11  spray holster, baton, baton holster.  If I have to

12  go out on an escape or something, transport,

13  firearm, firearm holster, ammunition.  Clothing and

14  boots.  The only thing they don't supply is socks

15  and undergarments.

16     Q.     You anticipated my second question.  The

17  Department of Public Safety supplies you with that

18  equipment; correct?

19     A.     Yes.

20     Q.     You were not free to use your own

21  equipment in lieu of that supplied by the Department

22  of Public Safety?

23     A.     No.

24     Q.     Sergeant Caraway, how long have you been

25  enrolled in the State Health Plan?

## DEPOSITION OF SERGEANT DANA CARAWAY

CONFIDENTIAL ATTORNEY EYES ONLY
* Confidential - Attorneys Eyes Only

Page 126

```
1        A.    Correct.

2        Q.    What is your basis for that belief?

3        A.    I read the news articles and seen

4    comments that he had made on the television and

5    read his comments directly out of the News &

6    Observer, out of Raleigh, they'd been posted or

7    pasted on the internet.

8        Q.    Did you attend any meetings of the board

9    of trustees of the State Health Plan?

10       A.    No.   But I do recall that was a closed

11   door session when they decided to place -- he

12   decided to place an exclusionary rule on

13   transgender services, so had I went to Raleigh

14   regardless I wouldn't have been allowed into that

15   room to have my voice heard.

16       Q.    You believe that was the end of 2017?

17       A.    I believe that was sometime in the year

18   2017 that he would have placed the exclusionary

19   rule to go into affect in January 1, 2018.

20       Q.    Have you ever reviewed the minutes of

21   the State Board of Trustees for the North Carolina

22   State Health Plan?

23       A.    No.

24       Q.    So your belief that it was a closed

25   session where this matter was discussed is based on
```

**Department of State Treasurer, Retirement Systems Division**
325 North Salisbury Street, Raleigh, North Carolina 27603-1388

<div style="border:1px solid black;">

**Exhibit
0004 SHP**

Caraway
</div>

_XX_ TEACHERS' AND STATE EMPLOYEES' RETIREMENT SYSTEM
____ LOCAL GOVERNMENTAL EMPLOYEES' RETIREMENT SYSTEM
PLEASE PRINT OR TYPE FORM AND ATTACH A PHOTOCOPY OF YOUR SOCIAL SECURITY CARD.

Active Register Number (To be provided by Retirement System) _____

| | | | | |
|---|---|---|---|---|
| Name | ███ (First) | ███ (M.I.) | _CARAWAY_ (Last) | S.S. # ███ |
| Address | ███ | | | Birthdate ███ |
| City | ███ | State ███ | Zip Code ███ | Sex: Male ███ Female ███ |

**CERTIFICATION BY EMPLOYER:** We certify that the above-named person is currently serving in a position which is eligible for membership in the Retirement System previously indicated.

Employer __DEPARMENT OF CORRECTIONS__    Employer Code _____

Membership Date _____    Position __CORRECTIONAL OFFICER__

Authorized Signature _____    Date _____

**BENEFICIARY DESIGNATION:** (Please read carefully the information on the reverse.) I request the Board of Trustees to pay, in the event of my death prior to retirement:

A. The total amount of accumulated contributions standing to my credit in the Retirement System:

| COMPLETE NAME | ADDRESS | RELATIONSHIP | DATE OF BIRTH |
|---|---|---|---|
| Principal: ███ | ███ | | |
| | ███ | | |
| Contingent: ███ | ███ | | |

B. The total amount of the death benefit provided under G.S. 135-5 or 128-27 to which I may be entitled.

| COMPLETE NAME | ADDRESS | RELATIONSHIP | DATE OF BIRTH |
|---|---|---|---|
| Principal: ███ | ███ | | |
| | | | |
| Contingent: ███ | ███ | | |

I hereby authorize the Board of Trustees to make payment to the beneficiary(ies) whom I have nominated above and agree on behalf of myself and my heirs and assigns, that payment so made shall be a complete discharge of the claim and shall constitute a release of the Retirement System from any further obligation on account of the benefit. In completing and signing this form, I acknowledge having read the information printed on the reverse. I reserve the right to change the beneficiary(ies) designated above as prescribed in the Rules and Regulations.

Signature ███ _Certified_    Date _Sept 23, 94_

**NOTARY PUBLIC CERTIFICATION:** State of _North Carolina_ County of _McDowell_

I, as a Notary Public of the said State and County, do hereby certify that ███ _Caraway_ personally appeared before me and executed the foregoing instrument.

Witness my hand and seal this _3rd_ day of _September_, 199_4_    (Notary Public Seal)
Signature of Notary _Ann Renee Hawkins_    My commission expires _Nov 14, 1998_

Confidential --Attorneys' Eyes Only      NCDPS 000040

ACKNOWLEDGEMENT
SECONDARY EMPLOYMENT

This is to acknowledge that I have read and understand the Department of

Correction policy of Secondary Employment.  I have also been provided with a

form in which to request approval for secondary employment

9-23-94
_____
(Date)

_____
(Employee Signature)

_____
Witness

Confidential --Attorneys' Eyes Only

NCDPS 000043

DC-4

## STATE OF NORTH CAROLINA
## OFFICE OF THE STATE CONTROLLER
Payroll Section
TAX EXEMPTION CERTIFICATES

Unit: 3730

| FOR PAYROLL OFFICER USE ONLY | Agency Name: | | Retirement Number: |
|---|---|---|---|
| | If the answer to the question below is 'YES', please furnish the following information | | |
| | Last Date Employed by State | Wages Paid by State Subject to Soc. Sec. Withholding | Social Security Tax Withheld: |

| If a new employee, have you been employed by the state of North Carolina during the current calendar year? ☐ YES ☑ NO | Name of Previous Agency |
|---|---|

---

Form **W-4**    **Employee's Withholding Allowance Certificate**    OMB No. 1545-0010

Department of the Treasury
Internal Revenue Service

| 1 Type or print your first and middle initial    Last name    Caraway | 2 Your social security number |
|---|---|

Home address (number and street or rural route)

City or town, state, and ZIP code

| 4 Total number of allowances you are claiming | 4 | |
|---|---|---|
| 5 Additional amount, if any, you want deducted from each pay | 5 | $ |

6 I claim exemption from withholding and I certify that I meet ALL of the following conditions for exemption:
- Last year I had a right to a refund of ALL Federal income tax withheld because I had NO tax liability; AND
- This year I expect a refund of ALL Federal income tax withheld because I expect to have NO tax liability; AND
- This year if my income exceeds $500 and includes nonwage income, another person cannot claim me as a dependent.

If you meet all of the above conditions, enter the year effective and "EXEMPT" here........................ ► | 6 | 19

7 Are you a full-time student? (**Note:** *Full-time students are not automatically exempt.*) ........................ | 7 | ☐ Yes ☑ No

Under penalties of perjury, I certify that I am entitled to the number of withholding allowances claimed on this certificate or entitled to claim the exempt status.

Employee's signature ► Caraway    Date ► Sept. 23, 19 94

8 Employer's name and address (**Employer:** Complete 8 and 10 only if sending to IRS) | 9 Office code (optional) | 10 Employer identification number

**OFFICE OF THE STATE CONTROLLER, RALEIGH, N.C. 27603-8003**    56-6023166

---

Form **NC-4**    **NORTH CAROLINA DEPARTMENT OF REVENUE**
**Employee's Withholding Allowance Certificate**

| 1 Type or print your first and middle initial    Last name    Caraway | 2 Your social security number |
|---|---|

Home address (number and street or rural route)

City or town, state, and ZIP code

| 4 Total number of allowances you are claiming | 4 | |
|---|---|---|
| 5 Additional amount, if any, you want deducted from each pay | 5 | $ |

6 I claim exemption from withholding and I certify that I meet ALL of the following conditions for exemption:
- Last year I had a right to a refund of ALL State income tax withheld because I had NO tax liability; AND
- This year I expect a refund of ALL State income tax withheld because I expect to have NO tax liability.

If claiming exempt, the statement is effective for one calender year only and a new statement must be completed by next February 15 and given to your employer.

If you meet all of the above conditions, the year effective and "EXEMPT" here........................ ► | 6 | 19

7 Are you a full-time student? (**Note:** *Full-time students are not automatically exempt.*) ........................ | 7 |

I certify, under penalties provided by law, that the withholding allowance on this certificate do not exceed the amount to which I am entitled.

Employee's signature ►    Caraway    Date ► SAME AS ABOVE , 19

8 Employer's name and address (**Employer:** Complete 8 and 9 only if sending to NCDR) | 9 Employer identification number

SAME AS ABOVE    092-100081

Confidential --Attorneys' Eyes Only      NCDPS 000044

MARION CORRECTIONAL INSTITUTION
# 3730

I hereby acknowledge receipt of a copy of Administrative
Memorandum: 1.07.27-88 entitled "Conditions of Continued
Employment."

I understand that it is my responsibility to become familiar with
and abide by these policies.

Also, I understand that a complete copy of the Department of
Correction Disciplinary and Grievance Policy and Procedures are
posted in the Assembly room and are available for my review.

_____ *Caraway*  Name (Print)

_____ *Caraway*  Employee's Signature

_9 - 23 - 94_____  Date

Confidential --Attorneys' Eyes Only

NCDPS 000274

<u>UPON COMPLETION, THIS FORM MUST BE RETURNED TO MCI PERSONNEL</u>

REQUIREMENTS OF THE DIVISION OF PRISONS REGARDING THE ACCEPTANCE
OF COURT SUBPOENAS

I have read, understand, and have received a copy of the directive
dated October 13, 1992 issued by the Division of Prison's Deputy
Director for Operations regarding the requirements of the Division
of Prisons regarding the acceptance of court subpoenas by staff.
I understand that if I have further questions about these require-
ments, that I may contact my supervisor.

EMPLOYEE SIGNATURE: ██████████ *Caraway*

PRINT NAME AS IT APPEARS ABOVE: ██████████ *Caraway*

POSITION: ██████████    DATE: 9-23-1994

Confidential --Attorneys' Eyes Only

NCDPS 000278

UPON COMPLETING TH_____ M MUST BE RETURNED TO SMCI ____ EL

**DIVISION OF PRISONS POLICY ON GIFTS, FAVORS, HONORARIUMS AND SOLICITATION OF DONATIONS**

It is the policy of the Division of Prisons to generally prohibit the acceptance or solicitation of gifts, favors or donations for personal use from individuals or other entities who are, or plan to be, conducting business with the Department of Correction. The details of this policy may be found in Department of Correction Administrative Memorandum 1.01.03-92. This rule applies to employees of the Division of Prisons and their immediate family.

The Department prohibits any employee from accepting honorariums for participating in activities while the employee is on duty. The Department prohibits employees who arrange or manage contracts from soliciting or accepting donations from any source, under any circumstances.

It is the responsibility of the employee to decline offers of gifts, favors, or honorariums. But in the event that refusal is unsuccessful and a gift, favor, or honorariums is received, the employee must report immediately in writing the facts of the matter to his/her supervisor.

Failure to comply with this policy will be considered unacceptable personal conduct as defined in the State Personnel Manual and subject to the sanctions contained therein.

I have read and understand this statement of the Department of Correction, Division of Prisons Policy on Gifts, Favors, Honorariums and Solicitation of Donations. I understand that specific details of the above rules are described in Department of Correction Administrative Memorandum 1.01.03-92.* If I have further questions about the policy, I understand that I may contact my supervisor or the Secretary's office directly.

*By signing below, I acknowledge receipt of a copy of this referenced memorandum.

EMPLOYEE SIGNATURE: ███████████ _Carawauf_

PRINT NAME AS IT APPEARS ABOVE: ███████████ _Carawauf_

POSITION #: ████    DATE: 9-23-94

Confidential --Attorneys' Eyes Only

NCDPS 000280

Page 1

1              IN THE UNITED STATES DISTRICT COURT FOR

2              THE MIDDLE DISTRICT OF NORTH CAROLINA

3

4

5     MAXWELL KADEL, et al.,          )
                                      )
6               Plaintiffs,           )
                                      )   No. 1:19-cv-272-LCB-LPA
7          V.                         )
                                      )
8     DALE FOLWELL, et al.,           )
                                      )
9               Defendants.           )
      _____        )

10

11

12

                    VIDEOCONFERENCE DEPOSITION

13                          OF

                        BECKI JOHNSON

14    30(b)(6) DESIGNEE FOR NC DEPARTMENT OF PUBLIC SAFETY

15

                     SEPTEMBER 15, 2021

16

17            THIS TRANSCRIPT IS NOT COMPLETE

         PORTIONS OF THIS TRANSCRIPT AND/OR EXHIBITS

18     MAY BE DESIGNATED CONFIDENTIAL/ATTORNEYS EYES ONLY

       AFTER REVIEW OF TRANSCRIPT BY ATTORNEYS WITHIN 30

19      DAYS OF DATE OF DEPOSITION PER PROTECTIVE ORDER

20

21

               WAKE COUNTY, NORTH CAROLINA

22

23

24

25     Reported by: Michelle Maar, RDR, RMR, FCRR

# DEPOSITION OF BECKI JOHNSON

Page 9

1    Q.    Okay.  And any other positions before that?

2    A.    No.

3    Q.    Or in between the two?

4    A.    Not for DPS.

5    Q.    Okay.  Yeah.

6          What are your, what are your responsibilities?

7    A.    I oversee the benefits programs for the

8    department, which include insurance benefits, leave

9    benefits, retirement and disability benefits, as well as

10   leave of absence and separations.

11   Q.    And what were your, what were your

12   responsibilities as disability -- was it Disability

13   Benefits Manager?  Was that the previous position?

14   A.    It was Disability and Retirement Program Manager.

15         And my responsibilities were to oversee the

16   retirement program for the agency, as well as the

17   disability benefits for the agency, and process disability

18   payments monthly for employees out on short-term

19   disability.

20   Q.    Ms. Johnson, does the Department of Public Safety

21   offer health insurance to its employees?

22   A.    Yes.  Through the State Health Plan.

23   Q.    Sorry -- you said through the State Health Plan?

24   A.    Yes.  Yes.

25   Q.    And does DPS pay money into the State Health Plan

# DEPOSITION OF BECKI JOHNSON

1    to contribute for its employees' health insurance premiums?

2         A.   Yes.  We pay a monthly employee, employer portion

3    for each employee.

4         Q.   And how is the amount that DPS pays into the

5    State Health Plan each month determined?

6         A.   The State Health Plan determines it each year and

7    provides it to us.

8         Q.   And so DPS doesn't play a role in making that

9    determination.  It's purely the State Health Plan, and DPS

10   just goes along with that.

11             Is that right?

12        A.   Yes.  That's correct.

13        Q.   And so if the amount changes at any point, that

14   would all be determined by the State Health Plan?

15        A.   Correct.

16        Q.   Approximately how many DPS employees qualify for

17   health insurance through the State Health Plan?

18        A.   We have about 21,000 employees.

19        Q.   And all of them are on the State Health Plan?

20             There aren't any who don't qualify for insurance

21   or --

22        A.   Well, depending on their hours worked, some

23   probably don't qualify, or some that have declined coverage

24   because they have other coverage.

25        Q.   Right.  Can you estimate of how many of those

**DEPOSITION OF BECKI JOHNSON**

Page 11

1    21,000 employees would be on the State Health Plan?

2         A.   I would say maybe about 18 or 19,000.

3         Q.   And again approximately, how much does DPS pay

4    the State Health Plan each year in total for all these

5    employees?

6         A.   We don't pay it directly, the Office of the State

7    Controller pays it.   I can give you the monthly amount per

8    employee.

9         Q.   Sure.  That's fine.

10        A.   It's 521.96 currently.

11        Q.   And so just to make sure I'm understanding -- so

12   that's, it's 521 or so for each of those employees.

13             And that's for all of those employees who are on

14   the Health Plan, correct?

15        A.   Correct.  Yes.

16        Q.   So if I were doing the math, I could just

17   multiply that by 18 or 19,000 and that would be the total?

18        A.   Yes.

19        Q.   Does the Department of Public Safety have any

20   control over the health insurance that its employees

21   receive?

22        A.   No.

23        Q.   Okay.  And I'm actually going to pull up -- well,

24   I'm going to send another, put another exhibit into the

25   folder, if you'll bear with me for a minute.

**DEPOSITION OF BECKI JOHNSON**

Page 17

1  would they have to ask a question about how to access the

2  website?

3       A.   So, yeah, generally they would go to the HBR at

4  their facility to ask questions, for help.

5            There is no form.  It has to be done through the

6  system.

7            But if they can't get up with the HBR, they would

8  reach out to the Insurance Section in our office.

9       Q.   Okay.  And HBR, is that Health Benefits

10  Representative?

11      A.   Yes.  It is.

12      Q.   Does DPS offer any type of health insurance apart

13  from what is offered through the State Health Plan?

14      A.   No.

15      Q.   Are DPS employees required to sign up for health

16  insurance?

17      A.   No.

18      Q.   Does DPS provide insurance, health insurance for

19  employees' qualifying dependents?

20      A.   Yes.

21      Q.   And does DPS offer health insurance for anyone

22  other than the employees and their qualifying dependents?

23      A.   No.

24      Q.   I'm going to pull up another exhibit here.

25           MR. MAROLF:  Give me one second, Alan.

## DEPOSITION OF BECKI JOHNSON

Page 29

1  to process those exception requests?

2      A.   So if our Insurance Section determines that we

3  can submit an exception request, we type up that exception

4  request and submit it through an online form to the State

5  Health Plan.

6           And then the State Health Plan reviews that and

7  makes the final determination as to whether they'll

8  reinstate the coverage or not.

9      Q.   And so that, that final determination is made by

10 the State Health Plan.

11          Is that right?

12     A.   Yes.  That's correct.

13     Q.   I want to ask about the State Health Plan's

14 exclusion of coverage for gender confirming healthcare.

15          Does that exclusion apply to DPS employees?

16     A.   Yes.  It would apply, if it's a State Health Plan

17 exclusion, it would apply to anybody enrolled in the State

18 Health Plan.

19     Q.   And does DPS have any control over whether that

20 exclusion remains in the Plan?

21     A.   We do not.

22     Q.   Does DPS have any control over any terms of the

23 Plan?

24     A.   No.  We do not.

25     Q.   Has DPS ever received any complaints from

# DEPOSITION OF BECKI JOHNSON

Page 30

1    employees about the exclusion for gender confirming care?

2         A.   Not to my knowledge.  If we received complaints

3    about what is covered, we usually just direct them to the

4    State Health Plan at the number on their insurance card

5    because we don't have any control over the coverage terms.

6         Q.   Have there ever been any communications between

7    DPS and Sergeant Dana Caraway regarding her insurance

8    coverage?

9         A.   Not to my knowledge.  It's possible, you know,

10   she reached out to someone else.

11        Q.   But you're not aware of any?

12        A.   I'm not.  That doesn't ring a bell, but I deal

13   with several employees so it's possible.

14        Q.   Has DPS had any communications with the State

15   Health Plan regarding the exclusion for gender confirming

16   healthcare?

17        A.   No.  Not to my knowledge.

18             MR. MAROLF:  Alan, I think I'm getting close to

19   done.

20             Do you mind if we take a quick break so I can go

21   back over my notes?

22             MR. MCINNIS:  Works for us.

23             MR. MAROLF:  10 minutes?  Let's just say come

24   back at 10:25.

25             (Off the record)

# DEPOSITION OF BECKI JOHNSON

Page 34

```
 1        A.   No, no, not in the termination.

 2             We just process the separation action in the

 3   Integrated HR Payroll System.

 4        Q.   I understand.  Who makes the decision to

 5   terminate an employee at a correctional institution?

 6        A.   So to my knowledge, it would probably start with

 7   the supervisor and then go up through the chain of command

 8   through the warden and superintendent.

 9             And then if it's a termination, they work with

10   the Employee Relations Section in Central HR.

11        Q.   So where does the buck stop?

12        A.   I believe the Employee Relations Section would

13   give that final approval to terminate somebody.

14        Q.   And that's an office in DPS.  Is that correct?

15        A.   Yes.  In the Central HR Office.

16        Q.   And that, and that individual then reports up to

17   the deputy secretary of the department?

18        A.   Correct.

19        Q.   And what is the name of the current person in

20   charge of the Employee Relations Section?

21        A.   Cassandra Harris-Skinner.

22        Q.   Let me just repeat it so I make sure -- Cassandra

23   Harris-Skinner.

24        A.   Yes.  Harris, H-A-R-R-I-S-hyphen-Skinner.

25        Q.   I thought that's what it was.  But between Zoom
```

# DEPOSITION OF BECKI JOHNSON

1  start date so that she could fill it out.

2      Q.  And I -- just -- I include this question only to

3  make sure the record is clear -- the paperwork I have,

4  which I received from your office, identifies the

5  employee's name as Dowd Caraway.

6          Would you agree for purposes of this litigation,

7  this is paperwork for Sergeant Dana Caraway within Sergeant

8  Caraway's personnel file?

9      A.  Yes.  I agree with that.

10     Q.  That way, that way I don't have to keep on

11 saying, you know, I didn't show you the right paperwork.

12          Now, is there a training or certification

13 requirement for corrections officers?

14     A.  Yes.  They go to a basic certification training.

15     Q.  And who provides that training?

16     A.  Department of Public Safety.

17     Q.  And is that training required as a condition of

18 being a corrections officer or being employed as a

19 corrections officer in the state of North Carolina?

20     A.  To my knowledge, they have to complete the

21 training.  But while they're going through the training or

22 until they pass the training, they're still a corrections

23 officer.

24     Q.  I understand.  So -- I'm going to show you

25 another exhibit.

## DEPOSITION OF BECKI JOHNSON

Page 39

1   as a corrections officer by the department?

2       A.   Not to my knowledge.  I think if they lose that

3   certification, then they usually separate at that point.

4       Q.   And you mentioned that Sergeant Caraway currently

5   works at the Foothills Correctional Institution or that's

6   -- we, we -- that's possible.

7            Do you know of any, Sergeant Caraway's other

8   employment stations since 1994?

9       A.   Looking through the personnel file, I believe she

10  was at Alexander Correctional.  That's the only one that

11  stands out to me.

12      Q.   So how does the hiring process work for a

13  corrections officer?

14      A.   I'm not, I'm not familiar with the hiring process

15  because that's done at the, at the facilities.

16      Q.   So, so the hiring process is handled by each

17  individual DPS facility?

18      A.   Yes.  That's correct.

19      Q.   And the facilities advertise that the job, that

20  they have a job available?

21      A.   Correct.

22      Q.   And then the facility staff review applications?

23      A.   Yes.  That's correct.

24      Q.   And then do they send some sort of notice to you

25  at the HR Department that they have hired someone?

# DEPOSITION OF BECKI JOHNSON

Page 40

1        A.   So the prison facilities each have a Regional

2   Employment Office.  So they would send the hiring paperwork

3   to the Regional Employment Office.  It's not sent to

4   Central HR.

5        Q.   So -- and the Regional Employment Office is --

6   are they under -- it sounds like they're not under Central

7   HR?

8        A.   They are.  They report up through -- we have --

9   there's a manager in Central HR that oversees the different

10  Regional Employment Offices across the state.

11       Q.   But the Regional Employment Office handles the

12  hiring paperwork.

13            Is that correct?

14       A.   Yes.  That's correct.

15       Q.   All right.  And when you mentioned the NCID and

16  the log-on to what used to be referred to as the Beacon

17  system, is that information that would be provided by the

18  Regional Employment Office at each facility?

19       A.   So each facility has an NCID administrator.  And

20  that person is who would assign the NCID.

21       Q.   Now, you say the NCID administrator -- is that a

22  DPS job title?

23       A.   It's not a job title.  It's just an assignment

24  that was given to someone at the facility to take on that

25  role.

## DEPOSITION OF BECKI JOHNSON

Page 44

1    individuals other than the lieutenant that would supervise

2    a correctional sergeant?

3         A.   No, not to my knowledge.  I think it would be the

4    lieutenant.  And there's captains above that as well.

5         Q.   But do you supervise any correctional sergeants?

6         A.   No.  I do not.

7         Q.   Would there -- are you aware of anyone other than

8    the correctional lieutenant who would supervise Sergeant

9    Caraway?

10        A.   Not to my knowledge, no.

11        Q.   If there were a decision to terminate Sergeant

12   Caraway -- and this is, this is about the process vis-à-vis

13   the department, not that I have knowledge that there's any

14   basis for termination for Sergeant Caraway -- but if there

15   were a decision to terminate Sergeant Caraway, how does

16   that process work?

17             Would that originate with the correctional

18   lieutenant?

19        A.   Yes, with the supervisor.

20        Q.   And then would be processed through layers of

21   supervision above that?

22        A.   Yes.  To my knowledge.

23        Q.   Are corrections sergeants expected to have

24   assigned uniforms and equipment?

25        A.   Yes.

# DEPOSITION OF BECKI JOHNSON

Page 45

1    Q.    Who supplies the assigned uniforms?

2    A.    Department of Public Safety.

3    Q.    Are they the property of the Department of Public

4    Safety?

5    A.    Yes.

6    Q.    And corrections officers are expected to return

7    those uniforms at the end of their service?

8    A.    Yes.  That's correct.

9    Q.    Are corrections officers supplied equipment that

10   they use in the performance of their duties?

11   A.    Yes.

12   Q.    What equipment are they supplied?

13   A.    I'm not aware of the specific equipment.

14   Q.    But is that equipment supplied by the Department

15   of Public Safety?

16   A.    Yes.

17   Q.    Are the officers allowed to bring in their own

18   equipment for use in a facility?

19   A.    Not to my knowledge.

20   Q.    And when an officer leaves the service of the

21   Department of Public Safety, are they expected to return

22   that equipment?

23   A.    Yes.

24   Q.    Where are employment records stored for DPS

25   employees?

## DEPOSITION OF BECKI JOHNSON

Page 47

1      I've seen corrections officers listed in certain

2  generally available state directories.

3      And I've seen other directories that take law

4  enforcement officials out of the general population.

5      You can find out how much the accountant at the

6  Department of Audits makes but not how much a corrections

7  officer makes.

8      Who monitors -- actually, I'm going to show you a

9  document because I just don't know what it is.  And I'm

10  going to ask if you, if you know -- it's a document

11  produced by the department.

12      (Exhibit 6 is marked for identification.)

13      MR. KNEPPER:  Good news -- this was uploaded

14  prior to the deposition.  Otherwise, we would be waiting

15  for a very long time.

16      THE WITNESS:  Okay.

17  BY MR. KNEPPER:

18      Q.   Have you seen a record like this before, Ms.

19  Johnson?

20      A.   I have not.

21      Q.   So do you know -- do you have any knowledge of

22  what information is contained in this record?

23      I see, for example, Begin Date, Completion Date,

24  and Course Number, Unlawful Workplace Harassment (2 hours),

25  and then the Contact Hours, 2.

# DEPOSITION OF BECKI JOHNSON

Page 48

1          Do you, do you have any understanding of what that

2    might be in reference to or what that might describe?

3          A.   Yeah.  I would assume it's the training courses

4    that are required.

5          Q.   And you said required.  Required by whom?

6          A.   The Department of Public Safety -- in most cases.

7               Some might be Criminal Justice stuff as well.

8          Q.   Does the Department of Public Safety have its own

9    training requirements for employees?

10         A.   Yes.

11         Q.   And employees are expected to participate in

12   those trainings or be disciplined?

13         A.   Yes.

14         Q.   You haven't seen this particular printout for

15   Sergeant Caraway.

16              Is that correct?

17         A.   Correct.

18         Q.   I want to show you another document in a slightly

19   different format.

20              Again, I'm going to ask you if you've seen it and

21   what it is.

22              (Exhibit 7 is marked for identification.)

23              THE WITNESS:  Okay.

24   BY MR. KNEPPER:

25         Q.   Have you seen this document before, Ms. Johnson?

## DEPOSITION OF BECKI JOHNSON

Page 51

1    Secretary of DPS?

2         A.   I think, I think he reports to -- well, currently

3    yes, because we have an interim secretary.

4              But I think there's somebody else that he reports

5    to, and then the secretary is above that person.

6         Q.   You said that -- does Mr. Dail have a title other

7    than HR Director?

8         A.   No.

9         Q.   Does DPS have a secondary employment policy?

10        A.   Yes.  We do.

11        Q.   What is the secondary employment policy?

12        A.   Employees have to notify us prior to taking on

13   secondary employment.

14             They would complete a form and give it to their

15   supervisor.  And then we would make sure there's no

16   conflict of interest prior to approving it.

17        Q.   And if an employee -- well, let me just ask you

18   -- what happens if an employee takes a secondary employment

19   position without receiving approval from the department?

20        A.   The department can take disciplinary action.

21        Q.   You said they can take disciplinary action.

22        A.   Okay.

23        Q.   Are you aware of circumstances in which the

24   department has taken disciplinary action?

25        A.   I'm sure they have.  It just doesn't come up

## DEPOSITION OF BECKI JOHNSON

Page 63

1         A.    No.

2         Q.    But your role is to ensure that the employee

3    record system reflects that leave of absence?

4         A.    Yes.

5         Q.    And that while someone is on an unpaid leave of

6    absence, they're not paid?

7         A.    Can you repeat that?

8         Q.    And to make sure that when someone is on an

9    unpaid leave of absence, they're not paid?

10        A.    That would be the facility's responsibility

11   because they're entering the time.

12        Q.    Okay.  Is the -- does the Department of Public

13   Safety employ Sergeant Caraway?

14        A.    Yes -- to my knowledge.

15        Q.    Does the State Health Plan employ Sergeant

16   Caraway?

17        A.    Not that I'm aware of.

18        Q.    Does the State Health Plan have the authority to

19   hire or fire Sergeant Caraway?

20        A.    Not that I'm aware of.

21        Q.    Does the State Health Plan have the authority to

22   supervise Sergeant Caraway?

23        A.    Not that I'm aware of.

24        Q.    Does the State Health Plan have the authority to

25   discipline Sergeant Caraway?

# DEPOSITION OF BECKI JOHNSON

Page 64

1      A.    Not that I'm aware of.

2      Q.    Does the State Health Plan furnish the equipment

3    or the place of work for Sergeant Caraway?

4      A.    Not that I'm aware of.

5      Q.    Does the State Health Plan have custody over

6    Sergeant Caraway's personnel file?

7      A.    No.  Not that I'm aware of.

8      Q.    Your testimony is that Sergeant Caraway has

9    worked for the Department of Public Safety since 1994.

10         Is that correct?

11     A.    Yes.  I believe that's correct.

12     Q.    So doing the math, is that 17 years of employment

13   with -- or I guess -- no, it's -- now I'm going to be

14   embarrassed by my math -- is that 27 years of employment

15   with the Department of Public Safety?

16     A.    Yes.  That's what I calculate.

17     Q.    I first thought 17 and then I realized that I've

18   been out of high school a lot longer than 17 years.  And

19   1994 isn't that far away from when I was in high school.

20         MR. MCINNIS:  Time flies.

21   BY MR. KNEPPER:

22     Q.    Does DPS provide corrections officers with formal

23   and informal training?

24     A.    Yes.

25     Q.    Does DPS track the training provided to its

## DEPOSITION OF BECKI JOHNSON

Page 65

1    employees?

2         A.   Yes.

3         Q.   Okay.  You stated that Sergeant Caraway -- we've

4    established that Sergeant Caraway is a Corrections Sergeant

5    for the Department of Public Safety.

6              Is that correct?

7         A.   Yes.  That's correct.

8         Q.   Is there a job description for a corrections

9    sergeant with the Department of Public Safety?

10        A.   Yes.  There should be.

11        Q.   And who, who, who is responsible for establishing

12   that job description?

13        A.   I'm not sure who creates them initially, but the

14   supervisor maintains them.

15        Q.   So an employee of the Department of Public Safety

16   at Foothills Correctional Institution is responsible --

17        A.   Yes.  That's correct.

18        Q.   -- is responsible for Sergeant Caraway's job

19   description?

20        A.   Yes.  That's correct.

21        Q.   And to the best of your knowledge, Sergeant

22   Caraway only provides services to the Department of Public

23   Safety?

24        A.   Yes -- to the best of my knowledge.

25        Q.   And if Sergeant Caraway provided, had a second

# DEPOSITION OF BECKI JOHNSON

Page 66

1      employer, the department's policy is that he needed to or

2      she needed to get that approved prior to assuming that

3      second task or second job?

4          A.   Yes.   That's correct.

5          Q.   And a failure to do so is a basis for discipline

6      by the Department of Public Safety?

7          A.   Yes.   That's correct.

8               MR. KNEPPER:   Ms. Johnson, I think that's it.

9               I'm going to ask for a couple of minutes to take

10     a brief break, to make sure there's nothing else that I've

11     missed or forgotten.

12              MR. MCINNIS:   John, before you do that, I have

13     just a couple of questions.   Let me ask those in case you

14     have some follow-up to those.

15

16                            EXAMINATION

17     BY MR. MCINNIS:

18         Q.   Ms. Johnson, my name is Alan McInnis.   I

19     represent the North Carolina Department of Public Safety in

20     this matter.

21              Let me -- Mr. Knepper asked you some questions

22     about -- if you could pull up Exhibit 6 again.

23              Okay.   I'm sorry, I'm sorry.   Go back to Exhibit

24     8, the last exhibit.

25              And he asked you some questions about some of the

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MAXWELL KADEL, et al.,

*Plaintiffs*,

v.

DALE FOLWELL, et al.,

*Defendants*.

No. 1:19-cv-00272-LCB-LPA

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56(a) and Local Rule 56.1, Plaintiffs Maxwell Kadel; Jason Fleck; Connor Thonen-Fleck; Julia McKeown; Michael D. Bunting, Jr.; C.B., by his next friends and parents, Michael D. Bunting, Jr. and Shelley K. Bunting; Sam Silvaine; and Dana Caraway (collectively, "Plaintiffs"), respectfully move the Court for summary judgment on their Equal Protection claims, seeking declaratory and permanent injunctive relief.[1] Plaintiffs also move for partial summary judgment on their statutory claims, seeking declaratory and permanent injunctive relief on all Plaintiffs' claims under Section 1557 of the Affordable Care Act ("ACA") and Plaintiff

---

[1]    Plaintiff Sam Silvaine's Equal Protection claim is moot because he no longer works for the state.

1

Dana Caraway's claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), and reserving issues of damages on all statutory claims for trial.

Plaintiffs' motion seeks a judgment as to liability on their claims that Defendants' enforcement of categorical exclusions of gender-confirming care for transgender people in the North Carolina State Health Plan for Teachers and State Employees constitutes unlawful discrimination based on sex and transgender status in violation of the Equal Protection Clause of the Fourteenth Amendment, the ACA, and Title VII. Plaintiffs respectfully request that this Court issue a declaratory judgement finding that Defendants' enforcement of the categorical exclusions violates Plaintiffs' rights under the Equal Protection Clause, ACA, and Title VII, and permanently enjoin Defendants, their agents, employees, successors, and all others acting in concert with them, from enforcing the categorical exclusions of coverage for gender-confirming health care.

Dated: December 20, 2021

Respectfully submitted,

/s/ Amy E. Richardson
Amy E. Richardson
N.C. State Bar No. 28768
Lauren E. Snyder
N.C. State Bar No. 54150
HARRIS, WILTSHIRE & GRANNIS LLP
1033 Wade Avenue, Suite 100
Raleigh, NC 27605-1155
Phone: 919-429-7386 | Fax: 202-730-1301
arichardson@hwglaw.com

Deepika H. Ravi*
Grace H. Wynn*
HARRIS, WILTSHIRE & GRANNIS LLP
1919 M Street N.W., 8th Floor,
Washington, D.C. 20036

Tara Borelli*
Carl S. Charles*
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
1 West Court Square, Ste. 105
Decatur, GA 30030
Telephone: 404-897-1880
Facsimile: 404-506-9320
tborelli@lambdalegal.org

Omar Gonzalez-Pagan*
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
Telephone: 212-809-8585

2

Phone: 202-730-1300 | Fax: 202-730-1301
dravi@hwglaw.com

Michael W. Weaver*
Adam M. Safer*
MCDERMOTT WILL & EMERY
444 W. Lake St., Suite 4000
Chicago, IL 60606
Phone: 312-984-5820 | Fax: 312-984-7700
mweaver@mwe.com

Dmitriy G. Tishyevich*
Warren Haskel*
MCDERMOTT WILL & EMERY
One Vanderbilt Avenue
New York, NY 10017-3852
Phone: 212-547-5534 | Fax: 646-417-7668
dtishyevich@mwe.com

Lauren H. Evans*
MCDERMOTT WILL & EMERY
One Vanderbilt Avenue
New York, NY 10017-3852
Phone: 202-756-8864 | Fax: 202-591-2900
levans@mwe.com

Facsimile: 212-809-0055
ogonzalez-pagan@lambdalegal.org

David Brown*
Ezra Cukor*
TRANSGENDER LEGAL DEFENSE AND
EDUCATION FUND, INC.
520 8th Ave, Ste. 2204
New York, NY 10018
Telephone: 646-993-1680
Facsimile: 646-993-1686
dbrown@transgenderlegal.org

*Counsel for Plaintiffs*

\* Appearing by special appearance pursuant to L.R. 83.1(d).

3

## CERTIFICATE OF SERVICE

I certify that the foregoing document was filed electronically with the Clerk of Court using the CM/ECF system which will send notification of such filing to all registered users.

Dated:  December 20, 2021

/s/ Amy E. Richardson
Amy E. Richardson
N.C. State Bar No. 28768
HARRIS, WILTSHIRE & GRANNIS LLP
1033 Wade Avenue, Suite 100
Raleigh, NC 27605-1155
Telephone: 919-429-7386
Facsimile: 202-730-1301
arichardson@hwglaw.com

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MAXWELL KADEL, et al.,

*Plaintiffs*,

v.

DALE FOLWELL, et al.,

*Defendants*.

No. 1:19-cv-00272-LCB-LPA

## MEMORANDUM IN SUPPORT OF PLAINTIFFS'
## MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................. i

NATURE OF THE CASE .......................................................... 1

STATEMENT OF FACTS ......................................................... 2

I.      THE PARTIES ................................................................ 2

II.     NCSHP'S HEALTH PLANS ........................................... 8

        A.    The State Health Plan Structure. ............................ 8

        B.    NCSHP Staff's Efforts to Comply with the ACA ......... 9

        C.    Coverage Lapses Under Treasurer Folwell ................ 13

III.    THE STANDARD OF CARE FOR GENDER-AFFIRMING CARE .................. 14

ARGUMENT ........................................................................ 17

I.      THE EXCLUSION VIOLATES THE EQUAL PROTECTION
        CLAUSE ...................................................................... 17

        A.    The Exclusion Discriminates Based on Sex ............... 18

        B.    The Exclusion Discriminates Based on Transgender Status ..... 20

        C.    The Exclusion Fails Heightened Scrutiny .................. 20

              1.   Purported cost savings cannot excuse invidious discrimination .......... 22

              2.   Medical consensus and FDA approval ................. 23

II.     THE EXCLUSION VIOLATES THE AFFORDABLE CARE ACT ............... 27

III.    THE EXCLUSION VIOLATES MS. CARAWAY'S RIGHTS
        UNDER TITLE VII ........................................................ 29

        A.    The Exclusion Is Impermissible Sex Discrimination
              Under Title VII ................................................. 29

i

B.      Defendants' Finger-Pointing Does Not Allow Them to
        Evade Liability ............................................................... 30

        1.   DPS is liable as Ms. Caraway's employer ............................. 31

        2.   NCSHP is liable as an agent of, and joint employer
             with, DPS ................................................................ 31

IV.   PLAINTIFFS SATISFY THE REQUIREMENTS FOR
      DECLARATORY AND INJUNCTIVE RELIEF .................................. 34

CONCLUSION .................................................................... 35

ii

Plaintiffs respectfully submit this memorandum of law in support of their motion for summary judgment on their Equal Protection claims, seeking declaratory and permanent injunctive relief;[1] and partial summary judgment on their statutory claims, seeking declaratory and permanent injunctive relief on their claims under Section 1557 of the Affordable Care Act ("ACA"), and Plaintiff Dana Caraway's claims under Title VII of the Civil Rights Act of 1964, reserving issues of damages on all statutory claims for trial.[2]

## NATURE OF THE CASE

Plaintiffs are current or former participants in the North Carolina State Health Plan for Teachers and State Employees ("NCSHP").  As part of compensation for employment, the State of North Carolina ("State") provides health coverage to employees and their dependents through NCSHP.  Some employees and their dependents, however, receive less compensation than others: those denied coverage for the gender-affirming care that transgender people require.  NCSHP contains sweeping exclusions of such care, while covering the same kinds of treatments for cisgender employees who require them for other reasons.  Defendants thus deny equal treatment to employees who are transgender or have transgender dependents, and harm transgender family members who depend on employees for health care coverage.

---

[1]    Plaintiff Sam Silvaine's Equal Protection claim is moot because he no longer works for the state.

[2]    Unless otherwise indicated, all exhibits are attached to the Declaration of Amy Richardson.

1

## STATEMENT OF FACTS

I.    **THE PARTIES.**

Plaintiffs are, or have been, enrolled in NCSHP for health coverage.  ECF No. 85

¶ 1.  Two Plaintiffs are parents whose children are denied gender-affirming care, and the

others are transgender employees, former employees, or dependents who have or

continue to be denied coverage solely because they are transgender.  All transgender

Plaintiffs have been diagnosed with gender dysphoria.  Mot. to Seal, Brown Rep.

¶¶ 50–68; Supp. Brown Rep. ¶¶ 9-14.  Plaintiffs have been denied care for their gender

dysphoria under NCSHP's exclusions of coverage for "[p]sychological assessment and

psychotherapy treatment in conjunction with proposed gender transformation"[3] and

"[t]reatment or studies leading to or in connection with sex changes or modifications and

related care" (collectively, the "Exclusion").  Exs. 8-9.

**Plaintiff Maxwell Kadel** is enrolled in NCSHP as a University of North Carolina,

Chapel Hill ("UNC") employee.  Kadel Decl. ¶¶ 2, 4, 16.  He is a 39-year-old transgender

man.[4]  *See id.* ¶ 2.  Before his transition, Mr. Kadel experienced significant distress as a

result of his gender dysphoria.  Ex. 15, 117:2-11; Kadel Decl. ¶ 6, 8.  He began hormone

therapy in 2016, but because of the Exclusion, Mr. Kadel has been forced to pay out-of-

pocket.  *Id.* ¶¶ 7, 9.  The Exclusion also prevented Mr. Kadel from obtaining chest

---

[3]    While the health plans exclude coverage for psychological treatment, NCSHP's Rule
30(b)(6) designee testified that NCSHP does not enforce that exclusion.  Ex. 12, 49:8-
23.

[4]    Mr. Kadel turned 39 on December 3, 2021.

2

surgery when he needed it, leading to a years-long delay while he saved up to pay at his own expense. *Id.* ¶¶ 12-15. Mr. Kadel has an ongoing need for hormone therapy and may seek additional surgical care in the future. *Id.* ¶ 16.

**Plaintiff Connor Thonen-Fleck** is enrolled in NCSHP as a dependent of **Plaintiff Jason Fleck**, a UNC-Greensboro employee. ECF No. 85 ¶¶ 83-84; ECF No. 96 ¶ 8. Mr. Thonen-Fleck is a 19-year-old transgender man. Thonen-Fleck Decl. ¶¶ 2-3. Until he began to transition, he experienced increasing anguish. *Id.* ¶ 5. Beginning hormone therapy and obtaining chest reconstruction surgery to masculinize his chest was life changing. Ex. 16, 102:8-19, 116:16-25; Ex. 17, 64:2-21; Thonen-Fleck Decl. ¶¶ 7, 16. Based on the Exclusion, Mr. Thonen-Fleck has been denied coverage for endocrinologist appointments, testosterone, and chest reconstruction surgery. Ex. 16, 6:23-7:11; Fleck Decl. ¶¶ 10-14. The denials invoked only the Exclusion for treatment of gender dysphoria and no other exclusions. Fleck Decl. ¶¶ 11-12. Mr. Thonen-Fleck has an ongoing need for hormone therapy and anticipates seeking additional surgical care in the future. *Id.* ¶ 17.

**Plaintiff Julia McKeown** is enrolled in NCSHP as an employee of North Carolina State University ("NCSU"). ECF No. 85 ¶ 94; ECF No. 96 ¶ 9. Dr. McKeown is a 45-year-old transgender woman. McKeown Decl. ¶ 2. Until she began her transition, she experienced significant distress. *Id.* ¶¶ 4-5, 9; Ex. 18, 150:11-151:4. By 2018, Dr. McKeown's medical provider referred her for vaginoplasty, and she requested preauthorization for the surgery. McKeown Decl. ¶ 9. The request was denied based on

3

the Exclusion for treatment of gender dysphoria and no other exclusions. *Id.* ¶¶ 10-11.

Dr. McKeown appealed that decision to Blue Cross and Blue Shield of North Carolina

("BCBSNC") but was informed that they only administer the plan and could not resolve

the issue. *Id.* ¶ 11; ECF No. 85 ¶ 96. Dr. McKeown has an ongoing need for hormone

therapy and anticipates possibly seeking additional surgical care in the future. McKeown

Decl. ¶ 14.

    **Plaintiff C.B.** is enrolled in NCSHP as a dependent of **Plaintiff Michael D.**

**Bunting, Jr.**, a retiree of UNC. ECF No. 85 ¶¶ 109, 117; C.B. Decl. ¶ 19; M. Bunting

Decl. ¶ 26; S. Bunting Decl. ¶ 16. C.B. is a 16-year-old transgender young man. C.B.

Decl. ¶¶ 2-4. Before his transition, C.B. experienced distress associated with his birth-

designated sex. Ex. 19, 35:8-22; C.B. Decl. ¶¶ 11, 13, 24; Ex. 20, 82:2-9; M. Bunting

Decl. ¶ 9; S. Bunting Decl. ¶¶ 7, 12. In 2017, C.B. was diagnosed with gender dysphoria

and was later prescribed puberty-delaying medication. C.B. Decl. ¶ 14; M. Bunting Decl.

¶ 14; S. Bunting Decl. ¶ 13. Because of the Exclusion, C.B.'s parents were forced to

obtain additional coverage for C.B. for 2019 in order to be able to afford C.B.'s puberty-

delaying medication. Ex. 20, 105:20-106:12; M. Bunting Decl. ¶¶ 22–23; S. Bunting

Decl. ¶ 27. C.B. has also been prescribed testosterone, but coverage has been denied on

multiple occasions. C.B. Decl. ¶¶ 21-22; M. Bunting Decl. ¶ 26; S. Bunting Decl. ¶¶ 30-

32. C.B. has an ongoing need for hormone therapy. Ex. 20, 132:21–133:1; M. Bunting

Decl. ¶ 26; S. Bunting Decl. ¶ 35. C.B.'s gender-conforming treatment has helped reduce

4

his anxiety and brought him much-needed relief.  Ex. 19, 36:1-3; C.B. Decl. ¶¶ 15, 21, 24; M. Bunting Decl. ¶ 15; S. Bunting Decl. ¶ 14.

**Plaintiff Sam Silvaine** was enrolled in NCSHP as an employee of NCSU from 2016 through 2018.  Ex. 21, 8:23-9:1; Silvaine Decl. ¶ 5.  He is a 33-year-old transgender man.  Silvaine Decl. ¶ 2.  While he was working at NCSU, Mr. Silvaine lived with significant distress caused by gender dysphoria.  Ex. 21, 105:14-23; Silvaine Decl. ¶ 7.  In 2017, Mr. Silvaine was prescribed hormone therapy, but that was not sufficient to alleviate his daily distress because of his non-masculine chest.  Ex. 21, 48:9-16; Silvaine Decl. ¶¶ 8-12.  In consultation with his provider, he decided to seek chest surgery to treat his gender dysphoria.  Ex. 21, 48:9-20; Silvaine Decl. ¶ 13.  Although he initially received prior authorization, after the Exclusion was reinstated, the authorization was rendered invalid.  Ex. 21, 73:9-74:19; Silvaine Decl. ¶¶ 14-16.  He was forced to pay for his surgery out-of-pocket, which was a stressful burden.  Ex. 21, 72:16-22; Silvaine Decl. ¶¶ 17-18.

**Plaintiff Dana Caraway** is a transgender woman and a State of North Carolina, Department of Public Safety ("DPS") employee.  Caraway Decl. ¶¶ 2-3, 8; ECF No. 96 ¶ 12.  She pays the same premium as other State employees to enroll in the 80/20 plan.  Caraway Decl. ¶¶ 16-17; ECF No. 96 ¶ 133.  Until she began to transition in 2018, she had grown increasingly isolated and distressed.  Ex. 22, 78:15-79:4, 79:18-80:1, 152:12-20; Caraway Decl. ¶¶ 9-14.  Treating her gender dysphoria was so important that she obtained surgery in 2020 by paying for it largely out of her retirement savings.  Caraway

5

Decl. ¶¶ 23-25.  BCBSNC denied coverage, citing the Exclusion as the only reason.  Ex. 22, 64:6-10; Caraway Decl. ¶ 24.  She paid for a second surgery and needs one more procedure to feminize her facial features, which she cannot afford.  Caraway Decl. ¶¶ 25-26.  She also takes hormone therapy, which NCSHP has covered inconsistently—both as to the medication and related visits to her practitioner.  *Id.* ¶¶ 20, 28.

**Defendant Dale Folwell** is sued in his official capacity as the North Carolina State Treasurer.  ECF No. 85 ¶ 13; Ex. 11, 30:23-31:5.  Defendant Folwell is Chair of NCSHP Board of Trustees (the "Board").  Ex. 11, 44:18-20; Ex. 10 at 2.  His statutory duties include administering and operating NCSHP, setting benefits with Board approval, and designing and implementing coordination of benefits policies.  N.C. Gen. Stat. § 135-48.30(a); Ex. 4 Admis. 4.  He approves the final agenda for each Board meeting as part of the process by which NCSHP determines which benefits the plan will cover each year.  Ex. 11, 44:21-45:2, 46:1-47:1; Ex. 3 Interrog. 7.

**Defendant Dee Jones** is sued in her official capacity as Executive Administrator of NCSHP.  ECF No. 85 ¶ 14; Ex. 12, 13:6-8.  She is responsible for management of the plan, Ex. 12, 14:21-23, and is statutorily authorized to negotiate, renegotiate, and execute contracts for NCSHP pursuant to N.C. Gen. Stat. § 135-48.23.  Ms. Jones testified as NCSHP's 30(b)(6) designee.  *Id.* 5:6-10.

**Defendant NCSHP** provides group health insurance to eligible state employees and their dependents pursuant to N.C. Gen. Stat. § 135-48.2.  "The opportunity to enroll in [NCSHP] is a part of the compensation package provided to state employees."  Ex. 4

6

Admis. 6.  NCSHP is self-funded, ECF No. 85 ¶ 1, and "determines what health benefits are available to state employees through their employment" and the number of plan options.  ECF No. 96 ¶ 179; Ex. 14, 13:3-14:6.  NCSHP receives federal funding through "quarterly payments under the Retiree Drug Subsidy from the U.S. Department of Health and Human Services."  Ex. 5 Admis. 1 Interrog. 1.

      **Defendant DPS** is an employer within the meaning of Title VII.  ECF No. 96 ¶ 18; ECF No. 85 ¶ 18; ECF Nos. 104-1, 105; Ex. 7 Admis. 1.  As an employer, DPS provides health care coverage to its employees through NCSHP.  ECF No. 85 ¶ 18; ECF No. 96 ¶¶ 18, 22; Ex. 14, 9:20-24, 17:18-23.  DPS facilitates employee access to NCSHP coverage in several ways.  DPS contributes $521.96 to NCSHP per month per employee.  Ex. 7 Admis. 2.  Upon hiring, and during annual open enrollment, DPS "Health Benefit Representatives provide the benefits information to the employees to give them the information they need to determine if they would like to join the SHP."  Ex. 6 Interrog. 3(a); Ex. 12, 88:22-89:3.

      Each Health Benefits Representative ("HBR") is an employee not of NCSHP, but instead of the relevant state agency, such as DPS.  Ex. 12, 118:6-17.  HBRs are "the first line of contact" for employees with questions about insurance, Ex. 14, 24:7-13, and are "responsible for their employer's employees and getting them enrolled [in NCSHP] and making sure they understand the processes."  Ex. 12, 118:6-14; Ex. 14, 21:20-22:13.  Additionally, the human resources staff of the participating employer, such as DPS, are responsible for entering information into the system so that the State Controller can

<div align="center">7</div>

deduct the employees' premiums.  Ex. 12, 90:19-24.  When an employee changes their health coverage because of a qualifying life event, DPS's human resources section reviews relevant documents and determines whether to approve the requested change. Ex. 14, 14:18-16:22.

DPS also becomes "involved if an employee loses coverage of the State Health Plan due to non-payment of the employee's premium."  Ex. 6 Interrogs. 3(b)-4.  "If the employee wants … coverage … reinstated before the annual enrollment period," DPS works with both "the employee to submit an exception request to the State Health Plan," and "with the State Health Plan which is a part of the State Treasurer's Office to submit the exception request …."  *Id.* 3(b).

## II.    NCSHP'S HEALTH PLANS.

### A.    The State Health Plan Structure.

NCSHP covers more than 740,000 teachers, state employees, retirees, and their dependents.  Ex. 10 at 2; Ex. 12, 18:14; ECF No. 85 ¶ 4.  NCSHP offers an 80/20 PPO Plan and a 70/30 PPO Plan (collectively, the "Plan") that are generally available to enrollees.  ECF No. 85 ¶ 48; ECF No. 96 ¶ 48.  Covered services include medically necessary pharmacy benefits, mental health benefits, and medical care such as surgical benefits at inpatient and outpatient facilities.  Exs. 8-9; ECF No. 85 ¶ 49; ECF No. 96 ¶ 49.  BCBSNC serves as the third-party administrator and CVS Caremark ("CVS") administers pharmacy benefits for the Plan.  ECF No. 85 ¶ 48.

8

NCSHP's health plans share one feature: a categorical Exclusion of coverage for gender-affirming care. Exs. 8-9. The Exclusion applies even to the very same treatments that are covered when they are medically necessary for cisgender participants, including hormone therapy, Ex. 2 Admis. 1, Ex. 5 Admis. 2; puberty-delaying hormone treatment, Ex. 5 Admis. 2; mammoplasty and breast reconstruction, Ex. 2 Admis. 2, Ex. 5 Admis. 3; vaginoplasty, Ex. 2 Admis. 3; and hysterectomy, Ex. 2 Admis. 4. Because of the Exclusion, transgender people are denied the opportunity to make the same individualized showing of medical necessity for treatments covered by the Plan as cisgender people are permitted. Exs. 8-9.

### B.    NCSHP Staff's Efforts to Comply with the ACA.

In 2010, Congress enacted Section 1557 of the ACA, 42 U.S.C. § 18116, a broad civil rights remedy to protect patients and other health care consumers from discrimination on the basis of race, ethnicity, sex, disability, and age. On May 18, 2016, the U.S. Department of Health and Human Services ("HHS") promulgated a final rule prohibiting "categorical coverage exclusion[s] or limitation[s] for all health services related to gender transition." Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,375, 31,471-72 (May 18, 2016).[5]

NCSHP was aware at least as early as summer 2016 that it needed to eliminate the Exclusion to comply with the ACA. NCSHP's Deputy Executive Administrator and

---

[5]    The prior administration's attempt to roll back this aspect of the rule was enjoined and the rule's gender identity protections remain in effect. *See Walker v. Azar*, 480 F.Supp.3d 417, 420 (E.D.N.Y. 2020).

Legal Counsel Lotta Crabtree asked Mark Collins, a Plan financial analyst, to investigate the "cost of coverage for gender dysphoria" because "[t]he Plan believes that we will need to cover treatment and services for gender dysphoria beginning with Plan year 2017." Ex. 31; *see also* Ex. 32 (email from Ms. Crabtree stating: "we need to ensure coverage under our benefits do not discriminate on the basis of … sex. Sex includes gender identity and so we are trying to determine what we need to cover for individuals diagnosed with gender dysphoria."); *see also* Ex. 30. By July 2016, NCSHP adopted a Section 1557 grievance procedure which explained NCSHP "is subject to Section 1557." Ex. 33, PLANDEF0012787.

Subsequently, Ms. Crabtree worked with then-Executive Administrator Mona Moon to create bullet points for the Board about the ACA requirements. Ex. 34. The bullet points explained that the ACA "applies to" NCSHP by virtue of the $19.5 million retiree drug subsidy NCSHP receives from HHS, and that participants "have a private right of action to sue for violations of the rule." *Id.* KADEL00136650.

NCSHP retained Segal Consulting ("Segal") for guidance regarding ACA requirements. Ex. 35; Ex. 12, 23:8-12. On November 29, 2016, Segal delivered a memo advising that NCSHP is "likely" a covered entity "subject to" the ACA, and that covered entities "must provide coverage for transgender health care … beginning on or after 1-1-17." Ex. 36. Segal also estimated that the new coverage would cost NCSHP between $350,000 and $850,000, or 0.011% to 0.027% of the plan's total premium. Ex. 36, PLANDEF0006965. Segal's estimate would prove to be highly accurate; NCSHP's

10

costs for gender-affirming care for the 2017 plan year were $404,609.26, at the lower end of Segal's estimate.  Ex. 3 Interrog. 10; Ex. 5 Admis. 6.

On November 28-29, 2016, NCSHP approved a press release related to the upcoming Board meeting stating:

> The Plan's outside legal counsel determined this rule requires action by the Plan on or before January 1, 2017.  If the Plan does not take action to comply, the Plan risks losing millions of dollars in federal funding and could face discrimination lawsuits for non-compliance.

Ex. 37.  Ms. Moon also helped NCSHP staff craft a response for members of the public, adding a statement that the Exclusion was being eliminated "as required by Federal law and to preserve federal Retiree Drug Subsidy funds received by the Plan."  Ex. 38.

NCSHP staff recommended that the Board remove the Exclusion during its December 2016 meeting to provide "medically necessary services for the treatment of gender dysphoria."  Ex. 39, PLANDEF006988; Ex. 12, 33:25-34:3.  State Health Plan Medical Director Patti Forest, M.D. educated the Board about "gender dysphoria diagnostic criteria and standards of care," noting that the American Medical Association ("AMA"), American College of Physicians, and American College of Obstetricians and Gynecologists endorse coverage for this care.  Ex. 40, PLANDEF0012825; *see also* ECF No. 131-2 (Br. Amici Curiae Am. Med. Ass'n, et al.).  Dr. Forest also explained that "elements of care for transgender people [are] a 'medical necessity'" and "[d]elaying treatment for [gender dysphoria] can cause and/or aggravate additional serious and expensive health problems, such as stress-related physical illnesses, depression, and substance abuse problems, which further endanger patients' health and strain the health

11

care system." Ex. 39, PLANDEF0006971. Dr. Forest explained that the World Professional Association for Transgender Health ("WPATH") has "established internationally accepted Standards of Care" for this treatment, noting that the AMA recognizes it as a "medical necessity." *Id.* PLANDEF0006969-71.

During the Board meeting, the Plan's outside legal counsel advised them that continuing to receive federal funding without coverage for treatment of gender dysphoria would render NCSHP "non-compliant as of January 1, 2017," resulting in "the possibility of civil action by someone challenging the violation." Ex. 40, PLANDEF0012825. NCSHP's then-Legal Counsel, Lotta Crabtree, further advised that if NCSHP covered this care, it would "adopt the [BCBSNC] medical policy, included in the Board material, which includes the requirements in support of medical necessity." *Id.* PLANDEF0012816; Ex. 12, 41:25-42:15; *see also* Ex. 43 (BCBSNC "Corporate Medical Policy, Gender Confirmation Surgery and Hormone Therapy"). NCSHP staff accordingly recommended to the Board that it "remov[e] the blanket exclusions" to provide "medically necessary services for the treatment of gender dysphoria." Ex. 39, PLANDEF006988.

A Board member moved to eliminate the Exclusion, and another Board member amended the motion to apply only for plan year 2017. Ex. 40, PLANDEF0012816-17; Ex. 12, 43:2-44:11. The amended motion, which stated that the Exclusion would be "revisited in advance of the 2018 plan year," was approved. Ex. 40, PLANDEF0012817. But the Board never revisited it. Ex. 12, 63:5-8.

12

In response to media requests, NCSHP reiterated its understanding that eliminating the Exclusion was necessary to avoid the risk of private discrimination suits. *See, e.g.*, Ex. 42; Ex. 41, PLANDEF0007138.  NCSHP staff also worked to survey their contractors to ensure compliance with the ACA.  Ex. 44.

### C.    Coverage Lapses Under Treasurer Folwell.

By August 2017, however, NCSHP staff had begun preparing for the Exclusion to be reinstated.  A representative of BCBSNC emailed plan staff member Caroline Smart to explain that NCSHP would need to "sign a hold harmless if the plan decided not to cover gender dysphoria."  Ex. 45.

The Exclusion was "reinstated on January 1, 2018" by "operation of law."  Ex. 3 Interrog. 6.  As NCSHP staff worked with vendors to reinstate the Exclusion, BCBSNC informed NCSHP again in December 2017 that it would need to sign an indemnification agreement before BCBSNC would make the necessary coding changes.  Ex. 47.  Several Plaintiffs and members of the public addressed the Board again at its October 22, 2018 Board meeting and asked that the Exclusion be eliminated.  Ex. 11, 144:2-145:21.  The Board declined.  Exs. 8-9.

Three days later, on October 25, 2018, Mr. Folwell released a statement providing that "[u]ntil the court system, a legislative body or voters tell us that we 'have to,' 'when to,' and 'how to' spend taxpayers money on sex change operations," he would not allow NCSHP to provide coverage.  Ex. 48.  Defendants Folwell and Jones negotiated and

13

approved contracts for 2018 through 2021 health plans excluding coverage for gender-confirming health care.  ECF No. 85 ¶ 63; Exs. 8-9.

As NCSHP participants began appealing denials of coverage for hormone therapy under the Exclusion after 2017, BCBSNC—which handled the appeals—emailed NCSHP staff to complain that CVS was inaccurately denying the coverage in the first instance based on a lack of medical necessity, when it should instead be denied "based on the Plan's benefits, not based on lack of medical necessity."  Ex. 49.  The email noted that "the services associated with the treatment of gender dysphoria generally meet the statutory definition of medical necessity" in N.C. Gen. Stat. § 58-3-200(b), and the "pharmacy denials should be handled as lack of benefits, rather than lack of medical necessity."  *Id.*

## III.    THE STANDARD OF CARE FOR GENDER-AFFIRMING CARE.

Gender identity is a person's internal sense of one's sex, such as male or female. Ex. 23(a) ¶ 20; Ex. 24(a) ¶ 17; Ex. 25(a) ¶ 24; Ex. 27(a) ¶ 22; Ex. 26(a) ¶ 18.  Although most people are cisgender, meaning their gender identity matches their birth-assigned sex, transgender people have a gender identity that differs from their birth-assigned sex. Ex. 23(a) ¶ 19; Ex. 25(a) ¶ 25; *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 594 (4th Cir. 2020).  Left untreated, the dissonance between one's gender identity and birth-assigned sex can be associated with clinically significant distress or significant impairment of functioning.  Ex. 23, 84:16-85:7; Ex. 24, 18:12-16; Ex. 25, 17:18-22; Ex. 26, 18:25-19:6; Ex. 27, 18:5-19:4; Ex. 23(a) ¶ 24; Ex. 24(a) ¶ 18; Ex. 25(a) ¶¶ 29, 35; Ex.

14

27(a) ¶¶ 23, 38; Ex. 26(a) ¶ 62. The medical diagnosis for that incongruence and the attendant distress or impairment is gender dysphoria. Ex. 23, 84:16-85:7; Ex. 25, 18:4-6; Ex. 26, 19:12-17; Ex. 27, 18:5-19:4; Ex. 25(a) ¶¶ 29, 32; Ex. 27(a) ¶¶ 23-25; *Grimm*, 972 F.3d at 594-95. Being transgender is a normal variation of human development and "gender identity and gender incongruity … are not a matter of choice." Ex. 25(a) ¶ 69; Ex. 26(a) ¶ 21; *Grimm*, 972 F.3d at 594; *Kadel v. N.C. State Health Plan for Tchrs. & State Emps.*, 12 F.4th 422, 427 (4th Cir. 2021) (same).

The diagnosis of gender dysphoria is codified in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders-5th edition* ("DSM-5"). Ex. 23, 86:25-87:7; Ex. 27, 18:17-19:2; Ex. 23(a) ¶ 24; Ex. 25(a) ¶ 29; Ex. 27(a) ¶¶ 24-25; Ex. 26(a) ¶ 24. "Gender incongruence" also is codified as a diagnosis in the *International Classification of Diseases* (World Health Org. 11th revision). Ex. 26, 23:4; Ex. 25(a) ¶ 29; Ex. 26(a) ¶ 25.

The WPATH has continuously maintained *Standards of Care for the Health of Transgender, Transsexual, and Gender-Nonconforming People* ("WPATH Standards") since 1979, publishing its most recent update, Version 7, in 2012. Ex. 23(a) ¶ 33; Ex. 24(a) ¶ 21; Ex. 25(a) ¶ 36; Ex. 27(a) ¶ 26. The WPATH Standards "represent the consensus approach of the medical and mental health community … and *have been recognized by various courts, including this one, as the authoritative standards of care*." *Grimm*, 972 F.3d at 595 (emphasis added; collecting authorities); Ex. 25, 99:9-15; Ex. 23(d) ¶¶ 80, 101; Ex. 24(a) ¶ 21; Ex. 25(a) ¶¶ 36-37; Ex. 27(a) ¶ 27; Ex. 26(a) ¶ 27. In

15

addition, the Endocrine Society has published Guidelines for Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons ("Endocrine Society Guidelines"), which are consistent with the WPATH Standards.  Ex. 23(a) ¶ 33; Ex. 27(a) ¶ 28; Ex. 26(a) ¶ 28.

The AMA and other major health organizations recognize the WPATH Standards and Endocrine Society Guidelines as authoritative.  Ex. 23(d) ¶¶ 80, 101; Ex. 25(a) ¶ 37; Ex. 27(a) ¶ 27; Ex. 26(a) ¶ 27.  BCBSNC relies on the WPATH Standards and the Endocrine Society Guidelines in its Corporate Medical Policy.  Ex. 50, KADEL00316792.  "There are no other competing, evidence-based standards that are accepted by any nationally or internationally recognized medical professional groups." *Grimm*, 972 F.3d at 595-96 (citation omitted).

Under the WPATH Standards, treatment for gender dysphoria may involve counseling, hormone therapy, and surgery.  Ex. 23(a) ¶ 34; Ex. 25(a) ¶ 38; Ex. 27(a) ¶ 29. Medically necessary surgical procedures treat gender dysphoria by bringing a person's body into better alignment with their gender identity, Ex. 24(a) ¶ 19; Ex. 24(b) ¶ 28; Ex. 26(a) ¶ 45, and are similar to surgical procedures performed for other diagnoses.  Ex. 24(a) ¶¶ 27, 30-31; Ex. 24(b) ¶¶ 11, 21.  Hormone therapy specifically for transgender adolescents may include puberty-delaying treatment.  The beginning of puberty in transgender adolescents "is often a painful and sometimes traumatic experience" as their body develops sex characteristics that are incongruent with their gender identity.  Ex. 26(a) ¶ 40; *see also* Ex. 27, 82:4-22; *Grimm*, 972 F.3d at 595.  Puberty-delaying

16

treatment "essentially pauses puberty," so that an adolescent can undergo "a single, correct pubertal process" consistent with their gender identity.  Ex. 26(a) ¶¶ 40, 43; Ex. 26, 63:1-4; Ex. 27, 82:4-22.  "No medical care is initiated until *after* the onset of puberty," and care is provided based on "the youth's unique cognitive and emotional maturation and ability to provide a knowing and informed consent."  Ex. 25(a) ¶ 74; Ex. 26(a) ¶¶ 36, 44; *see also* Ex. 26, 42:23-43:3; Ex. 27(a) ¶ 31; *Grimm*, 972 F.3d at 596.

"The American Medical Association [], the Endocrine Society, the American Psychiatric Association, and the American Psychological Association all agree that medical treatment for gender dysphoria is medically necessary and effective."  Ex. 23(a) ¶ 32; Ex. 25(a) ¶¶ 42, 49, 106; Ex. 24(a) ¶ 41; Ex. 24(b) ¶ 52; ECF No. 131-2.  Accordingly, the "denial of gender affirming care is harmful to transgender people, as it exacerbates gender dysphoria and leads to negative health outcomes."  Ex. 25(a) ¶¶ 57, 106; Ex. 27(a) ¶ 38.

## ARGUMENT

## I.    THE EXCLUSION VIOLATES THE EQUAL PROTECTION CLAUSE.

An Equal Protection claim requires that a plaintiff demonstrate "he has been treated differently from others with whom he is similarly situated," facially or as "the result of intentional … discrimination."  *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001).  The undisputed facts show that the Exclusion—which prohibits coverage for "*gender* transformation" and "*sex* changes"—facially discriminates, obviating the need to show intent.  Exs. 8-9; *see Fletcher v. Alaska*, 443 F.Supp.3d 1024, 1027, 1030 (D.

17

Alaska 2020) (finding "facially discriminatory policy" where health plan excluded coverage for treatment "related to changing sex or sexual characteristics").

### A.     The Exclusion Discriminates Based on Sex.

As described above, the Exclusion's explicitly sex-based terms make plain that the discrimination here is based on sex.  In addition, *Bostock v. Clayton Cnty.*, 140 S.Ct. 1731 (2020), confirms that if an employer takes an adverse action against "a transgender person who was identified as a male at birth but who now identifies as a female," but treats more favorably "an otherwise identical employee who was identified as female at birth, the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth."  *Id.* at 1741-42.  This is what the Exclusion does.

Considering a similar exclusion in the Alaska state employee health plan, another district court granted the plaintiff summary judgment, finding that where the plan "covers vaginoplasty and mammoplasty surgery if it reaffirms an individual's natal sex, but denies coverage for the same surgery if it diverges from an individual's natal sex," that constitutes "discrimination because of sex."  *Fletcher*, 443 F.Supp.3d at 1030; *see also Boyden v. Conlin*, 341 F.Supp.3d 979, 995 (W.D. Wisc. 2018) (discrimination in coverage for vaginoplasty based on one's birth-assigned sex is a "straightforward" case of sex discrimination).

"[D]iscrimination against transgender people" also "punish[es] transgender persons for gender non-conformity, thereby relying on sex stereotypes."  *Grimm*, 972

18

F.3d at 608; *see also id.* at 608-09 (collecting authorities). Courts throughout the country, including this one, have found that healthcare discrimination against transgender people is rooted in impermissible stereotyping. *See, e.g.*, *Kadel v. Folwell*, 446 F.Supp.3d 1, 14 (M.D.N.C. 2020) (the Exclusion "tethers Plaintiffs to sex stereotypes which, as a matter of medical necessity, they seek to reject"); *Toomey v. Arizona*, No. 19-cv-00035, 2019 WL 7172144, at *5-6 (D. Ariz. Dec. 23, 2019) ("Discrimination based on the incongruence between natal sex and gender identity—which transgender individuals, by definition, experience and display—implicates … gender stereotyping …."); *Rumble v. Fairview Health Servs.*, No. 14-cv-2037, 2015 WL 1197415, at *2 (D. Minn. Mar. 16, 2015). A health plan exclusion for gender-confirming care thus "entrenches" the sex-stereotyped "belief that transgender individuals must preserve the genitalia and other physical attributes of their [birth-assigned] sex over not just personal preference, but specific medical and psychological recommendations to the contrary." *Boyden*, 341 F.Supp.3d at 997; *see also Flack v. Wis. Dep't of Health Servs.*, 328 F.Supp.3d 931, 951 (W.D. Wisc. 2018).

Additionally, discrimination based on gender transition is necessarily discrimination *because of* sex. *Schroer v. Billington*, 577 F.Supp.2d 293, 306-08 (D.D.C. 2008) (employer's "refusal to hire [plaintiff] after being advised that she planned to … undergo[] sex  reassignment surgery was literally discrimination because of … sex"); *Fabian v. Hosp. of Cent. Conn.*, 172 F.Supp.3d 509, 527 (D. Conn. 2016). The same is true here, because the Exclusion expressly prohibits coverage for "treatment

19

in conjunction with proposed gender *transformation*" and "sex *changes*."  Exs. 8-9

(emphasis added); *see also Flack*, 328 F.Supp.3d at 949.

###### B.   The Exclusion Discriminates Based on Transgender Status.

The Fourth Circuit has ruled that government classifications based on transgender

status bear all the hallmarks of heightened scrutiny and are "at least quasi-suspect."

*Grimm*, 972 F.3d at 610; *see also id.* at 611-13.  Here, there is no dispute that the

Exclusion discriminates based on transgender status.  *See Toomey*, 2019 WL 7172144, at

*6 (exclusion "singles out transgender individuals for different treatment" because

"transgender individuals are the only people who would ever seek gender reassignment

surgery").

###### C.   The Exclusion Fails Heightened Scrutiny.

Because the Exclusion is subject to heightened scrutiny, the burden shifts to

Defendants to show that it is substantially related to an important governmental interest.

*United States v. Virginia*, 518 U.S. 515, 533 (1996).  Defendants argue that the Exclusion

is justified for two reasons:  as a cost-saving measure and because there is a supposed

uncertainty about whether gender-affirming care is effective.  Ex. 1 Interrog. 1; Ex. 5

Interrog. 3.  But neither point comes close to carrying Defendants' burden under

heightened scrutiny.  To start, these are post-hoc justifications on which Defendants did

not actually rely upon when permitting the Exclusion to remain, so they are irrelevant.

*Virginia*, 518 U.S. at 533 (justifications must be "genuine, not hypothesized or invented

20

post hoc in response to litigation"). And Defendants are wrong on both points on the substance.

NCSHP's cost for gender-affirming care in 2017 was $404,609, which—compared to NCSHP's cash balance of over $1 billion in August 2018—is not even a drop in the bucket. Ex. 3 Interrog. 10; Ex. 5 Admis. 6; Ex. 11, 148:21-149:20; Ex. 11(a), PLANDEF0154481-82. Not surprisingly, NCSHP's Rule 30(b)(6) representative admitted that "the cost of this benefit is not going to break the Plan, never was, never will." Ex. 12, 104:17-19. And in any event, it is settled law that saving money does not justify discrimination, since a state may not "protect the public fisc by drawing an invidious distinction." *Mem'l Hosp. v. Maricopa Cnty.*, 415 U.S. 250, 263 (1974).

Defendants' "medical uncertainty" argument is also a post-hoc rationale—because NCSHP *did* provide coverage for gender-affirming care in 2017 based on medical necessity—and it is wrong on the merits too. Every legitimate professional medical organization agrees that treatment for gender dysphoria is medically necessary and effective, as evidenced by (among other things) the amicus brief filed by many of those organizations in this case. ECF No. 131-2. Courts have recognized this as well, as recently as this year. *See, e.g.*, *Brandt v. Rutledge*, 2021 WL 3292057, at *4 (E.D. Ark. Aug. 2, 2021) (enjoining ban on gender-affirming medical care for adolescents, concluding that "gender-affirming treatment is supported by medical evidence that has been subject to rigorous study," and noting that this is the view of "*every* major expert medical association").

21

### 1.    Purported cost savings cannot excuse invidious discrimination.

When NCSHP eliminated the Exclusion in 2016, it knew what the care would cost, decided to eliminate the Exclusion on that basis, and ultimately incurred costs precisely as predicted—in fact, at the lower end of Segal's prediction, which represented less than 0.027% of the premium.  Ex. 3 Interrog. 10; Ex. 5, Admis. 6; Ex. 36, PLANDEF006965.  The cost-saving rationale also is implausible given that any savings from denying this care would be negligible, if not "illusory."  *See Mem'l Hosp.*, 415 U.S. at 265 (delayed medical care can cause a patient needless deterioration, requiring more expensive future care and possibly causing disability, which can strain state social services).

Defendants' witnesses did not contradict these facts.  Testifying as NCSHP's 30(b)(6) designee, Ms. Jones offered: "I'll totally admit that the cost of this benefit is not going to break the Plan, never was, never will."  Ex. 12, 104:17-19.  Mr. Folwell was disclosed as a Rule 26(a)(2)(C) expert to testify about the Plan's "unfunded liability" and the general concerns of the plan's financial sustainability.  Ex. 10 at 2-3.  Nonetheless, even he admitted that he was "not sure there's a direct correlation between the unfunded liability and the exclusion."  Ex. 11, 192:9-10.  Additionally, minutes from the Board's December 1, 2016 meeting reflect that Financial Analyst Mark Collins advised the Board "that the State Health Plan Board is *not responsible* for the retiree health benefits liability ….  He reiterated that while some of the Plan's programs can affect the unfunded liability, the Board *doesn't have a responsibility* for the results."  Ex. 40,

22

PLANDEF0012812 (emphasis added).  NCSHP has also undertaken initiatives to address

its unfunded liability that—in contrast to the minimal cost of gender-affirming care—

save in some cases hundreds of millions of dollars.  Ex. 5 Interrog. 2; Ex. 12, 80:13-

82:10.

Moreover, even if cost was a factor—and it is not—a state may not "protect the

public fisc by drawing an invidious distinction."  *Mem'l Hosp.*, 415 U.S. at 263; *see also*

*Graham v. Richardson*, 403 U.S. 365, 374-75 (1971) (same); *Shapiro v. Thompson*, 394

U.S. 618, 633 (1969), *overruled in part on other grounds by Edelman v. Jordan*, 415 U.S.

651 (1974) (same).  Defendants must "do more than show" that denying equal coverage

to transgender people "saves money," *Shapiro*, 394 U.S. at 633—otherwise, this does

nothing "more than justify [the] classification with a concise expression of an intention to

discriminate."  *Plyler v. Doe*, 457 U.S. 202, 227 (1982).

## 2.    Medical consensus and FDA approval.

Gender-confirming medical care is both medically necessary and beneficial for

transgender people with gender dysphoria.  Ex. 29 at 12-10;[6] Ex. 23(a) ¶ 32; Ex. 25(a)

¶¶ 42, 49, 106; Ex. 24(a) ¶ 41; Ex. 24(b) ¶ 52.  Nonetheless, NCSHP has identified

"medical uncertainty" as a governmental interest, raising several purported justifications

for the "uncertainty."  Ex. 5 Interrog. 3.

---

[6]    Exhibit 29 is self-authenticating as a publication issued by a public authority, Fed. R.
Evid. 902(5), and is appropriate for judicial notice, *United States v. Doe*, 962 F.3d
139, 147 n.6 (4th Cir. 2020).

23

First, NCSHP claims that it "has not identified any valid, reliable, peer-reviewed longitudinal studies that support the efficacy" of this care. Ex. 5 Interrog. 3. The Fourth Circuit has already accepted the WPATH Standards as "the authoritative standards of care." *Grimm*, 972 F.3d at 595. So have medical and mental health organizations across the United States. Ex. 23(d) ¶¶ 80, 101; Ex. 25(a) ¶ 37; Ex. 27(a) ¶ 27; Ex. 26(a) ¶ 27. And in 2016, NCSHP itself determined that enough medical certainty existed to remove the Exclusion and cover treatment for gender dysphoria. Even now, under a new administration, NCSHP's Rule 30(b)(6) designee, Ms. Jones, admitted that such studies are "[n]ot necessarily" required because NCSHP takes a "holistic view" and there is "no single pathway to coverage." Ex. 12, 72:21-73:10. Nor does Ms. Jones believe NCSHP has searched for such studies. *Id.* 75:9-11. When Treasurer Folwell was asked about the basis for his October 25, 2018 statement claiming "medical uncertainty" about this care, he admitted that he is not a doctor or a subject matter expert. Ex. 11, 47:15, 64:1, 66:13-14, 167:8-13. Mr. Folwell "most relied on" Board member (and his personal physician) Dr. Peter Robie to form this view, *id.* 167:20-168:2, 170:8-17, but could not recall what Dr. Robie told him on this topic. *Id.* 170:24-171:2.

Dr. Robie admits he is not an expert in the diagnosis of gender dysphoria or its treatment, and has never diagnosed a patient with or treated a patient for gender dysphoria. Ex. 13, 11:12-23; *see also* Ex. 10 at 6 (disclosing that Dr. Robie "is not a specialist in the treatment of gender dysphoria, and the Defendants do not seek to qualify him as such"). Dr. Robie testified that the medical necessity of this care is a decision

24

made by the patient and provider, and did not know whether this care can be medically necessary.  Ex. 13, 36:11-37:2.

In her capacity as NCSHP's Rule 30(b)(6) designee, Ms. Jones alluded to "uncertainty on whether or not the treatments are effective," but admitted that "in some cases, maybe they are."  Ex. 12, 70:4-6.  Ms. Jones testified that in evaluating benefit changes, NCSHP "use[s] a lot of research from Blue Cross or CVS or our actuary," in addition to other sources.  *Id.* 18:19-19:5.  Ms. Jones also testified that she conducted her own research on medical necessity for "[s]everal hours" in 2017, and "[p]robably less" in 2018, but the "main go-tos" for information on this subject are BCBSNC, CVS, and Segal.  *Id.* 95:5-12, 97:14-19.  BCBSNC, however, has advised Ms. Jones and NCSHP repeatedly that this care is medically necessary. *See, e.g.*, Ex. 50 (BCBSNC Corporate Medical Policy covers the excluded care); Ex. 49 (email correspondence from BCBSNC to NCSHP explaining that excluded care meets the statutory definition of medical necessity); Ex. 46 (BCBSNC provided Ms. Jones with numerous "Scientific Background and Reference Sources" relied upon by BCBSNC when it decided to cover the excluded care).

Second, Defendants identified the lack of an "objective test" to determine who would benefit from treatment as a justification.  Ex. 5 Interrog. 3.  But when asked about the necessity of an objective test, Ms. Jones clarified that this would simply be "taken into consideration" as part of NCSHP's "holistic review," and conceded that NCSHP has not searched for any such test.  Ex. 12, 76:18-77:9.  Additionally, the Fourth Circuit has

25

recognized that "transgender people constitute a discrete group with immutable characteristics," defined by a gender identity different from their birth-assigned sex, and has recounted in detail the diagnostic criteria used to diagnose gender dysphoria. *Grimm*, 972 F.3d at 594-95, 612.

NCSHP's similar concern about accurately identifying minors who are transgender is unsupported. Under heightened scrutiny, only NCSHP's actual motivations matter to the analysis, and NCSHP's admitted lack of expertise in the area and scant "research" on the Internet cannot support this claim. Ms. Jones' own sources of preferred guidance cover this care for transgender adolescents. Ex. 12, 18:19-19:5, 95:5-12, 97:14-19; Ex. 43, PLANDEF0008648 (BCBSNC's policy on coverage for puberty-delaying medication). And binding authority in this Circuit recognized the Standards of Care as authoritative in the context of an adolescent who had received gender-affirming care for gender dysphoria. *Grimm*, 972 F.3d at 595-96, 598.

Third, Defendants cited a lack of FDA approval for hormonal treatment of gender dysphoria. Ex. 5 Interrog. 3. But not only is it "common for medications to be used 'off label' across all domains of medicine," Ex. 26(a) ¶ 96, the lack of FDA approval did not prevent NCSHP from covering this care during plan year 2017, and NCSHP's Rule 30(b)(6) designee admitted the Plan has covered other non-approved applications of medications. *See* Ex. 12, 107:17-19 (testifying that the Plan covered COVID care).[7]

---

[7]    *See Coronavirus Updates,* NCSHP (Mar. 23, 2021), https://perma.cc/F33T-K6UQ (indicating NCSHP coverage for COVID vaccines in March 2021); *FDA Approves*

Moreover, as Defendants' proffered experts admitted, it has been the FDA's position for at least three decades that physicians may prescribe drugs on an off-label basis.  *See*, *e.g.*, Ex. 28, 223:14-232:6; *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 351 (2001) ("off-label use is generally accepted").

Finally, NCSHP invoked the inability "to identify a reasonable metric to distinguish the benefits sought by Plaintiffs from other uncovered medical treatments that affect small groups within the overall Plan's population." Ex. 5 Interrog. 3.  But the metric that distinguishes the benefits at issue here is that they are chosen for exclusion on the basis of sex.  *Grimm*, 972 F.3d at 607; *Bostock*, 140 S. Ct. at 1737 (when an employer takes an adverse action against an employee for being transgender, "[s]ex plays a necessary and undisguisable role in the decision").  The Exclusion does not treat all plan participants equally, but instead denies coverage based on sex and transgender status for medically necessary care while cisgender participants receive coverage for the same care.

## II.    THE EXCLUSION VIOLATES THE AFFORDABLE CARE ACT.

Congress passed the ACA with the "aim[] to increase the number of Americans covered by health insurance" through the creation of "a comprehensive national plan to provide universal health insurance coverage" across the nation.  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538, 583 (2012).  Section 1557 imposes an obligation to

---

*First COVID-19 Vaccine*, FDA (Aug. 23, 2021), https://perma.cc/Z9UP-RK8M (announcing first FDA approval of a COVID vaccine in August 2021).  A "publication purporting to be issued by a public authority" is self-authenticating.  Fed. R. Evid. 902(5).

27

not discriminate by incorporating "Title IX … to prohibit discrimination based on sex in healthcare."  *C.P. by & through Pritchard v. Blue Cross Blue Shield of Ill.*, No. 3:20-CV-06145-RJB, 2021 WL 1758896, at \*4 (W.D. Wash. May 4, 2021).

A plaintiff states a claim under Section 1557 by alleging that (1) defendant is a healthcare program that receives federal financial assistance; and (2) plaintiff was subjected to discrimination in healthcare services; (3) on the basis of sex.  *See C.P.*, 2021 WL 1758896, at \*4.  Here, the undisputed facts show that Plaintiffs are entitled to judgment on this claim.

First, NCSHP is a "health program or activity, any part of which is receiving Federal financial assistance."  42 U.S.C. § 18116(a).  "By extending nondiscrimination protections to individuals under 'any health program or activity,' Congress clearly intended to prohibit discrimination by any entity acting within the 'health' system."  *Fain v. Crouch*, No. CV 3:20-0740, 2021 WL 2657274, at \*3 (S.D. W.Va. June 28, 2021).  Health insurance providers "implicate[] the health of persons falling within the scope of ACA protections," including an insurer who denies access to transgender participants, "by virtue of its authority to design health benefits."  *Id.*  Accordingly, as "the gatekeeper" to transgender participants' health coverage, an insurer like NCSHP "qualifies as a 'health program' that Congress intended to rid of discrimination."  *Id.*[8]  In

---

[8]    Such understanding is consistent with other definitions of "health program" and "health care" in the ACA, which refers to "health programs" and "health care entities" as including insurers and insurance plans in other provisions.  *See*, *e.g.*, 42 U.S.C. § 18051; 42 U.S.C. § 18113.

28

addition, NCSHP receives federal funding for its Retiree Drug Subsidy from HHS.  Ex. 5 Admis. 1 Interrog. 1.

Second and third, Plaintiffs have been subjected to discrimination in the provision of healthcare services on the basis of sex for all the reasons described above.[9]

## III.    THE EXCLUSION VIOLATES MS. CARAWAY'S RIGHTS UNDER TITLE VII.

### A.    The Exclusion Is Impermissible Sex Discrimination Under Title VII.

Title VII prohibits an employer from discriminating against an individual in the terms of employment "because of such individual's … sex."  42 U.S.C. § 2000e-2(a)(1). Health insurance constitutes an important part of one's compensation for employment. *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 682 (1983). Substantively, the Exclusion is sex discrimination under Title VII for exactly the same reasons it is under Title IX.  Under Title VII, a facially discriminatory policy may be justified only where "gender is a 'bona fide occupational qualification [("BFOQ")] reasonably necessary to the normal operation of the particular business or enterprise.'" *Price Waterhouse v. Hopkins*, 490 U.S. 228, 242 (1989) (alterations omitted) (quoting 42 U.S.C. § 2000e-2(e)); *see also Fletcher*, 443 F.Supp.3d at 1030-31 (finding facially discriminatory exclusion in state employee plan only justifiable by BFOQ).

However, where a case involves "the terms of a retirement [or fringe benefit] plan," the BFOQ defense "is inapplicable since the terms of a retirement [or fringe

---

[9]    The Fourth Circuit has now settled NCSHP's previous claims of immunity from suit. *Kadel*, 12 F.4th at 439.

29

benefit] plan have nothing to do with occupational qualifications." *Ariz. Governing Comm. for Tax Deferred Annuity & Deferred Comp. Plans v. Norris*, 463 U.S. 1073, 1084 n.13 (1983); *EEOC v. Fremont Christian Sch.*, 781 F.2d 1362, 1367 (9th Cir. 1986). Title VII only permits an employer to "hire and employ" based on sex in the narrow circumstances where sex is a BFOQ. 42 U.S.C. § 2000e-2(e)(1); *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 201 (1991) (BFOQ defense "reaches only special situations."); *see also Fletcher*, 443 F.Supp.3d at 1031. Accordingly, judgment should be entered for Ms. Caraway because the Exclusion cannot be justified by a BFOQ.

### B. Defendants' Finger-Pointing Does Not Allow Them to Evade Liability.

Ms. Caraway raises this claim against two defendants: DPS, as her employer; and NCSHP, as an agent of and joint employer with DPS. If one credits both Defendants' arguments, no one bears any liability at all for the Exclusion's facial discrimination. *See* ECF No. 64 at 9 (NCSHP's argument that "[l]iability for delegated decisions remains with the employer [DPS]"); ECF No. 96 ¶¶ 187-88 (denying that DPS "violated Title VII"). Defendants' positions are thus "untenable." *Boyden*, 341 F.Supp.3d at 997. The law does not permit this kind of evasion because Title VII does not allow "an employer who exercises actual control [to] avoid Title VII liability by hiding behind another entity." *Butler v. Drive Auto. Indus. of Am., Inc.*, 793 F.3d 404, 415 (4th Cir. 2015). DPS and NCSHP share liability under Title VII.

30

### 1.     DPS is liable as Ms. Caraway's employer.

DPS admits it is Ms. Caraway's employer.  ECF No. 96 ¶ 12.  Title VII "prohibits an employer from offering its employees" a discriminatory fringe benefits plan.  *Norris*, 463 U.S. at 1074 (per curiam).  DPS plays an extensive role in facilitating access to the discriminatory coverage.  To begin, "had [DPS] not hired" Ms. Caraway, she "would not have been permitted to enroll in the Plan at all."  *Kadel*, 446 F.Supp.3d at 10.  DPS also contributes $521.96 monthly to NCSHP for each employee, Ex. 7 Admis. 2, and employs the HBRs responsible for assisting with enrollment.  Ex. 6 Interrogs. 2-3(a); Ex. 12, 88:22-89:3.  DPS human resources staff enter information in the system so that premiums can be deducted from employees' salary; they also approve coverage changes due to qualifying life events.  Ex. 12, 90:19-24; Ex. 14, 14:18−16:22.  DPS also assists employees who lose coverage due to non-payment of the premium.  Ex. 6 Interrog. 3(b).

### 2.     NCSHP is liable as an agent of, and joint employer with, DPS.

NCSHP has violated Title VII for two reasons, and each independently establishes NCSHP's liability under the statute.

***First, NCSHP is an agent of DPS.***  Title VII defines "employer" to include the "agent" of one as well.  42 U.S.C. § 2000e(b).  The Supreme Court held nearly half a century ago that a government administrative board that implements a discriminatory fringe benefit may be sued as the "agent" of the government agency that provides the benefit to its employees.  *City of Los Angeles, Dep't of Water & Power v. Manhart*, 435 U.S. 702, 718 n.33 (1978).  This Court examined these principles when Plaintiffs moved

31

to add Ms. Caraway's Title VII claims to the complaint, finding that "Title VII's inclusion of 'agent' within its definition of 'employer' reinforces the principle that 'an employer can[not] avoid his responsibilities by delegating discriminatory programs to corporate shells.'" *Kadel v. Folwell*, No. 1:19-cv-272, 2021 WL 848203, at *6 (M.D.N.C. Mar. 5, 2021) (quoting *Manhart*, 435 U.S. at 718 n.33).

This is consistent with this Court's analysis in analogous cases. In *Crowder v. Fieldcrest Mills, Inc.*, 569 F.Supp. 825 (M.D.N.C. 1983), the Court considered claims by a plaintiff against her employer and its health plan administrator as an agent of the employer under Title VII. The plaintiff sued because the health plan offered more favorable health coverage to male employees for their spouses than to female employees. *Id.* at 826. *Crowder* explained that where the administrator served in merely an "advisory capacity" with no "significant control" over the plan terms, no agent relationship existed; but where an employer had delegated responsibility for fringe benefits, this "delegation of authority functionally resulted in the associations having control of an aspect of the terms and conditions of employment," thus rendering the administrator an "employer" by virtue of serving as the employer's agent. *Id.* at 827-28. Here, there is no dispute that NCSHP has significant control over the terms of the plan, which has been delegated to it by operation of law. N.C. Gen. Stat. § 135-48.2(a); Ex. 5 Admis. 12-14; ECF No. 96 ¶ 179. State employers such as DPS do not have control over the health insurance their employees receive, the plan terms, which third-party administrators are selected, or

32

whether the Exclusion remains in the plan—all of which NCSHP decides.  Ex. 14, 11:19–22, 14:7-17, 29:13-24.

Where a "delegation of authority functionally result[s]" in an entity like NCSHP "having control of an aspect" of employment such as insurance, the failure to impose liability on that agent means that "the purposes of Title VII … could be frustrated by employers delegating to such parties authority over terms and conditions of employment." *Crowder*, 569 F.Supp. at 828.  The Court should not permit NCSHP to succeed with that kind of frustration here.  *See also Boyden*, 341 F.Supp.3d at 998 (being empowered to administer health policies "forms a sufficient basis to hold [defendant liable] as an agent of the State and the ultimate employer").

***Second, NCSHP is a joint employer with DPS.***  The "joint employment doctrine is the law of [the Fourth] Circuit." *Butler*, 793 F.3d at 409.  This doctrine "serves Title VII's purpose of eliminating discrimination in employment based on … sex," *id.* at 410 (quote marks omitted), "prevent[ing] those who effectively employ a worker from evading liability by hiding behind another entity." *Id.*  Accordingly, "multiple entities may simultaneously be considered employers for the purposes of Title VII." *Id.*  The Court should hold that NCSHP is such an entity.

The Fourth Circuit uses a "hybrid test" to allow for "the broadest possible set of considerations in making a determination of which entity is an employer." *Id.* at 414.  Courts consider nine factors to determine whether an entity is a joint employer, but none is dispositive—and the Fourth Circuit instructs that "courts can modify the factors to the

33

specific industry context." *Id.*; *see also id.* at 415 ("the consideration of factors must relate to the particular relationship under consideration") (citation omitted). The principal guidepost, however, remains the common law element of control. *Id.* at 415. "Otherwise, an employer who exercises actual control could avoid Title VII liability by hiding behind another entity." *Id.*

There is no dispute that state law delegates control over health coverage to NCSHP, which exists solely to permit that delegation, as its enacting statute makes clear. N.C. Gen. Stat. § 135-48.2(a). NCSHP thus is a joint employer with DPS for the same reasons it is an agent of DPS. Where an entity "exhibit[s] a high degree of control over the terms of [] employment," it is liable as a joint employer. *Butler*, 793 F.3d at 415.

## IV. PLAINTIFFS SATISFY THE REQUIREMENTS FOR DECLARATORY AND INJUNCTIVE RELIEF.

Plaintiffs satisfy the requirements for declaratory relief. This case presents an "actual controversy," allowing the Court to "declare the rights of the parties." 28 U.S.C. § 2201(a).

Plaintiffs also satisfy the four criteria for permanent injunctive relief. First, the denial of Plaintiffs' constitutional rights constitutes irreparable harm. *See Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987). So does the denial and delay of healthcare. Ex. 25(a) ¶¶ 57, 106; Ex. 27(a) ¶ 38. Second, no monetary damages can restore Plaintiffs to their rightful position of being able to access medical care at the time they need it, or undo the deprivation of equal treatment under law. *See Walker*, 480 F.Supp.3d 417. Third, the balance of the hardships tips sharply in Plaintiffs' favor. NCSHP negotiates

34

reduced rates and covering Plaintiffs at those lower rates would save NCSHP and taxpayers money, instead of compensating Plaintiffs for the full price charged by providers without those negotiated discounts. Ex. 12, 47:11-48:4. Finally, "upholding constitutional rights surely serves the public interest." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002); *see also Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F.Supp.3d 1, 61 (D.D.C. 2020) ("There is clearly a robust public interest in safeguarding prompt access to health care.").

## CONCLUSION

Plaintiffs respectfully request that the Court grant them summary judgment on their constitutional claims, and partial summary judgment on their statutory claims; declare that the Exclusion violates Equal Protection, the ACA, and Title VII; and permanently enjoin Defendants from enforcing it.

Dated: December 20, 2021

Respectfully submitted,

/s/ Amy E. Richardson
Amy E. Richardson
N.C. State Bar No. 28768
Lauren E. Snyder
N.C. State Bar No. 54150
HARRIS, WILTSHIRE & GRANNIS LLP
1033 Wade Avenue, Suite 100
Raleigh, NC 27605-1155
Phone: 919-429-7386 | Fax: 202-730-1301
arichardson@hwglaw.com

Deepika H. Ravi*
Grace H. Wynn*
HARRIS, WILTSHIRE & GRANNIS LLP
1919 M Street N.W., 8th Floor,

Tara Borelli*
Carl S. Charles*
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
1 West Court Square, Ste. 105
Decatur, GA 30030
Telephone: 404-897-1880
Facsimile: 404-506-9320
tborelli@lambdalegal.org

Omar Gonzalez-Pagan*
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005

35

Washington, D.C. 20036
Phone: 202-730-1300 | Fax: 202-730-1301
dravi@hwglaw.com

Michael W. Weaver*
Adam M. Safer*
MCDERMOTT WILL & EMERY
444 W. Lake St., Suite 4000
Chicago, IL 60606
Phone: 312-984-5820 | Fax: 312-984-7700
mweaver@mwe.com

Dmitriy G. Tishyevich*
Warren Haskel*
MCDERMOTT WILL & EMERY
One Vanderbilt Avenue
New York, NY 10017-3852
Phone: 212-547-5534 | Fax: 646-417-7668
dtishyevich@mwe.com

Lauren H. Evans*
MCDERMOTT WILL & EMERY
One Vanderbilt Avenue
New York, NY 10017-3852
Phone: 202-756-8864 | Fax: 202-591-2900
levans@mwe.com

Telephone: 212-809-8585
Facsimile: 212-809-0055
ogonzalez-pagan@lambdalegal.org

David Brown*
Ezra Cukor*
TRANSGENDER LEGAL DEFENSE AND
EDUCATION FUND, INC.
520 8th Ave, Ste. 2204
New York, NY 10018
Telephone: 646-993-1680
Facsimile: 646-993-1686
dbrown@transgenderlegal.org

*Counsel for Plaintiffs*

\* Appearing by special appearance pursuant to L.R. 83.1(d).

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief is in compliance with the Court's Order entered December 10, 2021 at ECF No. 176 because the body of this brief, including headings and footnotes, does not exceed 9,000 words as indicated by Microsoft Word, the program used to prepare this document.

Dated:  December 20, 2021

/s/ Amy E. Richardson
Amy E. Richardson
N.C. State Bar No. 28768
HARRIS, WILTSHIRE & GRANNIS LLP
1033 Wade Avenue, Suite 100
Raleigh, NC 27605-1155
Telephone: 919-429-7386
Facsimile: 202-730-1301
arichardson@hwglaw.com

## CERTIFICATE OF SERVICE

I certify that the foregoing document was filed electronically with the Clerk of

Court using the CM/ECF system which will send notification of such filing to all

registered users.

Dated:  December 20, 2021

/s/ Amy E. Richardson
Amy E. Richardson
N.C. State Bar No. 28768
HARRIS, WILTSHIRE & GRANNIS LLP
1033 Wade Avenue, Suite 100
Raleigh, NC 27605-1155
Telephone: 919-429-7386
Facsimile: 202-730-1301
arichardson@hwglaw.com

# DECLARATION OF MAXWELL KADEL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MAXWELL KADEL, *et al.*,

        *Plaintiffs*,

v.

DALE FOLWELL, in his official capacity as
State Treasurer of North Carolina, *et al.*,

        *Defendants*.

No. 1:19-cv-00272-LCB-LPA

**DECLARATION OF MAXWELL KADEL**

I, Maxwell Kadel, hereby state as follows:

    1.    I am a plaintiff in the above-captioned action. I have actual knowledge of the matters stated in this declaration.

    2.    I am a 38-year-old transgender man. I was employed by the University of North Carolina at Chapel Hill ("UNC") from October 2016 to November 2019. After working for a different employer since November 2019, I returned to work at UNC in October 2021. I live in Chapel Hill, North Carolina.

    3.    I was designated female at birth but have a male gender identity. I live all aspects of my life in accordance with my male gender identity.

    4.    I began working with the UNC School of Government in October 2016, where I worked as an Administrative Support Associate until I accepted another job opportunity outside the University system in November 2019. In October 2021, I returned to UNC as a Software Applications Developer in the UNC University Libraries system.

1

5.    While working at the UNC School of Government, as a North Carolina state employee, I was enrolled in the North Carolina State Health Plan for Teachers and State Employees ("NCSHP"), and I received health care benefits from this plan as part of my compensation. I contributed each month to the plan via a paycheck deduction.

6.    I have struggled with gender dysphoria since childhood, and was diagnosed with gender dysphoria at the age of 33.

7.    As part of my prescribed treatment for gender dysphoria, I began hormone therapy in June 2016.

8.    While I was working at the UNC School of Government, I lived with significant distress caused by gender dysphoria. This included distress and anxiety about how people treated me with regard to my gender, and discomfort with my physical appearance and with being seen as a woman.

9.    Because of the NCSHP's categorical Exclusion of coverage for gender-confirming health care, my insurance did not cover my hormone therapy and I was forced to pay for it out of pocket.

10.    On October 29, 2018, CVS issued a Notice of Determination ("ND") denying prior authorization for coverage of my testosterone prescription. A true and correct copy of the ND is attached as Exhibit A. The ND explained that the prescription would only be covered for males with "primary or hypogonadotropic hypogonadism," and that because my "use of this drug d[id] not meet th[is] requirement," it would not be covered. Exhibit A at 2 (KADEL00313153).

2

11.    In 2017, after the NCSHP eliminated the Exclusion, I considered pursuing chest surgery to create a more typically masculine chest, but decided to wait and see whether hormone therapy would be sufficient to relieve my gender dysphoria.

12.    In 2018, in consultation with my health care providers, I determined that chest surgery was necessary to alleviate my gender dysphoria, and was ready to move forward with further consultations leading to surgery. I then discovered that the NCSHP had reinstated the Exclusion, effective January 1, 2018, in all of its health plans.

13.    After the Exclusion was reinstated in 2018, I was deprived of insurance coverage for medically necessary hormone therapy and gender-confirming surgical care. I paid out-of-pocket for hormone therapy. During that time, to lessen the financial burden of paying out-of-pocket for testosterone every month, I often rationed and used vials of testosterone past the expiration date.

14.    I also had to forgo chest surgery, which caused me to experience significant gender dysphoria-related distress on a daily basis. I wore a binder to compress my chest, but it caused me physical discomfort and breathing difficulties. I also have asthma, which was exacerbated by having to bind my chest because I could not obtain a permanent medically necessary solution through surgery.

15.    Eventually, I was able to save enough to undergo chest surgery in February 2021. Although the expense for surgery was substantial for me as an individual paying out-of-pocket—$10,525—surgery brought significant relief from my gender dysphoria and

3

the physical discomfort I had felt with my body. I now feel much more comfortable with my body.

16.    Because I have returned to work at UNC, the Exclusion also prohibits me from seeking future medically necessary gender-confirming health care, such as ongoing hormone therapy and additional surgery I may need.

I declare under the penalty of perjury that the foregoing is true and correct.

DATED: 11/24/2021                    _Max Kadel_
                                     Maxwell Kadel

Subscribed and sworn before me, a Notary Public in and for the ORANGE COUNTY,

State of NORTH CAROLINA , this 24 day of NOVEMBER , 2021.



_____
Signature of Notary
Kyle F Hoopes
EXP: JANUARY 27, 2023

4

## CERTIFICATE OF SERVICE

I certify that the foregoing document was filed electronically with the Clerk of Court

using the CM/ECF system which will send notification of such filing to all registered users.

Dated: November 30, 2021

/s/ Amy E. Richardson
Amy E. Richardson
N.C. State Bar No. 28768
HARRIS, WILTSHIRE & GRANNIS LLP
1033 Wade Avenue, Suite 100
Raleigh, NC 27605-1155
Telephone: 919-429-7386
Facsimile: 202-730-1301
arichardson@hwglaw.com

*Counsel for Plaintiffs*

5

# Exhibit A



# Fax Transmittal

**To:** MEMBER

**From:** CVS Caremark® Prior Authorization

| Electronically (ePA) | Phone | Fax |
|---|---|---|
| (4 to 5 **minutes** process time) | (10 to 15 **minutes** process time) | (24 to 72 **hours** process time) |
| ePA is CVS Caremark's preferred method for receiving prior authorizations and now accepts PA requests online 24/7.<br><br>**Easier:** Reduce the need for paper forms, faxes, and phone calls<br><br>**More Convenient:** Centrally manage ePAs and more easily view their status<br><br>**Faster:** Generally receive faster determinations so patients can fill their medication sooner<br><br>**Visit http://info.caremark.com/ePA to learn more and get started today.** | Calling us with your PA request during our business hours is another option. **See next page for the specific phone number.**<br><br>The process over the phone can take between 10 and 15 minutes.<br><br>OR see ePA option | You may also continue to fax us your PA request. **See next page for specific fax number.**<br><br>Faxes received are processed within 24 to 72 hours.<br><br>OR see ePA option |

If this fax is in response to an inquiry about clinical criteria for coverage of a prescription drug for your patient, the criteria for the specific drug is attached.
Please note that your inquiry does not constitute a request for coverage. CVS Caremark cannot process a request for coverage until we receive a completed criteria form or appropriate clinical information.

The recipient of this fax may make a request to opt-out of receiving telemarketing fax transmissions from CVS Caremark. There are numerous ways you may opt-out: The recipient may call the toll-free number at 877-265-2711 and/or fax the opt-out request to 401-652-0893, at any time, 24 hours a day/7 days a week. The recipient may also send an opt-out request via email to do_not_call@cvscaremark.com. An opt out request is only valid if it (1) identifies the number to which the request relates, and (2) if the person/entity making the request does not, subsequent to the request, provide express invitation or permission to CVS Caremark to send facsimile advertisements to such person/entity at that particular number. CVS Caremark is required by law to honor an opt-out request within thirty days of receipt. The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Thank you, CVS Caremark.
91-41319A  062917

 

### Notice of Determination

Date: 10/29/2018

MAXWELL KADEL

███████████████████████

Plan Member Name: MAXWELL KADEL
Plan Member ID: ******███
Plan Name: North Carolina State Health Plan 0274 Non-Grandfathered

Prescriber Name: QUANG PHAM
Prescriber Phone: 1-9199428741
Prescriber Fax: 1-9199421473

Dear MAXWELL KADEL:

CVS Caremark® received a request from your provider for coverage of Testosterone Cypionate IM Injection. The request was denied because:

Your plan approved Testosterone Products criteria covers this drug when you have primary or hypogonadotropic hypogonadism. Your use of this drug does not meet the requirement. This is based on the information we have.

You can ask for a free copy of the actual benefit provision, guideline, protocol or other similar criterion used to make the decision and any other information related to this decision by calling Customer Care at **1-888-321-3124**.

For more information regarding your prescription benefit, please refer to your Benefit Booklet available on the Plan's website at **www.shpnc.org**.

If your provider would like to discuss this decision with a clinical reviewer at CVS Caremark, your provider can call CVS Caremark, and we will make arrangements for the conversation.

You may request an appeal by sending a written request to the address below. To be eligible for an appeal, your request must be in writing and received within 180 days of the date of this letter. Please mail or fax your appeal to:

> Blue Cross/Blue Shield of North Carolina
> Appeals Department / Level I
> PO Box 30055
> Durham, NC 27702
> Fax: 1-919-765-2322

This document contains references to brand-name prescription drugs that are trademarks or registered trademarks of pharmaceutical manufacturers not affiliated with CVS Caremark.
Your privacy is important to us. Our employees are trained regarding the appropriate way to handle your private health information.
91-40230B  032318                                                          TDD/TTY: 1-800-863-5488

If your situation is urgent as defined by law, you may ask for an expedited appeal. Important information about your appeal rights and directions about how to ask for an appeal are provided with this letter.

If you have questions, please call Customer Care at **1-888-321-3124**.

Sincerely,

CVS Caremark

Enclosures

cc: Dr. QUANG PHAM


PA# North Carolina State Health Plan 0274 Non-Grandfathered 18-035548880 AG
Plan-approved Criteria:  Testosterone Products
Claim Amount (if available):
Service Date:  10/25/2018 10:23:25 AM

If your provider included diagnosis or treatment codes with your claim for Testosterone Cypionate IM Injection to CVS Caremark, that information is listed here:
ICD diagnosis code:  E34.9
Associated diagnosis:  Endocrine disorder, unspecified
CPT treatment code:
Associated treatment:
You may wish to contact your provider for more information about these codes.

This document contains references to brand-name prescription drugs that are trademarks or registered trademarks of pharmaceutical manufacturers not affiliated with CVS Caremark.
Your privacy is important to us. Our employees are trained regarding the appropriate way to handle your private health information.
91-40230B   032318                                                                          TDD/TTY: 1-800-863-5488

## Important Information About Your Appeal Rights

**What if I need help understanding this denial?** You may contact CVS Caremark by calling **1-800-294-5979** if you need assistance understanding this notice or our decision to deny you a service or coverage.

**What options does my provider have?** If there is relevant information that has not been previously submitted, the treating physician may request a Provider Courtesy Review (PCR) by calling **1-800-446-8053 extension 52961** or by sending a written request within 180 days to:

> Blue Cross/Blue Shield of North Carolina
> Appeals Department / Provider Courtesy Review
> PO Box 30055
> Durham, NC 27702

**What if I don't agree with this decision?** You may request an appeal by sending a written request to the address below. To be eligible for an appeal, your request must be in writing and received within 180 days of the date of this letter.

> Blue Cross/Blue Shield of North Carolina
> Appeals Department / Level I
> PO Box 30055
> Durham, NC 27702

A member appeal form is available on the Web at **www.BCBSNC.com**.

**What if my situation is urgent?** If your situation meets the legal definition of urgency, the review of your claim will be conducted within 72 hours, or earlier if required by law. Generally, an urgent situation is one in which your health may be in serious jeopardy or, in the opinion of your physician, you may experience pain that cannot be adequately controlled while you wait for a decision on the external review of your claim. If you believe that your situation is urgent, you or your physician may request an expedited appeal by contacting BCBSNC via mail or fax at the address below. In addition, you may have the ability to seek an expedited external review of your adverse benefit determination. To determine whether an external review process is available to you, please consult your benefit booklet or call BCBSNC customer service on the back of your ID Card.

> Blue Cross/Blue Shield of North Carolina
> Appeals Department / Level 1
> PO Box 30055
> Durham, NC 27702
> Fax: 1-919-765-2322

This document contains references to brand-name prescription drugs that are trademarks or registered trademarks of pharmaceutical manufacturers not affiliated with CVS Caremark.
Your privacy is important to us. Our employees are trained regarding the appropriate way to handle your private health information.
91-40230B  032318                                                         TDD/TTY: 1-800-863-5488

**Who may file an appeal?** You or someone whom you name to act for you (your authorized representative) may file an appeal. A member consent form is attached for your convenience and is also available on our Web site at **www.BCBSNC.com**.

**Can I provide additional information about my appeal?** Yes. As part of the appeal process, you have the right to submit supporting materials in advance of a decision being made on your appeal.

**What happens next?** If you appeal, BCBSNC will review the decision and provide you a written determination within 30 calendar days. If the adverse benefit determination is overturned, BCBSNC will provide coverage or payment for your health care item or service. If the adverse benefit determination is upheld, you may have additional appeal rights.

**How do I file a request for external review?** You may be eligible for an external review process. To determine whether an external review process is available to you, please consult your benefit booklet or call BCBSNC customer service on the back of your ID card.

**What other remedies do I have?** Depending on your plan, you may also have the right to bring action under section 502(a) of ERISA. You and your plan may have other voluntary alternative dispute resolution options, such as mediation. One way to find out what may be available is to contact your local U.S. Department of Labor office and your state insurance regulatory agency.

**Can I request copies of information relevant to my adverse benefit determination?** Yes. You may request and receive, at no cost to you, reasonable access to and copies of all documents, records and other information relevant to your claim by writing to:

> Blue Cross and Blue Shield of North Carolina
> Healthcare Management & Operations
> P. O. Box 2291
> Durham, NC 27702

This information may also include the following:
- Any internal rules, guidelines, protocols, or other criteria used to make this decision, including any clinical review criteria indicated above (please include the referenced medical policy from page 1 of this notice with your request); and/or
- If the decision is based on medical necessity, experimental treatment or another similar exclusion, an explanation of the scientific or clinical judgment for the determination, applied to your medical circumstances.

**Other resources to help you:** For questions about your rights, this notice, or for assistance, you can contact the Employee Benefits Security Administration at **1-866-444-EBSA (3272)**. You may also receive assistance with appeals from Smart NC by contacting:

This document contains references to brand-name prescription drugs that are trademarks or registered trademarks of pharmaceutical manufacturers not affiliated with CVS Caremark.
Your privacy is important to us. Our employees are trained regarding the appropriate way to handle your private health information.
91-40230B  032318                                                              TDD/TTY: 1-800-863-5488

**JA334**

North Carolina Department of Insurance
Health Insurance Smart NC
1201 Mail Service Center
Raleigh, NC 27699-1201
**1-855-408-1212** (toll-free)

**External Review**
North Carolina law provides for review of *adverse benefit determinations* by an external, independent review organization (IRO). The North Carolina Department of Insurance (NCDOI) administers this service at no charge to you, arranging for an IRO to review your case once the NCDOI establishes that your request is complete and eligible for review. *BCBSNC* will notify you of your right to request an external review each time you receive:
· An *adverse benefit determination*, or
· An appeal decision upholding an *adverse benefit determination* or
· A second-level *appeal* decision upholding an *adverse benefit determination*.

You or someone whom you have authorized to represent you may request an external review.

In order for your request to be eligible for an external review, the NCDOI must determine the following:
· Your request is about a *medical necessity* determination that resulted in an *adverse benefit determination (i.e., a noncertification)*;
· You had coverage with *BCBSNC* when the *adverse benefit determination* was issued;
· The service for which the *adverse benefit determination* was issued appears to be a *covered service*; and
· You have exhausted *BCBSNC's* internal *appeal* review process as described below.

For a standard external review, you will have exhausted the internal *appeal* review process if you have:
· Completed *BCBSNC's* first- and second-level *appeal* review and received a written second-level determination from *BCBSNC*, or
· Filed a second-level *appeal* and have not requested or agreed to a delay in the second-level *appeal* process, but have not received *BCBSNC's* written decision within 60 days from the date that you can demonstrate that an appeal was filed with BCBSNC, or
· received written notification that *BCBSNC* has agreed to waive the requirement to exhaust the internal *appeal* and/or second-level *appeal* process.

External reviews are performed on a standard or expedited basis, depending on which is requested and on whether medical circumstances meet the criteria for expedited review.

This document contains references to brand-name prescription drugs that are trademarks or registered trademarks of pharmaceutical manufacturers not affiliated with CVS Caremark.
Your privacy is important to us. Our employees are trained regarding the appropriate way to handle your private health information.
91-40230B   032318                                                    TDD/TTY: 1-800-863-5488

**Standard External Review**

For all requests for a standard external review, you must file your request with the NCDOI within 120 days of receiving one of the notices listed above.

If the request for an external review is related to a retrospective *adverse benefit determination* (an *adverse benefit determination* that occurs after you have already received the services in question), the 60-day time limit for receiving *BCBSNC's* second-level determination does not apply. You will not be eligible to request an external review until you have exhausted the internal appeal process and have received a written second-level determination from *BCBSNC*.

**Expedited External Review**

An expedited external review may be available if the time required to complete either an expedited internal first- or second-level appeal review or a standard external review would reasonably be expected to seriously jeopardize your life or health or to jeopardize your ability to regain maximum function. If you meet this requirement, you may file a request to the NCDOI for an expedited external review, after you receive:

- An *adverse benefit determination* from *BCBSNC* and have filed a request with *BCBSNC* for an expedited first-level appeal; or
- A first-level appeal decision upholding an *adverse benefit determination* and have filed a request with *BCBSNC* for an expedited second-level *appeal* review; or
- A second-level *appeal* review decision from *BCBSNC*.

In addition, prior to your discharge from an inpatient facility, you may also request an expedited external review after receiving a first-level appeal or second-level appeal decision concerning an adverse benefit determination of the admission, availability of care, continued stay or emergency health care services.

If your request is not accepted for expedited review, the NCDOI may (1) accept the case for standard external review if you have exhausted the internal appeal review process; or (2) require the completion of the internal appeal review process and another request for an external review. An expedited external review is not available for retrospective adverse benefit determinations.

When processing your request for external review, the NCDOI will require you to provide the NCDOI with a written, signed authorization for the release of any of your medical records that need to be reviewed for the purpose of reaching a decision on the external review. For further information about external review or to request an external review, contact the NCDOI at:

This document contains references to brand-name prescription drugs that are trademarks or registered trademarks of pharmaceutical manufacturers not affiliated with CVS Caremark.
Your privacy is important to us. Our employees are trained regarding the appropriate way to handle your private health information.
91-40230B   032318                                    TDD/TTY: 1-800-863-5488

(Mail)
By Mail:
NC Department of Insurance
Health Insurance Smart NC
1201 Mail Service Center
Raleigh, NC 27699-1201
Toll-Free Telephone: **1-855-408-1212**
**www.ncdoi.com/smart**

(In person)
For the physical address for Health Insurance Smart NC, please visit the web-page:
**http://www.ncdoi.com/Smart**
Toll-Free Telephone: **1-855-408-1212**

The Healthcare Review Program provides consumer counseling on utilization review and appeal issues. Within ten business days (or, for an expedited review, within three business days) of receipt of your request for an external review, the NCDOI will notify you and your provider of whether your request is complete and whether it has been accepted. If the NCDOI notifies you that your request is incomplete, you must provide all requested, additional information to the NCDOI within 150 days of the written notice from BCBSNC upholding an adverse benefit determination (generally the notice of a second-level appeal review decision), which initiated your request for an external review. If the NCDOI accepts your request, the acceptance notice will include: (i) name and contact information for the IRO assigned to your case; (ii) a copy of the information about your case that BCBSNC has provided to the NCDOI; and (iii) a notification that you may submit additional written information and supporting documentation relevant to the initial adverse benefit determination to the assigned IRO within seven days after the receipt of the notice. It is presumed that you have received written notice two days after the notice was mailed. Within seven days of BCBSNC's receipt of the acceptance notice (or, for an expedited review, within the same business day), BCBSNC shall provide the IRO and you, by the same or similar expeditious means of communication, the documents and any information considered in making the adverse benefit determination, appeal decision or the second-level appeal review decision. If you choose to provide any additional information to the IRO, you must also provide that same information to BCBSNC at the same time and by the same means of communication (e.g., you must fax the information to BCBSNC if you faxed it to the IRO). When sending additional information to BCBSNC, send it to:

(Mail)
Blue Cross/Blue Shield of North Carolina
Appeals Department
PO Box 30055
Durham, NC  27702

This document contains references to brand-name prescription drugs that are trademarks or registered trademarks of pharmaceutical manufacturers not affiliated with CVS Caremark.
Your privacy is important to us. Our employees are trained regarding the appropriate way to handle your private health information.
91-40230B  032318                                                                TDD/TTY: 1-800-863-5488

**Questions? Do you need help in a different language or format?** If you do not speak English or have special needs, oral interpretation and alternate formats of this notice are available, as is other assistance, by contacting us at the number on your State Health Plan ID card.

**Spanish:**
Si usted necesita asistencia o necesita hablar con alguien en Español, por favor llame al número gratuito de Servicio al Cliente ubicado en su tarjeta de identificación de beneficios.

**Chinese (simplified):**
如果您需要帮助，或需要同中国人讲话，请拨打您的福利卡上面的客户服务免费电话号码。

**Tagalog:**
Kung kailangan ninyo ng tulong o kailangan ninyong makipag-usap sa isang tao sa Tagalog, mangyari lamang na tumawag nang walang-bayad sa Serbisyo sa Kostumer sa numero na nakasulat sa inyong ID kard ng benepisyo.

**Navajo:**
Shíka at'ohwol ei doodaii' dinék'ehgo lą bi'chį haadeedziih nínízinígo, t'áá shǫǫdí, t'áá jíík'e ya ndaalníshí, ni naaltsoos bikáa'gi bi'chį hodiilniih.

This document contains references to brand-name prescription drugs that are trademarks or registered trademarks of pharmaceutical manufacturers not affiliated with CVS Caremark.
Your privacy is important to us. Our employees are trained regarding the appropriate way to handle your private health information.
91-40230B  032318                                                    TDD/TTY:  1-800-863-5488

USCA4 Appeal: 22-1721    Doc: 41-1    Filed: 08/31/2022    Pg: 364 of 632

This document contains references to brand-name prescription drugs that are trademarks or registered trademarks of pharmaceutical
manufacturers not affiliated with CVS Caremark.
Your privacy is important to us. Our employees are trained regarding the appropriate way to handle your private health information.
91-40230B  032318                                                    TDD/TTY: 1-800-863-5488

## Activity Report

| Date/Time | 10−29−2018 | 05:29:33 p.m. | Transmit Header Text | |
|---|---|---|---|---|
| Local ID 1 | 0000000000 | | Local Name 1 | 000 |

Completed Jobs : 1

| No. | Job | Remote Station | Start Time | Duration | Pages | Line | Mode | Job Type | Results |
|---|---|---|---|---|---|---|---|---|---|
| 001 | 402 | CVS Caremark | 05:24:06 p.m. 10−29−2018 | 00:05:04 | 10/10 | 1 | EC | HR | CP2400 |

Abbreviations:

| | | | | |
|---|---|---|---|---|
| HS: Host send | PL: Polled local | MP: Mailbox print | CP: Completed | TS: Terminated by system |
| HR: Host receive | PR: Polled remote | RP: Report | FA: Fail | G3: Group 3 |
| WS: Waiting send | MS: Mailbox save | FF: Fax Forward | TU: Terminated by user | EC: Error Correct |

# DECLARATION OF CONNOR THONEN-FLECK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| MAXWELL KADEL, *et al.*, | No. 1:19-cv-00272-LCB-LPA |
| *Plaintiffs*, | |
| v. | **DECLARATION OF CONNOR THONEN-FLECK** |
| DALE FOLWELL, in his official capacity as State Treasurer of North Carolina, *et al.*, | |
| *Defendants*. | |

Pursuant to 28 U.S.C.§ 1746, I hereby declare as follows:

1.      I am a plaintiff in the above-captioned action.  I have actual knowledge of the matters stated in this declaration.

2.      I am a 19-year-old man.

3.      I am also transgender.  This means that although I was designated "female" at birth, I have a male gender identity.

4.      I am a college sophomore at the North Carolina State University.  I have long been passionate about veterinary science, and am currently working on a double-major in Animal Science and Biochemistry to prepare for veterinary school.

5.      I struggled with gender dysphoria since childhood.  I demonstrated stereotypically masculine tendencies and characteristics from a young age.  But until I began to transition, I was in serious and increasing distress, to the point that I experienced

1

suicidal ideation because of untreated gender dysphoria. Ultimately, I came out as transgender to my family and explained my need to transition.

6.      My family and I did some research and learned that there were medical professionals we could consult with about the proper treatment for me. I initially began seeing a psychiatrist and therapist. By the time I was 15 years old, I had socially transitioned and was living in my authentic male gender identity in all aspects of my life.

7.      In January of 2018, I began hormone therapy as part of treatment for my gender dysphoria. I did not undertake this decision lightly, and had been considering hormone therapy for many months prior to initiating that care. My doctors provided information so that my parents and I could make an informed decision that was right for me regarding whether to receive hormones. My parents both believed, based on my symptoms of gender dysphoria, and the advice and expertise of my treating doctors, that hormone therapy was the best treatment option for me. In fact, it was life-changing for me, and the anxiety and depression I had experienced without treatment began to lift.

8.      I continued my transition so that all aspects of my life were aligned with my male gender identity. In March of 2018, I obtained a legal name and gender marker change and subsequently obtained a corrected birth certificate and driver's license.

9.      Although counseling, hormone therapy, and social transition significantly improved my quality of life, I still experienced significant gender dysphoria on a daily basis because I did not have a typically male chest.

2

10.    As part of treatment for my gender dysphoria, my health care providers recommended chest surgery that would give me a more typical male chest.  This surgery was medically necessary, including to bring my body into better alignment with my gender identity and lived experience and further reduce my symptoms of gender dysphoria.

11.    My father, Jason Fleck, is a North Carolina state employee, and is enrolled for health coverage through NCSHP.  As my father's dependent, I also am enrolled in health coverage through NCSHP.

12.    In 2018, my father and I were both enrolled in the 80/20 Health Plan offered through NCSHP.  My father and I struggled after that point to obtain coverage of my required office visits to my endocrinologist, who prescribes and monitors my masculinizing hormone therapy.  My understanding is that because I received that care in connection with my gender dysphoria, insurance coverage for those visits has been inconsistent, and in some instances denied.  Where coverage has been denied, my father and I have been left with full financial responsibility for the cost of the care.

13.    My family and I have done our best to access medically necessary health care, but paying out-of-pocket for health care that has been denied under the plan has been an emotional and financial burden on me and my parents.  This became even more stressful after we had to pay out-of-pocket for chest surgery for me, since living indefinitely without it had become unbearable for me.

14.    Before obtaining that surgery, I lived with daily distress caused by not having a typically male chest, and urgently required gender-confirming surgery to treat my

3

symptoms of gender dysphoria.  My parents and I could not easily afford to pay for the surgery out of pocket, as it imposed a financial hardship on us.  As a result, even with my full academic workload, I took on a part-time job during high school in an effort to earn and save money so that I could contribute to the out-of-pocket costs for my surgery.  This mean that, as a 16-year-old, I needed to work a job in addition to my schoolwork so that I could help pay for my own medical care.

15.    My family witnessed my daily distress due to my inability to access health insurance coverage for medically necessary care and were worried about the effects my untreated gender dysphoria had on my mental and physical health, my education, and my future plans.

16.    We finally saved enough for me to undergo surgery on May 28, 2019.  Although shouldering that expense was stressful for me and my parents, I felt like my life was opening up, and I was much more at ease with myself and with other people in social situations.  The relief the surgery provided me from my gender dysphoria was critical for my ongoing development and functioning as a young adult.

17.    I require ongoing access to hormone therapy as treatment for gender dysphoria.  I also anticipate needed additional surgery in the future, including for example a hysterectomy.  Without access to health coverage, however, it is difficult to imagine when I can afford that surgery on my own.

4

I declare under the penalty of perjury that the foregoing is true and correct.

Dated: November ___15th___, 2021



Connor Thonen-Fleck

State of Texas

County of Tarrant

ANDREW L. HARRIS
Notary Public
STATE OF TEXAS
NOTARY ID 13248203-5
My Comm. Exp. 5/18/2024

This notarial act was an online notarization

Sworn and subscribed before me on November 15, 2021 by Connor Thonen-fleck. This notarial act was an online notarization.

5

**CERTIFICATE OF SERVICE**

I certify that the foregoing document was filed electronically with the Clerk of Court

using the CM/ECF system which will send notification of such filing to all registered users.

Dated: November 30, 2021

/s/ Amy E. Richardson
Amy E. Richardson
N.C. State Bar No. 28768
HARRIS, WILTSHIRE & GRANNIS LLP
1033 Wade Avenue, Suite 100
Raleigh, NC 27605-1155
Telephone: 919-429-7386
Facsimile: 202-730-1301
arichardson@hwglaw.com

*Counsel for Plaintiffs*

6

# DECLARATION OF JASON FLECK

E        E        A E
E M        E                                    A              A

|  |  |
|---|---|
| MAXWELL KADEL, *et al.*, | No. 1:19-cv-00272-LCB-LPA |
| *Plaintiffs*, | |
| v. | E    A  A              A |
| DALE FOLWELL, in his official capacity as State Treasurer of North Carolina, *et al.*, | E |
| *Defendants*. | |

Pursuant to 28 U.S.C.§ 1746, I hereby declare as follows:

1.      I am a plaintiff in the above-captioned action.  I have actual knowledge of the matters stated in this declaration.

2.      I am the father of Plaintiff Connor Thonen-Fleck, a 19-year-old transgender man.  I am an employee of the University of North Carolina, Greensboro ("UNCG"), and Connor receives health coverage as my dependent.  I live in High Point, North Carolina.

3.      I have been employed by UNCG since 1997 and currently work as Associate Director for Technology and Operations.

4.      As a North Carolina state employee, I am enrolled for health coverage through the North Carolina State Health Plan.  As my dependent, Connor is also enrolled in health coverage through NCSHP.

5.      Connor has long excelled academically and is a college sophomore.  In addition to his rigorous academic responsibilities, Connor also works at a veterinary clinic.

1

Connor is passionate about veterinary medicine and plans to pursue a career in the veterinary field.

6.      Looking back now, I can see that Connor struggled with gender dysphoria since his childhood.  But before we understood that he was transgender and began seeking treatment under the prevailing standards of care, Connor was in serious and consistently increasing distress.  His symptoms of depression and distress became more pronounced around his freshman year of high school.  I remember that he was sleeping excessively, was very unhappy, and was isolating himself from others.

7.      When Connor first came out to me and explained that he is transgender, I told him that he was my child, and as long as he was happy and healthy, that was all that was important to me.

8.      The lack of access to coverage through the state health plan has been a serious barrier at different points to helping Connor be happy and healthy, and has imposed significant stress on our family.

9.      In January of 2018, Connor began hormone therapy as part of treatment for his gender dysphoria.  He became a totally different person.  His mood brightened.  He started interacting with friends and being more social.  He started thriving.  The change was drastic.  Before he began this treatment, we were deeply worried about Connor's suicidal ideation.  But after he was on hormone therapy for a few months, he had improved so much that we no longer had that concern.  In retrospect, it has become clear to me that treatment for gender dysphoria was what Connor needed all along.

2

10.     But trying to access coverage for this care was stressful. In 2018, Connor and I were enrolled in the 80/20 Health Plan offered through NCSHP. The exclusion for gender-affirming care had been reinstated by that point and touched off an ongoing struggle to get Connor's urgently-needed medical care covered. We had difficulty getting coverage for Connor's required office visits to his endocrinologist, who prescribes and monitors Connor's masculinizing hormone therapy. Where coverage has been denied, Connor and I have been left with full financial responsibility for the cost of the care.

11.     On April 9, 2018, CVS issued a Notice of Determination denying prior authorization for coverage of Connor's testosterone prescription. The Notice of Determination explained that the diagnosis code submitted, F64.0 "Transsexualism," was not a covered diagnosis code for prescription testosterone under the plan. The Notice of Determination further explained that the prescription would be covered for males with "primary or hypogonadotropic hypogonadism," but not for Connor. No other exclusion in the health plan was cited as a basis for the denial of coverage. A true and correct copy of the Notice of Determination is attached as Exhibit A.

12.     We appealed the denial of coverage and were issued a Notice of Final Adverse Benefit Determination dated November 8, 2018. A true and correct copy is attached as Exhibit B. The sole basis provided for denial of the coverage is the exclusion of care for gender dysphoria. *See* Exhibit B at 2 (citing in relevant part exclusion for "Treatment or studies to or in connection with sex changes or modifications and related care"). No other exclusion was referenced to deny the coverage.

3

13.     We also struggled to cover the cost of Connor's chest reconstruction surgery. Despite the benefit he experienced from hormone therapy, it was clear that being a teenage boy without a typically male chest was very painful for him.  As part of treatment for the gender dysphoria he was experiencing relating to his chest, Connor's health care providers recommended surgery that would give Connor a more typical male chest.  Based on medical advice, I understand this surgery to have been medically necessary, including to bring Connor's body into better alignment with his gender identity and lived experience and further reduce his gender dysphoria.

14.     But without any coverage under our health plan, we could not afford the care when Connor was ready for it, and he had to suffer through delay while we saved money and he worked a job to help contribute to the cost of the surgery.  Watching your child suffer without needed care and have to shoulder the burden of earning money as a 16-year-old to pay for basic, essential medical treatment, is an awful feeling.

15.     After we saved enough money, Connor was finally able to undergo surgery on May 28, 2019.  The further relief this provided him from his gender dysphoria allowed him the basic sense of well-being to be able to thrive again.

16.     The process of obtaining this care for Connor has been thoughtful and deliberative.  Both Connor's mother and I were involved in working with a team of medical professionals who helped us understand why Connor was suffering without treatment for gender dysphoria, the risks and benefits of treatment, and the standard of care for treating gender dysphoria in adolescents.  The process was also a careful one on the provider side,

4

since the treatment requires multiple steps to help ensure that it is medically necessary and indicated for the adolescent.  While the process was not easy, the life-changing effect it has had for Connor is unmistakable.  After he started undergoing treatment, I finally felt like I had my kid back.

17.    As a North Carolina state employee, I am enrolled in the NCSHP and receive health care benefits from this plan as part of my compensation.  As a dependent of mine, Connor also is enrolled in the NCSHP.  I contribute $305.00 each month via a payroll deduction for family coverage under the 80/20 Health Plan.  Even though I receive inferior coverage because of the exclusion for gender-affirming care, I pay the same amount for this family coverage as my colleagues do.

* * *

5

I declare under the penalty of perjury that the foregoing is true and correct.

DATED: November ⟨11⟩, 2021

_____
Jason Fleck

6

JA354

**E      A E      E      E**

I certify that the foregoing document was filed electronically with the Clerk of Court

using the CM/ECF system which will send notification of such filing to all registered users.

Dated: November 30, 2021

/s/ Amy E. Richardson
Amy E. Richardson
N.C. State Bar No. 28768
HARRIS, WILTSHIRE & GRANNIS LLP
1033 Wade Avenue, Suite 100
Raleigh, NC 27605-1155
Telephone: 919-429-7386
Facsimile: 202-730-1301
arichardson@hwglaw.com

*Counsel for Plaintiffs*

7

## G.S. § 10B-41 NOTARIAL CERTIFICATE FOR ACKNOWLEDGMENT

_Guilford_____ County, North Carolina

I certify that the following person(s) personally appeared before me this day, each

acknowledging to me that he or she signed the foregoing document:

____Jason Fleck_____.
_Name(s) of principal(s)_

Date: 11/11/21

Official Signature of Notary

_Donna S Huff_____, Notary Public
_Notary's printed or typed name_

My commission expires: _June 6, 2026_

# Exhibit A

Apr 09 2018 12:40:26   AT&T/CVS Pharmacy ->      Fax Server                    Page 001



# Fax Transmittal

**To: DOCTOR**

**From: CVS Caremark® Prior Authorization**

| Electronically (ePA) | Phone | Fax |
|---|---|---|
| (4 to 5 **minutes** process time) | (10 to 15 **minutes** process time) | (24 to 72 **hours** process time) |
| ePA is CVS Caremark's preferred method for receiving prior authorizations and now accepts PA requests online 24/7.<br><br>**Easier:** Reduce the need for paper forms, faxes, and phone calls<br><br>**More Convenient:** Centrally manage ePAs and more easily view their status<br><br>**Faster:** Generally receive faster determinations so patients can fill their medication sooner<br><br>**Visit http://info.caremark.com/ePA to learn more and get started today.** | Calling us with your PA request during our business hours is another option. **See next page for the specific phone number.**<br><br>The process over the phone can take between 10 and 15 minutes.<br><br>OR see ePA option | You may also continue to fax us your PA request. **See next page for specific fax number.**<br><br>Faxes received are processed within 24 to 72 hours.<br><br>OR see ePA option |

If this fax is in response to an inquiry about clinical criteria for coverage of a prescription drug for your patient, the criteria for the specific drug is attached.
Please note that your inquiry does not constitute a request for coverage. CVS Caremark cannot process a request for coverage until we receive a completed criteria form or appropriate clinical information.

The recipient of this fax may make a request to opt-out of receiving telemarketing fax transmissions from CVS Caremark. There are numerous ways you may opt-out: The recipient may call the toll-free number at 877-265-2711 and/or fax the opt-out request to 401-652-0893, at any time, 24 hours a day/7 days a week. The recipient may also send an opt-out request via email to do_not_call@cvscaremark.com. An opt out request is only valid if it (1) identifies the number to which the request relates, and (2) if the person/entity making the request does not, subsequent to the request, provide express invitation or permission to CVS Caremark to send facsimile advertisements to such person/entity at that particular number. CVS Caremark is required by law to honor an opt-out request within thirty days of receipt. The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Thank you, CVS Caremark.
91-41319A  062917

Apr 09 2018 12:44:42   AT&T/CVS Pharmacy →        Fax Server              Page 002

 **♥CVS** caremark™                

### Notice of Determination

Date: 04/09/2018

MARIONELIZABETH WALSH
1 MEDICAL CENTER BLVD FL 1ST
WINSTON SALEM, NC 27103

Plan Member Name: CONNOR THONEN FLECK
Plan Member ID: *******
Plan Name: North Carolina State Health Plan 0274 Non-Grandfathered

Prescriber Name: MARIONELIZABETH WALSH
Prescriber Phone: 1-3367164500
Prescriber Fax: 1-336-713-4501

Dear CONNOR THONEN FLECK:

CVS Caremark® received a request from your provider for coverage of Testosterone
Cypionate IM Injection. The request was denied because:

Your plan approved Testosterone Products criteria covers this drug when you meet one
of these conditions: - You are a male with primary or hypogonadotropic hypogonadism
Your use of this drug does not meet the requirements. This is based on the information
we have.

You can ask for a free copy of the actual benefit provision, guideline, protocol or other
similar criterion used to make the decision and any other information related to this
decision by calling Customer Care at **1-888-321-3124**.

For more information regarding your prescription benefit, please refer to your Benefit
Booklet available on the Plan's website at **www.shpnc.org**.

If your provider would like to discuss this decision with a clinical reviewer at CVS
Caremark, your provider can call CVS Caremark, and we will make arrangements for
the conversation.

You may request an appeal by sending a written request to the address below. To be
eligible for an appeal, your request must be in writing and received within 180 days of
the date of this letter. Please mail or fax your appeal to:

> BlueCross BlueShield of North Carolina
> Appeals Department / Level I
> P.O. Box 30055
> Durham, NC 27702

This document contains references to brand-name prescription drugs that are trademarks or registered trademarks of
pharmaceutical manufacturers not affiliated with CVS Caremark.
Your privacy is important to us. Our employees are trained regarding the appropriate way to handle your private health information.
91-40230B  061317                                                    TDD/TTY: 1-800-863-5488

**JA359**

Fax: 919-765-2322

If your situation is urgent as defined by law, you may ask for an expedited appeal. Important information about your appeal rights and directions about how to ask for an appeal are provided with this letter.

If you have questions, please call Customer Care at **1-888-321-3124**.

Sincerely,

CVS Caremark

Enclosures

cc: Dr. MARIONELIZABETH WALSH

PA# North Carolina State Health Plan 0274 Non-Grandfathered 18-032492652 JM
Plan-approved Criteria: Testosterone Products
Claim Amount (if available): 0.0
Service Date: 4/9/2018 11:02:26 AM

If your provider included diagnosis or treatment codes with your claim for Testosterone Cypionate IM Injection to CVS Caremark, that information is listed here:
ICD diagnosis code: F64.0
Associated diagnosis: Transsexualism
CPT treatment code:
Associated treatment:
You may wish to contact your provider for more information about these codes.

This document contains references to brand-name prescription drugs that are trademarks or registered trademarks of pharmaceutical manufacturers not affiliated with CVS Caremark.
Your privacy is important to us. Our employees are trained regarding the appropriate way to handle your private health information.
91-40230B  061317                                                    TDD/TTY: 1-800-863-5488

**JA360**

## Important Information About Your Appeal Rights

**What if I need help understanding this denial?** You may contact CVS Caremark by calling **1-800-294-5979** if you need assistance understanding this notice or our decision to deny you a service or coverage.

**What options does my provider have?** If there is relevant information that has not been previously submitted, the treating physician may request a Provider Courtesy Review (PCR) by calling 1-800-672-7897 extension 52961 or by sending a written request within 180 days to:

> BlueCross BlueShield of North Carolina
> Appeals Dept. / Provider Courtesy Review
> P. O. Box 30055
> Durham, NC 27702

**What if I don't agree with this decision?** You may request an appeal by sending a written request to the address below. To be eligible for an appeal, your request must be in writing and received within 180 days of the date of this letter.

> BlueCross BlueShield of North Carolina
> Appeals Department / Level I
> P.O. Box 30055
> Durham, NC 27702

A member appeal form is available on the Web at **www.BCBSNC.com**.

**What if my situation is urgent?** If your situation meets the legal definition of urgency, the review of your claim will be conducted within 72 hours, or earlier if required by law. Generally, an urgent situation is one in which your health may be in serious jeopardy or, in the opinion of your physician, you may experience pain that cannot be adequately controlled while you wait for a decision on the external review of your claim. If you believe that your situation is urgent, you or your physician may request an expedited appeal by contacting BCBSNC via mail or fax at the address below. In addition, you may have the ability to seek an expedited external review of your adverse benefit determination. To determine whether an external review process is available to you, please consult your benefit booklet or call BCBSNC customer service on the back of your ID Card.

> BlueCross BlueShield of North Carolina
> Appeals Department / Level 1
> P. O. Box 30055
> Durham, NC 27702
> Fax: 919-765-2322

This document contains references to brand-name prescription drugs that are trademarks or registered trademarks of pharmaceutical manufacturers not affiliated with CVS Caremark
Your privacy is important to us. Our employees are trained regarding the appropriate way to handle your private health information.
91-40230B  061317                                                                 TDD/TTY: 1-800-863-5488

**JA361**

**Who may file an appeal?** You or someone whom you name to act for you (your authorized representative) may file an appeal. A member consent form is attached for your convenience and is also available on our Web site at **www.BCBSNC.com**.

**Can I provide additional information about my appeal?** Yes. As part of the appeal process, you have the right to submit supporting materials in advance of a decision being made on your appeal.

**What happens next?** If you appeal, BCBSNC will review the decision and provide you a written determination within 30 calendar days. If the adverse benefit determination is overturned, BCBSNC will provide coverage or payment for your health care item or service. If the adverse benefit determination is upheld, you may have additional appeal rights.

**How do I file a request for external review?** You may be eligible for an external review process. To determine whether an external review process is available to you, please consult your benefit booklet or call BCBSNC customer service on the back of your ID card.

**What other remedies do I have?** Depending on your plan, you may also have the right to bring action under section 502(a) of ERISA. You and your plan may have other voluntary alternative dispute resolution options, such as mediation. One way to find out what may be available is to contact your local U.S. Department of Labor office and your state insurance regulatory agency.

**Can I request copies of information relevant to my adverse benefit determination?** Yes. You may request and receive, at no cost to you, reasonable access to and copies of all documents, records and other information relevant to your claim by writing to:

> Blue Cross and Blue Shield of North Carolina
> Healthcare Management & Operations
> P. O. Box 2291
> Durham, NC 27702

This information may also include the following:
- Any internal rules, guidelines, protocols, or other criteria used to make this decision, including any clinical review criteria indicated above (please include the referenced medical policy from page 1 of this notice with your request); and/or
- If the decision is based on medical necessity, experimental treatment or another similar exclusion, an explanation of the scientific or clinical judgment for the determination, applied to your medical circumstances.

**Other resources to help you:** For questions about your rights, this notice, or for assistance, you can contact the Employee Benefits Security Administration at 866.444.EBSA (3272). You may also receive assistance with appeals from Smart NC by contacting:

This document contains references to brand-name prescription drugs that are trademarks or registered trademarks of pharmaceutical manufacturers not affiliated with CVS Caremark.
Your privacy is important to us. Our employees are trained regarding the appropriate way to handle your private health information.
91-40230B  061317                                                                TDD/TTY: 1-800-863-5488

North Carolina Department of Insurance
Health Insurance Smart NC
1201 Mail Service Center
Raleigh, NC 27699-1201
855-408-1212 (toll free)

**External Review**
North Carolina law provides for review of *adverse benefit determinations* by an
external, independent review organization (IRO). The North Carolina Department of
Insurance (NCDOI) administers this service at no charge to you, arranging for an IRO
to review your case once the NCDOI establishes that your request is complete and
eligible for review. *BCBSNC* will notify you of your right to request an external review
each time you receive:
- An *adverse benefit determination*, or
- An appeal decision upholding an *adverse benefit determination* or
- A second-level *appeal* decision upholding an *adverse benefit determination*.

You or someone whom you have authorized to represent you may request an external
review.

In order for your request to be eligible for an external review, the NCDOI must
determine the following:
- Your request is about a *medical necessity* determination that resulted in an
  *adverse benefit determination (i.e., a noncertification)*;
- You had coverage with *BCBSNC* when the *adverse benefit determination* was
  issued;
- The service for which the *adverse benefit determination* was issued appears to
  be a *covered service*; and
- You have exhausted *BCBSNC's* internal *appeal* review process as described
  below.

For a standard external review, you will have exhausted the internal *appeal* review
process if you have:
- Completed *BCBSNC's* first- and second-level *appeal* review and received a
  written second-level determination from *BCBSNC*, or
- Filed a second-level *appeal* and have not requested or agreed to a delay in the
  second-level *appeal* process, but have not received *BCBSNC's* written decision
  within 60 days from the date that you can demonstrate that an appeal was filed
  with BCBSNC, or
- received written notification that *BCBSNC* has agreed to waive the requirement
  to exhaust the internal *appeal* and/or second-level *appeal* process.

External reviews are performed on a standard or expedited basis, depending on which
is requested and on whether medical circumstances meet the criteria for expedited
review.

This document contains references to brand-name prescription drugs that are trademarks or registered trademarks of
pharmaceutical manufacturers not affiliated with CVS Caremark
Your privacy is important to us. Our employees are trained regarding the appropriate way to handle your private health information.
91-40230B  061317                                                    TDD/TTY: 1-800-863-5488

**JA363**

**Standard External Review**
For all requests for a standard external review, you must file your request with the NCDOI within 120 days of receiving one of the notices listed above.

If the request for an external review is related to a retrospective *adverse benefit determination* (an *adverse benefit determination* that occurs after you have already received the services in question), the 60-day time limit for receiving *BCBSNC's* second-level determination does not apply. You will not be eligible to request an external review until you have exhausted the internal appeal process and have received a written second-level determination from *BCBSNC*.

**Expedited External Review**
An expedited external review may be available if the time required to complete either an expedited internal first- or second-level appeal review or a standard external review would reasonably be expected to seriously jeopardize your life or health or to jeopardize your ability to regain maximum function. If you meet this requirement, you may file a request to the NCDOI for an expedited external review, after you receive:
· An *adverse benefit determination* from *BCBSNC* and have filed a request with *BCBSNC* for an expedited first-level appeal; or
· A first-level appeal decision upholding an *adverse benefit determination* and have filed a request with *BCBSNC* for an expedited second-level *appeal* review; or
· A second-level *appeal* review decision from *BCBSNC*.

In addition, prior to your discharge from an inpatient facility, you may also request an expedited external review after receiving a first-level appeal or second-level appeal decision concerning an adverse benefit determination of the admission, availability of care, continued stay or emergency health care services.

If your request is not accepted for expedited review, the NCDOI may (1) accept the case for standard external review if you have exhausted the internal appeal review process; or (2) require the completion of the internal appeal review process and another request for an external review. An expedited external review is not available for retrospective adverse benefit determinations.

When processing your request for external review, the NCDOI will require you to provide the NCDOI with a written, signed authorization for the release of any of your medical records that need to be reviewed for the purpose of reaching a decision on the external review. For further information about external review or to request an external review, contact the NCDOI at:

This document contains references to brand-name prescription drugs that are trademarks or registered trademarks of pharmaceutical manufacturers not affiliated with CVS Caremark.
Your privacy is important to us. Our employees are trained regarding the appropriate way to handle your private health information.
91-40230B  061317                                                    TDD/TTY: 1-800-863-5488

**JA364**

Apr 09 2018 12:57:29    AT&T/CVS Pharmacy →    Fax Server    Page 888

(Mail)
By Mail:
NC Department of Insurance
Health Insurance Smart NC
1201 Mail Service Center
Raleigh, NC 27699-1201
Toll-Free Telephone: (855) 408-1212
www.ncdoi.com/smart

(In person)
For the physical address for Health Insurance Smart NC, please visit the web-page:
http://www.ncdoi.com/Smart
Toll Free Telephone: (855) 408-1212

The Healthcare Review Program provides consumer counseling on utilization review and appeal issues. Within ten business days (or, for an expedited review, within three business days) of receipt of your request for an external review, the NCDOI will notify you and your provider of whether your request is complete and whether it has been accepted. If the NCDOI notifies you that your request is incomplete, you must provide all requested, additional information to the NCDOI within 150 days of the written notice from BCBSNC upholding an adverse benefit determination (generally the notice of a second-level appeal review decision), which initiated your request for an external review. If the NCDOI accepts your request, the acceptance notice will include: (i) name and contact information for the IRO assigned to your case; (ii) a copy of the information about your case that BCBSNC has provided to the NCDOI; and (iii) a notification that you may submit additional written information and supporting documentation relevant to the initial adverse benefit determination to the assigned IRO within seven days after the receipt of the notice. It is presumed that you have received written notice two days after the notice was mailed. Within seven days of BCBSNC's receipt of the acceptance notice (or, for an expedited review, within the same business day), BCBSNC shall provide the IRO and you, by the same or similar expeditious means of communication, the documents and any information considered in making the adverse benefit determination, appeal decision or the second-level appeal review decision. If you choose to provide any additional information to the IRO, you must also provide that same information to BCBSNC at the same time and by the same means of communication (e.g., you must fax the information to BCBSNC if you faxed it to the IRO). When sending additional information to BCBSNC, send it to:

(Mail)
Blue Cross/Blue Shield of North Carolina
Appeals Department
PO Box 30055
Durham, NC  27702

document contains references to brand-name prescription drugs that are trademarks or registered trademarks of
aceutical manufacturers not affiliated with CVS Caremark
rivacy is important to us. Our employees are trained regarding the appropriate way to handle your private health information.
30B  061317                                                                    TDD/TTY: 1-800-863-5488

KADEL0031

**Questions? Do you need help in a different language or format?** If you do not speak English or have special needs, oral interpretation and alternate formats of this notice are available, as is other assistance, by contacting us at the number on your State Health Plan ID card.

**Spanish:**
Si usted necesita asistencia o necesita hablar con alguien en Español, por favor llame al número gratuito de Servicio al Cliente ubicado en su tarjeta de identificación de beneficios.

**Chinese (simplified):**
如果您需要帮助，或需要同中国人讲话，请拨打您的福利卡上面的客户服务免费电话号码。

**Tagalog:**
Kung kailangan ninyo ng tulong o kailangan ninyong makipag-usap sa isang tao sa Tagalog, mangyari lamang na tumawag nang walang-bayad sa Serbisyo sa Kostumer sa numero na nakasulat sa inyong ID kard ng benepisyo.

**Navajo:**
Shíka at'ohwol ei doodaii' dinék'ehgo lą bi'chį haadeedziih nínízinígo, t'áá shǫǫdí, t'áá jíík'e ya ndaalníshí, ni naaltsoos bikáa'gi bi'chį hodiilniih.

This document contains references to brand-name prescription drugs that are trademarks or registered trademarks of pharmaceutical manufacturers not affiliated with CVS Caremark.
Your privacy is important to us. Our employees are trained regarding the appropriate way to handle your private health information.
91-40230B  061317                                                    TDD/TTY: 1-800-863-5488

# Exhibit



*North Carolina*
**State Health Plan**
FOR TEACHERS AND STATE EMPLOYEES
A Division of the Department of State Treasurer

Notice of Final Adverse Benefit Determination

Transcend Legal
Attn: Noah E. Lewis
3553 82nd Street #6D
Jackson Heights, NY 11372

Date of Notice: November 8, 2018

| Blue Cross Blue Shield of North Carolina | Telephone Number: 800-446-8053 |
|---|---|
| Appeals Department | Fax Number: 919-765-2322 |
| P.O. Box 30055 | Website: www.BlueCrossNC.com |
| Durham, NC 27702 | |

**This document contains important information that you should retain for your records.**

This document serves as notice of a final adverse benefit determination. We have declined to provide benefits, in whole or in part, for the requested treatment or service described below.

**Case Details:**

Patient Name: Connor Thonen Fleck
Member ID: ▓▓▓▓▓▓▓▓
Appeal ID: 469742

Provider: Marion Walsh, MD
Date(s) of Service: Future
Type of Service:  Testosterone Cypionate

Reason for Denial: Benefit Exclusion

**Claim(s) Detail:** *(Not available if this is a pre-service request.)*

| Claim #: | Charged Amt.: | Allowed Amt.: | Other Non-Covered Amts.: | Amt. Paid: |
|---|---|---|---|---|
| Diagnosis Code: | Diagnosis Description: | Treatment (Procedure) Code: | Treatment (Procedure) Description: | Treatment Category (Subcategory): |
| Denial Code(s): | | | | |

**Policy Information:** *(This information is current based on claims that have fully completed the adjudication process as of the date of this letter.)*

| Other Insurance: | Deductible: | Co-pay: |
|---|---|---|
| No | Not Applicable (N/A) | N/A |
| Coinsurance: | YTD Deductible Credit: | YTD Out-of-Pocket Credit: |

PLAN DEF0132767
ATTORNEY EYES ONLY
HIPAA -- Plaintiff

| N/A | N/A | N/A |
|-----|-----|-----|

**Background Information:**

This is in response to your request, on Connor Thonen Fleck's behalf, for an appeal received October 17, 2018.

**Reviewers' Understanding:**

You have requested that Blue Cross and Blue Shield of North Carolina (Blue Cross NC) reconsider the denial of testosterone cypionate intramuscular (IM) injection.

**Final Adverse Benefit Determination:**

The adverse benefit determination has been upheld.

**The following evidence and documentation were reviewed:**

- Member's North Carolina State Health Plan 80/20 PPO Plan Benefits Booklet;
- Level One Letter of Appeal dated October 6, 2018 written by Noah E. Lewis of Transcend Legal;
- Authorized Representative Request signed by Jason Fleek, member's guardian;
- Hellosign Fleck CVS Authorization to Appeal Document History dated October 5, 2018;
- Document labeled, "Exhibit 2" inclusive of CVS caremark Fax Transmittal dated April 9, 2018 and CVS caremark Notice of Determination dated April 9, 2018;
- Document labeled "Exhibit 3" inclusive of Prior Authorization Criteria for Testosterone Products (Brand and Generic) received on October 17, 2018;
- North Carolina State health Plan for Teachers and State Employees Third Party Authorization From dated October 21, 2018 signed by member's guardian, Jason P. Fleek;
- Blue Cross NC Tracking Systems.

**The professional qualifications and licensure of the reviewers are:**

- Medical Team Lead, Appeals, Registered Nurse;
- Clinical Appeals Analyst, Registered Nurse with over 15 years of healthcare experience.

**Findings:**

**Contractual Basis:**

According to the member's North Carolina State Health Plan 80/20 PPO Plan Benefits Booklet section titled, "What Is Not Covered?" it states, in pertinent part, "…The *Plan* does not cover services, supplies, medications or charges for…Sexual dysfunction unrelated to organic disease… [and/or] Treatment or studies to or in connection with sex changes or modifications and related care…"

**Clinical Rationale:** Not Applicable (N/A)

Page 2 of 7

PLAN DEF0132768
ATTORNEY EYES ONLY
HIPAA -- Plaintiff

A Blue Cross NC Medical Team Lead has reviewed your request, and based on the aforementioned North Carolina State Health Plan 80/20 PPO Plan Benefits Booklet language, it has been determined that the member does not have benefits for the requested treatment.

As a result of this review, Blue Cross NC has confirmed that the denial of benefits for the testosterone cypionate intramuscular (IM) injection was correct. Please consult your benefit booklet, under the section titled, "What Is Not Covered?" to review this exclusion.

If you have any questions regarding this appeal, please contact me directly. If you have other questions about your health plan benefits, please contact Customer Service at 1-888-234-2416.

Sincerely,

Joy Brazier, BSN, RN

Joy Brazier, BSN, RN
Clinical Appeals Analyst
Appeals Department

cc: Parent/Guardian of: Connor Thonen Fleck;
    Dr. Marion Walsh

PLAN DEF0132769
ATTORNEY EYES ONLY
HIPAA -- Plaintiff

**Important Information about Your Rights**

**What if I need help understanding this denial?**  Contact the appeals analyst at 1-800-446-8053, extension 52822 if you need assistance understanding this notice or our decision to deny you a service or coverage.

**What if I don't agree with this decision**?  You do have the right to appeal this decision with the Office of Administrative Hearings (OAH) by filing a "Petition for a Contested Case Hearing" within 60 days of the date of this letter.  A $20 filing fee is required by OAH.  If you cannot afford to pay the filing fee you may request a waiver by filing "A Petition to File a Petition for Contested Case as Indigent" with OAH prior to filing the "Petition for Contested Case Hearing."  You may obtain all necessary petition forms by contacting OAH at (919) 431-3000 or visiting the OAH website at www.oah.state.nc.us.  The completed form/s should be submitted to:

> Office of Administrative Hearings
> 1711 New Hope Church Rd
> Raleigh, North Carolina 27609

A *copy* of the completed form should also be mailed to:

> North Carolina State Health Plan
> Attention: General Counsel for the NC Department of State Treasurer
> 3200 Atlantic Avenue,
> Longleaf Building
> Raleigh, North Carolina 27604

**Can I request copies of information relevant to my claim?**  Yes. You may request and receive, at no cost to you, reasonable access to, and copies of, all documents, records and other information relevant to your claim by writing to:

> Blue Cross Blue Shield of North Carolina
> Appeals Department
> P. O. Box 30055
> Durham, NC 27702
> Fax: 919-765-2322

- This information may also include the following: any internal rules, guidelines, protocols, or other criteria used to make this decision, including any clinical review criteria indicated above (please include the medical policy number with your request); and/or
- If our decision is based on medical necessity, experimental treatment or another similar exclusion, an explanation of the scientific or clinical judgment for the determination, applied to your medical circumstances.

Page 4 of 7

PLAN DEF0132770
ATTORNEY EYES ONLY
HIPAA -- Plaintiff

**Other resources to help you:**

The North Carolina Department of Insurance is available to assist you with questions about health insurance. You may contact Health Insurance Smart NC at:

    **By Mail:**
    NC Department of Insurance
    Health Insurance Smart NC
    1201 Mail Service Center
    Raleigh, NC 27699-1201
    Toll Free Telephone: (855) 408-1212
    www.ncdoi.com/smart

    **In Person:**
    For the physical address for Health Insurance Smart NC, please visit the web-page:
    http://www.ncdoi.com/Smart
    Toll Free Telephone: (855) 408-1212

PLAN DEF0132771
ATTORNEY EYES ONLY
HIPAA -- Plaintiff

**Non-Discrimination and Accessibility Notice**

**Discrimination is Against the Law**

• Blue Cross and Blue Shield of North Carolina ("Blue Cross NC") complies with applicable Federal civil rights laws and does not discriminate on the basis of race, color, national origin, age, disability, or sex.

• Blue Cross NC does not exclude people or treat them differently because of race, color, national origin, age, disability, or sex.

Blue Cross NC:
- Provides free aids and services to people with disabilities to communicate effectively with us, such as:
  - Qualified interpreters
  - Written information in other formats (large print, audio, accessible electronic formats, other formats)
- Provides free language services to people whose primary language is not English, such as:
  - Qualified interpreters
  - Information written in other languages

• If you need these services, contact Customer Service **1-888-234-2416**, TTY and TDD, call **1-800-442-7028**.

• If you believe that Blue Cross NC has failed to provide these services or discriminated in another way on the basis of race, color, national origin, age, disability, or sex, you can file a grievance with:
  - Blue Cross NC, PO Box 2291, Durham, NC 27702, Attention: Civil Rights Coordinator- Privacy, Ethics & Corporate Policy Office, Telephone **919-765-1663**, Fax **919-287-5613**, TTY **1-888-291-1783** civilrightscoordinator@bcbsnc.com

• You can file a grievance in person or by mail, fax, or email. If you need help filing a grievance, Civil Rights Coordinator - Privacy, Ethics & Corporate Policy Office is available to help you.

• You can also file a civil rights complaint with the U.S. Department of Health and Human Services, Office for Civil Rights, electronically through the Office for Civil Rights Complaint Portal, available at *https://ocrportal.hhs.gov/ocr/portal/lobby.jsf,* or by mail or phone at: U.S. Department of Health and Human Services 200 Independence Avenue, SW Room 509F, HHH Building Washington, D.C. 20201**1-800-368-1019, 800-537-7697** (TDD). Complaint forms are available at *http://www.hhs.gov/ocr/office/file/index.html.*

• This Notice and/or attachments may have important information about your application or coverage through Blue Cross NC. Look for key dates. You may need to take action by certain deadlines to keep your health coverage or help with costs. You have the right to get this information and help in your language at no cost. Call Customer Service **1-888-234-2416**.

ATTENTION: If you speak another language, language assistance services, free of charge, are available to you. Call 1-888-234-2416 (TTY: 1-800-442-7028).

PLAN DEF0132772
ATTORNEY EYES ONLY
HIPAA -- Plaintiff

ATENCIÓN: Si habla español, tiene a su disposición servicios gratuitos de asistencia lingüística. Llame al 1-888-234-2416 (TTY: 1-800-442-7028).

注意：如果您講廣東話或普通話，您可以免費獲得語言援助服務。請致電 1-888-234-2416 (TTY：1-800-442-7028)

CHÚ Ý: Nếu bạn nói Tiếng Việt, có các dịch vụ hỗ trợ ngôn ngữ miễn phí dành cho bạn. Gọi số 1-888-234-2416 (TTY: 1-800-442-7028).

주의: 한국어를 사용하시는 경우, 언어 지원 서비스를 무료로 이용하실 수 있습니다. 1-888-234-2416 (TTY: 1- 800-442-7028)번으로 전화해 주십시오.

ATTENTION : Si vous parlez français, des services d'aide linguistique vous sont proposés gratuitement. Appelez le 1-888-234-2416 (ATS : 1-800-442-7028).

ملحوظة: إذا كنت تتحدث اللغة العربية، فإن خدمات المساعدة اللغوية تتوافر لك بالمجان. اتصل برقم 1 888 234 2416 .المبرقة الكاتبة: 1 800 442 7028.

LUS CEEV: Yog tias koj hais lus Hmoob, cov kev pab txog lus, muaj kev pab dawb rau koj. Hu rau 1-888-234-2416 (TTY: 1-800-442-7028).

ВНИМАНИЕ: Если вы говорите на русском языке, то вам доступны бесплатные услуги перевода. Звоните 1-888-234-2416 (телетайп: 1-800-442-7028).

PAUNAWA: Kung nagsasalita ka ng Tagalog, maaari kang gumamit ng mga serbisyo ng tulong sa wika nang walang bayad. Tumawag sa 1-888-234-2416 (TTY: 1-800-442-7028).

ગુજરાતી: જો તમે ગુજરાતી બોલતા હો, તો નિ:શુલ્ક ભાષા સહાય સેવાઓ તમારા માટે ઉપલબ્ધ છે. ફોન કરો 1-888-234-2416 (TTY: 1-800-442-7028).

ข้อความ ถ้าคุณพูดภาษาไทยคุณสามารถใช้บริการช่วยเหลือทางภาษาได้ฟรี โปรดติดต่อได้ที่หมายเลขโทรศัพท์ 1-888-234-2416 (TTY: 1-800-442-7028)

ACHTUNG: Wenn Sie Deutsch sprechen, stehen Ihnen kostenlos sprachliche Hilfsdienstleistungen zur Verfügung. Rufnummer: 1-888-234-2416 (TTY: 1-800-442-7028).

বাংলা দ্রষ্টব্য: আপনি যদি বাংলা কথা বলতে পারেন, তাহলে নিঃখরচায় ভাষা সহায়তা পরিষেবা উপলব্ধ আছে। ফোন করুন 1-888-234-2416 (TTY: 1-800-442-7028) নং এ কল করুন।

ໂປດຊາບ: ຖ້າວ່າ ທ່ານເວົ້າພາສາ ລາວ, ການບໍລິການຊ່ວຍເຫຼືອດ້ານພາສາ, ໂດຍບໍ່ເສັຽຄ່າ, ແມ່ນມີພ້ອມໃຫ້ທ່ານ. ໂທຣ 1-888-234-2416 (TTY: 1-800-442-7028).

注意事項：日本語を話される場合、無料の言語支援をご利用いただけます。1-888-234-2416（TTY: 1-800-442-7028）まで、お電話にてご連絡ください。

PLAN DEF0132773
ATTORNEY EYES ONLY
HIPAA -- Plaintiff

# DECLARATION OF JULIA MCKEOWN

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MAXWELL KADEL, *et al.*,

        *Plaintiffs*,

v.

DALE FOLWELL, in his official capacity as
State Treasurer of North Carolina, *et al.*,

        *Defendants*.

No. 1:19-cv-00272-LCB-LPA

**DECLARATION OF JULIA MCKEOWN**

I, Julia McKeown, hereby state as follows:

1.    I am a plaintiff in the above-captioned action.  I have actual knowledge of the matters stated in this declaration.

2.    I am a 45-year-old transgender woman.  I am employed by North Carolina State University ("NCSU").  I live in Apex, North Carolina.

3.    I was designated male at birth, but my gender identity is female.  I live in accordance with my female gender identity in all aspects of my life.

4.    I have struggled with gender dysphoria since childhood. I had to suppress my gender identity for much of my early life into adulthood.  I was first diagnosed with what was then called gender identity disorder in my mid-teens.

5.    I grew up and went to school in Florida.  During my time in Florida, I completed my higher education, including a bachelor's degree, two master's degrees, and a doctoral degree.  During this time, I was also battling severe, untreated gender dysphoria.

1

While I presented as female in my personal life starting in college, I did not present as female in my professional life for fear that I would experience discrimination.

6.    After completing my doctorate, I reached the point where I could no longer suppress who I really was.  I made the life-saving decision to live authentically, in accordance with my gender identity, in all aspects of life.  Between 2010 and 2016, I was progressing in my career, life, and transition.

7.    In 2016, I accepted a position with NCSU and moved to North Carolina from Florida.  Since 2016, I have been employed by NCSU as an Assistant Professor in the Teaching Education and Learning Design Department of the NCSU College of Education.  I currently teach in the Learning, Design, and Technology Program.  I also serve as the Graduate Coordinator for the Learning, Design, and Technology Program.

8.    As a North Carolina state employee, I am enrolled in the North Carolina State Health Plan for Teachers and State Employees ("NCSHP"), and receive health care benefits from this plan as part of my compensation.  I contribute each month to the plan via a paycheck deduction.  I pay the same amount for this coverage as other employees, even though I receive inferior coverage because of the exclusion for gender-affirming care.

9.    Once I moved to North Carolina, I started the medical part of my transition.  While hormone therapy and social transition have been important aspects of my transition, I was still dealing with significant distress related to gender dysphoria.  By 2018, my medical provider referred me for vaginoplasty, as part of treatment for my gender

2

dysphoria. After consulting with a surgeon, my surgeon and I requested preauthorization for vaginoplasty on or around July 19, 2018.

10. On or around July 23, 2018, the preauthorization was denied because of the reinstatement of the Exclusion of gender-confirming health care in the NCSHP. A true and correct copy of that notice of denial is attached as Exhibit A. Specifically, the notice from Blue Cross and Blue Shield of North Carolina ("BCBSNC") indicated my preauthorization was denied due to an exclusion in the policy, which stated, "Treatment or studies to or in connection with sex changes or modifications and related care." Exhibit A at 2 (KADEL00312897).

11. I appealed that decision to BCBSNC but was informed that they only administer the plan and could not resolve the issue. I also filed a grievance with the NCSHP Section 1557 Coordinator after the denial of preauthorization on or around August 13, 2018. Exhibit A at 1 (KADEL00312896). The grievance was denied on or around September 12, 2018. A true and correct copy of that denial is attached as Exhibit B (KADEL00311967).

12. At that point in my life, I could no longer wait for surgery. Left with no other options, I made the difficult decision to withdraw funds from my retirement and savings accounts, in order to pay for my medically necessary surgery. The surgery was life-changing. I felt like my physical body was finally aligned with who I really was, and I was able to life a more authentic, fulfilling life. The relief the surgery provided me from my gender dysphoria was critical for my wellbeing.

3

13.    As part of my treatment for gender dysphoria, I was also prescribed hormone therapy, which is excluded under the NCSHP.  My cost of gender affirming care that was not covered by insurance exceeded $13,000.00.

14.    The Exclusion also prohibits me from seeking future medically necessary gender-confirming health care, such as ongoing hormone therapy and additional surgery I may need, such as a mammoplasty.


I declare under the penalty of perjury that the foregoing is true and correct.

DATED: 11/19/2021                          Julia McKeown


Subscribed and sworn before me, a Notary Public in and for the _____,

State of North Carolina, this 19 day of November , 2021.



Signature of Notary

4



## CERTIFICATE OF SERVICE

I certify that the foregoing document was filed electronically with the Clerk of Court using the CM/ECF system which will send notification of such filing to all registered users.

Dated: November 30, 2021

/s/ Amy E. Richardson
Amy E. Richardson
N.C. State Bar No. 28768
HARRIS, WILTSHIRE & GRANNIS LLP
1033 Wade Avenue, Suite 100
Raleigh, NC 27605-1155
Telephone: 919-429-7386
Facsimile: 202-730-1301
arichardson@hwglaw.com

*Counsel for Plaintiffs*

5

# Exhibit A

Julia McKeown


August 12th, 2018

Chris Almberg
Compliance Officer and Section 1557 Coordinator
North Carolina State Health Plan
3200 Atlantic Avenue
Raleigh, NC 27604

RE:    Grievance for Discrimination: Benefits Denial and exclusions based on sex.


Dear Chris Almberg:

As the designated coordinator for Grievances involving discrimination for the North Carolina State
Health Plan, please accept this letter as my formal letter of complaint regarding denial of benefits (pre-
authorization) of a medically necessary and documented surgical procedure.
On July, 23rd, 2018 I received a letter from Blue Cross Blue Shield indicating an adverse benefit
determination for pre-authorization for surgery. I have attached a copy of this letter, which also includes
the case and reference number, as well as my insurance ID number. The letter indicated that I was
denied due to an exclusion in the policy which stated, "*Treatment or studies to or in connection with sex
changes or modifications and related care*". Citing this inclusion for my procedure is in clear violation of
several federal laws and as cited seems to be completely based on sex. I reviewed the surgery code and
determined that the code was correct as submitted: 55970, Intersex Surgery.

I filed a complaint with BCBSNC and they indicated that since they only service the plan for the state
that my complaint must be directed to the NC State Health Plan, which is the purpose of this letter.

My desired remedy is simply to have the State Health Plan and by extension BCBSNC approve and pay
for these medically necessary procedures according to my schedule of benefits. To exclude these
necessary procedures based on my medical situation is nothing less than a discriminatory action
specifically targeting me and denying benefits based on my sex. I do hope this issue can be resolved
amicably. Should you need additional information, please let me know. I give permission, to the extent
required to address this grievance, to access to my health insurance information, and specifically the
documents that were submitted as part of this claim, which includes documentation from three medical
professionals regarding these surgical procedures.

Sincerely,
Julia McKeown



*North Carolina*
**State Health Plan**
FOR TEACHERS AND STATE EMPLOYEES
*A Division of the Department of State Treasurer*

| | |
|---|---|
| BlueCross BlueShield of North Carolina<br>Healthcare Management and Operations<br>P.O. Box 2291<br>Durham, NC 27702 | Telephone Number: 800-672-7897<br>Fax Number: 800-672-6587<br>Website: WWW.BCBSNC.COM |

JULIA MCKEOWN

Date of Notice: July 23, 2018

**This document contains important information that you should retain for your records.**

This document serves as notice of an adverse benefit determination. We have declined to provide benefits, in whole or in part, for the requested treatment or service described below. If you think this determination was made in error, you have the right to appeal (see the enclosures to this letter for information about your appeal rights.)

**Case Details:**

Member/Patient Name: JULIA MCKEOWN
ID Number:

Provider: KEELEE MACPHEE, MD
Facility: NORTH CAROLINA SPECIALTY HOSPITAL
Service:    Surgical Stay
Date(s) of Service: 9/18/2018 - 9/19/2018
Service:    INTERSEX SURGERY; MALE TO FEMALE
Date(s) of Service:  9/18/2018 - 9/19/2018

Reference #:  112412394

Reason for Denial: The requested service is not a covered benefit per your benefit booklet or plan documents.

**Explanation of Basis for Determination:**

**The following is not a covered benefit: Treatment or studies to or in connection with sex changes or modifications and related care.**

Sincerely,

Healthcare Management and Operations

cc: KEELEE MACPHEE, MD
cc: NORTH CAROLINA SPECIALTY HOSPITAL

HC5

# Exhibit B



**North Carolina State Health Plan**
FOR TEACHERS AND STATE EMPLOYEES
A Division of the Department of State Treasurer



STATE TREASURER OF NORTH CAROLINA
DALE R. FOLWELL, CPA

3200 Atlantic Avenue    •    Raleigh, NC 27604    •    Phone: 919-814-4400    •    Fax: 919-814-5817    •    www.shpnc.org

Chris Almberg
Compliance Officer
North Carolina State Health Plan
3200 Atlantic Avenue
Raleigh, NC 27604

September 12, 2018

Julia McKeown

Ms. McKeown,

On August 13, 2018, you submitted a grievance letter by email pursuant to the North Carolina Department of State Treasurer (Department) policy, "Section 1557 Grievance Procedure." In this letter, you alleged that the basis for denying a benefit to you was your sex, and requested that the North Carolina State Health Plan (Plan) approve and pay for the denied benefit.

As required by Department policy, I, in my role as 1557 Coordinator for the Department, have conducted a thorough investigation of your complaint. This letter should be considered my formal written decision on your grievance, based on a preponderance of the evidence.

Section 135-48.30 of the North Carolina General Statutes delineates the powers and duties of the State Treasurer with regards to the Plan. It states, in part, that the Treasurer has the power and duty to set benefits for the Plan. N.C.G.S. § 135-48.30(a)(2). The Board of Trustees of the State Health Plan (the Board) has the power and duty to, "Approve benefit programs, as provided in § 135-48.30(a)(2)." N.C.G.S. § 135-48.22. These powers and duties outlined by statute allow the Treasurer, with approval of the Board, to set benefits for the Plan. Setting benefits for the Plan, by nature, includes the power to exclude benefits from coverage. Any benefit excluded from coverage will not be preauthorized by or paid for by the Plan.

On December 2, 2016, the Board voted in favor of covering the treatment of gender dysphoria, including treatment or studies regarding sex changes or modifications, psychological assessments, and psychotherapy treatment, for the 2017 plan year only.

To date, the Board has not voted on whether to cover these items beyond December 31, 2017. Therefore, treatment or studies to or in connection with sex changes or modifications and related care are not covered benefits for the 2018 plan year. These exclusions are listed in the 2018 Benefit Booklet, which was provided to all members in 2017. These exclusions are applied consistently to all Plan members.

You and your medical providers submitted a preauthorization request for intersex surgery; male to female, to the Plan's third party administrator, BlueCross BlueShield of North Carolina (BCBSNC), on or about July 19, 2018 with dates of service of September 18-19, 2018. The preauthorization request was denied because, per the 2018 Benefit Booklet, the requested service is not a covered benefit. You and your providers were informed of this denial by a notice of adverse benefit determination sent by BCBSNC dated July 23, 2018.

Title IX states that no person shall be subjected to discrimination on the basis of sex under any education program or activity receiving Federal financial assistance. Section 1557 of the Affordable Care Act applies the Title IX prohibition on sex discrimination to health programs or activities that receive federal financial assistance. The United States Courts of Appeal do not agree

**JA386**

about whether gender identity is included in the definition of sex in the Title IX context. Some courts have determined that the term "sex" as used in Title IX and its implementing regulations is ambiguous. Other courts have determined found that the plain language definition of "sex" in Title IX is clear and unambiguous. In addition, an injunction set forth by the United States District Court in Texas prohibits the United States Department of Health and Human Services (HHS) from promulgating rules that include gender identity within the definition of sex discrimination.

As a result, based upon all available information, I cannot conclude that excluding treatment of gender dysphoria, including treatment or studies regarding sex changes or modifications, psychological assessments and psychotherapy treatment as a covered benefit is discrimination on the grounds of sex in this case.

If you wish to appeal this decision, you may do so by writing to the Executive Administrator of the State Health Plan within 15 days of receiving this decision. The Executive Administrator shall issue a written decision in response to the appeal no later than 30 days after its filing. If you wish to appeal this decision, please address your appeal as follows:

Dee Jones, Executive Administrator
North Carolina State Health Plan
Department of State Treasurer
3200 Atlantic Avenue
Raleigh, NC 27604

The availability and use of this grievance procedure does not prevent you from pursuing other legal or administrative remedies, including filing a complaint of discrimination on the basis of race, color, national origin, sex, age, or disability in court or with the U.S. Department of Health and Human Services, Office for Civil Rights.

You can file a complaint of discrimination electronically through the Office for Civil Rights Complaint Portal, which is available at: https://ocrportal.hhs.gov/ocr/portal/lobby.jsf

Or by mail at:

U.S. Department of Health and Human Services
200 Independence Avenue SW.
Room 509F, HHH Building
Washington, DC 20201

Or by phone: 1-800-368-1019

Complaint forms are available at: http://www.hhs.gov/ocr/office/file/index.html.

Such complaints must be filed within 180 days of the date of the alleged discrimination.

Sincerely,

Chris Almberg
North Carolina State Health Plan
Compliance Officer

# DECLARATION OF C.B.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

MAXWELL KADEL, *et al.*,

      *Plaintiffs*,

v.

DALE FOLWELL, in his official capacity as
State Treasurer of North Carolina, *et al.*,

      *Defendants*.

No. 1:19-cv-00272-LCB-LPA

**DECLARATION OF C.B.**

---

I, C.B., do hereby state as follows:

1.     The initials of my legal name are C.B. I am a plaintiff in the above-captioned action. I have actual knowledge of the matters stated in this declaration.

2.     I am a boy.

3.     I am 16 years old. I was born and raised in Chapel Hill, North Carolina and currently live there with my family.

4.     I am transgender, which means that I was designated "female" at birth, even though I am and identify as male.

5.     I am a junior in high school. I enjoy swimming, video games, cars, and hanging out with my friends. In school, I particularly enjoy studying psychology and while I have not yet decided what I will study in college, I am considering psychology as a possible career path.

1

6.    Ever since I was a young child, I have known that I am boy.  I was always uncomfortable wearing stereotypically female clothing and would try to dress in a more masculine manner.  For example, as a child, I recall refusing to go to school one day because my mom wanted me to wear jeans that had pink stitching on them, which made them feel like girl's jeans.  I also recall since I was six or seven years old, refusing to wear stereotypically female swimming suits, opting instead to wear board shorts and a shirt.

7.    In late 2016, when I was 11 years old, I began to wear a short, typically masculine haircut, which made me feel more like myself.

8.    Knowing that I am a boy, in January 2017, while I was in sixth grade, I recall telling my mom that "I'm not a girl."

9.    My mom was supportive and asked me if I wanted to tell my dad and my sister, which I asked her to do on my behalf.

10.    After I came out to my parents and informed them that I am transgender, my parents and I began meeting with a therapist in the Spring of 2017.

11.    At the time, I was anxious about beginning female puberty, so after consultation with my parents and therapist, I asked to be placed on treatment to delay puberty.

12.    During the summer of 2017, I began living as male by informing friends and family of my male gender identity and my new more typically male name, wearing traditionally masculine clothes, and living openly as the boy I am.

2

13.    However, as my chest began to develop, I began to experience additional anxiety.

14.    In August 2017, I met a team of medical and mental health professionals at the Duke Gender Clinic, where I was diagnosed with gender dysphoria and was prescribed puberty delaying medication, which was delivered through an implant. The implant lasts about 18 months.

15.    The treatment of my gender dysphoria has helped reduce my anxiety, and I feel more comfortable knowing I am developing consistent with who I am.

16.    In the Spring of 2018, I legally changed my name to the more typically masculine name that I currently have. Soon after I got a U.S. passport that accurately reflects who I am by having a male sex designation. My driver's license, which I obtained later, also reflects the same.

17.    As the year 2019 and the 18-month period for my implant approached, I recall observing my parents worry about how they would pay for my medical care.

18.    My parents, who love and support me, have gone to great lengths to shield me from any discrimination, but as I have grown older, that discrimination has become more apparent to me.

19.    For example, I am aware that the reason I observed my parents worrying about how they would pay for my care is because the North Carolina State Health Plan for Teachers and State Employees, in which I am enrolled through my father, excludes

3

coverage of gender-confirming care. It made me feel unhappy and really bad to see my parents experience stress over how they would pay for my care.

20.    As a result of the Health Plan's exclusion, not only did my parents have to spend a lot of money, but in early 2019, I was forced to switch from the implant to injection shots as a form of puberty delaying medication. Switching from the implant to shots caused me a great deal of frustration, not only because the injections were painful, but because I also ended up developing cysts as a result of the injections on two separate occasions.

21.    In March 2019, I also began taking testosterone as hormone therapy for my gender dysphoria. Hormone therapy has brought me a great deal of relief. For example, I am happy with my voice and the fact that I have to shave now.

22.    It is my understanding that the Health Plan refuses to cover my hormone therapy as treatment for my gender dysphoria.

23.    It makes me feel bad knowing that a whole group of people, including myself, are being discriminated against for something that they cannot control, being transgender. It makes me feel like we are being treated as different and less than.

24.    For as long as I can remember, I have always felt gender dysphoria which I understand to be discomfort and distress due to my body not matching who I am. This dysphoria also causes me anxiety. However, the treatment for gender dysphoria with puberty delaying medication and now hormones, has reduced that anxiety and helped me feel better.

4

I declare under the penalty of perjury that the foregoing is true and correct.

Dated this 24 day of November, 2021.

$\frac{CMB}{C.B.}$ C.B.

C.B.

Subscribed and sworn before me, a Notary Public in and for the _Chatham County,_

State of _____, this 24 day of _November_, 2021.

_Signature of Notary_

5)12)2026

5

# DECLARATION OF MICHAEL D. BUNTING, JR.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| MAXWELL KADEL, *et al.*, | No. 1:19-cv-00272-LCB-LPA |
| *Plaintiffs*, | |
| v. | **DECLARATION OF MICHAEL D. BUNTING, JR.** |
| DALE FOLWELL, in his official capacity as State Treasurer of North Carolina, *et al.*, | |
| *Defendants*. | |

Pursuant to 28 U.S.C. § 1746, I hereby declare as follows:

1.    I am a plaintiff in the above-captioned action.  I have actual knowledge of the matters stated in this declaration.

2.    I am the father of Plaintiff C.B., a 16-year-old boy.  I live in Chapel Hill, North Carolina.

3.    I was a long-term employee of the University of North Carolina at Chapel Hill ("UNC").  I retired from UNC in April 2019.

4.    I was employed fulltime by UNC for 28 and a half years, beginning in September 1990 until my retirement in April 2019.  My last position with UNC was Associate Athletic Director for Facilities Planning.

1

5.      As a retired North Carolina state employee, I am enrolled for health coverage through the North Carolina State Health Plan.  I enrolled in the NCSHP effective October 1, 1990 as a state employee.  As my dependent, C.B. is also enrolled in health coverage through NCSHP.

6.      C.B., my son, is a boy.  He is also transgender.  C.B. was designated "female" at birth but has a male gender identity.  C.B. is a junior in high school.

7.      As I look back, I believe that C.B. has always understood himself to be a boy.

8.      Ever since he was a young child, even when he was as young as six years old, C.B. would reject stereotypically female clothing and would dress in a more masculine manner.  In late 2016, he began wearing a short, typically masculine haircut.

9.      Though C.B. always got along with people and has many friends, he exhibited high levels of anxiety and depressive behaviors that concerned me as his father.  C.B. exhibited low grade anger and a short temper over innocuous things, as well as a general unhappiness.  His mother and I later came to understand that these behaviors were associated with C.B.'s untreated gender dysphoria.

10.     In early 2017, C.B. informed us that he was transgender.  It was evident that the knowledge of his true identity was a burden he had carried for many years, causing his anxiety and depressive behavior.  C.B.'s openness about his gender appeared to be very freeing for him.

2

11.   Soon after, C.B., his mother, and I, met with a therapist in April 2017. After consultation with the therapist, C.B. asked to be placed on treatment to delay the onset of puberty, which was causing him anxiety.

12.   In April of 2017, C.B., Ms. Bunting and I, sought an appointment with the Duke Child and Adolescent Gender Care Clinic ("Duke"), ultimately scheduled for August 2017.

13.   During the summer of 2017, C.B. socially transitioned to living as his true self, informing friends and family of his male gender identity, wearing more masculine clothes, and living openly as the boy he is. However, as his breasts began to develop during the summer, C.B. began to experience additional anxiety.

14.   As a result of the distress associated with his birth-designated sex, C.B. was diagnosed with gender dysphoria. In August 2017, C.B. began obtaining care from medical and mental health professionals and was prescribed puberty-delaying treatment, in the form of an implant, as part of his treatment for gender dysphoria.

15.   Following the beginning of C.B.'s treatment, we noticed that the anxiety he had been experiencing diminished and that he was now a more happy, outgoing, and personable teenage boy.

16.   C.B. is treated and known as a boy at school and in all other aspects of his life. He legally changed his name to his current more typically male name in the Spring of 2018.

3

17.    Because in 2017 the NCSHP did not contain an exclusion for gender-confirming health care, C.B.'s puberty-delaying treatment was covered by the NCSHP.

18.    C.B.'s puberty-delaying implant only lasted 12 to 18 months. Accordingly, C.B. needed the implant to be removed and replaced in early 2019.

19.    However, in mid-2018, Ms. Bunting learned of the reinstitution of the Exclusion of coverage for gender-confirming care within the NCSHP.

20.    Worried that we could not afford out-of-pocket the puberty-delaying treatment that C.B. needed, Ms. Bunting and I communicated with the NCSHP Board of Trustees, urging them to once again eliminate the Exclusion of gender-confirming health care within the NCSHP, with no success.

21.    Without coverage, the puberty-delaying implant for C.B. would have cost thousands of dollars.

22.    In mid-December 2018, following the lack of action by the NCSHP Board of Trustees at their December 2018 meeting to eliminate the Exclusion, Ms. Bunting and I decided to purchase an additional health insurance plan with that would cover puberty-delaying treatment for C.B. Through the federally run ACA health care exchange we purchased a separate insurance plan for C.B. from Blue Cross Blue Shield of North Carolina. Though C.B. and I remained enrolled in the NCSHP and will continue to do so, purchasing additional coverage for C.B. was necessary in order for my family to

4

be able to afford C.B.'s gender-confirming care. As a result, Ms. Bunting and I had to pay an additional monthly premium and a $6,750.00 deductible for C.B., separate and apart from C.B.'s existing coverage under the NCSHP.

23.    In early 2019, C.B. began obtaining puberty-delaying treatment via injection, rather than a longer-lasting implant, because that was the only puberty-delaying treatment on the formulary of the additional health insurance purchased to supplement the coverage under the NCSHP. In March 2019, C.B. also began obtaining hormone therapy as treatment for his gender dysphoria.

24.    The additional costs associated with C.B.'s gender-confirming care and the lack of coverage under the NCSHP due to the discriminatory Exclusion were a significant contributing factor in my decision to retire from UNC in 2019.

25.    At the time of my decision to retire, Ms. Bunting and I had just learned of the Exclusion and were faced with a potential medical bill for hormone blockers in excess of $29,000 that we did not know how we could afford. I retired and took another job in an effort to increase my income sufficiently to better afford C.B.'s gender-confirming care.

26.    C.B. and I remain enrolled in the NCSHP as a dependent and retiree, respectively, following my retirement on April 1, 2019. C.B. now receives masculinizing hormone therapy as part of his gender-confirming care, which he began in 2019. While

5

the family no longer purchases separate ACA coverage for C.B., C.B.'s hormone therapy is not covered by the NCSHP and we must pay for that care out-of-pocket.

27.    As a retired North Carolina state employee, I am enrolled in the NCSHP and receive health care benefits from this plan as part of my compensation. As a dependent of mine, C.B. is also enrolled in the NCSHP. I contributed $700 each month to the plan this past year. Even though I receive inferior coverage because of the Exclusion for gender-affirming care, I pay the same amount towards coverage as other members of the NCSHP.

28.    The lack of access to coverage through the state health plan has been a serious barrier at different points to helping C.B. be happy and healthy, and has imposed significant stress on our family.

29.    The Exclusion discriminates against and stigmatizes C.B. as a transgender person which has impacted me and my family financially and emotionally, causing us to experience ongoing stress, anxiety, and uncertainty. I lost countless hours of sleep worrying for my son, who I love and support, and how we would pay for his gender-confirming care. Further, the uncertainty caused by the Exclusion contributed in large part to me, a lifelong Tar Heel, leaving my dream job at UNC.

I declare under the penalty of perjury that the foregoing is true and correct.

6

**JA400**

DATED: November 22 , 2021

Michael D. Bunting, Jr.

Subscribed and sworn before me, a Notary Public in and for the Orange County ,

State of North Carolina , this 22ᵗʰ day of November , 2021.

Signature of Notary

7

# DECLARATION OF SAM SILVAINE

Case 1:19-cv-00272-LCB-LPA   Document 179-7   Filed 12/20/21   Page 1 of 6

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MAXWELL KADEL, *et al.*,

        *Plaintiffs*,

v.

DALE FOLWELL, in his official capacity as
State Treasurer of North Carolina, *et al.*,

        *Defendants*.

No. 1:19-cv-00272-LCB-LPA

**DECLARATION OF SAM SILVAINE**

1. I am a plaintiff in the above-captioned action. I have actual knowledge of the matters stated in this declaration.

2. I am a 33-year-old transgender man.

3. I was designated female at birth but have a male affirmed sex. I live all aspects of my life in accordance with my gender identity.

4. I am a Licensed Clinical Mental Health Counselor and own my own counseling practice.

5. I previously worked as a North Carolina state employee at North Carolina State University ("NCSU"), where I was a post-master's counseling fellow. I was enrolled in the 80/20 NCSHP for plan years 2016, 2017, and 2018.

6. While covered by the NCSHP, I paid the same amount for coverage as other State employees on the 80/20 plan.

1

7.    While I was working at NCSU, I lived with significant distress caused by gender dysphoria. This included distress and anxiety about how people treated me with regard to my gender, and discomfort with my physical appearance and with being seen as a woman. I felt this distress every day, almost constantly, and knew that I needed something to be different.

8.    As part of my prescribed treatment for gender dysphoria, in April 2017, I began hormone therapy.

9.    After struggling for so long with the feeling that my body did not match my gender identity, it was a relief to finally see myself come into alignment, at least in some regards, with my gender identity. Specifically, hormone therapy masculinized my voice, some of my secondary sex characteristics, and my physical appearance.

10.    Unfortunately, hormone treatment was not sufficient to alleviate my gender dysphoria. I still felt significant, daily distress related to my female-presenting chest. As my body became more masculine as a result of hormone therapy and in greater alignment with my gender identity, my typically female chest began to be even more noticeable to me. The marked incongruence increased my gender dysphoria.

11.    Not only did I feel that this aspect of my body was out of alignment with my gender identity, but it caused a risk to my safety to have a female-presenting chest when I otherwise presented as male.

2

12.     While I used a binder to compress my chest, binding caused me physical discomfort and restricted my physical activities. I love the outdoors and believe that time in nature is essential to my mental and physical well-being. Binding made it difficult for me to spend time in nature hiking, backpacking, and climbing.

13.     Eventually, in consultation with and support from my health care providers, I made the decision to seek chest surgery as part of treatment for my gender dysphoria.

14.     In 2017, my NCSHP plan did not contain a categorical Exclusion for gender-confirming health care.  My counseling and hormone therapy were covered.  In August 2017, my surgeon and I sought preauthorization for reconstructive chest surgery.

15.     The preauthorization process took until fall of 2017 and at that time, the earliest available surgery date that I could obtain was in March 2018.  I accepted the March 2018 date in order to avoid an even greater delay in the treatment I required.

16.     After the categorical Exclusion of gender-confirming care was reinstated on January 1, 2018, the prior authorization for my surgery was rendered invalid.

17.     When I found out that my health insurance was no longer going to cover the surgery I desperately needed, I was devastated mentally and emotionally. Like other transgender North Carolina state employees who suddenly found themselves without health insurance coverage for their medically necessary health care, I was placed in a difficult position.

3

18.    I was living with severe gender dysphoria and ultimately, I could not delay the surgery. I paid for the surgery out of pocket and underwent chest surgery on March 1, 2018. I was billed a total of $7,100 for the surgery.

19.    The surgery proved life-changing, even potentially lifesaving, for me and has significantly reduced the distress caused by my gender dysphoria. I feel that if I had not received this surgery and brought my body into alignment with my gender identity, I would be chronically suicidal.

20.    I have not been reimbursed by Defendants for my surgery costs or other out-of-pocket costs I incurred due to the Exclusion of gender-confirming health care in the 2018 plan.

* * *

I declare under the penalty of perjury that the foregoing is true and correct.

DATED: 11/22/2021

_____
Sam Silvaine

4

Subscribed and sworn before me, a Notary Public in and for the _Wake County_,

State of _North Carolina_, this _22_ day of _November_, 2021.



Commission expiry:

AUG 2 3 2026        Signature of Notary

## CERTIFICATE OF SERVICE

I certify that the foregoing document was filed electronically with the Clerk of
Court using the CM/ECF system which will send notification of such filing to all
registered users.

Dated: November 30, 2021

/s/ Amy E. Richardson
Amy E. Richardson
N.C. State Bar No. 28768
HARRIS, WILTSHIRE & GRANNIS LLP
1033 Wade Avenue, Suite 100
Raleigh, NC 27605-1155
Telephone: 919-429-7386
Facsimile: 202-730-1301
arichardson@hwglaw.com

_Counsel for Plaintiffs_

5

# DECLARATION OF SHELLEY K. BUNTING

Case 1:19-cv-00272-LCB-LPA   Document 179-8   Filed 12/20/21   Page 1 of 41

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MAXWELL KADEL, *et al.*,

    *Plaintiffs*,

v.

DALE FOLWELL, in his official capacity as
State Treasurer of North Carolina, *et al.*,

    *Defendants*.

No. 1:19-cv-00272-LCB-LPA

**DECLARATION OF SHELLEY K.
BUNTING**

Pursuant to 28 U.S.C.§ 1746, I hereby declare as follows:

1.    I am the parent and next friend of C.B., a plaintiff in the above-captioned

action. I have actual knowledge of the matters stated in this declaration.

2.    I am the mother of C.B., a 16-year-old boy. I have also been a nurse

practitioner for over 20 years.

3.    C.B. is a junior in high school. Like many teenage boys, he likes hanging

out with his friends, swimming, cars, and playing video games.

4.    C.B. is transgender, which means he was designated "female" at birth but

has a male gender identity.

5.    Ever since he was a young child, C.B. would reject stereotypically female

clothing and would dress in a more masculine manner. There were times he would refuse

to leave the house if the outfit I had picked out for him was too feminine or would be

considered "girl's clothes."

1

6.    In late 2016, he began wearing a short, typically masculine haircut.

7.    Though C.B. always got along with people and has many friends, he exhibited high levels of anxiety and depressive behaviors that concerned me as his mother.  His father and I later came to understand that these behaviors were was associated with C.B.'s untreated gender dysphoria.

8.    In January 2017, C.B., who was then 11 years old, called me into his room. He had something to tell me, and I could tell it was very hard for him to say it. Finally, he said, "Mama, I don't think I am supposed to be a girl." I hugged him, reassured him, and told him we would figure this out together.

9.    We spent the next several months gathering information and learning what it means to be transgender.

10.   Soon after C.B. shared with me who he was and how he felt, C.B., his father Michael D. Bunting, Jr., and I all met various times with a therapist in early 2017. After consultation with the therapist, C.B. asked to be placed on treatment to delay female puberty.

11.   In April of 2017, C.B., Mr. Bunting, and I sought an appointment with the Duke Child and Adolescent Gender Care Clinic ("Duke"), which was ultimately scheduled for August 2017.

12.   During the summer of 2017, C.B. socially transitioned to living as his true self, informing friends and family of his male gender identity, wearing more masculine clothes, and living openly as the boy he is.  However, as his chest began to develop

2

during the summer, I recall C.B. experiencing additional anxiety. C.B. was mortified by his breast buds and we spent all summer putting band aids over them so they were not visible through his swim shirts.

13.    As a result of the distress associated with his birth-designated sex, C.B. was diagnosed with gender dysphoria. In August 2017, C.B. began obtaining care from medical and mental health professionals and was prescribed puberty-delaying treatment, in the form of an implant, as part of his treatment for gender dysphoria.

14.    Following the beginning of C.B.'s treatment, we noticed that the anxiety he had been experiencing diminished and that he became a more happy, outgoing, and personable teenage boy. As parent, it was such a relief to see my son begin to be truly comfortable in his own skin.

15.    In fact, C.B. is treated and known as a boy at school and in all other aspects of his life. He legally changed his name to his current more typically male name in the Spring of 2018, and his passport and driver's license both reflect that he is male.

16.    Because Mr. Bunting enrolled in the NCSHP as a North Carolina state employee and remains enrolled and continues to receive health care benefits as a retiree, C.B. is also enrolled in the NCSHP, as a dependent. Our family contributes a premium each month to the plan. We pay the same amount for family coverage as others, even though we receive inferior coverage because of the exclusion for gender-affirming care.

17.    When C.B. came out to us in 2017, the NCSHP did not contain an exclusion for coverage of gender-confirming health care. As a result, we were fortunate

3

enough to have coverage for C.B.'s treatment for his gender dysphoria when we first started this journey in 2017.

18.     Without coverage in 2017, it would have been much more difficult, if not impossible, for us to pay for the medical care C.B. needed at the time. Without such treatment, C.B. would have undergone a puberty inconsistent with who he is and which would have been source of a lot of anxiety and stress for him. I cannot imagine how we would have handled that as a family and how worried we would have been about C.B.'s wellbeing.

19.     C.B.'s puberty-delaying implant was only meant to last 12 to 18 months. Accordingly, C.B. needed the implant to be removed and replaced in early 2019.

20.     However, in mid-2018, I learned of the reinstitution of the Exclusion of coverage for gender-confirming care within the NCSHP.

21.     Worried that we could not afford out-of-pocket the puberty-delaying treatment that C.B. needed, Mr. Bunting and I communicated with the NCSHP Board of Trustees, urging them to once again eliminate the Exclusion of gender-confirming health care within the NCSHP, with no success.

22.     I personally testified at the NCSHP Board of Trustees meeting on October 22, 2018 and provided written testimony for the meeting on December 10, 2018.

23.     Notwithstanding our pleas, the NCSHP Board of Trustees decided to keep the Exclusion of coverage for gender-confirming care in the NCSHP.

4

24.    Figuring out how we would pay for C.B.'s gender-confirming care caused a great deal of stress and strain within our family. As parents, we want to make sure that our children get access to whatever health care they need. However, we did not have the resources to pay for a puberty-delaying implant out of pocket.

25.    As we considered how we would pay for C.B.'s gender-confirming care, we contemplated several options including having my husband retire and find a new job outside of the state system, increasing my hours at work to full time, or trying to purchase a separate medical policy for my son through the Affordable Care Act Marketplace. None of these options were ideal since my husband was not ready to leave his job, I love the balance I have between family and professional life, and another policy would cost us several hundreds of dollars per month if C.B. qualified.

26.    Ultimately, we needed to avail ourselves of more than one of the above options to pay for C.B.'s care.

27.    In mid-December 2018, following the lack of action by the NCSHP Board of Trustees at their December 2018 meeting to eliminate the Exclusion, Mr. Bunting and I decided to purchase an additional health insurance plan that would cover puberty-delaying treatment for C.B. Through the federally-run ACA health care exchange, we purchased an additional insurance plan for C.B. from Blue Cross Blue Shield of North Carolina. A true and correct copy of the Certification of Health Insurance Coverage for this plan is attached as Exhibit A.

<div align="center">5</div>

28.     Though C.B. and Mr. Bunting remained enrolled in the NCSHP and will continue to do so, purchasing additional coverage for C.B. was necessary for my family to be able to afford C.B.'s gender-confirming care. As a result, Mr. Bunting and I had to pay an additional monthly premium of $199.57 as well as a $6,750.00 deductible for C.B., separate and apart from C.B.'s existing coverage under the NCSHP.

29.     In early 2019, C.B. began obtaining puberty-delaying treatment via injection, rather than a longer-lasting implant, because that was the only puberty-delaying treatment on the formulary of the additional health insurance we purchased to supplement the coverage under the NCSHP.

30.     In March 2019, C.B. was also prescribed testosterone as part of his treatment for gender dysphoria. Due to the Exclusion, the NCSHP has not covered any of this care.

31.     On March 21, 2019, CVS, which administers the prescription benefits under the NCSHP, issued a Notice of Determination denying prior authorization for coverage of C.B's Testosterone Cypionate IM Injection prescription. The Notice of Determination explained that C.B. did not meet the requirements of the NCSHP. Per the Notice of Determination, the prescription would have been covered for "primary or hypogonadotropic hypogonadism," among other reasons. A true and correct copy of the Notice of Determination is attached as Exhibit B.

32.     On March 25, 2019, January 17, 2020, and March 23, 2020, CVS issued additional Notices of Determination denying coverage for C.B.'s Testosterone Cypionate

6

IM Injection because he did not meet the requirements of the plan and the plan would cover the prescription if C.B. had "primary or hypogonadotropic hypogonadism." True and correct copies of theses Notices of Determination is attached as Exhibit C, Exhibit D, and Exhibit E, respectively.

33.     Aside from having to purchase the additional coverage for C.B., the lack of coverage under the NCSHP due to the discriminatory Exclusion forced our family to make difficult decisions. Given the high deductible of $6,750.00 that was part of the additional coverage, we still needed to come up with ways in which we could increase our income in order to pay for C.B.'s necessary care. This was a significant contributing factor to Mr. Bunting's decisions to retire from his job at UNC, which allowed him to obtain a new job and increase the family's income.

34.     Mr. Bunting and C.B. remain enrolled in the NCSHP as a retiree and his dependent, respectively.

35.     C.B. continues to receive masculinizing hormone therapy as part of his gender-confirming care. While the family no longer purchases separate ACA coverage, C.B.'s hormone therapy is not covered by the NCSHP and we must pay for that care out-of-pocket.

36.     The Exclusion discriminates against and stigmatizes C.B. as a transgender person which has impacted our family financially and emotionally, causing us to live a life of ongoing stress, anxiety, and uncertainty.

7

37.    No child should be denied medically necessary care because of who he is. Being discriminated against does not feel good.  Yet, that is what the NCSHP has done to my son and our family by refusing to cover his medically necessary health care because he is transgender.  It makes me mad and sad at the same time to know that our state refuses to pay for medically necessary health care for its own state employees and their families.


I declare under the penalty of perjury that the foregoing is true and correct.

DATED: November 24 , 2021                    _Shelley K. Bunting_
                                                          Shelley K. Bunting


Subscribed and sworn before me, a Notary Public in and for the _Chath cours_

State of _NC_ , this 24 day of _November_ , 2021.

Signature of Notary
5/12/2020

8

# Exhibit A

Declaration of Shelley K. Bunting
*Kadel v. Folwell*, No. 1:19-cv-00272-LCB-LPA

**BlueCross BlueShield of North Carolina**

An Independent Licensee of the Blue Cross and Blue Shield Association.

## CERTIFICATION OF HEALTH INSURANCE COVERAGE

12/31/2019

Subscriber ID: ▮▮▮▮▮▮▮▮

**IMPORTANT - KEEP THIS CERTIFICATE**: This certificate confirms your dates of health care coverage. Our records indicate your coverage was terminated as of the DATE COVERAGE ENDS shown below due to the subscriber requesting to be terminated from the policy. Under a federal law known as HIPAA, you may need evidence of your coverage to reduce a preexisting condition exclusion period under another plan, to help you get special enrollment in another plan, or to get certain types of individual health coverage even if you have health problems.

| MEMBER NAME | DATE COVERAGE BEGAN* | DATE COVERAGE ENDED |
|---|---|---|
| C.B. | 01/01/19 | 12/31/19 |

\* "Date Coverage Began" only reflects the start date of your most recent coverage. You may have had other Blue Cross and Blue Shield of North Carolina coverage that is not reflected in this certificate.

For questions about this form, please call Customer Service at 1-888-206-4697, 8 a.m. to 7 p.m., Monday through Friday, EST. We hope to have the opportunity to provide you and your family with your health plan needs again in the future.

## STATEMENT OF HIPAA PORTABILITY RIGHTS

**Preexisting condition exclusions**: Some group health plans restrict coverage for medical conditions present before an individual's enrollment. These restrictions are known as "preexisting condition exclusions." A preexisting condition exclusion can apply only to conditions for which medical advice, diagnosis, care, or treatment was recommended or received within 6 months before your "enrollment date." Your enrollment date is your first day of coverage under the plan, or, if there is a waiting period, the first day of your waiting period (typically, your first day of work). In addition, a preexisting condition exclusion cannot last for more than 12 months after your enrollment date (18 months if you are a late enrollee). Finally, a preexisting condition exclusion cannot apply to pregnancy and cannot apply to a child who is enrolled in health coverage within 30 days after birth, adoption, or placement for adoption.

If a plan imposes a preexisting condition exclusion, the length of the exclusion must be reduced by the amount of your prior creditable coverage. Most health coverage is creditable coverage, including group health plan coverage, COBRA continuation coverage, coverage under an individual health policy, Medicare, Medicaid, State Children's Health Insurance Program (SCHIP), and coverage through high-risk pools and the Peace Corps. Not all forms of creditable coverage are required to provide certificates like this one. If you do not receive a certificate for past coverage, talk to your plan administrator.

You can add up any creditable coverage you have, including the coverage shown on this certificate. However, if at any time you went for 63 days or more without any coverage (called a break in coverage) a plan may not have to count the coverage you had before the break.

Therefore, once your coverage ends, you should try to obtain alternative coverage as soon as possible to avoid a 63-day break. You may use this certificate as evidence of your creditable coverage to reduce the length of any preexisting condition exclusion if you enroll in another plan.

**Right to get special enrollment in another plan**: Under HIPAA, if you lose your group health plan coverage, you may be able to get into another group health plan for which you are eligible (such as a spouse's plan), even if the plan generally does not accept late enrollees, if you request enrollment within 30 days. (Additional special enrollment rights are triggered by marriage, birth, adoption, and placement for adoption.)

> Therefore, once your coverage ends, if you are eligible for coverage in another plan (such as a spouse's plan), you should request special enrollment as soon as possible.

**Prohibition against discrimination based on a health factor**: Under HIPAA, a group health plan may not keep you (or your dependents) out of the plan based on anything related to your health. Also, a group health plan may not charge you (or your dependents) more for coverage, based on health, than the amount charged for a similarly situated individual.

**Right to individual health coverage:** Under HIPAA, if you are an "eligible individual," you have a right to buy certain individual health policies (or in some states, to buy coverage through a high-risk pool) without a preexisting condition exclusion. To be an eligible individual, you must meet the following requirements:

- You have had coverage for at least 18 months without a break in coverage of 63 days or more;
- Your most recent coverage was under a group health plan (which can be shown by this certificate);
- Your group coverage was not terminated because of fraud or nonpayment of premiums;
- You are not eligible for COBRA continuation coverage or you have exhausted your COBRA benefits (or continuation coverage under a similar state provision); and
- You are not eligible for another group health plan, Medicare, or Medicaid, and do not have any other health insurance coverage.

The right to buy individual coverage is the same whether you are laid off, fired, or quit your job.

# Exhibit B

Declaration of Shelley K. Bunting
*Kadel v. Folwell*, No. 1:19-cv-00272-LCB-LPA

Case 1:19-cv-00272-LCB-LPA   Document 179-8   Filed 12/20/21   Page 13 of 41

 

## Notice of Determination

Date: 03/21/2019

C.B.

CHAPEL HILL, NC

Plan Member Name:     C.B.
Plan Member ID: *******
Plan Name: North Carolina State Health Plan 0274 Non-Grandfathered

Prescriber Name:
Prescriber Phone: 1-9196848225
Prescriber Fax: 1-9198625782

Dear     C.B.     :

CVS Caremark ® received a request from your provider for coverage of Testosterone Cypionate IM Injection. The request was denied because:

You do not meet the requirements of your plan. Your plan Testosterone Products criteria covers this drug when you meet one of these conditions:
- You have primary or hypogonadotropic hypogonadism
- For testosterone enanthate injection (generic Delatestryl), you are a postmenopausal patient with metastatic breast cancer, surgery is not possible, and other drugs for your cancer did not work for you
- For testosterone enanthate injection (generic Delatestryl), you are a premenopausal patient with breast cancer, have a hormone-responsive tumor, and had your ovaries removed
- Testosterone enanthate injection (generic Delatestryl) or Testopel is being prescribed for delayed puberty
Your request has been denied based on the information we have.

You can ask for a free copy of the actual benefit provision, guideline, protocol or other similar criterion used to make the decision and any other information related to this decision by calling Customer Care at 888-321-3124.

For more information regarding your prescription benefit, please refer to your Benefit Booklet available on the Plan's website at **www.shpnc.org**.

You may request an appeal by sending a written request to the address below. To be eligible for an appeal, your request must be in writing and received within 180 days of the date of this letter. Please mail or fax your appeal to:

This document contains references to brand-name prescription drugs that are trademarks or registered trademarks of pharmaceutical manufacturers not affiliated with CVS Caremark .
Your privacy is important to us. Our employees are trained regarding the appropriate way to handle your private health information.
91-40230B   110818                                                           TDD/TTY: 1-800-863-5488

# Exhibit C

Declaration of Shelley K. Bunting
*Kadel v. Folwell*, No. 1:19-cv-00272-LCB-LPA

 

## Notice of Determination

Date: 03/25/2019

C.B.

CHAPEL HILL, NC

Plan Member Name:    C.B.
Plan Member ID:  *******
Plan Name:  North Carolina State Health Plan 0274 Non-Grandfathered

Prescriber Name:
Prescriber Phone:  1-919-862-1200
Prescriber Fax:  1-919-862-5782

Dear    C.B.

CVS Caremark ® received a request from your provider for coverage of Testosterone Cypionate IM Injection. The request was denied because:

You do not meet the requirements of your plan. Your plan covers this drug when you have primary or hypogonadotropic hypogonadism. Your request has been denied based on the information we have.

You can ask for a free copy of the actual benefit provision, guideline, protocol or other similar criterion used to make the decision and any other information related to this decision by calling Customer Care at 888-321-3124.

For more information regarding your prescription benefit, please refer to your Benefit Booklet available on the Plan's website at **www.shpnc.org.**

You may request an appeal by sending a written request to the address below. To be eligible for an appeal, your request must be in writing and received within 180 days of the date of this letter. Please mail or fax your appeal to:

Blue Cross/Blue Shield of North Carolina
Appeals Department / Level I
PO Box 30055
Durham, NC 27702
Fax: 1-919-765-2322

If your situation is urgent as defined by law, you may ask for an expedited appeal. Important information about your appeal rights and directions about how to ask for an appeal are provided with this letter.

This document contains references to brand-name prescription drugs that are trademarks or registered trademarks of pharmaceutical manufacturers not affiliated with CVS Caremark .
Your privacy is important to us. Our employees are trained regarding the appropriate way to handle your private health information.
91-40230B  110818                                                                          TDD/TTY: 1-800-863-5488

If your provider would like to discuss this decision with a clinical reviewer at CVS Caremark , your provider can call CVS Caremark , and we will make arrangements for the conversation.

If you have questions, please call Customer Care at 888-321-3124.

Sincerely,

CVS Caremark

Enclosures

cc: Dr. █████████████

PA# North Carolina State Health Plan 0274 Non-Grandfathered 19-038180875 SB
Plan-approved Criteria: Testosterone Products
Claim Amount (if available): 0.0
Service Date: 3/25/2019 3:28:05 PM

If your provider included diagnosis or treatment codes with your claim for Testosterone Cypionate IM Injection to CVS Caremark , that information is listed here:
ICD diagnosis code: E34.9
Associated diagnosis: Endocrine disorder, unspecified
CPT treatment code:
Associated treatment:
You may wish to contact your provider for more information about these codes.

This document contains references to brand-name prescription drugs that are trademarks or registered trademarks of pharmaceutical manufacturers not affiliated with CVS Caremark .
Your privacy is important to us. Our employees are trained regarding the appropriate way to handle your private health information.
91-40230B   110818                                                                                    TDD/TTY: 1-800-863-5488

**Important Information About Your Appeal Rights**

**What if I need help understanding this denial?** You may contact CVS Caremark by calling **1-800-294-5979** if you need assistance understanding this notice or our decision to deny you a service or coverage.

**What options does my provider have?** If there is relevant information that has not been previously submitted, the treating physician may request a Provider Courtesy Review (PCR) by calling **1-800-446-8053 extension 52961** or by sending a written request within 180 days to:

>Blue Cross/Blue Shield of North Carolina
>Appeals Department / Provider Courtesy Review
>PO Box 30055
>Durham, NC 27702

**What if I don't agree with this decision**? You may request an appeal by sending a written request to the address below. To be eligible for an appeal, your request must be in writing and received within 180 days of the date of this letter.

>Blue Cross/Blue Shield of North Carolina
>Appeals Department / Level I
>PO Box 30055
>Durham, NC 27702

A member appeal form is available on the Web at **www.BCBSNC.com**.

**What if my situation is urgent?** If your situation meets the legal definition of urgency, the review of your claim will be conducted within 72 hours, or earlier if required by law. Generally, an urgent situation is one in which your health may be in serious jeopardy or, in the opinion of your physician, you may experience pain that cannot be adequately controlled while you wait for a decision on the external review of your claim. If you believe that your situation is urgent, you or your physician may request an expedited appeal by contacting Blue Cross and Blue Shield of North Carolina (Blue Cross NC) via mail or fax at the address below. In addition, you may have the ability to seek an expedited external review of your adverse benefit determination. To determine whether an external review process is available to you, please consult your benefit booklet or call BLUE CROSS NC customer service on the back of your ID Card.

>Blue Cross/Blue Shield of North Carolina
>Appeals Department / Level 1
>PO Box 30055
>Durham, NC 27702
>Fax:  1-919-765-2322

This document contains references to brand-name prescription drugs that are trademarks or registered trademarks of pharmaceutical manufacturers not affiliated with CVS Caremark .
Your privacy is important to us. Our employees are trained regarding the appropriate way to handle your private health information.
91-40230B  110818                                                                                    TDD/TTY:  1-800-863-5488

**Who may file an appeal?** You or someone whom you name to act for you (your authorized representative) may file an appeal. A member consent form is attached for your convenience and is also available online at **www.BCBSNC.com**.

**Can I provide additional information about my appeal?** Yes. As part of the appeal process, you have the right to submit supporting materials in advance of a decision being made on your appeal.

**What happens next?** If you appeal, BLUE CROSS NC will review the decision and provide you a written determination within 30 calendar days. If the adverse benefit determination is overturned, BLUE CROSS NC will provide coverage or payment for your health care item or service. If the adverse benefit determination is upheld, you may have additional appeal rights.

**How do I file a request for external review?** You may be eligible for an external review process. To determine whether an external review process is available to you, please consult your benefit booklet or call BLUE CROSS NC customer service on the back of your ID card.

**What other remedies do I have?** Depending on your plan, you may also have the right to bring action under section 502(a) of ERISA. You and your plan may have other voluntary alternative dispute resolution options, such as mediation. One way to find out what may be available is to contact your local U.S. Department of Labor office and your state insurance regulatory agency.

**Can I request copies of information relevant to my adverse benefit determination?** Yes. You may request and receive, at no cost to you, reasonable access to and copies of all documents, records and other information relevant to your claim by writing to:

> Blue Cross and Blue Shield of North Carolina
> Healthcare Management & Operations
> P. O. Box 2291
> Durham, NC 27702

This information may also include the following:
- Any internal rules, guidelines, protocols, or other criteria used to make this decision, including any clinical review criteria indicated above (please include the referenced medical policy from page 1 of this notice with your request); and/or
- If the decision is based on medical necessity, experimental treatment or another similar exclusion, an explanation of the scientific or clinical judgment for the determination, applied to your medical circumstances.

**Other resources to help you:** For questions about your rights, this notice, or for assistance, you can contact the Employee Benefits Security Administration at **1-866-444-EBSA (3272)**. You may also receive assistance with appeals from Smart

This document contains references to brand-name prescription drugs that are trademarks or registered trademarks of pharmaceutical manufacturers not affiliated with CVS Caremark .
Your privacy is important to us. Our employees are trained regarding the appropriate way to handle your private health information.
91-40230B  110818                                                                              TDD/TTY:  1-800-863-5488

**JA426**

NC by contacting:

North Carolina Department of Insurance
Health Insurance Smart NC
1201 Mail Service Center
Raleigh, NC 27699-1201
**1-855-408-1212** (toll-free)

**External Review**
North Carolina law provides for review of *adverse benefit determinations* by an
external, independent review organization (IRO). The North Carolina Department of
Insurance (NCDOI) administers this service at no charge to you, arranging for an IRO
to review your case once the NCDOI establishes that your request is complete and
eligible for review. *BLUE CROSS NC* will notify you of your right to request an external
review each time you receive:
- An *adverse benefit determination*, or
- An appeal decision upholding an *adverse benefit determination* or
- A second-level *appeal* decision upholding an *adverse benefit determination*.

You or someone whom you have authorized to represent you may request an external
review.

In order for your request to be eligible for an external review, the NCDOI must
determine the following:
- Your request is about a *medical necessity* determination that resulted in an
  *adverse benefit determination (i.e., a noncertification)*;
- You had coverage with *BLUE CROSS NC* when the *adverse benefit
  determination* was issued;
- The service for which the *adverse benefit determination* was issued appears to
  be a *covered service*; and
- You have exhausted *BLUE CROSS NC's* internal *appeal* review process as
  described below.

For a standard external review, you will have exhausted the internal *appeal* review
process if you have:
- Completed *BLUE CROSS NC's* first- and second-level *appeal* review and
  received a written second-level determination from *BLUE CROSS NC*, or
- Filed a second-level *appeal* and have not requested or agreed to a delay in the
  second-level *appeal* process, but have not received *BLUE CROSS NC's* written
  decision within 60 days from the date that you can demonstrate that an appeal
  was filed with BLUE CROSS NC, or
- received written notification that *BLUE CROSS NC* has agreed to waive the
  requirement to exhaust the internal *appeal* and/or second-level *appeal* process.

External reviews are performed on a standard or expedited basis, depending on which
is requested and on whether medical circumstances meet the criteria for expedited

This document contains references to brand-name prescription drugs that are trademarks or registered trademarks of pharmaceutical
manufacturers not affiliated with CVS Caremark .
Your privacy is important to us. Our employees are trained regarding the appropriate way to handle your private health information.
91-40230B  110818                                                                          TDD/TTY: 1-800-863-5488

**JA427**

review.

**Standard External Review**
For all requests for a standard external review, you must file your request with the
NCDOI within 120 days of receiving one of the notices listed above.

If the request for an external review is related to a retrospective *adverse benefit
determination* (an *adverse benefit determination* that occurs after you have already
received the services in question), the 60-day time limit for receiving *BLUE CROSS
NC's* second-level determination does not apply. You will not be eligible to request an
external review until you have exhausted the internal appeal process and have
received a written second-level determination from *BLUE CROSS NC*.

**Expedited External Review**
An expedited external review may be available if the time required to complete either
an expedited internal first- or second-level appeal review or a standard external review
would reasonably be expected to seriously jeopardize your life or health or to
jeopardize your ability to regain maximum function. If you meet this requirement, you
may file a request to the NCDOI for an expedited external review, after you receive:
· An *adverse benefit determination* from *BLUE CROSS NC* and have filed a
  request with *BLUE CROSS NC* for an expedited first-level appeal; or
· A first-level appeal decision upholding an *adverse benefit determination* and
  have filed a request with *BLUE CROSS NC* for an expedited second-level *appeal*
  review; or
· A second-level *appeal* review decision from *BLUE CROSS NC*.

In addition, prior to your discharge from an inpatient facility, you may also request an
expedited external review after receiving a first-level appeal or second-level appeal
decision concerning an adverse benefit determination of the admission, availability of
care, continued stay or emergency health care services.

If your request is not accepted for expedited review, the NCDOI may (1) accept the
case for standard external review if you have exhausted the internal appeal review
process; or (2) require the completion of the internal appeal review process and
another request for an external review. An expedited external review is not available for
retrospective adverse benefit determinations.

When processing your request for external review, the NCDOI will require you to
provide the NCDOI with a written, signed authorization for the release of any of your
medical records that need to be reviewed for the purpose of reaching a decision on the
external review. For further information about external review or to request an external
review, contact the NCDOI at:

This document contains references to brand-name prescription drugs that are trademarks or registered trademarks of pharmaceutical
manufacturers not affiliated with CVS Caremark .
Your privacy is important to us. Our employees are trained regarding the appropriate way to handle your private health information.
91-40230B   110818                                                                            TDD/TTY:  1-800-863-5488

(Mail)
By Mail:
NC Department of Insurance
Health Insurance Smart NC
1201 Mail Service Center
Raleigh, NC 27699-1201
Toll-Free Telephone: **1-855-408-1212**
**www.ncdoi.com/smart**

(In person)
For the physical address for Health Insurance Smart NC, please visit the web-page:
**http://www.ncdoi.com/Smart**
Toll-Free Telephone: **1-855-408-1212**

The Healthcare Review Program provides consumer counseling on utilization review
and appeal issues. Within ten business days (or, for an expedited review, within three
business days) of receipt of your request for an external review, the NCDOI will notify
you and your provider of whether your request is complete and whether it has been
accepted. If the NCDOI notifies you that your request is incomplete, you must provide
all requested, additional information to the NCDOI within 150 days of the written notice
from BLUE CROSS NC upholding an adverse benefit determination (generally the
notice of a second-level appeal review decision), which initiated your request for an
external review. If the NCDOI accepts your request, the acceptance notice will include:
(i) name and contact information for the IRO assigned to your case; (ii) a copy of the
information about your case that BLUE CROSS NC has provided to the NCDOI; and (iii)
a notification that you may submit additional written information and supporting
documentation relevant to the initial adverse benefit determination to the assigned IRO
within seven days after the receipt of the notice. It is presumed that you have received
written notice two days after the notice was mailed. Within seven days of BLUE CROSS
NC's receipt of the acceptance notice (or, for an expedited review, within the same
business day), BLUE CROSS NC shall provide the IRO and you, by the same or similar
expeditious means of communication, the documents and any information considered
in making the adverse benefit determination, appeal decision or the second-level
appeal review decision. If you choose to provide any additional information to the IRO,
you must also provide that same information to BLUE CROSS NC at the same time and
by the same means of communication (e.g., you must fax the information to BLUE
CROSS NC if you faxed it to the IRO). When sending additional information to BLUE
CROSS NC, send it to:

(Mail)
Blue Cross/Blue Shield of North Carolina
Appeals Department
PO Box 30055
Durham, NC 27702

This document contains references to brand-name prescription drugs that are trademarks or registered trademarks of pharmaceutical
manufacturers not affiliated with CVS Caremark .
Your privacy is important to us. Our employees are trained regarding the appropriate way to handle your private health information.
91-40230B   110818                                                                TDD/TTY: 1-800-863-5488

**Questions? Do you need help in a different language or format?** If you do not speak English or have special needs, oral interpretation and alternate formats of this notice are available, as is other assistance, by contacting us at the number on your State Health Plan ID card.

**Spanish:**
Si usted necesita asistencia o necesita hablar con alguien en Español, por favor llame al número gratuito de Servicio al Cliente ubicado en su tarjeta de identificación de beneficios.

**Chinese (simplified):**
如果您需要帮助，或需要同中国人讲话，请拨打您的福利卡上面的客户服务免费电话号码。

**Tagalog:**
Kung kailangan ninyo ng tulong o kailangan ninyong makipag-usap sa isang tao sa Tagalog, mangyari lamang na tumawag nang walang-bayad sa Serbisyo sa Kostumer sa numero na nakasulat sa inyong ID kard ng benepisyo.

**Navajo:**
Shíka at'ohwol ei doodaii' dinék'ehgo łą bi'chį haadeedziih nínízinígo, t'áá shǫǫdí, t'áá jíík'e ya ndaalníshí, ni naaltsoos bikáa'gi bi'chį hodiilniih.

This document contains references to brand-name prescription drugs that are trademarks or registered trademarks of pharmaceutical manufacturers not affiliated with CVS Caremark .
Your privacy is important to us. Our employees are trained regarding the appropriate way to handle your private health information.
91-40230B   110818             TDD/TTY: 1-800-863-5488

## Notice of Nondiscrimination

Federal civil rights laws prohibit certain health programs and activities from discriminating on the basis of race, color, national origin, age, disability, or sex. The laws apply to health programs and activities that receive funding from the Federal government, are administered by a Federal agency or are offered on a public Health Insurance Marketplace. Health plans that are subject to the laws include Medicare Part D plans, Medicaid plans, health plans offered by issuers on Health Insurance Marketplaces, and certain employee health benefit plans. If you have questions about whether these Federal civil rights laws apply to your plan, please contact your health plan at the number in your benefit plan materials.

If your health plan is subject to these Federal civil rights laws, it complies with the laws and does not discriminate on the basis of race, color, national origin, age, disability, or sex and does not exclude people or treat them differently because of race, color, national origin, age, disability, or sex.

Your health plan:

- Provides appropriate aids and services, free of charge, when necessary to ensure that people with disabilities have an equal opportunity to communicate effectively with us, such as:
  - Auxiliary aids and services
  - Written information in other formats (large print, audio, accessible electronic formats, other formats)

- Provides language assistance services, free of charge, when necessary to provide meaningful access to people whose primary language is not English, such as:
  - Qualified interpreters
  - Information written in other languages

If you need these services, call Customer Care at the phone number on your benefit ID card.

If you believe these services have not been appropriately provided to you or you have been discriminated against on the basis of race, color, national origin, age, disability, or sex, you can file a grievance by mail, fax, or email with your health plan's Civil Rights Coordinator.

You may also contact Customer Care and we will direct your grievance to your health plan's Civil Rights Coordinator:

Nondiscrimination Grievance Coordinator
PO BOX 6590, Lee's Summit, MO 64064-6590
Phone: 1-866-526-4075
TTY: 1-800-863-5488
Fax: 1-855-245-2135
Email: nondiscrimination@cvscaremark.com

If you need additional help filing a grievance, your health plan's Civil Rights Coordinator is available to help you.

You can also file a civil rights complaint with the U.S. Department of Health and Human Services, Office for Civil Rights electronically through the Office for Civil Rights Complaint Portal, available at https://ocrportal.hhs.gov/ocr/portal/lobby.jsf or by mail or phone at:

U.S. Department of Health and Human Services
200 Independence Avenue, SW
Room 509F, HHH Building
Washington, DC 20201
1-800-368-1019, 1-800-537-7697 (TDD)

Complaint forms are available at http://www.hhs.gov/ocr/office/file/index.html.

106 39432A 092316

**JA431**

# Exhibit D

Declaration of Shelley K. Bunting
*Kadel v. Folwell*, No. 1:19-cv-00272-LCB-LPA

   

**Notice of Determination**

Date: 01/17/2020

C.B.

CHAPEL HILL, NC

Plan Member Name:      C.B.
Plan Member ID:  *******
Plan Name:  North Carolina State Health Plan 0274 Non-Grandfathered

Prescriber Name:
Prescriber Phone: 1-9196848225
Prescriber Fax: 1-9198625372

Dear      C.B.      :

CVS Caremark ® received a request from your provider for coverage of Testosterone
Cypionate IM Injection. The request was denied because:

You do not meet the requirements of your plan. Your Testosterone Products plan
covers this drug when you meet one of these conditions:
- You have primary or hypogonadotropic hypogonadism
Your request has been denied based on the information we have.

You can ask for a free copy of the actual benefit provision, guideline, protocol or other
similar criterion used to make the decision and any other information related to this
decision by calling Customer Care at **888-321-3124**.

For more information regarding your prescription benefit, please refer to your Benefit
Booklet available on the Plan's website at **www.shpnc.org**.

You may request an appeal by sending a written request to the address below. To be
eligible for an appeal, your request must be in writing and received within 180 days of
the date of this letter. Please mail or fax your appeal to:

>    Blue Cross/Blue Shield of North Carolina
>    Appeals Department / Level I
>    PO Box 30055
>    Durham, NC 27702
>    Fax: 1-919-765-2322

If your situation is urgent as defined by law, you may ask for an expedited appeal.
Important information about your appeal rights and directions about how to ask for an

This document contains references to brand-name prescription drugs that are trademarks or registered trademarks of pharmaceutical
manufacturers not affiliated with CVS Caremark .
Your privacy is important to us. Our employees are trained regarding the appropriate way to handle your private health information.
91-40230B  081319                                                              TDD/TTY:  1-800-863-5488

appeal are provided with this letter.

If your provider would like to discuss this decision with a clinical reviewer at CVS Caremark , your provider can call CVS Caremark , and we will make arrangements for the conversation.

If you have questions, please call Customer Care at **888-321-3124**.

Sincerely,

CVS Caremark

Enclosures

cc: Dr. ▮▮▮▮▮▮▮▮

PA# North Carolina State Health Plan 0274 Non-Grandfathered 20-043207569 MN
Plan-approved Criteria: Testosterone Products
Claim Amount (if available):
Service Date: 1/17/2020 12:22:09 PM

If your provider included diagnosis or treatment codes with your claim for Testosterone Cypionate IM Injection to CVS Caremark , that information is listed here:
ICD diagnosis code: F64.0
Associated diagnosis: Transsexualism
CPT treatment code:
Associated treatment:
You may wish to contact your provider for more information about these codes.

This document contains references to brand-name prescription drugs that are trademarks or registered trademarks of pharmaceutical manufacturers not affiliated with CVS Caremark .
Your privacy is important to us. Our employees are trained regarding the appropriate way to handle your private health information.
91-40230B  081319                                                                                    TDD/TTY  1-800-863-5488

## Important Information About Your Appeal Rights

**What if I need help understanding this denial?** You may contact CVS Caremark  by calling **1-800-294-5979** if you need assistance understanding this notice or our decision to deny you a service or coverage.

**What options does my provider have?** If there is relevant information that has not been previously submitted, the treating physician may request a Provider Courtesy Review (PCR) by calling **1-800-446-8053** and ask for Pharmacy Provider Courtesy Reviews or by calling **(919) 765-2961**. You may also send a written request within 180 days to:

> Blue Cross/Blue Shield of North Carolina
> Appeals Department / Provider Courtesy Review
> PO Box 30055
> Durham, NC 27702

**What if I don't agree with this decision**? You may request an appeal by sending a written request to the address below. To be eligible for an appeal, your request must be in writing and received within 180 days of the date of this letter.

> Blue Cross/Blue Shield of North Carolina
> Appeals Department / Level I
> PO Box 30055
> Durham, NC 27702

A member appeal form is available on the Web at **www.BCBSNC.com**.

**What if my situation is urgent?** If your situation meets the legal definition of urgency, the review of your claim will be conducted within 72 hours, or earlier if required by law. Generally, an urgent situation is one in which your health may be in serious jeopardy or, in the opinion of your physician, you may experience pain that cannot be adequately controlled while you wait for a decision on the external review of your claim. If you believe that your situation is urgent, you or your physician may request an expedited appeal by contacting Blue Cross and Blue Shield of North Carolina (Blue Cross NC) via mail or fax at the address below. In addition, you may have the ability to seek an expedited external review of your adverse benefit determination. To determine whether an external review process is available to you, please consult your benefit booklet or call BLUE CROSS NC customer service on the back of your ID Card.

> Blue Cross/Blue Shield of North Carolina
> Appeals Department / Level 1
> PO Box 30055
> Durham, NC 27702
> Fax: 1-919-765-2322

This document contains references to brand-name prescription drugs that are trademarks or registered trademarks of pharmaceutical manufacturers not affiliated with CVS Caremark .
Your privacy is important to us. Our employees are trained regarding the appropriate way to handle your private health information.
91-40230B  081319                                                                                         TDD/TTY: 1-800-863-5488

**JA435**

**Who may file an appeal?** You or someone whom you name to act for you (your authorized representative) may file an appeal. A member consent form is attached for your convenience and is also available online at **www.BCBSNC.com**.

**Can I provide additional information about my appeal?** Yes. As part of the appeal process, you have the right to submit supporting materials in advance of a decision being made on your appeal.

**What happens next?** If you appeal, BLUE CROSS NC will review the decision and provide you a written determination within 30 calendar days. If the adverse benefit determination is overturned, BLUE CROSS NC will provide coverage or payment for your health care item or service. If the adverse benefit determination is upheld, you may have additional appeal rights.

**How do I file a request for external review?** You may be eligible for an external review process. To determine whether an external review process is available to you, please consult your benefit booklet or call BLUE CROSS NC customer service on the back of your ID card.

**What other remedies do I have?** Depending on your plan, you may also have the right to bring action under section 502(a) of ERISA. You and your plan may have other voluntary alternative dispute resolution options, such as mediation. One way to find out what may be available is to contact your local U.S. Department of Labor office and your state insurance regulatory agency.

**Can I request copies of information relevant to my adverse benefit determination?** Yes. You may request and receive, at no cost to you, reasonable access to and copies of all documents, records and other information relevant to your claim by writing to:

> Blue Cross and Blue Shield of North Carolina
> Healthcare Management & Operations
> P. O. Box 2291
> Durham, NC 27702

This information may also include the following:
- Any internal rules, guidelines, protocols, or other criteria used to make this decision, including any clinical review criteria indicated above (please include the referenced medical policy from page 1 of this notice with your request); and/or
- If the decision is based on medical necessity, experimental treatment or another similar exclusion, an explanation of the scientific or clinical judgment for the determination, applied to your medical circumstances.

**Other resources to help you:** For questions about your rights, this notice, or for assistance, you can contact the Employee Benefits Security Administration at **1-866-444-EBSA (3272)**.

This document contains references to brand-name prescription drugs that are trademarks or registered trademarks of pharmaceutical manufacturers not affiliated with CVS Caremark .
Your privacy is important to us. Our employees are trained regarding the appropriate way to handle your private health information.
91-40230B  081319                                                                    TDD/TTY:  1-800-863-5488

You may also receive assistance with appeals from Smart NC by contacting:

North Carolina Department of Insurance
Health Insurance Smart NC
1201 Mail Service Center
Raleigh, NC 27699-1201 **1-855-408-1212** (toll-free)

### External Review

North Carolina law provides for review of *adverse benefit determinations* by an external, independent review organization (IRO). The North Carolina Department of Insurance (NCDOI) administers this service at no charge to you, arranging for an IRO to review your case once the NCDOI establishes that your request is complete and eligible for review. *BLUE CROSS NC* will notify you of your right to request an external review each time you receive:

- An *adverse benefit determination*, or
- An appeal decision upholding an *adverse benefit determination* or
- A second-level *appeal* decision upholding an *adverse benefit determination.*

You or someone whom you have authorized to represent you may request an external review.

In order for your request to be eligible for an external review, the NCDOI must determine the following:

- Your request is about a *medical necessity* determination that resulted in an *adverse benefit determination (i.e., a noncertification)*;
- You had coverage with *BLUE CROSS NC* when the *adverse benefit determination* was issued;
- The service for which the *adverse benefit determination* was issued appears to be a *covered service*; and
- You have exhausted *BLUE CROSS NC's* internal *appeal* review process as described below.

For a standard external review, you will have exhausted the internal *appeal* review process if you have:

- Completed *BLUE CROSS NC's* first- and second-level *appeal* review and received a written second-level determination from *BLUE CROSS NC*, or
- Filed a second-level *appeal* and have not requested or agreed to a delay in the second-level *appeal* process, but have not received *BLUE CROSS NC's* written decision within 60 days from the date that you can demonstrate that an appeal was filed with BLUE CROSS NC, or
- received written notification that *BLUE CROSS NC* has agreed to waive the requirement to exhaust the internal *appeal* and/or second-level *appeal* process.

External reviews are performed on a standard or expedited basis, depending on which is requested and on whether medical circumstances meet the criteria for expedited review.

This document contains references to brand-name prescription drugs that are trademarks or registered trademarks of pharmaceutical manufacturers not affiliated with CVS Caremark
Your privacy is important to us. Our employees are trained regarding the appropriate way to handle your private health information.
91-40230B 081319    TDD/TTY: 1-800-863-5488

**Standard External Review**

For all requests for a standard external review, you must file your request with the NCDOI within 120 days of receiving one of the notices listed above.

If the request for an external review is related to a retrospective *adverse benefit determination* (an *adverse benefit determination* that occurs after you have already received the services in question), the 60-day time limit for receiving *BLUE CROSS NC's* second-level determination does not apply. You will not be eligible to request an external review until you have exhausted the internal appeal process and have received a written second-level determination from *BLUE CROSS NC.*

**Expedited External Review**

An expedited external review may be available if the time required to complete either an expedited internal first- or second-level appeal review or a standard external review would reasonably be expected to seriously jeopardize your life or health or to jeopardize your ability to regain maximum function. If you meet this requirement, you may file a request to the NCDOI for an expedited external review, after you receive:

- · An *adverse benefit determination* from *BLUE CROSS NC* and have filed a request with *BLUE CROSS NC* for an expedited first-level appeal; or
- · A first-level appeal decision upholding an *adverse benefit determination* and have filed a request with *BLUE CROSS NC* for an expedited second-level *appeal* review; or
- · A second-level *appeal* review decision from *BLUE CROSS NC.*

In addition, prior to your discharge from an inpatient facility, you may also request an expedited external review after receiving a first-level appeal or second-level appeal decision concerning an adverse benefit determination of the admission, availability of care, continued stay or emergency health care services.

If your request is not accepted for expedited review, the NCDOI may (1) accept the case for standard external review if you have exhausted the internal appeal review process; or (2) require the completion of the internal appeal review process and another request for an external review. An expedited external review is not available for retrospective adverse benefit determinations.

When processing your request for external review, the NCDOI will require you to provide the NCDOI with a written, signed authorization for the release of any of your medical records that need to be reviewed for the purpose of reaching a decision on the external review. For further information about external review or to request an external review, contact the NCDOI at:

This document contains references to brand-name prescription drugs that are trademarks or registered trademarks of pharmaceutical manufacturers not affiliated with CVS Caremark .
Your privacy is important to us. Our employees are trained regarding the appropriate way to handle your private health information.
91-40230B   081319                                                                TDD/TTY:  1-800-863-5488

**Questions? Do you need help in a different language or format?** If you do not speak English or have special needs, oral interpretation and alternate formats of this notice are available, as is other assistance, by contacting us at the number on your State Health Plan ID card.

**Spanish:**
Si usted necesita asistencia o necesita hablar con alguien en Español, por favor llame al número gratuito de Servicio al Cliente ubicado en su tarjeta de identificación de beneficios.

**Chinese (simplified):**
如果您需要帮助，或需要同中国人讲话，请拨打您的福利卡上面的客户服务免费电话号码。

**Tagalog:**
Kung kailangan ninyo ng tulong o kailangan ninyong makipag-usap sa isang tao sa Tagalog, mangyari lamang na tumawag nang walang-bayad sa Serbisyo sa Kostumer sa numero na nakasulat sa inyong ID kard ng benepisyo.

**Navajo:**
Shíka at'ohwol ei doodaii' dinék'ehgo łą bi'chị haadeedziih nínízinígo, t'áá shǫǫdí, t'áá jíík'e ya ndaalníshí, ni naaltsoos bikáa'gi bi'chị hodiilniih.

This document contains references to brand-name prescription drugs that are trademarks or registered trademarks of pharmaceutical manufacturers not affiliated with CVS Caremark
Your privacy is important to us. Our employees are trained regarding the appropriate way to handle your private health information.
91-40230B   081319                                                          TDD/TTY:  1-800-863-5488

# Exhibit E

Declaration of Shelley K. Bunting
*Kadel v. Folwell*, No. 1:19-cv-00272-LCB-LPA



 

**Notice of Determination**

Date: 03/23/2020

C.B.

CHAPEL HILL, NC

Plan Member Name: C.B.
Plan Member ID: *******
Plan Name: North Carolina State Health Plan 0274 Non-Grandfathered

Prescriber Name:
Prescriber Phone: 1-9199543993
Prescriber Fax: 1-9198625782

Dear C.B.

CVS Caremark ® received a request from your provider for coverage of Testosterone Cypionate 200MG/ML IM SOLN. The request was denied because:

You do not meet the requirements of your plan. Your plan approved Testosterone Products criteria covers this drug when you meet one of these conditions:
- You have primary or hypogonadotropic hypogonadism
- For testosterone enanthate injection (generic Delatestryl), you are a postmenopausal patient with metastatic breast cancer, surgery is not possible, and other drugs for your cancer did not work for you
- For testosterone enanthate injection (generic Delatestryl), you are a premenopausal patient with breast cancer, have a hormone-responsive tumor, and had your ovaries removed
- Testosterone enanthate injection (generic Delatestryl) or Testopel is being prescribed for delayed puberty
Your request has been denied based on the information we have.

You can ask for a free copy of the actual benefit provision, guideline, protocol or other similar criterion used to make the decision and any other information related to this decision by calling Customer Care at **888-321-3124**.

For more information regarding your prescription benefit, please refer to your Benefit Booklet available on the Plan's website at **www.shpnc.org**.

You may request an appeal by sending a written request to the address below. To be eligible for an appeal, your request must be in writing and received within 180 days of the date of this letter. Please mail or fax your appeal to:

This document contains references to brand-name prescription drugs that are trademarks or registered trademarks of pharmaceutical manufacturers not affiliated with CVS Caremark .
Your privacy is important to us. Our employees are trained regarding the appropriate way to handle your private health information.
91-40230B  081319                                                                        TDD/TTY: 1-800-863-5488

Blue Cross/Blue Shield of North Carolina
Appeals Department / Level I
PO Box 30055
Durham, NC 27702
Fax: 1-919-765-2322

If your situation is urgent as defined by law, you may ask for an expedited appeal.
Important information about your appeal rights and directions about how to ask for an
appeal are provided with this letter.

If your provider would like to discuss this decision with a clinical reviewer at CVS
Caremark , your provider can call CVS Caremark , and we will make arrangements for
the conversation.

If you have questions, please call Customer Care at **888-321-3124**.

Sincerely,

CVS Caremark

Enclosures

cc: Dr. ▮▮▮▮▮▮▮▮▮

PA# North Carolina State Health Plan 0274 Non-Grandfathered 20-044413290 JR
Plan-approved Criteria: Testosterone Products
Claim Amount (if available):
Service Date: 3/23/2020 3:21:05 PM

If your provider included diagnosis or treatment codes with your claim for Testosterone
Cypionate 200MG/ML IM SOLN to CVS Caremark , that information is listed here:
ICD diagnosis code: F64.0
Associated diagnosis: Transsexualism
CPT treatment code:
Associated treatment:
You may wish to contact your provider for more information about these codes.

This document contains references to brand-name prescription drugs that are trademarks or registered trademarks of pharmaceutical
manufacturers not affiliated with CVS Caremark .
Your privacy is important to us. Our employees are trained regarding the appropriate way to handle your private health information.
91-40230B   081319                                                                              TDD/TTY:  1-800-863-5488

## Important Information About Your Appeal Rights

**What if I need help understanding this denial?** You may contact CVS Caremark by calling **1-800-294-5979** if you need assistance understanding this notice or our decision to deny you a service or coverage.

**What options does my provider have?** If there is relevant information that has not been previously submitted, the treating physician may request a Provider Courtesy Review (PCR) by calling **1-800-446-8053** and ask for Pharmacy Provider Courtesy Reviews or by calling **(919) 765-2961**. You may also send a written request within 180 days to:

> Blue Cross/Blue Shield of North Carolina
> Appeals Department / Provider Courtesy Review
> PO Box 30055
> Durham, NC 27702

**What if I don't agree with this decision?** You may request an appeal by sending a written request to the address below. To be eligible for an appeal, your request must be in writing and received within 180 days of the date of this letter.

> Blue Cross/Blue Shield of North Carolina
> Appeals Department / Level I
> PO Box 30055
> Durham, NC 27702

A member appeal form is available on the Web at **www.BCBSNC.com**.

**What if my situation is urgent?** If your situation meets the legal definition of urgency, the review of your claim will be conducted within 72 hours, or earlier if required by law. Generally, an urgent situation is one in which your health may be in serious jeopardy or, in the opinion of your physician, you may experience pain that cannot be adequately controlled while you wait for a decision on the external review of your claim. If you believe that your situation is urgent, you or your physician may request an expedited appeal by contacting Blue Cross and Blue Shield of North Carolina (Blue Cross NC) via mail or fax at the address below. In addition, you may have the ability to seek an expedited external review of your adverse benefit determination. To determine whether an external review process is available to you, please consult your benefit booklet or call BLUE CROSS NC customer service on the back of your ID Card.

> Blue Cross/Blue Shield of North Carolina
> Appeals Department / Level 1
> PO Box 30055
> Durham, NC 27702
> Fax: 1-919-765-2322

This document contains references to brand-name prescription drugs that are trademarks or registered trademarks of pharmaceutical manufacturers not affiliated with CVS Caremark .
Your privacy is important to us. Our employees are trained regarding the appropriate way to handle your private health information.
91-40230B   081319                                                          TDD/TTY:  1-800-863-5488

**Who may file an appeal?** You or someone whom you name to act for you (your authorized representative) may file an appeal. A member consent form is attached for your convenience and is also available online at **www.BCBSNC.com**.

**Can I provide additional information about my appeal?** Yes. As part of the appeal process, you have the right to submit supporting materials in advance of a decision being made on your appeal.

**What happens next?** If you appeal, BLUE CROSS NC will review the decision and provide you a written determination within 30 calendar days. If the adverse benefit determination is overturned, BLUE CROSS NC will provide coverage or payment for your health care item or service. If the adverse benefit determination is upheld, you may have additional appeal rights.

**How do I file a request for external review?** You may be eligible for an external review process. To determine whether an external review process is available to you, please consult your benefit booklet or call BLUE CROSS NC customer service on the back of your ID card.

**What other remedies do I have?** Depending on your plan, you may also have the right to bring action under section 502(a) of ERISA. You and your plan may have other voluntary alternative dispute resolution options, such as mediation. One way to find out what may be available is to contact your local U.S. Department of Labor office and your state insurance regulatory agency.

**Can I request copies of information relevant to my adverse benefit determination?** Yes. You may request and receive, at no cost to you, reasonable access to and copies of all documents, records and other information relevant to your claim by writing to:

> Blue Cross and Blue Shield of North Carolina
> Healthcare Management & Operations
> P. O. Box 2291
> Durham, NC 27702

This information may also include the following:
- Any internal rules, guidelines, protocols, or other criteria used to make this decision, including any clinical review criteria indicated above (please include the referenced medical policy from page 1 of this notice with your request); and/or
- If the decision is based on medical necessity, experimental treatment or another similar exclusion, an explanation of the scientific or clinical judgment for the determination, applied to your medical circumstances.

**Other resources to help you:** For questions about your rights, this notice, or for assistance, you can contact the Employee Benefits Security Administration at **1-866-444-EBSA (3272).**

This document contains references to brand-name prescription drugs that are trademarks or registered trademarks of pharmaceutical manufacturers not affiliated with CVS Caremark .
Your privacy is important to us. Our employees are trained regarding the appropriate way to handle your private health information.
91-40230B   081319                                                                              TDD/TTY: 1-800-863-5488

You may also receive assistance with appeals from Smart NC by contacting:

North Carolina Department of Insurance
Health Insurance Smart NC
1201 Mail Service Center
Raleigh, NC 27699-1201**-855-408-1212** (toll-free)

**External Review**
North Carolina law provides for review of *adverse benefit determinations* by an external, independent review organization (IRO). The North Carolina Department of Insurance (NCDOI) administers this service at no charge to you, arranging for an IRO to review your case once the NCDOI establishes that your request is complete and eligible for review. *BLUE CROSS NC* will notify you of your right to request an external review each time you receive:
- An *adverse benefit determination*, or
- An appeal decision upholding an *adverse benefit determination* or
- A second-level *appeal* decision upholding an *adverse benefit determination*.

You or someone whom you have authorized to represent you may request an external review.

In order for your request to be eligible for an external review, the NCDOI must determine the following:
- Your request is about a *medical necessity* determination that resulted in an *adverse benefit determination (i.e., a noncertification)*;
- You had coverage with *BLUE CROSS NC* when the *adverse benefit determination* was issued;
- The service for which the *adverse benefit determination* was issued appears to be a *covered service*; and
- You have exhausted *BLUE CROSS NC's* internal *appeal* review process as described below.

For a standard external review, you will have exhausted the internal *appeal* review process if you have:
- Completed *BLUE CROSS NC's* first- and second-level *appeal* review and received a written second-level determination from *BLUE CROSS NC*, or
- Filed a second-level *appeal* and have not requested or agreed to a delay in the second-level *appeal* process, but have not received *BLUE CROSS NC's* written decision within 60 days from the date that you can demonstrate that an appeal was filed with BLUE CROSS NC, or
- received written notification that *BLUE CROSS NC* has agreed to waive the requirement to exhaust the internal *appeal* and/or second-level *appeal* process.

External reviews are performed on a standard or expedited basis, depending on which is requested and on whether medical circumstances meet the criteria for expedited review.

This document contains references to brand-name prescription drugs that are trademarks or registered trademarks of pharmaceutical manufacturers not affiliated with CVS Caremark .
Your privacy is important to us. Our employees are trained regarding the appropriate way to handle your private health information.
91-40230B  081319                                                                                     TDD/TTY: 1-800-863-5488

**Standard External Review**
For all requests for a standard external review, you must file your request with the NCDOI within 120 days of receiving one of the notices listed above.

If the request for an external review is related to a retrospective *adverse benefit determination* (an *adverse benefit determination* that occurs after you have already received the services in question), the 60-day time limit for receiving *BLUE CROSS NC's* second-level determination does not apply. You will not be eligible to request an external review until you have exhausted the internal appeal process and have received a written second-level determination from *BLUE CROSS NC*.

**Expedited External Review**
An expedited external review may be available if the time required to complete either an expedited internal first- or second-level appeal review or a standard external review would reasonably be expected to seriously jeopardize your life or health or to jeopardize your ability to regain maximum function. If you meet this requirement, you may file a request to the NCDOI for an expedited external review, after you receive:
- An *adverse benefit determination* from *BLUE CROSS NC* and have filed a request with *BLUE CROSS NC* for an expedited first-level appeal; or
- A first-level appeal decision upholding an *adverse benefit determination* and have filed a request with *BLUE CROSS NC* for an expedited second-level *appeal* review; or
- A second-level *appeal* review decision from *BLUE CROSS NC*.

In addition, prior to your discharge from an inpatient facility, you may also request an expedited external review after receiving a first-level appeal or second-level appeal decision concerning an adverse benefit determination of the admission, availability of care, continued stay or emergency health care services.

If your request is not accepted for expedited review, the NCDOI may (1) accept the case for standard external review if you have exhausted the internal appeal review process; or (2) require the completion of the internal appeal review process and another request for an external review. An expedited external review is not available for retrospective adverse benefit determinations.

When processing your request for external review, the NCDOI will require you to provide the NCDOI with a written, signed authorization for the release of any of your medical records that need to be reviewed for the purpose of reaching a decision on the external review. For further information about external review or to request an external review, contact the NCDOI at:

This document contains references to brand-name prescription drugs that are trademarks or registered trademarks of pharmaceutical manufacturers not affiliated with CVS Caremark .
Your privacy is important to us. Our employees are trained regarding the appropriate way to handle your private health information.
91-40230B   081319                                                              TDD/TTY: 1-800-863-5488

Attorneys' Eyes Only KADEL00314412

**JA446**

(Mail)
By Mail:
NC Department of Insurance
Health Insurance Smart NC
1201 Mail Service Center
Raleigh, NC 27699-1201
Toll-Free Telephone: **1-855-408-1212**
**www.ncdoi.com/smart**

(In person)
For the physical address for Health Insurance Smart NC, please visit the web-page:
**http://www.ncdoi.com/Smart**
Toll-Free Telephone: **1-855-408-1212**

The Healthcare Review Program provides consumer counseling on utilization review and appeal issues. Within ten business days (or, for an expedited review, within three business days) of receipt of your request for an external review, the NCDOI will notify you and your provider of whether your request is complete and whether it has been accepted. If the NCDOI notifies you that your request is incomplete, you must provide all requested, additional information to the NCDOI within 150 days of the written notice from BLUE CROSS NC upholding an adverse benefit determination (generally the notice of a second-level appeal review decision), which initiated your request for an external review. If the NCDOI accepts your request, the acceptance notice will include: (i) name and contact information for the IRO assigned to your case; (ii) a copy of the information about your case that BLUE CROSS NC has provided to the NCDOI; and (iii) a notification that you may submit additional written information and supporting documentation relevant to the initial adverse benefit determination to the assigned IRO within seven days after the receipt of the notice. It is presumed that you have received written notice two days after the notice was mailed. Within seven days of BLUE CROSS NC's receipt of the acceptance notice (or, for an expedited review, within the same business day), BLUE CROSS NC shall provide the IRO and you, by the same or similar expeditious means of communication, the documents and any information considered in making the adverse benefit determination, appeal decision or the second-level appeal review decision. If you choose to provide any additional information to the IRO, you must also provide that same information to BLUE CROSS NC at the same time and by the same means of communication (e.g., you must fax the information to BLUE CROSS NC if you faxed it to the IRO). When sending additional information to BLUE CROSS NC, send it to:

(Mail)
Blue Cross/Blue Shield of North Carolina
Appeals Department
PO Box 30055
Durham, NC 27702

This document contains references to brand-name prescription drugs that are trademarks or registered trademarks of pharmaceutical manufacturers not affiliated with CVS Caremark .
Your privacy is important to us. Our employees are trained regarding the appropriate way to handle your private health information.
91-40230B_081319             TDD/TTY: 1-800-863-5488

**Questions? Do you need help in a different language or format?** If you do not speak English or have special needs, oral interpretation and alternate formats of this notice are available, as is other assistance, by contacting us at the number on your State Health Plan ID card.

**Spanish:**
Si usted necesita asistencia o necesita hablar con alguien en Español, por favor llame al número gratuito de Servicio al Cliente ubicado en su tarjeta de identificación de beneficios.

**Chinese (simplified):**
如果您需要帮助，或需要同中国人讲话，请拨打您的福利卡上面的客户服务免费电话号码。

**Tagalog:**
Kung kailangan ninyo ng tulong o kailangan ninyong makipag-usap sa isang tao sa Tagalog, mangyari lamang na tumawag nang walang-bayad sa Serbisyo sa Kostumer sa numero na nakasulat sa inyong ID kard ng benepisyo.

**Navajo:**
Shíka at'ohwol eí doodaii' dinék'ehgo ła bi'chį haadeedziih nínízinígo, t'áá shǫǫdí, t'áá jiík'e ya ndaalníshí, ni naaltsoos bikáa'gi bi'chį hodiilniih.

This document contains references to brand-name prescription drugs that are trademarks or registered trademarks of pharmaceutical manufacturers not affiliated with CVS Caremark .
Your privacy is important to us. Our employees are trained regarding the appropriate way to handle your private health information.
91-40230B  081319                                                                                    TDD/TTY:  1-800-863-5488

# DECLARATION OF DANA CARAWAY

Case 1:19-cv-00272-LCB-LPA   Document 179-9   Filed 12/20/21   Page 1 of 17

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| MAXWELL KADEL, *et al.*, | No. 1:19-cv-00272-LCB-LPA |
| *Plaintiffs*, | |
| v. | **DECLARATION OF DANA CARAWAY** |
| DALE FOLWELL, in his official capacity as State Treasurer of North Carolina, *et al.*, | |
| *Defendants.* | |

Pursuant to 28 U.S.C. § 1746, I hereby declare as follows:

1.     I am a plaintiff in the above-captioned action. I have actual knowledge of the matters stated in this declaration.

2.     I am a native of Morganton, North Carolina. I have worked for the State of North Carolina as a corrections officer for twenty-seven years.

3.     I am transgender, and I am being denied equal access to healthcare coverage under the North Carolina State Health Plan for Teachers and State Employees ("NCSHP") because it contains an exclusion for coverage of gender-confirming care.

4.     I have brought suit to end the State's discrimination and to seek compensation for the harm I have suffered. I submit this declaration in support of summary judgment.

**Career**

1

5.    I have worked as a corrections officer since 1994. For that whole time, my employer has been the Department of Public Safety, although it was still called the Department of Corrections when I started. I was hired at the rank of correction officer, and I was promoted in 2006 to the rank of Sergeant.

6.    I currently hold the position of supervisor in the Division of Adult Correction and Juvenile Justice at Foothills Correctional Institution in Morganton. I supervise up to fifteen corrections officers to ensure that they are following laws and policies regarding inmate custody, housing, programming, medical care, and discipline.

7.    For the past two years, I have also worked part-time as a salesperson at Torrid, a women's clothing boutique in Hickory. This part-time job does not afford me access to health insurance.

**My Gender Transition**

8.    I am a transgender woman. Although I was assigned the sex of male at birth based on external physical sex characteristics, I am female.

9.    I have known I am female since even before I knew how to describe that feeling. By the time I was around four or five, I was already wearing my mother's and my girl friends' clothes, but I had to stop when I got caught and was punished multiple times for wearing clothes not consistent my sex assigned at birth. But I would still dream. As far back as I can remember dreaming, I would dream about having a female body, and about not being punished for wearing the "wrong" clothes.

10.    As I grew older, my desperation deepened, knowing that I was born into the wrong body, not the body I should have, and that society would punish me for this feeling

2

this way, or for doing anything about it. So I mostly kept my feelings to myself. I would occasionally dress as a woman alone in my home. But I was ashamed and scared, and I for a long time I didn't even talk to my family about how I felt.

11.    Knowing that I was in the wrong body caused me great distress and mental anguish. Not being able to do anything about it just made it worse. I was so uncomfortable with who I was physically that I became a recluse and wouldn't let other people in to my life. I gained a lot of weight, I had relationship problems and sleeplessness. I didn't see anyone outside my home other than wife and kids. Everything was centered around having to hide the fact that I was female and born in the wrong body.

12.    Around 2014 I couldn't take being along with these feelings anymore. I started to talk about them with my wife, and I started to dress as a woman outside my home occasionally.

13.    In 2017 I started reaching out over the internet to members of the LGBTQ community for support. We talked about gender dysphoria, and about organizations that supported LGBTQ people in Western North Carolina, and about seeking healthcare.

14.    By mid-2018, I had decided to stop living as the wrong gender and in the wrong body, relieve my distress, and be more in line with my true self. I had decided I would begin the process of transition. I found a therapist who could help me figure out what was going on, and a medical practice that would be provide me proper treatment if it was deemed necessary. I wanted to be sure my health insurance would cover any medical care I needed. The 2018 NCSHP plan booklet hadn't come out yet, so I looked in

3

the 2017 plan booklet, and I was relieved to see that transgender healthcare was not excluded.

15.     I also came out at work in 2018. My colleagues have been abusive. When I had to take a brief medical leave in early 2019 due to a kidney issue, I had a breakdown and was unable to return to work due to the situational anxiety caused by my coworkers' hostility—and because, as it turned out, NCSHP refused to cover the healthcare I needed. I was forced to stay out of work for several additional weeks until my condition stabilized. I have filed an EEOC charge, separately from this lawsuit, against the Department of Public Safety about my hostile work environment.

**NCSHP**

16.     I am required by the Department of Public Safety to have health insurance and have been a member of NCSHP since I joined the Department of Corrections.

17.     I am enrolled in NCSHP's 80/20 plan. I pay a $50 per month premium for it, which is deducted from my paychecks. As far as I know, this is the same as what other State employees pay. For example, my spouse, who is also a State employee, pays the same.

18.     The NCSHP covers most of my healthcare. However, on January 1, 2018, the exclusion for transgender care was reinstated. This means that surgery for things like my kidney condition has been covered, but the gender-confirming surgeries I need are not.

**Being Denied Healthcare Coverage**

19.     My therapist diagnosed me with gender dysphoria in mid-2018. I began

4

regular mental health therapy, and I still go regularly.

20.    Also in mid-2018, I began hormone replacement therapy.  At my first visit to Planned Parenthood, I discussed hormone replacement therapy options, but they did not prescribe hormone replacement therapy for me right away.  They eased me into it gradually during subsequent visits over several months, adding and adjusting medications as appropriate to treat my gender dysphoria.  I still need to take these medications now, in order to maintain alignment between my body and my gender, and also because my body no longer produces sex hormones, and so I still go to Planned Parenthood regularly for them to adjust my medications.

21.    I had problems getting health insurance coverage for this care.  Around October of 2018, I went back to the NCSHP plan booklet to confirm that my healthcare should be covered.  But this time, I couldn't find anything comparable to what I had seen in the information from the year before.  Instead of saying transgender health services were covered, the 2018 plan booklet said they were excluded.

22.    So I googled things, and I saw the news that the exclusion had been reinstated. This was immensely upsetting, emotionally, physically, and mentally. I felt hated and treated as a second-class person, not as an equal, by the State.

23.    I also discussed the possibility of gender confirming surgery with my therapist, and later also with a psychologist.  My therapist recommended gender-confirming surgery because it would help alleviate gender dysphoria.  So did my psychologist, who also sent a letter to my surgeon recommending surgery.  I selected a surgeon for top and bottom surgery, met with her, discussed the risks and benefits of the

5

surgery, and set a surgery date for November of 2019.

24.     However, by this time, I knew that the NCSHP had an exclusion in it, and I couldn't afford to pay for the surgery then. So I had to postpone it. This was devastating. But I wasn't going to let it stop me. I started withdrawing funds out of my retirement account. I began making payments to my surgeon. By the summer of 2020, I had fully paid for the surgery. At that point, my surgeon submitted another preauthorization request, even though we both expected it would be denied, because we both hoped I might recoup at least something. But the preauthorization request was denied completely. The denial letter from NCSHP states that only reason for the denial is the exclusion. A true and correct copy of the letter, with redactions applied, is attached as Exhibit A. On August 5, 2020, I was finally able to obtain top and bottom surgery.

25.     Including the surgeon's fee, the hospital fee, the anesthesiologist fee, and the hair removal I was required to have for the surgery, has cost me over $27,000. I even had to pay for an Airbnb to stay near the hospital, because I couldn't afford the cost of staying in-hospital during my recovery.

26.     I also have an appointment for vocal feminization surgery, on November 18, 2021. My surgeon for that procedure has recommended the surgery because it would alleviate my dysphoria with my voice. He has also recommended therapy to help change my voice, which I started doing earlier this year. Because NCSHP excludes coverage of vocal therapy or surgery for treatment of gender dysphoria, I have had to pay about $11,000 out of pocket for these items.

27.     I would like to make an appointment for facial feminization surgery as well,

6

because it would alleviate my gender dysphoria by taking away or improve the masculine portions of my appearance and bring my face more in line with my gender identity. However, I cannot make the appointment because I have not yet saved up enough money to make an appointment for that. I believe this would be covered if BCBSNC eliminated its exclusion, because it is covered under Blue Cross Blue Shield of North Carolina's Corporate Medical Policy, and so if the exclusion were removed I could stop waiting and obtain the care I need.

28.    I have even had trouble getting coverage for my hormone replacement therapy under the NCSHP. The NCSHP has sometimes covered my hormone medications and visits to Planned Parenthood, and sometimes it has not. I don't understand why. For example, when I first started my visits with Planned Parenthood, NCSHP did not cover them. After my first four visits, it began covering them, but sometimes in full and sometimes only partially. Also, the NCSHP has sometimes paid for my hormones, and sometimes hasn't. Currently, it is refusing to cover the estrogen pellets that I have to have inserted a few times a year. This is confusing me to me because I have male co-workers whose hormone pellets are covered under NCSHP.

29.    The transgender care that I have been able to obtain thus far, mostly by paying for it myself, has helped, up to a point.

30.    But I still feel a lot of distress, anxiety, stress and sleeplessness due to having to stay in a body that still feels in important ways like it isn't mine. I still need to take medications to manage anxiety and sleeplessness. I expect I will feel this way until my medical care is completed. My providers still notice this as well, and my providers

7

agree that feminizing my face and voice would be an improvement for me socially, mentally, physically. The reason I stayed in this body for longer than I needed to, and the reason I still haven't completed my surgical care, is that NCSHP has forced me to by denying coverage for my medically necessary care.

31.    Also, without facial feminization surgery, and without feminizing my voice, I continue to suffer discrimination based on my appearance. People see me as transgender. I've been denied service in restaurants. I feel more vulnerable to hate crimes. On June 20, 2021, I was assaulted on duty at work by an inmate, who called me a transgender-related derogatory name and struck me.

32.    I also still feel a lot of heartache and hurt because of the exclusion. It makes me feel like I'm being treated like a nobody. This contributes to my sleeplessness, anxiety, and distress.

33.    I do believe that with the completion of the rest of my gender confirming surgeries, along with the ones that I have already undertaken, that I will be a complete person. I do believe that if the exclusion is removed that I will feel like a person who deserves equality and respect from co-workers and the community, and not the second-class citizen I have been treated as.

8

I declare under the penalty of perjury that the foregoing is true and correct.

DATED: November _17_, 2021    Dana Caraway

SUBSCRIBED AND SWORN TO BEFORE ME THIS

_15_ DAY OF _November_, 20 _21_

COURTLAND BUTTS, III
NOTARY PUBLIC
ALAMANCE COUNTY, NC
My Commission Expires: 1/30/2024

9

## CERTIFICATE OF SERVICE

I certify that the foregoing document was filed electronically with the Clerk of Court using the CM/ECF system which will send notification of such filing to all registered users.

Dated: November 30, 2021

/s/ Amy E. Richardson
Amy E. Richardson
N.C. State Bar No. 28768
HARRIS, WILTSHIRE & GRANNIS LLP
1033 Wade Avenue, Suite 100
Raleigh, NC 27605-1155
Telephone: 919-429-7386
Facsimile: 202-730-1301
arichardson@hwglaw.com

*Counsel for Plaintiffs*

10

# Exhibit A



**State Health Plan**
FOR TEACHERS AND STATE EMPLOYEES
A Division of the Department of State Treasurer

| | |
|---|---|
| BlueCross BlueShield of North Carolina<br>Healthcare Management and Operations<br>P.O. Box 2291<br>Durham, NC 27702 | Telephone Number: 800-672-7897<br>Fax Number: 800-672-6587<br>Website: WWW.BCBSNC.COM |

 CARAWAY

MORGANTON  NC  ▮▮▮▮▮

Date of Notice: June 19, 2020

## This document contains important information that you should retain for your records.

This document serves as notice of an adverse benefit determination.  We have declined to provide benefits, in whole or in part, for the requested treatment or service described below. If you think this determination was made in error, you have the right to appeal (see the enclosures to this letter for information about your appeal rights.)

### Case Details:

Member/Patient Name:  ▮▮▮▮ CARAWAY
ID Number: ▮▮▮▮▮▮

Provider: ▮▮▮▮▮▮▮▮, MD
Facility: ▮▮▮▮▮▮▮▮▮▮▮▮▮
Service:    Surgical Stay
Date(s) of Service: 8/5/2020 - 8/6/2020
Service:    INTERSEX SURGERY; MALE TO FEMALE
Date(s) of Service:  8/5/2020 - 8/6/2020
Service:    MAMMAPLASTY, AUGMENTATION; WITH PROSTHETIC
                IMPLANT
Date(s) of Service:  8/5/2020 - 8/6/2020

Reference #:  114690052

Reason for Denial: The requested service is not a covered benefit per your benefit booklet or plan documents.

### Explanation of Basis for Determination:

**"The following is not a covered benefit " see page 53 of 2020 SHP BB:
Treatment or studies leading to or in connection with sex changes or
modifications and related care.**

Sincerely,

Healthcare Management and Operations

cc: ▮▮▮▮▮▮▮▮, MD
cc: ▮▮▮▮▮▮▮▮▮▮▮▮

# Important Information about Your Appeal Rights

This notice is an "adverse benefit determination." This means that a request for a procedure or services made by you or your doctor has not been approved for coverage. Please read this information, and call our customer service department if you have any questions about this notice.

***What if I don't agree with this decision?*** You may ask for an appeal. You must ask for an appeal within 180 days of the date of this letter. If you need help in filing an appeal, please call 1-888-234-2416.

***What is an appeal?*** An appeal is another review of your case. A staff member who works in a separate department from the staff members who denied your first request will look at your appeal. The appeals staff members have not reviewed your case or information before. These reviews can take up to 30 calendar days. You will get a letter of the decision of your appeal by the end of the 30-day timeframe. The decision may be to agree with the first adverse benefit determination, or to disagree with the first adverse benefit determination and allow your request to be covered. If the decision is to agree with the first adverse benefit determination, you may have more appeal rights. The appeal decision letter will tell you about these rights.

***Who can ask for an appeal?*** Only you have the right to ask for an appeal. You can also give permission for someone else to ask for the appeal for you. BCBSNC must have a signed release form from you on record so that person can act for you. You can get the release form by calling Customer Service or on the internet at www.shpnc.org and searching for "important forms."

***How do I file an appeal?*** Appeals must be in writing. You can send a letter for an appeal request or fill out a member appeal form. You can get these forms by calling Customer Service or on the internet at www.shpnc.org and searching for "important forms." You have the right to give us any information or materials that support your request. You should fax or mail the letter, appeal form, and any other clinical information to:

    Blue Cross and Blue Shield of North Carolina
    Appeals Department Level I
    PO Box 30055
    Durham, NC 27702
    Fax: 1-919-765-2322


***What happens next for an appeal?*** When the BCBSNC Appeals Department has received your appeal request, they will mail you a letter within three business days. This letter will give your next steps for the appeals process.

*How do I learn more about this decision?* You may ask for information about your case at no cost to you. This could include:

- copies of all records about your case;
- copies of the rules, medical policies, or any other clinical guidelines used to make this decision. The specific rule, policy, or guideline used for your decision is included on the first page under "Explanation of Basis of Determination."

You can ask for this information by writing to us at the address below. Please include your medical policy ID number on your BCBSNC ID card with your request.

Blue Cross and Blue Shield of North Carolina
Care Management & Operations
PO Box 2291
Durham, NC 27702

*What if I need more help?* The Health Insurance Smart NC Program through the NCDOI is able to help you with questions about health insurance. Health Insurance Smart NC also gives consumer counseling on utilization review and appeals issues. You may contact Health Insurance Smart NC at:

**By Mail:**
North Carolina Department of Insurance
Health Insurance Smart NC
1201 Mail Service Center
Raleigh, NC 27699-1201
Toll Free Telephone: (855) 408-1212
http://www.ncdoi.com/smart

**In Person:**
For the physical address for Health Insurance Smart NC, please visit the web-page:
http://www.ncdoi.com/smart
Toll Free Telephone: (855) 408-1212



**BlueCross BlueShield**
**of North Carolina**

# Non-Discrimination and Accessibility Notice

## Discrimination is Against the Law

- Blue Cross and Blue Shield of North Carolina ("BCBSNC") complies with applicable Federal civil rights laws and does not discriminate on the basis of race, color, national origin, age, disability, or sex.

- BCBSNC does not exclude people or treat them differently because of race, color, national origin, age, disability, or sex.

  BCBSNC:

  - Provides free aids and services to people with disabilities to communicate effectively with us, such as:
    - Qualified interpreters
    - Written information in other formats (large print, audio, accessible electronic formats, other formats)

  - Provides free language services to people whose primary language is not English, such as:
    - Qualified interpreters
    - Information written in other languages

- If you need these services, contact Customer Service **1-888-234-2416**, TTY and TDD, call **1-800-442-7028**.

- If you believe that BCBSNC has failed to provide these services or discriminated in another way on the basis of race, color, national origin, age, disability, or sex, you can file a grievance with:

  - BCBSNC, PO Box 2291, Durham, NC 27702, Attention: Civil Rights Coordinator- Privacy, Ethics & Corporate Policy Office, Telephone **919-765-1663**, Fax **919-287-5613**, TTY **1-888-291-1783** civilrightscoordinator@bcbsnc.com

- You can file a grievance in person or by mail, fax, or email. If you need help filing a grievance, Civil Rights Coordinator - Privacy, Ethics & Corporate Policy Office is available to help you.

- You can also file a civil rights complaint with the U.S. Department of Health and Human Services, Office for Civil Rights, electronically through the Office for Civil Rights Complaint Portal, available at *https://ocrportal.hhs.gov/ocr/portal/lobby.jsf,* or by mail or phone at: U.S. Department of Health and Human Services 200 Independence Avenue, SW Room 509F, HHH Building Washington, D.C. 20201 **1-800-368-1019, 800-537-7697** (TDD). Complaint forms are available at *http://www.hhs.gov/ocr/office/file/index.html.*

- This Notice and/or attachments may have important information about your application or coverage through BCBSNC. Look for key dates. You may need to take action by certain deadlines to keep your health coverage or help with costs. You have the right to get this information and help in your language at no cost. Call Customer Service **1-888-234-2416**.

® Marks of the Blue Cross and Blue Shield Association, an association of independent Blue Cross and Blue Shield Plans. Blue Cross and Blue Shield of North Carolina is an independent licensee of the Blue Cross and Blue Shield Association.

v. 10/16



**BlueCross BlueShield of North Carolina**

ATTENTION: If you speak another language, language assistance services, free of charge, are available to you. Call 1-888-234-2416 (TTY: 1-800-442-7028).

ATENCIÓN: Si habla español, tiene a su disposición servicios gratuitos de asistencia lingüística. Llame al 1-888-234-2416 (TTY: 1-800-442-7028).

注意：如果您講廣東話或普通話，您可以免費獲得語言援助服務。請致電 1-888-234-2416 (TTY：1-800-442-7028)。

CHÚ Ý: Nếu bạn nói Tiếng Việt, có các dịch vụ hỗ trợ ngôn ngữ miễn phí dành cho bạn. Gọi số 1-888-234-2416 (TTY: 1-800-442-7028).

주의: 한국어를 사용하시는 경우, 언어 지원 서비스를 무료로 이용하실 수 있습니다. 1-888-234-2416 (TTY: 1- 800-442-7028)번으로 전화해 주십시오.

ATTENTION : Si vous parlez français, des services d'aide linguistique vous sont proposés gratuitement. Appelez le 1-888-234-2416 (ATS : 1-800-442-7028).

ملحوظة: إذا كنت تتحدث اللغة العربية، فإن خدمات المساعدة اللغوية تتوافر لك بالمجان. اتصل برقم 1-888-234-2416. المبرقة الكاتبة: 1-800-442-7028.

LUS CEEV: Yog tias koj hais lus Hmoob, cov kev pab txog lus, muaj kev pab dawb rau koj. Hu rau 1-888-234-2416 (TTY: 1-800-442-7028).

ВНИМАНИЕ: Если вы говорите на русском языке, то вам доступны бесплатные услуги перевода. Звоните 1-888-234-2416 (телетайп: 1-800-442-7028).

PAUNAWA: Kung nagsasalita ka ng Tagalog, maaari kang gumamit ng mga serbisyo ng tulong sa wika nang walang bayad. Tumawag sa 1-888-234-2416 (TTY: 1-800-442-7028).

સુચના: જો તમે ગુજરાતી બોલતા હો, તો નિઃસુલ્ક ભાષા સહાય સેવાઓ તમારા માટે ઉપલબ્ધ છે. ફોન કરો 1-888-234-2416 (TTY: 1-800-442-7028).

ចំណាំ៖ ប្រសិនបើលោកអ្នកនិយាយជាភាសាខ្មែរ សេវាកម្មជំនួយផ្នែកភាសាមានឥតគិតថ្លៃសម្រាប់លោកអ្នកដោយមិនគិតថ្លៃ។ សូមទំនាក់ទំនងតាមរយៈលេខ៖ 1-888-234-2416 (TTY: 1-800-442-7028)។

ACHTUNG: Wenn Sie Deutsch sprechen, stehen Ihnen kostenlos sprachliche Hilfsdienstleistungen zur Verfügung. Rufnummer: 1-888-234-2416 (TTY: 1-800-442-7028).

ध्यान दें:  यदि आप हिन्दी बोलते हैं तो आपके लिए मुफ्त में भाषा सहायता सेवाएं उपलब्ध हैं। 1-888-234-2416 (TTY: 1-800-442-7028) पर कॉल करें।

ໂປດຊາບ: ຖ້າວ່າ ທ່ານເວົ້າພາສາ ລາວ, ການບໍລິການຊ່ວຍເຫຼືອດ້ານພາສາ, ໂດຍບໍ່ເສັຽຄ່າ, ແມ່ນມີພ້ອມໃຫ້ທ່ານ. ໂທຣ 1-888-234-2416 (TTY: 1-800-442-7028).

注意事項：日本語を話される場合、無料の言語支援をご利用いただけます。1-888-234-2416（TTY: 1-800-442-7028）まで、お電話にてご連絡ください。

® Marks of the Blue Cross and Blue Shield Association, an association of independent Blue Cross and Blue Shield Plans. Blue Cross and Blue Shield of North Carolina is an independent licensee of the Blue Cross and Blue Shield Association.

v. 10/16

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| **MAXWELL KADEL, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | No. 1:19-cv-272-LCB-LPA |
| ) | |
| **DALE FOLWELL, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

### PLAN DEFENDANTS' RESPONSE IN OPPOSITION
### TO MOTION FOR LEAVE TO FILE BRIEF OF *AMICI CURIAE* BY
### AMERICAN MEDICAL ASSOCIATION AND SEVEN ADDITIONAL
### HEALTH CARE ORGANIZATIONS IN SUPPORT OF PLAINTIFFS

Pursuant to Local Rule 7.5(b), Defendants, the North Carolina State Health Plan for Teachers and State Employees, Dale Folwell, and Dee Jones (the "Plan Defendants"), by and through undersigned counsel, respond in opposition to the Motion for Leave to File Brief of *Amici Curiae* in Support of Plaintiffs submitted by eight medical associations.

### INTRODUCTION

The Court should acknowledge the proposed *amicus* brief for what it is: an anonymous, unsworn expert report, and it should deny the motion for leave to file. The proposed *amicus* brief does not cite a single judicial decision, legal brief, or law review article. Instead, the *amici* seek to provide medical information, (Doc. No. 131 at p.7), much of which is nowhere else in the record.

Approximately 50% of the medical articles cited in the proposed *amicus* brief (24 of 46) are not in any of the reports by Plaintiffs' experts. Because of this, the proposed *amicus* creates the risk that the Court will reach conclusions using unsolicited "evidence" that none of the parties, nor the parties' experts, have identified as a legitimate basis for summary judgment.

Moreover, the proposed *amici* do not offer or meet any of the three possible justifications for their participation at the trial court. *See Bryant v. Better Business Bureau,* 923 F. Supp. 720, 727 (D. Md.1996). The proposed brief does not aid the court's legal analysis. The proposed brief is not needed to help struggling counsel. Finally, the stated interest of *amici*—a "commitment to improving the physical and mental health of all Americans"—does not qualify as the type of special interest required by the courts to justify *amicus* participation at the district court level. This Court should thus deny the request to file the proposed *amicus* brief.

## I.    Granting *Amici*'s Motion will Prejudice the Defendants.

Rule 26(a) requires that, during the discovery period, all parties must disclose all expert witnesses and submit a report with a "complete statement of all opinions … and the reason and basis for them." Fed. R. Civ. P. 26(a)(2)(B)(i). Moreover, expert testimony must comply with this Court's case management orders. The Court required disclosure of Plaintiffs' experts by March 1, 2021, the Plan Defendants' experts by May 1, 2021, and Plaintiffs'

2

rebuttal experts by June 11, 2021. *See* Text Order adopting Parties' Rule 26(f) Report, (Doc. No. 61, August 13, 2020); Order granting Motion for Extension of Time, (Doc. No. 90, Mar. 25, 2021); Order granting Motion for Extension of Time, (Doc. No. 101, May 12, 2021). With two limited exceptions, all expert depositions needed to be complete by September 30, 2021. (Doc. No. 98, May 11, 2021).

The proposed *amicus* brief complies with none of these requirements, even though it directly addresses a factual disagreement between the parties. The Plaintiffs assert that the gender transition treatments they desire are medically necessary, and the Plan Defendants' experts have testified that the current peer-reviewed science indicates that these treatments remain experimental.

As one example, Dr. Stephen Levine, M.D., wrote in his expert declaration for the Plan Defendants that "[w]ithin the last two years, detailed research reviews exposing multiple and serious methodological and ethical flaws in the research of … affirmation supporters have pinpointed fundamental methodological errors in their papers which claim to support affirmation treatment." Declaration of Stephen B. Levine at 10 (April 29. 2021). Dr. Levine will testify that the treatments Plaintiffs seek "remain experimental and have never been accepted by the relevant scientific community and have no known nor published error rate." *Id.* at 10-11.

3

Now, long after discovery has closed, the proposed *amici* seek to provide their views on the "best practices when treating transgender individuals for gender dysphoria and providing gender-confirming care." (Doc. 131 at p.6). The proposed *amicus* brief discusses the diagnosis of Gender Dysphoria, "What it means to be transgender," (Doc. 131-2, Proposed *amicus* brief at p.4), "Accepted treatment protocols for Gender Dysphoria," *id.* at p.11, and *amici*'s views on treatment outcomes for this illness, *id.* at p.17. The Motion for Leave asserts that the brief reflects "agreed upon best practices" in transgender health. (Doc. No. 131 at p.6).

The *amici* offer this information even though the *amicus* brief lacks the signature, or even the name, of a single individual with a medical degree who has reviewed or approved its contents. *See* Fed. R. Civ. P. 26(a)(2) (requirements for expert witnesses).

Were the proposed *amicus* brief offered by a party, its timing and contents would be the type of procedural unfairness that "unfairly inhibits" the other party's "ability to properly prepare" for trial. *Garey v. James S. Farrin, P.C.*, 514 F. Supp. 3d 784, 788 (M.D.N.C. 2021). "Conclusory expert reports, eleventh hour disclosures, and attempts to proffer expert testimony without compliance with Rule 26 violate both the rules and principles of discovery, and the obligations lawyers have to the court." *White v. City of Greensboro*, 532 F. Supp. 3d 277, 300 (M.D.N.C. 2021) (quoting *Tokai Corp. v. Easton Enters., Inc.*,

<div align="center">4</div>

632 F.3d 1358, 1365-66 (Fed. Cir. 2011)). "Exclusion and forfeiture are appropriate consequences to avoid repeated occurrences of such manipulation of the litigation process." *Id.*[1]

There is no rule or other authority that allows an *amicus* to offer such expert testimony when the opposing party does not do so. Indeed, at least one court has made clear that "an *amicus* who argues facts should rarely be welcomed." *Strasser v. Doorley,* 432 F.2d 567, 569 (1st Cir.1970).

---

[1] Were the Plaintiffs themselves to seek to introduce the information from the proposed *amicus* brief—something they arguably desire considering their citation to the *amicus* brief in their own motion for summary judgment—they would have to show their failure to disclose this information during discovery "was substantially justified or is harmless." *Id.* (quoting Fed. R. Civ. P. 37(c)(1)). *See* Doc No. 179 at p.21 (citing "the *amicus* brief filed by many of those organizations in this case" as evidence for this Court's consideration).

The Fourth Circuit analyzes out-of-time expert material under a five-part test. The Court must consider (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the non-disclosing party's explanation for its failure to disclose the evidence. *S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003).

The first four factors relate primarily to the harmlessness exception, while the final factor tests whether the initial exclusion of information was substantially justified. *Id.* The information in the proposed *amicus* was presented to the Plan Defendants the same day properly filed summary judgment motions were due, November 30, 2021. (Doc. No. 131, 131-2). Moreover, the information cannot simultaneously "assist the Court in its deliberations," (Doc. No. 131 at p.7), and be harmless to the interests of the other parties in the litigation. The proper remedy would be to strike the proposed expert testimony, and that should be the Court's ruling here.

5

Beyond the procedural unfairness, the proposed *amicus* brief creates the potential for reversible error. When a Court reviews motions for summary judgment, the record includes only that information that could be considered at trial. *See* Fed. R. Civ. P. 56. A Court cannot rely upon "factual assertions supported only by a citation to an unsworn expert report" as such information is "hearsay and do[es] not qualify as admissible evidence." *Penobscot Nation v. Mills*, 151 F. Supp. 3d 181, 185 (D. Me. 2015).

The proposed *amicus* brief is precisely this—inadmissible "factual assertions supported only by a citation to an unsworn expert report." *Id.* The brief is not signed by a medical expert or anyone else qualified to provide expert testimony. The brief is not a sworn declaration. More than 50% of the citations in the proposed brief (24 of 46) are new; they do not appear in any reports submitted by either the Plaintiffs' initial or rebuttal experts. Nevertheless, the *amici* ask that this Court take "the information contained in their proposed brief" into "its deliberations" on summary judgment. (Doc. No. 131 at p.7).

The risk should be clear. If the Court does not intend to rely upon the information in the proposed *amicus* brief, then it should deny the Motion for Leave and exclude the information entirely. If the Court does rely on the information in the proposed brief, then its decision will include extra-record evidence that neither party put before the Court and that lacks the "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction

6

on the burden of proof" that expert opinion requires. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993).

The Court should not risk poisoning the factual record with "unsworn expert testimony" on summary judgment. *See*, *e.g.*, *New York v. Microsoft*, No. CIV.A. 98-1233 CKK, 2002 WL 31628215 at *1 (D.D.C. Nov. 14, 2002). The Motion for Leave should be denied on this basis alone.

## II. The Proposed *Amici* must justify their *amicus* participation and have wholly failed to do so.

In addition, the Motion for Leave ignores the requirements for *amicus* participation that are regularly applied by trial courts in the Fourth Circuit. No Federal Rule of Civil Procedure governs *amicus curiae* before a federal district court. *City of Columbus v. Trump*, 453 F. Supp. 3d 770, 785 (D. Md. 2020). The Middle District's local rules provide a process but no substantive standard. Local Rule 7.5. "Whether to permit a nonparty to submit a brief, as *amicus curiae*, is, with immaterial exceptions, a matter of judicial grace." *Nat'l Org. for Women v. Scheidler*, 223 F.3d 615, 616 (7th Cir. 2000).

Although the Court has discretion, Judge Davis—when serving as a U.S. District Court Judge before joining the Fourth Circuit—summarized the usual analysis for an *amicus* request as follows: *Amici* are "allowed at the trial level where [1] they provide helpful analysis of the law, [2] they have a special interest in the subject matter of the suit, or [3] existing counsel is in need of

assistance." *Bryant v. Better Business Bureau,* 923 F. Supp. 720, 727 (D. Md. 1996) (internal citations omitted). Even then, "[a] motion for leave to file an *amicus* curiae brief ... should not be granted unless the court 'deems the proffered information timely and useful.'" *Bryant,* 923 F. Supp. at 727–28 (citing *Yip v. Pagano,* 606 F. Supp. 1566, 1568 (D.N.J.1985)). *See also Am. Humanist Ass'n v. Maryland-Nat'l Cap. Park*, 147 F. Supp. 3d 373, 389 (D. Md. 2015) (same analysis).[2]

The proposed *amicus* brief does not fulfill any of the roles identified by Judge Davis. *Amici*'s brief does not "provide helpful analysis of the law" because it contains no legal reasoning whatsoever. Neither are Plaintiffs' fifteen "existing counsel in need of assistance."

While *amici* with a "special interest" in the case are sometimes allowed, courts often require that the proposed *amicus* also demonstrate at least one of the other two criteria. "[A] special interest in the outcome of the suit" alone is not sufficient to justify participation when *amici* does not provide "helpful legal analysis beyond the thorough job done by the parties' counsel." *Am. Humanist*

---

[2] District courts elsewhere have suggested that the meaning of the phrase *amicus curiae*—"friend of the court"—implies that an *amicus* should not be "partial to a particular outcome in the case." *James v. Glob. Tel-Link Corp.*, No. 2:13-CV-04989-WJM-MF, 2020 WL 6194016 at *5 (D.N.J. Oct. 22, 2020). District Courts in this circuit have not always demanded neutrality, but this Motion for Leave makes no pretense to it, filed as a Motion "in Support of Plaintiffs." (Doc. 131 at p.1).

8

*Ass'n*, 147 F. Supp. 3d at 389. *See also Wheelabrator Baltimore, L.P. v. Mayor & City Council of Baltimore*, 449 F. Supp. 3d 549, 555 n.1 (D. Md. 2020) (While "the Local Government Coalition for Renewable Energy and the Energy Justice Network purport to have a special interest in this litigation," the *amici* "do not provide any legal analysis beyond the arguments raised in the parties' briefs and are not necessary for the Court's determination of the legal issues at hand" and are therefore denied leave to file.).

Even if a "special interest" was sufficient justification alone, the proposed *amici* fail to identify any such special interest. Instead, the proposed *amici* offer only one broad reason for their participation:

> All *amici* share a commitment to improving the physical and mental health of all Americans—regardless of gender identity—and to informing and educating lawmakers, the judiciary, and the public regarding the public-health impacts of laws and policies.

(Doc. No. 131 at p.6). A generic interest in "improving the physical and mental health of all Americans" does not qualify as a "special interest." "When evaluating a potential *amici*'s proffered interest in a case, the court looks to whether its 'interests which would be ultimately and directly affected by the court's ruling on the substantive matter before it." *Dwelling Place Network v. Murphy*, No. CV 20-6281 (RBK/AMD), 2020 WL 3056305 at *1 (D.N.J. June 9, 2020) (quoting *Granillo v. FCA US LLC*, 2018 WL 4676057 at *5 (D.N.J. Sept. 28, 2018)).

A special interest is more than "a trade association with a generalized interest in all cases" related to a specific subject matter. *Sciotto v. Marple Newtown Sch. Dist.*, 70 F. Supp. 2d 553, 555 (E.D. Pa. 1999). Rather, a special interest at the trial level exists when a party, "although short of a right to intervene[,]" has "a special interest that justifies his having a say." *Strasser,* 432 F.2d at 569.

The importance of a "special interest"—rather than a generalized one— has been aptly explained by the First Circuit. "[A] district court lacking joint consent of the parties should go slow in accepting, and even slower in inviting, an *amicus* brief unless, as a party, although short of a right to intervene, the *amicus* has a special interest that justifies his having a say, or unless the court feels that existing counsel may need supplementing assistance." *Id.* at 569. This is true even though, "if an *amicus* causes the district court to make an error of law—an *amicus* who argues facts should rarely be welcomed—the error can be corrected on appeal." *Id.*

This Court should reject and deny the proposed Motion for Leave, (Doc. No. 131), as insufficient to justify the participation of the *amici* at this stage of litigation. The *amici* organizations do not specialize in transgender health. *Id.* at p.1-4). The *amici*'s interest in "informing and educating" decisionmakers, *id.* at p.6, may justify their own decision to submit "*amicus* briefs in similar cases pending throughout the country," but this private interest is not one of

10

the "special interests that would weigh in favor of granting *amici* status."

*Dwelling Place Network,* 2020 WL 3056305 at *1. *See also Havana Docks Corp.*

*v. Royal Caribbean Cruises, Ltd.*, No. 19-CV-23590, 2021 WL 4819580 at *1

(S.D. Fla. Oct. 15, 2021) (trade association "failed to explain how its brief will

benefit the Court by offering a new or unique perspective beyond that already

presented by the parties"); *Granillo*, 2018 WL 4676057 (2018) (denying *amici*

status to a consumer group that regularly filed *amicus* briefs, noting this

indicates generalized concern not specific interest).

 Lacking any legal analysis, the need to assist Plaintiffs' counsel, or any

assertion of a special interest, the Motion for Leave by the proposed *amici*

should be denied.

## III. Conclusion

 The Court should promptly deny the Motion for Leave to File the

Proposed *Amicus* Brief, Doc. No. 131. The request is procedurally untimely,

unsupported by evidence that can be considered under Rule 56, and prejudicial

to the Plan Defendants. In the face of these concerns, the proposed *amici* have

neither analyzed their request under the generally accepted test used by trial

courts in the Fourth Circuit nor offered meaningful justification for their

participation. Because of this failure, combined with the risk to the record

presented by the proposed brief, the Court should promptly deny the Motion

for Leave to File the Proposed *Amicus* Brief, Doc. No. 131.

Respectfully submitted this 20th day of December, 2021.

*/s/ Ben Garner*
James Benjamin Garner
N.C. Bar. No. 41257
General Counsel
North Carolina Department of
    the State Treasurer
3200 Atlantic Avenue
Raleigh, North Carolina 27604
Telephone: (919) 814-4000
Ben.Garner@nctreasurer.com

*/s/ John G. Knepper*
John G. Knepper
Wyo. Bar No. 7-4608
LAW OFFICE OF JOHN G. KNEPPER, LLC
Post Office Box 1512
Cheyenne, WY 82003-1512
Telephone: (307) 632-2842
John@KnepperLLC.com

*/s/ Kevin G. Williams*
Kevin G. Williams
N. C. Bar No. 25760

*/s/ Mark A. Jones*
Mark A. Jones
N.C. Bar No. 36215
BELL, DAVIS & PITT, P.A.
100 North Cherry St., Suite 600
Winston-Salem, NC  27120-1029
Telephone: (336) 722-3700
Facsimile: (336) 722-8153
kwilliams@belldavispitt.com
mjones@belldavispitt.com

12

## CERTIFICATE OF WORD COUNT

Pursuant to L.R. 7.3(d)(1), the undersigned certifies that this Response in Opposition to Motion for Leave to File Brief of *Amici Curiae* complies with the Court's word limit, containing 2,689 words calculated with the word count feature of the word processing software in making this certification.

*/s/ John G. Knepper*
John G. Knepper
Wyo. Bar No. 7-4608
LAW OFFICE OF JOHN G. KNEPPER, LLC
Post Office Box 1512
Cheyenne, WY 82003-1512
Telephone: (307) 632-2842
John@KnepperLLC.com

*/s/ Kevin G. Williams*
Kevin G. Williams
N.C. Bar No. 25760

*/s/ Mark A. Jones*
N.C. Bar No. 36215
BELL, DAVIS & PITT, P.A
100 N. Cherry St., Suite 600
Winston-Salem, NC 27101
T(336)722-3700;F 722-8153
kwilliams@belldavispitt.com
mjones@belldavispitt.com

13

## CERTIFICATE OF SERVICE

I hereby certify that on 20th day of December, the foregoing Response in Opposition to Motion for Leave to File Brief of *Amici Curiae* was filed electronically with the Clerk of Court using the CM/ECF electronic filing system which will send notification of such filing to all registered users.

*/s/ John G. Knepper*
John G. Knepper
Wyo. Bar No. 7-4608
Law Office of John G. Knepper, LLC
Post Office Box 1512
Cheyenne, WY 82003-1512
Telephone: (307) 632-2842
John@KnepperLLC.com

*/s/ Kevin G. Williams*
Kevin G. Williams
N.C. Bar No. 25760

*/s/ Mark A. Jones*
N.C. Bar No. 36215
BELL, DAVIS & PITT, P.A
100 N. Cherry St., Suite 600
Winston-Salem, NC 27101
T(336)722-3700;F 722-8153
kwilliams@belldavispitt.com
mjones@belldavispitt.com

14

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MAXWELL KADEL, et al.,

*Plaintiffs*,

v.

DALE FOLWELL, et al.,

*Defendants*.

No. 1:19-cv-00272-LCB-LPA

## PLAINTIFFS' OPPOSITION TO STATE HEALTH PLAN DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

## TABLE OF CONTENTS

STATEMENT OF THE CASE AND FACTS .................................................. 1

ARGUMENT.............................................................................................. 1

I.      The Exclusion Discriminates Based on Sex and Transgender Status ...................... 1

II.     NCSHP is Liable as an Agent and Joint Employer Under Title VII ...................... 13

        A.     NCSHP is Liable as an Agent. ........................................................ 13

        B.     NCSHP is Liable as a Joint Employer........................................... 15

CONCLUSION ......................................................................................... 23

i

Plaintiffs respectfully oppose the Motion for Partial Summary Judgment ("MSJ") by Defendants Folwell, Jones, and North Carolina State Health Plan for Teachers and State Employees ("NCSHP"; collectively, "Defendants").[1]  ECF Nos. 136-37.

## STATEMENT OF THE CASE AND FACTS

This case seeks to vindicate the right of state employees and their dependents to receive health coverage free from sex discrimination.  Although Defendants repeatedly argue that NCSHP need not cover all medical treatments or all medically necessary care, ECF No. 137 at 5, 8, that is not what Plaintiffs seek.  Instead, Plaintiffs ask that Defendants comply with their obligations under federal law to provide coverage without invidious distinctions based on sex or transgender status.

## ARGUMENT

I.      **The Exclusion Discriminates Based on Sex and Transgender Status.**

Although Defendants move only on Plaintiffs' statutory claims, Defendants' MSJ begins with extraneous discussion of constitutional doctrine.  ECF No. 137 at 1.  But Defendants subsequently clarify that they seek "partial summary judgment" on "two of Plaintiffs' claims" under Title VII and the ACA.  *See* ECF No. 137 at 1-2; *see also id.* at 2 ("Plaintiffs' equal protection claims remain for trial.").  Defendants' discussion of constitutional law is thus irrelevant, but to eliminate all doubt, Plaintiffs briefly explain

---

[1] All references to "Ex." refer to exhibits to the Declaration of Amy Richardson at ECF Nos. 180-81.  All references to "Supp. Richardson Decl." refer to the declaration filed with this brief.  All defined terms have the meaning ascribed to them in Plaintiffs' Motion for Summary Judgement "Plaintiffs' MSJ".

1

why Defendants' cited authorities do not affect Plaintiffs' statutory or constitutional claims.[2]

Defendants cite *Geduldig v. Aiello*, 417 U.S. 484 (1974), in an effort to paint the Exclusion as facially neutral, but this argument fails. ECF No. 137 at 1, 3. First, *Geduldig* was decided before the Supreme Court recognized sex stereotyping claims in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989), and therefore says nothing about Plaintiffs' sex stereotyping claims. Second, *Geduldig* does not transform the sex discrimination on the face of the Exclusion into neutral "medical benefit" discrimination. ECF No. 137 at 3. In ruling on a disability insurance program's exclusion of pregnancy coverage, *Geduldig* did not hold that pregnancy-based classifications *never* violate the Equal Protection Clause, instead concluding more narrowly that not every pregnancy classification is an explicit sex-based classification "like those considered in" *Reed v. Reed*, 404 U.S. 71 (1971), and *Frontiero v. Richardson*, 411 U.S. 677 (1973). *Geduldig*, 417 U.S. at 496 n.20. Courts have had no trouble identifying the sex-based classification explicit in exclusions for gender-confirming care. *See, e.g.*, *Fletcher v. Alaska*, 443 F.Supp.3d 1024, 1030 (D. Alaska 2020); *Boyden v. Conlin*, 341 F.Supp.3d 979, 995 (W.D. Wis. 2018); *Flack v. Wis. Dep't of Health Servs.*, 328 F.Supp.3d 931, 948 (W.D. Wis. 2018).

---

[2] Plaintiff Silvaine's Equal Protection claim is moot since he no longer works for the state, but contrary to Defendants' suggestion, ECF No. 137 at 4, Mr. Kadel retains a ripe Equal Protection claim since he has rejoined state employment and is covered through NCSHP. ECF No. 179-1 ¶ 2. All Plaintiffs have damages claims under the ACA. ECF No. 75, Count III.

2

Regardless, Defendants' reliance on *Geduldig* in a motion regarding Plaintiffs' statutory claims is particularly odd.  After the Supreme Court applied *Geduldig* to Title VII in *General Elec. Co. v. Gilbert*, 429 U.S. 125 (1976), Congress expressly repudiated *Gilbert* (and its reliance on *Geduldig*) by amending Title VII to include pregnancy discrimination.  *See Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C.*, 462 U.S. 669, 678 (1983) (Congress "unambiguously expressed its disapproval of both the holding and the reasoning of the Court in the *Gilbert* decision").  "By concluding that pregnancy discrimination is not sex discrimination within the meaning of Title VII, the Supreme Court disregarded the intent of Congress … to protect all individuals from unjust employment discrimination, including pregnant women." *Discrimination on the Basis of Pregnancy, 1977: Hearing on S. 995 Before the Subcomm. on Labor of the Senate Comm. on Hum. Res.,* 95th Cong. 1 (1977), *available at* https://bit.ly/2meSlm9; *see also Newport News*, 462 U.S. at 679 ("Proponents of the bill repeatedly emphasized that the Supreme Court had erroneously interpreted Congressional intent …").  Accordingly, *Geduldig*'s reasoning has been expressly repudiated under Title VII.

Defendants also cite *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993), but that case supports Plaintiffs, not Defendants.  As *Bray* observed, "[s]ome activities may be such an irrational object of disfavor that, if they are targeted, and … happen to be engaged in exclusively or predominantly by a particular class of people, an intent to disfavor that class can readily be presumed." *Id.* at 270.  Just as a "tax on wearing yarmulkes is a tax on Jews," *id.*, an exclusion of gender-affirming care is an

3

exclusion of transgender people since the need for medical transition applies exclusively to transgender people. *See Boyden*, 341 F.Supp.3d at 1000; *Toomey v. Arizona*, No. 19-cv-00035, 2019 WL 7172144, at *6 (D. Ariz. Dec. 23, 2019) ("[T]ransgender individuals are the only people who would ever seek gender reassignment surgery.").

Defendants misleadingly imply that four exclusions deny coverage to transgender people. ECF No. 137 at 8. Not so. Plaintiffs' Complaint challenged two facially discriminatory exclusions: one for "[p]sychological assessment and psychotherapy treatment in conjunction with proposed gender transformation," and one for "[t]reatment … in connection with sex changes or modifications" (the "Exclusion"). Exs. 8-9. NCSHP's corporate designee testified that NCSHP does not enforce the first exclusion, Ex. 12, 49:8-23, and Defendants now clarify that it has not been enforced for decades and will be removed in 2022. ECF No. 137 at 8 n.2. Accordingly, the Exclusion for "[t]reatment … in connection with sex changes or modifications" is the one at issue. ECF No. 137 at 8.

Defendants point to two other exclusions, including one for "[c]osmetic services … and surgery for psychological or emotional reasons," *id.*, and one for experimental medications and medications not approved by the U.S. Food and Drug Administration ("FDA"), *id.* at 9. Neither has any relevance to this case. They have not been invoked in Plaintiffs' denials of care. *See* ECF No. 179-3 ¶¶ 11-12 Exs. A-B; ECF No. 179-9 ¶ 24 Ex. A; ECF No. 179-4 ¶ 10 Ex. A; ECF No. 179-1 ¶ 10 Ex. A; ECF No. 179-8 ¶¶ 31-32 Exs. B-E. When NCSHP staff recommended that the Exclusion for gender-confirming

4

care be eliminated in 2017, they did not mention any other exclusion, Ex. 39, PLANDEF0006985, PLANDEF00069888; and those exclusions remained untouched in 2017 while NCSHP covered gender-confirming care.  Supp. Richardson Decl. Exs. A-B.  In 2017, NCSHP followed the Blue Cross Blue Shield of North Carolina ("BCBSNC") Corporate Medical Policy, which does not apply those exclusions.  *See* Ex. 40, PLANDEF0012816; Ex. 12, 41:25-42:15; Ex. 43.  Indeed, the very BCBSNC testimony that Defendants submitted with their MSJ states that BCBSNC "has never implemented the portion of the Plan's benefit booklets that excludes 'surgery for psychological or emotion[al] reasons.'"  ECF No. 137-4 ¶ 27.

Defendants also note that several medications prescribed to transgender people are not approved by the FDA to treat gender dysphoria.  ECF No. 137 at 13; ECF No. 137-10.  But they ignore the evidence in the record that off-label usage is common and has been covered by NCSHP previously.[3]  Regardless, Defendants fail to explain how this could serve as a defense to Plaintiffs' claims.  As explained in Plaintiffs' MSJ, exclusions for gender-confirming care are facially discriminatory.  ECF No. 179 at 17-18; *Fletcher*, 443 F.Supp.3d at 1030-31.  Facial discrimination can be justified *only* by a bona

---

[3] Not only is it "common for medications to be used 'off label' across all domains of medicine," Ex. 26(a) ¶ 96, the lack of FDA approval did not prevent NCSHP from covering care during plan year 2017, and NCSHP's Rule 30(b)(6) designee admitted NCSHP has covered other non-approved applications of medications.  *See* Ex. 12, 107:17-19 (NCSHP covered COVID care, which was not FDA-approved until many months after).  The FDA has provided for at least three decades that physicians may prescribe drugs on an off-label basis.  *See, e.g.*, Ex. 28, 223:14-232:6; *see also Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 351 (2001) ("off-label use is generally accepted").

5

fide occupational qualification, which does not apply to fringe benefits plans. *Ariz.*

*Governing Comm. for Tax Deferred Annuity & Deferred Comp. Plans v. Norris*, 463 U.S.

1073, 1084 n.13 (1983). Defendants' claims about FDA approval are both misleading

and irrelevant to the statutory analysis.

With little to say about the Exclusion actually at issue, Defendants focus instead

on the billing practices of BCBSNC and CVS. ECF No. 137 at 9-12. But BCBSNC and

CVS are not the problem. Both administered inclusive coverage in 2017, it was

BCBSNC's Corporate Medical Policy that was used to determine coverage parameters,

and BCBSNC advised NCSHP that it would need to be indemnified once NCSHP

reinstated the Exclusion. *See* Exs. 45, 47.

Defendants nonetheless recount at length the codes used to process claims for

care, ECF No. 137 at 10-12, arguing that the Exclusion "is based on diagnosis and

medical coding and not transgender identity"—as if the codes employed by third party

administrators *to implement NCSHP's discriminatory Exclusion* are somehow the culprit.

The way the Exclusion operates is simple: NCSHP inserts it into the plans (against the

advice of their consultants, and over BCBSNC's objection that it needs to be

indemnified); and BCBSNC and CVS have no choice but to implement it. *See, e.g.*, ECF

No. 137-4 ¶ 11 (testimony from BCBSNC that NCSHP "creates a benefits booklet" and

BCBSNC "is responsible for implementation" of it); *see also* ECF No. 137 at 5

(acknowledging that the booklet "describes the covered and non-covered services,"

which BCBSNC "implements"). Defendants also emphasize that BCBSNC and CVS do

6

not track whether a participant is transgender, ECF No. 137 at 9-10, 12, but that does not change the analysis.  Defendants ensure that the care is not covered when transgender people need it for gender transition, and BCBSNC and CVS implement the discriminatory Exclusion.  *See* ECF No. 137-4 ¶ 19 (BCBSNC "will not approve a claim … not covered by the Plan").

This structure is apparent even when one considers the codes themselves: Treatment is not covered when "performed to treat one of two diagnosis codes: F64.0 (*Transsexualism*) or Z87.890 (Personal history of *sex reassignment*)"—i.e., when the codes indicate the care is required by transgender people for gender transition.  ECF No. 137 at 10 (emphasis added); *see also* ECF No. 137 at 9-10, 12 (procedures are not covered when used for "treatment of gender dysphoria," but if care is coded for other purposes, "the Plan would pay it").

Defendants' attempt to disguise the Exclusion as mere "diagnosis and medical coding" discrimination—instead of sex and transgender status discrimination—repeats an error the Supreme Court has rejected definitively.  It is "irrelevant" what a defendant "might call its discriminatory practice, how others might label it, or what else might motivate it."  *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1744 (2020).  For this reason, the defendant in *Manhart v. City of Los Angeles, Dep't of Water & Power*, 435 U.S. 702 (1978), could not have justified requiring larger pension contributions from women as "life expectancy" discrimination instead of sex discrimination.  *Bostock*, 140 S. Ct. at 1744.  Nor could the defendant in *Phillips v. Martin Marietta Corp.*, 400 U.S.

7

542 (1971) (per curiam), have recast its prohibition on pre-school age children for female applicants as "motherhood" discrimination instead of sex discrimination. *Bostock*, 140 S. Ct. at 1744. Defendants thus cannot pretend that the facially discriminatory Exclusion is mere "diagnosis and medical coding" discrimination. "[J]ust as labels and additional intentions or motivations didn't make a difference in *Manhart* or *Phillips*, they cannot make a difference here." *Id.* Accordingly, the Exclusion is sex discrimination for all the reasons described in Plaintiffs' MSJ. ECF No. 179 at 17-20.

Defendants offer some tangential assertions about the nature of gender dysphoria, but without explaining how they relate to the legal analysis. ECF No. 137 at 7-8. "Critically," Defendants claim, "not all transgender individuals suffer from gender dysphoria." *Id.* at 7. While Defendants never explain why that is purportedly "critical," the fact that symptoms of gender dysphoria abate after treatment is not remarkable—it is the purpose of providing care. *See* Supp. Richardson Decl. Ex. C, 20:12-22; Ex. 25(a) ¶ 56 (the "overarching goal … is to eliminate clinically significant distress by aligning an individual patient's body and presentation with their internal sense of self"). Defendants also claim Plaintiffs have not provided evidence of the "proportion of transgender individuals suffer[ing] from gender dysphoria." ECF No. 137 at 7-8. But this makes no difference. The Exclusion is not concerned with how many transgender participants experience untreated gender dysphoria—it simply denies care to them all. Nor is this relevant to the legal analysis. There is no numerosity threshold that a targeted group must reach before it is entitled to equal protection of the law.

8

Defendants feign confusion about whether the Exclusion targets transgender people, or whether cisgender people might also be affected. ECF No. 137 at 2 ("Plaintiffs cannot prevail only with assertions that gender dysphoria disproportionately affects members of a protected class."). But the Exclusion makes clear who is targeted: those seeking "[t]reatment … in connection with sex changes or modifications"—i.e., transgender people. Exs. 8-9. In fact, this Court has previously rejected Defendants' "attempt to frame the Exclusion as one focused on 'medical diagnoses, not ... gender.'" *Kadel v. Folwell*, 446 F.Supp.3d 1, 18 (M.D.N.C. 2020); *id.* ("[S]ex and gender are directly implicated; it is impossible to refer to the Exclusion without referring to them."). The Exclusion's singling out of transgender people for differential treatment thus is unmistakable. *See also Toomey*, 2019 WL 7172144, at *6 ("No cisgender person would seek, or medically require, gender reassignment. Therefore, as a practical matter, the exclusion singles out transgender individuals for different treatment."); *Kadel*, 446 F.Supp.3d at 18 (an "employer cannot be permitted to use a technically neutral classification as a proxy to evade the prohibition of intentional discrimination") (quote omitted).[4]

Defendants' argument also is belied by a record replete with admissions that Defendants knew the Exclusion treats transgender people differently, lifted it for one year

---

[4] For these reasons, the motion to dismiss-stage holding in *Lange v. Houston County, Georgia*, 499 F.Supp.3d 1258, 1275 (M.D. Ga. 2020), that a similar exclusion was facially neutral, fails to persuade. ECF No. 137 at 2-3. This Court has already rejected that analysis, and *Lange*'s reliance on *Geduldig* renders it particularly unpersuasive for Plaintiffs' statutory claims, where Congress has directly renounced *Geduldig*'s reasoning.

9

to afford equal treatment, and provided for reinstatement after concluding (wrongly) that the law no longer required equal treatment. *See, e.g.*, Ex. 39 (slides presented to the Board as it considered lifting the Exclusion for 2017, which include the term "transgender" 10 times); *see also id.* PLANDEF0006980 (explaining that ACA regulation "makes clear … that blanket exclusions of transgender services" are outmoded); Ex. 36 ( "Transgender Cost Estimate" memorandum from Segal Consulting); Ex. 48 (Defendant Folwell's statement that he would not provide coverage for "sex change operations" until "the court system … tells us that we 'have to'"); Supp. Richardson Decl. Ex. D, 107:17-108:6 (Defendant Folwell uses "sex change operation" to refer to "folks who want to transition, transition their gender"—i.e., transgender people).

*In re Union Pacific R.R. Emp. Pracs. Litig.*, 479 F.3d 936 (8th Cir. 2007), does not change the analysis.  Defendants cite this case for the proposition that the proper comparator is the medical benefit in question, ECF No. 137 at 3, but *Union Pacific* merely clarified that in a challenge alleging that men were treated more favorably than women for contraception coverage, one must compare women's contraception coverage with men's contraception coverage—not women's contraception coverage with men's coverage for male-pattern baldness or tetanus shots.  479 F.3d at 944.  Here, the comparison between the care covered for cisgender people and excluded for transgender people is direct: the Exclusion bars the same treatments for transgender people that are covered when medically necessary for cisgender participants, including hormone therapy,

10

Ex. 2 Admis. 1, Ex. 5 Admis. 2; puberty-delaying hormone treatment, Ex. 5 Admis. 2;

mammoplasty and breast reconstruction, Ex. 2 Admis. 2, Ex. 5 Admis. 3; vaginoplasty,

Ex. 2 Admis. 3; and hysterectomy, Ex. 2 Admis. 4.

Because of the Exclusion's facial discrimination, showing discriminatory intent is

not necessary—let alone "animus."  ECF No. 137 at 3.  *See, e.g.*, *Gerdom v. Cont'l*

*Airlines*, 692 F.2d 602, 608 (9th Cir. 1982) (where a policy "on its face applies less

favorably" to a group, the complainant "need not otherwise establish … discriminatory

intent"); *Lusardi v. Dep't of the Army*, EEOC Appeal No. 0120133395, 2015 WL

1607756, at *6 (Apr. 1, 2015).  And as this Court already has observed, "[s]ometimes …

the government's chosen classification will be clear from the text of the law or policy

itself.  Plaintiffs argue that that is the case here … and the Court agrees."  *Kadel*, 446

F.Supp.3d at 18.

Defendants inaccurately claim that Plaintiffs allege that "discriminatory animus"

motivated the reinstatement of the Exclusion, but that term appears nowhere in Plaintiffs'

Complaint, ECF No. 75, and animus has never been required for statutory or

constitutional claims.  It does not matter whether discriminatory treatment is rooted in an

undisputed truth, innocent misunderstanding, or active bias—sex and transgender

discrimination are no more tolerable in any of these circumstances.  *See, e.g.*, *Manhart*,

435 U.S. at 707 (pension plan violated Title VII even though "the parties accept as

unquestionably true [that]: Women, as a class, do live longer than men."); *Erie Cnty.*

*Retirees Ass'n v. Cnty. of Erie, Pa.*, 220 F.3d 193, 212 (3d Cir. 2000) (an employer's

11

"beneficence … does not undermine the conclusion that an explicit gender-based policy is sex discrimination") (quoting *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 200 (1991)); *cf. Parker v. Sony Pictures Ent., Inc.*, 260 F.3d 100, 112 (2d Cir. 2001) (it is no defense "to hold a good-faith, but erroneous, belief that the law permits taking an adverse job action on the basis of a prohibited factor").[5]

For these reasons, the argument that Defendants merely maintain the Exclusion based on their (mistaken) conclusion that the ACA no longer requires equal treatment is both incorrect on the law, and inadequate. Defendants invoke *Franciscan All., Inc. v. Burwell*, 227 F.Supp.3d 660 (N.D. Tex. 2016), but that only enjoined the U.S. Department of Health and Human Services ("HHS") from enforcing an ACA regulation; it did not alter the statutory guarantee of freedom from sex discrimination, or enjoin the ability to bring private suits. Separately, deliberately reinstating and maintaining the Exclusion because of a mistaken belief about the status of the ACA's regulations provides Defendants no shelter. The question is not whether Defendants intended to be meanspirited, but simply whether they intended to do it. On that point, there is no dispute: the Exclusion was not accidental or inadvertent, but intentional and deliberate. Ex. 40, PLANDEF0012816-17.

---

[5] Defendants cite *Williams v. Hansen*, 326 F.3d 569 (4th Cir. 2003) to suggest that animus is required, but cite the *dissenting* opinion in this constitutional case, which says nothing about Plaintiffs' statutory claims. ECF No. 137 at 3.

12

## II.    NCSHP is Liable as an Agent and Joint Employer Under Title VII.

### A.    NCSHP is Liable as an Agent.

Title VII defines "employer" to include the "agent" as well, and prohibits sex discrimination by both.  42 U.S.C. § 2000e(b).  Defendants argue that inclusion of an employer's "agent" in the statute does not establish liability for the agent, but simply expands the employer's liability for an agent's conduct.  ECF No. 137 at 20-21.  But this Court previously rejected that argument when Plaintiffs sought to amend their Complaint with Sgt. Caraway's Title VII claim against NCSHP.  ECF No. 74.  Defendants nonetheless press the argument again, claiming that *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507 (4th Cir. 1994), and *Lissau v. S. Food Serv., Inc.*, 159 F.3d 177 (4th Cir. 1998), establish that only employers may bear liability and not their agents.  ECF No. 137 at 21.  This Court flatly rejected that characterization:

> [I]n context *Birkbeck* merely concluded that no liability could attach to an *individual* employee …, see *Birkbeck*, 30 F.3d at 509-11, … consistent with the many courts that have rejected employment discrimination claims against individuals, *see Lissau*, 159 F.3d at 181 ….  *Birkbeck* neither foreclosed nor endorsed an agency theory under which more than one *entity* may bear Title VII liability.  …  Here, the issue of individual Title VII liability (and *Birkbeck*'s holding to that effect) remains irrelevant because the Amended Complaint does not lodge a Title VII claim against anyone in an individual capacity.

ECF No. 74 at 22-23.  Then as now, "Defendants have identified no authority demonstrating that such theory … fails."  *Id.* at 23-24, and case law instead shows that

13

NCSHP is liable on the merits.[6]  *See* ECF No. 179 at 31-33 (discussion in Plaintiffs' MSJ of NCSHP's liability as an agent of Sgt. Caraway's employer).

The Supreme Court itself held in *Manhart* that an administrative board implementing a discriminatory fringe benefit may be sued as the "agent" of the employing government agency.  435 U.S. at 718 n.33; *id*. ("Title VII applies to 'any agent' of a covered employer.").  Other courts examining this question in a similar context have reached the same conclusion.  *See, e.g.*, *Boyden v. Conlin*, No. 17-cv-264, 2017 WL 5592688, at *2-3 (W.D. Wis. Nov. 20, 2017) (collecting authorities demonstrating that to be liable as an agent under Title VII, an entity must be "empowered" with respect to an employment practice such as "provid[ing] benefits"); *id*. at *3 (W.D. Wis. May 11, 2018) (finding plaintiff's university employers had delegated responsibility for health coverage to state entities administering that coverage).

This Court also considered a similar argument in *Crowder v. Fieldcrest Mills, Inc.*, 569 F.Supp. 825 (M.D.N.C. 1983), involving claims against an employer and its health plan administrator as the employer's agent under Title VII.[7]  The plaintiff challenged the

---

[6] Defendants also misconstrue *Butler v. Drive Auto. Indus. of Am., Inc.*, 793 F.3d 404 (4th Cir. 2015), claiming that it held only an "employer" can be liable under Title VII.  ECF No 137 at 20.  But the paragraph Defendants quote observes that Title VII expressly defines an employer to include an "agent." 793 F.3d at 408.  *Butler* does not otherwise discuss agent liability, and certainly does not contain the holding Defendants suggest.  Instead, *Butler*'s adoption of the joint employer doctrine expressly recognizes that more than one entity can be liable as an employer.

[7] Defendants attempt to distinguish *Crowder* because it was decided before *Butler* adopted the current standards for the joint employment doctrine.  ECF No. 137 at 22 n.5.  But Plaintiffs rely on *Crowder*'s analysis of whether an entity is liable as an "agent." 569 F.Supp. at 828.

14

health plan's more favorable coverage for spouses of male employees than female employees. *Id.* at 826. Because the administrator served in merely an "advisory capacity" with no "significant control" over the plan terms, no agent relationship existed; but where an employer delegates responsibility, that "functionally result[s]" in the administrator "having control of an aspect of the terms and conditions of employment," rendering the administrator an "employer" by virtue of serving as an agent. *Id.* at 827-28. That describes NCSHP precisely. *See* N.C. Gen. Stat. § 135-48.2(a); Ex. 5 Admis. 12-14; ECF No. 96 ¶ 179. For these reasons, the Court should find that NCSHP has violated Title VII as an agent of DPS.

### B.    NCSHP is Liable as a Joint Employer.

NCSHP admits that the "'joint employment doctrine is the law of [the Fourth] Circuit.'" ECF No. 137 at 22 (quoting *Butler*, 793 F.3d at 409). Defendants try to undercut *Butler*'s application by focusing rigidly on the factors it identifies to help determine whether two entities share control over a key aspect of employment. ECF No. 137 at 23-27. But the underlying purpose of *Butler*'s "hybrid test" is to allow for "the broadest possible set of considerations in making a determination of which entity is an employer." 793 F.3d at 414. *Butler* instructs that "courts can modify the factors to the specific industry context." *Id.* Importantly, "the consideration of factors must relate to the particular relationship under consideration." *Id.* at 415 (quote omitted). Above all else, the guide star remains the common law element of control. *Id.* The Court should heed *Butler*'s call to adapt the analysis to this context, and set aside Defendants' urging to

15

focus on everything but the term of employment actually at issue—health coverage.  ECF No. 137 at 24-27.  NCSHP's mechanistic arguments about irrelevant factors such as control of Sgt. Caraway's work uniform thus should not persuade this Court.  ECF No. 137 at 23-24.  Nothing about the *Butler* test requires the Court to apply a host of factors with no bearing on the term of employment at issue, and the Court should instead examine *Butler*'s guidepost, i.e., "control" over the health coverage relevant to this case.  *Id.* at 414.

On this core issue, NCSHP is largely silent.  But there is no dispute that state law delegates control over employee health coverage to NCSHP, which exists solely to permit that delegation.  N.C. Gen. Stat. § 135-48.2(a); *see also* ECF No. 96 ¶ 179; Ex. 14, 13:3-14:6.  NCSHP implicitly concedes the point.  *See* ECF No. 137 at 17 (conceding that "DPS does not determine the health risks that the Plan will protect against or the benefits available to those who elected to participate"—because that is NCSHP's role).  Where an entity "exhibit[s] a high degree of control over the terms of [] employment," it must be held liable as a joint employer.  *Butler*, 793 F.3d at 415.  The undisputed facts here make clear that NCSHP functions as a joint employer for purposes of health coverage, and is liable under Title VII for all the reasons explained in Plaintiffs' MSJ.  ECF No. 179 at 33-34.

## III.    Defendants' Reliance on HHS's Redefinition of "Health Program or Activity" in 2020 is Misplaced.

Defendants argue NCSHP is entitled to summary judgment on Plaintiffs' ACA claim because in 2020, HHS, under the Trump administration, issued a rule redefining

16

"health program or activity" to exclude health insurance and that such redefinition is entitled to deference under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). Defendants' argument lacks merit. The text of Section 1557 is unambiguous in this regard and the redefinition is contrary to law, arbitrary, and capricious.

"*Chevron* deference is not a given." *People for the Ethical Treatment of Animals v. United States Dep't of Agric.*, 861 F.3d 502, 506–07 (4th Cir. 2017). "*Chevron* deference is not warranted where … the agency errs by failing to follow the correct procedures in issuing the regulation." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 220 (2016). Among those requirements is that a rule not be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706.

### A.    The Statutory Text is Clear and Unambiguous Such That the Health Insurance is Covered.

Resolving the dispute over the meaning of "health program or activity" "begins where all such inquiries must begin: with the language of the statute itself." *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989); *see also King v. Burwell*, 759 F.3d 358, 367 (4th Cir. 2014) ("At *Chevron*'s first step, a court looks to the 'plain meaning' of the statute."), *aff'd*, 576 U.S. 473 (2015). "[W]hen conducting [this] statutory analysis, a reviewing court should not confine itself to examining a particular statutory provision in isolation." *King*, 759 F.3d at 368 (quote omitted).

The redefinition of "health program or activity" is contrary to the ACA's statutory text, as well as common sense. Section 1557 plainly covers health insurance as a "health program or activity." Indeed, health insurance is what enables most Americans to access

17

health care.  It defies logic to argue that *health* insurance is not a *health* program or activity.  Moreover, Section 1557 applies to "*any health program or activity*, any part of which is receiving Federal financial assistance, including … *contracts of insurance*."  42 U.S.C. § 18116(a) (emphasis added).  "It is unclear to whom this clause would apply if not health insurance issuers like The Health Plan."  *Fain v. Crouch*, No. CV 3:20-0740, 2021 WL 2657274, at *3 (S.D.W. Va. June 28, 2021).

　　This Court should not review the meaning of "health program or activity" in isolation; it should seek to ascertain the statutory term's meaning from its context.  *King*, 759 F.3d at 368.  The Court "must … interpret the statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into a harmonious whole."  *Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132-33 (2000) (cleaned up).  In that sense, that "health program or activity" includes health insurance is evident from definitions of "health program" and "health care" contained within the ACA, which refers to "health programs" and "health care entities" as including insurers and insurance plans in other provisions. *See Fain*, 2021 WL 2657274, at *3 (noting "[o]ther sections of the ACA provide further support").  For example, Section 1331 permits states flexibility to provide a "basic *health program*" by offering "1 or more standard *health plans* providing at least the essential health benefits described in section 1302(b) to eligible individuals." 42 U.S.C. § 18051 (emphasis added).  Similarly, Section 1553 defines "health care entity" to include "*a health maintenance organization*, *a health*

18

*insurance plan*, or any other kind of health care facility, organization, or *plan*." 42 U.S.C. § 18113 (emphasis added).

Defendants invite the Court to ignore the statute's plain language and rewrite the law, but courts "are not permitted to ignore the statute's plain language." *United States v. Stitt*, 552 F.3d 345, 353 (4th Cir. 2008). And an agency "may not make its own administrative amendments," as HHS sought to do here. *Bracamontes v. Holder*, 675 F.3d 380, 387 (4th Cir. 2012). Instead, courts "are obliged to give effect to the statutes as they are written and enacted." *Id.* (cleaned up); *see also Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 376 (1986) ("[O]nly Congress can rewrite [a] statute.").

Moreover, courts "must reject administrative constructions which are contrary to clear congressional intent." *Chevron*, 467 U.S. at 843 n.9. Here, the inclusion of health insurance within "health program or activity" is apparent from Congress's intent. Senator Patrick Leahy explained that Section 1557's prohibition on discrimination was "necessary to remedy the shameful history of invidious discrimination and the stark disparities in outcomes in our health care system" and to "ensure that all Americans are able to reap the benefits of *health insurance* reform equally *without discrimination*." Health Care and Education Reconciliation Act of 2010, 156 Cong. Rec. S. 1821, 1842 (daily ed. Mar. 23, 2010) (emphasis added). Moreover, "when looking at the ACA as a whole, the Act clearly aims to increase the number of Americans covered by health insurance by transforming the health insurance industry." *Fain*, 2021 WL 2657274, at *3 (quote omitted). "Given this context, … 'health program or activity' under Section 1557

19

necessarily includes health insurance issuers such as The Health Plan." *Fain*, 2021 WL 2657274, at *3.

Defendants' argument that this Court holding that "health program or activity" unambiguously includes health insurance would mean that HHS can never interpret that phrase, ECF No. 137 at 31 n.6, is without merit. It just means that HHS cannot adopt a definition excluding health insurance, in accordance with the statutory text and context.

The Court should therefore "conclude that The Health Plan is unambiguously a 'health program or activity' under the plain text of Section 1557." *Fain*, 2021 WL 2657274, at *5; *see also T.S. v. Heart of CarDon, LLC*, No. 1:20-cv-01699, 2021 WL 981337, at *9 (S.D. Ind. Mar. 16, 2021), *reconsideration denied, motion to certify appeal granted*, No. 1:20-cv-01699, 2021 WL 2946447 (S.D. Ind. July 14, 2021).[8]

## B. The 2020 Redefinition of "Health Program or Activity" is Not Entitled to Deference.

Even assuming "health program or activity" is ambiguous with regard to inclusion of health insurance (it is not), the Court, under *Chevron* Step Two, must assess whether the redefinition of "health program or activity" is permissible or reasonable. *See PETA v. United States Dep't of Agric.*, 861 F.3d 502, 510 (4th Cir. 2017). It is not, as the

---

[8] Defendants claim that *Callum v. CVS Health Corp.*, 137 F.Supp.3d 817, 849-50 (D.S.C. 2015) found the term "health program or activity" to be ambiguous. ECF No. 137 at 30. Not so. *Callum* simply noted that it was undefined and "the parties disagree as to whether a retail pharmacy outlet … qualifies as one." *Callum*, 137 F.Supp.3d at 850. *Callum* "did not consider whether an insurance issuer could be held liable under Section 1557 and instead applied the law to pharmacies." *Fain*, 2021 WL 2657274, at *2 n.2.

20

redefinition is inconsistent with the ACA's text and Congress's intent, as well as arbitrary and capricious.

In 2016, HHS issued a regulation interpreting "health program or activity" to include all operations of an entity "principally engaged" in "the provision or administration of … health-related coverage." 81 Fed. Reg. 31,467. Notably, courts applied Section 1557 to health insurance *prior to* the 2016 rule. *See East v. Blue Cross & Blue Shield of Louisiana*, No. 3:14-cv-00115, 2014 WL 8332136 (M.D. La. Feb. 24, 2014).

When it issued its 2020 rule, HHS did not explain or provide rational explanation for its redefinition. Rather, it sought to justify the redefinition through its *ipse dixit* that providing "health insurance" is different than providing "healthcare." 85 Fed. Reg. at 37,172-73. But Section 1557 plainly covers "*any* health program or activity," not just direct health care. The argument that the Civil Rights Restoration Act ("CRRA") applies "to all health programs or activities receiving Federal financial assistance, but not to all providers of health insurance" has no support. 85 Fed. Reg. at 37,171. Indeed, the CRRA does not define "health care" or suggest that "being principally engaged in the business of providing healthcare" excludes health insurance companies.

Furthermore, the redefinition violates Section 1554 of the ACA and undermines the ACA's purpose, which was designed to expand access to health insurance and create new nondiscrimination protections in health insurance. *See, e.g.*, *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 519 (2012). Section 1554 explicitly prohibits HHS from

21

promulgating any regulation that "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care" or "impedes timely access to health care services." 42 U.S.C. § 18114. The redefinition of "health program or activity" frees health insurance providers from the ACA's nondiscrimination mandate and violates Section 1554 by creating unreasonable barriers to individuals seeking care.

In addition, the administration "entirely failed to consider an important aspect of the problem"—the harm caused by its new interpretation. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Commenters expressed concern that the exclusion of "many of the plans, products, and operations of most health insurance issuers, such as self-funded group health plans," would allow health insurers to conduct their activities "in a discriminatory manner." 85 Fed. Reg. at 37,173. The Trump administration arbitrarily and capriciously ignored these concerns, responding only that HHS "will robustly enforce the nondiscrimination requirements for [qualified health plans] under Title I of the ACA, for Exchange plans established by the ACA, and for any other insurance plans that Section 1557 covers." *Id.*

Finally, multiple challenges to the redefinition are pending and stayed in courts across country. *See, e.g.*, *Whitman-Walker Clinic v. U.S. Dep't of Health & Hum. Servs.*, 485 F.Supp.3d 1 (D.C. Cir. 2020);[9] *Boston All. of Gay, Lesbian, Bisexual & Transgender*

---

[9] Defendants misrepresent *Whitman-Walker Clinic*. There the court found plaintiffs had not sufficiently showed standing at the preliminary injunction stage but noted "the potential for Plaintiffs to better support their standing argument in the future with revamped allegations," such as through "representational standing." 485 F.Supp.3d at 32.

22

*Youth v. U.S. Dep't of Health & Hum. Servs.*, No. 20-cv-11297, 2021 WL 3667760 (D. Mass.); *New York v. U.S. Dep't of Health & Hum. Servs.*, No.1:20-cv-05583 (S.D.N.Y.). These cases are stayed based on the Biden administration's reporting "that its ongoing reassessment had raised substantial and legitimate policy concerns with the challenged Rule that HHS intends to address in a Section 1557 rulemaking proceeding … in early 2022." Defs.' Mem. in Opposition to Mot. to Lift Stay at 11, *Whitman-Walker Clinic*, 485 F.Supp.3d 1 (D.D.C. filed Aug. 13, 2021) (ECF No. 75). Given the above, the Court should refuse to afford the 2020 redefinition *Chevron* deference.

Health insurance is a "health program or activity" covered by Section 1557 of the ACA. This Court should join the multitude of courts that have applied Section 1557 to health insurance plans. *See, e.g.*, *Schmitt v. Kaiser Found. Health Plan of Washington*, 965 F.3d 945, 951 (9th Cir. 2020); *Tovar v. Essentia Health*, 857 F.3d 771, 779 (8th Cir. 2017); *Fain*, 2021 WL 2657274; *C.P. v. Blue Cross Blue Shield of Illinois*, 536 F.Supp.3d 791 (W.D. Wash. 2021); *T.S.*, 2021 WL 981337; *Boyden*, 341 F.Supp.3d 979; *Ferrer v. CareFirst, Inc.*, 265 F.Supp.3d 50 (D.D.C. 2017); *East*, 2014 WL 8332136.

## CONCLUSION

For all the reasons above, the Court should deny Defendants' MSJ on Sgt. Caraway's Title VII claim, and all Plaintiffs' ACA claims, against NCSHP.

23

Dated: December 30, 2021

/s/ Amy E. Richardson
Amy E. Richardson
N.C. State Bar No. 28768
Lauren E. Snyder
N.C. State Bar No. 54150
HARRIS, WILTSHIRE & GRANNIS
LLP
1033 Wade Avenue, Suite 100
Raleigh, NC 27605-1155
Phone: 919-429-7386 | Fax: 202-730-1301
arichardson@hwglaw.com

Deepika H. Ravi*
Grace Wynn*
HARRIS, WILTSHIRE & GRANNIS
LLP
1919 M Street N.W., 8th Floor
Washington, D.C. 20036
Phone: 202-730-1300 | Fax: 202-730-1301
dravi@hwglaw.com

Michael W. Weaver*
Adam M. Safer*
MCDERMOTT WILL & EMERY
444 W. Lake St., Suite 4000
Chicago, IL 60606
Phone: 312-984-5820 | Fax: 312-984-7700
mweaver@mwe.com

Dmitriy G. Tishyevich*
Warren Haskel*
MCDERMOTT WILL & EMERY
One Vanderbilt Avenue
New York, NY  10017-3852
Phone: 212-547-5534 | Fax: 646-417-7668
dtishyevich@mwe.com

Respectfully submitted,

Tara L. Borelli
Carl S. Charles*
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
1 West Court Square, Suite 105
Decatur, GA 30030
Telephone: 404-897-1880
Facsimile: 404-506-9320
tborelli@lambdalegal.org

Omar Gonzalez-Pagan*
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
Telephone: 212-809-8585
Facsimile: 212-809-0055
ogonzalez-pagan@lambdalegal.org

David Brown*
Ezra Cukor*
TRANSGENDER LEGAL
DEFENSE AND EDUCATION
FUND, INC.
520 8th Ave, Suite 2204
New York, NY 10018
Telephone: 646-993-1680
Facsimile: 646-993-1686
dbrown@transgenderlegal.org

24

Lauren H. Evans*
MᴄDᴇʀᴍᴏᴛᴛ Wɪʟʟ & Eᴍᴇʀʏ
One Vanderbilt Avenue
New York, NY  10017-3852
Phone: 202-756-8864 | Fax: 202-591-2900
levans@mwe.com

*Counsel for Plaintiffs*

\* Appearing by special appearance pursuant to L.R. 83.1(d).

25

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief is in compliance with Local Rule 7.3(d)(1) because the body of this brief, including headings and footnotes, does not exceed 6,250 words as indicated by Microsoft Word, the program used to prepare this document.

Dated:  December 30, 2021          /s/ Amy E. Richardson
                                   Amy E. Richardson
                                   N.C. State Bar No. 28768
                                   HARRIS, WILTSHIRE & GRANNIS LLP
                                   1033 Wade Avenue, Suite 100
                                   Raleigh, NC 27605-1155
                                   Phone: 919-429-7386
                                   Fax: 202-730-1301
                                   arichardson@hwglaw.com

**CERTIFICATE OF SERVICE**

I certify that the foregoing document was filed electronically with the Clerk of Court using the CM/ECF system which will send notification of such filing to all registered users.

Dated:  December 30, 2021

/s/ Amy E. Richardson
Amy E. Richardson
N.C. State Bar No. 28768
HARRIS, WILTSHIRE & GRANNIS LLP
1033 Wade Avenue, Suite 100
Raleigh, NC 27605-1155
Phone: 919-429-7386
Fax: 202-730-1301
arichardson@hwglaw.com

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MAXWELL KADEL, et al.,

*Plaintiffs*,

v.

DALE FOLWELL, et al.,

*Defendants*.

No. 1:19-cv-00272-LCB-LPA

### SUPPLEMENTAL DECLARATION OF AMY RICHARDSON

I, Amy Richardson, do hereby declare as follows:

1.       I am more than 18 years of age, have personal knowledge of the facts set forth herein, and am otherwise competent to testify to the matters set forth herein.

2.       I am a partner with Harris, Wiltshire & Grannis LLP, and counsel for Plaintiffs in this matter.  I submit this declaration in support of Plaintiffs' Opposition to State Health Plan Defendants' Motion for Partial Summary Judgment.

3.       Attached to this declaration are true and correct copies of the documents listed in the table below.  Entries in the table indicate where documents have been excerpted, or have had highlighting applied to indicate the relevant portions of the document.

1

| Exhibit | Description |
|---------|-------------|
| A | Excerpt from 70/30 PPO Plan Benefits Booklet for 2017, with yellow highlighting applied to relevant portions |
| B | Excerpt from 80/20 PPO Plan Benefits Booklet for 2017, with yellow highlighting applied to relevant portions |
| C | Excerpt of Dep. Tr. of Dan H. Karasic, M.D. |
| D | Excerpt of Dep. Tr. of Dale Folwell |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: December 30, 2021                    /s/ Amy Richardson
                                            Amy Richardson

2

**CERTIFICATE OF SERVICE**

I certify that the foregoing document was filed electronically with the Clerk of Court using the CM/ECF system which will send notification of such filing to all registered users.

Dated:  December 30, 2021

/s/ Amy E. Richardson
Amy E. Richardson
N.C. State Bar No. 28768
HARRIS, WILTSHIRE & GRANNIS LLP
1033 Wade Avenue, Suite 100
Raleigh, NC 27605-1155
Telephone: 919-429-7386
Facsimile: 202-730-1301
arichardson@hwglaw.com

3

# Exhibit A



North Carolina
**State Health Plan**
FOR TEACHERS AND STATE EMPLOYEES
*A Division of the Department of State Treasurer*



State Health Plan for Teachers and State Employees

# TRADITIONAL 70/30 PPO PLAN
# BENEFITS BOOKLET

January 1 – December 31, 2017

**BlueCross BlueShield of North Carolina**

October 1, 2016

PLAN DEF0072540

## What is not Covered?



- **Body** piercing
- Collection and storage of **blood** and stem cells taken from the umbilical cord and placenta for future use in fighting a disease
- **Bone** density wrist or heel radiology testing
- **Blood** pressure machines, cuffs or other blood pressure monitoring device



- **Childbirth** preparation classes, including but not limited to Lamaze classes, childbirth refresher classes, cesarean birth classes, vaginal birth after cesarean classes, and infant safety classes including CPR by a non-physician *provider*

    - Human breast milk processing, storage and distribution

- **Claims** not submitted to the *Plan* within 18 months of the date the charge was *incurred*, except in the absence of legal capacity of the *member*
- Side effects and **complications** of non-*covered services*, except for *emergency services* in the case of an *emergency*
- **Convenience** items such as, but not limited to, devices and equipment used for environmental control, urinary incontinence devices (including bed wetting devices) and equipment, heating pads, hot water bottles, ice packs and personal hygiene items
- *Cosmetic* services, which include the removal of excess skin from the abdomen, arms or thighs, skin tag excisions, cryotherapy or chemical exfoliation for active acne scarring, superficial dermabrasion, injection of dermal fillers, services for hair *transplants*, electrolysis and *surgery* for psychological or emotional reasons, except as specifically covered by the *Plan* including:
- Services received either before or after the **coverage period** of the *Plan*, regardless of when the treated condition occurred, and regardless of whether the care is a continuation of care received prior to the termination
- *Custodial care* designed essentially to assist an individual with activities of daily living, with or without routine nursing care and the supervisory care of a *doctor*. While some skilled nursing services may be provided, the patient does not require continuing skill services 24 hours daily. The individual is not under specific medical, surgical, or psychiatric treatment to reduce a physical or mental disability to the extent necessary to enable the patient to live outside either the institution or the home setting with substantial assistance and supervision, nor is there reasonable likelihood that the disability will be reduced to that level even with treatment. *Custodial care* includes, but is not limited to, help in walking, bathing, dressing, feeding, preparation of special diets and supervision over medications that could otherwise be self-administered. Such services and supplies are custodial as determined by the *Plan* without regard to the place of service or the *provider* prescribing or providing the services.
- **Camisoles**, or other clothing, post-mastectomy
- **Communication** boards or alternative communication devices



- **Dental care**, dentures, dental implants, oral orthotic devices, palatel expanders and orthodontics except as specifically covered by the *Plan*.
- **Dental services** provided in a *hospital*, except as specifically covered by the *Plan*.
- Evaluation and treatment of *developmental dysfunction* and/or learning disability.
- The following medications:
    - Injections by a health care professional of injectable *prescription medications*

44

Return to Table of Contents

PLAN DEF0072591

**JA514**

### What is not Covered?

which can be self-administered, unless medical supervision is required

o  Medications associated with conception by artificial means.

o  For prescribed *sexual dysfunction* medications

o  Take home medications furnished by a *hospital* or *nonhospital facility*

o  *Experimental* medication or any medication or device not approved by the Food and Drug Administration (FDA) for the applicable diagnosis or treatment. However, this exclusion does not apply to *prescription medications* used in covered phases I, II, III and IV clinical trials, or medications approved by the FDA for treatment of cancer, if prescribed for the treatment of any type of cancer for which the medication has been approved as effective and accepted in any one of the following nationally recognized medication reference guides:

- The American Medical Association Drug Evaluations
- The American *Hospital Formulary* Service Drug Information
- The United States Pharmacopoeia Drug Information
- The National Comprehensive Cancer Network Drugs & Biologics Compendium
- The Thomson Micromedex DrugDex
- The Elsevier Gold Standard's Clinical Pharmacology
- Any other authoritative compendia as recognized periodically by the United States Secretary of Health and Human Services.



- Services primarily for *educational treatment* an/or purposes including, but not limited to, evaluation, books, tapes, pamphlets, seminars, classroom, Web or computer programs, individual or group instruction, counseling, and vocational counseling, educational supplies such as books, tapes, and pamphlets for the patient's education at cost to physician or other qualified health care professional, educational services rendered to patients in a group setting by physician or other qualified health care professional, except as specifically covered by the *Plan*

- For **educational** or achievement testing for the sole purpose of resolving educational performance questions

- The following **equipment**:

  - Air conditioners, furnaces, humidifiers, vacuum cleaners, electronic air filters and similar equipment
  - Devices and equipment used for environmental accommodation requiring vehicle and/or building modifications such as, but not limited to, positioning seats, chair lifts, stair lifts, home elevators, and ramps
  - Physical fitness equipment, hot tubs, Jacuzzis, heated spas, whirlpools, pools or membership to health clubs
  - Personal computers
  - Pacemaker monitors and external defibrillators with integrated electrocardiogram analysis
  - Postural drainage boards and similar equipment
  - Standing frames.

Return to Table of Contents

PLAN DEF0072592

# Exhibit B





State Health Plan for Teachers and State Employees

# ENHANCED 80/20 PPO PLAN
# BENEFITS BOOKLET

January 1 – December 31, 2017



BlueCross BlueShield
of North Carolina

Revised: September 3, 2016

1

PLAN DEF0050758

# WHAT IS NOT COVERED?

Exclusions that are specific to a type of service are stated along with the benefit description in "*Covered Services*." Exclusions that apply to many services are listed in this section. To understand all of the exclusions that apply, read "*Covered Services*," "Summary of Benefits" and "What Is Not Covered?" In addition, your health benefit plan does not cover services, supplies, drugs or charges that are:

- Not *medically necessary*
- Anything specifically listed in this benefits booklet as not covered or excluded, regardless of *medical necessity*.
- *Investigational* in nature or obsolete, including any service, medications, procedure or treatment directly related to an *investigational* treatment, except as specifically covered by the plan.
- Any *experimental* medication or any medication or device not approved by the Food and Drug Administration (FDA) for the applicable diagnosis or treatment. However, this exclusion does not apply to *prescription drugs* used in covered phases I, II, III and IV clinical trials, or drugs approved by the FDA for treatment of cancer, if prescribed for the treatment of any type of cancer for which the drug has been approved as effective and accepted in any one of the following:
    - The National Comprehensive Cancer Network Drugs & Biologics Compendium
    - The Thomson Micromedex DrugDex
    - The Elsevier Gold Standard's Clinical Pharmacology
    - Any other authoritative compendia as recognized periodically by the United States Secretary of Health and Human Services
- Side effects and complications of non-*covered services*, except as specifically covered by your health benefit plan or except for *emergency services* in the case of an *emergency*
- Not prescribed or performed by or upon the direction of a doctor or *other provider*
- For any condition, disease, illness or injury that occurs in the course of employment, if the *employee*, employer or carrier is liable or responsible for the specific medical charge (1) according to a final adjudication of the claim under a state's workers' compensation laws, or (2) by an order of a State Industrial Commission or other applicable regulatory agency approving a settlement agreement
- For basic life or work-related or medical disability examinations
- For a health care professional to administer injectable *prescription drugs* which can be self-administered, unless medical supervision is required
- For *inpatient* admissions primarily for the purpose of receiving diagnostic services or a physical examination. *Inpatient* admissions primarily for the purpose of receiving therapy services are excluded except when the admission is a continuation of treatment following care at an *inpatient* facility for an illness or accident requiring therapy
- For care in a self-care unit, apartment or similar facility operated by or connected with a *hospital*
- For *custodial care*, domiciliary care or rest cures, care provided and billed for by a hotel, health resort, convalescent home, rest home, nursing home or other extended care facility, home for the aged, infirmary, school infirmary, institution providing education in special environments, in residential treatment facilities, except for *chemical dependency* treatment, or any similar facility or institution
- For respite care of any kind except as specifically covered by your health benefit plan
- For services provided at request of patient in a location other than physician's office which are normally provided in the physician's office
- For day care services, chore services, attendant care services, homemaker services, companion care services, foster care services
- Received prior to the *member's effective date*
- Received after the coverage termination date, regardless of when the treated condition occurred, and regardless of whether the care is a continuation of care received prior to the termination
- For telephone consultations or web-based, online or other electronic evaluations, charges for failure to keep a scheduled visit, charges for completion of a claim form, charges for obtaining medical records, and late payment charges
- *Incurred* more than 18 months prior to the *member's* submission of a claim

Return to Table of Contents

PLAN DEF0050810



## What is not Covered?

- For *cosmetic* purposes for any reason, including but not limited to excess skin from the abdomen, arms or thighs, and *surgery* for psychological or emotional reasons except as specifically covered by this health benefit plan.
- For camisoles, or other clothing, post-mastectomy
- For any services that would not be necessary if a non-*covered service* had not been received, except for *emergency services* in the case of an *emergency*
- For benefits that are provided by any governmental unit except as required by law
- For services that are ordered by a court that are otherwise excluded from benefits under this health benefit plan
- For care that the *provider* cannot legally provide or legally charge or is outside the scope of license or *certification*
- Provided and billed by a licensed health care professional who is in training
- Available to a *member* without charge and/or for care given to a *member* by a *provider* who is in a *member's* immediate family
- For any condition suffered as a result of any act of war or while on active or reserve military duty
- In excess of the *allowed amount* for services usually provided by one doctor, when those services are provided by multiple doctors
- For palliative, *cosmetic* or *routine foot care*
- For dental care, dentures, dental implants, oral orthotic devices, palatal expanders and orthodontics except as specifically covered by the Plan
- Considered to be dental services provided in a *hospital*, except when a hazardous condition exists at the same time or covered oral *surgery* services are required at the same time as a result of a bodily injury
- For any treatment or regimen, medical or surgical, for the purpose of reducing or controlling the weight of a *member* or for treatment of obesity, except for nutritional visits or surgical treatment of morbid obesity, or as specifically covered by your health benefit plan
- Bariatric *surgery*, except when provided at a Blue Distinction Center (BDC).
- Wigs, hair pieces and services for hair implants and electrolysis for any reason
- Received from a dental or medical department maintained by or on behalf of an employer, a mutual benefit association, labor union, trust or similar person or group
- For prescribed *sexual dysfunction* medications
- Music therapy, remedial reading, recreational or activity therapy, alternative therapy services, all forms of special education and supplies or equipment used similarly
- Hypnosis except when used for control of acute or chronic pain
- Acupuncture and acupressure
- Travel, whether or not recommended or prescribed by a doctor or other licensed health care professional, except as specifically covered by your health benefit plan
- For heating pads, hot water bottles, ice packs and personal hygiene and convenience items such as, but not limited to, devices and equipment used for environmental control, incontinence products (including briefs, diapers, underwear, underpads), and urinary incontinence devices (including bed wetting devices) and equipment
- For devices and equipment used for environmental accommodation requiring vehicle and/or building modifications such as, but not limited to, positioning seats, chair lifts, stair lifts, home elevators, and ramps
- Communication boards or alternative communication devices
- For safety equipment, devices or accessories, including but not limited to helmets with face guards and soft interfaces and any type of restraints
- For air conditioners, furnaces, humidifiers, dehumidifiers, vacuum cleaners, electronic air filters and similar equipment
- Physical fitness equipment, hot tubs, Jacuzzis, heated spas, whirlpools, pool or memberships to health clubs
- Athletic training evaluations or re-evaluations
- The following vision services:

47

Return to Table of Contents

PLAN-DEF0050811

**JA519**

# Exhibit C

Page 1

1            IN THE UNITED STATES DISTRICT COURT

2           FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

3              Civil Action No. 1:19-cv-00272

4

     MAXWELL KADEL, et al.,            )

5                                      )

                         Plaintiffs,   )

6                                      )

            vs.                        )

7                                      )

     DALE FOLWELL, in his official     )

8    capacity as State Treasurer of    )

     North Carolina, et al.,           )

9                                      )

                         Defendants,   )

10   _____)

11

12            DEPOSITION OF DAN H. KARASIC, M.D.

13                        Remote

                    September 20, 2021

14                9:00 a.m. Pacific Time

15

16

17

18

19   Prepared by:

     Vicki L. O'Ceallaigh Champion, CR

20   Certificate No. 50534

21

22

23   Prepared for:

24

25   (Certified copy)

Page 2

```
 1                    I N D E X

 2

 3   WITNESS:

 4   DAN H. KARASIC, M.D.                        PAGE

 5        Examination by Mr. Knepper ..............    5

 6        Examination by Mr. Haskel...............   Xx

 7

 8                   E X H I B I T S

 9   NO.              DESCRIPTION              PAGE

10   1    Dr. Karasic's Curriculum Vitae............   13

11   2    Dr. Karasic's Expert Report..............   29

12   3    Bibliography..............................   30

13   4    Article: International Clinical Practice     44
          Guidelines For Gender Minority/Trans People:
14        Systematic Review And Quality Assessment

15   5    Article:  Expertise In Psychotheraphy.....   51

16   6    Branstrom and Pachankis Study.............   56

17   7    Letters To The Editor, American Journal of   69
          Psychiatry
18

     8    A Follow-Up Study of Boys With ...........   78
19        Gender Identity Disorder

20   9    Short-Term Outcomes Of Pubertal Suppression  80
          In A Selected Cohort Of 12 To 15 Year Old
21        Young People With Persistent Gender Dysphoria
          In The UK
22

     10   Puberty Blockers and Suicidality in .......   91
23        Adolescents Suffering from Gender Dysphoria

24

25
```

JA522

```
 1                DEPOSITION OF DAN H. KARASIC, M.D.
 2    commenced at 9:00 a.m. on September 20, 2021, via
 3    Zoom, before VICKI L. O'CEALLAIGH CHAMPION, a
 4    Certified Reporter, CR No. 50534, for the State of
 5    Arizona.
 6
 7                          * * *
 8                    A P P E A R A N C E S
 9
10    For the Plaintiffs:
11        McDERMOTT WILL & EMERY, L.L.P.
          By:        Warren Haskel, Esq.
12                   One Vanderbilt Avenue
                     New York, New York 10017-3852
13                   (212) 547 5533
                     whaskel@mwe.com
14
          LAMBDA LEGAL
15        By:        Omar Gonzalez-Pagan, Esq.
                     120 Wall Street, 19th Floor
16                   New York, New York 10005-3919
                     (212) 809-8585, ext. 211
17                   ogonzalez-pagan@lambdalegal.org
18
19    For the Defendants:
20        LAW OFFICE OF JOHN G. KNEPPER, L.L.C.
          By:        John G. Knepper, Esq.
21                   Post Office Box 1512
                     Cheyenne, Wyoming 82003-1512
22                   (307) 632-2842
                     john@knepperllc.com
23
24    Also Present:
25                   Mr. Braden Bates, Legal Videographer
```

1   when we are referring to people with gender

2   dysphoria, little-G-little-D, we are also maybe

3   referring people -- to people who might meet a

4   criteria -- might meet the criteria for the DSM

5   diagnosis, but the DSM diagnosis is, you know -- has

6   a specific set of criteria.

7          And the gender dysphoria, small letters,

8   existed before those seven criteria were laid out,

9   because that -- those criteria did not, you know,

10   exist until 2013.

11   BY MR. KNEPPER:

12      Q.   Do all transgender people suffer from the

13   diagnosis of gender dysphoria?

14          MR. HASKEL:   Objection to form, foundation.

15      A.   So in the DSM, they put in a post-transition

16   specifier, and specifically -- so the people --

17   people can get ongoing care post-transition, so --

18   so I think that that was put in specifically so that

19   if people are being, you know, treated under that

20   diagnosis and their -- their symptoms have

21   alleviated because of treatment, they can continue

22   getting treatment under that diagnosis.

23   BY MR. KNEPPER:

24      Q.   Are there individuals -- does that mean that

25   all individuals -- are there any other individuals

# Exhibit D



Deposition of:
# Dale Folwell

*August 12, 2021*

In the Matter of:

# Kadel, et al vs. Folwell

Veritext Legal Solutions
800-734-5292 | calendar-dmv@veritext.com |

```
 1            IN THE UNITED STATES DISTRICT COURT FOR
 2             THE MIDDLE DISTRICT OF NORTH CAROLINA
 3
 4
 5      MAXWELL KADEL, et al.,         )
                                       )
 6               Plaintiffs,           )
                                       )   No. 1:19-cv-272-LCB-LPA
 7           V.                        )
                                       )
 8      DALE FOLWELL, et al.,          )
                                       )
 9               Defendants.           )
        _____    )
10
11
12
                            DEPOSITION
13                              OF
                            DALE FOLWELL
14
15                      AUGUST 12, 2021
16
17            THIS TRANSCRIPT IS NOT COMPLETE
            PORTIONS OF THIS TRANSCRIPT AND/OR EXHIBITS
18      MAY BE DESIGNATED CONFIDENTIAL/ATTORNEYS EYES ONLY
        AFTER REVIEW OF TRANSCRIPT BY ATTORNEYS WITHIN 30
19       DAYS OF DATE OF DEPOSITION PER PROTECTIVE ORDER
20
21
22              NORTH CAROLINA STATE HEALTH PLAN
                3200 Atlantic Avenue, First Floor
23                  Raleigh, North Carolina
24
25        Reported by: Michelle Maar, RDR, RMR, FCRR
```

```
 1      APPEARANCES:
 2      On behalf of the Plaintiffs:
 3          MCDERMOTT WILL & EMERY
            By: Michael W. Weaver
 4          444 W. Lake Street, Suite 4000
            Chicago, IL 60606
 5          Mweaver@mwe.com
 6          Lambda Legal Defense and Education Fund
            By: Tara Borelli
 7          730 Peachtree Street NE, Suite 640
            Atlanta, GA 30318
 8          Tborelli@lambdalegal.org
 9          HARRIS, WILTSHIRE & GRANNIS
            By: Amy E. Richardson
10          1033 Wade Avenue, Suite 100
            Raleigh, NC 27605
11          Arichardson@hwglaw.com
12
        On behalf of Defendants Dale Folwell, Dee Jones, and the NC
13      State Health Plan for Teachers and State Employees:
14          BELL, DAVIS & PITT
            By: Kevin G. Williams
15              Mark A. Jones
            100 N. Cherry Street, Suite 600
16          Winton-Salem, NC 27101
            Kwilliams@belldavispitt.com
17          Mjones@belldavispitt.com
18          NORTH CAROLINA STATE HEALTH PLAN/NORTH CAROLINA
            DEPARTMENT OF THE STATE TREASURER
19          By: James Benjamin Garner
                Joel Heimbach
20          3200 Atlantic Avenue
            Raleigh, NC 27604
21          Ben.garner@nctreasurer.com
            Joel.heimbach@nctreasurer.com
22
            LAW OFFICE OF JOHN G. KNEPPER
23          By: John G. Knepper
            1720 Carey Avenue, Suite 590
24          Cheyenne, WY 82001
            John@knepperLLC.com
25
```

1      On behalf of Defendant State of North Carolina
       Department of Public Safety:

2

       NORTH CAROLINA DEPARTMENT OF JUSTICE

3      By: Alan McInnes (via teleconference)
       114 W. Edenton Street

4      Raleigh, NC 27603
       Amcinnes@ncdoj.gov

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 107

1    Ms. Fitzgerald.

2        A.    What generated me saying that?

3        Q.    Yes.

4        A.    I got a call.

5        Q.    Okay.  And it says that you, your statement was

6    that the State Health Plan's 32 billion dollar debt --

7    again, are you referencing the unfunded liability there?

8        A.    Yes.  And the reason I use terms like that is

9    it's important, if you're trying to fix a problem, that you

10   describe it in terms that people are more accustomed to.

11        Unfunded liability and OPEB are not something

12   people are accustomed to.

13        Q.    Do you know what the unfunded liability is today?

14        A.    I do.

15        Q.    And what is it?

16        A.    27.8 billion.

17        Q.    And the last sentence there, it says the

18   provisions to pay for sex change operations does none of

19   these three things.

20        What did you mean by sex change operations?

21        A.    The topic for which we've been discussing, that

22   you refer to as gender dysphoria.

23        Q.    Okay.  So if -- so what is your understanding of

24   a sex change operation I guess I'm trying to get at?

25        MR. WILLIAMS:  Objection to the form.

1          You can answer.

2          THE WITNESS:  My definition of -- I don't have a

3     medical definition of a sex change operation.

4          It's the things that are commonly known, commonly

5     think of, which I've already described as things associated

6     with folks who want to transition, transition their gender.

7     BY MR. WEAVER:

8          Q.   Is it your understanding that there's other

9     healthcare benefits provided by the Plan that don't achieve

10    those three goals, reducing the debt, providing a more

11    affordable family premium, and provide transparency to

12    taxpayers?

13         A.   I'm sure there are, but I cannot articulate them.

14         Q.   Okay.  Now, my understanding, you were sworn in

15    officially in your duties on January 1, 2017.

16         A.   Correct.

17         Q.   Okay.  I'll show you Exhibit 6.

18         (Exhibit 6 is marked for identification.)

19    BY MR. WEAVER:

20         Q.   It's another e-mail chain.  This is PLAN

21    DEF0021691.

22         A.   Do I go to the back again?

23         Q.   Yes, please, sir.

24         A.   Last time it was in the front.

25         Okay.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

|  |  |
|---|---|
| MAXWELL KADEL, *et al.*, | |
| *Plaintiffs*, | |
| v. | 1:19-cv-00272-LCB-LPA |
| DALE FOLWELL, in his official capacity as State Treasurer of North Carolina, *et al.*, | |
| *Defendants*. | |

## REPLY BRIEF OF *AMICI CURIAE* THE AMERICAN MEDICAL ASSOCIATION AND SEVEN ADDITIONAL HEALTH CARE ORGANIZATIONS IN SUPPORT OF THEIR MOTION FOR LEAVE TO FILE AN AMICUS BRIEF

Pursuant to L.R. 7.5, the American Medical Association ("AMA"), the American Academy of Pediatrics, American College of Obstetricians and Gynecologists, the American Psychiatric Association, the Endocrine Society, the North American Society for Pediatric and Adolescent Gynecology, National Association of Nurse Practitioners in Women's Health, and the Society of OB/GYN Hospitalists (together, "*Amici*") respectfully submit this Reply in support of their motion for leave to submit a brief as *amici curiae* (the "Motion"). As set forth below, Defendants' arguments for opposing leave to file *Amici's* brief are meritless,

1

particularly in view of the fact that several of these *Amici* already have served exactly this role on the same issues in a recent case before the Fourth Circuit.

## I.    *Amici* Are Experts in their Fields, Not Expert Witnesses.

Proposed *Amici* are eight leading medical, mental health, and other health care organizations. Collectively, *Amici* represent hundreds of thousands of physicians, nurses and mental-health professionals, including specialists in family medicine, mental health, internal medicine, endocrinology, obstetrics and gynecology. As leading healthcare providers both within the State of North Carolina and beyond, *Amici* are in a unique position to inform the Court about the proper treatments for people experiencing gender dysphoria, the negative health outcomes when gender dysphoria is left untreated, and other health concerns that could arise from lack of coverage by State health care plans, which will directly impact the *Amici's* ability to care for their patients. *Amici's* expertise in a particular field, however, does not mean that they are expert *witnesses*.

Defendants spend over half their brief arguing that *Amici* are seeking to serve as expert witnesses in this case and are not complying with Fed. R. Civ. P. 26. (Doc. 186, at 2–7). That argument is completely inapt: *Amici* have not been retained as expert witnesses by any party to this case and are not receiving any compensation whatsoever for submitting their brief. *See* L.R. 7.5(d). *Amici*, unlike the parties' expert witnesses, do not opine on the care owed to the individual plaintiffs in this

2

case, the evidence at issue, or the wrongdoing or liability of the specific defendants in this case. *Amici* are not witnesses of any sort.

Moreover, unlike a typical expert witness, *Amici* have a direct interest and stake in the outcome of this litigation, because of the patients they serve. *Amici's* ability to serve those patients, including their ability to provide necessary treatments to those patients, will be affected by the decision in the present case. *Amici*'s brief therefore seeks to inform the Court of the medical consensus regarding what it means for their patients to be transgender; the protocols for the treatment of gender dysphoria, which include living in accordance with one's gender identity in all aspects of life; and the predictable harms to the health and well-being of transgender individuals who are denied access to necessary medical treatments.

As *amicus curiae*, and *not* as expert witnesses, prior *amicus* briefs submitted by the proposed *Amici* have been accepted – and cited extensively – by federal and state courts throughout the country, including the Fourth Circuit and the U.S. Supreme Court.  Proposed *Amicus* AMA, for example, has been granted leave to file hundreds of *amicus* briefs over the years. Those briefs have been cited favorably in judicial decisions at the district court level, *see, e.g.*, *United States v. Jefferson*, No. CRIM. 97-276 04 MJD, 2015 WL 501968 at *3 n. 1 (D. Minn. Feb. 5, 2015), *aff'd*, 816 F.3d 1016 (8th Cir. 2016) ("[T]he Court found the Amici Curiae brief of the American Medical Association . . . to be excellent resources . . ."); before courts of

3

appeals (including the Fourth Circuit), *see, e.g.*, *Peters v. Aetna Inc.,* 2 F.4th 199, 234 (4th Cir. 2021), *petition for cert. filed*, No. 21-761 (U.S. Nov. 22, 2021) ("This interpretation is bolstered by the brief of *amici*, the American Medical Association . . . ."); *Kohl by Kohl v. Woodhaven Learning Ctr.,* 865 F.2d 930, 933 n. 2 (8th Cir. 1989) ("We are indebted to the American Medical Association for its excellent amicus curiae brief, which is the source of much of our information . . . ."); and before the Supreme Court of the United States (*see, e.g.*, *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 63, 78, 208 L. Ed. 2d 206 (2020) (Breyer, J. dissenting) (citing AMA *amicus curiae* brief); *Sch. Bd. of Nassau Cty., Fla. v. Arline*, 480 U.S. 273, 288 (1987) ("[W]e agree with *amicus* American Medical Association . . . ."). The other proposed *Amici* have also filed *amicus* briefs that have likewise garnered citations and appreciation from the reviewing court. *See, e.g.*, *Stenberg* v. *Carhart*, 530 U.S. 914, 932–936 (2000) (quoting American College of Obstetricians and Gynecologists ("ACOG") brief extensively and referring to ACOG as a "significant medical authority"); *Jefferson*, 2015 WL 501968, at *3 n. 1 ("the Court found the Amici Curiae brief of the . . American Psychiatric Association . . . to be excellent resources in preparing for this resentencing, and would recommend that a court that is resentencing a defendant in light of Miller consult these references.").

   Particularly notable is that the Fourth Circuit recently relied on and quoted extensively from a substantially similar *amicus* brief filed by some of the same

*Amici*—the American Academy of Pediatrics, the AMA, and the American Psychiatric Association—on the very same subject matter presented here. *See Grimm v. Gloucester Cty. Sch. Bd.,* 972 F.3d 586 (4th Cir. 2020). *Grimm* involved a transgender student's lawsuit against a school district, alleging that its policy requiring students to use bathrooms based on their birth-assigned sex and its refusal to amend the plaintiff's school records to reflect his gender identity violated the Equal Protection Clause and Title IX. *Id.* at 593. The relevant portions of the *amicus* brief accepted by the court in *Grimm* are substantially identical to the brief submitted in this case (and written by one of the same law firms as on the brief here, Jenner & Block LLP) and addressed the same pertinent background as presented here: namely, what it means to be transgender and the medical and mental health issues that transgender individuals face. Recognizing the value of the information and insights presented by the *Amici Curiae*, the Fourth Circuit devoted three pages of its opinion to a recitation of the information provided in the *Amici's* brief, with extensive quotations from the brief. *Id.* at 594–96. As the court put it, "[w]ith that essential grounding, we turn to the facts of this case." *Id.* at 597.

Amici believe that the information contained in their proposed brief will assist the Court in its deliberations by presenting a complete and accurate description of the medical conditions and treatments at issue in the pending case, from the unique perspective that the *Amici* can offer as healthcare providers. As the Fourth Circuit

5

described it in *Grimm*, the information provided by *Amici* on these topics is the "essential grounding" to inform the Court as it turns to the facts of the case. 972 F.3d at 597.

Finally, Defendants' argument, taken to its logical conclusion, would prohibit *any amicus* from ever submitting a brief. If the Court should not consider the information submitted by an *amicus* in its deliberations, as urged by Defendants (Doc. 186, at 6–7), then no *amicus* could ever be helpful to the Court, and LR 7.5 would serve no purpose. Defendants' argument should be summarily rejected.

## II.     *Amici* **Have Particular Expertise Not Possessed by Any Party.**

As courts around the country have recognized, *amicus* briefs are appropriate and useful when, as here, the proposed *Amici* have "particular expertise not possessed by any party." *Neonatology Assocs., P.A. v. Comm'r*, 293 F.3d 128, 132 (3d Cir. 2002) (Alito, J.). As in *Grimm* and in this case, the proposed *Amici* often file *amicus* briefs when the issue before the court is uniquely within their knowledge or expertise and when they believe that they may be able to assist the Court in understanding relevant medical and scientific information. *Amici* have rigorous approval processes for *amicus* briefs, the touchstone of which is an assessment of whether a case is one in which there is sufficient medical and scientific research, data, and literature relevant to one or more questions before the court so that they

6

can usefully contribute to the court's understanding of that question. *Amici* regard this case as presenting such questions.

As Defendants acknowledge, *amici* are "allowed at the trial level where . . . they have a special interest in the subject matter of the suit." (*Id.* at 7) (citation omitted). As explained above, *Amici's* concern for and knowledge about the effect this Court's decision will have on their constituents' patients and their own ability to care for their patients amply vests *Amici* with the special interest that qualifies them to submit a brief. Defendants' footnote about "neutrality" is confounding. (Doc. 186, at 8 n. 2). Throughout this case, Defendants have demanded strict compliance with the Middle District of North Carolina's Local Rules. Local Rule 7.5(b) requires *Amici* to "identify the party or parties supported." Now that *Amici* have done so, Defendants seek to exclude their proposed brief. Indeed, *Amici* support the Plaintiffs in this case, as patients of their constituents seeking medical care. As such, *Amici* have the special interest required.

Conspicuously, several of the cases cited by Defendants in their opposition (Opp. at 7–8) *granted* motions for leave to file *amicus* briefs for similar reasons. *See City of Columbus v. Trump,* 453 F. Supp. 3d 770, 786 (D. Md. 2020) (granting leave where *amici* "demonstrated a special interest in the outcome of the suit and provided helpful information to the court"); *Bryant v. Better Bus. Bureau of Greater Md, Inc.,* 923 F. Supp. 720, 728 (D. Md. 1996) (granting leave to the National Association for

7

the Deaf to appear as *amicus* in an individual's discrimination lawsuit because the organization "represent[s] large constituencies of individuals which have a vested interest in how the provisions of the ADA are construed and applied" and observing that permitting *amici* "may be advisable where third parties can contribute to the court's understanding") (citation omitted).

Defendants argue that *Amici* will not offer a "new or unique perspective beyond that already presented by the parties" (Doc. 186, at 11 (citation omitted)), but that argument was rejected by the Fourth Circuit in *Grimm*. The Fourth Circuit relied heavily on the substantially similar *amicus* brief presented by some of the same *Amici* to provide the "essential grounding" that assisted the court in its analysis of the facts. 972 F.3d at 597. For example, the Fourth Circuit relied on *Amici's* similar brief for an understanding of gender identity and what it means to be transgender. *Id.* at 594. The court went on to quote *Amici* and their resources extensively regarding health disparities experienced by transgender people, the diagnosis and treatment of gender dysphoria, and the widely accepted standards of care utilized by medical and health professionals in treating transgender people, including young people.  *Id.* at 595-96.   Notably, Defendants themselves acknowledge that *Amici* will present the Court with fresh information and perspectives that are not presented by the other parties to this case. (Doc. 186, at 2)

8

("Approximately 50% of the medical articles cited in the proposed *amicus* brief (24 of 46) are not in any of the reports by Plaintiffs' experts").

That is exactly the appropriate role that *Amici* request the opportunity to serve here. The Fourth Circuit welcomed *Amici's* participation and input to inform its analysis, and *Amici* respectfully request that this Court do so as well.

## **CONCLUSION**

For the foregoing reasons, proposed *Amici's* motion for leave to submit a brief as *amici curiae* should be granted.

Respectfully submitted, this the 3rd day of January, 2022.

<div style="text-align:right">

/s/ Sarah M. Saint

Shana L. Fulton
NC State Bar No. 27836
sfulton@brookspierce.com
Sarah M. Saint
NC State Bar No. 52586
ssaint@brookspierce.com
  BROOKS PIERCE McLENDON
HUMPHREY & LEONARD, LLP
Suite 2000 Renaissance Plaza
230 North Elm Street (27401)
Post Office Box 26000
Greensboro, NC 27420-6000
Telephone: 336-373-8850
Fax: 336-378-1001

Matthew D. Cipolla
  JENNER & BLOCK LLP
919 Third Avenue
New York, NY 10022
(212) 891-1600

</div>

9

Howard S. Suskin
D. Matthew Feldhaus
Connor S.W. Rubin
Scott M. De Nardo
  JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
(312) 222-9350

Illyana A. Green
  JENNER & BLOCK LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001
(202) 639-6000

*Counsel for Amici Curiae*

10

**JA541**

## CERTIFICATE OF WORD COUNT

Pursuant to L.R. 7.3(d)(1) the undersigned counsel hereby certifies that the brief, in support of a motion, which is prepared using a proportionally spaced font, is less than 3,125 words (excluding cover, captions, indexes, tables of authorities, certificates of service, and this certificate of word count, counsel's signature block, and appendixes) as reported by word-processing software used to prepare this brief.

Respectfully submitted, this 3rd day of January 2022.

/s/ Sarah M. Saint

Sarah M. Saint
N.C. State Bar No. 52586
ssaint@brookspierce.com

BROOKS PIERCE McLENDON
HUMPHREY & LEONARD, LLP
Suite 2000 Renaissance Plaza
230 North Elm Street (27401)
Post Office Box 26000
Greensboro, NC 27420-6000
Telephone: 336-373-8850
Fax: 336-378-1001

*Counsel for Amici Curiae*

11

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this date, the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's Electronic Filing System to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

Respectfully submitted, this the 3rd day of January 2022.

/s/ Sarah M. Saint

Sarah M. Saint
  N.C. State Bar No. 52586
  ssaint@brookspierce.com

BROOKS PIERCE McLENDON
  HUMPHREY & LEONARD, LLP
Suite 2000 Renaissance Plaza
230 North Elm Street (27401)
Post Office Box 26000
Greensboro, NC 27420-6000
Telephone: 336-373-8850
Fax: 336-378-1001

*Counsel for Amici Curiae*

12

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MAXWELL KADEL, *et al.*,
           *Plaintiffs*,

     v.

DALE FOLWELL, *et al.*,
           *Defendants*.

No. 1:19-cv-00272-LCB-LPA

### REPLY IN SUPPORT OF STATE HEALTH PLAN DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**I.  Plaintiff Caraway's Title VII claim does not lie against the State Health Plan, either as an agent of her actual employer, the North Carolina Department of Public Safety, or as a joint employer.**

Caraway seeks to expand the reach of Title VII, arguing that the State Health Plan (the "Plan") is her "joint employer for purposes of health coverage," ECF No. 188 at 18, or that an "agent" of an employer can have liability under Title VII, *id.* at 13-14.

The Plan is not Caraway's employer because, like most health benefit programs, it does not employ prison guards. Common sense dictates this result, and the Fourth Circuit's rules for Title VII liability align with common sense. An agent can *create* Title VII liability, but the liability belongs to the employer, not the agent. Moreover, "joint employers" must "share or co-determine … the essential terms and conditions of employment." *Butler v. Drive Auto. Indus. of*

*- 1 -*

*Am., Inc.*, 793 F.3d 404, 408 (4th Cir. 2015). Caraway cannot satisfy *Butler*'s nine-factor analysis and makes no attempt to do so. The Plan is not her "joint employer," and her Title VII claim against the Plan should be dismissed.

## A. Under Title VII, only employers incur liability for agents' actions.

Caraway argues that the Plan is an "agent" of her employer, the North Carolina Department of Public Safety ("DPS"). But the reference to "agent" in the Title VII definition of "employer" is "an unremarkable expression of *respondeat superior*—that discriminatory personnel actions taken by an employer's agent may create liability for the employer." *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 510 (4th Cir. 1994); *Lissau v. S. Food Serv., Inc.*, 159 F.3d 177, 180 (4th Cir. 1998) (definition of employer in Title VII "must be read in the same fashion" as *Birkbeck*'s interpretation of "employer" in Age Discrimination in Employment Act).

Caraway provides two unpersuasive responses. First, Caraway attempts to distinguish between cases where the "agent" is an individual and where the "agent" is an entity. ECF No. 188 at 15. Such a distinction cannot be squared with *Lissau,* which held that Title VII does not allow claims against an agent of an employer. 159 F.3d at 181. *Lissau* does not distinguish between 'types' of agents, and it would be novel if it did. The rule of law does not allow the interpretation of a statutory term—in this case "agent of the employer"—to

- 2 -

vary based on the defendant's identity. It is Caraway's obligation, not the Plan's, to identify some basis for her distinction in the statutory text, and she fails to do so.[1]

Second, Caraway asks this Court to adopt forty-year-old dicta from *Crowder v. Fieldcrest Mills, Inc.*, 569 F.Supp. 825 (M.D.N.C. 1983). *Crowder* speculated that "control of **an aspect** of the terms and conditions of employment" might make an entity an "employer," even though this reasoning played no role in its decision. *Id.* at 828 (emphasis added).

*Butler* overruled such analysis. *Butler* held that "[a]n entity can be held liable in a Title VII action **only if it is an 'employer' of the complainant**" and provides the framework to determine who, precisely, qualifies as such. 793 F.3d at 408 (emphasis added). Title VII's definition of "employer" may include "any agent" of an employer, but **liability** does not extend to a defendant unless it has "joint employer liability." *Id.*

---

[1]   While Judge Auld allowed Plaintiffs to amend their Complaint, adding Caraway and her Title VII claim, he held only that, before discovery, Caraway's Title VII claim "does not suffer from futility." ECF No. 74 at 23-24. Judge Auld did not rule that Title VII permits Caraway's claim against the Plan.

*- 3 -*

### B. Control over the benefits available under the Plan fails to satisfy the Fourth Circuit's nine-factor analysis of joint employment.

As Plaintiffs note in their motion for summary judgment, "[h]ealth insurance constitutes an important part of one's compensation for employment." ECF No. 179 at 32 (citing *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 682 (1983)). However, "joint employer" status requires more than supplying one part of compensation, no matter how "important." There first must be an employer-employee relationship. It is this "contractual relationship of employment" that "triggers the provision of Title VII governing 'terms, conditions, or privileges of employment.'" *Hishon v. King & Spalding*, 467 U.S. 69, 74 (1984).

Caraway inverts the Title VII analysis, asserting that "control over employee health coverage," a single employee benefit, necessarily constitutes "a high degree of control over the terms of employment." ECF No. 188 at 18. This is clear error; Title VII liability rests on whether the Plan "actually exercise[s] control over an **employee**," not an employee benefit. *Butler*, 793 F.3d at 409. The "provisions of Title VII attach and govern certain aspects of that relationship" only after "a contractual relationship of employment is established." *Hishon*, 467 U.S. at 74.

*Butler*'s "joint employment doctrine" instructs this Court how to identify an employment relationship. "[C]ontrol remains the principal guidepost for determining whether multiple entities can be a plaintiff's joint employers." 793 F.3d at 415. For the Plan and DPS to jointly employ Caraway, both must "exercise significant control" over her work. *Id.* at 408.

As outlined in Plan Defendants' Motion for Partial Summary Judgment, every *Butler* factor shows that the Plan is not Caraway's "joint employer." ECF No. 137 at 21-27. DPS possesses exclusive authority to hire, fire, supervise, discipline, and train Caraway. DPS provides her equipment and place of employment. Caraway works exclusively for the benefit of DPS. Caraway has provided no indicia of an employment relationship with the Plan. Therefore, even if the Plan has "control over employee health coverage," ECF No. 188 at 18, Caraway has not, and cannot, establish that the Plan "exercises **control over an employee** to the extent necessary to be held liable under Title VII," *Butler*, 793 F.3d at 410 (emphasis added). Without an employment relationship, there is no Title VII liability.

## C. *Arguments regarding DPS's liability cannot expand Title VII beyond its statutory scheme.*

Caraway asserts that if this Court "credits both Defendants' arguments, no one bears any liability at all" under Title VII for her alleged discrimination.

*- 5 -*

ECF No. 179 at 33. Without elaboration, Caraway argues that this renders "Defendants' positions … untenable." *Id.* It is unsurprising that DPS and the Plan have different perspectives about Title VII. DPS's arguments do not, however, overcome the Fourth Circuit's repeated holdings that Title VII liability for "employers" extends only within the doctrine of *respondeat superior*. *See* ECF No. 133 at 11-21. Even if this Court allows Caraway's Title VII claim to proceed, any such liability would attach only to DPS, not the Plan.[2]

## II.     Plaintiffs' Affordable Care Act claims fail as a matter of law.

### A. *This Court should defer to HHS's interpretation of "health care program or activity."*

Plaintiffs fail to establish that the Plan has liability under § 1557 of the Affordable Care Act ("ACA"), 42 U.S.C. § 18116. The U.S. Department of Health and Human Services ("HHS") has interpreted § 1557 to not encompass employer health benefit plans; because the statute is ambiguous, and because

---

[2]     DPS disclaims Title VII liability on the basis that it cannot offer health benefits that compete with those offered by the State Health Plan. ECF No. 133 at 6-7 (citing ECF No. 134-5 at 30-37). The North Carolina Attorney General's opinion, however, explicitly permit health benefits that are "over and above rather [than] duplicat[ing]" Plan coverage. ECF No. 134-5 at 30-31. Such is the case for the benefits at issue here.

the agency's regulation is consistent with the text of the statute, this Court must defer to HHS's rule.

As outlined in the Plan Defendants' Motion for Partial Summary Judgment, ECF No. 137 at 28-32, HHS defines "health program or activity" to exclude "an entity principally or otherwise engaged in the business of providing insurance," 85 Fed. Reg. 37160 (June 19, 2020); 45 C.F.R. §92.3(b),(c)(2021). Although this interpretation has been challenged in the courts, it has not been overruled or enjoined, and it remains in full effect. *See Boston All. of Gay, Lesbian, Bisexual & Transgender Youth v. U.S. Dep't of Health & Hum. Servs.*, 2021 WL 3667760 at *9 (D. Mass. Aug. 18, 2021); *New York v. U.S. Dep't of Health & Hum. Servs.*, No. 1:20-cv-05583 (Doc. No. 145) (Aug. 23, 2021).

HHS's interpretation of "health program or activity" is entitled to *Chevron* deference. Congress has explicitly authorized HHS to "promulgate regulations to implement" § 1557. 42 U.S.C. § 18116(c). This "delegated legislative power" allows HHS to issue legislative rules, *Guedes v. ATF*, 920 F.3d 1, 17-18 (D.C. Cir. 2019), which "have the force and effect of law," *Guilford Coll. v. Wolf*, 2020 WL 586672, at *4 (M.D.N.C. Feb. 6, 2020) (Biggs, J.).[3]

--------

[3]    Beyond their statutory arguments, Plaintiffs argue the 2020 HHS regulation is not a "permissible or reasonable" interpretation of the phrase "health

**B. Congress has not "directly spoken to the precise question" of whether employee health benefits plans are "health programs or activities" under § 1557.**

Under *Chevron*, the threshold question is whether a statutory provision is "ambiguous," such that Congress has not "directly spoken to the precise question at issue." *Othi*, 734 F. 3d at 265 n.4. Plaintiffs urge this Court to hold that, as a matter of law, the phrase "health program or activity" includes employer health benefit programs such as the Plan. Plaintiffs discern this clear meaning from "common sense" and by reference to other provisions of the Affordable Care Act. ECF No. 188 at 19-20. Neither "common sense" nor these other, scattered terms, however, provides what *Chevron* requires: evidence that "Congress has directly spoken to the precise question at issue." *Othi v. Holder*, 734 F. 3d 259, 265 n.4 (4th Cir. 2013) (quoting *Chevron v. Nat'l Res. Def. Coun.*, 467 U.S. 837, 842 (1984)).

Federal courts have widely agreed that "health program or activity" is ambiguous in the context of the ACA, *Callum v. CVS Health Corp.*, 137 F.Supp.3d 817, 849-50 (D.S.C. 2015), and in other statutory contexts

---

program or activity" because HHS did not provide a "rational explanation" for its interpretation or consider the "harm caused by its new explanation" to individuals such as Plaintiffs. ECF No. 188 at 22, 24. HHS considered and rejected these arguments, as have other courts considering challenges to the 2020 rule.

- *8* -

featuring identical language, *see Nat'l Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459, 467-68 (1999); *Currie v. Grp. Ins. Comm'n*, 290 F.3d 1, 6-7 (1st Cir. 2002); *Victim Rts. L. Ctr. v. Cardona*, 2021 WL 3185743 at *12 (D. Mass. July 28, 2021). This precedent significantly outweighs Plaintiffs' citation to a single district court holding. ECF No. 188 at 17-18 (citing *Fain v. Crouch*, 2021 WL 2657274 at *2-4 (S.D.W.Va. June 28, 2021)). If anything, the disagreement among the federal courts over the meaning of "health program or activity" should be dispositive proof that ambiguity exists and that Congress has not provided direct guidance. *See Othi*, 734 F.3d at 265 n.4.

In response, Plaintiffs argue that it "defies logic" to conclude that a "health program or activity" does not include health insurance. ECF No. 188 at 19-20. But the State Health Plan is not an insurance plan. Rather, like other arrangements in which an employer pays for employee health care costs, the Plan is an "employee health benefit program." Even the 2016 version of the HHS rule exempted **some** employee health benefit plans from its scope. 81 Fed. Reg. 31376, 31472 (May 18, 2016) (creating 45 CFR § 92.208, which holds an "employee health benefit plan" is covered by § 1557 *only* if the entity is "principally engaged in providing or administering health services" and "receives Federal financial assistance a primary objective of which is to fund the entity's employee health benefit program"). It is therefore incorrect to say

- 9 -

that HHS previously concluded that the phrase "health program or activity" in § 1557 unambiguously extends to all employee health benefit programs. It never has.

Plaintiffs' next argument is that Congress has "spoken directly to the precise question" of whether § 1557 extends to health benefit plans, *Chevron*, 467 U.S. at 842, because it uses similar phrases elsewhere in the Affordable Care Act that appear to refer to insurance products. ECF No. 188 at 18. As an initial matter, the Court should disregard this argument as inconsistent with the Plaintiffs' representations to the U.S. Supreme Court, where they urged that Court to conclude that § 1557 "is itself a federal statute" that can be considered apart from the "omnibus" Affordable Care Act. Brief in Opp., *NCSHP v. Kadel*, No. 21-674 at 14-15 (Dec. 27, 2021).

Moreover, while *Chevron* analysis acknowledges "that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme," *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007), *Chevron* does not allow a court to jumble similar phrases into a pastiche. The relevant canon of statutory construction states there is a "natural presumption that **identical** words used in different parts of the same act are intended to have the same meaning," *Atl. Cleaners & Dyers v. U.S.*, 286 U.S. 427, 433 (1932) (emphasis added). None of the phrases

*- 10 -*

collected by Plaintiffs, or by the *Fain* court, are identical, and their context varies widely. *See Fain* 2021 WL 2657274 at *3; *compare* 42 U.S.C. § 18116 ("health program or activity") *with*, *e.g.*, Patient Protection and Affordable Care Act, 124 Stat. 119, 580 (data collection for "federally conducted or supported health care or public health program or activity"); 124 Stat. 199-201 ("basic health programs" under which States can offer "standard health plans"); 124 Stat. 331 (requiring panel members with expertise in "Federal safety net health programs" and, separately listed, "health plans and integrated delivery systems"); 124 Stat. 333 (referring to "Health programs operated by the Indian Health Service, Indian tribes, tribal organizations, and Urban Indian organizations"); 124 Stat 382 (data measurement for quality improvement in "Federal health programs").[4]

---

[4]     Plaintiffs argue § 1557's reference to "contracts of insurance" demonstrates Congress intended to include health benefits plans. ECF No. 188 at 19-20; *Fain*, 2021 WL 2657274 at *3 n.3. This misunderstands health care law. Title VI of the Civil Rights Act of 1964 expressly excludes its application to "a contract of insurance or guaranty." 42 U.S.C. § 2000d-1; 42 U.S.C. § 2000d-4. In 1967, the Department of Health, Education and Welfare issued a regulation concluding that physicians treat patients under Medicare Part B pursuant to a "contract of insurance" and are therefore not subject to Title VI. Sidney D. Watson, *Section 1557 of the Affordable Care Act: Civil Rights, Health Reform, Race, and Equity*, 55 HOW. L.J. 855, 865-66 (2012). § 1557's reference to "contracts of insurance" therefore addresses a separate participant in the health care system: physicians. This is reinforced by the fact that "contract of insurance" in § 1557 is listed with other forms of "federal financial assistance," not as part of a clause modifying "health program or activity." 42 U.S.C. §18116(a).

- 11 -

One cannot infer that these phrases all mean the same thing. Indeed, Plaintiffs identify another antidiscrimination provision in the ACA, § 1553, that applies to every "health care entity" and is defined to specifically include providers *and* health insurance plans. ECF No. 188 at 20-21 (quoting 42 U.S.C. § 18113(b)). That Congress explicitly defined "health care entity" broadly in § 1553 is, contrary to Plaintiffs' assertion, and strong evidence that the phrase "health program or activity" in § 1557 has a different, narrower meaning that does not include a 'health insurance plan' or its like.

Plaintiffs attempt to bolster their textual argument with a floor statement Senator Leahy made *months after* the Senate debated the Affordable Care Act and *after* the ACA had become law. ECF No. 188 at 21-22. The Affordable Care Act, H.R. 3590, passed the Senate on December 24, 2009. 155 Cong. Rec. S13891 (daily ed.). The House of Representatives concurred in the Senate bill on March 21, 2010, clearing it for the President's signature. *See* 156 Cong. Rec. H2153 (daily ed.). The President signed the ACA on March 23, 2010, at a ceremony that began at 12:39 p.m. Remarks on the Patient Protection and Affordable Care Act, 2010 Daily Comp. Pres. Doc. 197. The Senate did not convene until later that day, at 3:13 p.m., when Senator Leahy spoke during debate on a separate piece of legislation, H.R. 4872. 156 Cong. Rec. S1821&1841-44 (daily ed. March 23, 2010). "[W]hatever interpretive force

*- 12 -*

one attaches to legislative history, the Court normally gives little weight to statements, such as those of the individual legislators, made *after* the bill in question has become law." *Barber v. Thomas*, 560 U.S. 474, 486 (2010).

Ultimately, without the identical phrases required by this interpretive canon, the Court is left with the impermissible "parsing of general terms in the text of the statute" in the hope this "will reveal an actual intent of Congress." *Chevron*, 467 U.S. at 861. As in *Chevron*, "overlapping" terms and "language [that] is not precisely directed to the question" does not provide clear Congressional intent. *Id.* Plaintiffs are left asking this Court to interpret "health program or activity" by "looking at the ACA as a whole." *Fain*, 2021 WL 2657274 at *3. *Chevron* deference exists, however, because sweeping conclusions about the policy goals of the ACA are left to administrative agencies, not courts.

### C. Chevron *requires this Court to defer to HHS's reasonable interpretation of § 1557, which forecloses its application to the Plan.*

Pursuant to the second step of *Chevron*, this Court must defer to HHS's interpretation if it is "based on a permissible construction of the statute." *Schafer v. Astrue*, 641 F.3d 49, 54 (4th Cir. 2011) HHS's analysis of the distinction between "health insurance" and "healthcare" is compatible with the text. *See* 85 Fed. Reg. 37172-74. In particular, as the rule's preamble points

*- 13 -*

out, when Congress enacted the Civil Rights Restoration Act of 1990, it redefined "program or activity" in the context of other civil rights laws, defining the term 'program' to be, *inter alia*, the "entire … private organization … which is principally engaged in the business of providing … health care." 20 U.S.C. § 1687(3)(A)&3(A)(ii). The agency could certainly make a "reasonable policy choice," *Chevron*, 467 U.S. at 845, to reject Plaintiffs' interpretation and adopt the distinction advanced by a commenter that "paying for healthcare is not providing healthcare," 85 Fed. Reg. 37,172.

Employee health benefit plans are specifically exempted from the term "health program or activity" in § 1557, so the Plan cannot be liable under the Affordable Care Act as a matter of law. Plaintiffs' § 1557 claim should be dismissed.

*- 14 -*

Respectfully submitted, this the 13th day of January, 2022.

*/s/ John G. Knepper*
John G. Knepper
Wyo. Bar No. 7-4608
Law Office of John G. Knepper, LLC
1720 Carey Avenue, Suite 590
Cheyenne, WY 82001
Telephone: (307) 632-2842
John@KnepperLLC.com

*/s/ Kevin G. Williams*
Kevin G. Williams
N.C. Bar No. 25760

*/s/ Mark A. Jones*
Mark A. Jones
N.C. Bar No. 36215
BELL, DAVIS & PITT, P.A.
100 N. Cherry St., Suite 600
Winston-Salem, NC 27101
Telephone: (336) 722-3700
Facsimile: (336) 722-8153
kwilliams@belldavispitt.com
mjones@belldavispitt.com

*- 15 -*

## CERTIFICATE OF WORD COUNT

Pursuant to L.R. 7.3(d)(1), the undersigned certifies that this Brief complies with the Court's word limit as calculated using the word count feature of the word processing software. Specifically, this Brief contains less than 3,125 words. This count includes the body of the brief and headings, but does not include the caption, signature lines, this certificate or the certificate of service.

This the 13th day of January, 2022.


*/s/ John G. Knepper*
John G. Knepper
Wyo. Bar No. 7-4608
Law Office of John G. Knepper, LLC
1720 Carey Avenue, Suite 590
Cheyenne, WY 82001
Telephone: (307) 632-2842
John@KnepperLLC.com

*/s/ Kevin G. Williams*
Kevin G. Williams
N.C. Bar No. 25760

*/s/ Mark A. Jones*
Mark A. Jones
N.C. Bar No. 36215
BELL, DAVIS & PITT, P.A.
100 N. Cherry St., Suite 600
Winston-Salem, NC 27101
Telephone: (336) 722-3700
Facsimile: (336) 722-8153
kwilliams@belldavispitt.com
mjones@belldavispitt.com

*- 16 -*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will provide electronic notification to all counsel of record in this matter.

This the 13th day of January, 2022.

/s/ John G. Knepper
John G. Knepper
Wyo. Bar No. 7-4608
Law Office of John G. Knepper, LLC
1720 Carey Avenue, Suite 590
Cheyenne, WY 82001
Telephone: (307) 632-2842
John@KnepperLLC.com

/s/ Kevin G. Williams
Kevin G. Williams
N.C. Bar No. 25760

/s/ Mark A. Jones
Mark A. Jones
N.C. Bar No. 36215
BELL, DAVIS & PITT, P.A.
100 N. Cherry St., Suite 600
Winston-Salem, NC 27101
Telephone: (336) 722-3700
Facsimile: (336) 722-8153
kwilliams@belldavispitt.com
mjones@belldavispitt.com

- 17 -

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

|  |  |
|---|---|
| MAXWELL KADEL; JASON FLECK; CONNOR THONEN-FLECK; JULIA MCKEOWN; MICHAEL D. BUNTING, JR.; C.B., *by his next friends and parents*, MICHAEL D. BUNTING, JR. and SHELLEY K. BUNTING; SAM SILVAINE, and DANA CARAWAY. <br><br> Plaintiffs, <br><br> v. <br><br> DALE FOLWELL*, in his official capacity as State Treasurer of North Carolina*; DEE JONES, *in her official capacity as Executive Administrator of the North Carolina State Health Plan for Teachers and State Employees*; NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES; NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY. <br><br> Defendants. | No. 1:19-cv-272 |

## STATE HEALTH PLAN DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................ii

TABLE OF AUTHORITIES ........................................................... iv

STATEMENT OF THE CASE ......................................................... 1

ARGUMENT ................................................................................. 4

    I.    Plaintiffs' motion for summary judgment rests on disputed material facts. .............................................................4

        A.    The efficacy of Plaintiffs' desired medical treatments presents a crucial dispute of material fact. ...................................5

        B.    Plaintiffs' purported expert evidence is not appropriate for resolution without consideration by the factfinder..................... 12

        C.    Plaintiffs' characterization of the Plan's coverage decisions is contradicted by the facts............................................. 13

        D.    Plaintiffs have failed to provide the necessary evidence to answer crucial questions of fact................................................. 14

    II.    Plaintiffs have not provided sufficient evidence to receive summary judgment on their claim pursuant to the Equal Protection Clause of the 14th Amendment. ..................................... 16

        A.    Plaintiffs have not identified a group of individuals, with whom they are similarly situated, who are treated differently. ...................................................................... 16

        B.    Plaintiffs have not established that the State Health Plan imposes facial classifications on its beneficiaries ....................... 23

        C.    Plaintiffs have not established any legal authority for their claim that the Plan has an obligation to provide any member with specific medical care........................................... 31

III.    Plaintiffs' remaining claims are not supported by the evidence. ...... 35

    A.    Plaintiffs have not provided sufficient evidence to support a grant of summary judgment under § 1557 of the Affordable Care Act. ........................................................................... 35

    B.    Plaintiff Caraway has not produced sufficient evidence to support her Title VII claim ................................................. 37

CONCLUSION ........................................................................... 39

CERTIFICATE OF WORD COUNT ............................................... 41

*- iii -*

# TABLE OF AUTHORITIES

CASES

*Agostini v. Felton*, 521 U.S. 203 (1997)------------------------------------------- 29

*Geduldig v. Aiello,* 417 U.S. 484 (1974) ----------------------------- 28, 29, 33, 34

*Alexander v. Choate*, 469 U.S. 287 (1985) ---------------------------------------- 31

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ----------------------------------------- 27

*Barrington Cove Ltd. P'ship v. R.I. Hous. & Mortg. Fin. Corp.,*
    246 F.3d 1 (1st Cir. 2001)----------------------------------------------------- 17

*Bostock v. Clayton County*, 140 S. Ct. 1731 (2020) ----------------------------- 25, 29

*Boyd v. Bulala,* 877 F.2d 1191 (4th Cir.1989)----------------------------------- 33

*Boyden v. Conlin,* 341 F.Supp.3d 979 (W.D. Wis. 2018) -------------------------- 19

*Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263 (1993) --------- 11, 29

*C.P. by & through Pritchard v. Blue Cross Blue Shield of Illinois,*
    536 F. Supp.3d 791 (W.D. Wash. 2021) ----------------------------------------- 34

*City of Los Angeles, Dep't of Water & Power v. Manhart,*
    435 U.S. 702 (1978)----------------------------------------------------------- 37

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ---------------------- 12

*Doe v. Fairfax Cty. Sch. Bd.*,403 F.Supp.3d 508 (E.D. Va. 2019).---------------- 36

*Flaming v. Univ. of Texas Med. Branch,*
    2016 WL 727941 (S.D. Tex. Feb. 24, 2016)------------------------------------- 17

*Fletcher v. Alaska*, 443 F.Supp.3d 1024 (D. Alaska 2020)------------------------- 19

*Gann v. Schramm*, 606 F.Supp. 1442 (D. Del. 1985)------------------------------- 17

*Grider v. City of Auburn, Ala.*, 618 F.3d 1240 (11th Cir. 2010)------------- 17, 23

*Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020)---------------- 16

*Harris v. Pittman*, 927 F.3d 266 (4th Cir. 2019) --------------------------------- 4

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am.,
UAW v. Johnson Controls, Inc.*, 499 U.S. 187 (1991) ------------------------------- 23

*Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562 (4th Cir. 2015) ------------ 4

*Kirk v. State*, 465 S.E.2d 301 (N.C. Ct. App. 1995) --------------------------------- 31

*LaBella Winnetka, Inc. v. Village of Winnetka,*
    628 F.3d 937 (7th Cir. 2010) ---------------------------------------------- 17, 23

*Lake v. State Health Plan for Tchrs. & State Emps.*,
    825 S.E.2d 645 (N.C. Ct. App. 2019) --------------------------------------- 31

*Lange v. Houston Cty.*, 499 F. Supp. 3d 1258 (M.D. Ga. 2020) ------------------ 30

*Maher v. Roe*, 432 U.S. 464 (1977)----------------------------------------------- 32

*McMain v. Peters*, 2018 WL 3732660 (D.Or. Aug. 2, 2018) ----------------------- 18

*Per*s. *Adm'r of Mass. v. Feeney*,442 U.S. 256 (1979)-------------------------------- 32

*Price v. City of Charlotte, N.C.*, 93 F.3d 1241 (4th Cir. 1996) ---------------- 15, 36

*Raymond Lee X v. Johnson*, 888 F.2d 1387 (4th Cir. 1989) ------------------------ 14

*- v -*

*Roller v. Gunn*, 107 F.3d 227 (4th Cir. 1997)----------------------------------------- 16

*Saah v. Contel Corp.*, 978 F.2d 1256 (4th Cir.1992) -------------------------------- 33

*Saks v. Franklin Covey Co.*, 316 F.3d 337 (2d Cir. 2003)---------------------- 22, 32

*Sandlands C & D LLC v. Cty. of Horry*, 737 F.3d 45 (4th Cir. 2013) ------ 16, 22

*Toomey v. Arizona*, 2019 WL 7172144 (D. Ariz. Dec. 23, 2019)------------------ 27

*Union Pac. R.R. Emp.Practices Litig.*, 479 F.3d 936 (8th Cir. 2007)------------ 22

*United States v. Olvis,* 97 F.3d 739 (4th Cir. 1996) --------------------------------- 22

*Walls v. Ford Motor Co.*, 2021 WL 5206388 (M.D.N.C. Nov. 9, 2021) ------------4

*Williams v. Hansen*, 326 F.3d 569 (4th Cir.2003)----------------------------------- 16

*Willis v. Town of Marshall, N.C.,* 275 Fed. App'x 227 (4th Cir. 2008)--------- 17

### STATUTES

§ 1557 of the Affordable Care Act, 42 U.S.C. § 18116, ----------------3, 14, 34, 36
N.C. Gen. Stat. Ann. § 135-48.2 ----------------------------------------------------------1
N.C. Gen. Stat. Ann. § 135-48.42(a)----------------------------------------------------1
N.C. Gen. Stat. Ann.  § 135-1(7a)(b) ----------------------------------------- 31, 37

### OTHER AUTHORITIES

81 Fed. Reg. 31429 (May 18, 2019)---------------------------------------------------- 35
85 Fed. Reg. 37187 (June 19, 2020)-----------------------------------------------------35
Fed. R. Civ. P. 56(a) ---------------------------------------------------------------4, 23
Fed. R. Evid. 702 ----------------------------------------------------------------------- 12
Fed. R. Civ. P. 65(d)-------------------------------------------------------------14, 18

## STATEMENT OF THE CASE

The Court should deny Plaintiffs' motion for summary judgment against the Plan Defendants because their claims are inextricably tied to contested facts.

At the outset of their Memorandum in Support of Plaintiffs' Motion for Summary Judgment, Plaintiffs assert that "health coverage" is part of their employee compensation, and thus the Plan's "sweeping exclusion" for "gender-affirming care" means Plaintiffs receive "less compensation than others" for the same work. ECF No. 179 at 4. Plaintiffs further assert that because the Plan provides certain drugs and surgeries "for other reasons," it should pay for "the same kinds of treatments" for their psychiatric diagnosis of gender dysphoria.

Each of these assertions is incorrect. The General Assembly and courts of North Carolina are clear that state employees do not receive "health coverage" as a part of compensation. Rather, the State "undertakes to make available a State Health Plan," N.C. Gen. Stat. Ann. § 135-48.2, and state employees, such as Plaintiffs, are "given the opportunity to enroll or decline enrollment" in a group plan at the time they are hired (but only if they meet other eligibility criteria, such as working full-time), N.C. Gen. Stat. Ann. § 135-48.42(a). In return for payment of a premium, the Plan pays money to health

care providers to offset the member's cost of treatment for various diagnoses and procedures. Plaintiffs pay the same premiums as other members do, and they receive the same coverage for the same illnesses. ECF No. 137 at 9-10.

Second, "gender affirming care" has no accepted medical definition and does not correspond to the actual delivery of healthcare services, and Plaintiffs offer no definition in their motion for summary judgment. Plaintiffs have invented this artificial category for litigation purposes to distinguish it from "treatments for cisgender employees," but no such distinction exists in the world. ECF No. 179 at 4. Like the rest of the healthcare industry, the Plan uses the medical coding system to determine whether to pay for specific medical procedures to treat a specific diagnosis. ECF No. 137 at 10-11. When one reviews the specific procedures that Plaintiffs do identify, they are offered to *everyone*, including the Plaintiffs themselves, for treatment of the same diagnoses. The Plan's coding and payment practices make this clear. *See* ECF No. 137 at 13-18.

The ambiguity of the category "gender-affirming care" also distracts the Court from understanding that some of the treatments that Plaintiffs seek are not covered for *anyone* on the State Health Plan. Plaintiffs' equal protection claim—that they are denied the "kinds of treatments" offered to "cisgender employees" for "other reasons," ECF No. 179 at 4—cannot justify the

- 2 -

expansion of Plan coverage to services that are offered to *no one else* for any diagnosis.

The Plan's decision not to provide more generous health benefits is not a violation of the equal protection clause, § 1557 of the Affordable Care Act, or Title VII of the Civil Rights Act. The Plan has legitimate, non-discriminatory reasons to deny coverage for hormonal and surgical treatment for gender dysphoria. The Plan's leadership has a fiduciary duty to all Plan members. Consistent with this statutory duty, the Board has chosen to "focus on costs" and limit spending to protect the long-term health and availability of the Plan. The Plan's "fiduciary responsibility to cover basic health" needs for Plan participants, with limited dollars, requires that it focus on coverage for illnesses that affect many Plan members (diabetes, rheumatoid arthritis, and cancer) and is inconsistent with adding additional benefits for small "niche groups" (including not only gender dysphoria, but also adult hearing aids, special infant formula, and acupuncture) Ex. 1 (Jones. Dep.) at 104:20-105:24. This is especially true when, as here, there is considerable uncertainty about whether medical science supports these desired hormonal and surgical interventions.

*- 3 -*

## ARGUMENT

### I.   Plaintiffs' motion for summary judgment rests on disputed material facts.

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party." *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 568 (4th Cir. 2015) (internal quotations omitted). "[I]n deciding a motion for summary judgment, a district court is required to view the evidence in the light most favorable to the nonmovant… and to draw all reasonable inferences in his favor." *Harris v. Pittman*, 927 F.3d 266, 272 (4th Cir. 2019). A court "cannot weigh the evidence or make credibility determinations," and thus must "usually" adopt "the nonmovant's version of the facts," even if it seems unlikely that the moving party would prevail at trial. *Walls v. Ford Motor Co.*, 2021 WL 5206388, at *1 (M.D.N.C. Nov. 9, 2021) (Biggs, J.) (quoting *Jacobs*, 780 F.3d at 569 and *Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011)).

The parties fundamentally disagree on critical facts underlying Plaintiffs' claims, so the Plan Defendants respectfully submit that this Court may not resolve their claims at summary judgment.

- 4 -

## A. *The efficacy of Plaintiffs' desired medical treatments presents a crucial dispute of material fact.*

First, Plaintiffs have not established the efficacy of the medical treatments that they demand. Plaintiffs assert that undefined "gender affirming care" procedures are medically necessary treatments for gender dysphoria, and they have offered several experts who will testify about the need for hormonal therapy and surgical procedures. Plaintiffs also ask this Court to defer to the WPATH Guidelines as "authoritative standards of care" for transgender individuals, and proof that these treatments are "medically necessary and effective." ECF No. 179 at 17, 20. In doing so, Plaintiffs ask this Court to make a judgment about a significant medical controversy without any review of the current scientific evidence.[1]

"[G]ender dysphoria was, until just a few years ago, a very rare condition." Ex. 3 (Hruz Rep.) at 41. Recent data, however, shows "the number of people seeking care for gender dysphoria is rapidly increasing," *id.* at 42,

---

[1] Evidence before this Court shows that the WPATH Guidelines are far from a trustworthy resource. Dr. Stephen B. Levine, a licensed psychiatrist and Professor at Case Western Reserve University School of Medicine was a member of WPATH for almost 20 years. Ex. 2 (Levine Rep.) at 1. Dr. Levine explains that WPATH has become "a voluntary membership, activist advocacy organization" that accepts members who are not licensed medical professionals and "can no longer be considered a purely professional or scientific organization." Id. at 36.

- 5 -

and there has been a drastic "transformation of the patient population from early onset males to rapid onset adolescent girls," *id* at 67. For example, "[t]he number of adolescent girls seeking sex transitioning" in the United Kingdom increased "4,000% in the last decade." *Id.* For many decades, the typical patient with gender dysphoria was a biological male with a long, stable history of dysphoria since early childhood. But in the past 10 years, this has changed abruptly, and the typical patient is now an adolescent female with no documented long-term history of gender dysphoria. *Id.* at 67-68. Scientists have not explained this surprising shift, but such a quick change in a patient population suggests that theories of the cause or causes of gender dysphoria that are based on static features like "brain structures" or "genetics" are incorrect. *Id.* at 69.

While the patient population has changed and increased, the physical interventions for gender dysphoria remain experimental. As Dr. Paul McHugh noted in his expert report, "this controversial field has faced increasing scrutiny" in recent years, with "national research reviews in England, Sweden, and Finland" and other studies finding that "the evidentiary base for these experimental treatments is weak;" hormonal and surgical treatments demonstrate "few benefits" and may actually "cause more harm than good." Ex. 4 (McHugh Rep.) at 10.

There are no long-term, peer-reviewed, reliable research studies that allow physicians to know "the percentage of patients receiving gender transition procedures who *are helped* by such procedures, using objective criteria" or the "percentage of patients receiving gender transition procedures who *are harmed* by such procedures, measured with objective criteria." Ex. 2 (Levine Rep.) at 87 (emphasis added).

While patients may say, when interviewed, that they have benefited from hormone and surgical treatment, the current peer-reviewed scientific literature has not found evidence to support these subjective claims. As Plaintiffs note, a diagnosis of gender dysphoria requires more than a feeling of "dissonance" between one's perceived gender and one's biological sex; the patient must also suffer "clinically significant distress or significant impairment of functioning." ECF No. 179 at 17-18. Patients identify depression or anxiety as debilitating symptoms of gender dysphoria, and they assert anecdotally, after hormone therapy or surgery, that they feel less anxious or depressed. But when follow-up studies track *objective* measurements, like use of antidepressants and anti-anxiety medication, there

is no measurable difference between patients who receive hormone therapy or surgery and those who do not.[2]

In particular, the "affirmation" model of care—the basis for the WPATH Guidelines—is not supported by existing medical science. "The available data does not support the contention that 'affirmation' of transgender identity reduces suicide or results in better physical or mental health outcomes generally." Ex. 2 (Levine Rep.) at 45, 45-69. Finland, Sweden, and United Kingdom have retreated from prior medical policies on cross-sex hormones and surgical treatments. Medical providers in these countries now restrict the use of hormones and surgery in minors based on identified gaps in the medical science. *Id.* at 51-55. "The current status of the field of gender affirmation treatments has been labelled 'low quality' science by multiple reviews." *Id.* at 56. Studies have concluded that the field of affirmation treatments is "still at the experimental stage lacking in general acceptance within the relevant

---

[2] The lack of valid, reliable scientific data about the effect of gender dysphoria treatments has ethical consequences, especially when a patient seeks surgery. "Since the abandonment of frontal lobotomies in 1967, there has been no other psychological condition for which surgery is performed, and there is no other area of surgical care where the diagnostician is the patient themselves, and the surgeon has no means of confirming or rejecting the diagnosis." Ex. 5 (Lappert Rep.) at 23-24. Valid surgical consent requires that a surgeon be able to ensure that a diagnosis is correct. *Id.* at 24. The surgical procedures involved in gender transition can have very high complication rates, with one procedure having a rate of complication over 50%, making it even more important to have confidence in treatment benefits. *Id.* at 29-39.

- 8 -

scientific communities and without known error rates for the efficacy of the treatment." *Id.*

Striking scientific evidence was made public in 2020. The American Journal of Psychiatry published a study of individuals in Sweden with gender dysphoria. *Id.* at 57-58. Researchers used national health system data to research individuals with gender dysphoria in 2005 and again in 2015. The study sought to determine whether individuals who used cross-sex hormones or underwent surgery had, ten years later, lower use of anti-anxiety medication or anti-depressants, fewer mental health visits, or fewer hospitalizations connected to unsuccessful suicide attempts (*i.e.* improved mental health) when compared to individuals who did not receive these treatments. Ex. 6 (Branstrom & Pachankis; Follow-up Letters). After review of the study's data, outside experts and the authors agreed that the evidence did not show that hormone treatment or surgery improves the mental health of patients with gender dysphoria. Ex. 2 (Levine Rep.) at 57-63. Indeed, patients who received surgery "were more likely to be treated for anxiety disorders" than those who did not. *Id.* at 63.[3]

---

[3] This conclusion—that hormone treatment for gender dysphoria does not reduce mental healthcare needs—is supported by a 2021 study in the peer-reviewed Journal of Sexual Medicine. Looking over time at adolescents who received cross-sex hormones, researchers found the patients' "mental health

Dr. Paul W. Hruz, M.D., Ph.D. is a pediatric endocrinologist and a Professor of Medicine at the Washington University School of Medicine in St. Louis. Ex. 3 (Hruz Rep.) at 2. He is also the *only endocrinologist—i.e.*, a physician with specific expertise in the endocrine system (hormones)—to provide an expert opinion in this case. Dr. Hruz's opinion is that hormone therapy and surgery are "experimental, highly intrusive, and potentially harmful medical procedures" that lack "credible, reliable, and valid scientific support." *Id.* at 7-8. As one example, scientists understand that sex hormones affect brain development, but this knowledge "is in its rudimentary stages right now." Ex. 7 (Hruz Dep.) at 285:1-286:11. Testosterone appears to have some effect on brain development for biological males, and this finding creates "many reasons to be concerned and question" what the effect of puberty suppressing medications or testosterone has on the brain of a biological female. *Id.* at 285:1-287:2. At this time, any effect is completely unknown. Plaintiffs respond to these concerns by citing to guidelines from the Endocrine Society regarding hormone therapy, but the guidelines explicitly state that "the strength of recommendations and the quality of evidence was low or very low"

---

utilization remained elevated" even after hormone treatment, and the "use of psychotropic medications increased." Ex. 7 (Hruz Dep.) at 269:8-271:6. *See also* Ex.8 (Hisle-Gorman).

*- 10 -*

in support of these treatments. Ex. 3 (Hruz Rep.) at 53. "Low" and "very low" are terms of art. A "low recommendation" means that "[f]urther research is very likely to have an important impact on our confidence in the estimate of effect and is likely to change the estimate." Very low recommendations mean that "any estimate of effect is very uncertain." *Id.*

Plaintiffs' experts do not inform the Court about this current, raging scientific controversy. Instead, Plaintiffs shift the argument to assertions that the Plan has changed its mind about the efficacy of Plaintiffs' desired treatments, or that, in any event, any concerns are misplaced. ECF No. 179 at 27-30. In doing so, Plaintiffs improperly shift the burden of proof.

The Plan need not demonstrate that Plan officials are experts on medical care. It is the Plaintiffs who must demonstrate that the medical evidence supporting their proposed treatments is so strong that it would be "irrational" to "disfavor" coverage for such procedures. *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993). They cannot. Not a single drug has been FDA-approved for treatment of gender dysphoria. ECF No. 137 at 18.

Plaintiffs assert that these treatments have reduced their symptoms, ECF No. 137 at 5-9, but anecdotal evidence cannot establish that it is *unconstitutional* to reach a different conclusion about medical science. The existing scientific ambiguity demonstrates it would be profoundly

inappropriate for this Court enter an injunction at summary judgment, as Plaintiffs ask, and order the Plan to pay for Plaintiffs' desired medical treatment.

### B.     Plaintiffs' purported expert evidence is not appropriate for resolution without consideration by the factfinder.

To avoid the ongoing scientific controversy, Plaintiffs place extensive reliance upon guidelines issued by the World Professional Association for Transgender Health and the Endocrine Society. But this Court cannot summarily resolve this case by adopting such opinions as its own. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 584 (1993). Prior to *Daubert*, courts asked whether a scientific opinion is based on a scientific technique that is "'generally accepted' as reliable in the relevant scientific community." *Daubert,* 509 U.S. at 584. Adoption of the Federal Rules of Evidence eliminated this standard. Instead, Plaintiffs must provide more.

*Daubert* held that to be admissible, expert testimony must be "not only relevant, but reliable"—*i.e.*, it must impart "'scientific knowledge'" "*derived by [a] scientific method*" and "*supported by appropriate validation*." 509 U.S. at 589-590 (emphasis added). Federal Rule of Evidence 702 requires courts to determine not only that expert testimony is "the product of reliable principles

and methods," but also that the expert has "reliably applied" those principles and methods to the facts of the case before admitting testimony.

Reference to the holdings of a professional association can be relevant under *Daubert*, but the WPATH Guidelines do not accurately reflect medical science, having been developed by a "private, activist, non-science organization" that "takes a very narrow and politically-ideologically driven view on increasingly controversial issues as to which there is a wide range of opinion among professionals." Ex. 2 (Levine Rep.) at 36, 35-40. "When policy is made by voting in the face of low quality science, claims that treatments are evidence-based should be considered misleading and deceptive." *Id.* at 89.

## C.   *Plaintiffs' characterization of the Plan's coverage decisions is contradicted by the facts.*

Another factual dispute arises, in part, from disagreement over medical efficacy. Because Plaintiffs are certain about the effect of their desired treatments, they assert that no possible motive other than sex stereotyping or discriminatory animus could justify the Plan's coverage decisions. This is not supported by the evidence. The Plan's decision has no animus associated with it. Rather, the timeline is transparent. The Plan received federal funding from the Retiree Drug Subsidy program. When the federal government attached new requirements to this funding—requiring that the Plan cover the Plaintiffs'

desired benefits—the Plan complied, but the Board of Trustees' approval in 2016 was temporary due to their uncertainty regarding the benefits. When this funding condition was enjoined, later to be rescinded, the Plan allowed the benefits to expire when the initial approval sunset. Ex. 1 (Jones Dep.) at 69:9-19; 56:12-57:25. As the courts have repeatedly recognized, health plans are permitted to cover some illnesses and not others. In this case, the Board of Trustees focused on reducing the overall cost of treatment under the Plan and covering illnesses that affect large numbers of members.

### D.  Plaintiffs have failed to provide any evidence for crucial questions of fact.

Several remaining factual disputes arise from Plaintiffs' failure to develop evidence to carry their burden of proof. Plaintiffs repeatedly refer to "gender-confirming care," but they have never defined or otherwise provided a concrete list of the procedures that comprise such care. Plaintiffs seek injunctive relief for the alleged violation of the Equal Protection clause, ECF No. 75 at 37, but this Court cannot grant summary judgment and order such relief without clarity about exactly how the Plan is to comply. The Plan can no more be ordered to provide undefined "gender-confirming care" than a prison can be ordered to accommodate religious "dietary requirements." *Raymond Lee X v. Johnson*, 888 F.2d 1387 (4th Cir. 1989) (holding "Muslim dietary

- 14 -

requirements" insufficiently clear requirement to impose as an injunction under Fed. R. Civ. P. 65(d).

Moreover, under both § 1557 of the Affordable Care Act, 42 U.S.C. § 18116, and Title VII, Plaintiffs seek damages. But they have not presented any evidence for these damages. Plaintiffs seek damages for "financial harm," ECF No. 75 at 42, 44-45, but present no calculations or medical bills. Without such evidence, the Court cannot award summary judgment. Plaintiffs allege emotional damages, *id.*, but they have neither identified nor attempted to quantify the "independent compensable harm" that resulted from the alleged violation. *Price v. City of Charlotte, N.C.*, 93 F.3d 1241, 1248 (4th Cir. 1996).

Indeed, Plaintiffs have not submitted any medical records to this Court that prove they suffer from gender dysphoria. As noted in the Plan Defendants' response to the Plaintiffs' Motion to Seal, ECF No. 190 at 6-7, Plaintiffs submitted an expert report from George Brown, M.D., which includes statements about Plaintiffs' medical histories. Dr. Brown's report, however, does not specifically cite any of Plaintiffs' medical records, and he expressly disavowed that he himself was engaged in the practice of medicine (which is required to provide a medical diagnosis). *Id.*

**II. Plaintiffs have not provided sufficient evidence to receive summary judgment on their claim pursuant to the Equal Protection Clause of the 14th Amendment.**

### A. *Plaintiffs have not identified a group of individuals, with whom they are similarly situated, who are treated differently.*

The Equal Protection Clause of the 14th Amendment is "essentially a direction that all persons *similarly situated* should be treated alike." *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 635 (4th Cir. 2020) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (emphasis in original)). Plaintiffs must therefore produce evidence that the Plan is "treating differently persons *who are in all relevant respects alike*." *Id.* (emphasis in original).[4]

This is a sequential analysis. First, Plaintiffs must make an "initial showing" they have been "intentionally treated differently" from others who are "similarly situated." *Sandlands C & D LLC v. Cty. of Horry*, 737 F.3d 45, 55 (4th Cir. 2013). The court does not apply constitutional scrutiny—whether rational-basis or heightened—until *after* a plaintiff has made this showing of

---

[4] The Defendants note that Plaintiffs can still demonstrate an Equal Protection violation if they can prove that a discriminatory animus motivated the adoption of a facially neutral policy that is neutrally applied. *Williams v. Hansen*, 326 F.3d 569, 584 (4th Cir.2003). Plaintiffs must proceed to trial, however, and allow the jury to weigh competing evidence of the Plan's intent.

similarity. *Id.* Without proof that two groups are "similarly situated," the Court has no basis to proceed with an equal protection analysis. "The Constitution does not require things which are different in fact … to be treated in law as though they were the same." *Roller v. Gunn*, 107 F.3d 227, 234 (4th Cir. 1997) (quoting *Tigner v. Texas,* 310 U.S. 141, 147 (1940)).

To satisfy the "similarly situated" standard, Plaintiffs must identify a comparative group of persons who are (1) materially identical to them but who (2) have received different treatment. "[A]pples should be compared to apples." *Barrington Cove Ltd. P'ship v. R.I. Hous. & Mortg. Fin. Corp.,* 246 F.3d 1, 8 (1st Cir. 2001). Two compared groups must be "identical or directly comparable in all material respects," *LaBella Winnetka, Inc. v. Village of Winnetka,* 628 F.3d 937, 942 (7th Cir. 2010), or "prima facie identical," *Grider v. City of Auburn, Ala.,* 618 F.3d 1240, 1264 (11th Cir. 2010). The Fourth Circuit requires that the "evidence must show an extremely high degree of similarity." *Willis v. Town of Marshall, N.C.,* 275 Fed. App'x. 227, 233 (4th Cir. 2008); *see also LaBella,* 628 F.3d at 942 ("The similarly situated analysis is not a precise formula, but … what is clear is that similarly situated individuals must be very similar indeed.").

Providing different medical treatments for different medical diagnoses does not violate equal protection. "[A] function of medical diagnosis is to

- 17 -

determine in what ways individuals are not similarly situated so that they can be treated accordingly." *Gann v. Schramm*, 606 F. Supp. 1442, 1447 (D. Del. 1985). This remains true even when different diagnoses have the same treatment. *Flaming v. Univ. of Texas Med. Branch*, 2016 WL 727941, at *9 (S.D. Tex. Feb. 24, 2016). An individual with testicular cancer may need testosterone injections, but that person is not 'similarly situated' to someone with gender dysphoria. *McMain v. Peters*, 2018 WL 3732660, at *3-4 (D.Or. Aug. 2, 2018).

This failure to define who is "similarly situated" to the Plaintiffs is exacerbated by the WPATH Guidelines on which Plaintiffs rely. Plaintiffs repeatedly cite the WPATH Guidelines as a "consensus" approach to the medical care they need, ECF No. 179 at 17-19, but when asked about that care, emphasize that the Guidelines are expressly "meant to be flexible standards," Ex. 13 (Brown. Dep.) at 160:8-18, that "individual health professionals and programs may modify themselves." Eli Coleman, et al., Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People, v.7 at 2 (2012) (WPATH Guidelines). The term "gender affirming care" thus means anything the Plaintiffs, or an individual physician, believes could be helpful to a child or adult with gender dysphoria. This vague concept, which Plaintiffs advance despite the encyclopedic coding

system adopted by the federal government for medical diagnoses and procedures, is not sufficient information to permit the determination whether one Plan participant is "similarly situated" to another.[5]

Plaintiffs, and the two out-of-circuit district court cases they cite, do not acknowledge or even consider this initial requirement of an equal protection analysis. *See, e.g.*, *Fletcher v. Alaska*, 443 F.Supp.3d 1024, 1030-31 (D. Alaska 2020). This failure is most clear in *Boyden v. Conlin*. 341 F.Supp.3d 979, 995 (W.D. Wis. 2018). In that case, the district court assumed, without medical evidence, that a person with an unidentified genetic birth defect ("born without a vagina") is similarly situated to an individual with gender dysphoria, but then held that "no reasonable factfinder" could conclude without additional medical evidence that "a cisgender woman's depression because of small breast size" (which was not covered) "is medically comparable to gender dysphoria." *Id.*

If Plaintiffs want this Court to make similar findings, then at a minimum they need to show "medically comparable" diagnoses. *Id.* Plaintiffs do not. They argue only that if the Plan provides "the same kinds of treatments" for "other

---

[5]    This vagueness also prevents the Court from simply relying on the WPATH Guidelines to define the healthcare procedures at issue. An injunction must "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d).

reasons," then it must also cover their desired treatment for gender dysphoria. ECF No. 179 at 4. In doing so, Plaintiffs claim that hormones, puberty-delaying hormones, mammoplasty and breast reduction, vaginoplasty, and hysterectomies are available only for "cisgender participants" but not for "transgender people." ECF No. 179 at 12.

This is false. The Plan does not identify or track or record whether any participant is transgender, cisgender, non-binary or otherwise. ECF No. 137 at 14. The Plan evaluates whether the billed medical procedure corresponds to a covered diagnosis. For prescription medicines that are neither costly nor subject to abuse, neither the Plan nor CVS/Caremark (the Plan's Pharmacy Benefit Manager) *ever know* the reason for the prescription (*i.e.* the patient's diagnosis). *Id.* at 17-18. Those claims are paid.

Some prescription drugs are subject to special restrictions because they are expensive or subject to abuse. Each of these drugs must be prescribed for an FDA-approved diagnosis or for cancer treatment. *Id.* When these drugs are prescribed "off-label" for any other use, including treatment of gender dysphoria, they are denied. For example, the Plan requires prior authorization for some testosterone prescriptions. *See* Ex. 9 (CVS/Caremark, Prior Authorization Criteria). The authorization criteria identify the covered diagnoses: primary hypogonadism, hypogonadotropic hypogonadism, and

metastatic mammary cancer. *Id.* No individual ever receives a testosterone prescription to "reaffirm an individual's natal sex" or to "diverge[ ] from an individual's natal sex." ECF No. 179 at 21. Nothing in the authorization document refers to transgender individuals; prescriptions are authorized for both men and women.

The Plan applies the same restrictions—that the prescription is used to treat an FDA-approved diagnosis or to treat cancer—to hormone suppressing drugs that are covered by Specialty Guideline Management: Supprelin (central precocious puberty in all children), Eligard (prostate cancer and certain salivary gland tumors); Vantas (prostate cancer); Zoladex (prostate cancer, endometriosis, breast cancer); Triptodur (central precocious puberty in all children); and Trelstar (prostate cancer). *See* Ex. 10. Plaintiffs qualify for these prescriptions on the exact same basis as every other Plan participant.

For surgeries, again, the Plan authorizes payment based on diagnosis and procedure code. The Plan provides mastectomies for breast cancer, gynecomastia, breast reduction for macromastia (when breast size causes neck, back, and shoulder pain), and for individuals with a high risk of breast cancer. Ex. 11 (Blue Cross Blue Shield of North Carolina, Corporate Medical Policy, Breast Surgeries, August 2020. These patients can also, if they desire, receive breast reconstruction, but this is not the result of a Plan design or "sex

stereotypes." Federal law requires it. Every group health plan that provides "medical and surgical benefits with respect to a mastectomy" must provide "all stages of reconstruction of the breast on which the mastectomy has been performed" and "surgery and reconstruction of the other breast to produce a symmetrical appearance." 29 U.S.C. § 1185b(a).[6]

Payment for a specific procedure is not based on the sex or transgender identity of the patient; rather, the denial of coverage arises from the diagnosis. At deposition, at least some of the Plaintiffs conceded this point. *See*, *e.g.,* Ex. 12 (M. Bunting. Dep.) at 108:11-20 (Plaintiff does not assert that the "Plan does not pay for any of [C.B.'s] medical treatment," but rather that the Plan does not "cover treatment connected to [C.B.'s] gender dysphoria."). *See Saks v. Franklin Covey Co.*, 316 F.3d 337, 342 (2d Cir. 2003) (applying similar analysis to infertility); *In re Union Pac. R.R. Employment Practices Litig.*, 479 F.3d 936, 942, 944 (8th Cir. 2007) (contraceptive coverage).

"Generally, in determining whether persons are similarly situated for equal protection purposes, a court must examine *all* relevant factors." *United States v. Olvis,* 97 F.3d 739, 744 (4th Cir. 1996) (emphasis added). *Sandlands*

---

[6]    The Plaintiffs claim there is a discrepancy in coverage of hysterectomies, ECF No. 179 at 12, but the Plan has no procedure codes that limit hysterectomies in connection with a diagnosis of gender dysphoria, ECF No. 137 at 15-17.

*- 22 -*

*C & D LLC,* 737 F.3d at 55. Plaintiffs' motion for summary judgment fails at this threshold inquiry because they have not produced any evidence to establish that an individual with gender dysphoria is "identical or directly comparable in all material respects," *LaBella Winnetka,* 628 F.3d at 942, or "prima facie identical," *Grider,* 618 F.3d at 1264, to an individual with a different medical diagnosis, such as breast or prostate cancer.

At the summary judgment stage, these relevant factors must be resolved against the Plaintiffs. The Court must assume that the differences between the diagnosis of gender dysphoria and other diagnoses are significant, and that the medical efficacy of the treatments differs, creating a "genuine dispute" of "material fact." Fed. R. Civ. P. 56(a).

## B. Plaintiffs have not established that the State Health Plan imposes facial classifications on its beneficiaries

"Whether an employment practice involves disparate treatment through explicit facial discrimination does not depend on why the employer discriminates but rather on the explicit terms of the discrimination." *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991). The Plaintiffs argue that the Plan discriminates, on its face, against the Plaintiffs. They do so based on the

*- 23 -*

Plan's benefit booklet, which states that the Plan does not cover, among other medical treatments, the following services:

> Treatment or studies leading to or in connection with sex changes or modifications and related care.

The text of this exclusion, however, does not distinguish between individuals on the basis of sex, gender, or transgender status. To be facial discrimination, the provision must distinguish between men and women. It does not. To discriminate against transgender individuals, it must separate the health care available to transgender individuals from the health care available to others. The provision does not.

Plaintiffs attempt to establish facial discrimination under two broad lines of reasoning. First, and primarily, Plaintiffs assert that the State Health Plan improperly denies coverage for certain "medically necessary care … based on an employee's birth-assigned sex." ECF No. 153 at 17. But by focusing on their individual desires for specific medical treatments, Plaintiffs miss the broader context of how those treatments are prescribed, administered, and paid for across the healthcare industry.

Plaintiffs are mistaken in their assertion that the Plan's exclusion of certain coverage is "discriminating against a person for being transgender," "based on gender transition," or "based on an employee's birth-assigned sex."[7] ECF No. 153 at 16-18. The Plan excludes coverage for specific procedures if they are prescribed for treatment of the psychiatric diagnosis of gender dysphoria. Ex. 1 (Jones Dep.) at 15:1-16:23, 117:10-18:5.

Payment hinges solely on the medical condition and the procedure performed to treat it, which is determined independently of the Plan by the patient's chosen healthcare provider. Unlike in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), where the employer both evaluated the Plaintiff's biological sex and terminated the employee after considering that information, a patient's biological sex and/or expressed gender play no role in Plan coverage. For example, the Plan covers breast reduction surgery for a transgender man with a family history of breast cancer, a hysterectomy for a transgender man suffering from endometriosis, testosterone treatment for a transgender woman

---

[7] Plaintiffs improperly conflate these three distinct equal protection claims into a single element of "discrimination." Discrimination based on gender identity and discrimination based on biological sex operate in different ways. Furthermore, Plaintiffs make no effort to clarify whether they allege discriminatory animus, disparate impact, or both. In sum, the breadth and vagueness of Plaintiffs' assertions highlight their misunderstanding of the specific policy grounds for the State Health Plan's coverage policies.

*- 25 -*

based on specific hormonal needs, or genital constructive surgery for any transgender (or cisgender) person with relevant injuries from a workplace or automobile accident. Ex. 14 (BCBS Decl.) at ¶ 28.

As the Plan has shown, ECF No. 137 at 14, none of its coverage decisions for gender dysphoria consider a patient's sex. It is unclear whether Plaintiffs' claim of discrimination is that *any* coverage decision is subject to heightened scrutiny if *the healthcare provider* considered the patient's biological sex as part of the diagnostic process. Healthcare providers must know a patient's sex for *every* medical diagnosis. While hormones or surgical procedures can alter the visual appearance of a patient, "the biology of the person remains as defined by genetic makeup, normatively by his (XY) or her (XX) chromosomes, including cellular, anatomic, and physiologic characteristics and the particular disease vulnerabilities associated with that chromosomally-defined sex." Ex. 3 (Hruz Rep.) at 66. As but one example how this is so: under the clinical guidelines for cardiovascular health, male biological sex is, by itself, a risk factor indicating preventive intervention. Ex. 15 (Robie. Dep.) at 70:13-71:25. Competent medical care requires *every diagnosing physician* to know and to consider the patient's biological sex. *Id.* This does not, however, make the

physician an agent of the Plan or mean that the Plan itself has looked beyond the diagnosis that this independent actor has supplied.[8]

Gender dysphoria is a mental illness that affects some people who are transgender and some who are not, Ex. 16 (Ettner Dep.) at 28:11-13, Ex. 17 (Levine Dep.) at 241:24-243:20, and the proportion of transgender individuals who suffer from this condition is entirely unknown. Ex. 13 (Brown Dep.) at 92:17-25. Many transgender people do not suffer from gender dysphoria at all. Ex. 16 (Ettner Dep.) at 28:11-13; Ex. 17 (Levine Dep.) at 241:24-243:20. Furthermore, "there may be people who have symptoms of gender dysphoria, but they personally don't identify as transgender." Ex. 18 (Karasic Dep.) at 27:25-28:17; Ex. 17 (Levine Dep.) at 241:24-243:20. As a result, Plaintiffs' assertion that "transgender individuals are the only people who would ever seek" treatments for gender dysphoria is flatly contradicted by the testimony

---

[8]    In contrast to the information before a treating physician, the Plan sees only the information on the standard reimbursement form for health insurance, adopted by BCBSNC and the entire healthcare industry. This form does require each healthcare provider to report the patient's sex, but this can be biological sex or expressed gender; the information is irrelevant because the coverage decisions here do not consider this information at all. ECF No. 137 at 10-11. The Plan also receives bills that use the diagnostic codes developed by the World Health Organization and required by HHS, as is the case for every other participant in the healthcare industry. While some diagnostic or procedure codes are sex-specific, *see*, *e.g.*, ECF No. 137 at 10, this does not mean that the Plan has made any decision other than to use coding required by the healthcare industry.

*- 27 -*

of their own medical experts submitted to this Court. ECF No. 139 at 16 (citing *Toomey v. Arizona*, 2019 WL 7172144 at *6 (D. Ariz. Dec. 23, 2019)).[9]

The Plan's benefits, and limits on coverage, apply equally, and they are implemented *without any knowledge of the beneficiary's sex or gender*. Ex. 14 (BCBS Decl.) at ¶¶ 22,28. The Plan's benefit scheme therefore cannot be shown to discriminate facially on the basis of sex. This remains true even if one assumes, incorrectly, that only transgender individuals suffer from gender dysphoria. Ex. 16 (Ettner Dep.) at 28:11-13; Ex. 17 (Levine Dep.) at 241:24-243:20.

In *Geduldig v. Aiello*, the Supreme Court held that the exclusion of pregnancy from an insurance program was not facially "sex-based" even though only (biological) females become pregnant. 417 U.S. 484, 496 n.20 (1974). There is "no risk from which men are protected and women are not. Likewise, there is no risk from which women are protected and men are not." *Id.* at 496. "The lack of identity between the excluded disability and gender as

---

9    Plaintiffs rely on the denial of a motion to dismiss in *Toomey v. Arizona*, 2019 WL 7172144 (D.Ariz. 2019) to support their motion for summary judgment. *Toomey* decided only that a particular plaintiff had stated a claim "that is plausible on its face," accepting all allegations and reasonable inferences as true, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard is in sharp contrast to Plaintiffs' motion here for summary judgment, under which the Plaintiffs themselves must produce evidence there is "no genuine dispute as to any material fact."

such under this insurance program becomes clear upon the most cursory analysis." *Id.*

> The program divides potential recipients into two groups—
> pregnant women and nonpregnant persons. While the first group
> is exclusively female, the second includes members of both sexes.
> The fiscal and actuarial benefits of the program thus accrue to
> members of both sexes.

*Id.* at 496 n.20. This case is the same. Not all transgender individuals suffer from gender dysphoria. Ex. 16 (Ettner Dep.) at 28:11-13; Ex. 17 (Levine Dep.) at 241:24-243:20; Ex. 13 (Brown Dep.) at 92:17-25. The Supreme Court's reasoning in *Aiello* controls the analysis here:

> The program divides potential recipients into two groups—
> [individuals who suffer from gender dysphoria and individuals
> who do not. Even if] the first group is exclusively [transgender (and
> the evidence shows it is not)], the second group includes [both
> transgender and non-transgender individuals]. The fiscal and
> actuarial benefits of the program thus accrue to members of both
> [groups]

*Aiello*, 417 U.S. at 496. Under the Plan, transgender females have the same coverage as a transgender males, and both transgender males and females have the same coverage as cisgender males and females.

Plaintiffs may feel that the Plan burdens them unfairly as transgender people, but this does not establish discrimination. *Aiello* holds that an insurance exclusion that disparately impacts members of a particular class is

not discrimination without evidence of discriminatory intent.[10] 417 U.S. at 496 n.20. Plaintiffs have made no effort to establish discriminatory intent beyond vague references to "impermissible stereotyping." This is precisely the type of contested fact that must proceed to trial. The Plan's exclusion of certain treatments for the psychiatric condition of gender dysphoria does not stem from any view about what healthcare Plaintiffs should receive; it stems from judgment about how to best provide medical care for all members in light of existing regulations, the health care needs for all patients covered by the Plan, and limited financial resources. Ex. 1 (Jones Dep.) at 73:4-75:8.

Plaintiffs must proceed to trial and provide more: evidence of discriminatory intent. They cannot prevail only with assertions that gender dysphoria disproportionately affects members of a protected class. *See Lange*

---

[10]     Plaintiffs argue that *Aiello* has been overruled, ECF No. 188 at 5-6, but this is flatly incorrect. The Pregnancy Discrimination Act and cases cited by Plaintiffs "cast[ ] no doubt on the continuing vitality" of *Aiello*. *Bray*, 506 U.S. at 273 n.3. Nor does *Bostock* permit this Court to depart from *Aiello*'s reasoning and analysis. *Bostock* involved statutory interpretation. 140 S.Ct. at 1738. The Court did not consider whether the same analysis should apply in cases involving the Equal Protection Clause. When a Supreme Court precedent "has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions," the lower court must "follow the case which directly controls, leaving to [the Supreme Court] the prerogative of overruling its own decisions." *Agostini v. Felton*, 521 U.S. 203, 237 (1997).

*- 30 -*

*v. Houston Cty.*, 499 F. Supp. 3d 1258, 1275-77 (M.D. Ga. 2020) (insurance exclusion for gender dysphoria not facially discriminatory).

> ### C. Plaintiffs have not established any legal authority for their claims that the Plan has an obligation to provide any member with specific medical care or that the refusal to do so is improper.

Plaintiffs' motion for summary judgment devotes significant time and attention to assertions that "medical treatment for gender dysphoria is medically necessary and effective." ECF No. 179 at 17-20. The claim that denial of medically necessary care inherently constitutes discrimination is mistaken, because *the Plan has no obligation to cover medically necessary care for participants*.

Plaintiffs assert that health benefits are "compensation" to employees. ECF No. 179 at 4. This is false. The General Assembly of North Carolina has explicitly provided that "employer-provided fringe benefits," which include "health, life or disability plans," are *not* "compensation." N.C. Stat. § 135-1(7a)(b). "A State employee receives the benefits of the State Health Plan only when needed," so the agency's payment to the Plan to offset the cost of these health benefits is not part of the employee's wages. *Kirk v. State*, 465 S.E.2d 301, 306 (N.C. Ct. App. 1995). "The State endeavors to 'make available a State Health Plan.' But "[m]aking available and providing access

*- 31 -*

does not create any specific contractual financial obligation." *Lake v. State Health Plan for Tchrs. & State Emps.*, 825 S.E.2d 645, 656 (N.C. Ct. App. 2019).

Plaintiffs' participation or "subscription" to the Plan does not guarantee any particular health benefits. "The value of this benefit [participation in the health plan] cannot be quantified." *Kirk*, 465 S.E.2d at 306. Moreover, the facts clearly indicate that the medical necessity of a given treatment is irrelevant to the State Health Plan's policies. The Plan declines to cover any number of "medically necessary" treatments and procedures, and it is well within its rights to do so. Ex. 1 (Jones Dep.) at 58:12-15; 72:4-6. The Plan is not a doctor. Its duty is not to guarantee maximalist treatment for every member; rather, its duty is to maximize value for the whole of its members. The Plan's "package of services has the general aim of assuring that individuals will receive necessary medical care, but the benefit provided remains the individual services offered—not 'adequate health care.'" *Alexander v. Choate*, 469 U.S. 287, 303 (1985).

Accordingly, any differences in the "individual services offered" by the Plan stems from its discretionary analysis of the applicable regulations, the relative priority of different treatments, and the available resources—not "because of … its adverse effects" upon Plaintiffs or any other group. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

The federal courts have endorsed insurers' rights to make these decisions. Even when a patient has a fundamental right to a medical procedure and cannot afford to pay for it, the Constitution does not require that the Plan cover it; if anything, this barrier to care (refusal to pay for a procedure) represents a wealth classification based on individuals' ability to pay for certain treatment, not an actionable form of discrimination under the ACA or on equal protection grounds. *See Maher v. Roe*, 432 U.S. 464, 471 (1977). The Plan's policies discriminate against Plaintiffs "only in the same sense that [they] discriminate[ ] against those who might need penile prosthetic implants (which may be medically necessary to cure impotence), Kerato-refractive eye surgery (which may be medically necessary to cure vision defects), hearing aids (which may be medically necessary to overcome deafness), or those who suffer from eating or sleep disorders: they must pay for those procedures or devices themselves." *Saks v. Franklin Covey Co.*, 117 F.Supp.2d 318, 329 (S.D.N.Y. Oct. 2, 2000). All Plan members, including Plaintiffs, receive the actuarial benefit of this—and every other—coverage limit. Just as not all women are pregnant, not all transgender individuals require treatment for gender dysphoria.

Finally, it is a "legitimate purpose" to "limit[] health care costs." *Saah v. Contel Corp.*, 978 F.2d 1256 (4th Cir.1992) (per curiam). *See also Boyd v.*

*Bulala*, 877 F.2d 1191, 1197 (4th Cir.1989) ("[C]ap on [malpractice] liability bears a reasonable relation to a valid legislative purpose—the maintenance of adequate health care services."). "[S]o long as the line drawn by the State is rationally supportable, the courts will not interpose their judgment as to the appropriate stopping point" even if members of a protected class are disproportionately affected by the lack of coverage. *Aiello*, 417 U.S. at 495.

As one member of the Board of Trustees stated, his goal is "not to limit increases in cost" but to actually "cut the cost of healthcare for our state workers" because some individuals "are paying 20, 25 percent of their monthly income on healthcare on the State Health Plan." Robie.Dep.73:3-11. Once the Plan starts adding niche benefits, "then I have to keep going" for "[e]verybody who comes in and wants a benefit … because I can't discriminate." Jones.Dep.104:25-105:24. Plaintiffs suggest that this rationale weakens when the marginal cost of additional coverage is low, but there is no *de minimus* exception permitting Court intrusion when only "moderate alterations" to premium "variables" are needed. *Aiello*, 417 U.S. at 495-96. "The State has a legitimate interest in maintaining the self-supporting nature of its insurance program" and nothing in the Constitution requires a "more comprehensive" one. *Id.* at 496.

III.  **The Plaintiffs' remaining claims are not supported by the evidence.**

    A.  *Plaintiffs have not provided sufficient evidence to support a grant of summary judgment under § 1557 of the Affordable Care Act.*

Plaintiffs seek summary judgment for injunctive relief and damages under § 1557 of the Affordable Care Act, alleging that the failure to cover hormone treatment and surgery for gender dysphoria is "discrimination based on sex in healthcare." ECF No. 179 at 30-32.[11]

To the extent Plaintiffs claim the Plan's decision not to cover each and every possible treatment for gender dysphoria reflects discrimination "on the basis of sex," this argument has been addressed above. Also relevant to the § 1557 claim, however, is the fact that the U.S. Department of Health and Human Services ("HHS") has now expressly disavowed the factual analysis and conclusions reached in its earlier 2016 rule interpreting the scope of § 1557. In 2016, HHS stated that transition-related treatment could no longer be considered "cosmetic or experimental;" refusal to cover hormone treatment

---

[11]  Plaintiffs cite another district court ruling on a motion to dismiss as support for a grant of summary judgment. ECF No. 179 at 28 (citing *C.P. by & through Pritchard v. Blue Cross Blue Shield of Illinois*, 536 F. Supp.3d 791 (W.D. Wash. 2021). *CP* held only that "[p]laintiffs provide enough [unspecified] factual support" to make an allegation of discrimination "plausible." The case is irrelevant on summary judgment, especially as the court did not identify the "factual support" it found persuasive. *Id.*

*- 35 -*

or surgery on such a basis "is now recognized as outdated and not based on current standards of care." 81 Fed. Reg. 31429 (May 18, 2019).

The revised 2020 Rule studied this factual question, received extensive comment, and the agency concluded after a "review of the most recent evidence" that the 2016 statement "was an erroneous assertion." 85 Fed. Reg. 37187 (June 19, 2020). The current Rule found that "there is, at a minimum, a lack of scientific and medical consensus to support this assertion," and the "lack of scientific and medical consensus—and the lack of high-quality scientific evidence supporting such treatments—is borne out by other evidence." *Id.*

With their claim under § 1557, Plaintiffs ask this Court to do what HHS has refused: impose a view about appropriate care for gender dysphoria in a way that "inappropriately interfere[s] with the ethical and medical judgment of health professionals." 85 Fed. Reg. 37187. "A medical provider may rightly judge a hysterectomy due to the presence of malignant tumors to be different in kind from the removal of properly functioning and healthy reproductive tissue for psychological reasons, even if the instruments used are identical." *Id.*[12]

---

[12] Plaintiffs have provided no alternative theories or evidence in support their § 1557 claim other than the claim of facial discrimination rejected above.

Plaintiffs have also provided no evidence of damages. Under both § 1557 of the Affordable Care Act, 42 U.S.C. § 18116, and Title VII, Plaintiffs seek damages, but have presented no evidence for this Court to consider. Although Plaintiffs allege "financial harm," ECF No. 75 at 42, 44-45, they present no calculations or medical bills. Similarly, Plaintiffs allege emotional damages, *id.*, but have not identified or quantified the "independent compensable harm" that resulted from the alleged statutory violation. *Price v. City of Charlotte, N.C.*, 93 F.3d 1241, 1248 (4th Cir. 1996). Without such evidence, the Court cannot award summary judgment to Plaintiffs on either the § 1557 claim or the Title VII claim.

### B.     *Plaintiff Caraway has not produced sufficient evidence to support her Title VII claim.*

The Court should deny Caraway's motion for summary judgment and dismiss her Title VII claim. ECF No. 137 at 25-33; ECF No. 193 at 1-6. Caraway misunderstands the application of Title VII to fringe benefits, asserting that her health benefits are "compensation." ECF No. 179 at 4. This is false. As discussed earlier, "employer-provided fringe benefits" which include

---

Because § 1557 adopts the "enforcement mechanisms provided for and available under" the referenced civil rights statutes, 42 U.S.C. § 18116(a), and because Title IX does not permit a claim based on "disparate impact," *Doe v. Fairfax Cty. Sch. Bd.*, 403 F.Supp.3d 508, 515 (E.D. Va. 2019), Plaintiffs cannot assert a disparate impact claim in this case either.

*- 37 -*

"health, life or disability plans" are *not* "compensation." N.C. Stat. § 135-1(7a)(b).

*Manhart*, the case Caraway relies upon, makes this analysis clear. In *Manhart*, the Supreme Court considered whether a pension plan could "require[ ] female employees to make monthly contributions to the fund which were…higher than the contributions required of comparable male employees." *City of Los Angeles, Dep't of Water & Power v. Manhart*, 435 U.S. 702, 705 (1978). The Court rejected such a distinction, because Title VII's "focus on the individual is unambiguous" and "precludes treatment of individuals as simply components of a racial, religious, sexual, or national class." *Id.* at 708. Therefore, even if "[w]omen, as a class, do live longer than men," *id.* at 707, the employer could not charge different amounts based on sex.

In response, the employer made an argument very similar to Caraway's. Just as Caraway argues that it is unfair that the Plan does not pay for all of her treatments, Manhart's employer argued that a *failure* to charge different contributions "would itself violate Title VII because of its disproportionately heavy impact on male employees." *Id.* at 710 n.20. The Court rejected this analysis. "This suggestion has no force in the sex discrimination context because each retiree's total pension benefits are ultimately determined by his *actual life span*; any differential in benefits paid to men and women in the

*- 38 -*

aggregate is thus "based on [a] factor other than sex." *Id*. The same logic applies here. Caraway's health care payments "are ultimately determined by" her *actual medical needs*; "any differential in benefits paid ... in the aggregate is thus based on a factor other than sex." *Id*.

## CONCLUSION

Plaintiffs ask this Court to conceptualize their case as involving an by the Plan on the autonomy of transgender individuals, but this profoundly misstates the facts, the law, and the procedural posture. The State Health Plan does not restrict Plaintiffs' medical care. The Plan does not classify Plan members based on whether they identify as transgender, cisgender, non-binary, non-gendered, or otherwise. The Plan does not provide different health coverage to Plaintiffs. The discrimination alleged by Plaintiffs is that the Plan cannot cover a medication or treatment for one diagnosis—for example, a mastectomy for a man or woman with breast cancer—without also paying for medical treatment for *a different diagnosis*. This is not the law.

Respectfully submitted, this the 19th day of January, 2022.

/s/ John G. Knepper
Wyo. Bar. No. 7-4608
LAW OFFICE OF JOHN G. KNEPPER, LLC
1720 Carey Ave. Suite 590
Cheyenne, WY 82001
Telephone:  (307) 632-2842
Facsimile:  (307) 432-0310
john@knepperllc.com

/s/ Kevin G. Williams
N.C. Bar No. 25760

/s/ Mark A. Jones
N.C. Bar No. 36215
BELL, DAVIS & PITT, P.A.
100 N. Cherry St. Suite 600
Winston-Salem, NC 27101
Telephone:  (336) 722-3700
Facsimile:  (336) 722-8153
kwilliams@belldavispitt.com
mjones@belldavispitt.com

## CERTIFICATE OF WORD COUNT

Pursuant to L.R. 7.3(d)(1), the undersigned certifies that this Brief complies with the Court's expanded word limit using the word count feature of the word processing software in making this certification.

*/s/ John G. Knepper*
Wyo. Bar. No. 7-4608
LAW OFFICE OF JOHN G. KNEPPER, LLC
1720 Carey Ave. Suite 590
Cheyenne, WY 82001
Telephone: (307) 632-2842
Facsimile: (307) 432-0310
john@knepperllc.com

*/s/ Kevin G. Williams*
N.C. Bar No. 25760

*/s/ Mark A. Jones*
N.C. Bar No. 36215
BELL, DAVIS & PITT, P.A.
100 N. Cherry St. Suite 600
Winston-Salem, NC 27101
Telephone: (336) 722-3700
Facsimile: (336) 722-8153
kwilliams@belldavispitt.com
mjones@belldavispitt.com