# NO. 22-1721

In The

# United States Court Of Appeals

## For The Fourth Circuit

**MAXWELL KADEL; JASON FLECK; CONNOR THONEN-FLECK; JULIA MCKEOWN; MICHAEL D. BUNTING, JR.; C.B., by his next friends and parents; SAM SILVAINE; DANA CARAWAY,**

*Plaintiffs – Appellees,*

v.

**DALE FOLWELL, in his official capacity as State Treasurer of N.C.; DEE JONES, in her official capacity as executive Administrator of the N.C. State Health Plan for Teachers and State Employees,**

*Defendants – Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA AT GREENSBORO

————————

## JOINT APPENDIX
### Volume V of IX
### (Pages: 1902 – 2581)

————————

Mark A. Jones
Kevin G. Williams
BELL, DAVIS & PITT, P.A.
100 N. Cherry Street
Suite 600
Winston-Salem, NC 27101
(336) 722-3700

*Counsel for Appellants*

John G. Knepper
LAW OFFICE OF
JOHN G. KNEPPER, LLC
P. O. Box 1512
Cheyenne, WY 82003
(307) 632-2842

*Counsel for Appellants*

Tara L. Borelli
LAMBDA LEGAL DEFENSE
 & EDUCATION FUND, INC.
1 West Court Square
Suite 105
Decatur, GA 30030
(470) 225-5341

*Counsel for Appellees*

David P. Brown
Ezra U. Cukor
TRANSGENDER LEGAL DEFENSE
 & EDUCATION FUND, INC.
520 8th Avenue
Suite 2204
New York, NY 10018
(646) 993-1675

*Counsel for Appellees*

Omar F. Gonzalez-Pagan
LAMBDA LEGAL DEFENSE
 & EDUCATION FUND, INC.
120 Wall Street
19th Floor
New York, NY 10005
(212) 809-8585

*Counsel for Appellees*

Warren Haskel
Dmitriy Tishyevich
MCDERMOTT WILL
 & EMERY LLP
One Vanderbilt Avenue
New York, NY 10017
(212) 547-5400

*Counsel for Appellees*

Michael W. Weaver
MCDERMOTT WILL
 & EMERY LLP
444 West Lake Street
Suite 4000
Chicago, IL 60606
(312) 984-5820

*Counsel for Appellees*

Amy E. Richardson
Lauren Snyder
HWG LLP
1919 M Street, NW
8th Floor
Washington, DC 20036
(202) 730-1300

*Counsel for Appellees*

# **TABLE OF CONTENTS**
## **Joint Appendix - Volume I of IX**

**Page:**

Docket Entries. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **JA1**

First Amended Complaint
      filed March 9, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **JA47**

*Amici Curiae*'s Motion for Leave to File Brief in Support of Plaintiffs
      filed November 30, 2021.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **JA95**

State Health Plan Defendants'
Motion for Partial Summary Judgment
      filed November 30, 2021.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **JA106**

State Health Plan Defendants' Memorandum
In Support of Partial Summary Judgment,
With Exhibits,
      filed November 30, 2021.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **JA110**

      <u>Exhibits</u>:

    1.    Deposition of Dale Folwell
          taken on August 12, 2021. . . . . . . . . . . . . . . . . . . . . . .  **JA150**

    2.    Deposition of Dee Jones
          taken on August 3, 2021. . . . . . . . . . . . . . . . . . . . . . . .  **JA157**

    3.    80/20 and 70/30 Plans - 2021 Recommendation. . . . . . . . .  **JA177**

<u>Exhibits</u> **to**
**State Health Plan Defendants' Memorandum**
**In Support of Partial Summary Judgment**
      **filed November 30, 2021, Continued:**

4.    **Declaration of BCBSNC,**
      **With Attachments,**
        **sworn November 30, 2021**. . . . . . . . . . . . . . . . . . . . . **JA183**

5.    **Prior Authorization and Utilization Management**
      **Concepts in Managed Care Pharmacy**
        **Vol. 25, No. 6 June 2019 JMCP**. . . . . . . . . . . . . . . . . **JA197**

6.    **Deposition of Dan H. Karasic, M.D.**
        **taken on September 20, 2021.** . . . . . . . . . . . . . . . . . . **JA201**

7.    **Deposition of Randi C. Ettner, Ph.D.**
        **taken on October 15, 2021.** . . . . . . . . . . . . . . . . . . . **JA206**

8.    **Deposition of Stephen B. Levine, M.D.**
        **taken on September 10, 2021.** . . . . . . . . . . . . . . . . . **JA208**

9.    **Deposition of George R. Brown, M.D.**
        **taken on September 23, 2021.** . . . . . . . . . . . . . . . . . **JA212**

10.    **Affidavit of Alina Neuberger MD, MBA**
        **sworn September 29, 2021.** . . . . . . . . . . . . . . . . . . . **JA214**

11.    **Affidavit of Adam Korn**
        **sworn September 29, 2021.** . . . . . . . . . . . . . . . . . . . **JA224**

**Exhibits to**
**State Health Plan Defendants' Memorandum**
**In Support of Partial Summary Judgment**
> **filed November 30, 2021, Continued:**

> 12.   **Deposition of Sergeant Dana Caraway,**
>       **With Attachments,**
>       > **taken on September 17, 2021.** . . . . . . . . . . . . . . . . . . **JA226**

> 13.   **Deposition of Becki Johnson**
>       > **taken on  September 15, 2021.** . . . . . . . . . . . . . . . . . . **JA258**

**Plaintiffs' Motion for Summary Judgment**
> **filed December 20, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA278**

**Plaintiffs' Memorandum in Support of Summary Judgment,**
**With Exhibits,**
> **filed December 20, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA282**

> **Exhibits:**

> 1.   **Declaration of Maxwell Kadel**
>      > **sworn November 24, 2021.** . . . . . . . . . . . . . . . . . . . . . . **JA323**

> 2.   **Declaration of Connor Thonen-fleck**
>      > **sworn November 15, 2021.** . . . . . . . . . . . . . . . . . . . . . . **JA341**

> 3.   **Declaration of Jason Fleck**
>      > **sworn November 11, 2021.** . . . . . . . . . . . . . . . . . . . . . . **JA348**

> 4.   **Declaration of Julia McKeown**
>      > **sworn November 19, 2021.** . . . . . . . . . . . . . . . . . . . . . . **JA375**

<u>Exhibits</u> to
**Plaintiffs' Memorandum in Support of Summary Judgment**
     **filed December 20, 2021, Continued:**

    5.    **Declaration of C.B.**
          **sworn November 24, 2021**......................**JA388**

    6.    **Declaration of Michael D. Bunting, Jr.**
          **sworn November 22, 2021**......................**JA394**

    7.    **Declaration of Sam Silvaine**
          **sworn November 22, 2021**......................**JA402**

    8.    **Declaration of Shelley K. Bunting**
          **sworn November 24, 2021**......................**JA408**

    9.    **Declaration of Dana Caraway**
          **sworn November 15, 2021**......................**JA449**

**Plan Defendants' Response in Opposition to**
**Motion for Leave to File Brief of** *Amici Curiae*
     **filed December 20, 2021**...................................**JA466**

**Plaintiffs' Opposition to State Health Plan Defendants'**
**Motion for Partial Summary Judgment,**
**With Attachment,**
     **filed December 30, 2021**...................................**JA480**

    <u>Attachment</u>:

    **Supplemental Declaration of Amy Richardson,**
    **With Exhibits,**
          **sworn December 30, 2021.**.........................**JA509**

**Reply Brief of** *Amici Curiae*
> filed January 3, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA532**

**Reply in Support of State Health Plan Defendants'**
**Motion for Partial Summary Judgment**
> filed January 13, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA544**

**State Health Plan Defendants' Response in Opposition**
**To Plaintiffs' Motion for Summary Judgment,**
**With Attachments,**
> filed January 19, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA561**

## TABLE OF CONTENTS
### Joint Appendix - Volume II of IX

<u>Attachments</u> to
State Health Plan Defendants' Response in Opposition
To Plaintiffs' Motion for Summary Judgment
      filed January 19, 2022, Continued:

1.     **Deposition Transcript Excerpt of Defendant Dee Jones,**
        **sworn August 3, 2020 1.. . . . . . . . . . . . . . . . . . . . . . . . JA608**

2..    **Declaration of Dr. Stephen B. Levine, M.D.,**
      **With Exhibits,**
        **sworn April 28, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . JA622**

3.     **Declaration of Dr. Paul W. Hruz, PhD.**
        **sworn April 30, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . JA735**

4.     **Declaration of Dr. Paul R. McHugh, M.D.,**
      **With Exhibit A**
        **sworn May 1, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . JA850**

5.     **Declaration of Dr. Patrick W. Lappert, M.D.**
        **sworn May 1, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . JA897**

6.     **Study by Branstrom and Pachankis. . . . . . . . . . . . . . . . . JA953**

7.     **Deposition Excerpt of Dr. Paul W. Hruz,**
        **sworn Sept. 29, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . JA970**

8.     **Article: Mental Healthcare Utilization of**
      **Transgender Youth Before and**
      **After Affirming Treatment. . . . . . . . . . . . . . . . . . . . . . . JA976**

**Attachments to**
**State Health Plan Defendants' Response in Opposition**
**To Plaintiffs' Motion for Summary Judgment,**
**With Attachments, Continued:**

9.    **Prescription Medicine Prior Authorization Criteria**. . . . . . . **JA987**

10.   **Prescription Medicine Specialty**
      **Guideline Management - Supprelin LA.** . . . . . . . . . . . . . . **JA991**

11.   **Deposition Excerpt of Dr. George R. Brown, M.D.,**
           **taken on September 23, 2021**. . . . . . . . . . . . . . . . . . **JA1001**

12.   **Deposition Excerpt of Plaintiff Michael D. Bunting,**
           **taken on August 9, 2021**. . . . . . . . . . . . . . . . . . . . . . **JA1005**

13.   **Deposition Excerpt of Dr. George R. Brown, M.D.,**
           **taken on September 23, 2021**. . . . . . . . . . . . . . . . . . **JA1007**

14.   **Declaration of Blue Cross Blue Shield of North Carolina,**
      **With Exhibits,**
           **sworn November 30, 2021**. . . . . . . . . . . . . . . . . . . . . **JA1011**

15.   **Deposition Excerpt of Fr. Peter Robie, M.D.**
           **taken on September 22, 2021**. . . . . . . . . . . . . . . . . . **JA1025**

16.   **Deposition Excerpt of Dr. Randi C. Ettner, PhD.,**
           **taken on October 15, 2021.** . . . . . . . . . . . . . . . . . . **JA1029**

17.   **Deposition Excerpt of Dr. Stephen B. Levine, M.D.**
           **taken on September 100, 2021**. . . . . . . . . . . . . . . . . **JA1031**

18.   **Deposition Excerpt of Dr. Dan H. Karasic, M.D.,**
           **taken on September 20, 2021**. . . . . . . . . . . . . . . . . . **JA1035**

# <u>TABLE OF CONTENTS</u>
## Joint Appendix Volume III of IX

Page:

**Plan Plaintiffs' Reply in Support of Motion for Summary Judgment,
With Attachment,**
          filed February 2, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA1038

          <u>Attachment</u>:

          **Third Supplemental Declaration of Amy Richardson,
          With Exhibits,**
                    sworn February 2, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA1060

**Plaintiffs' Motion to Exclude Expert Testimony of Dr. Peter Robie**
          filed February 2, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA1092

**Plaintiffs' Memorandum of Law in Support of
Motion to Exclude Expert Testimony of Dr. Peter Robie.
With Attachment,**
          filed February 2, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA1096

          <u>Attachment</u>:

          **Declaration of Deepika H. Ravi,
          With Exhibits,**
                    sworn February 2, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . JA1119

**Plaintiffs' Motion to Exclude
Expert Testimony of Dr. Paul W. Hruz**
          filed February 2, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA1188

-viii-

**Plaintiffs' Memorandum of Law in Support of Motion to
Exclude Expert Testimony of Dr. Paul W. Hruz,
With Attachment,**

>   filed February 2, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA1192

>   <u>Attachment:</u>

>   **Declaration of Omar Gonzalez-Pagan,
>   With Exhibits,**

>   >   sworn February 2, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . JA1221

**Plaintiffs' Motion to Exclude
Expert Testimony of Dr. Paul R. McHugh**

>   filed February 2, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA1593

# TABLE OF CONTENTS
## Joint Appendix Volume IV of IX

Page:

Plaintiffs' Memorandum of Law in Support of Motion to
Exclude Expert Testimony of Dr. Paul R. McHugh,
With Attachment,
  filed February 2, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA1597

Attachment:

  Declaration of Omar Gonzalez-Pagan,
  With Exhibits,
    sworn February 2, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . JA1627

Plaintiffs' Motion to Exclude Expert
Testimony of Dr. Patrick W. Lappert
  filed February 2, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA1899

# <u>TABLE OF CONTENTS</u>
## Joint Appendix Volume V of IX

**Page:**

**Plaintiffs' Memorandum of Law in Support of Motion
To Exclude Expert Testimony of Dr. Patrick W. Lappert,
With Attachment,**

  **filed February 2, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA1902**

**<u>Attachment</u>:**

**Declaration of Dmitriy Tishyevich,
With Exhibits,**

  **sworn February 2, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA1929**

# **TABLE OF CONTENTS**
## **Joint Appendix Volume VI of IX**

**Page:**

**Plaintiffs' Memorandum of Law in Support of Motion
To Exclude Expert Testimony of Dr. Patrick W. Lappert,
With Attachment,**
  **filed February 2, 2022, Continued:**

 **Attachment:**

  **Declaration of Dmitriy Tishyevich,
With Exhibits,**
   **sworn February 2, 2022..** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA2582**

**Plaintiffs' Motion to Exclude
Expert Testimony of Stephen B. Levine, M.D.**
  **filed February 2, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA2881**

**Plaintiffs' Memorandum of Law in Support of Motion to
Exclude Expert Testimony of Stephen B. Levine, M.D.,
With Attachment,**
  **filed February 2, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA2884**

 **Attachment:**

  **Declaration of Carl S. Charles,
With Exhibits,**
   **sworn February 2, 2022..** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA2912**

# TABLE OF CONTENTS
## Joint Appendix Volume VII of IX

Page:

State Health Plan Defendants' Response in Opposition
To Plaintiffs' Motions to Exclude Expert Testimony,
With Attachments,
    filed February 23, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA3130

Attachments:

Declaration of Stephen B. Levine, M.D.
    sworn April 28, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA3167

Expert Witness Declaration of Paul R. McHugh, MD
    sworn May 1, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA3280

Expert Witness Declaration of Paul W. Hruz, M.D., Ph.D.
    sworn April 30, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA3327

Declaration of Patrick W. Lappert, MD
    sworn May 1, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA3442

Statement of State Health Plan
Coverage of Sex Change Operation
    dated October 24, 2018. . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA3498

Disclosure of Expert Witness Peter W. Robie, M.D., FACP
    dated May 1, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA3499

Deposition of Stephen B. Levine, M.D.
    taken on September 10, 2021.. . . . . . . . . . . . . . . . . . . . . . . . JA3501

**Plaintiffs' Reply in Support of Motions to**
**Exclude Expert Testimony,**
**With Attachment,**
 filed March 9, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA3504**

 <u>Attachment</u>:

 **Supplemental Declaration of Omar Gonzalez-Pagan,**
 **With Exhibit,**
  sworn March 9, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA3521**

**Memorandum Opinion and Order**
 filed April 7, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA3535**

**Brief of** *Amici Curiae*
 filed April 11, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA3539**

**Exhibit F - Expert Rebuttal Disclosure Report of**
**George Richard Brown, M.D., DFAPA**
 dated June 10, 2021
 filed June 2, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA3563**

**Memorandum Opinion and Order**
 filed June 10, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA3569**

**Notice of Interlocutory Appeal**
 filed July 1, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA3642**

**Motion to Correct Memorandum Opinion and Order**
 filed July 7, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA3645**

**State Health Plan Defendant's Memorandum in Support of**
**Motion to Correct Memorandum Opinion and Order**
 filed July 7, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA3649**

**Notice of Non-Opposition to State Health Plan's Motion to Correct**
filed July 15, 2022................................................ JA3655

**Notice of Intent to Correct and Clarify**
**Memorandum Opinion and Order**
filed July 18, 2022................................................ JA3658

**Order**
filed August 10, 2022............................................. JA3661

**Corrected Memorandum Opinion and Order**
filed August 10, 2022............................................. JA3663

# TABLE OF CONTENTS
## Joint Appendix Volume VIII of IX - Under Seal

Page:

Memorandum in Support of Plaintiffs'
Motion for Summary Judgment
    filed December 20, 2021.................................. JA3736

Declaration of Amy Richardson,
With Exhibits,
    filed December 20, 2021.................................. JA3777

Exhibits:

1.    Excerpt of Objs. and Resps. of Defs.
    Dale Powell and Dee Jones to Pls.' First Set of Inteerrogs.
        dated September 3, 2020. ......................... JA3785

2.    Am. Objs. and Resps. of Defs. Dale Folwell and
    Dee Jones to Pls.' Am. First Set of Requests for Admis.
        dated September 29, 2020........................ JA3789

3.    Excerpt of Am. Resps. and Objs. of Defs.
    Dale Folwell and Dee Jones to Pls.' First Set of Interrogs.
        dated October 9, 2020........................... JA3795

4.    Excerpt of Objs. and Resps. of Defs. Dale Folwell and
    Dee Jones to University Defs' First Set of
    Reqs. for Admis. and Interrogs.
        dated February 10, 2021. ........................ JA3803

<u>Exhibits</u> to
**Declaration of Amy Richardson**
    **filed December 20, 2021, Continued:**

5.   Excerpt of Objs. and Resps. of Def. North Carolina State
     Health Plan for the Teachers and State Employees to
     Pls.' First Reqs. for Admis., Inteerrogs., and Reqs. for
     Produc. of Docs. and Things
          dated July 9, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA3808

6.   Excerpt of Def. North Carolina Department of
     Public Safety's Resp. to Pls'. First Set of Interrogs.
          dated June 18, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA3824

7.   Excerpt of Def. North Carolina Department of
     Public Safety's Resp. to Pls'. First Set of Req. for Admis.
          dated June 18, 20211. . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA3829

8.   Composite of Excerpts from 70/30 PPO Plan
     Benefits Booklets, 2016-2021, with yellow
     highlighting applied to relevant portions. . . . . . . . . . . . . . . . . JA3832

9.   Composite of excerpts from 80/20 PPO Plan Benefits
     Booklets, 2016-2021, with yellow highlighting
     applied to relevant portions. . . . . . . . . . . . . . . . . . . . . . . . . . . JA3858

10.  Disclosure of Expert Witnesses Who Do Not Provide a
     Written Report Pursuant to Fed. R. Civ. P. 26(a)(2) by
     Defs. Dale Folwell, Dee Jones and the North Carolina
     State Health Plan for Teachers and State Employees
          dated May 1, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA3881

11.  Excerpt of Dep. Tr. of Dale Folwell. . . . . . . . . . . . . . . . . . . . . JA3891

**Exhibits** to

**Declaration of Amy Richardson**
   **filed December 20, 2021, Continued:**

**11(a). Excerpt of Ex. 14 to Dep. Tr. of Dale Folwell,**
      **"Financials Update,"**
         **dated October 22, 2018,**
         **PLANDEF0154431,0154481-82.** . . . . . . . . . . . . . . . . **JA3915**

**12.**   **Excerpt of Dep. Tr. of Dee Jones,**
      **Rule 30(b)(6) Designee of NCSHP..** . . . . . . . . . . . . . . . . . **JA3919**

**13.**   **Excerpt of Dep. Tr. of Dr. Peter Robie, M.D...** . . . . . . . . . **JA3961**

**14.**   **Excerpt of Dep. Tr. of Becki Johnson, Rule 30(b)(6)**
      **Designee of N.C. Dept. of Public Safety.** . . . . . . . . . . . . **JA3971**

**15.**   **Excerpt of Dep. Tr. of Pltf. Maxwell Kadel.** . . . . . . . . . . **JA4002**

**16.**   **Excerpt of Dep. Tr. of Pltf. Connor Thonen-Fleck.** . . . . . **JA4007**

**17.**   **Excerpt of Dep. Tr. of Pltf. Jason Fleck..** . . . . . . . . . . . . . **JA4015**

**18.**   **Excerpt of Dep. Tr. of Pltf. Julia McKeown..** . . . . . . . . . . **JA4021**

**19.**   **Excerpt of Dep. Tr. of Pltf. C.B..** . . . . . . . . . . . . . . . . . . . **JA4027**

**20.**   **Excerpt of Dep. Tr. of Pltf. Michael D. Bunting, Jr..** . . . . **JA4032**

**21.**   **Excerpt of Dep. Tr. of Pltf. Sam Silvaine.** . . . . . . . . . . . . **JA4040**

**22.**   **Excerpt of Dep. Tr. of Pltf. Dana Caraway..** . . . . . . . . . . . **JA4050**

**23.**   **Excerpt of Dep. Tr. of Dr. George R. Brown, M.D..** . . . **JA4063**

<u>Exhibits</u> to

**Declaration of Amy Richardson**

**filed December 20, 2021, Continued:**

23(a). Expert Report of Dr. George R. Brown, M.D., DFAPA. . . . . . JA4074

23(b). Bibliography to Expert Report of
Dr. George R. Brown, M.D., DFAPA.. . . . . . . . . . . . . . . . . . . JA4107

23(c). Supp. Expert Report of
Dr. George R. Brown, M.D., DFAPA.. . . . . . . . . . . . . . . . . . . JA4116

23(d). Expert Rebuttal Report of
Dr. George R. Brown, M.D., DFAPA.. . . . . . . . . . . . . . . . . . . JA4124

23(e). C.V. of Dr. George R. Brown, M.D., DFAPA. . . . . . . . . . . . . . JA4179

23(f). Corrected bibliography to Dr. Brown's
expert rebuttal report, served on Defendants
dated July 1, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA4223

24.      Excerpt of Dep. Tr. of Dr. Loren S. Schechter, M.D.. . . . . . . . JA4238

24(a) Expert Repo1t of Dr. Loren S. Schechter, M.D.
(including attached bibliography). . . . . . . . . . . . . . . . . . . . . . . JA4255

24(b). Expert Rebuttal Report of Dr. Loren S. Schechter, M.D.
(including attached bibliography). . . . . . . . . . . . . . . . . . . . . . . JA4272

24(c). C.V. of Dr. Loren S. Schechter.. . . . . . . . . . . . . . . . . . . . . . . . . JA4311

25.      Excerpt of Dep. Tr. of Dr. Randi C. Ettner, Ph.D.. . . . . . . . . . JA4370

25(a). Expert Rebuttal Report of Dr. Randi C. Ettner, Ph.D.. . . . . . . JA4377

## <u>TABLE OF CONTENTS</u>
### Joint Appendix Volume IX of IX - Under Seal

**Page:**

**<u>Exhibits</u> to**
**Declaration of Amy Richardson**
      **filed December 20, 2021, Continued:**

25(b). C.V. of Dr. Randi C. Ettner, Ph.D... . . . . . . . . . . . . . . . . . JA4421

25(c). Bibliography to Dr. Ettner's expert rebuttal report. . . . JA4433

26.    Excerpt of Dep. Tr. of
       Dr. Johanna Olson-Kennedy, M.D., M.S.. . . . . . . . . . . . . JA4445

26(a). Expert Rebuttal Report of
       Dr. Johanna Olson-Kennedy, M.D., M.S... . . . . . . . . . . . JA4456

26(b). C.V. of Dr. Johanna Olson-Kennedy, M.D., M.S.. . . . . JA4503

26(c). Corrected bibliography to Dr. Olson-Kennedy's
       expert rebuttal report, served on Defendants
          dated September 24, 2021. . . . . . . . . . . . . . . . . . . . . JA4524

27.    Excerpt of Dep. Tr. of Dr. Dan H. Karasic, M.D.. . . . . . JA4530

27(a). Expert Rebuttal Report of Dr. Dan H. Karasic, M.D.. . JA4537

27(b). C.V. of Dr. Dan H. Karasic, M.D.. . . . . . . . . . . . . . . . . . JA4564

27(c). Corrected bibliography to Dr. Karasic's expert
       rebuttal report, served on Defendants
          dated September 24, 2021. . . . . . . . . . . . . . . . . . . . . JA4585

**Exhibits** to
**Declaration of Amy Richardson**
    **filed December 20, 2021, Continued:**

28.   Excerpt of Dep. Tr. of Patrick Lappert, M.D... . . . . . . . .   JA4590

29.   National Academies of Sciences, Engineering, and
      Medicine, Understanding the Well-Being of
      LGBTQI+ Populations (2020). . . . . . . . . . . . . . . . . . . . . . .   JA4610

30.   Email chain re: "time to talk on Tuesday?,"
          dated May 27, 2016, PLANDEFO 136562-63. . . . .   JA4617

31.   Email from Lotta Crabtree
      re: "Coverage for gender dysphoria,"
          dated July 5, 2016, PLANDEF00007 6540-41. . . . .   JA4620

32.   Email chain re: "1557,"
          dated July 14, 2016, KADEL00152143-44. . . . . . . .   JA4623

33.   "DST POLICIES AND PROCEDURES,
      Section 1557 Grievance Procedure,"
          dated July 15, 2016, PLANDEF0012787-92. . . . . . .   JA4626

34.   Email chain re: "Bullet points for the BOT,"
      With attachment titled, "Affordable Care Act-
      Section 1557 Final Rule," KADEL00136650
          dated July 27, 2016, KADEL00136645-46. . . . . . . . .   JA4633

35.   Letter of Agreement with the Segal Company for
      assistance related to compliance with Sect. 1557
          dated November 1, 2016, PLANDEF0008908-10. . . .   JA4637

<u>Exhibits</u> to

Declaration of Amy Richardson

filed December 20, 2021, Continued:

36.  Memo. to Mona Moon from Segal Consulting
     re: "Transgender Cost Estimate,"
          dated November 29, 2016, PLANDEF0006964-65. . . . . . JA4641

37.  Email chain re: "1557 draft statement"
          dated November 29, 2016, PLANDEF0016424-26. . . . . . JA4644

38.  Email chain re: "Inclusion of Sex Change Surgery on Plan?,"
          dated December 1, 2016, PLANDEF0007946-48. . . . . . JA4648

39.  Slides presented to Board of Trustees entitled, "
     Affordable Care Act -Section 1557 Requirements,
     Coverage for Gender Dysphoria,"
          dated December 2, 2016, PLANDEF0006966-89. . . . . . JA4653

40.  Minutes for meeting of Board of Trustees
          dated December 1-2, 2016, PLANDEF0012810-22. . . . . . JA4678

41.  Email chain re: "State Health Plan board to
     cover gender reassignment surgery,"
          dated December 6, 2016, PLANDEF0007133-40. . . . . . JA4692

42.  Email chain re: "WUNC: Gender Dysphoria
     Coverage (noon deadline),"
          dated December 8, 2016, PLANDEF0029555-57. . . . . . JA4701

43.  BlueCross BlueShield of North Carolina
     Corporate Medical Policy, "Gender Affirmation
     Surgery and Hormone Therapy,"
          dated January 1, 2017, PLANDEF0008644-52. . . . . . . . JA4705

-xxii-

Exhibits to
Declaration of Amy Richardson
     filed December 20, 2021, Continued:

44.    Email from Chris Almberg re: "ACA Section 1557
     Compliance Questionnaire,"with attachment,
       dated March 30, 2017, KADEL00223708-13. . . . . . . . . . JA4715

45.    Email chain re: "Hold Harmless,"
       dated August 4, 2017, PLANDEF0069016. . . . . . . . . . . JA4722

46.    Email chain re: "Medical Policy Development,"
       dated September 28, 2017, PLANDEF0073378-81. . . . . JA4724

47.    Email chain re: "Gender Transition Services Amendment,"
     attachment, "Amendment to Third Party
     Administration Services Contract," PLANDEF0030342
       dated December 6, 2017, PLANDEF0071731-32. . . . . . . JA4729

48.    Email from Lonaine Munk
     re: "Message from Treasurer Folwell,"
       dated October 25, 2018, PLANDEF0028665-66. . . . . . . JA4733

49.    Email from Susan Munay re: "Pharmacy appeals
     related to gender dysphoria or transgender services,"
       dated October 25, 2018, PLANDEF0120919-20. . . . . . . JA4736

<u>Exhibits</u> to
**Declaration of Amy Richardson**
> **filed December 20, 2021, Continued:**

> 50.  **BlueCross BlueShield of North Carolina
> Corporate Medical Policy, "Gender
> Affirmation Surgery and Hormone Therapy,"
>> dated June 2021, KADEL00316786-96**. . . . . . . . . . . . . . **JA4739**

<u>Exhibit</u> to
**Plaintiffs' Memorandum to Exclude Expert
Testimony of Dr. Patrick W. Lappert**
> **filed February 2, 2022:**

> 1.  **Declaration of Patrick W. Lappert, MD
>> sworn May 1, 2021**. . . . . . . . . . . . . . . . . . . . . . . . . . . **JA4752**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MAXWELL KADEL, *et al.*,

                *Plaintiffs*,

        v.

DALE FOLWELL, in his official capacity as
State Treasurer of North Carolina, *et al.*,

              *Defendants*.

Case No. 1:19-cv-00272-LCB-LPA

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION
TO EXCLUDE EXPERT TESTIMONY OF DR. PATRICK W. LAPPERT**

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

LEGAL STANDARD ........................................................................................ 3

ARGUMENT....................................................................................................... 5

    I.    Dr. Lappert Is Not Qualified to Offer Any of His Purported
Opinions. ............................................................................................... 5

        A.    Dr. Lappert Has Never Performed Gender-Affirming Surgery
and Is Not Qualified to Opine on Such Procedures. .......................... 6

        B.    Dr. Lappert Has No Basis to Offer Opinions on Topics
Outside of Plastic Surgery................................................................... 9

    II.    Dr. Lappert's Opinions on Topics Outside of Gender-Affirming
Surgery Do Not "Fit" the Disputed Issues, Are Unreliable, Or Both. ........ 11

        A.    Far from Being Generally Accepted, Dr. Lappert's Opinions
Have Been Rejected by the Scientific Community........................... 11

        B.    Dr. Lappert's Critiques of WPATH, Endocrine Society
Guidelines, DSM-V, and Other Organizations' Positions Are
Unreliable. ........................................................................................ 14

        C.    Dr. Lappert's Opinions About the Need for Randomized
Clinical Trials Are Unreliable. ......................................................... 16

        D.    Dr. Lappert's Speculation About "Detransitioners," "Regret"
and "Social Contagion" Is Unreliable. .............................................. 18

        E.    Dr. Lappert's Opinions About Risks Communicated to
Plaintiffs Are Unreliable. ................................................................. 19

    III.    Dr. Lappert's Opinions Are Based on His Personal Beliefs Rather
than Science................................................................................ 20

CONCLUSION ................................................................................................. 23

i

**JA1903**

Plaintiffs respectfully submit this memorandum of law in support of their motion to exclude the expert testimony of Dr. Patrick W. Lappert.

### INTRODUCTION[1]

Dr. Lappert holds himself out as being board-certified in both plastic surgery and general surgery. He is neither: his certification in plastic surgery lapsed in 2018, and he has not been board-certified in surgery since *2002*. Moreover, in his entire career, Dr. Lappert has never performed a single surgical procedure to treat gender dysphoria—which is not surprising, since he considers those procedures to be "intentional mutilation" and "child abuse." Dr. Lappert has no reliable basis to opine about gender-affirming surgery, and his purported expert opinions about those procedures should be excluded.

And Dr. Lappert's opinions outside of surgery are even more ripe for exclusion. Straying far afield from his surgical experience, Dr. Lappert gives a smorgasbord of opinions that he is not qualified to provide, and for which he has no basis. For example, he criticizes how organizations like the World Professional Association for Transgender Health ("WPATH") and the Endocrine Society have developed guidelines for diagnosis and treatment of gender dysphoria, despite admitting that he does not know the first thing about how those guidelines were created. He speculates about whether puberty-blocking treatment is appropriate for adolescents, even though he is not an endocrinologist and he admits "that's not [his] area of expertise." He criticizes the process by which patients are

---

[1] Unless otherwise noted, all emphasis is added, and all citations, alterations, and ellipsis are omitted. Exhibits referenced herein are attached to the concurrently-filed Declaration of Dmitriy Tishyevich.

1

diagnosed with gender dysphoria, despite admitting that he has "very limited psychiatric / psychological knowledge," is not "a licensed mental healthcare provider of any kind," and is not qualified to make this diagnosis himself. And he also offers rank speculation about patients with gender dysphoria who "detransition" or experience "regret," even though he concedes he has no reliable data to quantify these phenomena. These and other of Dr. Lappert's many non-surgery opinions are both unreliable and irrelevant, and they should all be excluded accordingly.

Dr. Lappert's deposition also made clear that he is certainly not a dispassionate expert who will offer neutral "specialized knowledge" to "help the trier of fact to understand the evidence," as Rule 702 contemplates. Far from it. In addition to calling gender-affirming surgery "intentional mutilation," Dr. Lappert says that parents who talk to their children about gender identity issues are "sexualizing them" and "grooming" them for abuse. He accuses doctors who provide gender-affirming treatment of being part of a "Transgender Treatment Industry" cabal—a term that he concedes is certainly not "commonly used" in his professional field, and is instead "idiosyncratic" to his report. He has given inflammatory presentations on gender-affirming surgery, opining that performing these surgeries is a "moral violation" for physicians and that "changing a person's sex is a lie." He tours the country, urging state legislatures to outlaw gender-affirming treatment for minors. And he also thinks that states should "criminally prosecute doctors" that provide this critically-needed treatment—even though *every* reputable

2

medical organization in the country, including his own professional society, has said that such treatment is medically necessary and appropriate.

Even if Dr. Lappert's opinions were reliable under Rule 702 (and they are not), and even if they had any minimal probative value (and they do not), that value would be far outweighed by unfair prejudice and confusion of the issues under Rule 403. For these reasons, and as explained below, all of Dr. Lappert's opinions should be excluded.

## LEGAL STANDARD

Federal Rule of Evidence 702 places "a special gatekeeping obligation" on the trial court to ensure that an expert's testimony is "relevant to the task at hand" and "rests on a reliable foundation." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993); *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021). As the Fourth Circuit recently reaffirmed, "the importance of the gatekeeping function cannot be overstated." *Sardis*, 10 F.4th at 283.

"The proponent of the testimony must establish its admissibility by a preponderance of proof." *Mod. Auto. Network, LLC v. E. All. Ins. Co.*, 416 F. Supp. 3d 529, 537 (M.D.N.C. 2019). The first step is to determine if the expert is qualified to give the proffered opinion, which requires examining the expert's professional qualifications and "full range of experience and training." *Belk, Inc. v. Meyer Corp.*, U.S., 679 F.3d 146, 162 (4th Cir. 2012). If the expert is not qualified, the testimony should be excluded. *See SMD Software, Inc. v. EMove, Inc.*, 945 F. Supp. 2d 628, 639 (E.D.N.C. 2013).

3

Even if the expert is qualified, the court must consider the relevancy of the expert's testimony as "a precondition to admissibility." *Sardis*, 10 F.4th at 282. To be relevant, the testimony must have "a valid scientific connection to the pertinent inquiry." *Id.* at 281. "If an opinion is not relevant to a fact at issue, *Daubert* requires that it be excluded." *Id.*

The opinion must also be based on a reliable foundation, with the inquiry focusing on the expert's "principles and methodology" to assess whether it is "based on scientific, technical, or other specialized knowledge and not on belief or speculation." *Id.* at 281-82. In evaluating reliability, courts consider, among other things, whether: (1) the theory "can be and has been tested"; (2) has been "subjected to peer review and publication"; (3) "the known or potential rate of error"; and (4) "whether the technique is generally accepted in the scientific community." *Id.* at 281.

When an expert relies upon experience and training rather than a specific methodology, the application of the *Daubert* factors is more limited. *See Freeman v. Case Corp.*, 118 F.3d 1011, 1016 n.6 (4th Cir. 1997). In those cases, courts consider: "1) how the expert's experience leads to the conclusion reached; 2) why that experience is a sufficient basis for the opinion; and 3) how that experience is reliably applied to the facts of the case." *SAS Inst., Inc. v. World Programming Ltd.*, 125 F. Supp. 3d 579, 589 (E.D.N.C. 2015).

Finally, the Fourth Circuit has cautioned that although the trial court has "broad latitude" to determine reliability, it must still engage in the gatekeeping process and not simply "delegate the issue to the jury." *Sardis*, 10 F.4th at 281. Even rigorous cross-

4

examination is not a substitute for the court's gatekeeping role.  *See Nease v. Ford Motor Co.*, 848 F.3d 219, 231 (4th Cir. 2017).

## ARGUMENT

### I.     Dr. Lappert Is Not Qualified to Offer Any of His Purported Opinions.

An expert witness must have "knowledge, skill, experience, training, or education" that would assist the trier of fact.  *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993).  "[Q]ualifications alone do not suffice," however.  *Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999); *Patel ex rel. Patel v. Menard, Inc.*, 2011 WL 4738339, at *1 (S.D. Ind. Oct. 6, 2011).  Even "a supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant."  *Clark*, 192 F.3d at 759 n.5.

Moreover, "an expert's qualifications must be within the same technical area as the subject matter of the expert's testimony; in other words, a person with expertise may only testify as to matters within that person's expertise." *Martinez v. Sakurai Graphic Sys. Corp.*, 2007 WL 2570362, at *2 (N.D. Ill. Aug. 30, 2007); *Lebron v. Sec. of Fla. Dept. of Children and Families*, 772 F.3d 1352, 1369 (11th Cir. 2014).

Importantly, this qualification inquiry is subject-specific, because "[g]eneralized knowledge of a particular subject will not necessarily enable an expert to testify as to a specific subset of the general field of the expert's knowledge."  *Martinez*, 2007 WL 2570362, at *2.  "For example, no medical doctor is automatically an expert in every medical issue merely because he or she has graduated from medical school or has achieved

5

certification in a medical specialty." *O'Conner v. Commonwealth Edison Co.*, 807 F. Supp. 1376, 1390 (C.D. Ill. 1992), *aff'd*, 13 F.3d 1090 (7th Cir. 1994). Dr. Lappert fails these requirements, for reasons below.

### A. Dr. Lappert Has Never Performed Gender-Affirming Surgery and Is Not Qualified to Opine on Such Procedures.

Dr. Lappert's report represents that he is "Board Certified in Surgery and Plastic Surgery." (Ex. 1 at 1.) This is not true. As he admitted, his "plastic surgery board certificate expired at the end of 2018." (Ex. 2 at 23.) His "board certification in surgery" expired "in 2002"; thus, he has not "been board-certified in surgery" for "over nineteen years." (*Id.* at 31-32.)

These are not trivial fibs, because physicians are not allowed to hold themselves out as board-certified unless they actually have a ***current*** board certificate. The American Board of Plastic Surgeons unequivocally prohibits such misrepresentations, stating that "when a physician misrepresents certification status," as Dr. Lappert did here, "ABPS may notify local credentialing bodies, licensing bodies, law enforcement agencies, and others." (*Id.* at 30; Ex. 3 at 3.) And the American Board of Surgery takes a similarly dim view of such misrepresentations, as Dr. Lappert also acknowledged. (Ex. 2 at 32 (agreeing it does not "surprise [him] that the [ABS] does not allow doctors to represent that they are board-certified in surgery unless they have a current board certificate.").)

Setting aside these misrepresentations about his credentials, Dr. Lappert is also not qualified to give expert opinions about gender-affirming surgery for a more basic reason: he has never even performed a single such procedure. He admitted that he has "never

6

performed facial feminization surgery" or "facial masculinization surgery" for any transgender patient. (*Id.* at 167.) The same is true for "transfeminine top surgery" and "chest reconstruction surgery." (*Id.* at 167.) He has also never "performed a vaginoplasty" nor "metoidioplasty." (*Id.* at 167-68.) In short, Dr. Lappert has "***never*** performed ***any kind*** of gender-affirming surgery in transgender patients." (*Id.* at 168; *id.* at 151 ("I have never treated a patient with gender dysphoria surgically.").) He was also emphatic that he would never perform such surgeries, because he personally does not "see them as beneficial" and thinks that they are "incorrect treatments." (*Id.* at 150.)

Dr. Lappert has not published any research on gender-affirming surgery either. He agreed that he has "not published any original research in peer-reviewed literature within the ***last 23 years***" at all—and of the six total articles that he did publish a quarter-century ago, not one was on gender-affirming surgeries for patients with gender dysphoria. (*Id.* at 129; *see id.* at 130-134.)

As a substitute for first-hand experience, Dr. Lappert cites a handful of studies in his report about supposed complications from gender-affirming surgery. But reading studies does not make one an expert. That is just the sort of "generalized knowledge of a particular subject" that courts have rejected as a qualification under Rule 702. *Martinez*, 2007 WL 2570362, at *2. As with the disqualified expert in *Lebron* who "reached his opinion . . . by relying on studies," reading literature is not enough. 772 F.3d at 1369.

7

It is also telling that the Code of Ethics of the American Society of Plastic Surgeons ("ASPS") prohibits members from giving this kind of unfounded testimony.[2]  Section IV of that Code of Ethics says that "to help limit false, deceptive and/or misleading testimony, Members serving as expert witnesses ***must***:   1.  Have ***recent and substantive experience*** (as defined in the Glossary of the Code) in the area in which they testify[.]"  (Ex. 4 at 6.)  The Glossary, in turn, defines "recent and substantive experience" to mean (among other requirements) that the member "has performed the specific procedure in question within three (3) years of the date of being retained as an expert witness."  (*Id.* at 8.)

Dr. Lappert fails these requirements.  Far from having actually performed any of the gender-affirming procedures that he criticizes in his report (*see* Ex. 1 at 29-39)—*ever*, let alone within the last three years—Dr. Lappert was emphatic that he would never perform such surgeries because he does not "see them as beneficial."  (Ex. 2 at 150.)  To be sure, the ASPS Code of Ethics is not a substitute for the Court's Rule 702 inquiry.  But the fact that the ASPS prohibits members from providing these kinds of ill-informed expert opinions precisely to "help limit false, deceptive, and/or misleading [expert] testimony" from being offered in court (Ex. 4 at 6) should give the Court serious pause, to say the least, about allowing Dr. Lappert's testimony.

---

[2] Dr. Lappert resigned from ASPS around the time his board certification lapsed (Ex. 2 at 100-101), but he was a member from 1997 to 2017, and he agreed that ASPS is a "reputable organization" to which "93 or so percent of all plastic surgeons" in the country belong.  (*Id.* at 102-103.)

8

**B.    Dr. Lappert Has No Basis to Offer Opinions on Topics Outside of Plastic Surgery.**

Dr. Lappert also offers a grab-bag of opinions on topics far outside his field of plastic surgery—including endocrinology (*e.g.*, opining whether puberty-blocking agents and cross-sex hormones like testosterone are appropriate treatments for gender dysphoria), psychiatry (*e.g.*, criticizing how patients are diagnosed with gender dysphoria), and more.

Dr. Lappert has no qualifications or any other basis to give any of these opinions, and they all should be excluded.  For example, he has no basis to opine about purported risks of puberty-blocking treatments, given that he agreed that he is "not an endocrinologist" and has "no specialized training or expertise in endocrinology." (Ex. 2 at 153, 204.)  He also has "never prescribed any puberty-blocking drugs of any kind"; and indeed, he admitted: "I ***do not*** consider myself an expert in that area" and "that's not my area of expertise."  (*Id.* at 201, 203.)

The same is true for Dr. Lappert's opinions on cross-sex hormone treatments—given that he admits that he has "never prescribed cross-sex hormones for treatment of gender dysphoria," and that he has "no firsthand experience with advising [his] patients about potential risks and benefits" of such treatment.  (*Id.* at 214.)  Here, again, Dr. Lappert conceded that he does not "hold [himself] out as an expert in endocrinology," and that he does not plan to offer "any expert opinions in endocrinology in this case because that's outside [his] scope of expertise."  (*Id.* at 204.)  All of his purported opinions related to endocrinology should be excluded accordingly.

9

Dr. Lappert also has no qualifications—or any other basis—to opine about diagnosis or treatment of mental conditions. He admits that he has "very limited psychiatric/psychological knowledge"; he is "not a psychiatrist" or "a licensed mental healthcare provider of any kind"; and in his "professional day-to-day practice," he "do[es] not diagnose mental health conditions of any kind." (*Id.* at 68, 153-54.)[3]  Thus, as Dr. Lappert conceded, "for any patient that presents to [him] with a mental health condition," he would "send them to someone who is . . . trained in how to diagnose mental health conditions."). (*Id.* at 157.)  And after all of these admissions, he also conceded that he "do[es] not hold [himself] out as an expert in ***diagnosing*** mental health conditions outside, potentially, of body dysmorphic disorder," and that he also does "not have special[ized] training or expertise in ***treating*** mental health conditions." (*Id.* at 75.)

In short, while Dr. Lappert does not even have the relevant expertise to opine about gender-affirming surgery, he certainly does not have the expertise to "waltz into the courtroom" and mislead a factfinder with purported expert testimony about endocrinology, psychiatry, or anything else. *See Clark*, 192 F.3d at 759 n.5.  So at the very least, all of his opinions outside of plastic surgery should be excluded.

---

[3] Dr. Lappert said he feels qualified to identify a potential diagnosis of body dysmorphia, and to then "offer referral for psychiatric/psychological support and evaluation" to those patients. (Ex. 2 at 72.)  Body dysmorphic disorder is a distinct condition from gender dysphoria, however, that "is primarily characterized by an excessive preoccupation with a perceived defect or flaw in appearance that others cannot see or would judge as slight in appearance." (Ex. 17 at 1; Ex. 2 at 71 ("They see a defect that you don't see.").)

10

II.    **Dr. Lappert's Opinions on Topics Outside of Gender-Affirming Surgery Do Not "Fit" the Disputed Issues, Are Unreliable, Or Both.**

An expert's testimony should only be admitted if it is reliable.  And "proffered evidence that has a greater potential to mislead than to enlighten should be excluded."  *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig. (No II) MDL 2502*, 892 F.3d 624, 632 (4th Cir. 2018).

Even if the testimony is reliable, the court must still "satisfy itself that the proffered testimony is relevant to the issue at hand, for that is a precondition to admissibility." *Sardis*, 10 F.4th at 282.  "The test for relevance, or fit, considers whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Viva Healthcare Packaging USA Inc. v. CTL Packaging USA Inc.*, 197 F. Supp. 3d 837, 846 (W.D.N.C. 2016).

This case turns on whether Defendants' exclusion of coverage for gender-confirming health care treatments violates Plaintiffs' rights under the equal protection clause, Title VII, and Section 1557 of the Affordable Care Act.  Many of Dr. Lappert's opinions are both unreliable and irrelevant to this inquiry, as described below.

A.    **Far from Being Generally Accepted, Dr. Lappert's Opinions Have Been <u>Rejected</u> by the Scientific Community.**

General acceptance is a reliability factor, *Nease*, 848 F.3d at 229, and the fact that a particular theory "has been able to attract only minimal support within the community may properly be viewed with skepticism." *Daubert*, 509 U.S. at 594.  Dr. Lappert asserts that gender-affirming surgical and hormonal treatments "have not been accepted by the relevant

11

scientific communities" (Ex. 1 at 40), but this is not true. In fact, it is Dr. Lappert's opinions that are on the scientific fringe, to say the least.

Another court found as much just last year in addressing a challenge to Arkansas' state-law ban on gender-affirming treatment for minors, where Dr. Lappert had offered virtually identical opinions to support that ban. *Brandt v. Rutledge*, 4:21-cv-450 (E.D. Ark.); Ex. 2 at 33-34; Ex. 5 (Lappert *Brandt* Declaration). In *Brandt*, Dr. Lappert asserted that "'[g]ender affirming' treatments are experimental," which he agreed was "basically the same opinion that [he] offered in this case." (Ex. 2 at 35.) Drs. Hruz and Levine had also submitted similar declarations in *Brandt* in support of the ban. (*See id.* at 33-34.)

The *Brandt* court preliminarily enjoined the ban on August 2, 2021 (Ex. 6), squarely rejecting these opinions. That court recognized that "the consensus recommendation of medical organizations is that the ***only*** effective treatment for . . . gender dysphoria is to provide gender-affirming care," citing briefs from organizations like the American Medical Association, American Academy of Pediatrics, and many more. (*Id.* at 6 n.3; Br. of Am. Med. Ass'n, et al. (ECF No. 131 (expressing same views in this case).) *Brandt* also found that "gender-affirming treatment is supported by medical evidence that has been subject to rigorous study," and that "***every*** major expert medical association recognizes that gender-affirming care for transgender minors may be medically appropriate and necessary to improve the physical and mental health of transgender people." (Ex. 6 at 7-8.)

As Dr. Lappert admitted, *Brandt*'s findings were "contrary to the opinions that [he] offered." (Ex. 2 at 39.) And as he also agreed, "every major expert medical association

12

disagrees with [him] because they've all taken [the] position that this treatment is in fact medically necessary." (*Id.* at 40; *see also id.* (agreeing the same is true regarding Drs. Hruz and Levine).) In fact, Dr. Lappert admits that there are at least "18 different professional medical organizations" that "take[] the view that's contrary to the opinions that [he] and Dr. Hruz and Dr. Levine are offering" here, testifying that "there's a consensus of consensus on this, exactly." (*Id.* at 42.)

That consensus also includes Dr. Lappert's own former association, the ASPS. While he says that gender-affirming surgery is experimental, the ASPS said the exact opposite in a February 2021 statement—stating that it "***firmly believes*** that plastic surgery services can help gender dysphoria patients align their bodies with whom they know themselves to be," and promising to "continue its efforts to advocate across state legislatures for full access to medically necessary transition care." (Ex. 8 at 3.) So as Dr. Lappert admitted, the ASPS also "does not agree with [his] opinions that gender-affirming surgery is experimental." (Ex. 2 at 112-13.)

And it is not just professional medical associations either. ***Every major insurer*** in the country also says that gender-affirming surgical and hormonal treatments are medically necessary, as Dr. Lappert also admitted. (Ex. 2 at 334-38 & Ex. 9 at 2 (BCBS North Carolina policy, stating that "[s]ervices for gender affirming surgery and hormone therapy may be considered medically necessary when the criteria below are met"); Ex. 2 at 427-28 & Ex. 10 at 1 (similar for Aetna); Ex. 2 at 430-33 & Ex. 11 (similar for Cigna); Ex. 2 at 434-39 & Ex. 12 (similar for UnitedHealthCare).)

13

In short, this overwhelming consensus confirms that far from being generally accepted, Dr. Lappert's opinions are fringe and unreliable.

**B.    Dr. Lappert's Critiques of WPATH, Endocrine Society Guidelines, DSM-V, and Other Organizations' Positions Are Unreliable.**

Aware that his views are contrary to those of every major medical society and professional organization, Dr. Lappert tries to dismiss every single one of them as partisan—part of the same supposed "Transgender Treatment Industry" that he crusades against. For example, he contends that the "WPATH, APA, AAP," and "AMA" all supposedly rely on a "non-scientific" methodology, and that the guidelines and position statements issued by every one of those organizations are "political" and are "not the product of a reliable scientific method." (Ex. 1 at 10-11.)

These opinions are—again—not generally accepted, to put it mildly. Just recently, the Fourth Circuit confirmed that the WPATH guidelines in particular "represent the consensus approach of the medical and mental health community" and "have been recognized by various courts, including [the Fourth Circuit], as the authoritative standards of care." *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 595 (4th Cir. 2020). "There are ***no*** other competing, evidence-based standards that are accepted by any nationally or internationally recognized medical professional groups," in fact. *Id.* at 595-596.

Dr. Lappert's deposition further confirmed that his critiques are baseless *ipse dixit* because he admitted that he has no idea how any of these standards of care were actually developed, and on what scientific basis. Take WPATH SOC Version 7 ("WPATH7"), for example. Dr. Lappert admits that he has "not been involved with the development" of

14

WPATH7; he does not "know what kind of scientific literature [review] the WPATH conducted as part of drafting" WPATH7; he does not know what kind of "peer review" or "outside experts" or "public comments" the WPATH may have relied on in developing WPATH7, or how many "different drafts" the WPATH7 went through, or "what may have gone on during [WPATH] meetings or conferences" to discuss the development of WPATH7.  (Ex. 2 at 184-87.)  And after these admissions, Dr. Lappert unsurprisingly conceded that he is "***not an expert*** in how Version 7 of the WPATH was developed."  (*Id.* at 188.)  The same is true for WPATH SOC Version 8.  (*Id.* at 189 (agreeing he does not "hold [himself] out as an expert on how Version 8" is being developed).)

The same is also true with respect to Dr. Lappert's critiques of other standards of care and position statements:

- Endocrine Society Guidelines for Treatment of Gender Dysphoria:  Dr. Lappert does not know when these guidelines "were initially published" or "last revised"; he was "not involved with the[ir] development"; he does not know "what kind of scientific literature review" went into that development; thus, he agrees he is "***not an expert*** in how the Endocrine Society developed the original 2009 guidelines" or "the 2017 updates" (Ex. 2 at 195-200);

- DSM-5:  Dr. Lappert has "not been involved with the development of DSM-5"; does not know "what kind of scientific literature review was done" during that development; does not know what went on during "different meetings or conferences" to "discuss that development"; thus, he "do[es] ***not*** have expert firsthand knowledge of how the DSM-5 was developed" (*id.* at 190-93);

- AMA Position Statement on Gender-Affirming Treatment:  Dr. Lappert "do[es] not know how the AMA came to issue this consensus statement" and has "no personal knowledge what scientific literature they reviewed"; thus, he has "***no idea*** . . . how the AMA came to reach this consensus statement" (*id.* at 47-48);

15

- American Academy of Pediatrics Position Statement on Gender-Affirming
  Treatment: has no "personal knowledge" of how the AAP adopted this
  statement (*id.* at 48).

In the end, Dr. Lappert agreed more broadly that he does "not have firsthand
knowledge of how *any* of those organizations came to reach these positions," and that he
"do[es] not know what scientific literature they relied on." (*Id.* at 49-50.) He should not
be allowed to mislead a factfinder with these unfounded *ipse dixit* critiques. *See Gen. Elec.
Co. v. Joiner*, 522 U.S. 136, 146 (1997).

## C. Dr. Lappert's Opinions About the Need for Randomized Clinical Trials Are Unreliable.

A key component of Dr. Lappert's opinions is that surgical and hormone gender-
affirming treatments are supposedly experimental because they are unsupported by results
from randomized clinical trials ("RCTs"). (*See, e.g.*, Ex. 1 at 5 (arguing that "properly
conducted [RCTs] and long-term treatment outcome studies" are necessary to make
"experimental procedures actual, proven treatments"). But his deposition confirmed that
these critiques are baseless because he agreed that: (1) it is common for surgeons to
perform procedures unsupported by RCT results; and (2) in any event, it is not possible to
conduct RCTs for hormonal or surgical gender-affirming treatments.

First, RCTs in surgery are exceedingly rare. The ASPS's Plastics and
Reconstructive Surgery Journal—which Dr. Lappert agreed is the "premier peer-reviewed
source for current information on reconstructive and cosmetic surgery" (Ex. 2 at 296)—
confirms as much. As a 2019 study found, in 2018, "only *2.1 percent* of all publications"
in the ASPS Journal "were level 1 [*i.e.*, RCT] evidence"; "in 2008 and 2013, those

16

percentages were *0.3* and *1.7 percent* respectively," as he also agreed.  (*Id.* at 299, 302;

Ex. 7 (Sugrue study)).  Given this paucity of RCTs, Dr. Lappert unsurprisingly conceded

that surgeons in the real world do not actually wait for RCT results before deciding that a

particular procedure is non-experimental.  (Ex. 2 at 294-95 (agreeing it is "not uncommon

for plastic surgeons to perform procedures that are not supported by results from an

RCT").)  In fact, he *himself* does not even "think it's necessary for a surgical procedure to

be supported by results from a[n] . . . RCT before it can be considered effective."  (*Id.* at

285.)  Rule 702 demands that experts apply "the same level of intellectual rigor [in the

courtroom] that characterizes the practice of an expert in the relevant field."  *Cooper*, 259

F.3d at 200.  Here, though, Dr. Lappert tries to impose an impossible RCT-based standard

that he concedes surgeons in the real world—including himself—do not actually apply.

Second, it is not possible to perform RCTs for gender-affirming surgery or hormonal

treatment.  Dr. Lappert conceded this too:  he agreed "it is not possible to perform RCTs

for some surgical procedures because you can't blind the patient or the investigator to what

the procedure is" (meaning, it is impossible to do the surgery without the patient and the

investigator knowing that it was done)—including for "phalloplasty," "metoidioplasty,"

and more generally for all types of what is "colloquially known as bottom surgery."  (Ex. 2

at 315-16.)  He also agreed the same is true for "puberty-blocking hormones," since they

cause "observable physical effects"; thus, "it's not possible to do an RCT for puberty-

blocking hormones" either.  (*Id.* at 316-18.)  And he also conceded that the same is true for

17

cross-sex hormones, because those also cause "physical effects" and thus "it's not possible to design a double-blind RCT" for those treatments.  (*Id.* at 318-19.)

Given all this, Dr. Lappert should not be permitted to offer his misleading opinion that gender-affirming surgery and hormone treatments are experimental in the absence of RCT support.

### D.     Dr. Lappert's Speculation About "Detransitioners," "Regret" and "Social Contagion" Is Unreliable.

Dr. Lappert also opines that some patients will "drop out of transitioning or reverse the process" (so-called "detransitioners"); others will experience "regret" after surgery; and yet others supposedly develop gender dysphoria as a result of "social contagion" like "peer group, social media, [and] YouTube role modeling."  (Ex. 1 at 21-22, 40.)

None of this passes *Daubert* muster.  To start, none of these opinions are even remotely connected to Dr. Lappert's experience as a plastic surgeon, given that he studiously avoids performing gender-affirming surgical procedures due to his personal beliefs, and has "never treated a single patient for gender dysphoria."  (Ex. 2 at 150-51; *SAS Inst., Inc.*, 125 F. Supp. 3d at 589 (when an expert relies on experience, he must show how his "experience leads to the conclusion reached" and "why that experience is a sufficient basis for the opinion").)

Next, Dr. Lappert's own report makes clear that these are all speculative hypotheses at best.  For instance, he admits that the extent of "social contagion" is unknown, writing: "a currently <u>unknown</u> percentage and number of patients reporting gender dysphoria are being manipulated by . . . social contagion and social pressure processes."  (Ex. 1 at 40

18

(underlining in original).)  He also wrote the same thing about "desistance" and "regret," stating that these phenomena have "to my knowledge ***not been quantified or well-studied***." (*Id.* at 21 (emphasis in original).)

Dr. Lappert's deposition confirmed that these opinions are pure guesswork.  He conceded that he is "not aware of any peer-reviewed studies that quantifies the number of people" affected by social contagion, and that "we don't know the numbers."  (Ex. 2 at 367-38; *id.* at 373 ("At present, we're ***hypothesizing*** about the actual cause.").)  The same was true for his "regret" opinions.  (*Id.* at 329 (agreeing "there's no data available on the percentage of people" treated for "gender dysphoria who experience regret.").

But "the courtroom is not the place for scientific guesswork, even of the inspired sort." *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996); *accord, e.g.*, *Small v. WellDyne, Inc.*, 927 F.3d 169, 176-77 (4th Cir. 2019) (expert testimony "must not be based on belief or speculation").  Dr. Lappert's speculation about regret, de-transitioning, and social contagion should be excluded accordingly.

### E.    Dr. Lappert's Opinions About Risks Communicated to Plaintiffs Are Unreliable.

Dr. Lappert also purports to opine about what risks were or were not communicated to individual Plaintiffs before they started gender dysphoria treatment.  (*See, e.g.*, Ex. 1 at 50 (for C.B., asserting there is no evidence that "the parents were counseled concerning" risks of "off-label use of puberty blocker"); *id.* (opining there was a "failure to obtain proper informed consent" for Plaintiff "CT-F").)

19

There is no basis for these opinions either.  Dr. Lappert "did not meet with any of the plaintiffs" and has "never spoken" with any of them about what risks their doctors discussed.  (Ex. 2 at 417-18.)  He was "not present in any meetings that any of these plaintiffs may have had with their mental health professionals," or their "endocrinologists," or their "surgeons"; thus, outside of reviewing medical records, he has no idea "what was said or not said during those meetings." (*Id.* at 418-19.)  With no reliable basis to say what was or was not communicated during these meetings, Dr. Lappert should not be permitted to create confusion with this speculation. *See, e.g.*, *Small*, 927 F.3d at 176-77.

## III.   Dr. Lappert's Opinions Are Based on His Personal Beliefs Rather than Science.

Reliability is a flexible inquiry, under which "courts must ensure that an expert's opinion is based on scientific, technical, or other specialized knowledge and not on belief or speculation." *Sardis*, 10 F.4th at 281.  There is ample evidence that Dr. Lappert's opinions are so tainted by his strong personal views against gender-affirming care as to make those opinions unreliable.  To be clear, Plaintiffs do not seek to impugn whatever moral or religious views Dr. Lappert may hold.  But because those views plainly inform the opinions that he offers here—indeed, they seem to be the main driver of those opinions—they are something the Court should consider in assessing their reliability.

Dr. Lappert readily admits that he has "strong personal opinions on whether doctors should be providing gender-affirming treatment to minors." (Ex. 2 at 79.)  That's putting it mildly.  He has urged state legislatures in Utah, Arkansas, Alabama, and Texas (at least) to pass laws that would ban doctors from being able to provide this medical care for

20

adolescents.  (*Id.* at 57, 61-62; *id.* at 54-55 (agreeing he has "actively lobbied to get these kinds of bans passed").)  For example, he spoke in favor of the ban before the Alabama legislature and "publish[ed] an op-ed" that urged the legislature to protect what he called "gender-confused children."  (Ex. 2 at 77, 64, 76 & Ex. 14.)  He likewise threw his support behind a similar proposed ban in Utah—arguing to the legislature that "you can't change a person's sex," and that "all that is happening is that the patient is undergoing an intentional mutilation in order to create a counterfeit appearance of the other sex."  (Ex. 13 at 5.)

Dr. Lappert was unapologetic about these opinions at his deposition.  He testified that he "absolutely" stands by them, and that he "absolutely" considers "gender reassignment surgery to be an intentional mutilation."  (Ex. 2 at 60.)  What's more, he also wants doctors who perform these gender-affirming surgeries to be "criminally prosecute[d]"—agreeing that he thinks "that's a good idea."  (*Id.* at 52.)

And even though Dr. Lappert was understandably more careful in how he phrased his expert report—avoiding inflammatory language that he uses outside of litigation, like calling gender-affirming care "intentional mutilation"—sometimes the mask slips.  For instance, his report accuses every single doctor and organization who oppose his views of being part of some made-up "Transgender Treatment Industry."  That is obviously not "a commonly used term in the field of treatment and diagnosis of gender dysphoria," as he admitted; instead, it is "idiosyncratic" to his report.  (*Id.* at 21-22.)

Dr. Lappert has also worked closely with the Alliance Defending Freedom ("ADF"), an organization he agreed has "moral objections" to gender-affirming healthcare.  (*Id.* at

21

83, 82.) Among other things, he attended an ADF conference that discussed the "poverty of [experts] who are willing to testify" about these anti-gender-affirming treatments. (*Id.* at 90-91.) Attendees at that conference "were asked whether they would be willing as participate as expert witnesses"; not coincidentally, Dr. Lappert became an expert witness for the first time after attending that conference. (*Id.* at 91.)

Dr. Lappert's report also unapologetically misgenders individual Plaintiffs—"referring to [them] in a way that doesn't align with their gender"—because in Dr. Lappert's view, he is "obliged to honor objective biological realities" (*id.* at 447), which is to say that he does not believe that a person's birth-assigned sex can ever be changed. (*See also id.* at 448 ("I think it's essential that we stick to the biological reality that . . . biological sex is ***immutable***.").)

And then there are Dr. Lappert's many public interviews and presentations where he crusades against gender-affirming care. These include, for example, his views that the religious conception of "the human person" "defines the 'end' of medical and surgical care." (Ex. 2 at 459.) They also include his opinions that "changing a person's sex is a lie and also a moral violation for a physician," and that gender-affirming surgery is "diabolical in every sense of the word." (*Id.* at 464 & Ex. 16 at 1, 7; Ex. 2 at 465 (agreeing that he "hold[s] those views"). And finally, these also include his inflammatory views that parents who "discuss[] gender identity issues with children" are "sexualizing them" (Ex. 2 at 462), and that these conversations are "grooming a generation" for abuse. (*Id.* at 461 & Ex. 15 (Dr. Lappert's presentation titled "Transgender Surgery & Christian Anthropology") at 23;

22

*see also* Ex. 16 at 1, 2 (another interview with Dr. Lappert titled "Plastic surgeon: sex-change operation 'utterly unacceptable' and a form of 'child abuse'"; reporting that "regarding children, Lappert said, sexualizing them at a young age with these ideas is grooming them for later abuse.").)

These are obviously not neutral, well-reasoned scientific opinions by a dispassionate expert. It is moral opprobrium masquerading as science, and it should be excluded as such.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should exclude Dr. Lappert's opinions in full.

23

Dated: February 2, 2022

Respectfully submitted,

/s/ Amy E. Richardson
Amy E. Richardson
(N.C. Bar No. 28768)
Lauren E. Snyder
(N.C. Bar No. 54150)
HARRIS, WILTSHIRE & GRANNIS LLP
1033 Wade Avenue, Suite 100
Raleigh, NC 27605-1155
Phone: 919-429-7386 | Fax: 202-730-1301
arichardson@hwglaw.com

Deepika H. Ravi*
HARRIS, WILTSHIRE & GRANNIS LLP
1919 M Street N.W., 8th Floor,
Washington, D.C. 20036
Phone: 202-730-1300 | Fax: 202-730-1301
dravi@hwglaw.com

Michael W. Weaver*
Adam M. Safer*
MCDERMOTT WILL & EMERY
444 W. Lake St., Suite 4000
Chicago, IL 60606
Phone: 312-984-5820 | Fax: 312-984-7700
mweaver@mwe.com

Lauren H. Evans*
MCDERMOTT WILL & EMERY
500 N. Capitol St., NW
Washington, D.C. 20001
Phone: 202-756-8864 | Fax: 202-591-2900
levans@mwe.com

/s/ Dmitriy Tishyevich
Dmitriy Tishyevich*
Warren Haskel*
MCDERMOTT WILL & EMERY LLP
One Vanderbilt Avenue
New York, NY 10017-3852
Phone: 212-547-5534
Fax: 646-417-7668
dtishyevich@mwe.com

Tara Borelli*
Carl S. Charles*
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
1 West Court Square, Ste. 105
Decatur, GA 30030
Telephone: 404-897-1880
Facsimile: 404-506-9320
tborelli@lambdalegal.org

Omar Gonzalez-Pagan*
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
Telephone: 212-809-8585
Facsimile: 212-809-0055
ogonzalez-pagan@lambdalegal.org

David Brown*
TRANSGENDER LEGAL DEFENSE AND
EDUCATION FUND, INC.
520 8th Ave, Ste. 2204
New York, NY 10018
Telephone: 646-993-1680
Facsimile: 646-993-1686
dbrown@transgenderlegal.org

*Counsel for Plaintiffs*

* Appearing by special appearance pursuant to L.R. 83.1(d).

24

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing brief is in compliance with Local Rule 7.3(d)(1) because the body of this brief, including headings and footnotes, does not exceed 6,250 words as indicated by Microsoft Word, the program used to prepare this document.

Dated:  February 2, 2022                     /s/ Dmitriy Tishyevich
                                              Dmitriy Tishyevich*
                                              MCDERMOTT WILL & EMERY LLP
                                              One Vanderbilt Avenue
                                              New York, NY 10017
                                              Telephone: 212-547-5534
                                              Facsimile: 212-547-5444
                                              dtishyevich@mwe.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing document was filed electronically with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all registered users.

Dated:  February 2, 2022                     /s/ Dmitriy Tishyevich
                                              Dmitriy Tishyevich
                                              MCDERMOTT WILL & EMERY LLP
                                              One Vanderbilt Avenue
                                              New York, NY  10017-3852
                                              Phone: 212-547-5534
                                              Fax: 646-417-7668
                                              dtishyevich@mwe.com

25

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

|  |  |
|---|---|
| MAXWELL KADEL, *et al.*, | |
| *Plaintiffs*, | |
| v. | Case No. 1:19-cv-00272-LCB-LPA |
| DALE FOLWELL, in his official capacity as State Treasurer of North Carolina, *et al.*, | |
| *Defendants*. | |

## <u>DECLARATION OF DMITRIY TISHYEVICH</u>

Pursuant to 28 U.S.C.§ 1746, I, Dmitriy Tishyevich, do hereby declare as follows:

1.      I am over 18 years of age.

2.      I am a partner at the law firm McDermott Will & Emery LLP, and I serve as counsel of record for the Plaintiffs in the above-captioned matter.

3.      I have personal knowledge of the facts stated herein, except those stated on information and belief, and if called upon, could and would testify competently to them.

4.      I submit this declaration in support of Plaintiffs' Motion to Exclude Expert Testimony of Dr. Patrick Lappert.

5.       Attached as **Exhibit 1** is a true and correct copy of Dr. Lappert's May 1, 2021 expert report submitted by Defendants in this matter.  (Pages 47 to 55 of this report reference confidential medical information for individual Plaintiffs, are subject to the

1

concurrently-filed Plaintiffs' Motion to Seal, and have been redacted from this exhibit accordingly.)

6.      Attached as **Exhibit 2** is a true and correct copy of the transcript of the September 30, 2021 deposition of Dr. Lappert in this matter.

7.      Attached as **Exhibit 3** is a true and correct copy of a printout of the webpage "Guidelines for Stating Certification Status," published by the American Society of Plastic Surgeons, entered as Exhibit 2 at Dr. Lappert's deposition.

8.      Attached as **Exhibit 4** is a true and correct copy of the Code of Ethics of the American Society of Plastic Surgeons, updated September 25, 2017, entered as Exhibit 10 at Dr. Lappert's deposition.

9.      Attached as **Exhibit 5** is a true and correct copy of the Declaration of Dr. Patrick W. Lappert, filed on July 9, 2021 in *Brandt, et al. v. Rutledge, et al.*, E.D. Ark. (Case No. 4:12-cv-450-JM), entered as Exhibit 3 at Dr. Lappert's deposition.

10.    Attached as **Exhibit 6** is a true and correct copy of the August 2, 2021 Supplemental Order from *Brandt, et al. v. Rutledge, et al.*, E.D. Ark. (Case No. 4:12-cv-450-JM), entered as Exhibit 4 at Dr. Lappert's deposition.

11.    Attached as **Exhibit 7** is a true and correct copy of "Levels of Evidence in Plastic and Reconstructive Surgery Research:  Have We Improved Over the Past 10 Years?," by Conor M. Sugrue, FRCS, et al., published in Plastic Reconstructive Surgery—Global Open in September 2019, entered as Exhibit 17 at Dr. Lappert's deposition.

2

12.     Attached as **Exhibit 8** is a true and correct copy of a printout of the webpage "State Focus on Gender Affirmation Intensifies," published by the American Society of Plastic Surgeons on February 25, 2021, entered as Exhibit 7 at Dr. Lappert's deposition.

13.     Attached as **Exhibit 9** is a true and correct copy of the Blue Cross Blue Shield of North Carolina Corporate Medical Policy, Gender Affirmation Surgery and Hormone Therapy, updated March 2021, entered as Exhibit 23 at Dr. Lappert's deposition.

14.     Attached as **Exhibit 10** is a true and correct copy of a printout of the webpage "Gender Affirming Surgery—Medical Clinical Policy Bulletins," published by Aetna, updated January 2021, entered as Exhibit 30 at Dr. Lappert's deposition.

15.     Attached as **Exhibit 11** is a true and correct copy of the Cigna Medical Coverage Policy, Treatment of Gender Dysphoria, updated May 2021, entered as Exhibit 31 at Dr. Lappert's deposition.

16.     Attached as **Exhibit 12** is a true and correct copy of the United HealthCare Commercial Medical Policy, Gender Dysphoria Treatment, updated April 2021, entered as Exhibit 32 at Dr. Lappert's deposition.

17.     Attached as **Exhibit 13** is a true and correct copy of a document titled "Transgender 'Transition' Procedures Performed on Minors, Answers to Questions and Information for Joint Interim Committee, Submitted by [Utah House of Representatives member] Rep. Rex. P. Shipp," dated June 10, 2021, entered as Exhibit 5 at Dr. Lappert's deposition.

3

18.     Attached as **Exhibit 14** is a true and correct copy of a printout of a webpage titled "Alabama bill that would criminalize treatment for transgender minors headed to full Alabama Senate," published on www.rocketcitynow.com, dated February 14, 2021, entered as Exhibit 6 at Dr. Lappert's deposition.

19.     Attached as **Exhibit 15** is a true and correct copy of a presentation by Dr. Lappert titled "Transgender Surgery & Christian Anthropology," entered as Exhibit 33 at Dr. Lappert's deposition.

20.     Attached as **Exhibit 16** is a true and correct copy of a printout of a webpage titled "Plastic surgeon:  Sex-change operation 'utterly unacceptable' and a form of 'child abuse,'" published on www.lifesitenews.com, entered as Exhibit 34 at Dr. Lappert's deposition.

21.     Attached as **Exhibit 17** is a true and correct copy of an abstract from C.M. Elliott & S. Wilhelm, "Body Dysmorphic Disorder," in the Encyclopedia of Mental Health (2d ed., 2016), *available at* https://doi.org/10.1016/B978-0-12-397045-9.00081-1.


I declare under penalty of perjury that the foregoing is true and correct.

Dated this 2nd of February 2022.


 /s/ Dmitriy Tishyevich
Dmitriy Tishyevich

4

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Case No.: 1:19-cv-272-LCB-LPA

MAXWELL KADEL, et al.,                )
                                      )
            Plaintiffs;               )
v.                                    )
                                      )
DALE FOLWELL, in his official         )
capacity as State Treasurer of North  )
Carolina, et al,                      )
                                      )
            Defendants.               )

Declaration of
Patrick W. Lappert, MD
Board Certified in Surgery and Plastic Surgery
Decatur, AL 35603

**Knowledge Training and Experience :**

1.      **Education and Training :** I received my Bachelor of Arts in Biological Sciences at the University of California, Santa Barbara, 1979. There I was engaged in research in cell membrane physiology with Dr. Philip C. Laris, studying stoichiometry of the sodium: potassium ATPase pump.  I received my M.D., Doctor of Medicine degree at the Uniformed Services University of the Health Sciences, 1983 at Bethesda, Md.   I served my General Surgery Residency at the Naval Hospital Oakland/ UC Davis East Bay Consortium, 1987-1991 and served as Chief Resident, Department of Surgery, Naval Hospital Oakland, 1990-1991. I also served a Plastic Surgery Residency at the University of Tennessee- Memphis, 1992-1994. My

professional background, experience, and publications are described in more detail in my curriculum vitae. An updated copy of my CV is attached as Exhibit A to this declaration.

2.    **Board Certifications in Medicine :** I have been Board Certified in Surgery (American Board of Surgery, 1992), in Plastic Surgery (American Board of Plastic Surgery, 1997; American Board of Plastic Surgery, 2008).

3.    **Medical Staff Appointments : I served as the** Staff General Surgeon at the Naval Hospital Oakland, CA 1991-1992 and as Associate Professor of Surgery, UC Davis-East Bay, 1991-1992.  I also served as a Plastic and Reconstructive Surgeon, Naval Medical Center, Portsmouth, VA 1994-2002 and as Chairman, Department of Plastic and Reconstructive Surgery, Naval Hospital Portsmouth, VA 1996-2002.   I later served as Clinical Assistant Professor, Department of Surgery, Uniformed Services University of the Health Sciences, 1995-2002 and as Founding Director, Pediatric Cleft Palate and Craniofacial Deformities Clinic, Naval Hospital Portsmouth, VA 1996-20002 also as the Founding Director, Wound Care Center, Naval Hospital Portsmouth, VA 1995-2002. I have also served as a Staff Plastic Surgeon in Nebraska, and Alabama.

4.    **U.S. Surgeon General Service:** I served as a  Specialty Leader, Plastic and Reconstructive Surgery, Office of the Surgeon General-USN, 1997-2002

5.    **Faculty Appointments:** I served as Teaching Faculty at Eastern Virginia Medical School, Division of Plastic Surgery, 1995-2002

6.    **Military Service :** I served as an Aviation Officer Candidate, Naval Aviation Schools Command, NAS Pensacola, 1978 and was Commissioned an Ensign, MC, USNR 1979 and Commissioned as a Lieutenant, MC, USN 1983 . I served as a Designated Naval Flight

Surgeon, Naval Aerospace Medical Institute, 1985 and was Assigned Marine Fighter/ Attack Squadron-451, serving as Flight Surgeon, and serving as Radar Intercept Officer in the Marine F-4S Phantom, accumulating 235 flight hours, and trained for qualification as an Air Combat Tactics Instructor. Deployed to the Western Pacific as UDP forward deployed fighter squadron in Korea, Japan, and the Philippines. I served in the US Navy for 24 years, served in the USMC for 3 years. I retired with the rank of Captain, USN in 2002

7.     **Publications - Peer Reviewed Medical Journals** : Lappert PW. Peritoneal Fluid in Human Acute Pancreatitis. Surgery. 1987 Sep;102(3):553-4 ;    Toth B, Lappert P. Modified Skin Incisions for Mastectomy: The Need for Plastic Surgical Input in Preoperative Planning. J Plastic and Reconstructive Surgery. 1991; 87 (6): 1048-53 ; Lappert P. Patch Esophagoplasty. J Plastic and Reconstructive Surgery. 1993; 91 (5): 967-8 ; Smoot E C III, Bowen D G, Lappert P, Ruiz J A. Delayed development of an ectopic frontal sinus mucocele after pediatric cranial trauma. *J Craniofacial Surg.* 1995;6(4):327–331 ;    Lappert PW. Scarless Fetal Skin Repair: "Unborn Patients" and "Fetal Material". J Plastic and Reconstructive Surgery. 1996 Nov;98(6):1125 ;    Lappert PW, Lee JW. Treatment of an isolated outer table frontal sinus fracture using endoscopic reduction and fixation. P!astic and Reconstructive Surgery 1998;102(5):1642-5.

8.     **Publications - Medical Textbooks:** Wound Management in the Military. Lappert PW, Weiss DD, Eriksson E. Plastic Surgery: Indications, Operations, and Outcomes, Vol. 1; 53-63. Mosby. St. Louis, MO 2000

9.     **Operations and Clinical Experience - Consultations and Discussions** : As a physician and surgeon, I have treated many thousands of patients in 7 states and 4 foreign

nations. My practice has included Primary Care, Family Medicine, Aerospace Medicine, General Surgery, Reconstructive Surgery for combat injured, cancer reconstructive surgeries including extensive experience with microvascular surgery, Pediatric Congenital Deformity, and the care of chronic wounds. I have practiced in rural medicine, urban trauma centers, military field hospitals, university teaching hospitals, and as a solo private practitioner. In my private practice I have had occasion to treat many self-identified transgender patients for skin pathologies related to their use of high dose sex steroids, laser therapies for management of facial hair both in transitioners and detransitioners. I have performed breast reversal surgeries for detransitioning patients. My practice is rated as "LGBTQ friendly" on social media. I have consulted with families with children who are experiencing gender discordance.    I have given many presentations to professional meetings of educators and counselors on the subject of transgender, and the present state of the science and treatment.   I have discussed the scientific issues relevant to the case with many physicians and experts over a number of years and also discussed related issues with parents and others.

        10.    **Retained as an Expert Witness - Compensation - Bases for Opinions**:  I have been retained as an expert witness by John G. Knepper, JD for the defense in connection with the Kadal, et al. vs. Folwell, et al litigation. I have actual knowledge of the matters stated in this declaration.  I am being compensated at an hourly rate for actual time devoted, at the rate of $400 per hour including report drafting, travel, testimony, and consultation.   My compensation does not depend on the outcome of this litigation. I am paid in advance for all written opinions or testimony to avoid any conflict of interest.   To formulate opinions in this case I have reviewed

many scientific publications, the plaintiff's medical records, the Complaint and Answer, and all expert witness declarations.

11.    **Affirmation Treatments are Currently *Experimental*** — as they have not been competently tested, not proven effective, are not generally accepted by the relevant scientific community, and have no documented error rates:    Patients who experience a gender identity that is discordant with biological sex have an alarmingly high incidence of serious psychosocial morbidity including depression, anxiety, eating disorders, substance abuse, HIV infection, suicidality, and homelessness [ Connolly, M. D., M. J. Zervos, C. J. Barone, C. C. Johnson, and 2nd C. L. Joseph. 2016. *"The Mental Health of Transgender Youth: Advances in Understanding."* Journal of Adolescent Health 59:489–95.  :10.1016/j.jadohealth.2016.06.012. ] . While a need for effective treatment modalities is clear, *there are currently significant deficiencies in our understanding the etiology of this condition, the risks and benefits of the current experimental (unproven, untested) medical interventions, and the long-term success of various affirmation experimental treatments in achieving the primary desired goal of reducing mental illness including reductions in suicide risk. M*ultiple recent studies and reviews including the recent national science summaries and guidelines from England-NICE, Sweden, Finland, the Cochrane Review, the British Royal College of Psychiatrists and others *all document significant deficits in our current understanding of these complex disorders and signifigant defects in the existing science.*   As we strive to provide real, effective, and sustained treatment to patients who experience gender dysphoria within established ethical boundaries, it is essential that we properly and scientifically research the causes of gender dysphoria as well as conduct competent, properly conducted *randomized clinical trials and long-term treatment*

***outcome studies.*** These basic, foundational tasks — the tasks that make experimental procedures actual, proven treatments worthy of trust — have ***never been accomplished in the highly controversial field of the Transgender Treatment Industry***. Why? Suffering and vulnerable patients and their families continue to wait for this basic, foundational scientific work to be completed.   Meanwhile, affirmation "treatments" must continue to be properly viewed as experimental.

The science and medical world have — in just the past few years — become increasingly aware of and deeply concerned about the glaring science and ethical defects of the Transgender Treatment Industry.   For example, the very recently released 2020 Finland national science review and guidelines documented "***a lack of quality evidence*** to support the use of hormonal interventions in adolescents with gender dysphoria.". The new strict Finnish guidance prioritizes psychological therapy over treatment with hormones or surgery thus directly contradicting the non-science-based association protocols of WPATH]. The 2020 Finland national science review and guidelines also document the ongoing lack of scientific basis for the Transgender Treatment Industry stating "***Only limited research has been conducted on transgender identity and other gender identity conflicts, and comparative studies are very rare.***"   In sum, the Finland National Science Review and Guidelines, like the new Sweden Review and Guidelines, and other reviews, and the collapse and recantation of the 2020 Branstrom long-term treatment outcome study claims under withering methodological criticisms, all appear contrary to the opinions of Drs Brown and Schechter and WPATH. See, e.g., https://genderreport.ca/finland-strict-guidelines-for-treating-gender-dysphoria/

Meanwhile, practitioners in this troubled field continue to offer defective research and politicized endorsements from politicized, union-like associations (WPATH, APA, ACP, etc) rather than competent, credible, valid and reliable, peer reviewed and published scientific evidence. As with the plaintiffs' experts in this case, they continue to refuse the serious defects and methodological limits of their data and experimental practices. 50 years of experimenting is enough! Its time for the Transgender Treatment Industry to come up with real, competently constructed scientific evidence that they are helping more people than they are hurting. As the recent recent national science reviews from England, Sweden, and Finland have all noted, its time to step back, slow down, and prudently investigate a range of approaches to vulnerable patients struggling with gender discordance issues.

12.    **My Opinions regarding the Plaintiff's Expert Reports in this Case by Drs Schechter and Brown :**

As a physician and surgeon for decades, I have dedicated my life to helping the injured, the wounded, the sick, the vulnerable, and those in distress. As a physician and surgeon, I have a duty to carefully assess the available scientific research literature and determine what surgical procedures have been ***scientifically proven safe and effective for use on patients — and which procedures are still experimental***, potentially dangerous, and may well do more harm than good for patients. Such an assessment requires prudentialy reviewing scientific publications and being familiar with ***the ongoing methodological and scientific debates in the field***. In my opinion, the expert reports from Drs. Schechter and Brown in this case demonstrate little or no knowledge of the ongoing, raging scientific debates over the safety and effectiveness of "gender affirming" medical procedures. The reports of Drs. Schechter and Brown offer no disclosure and

demonstrate no awareness of the serious methodological defects and controversies exposing the lack of scientific foundations for the Transgender Treatment Industry (TTI). Over the past few years, scientific review after scientific review and multiple methodological exposes and national reviews in England, Sweden, Finland plus other reviews (e.g. Cochrane, Griffin, Carmichael, etc) have raised ***urgent warnings and serious questions about the quality and the integrity of the scientific foundation for this very controversial field.***    It it troubling that Drs Schechter and Brown appears to have financial and professional conflicts of interest as they appear to have admitted that much of their practices and income are derived from the experimental, unproven, potentially harmful methods and procedures of "affirmation" medical treatments.    My review of the declarations of Drs Brown Schechter produced the following list of errors, omissions, and failures:

FAILURE TO DISCLOSE THE ONGOING CONTROVERSIES  :  Drs Schechter and Brown failed to properly disclose and discuss the international debates and controversies surrounding transgender affirmation methods and procedures. (See, the multiple journal articles, news reports, court cases, international reviews, etc cited below).

DEFECTIVE RESEARCH — Drs Schechter and Brown failed to properly disclose and discuss multiple peer-reviewed published exposes of significant methodological defects in research on transgender affirmation methods and procedures (e.g. the defective studies by Branstrom, Turban, and others discussed in detail below).

FAILURE TO DISCUSS CONTRARY STUDIES:  Drs Schechter and Brown also failed to properly disclose and discuss recent scientific studies and reviews including the Cochrane Review, the Carmichael study, the Griffin review and the devastating scientific critiques of the

ill-fated and recanted Branstrom et al study including the many multiple, detailed, methodologically sophisticated letters to the editor.

TRANSGENDER, AFFIRMATION BREAST SURGERY IS EXPERIMENTAL and THUS NOT MEDICALLY NECESSARY:   Drs Schechter and Brown failed to properly disclose and discuss the methodological and ethical controversies involving transgender breast surgery. The diagnostic process for such surgery is based soley on the patient's subjective report of dysphoria, but the medical necessity is based on the expectation that surgery will relieve the patient of the risk of, among other things, major depression, self-harm behaviors, and suicide. Competent , credible ressearch demonstrating such benefits does *not* yet exist.   *None of the papers cited by Dr. Schechter (20, 21, 22, 23, 24, 25 ) address themselves to the question of medical necessity for either masculinizing surgery, or feminizing surgery.* They only address technical issues, management of complications, and subjective outcomes that employ precisely the same language that is used to assess cosmetic (not medically necessary) surgery of the breast. In summary, the medical necessity of transgender chest surgery is ***not supported by credible, competent, methodologically rigorous scientific evidence, and appears to be firmly in the category of cosmetic (not medically necessary) surgery.***

THE  ENGLAND-SWEDEN-FINLAND-COCHRANE-CARMICHAEL-GRIFFIN-BRANSTROM (Retraction) — NATIONAL SCIENCE REVIEWS and/or GUIDELINES ALL APPARENTLY CONTRADICT WPATH and the other ASSOCIATION NON-SCIENCE ENDORSEMENTS BASED ON VOTING PROCESSES :  Drs Schechter and Brown also failed to properly disclose and discuss the internationally reported national reviews from England (NICE), Sweden, and Finland.   These new science-based guidelines recommend different

methods, approaches, foci, and treatments than the controversial, unproven WPATH model supported by Drs. Schechter and Brown in this case.   Where is the concern of WPTAH and Drs. Schechter and Brown for the suffering, vulnerable patients who deserve properly tested, proven, reliable, and efficacious treatments?

EXPERIMENTAL, UNPROVEN TREATMENTS ARE NOT "MEDICALLY NECESSARY" :  Drs Schechter and Brown also failed to properly disclose and discuss the opinion of the relevant scientific community that that all Transgender Transition affirmation "treatments" remain — after 50 years — controversial, untested, unproven, and thus clearly still experimental — and thus *cannot be medically necessary* — given the state of current research. (See, national reviews of England, Sweden, Finland, the Cochrance Review, the Griffin review, the Carmichael study, the Branstrom (recanted) study and others as cited in detail below).

THE ASSOCIATION VOTES CITED BY DRS BROWN and SCHECHTER ARE NOT THE PRODUCT OF A RELIABLE SCIENTIFIC METHOD, NOT ACCEPTED BY THE RELEVANT SCIENTIFIC COMMUNITY, HAVE NO KNOWN ERROR RATSE. SUCH METHODS HAVE NOTABLY PRODUCED SOME HISTORIC, DISASTROUS RESULTS : — Drs Schechter and Brown also failed to disclose and properly discuss the methodological defects in the ***non-scientific, unreliable, consensus-seeking, "voting" methodology*** of "associations" (e.g. WPATH, APA, ES, AAP, etc)  in contrast to reliable-valid scientific research undergoing peer reivew, publication, then public review?    Where is their concern for the suffering, vulnerable patients who deserve properly tested, proven, reliable, and efficacious treatments?

Professional associations and similar organizations have a tainted history of supporting unproven, controversial notions that were later shown to be improper, unreliable, and/or unethical.  For example, it has been widely reported by historians that the American Medical Association supported (by voting) eugenic proposals to "improve the quality of the human stock" by coercive sterilization of "defective and undesirable Americans" and selective breeding. During the 1890s the renowned surgeon Albert Ochsner was invited to speak about his vasectomy procedure to the meeting of the American Medical Association. He recommended vasectomies to prevent the reproduction of "criminals, chronic inebriates, imbeciles, perverts, and paupers." (See, Oshsner, AJ, Surgical treatment of habitual criminals. JAMA, 1899:32:867-868). Similar to the political-policy-voting support of associations such as WPATH and APA for the Transgender Treatment Industry methods, the AMA's policy support for eugenics was a political not a scientific process.    The unproven, political, experimental "treatments" of this movement were focused on "terminating the bloodlines" of the "submerged lower ten percent of the population with 'defective germ-plasm'".  (See, Black, E. War Against the Weak, New York, NY, 2003). With the political-policy-voting support of  the AMA, a Model Eugenics Sterilization Law was proposed to authorize sterilization of those supported in institutions or maintained at public expense.  The model law encompassed the "feebleminded, insane, criminalistic, epileptic, inebriate, diseased, blind, deaf, deformed, and dependent" — including "orphans, ne'er-do-wells, tramps, the homeless and paupers". Eighteen states passed laws based on the 1922 model legislation and *sixty-four thousand people were forcibly sterilized.*    The lesson from the eugenics era is that associations can lend their weight and prestige to social movements believing that they are speaking from a foundation of science when

in fact they are articulating political or ideological concepts.    Such pseudoscientific voting consensus processes are neither valid, reliable,   nor evidence-based — whether they vote for experimental eugenics "treatments"  or experimental transgender affirmation "treatments". . Suffering patients deserve more than political posturing they deserved competent, scientifically validated, tested and proven, effective and safe treatments.    We are all still waiting for the politicized Transgender Treatment Industry to provide competent scientific support for their controversial, experimental methods and theories.

A similar methodological critique is relevant to the understanding of WPATH, the American Academy of Pediatrics, the American Endocrine Society, the American Psychiatric Association, the American Psychological Association and similar groups as they declare supportive policies that are not based on credible, reliable-valid science.  These policies often do not acknowledge the glaring scientific deficiencies of proposed guidelines  Beyond such policy voting statements is the absence of controlled studies, the absence of prospective follow up studies and no discussion nor proof of the error rates of interventions.   It might be useful to examine what has been called the "Transgender Treatment Industry" (TTI).  The TTI generates considerable income for hospitals, clinicians, and pharmaceutical companies.   Members of the TTI have a vested interest in believing that science has already justified their existence. As sterilization is the expected adult outcome of endocrine and surgical treatments of the procedures undertaken in youth prior, the TTI must have developed strong rationalizations to justify creating infertility. Will one day the medical profession look at support for transitioning youth in the same manner the eugenics movement is now regarded? (See, Hruz, PW, Mayer, LS, and McHugh, PR, "Growing Pains: Problems with Puberty Suppression in Treating Gender Dysphoria," The New

Atlantis, Number 52, Spring 2017 pp. 3 -36 ; See also, McHugh, P., Psychiatric Misadventures, The American Scholar, Vol. 62, No. 2 (Spring 1993), pp. 316-320

Why did Drs Brown and Schechter fail to report this issue?  Where is their concern for the suffering, vulnerable patients who deserve properly tested, proven, reliable, and efficacious treatments?

ANECDOTAL PATIENT STORIES ARE NOT DATA: — Drs Schechter and Brown also *failed* to disclose and properly discuss that Anecdotal Data unverified patient reports without control groups, randomized trials, or other scientific protections for the integrity of the medical system — are NOT reliable science.  Tragically, much of the Transgender Treatment Industry support seems to come from personal patient stories claiming the "transitioning treatments" helped them.  ***This is unreliable Anecdotal Data*** and it is not credible, ***scientific*** information. For example, for hundreds of years physicians/barbers would use "bleeding and leeching" to remove "unhealthy blood" as a "treatment" for a range of disorders including fevers. Many people were killed by such untested, unproven procedures but the patients who survived offered wonderful marketing by naively and unscientifically claiming that "bleeding and leeching" cured them.

PATIENTS SHOULD NOT RUN THE HOSPITAL  — Drs Schechter and Brown also *failed* to disclose and properly discuss that surgeons are not permitted to give patients whatever they ask for (see e.g. Body Identity Disorder patients in the grip of a delusion demanding amputations ) without credible research demonstrating safety and effectiveness Much of the Transgender Treatment Industry support comes from personal patient stories (unreliable anecdotal evidence)   claiming the "treatments" will help them.   Such patient stories are

Anecdotal Data. Such data if well known to be highly unreliable unscientific information. For example, for hundreds of years physicians/barbers would use "bleeding and leeching" to remove "unhealthy blood" as a "treatment" for a wide range of illnesses. Many people were killed by such procedures (including reportedly George Washington)  but the ones who survived often offered wonderful marketing by naively and unscientifically believing and claiming that "bleeding and leeching" cured them.  If the patient died during bleeding the physician could say "if she had only come in sooner so we could take more of the bad blood out" and alternatively if the patient recovered from the fever the physician could claim a treatment success.  This failure to understand or apply fundamental scientific principles used in clinical trial research doomed millions to death and injury by quackery. It appears that the Transgender Treatment Industry is following in this destructive, unscientific footsteps.

CONFIRMATION BIAS —  A POTENTIALLY DEADLY ERROR:  — Drs Schechter and Brown also *failed* to disclose and properly discuss the wide spread foundational error of Confirmation Bias in the Transgender Treatment Industry.  Providers in this troubled field apply a uni-causal hypothesis for very complex psychological disturbances, in spite of the fact that gender dysphoria can appear in different ways at different stages of development, and that the demographics show exponential growth and a radical switch in demographics. Whereas gender dysphoria historically affected boys 80% of the time, now the majority of new patients are adolescent females.  In the politically tainted process of the Transgender Treatment industry the dangerous error of Confirmation Bias is built in to the system and institutionalized because the process of competent diagnosis and treatment — *seeking and testing scientifically validated alternative theories, methods, and treatments* — is demonized as "conversion therapy" when

actually such treatments are scientifically proven methods for reducing anxiety, depression, suicidality (e.g. Cognitive Behavioral Therapy that would *not challenge* any of the patients' beliefs regarding gender orientation or identity).        In fact, an alternative hypothesis for investigation is that the "affirmation" providers want the patient to suffer depression and anxiety *such untreated suffering motivates vulnerable patients* to undergo the often painful and damaging experimental "transitioning" process.        Once again,  Drs. Brown and Schechter's defective expert reports somehow ignored all of these key issues.  Where is their concern for the suffering, vulnerable patients who deserve properly tested, proven, reliable, and efficacious treatments?

THE DSM IS A DICTIONARY, NOT RELIABLE, VALID, PROVEN, METHODOLOGICALLY COMPETENT  SCIENCE: — Drs Schechter and Brown also *failed* to disclose and properly discuss the *fundamentally unreliable, defective and dangerous mis-diagnostic processes* at the heart of the Transgender Treatment Industry.  Basing life changing surgeries that damage and destroy the natural functions of perfectly healthy organs on nothing more than the *unverified self-reports (conversations) of often disturbed patients* as part of untested, unproven, experimental "treatments" that are "supported" by a methodologically defective research base when competent   reviews have called such research "low quality" evidence and noted the "lack of any randomized clinical trials" — should be properly investigated as unethical, misconduct and an abuse of a vulnerable patient population.   In addition, the reliance upon the DSM category of "gender dysphoria".   It is important for legal professionals to understand that the DSM was created using a consensual, political process of small committees using *voting methodologies. Voting by DSM committees is not a reliable-*

***valid scientific, evidence-based process*.**    In the DSM methodology, small groups of professionals, often with ideological agendas and potentially with financial conflicts of interest, would form committees and create diagnoses to be "voted" into the DSM.    The field has increasingly come to see the DSM as controversial and unreliable and in need of significant reform or retirement as a diagnostic methodology.    The serious defects and limitations of DSM methodology are now well known leading to calls for reform by the relevant scientific community.    See, e.g., Lee, C.,    *The NIMH Withdraws Support for DSM-5: The latest development is a humiliating blow to the APA*. Psychology Today News Blog at https://www.psychologytoday.com/us/blog/side-effects/201305/the-nimh-withdraws-support-dsm-5 ["Just two weeks before DSM-5 is due to appear, the National Institute of Mental Health, the world's largest funding agency for research into mental health, has indicated that it is withdrawing support for the APA's manual. In a humiliating blow to the American Psychiatric Association, Thomas R. Insel, M.D., Director of the NIMH, made clear the agency would no longer fund research projects that rely exclusively on DSM criteria. Henceforth, the NIMH, which had thrown its weight and funding behind earlier editions of the manual, would be "re-orienting its research away from DSM categories."    See,    NIMH Director Thomas Insel: Transforming Diagnosis,    April 29, 2013,    See,    https://www.nimh.nih.gov/about/directors/thomas-insel/blog/2013/transforming-diagnosis.shtml    The National Institute of Mental Health website documents the defects in DSM methodology.    "Unlike our definitions of ischemic heart disease, lymphoma, or AIDS, the ***DSM diagnoses are based on a consensus about clusters of clinical symptoms, not any objective laboratory measure*. *In the rest of medicine, this would be equivalent to creating diagnostic systems based on the nature of chest pain or the quality of***

*fever*. Indeed, symptom-based diagnosis, once common in other areas of medicine, *has been largely replaced* in the past half century as we have understood that *symptoms alone rarely indicate the best choice of treatment. Patients with mental disorders deserve better*. NIMH has launched the Research Domain Criteria (RDoC) project to transform diagnosis by incorporating genetics, imaging, cognitive science, and other levels of information to lay the foundation for a new classification system."]    In my opinion, these views are generally accepted by the relevant scientific community and sound the death knell for the diagnostic practices of the experimental Transgender Treatment Industry.  In sum, the field has come to agree that the DSM was indeed based upon a less than optimal process.

   DRS BROWN AND SCHECHTER DID NOT REPORT RISKS AND DANGERS TO "TRANSGENDER TREATMENTS" INCLUDING: — Drs Schechter and Brown also *failed* to disclose and properly discuss serious risks with their experimental "treatments":

   Sterilization.  Sex Reassignment Surgery (SRS) that removes testes, ovaries, or the uterus is *inevitably sterilizing and irreversible*. While by no means all transgender adults elect SRS, many patients do ultimately feel compelled to take this serious step in their effort to "live fully as the opposite sex". More immediately, practitioners recognize that the administration of cross-sex hormones, which is often viewed as a less radical measure, and is now increasingly done to minors, creates a risk of irreversible sterility. 31 These risks have never been properly studied nor quantified in a systematic manner.    As a result, even when treating a child, the MHP, patient, and parents must consider *permanent loss of reproductive capacity (sterilization) to be one of the major risks of starting down the road*. The risk that supporting social transition may put the child on a pathway that leads to intentional or unintentional permanent sterilization is

particularly concerning given **the disproportionate representation of minority and other vulnerable groups** among children reporting a transgender or gender-nonconforming identity. *See* C. Guss et al., *TGN Adolescent Care* at 4 ("a side effect [of cross-sex hormones] may be infertility") and 5 ("cross-sex hormones . . . may have irreversible effects"); Tishelman et al., *Serving TG Youth* at 8 (Cross-sex hormones are "irreversible interventions" with "significant ramifications for fertility").

Loss of sexual response. Puberty-blockers prevent maturation of the sexual organs and response. Some and perhaps many transgender individuals who transitioned as children and thus did not go through puberty consistent with their sex face significantly diminished sexual response as they enter adulthood, and are unable ever to experience orgasm. To my knowledge, data quantifying this impact has not been published. In the case of males, the cross-sex administration of estrogen limits penile genital function. Much has been written about the negative psychological and relational consequences of anorgasmia among non-transgender individuals that is ultimately applicable to the transgendered. (Levine, *Informed Consent,* at 6.) (Perelman and Watters, 2016) Delayed Ejaculation in Handbook of Clinical Sexuality for. Mental Health Professionals 3rd edition, New York, Routledge)

The long-term health risks of this major alteration of hormonal levels **have not yet been quantified** in terms of exact risk *thus appropriate, ethical, complete informed consent **is not yet possible** for such experimental "treatments".* However, a recent study found *greatly elevated levels of strokes and other acute cardiovascular events among male-to-female transgender individuals* taking estrogen. Those authors concluded, "it is critical to keep in mind that the risk for these cardiovascular events in this population must be weighed against the benefits of

hormone. *See* Tishelman et al*., Serving TG Youth* at 6-7 (Long-term effect of cross-sex hormones "is an area where *we currently have little research to guide us*"). treatment." See, D. Getahun et al. (2018), *Cross-Sex Hormones and Acute Cardiovascular Events in Transgender Persons: A Cohort Study*, Annals of Internal Medicine at 8, DOI:10.7326/M17-2785.

Others similarly noted that administration of cross-sex hormones creates "an additional *risk of thromboembolic events"—which is to say blood clots* (Guss et al., *TGN Adolescent Care* at 5), *which are associated with strokes, heart attack, and lung and liver failure.* The young patient may feel, "I don't care if I die young, just as long I get to live as a woman." The mature adult may take a different view.

Health risks inherent in complex surgery. Complications of surgery exist for each procedure, and complications in surgery affecting the reproductive organs and urinary tract can have significant anatomical and functional complications for the patient's quality of life.

Disease and mortality generally. The MHP, the patient, and in the case of a child the parent, must also be aware of the wide sweep of strongly negative health outcomes among transgender individuals. *Shortened life expectancy has been repeatedly documented* in Sweden, US, and Denmark. See, Levine, Informed Consent, at 5 (citing T. van de Grift, G. Pigot et al. (2017), A Longitudinal Study of Motivations Before & Psychosexual Outcomes After Genital Gender-Confirming Surgery in Transmen, J. Sexual Medicine 14(12) 1621.).

Whatever the reason, transgender individuals including transgender youth certainly experience greatly increased rates of mental health problems. I have detailed this above with respect to adults living under a transgender identity. Indeed, Swedish researchers in a long- term study (up to 30 years since Sex Reassignment Surgery (SRS), with a median time since SRS of >

10 years) concluded that ***individuals who have SRS should have postoperative lifelong psychiatric care.*** (Dhejne, Long Term, at 6-7.) With respect to youths a cohort study found that transgender youth had an elevated risk of depression (50.6% vs. 20.6%) and anxiety (26.7% vs. 10.0%); a higher risk of suicidal ideation (31.1% vs. 11.1%), suicide attempts (17.2% vs. 6.1%), and self-harm without lethal intent (16.7% vs. 4.4%) relative to the matched controls; and a significantly greater proportion of transgender youth accessed inpatient mental health care (22.8% vs. 11.1%) and outpatient mental health care (45.6% vs. 16.1%) services.

AFFIRMATION IGNORES MANY OTHER WAYS TO HELP THE SUFFERING— Drs Schechter and Brown also ***failed*** to disclose and properly discuss that the *diagnosis of "gender dysphoria" encompasses a diverse and* ***controversial array of conditions***, with widely differing pathways and characteristics depending on age of onset, the complexities introduced by co-occurring mental illnesses, social contagion and other environmental factors, among other things. Data from one population (e.g. adults, those struggling with complex mental illnesses ) should not naively be assumed to be easily applicable to others (e.g. children, those changed by social contagion ) and other factors. The developmental and mental health patterns for  of these groups are sufficiently different that data developed in connection with one of these populations ***cannot be assumed to be reliably applicable to another.*** See,    K. Zucker (2018), The Myth of Persistence: Response to "A Critical Commentary on Follow-Up Studies & 'Desistance' Theories about Transgender & Gender Non-Conforming Children" by Temple Newhook et al., INT'L J. OF TRANSGENDERISM at 10, DOI: 10.1080/15532739.2018.1468293 ("Myth of Persistence").

NOT FDA APPROVED: — Drs Schechter and Brown also *failed* to disclose and properly discuss that the Food and Drug Administration has not approved the medications/ hormones used in the Transgender Treatment Industry for the treatment of gender dysphoria. The treatment research appears to document that such hormone treatments are of little if any benefit to patients and can cause severe damage to bone density and prevent normal psychological development during the key adolescent phase of life.  (See, Carmichael, national science reviews of England-Sweden-Finland, and other publications cited in the Notes section of this declaration). Such off-label (not FDA approved) use of these powerful, permanently life-altering, medications is further evidence of the experimental nature of these scientifically unsupported treatments.

FAILURE TO DISCUSS THE FAILURE TO CONDUCT COMPETENT RESEARCH ON the *UNKNOWN NUMBER AND PERCENTAGE of PATIENTS* WHO DROP OUT OF TRANSITIONING OR REVERSE THE PROCESS (Detransitioners) :    — Drs Schechter and Brown also *failed* to disclose and properly discuss — the phenomenon of desistance or regret experienced *later* than adolescence or young adulthood, or among older transgender individuals, has to my knowledge *not been quantified or well-studied.* However, it is a real phenomenon. I myself have worked with multiple individuals who have abandoned trans female identity after living in that identity for years, and who would describe their experiences as "regret".  More dramatically, a surgical group prominently active in the SRS field has published a report on a series of seven male-to-female patients requesting surgery to transform their surgically constructed female genitalia back to their original male form. See Djordjevic ML, Bizic MR, Duisin D, Bouman MB, Buncamper M. Reversal Surgery in Regretful Male-to-Female

Transsexuals After Sex Reassignment Surgery. J Sex Med. 2016 Jun;13(6):1000-7. doi: 10.1016/ j.jsxm.2016.02.173. Epub 2016 May 4. PMID: 27156012. An increasingly visible online community of young women who have desisted after claiming a male gender identity at some point during their teen years.  Given the rapid increase in the number of girls presenting to gender clinics within the last few years, the phenomena of regret and desistance by young women deserves careful attention and study by MHPs.  As reported by one author in 2021, *60,000 testimonies of personal de-transition can be found on the Internet*. See, Pablo Exposito-Campos.  A typology of gender detransition and its implications for health care providers J Sex & Marital Therapy 2020 https:..doi.org/101080/0092623x.2020.1869126);  See also,  reportedly one Reddit subthread [  See,   https://www.reddit.com/r/detrans/new/    ]   for detransitioners currently has more than 17,000 members, and a facility in Sweden, the Lundstrom Gender Clinic, provides trauma therapy for detransitioners.  [ See,  The Trans Train and Teenage Girls (Swedish documentary with English subtitles) at https://www.youtube.com/watch?v=oDV-ZL6-Gu0 ]

NOT GENERALLY ACCEPTED — Drs Schechter and Brown also *failed* to honestly and properly disclose that the A) underlying defective science, B) unreliable diagnostic methods, C) confirmation bias riddled treatment selection procedures, and the still unproven-experimental treatments of the Transgender Treatment Industry have never been generally accepted by the relevant scientific community.

NO ERROR RATES — Drs Schechter and Brown also *failed* to honestly and properly disclose that the A) underlying defective science, B) unreliable diagnostic methods, C) confirmation bias riddled treatment selection procedures, and the still unproven-experimental

treatments of the Transgender Treatment Industry have no known error rates thus more patients could be injured than helped by such methods and procedures as recent studies demonstrate (See Branstrom critiques, Carmichael study, etc.)

FAILURES TO DISCLOSE INFORMED CONSENT ERRORS: In the present treatment paradigm that is supported by Dr. Schechter, and applied to self-identified transgender persons, the diagnosis is made by the patient, and affirmed by counselors, primary care providers, pediatricians, and psychological services providers. Confirmation of the diagnosis amounts to the use of questionnaires that often are identical to questionnaires found on line. The questions, and their answers use highly rehearsed language that is the same whether asked by the school nurse, or the licensed psychologist. They are based upon the affirmation model of the condition, and assumes that the condition is biologically determined, even though there is little to no scientific evidence to support this hypothesis. No alternative hypotheses of causation of the patient's condition are permitted.

By the time the patient presents to the transgender surgeon, they have been the subject of affirmation processes that include everything from social transitioning, to hormonal manipulation. The surgical services provider does not question the diagnosis, nor investigate the science upon which it is based. Essentially the surgeon is performing permanently life-altering surgical interventions to cure a psychological condition that was diagnosed by the patient, and sometimes the patient made the diagnosis before they even entered puberty. ***Since the abandonment of frontal lobotomies in 1967, there has been no other psychological condition for which surgery is performed***, and there is no other area of surgical care where the

diagnostician is the patient themselves, and the surgeon has no means of confirming or rejecting the diagnosis.

Valid surgical consent requires that the surgeon is ultimately responsible for the accuracy of the diagnosis. For example, if an endocrinologist refers a patient for thyroidectomy because they have diagnosed a malignant thyroid nodule, the operating surgeon is still obliged to ensure the validity of the diagnosis. He has to entertain alternative diagnoses. Is it a benign nodule? Can it be treated with non-surgical means at lower risk to the patient. What do the scans show? What do the hormone levels show? Having evaluated all the alternative possibilities in the differential diagnosis, the surgeon can then counsel the patient and their family on the options of care, the likelihood of cure, and proper informed consent can be obtained.

The Transgender Treatment Industry, employing the scientifically unsupported WPATH guidelines, co-authored by Dr. Schechter, essentially excuse the surgeon from any responsibility for the diagnostic process or its consequences if the diagnosis is incorrect.

The 7th edition of the WPATH guidelines only requires two letters written by psychologists, and a period of social transition. There is no action taken to verify the diagnosis on the part of the surgeon. The surgeon has no means by which to anticipate who might benefit or who might be harmed by surgery.

Transgender surgeons like Dr. Schechter have no means of evaluating the diagnostic error rate because there is no= body of reliable scientific evidence that can be used to counsel the patient about what their risk of transgender regret is. The ever growing population of de-transitioning patients suggests that the error rate may be considerable, and the future medico-legal consequences may be proportionate.

In sum, in my opinion the expert reports of Drs Brown and Schechter — are misleading, un-scientific, advocacy statements of two providers that appear deeply embedded — politically, ideologically, and financially — in the Transgender Treatment Industry.  It is currently not clear whether the "treatment" efforts of that industry and providers like Drs Schechter and Brown are causing more harm than benefit  to the vulnerable, suffering patients we should seek to help and support with treatments proven safe and effective by validated, competent scientific research. *After 50 years of experimental, unproven, treatments in this area, the vulnerable, suffering patients are still waiting for scientifically validated treatments.*

13.    Review of Dr. Brown's Opinions Regarding the Plaintiff's Medical Records and My Review of the Plaintiff's Medical Records:

Dr Brown's updated (2nd) report on the plaintiff's medical records continued his avoidance of the many controversies, methodological defects, ongoing debates, and incongruous findings of the Transgender Treatment Industry.  Once again, he failed to mention the significant hazards involved with these experimental treatments and the published reviews documents documented the lack of benefits and harms of "transitioning" treatments.  My own review of the plaintiff's medical records found a demonstration of the errors in the industry described below including :

— *lack of appropriate informed consent* including failure to disclose and discuss the "low quality" of evidence this industry is based upon and the lack of randomized trial research and the lack of long-term research indicating such experimental treatments are more helpful than harmful to most patients.

*— failure to carefully investigate the psychosocial alternative hypotheses regarding the etiology of the patient's disorder* (See, new treatment guidelines from Sweden and Finland seeking psychological evaluations over years prior to intrusive medical "treatments" leading to harm to otherwise healthy organs

*— failure to acknowledge that the "association" endorsements of these experimental treatments are based upon consensus-seeking (committee voting) and not evidence-seeking, scientific methodologies.*

and the other errors and failures to disclose as discussed above.

14.    **Why I Do Not Engage in *Experimental* Treatments Lacking Reliable, Credible Scientific Support with Gender Dysphoric (Transgender) Patients — or Any Other Patients:** As multiple national science reviews and multiple peer reviewed science publications demonstrate, the relevant scientific community has never accepted the reliability, validity, safety or effectiveness of "gender affirmation" treatment procedures — including surgical procedures. Significant medical, ethical, and potential legal problems are created when health care providers employ experimental, unproven, treatment including surgical procedures. As multiple national science reviews (e.g. Sweden, Great Britain, Finland), a Cochrane Review and multiple other published reviews of this controversial research field have recently noted, current Transgender Treatment Industry procedures are only supported by "low quality" methodologically flawed, research lacking general acceptance and lacking any published error rates. (See, eg. the Branstrom, et al study with accompanying multiple exposes of the researchers' serious methodological errors and failures to report the data accurately). For example, the current assortment of "gender affirmation" surgical procedures lack credible,

reliable and valid scientific support as there are currently no published randomized trials, nor and competent long-term research studies demonstrating safety, efficacy, and scientific validity for these currently controversial, unproven, experimental treatment protocols.   Due to this well-documented lack of scientific support and only low quality evidence of efficacy and safety, I will not personally engage in the delivery of experimental gender affirming medical interventions to patients of any age.   I will not consider doing such invasive, potentially harmful surgical procedures — that can lead to life-long sterilization of vulnerable patients — until reliable-valid, credible scientific research supports such methods.

15.    **The biological basis of sex**  — Sex is not "assigned at birth" but permanently "assigned" at conception by DNA.  Medical technology can be used to determine a fetus's sex *before birth*. It is thus not scientifically correct to talk of doctors "assigning" the sex of a child at birth; almost anyone can accurately and reliably identify the sex of an infant by genital inspection with approx 99.9% accuracy. Every nucleated cell of an individual's body is chromosomally identifiably male or female—XY or XX.   Claims that patients can — via hormonal and surgical treatments —  obtain a "sex change" or a "gender transition" process are *misleading and scientifically impossible*. In reality, the typical "transgender" Gender Discordant patient has normal healthy sex organs but struggles with Gender Discordant *feelings and perceived identity — a psychiatric and not a medical problem*.

16.    ARE PATIENTS and PARENTS UNETHICALLY MISINFORMED BY PROVIDERS WHO FAIL TO DISCUSS THE KNOWN RISKS AND DANGERS OF "TRANSITIONING" TREATMENTS AND THE INTERNATIONAL CONTROVERSIES IN

THIS FIELD? : Putting a patient of any age on a pathway towards life as a transgender person puts that individual at risk of a wide range of long-term or even life-long harms, including:

— sterilization (whether chemical or surgical) and associated regret and sense of loss;

— inability to experience orgasm (for trans women);

— physical health risks associated with exposure to elevated levels of cross-sex hormones;

— surgical complications and life-long after-care;

— alienation of family relationships;

— inability to form healthy romantic relationships and attract a desirable mate;

— elevated mental health risks including increased depression, suicidality, and completed suicide.

Given that Drs Schechter and Brown failed to inform this court of the defects, uncertainties and controversies surrounding the entire field of Transgender Treatments, it seems difficult to imagine that they are properly informing patients of these defects, uncertainties and controversies.

17.   VIRTUALLY ALL TRANSGENDER PATIENTS ARE BORN WITH HEALTHY NORMAL SEX ORGANS AND NO KNOWN BRAIN OR GENETIC ABNORMALITIES and NO SCIENTIFICALLY VALIDATED REASON TO SURGICALLY DAMAGE THEIR HEALTHY ORGANS - Transgender surgery is currently experimental and thus not medically necessary, as it seeks goals and benefits that have not yet been scientifically tested, validated, and proven. The long-term research on transgender surgical outcomes FAILED to show benefits and

suggested injuries from these experimental procedures (See Branstrom et al. research cited and discussed in the notes section of this declaration).

Contrary to assertions and hopes that medicine and society can fulfill the aspiration of the trans individual to become "a complete man" or "a complete woman," ***this is not biologically attainable***. It is possible for some adolescents and adults to pass unnoticed as the opposite gender that they aspire to be—but with unknown levels of limitations, costs, and risks.

18.    INDIVIDUAL PATIENTS and THE FIELD AS A WHOLE SHOULD CAREFULLY REVIEW AND CONSIDER THE POTENTIAL SURGICAL COMPLICATIONS and/or IATROGENIC INJURIES WITH EXPERIMENTAL TRANSGENDER SURGERY of UNKNOWN LONG-TERM SAFETY AND EFFECTIVENESS :

EXAMPLES OF SURGICAL RISKS:    "Masculinizing" Female to "Male" - Complications:

"Transgender Procedures Metoidioplasty: Following hormonally induced clitoromegaly, the clitoris is released so that it hangs dependently, mimicking a small phallus, the urethra is lengthened by the use of mucosal, and/ or cutaneous flaps and/or grafts so that the urinary stream emerges from the tip of the counterfeit phallus. Reported complications with varying degrees of frequency:

1. Urethral strictures producing varying degrees of urinary obstruction and retention. a. Requires re-operation to open or dilate the scar strictures, additional grafts, urinary diversion through the use of a bladder catheter through the lower abdominal skin (suprapubic catheter)

2. Urethral- cutaneous fistulae (urine leaking from holes in the neo-urethra caused by wound healing problems and obstruction as in 1. above) a. Requires re-operative procedures as in 1. a. above.

3. Recurrent lower urinary tract infections caused by 1, and 2 above.

4. Chronic cysto-cutaneous fistula (urine leaking from the bladder through the skin of the lower abdomen) caused by the need for suprapubic catheter to divert the urinary stream to protect the neo-urethra construct if chronic distal urinary obstruction results from original or subsequent re-operation.

*5.* **Life-long reproductive sterilization**, since metoidioplasty is often accompanied by previous or subsequent hysterectomy and oophorectomy.

Phalloplasty: The construction of a counterfeit "neo-phallus". Typically accomplished by the transplantation of a vascularized, sensate flap of skin and associated soft tissue from the non-dominant forearm (Sensate Radial Forearm Flap). Blood vessels and sensory nerves in the flap are connected to blood vessels and nerve in the area of the native genital structures. A highly technical procedure requiring microscopic assistance. ***Many published studies do NOT report complication rates****. Overall, **the reported complication rate is above 50%** for the most favored operation to construct counterfeit phallus (1).* The most frequent complications involve stricture or leakage of urine, and occurs in approximately 40% of all patients  (2, 3, 4), requiring surgical correction. Infectious complication rate of 9%, with associated complete flap loss in 2% of patients have been reported in a patient series by Leriche et al., as is cited in a comprehensive review of phalloplasty complications   (5). One single center review of a 20 year experience shows that blockage of blood flow to the pseudo-phallus, requiring reoperation occurs 11% of

**JA1963**

the time (6). This same review showed complete loss of the construct occurred in 3% of patients, and 17% of patients showed significant wound healing issues requiring re-operation and long term wound care. In a comprehensive review of the most common phalloplasty surgeries, published in Clinics of Plastic Surgery in 2018, the authors state, *"Phalloplasty is known for its high rate of complication"*. Their systematic review of the literature showed complete flap loss approaching 2%, partial loss of the flap in 5-7% of cases, opening of wounds (dehiscence) in 11% of patients, and a high rate of blood clot formation in the patient's legs with risk of pulmonary embolization due to the long operative time, patient positioning for surgery, and the prolonged bed rest required (5). Similar complication rates have been reported in a review of 269 phalloplasties performed at a single center in Germany over a 22 year period. A review of patients whose phalloplasties included the use of prosthetic implants *showed implant associated complication rate of 44%, including infection, extrusion, surgical replacement, and the need for surgical removal (8).* There is also a high complication rate associated with the defect caused by harvesting the forearm tissue that is used in the construction of the counterfeit phallus. Kuran et al. in a 2019 article reviewing 940 radial forearm flap surgeries (730 of which were in transgender patients) showed an overall complication rate of 8%. **Infection in 16%, chronic pain in 10%,** loss of strength and sensation in the limb in 5%, contracture with loss of mobility requiring occupational therapy in 6.5%, and failure of the covering skin graft in 4.5%. (9) In addition to the cosmetic result, and the ability to urinate while standing, *it would be expected that the transgender scientific literature would rigorously investigate the effects of these surgeries on erotic sensibility but they have not. Human sexuality and gender identity discordance is at the heart of the justification for these very elaborate surgeries which carry high*

*complication rates, however, **a review of outcomes in this area shows the low quality of outcomes data, and thus the experimental nature of these operations.** In a 2019 literature review by Morrison et al. (10) the authors found that of 341 articles that had been published in peer reviewed journals, only 26 were found suitable for analysis.*

*The authors summarize by saying, " Little data are available on genital sensibility outcomes after phalloplasty, and there are no standardized approaches for assessment of either sensibility or erogenous perception." They then conclude by confessing, " it is difficult to draw evidence-based conclusions." This is a remarkable finding given that the human genital apparatus has two basic functions, namely reproduction and erotic sensibility. We know that reproduction is irreversibly destroyed by these operations, and now we see that erotic sensibility is degraded if not destroyed as well. Having thus excluded the entirety of genital function, all that remains is a cosmetic result, which is not a scientifically quantifiable product. In summary, masculinizing female to "male" surgeries are highly complex procedures with a very high complication rate. The scientific literature in this area of medicine is largely of low quality, and evidences the experimental nature of these operations. The most scientifically rigorous long-term studies (11, ) show that the stated goals of the surgeries, including decreased anxiety, decreased psychiatric hospitalization, decreased substance abuse, decreased self harm, and decreased suicide are not met. The long term cohort study from Sweden shows that persons who have completed all transition steps from female to "male", when compared with a population matched cohort, have a substance abuse rate that is 3.5 times higher, a psychiatric hospitalization rate that is 3.5 times higher, a rate of incarceration for violent crime that is 9.9 times higher, and a suicide rate that is 40 times higher than the control group. When the authors graphed these*

*findings over time, they show that any improvement in these markers begins to disappear within 6 to 8 years following completion of surgery. This largely explains the suggestion of improvement seen in the low quality data that is tainted by short follow-up, and self-selection bias. The best population based, cohort matched, longitudinal studies appear to show that all that is achieved by these surgeries is a cosmetic result, and reproductive sterilization.*

*COMPLICATIONS:*

*1. Complete loss of the microvascular flap. Typically caused by technical failure of the venous connection, may also result from clot formation in the blood vessels, or pressure of swelling that compresses the blood supply. a. Requires major re-operation to remove the dead flap, and placement or retention of urinary diversion with the use of a suprapubic bladder catheter.*

*2. Partial loss of the microvascular flap. Caused by transient or persistent insufficiency of blood flow, with similar etiologies as in 1 above. a. Requires re-operation to debride (remove) dead tissue, and chronic wound care involving daily dressing changes, wound care visits. b. Requires placement or retention of urinary diversion with suprapubic catheter to prevent urinary contamination of the chronic wound.*

*3. Urethro-cutaneous fistulae (urine leakage from the counterfeit phallus). Caused by wound healing problems within the construct that may result from inadequate blood flow, pressure, or distal urinary obstruction. a. Requires placement or long term retention of the suprapubic catheter, and surgical procedures to repair the wound openings.*

*4. Urethral strictures with associated urinary obstruction of varying degrees. a. Repeated urethral dilation and/ or catheterization, or re-operation to relieve chronic strictures, and will likely require urinary diversion as above.*

*5. Lower Urinary Tract Infections: resulting from any or the above complications of surgery. 6. Extrusion of erectile and or testicular prostheses. Cause by presence of bacteria on the implanted devices. Bacteria may have been introduced at time of surgical placement, or may result from above complications of partial flap loss or lower urinary tract infections that result from above complications.*

*7. Partial or complete loss of erotic sensibility. Native clitoris is typically placed at the base of the counterfeit phallus as part of the construct. Some degree of incidental surgical injury to sensory nerves is expected. Sensation from the shaft of the counterfeit phallus, provided by the surgical connection of the forearm nerve to the groin nerves, is considered successful if it provides any tactile sensation. It is not expected to produces the erotic provocation that the sensory apparatus of the native vagina produces.*

*8. Upper extremity complications. Common problems with the donor site can include: partial or complete loss of the skin grafts used to cover the exposed muscles and tendons that results from harvesting the forearm flap. Uncommon, but nonetheless possible, ischemic hand injury (inadequate blood flow to hand). a. Chronic wound care to achieve healing, and to protect exposed tendons. b. Scarring and tendon injuries from exposure may result in loss of range of motion. This is typically temporary, but may become permanent, depending on the age of the patient, and will require occupational therapy (OT). c. Chronic pain from harvest of the flap, or complications of healing as above.*

*9. Lifelong Reproductive Sterilization. These surgeries are typically preceded by or followed by hysterectomy and oophorectomy. An essential human function is being destroyed in order to produce a cosmetic result.'*

**Vaginoplasty - Complications :**

Feminizing surgeries, performed on male persons, include the creation of external and internal structures that mimic the appearance and function of female genitalia. The most commonly performed surgery, called "inversion vaginoplasty" uses tissues from the patient's native genital structures to create neo-vaginal labia majora and minora, and a skin sleeve that is inverted into the pelvis to create a receptive passage capable of receptive copulation. In the process of this operation, the patient is castrated, the penis is opened, the erectile tissues removed, a portion of the glans is preserved while trying to preserve the erotic innervation so that it can be used to create a neo-clitoris, the skin of the penis is surgically closed and inverted into the pelvis, while preserving its native blood supply. The scrotal skin is used to construct the labia, and the urethra is shortened to an opening at the base of the neo-clitoris. Other vaginoplasty operations may involve the use of vascularized flaps from the thighs or abdomen to create the receptive neo-vaginal structure. Portions of the lower intestinal tract may be used to create the receptive sleeve of the neo-vagina. These operations are often used when prior surgeries have failed for a variety of reasons that will be presented below, or they may be a first choice if the patient has a poverty of genital tissue. Such poverty is a common result of prior use of puberty blockade and cross-sex hormones if the patient has been the subject of treatments that began in early adolescence.

*As documented in the NOTES section of this declaration, The scientific literature offered in support of the efficacy, safety, and cost-effectiveness of these procedures is of low quality, and comprised almost entirely of case-series reports that lack controls, are of short duration, suffer from various biases including self-selection and confirmation bias.* These problems are attested to by citations offered by Dr. Schechter in his expert testimony for the plaintiff. Dr. Schechter, in support of the efficacy of vaginoplasty surgery, cites a 2014 paper (20) which is typical. It reports outcomes on a consecutive case series of 254 male to "female" surgical patients. The data presented in support of the efficacy of surgery was in the form of a *questionnaire* that asked questions about satisfaction with the result (subjective data). The average follow up interval was 5 years, with the longest follow up in a single patient at 7 years (short follow-up), and *<u>only 46% of patients completed the questionnaire</u>* (self-selection bias). In another of Dr. Schechter's cited articles, the authors present a prospective study **of only 39 patients (a very small sample)**, who are given *questionnaires* about their quality of life (subjective data), and the final evaluation of outcomes is *only 6 months post operation* (very short follow up given that research shows deep regret often begins on average *10 years after surgery*. Based upon such *low quality data*, the authors conclude by claiming that their study result, "endorses sex reassignment surgery as a valuable option for these patients."

In his expert testimony, Dr. Schechter, having defined gender dysphoria, then goes on to justify surgical treatment based upon "medical necessity". He states, "Gender dysphoria can lead to debilitating anxiety and depression, as well as serious incidents of self-harm, including self-mutilation, suicide attempts, and suicide. Yet with only a single exception, *no measure was made of the effects of surgery* on what is claimed to constitute the "medical necessity" for these

procedures. The long term research — the Branstrom study cited in detail in the Notes Section of this declaration showed NO benefits for transgender surgery and NO reduction in succeed and an *increase* in serious suicide attempts requiring hospitalization in patients *receiving* the surgery. ***These recent, long-term, published, peer reviewed, credible research findings are <u>quite contrary to the claims of Dr Schechter and Dr Brown</u> — as are the National Science Reviews in this area from England-NICE, Sweden, and Finland (see Notes section in this declaration).***

Scientific rigor would demand an examination of such outcomes as: rates of substance abuse, psychiatric hospitalization, self-harm, or suicide, and how they were changed by surgery. The only paper in Dr. Schechter's list of citations that asks these crucial questions concerning efficacy is a very comprehensive, long term, longitudinal population cohort study (11 ) *which actually shows the opposite* of what Dr. Schechter claims for these patient outcomes. When followed beyond 8 years post operatively, this paper shows patients receiving Dr Schechter's treatments have *the same alarmingly high rates of hospitalization, substance abuse, self-harm, and completed suicide as persons who have had no medical or surgical intervention*. The fact that the citation is included by Dr. Schechter, but never discussed in his opinion regarding efficacy is troubling. In summary, on the issue of the safety and efficacy of these surgeries, the scientific support is very weak, *while the scientific evidence rejecting the hypothesis of efficacy is quite strong.*

**BREAST SURGERY - COMPLICATIONS:**

Mastectomy/ Chest Masculinization, Breast Augmentation/ Chest Feminization

The surgical removal of the breasts, and the re-contouring of the chest through liposuction is a common procedure for women who seek to present as men. These operations are

performed in both men and women, for a variety of reasons, are very safe, and typically performed in the outpatient setting. It is important to understand that the only way of distinguishing cosmetic breast surgery from "medically indicated" surgery is based upon the diagnosis of underlying pathology. For example, breast reduction may be cosmetic, or it may be medically indicated. In both cases, the patient presents with a complaint that her breast are too big. The distinction between cosmetic breast reduction, and medically indicated breast reduction, is based upon the presenting symptoms of orthopedic problems caused by the weight of the breasts, but even then, the weight of the removed tissue is factored into the objective verification that the surgery was "medically necessary".

The same issues are at stake in breast enhancement for men seeking to present as women. Cross-sex hormones will have caused varying degrees of gynecomastia (breast enlargement in men). Surgical enhancement procedures are exactly the same in both men and women. Medically necessary surgery in women is based upon the diagnosis of an objective medical condition, such as Poland's syndrome (congenital absence of a breast), surgical absence of the breast following cancer care. In men, the objective diagnosis of gynecomastia might warrant surgery based upon medical necessity, but it would be a removal of tissue. A rare diagnosis of breast cancer in a man might warrant chest wall reconstruction after cancer care. On the other hand, cosmetic surgery of the breast is entirely about the subjective feelings of the patient, and that is all that we have in the case of the self-identified transgender patient.

In the case of transgender chest surgery, the diagnosis is based on the patient's subjective report of dysphoria, but the medical necessity is based on the expectation that surgery will relieve the patient of the risk of, among other things, major depression, self-harm behaviors, and

suicide. None of the papers cited by Dr. Schechter (20, 21, 22, 23, 24, 25 )address themselves to the question of medical necessity for either masculinizing surgery, or feminizing surgery. They only address technical issues, management of complications, and subjective outcomes that employ precisely the same language that is used to assess cosmetic surgery of the breast. In summary, the medical necessity of transgender chest surgery is not supported by scientific evidence, and appears to be firmly in the category of cosmetic surgery.

19. **SUMMARY OF OPINIONS:**

— There are no currently no competently conducted, long-term, peer-reviewed published, reliable and valid, research studies documenting the number or percentage of patients receiving gender affirming medical interventions who are helped by such procedures.

— There are no long-term, peer-reviewed published, reliable and valid, research studies documenting the number or percentage of patients receiving gender affirming medical interventions who are injured or harmed by such procedures.

— There are no long-term, peer-reviewed published, reliable and valid, research studies documenting the reliability and validity of assessing gender identity by relying solely upon the expressed desires of a patient.

— There are no long-term, peer-reviewed published, reliable and valid, research studies documenting any valid and reliable biological, medical, surgical, radiological, psychological, or other objective assessment of gender identity or gender dysphoria.

— A currently <u>unknown</u> percentage and number of patients reporting gender dysphoria suffer from mental illness(es) that complicate and may distort their judgments and perceptions of gender identity.

— A currently <u>unknown</u> percentage and number of patients reporting gender dysphoria are being manipulated by a — peer group, social media, YouTube role modeling, and/or parental — social contagion and social pressure processes.

— Patients suffering from gender dysphoria or related issues have a right to be <u>protected</u> from experimental, potentially harmful treatments lacking reliable and valid, peer reviewed, published, long-term scientific evidence of safety and effectiveness.

— It would be a serious violation of licensing rules, ethical rules, and professional standards of care for a health care professional to provide gender transition or related procedures to any patient without first properly obtaining informed consent including informing the patient and/or guardian(s) of the lack of valid and reliable on the long-term risks and benefits of "affirmation" treatments.

— A large percentage of children (over 80% in some studies) who questioned their gender identity will, if left alone, develop an acceptance of their natal (biological) sex.

— Medical treatments may differ significantly by sex according to chromosomal assessment but not gender identity. Misinforming physicians of a patient's biological sex can have deleterious effects on treatment for medical conditions.

— NOT GENERALLY ACCEPTED:   Affirmation medical treatments — hormones and surgery — for gender dysphoria and "transitioning" have <u>not been accepted by the relevant scientific communities</u> (biology, genetics, neonatolgy, medicine, psychology, etc).

— NO KNOWN NOR PUBLISHED ERROR RATES:  Gender transition "Affirmation" medical assessments and treatments — hormones and surgery — for gender dysphoria and

"transitioning" have no known, peer reviewed and published error rates — the treatments and assessment methods lack demonstrated, reliable and valid error rates.

— ASSOCIATION GUIDELINES AND ENDORSEMENTS ARE NOT SCIENCE : Political activists, political activist physicians, and politically active medical organizations that operate by voting methodologies (e.g, WPATH, the American Medical Association, the American Academy of Pediatrics, the American Endocrine Society) are not the relevant scientific community, they are politically active professional organizations. These organizations operate via consensus-seeking methodology (voting) and political ideologies (e.g., Critical Theory) rather than evidence-based scientific methodologies.

— ETHICAL RESTRICTIONS ON EXPERTS - WILL THERE BE A PROPER INVESTIGATION OF MISINFORMATION? : Experts in legal cases have an ethical obligation to honestly, fairly, and accurately disclose and discuss the international controversies regarding the safety, effectiveness, reliability, and credibility of the Gender Transition Industry. It is astonishing that in their expert declarations, Drs Schechter and Brown *failed* to disclose and discuss the controversies, complex issues, debates, and contrary national science review recommendations in this field. Dr Brown even swore in his declaration that… *"Nor is there **any** uncertainty or dispute in the medical field regarding the medical necessity of this care."* It is difficult to imagine a more inaccurate summary of the state of the embattled, experimental Transgender Treatment Industry. Will such mis-information be properly investigated by the relevant authorities?

20.   DR LAPPERT's RESEARCH NOTES:   To assist in my testimony in this case. I include my notes, references and citations documenting the depth and breadth of the serious

controversies in this field. Over the past few years, the glaring defects in the research

foundations of the Transgender Treatment Industry have been exposed for all the world to see.

> **Controversy** - 2015 Dutch Study by *Vrouenraets et al, Early Medical Treatment of Children and Adolescents With Gender Dysphoria: An Empirical Ethical Study,* Journal of Adolescent Health 57 (2015) 367e373. *...no consensus exists whether to use these early medical interventions.....*Results: Seven themes give rise to different, and even opposing, views *on treatment*: (1) *the lack of an explanatory model for GD*; (2) *the unknown nature of GD (normal variation?, social construct?, or mental illness?)*; (3) the role of physiological puberty in developing gender identity; (4) *the role of comorbidity [ with severe mental illnesses ]* ; (5) unknown possible *physical or psychological effects of (refraining from) early medical interventions*; (6) *child competence and decision making authority [ to give truly informed consent to be sterilized for experimental procedures? ]*; and (7) *the role of social context ...how GD is perceived.* Strikingly, the guidelines are debated both for being too liberal and for being too limiting. Conclusions: As long as *debate* remains on these seven themes and *only limited long-term data are available, there will be* **no** *consensus on treatment.* Therefore, more systematic interdisciplinary and (worldwide) multi-center research is required.    It is striking that Drs. Brown and Schechter somehow both failed to properly report this ongoing international debate within their claimed filed of expertise.

---

> **2011 - Dhejne** et al. (**2011**), Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden, PLOS ONE 6(2) e16885 ("Long Term"); See also, R. K. Simonsen et al. (2016), Long-Term Follow-Up of Individuals Undergoing Sex Reassignment Surgery: Psychiatric Morbidity & Mortality, Nordic J. of Psychiatry 70(4). Swedish follow-up study of patients who underwent sex-reassignment surgery over a 30-year period found a *suicide rate in the post-Sex Reassignment Surgery (SRS) population 19.1 times greater* — after affirmation treatment — than that of the controls; both studies demonstrated elevated mortality rates from medical and psychiatric conditions.

> **2021-2020 Carmichael** P, Butler G, Masic U, et al. Short-term outcomes of pubertal suppression in a selected cohort of 12 to 15 year old young people with persistent gender dysphoria in the UK. medRxiv 2020.12.01.20241653 ... Self-harm did NOT improve and "no changes in psychological function," meaning no improvement. (Also, "YSR [Youth Self Report] data at 36 months (n = 6) were not analyzed."... no significant effect on their psychological function, thoughts of self-harm, or body image, a study has found... children experienced reduced growth in height and bone strength by the time they finished their treatment at age 16. The findings, from a study of 44 children treated by the Gender Identity Development Service (GIDS) run by the Tavistock and Portman NHS Foundation Trust in London, have emerged as the trust prepares to appeal against a High Court ruling that led NHS England to pause referrals of under 16s for puberty blockers.

---

> **See, 2020  Bränström and Panchankis long term surgical results NO benefit (data**

**suggests and suggests an increased risk of serious suicide attempts)** …See also  See, Kalin, N.H., Reassessing Mental Health Treatment Utilization Reduction in Transgender Individuals After Gender-Affirming Surgeries: A Comment by the Editor on the Process by the Editor-in-Chief The American Journal of Psychiatry,  Am J Psychiatry 2020; 177:7 64; doi: 10.1176/appi.ajp.2020.20060803;  See also, Anckarsäter,  H., (MD, Ph.D. ) and Gillberg, C.,  (M.D., Ph.D. )  Methodological Shortcomings Undercut Statement in Support of Gender-Affirming Surgery, Am J Psychiatry 2020; 177:764–765; doi: 10.1176/appi.ajp.2020.19111117 .

---

**DEMOGRAPHICS…**  no biological explanation…   The radical change in patient demographics from early onset in boys to teen girls with rapid onset— has been termed late-, adolescent-, or rapid-onset gender dysphoria — has now been seen in every gender clinic in the western world, and there has been a huge surge in the number of cases. "National College Health Assessment: ACHA-NCHA s://www.acha.org/NCHA/ACHA-NCHA_Data/Publications_and_Reports/NCHA/Data/Publications_and_Reports.aspx?hkey=d5fb767c-d15d-4efc-8c41-3546d92032c5   See,   Kaltiala-Heino, Riittakerttu, Hannah Bergman, Marja Työläjärvi, and Louise Frisen. "Gender Dysphoria in Adolescence: Current Perspectives." Adolescent Health, Medicine and Therapeutics Volume9 (March 2018): 31–41. https://doi.org/10.2147/AHMT.S135432 See, Vries, Annelou L.C. de. "Challenges in Timing Puberty Suppression for Gender-Nonconforming Adolescents." Pediatrics 146, no. 4 (October 2020): e2020010611. https://doi.org/10.1542/peds.2020-010611. See, Zucker, Kenneth J. "Adolescents with Gender Dysphoria: Reflections on Some Contemporary Clinical and Research Issues." Archives of Sexual Behavior 48, no. 7 (October 2019): 1983–92. https://doi.org/ 10.1007/s10508-019-01518-8.
and reportedly Australia.

---

2020 See National Review for Great Britain (NICE),   Deborah Cohen and Hannah Barnes,   Evidence for puberty blockers use very low, says NICE at https:// www.bbc.com/news/health-56601386 [ "The evidence for using puberty blocking drugs to treat young people struggling with their gender identity is "very low", an official review has found. The National Institute of Health and Care Excellence (NICE) said existing studies of the drugs were small and "subject to bias and confounding".;

---

See, Asscheman H, Giltay EJ, Megens JA, et al. A long-term follow-up study of mortality in transsexuals receiving treatment with cross-sex hormones. *Eur J Endocrinol.* 2011;164:635-642.   *"There is no evidence that transition reduces suicide when we look past 10 years, and there is some suggestion that suicide rates may actually increase after the transition honeymoon phase is over,"* says Malone, stressing the importance of providing proper evaluation and appropriate psychological treatment for any suicidal tendencies. ( Supports the Branson conclusions after recantation and correction).

---

**Sweden** = Review of Gender dysphoria in children and adolescents: an inventory of the literature, SBU Policy Support no 307, 2019 www.sbu.se/en • registrator@sbu.se Contact SBU: Jan Adolfsson, Medical Advisor, Project Manager, jan.adolfsson@sbu.se,

English Proofreading: Project group and Jan Adolfsson, SBU [" No relevant randomized controlled (treatment outcome) trials in children and adolescents were found."]  ; See, also e.g., FINLAND Issues Strict Guidelines for Treating Gender Dysphoria at https://genderreport.ca/finland-strict-guidelines-for-treating-gender-dysphoria/.    In 2020, Finland reportedly became the first country in the world to issue <u>new guidelines</u> for this group of patients when it concluded similarly to the UK High Court that there is <u>a lack of quality evidence</u> to support the use of hormonal interventions in adolescents with gender dysphoria…. they also issued the guideline ordering "No surgical interventions are allowed for children under the age of 18". ). As the ***methodological quality of the studies was already poor*** based on the type of study, thus <u>no actual quality assessment or determination of the degree of evidence was performed.</u>"]  ;

**See, Cochrane Review** (See, Haupt, C., Henke, M. et. al., <u>Cochrane Database of Systematic Reviews</u> Review - Intervention, Antiandrogen or estradiol treatment or both during hormone therapy in transitioning transgender women, 28 November 2020.)

---

**See,** Griffin, L., Clyde, K., Byng, R., Bewley, S., Sex, gender and gender identity: a re-evaluation of the evidence. BJPsych Bulletin (2020) doi:10.1192/bjb.2020.73, Cambridge University Press,  21 July 2020,  the authors noted ***the hazardous error of mandating "affirmation treatments"*** — thus requiring the negligent practice of Confirmation Bias — rather than properly and carefully exploring alternative hypotheses — the standard, required ethical, medical  standard of practice. …  As Griffin discussed,  "Attempts to <u>properly</u> explore, formulate and treat coexisting mental illness in gender dysphoric populations, including that relating to childhood trauma, might be considered tantamount to 'conversion therapy'. Although mental illness is overrepresented in the trans population it is important to note that gender non-conformity itself is not a mental illness or disorder. ***As there is evidence that many psychiatric disorders persist despite positive affirmation and medical transition, it is puzzling why transition would come to be seen as a key goal rather than other outcomes, such as improved quality of life and reduced morbidity.*** When the phenomena related to identity disorders and the evidence base are uncertain, it might be wiser for the profession to admit the uncertainties. Taking a supportive, exploratory (psychotherapy) approach with gender-questioning patients should not be considered conversion therapy."… In addition, Griffin et al wrote:  "Transgender support groups have emphasized the risk of suicide. After controlling for coexisting mental health problems, studies show an increased risk of suicidal behaviour and self-harm in the transgender population, although ***underlying causality has not been convincingly demonstrated.***

---

**See,** Dyer, C., Puberty blockers do not alleviate negative thoughts in children with gender dysphoria, finds study   BMJ 2021; 372 doi: https://doi.org/10.1136/bmj.n356 (Published 08 February 2021) Cite this as: BMJ 2021;372:n356  [ Puberty blockers used to treat children aged 12 to 15 who have severe and persistent gender dysphoria had no significant effect on their psychological function, thoughts of self-harm, or body image, a study has found.  However, as expected, the children experienced reduced growth in height and bone strength by the time they finished their treatment at age 16]

---

See, e.g., Wold, A. (M.D., Ph.D.) Gender-Corrective Surgery Promoting Mental Health in Persons With Gender Dysphoria Not Supported by Data Presented in Article, Am J Psychiatry 2020; 177:768; doi: 10.1176/appi.ajp.2020.19111170.      [ among the individuals examined in the Branstrom study, the risk of being hospitalized for a suicide attempt was 2.4 times HIGHER if they had undergone gender-corrective surgery than if they had not.... the data presented in the Branstrom article do not support the conclusion that surgery is beneficial to mental health in individuals with gender dysphoria." ]
"Therefore, ... the data in the article ... ***OVERTURNS the authors' stated conclusions, suggesting that sex reassignment surgery is in fact associated with INCREASED mental health treatment*** See, Ring, A. (PhD) and Malone, W. , Confounding Effects on Mental Health Observations After Sex Reassignment Surgery, Am J Psychiatry 2020; 177:768–769; doi: 10.1176/appi.ajp.2020.19111169.

See, See, Van Mol, A., , Laidlaw, M. K., Grossman, M., McHugh, P. ,  Gender-Affirmation Surgery Conclusion Lacks Evidence, Am J Psychiatry 177:8, August 2020 ajp.psychiatryonline.org 765. "The study confirms the strong association between psychiatric morbidity and the experience of incongruity between gender identity and biological sex. However, the study does NOT demonstrate that either hormonal treatment or surgery has ANY effect on this morbidity. It seems that the main message of this article is that the incidence of mental health problems and suicide attempts is especially HIGH in the year AFTER the completion of gender-affirming surgery  [ It is telling that the authors some how ignored this most essential finding ] ..." See,  Curtis, D. (M.D., Ph.D. ), Study of Transgender Patients: Conclusions Are Not Supported by Findings, Am J Psychiatry 2020; 177:766; doi: 10.1176/appi.ajp.2020.19111131.

See,  Malone, W. and Roman, S. , Calling Into Question Whether Gender-Affirming Surgery Relieves Psychological Distress, Am J Psychiatry 2020; 177:766–767; doi: 10.1176/appi.ajp.2020.19111149.      "Bränström and Pachankis study on mental health treatment and suicide attempts ... is misleading because the study design is flawed." "The authors first found what was already known ... the rate of psychiatric morbidity is much higher in persons with gender dysphoria compared with the general population (both before AND after "transitioning"). The authors then explored if the risk for mental health treatment changes as a function of years since starting HORMONAL treatment. They find NO effect (odds ratio = 1.0), but they do find a trend toward INCREASED risk of suicide attempts as a function of years since starting [ gender affirmation ] HORMONAL treatment. They somehow failed to publish this essential finding.
    See,  Landén, M. ( M.D., Ph.D. ) The Effect of Gender-Affirming Treatment on Psychiatric Morbidity Is Still Undecided, Am J Psychiatry 2020; 177:767–768; doi: 10.1176/appi.ajp.2020.19111165. this conclusion is not supported by the data presented in the article.

See, Bränström, R. and Pachankis, J. ,  Toward Rigorous Methodologies for Strengthening Causal Inference in the Association Between Gender-Affirming Care and Transgender Individuals' Mental Health: Response to Letters, Am J Psychiatry 2020; 177:769–772; doi: 10.1176/appi.ajp.2020.20050599.

---

2020 - Sweden, following a national review of transgender science,  published a new guideline that is NOT consistent with WPATH protocols nor the opinions of Drs Schechter and Brown in this case.  [  https://genderreport.ca/finland-strict-guidelines-

for-treating-gender-dysphoria/    The SWEDISH NATIONAL GUIDELINES appear quite contrary to the opinions of Drs Brown and Schechter and WPATH.

---

2020 - Finland following a review of transgender science, became the first country in the world to issue new guidelines for this group of patients when it concluded similarly to the UK High Court that *there is a lack of quality evidence to support the use of hormonal interventions in adolescents with gender dysphoria*. This new Finnish guidance *prioritizes psychological therapy over treatment with hormones or surgery* and suggests different care plans for early-onset vs late-onset childhood gender dysphoria.
The 2020 Finland guidelines state *"Only limited research has been conducted on transgender identity and other gender identity conflicts, and comparative studies are very rare."*] The Finland National Guidelines appear quite contrary to the opinions of Drs Brown and Schechter and WPATH.

See, https://genderreport.ca/finland-strict-guidelines-for-treating-gender-dysphoria/ Finland Clinical Guidelines and Conclusions Three reports were created by COHERE in Finland. The report "Medical treatment methods for dysphoria associated with variations in gender identity in minors – recommendation" clarifies the roles of different healthcare providers in a situation where a minor is uncertain about their gender identity. They also produced general recommendations for the treatment of transgender people, which applies to adults. And interestingly, a third and separate set of recommendations for the treatment of gender dysphoria related to non-binary people and people with gender identities other than opposite-sex gender identities. The summaries are available for download here:
Summary-transgender_enDownload
Summary_minors_enDownload
Summary_non-binary_enDownload

---

21.    **Expert Report Limitations:**    My opinions and hypotheses in this matter are —

as in all expert witness reports — subject to the limitations of documentary and related evidence,

the impossibility of absolute predictions, as well as the limitations of social, biological, and

medical science. All opinions have been offered to a reasonable degree of medical certainty. I

have not met with, nor personally interviewed, anyone in this case. As always, I have no expert

opinions regarding the veracity of witnesses in this case. I have not yet reviewed all of the

evidence in this case and my opinions are subject to change at any time as new information

becomes available to me. Only the trier of fact can determine the credibility of witnesses and

how scientific research may or may not be related to the specific facts of any particular case. In

my opinion, a key role of an expert witness is to help the court, lawyers, parties, and the public understand and apply reliable scientific, technical, and investigative principles, hypotheses, methods, and information. I have transmitted this confidential expert report directly to <u>attorney John G. Knepper, J.D.</u> for distribution as consistent with the laws of the appropriate jurisdiction for this case.

**CONFIDENTIAL INFORMATION SECTION BELOW**







Case 1:19-cv-00272-LCB-LPA   Document 209-2   Filed 02/02/22   Page 51 of 58
**JA1983**





Case 1:19-cv-00272-LCB-LPA   Document 209-2   Filed 02/02/22   Page 53 of 58



**JA1986**







Pursuant to 28 U.S.C § 1746, I declare under penalty of perjury under the laws of the United

States of America that the foregoing is true and correct.


Date: _____


Signed: _____    **May 1, 2021**

**Patrick W. Lappert, MD**

# EXHIBIT 2

Case 1:19-cv-00272-LCB-LPA   Document 209-3   Filed 02/02/22   Page 1 of 577



Deposition of:

# Patrick Lappert, M.D.

*September 30, 2021*

In the Matter of:

# Kadel, et al vs. Folwell

Veritext Legal Solutions

800-734-5292 | calendar-dmv@veritext.com |

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2       FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

3

4

5

6

7       CIVIL ACTION NO.:  1:19-cv-272-LCB-LPA

8

9       MAXWELL KADEL, et al.

10               Plaintiffs

11

12       v.

13

14       DALE FOLWELL, et al.

15               Defendants

16

17

18       REMOTE VIDEOTAPED VIDEOCONFERENCE

19            DEPOSITION TESTIMONY OF:

20            PATRICK LAPPERT, M.D.

21             September 30, 2021

22

23

1              A P P E A R A N C E S

2

3     FOR THE PLAINTIFFS (via remote

4     videoconference):

5

6     Dmitriy Tishyevich, Esq.

7     MCDERMOTT, WILL & EMERY

8     One Vanderbilt Avenue

9     New York, New York  10017

10    dtishyevich@mwe.com

11

12    Tara L. Borelli, Esq.

13    LAMBDA LEGAL DEFENSE AND EDUCATION FUND

14    158 West Ponce de Leon Avenue, Suite 105

15    Decatur, Georgia  30030

16    tborelli@lambdalegal.com

17

18    Omar Gonzalez-Pagan, Esq.

19    LAMBDA LEGAL DEFENSE AND EDUCATION FUND

20    120 Wall Street, 19th Floor

21    New York, New York  1005

22    ogonzalez-pagan@lambdalegal.com

23

```
 1      FOR THE DEFENDANTS (via remote
 2      videoconference):
 3
 4      John G. Knepper, Esq.
 5      LAW OFFICE OF JOHN G. KNEPPER LLC
 6      1720 Carey Avenue, Suite 590
 7      Cheyenne, Wyoming  82001
 8      john@knepperllc.com
 9
10      Kevin G. Williams, Esq.
11      BELL, DAVIS & PITT
12      100 North Cherry Street, Suite 600
13      Winston-Salem, North Carolina  27101
14      kwilliams@belldavispitt.com
15
16
17      ALSO PRESENT (via remote
18      videoconference):
19
20      Andrew Baker, Videographer
21
22
23
```

```
 1                    I N D E X

 2

 3    EXAMINATION BY:                      PAGE

 4    Mr. Tishyevich                         11

 5    Mr. Knepper                           472

 6    REEXAMINATION BY:

 7    Mr. Tishyevich                        489

 8

 9

10                  E X H I B I T S

11

12    FOR THE PLAINTIFFS:                  MARKED

13    Exhibit 1    Lappert Expert Report      12

14    Exhibit 2    ABPlasticSurgery.org       27

15    Exhibit 3    Brandt - Lappert Declaration  34

16    Exhibit 4    Brandt - Supplemental Order,  37

17                 08/02/2021

18    Exhibit 5    Utah Legislature - Answers    55

19                 for Joint Interim Committee

20    Exhibit 6    "Alabama bill that would      62

21                 criminalize treatment for

22                 transgender minors headed to

23                 full Alabama Senate,"
```

Page 5

1              rocketcitynow.com

2    Exhibit 7    ASPS - "State Focus on        108

3                 Gender Affirmation

4                 Intensifies"

5    Exhibit 8    ASPS - 2021 State Policy       116

6                 Priorities

7    Exhibit 9    Lappert Resumé                 127

8    Exhibit 10   Code of Ethics of the          171

9                 American Society of Plastic

10                Surgeons

11   Exhibit 11   Federal Register, Vol, 59,     223

12                No. 22 - November 18, 1994

13   Exhibit 12   FDA, Understanding             230

14                Unapproved Use of Approved

15                Drugs "Off Label"

16   Exhibit 13   FDA, "Off-Label" and           232

17                Investigational Use of

18                Marketed Drugs, Biologics,

19                and Medical Devices

20   Exhibit 14   American Academy of            239

21                Pediatrics Policy Statement,

22                Off-Label Use of Drugs in

23                Children

Page 6

1       Exhibit 15   Yackey, Off-label Medication    256
2                    Prescribing Patterns in
3                    Pediatrics: An Update
4       Exhibit 16   FDA Botox Cosmetic              263
5                    2017-10-02 Approval Letter
6       Exhibit 17   Sugrue 2019, Levels of          299
7                    Evidence in Plastic and
8                    Reconstructive Surgery
9                    Research: Have We Improved
10                   Over the Past 10 Years?
11      Exhbiit 18   Reversal Surgery in             326
12                   Regretful Male-to-Female
13                   Transsexuals After Sex
14                   Reassignment Surgery
15                   (Djordjevic)
16      Exhibit 19   (Exhibit number not used)       ---
17      Exhibit 20   Wiepjes 2018, The Amsterdam     339
18                   Cohort of Gender Dysphoria
19                   Study (1972-2015)
20      Exhibit 21   Wilson 2017, Regret In          355
21                   Surgical Decision Making: A
22                   Systematic Review of Patient
23                   and Physician Perspectives

Page 7

1       Exhibit 22   Exposito-Campos, A Typology    361
2                    of Gender Detransition and
3                    Its Implications for
4                    Healthcare Providers
5       Exhibit 23   BCBS NC - Corporate Medical    375
6                    Policy, update July 2021
7       Exhibit 24   Dhejne, Long-Term Follow-Up    388
8                    of Transsexual Persons
9                    Undergoing Sex Reassignment
10                   Surgery: Cohort Study in
11                   Sweden
12      Exhibit 25   Finnish Guidelines 2020        394
13                   Minors, Unofficial
14                   Translation
15      Exhibit 26   WPATH Standards of Care,       396
16                   Version 7
17      Exhibit 27   Carmichael, Short-term         411
18                   outcomes of pubertal
19                   suppression in a selected
20                   cohort of 12 to 15 year old
21                   young people with persistent
22                   gender dysphoria in the UK
23      Exhibit 28   2020 Cochrane Database of      414

```
 1              Systematic Reviews
 2      Exhibit 29   Tradition 70/30 PPO Plan      419
 3                   Benefits Booklet, 2017
 4      Exhibit 30   Aetna, Gender Affirming       427
 5                   Surgery Policy
 6      Exhibit 31   Cigna Medical Coverage        430
 7                   Policy, Treatment of Gender
 8                   Dysphoria
 9      Exhibit 32   United Healthcare Medical     434
10                   Policy, Gender Dysphoria
11                   Treatment
12      Exhibit 33   Lappert Denver Conference     451
13                   Presentation
14      Exhibit 34   Plastic surgeon: Sex-change   463
15                   operation 'utterly
16                   unacceptable' and a form of
17                   'child abuse',
18                   LifeSiteNews.com
19
20          (Exhibits attached to transcript.)
21
22
23
```

Page 9

1            I, Lane C. Butler, a Court

2     Reporter and Notary Public, State of

3     Alabama at Large, acting as Notary,

4     certify that on this date, pursuant to

5     the Federal Rules of Civil Procedure,

6     there came before me via remote

7     videoconference from Decatur, Alabama,

8     commencing at approximately 8:30 a.m.

9     Central, on the 30th day of September,

10    2021, PATRICK LAPPER, M.D., witness in

11    the above cause, for oral examination,

12    whereupon the following proceedings were

13    had:

14

15            THE VIDEOGRAPHER:  Good morning.

16    We are going on the record at 8:31 a.m.,

17    Thursday, September 30th, 2021.  This is

18    Media Unit 1 of the videorecorded

19    deposition of Dr. Patrick Lappert as

20    taken by counsel for plaintiff in the

21    matter of Kadel, et al. v. Folwell, et

22    al., filed in the United States District

23    Court for the Middle District of North

1    Carolina, Civil Action No.

2    1:19-cv-272-LCB-LPA.

3         This deposition is being

4    recorded remote via Zoom located in

5    Decatur, Alabama.  My name is Andrew

6    Baker from the firm Veritext Legal

7    Solutions.  I am the videographer.  The

8    court reporter is Lane Butler, also from

9    Veritext Legal Solutions.

10        Will counsel now state their

11   appearance and affiliations for the

12   record.  The court reporter will swear in

13   the witness.  Thank you.  We may proceed.

14        MR. TISHYEVICH:  This is Dmitriy

15   Tishyevich from McDermott, Will & Emery,

16   LLP, for plaintiffs.

17        MR. KNEPPER:  My name is John

18   Knepper.  I represent three of the

19   defendants in this matter: the North

20   Carolina State Health Plan for Teachers

21   and State Employees; Dale Folwell, the

22   treasurer for the State of North

23   Carolina; and Dee Jones, the executive

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 11

```
 1      administrator of the North Carolina State
 2      Health Plan.  I'll be defending Dr.
 3      Lappert's deposition.
 4
 5              PATRICK LAPPERT, M.D.,
 6          having first been duly sworn,
 7        was examined and testified as follows:
 8
 9      EXAMINATION BY MR. TISHYEVICH:
10          Q.    Good morning, Doctor.
11          A.    Good morning, sir.
12          Q.    State your full name for the
13      record.
14          A.    Patrick Walter Lappert.
15          Q.    Any reason you're not able to
16      give complete and truthful testimony
17      today?
18          A.    There is no reason.
19          Q.    You've been retained as an
20      expert by defendants in this case;
21      correct?
22          A.    I have.
23          Q.    You've prepared an expert
```

**DEPOSITION OF PATRICK LAPPERT, M.D.**

```
1     report; right?
2          A.    I have.
3          Q.    So, I've premarked Exhibit 1.
4     Open that, and let me know when you have
5     it.
6     (Exhibit 1 was marked for identification
7     and is attached.)
8          A.    Okay.  I have it.
9          Q.    This report contains all the
10    opinions that you intend to offer in this
11    case; correct?
12         A.    It does.
13         Q.    All right.  Without telling me
14    any conversations that you had with
15    counsel, what did you do to prepare for
16    your deposition today?
17         A.    Well, I reviewed the -- the
18    documents.  I guess it's called the
19    complaint.  I reviewed the patient
20    records.  And then, I reviewed the
21    literature, pertinent journal articles,
22    publications, and had conversations with
23    -- with counsel, Mr. Kadel [sic], and his
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 13

```
1    staff at various times.
2        Q.   When you say "patient records,"
3    are you talking about the medical records
4    for the individual plaintiffs?
5        A.   Yes.  The ones that were -- that
6    were given to me to review.
7        Q.   And when you say "the
8    literature," are you referring to some of
9    the studies that you cite in your report?
10       A.   Yes.
11       Q.   Have you reviewed any studies --
12   strike that.
13           In preparing for your deposition
14   today, have you reviewed additional
15   studies that are not cited in your
16   report?
17       A.   No.  The report contains all of
18   the studies that I -- that I reviewed
19   that I consider pertinent.  I glossed
20   some but didn't see them as germane.  So
21   all the ones that were -- that were
22   germane to my opinion are -- are in the
23   -- in the document.
```

**DEPOSITION OF PATRICK LAPPERT, M.D.**

Page 14

```
1        Q.   Understood.  And you mentioned
2    that you met with or spoke with Mr.
3    Knepper in preparing for today?
4        A.   I have.
5        Q.   Okay.  Again, without disclosing
6    any substance of the conversation, how
7    many times did you speak or meet with
8    him?
9        A.   Three or four times, I think.
10       Q.   And when did those conversations
11   take place?
12       A.   Well, as recently as yesterday
13   evening and I think a couple of meetings
14   back in May, I think it was.  I'd have to
15   look at my calendar, but.
16       Q.   Last evening, you spoke --
17   strike that.
18            You know that Dr. Hruz was
19   deposed yesterday; right?
20       A.   I'd heard, yes.
21       Q.   And so before yesterday, when
22   was the last time that you spoke with Mr.
23   Knepper to prepare for your deposition?
```

**DEPOSITION OF PATRICK LAPPERT, M.D.**

Page 15

```
 1        A.   I want to say it's a couple of
 2   weeks ago.  I'm not exactly sure.
 3        Q.   How long was the conversation
 4   with Mr. Knepper last night?
 5        A.   A little less than an hour.
 6        Q.   Did he provide you with copies
 7   of any of the exhibits that were used at
 8   Dr. Hruz's deposition?
 9        A.   No, he did not.
10        Q.   Did he provide you with any --
11   any portions of that deposition
12   transcript?
13        A.   No.
14        Q.   And then going in reverse
15   chronological order, you mentioned you
16   may have spoken a couple of weeks ago?
17        A.   I think.  I don't know exactly
18   -- I don't know exactly when that was,
19   Mr. Tishyevich.  I want to say three
20   weeks ago perhaps.  I'm not exactly sure.
21        Q.   Do you recall roughly how long
22   that conversation was?
23        A.   About the same duration.  I
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 16

1    think it was perhaps an hour, perhaps an
2    hour.
3        Q.   Okay.  All right.  You -- in the
4    course of -- strike that.
5             In the course of working on this
6    case, have you ever communicated with Dr.
7    Hruz?
8        A.   Not directly.  I've spoken with
9    Dr. Hruz, but in the matter at hand, I
10   have not spoken with him about it.
11            MR. TISHYEVICH:  For the court
12   reporter, that's H-R-U-Z.  And I'll try
13   and spell things as we go to make it a
14   little easier.
15       Q.   How about Dr. McHugh?
16   M-C-H-U-G-H.  Have you spoken with him in
17   the course of working on this case?
18       A.   I've never spoken directly to
19   him, no.
20       Q.   How about Dr. Levine?
21   L-E-V-I-N-E.
22       A.   I have not spoken with Dr.
23   Levine.

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 17

```
1        Q.   But you have met Dr. Hruz before
2   working on this case; right?
3        A.   Yes.
4        Q.   And is the same true for Dr.
5   Levine?
6        A.   I've never met Dr. Levine.
7        Q.   All right.  About how many hours
8   do you estimate you've spent working on
9   your expert report?
10       A.   Somewhere around maybe 60 hours.
11   I could -- I could look for that number,
12   but I'm going to estimate it at about 60
13   hours, something like that.
14       Q.   You're aware that the individual
15   plaintiffs in this case have been
16   deposed; right?
17       A.   Yes, I've heard.
18       Q.   Were you provided with
19   deposition transcripts or any portion of
20   their testimony?
21       A.   I have -- I have not seen those,
22   no.
23       Q.   Okay.  You're aware that other
```

USCA4 Appeal: 22-1721    Doc: 41-5    Filed: 08/31/2022    Pg: 134 of 705

## DEPOSITION OF PATRICK LAPPERT, M.D.

1    experts in this case have also already
2    been deposed?
3        A.   Yes.
4        Q.   Have you been provided with
5    deposition transcripts or any portion of
6    their deposition testimony?
7        A.   I -- I saw a transcript of Dr.
8    McHugh's.
9        Q.   Was that the only tran- --
10   strike that.
11           Was Dr. McHugh's transcript the
12   only expert deposition transcript you've
13   seen?
14       A.   It's the only one I've read.  I
15   -- I think that -- yeah, I think it's the
16   only one I read.  Yes, sir.
17       Q.   Okay.  All right.  So throughout
18   your report, you use this term --
19       A.   Could I amend that last answer?
20       Q.   Of course.
21       A.   I -- I did read portions of Dr.
22   Brown's transcript, actually, some days
23   back.  My -- my apologies.

Case 1:19-cv-00272-LCB-LPA   Document 209-3   Filed 02/02/22   Page 20 of 577

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 19

1    Q.    No.    And I should say that.    If
2    at any point in time in your deposition
3    you want to go back and amend your
4    answer, that is totally fine.
5    A.    Thank you.
6    Q.    Okay.    So in your report, you
7    use this term "transgender treatment
8    industry."    Right?
9    A.    Yes.
10    Q.    And you and Dr. Levine and Dr.
11    McHugh all use this term in your reports.
12    Were you aware of that?
13    A.    Oh, I was aware that the -- no,
14    I wasn't aware that they were using it,
15    actually.
16    Q.    Is it coincidental that the
17    three of you are using this term?
18    A.    I -- I think it's sort of
19    becoming a common term lately.    I don't
20    know where it came from.    I was trying to
21    think about that.    I don't know who
22    originated it, but I've -- I don't know
23    even if it was me that originated it,

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 20

```
1     actually, since I've been speaking about
2     this subject for some time now.  But it
3     seemed like an apt term, so it doesn't
4     surprise me that others are using it.
5          Q.   You don't know who came up with
6     that term?
7          A.   I don't.
8          Q.   It's possible that it was you?
9          A.   It wouldn't surprise me.
10         Q.   And you mentioned that it's
11    becoming more commonly used.  Is that
12    right?
13         A.   It seems to be.  I don't know.
14    I don't know how common it is, but it's
15    kind of a small circle of people talking
16    about these things.
17         Q.   Are you aware of a single
18    peer-reviewed scientific article that has
19    used the term "transgender treatment
20    industry"?
21         A.   I am not.
22         Q.   Do you know what PubMed is?
23    P-U-B-M-E-D.
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 21

1      A.   Yes.

2      Q.   It's a search engine maintained

3  by the National Institute of Health;

4  right?

5      A.   Yes.   That's my understanding.

6      Q.   It's a search engine for

7  scientific articles, basically; right?

8      A.   Yes.

9      Q.   So I'll represent to you that I

10  ran a search in PubMed for the phrase

11  transgender treatment industry, in

12  quotation marks, and came back with zero

13  results for that phrase.

14          MR. KNEPPER:  Objection to form.

15      Q.   Do you find that surprising?

16      A.   No.

17      Q.   Okay.  What does that lack of

18  results tell you about whether this term

19  is a commonly used term in this field?

20          MR. KNEPPER:  Objection to form.

21      A.   I wouldn't expect it to be a

22  commonly used term, and it doesn't

23  surprise me that you didn't find it.

**DEPOSITION OF PATRICK LAPPERT, M.D.**

Page 22

1      Q.    Yeah.   "Transgender treatment

2      industry" is not a commonly used term in

3      the field of treatment and diagnosis of

4      gender dysphoria; right?

5            MR. KNEPPER:  Objection to form.

6      A.    I would agree.

7      Q.    Yeah.  It's a term that, as far

8      as I can tell, is fairly idiosyncratic to

9      the opinions that you and the other

10     defendant experts are using in this case.

11     Does that sound right?

12           MR. KNEPPER:  Objection to form.

13     A.    That sounds right to me, yeah.

14     Q.    Okay.  Look at page 1 of your

15     expert report, Exhibit 1.

16     A.    All right.

17     Q.    I see it says, "Declaration of

18     Patrick Lappert, MD."  You see that?

19     A.    Yes.

20     Q.    Under that, it says, "Board

21     Certified in Surgery and Plastic

22     Surgery."  Do you see that?

23     A.    I do.

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 23

1          Q.   Let's talk about your
2     certifications.  Let's start with plastic
3     surgery.  You originally received your
4     board certification in plastic surgery in
5     1997; correct?
6          A.   That's correct.
7          Q.   Then you got recertified in
8     2008; correct?
9          A.   That's correct.
10         Q.   That board certificate was only
11    valid for ten years; correct?
12         A.   Correct.
13         Q.   And your plastic board -- strike
14    that.
15              And your plastic surgery board
16    certificate expired at the end of 2018;
17    correct?
18         A.   Correct.
19         Q.   Well, why did you decide not to
20    renew your board certificate past 2018?
21         A.   Well, I'm a -- I'm a solo
22    practitioner, and the main reason for
23    maintaining that expensive certificate

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 24

```
 1    was that many hospitals required it in
 2    order to have privileges.  Several years
 3    ago, a lot of hospitals started dropping
 4    that requirement, so it didn't make sense
 5    for a surgeon who is within three years
 6    of retirement to expend all that money
 7    and time to maintain a certification that
 8    was no longer necessary for me in terms
 9    of maintaining my practice.
10         Q.   Do you currently have admitting
11    privileges at any hospital?
12         A.   No.
13         Q.   When was the last time you had
14    admitting privileges in any hospital?
15         A.   A year ago.
16         Q.   What hospital was that?
17         A.   Crestwood Hospital, Huntsville,
18    Alabama.
19         Q.   So within the last year at
20    least, I take it you haven't performed
21    any surgeries at a hospital.  Right?
22         A.   That's correct.  A -- a year
23    ago, I retired from active surgical
```

**DEPOSITION OF PATRICK LAPPERT, M.D.**

1    practice.

2        Q.    Were you doing surgeries in 2019

3    after your plastic -- plastic surgery

4    board certificate expired?

5        A.    Yes.

6        Q.    When -- just can we pin this

7    down more?  What -- what month do you

8    think you stopped performing surgeries?

9        A.    Let's see.  This is November of

10   2021, so it would have been August of

11   2020.

12       Q.    All right.  You are not

13   currently board-certified in plastic

14   surgery; correct?

15       A.    Correct.

16       Q.    And you have not been

17   board-certified in plastic surgery since

18   2018; correct?

19       A.    Correct.

20       Q.    For over two and a half years at

21   this point; right?

22       A.    Correct.

23       Q.    So this page 1 of your report

## DEPOSITION OF PATRICK LAPPERT, M.D.

1    says that you're board-certified in
2    plastic surgery.  Do you think it's
3    appropriate for you to make that
4    representation even though you don't have
5    an active certification?
6           MR. KNEPPER:  Objection, form.
7       A.   Well, appropriate in terms of --
8    I don't understand the question.
9       Q.   Let me be more specific.
10      A.   Okay.
11      Q.   Do you know what the Amer- --
12   I'll go back.
13           You know what the American Board
14   of Plastic Surgery is; right?
15      A.   Certainly.
16      Q.   Do you know what the American
17   Board of Plastic Surgery has to say about
18   doctors who represent that they're
19   board-certified when they don't have an
20   active certification?
21           MR. KNEPPER:  Objection, form.
22      A.   They discourage it.  I -- I
23   suspect that the -- the document -- well,

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 27

1    I didn't prepare that -- that particular

2    part of the document, although I signed

3    it, certainly.  But I see your point,

4    yes.

5        Q.   Okay.  I'm going to introduce

6    another exhibit.  You'll see it in a

7    minute.  Let me know when you have it,

8    Doctor.

9    (Exhibit 2 was marked for identification

10   and is attached.)

11       A.   I have it.

12       Q.   This is a printout from the -- a

13   web page from the American Board of

14   Plastic Surgery.  Go to page 2.

15       A.   All right.  I'm there.

16       Q.   Middle of the page, it says in

17   bold letters, "Guidelines for Stating

18   Certification Status."  Do you see that?

19       A.   I do.

20       Q.   Look at the third paragraph.

21       A.   All right.

22       Q.   It says, "ABPS does not mandate

23   the specifics of how diplomates state

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 28

1    their certification, except to assert

2    that diplomates should not state or imply

3    that they are certified if their

4    certification has expired."

5           Do you see that?

6        A.    I do.

7        Q.    All right.  You understand that

8    under this guidance from the ABPS, you

9    are not supposed to be representing that

10   you are board-certified in plastic

11   surgery because you do not have a current

12   certification; correct?

13          MR. KNEPPER:  Objection, form.

14       A.    Yes, I understand it.

15       Q.    Let's look at what else it says.

16   Towards the bottom of page 2, it says,

17   "We ask that you follow these guidelines

18   throughout your career to accurately

19   state your ABPS certification."  Do you

20   see that?

21       A.    I do.

22       Q.    The first bullet says,

23   "Diplomates of ABPS must accurately state

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 29

```
 1      their certification status at all times."
 2      Do you see that?
 3           A.   I do.
 4           Q.   And you understand what this
 5      means; right?
 6           A.   I do.
 7                MR. KNEPPER:  Objection, form.
 8           Q.   Page 3, next bullet says,
 9      "Diplomates with expired time-limited
10      certification or those whose
11      certification is revoked may not claim
12      Board certification by ABPS and must
13      revise all descriptions of their
14      qualifications accordingly."  Right?
15                MR. KNEPPER:  Objection to form.
16           A.   Yes.  Yes, I see that.
17           Q.   And you understand what that
18      means; right?
19                MR. KNEPPER:  Objection to form.
20           A.   I do.
21           Q.   Your expert report is not in
22      compliance with this guidance from the
23      ABPS; correct?
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 30

```
 1              MR. KNEPPER:  Objection, form.
 2         A.    The -- the one line there under
 3    my name is not in compliance.  That's
 4    correct.
 5         Q.    And the same is true of your CV;
 6    right?
 7         A.    Well, the CV states that I have
 8    been board-certified by the American
 9    Board of Surgery and have been
10    board-certified by the ABPS in 1997 and
11    2008, yes.  Have been.
12         Q.    And look back at this page 3
13    from the ABPS.  It says, "When a
14    physician misrepresents certification
15    status, ABPS may notify local
16    credentialing bodies, licensing bodies,
17    law enforcement agencies and others."  Do
18    you see that?
19         A.    I do.
20         Q.    All right.  And you understand
21    what this means; right?
22              MR. KNEPPER:  Objection to form.
23         A.    Yes.
```

# DEPOSITION OF PATRICK LAPPERT, M.D.

Page 31

```
 1        Q.   Okay.  Are you going to update
 2   your expert report so that it comports
 3   with this guidance from the ABPS?
 4        MR. KNEPPER:  Objection to form.
 5        A.   Certainly.
 6        Q.   Okay.  So that's plastic
 7   surgery.  Let's talk about your board
 8   certification in surgery next.  So, go
 9   back to your expert report, page 1.
10        A.   Okay.
11        Q.   You received your board
12   certification in surgery in 1992;
13   correct?
14        A.   Was it '92 or '91?  '92, yes,
15   sir.
16        Q.   And that certification expired
17   in 2002; right?
18        A.   Yes.
19        Q.   And you had not renewed that
20   after 2002; right?
21        A.   Correct.
22        Q.   You're not currently
23   board-certified in surgery; correct?
```

**DEPOSITION OF PATRICK LAPPERT, M.D.**

Page 32

1          A.    Correct.

2          Q.    You have not been

3      board-certified in surgery since 2002;

4      correct?

5          A.    Since 2002, yes, sir.

6          Q.    That's over nineteen years;

7      right?

8                So, I showed you this guidance

9      from the American Board of Plastic

10     Surgery.  How about the American Board of

11     Surgery?  What do you think they have to

12     say about doctors who make these kind of

13     representations?

14               MR. KNEPPER:  Objection, form.

15         A.    I'm sure it's probably the same.

16         Q.    Yeah.  Would it surprise you

17     that the American Board of Surgery does

18     not allow doctors to represent that they

19     are board-certified in surgery unless

20     they have a current board certificate?

21               MR. KNEPPER:  Objection, form.

22         A.    It would not surprise me, no.

23         Q.    All right.  You are currently

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 33

1      serving as an expert in another case,

2      Brandt v. Rutledge.  B-R-A-N-D-T.

3      Correct?

4          A.   Yes.

5          Q.   That's a case pending in federal

6      court in Arkansas; right?

7          A.   Correct.

8          Q.   In that case, you were retained

9      by the defendants, by the State of

10     Arkansas; right?

11         A.   Yes.

12         Q.   Dr. Hruz, who is one of the

13     defendants -- strike that.  Dr. Hruz, who

14     is one of the experts in this case, is

15     also serving as an expert for defendants

16     in that Brandt case; right?

17         A.   That's my understanding, yes.

18         Q.   And the same is true for Dr.

19     Levine; right?

20         A.   I didn't know about Dr. Levine,

21     but.

22         Q.   And you submitted an expert

23     declaration in that Brandt case in July

# DEPOSITION OF PATRICK LAPPERT, M.D.

Page 34

```
 1      of this year; correct?
 2          A.   I believe that was when I
 3      submitted it, yes.
 4          Q.   All right.  Let's look at it.
 5      And let me know when you get the exhibit,
 6      Doctor.
 7      (Exhibit 3 was marked for identification
 8      and is attached.)
 9          A.   Here it is.  Let's see.  All
10      right.
11          Q.   All right.  Page 1 says,
12      "Declaration of Dr. Patrick Lappert."
13      That's you; right?
14          A.   Yes.
15          Q.   Fair to say that there is at
16      least some overlap between the opinions
17      that you're offering in this case and the
18      opinions that you're offering in that
19      Brandt case; right?
20              MR. KNEPPER:  Form.
21          A.   Well, given that the subject
22      matter is the same, I would expect some
23      overlap, yes, sir.
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

1      Q.   Go to page 5 of that
2    declaration.
3      A.   All right.  I'm there.
4      Q.   You say under Section II,
5    "'Gender affirming' treatments are
6    experimental."  Right?
7      A.   Yes.
8      Q.   It's basically the same opinion
9    that you offered in this case; right?
10     A.   Yes, sir.
11     Q.   Go to page 29 of your
12   declaration.  See there's a paragraph 63?
13     A.   Yes, sir.
14     Q.   And toward the end of that
15   paragraph, you talk about the national
16   reviews in England, Sweden, and Finland
17   and other reviews like Cochrane, Griffin,
18   and Carmichael.  You see that?
19     A.   Yes, sir.
20     Q.   You relied -- you relied on all
21   those studies for your opinions in this
22   case as well; right?
23     A.   I did.

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 36

```
1        Q.    Okay.  Go to page 38 of your
2   declaration.  Do you see that it's the
3   section titled "Concluding Opinions" and
4   it goes through the next --
5        A.    Yes, sir.
6        Q.    -- few pages?
7             We don't need to go through
8   these individually, but you agree there's
9   a lot of overlap between the opinions
10  you're offering in that Brandt case and
11  the opinions you're offering in this
12  case; right?
13             MR. KNEPPER:  Objection to form.
14       A.    Yes.
15       Q.    The Brandt case involves a
16  challenge to an Arkansas law which bans
17  doctors from providing various types of
18  gender-affirming treatments to
19  adolescents; correct?
20       A.    Yes.
21       Q.    Including puberty blockers and
22  cross-sex hormones and gender-affirming
23  surgery; correct?
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 37

1         A.    Yes.

2               MR. KNEPPER:  Objection.

3         Q.    Have you kept up with what's

4     going on in that case in Arkansas?

5               MR. KNEPPER:  Objection, form.

6         A.    I haven't heard anything perhaps

7     in the last several weeks.

8         Q.    Well, are you aware that in July

9     of this year, the judge in that case held

10    that the State is prohibited from

11    enforcing the ban while the case is being

12    decided?

13        A.    I've heard that.

14        Q.    All right.  And as part of that

15    order, the judge made some factual

16    findings.  Are you aware of that?

17        A.    I'm not -- haven't read the

18    details.

19        Q.    All right.  Let me show you.

20        A.    Okay.

21        Q.    Let me introduce one more

22    exhibit.

23        (Exhibit 4 was marked for identification

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 38

1       and is attached.)

2           A.   I have it now.

3           Q.   Okay.  So, this is a

4       supplemental order from Judge Moody in

5       Arkansas dated August 2nd, 2021.  Do you

6       see that?

7           A.   I see that, yes.

8           Q.   This first paragraph says,

9       "After further consideration, the Court

10      supplements the ruling made at the

11      conclusion of the July 21, 2021 hearing

12      to include the following findings."  Do

13      you see that?

14          A.   I do.

15          Q.   By the way, did you testify live

16      at that July 2021 hearing?

17          A.   No.

18          Q.   Do you know if any of the other

19      experts testified live at that hearing?

20          A.   I don't know.

21          Q.   Go to page 7.

22          A.   All right.

23          Q.   All right.  Look at the last

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 39

1  paragraph.

2      A.   Okay.

3      Q.   The second sentence in that last

4  paragraph says, "Gender-affirming

5  treatment is supported by medical

6  evidence that has been subject to

7  rigorous study."  Right?  Do you see

8  that?

9      A.   That's what it says, yes, sir.

10      Q.   And that finding by the Court in

11  Arkansas is contrary to the opinions that

12  you offered in that case; right?

13      A.   Apparently so, yes.

14      Q.   And it's also contrary to the

15  opinions that Dr. Hruz and Dr. Levine

16  offered in that case; right?

17      A.   Yes.

18          MR. KNEPPER:  Objection to form.

19      A.   It appears to be, yes.

20      Q.   And it's also contrary to the

21  opinions that you and Dr. Hruz and Dr.

22  Levine are offering in this case; right?

23      A.   Yes.

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 40

```
1        Q.   Look at the next sentence.  It
2    says, "Every major expert medical
3    association recognizes that
4    gender-affirming care for transgender
5    minors may be medically appropriate and
6    necessary to improve the physical and
7    mental health of transgender people."
8             That's what it says; right?
9        A.   That's what it says, yes, sir.
10       Q.   That's also contrary to the
11   opinions that you and Dr. Hruz and Dr.
12   Levine are offering in both these cases;
13   right?
14       A.   Yes, it certainly is.
15       Q.   In fact, according to this
16   order, every major expert medical
17   association disagrees with you because
18   they've all taken a position that this
19   treatment is in fact medically necessary;
20   right?
21             MR. KNEPPER:  Objection to form.
22       A.   Apparently so, yes.
23       Q.   All right.  Look at page 6.
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 41

```
 1        Look at the last paragraph.  You see it
 2        says that -- the third sentence says,
 3        "The consensus recommendation of medical
 4        organizations is that the only effective
 5        treatment for individuals at risk of or
 6        suffering from gender dysphoria is to
 7        provide gender-affirming care."  Do you
 8        see that?
 9             A.    I do.
10             Q.    You see there's a Footnote 3?
11             A.    Let me get my glasses on here.
12        Footnote 3.  I don't see Footnote 3.
13        Let's see.
14             Q.    The bottom of page 6.
15             A.    I see it now, yes.
16             Q.    Footnote 3 has a long list of
17        medical organizations that all have taken
18        the position that gender-affirming care
19        is medically appropriate for individuals
20        with gender dysphoria; right?
21                  MR. KNEPPER:  Objection to form.
22             A.    Yeah, the consensus
23        recommendations.  Those are consensus
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 42

1    recommendations.  And yes, I was aware

2    that those were the positions taken by

3    those organizations even before the

4    judge's opinion.

5         Q.   Yeah.  By my count, Footnote 3

6    lists 18 different professional medical

7    organizations, and as I read this

8    footnote, every single one of them takes

9    the view that's contrary to the opinions

10   that you and Dr. Hruz and Dr. Levine are

11   offering; right?

12            MR. KNEPPER:  Objection to form.

13        A.   Yes.  There's a consensus of

14   consensus on this, exactly, yes, sir.

15        Q.   And you're not aware of a single

16   professional medical organization that

17   submitted anything in this Brandt case

18   and said that they agree with the

19   opinions that you and Dr. Hruz and

20   Dr. Levine are offering; right?

21        A.   Well, I'm aware of at least one

22   professional organization that -- that

23   disagrees with that, yeah, the

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 43

1    pediatric -- American Pediatric --

2    American Association of Pediatricians.

3        Q.   Do you know if they submitted

4    anything to the Court in this Brandt case

5    to that effect?

6        A.   I'm not aware.  I don't know.

7        Q.   Okay.  Look back to your report,

8    Exhibit 1.

9        A.   Okay.

10        Q.   And go to page 5.

11        A.   Okay.

12        Q.   See there's paragraph 11?

13        A.   Yes.

14        Q.   And you say that "Affirmation

15    Treatments are Currently Experimental."

16    And then you say, "are not generally

17    accepted by the relevant scientific

18    community."  Right?

19        A.   Yes, I say that, absolutely.

20        Q.   Well, apparently, there's at

21    least eighteen different professional

22    medical organizations that all say that

23    you and Dr. Hruz and Dr. Levine are wrong

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 44

1    and that these gender-affirming

2    treatments are, in fact, medically

3    appropriate; right?

4         A.   Well, I --

5              MR. KNEPPER:   Object.

6         A.   I would say that part of the

7    difficulty here is a misunderstanding

8    about how those consensus opinions are

9    arrived at.   They're not arrived at

10   scientifically.   So minus a scientific

11   opinion, those are -- those are consensus

12   opinions.

13            For example, in plastic surgery,

14   there was a controversy some years ago

15   about the use of fat grafting in breast

16   reconstruction, and there was a concern

17   about whether it would promote malignant

18   degeneration.   The American Society of

19   Plastic and Reconstructive Surgeons came

20   out with a consensus statement

21   essentially recommending against, if not

22   outright forbidding, the use of fat

23   grafting in breast reconstruction or

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 45

```
1    cosmetic surgery.  But I was never
2    polled.  I was a member of the American
3    Society of Plastic Surgery, but I was
4    never polled.
5            These consensus statements do
6    not poll the scientific or professional
7    community.  They're the work product of
8    a -- of small committees where they
9    perhaps will review scientific literature
10   and come to an opinion within that
11   relatively small group.
12           So I think the misunderstanding
13   is that because, for example, the
14   American Medical Association or the
15   American Pediatric Society has a
16   statement making this claim, it's not, by
17   definition, supported by the membership
18   of that -- that society.  It is the work
19   product of a committee, and it's -- and
20   it doesn't -- it doesn't lay out the
21   scientific basis for those opinions for
22   the membership to review, as was the case
23   in -- and it turns out that seven, eight
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 46

```
 1      years later, the American Society of
 2      Plastic and Reconstructive Surgery
 3      rescinded their prohibition when the
 4      membership basically chimed in and said
 5      this is incorrect and this is our
 6      evidence, here's the science.  And the
 7      American Society rescinded that consensus
 8      statement that they had made ten years
 9      earlier.
10           So I imagine that similar things
11      are going on here.  Committees generates
12      consensus statements.  The consensus
13      statements are published.  And one gets
14      the impression that the entire membership
15      supports the statement when that in fact
16      is not the case.  And when these
17      consensus statements are published, they
18      don't publish the supporting scientific
19      literature.  They merely make the
20      statement.  So I think this is the case
21      here as well.
22           Q.   You are not a member of the,
23      let's say, American Medical Association;
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 47

```
 1    right?
 2        A.    Not -- not any longer, no.
 3        Q.    And your -- I hear you
 4    speculating that there's a committee that
 5    came to this decision at the AMA; right?
 6            MR. KNEPPER:  Objection, form.
 7        A.    Well, if the AMA functions like
 8    the American Society of Plastic Surgery
 9    or other -- other professional bodies
10    like that, professional organizations
11    like that, I would expect that's how they
12    make their consensus statements, yes.
13        Q.    You personally do not know how
14    the AMA came to issue this consensus
15    statement, do you?
16            MR. KNEPPER:  Objection.
17        A.    I have no personal knowledge,
18    no.
19        Q.    You have no personal knowledge
20    what scientific literature they reviewed
21    in coming up with that consensus
22    statement, do you?
23        A.    That's the difficulty.  Yes,
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 48

```
 1    sir.
 2         Q.    Yeah.
 3         A.    Correct.
 4         Q.    You have no idea, in short, how
 5    the AMA came to reach this consensus
 6    statement; right?
 7              MR. KNEPPER:  Objection to form.
 8         A.    I have no personal knowledge of
 9    it, no.
10         Q.    How about the American Pediatric
11    Society?  You're not a member of that;
12    right?
13         A.    No.
14         Q.    You have no idea how the
15    American Pediatric Society came to
16    support this consensus statement; right?
17         A.    Well, in that case, I do have
18    friends who are members of the American
19    Pediatric Society, I think it is.  And
20    they, in conversation, have told me that
21    this is how the process works.  I don't
22    have personal -- personal knowledge of
23    it, no.
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 49

```
 1        Q.   Are those friends on the
 2   committee at the APA that decided to
 3   adopt this consensus statement?
 4        A.   Not to my knowledge.
 5        Q.   So they also -- strike that.
 6             How about the American
 7   Psychiatric Association?  You're not a
 8   member of that --
 9        A.   No.
10        Q.   -- right?
11        A.   No.
12        Q.   You have no idea on what basis
13   they decided to support this consen- --
14   what you call consensus -- consensus
15   statement about the necessity of
16   treatment for gender dysphoria, do you?
17        A.   No.
18        Q.   So, Doctor, I hear you
19   criticizing these organizations, but you
20   do not have firsthand knowledge of how
21   any of those organizations came to reach
22   these positions, do you?
23             MR. KNEPPER:  Objection to form.
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 50

1          A.    No.

2          Q.    And you do not know what

3     scientific literature they relied on, do

4     you?

5          A.    No.

6               MR. KNEPPER:   Objection to form.

7          A.    Other than to say that I'm

8     familiar with the current literature, and

9     I -- and whenever these -- these

10    consensus statements are supported with

11    references to the scientific literature,

12    that literature I have reviewed.   That

13    was part of the process of generating my

14    expert testimony.

15         Q.    I thought I just heard you say

16    that these position statements are not

17    typically supported by "Here's the study

18    we relied on."   Isn't that what you said?

19         A.    Well, no.   In the -- in the

20    actual document that they publish, they

21    make -- they make reference to things

22    like that.

23               What I meant to say, I suppose,

**DEPOSITION OF PATRICK LAPPERT, M.D.**

1    is that -- that I've reviewed the current

2    literature, particularly in the last

3    three to five years, that's germane to

4    the subject of gender affirmation in

5    pediatric patients and adolescents, and

6    I -- and I find that the science is weak,

7    so --

8        Q.   But because you have no

9    firsthand knowledge of how any of these

10   associations came out with these position

11   statements, you do not know to what

12   extent it may have taken that literature

13   into account before adopting these

14   position statements; right?

15            MR. KNEPPER:  Objection.

16       A.   I can only say that if they gave

17   full force to the scientific literature

18   that is used to support their position, I

19   find the scientific literature weak,

20   yeah.

21       Q.   This Brandt case involves a

22   state law that prohibits doctors in

23   Arkansas from providing gender-affirming

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 52

```
 1      medical treatment to anyone under
 2      eighteen; correct?
 3           A.   Yes.
 4           Q.   You yourself support these kind
 5      of state law bans; right?
 6                MR. KNEPPER:  Objection, form,
 7      scope.
 8           A.   I do support a control over
 9      these kinds of therapies, yes, I do.
10           Q.   Well, not -- not just control,
11      because Arkansas says it will criminally
12      prosecute doctors that do it; right?
13           A.   Right.
14                MR. KNEPPER:  Objection to form,
15      scope.
16           Q.   And you think that's a good
17      idea; right?
18           A.   I do.
19                MR. KNEPPER:  Objection to form,
20      scope.
21           Q.   You think that other states
22      outside of Arkansas should be passing
23      similar bans; right?
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 53

```
 1              MR. KNEPPER:  Objection, form,
 2       scope.
 3         A.   Actually, what I would prefer to
 4       see is the -- is the professional
 5       societies recommend against these sorts
 6       of things, yes.  That would be my
 7       preference.  I would rather that the
 8       State did not step in and manage the care
 9       of people who are suffering.  I'd rather
10       the State stayed out of it.  But short of
11       that, I suppose that's the -- the
12       fallback position is to recourse through
13       the law.
14              It would seem to me that
15       professional organizations should be
16       managing these issues, and practitioners
17       ultimately should be responsible, as was
18       found in the -- in the -- the case in
19       Great Britain at the Tavistock Portman
20       Institute when the Court came back and
21       reviewed the find -- the ruling there and
22       declared that primacy should be given to
23       the decision-making of doctors rather
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 54

```
1      than the Courts stepping in as -- as

2      managers of medical care.

3              And I feel the same way.  I

4      don't think that the State should have to

5      do this.  But -- given that -- given that

6      things are moving at the pace they are.

7          Q.   Are you aware that state

8      legislators in Utah have proposed a

9      similar ban as Arkansas for

10     gender-affirming medical treatment for

11     minors?

12         A.   Yes.

13              MR. KNEPPER:  Objection to form,

14     scope.

15         Q.   You had involvement with those

16     legislative efforts in Utah, didn't you?

17         A.   I think I made some

18     recommendations to them.  Yes, I did.

19         Q.   Yeah.  Because now I hear you

20     saying you prefer the professional

21     organizations handle it.  But the fact is

22     you have actively lobbied to get these

23     kind of bans passed in other states,
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 55

1    haven't you?

2         A.   Yes, I have.

3              MR. KNEPPER:   Objection to form,

4    scope.

5         A.   Yes, I have.

6         Q.   I'm going to introduce another

7    exhibit.  Let me know when you have it,

8    Doctor.

9    (Exhibit 5 was marked for identification

10   and is attached.)

11        A.   I have it.

12        Q.   Exhibit 5 is a document titled:

13   "Transgender 'Transition' Procedures

14   Performed on Minors.  Answers to

15   Questions and Information for Joint

16   Interim Committee," dated June 10th,

17   2021.  Do you see that?

18        A.   I do.

19        Q.   It says, "Submitted by Rep Rex

20   P. Shipp," S-H-I-P-P.  Do you know who

21   that is?

22        A.   I don't know him personally, but

23   I -- I see he's a representative from

# DEPOSITION OF PATRICK LAPPERT, M.D.

Page 56

```
 1        Utah apparently.
 2        Q.    Have you ever communicated with
 3     Mr. Shipp and his staff?
 4        A.    I may have and don't recall.
 5        Q.    Why do you say you may have?
 6        A.    I have a lot of correspondence
 7     with people who ask a lot of questions
 8     who are involved in this -- in this
 9     issue, and I don't have a great memory
10     for names sometimes.  But I know I was in
11     communication at some level with people
12     in Utah, but I don't recall exactly the
13     nature of that conversation, or that
14     interchange.
15        Q.    Go to page 16.
16        A.    Sixteen?
17        Q.    One six.
18        A.    One six.  Okay.
19        Q.    Toward the bottom of the page,
20     it says, "We express appreciation to
21     these noted professionals who contributed
22     to this report."  Do you see that?
23        A.    I do.
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 57

1        Q.    Go to page 17.

2        A.    Okay.

3        Q.    The bottom of the page says,

4     "Patrick Lappert, M.D."

5        A.    Yes.

6        Q.    That's you; right?

7        A.    Yes.

8        Q.    So at some point earlier this

9     year, you were providing information to

10    the Utah State Legislature to support the

11    potential enactment of a ban on

12    gender-affirming healthcare for minors;

13    right?

14             MR. KNEPPER:  Objection, form.

15       A.    Yes.

16       Q.    Look at the fourth name from the

17    bottom on page 17.

18       A.    Fourth name -- I'm sorry?

19       Q.    Fourth name from the bottom.

20       A.    Paul Hruz.  Yes.

21       Q.    That's the same Dr. Hruz who's

22    an expert in this case; right?

23       A.    Yes.

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 58

```
 1        Q.   Go to page 18.  The second name
 2   from the top is Stephen B. Levine M.D.;
 3   right?
 4        A.   Yes.
 5        Q.   Same Dr. Levine who is an expert
 6   in this case; right?
 7        A.   Yes.  I think so, yes.
 8        Q.   And the next name is Paul
 9   McHugh, M.D.; right?
10        A.   Yes.
11        Q.   The same Dr. McHugh who is an
12   expert in this case; right?
13        A.   Yes.
14        Q.   All four of you were providing
15   information to the Utah State Legislature
16   to support this potential ban; right?
17             MR. KNEPPER:  Objection to form.
18        A.   Yes.
19        Q.   How did you get involved with
20   providing this information to the Utah
21   State Legislature?
22        A.   I don't recall.  My -- my
23   suspicion is I may have been contacted by
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 59

1    e-mail or some other such thing.  In

2    fact, I'm fairly confident it was an

3    e-mail request for assistance, probably.

4        Q.    Do you remember who the e-mail

5    was from?

6        A.    I do not.

7        Q.    Do you remember who at the Utah

8    State Legislature or anyone affiliated

9    with them you were communicating with in

10   this respect?

11       A.    I don't remember, no.

12       Q.    All right.  Let's see what you

13   were telling the state legislature in

14   this report.  Go to page 5.  See there's

15   a section near the top titled "Sex

16   reassignment surgeries"?

17       A.    Yes.

18       Q.    There's some language in quotes

19   -- in quotes and italicized.  Do you see

20   that?

21       A.    I do.

22       Q.    And the first portion of the

23   paragraph says: '"Sex reassignment

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 60

1    surgery' is a massive misrepresentation

2    of what these operations actually do.

3    You can't change a person's sex.  All

4    that is happening is that the patient is

5    undergoing an intentional mutilation in

6    order to create a counterfeit appearance

7    of the other sex."

8           Do you see that?

9      A.   I do.

10     Q.   And underneath, it says,

11   "Patrick Lappert, M.D."  Right?

12     A.   Yes.

13     Q.   These are your words, Dr.

14   Lappert; right?

15     A.   Yes.

16     Q.   You consider gender reassignment

17   surgery to be an intentional mutilation;

18   right?

19     A.   I do.  Absolutely.

20          MR. KNEPPER:  Form.

21     Q.   And calling gender reassignment

22   surgery, quote, intentional mutilation,

23   is that commonly accepted terminology in

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 61

1      this field, Doctor?

2          A.   I expect not.

3          Q.   And then you say that when a

4      patient undergoes gender reassignment

5      surgery, all that is happening is, quote,

6      a counterfeit appearance of the other

7      sex; right?

8          A.   Yes.

9          Q.   This phrase, "counterfeit

10     appearance," do you think that's an

11     appropriate term for a doctor to use?

12         A.   Absolutely.

13         Q.   And you stand by these words;

14     right?

15         A.   I do.

16         Q.   All right.  So, we've talked

17     about Arkansas, we've talked about Utah.

18     Now, I know there is currently a number

19     of other states that are considering

20     passing similar bans.  Outside of Utah,

21     have you done any work whatsoever in

22     connection with these potential bans in

23     other states?

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 62

```
 1          MR. KNEPPER:  Objection, form,
 2     scope.
 3          A.   I have.
 4          Q.   Which states?
 5          A.   Alabama, Texas.
 6          Q.   What else?
 7          A.   Texas.  I don't know if there
 8     were any in the Northwest or not.  I
 9     think that's all of them.  I may be
10     wrong, but I think that's all.  Alabama
11     and Texas I would just add to your list.
12          Q.   Okay.
13          A.   There may been something in
14     Arizona.  I'm not certain about Arizona
15     as well, but --
16          Q.   Now let me introduce another
17     exhibit.  Okay.  Let me know when you get
18     this one.
19     (Exhibit 6 was marked for identification
20     and is attached.)
21          A.   I've got it.
22          Q.   All right.  This article is
23     titled, "Alabama bill that would
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 63

```
 1        criminalize treatment for transgender
 2        minors headed to full Alabama Senate."
 3        You see that?
 4            A.   I do.
 5            Q.   Alabama, your home state, was
 6        considering a ban very similar to
 7        Arkansas just this year; correct?
 8            A.   Actually over the last couple of
 9        years.
10            Q.   Okay.  The first paragraph says,
11        "The Alabama Senate Health Committee on
12        Wednesday approved a bill that would
13        outlaw puberty-blocking medications and
14        gender-affirming care for minors,
15        giving" -- "giving it a favorable report
16        in an 11-2 vote."  You see that?
17            A.   I do.
18            Q.   Then it says, "An Alabama House
19        committee heard testimony in a public
20        hearing on a companion bill, but the
21        committee did not vote on the" -- "on the
22        measure."  You see that?
23            A.   I do.
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 64

1        Q.    You testified in support of this
2     bill; right?
3        A.    Yes, sir.
4        Q.    Go to page 2.
5        A.    Okay.
6        Q.    Look at the second paragraph
7     from the bottom.
8        A.    Second from the bottom.  Yes.
9        Q.    It says, "Dr. Patrick Lappert, a
10    Decatur plastic surgeon, spoke in favor
11    of the bill."
12           That's you; right?
13       A.    That's right.
14       Q.    Go to page 3.
15       A.    Okay.
16       Q.    And look at the third paragraph.
17    It says that you've "spoken against the
18    use of medicine and surgery for
19    transgender people as a Catholic deacon
20    in his local diocese."  See that?
21       A.    Yes.
22       Q.    You don't deny that you've
23    spoken against the use of medical and

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 65

```
 1     surgical treatment for transgender people
 2     in your position as a Catholic deacon;
 3     right?
 4          A.    That's correct, I do not.
 5          Q.    All right.  Focus on the last
 6     sentence of this third paragraph.  It
 7     says that when a committee member
 8     questioned your medical expertise on this
 9     issue, you said that you would not treat
10     a person for gender dysphoria and would
11     instead refer them to a qualified mental
12     health professional.  You see that?
13          A.    Yes.
14          Q.    At this hearing, someone on the
15     committee was questioning your medical
16     expertise to offer these opinions; right?
17               MR. KNEPPER:  Objection, form.
18          A.    I don't remember that detail,
19     but I think so, yeah.  I think the
20     objection they raised was that I don't do
21     these treatments, how could I know.
22          Q.    You're not a psychiatrist;
23     right?
```

**DEPOSITION OF PATRICK LAPPERT, M.D.**

Page 66

1        A.   No.

2        Q.   You do not have specialized

3    training or expertise in diagnosing

4    mental health conditions; right?

5        A.   I have limited -- limited

6    training.  Yes.

7        Q.   And when you say "limited

8    training," what does that mean?

9        A.   Well, in the training of plastic

10   surgeons, we are -- we are required --

11   because we offer aesthetic surgery, we

12   get some training in issues,

13   psychological/psychiatric issues relating

14   to people who will seek to modify their

15   bodies in order to achieve a sense of

16   peace or a sense of improvement in their

17   lives.  And it's imperative that a

18   plastic surgeon be able to recognize

19   persons who are suffering from

20   psychiatric problems because plastic

21   surgery -- to offer them plastic surgery

22   to modify their bodies is in the category

23   of malpractice, not to mention that very

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 67

```
 1      often, dissatisfied patients will -- will
 2      make life very difficult for the
 3      practitioner, if not threaten them with
 4      physical harm.
 5              I would refer you to an article
 6      by -- although we haven't offered it up,
 7      -- a friend of mine, Dr. Mark Gorney, who
 8      was one of the -- one of the grand old
 9      men of plastic surgery, started the
10      Physicians Company to manage physician
11      liability and risk and had -- he
12      discovered that there's an
13      overrepresentation of -- of violence
14      against physicians by aesthetic patients
15      committing violence against plastic
16      surgeons.  That's just one of the
17      motivators.
18              But nonetheless, the issue of
19      body dysmorphic disorder is part of our
20      training, persons who are seeking a
21      remedy to their interior woundedness or
22      their psychological disturbances by
23      changing their outward opinion.  And body
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 68

```
 1      dysmorphic disorder is a
 2      well-characterized psychiatric diagnosis
 3      that impinges greatly upon plastic
 4      surgery precisely because aesthetic
 5      surgery -- even in its name, you can tell
 6      that aesthetic surgery is surgery aimed
 7      at the aesthetic, the feelings, esthesia,
 8      the feelings that a patient has about
 9      themselves, about their life.  So it's
10      incumbent upon plastic surgeons to know
11      about these things, and so we get trained
12      in those matters.
13              So again, I have very limited
14      psychiatric/psychological knowledge, but
15      I do know that that subset of patients
16      should be referred for psychological help
17      rather than offered surgery.  Not to
18      mention the fact that such patients can't
19      even give informed consent because of
20      their psychological disturbances.
21         Q.   All right.  You're talking about
22      patients who have body dysmorphic
23      disorder; right?
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 69

1       A.    That's right.

2       Q.    When did you last receive

3    training in how to diagnose someone with

4    body dysmorphic disorder?

5       A.    I guess it's ongoing training

6    when one's in the -- in the practice of

7    plastic surgery.  But I had originally in

8    my residency and then on an ongoing basis

9    I think at conferences through the years.

10           Formal training in it, I -- I

11    don't recall beyond my residency.  All I

12    do is try to keep abreast of the

13    literature.

14       Q.    Yeah.  So, let's take that in

15    steps.  Outside of -- when was your

16    residency in plastic surgery, Doctor?

17       A.    '92 to '94.

18       Q.    Right.  Past '94, you have not

19    received formal training in how to

20    diagnose someone with body dysmorphic

21    disorder; right?

22       A.    There may have been some CME

23    credits at a conference in there

## DEPOSITION OF PATRICK LAPPERT, M.D.

1    somewhere or remote learning.  I don't

2    recall.

3        Q.   But sitting here, you can't

4    recall any of those specifically; right?

5        A.   I cannot, no.

6        Q.   What are the diagnostic criteria

7    for body dysmorphic disorder?

8        A.   Well --

9        Q.   Do you know that sitting here

10   today?

11       A.   Yes.  So, a person with body

12   dysmorphic disorder, the diagnostic

13   criteria is the -- is the patient who

14   presents with evidence of a psychological

15   disturbance.  In review of their history

16   and physical examination, you may see

17   evidence of a history of substance abuse,

18   maybe evidence of some self-harm,

19   evidence of social isolation in their

20   intake forms, that sort of thing.  That

21   would raise the concern.

22            The second would be the person

23   who attaches tremendous potential benefit

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 71

1      of, psychologically, the -- the quality

2      of the -- sort of a transformative power

3      of cosmetic surgery.

4           And then the third criteria

5      would be that they -- they see something

6      that you don't see.  They see a defect

7      that you don't see.  And that's probably

8      the key diagnostic criteria.  For

9      example, a man who presents seeking a

10     modification to his nose who has evidence

11     of living a life of social isolation who

12     is adamant that by changing his -- the

13     appearance of his nose, he will -- he

14     will have a much better life.  And

15     hearing that, of course, the alarm bells

16     go off and then examining the patient and

17     seeing that there's no objectively

18     definable deformity, only a normal

19     variation that one would expect to see on

20     a man's face.

21           Those are all red flags.  And --

22     and based upon that, it is -- it

23     is definitely the -- has been

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 72

```
 1        historically the recommendation of the
 2        likes of Dr. Mark Gorney and other
 3        leaders in the American Society of
 4        Plastic Surgery to not offer surgery, but
 5        rather to offer referral for
 6        psychiatric/psychological support and
 7        evaluation.
 8            Q.    These diag- -- these diagnostic
 9        criteria that you mentioned, where do
10        they come from?
11            A.    They -- I think you can find
12        much of that in the DSM book, if -- if --
13        if that's the route you want to go.  You
14        find it in the literature.  There are --
15        there are references in the scientific
16        literature about it dating back to I
17        think the 1920s.  I included some of
18        those, I think, in my discussion, if not
19        on this one, in the Arkansas case.
20                But -- but there have been
21        papers published through the years that
22        describe the condition and make
23        recommendations about care, and again,
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

1    going all the way back even to textbooks

2    in plastic surgery and -- and of course,

3    the residency training that speaks about

4    that as well.

5        Q.    So for diagnosing someone with

6    body dysmorphic disorder, you would rely

7    on the DSM-5; right?

8        A.    I wouldn't rely on it, no.  No.

9    I would rely on my -- my clinical

10   experience more than anything else there.

11       Q.    Well, you just rattled off three

12   or four guidelines that I think I heard

13   you say come from the DSM-5; right?

14            MR. KNEPPER:  Objection, form.

15       A.    Well, they're -- they don't come

16   from the DSM-5 but are described in the

17   DSM-5, yeah.

18       Q.    So when I asked you --

19       A.    And 4 -- actually, DSM-4 has a

20   clearer description, I think, than DSM-5.

21       Q.    So when I asked you what

22   criteria you would use to diagnose

23   someone with body dysmorphic disorder,

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 74

```
 1      the source you went to was the DSM;
 2      right?
 3          A.   No.  The source I went to was my
 4      training and the -- and the papers that
 5      relate to it.  I think it's just been
 6      subsequently characterized in the DSM.
 7      And it's a ready -- it's a volume that's
 8      readily accessible to people.  The
 9      language is readily accessible, so people
10      who are seeking information about that,
11      they can go there for it or they can go
12      to the articles, if they like.  Yes.
13          Q.   Outside of whatever training you
14      had on diagnosing someone with body
15      dysmorphic disorder, you do not have
16      specialist training or expertise in
17      diagnosing other mental health
18      conditions; fair?
19              MR. KNEPPER:  Objection, form.
20          A.   Let's see.  Well, there's -- I
21      guess there are subcategories of -- of
22      body dysmorphic disorder, like
23      recognizing the anorexic patient, of
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

1        course, who presents for body

2        modification.  That -- that's a fairly

3        readily and obvious one.

4              But no, I'm not a -- I'm not

5        formally trained in psychiatry or

6        psychology.

7           Q.   You do not have -- you do not

8        hold yourself out as an expert in

9        diagnosing mental health conditions

10       outside, potentially, of body dysmorphic

11       disorder; right?

12          A.   Correct.

13          Q.   You do not have specialist

14       training or expertise in treating mental

15       health conditions; right?

16          A.   No.

17          Q.   You would refer that person to a

18       qualified mental health professional;

19       right?

20          A.   I would.  I would.

21          Q.   Because you yourself are not a

22       qualified mental health professional;

23       correct?

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 76

1      A.   Correct.

2      Q.   All right.  You've also

3  published an op-ed in May of this year

4  supporting this Alabama ban; correct?

5      A.   Yes.

6      Q.   And you said that Alabama

7  legislators should enact this ban because

8  they have a duty to protect the

9  vulnerable population of gender-confused

10  children.  Does that sound familiar?

11      A.   Yes.

12      Q.   So again, earlier you said you

13  had a preference for professional

14  societies dealing with this, but you're

15  out there publishing op-eds calling on

16  state legislatures to pass these bans;

17  right?

18           MR. KNEPPER:  Objection, form.

19      A.   Right.  Yes, sir.

20      Q.   All right.  How about Texas?

21  Tell me what work you've done supporting

22  this kind of a ban in Texas?

23      A.   It's been similar.  I've been in

## DEPOSITION OF PATRICK LAPPERT, M.D.

1    communication with -- I can't remember if

2    they're on the legislative side or on the

3    justice side.  I don't remember exactly

4    where they fit into the -- the government

5    of Texas, but I've corresponded with them

6    and offered them information and advice.

7        Q.   Was it similar information to

8    what we've seen in that Utah packet?

9        A.   I'm sorry, sir?

10       Q.   Was it information similar to

11   what we've seen in that Utah legislation

12   packet?

13           MR. KNEPPER:  Objection, form.

14       A.   Right.  The substance -- the

15   substance of the issue at hand is the

16   same wherever you find it.  It's this

17   contest between those who -- who promote

18   gender-affirming care versus those who

19   promote, in the case of children, for

20   example, watchful waiting and

21   psychological support and cognitive

22   behavioral therapy and those things, yes.

23   It's the same battle wherever you find it

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 78

1    because it's the same problem, the same

2    science, the same language.  All of it's

3    the same.

4         Q.   So earlier, we saw that in

5    addition to you, Dr. Hruz and Dr. Levine

6    and Dr. McHugh were also involved with

7    those Utah legislative efforts; right?

8              MR. KNEPPER:  Objection, form.

9         A.   I -- I don't know their

10   involvement in -- in Texas.  I'm -- I'm

11   not aware.

12        Q.   Yeah.  Do you know whether any

13   of them have been involved with any of

14   these efforts in any other state?

15        A.   I don't.  I don't know.

16        Q.   Okay.  Fair to say that you have

17   some strong personal opinions on whether

18   doctors should be providing

19   gender-affirming treatment to minors?

20             MR. KNEPPER:  Objection to form.

21        A.   Very fair to -- very fair to

22   say, yes.

23             MR. TISHYEVICH:  Let's go off

## DEPOSITION OF PATRICK LAPPERT, M.D.

```
 1     the record.
 2            THE VIDEOGRAPHER:  This is the
 3     end of Media Unit 1.  We are off the
 4     record at 9:33 a.m.
 5                (Break taken.)
 6            THE VIDEOGRAPHER:  This is the
 7     beginning of Media Unit No. 4.  We are on
 8     the record at 9:44 a.m.
 9        Q.   (By Mr. Tishyevich) Doctor,
10     you're familiar with an organization
11     called Alliance Defending Freedom, ADF;
12     right?
13        A.   Yes.
14        Q.   How are you familiar with the
15     ADF?
16        A.   I was invited down there for a
17     conference on the subject of transgender.
18     I was an invited presenter, I should say.
19     They asked me to come and speak from a
20     plastic surgeon's perspective on how I
21     view the current state of transgender
22     medicine and surgery.
23        Q.   Those were -- those were the
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 80

```
 1     meetings in Arizona?  Is that right?
 2             MR. KNEPPER:  Objection.
 3       A.    Yes.
 4       Q.    Who invited you?
 5       A.    I don't remember who the
 6     particular name was.  I -- I don't recall
 7     who the -- the particular person, the one
 8     that sent me the invitation.
 9       Q.    Was it --
10       A.    It may have been -- it may have
11     been Gary McCaleb, I want to say.  I'm
12     not positive about that, though.
13       Q.    You -- you anticipated my
14     question.
15       A.    Okay.
16       Q.    To your knowledge, what's the
17     view that the FDA takes on providing
18     healthcare treatment to patients with
19     gender dysphoria?
20       A.    The position of the FDA?
21       Q.    The ADF.
22       A.    Oh, the ADF.  They -- let's see.
23     So, the sense I get is that the ADF takes
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 81

1    a -- the opinion that the present state
2    of transgender medicine and surgery is
3    not in the interest of the patients or
4    the families.
5        Q.   The ADF has moral objections to
6    doctors performing this kind of surgery
7    and treatment; right?
8             MR. KNEPPER:  Objection, form,
9    scope.
10       A.   I would -- I would characterize
11   the ADF's position as more than just a
12   moral objection.  It's both moral and
13   objective scientific objections.
14            So the -- the -- the sense I got
15   from that conference was that most of the
16   invited speakers came to speak about --
17   for example, Dr. Hruz was there, and he
18   spoke about endocrinology and the
19   endocrinol- -- endocrinologic basis for
20   sex/gender.  And he spoke about the
21   effects of -- the endocrinological
22   effects, the objective changes that are
23   caused by, for example, puberty-blocking

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 82

1    cross-sex hormones.

2           I was -- there was also another

3    speaker there, I think, on the subject

4    of -- from the family medicine

5    perspective, the overall effects on the

6    health of the child, developmental

7    issues.  There was a presenter on the

8    objective psychological issues.

9           And then, I presented on the

10   realities of the surgery.  They wanted me

11   to speak about the technical details of

12   transgender surgery, kind of the

13   evolution of the process of transitioning

14   surgery, and the -- and to give them a

15   summary of the state of the science on

16   it.

17          So I would characterize the ADF

18   as interested in both the moral -- the

19   moral issues and the objective, and they

20   impinge upon one another.  Clearly, to do

21   something that is not in the -- in the

22   objective benefit of the patient is a

23   moral problem.

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 83

```
 1              Did I answer your question?
 2      Q.    That's helpful, yeah.
 3              The ADF is not a professional
 4      scientific organization; right?
 5      A.    Not to my knowledge, no.
 6              MR. KNEPPER:  Objection to form,
 7      scope.
 8      Q.    They're a legal organization;
 9      right?
10      A.    Yes.  That's my understanding.
11      Q.    ADF is engaged with bringing
12      lawsuits that do things like challenge
13      schools' rights to -- to have transgender
14      persons on their teams; right?
15              MR. KNEPPER:  Objection, form,
16      scope.
17      A.    I don't know the scope, the full
18      scope of their efforts, but yeah, they're
19      one of I guess several legal
20      organizations that are -- that are
21      approaching these matters, as are you,
22      for example.
23      Q.    All right.  Let's talk about
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 84

1      these meetings in more detail.  So, how

2      many -- strike that.

3              You've been to two meetings

4      organized by ADF?

5          A.   That's my recoll- -- yeah, two

6      meetings.  I think that's right.

7          Q.   All right.  Let's start with the

8      first one.  This was in 2017?

9          A.   That sounds about right, yeah.

10         Q.   What --

11         A.   I think it was 2017, yeah.

12         Q.   What month roughly?

13         A.   I don't remember now.

14         Q.   Do you know how they came to

15     invite you to that first meeting?

16         A.   I do not.

17         Q.   Before that meeting, you had not

18     published anything about gender

19     dysphoria, had you?

20         A.   No.

21         Q.   Before that meeting, you had not

22     published anything about the risks of use

23     of hormone blockers in minors; right?

## DEPOSITION OF PATRICK LAPPERT, M.D.

1      A.   No.  I've given -- I gave some

2   -- some -- I think they may have heard of

3   me not through publications, but through

4   public speaking.

5      Q.   How long have you been doing

6   public speaking on the issues related to

7   gender dysphoria?

8      A.   Since 2014.

9      Q.   Let's start with the first

10  meeting.  So, Dr. Hruz was also present

11  at that meeting?

12     A.   Yes.

13     Q.   Was Dr. Levine present at that

14  meeting?

15     A.   I don't think I've ever met Dr.

16  Levine, so I don't -- he couldn't have

17  been there because I would have

18  remembered meeting him, and I don't

19  remember ever having met him.

20     Q.   How about Dr. McHugh?

21     A.   No.  I would have remembered

22  him.  He's a very famous person.

23     Q.   How many people were present at

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 86

1     this first meeting?

2          A.    Perhaps ten.  I'm not certain.

3          Q.    Outside of you and Dr. Hruz, who

4     else do you remember being at that first

5     meeting?

6          A.    I remember meeting a Dr. Andre

7     Van Mol.  I believe he was at that

8     meeting.  There was a pediatric

9     endocrinologist there by the name of

10    Quentin Van Meter.  I think he was there.

11          There was a -- there was an

12    expert in scientific data and scientific

13    data analysis, medical record data

14    analysis from UC-San Francisco.  I don't

15    believe he was a physician.  I think he

16    was a -- had a doctorate in science.  And

17    he was a -- he was actually a

18    detransitioner.  So he was giving not

19    only his knowledge of the medical

20    literature, he was just an incredible

21    resource and reference for medical

22    literature.  You could just about ask him

23    anything.  But he was also there, I

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 87

```
 1      think, to speak from a personal
 2      perspective as well, being a
 3      detransitioner.
 4           There was another detransitioner
 5      there who I don't remember their name,
 6      but they were there to speak.  I think
 7      they were also an educator as well.  I'm
 8      not positive about that.
 9           So it's kind of vague for me,
10      but I -- but definitely Paul Hruz stands
11      out because we had a very good
12      conversation there.
13          Q.   What was the format?  Were there
14      presentations, a round table discussion?
15      How did the conversations go?
16          A.   There was some introductory
17      remarks, and then -- and then each --
18      each sort of specialist gave a
19      presentation.  I think I gave an
20      hour-long presentation.  And there were
21      others like mine on those other subjects
22      we talked about.
23          Q.   Did you use slides as part of
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 88

```
 1      that presentation?
 2          A.   I usually do, yes, although I
 3      don't know what I've done with that slide
 4      deck.  I don't keep them very long.  They
 5      sort of morph all the time.
 6          Q.   Do you think you might have an
 7      electronic copy of that slide deck
 8      somewhere?
 9          A.   I don't.
10          Q.   At a very high level, what was
11      the -- what were you trying to convey
12      through your presentation to that group?
13      Let me ask it a different way.  Were --
14      was your presentation broadly similar to
15      the opinions that you're offering in this
16      case and in the Brandt case?
17              MR. KNEPPER:  Objection, form.
18          A.   Well, by the -- by "broadly
19      similar," do you mean the subject matter
20      or the nature of my opinion or the
21      evidence used to support my opinion?
22          Q.   All right.  Give me a high-level
23      summary of what your presentation was at
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 89

1      that first meeting.

2          A.    It was a --

3                MR. KNEPPER:  Objection, form,

4      scope.

5          A.    -- a summary, a summary of the

6      present state of transgender medicine and

7      surgery, a review of the scientific

8      literature used to support the treatments

9      that are being offered, a review of the

10     long-term outcomes of treatment that are

11     being offered, with particular attention

12     to the European literature, which is more

13     reliable.  I sort of -- I compared the

14     American literature to the European

15     literature because that's one of the

16     great problems we're having in this

17     issue.  And it was already evident in

18     2017 that there was a great disparity

19     between the American literature and the

20     European literature in terms of the

21     quality of the scientific evidence that's

22     being used to support the interventions.

23                So that was -- really at the

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 90

```
1        heart of the presentation was what's the
2        state of the science and where is the
3        reliable science coming from and what is
4        it -- what is it showing us, so.  But
5        they also -- the audience wanted to have
6        an understanding of what these plastic
7        surgery interventions were.  So there was
8        an extensive discussion of the
9        particulars of the surgeries, the details
10       about the surgeries, the typical outcomes
11       of the surgeries, so.
12            Q.   I want to -- strike that.
13                 One of the topics of discussion
14       at that meeting was about the need to
15       have expert witnesses for litigation;
16       right?
17                 MR. KNEPPER:  Objection, form,
18       scope.
19            A.   I remember -- I remember a
20       fairly long discussion about the poverty
21       of people who are willing to testify
22       because of the risk that they take in
23       testifying.  That was a -- that was a
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

1    fairly long discussion.  And the

2    difficulty that that -- that people have

3    in finding expert witnesses because of

4    the risks they place themselves in, in

5    testifying.

6        Q.    And people at that meeting were

7    asked whether they would be willing to

8    participate as expert witnesses; right?

9        A.    Yes.

10       Q.    Before that meeting, you had

11   never testified as an expert witness?

12       A.    Before this moment, I never

13   testified as an expert witness.

14       Q.    Who made the introductory

15   remarks at the beginning of this meeting?

16            MR. KNEPPER:  Objection, form,

17   scope.

18       A.    I'm trying to remember.  It was

19   a -- it was an attorney whose first name

20   is Jeff, and I'm trying to remember what

21   his last name was.  But he seemed to be

22   the -- the -- kind of the emcee, if you

23   will.  Yeah, Jeff.  I'll see if, in the

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 92

1    course of our conversation today, the

2    name will pop in.  This is the difficulty

3    I have with remembering names.  They'll

4    just pop in at a moment's notice.

5            But it was -- yeah, it was an

6    attorney who gave the overall scope of

7    why -- why we were there, to discuss this

8    issue, to see what -- what the -- what

9    the science is showing to see where --

10   what the -- the moral aspects of good

11   science versus bad science and issues

12   like that, yeah.

13      Q.   Aside from you and Dr. Hruz, do

14   you recall anyone else expressing an

15   interest at that conference about serving

16   as an expert witness?

17           MR. KNEPPER:  Objection, form,

18   scope.

19      A.   You mean someone expressing just

20   generally about having expert witnesses?

21      Q.   No.  Other participants saying,

22   "I might consider being an expert witness

23   in one of these cases."

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 93

```
 1          A.    I don't recall.  I don't, no.
 2          Q.    Okay.  All right.  So then there
 3     was a second meeting also in Arizona;
 4     right?
 5          A.    Right.
 6          Q.    And that was also in 2017?
 7          A.    I don't remember the date of
 8     that as well -- either, no.
 9          Q.    What was the purpose of that
10     second meeting?
11          A.    I think it was similar, although
12     it may have been a little bit more
13     refined.  There was not as much
14     discussion of the really foundational
15     science as more a review, I think, of --
16     you know, I -- I guess it was similar in
17     terms of format.  I think there were more
18     -- more people there who were speaking
19     from personal experience.
20               So I think the most important
21     thing I recall from that meeting was that
22     -- that there was a mother -- actually, a
23     couple of family members of persons who
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 94

```
1      experienced cross-sex self-identification
2      who have gone through various -- various
3      phases of transitioning.  And they were
4      giving sort of a personal experience,
5      trying to describe to us what they went
6      through as a family, what they went
7      through with their children.  And that's
8      what -- so that was the difference
9      between the first and the second meeting.
10     I think it was more of a personal thing.
11     It had the science as well, but I think
12     it had more of a personal side to it as
13     well.
14          Q.   How many people do you think
15     attended -- attended that second meeting?
16          A.   I'm trying to think how full the
17     room was.  I think it was probably
18     comparable maybe, a dozen perhaps.  I'm
19     not sure.
20          Q.   Who do you remember being there
21     by name?
22          A.   I think that may have been when
23     I met Dr. Cretella.  I can't remember if
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 95

1    I met her at the first meeting or the
2    second meeting.
3              Oh, also at that second meeting,
4    there was a plastic surgeon.  I can't
5    remember his last name.  I was -- I
6    remember being very encouraged to meet
7    another plastic surgeon who saw this as
8    an issue.  And I do remember that he had
9    been the chairman -- this speaks to the
10   issue of fear about testifying.  He had
11   been the chairman of a major plastic
12   surgery department in a large Midwest
13   university, had built that program for
14   many years, had run one of the most
15   successful residency training programs.
16   And he had been fired because he had
17   objections to the transgender services
18   that the hospital administration -- or
19   the university administration wanted to
20   introduce.  And I thought it was a very
21   heartbreaking story to see that a man had
22   lost his entire career over his
23   professional opinion.  I don't remember

# DEPOSITION OF PATRICK LAPPERT, M.D.

Page 96

1    his last name, but I do know that I met

2    him at that second meeting.

3         Q.   Do you remember his first name?

4         A.   I don't.

5         Q.   Do you remember which center he

6    was affiliated with?

7         A.   I believe he was from the Ohio

8    State University.  But I haven't seen or

9    heard from him since.  He has just

10   disappeared.  I tried to reach out to

11   him, I recall, because, again, there's

12   not a lot of plastic surgeons who are

13   willing to speak on this matter.  And --

14   but I haven't heard from him since.

15        Q.   Did participants at the second

16   meeting make presenta- -- make

17   presentations as well?

18            MR. KNEPPER:  Objection, form,

19   scope.

20        A.   I -- I don't -- yeah, I think it

21   was more limited presentations, briefer,

22   sort of reviews sort of thing.  But it

23   wasn't -- it didn't have the formality of

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 97

```
 1      the first meeting, as I recall.  Again,
 2      it's -- it's a little bit murky four
 3      years on.
 4          Q.   Yeah.  I'm just asking for your
 5      best recollection.  That's fine.
 6          A.   Sure.  Okay.
 7          Q.   Do you remember giving a
 8      presentation at that second meeting?
 9          A.   I believe I did.
10          Q.   How long do you think that
11      meeting lasted, roughly?
12               MR. KNEPPER:  Objection, form,
13      scope.
14          A.   Well, I remember it -- we went
15      through a full morning, a light lunch,
16      and perhaps into the very early
17      afternoon.
18          Q.   And you mentioned that there was
19      some personal testimony from parents,
20      families.  What portion of the meeting
21      was that, roughly?
22          A.   What -- what portion?
23               MR. KNEPPER:  Objection, form,
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 98

```
1     scope.
2          Q.    What portion, yes.
3          A.    I would be guessing that perhaps
4     a third of the meeting was -- was that.
5          Q.    Okay.  After these meetings in
6     2017, have you continued to stay in touch
7     with the ADF?
8               MR. KNEPPER:  Objection, form,
9     scope.
10         A.    I think perhaps, you know, one
11    or two e-mail exchanges, but nothing --
12    nothing substantive.  I haven't really
13    heard anything from them.  I think I got
14    a -- no.  Well, I can't -- I can't recall
15    anything other than maybe a thank-you
16    e-mail or hope you're doing well kind of
17    thing, but nothing substantive, no.
18         Q.    How did you come to get involved
19    with being an expert in this case?
20         A.    I was contacted by Mr. Knepper.
21         Q.    Okay.
22         A.    Actually, I was contacted by his
23    staff.  He didn't call me himself, but
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 99

1     his -- someone on his staff called me and

2     asked --

3          Q.   I understand.

4          A.   -- if I would be available.

5     Yeah.

6          Q.   How did you come to get involved

7     with the Brandt case in Arkansas?

8               MR. KNEPPER:  Objection, form,

9     scope.

10         A.   I think it may have been

11    similar.  I don't recall the particulars,

12    but I -- someone on -- on the legal

13    counsel side contacted me.  I don't

14    remember who it was.

15         Q.   Okay.  Let me shift gears a bit.

16    You know what the American Society of

17    Plastic Surgeons is; right?

18         A.   Of course.

19         Q.   Are you a current member?

20         A.   No.  I -- I let my membership

21    lapse years ago, yeah.

22         Q.   When --

23         A.   About two years ago, I would

## DEPOSITION OF PATRICK LAPPERT, M.D.

1    say.  Maybe two years ago, yeah.

2       Q.   Why did you decide to let your

3    membership lapse?

4       A.   Well, in order to be a member of

5    the American Society of Plastic Surgeons,

6    you have to be board-certified.  And so

7    since I declined continuing board

8    certification for the reasons I explained

9    to you, then my membership -- you know,

10   over time, when my subscriptions and

11   membership fees lapsed, so did my

12   membership.  And I think that would have

13   been in 2019.

14      Q.   I understand.

15      A.   Yeah.

16      Q.   Is it -- is an active board

17   certification in plastic surgery a

18   prerequisite to being in the American

19   Society of Plastic Surgeons?

20      A.   I seem to remember that when I

21   -- back in the '90s after my residency,

22   there's a -- there's a membership for --

23   for board-eligible.  It's not the full

## DEPOSITION OF PATRICK LAPPERT, M.D.

1   membership, but then when you get
2   board-certified, then you get full
3   membership and the rights to use the logo
4   and all that sort of stuff, so.  Yeah, as
5   I recall.  It's been a long time since I
6   read the bylaws.  That would have been
7   back in '95, I think, that I read those
8   things.
9       Q.   Yeah.  When did you first join
10  the ASPS?
11      A.   I think I joined as a student
12  member when I was in my residency.  I
13  want to say it was probably like '92 or
14  '93, somewhere in there.
15      Q.   So you were in the ASPS roughly
16  '92 --
17      A.   I think, yeah.
18      Q.   -- to 2017?
19      A.   I think, yeah.  As I recall --
20  again, it's a little bit murky, but as I
21  recall, there's sort of a provisional
22  membership for residents in training.
23  You sort of get a discounted rate on all

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 102

```
 1    of the expensive things, and the -- and
 2    access to the White Journal, as it's
 3    called.  And then -- and then I -- as I
 4    recall, you don't get the full membership
 5    until you've been board-certified, which
 6    happened for me, as you know, in '97.
 7         Q.   Okay.  But you were part of the
 8    ASPS for a long time; right?
 9         A.   Yes.  Going to meetings.
10         Q.   You consider the ASPS to be a
11    reputable organization; right?
12              MR. KNEPPER:  Objection, form.
13         A.   Yeah.  Well, for the most part,
14    yeah.  Certainly, the members, virtually
15    most of the members I've ever known are
16    reputable.  And there are some things
17    that the ASPS has done through the years
18    that -- that I've had difficulty with
19    and -- but they're certainly the
20    organization in American plastic surgery.
21         Q.   Yeah.  I think one statistic I
22    heard is 93 or so percent of all plastic
23    surgeons are part of the ASPS.
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 103

1      A.    Yeah.

2      Q.    Right?

3      A.    That -- that number wouldn't

4   surprise -- I would have thought even

5   higher, actually, but yeah.

6      Q.    Do you think the ASPS would

7   encourage its members to perform

8   surgeries that are not medically

9   necessary?

10          MR. KNEPPER:  Objection, form.

11     A.    Well, the -- as a -- as an

12   organization, they don't encourage

13   particular surgeries, but they may

14   support them with their scientific

15   presentations, their conferences, and

16   that sort of thing.

17          For example, three or four years

18   ago, I went to a meeting of the

19   California Society of Plastic Surgery,

20   which is -- I think it has sort of a

21   subsidiary relationship with the ASPS.

22   And at that conference, among other

23   things -- I went there because that's one

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 104

1    of the -- the areas of the country where

2    I trained and I had hoped to see some

3    friends there.  But -- but for example,

4    in that conference I went to a lot of

5    great presentations, but the last day was

6    devoted almost entirely to transgender

7    surgery.

8              And so if you're asking me do I

9    -- how do I feel about that, well, I have

10   great difficulty with a professional

11   organization that would support or

12   promote those sorts of interventions

13   knowing what I know about the scientific

14   underpinnings of those medical and

15   surgical procedures.  And I had many

16   conversations at that conference on the

17   subject with persons who were providing

18   the services, and I didn't find their

19   answers particularly satisfactory.  So

20   that would be an example.

21              I can't give you carte blanche

22   that everything that the Society says and

23   does is to my liking.  I would say

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 105

1    probably most of what they say and do is
2    very much to my liking.  But on this
3    matter, I have -- I have a great
4    difficulty.  And it's one of the reasons
5    that I -- I -- yeah.
6        Q.   It's one of -- one of the
7    reasons that you what?
8        A.   That I -- that I don't have a
9    lot of heartache about stepping away from
10   the ASPS.
11       Q.   Do you think the AS- -- ASPS
12   advocates in favor of surgical procedures
13   that are not medically necessary?
14       A.   I think that would be probably
15   an overreaching statement.  I wouldn't
16   say that.  I would say that perhaps
17   they're mute on some of the -- some of
18   the procedures that their members
19   perform, and they certainly have their
20   eyes and ears open for new things.  And
21   so when members come forward to make
22   presentations about particular new
23   therapies and new approaches, as they

## DEPOSITION OF PATRICK LAPPERT, M.D.

1    should, the ASPS is open to those things.

2    So for many years, transgender surgery

3    has been in that category.

4         I remember when I was a -- even

5    when I was a general surgeon and I was

6    looking for residency programs to train

7    in, I was considering UVA.  And I saw

8    that -- that Milton Edgerton, one of the

9    great names in plastic surgery was at UVA

10   doing transgender surgery, both at UVA

11   and at Johns Hopkins.  And I remember

12   thinking, well, I'm -- I really need --

13   it struck me as an unusual operation, and

14   I -- I started doing some research into

15   it.

16         And I remember starting to think

17   about the issue of transgender surgery

18   back in the -- what would have been 1991,

19   1990, 1991.  And -- and through the

20   years, the ASPS has made room for that

21   intervention, those therapies, in their

22   conferences, in their dialogues, in their

23   publications.  And I've reviewed all that

## DEPOSITION OF PATRICK LAPPERT, M.D.

1      stuff as it has come along.  And I think

2      now being twenty, nearly thirty years on

3      since I first started looking at it and

4      they're still just sort of at that stage

5      of -- of putting it out there, although

6      now they're offering more extensive

7      training conferences on how to do those

8      procedures, and they're now encouraging

9      that it be included in residency

10     programs, and so -- yeah.

11         Q.   Do you know what position the

12     ASPS takes on whether gender-affirming

13     surgery is medically necessary?

14         A.   I think that position has

15     changed, and now they're -- they're

16     speaking positively about it.

17         Q.   Yeah.  Your own professional

18     organization, or at least your former

19     organization, takes the position that

20     gender-affirming surgery is medically

21     necessary; right?

22              MR. KNEPPER:  Objection, form.

23         A.   Yeah.  As I -- as I said before,

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 108

1    this is one of the reasons why I don't

2    have a lot of heartache about having

3    withdrawn my membership.  Yeah.

4        Q.    Now let me introduce another

5    exhibit.  Let me know when you have it,

6    Doctor.

7    (Exhibit 7 was marked for identification

8    and is attached.)

9        A.    Okay.  Okay.  I've got it.

10       Q.    The top of the page says,

11   "American Society of Plastic Surgeons."

12   Right?

13       A.    Yes.

14       Q.    You see this document is dated

15   February 25, 2021; right?

16       A.    Yes.

17       Q.    This is after all the studies

18   that you cite in your report; right?

19       A.    Where does that say that?  I'm

20   sorry, you're at a particular paragraph?

21       Q.    No.  The date of this --

22       A.    Oh, I see.  Oh, the date is

23   after this --

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 109

1        Q.   Yeah.

2        A.   Yes.  Well, February 25th, yes,

3    2021.

4        Q.   Yeah.  This is -- this is dated

5    after all of the studies that you cite in

6    your report; correct?

7        A.   I don't -- yeah, I don't

8    remember off the top of my head any

9    studies that were dated after.  There may

10   have been an April study in there, but

11   okay.

12       Q.   The first sentence says, "Policy

13   around transgender care has recently

14   gained considerable attention amid a

15   growing trend of legislation carrying

16   serious professional, financial or

17   criminal penalties for the provision of

18   gender affirmation care."  You see that?

19       A.   I do.

20       Q.   Now, this reference to a growing

21   trend of legislation, that's talking

22   about legislation like the Arkansas ban

23   and the Utah ban and the Alabama ban that

# DEPOSITION OF PATRICK LAPPERT, M.D.

Page 110

1    we talked about earlier; right?

2        A.    Right.

3             MR. KNEPPER:  Objection, form.

4        Q.    Go to page 2.  Look at the

5    second paragraph.  It says that "Less

6    than three months into 2021, 11 pieces of

7    legislation attempting to criminalize

8    gender affirmation therapies have been

9    introduced in 10 states."  See that?

10       A.    I do.

11       Q.    And then there's a list of

12   states; right?

13       A.    Yes.

14       Q.    So we talked about Utah and

15   Alabama and Texas before.  Looking at

16   this list, does that refresh your

17   recollection whether you've worked on

18   these kind of legislative efforts in any

19   other states?

20       A.    I think -- I think, yeah, my

21   answer has not changed.  I think I've

22   only been involved in Alabama, Texas, and

23   Utah.  I don't remember anything from

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 111

1    Oklahoma, New Hampshire, Montana, or

2    Missouri or Mississippi.  I don't recall

3    any other states in that list, no.

4        Q.   Okay.  All right.  Now let's

5    look at what position the ASPS takes on

6    whether gender-affirming treatment is

7    medically necessary.  Go to page 3.  The

8    first sentence says, "ASPS firmly

9    believes that plastic surgery services

10   can help gender dysphoria patients align

11   their bodies with whom they know

12   themselves to be and improve their

13   overall mental health and well-being."

14   Do you see that?

15       A.   I do.

16       Q.   The ASPS, your own professional

17   organization, does not agree with your

18   opinions that gender-affirming surgery is

19   medically inappropriate; right?

20           MR. KNEPPER:  Objection, form.

21       A.   Let me just read that.  Give me

22   just a moment to look at that.  Okay.

23           Yeah.  This is a very --

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 112

1    language used by the other professional

2    organizations, and essentially, the

3    language takes the position that surgical

4    intervention for a subjective problem is

5    medically indicated.  And that's the

6    difficulty that I'm having here, is that

7    in this document the ASPS does not --

8    does not provide medical scientific

9    support.  They essentially admit that the

10   surgery is for help with a psychological

11   problem of perception on the part of the

12   patient.  So essentially what -- what the

13   ASPS firmly believes in is the use of

14   surgery to manage a psychological

15   problem.  And -- and this is -- this is

16   consonant with the -- with the -- the

17   consensus opinions that were offered by

18   the other professional organizations that

19   you listed earlier.

20       Q.   The AS- -- ASPS does not agree

21   with your opinions that gender-affirming

22   surgery is experimental; correct?

23            MR. KNEPPER:  Objection, form.

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 113

1      A.   They don't -- let's see, do they
2   say anything about experimental in here?
3   No, they don't.  So yeah, I would agree.
4      Q.   Do you agree?  Yeah.
5      A.   I would agree, yeah, sure.
6      Q.   Look at the last sentence.  It
7   says, "ASPS will continue its efforts to
8   advocate across state legislatures for
9   full access to medically necessary
10  transition care."  Do you see that?
11     A.   Yeah.  I don't find that
12  statement at all surprising.  No.
13     Q.   Yeah.
14     A.   I do see that, yeah.  Not
15  surprising.  This is legislative --
16     Q.   The ASPS --
17     A.   -- legislative advocacy by the
18  ASPS.
19     Q.   The ASPS considers transition
20  care to be medically necessary; right?
21          MR. KNEPPER:  Objection, form.
22     A.   Again, that returns -- returns
23  to that -- that inherent and

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 114

1    contradictory statement of medical

2    necessity for a subjective condition.

3    And the statement is consistent with what

4    -- yeah.  Exactly, yeah.

5        Q.   It's fair to say that the

6    opinions that you and Dr. Hruz and Dr.

7    Levine are offering in this case are very

8    different than the position that the ASPS

9    has adopted on whether gender-affirming

10   surgery is medically necessary; right?

11           MR. KNEPPER:  Objection, form.

12       A.   Absolutely correct.

13       Q.   In fact, let me show you how

14   strongly the ASPS feels about this issue.

15   Let me introduce another exhibit.  Okay.

16   Let me know when you -- when you receive

17   it.

18           MR. KNEPPER:  Dmitriy, I -- I

19   will tell you, it seems to be moving more

20   slowly than normal.  I don't know if

21   you're seeing the same thing on your end.

22           MR. TISHYEVICH:  I am.

23       A.   So yeah, I have this document.

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 115

1    Again from the ASPS?  Is that the one?

2    February 25th?

3        Q.   No.  It should be -- it's a

4    one-page document.  I think it just says

5    ASPS in your folder.

6        A.   Exhibit 7?

7            MR. TISHYEVICH:  Let me -- let's

8    go off the record for a minute.

9            MR. KNEPPER:  Sure.

10           THE VIDEOGRAPHER:  We are off

11    the record at 10:19 a.m.

12               (Break taken.)

13           THE VIDEOGRAPHER:  We are back

14    on the record at 10:21 a.m.

15       Q.   (By Mr. Tishyevich) All right.

16    Doctor, before the break, we were talking

17    about the ASPS and the position they take

18    on the medical necessity of

19    gender-affirming surgery.  You recall

20    that?

21       A.   Yes.

22       Q.   All right.  This is a document

23    from the ASPS titled "2021 State Policy

**DEPOSITION OF PATRICK LAPPERT, M.D.**

Page 116

```
 1        Priorities."  Do you see that?
 2        (Exhibit 8 was marked for identification
 3        and is attached.)
 4             A.   Yes.
 5             Q.   Last sentence of the first
 6        paragraph says, "To ensure that our
 7        health care system is effective and
 8        efficient, ASPS will focus its state
 9        advocacy efforts on," and then there's a
10        list.  Do you see that?
11             A.   Yes.
12             Q.   And there's three sections:
13        "Core Priorities," "High Priorities," and
14        "Other Priorities."  You see that?
15             A.   Yes.
16             Q.   Go to the "High Priorities"
17        section.
18             A.   Okay.
19             Q.   The last bullet says, "Opposing
20        attempts to criminalize gender
21        confirmation."  Do you see that?
22             A.   I do.
23             Q.   And you understand what this
```

# DEPOSITION OF PATRICK LAPPERT, M.D.

Page 117

```
 1      bullet means; right?
 2          A.    I do.
 3              MR. KNEPPER:  Objection to form.
 4          Q.    One of the ASPS's high
 5      priorities for this year is to oppose
 6      legislation like the Arkansas ban and the
 7      Utah ban and the Alabama ban that you are
 8      supporting; right?
 9          A.    Apparently so, yes.
10              MR. KNEPPER:  Objection, form,
11      scope.
12          Q.    The sense that I got from
13      reading your report, Doctor, is that it's
14      supposedly generally accepted that
15      gender-affirming surgical treatment is
16      experimental and should not be performed
17      on anyone; right?  That's what you think?
18              MR. KNEPPER:  Objection, scope,
19      form.
20          A.    Right.  My opinion -- my opinion
21      in that matter is based on the -- on the
22      world literature rather than advocacy
23      statements by a professional
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 118

```
1     organization.  That's right.
2         Q.    You are suggesting, in fact,
3     that doctors who do these surgeries
4     should be investigated for unethical
5     behavior and potential misconduct; right?
6              MR. KNEPPER:  Objection, form.
7         A.    I -- yes, I do.
8         Q.    And you do not think it's
9     relevant to mention that your own
10    professional society takes a view that is
11    contrary to the opinions that you're
12    offering in this case; right?
13        A.    I'm not sure I understood your
14    question, sir.
15        Q.    Yeah.  When you talk about how
16    these doctors should be investigated for
17    misconduct, you don't think it's relevant
18    that your own professional society takes
19    a completely contrary view?
20             MR. KNEPPER:  Objection, form.
21        A.    Well, I think I would -- I would
22    characterize my concern and -- and
23    possibly recommendation of investigation,
```

**DEPOSITION OF PATRICK LAPPERT, M.D.**

```
 1        I was discussing, I think, consent
 2        procedures and getting informed consent.
 3        I don't think -- yeah, so -- so I think
 4        the object- -- the concerns I raised had
 5        to do with the off-label use of drugs in
 6        irreversible treatments, the -- the
 7        problem of obtaining consent from
 8        emotionally compromised people who are
 9        threatening suicide.  Those were the
10        issues that I raised in terms of, you
11        know, investigation kind of things, or
12        examination would be a better term,
13        examination of -- of how a
14        physician/surgeon conducts their
15        practice, so.
16            Q.    Go -- go back to your report.
17            A.    Okay.
18            Q.    Go to page 15.  You with me?
19            A.    Yes, sir.
20            Q.    Look at the second sentence in
21        the bottom paragraph.  You say, "Basing
22        life changing surgeries that damage and
23        destroy the natural functions of
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

1   perfectly healthy organs on nothing more

2   than the unverified self-reports

3   (conversations) of often disturbed

4   patients as part of untested, unproven,

5   experimental 'treatments' that are

6   'supported' by a methodo-" --

7   "methodologically defective research base

8   when competent reviews have called such

9   research 'low quality' evidence and noted

10  the 'lack of any randomized clinical

11  trials' -- should be properly

12  investigated as unethical, misconduct and

13  an abuse of a vulnerable patient

14  population."

15          Right?  That's your opinion?

16      A.   Yes, sir.  And I stand by that.

17      Q.   You know that today there's

18  thousands of plastic surgeons that are

19  performing these surgeries; right?

20          MR. KNEPPER:  Objection, form,

21  scope.

22      A.   I don't know the number of

23  plastic surgeons who do these surgeries.

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 121

1      Q.    Hundreds?

2      A.    I'm -- I'm sure the number is

3   large.  I don't know what the number is.

4   Yes.

5      Q.    And you think all of those

6   doctors are out there committing

7   misconduct?  Is that really what you

8   think?

9      A.    Well, I think that -- that their

10   knowledge might affect their

11   decision-making.  So if somebody is going

12   through a residency training program that

13   -- that is teaching these things and they

14   grow up in that world -- let me give you

15   an example.

16          When I was a surgeon in training

17   in general surgery, the -- the most

18   coveted surgical experience would be, as

19   a chief resident, to do ulcer surgery.

20   At the time, we thought that ulcers were

21   caused by neurologic problems affecting

22   the stomach.  And so some of the most

23   complex abdominal surgeries were ulcer

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 122

1    surgeries, and some of the greatest names
2    in general surgery were given to those
3    operations.  Subsequent to my residency
4    training, perhaps five years later, it
5    was found to be a medical condition
6    treatable with antibiotics and antacids.
7    Nobody does ulcer surgery any longer.
8            I would put -- I would put
9    transgender surgery in the same category.
10   Well-meaning persons who are interested
11   in the care of people who are suffering,
12   in this case, transgender persons who are
13   suffering, well-meaning physicians and
14   surgeons are offering them the best care
15   that they've learned in their training.
16   But I -- I would expect that when the
17   science shows that to be not the case,
18   that those same doctors will abandon it.
19   And I think we're at the same stage now.
20   We're at an inflection point in plastic
21   surgery where in the last three years
22   things have changed radically.
23           If you had asked that question

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 123

1    five, seven years ago, it would have been
2    up for grabs.  But things have changed
3    radically with the flood of credible
4    scientific evidence pouring in from
5    Europe to now -- if -- if five years from
6    now, having seen that information,
7    surgeons persist in doing transgender
8    surgery, then I would -- then I would
9    have real issues with that, as I would
10   with a -- with a general surgeon offering
11   a Billroth II ulcer operation today when
12   you could give the patient erythromycin
13   and some -- and some Zantac.  You see
14   where I'm going.
15           So we're at a -- we're at a
16   tipping point in the world of plastic
17   surgery right now, and the last three
18   years have changed everything, because
19   the very, very well-supported -- see, the
20   problem is quality of evidence.  Plastic
21   surgeons in America are operating with
22   scientific evidence that even the
23   American Society of Plastic Surgery

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 124

```
 1      characterizes as level 5 evidence,
 2      basically, the -- the professional
 3      opinions based on personal experience.
 4      This is entry-level science for a
 5      particular therapy or a particular
 6      intervention.
 7              To raise to level 4, you would
 8      have to have the same collected cases
 9      with -- with before and after tests of
10      the patient.  We haven't gotten to that
11      level yet.  There are no long-term
12      longitudinal studies in the American
13      literature.  It's all in the European
14      literature, and the bulk of it in the
15      last three years.
16              So the question is a difficult
17      one to answer.  As simply as saying that
18      all of these people are immoral, I'm not
19      saying that at all.  I'm saying that
20      they're doing the best that they know how
21      according to the training that they've
22      received for people that they very much
23      care for and are hoping to do good by.
```

# DEPOSITION OF PATRICK LAPPERT, M.D.

1    But the -- but the world is changing

2    rapidly now, and we've reached a stage

3    now where it's such a controversy that

4    this is -- this is -- this is why I've

5    become so publicly vocal about it,

6    because the controversy is now raging.

7    It's no longer:  "Maybe so.  Milton

8    Edgerton, interesting guy.  You know, the

9    surgery at UVA, the surgery at Johns

10   Hopkins, let's get a look at that kind of

11   thing."  We've gone beyond that now, and

12   just in the last three years.

13          So I -- the people who do these

14   surgeries are not right out of residency

15   training.  These are people who have --

16   you know, who have been in the -- in the

17   business for a number of years now, and

18   they're relying on what they learned and

19   doing the best that they can.  But as I

20   say, the science is changing everything,

21   so.

22          MR. TISHYEVICH:  With respect,

23   I'm going to strike that answer as not

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 126

```
 1   responsive.
 2        Q.    Here's the -- here's --
 3             MR. KNEPPER:  No.
 4        Q.    -- the question that I'd like
 5   you to answer.
 6             MR. KNEPPER:  Go ahead.
 7        Q.    Here's the question that I'd
 8   like you to answer.  Is it your expert
 9   opinion that the surgeons that are today
10   performing gender-affirming surgical
11   procedures are committing or potentially
12   committing misconduct, yes or no?
13             MR. KNEPPER:  Objection, form,
14   scope, asked and answered.  Dmitriy, you
15   asked him.  He gave you a --
16             MR. TISHYEVICH:  I don't need
17   the speaking objections.  I do not need
18   the speaking objections.
19        Q.    Answer my question, Doctor.
20             MR. KNEPPER:  He gave you a
21   thoughtful answer.
22        A.    Okay.  If you could ask me the
23   question again, I want to be sure that
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 127

1      I -- I answer it as succinctly as I can.

2          Q.   Is it your expert opinion that

3      the surgeons that are performing

4      gender-affirming surgical procedures

5      today are potentially committing

6      professional misconduct, yes or no?

7               MR. KNEPPER:  Objection, form.

8          A.   I would -- I would say, only to

9      the extent that they're familiar with the

10     more recent literature would make them

11     sort of culpable, if you will.  Not --

12     not being aware of that literature, I

13     would not accuse them of such a thing.

14         Q.   All right.  Let me introduce

15     another exhibit.  Let me know when you

16     get this one, Doctor, Exhibit 9.

17     (Exhibit 9 was marked for identification

18     and is attached.)

19         A.   All right.  The first page of

20     my -- well, that's the CV, I guess.  My

21     CV, yes.

22         Q.   This is a copy of your CV;

23     right?

## DEPOSITION OF PATRICK LAPPERT, M.D.

1      A.    Yeah.  Yes.

2      Q.    You prepared this?

3      A.    Well, it was prepared for me by

4  -- I gave -- I gave the factual input for

5  it, but I didn't prepare it myself, let's

6  say.

7      Q.    Top of the page says, "Board

8  Certified in Surgery and Plastic Surgery"

9  again; right?

10     A.    Right.  Same mistake, yeah.

11     Q.    We agree that's not consistent

12  with guidance from the American Board of

13  Surgery, American Plastic Board of

14  Surgery; correct?

15         MR. KNEPPER:  Objection, form.

16     A.    Yes.

17     Q.    Go to page 3, the bottom of the

18  page.  It says, "Publications - Peer

19  Reviewed Medical Journals."  You see

20  that?

21     A.    I do.

22     Q.    And then through page 4, it

23  lists six publications; right?

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 129

1      A.    Right.

2      Q.    In your professional career,

3   you've published six articles in

4   peer-reviewed medical journals; right?

5      A.    Right.

6      Q.    First one was in 1997; right?

7      A.    '87.  Yes.

8      Q.    Most recent one was in 1998;

9   correct?

10      A.    Correct.

11      Q.    That's 23 years ago; right?

12      A.    Right.

13      Q.    You have not published any

14   original research in peer-reviewed

15   literature within the last 23 years;

16   correct?

17      A.    Correct.

18      Q.    All right.  Let's go through

19   these in reverse order.  All right.  Most

20   recent one from '98 is titled "Treatment

21   of an isolated outer table frontal sinus

22   fracture using endoscopic reduction and

23   fixation."  Right?

## DEPOSITION OF PATRICK LAPPERT, M.D.

1      A.   Yes.

2      Q.   That publication doesn't relate

3  to gender-affirming surgery or to gender

4  dysphoria; correct?

5      A.   Tangentially, it would relate to

6  it.  And I would say this about it.  It

7  was one of the first, if not the first,

8  paper demonstrating the use of endoscopic

9  technique to operate on facial bones of

10  the forehead and the use of internal

11  fixation devices for modification or

12  repair of the forehead.  Those are the

13  same techniques that are now used by

14  transgender surgeons who are offering top

15  surgery.  For example, for feminization

16  of a masculine brow ridge, they use

17  endoscopic technique, which is described

18  in this paper that came out 23 years ago

19  and was written by myself and another

20  Navy surgeon.

21      Q.   Understood.

22      A.   Yeah.

23      Q.   The -- the patient in this

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 131

 1        publication was not treated for face --

 2        for gender dysphoria obviously; right?

 3            A.    No.   She was a sweet pizza maker

 4        who had slipped in the kitchen and struck

 5        her head on a stainless steel table and

 6        had a -- had a displaced fracture of her

 7        forehead.   But no, she was -- not to my

 8        knowledge.   I don't know if she was or

 9        not, but to my knowledge, she was not.

10            Q.    Next one going backwards is from

11        1996, and it's titled, "Scarless Fetal

12        Skin Repair: 'Unborn Patients' and 'Fetal

13        Material.'"   Do you see that?

14            A.    I do.

15            Q.    All right.   That doesn't relate

16        to gender-affirming surgery or to gender

17        dysphoria, I take it?

18            A.    It -- it actually refers to all

19        forms of surgery and particularly,

20        ethical decision-making.   So I would say

21        that it's -- it's a -- it's a fairly

22        broad paper that talks about how we treat

23        other human persons.   So transgender

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 132

1      surgery is all about how we treat other

2      human persons.  That's what that paper is

3      about and how -- how some surgeons are

4      likely -- or possibly physicians and

5      surgeons could characterize someone as

6      less than human, which is a -- which is a

7      danger that transgender persons

8      experience when they're seeking care.

9      And so I would say that in a very

10     tangential way, it does.  It does impinge

11     upon the field of transgender medicine

12     precisely for the reason that transgender

13     persons suffer oftentimes from being

14     treated as -- as someone who is less than

15     human.

16         Q.   Aside from that very tangential

17     angle, this paper does not specifically

18     relate to gender-affirming surgery or

19     gender dysphoria; correct?

20         A.   No, it does not.

21         Q.   And the next one before that is

22     in 1995.  Do you see that?

23         A.   I do.

## DEPOSITION OF PATRICK LAPPERT, M.D.

```
 1        Q.    You're listed as the third
 2    author in this one; right?
 3        A.    Yes, sir.
 4        Q.    Because you're not the lead
 5    author; right?
 6        A.    No.   The attending surgeon is
 7    always the lead author, and I was a
 8    resident.   I was a resident at that time,
 9    yeah.
10        Q.    Understood.   This one's titled
11    "Delayed development of an ectopic
12    frontal sinus mucocele after pediatric
13    cranial trauma."
14        A.    Mucocele, yes.   Mucocele.
15        Q.    Thank you.   This publication
16    doesn't relate to gender-affirming
17    surgery or gender dysphoria; correct?
18        A.    Not directly, no.
19        Q.    Okay.   Next one before that is
20    titled "Patch Esophagoplasty"?
21        A.    Very good.
22        Q.    And that's repair or
23    reconstruction of the esophagus; right?
```

# DEPOSITION OF PATRICK LAPPERT, M.D.

1      A.   Yes.

2      Q.   Does this relate to

3   gender-affirming surgery or gender

4   dysphoria?

5      A.   No.

6      Q.   Next one before that is titled

7   "Modified Skin Incisions for Mastectomy:

8   The Need for Plastic Surgical Input in

9   Preoperative Planning."  Do you see that?

10      A.   I do.

11      Q.   And finally, your oldest

12   publication is from 1987, titled

13   "Peritoneal Fluid in Human Acute

14   Pancreatitis."  Do you see that?

15      A.   Yes.

16      Q.   Does that relate to

17   gender-affirming surgery or gender

18   dysphoria?

19      A.   It does not.  By the way,

20   that -- that second to the last article,

21   your pattern of questions, I wondered if

22   you overlooked asking the same question

23   on that paper.

## DEPOSITION OF PATRICK LAPPERT, M.D.

1      Q.   No.  I want to ask you more
2    specific questions about that one, so
3    we'll spend --
4      A.   Oh, okay.
5      Q.   -- more time on that one.
6      A.   Good.  Good.  Very good.  All
7    right.
8      Q.   Don't worry.
9      A.   Yeah.  "Peritoneal Fluid in
10   Acute Pancreatitis" was a research paper,
11   animal model, and review of the
12   literature.  Yeah.
13     Q.   Okay.  You agree there's a
14   difference between a scientific article
15   that reports original research versus a
16   letter to the editor that's published in
17   a scientific journal?
18          MR. KNEPPER:  Objection, form.
19     A.   Yes.
20     Q.   Some of your publications listed
21   here are just letters to editors; right?
22     A.   Yes.
23     Q.   Why is it that your CV doesn't

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 136

```
 1      identify those as letters as opposed to
 2      original research?
 3          A.   I didn't -- that didn't occur to
 4      me to do that.  Do we generally list them
 5      separately?  I don't know.  I just put
 6      all my publications there.
 7          Q.   So we can look at them, but for
 8      example, the scarless fetal skin repair,
 9      that's a letter to the editor; right?
10          A.   Right.
11          Q.   And so is the 1993 publication
12      on patch esophagoplasty; right?
13          A.   Right.
14          Q.   So out of the six publications
15      that you list in your CV, at least two of
16      them are letters to editors rather than
17      original research; fair?
18              MR. KNEPPER:  Objection, form.
19          A.   Right.  Yes.
20          Q.   Okay.  Let's talk about your
21      experience treating transgender patients.
22      You retired from the military in 2002;
23      correct?
```

**DEPOSITION OF PATRICK LAPPERT, M.D.**

1        A.    Correct.

2        Q.    In 2002, the U.S. military

3    certainly was not providing any

4    gender-affirming treatment to anyone in

5    the military; right?

6        A.    That's correct.

7        Q.    Or to veterans; right?

8        A.    Correct.

9        Q.    In fact, at that time, there was

10   a policy not to provide gender-affirming

11   treatment to active military or to

12   veterans; correct?

13           MR. KNEPPER:  Objection, form,

14   scope.

15       A.    Correct.

16       Q.    So during your career in the

17   military, you did not provide any

18   gender-affirming treatment to any

19   patients; correct?

20       A.    Correct.

21       Q.    All right.  Let's focus on your

22   practice after you left the military in

23   2002.  You currently run the Lappert Skin

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 138

1    Care clinic; right?

2        A.    That's correct.

3        Q.    How long have you operated that

4    clinic?

5        A.    One year.

6        Q.    Did you operate any clinics

7    before opening this one?

8        A.    Yes.

9        Q.    What was that one?

10       A.    That was my plastic surgery

11   office called Lappert Plastic Surgery in

12   Madison, Alabama.  And before that, it

13   was under the same name but located in

14   Decatur, Alabama.  And before that, it

15   was in Scottsbluff, Nebraska, same name.

16       Q.    How long did you run the Lappert

17   Plastic Surgery clinic?

18       A.    The Madison office was for 15

19   years.  I'm sorry.  The Madison office

20   was for ten years.  My -- my mistake.

21   Ten years at the Madison office, five

22   years at the Decatur office, and three

23   years at the Scottsbluff office.

# DEPOSITION OF PATRICK LAPPERT, M.D.

1      Q.   So, let me just make sure I have

2   my timing here.  So you've had the

3   Lappert Skin Care clinic for a year,

4   since 2020?

5      A.   Right.

6      Q.   And then the Lappert Plastic

7   Surgery ten years in Madison, so roughly

8   2010 to 2020?

9      A.   That's right.

10      Q.   And then five years before that

11   in Decatur, 2005 --

12      A.   Right.

13      Q.   -- to 2010, roughly?

14      A.   Right.

15      Q.   And then --

16      A.   Scottsbluff was from 2002

17   through two -- through 2005.  That was

18   where I went when I retired out of the

19   Navy.

20      Q.   Your -- your skin clinic

21   currently does treatments like Botox,

22   light therapy, laser hair removal; right?

23      A.   Right.  Laser tattoo removal,

## DEPOSITION OF PATRICK LAPPERT, M.D.

1    injectables, just skin consultations for
2    skin problems like rosacea, acne, that
3    sort of thing.  That's right.
4        Q.   Were you performing similar
5    treatments at the Lappert Plastic Surgery
6    clinic?
7        A.   Yes.  All I've done is I've just
8    suspend -- I just retired from active
9    surgical practice.  I had an operatory in
10   my office in Madison as well as in
11   Decatur previously, so I would do both
12   hospital-based surgeries as well as
13   clinic-based, office-based procedures.
14       Q.   So for example, light therapy
15   services, you've offered that for
16   ten-plus years, I take it?
17       A.   I believe we got that instrument
18   in 2006.
19       Q.   How about Botox?  Have you been
20   offering that for more than ten years?
21       A.   Yes.
22       Q.   Have you done forehead
23   injections for more than ten years?

## DEPOSITION OF PATRICK LAPPERT, M.D.

```
1        A.    With Botox?

2        Q.    Yes.

3        A.    Yes.

4        Q.    How about crow's feet?  Is that

5   the right term?

6        A.    Yes.

7        Q.    More than -- more than ten

8   years?

9        A.    Yes.

10       Q.    When was the last time you've

11   performed a surgical procedure?

12       A.    Well, as I said, I retired from

13   surgery in August of 2020, so it was -- I

14   think I was doing some last procedures in

15   that same month, perhaps July, somewhere

16   in there.

17       Q.    And in 2020, roughly how many

18   surgical procedures do you think you've

19   performed?

20       A.    From January to July?

21       Q.    Yes.

22       A.    Let's see.  Seven months.

23   Perhaps -- I don't know.  Maybe eighty,
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 142

1   something 80 to 100, I'm guessing.  I

2   don't know.

3       Q.   And give me examples of common

4   surgeries you would have performed in

5   2020.

6       A.   Well, among the most common ones

7   that we did in the -- in the office were

8   autologous fat grafting for recon- -- for

9   rejuvenation of the face, autologous fat

10  grafting for breast augmentation,

11  ultrasound -- I'm sorry -- laser

12  lipoplasty for body contouring, and then

13  many in-office surgical procedures for

14  skin cancer and skin cancer

15  reconstruction, particularly of the face

16  and the extremities.

17      And then on the hospital side, I

18  would be guessing how many, but it was

19  common for me to do breast reductions and

20  abdominoplasties, little local flap

21  reconstructions in the hospital for

22  younger patients who needed anesthesia,

23  reconstruction -- little reconstructive

## DEPOSITION OF PATRICK LAPPERT, M.D.

1    flaps for trauma or for cancer.

2            I had a working relationship

3    with a dermatologist who did a lot of

4    what's called Mohs surgery for removal of

5    cancers.  He would send me his patients

6    if they -- if they were cancers that

7    involved the face.  I would do those

8    reconstructive surgeries.

9            Yeah, that was probably -- I was

10   definitely throttling back in my last

11   year.  I didn't take on a lot of complex

12   cases, so.

13       Q.   Okay.

14       A.   Because I needed -- you need

15   follow-up, and so limited.

16       Q.   I understand.  Let's go back to

17   your report.  Go to page 4.

18       A.   Okay.

19       Q.   Okay.  Five lines down, you see

20   the sentence starting with, "In my

21   private practice"?

22       A.   Yes.

23       Q.   Okay.  Let's break this down.

## DEPOSITION OF PATRICK LAPPERT, M.D.

1    So you reference treated skin

2    pathologies.  What skin pathologies are

3    you referring to here?

4        A.   Skin can- -- well, surgically or

5    medically, we're talking two different

6    categories, but.  So I'm consulted on --

7    on a lot of nonsurgical skin pathologies.

8    But as far as surgical skin pathologies,

9    that would include various forms of

10   malignancy and then benign growths and

11   things that are either aesthetically or

12   -- aesthetically problematic or

13   suspicious in appearance, so both proven

14   cancers and things that are suspicious of

15   cancers.  So those would be the skin

16   conditions.  The medical --

17       Q.   Yeah.  Well --

18       A.   -- skin conditions -- I'm sorry?

19       Q.   Yeah.  That's all right.  I'm

20   asking more specifically.

21       A.   Okay.

22       Q.   Because here, you write, "I've

23   had occasion to treat many

## DEPOSITION OF PATRICK LAPPERT, M.D.

```
1      self-identified transgender patients for
2      skin pathologies related to their use of
3      high dose sex steroids."
4          A.    Yeah.
5          Q.    So focusing specifically on that
6      patient population.
7          A.    Okay.
8          Q.    So, what skin pathologies are
9      you referring to here with respect to
10     transgender patients?
11         A.    Well, I've had a few patients
12     who've come in evidencing, you know,
13     acneiform conditions of the facial skin.
14     And so helping people manage acne is a
15     common thing that I do, and a variety of
16     interventions including, you know, the
17     light therapy, but more -- more properly,
18     the use of medications and -- and
19     sometimes laser therapy to manage
20     scarring.  But in those particular cases
21     of the trans-identified people, it's
22     mostly just ordinary management of acne.
23     And it's usually the same patients who
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

1      come to see me about facial hair removal

2      with laser.  I have a couple of patients

3      in that category, people who are

4      transitioning and who are seeking laser

5      removal of hair from their faces.

6          Q.   And you said this is a few

7      patients.  How many transgender patients

8      would you estimate you've treated for

9      skin pathologies related to steroids?

10         A.   Related to -- to sex steroids?

11         Q.   Yes.

12         A.   Oh, I don't know.  Probably less

13     than half a dozen.

14         Q.   Okay.  The acne you're referring

15     to, it's essentially a side effect from

16     the steroids; right?

17         A.   It's a common side effect of --

18     of -- yeah.  Particularly androgen is the

19     most common.

20         Q.   So this -- and so you're

21     treating patients with gender dysphoria

22     after they have already decided to follow

23     a certain course of treatment and started

## DEPOSITION OF PATRICK LAPPERT, M.D.

```
 1      taking sex steroids; right?
 2          A.   Right.  Yeah.
 3          Q.   Okay.  And then you say you've
 4      done laser therapies for management of
 5      facial hair of also the transgender
 6      population?
 7          A.   That's right.
 8          Q.   Right?
 9          A.   That's right.
10          Q.   And is that also in about half a
11      dozen patients?  Or what's you're
12      estimate?
13          A.   Yeah.  It's not a huge number.
14          Q.   Okay.  And finally, you say
15      you've done breast reversal surgeries for
16      detransitioning patients.  On how many
17      patients have you performed -- strike
18      that.
19               On how many detransitioning
20      patients have you performed the surgery?
21          A.   Two.
22          Q.   Two.  All right.  It's not a
23      commonly performed procedure for you;
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

1    fair?

2         MR. KNEPPER:  Objection, form.

3      A.   Yeah, no.  They -- they started

4    coming to me in that last year of

5    practice, so.  Yeah, that -- it's not

6    a -- yeah, it's not a -- it was never a

7    common procedure for me.  I did a lot of,

8    you know, implant removals and stuff

9    through my years.  It's the same

10   operation.  And I've done a lot of

11   gynecomastectomy surgeries.  That's also

12   the same operation.  But in terms of as

13   it's applied to a trans- -- a

14   transitioned person who wants to revert

15   back to male presentation, very limited

16   experience.  But even though it's the

17   same operation, I have only done it for

18   two people.

19     Q.   And you said both of those

20   patients were in 2020?

21     A.   I believe so, yeah.  One of them

22   may have been in 2019.  I'm not positive

23   about that.

**DEPOSITION OF PATRICK LAPPERT, M.D.**

1    Q.    Before 2019 or 2020, you had

2    never had a detransitioning patient come

3    to you to obtain breast reversal surgery;

4    fair?

5    A.    I think that's correct, yeah.

6    I'm just trying to think if there was

7    any, but I can't -- I can't recall any

8    other.

9    Q.    Okay.  Are you aware that modern

10   gender affirmation programs typically

11   have a multidisciplinary team of

12   healthcare providers?

13   A.    Yes.

14        MR. KNEPPER:  Objection, form.

15   Q.    And they usually involve mental

16   health specialists; right?

17   A.    Yes.

18        MR. KNEPPER:  Objection, form.

19   Q.    Endocrinologists?

20   A.    Yes, that's my understanding.

21   Q.    And oftentimes plastic surgeons

22   if the patient wants to go that route;

23   right?

## DEPOSITION OF PATRICK LAPPERT, M.D.

1      A.   Right.  That's -- that's my
2   understanding, yes.
3      Q.   You personally have never been
4   part of this kind of a multidisciplinary
5   team for any patient with gender
6   dysphoria; correct?
7      A.   No.  I have always -- I have
8   always turned away personal -- for per-
9   -- well, my understanding of those
10  procedures has caused me to reject
11  offering them to my patients because I
12  don't see them as beneficial.  So
13  clearly, I wouldn't want to participate
14  in a multidisciplinary team that's
15  offering therapies that I consider to be
16  incorrect treatments for a condition that
17  deserves our care, so.
18     Q.   All right.
19     A.   If you want, I can give you a
20  shorter answer.  No.
21     Q.   Yeah, let's -- you personally
22  have never treated a single patient for
23  gender dysphoria; correct?

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 151

1     A.   I have never treated a patient

2  with gender dysphoria surgically.

3     Q.   Okay.

4     A.   Other than the detransitioner.

5  I -- I suspect they were still suffering

6  from dysphoria even though they were

7  detransitioning, but I didn't treat them

8  with surgery to -- per se for that

9  condition the way the transgender teams

10  do.  Yeah.

11     Q.   When you were providing laser

12  hair removal to trans women, is that

13  providing gender-affirming care?

14       MR. KNEPPER:  Objection, form.

15     A.   I don't get into the affirmation

16  side of the treatment.  I'm simply

17  providing a service to -- to people who

18  -- who I want to have as friends.

19  Believe it or not, it's true.  I -- I

20  don't turn anyone away whose -- whose

21  request is -- is within the scope of what

22  I consider moral practice of medicine and

23  surgery, so.

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 152

1    Q.   So earlier, I asked you, you
2    personally have never treated a single
3    patient for gender dysphoria, and I think
4    you said not surgically.  Let me ask more
5    broadly.  Not limited to surgery, you
6    have never treated a single patient for
7    their gender dysphoria symptoms; correct?
8    A.   Well, I guess if -- if you were
9    to look at laser facial hair removal and
10   consider that in the -- in the spectrum
11   of care, certainly that's -- that's --
12   that's clinic care that's probably
13   improving the emotional life of the
14   patient because they're seeking to
15   present as women.  So in that sense, I
16   have, yeah.
17   Q.   Nothing outside of laser hair
18   removal?
19   A.   No.
20   Q.   You personally have never --
21   A.   Well, and -- and acne.  Because
22   clearly, that's a problem.  But in terms
23   of their -- the trajectory of their

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 153

1    transition, acne doesn't enter into it.

2    But certainly laser hair removal, yeah.

3        Q.   You personally have never sat in

4    any meetings between a provider and a

5    patient where the doctor was trying to

6    diagnose whether the patient has gender

7    dysphoria; correct?

8        A.   Correct.

9        Q.   You have never sat in any

10   meetings between a provider and a patient

11   discussing their potential treatment

12   options for gender dysphoria; correct?

13       A.   No.

14       Q.   All right.  You're not an

15   endocrinologist; right?

16       A.   Correct.

17       Q.   You're not a psychiatrist;

18   right?

19       A.   Correct.

20       Q.   You're not a licensed mental

21   healthcare provider of any kind; right?

22       A.   Correct.

23       Q.   In your professional day-to-day

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 154

```
 1      practice, you do not diagnose mental
 2      health conditions of any kind; right?
 3             MR. KNEPPER:  Objection, form.
 4         A.   With the exception of what we
 5      discussed earlier about body dysmorphic
 6      disorder and gender -- gender identity as
 7      a subcategory of body dysmorphic
 8      disorder, no, I would say I don't.
 9         Q.   Okay.  If some patient thinks
10      that they may have depression or anxiety,
11      you would expect that patient to go to a
12      mental health professional, not to you;
13      right?
14         A.   That's my expectation.  But
15      again, many depressed people come to
16      plastic surgeons seeking a remedy for
17      their depression thinking that their
18      appearance is the cause of their
19      depression.  And it's my duty as a
20      plastic surgeon to recognize those
21      patients and -- and send them to the
22      psychologist, psychiatrist, rather than
23      offering them surgical care, yeah, so.
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

1      Q.    Yeah.   I'm asking a slightly

2    different question.

3      A.    Okay.

4      Q.    If a -- if a patient, for some

5    reason, came to you and asked you to

6    diagnose them with depression or anxiety,

7    I assume you would refer them to a train

8    -- trained mental health professional;

9    right?

10     A.    Yes.

11     Q.    Because doctors should not be

12   diagnosing patients with mental health

13   conditions if they do not have training

14   in how to diagnose mental health

15   conditions; right?

16          MR. KNEPPER:   Objection, form.

17     A.    Well, I wouldn't say that,

18   because for example, as a -- as a -- as a

19   surgeon, as a plastic surgeon, we do have

20   to make diagnoses outside of our

21   specialty in order to get people to the

22   right specialist.   So to an extent, you

23   have to make that diagnosis.

## DEPOSITION OF PATRICK LAPPERT, M.D.

```
1              So for example, as a resident in
2        training, I diagnosed an endocrinological
3        disease and probably saved a woman's life
4        because she was in a psych ward, and --
5        and -- and the doctors had a question
6        about her -- a lump in her neck.  She had
7        been on the psych ward for weeks, and I
8        diagnosed a hyperfunctioning thyroid
9        nodule.  I didn't confirm that diagnosis.
10       I sent her to an endocrinologist.  But I
11       made the initial diagnosis of
12       hyperfunctioning thyroid nodule, and --
13       and ultimately, I did her thyroidectomy.
14       But that's an example.
15              You have to understand pathology
16       outside your specialty because you don't
17       know why the patient is going to present
18       to you, and you have to be ready to start
19       the process that gets them to the
20       specialist, so you have to have a working
21       knowledge of the problems.
22          Q.   Yeah, that's exactly the point.
23       Even for that one example, you still send
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 157

1    this patient to a trained endocrinologist

2    to confirm the diagnosis; right?

3        A.   Right.  And then they sent them

4    back to me to give them definitive care.

5        Q.   Yeah.  And that's what you would

6    do for any patient that presents to you

7    with a mental health condition; right?

8    You would train -- you would send them to

9    someone who is -- who is trained in how

10   to diagnose mental health conditions;

11   right?

12           MR. KNEPPER:  Objection, form.

13       A.   Yes.

14       Q.   You're not trained in providing

15   psychotherapy counseling; right?

16       A.   Right.

17       Q.   You've never provided

18   counseling, psychotherapy counseling to

19   children or adolescents with gender

20   dysphoria; right?

21       A.   Right.

22       Q.   You've never provided

23   psychotherapy counseling to adults who

**DEPOSITION OF PATRICK LAPPERT, M.D.**

1    have gender dysphoria; right?

2        A.    Right.

3        Q.    You do not have the professional

4    training to provide psychotherapy

5    counseling to adults who have gender

6    dysphoria; right?

7            MR. KNEPPER:  Objection, form.

8        A.    Correct.

9        Q.    Or to children or adolescents

10   with gender dysphoria; right?

11           MR. KNEPPER:  Objection, form.

12       A.    Correct.

13       Q.    Go to page -- back to your --

14   strike that.

15           Back to your report on page 4,

16   in this paragraph 9, about six lines

17   down, you say, "I have consulted with

18   families with children who are

19   experiencing gender discordance."  Do you

20   see that?

21       A.    Yes.

22       Q.    Describe these consultations for

23   me at a high level.

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 159

1          A.   Basically, it was families that
2     wanted to understand what -- the nature
3     of plastic surgery sort of in the future
4     for their children.  These were -- these
5     were personal encounters rather than in
6     the office, but fairly lengthy at times,
7     talking to families about -- they wanted
8     to understand what was being offered to
9     their children.  They wanted to
10    understand the nature of -- or what the
11    future would look like for their
12    children.  They wanted to get some idea
13    of -- basically, they wanted to hear sort
14    of a fuller explanation of the -- of the
15    medical and surgical side of things.  So
16    I wasn't giving them psychiatric
17    counseling, but basically offering them
18    my experience as a plastic surgeon,
19    wanting to know what the surgery's about,
20    what the -- the hormone therapy that
21    precedes the surgery's about, that sort
22    of thing.
23         Q.   How many of these consultations

# DEPOSITION OF PATRICK LAPPERT, M.D.

Page 160

```
 1      have you done, would you estimate?
 2          A.    Perhaps five or six, maybe more.
 3      Maybe -- yeah, five or six would be a
 4      fair number, I think.
 5          Q.    Over what years?
 6          A.    Perhaps the last three.
 7          Q.    Do you know how these parents
 8      know to reach out to you for these
 9      consultations?
10          A.    It's -- I think maybe some of
11      them were -- having heard about my public
12      presentations at various venues.  People
13      hear about this plastic surgeon in
14      Decatur who's raising objections, I
15      guess.  I don't know the particular
16      details about how a particular patient
17      might have come to me.  I just -- I just
18      always make myself available when people
19      are anxious for their children and
20      they're looking for an understanding of
21      what transgender is about.
22          Q.    What's the typical advice that
23      you give to parents of children or
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 161

1    adolescents who are considering starting

2    puberty blockers?

3        A.   Well, my advice on that score is

4    based on the -- on the world literature,

5    that the desistance rate for their child,

6    if they don't give them puberty blockers,

7    the likelihood is that by the time they

8    reach mid-adolescence, they have an 80

9    percent likelihood of desisting in their

10   cross-sex self-identification.  And if

11   you follow them into young adulthood,

12   that percentage will be in the 90s.

13       But essentially, I recommend

14   that they slow everything down, and I

15   recommend against the use of puberty

16   blockade because it's experimental and

17   because the likelihood is very high -- in

18   fact, if I had any medical procedure that

19   gave me 90-plus percent success rate, I

20   would consider that a great victory.

21   So -- so that's -- that's what I speak to

22   them about.

23       That -- that desistance data is

## DEPOSITION OF PATRICK LAPPERT, M.D.

1    a very important thing for parents to

2    understand.  And very often, the patient

3    -- the parents are experiencing

4    tremendous pressure from the people

5    they've seen in consultation, a

6    tremendous pressure.  And usually, the

7    parents are very distressed about what

8    they're hearing, particularly the -- the

9    fear of suicide and self-harm.

10        Q.   Yeah.

11        A.   So --

12        Q.   You encourage -- yeah, no, I got

13   it.  You encourage patients of children

14   who -- or adolescents who experience

15   gender dysphoria not to start them on

16   puberty-blocking drugs; fair?

17        MR. KNEPPER:  Objection, form.

18        A.   Yeah, I discourage the use of

19   puberty blockade for anything other than

20   precocious puberty or other

21   endocrinopathies.

22        Q.   And you also discourage them

23   from pursuing surgical procedures for

# DEPOSITION OF PATRICK LAPPERT, M.D.

Page 163

1    gender dysphoria; correct?

2         MR. KNEPPER:  Objection, form.

3    A.    Correct.

4    Q.    When you do these consultations,

5    do you talk just to the parents or to the

6    children as well?

7    A.    Both, yeah.  I like to meet the

8    children and -- and -- and get to know

9    them, yeah.

10    Q.    And do you convey the same

11    message to the children?  Don't start

12    puberty blockers; don't start -- don't do

13    any surgical procedures?

14         MR. KNEPPER:  Objection.

15    A.    I -- I generally don't -- I'm

16    sorry.  I generally don't speak about the

17    details of therapy to children.  I speak

18    to their parents.

19    Q.    How many children do you think

20    you have consulted with specifically?

21    A.    On this -- on this issue?

22    Q.    Yes.

23    A.    As I say, maybe six.  I often --

## DEPOSITION OF PATRICK LAPPERT, M.D.

1    well, yeah, I would say six is a good

2    number.

3        Q.    Do you know how many of them

4    went on to start hormone-blocking

5    therapy, if any?

6        A.    I don't.  I don't know the

7    answer to that question.  Yeah, I don't.

8        Q.    Do you know how many of them, if

9    any, went on to start cross-sex hormone

10   therapy?

11       A.    I don't know the answer to that

12   question, no.

13       Q.    You don't know how many of them

14   went on to do any kind of surgical

15   gender-affirming procedures?

16       A.    No.

17       Q.    You haven't done any follow-up

18   with any of these families that you've

19   consulted?

20       A.    As I say, this was an informal

21   thing, so.  Yeah.  So no, I -- I haven't

22   followed up long-term.  This has -- as I

23   say, this has happened over the last

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 165

1     perhaps three years.  And so the general

2     course of events there is -- is typically

3     longer than that, so.  But I have not

4     seen -- well, I have seen one -- one

5     child twice, actually, with the parents.

6     And actually -- okay.  So -- so perhaps

7     she would be an exception.

8          She was sort of headed in the

9     direction of seeking puberty blockade.

10    And then in our meetings, she has sort of

11    given that up.  She was under a lot of

12    pressure at school, you know, being

13    pressured by boys because she was

14    starting to develop secondary sex

15    characteristics, and she developed a

16    tremendous anxiety about it.  And someone

17    had told her that -- that if she went

18    through transition care, that that would

19    be avoided.  And I had a conversation

20    with her parents, I had a conversation

21    with her, and essentially just encouraged

22    her to slow down and sort of examine her

23    other options.  And I think within about

## DEPOSITION OF PATRICK LAPPERT, M.D.

1    seven months, she came back to me, and

2    she's not even thinking along those lines

3    any longer.  In fact, now she's talking

4    about what high school she wants to go

5    to, so.

6        Q.   Okay.  So this is one child who

7    was considering, or whose parents were

8    considering starting puberty-blocking,

9    but after consultation with you, decided

10   not to; right?

11       A.   I think that she -- yeah.

12           MR. KNEPPER:  Objection to form.

13           MR. TISHYEVICH:  Okay.  All

14   right off the record.

15           THE VIDEOGRAPHER:  This is the

16   end of Media Unit No. 2.  We are off the

17   record at 11:06 a.m.

18               (Break taken.)

19           THE VIDEOGRAPHER:  This is the

20   beginning of Media Unit No. 3.  We are on

21   the record at 11:16 a.m.

22       Q.   (By Mr. Tishyevich) Doctor, you

23   know what facial feminization surgery is;

## DEPOSITION OF PATRICK LAPPERT, M.D.

1    right?

2         A.   Yes, I do.

3         Q.   You have never performed facial

4    feminization surgery for any transgender

5    patient; correct?

6         A.   Correct.

7         Q.   You know what facial

8    masculinization surgery is?

9         A.   Yes.

10        Q.   You have never performed that

11   for any transgender patient; correct?

12        A.   Correct.

13        Q.   Do you know what transfeminine

14   top surgery is?

15        A.   Yes.

16        Q.   You have never performed that on

17   a transgender patient?

18        A.   No.

19        Q.   How about a chest reconstruction

20   surgery?  Have you performed that on a

21   transgender patient?

22        A.   No.

23        Q.   You have never performed a

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 168

1    vaginoplasty for a transgender patient?

2        A.    No.

3        Q.    You have never performed a

4    metoidioplasty for any transgender

5    patient?

6        A.    No.

7        Q.    You've never performed what's

8    colloquially known as bottom surgery for

9    any transgender patient; correct?

10        A.    Correct.

11        Q.    Fair to say you've never

12    performed any kind of gender-affirming

13    surgery in transgender patients; right?

14        A.    Correct.

15        Q.    And fair to say you don't have

16    recent and substantive experience in

17    performing gender-affirming -- -affirming

18    surgery for transgender patients;

19    correct?

20            MR. KNEPPER:    Form.

21        A.    I have -- I have substantive

22    experience with all the actual -- the

23    nature of the particular operations but

# DEPOSITION OF PATRICK LAPPERT, M.D.

Page 169

1    never performed for transgender patients

2    to transition them, no.  But the

3    operations themselves as used in

4    reconstruction, I have considerable

5    experience with.

6        Q.   We talked earlier about the

7    American Society of Plastic Surgeons.

8    You recall that?

9        A.   I do.

10       Q.   You know that the ASPS has a

11   code of ethics?

12       A.   Yes.

13       Q.   And you know that members are

14   required to comply with the code of

15   ethics; right?

16       A.   Yes.

17       Q.   And I know you're not a member

18   now, but you were a member of the ASPS

19   for a considerable amount of time; right?

20       A.   Yes.

21       Q.   And I assume during that time,

22   you followed the ASPS code of ethics;

23   right?

**DEPOSITION OF PATRICK LAPPERT, M.D.**

Page 170

1        A.    To my knowledge, I never
2     violated it.  Yes.
3        Q.    When was the last time you
4     reviewed it?
5        A.    I'm sorry, did I lose the sound
6     here?
7        Q.    When was the last time you
8     reviewed the ASPS code of ethics?
9        A.    Oh, gosh.  Years ago.  Years
10    ago.
11       Q.    Let me introduce an exhibit.
12             Let me ask you this first.  Are
13    you aware that the ASPS code of ethics
14    had some specific rules for members who
15    provide expert testimony?
16       A.    Yes.
17       Q.    Okay.  You didn't review those
18    provisions before you formed your expert
19    opinions in this case?
20       A.    No.
21       Q.    Sitting here today, do you know
22    if your opinions in this case are in
23    compliance with what the ASPS code of

## DEPOSITION OF PATRICK LAPPERT, M.D.

1   ethics says about members who provide

2   expert testimony?

3       A.   I'm not aware that I've violated

4   them in any way, yeah.

5       Q.   Let me introduce an exhibit.

6   Okay.  Let me know when you have it.

7   (Exhibit 10 was marked for identification

8   and is attached.)

9       A.   Okay.

10      Q.   It's still opening on my end.

11           Okay.  So, Exhibit 10 is the

12  Code of Ethics of the American Society of

13  Plastic Surgeons.  You see that?

14      A.   I do.

15      Q.   The bottom left corner says,

16  "Updated September 25, 2017."  See that?

17      A.   I do.

18      Q.   That's when you were still an

19  active member of the ASPS; right?

20      A.   Yeah, that's right.

21      Q.   Go to page 4.

22      A.   I think I'm on page 4 here.

23  They're not numbered.  Oh, here we are,

**DEPOSITION OF PATRICK LAPPERT, M.D.**

1    yes.

2          Q.    Or I'm sorry, page 6.

3          A.    Page 6.

4          Q.    Section IV.

5          A.    Section IV, yes.

6          Q.    Section IV is "Expert

7    Testimony"; right?

8          A.    Yes.

9          Q.    I want to focus you on the last

10   two sentences of this first paragraph.

11   It says, "Members whose testimony,

12   including testimony as to credentials or

13   qualifications, is false, deceptive, or

14   misleading may be subject to disciplinary

15   action, including expulsion."  You see

16   that?

17         A.    Yes.

18         Q.    The next sentence says, "Further

19   to help limit false, deceptive and/or

20   mislead" -- "misleading testimony,

21   Members serving as expert witnesses

22   must," and then there's a list of

23   requirements.  You see that?

## DEPOSITION OF PATRICK LAPPERT, M.D.

1          A.    I do.

2          Q.    Okay.  So "must" means this is a

3     mandatory rule, not an optional

4     suggestion; right?

5               MR. KNEPPER:  Objection, form.

6          A.    I expect that's what it means,

7     yes.

8          Q.    All right.  Let's look at these

9     rules.  Number 1 says that members

10    serving as expert witnesses must "Have

11    recent and substantive experience (as

12    defined in the Glossary of the Code) in

13    the area in which they testify,

14    including, without limitation, experience

15    in the relevant subspecialty or the

16    particular procedure performed on the

17    plaintiff."

18               Do you see that?

19         A.    I do.

20         Q.    All right.  Without looking at

21    the glossary, do you know, sitting here

22    today, how the glossary defines "recent

23    and substantive experience"?

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 174

1      A.    I don't.

2      Q.    Okay.  Why don't we look at that

3   definition together.  Go to page 8.

4      A.    Okay.

5      Q.    See there's subsection F?

6      A.    Yes.

7      Q.    All right.  Read that definition

8   to yourself, and tell me when you're

9   done.

10      A.    Okay.

11         (Witness reviews document.)

12      A.    Okay.

13      Q.    To be able to provide expert

14   testimony -- well, strike that.

15         Let me focus you on the very

16   last part of this definition.  Okay.  To

17   be able to provide expert testimony about

18   a particular surgical procedure, the ASPS

19   Code of Ethics requires a surgeon to have

20   performed a specific procedure in

21   question within three years of being

22   retained as an expert witness; correct?

23      A.    That's what it says, yes, sir.

# DEPOSITION OF PATRICK LAPPERT, M.D.

1            MR. KNEPPER:  Objection, form.

2       Q.    All right.  Now, as we've just

3    discussed, you personally have not

4    performed any kind of facial

5    masculinization surgery in the last three

6    years; correct?

7            MR. KNEPPER:  Objection, form.

8       A.    Correct.

9       Q.    Any kind of facial feminization

10   surgery; right?

11      A.    Correct.

12           MR. KNEPPER:  Objection, form.

13      Q.    Vaginoplasty; right?

14           MR. KNEPPER:  Objection, form.

15      A.    Correct.

16      Q.    Metoidioplasty; right?

17           MR. KNEPPER:  Objection to form.

18      A.    Correct.

19      Q.    You personally have not

20   performed any kind of gender-affirming

21   surgical procedure on a transgender

22   patient in the last three years; correct?

23           MR. KNEPPER:  Objection, form.

## DEPOSITION OF PATRICK LAPPERT, M.D.

1     A.   I have never performed such

2    procedures.

3     Q.   All right.  Well, given that you

4    have not ever personally performed any

5    kind of surgical procedures in the last

6    three years, I take it you're not

7    offering expert opinions on any of these

8    surgeries because doing so would be

9    inconsistent with the ASPS code of

10    ethics; right?

11          MR. KNEPPER:  Objection, form.

12     A.   Well, so the ethics that informs

13    my opinion here is I don't derive from

14    the ASPS, nor am I subject to their --

15    their -- what's the word I'm looking

16    for -- their sanctions, I guess, would be

17    the correct word.  The expert opinion I

18    offer here is not on -- on complications

19    of an operation that might enter into a

20    litigation.  In terms of the -- you know,

21    I guess the -- the question at hand here

22    is transition surgery, the bigger

23    picture.  I certainly make record of --

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 177

1    of the known complications as available

2    in the literature.  And in my testimony,

3    I did a literature review on the

4    complications of particular surgeries.

5              But I don't do these operations

6    for a reason, and the reason I don't do

7    these operations is ethical based on my

8    knowledge of the science.  I don't derive

9    my ethical decision-making from the ASPS,

10   and this is one of the reasons why,

11   again, I have no heartburn about having

12   withdrawn my membership.  I have great

13   issue with -- with the idea that a

14   professional organization would encourage

15   or sanction these operations given the

16   world literature.

17      Q.   Your opinion -- your -- strike

18   that.

19              Your expert report does offer

20   some opinion, or purports to offer some

21   opinions about surgical risks of some of

22   these gender-affirming surgical

23   procedures, does it not?

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 178

1        A.    Yes.  Based on my -- my

2    experience in microvascular surgery, on

3    flap reconstruction of the perineum, for

4    example, flap reconstruction of the chest

5    or the -- or the genital area in

6    treatment for traumatic injuries and

7    things.  So the operations themselves,

8    I'm quite familiar with.  I'm quite

9    familiar with the complications that are

10   peculiar to free flap or local flap

11   reconstructions.

12            But as far as doing those

13   operations for gender transitioning, I --

14   I don't do those operations.  But the

15   complications are the same: flap loss,

16   flap necrosis, urinary fistulas.  All of

17   those things I have -- I have experience

18   with in managing trauma, in managing

19   cancer, in managing infectious

20   destruction of the genital area.  But

21   I've never done the operation for

22   transgender per se, correct.

23        Q.    And because you've never done

## DEPOSITION OF PATRICK LAPPERT, M.D.

1    any of those procedures on transgender

2    patients, can we agree that offering

3    those opinions is inconsistent with the

4    ASPS Code of Ethics?

5            MR. KNEPPER:  Objection, form.

6        A.   I would not agree with that.

7        Q.   Does it bother you that you

8    might be in violation of the Code of

9    Ethics by offering these opinions?

10           MR. KNEPPER:  Objection.

11       A.   No.  Not in the least.

12       Q.   Do you think that a judge might

13   be troubled by the fact that your

14   professional organization, former

15   professional organization, says you

16   shouldn't be allowed -- you shouldn't be

17   offering these kind of opinions?

18           MR. KNEPPER:  Objection, form.

19       A.   Yeah, I find -- I find the --

20   the whole situation troubling, and I

21   would hope that the judge would be

22   troubled by it, yes.

23       Q.   Okay.  Yeah, no, I mean, I'm

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 180

```
 1      asking a much more specific question.
 2      The judge is going to be asked to find
 3      whether your testimony is reliable.  Do
 4      you think the judge might have some
 5      concerns if she -- if they were to
 6      conclude that the testimony you're
 7      offering in this case is not allowed
 8      under the code of ethics of the ASPS?
 9              MR. KNEPPER:  Objection, form.
10          A.   I -- I -- I haven't thought
11      about it.
12          Q.   And you haven't thought about it
13      because before today, you didn't know
14      whether or not your testimony complies
15      with the ASPS Code of Ethics; right?
16              MR. KNEPPER:  Objection, form.
17          A.   I was not -- I was not concerned
18      with the ASPS Code of Ethics, for reasons
19      we've discussed earlier.
20          Q.   Did you know that -- did you
21      know that the ASPS Code of Ethics
22      prohibits members from offering expert
23      testimony on topics in which they do not
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 181

1    have recent and substantive experience?

2         MR. KNEPPER:  Objection, form.

3    A.   Could you -- can you -- I want

4    to make sure I answer your question and

5    not something else.  Could you offer me

6    that question again, please?

7    Q.   Before I showed you this code of

8    ethics at your deposition today, were you

9    aware that the ASPS Code of Ethics

10   prohibits members from offering expert

11   opinions on topics on which they do not

12   have recent and substantive experience?

13        MR. KNEPPER:  Objection, form.

14   A.   Actually, I dreaded that such a

15   -- such a fact would come to light.  I

16   have not read the -- the ethics code in

17   recent years, as I said earlier.  But

18   I -- I have dreaded this evolution in the

19   ethics of my former professional society,

20   that they would consider transgender

21   surgery the way they do.

22        I -- other -- aside from that, I

23   was not concerned that I might be

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 182

```
 1    violating the ethics of the society
 2    because in all my previous life, I have
 3    never violated the ethics of the society.
 4    And I don't -- at present, I don't
 5    consider my testimony to be a violation
 6    of this policy that we've read together.
 7         Q.   I understand.  All right.  Let's
 8    switch gears.  You know what the WPATH
 9    is?  The World Professional Association
10    for Transgender Health?
11         A.   Yes.
12              MR. TISHYEVICH:  And for the
13    court reporter, it's W-P-A-T-H, all
14    capital.
15         Q.   All right.  You know that the
16    WPATH publishes standards of care for the
17    health of transgender people; right?
18         A.   They have a publication that
19    they call the standards of care, yes.
20         Q.   And are you aware that they've
21    been publishing those standards since
22    1979?
23         A.   Yes.
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 183

1      Q.    The latest publicly available
2  standard of care is Version 7; correct?
3      A.    Correct.
4      Q.    And that was published in 2012;
5  right?
6      A.    That's right.
7      Q.    All right.  Before you wrote
8  your report, did you sit down and review
9  the Standards of Care, Version 7 that
10 you're criticizing?
11     A.    Yes, I did.
12     Q.    All right.  You yourself are not
13 part of the WPATH; correct?
14     A.    No, I am not.
15     Q.    You've never been part of the
16 WPATH; right?
17     A.    I would never be part of the
18 WPATH.
19     Q.    You've never advised the WPATH
20 in any capacity; right?
21     A.    They've never asked my opinion.
22 No.
23     Q.    You've never advised the WPATH

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 184

```
 1      in any capacity; correct?
 2          A.   I have not.
 3          Q.   You personally have not been
 4      involved with the development of WPATH's
 5      Standards of Care, Version 7; correct?
 6          A.   Correct.
 7          Q.   You don't know what year the
 8      WPATH started working on Version 7;
 9      right?
10          A.   My understanding was it was in
11      2007, but I could be wrong.  I think it
12      was 2007.  I think it was a five-year
13      process, but I could be wrong on that.
14          Q.   You don't know for sure?
15          A.   I don't know for sure.
16          Q.   You don't know how many
17      different work groups at the WPATH were
18      involved with working on Version 7;
19      correct?
20              MR. KNEPPER:  Objection, form.
21          A.   In reading the -- the
22      introduction to the document, the number
23      nine pops into my mind, but I can't swear
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 185

1    to that.

2         Q.    Okay.   You don't know what kind

3    of scientific literature the WPATH

4    conducted as part of drafting Version 7;

5    right?

6         A.    As far as naming the particular

7    papers that they may have reviewed, I

8    can't do that for you because those

9    are -- that happens in closed committee.

10   I -- all I can say to you is my -- based

11   upon my reading of the product and the

12   verbiage that it's used, my suspicion is

13   that it's pretty heavily weighted towards

14   the American literature and -- and does

15   not bring in particular document -- well,

16   being that it was published in 2012, the

17   big inflection point in 2011 probably

18   wasn't available to the committee when

19   they were writing that document.

20              So given that the document is

21   already out of date and it's -- and the

22   subsequent WPATH 8, no one knows when

23   it's going to come out, yeah, it's --

# DEPOSITION OF PATRICK LAPPERT, M.D.

Page 186

```
1     it's almost -- it's almost irrelevant

2     because of the change in the literature

3     that happened since it was published, so.

4     In particular, the 2011 article by

5     Dhejne, Cecilia Dhejne, and -- and others

6     that kind of changed the view of the

7     scientific evidence.

8              So yeah, it's an out-of-date

9     document by the standards of what are

10    called standards of care.  It's not a

11    standards of care document.  It's a --

12    it's a treatment guideline document is

13    really what it is, and it's a poorly

14    supported treatment guideline at that,

15    so -- gosh, I wandered off.

16             Did I -- did I answer your

17    question?

18        Q.   Yeah, you anticipated my

19    objection.

20             MR. TISHYEVICH:  Which, again,

21    I'll move to strike most of that as

22    nonresponsive.

23        Q.   Because here's my question.  You
```

# DEPOSITION OF PATRICK LAPPERT, M.D.

Page 187

1    don't personally know what kind of

2    scientific literature the WPATH conducted

3    as part of drafting Version 7; correct?

4         MR. KNEPPER:  Objection, form.

5      A.   No.  Again, a closed session, so

6    I don't know what documents they used.

7      Q.   You don't know what kind of

8    outside experts the WPATH may have

9    consulted in drafting Version 7; right?

10     A.   No.

11     Q.   You don't know what kind of peer

12   review the WPATH may have conducted as

13   part of developing Version 7; right?

14        MR. KNEPPER:  Objection, form.

15     A.   No.

16     Q.   You don't know what kind of

17   public comments the WPATH may have

18   solicited as part of developing Version

19   7.

20        MR. KNEPPER:  Objection, form.

21     Q.   Right?

22     A.   No.

23     Q.   You don't know how many

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 188

1    different drafts the Version 7 went

2    through before it was finalized; right?

3        A.    No.

4        Q.    You don't know how many

5    different meetings or conferences the

6    WPATH had to discuss the development of

7    Version 7; right?

8        A.    Correct.

9        Q.    You have no idea what may have

10   gone on during those meetings or

11   conferences; correct?

12           MR. KNEPPER:   Objection, form.

13       A.    No.   I was not a part of the

14   conferences that produced the product.

15       Q.    Yeah, you are not an expert in

16   how Version 7 of the WPATH was developed;

17   right?

18       A.    Correct.

19       Q.    And we can go through all these

20   questions again individually for Version

21   8, but maybe we can shortcut this.

22       A.    Well, no one knows what's in

23   Version 8 except the people who are in

1 the committee.  It's a -- it's a

2 privileged document.  There's no one in

3 plastic surgery who knows it apart from

4 the people who serve as members of the

5 WPATH, so that would be the case.

6   Q. Okay.

7   A. It's a -- it -- yeah.

8   Q. So just so we have it on the

9 record, you don't hold yourself out as an

10 expert on how Version 8 of the WPATH

11 Standards of Care are currently being

12 developed; fair?

13   A. Fair.

14   Q. Okay.  We talked earlier about

15 the DSM; right?

16   A. Yes.

17   Q. In your day-to-day practice, you

18 don't use the DSM-5; correct?

19   A. No.

20   Q. But you do know the DSM-5 is

21 widely used by psychiatrists; correct?

22   A. Yes.

23   Q. The DSM-5 was published in 2013;

**DEPOSITION OF PATRICK LAPPERT, M.D.**

1    correct?

2        A.    I don't know the publication

3    date, but it sounds about right.

4        Q.    Do you know that it was

5    developed by the American Psychiatric

6    Association?

7        A.    Yes.

8        Q.    You're not a member of the APA;

9    right?

10       A.    Correct.

11       Q.    You personally have not been

12   involved with the development of DSM-5;

13   right?

14       A.    No.

15       Q.    You don't know how many

16   different working groups were involved

17   with developing the DSM-5; right?

18            MR. KNEPPER:  Objection, form.

19       A.    Correct.

20       Q.    You don't know how many

21   different members those working groups

22   had; right?

23            MR. KNEPPER:  Objection, form.

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 191

1        A.    No.

2        Q.    Or how they were selected;

3    right?

4            MR. KNEPPER:  Objection, form.

5        A.    Correct.

6        Q.    You don't know how many

7    different authors contributed to the

8    development of DSM-5; correct?

9        A.    Correct.

10           MR. KNEPPER:  Objection, form.

11       Q.    You don't know what kind of

12   scientific literature review was done by

13   different work groups as part of

14   developing the DSM-5; correct?

15           MR. KNEPPER:  Objection, form.

16       A.    Correct.

17       Q.    You don't know what kind of

18   public comments the APA may have

19   solicited in developing the DSM-5;

20   correct?

21           MR. KNEPPER:  Objection, form.

22       A.    Correct.

23       Q.    You don't know how many

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 192

1      different drafts the DSM-5 went through

2      before it was finalized; correct?

3                MR. KNEPPER:  Objection, form.

4          A.    Correct.

5          Q.    You don't know how many

6      different meetings or conferences or

7      telephonic conferences the working groups

8      had to discuss the development of the

9      DSM-5; right?

10               MR. KNEPPER:  Objection, form.

11         A.    Right.

12         Q.    You have no idea what was

13     discussed during any of those meetings;

14     right?

15         A.    Right.

16         Q.    Let me ask you specifically

17     about the Sexual and Gender Identity

18     Disorders Work Group.  First of all,

19     before today, did you know that the APA

20     had a Sexual and Gender Identity

21     Disorders Work Group as part of the

22     development of the DSM-5?

23               MR. KNEPPER:  Objection, form.

## DEPOSITION OF PATRICK LAPPERT, M.D.

```
1        A.   Yes.

2        Q.   Do you know how many members

3   were in that work group?

4        A.   No.

5        Q.   You don't know --

6             MR. KNEPPER:  Objection.

7        Q.   -- how those members were

8   selected; right?

9             MR. KNEPPER:  Objection to form.

10       A.   Correct.

11       Q.   You don't know their expertise;

12  right?

13       A.   Correct.

14       Q.   You do not have expert firsthand

15  knowledge of how the DSM-5 was developed;

16  fair?

17            MR. KNEPPER:  Objection, form.

18       A.   Fair.

19       Q.   Are you aware that the DSM-4

20  used the term "gender identity disorder"

21  instead of "gender dysphoria"?

22       A.   Yes.

23       Q.   Do you know the reason for that
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

1    change?

2         A.    From DSM-4 to DSM-5?

3         Q.    Yes.

4         A.    Yes.

5         Q.    What's the reason?

6         A.    In reading the literature and

7    reading the reports of perhaps people who

8    served on the committee, because I don't

9    know how else you would be privy to this

10   information, there was a desire on the

11   part of the APA to de-pathologize the

12   condition, and they wanted to use

13   terminology that didn't sound like

14   medical diagnoses.  It was the opinion of

15   the members of that committee that --

16   that transgenderism is only a diagnostic

17   issue from the standpoint of the

18   discomfort or the sorrow that the patient

19   feels rather than any underlying

20   pathology.  So the -- the desire was to

21   move those -- the diagnosis to change the

22   language of diagnosis to de-pathologize

23   it.  But the problem that the committee

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 195

```
1    faces is that having done that, there's
2    no mechanism for providing the services
3    that they felt that the patients needed,
4    so there had to be a diagnose -- a
5    diagnostic code in order to get
6    thirty-part -- third-party payers to pay.
7    So it's a de-pathologize but maintain a
8    diagnostic -- diagnostic code.  That's my
9    understanding of it.
10            Again, I wasn't there.  But
11   again, reading the writings of people who
12   could only have gleaned it from having
13   been present because it's closed session,
14   that's my understanding.
15       Q.   Understood.  All right.  Do you
16   know what the Endo- -- Endocrine Society
17   guidelines for treatment of
18   gender-dysphoric or gender-incongruent
19   persons are?
20       A.   Do I know what they are?
21       Q.   Yeah.
22       A.   Yes.
23       Q.   Do you know when they were
```

**DEPOSITION OF PATRICK LAPPERT, M.D.**

1    initially published?

2        A.    No.

3        Q.    Do you know when they were last

4    revised?

5        A.    I think it was just a couple of

6    years ago, but I don't know the exact

7    date.

8        Q.    If I tell you it's 2017, does

9    that sound right?

10       A.    That wouldn't -- it wouldn't

11   surprise me if that were true.  I -- just

12   within the last couple of years.  I think

13   theirs are current, and the expectation

14   is that these standards of care or

15   treatment guidelines will have a

16   five-year revision.  So given that

17   they're current, they couldn't be any

18   older than, say, 2017.  So I suspect that

19   -- yeah.

20       Q.    All right.  Did you review the

21   latest available version of those

22   Endocrine Society guidelines before

23   forming your opinions in this case?

## DEPOSITION OF PATRICK LAPPERT, M.D.

1    A.   Yes.  I have read them, yes.

2    Q.   Okay.  You yourself are not part

3    of the Endocrine Society; right?

4    A.   Correct.

5    Q.   Have never been part of that

6    society; right?

7    A.   Correct.

8    Q.   You've never advised the

9    Endocrine Society in any capacity;

10   correct?

11   A.   Correct.

12   Q.   You personally were not involved

13   with the development of these original

14   guidelines; correct?

15   A.   That's correct.

16   Q.   Not personally involved with the

17   development of the updated guidelines in

18   2017; right?

19   A.   Correct.

20   Q.   Do you know how many people at

21   the Endocrine Society were involved with

22   those 2017 updates?

23   A.   I do not know that number.

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 198

```
 1        Q.   And you don't know how they were
 2   selected to work on the 2017 updates;
 3   correct?
 4        A.   Correct.
 5        Q.   You personally don't know what
 6   kind of scientific literature review the
 7   Endocrine Society conducted in developing
 8   those updates; correct?
 9             MR. KNEPPER:  Objection to form.
10        A.   Correct.
11        Q.   You don't know what kind of
12   outside experts they may have used;
13   right?
14        A.   What kind of outside experts?  I
15   would imagine they were all
16   endocrinologists.  Or are you asking did
17   they have plastic surgeon input or --
18        Q.   Do you know specifically whether
19   the Endocrine Society used any outside
20   experts in updating the -- in
21   implementing the 2017 updates?
22        A.   Well --
23             MR. KNEPPER:  Objection, form.
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 199

```
1        A.    I can only infer that they
2    would, because such -- such statements,
3    in order to be valid, demand review by
4    outside parties to -- to obviate
5    conflicts of interest, whether financial
6    or professional.  Those are all issues
7    when generating standards of care, so of
8    necessity, they would have had to have
9    had outside experts to come in, yes.
10       Q.    Okay.  Do you know what kind of
11   public comments the Endocrine Society may
12   have solicited as part of developing the
13   2017 updates?
14       A.    I don't.
15            MR. KNEPPER:  Objection to form.
16       Q.    You don't know how many
17   different drafts there were of those 2017
18   updates before they were finalized;
19   right?
20       A.    No.
21            MR. KNEPPER:  Objection to form.
22       A.    No, I don't.
23       Q.    Again, you haven't been to any
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 200

1      meetings or conferences or telephonic

2      conferences where those 2017 updates were

3      discussed, where the development of those

4      2017 updates was discussed; correct?

5              MR. KNEPPER:  Objection to form.

6          A.   Correct.

7          Q.   You don't know what went on

8      during those meetings or conferences;

9      right?

10             MR. KNEPPER:  Objection, form.

11         A.   I do not.

12         Q.   You -- you're not an expert in

13     how the Endocrine Society developed the

14     original 2009 guidelines for treating

15     gender dysphoria; correct?

16             MR. KNEPPER:  Objection to form.

17         A.   That's not -- that's not my area

18     of expertise.  That's correct.

19         Q.   Right.  And you're also not an

20     expert in how the Endocrine Society then

21     developed the 2017 updates back to those

22     guidelines; correct?

23         A.   Correct.

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 201

1    Q.    Okay.  All right.  Now let's

2    talk about puberty-blocking agents.  What

3    puberty blocker drugs are you aware of by

4    name?

5    A.    Well, Lupron is probably the

6    most widely used one.  They're -- they're

7    all gonadotropin-releasing hormone

8    agonists.  They come by a variety of

9    trade names.  But gonadotropin-releasing

10   hormone is the genetic -- I'm sorry, the

11   generic name for the drug that may appear

12   under a variety of, you know, proprietary

13   names, Lupron being the most commonly

14   used.

15   Q.    You've never prescribed Lupron;

16   right?

17   A.    No, I have never.  No.

18   Q.    You have never prescribed any

19   puberty-blocking drugs of any kind;

20   right?

21   A.    No.  That's not my area of

22   expertise.

23   Q.    Right.  Have you ever looked at

# DEPOSITION OF PATRICK LAPPERT, M.D.

Page 202

```
 1      the package -- strike that.
 2             You know what a package insert
 3      is; right?
 4         A.   Yes.
 5         Q.   Have you ever looked at a
 6      package insert for Lupron?
 7         A.   Some time ago, but yes, I have.
 8         Q.   Okay.  How recently do you
 9      think?
10         A.   Gosh, it's probably more than
11      four or five years ago.  I think probably
12      when I first started go -- you know,
13      looking into this more carefully back in
14      2014.  It was probably that long ago.
15         Q.   Do you know what Vantas is?
16      V-A-N-T-A-S.
17         A.   Oh, I've read that somewhere
18      before.  Let's see.  Is it -- it's the
19      adverse events reporting -- is that what
20      I -- I don't --
21         Q.   It's a type of drug.
22         A.   Oh.
23         Q.   So no, that doesn't sound
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 203

```
 1     familiar?
 2         A.    It does not sound familiar, no.
 3         Q.    How about Triptodur?
 4     T-R-I-P-T-O-D-U-R.
 5         A.    That sounds like a trade name
 6     I'm not familiar with.
 7         Q.    Okay.  Fensolvil?
 8     F-E-N-S-O-L-V-I-L.
 9         A.    That sounds like a trade name
10     I'm not familiar with.
11         Q.    Trelstar?  T-R-E-L-S-T-A-R.
12         A.    Same.
13         Q.    All right.  You're not an expert
14     in the different types of prescription
15     drugs that are used as puberty-blocking
16     agents; fair?
17         A.    I do not consider myself an
18     expert in that area, no.  I rely on
19     experts.
20         Q.    All right.  You know that
21     puberty blockers are typically prescribed
22     by endocrinologists; right?
23         A.    Yes.  Pediatricians and
```

**DEPOSITION OF PATRICK LAPPERT, M.D.**

Page 204

```
 1    endocrinologists, yes.
 2         Q.    Right.  You have no specialized
 3    training or expertise in endocrinology;
 4    correct?
 5         A.    Correct.
 6         Q.    You don't hold yourself out as
 7    an expert in endocrinology; correct?
 8         A.    No, I do not.
 9         Q.    You're not planning on offering
10    any expert opinions in endocrinology in
11    this case because that's outside your
12    scope of expertise; right?
13         A.    Yes.
14              MR. KNEPPER:  Objection to form.
15         Q.    All right.  Earlier, you said
16    you have never prescribed
17    puberty-blocking agents to anyone, so I
18    take it you have no experience, no
19    firsthand experience with advising your
20    patients about potential risks and
21    benefits of puberty blockers; right?
22              MR. KNEPPER:  Objection, form.
23         A.    Well, I have talked to patients
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

1    -- well, families, really, about the

2    risks of puberty blockers in -- in early

3    puberty and into adolescence.  I have

4    because I've reviewed the literature and

5    I've spoken with experts in the area.

6    And so, is that the question --

7        Q.   Yeah.

8        A.    -- you're asking, have I spoken

9    to anybody?  Yeah, I have.  I -- I have,

10   again, knowing that -- for example, that

11   the drug Lupron, as an example, is -- is

12   -- is not cleared by the FDA for

13   application.  It's an off-label use when

14   using it in the diagnosed condition of

15   gender dysphoria.  So I know that it's an

16   off-label application of the drug, and I

17   know what the effects of the drug are.

18   But nobody knows what the effects of the

19   drug are on otherwise normal children,

20   and that's pretty much all I'd relate to

21   the families on the -- on that subject.

22            I don't offer myself as an

23   endocrinologist, but I offer myself as a

**DEPOSITION OF PATRICK LAPPERT, M.D.**

Page 206

1    concerned physician who has spoken with

2    the specialists and read the package

3    insert.  Yes.

4        Q.   You think off-label use is

5    improper; right?  That's the sense I got

6    from reading your report.

7            MR. KNEPPER:  Objection, form.

8        A.   Off-label use in certain

9    situations.  So I use -- I use -- I have

10   applied drugs' off-label use many times.

11   But what the -- what the practitioner has

12   to do is weigh the risk/benefit equation

13   there and what is the expected goal and

14   what are the likely risks.

15           For example, I used Botox long

16   ago in the treatment of -- of

17   hyperhidrosis before the company that

18   produces it got FDA clearance to use it

19   that way.  The risk, very, very low risk;

20   the potential benefit, very, very high.

21   But in this case, we're talking about

22   very significant risks for an unproven

23   benefit.  So that's an example of how you

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 207

```
 1     have to weigh off-label use.
 2             And the FDA understands that,
 3     and they don't go after off-label use
 4     unless there's significant risk.  And
 5     even then, they might not yet spring into
 6     action.  It's a pretty slow-moving
 7     organization.
 8        Q.   All right.  We'll come back to
 9     that.
10        A.   Okay.
11        Q.   You never sat in on any
12     appointment where an endocrinologist
13     prescribed a puberty-blocking drug to a
14     patient; correct?
15        A.   I have never.
16             MR. KNEPPER:  Objection, form.
17        Q.   You personally don't know what
18     endocrinologists typically tell their
19     patients about risks and benefits of
20     puberty blockers; right?
21             MR. KNEPPER:  Objection, form.
22        A.   Only what I have read in the
23     record.  For example, the plaintiffs'
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 208

```
 1    records, I -- I -- I believe I have read

 2    that -- that kind of consultation, yeah.

 3    But I -- but I wasn't present in the

 4    room, if that's what your question is.

 5        Q.   Yeah.  You don't know what was

 6    actually communicated to the patient;

 7    correct?

 8        A.   Only what was entered in the

 9    record, yeah, the medical record.

10        Q.   And just as a more -- outside of

11    these plaintiffs, as a more general

12    matter, you don't personally know what

13    endocrinologists tell their patients

14    about potential risks and benefits of

15    puberty blockers because you're not

16    present on those prescribing decisions;

17    right?

18            MR. KNEPPER:  Objection, form.

19        A.   Well, if -- I assume that they

20    follow the same sort of process that

21    every other medical professional does

22    when getting consent for -- for therapies

23    of various kinds.  And so to offer
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 209

1     informed consent to a -- in this case,

2     perhaps a family, parents, that informed

3     consent would have to include -- in order

4     to be valid, it would have to include the

5     potential risks that are enumerated in

6     the package insert.  And then they would

7     also, in certain cases, have to enumerate

8     risks that may not be in the package

9     insert but may be expected given the --

10    the particular case of their child or the

11    particular patient.

12          So we all have to follow that

13    same general standard, and so to that

14    extent, I have some knowledge of what

15    they would be saying.  But the particular

16    words or the particular things they may

17    have emphasized, I have no -- no personal

18    knowledge of.

19    Q.   Your general expectation is that

20    before a doctor prescribes the drugs,

21    they will at least inform the patients of

22    the risks as specifically enumerated in

23    the drug labeling; right?

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 210

1    A.   Among other things, yes.

2    Q.   And the doctor may also go

3  beyond the labeling and advise them of

4  potential risks even though they're not

5  specifically disclosed in the drug

6  labeling; right?

7    A.   Yes.  Because there -- there are

8  circumstances wherein the underlying

9  conditions of the patient may -- may

10  cause particular risks in particular

11  areas, so that's right.

12        So there's the general

13  precautions that are included in the

14  package insert, but they usually tend to

15  be exhaustive.  They -- they list in the

16  package inserts even remote

17  possibilities, so.  But most physicians

18  can't drill down into those details with

19  a patient.  You don't want to overwhelm

20  the patient and their family with those

21  minute details.  You want to talk about

22  the major risks and then the risks that

23  are peculiar to the patient because of

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 211

1    their underlying condition.  And that's
2    generally what everybody does.
3        Q.    Yeah.
4        A.    Although, again, I'm not present
5    in every office on every occasion, but
6    that's generally how we're trained to
7    conduct a consent.
8        Q.    Do you know -- are you aware
9    that patients who are prescribed
10   puberty-blocking agents are typically
11   monitored through blood tests and lab
12   work?
13            MR. KNEPPER:  Objection, form.
14       A.    It -- I don't -- I'm not
15   familiar in all cases to what extent
16   they're monitored.  My hope is that
17   they're being monitored.  I would expect
18   that they're being monitored.
19       Q.    Yeah.  And you don't have
20   experience with monitoring patients who
21   undergoing treatment with puberty
22   blockers; right?
23       A.    No.

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 212

1      Q.   And you don't have experience

2  with reviewing blood work, labs, what's

3  normal, what's not, anything in that

4  field; right?

5           MR. KNEPPER:  Objection to form.

6      A.   Oh, no, I am familiar with

7  reviewing labs and interpreting

8  laboratory data --

9      Q.   Sorry.

10     A.   -- as it pertains -- yeah.

11     Q.   Sorry.  Let me make -- make my

12  question more specific.  I'm still

13  talking about patients who are treated

14  with puberty-blocking agents.

15     A.   Okay.

16     Q.   For those patients in

17  particular, you don't have experience

18  with reviewing their blood work, labs to

19  see -- to check their hormone levels and

20  see if any adjustments are needed; right?

21           MR. KNEPPER:  Objection, form.

22     A.   No.  I have some familiarity

23  with the interpretation of hormone levels

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 213

1    in endocrinology.  As a -- as a general

2    surgeon and a critical care doctor, these

3    issues were very important to me for a

4    number of years.  So I'm familiar with

5    that, although I haven't monitored

6    patients receiving puberty blockers or

7    cross-sex hormones per se.  So generally,

8    I am familiar with -- with that and the

9    ramifications of endocrinopathies, again,

10   because I had considerable experience

11   with management of critical care patients

12   and -- yeah.

13        Q.   Yeah.  My question is more

14   specific.

15        A.   Okay.

16        Q.   You personally have not

17   monitored blood work from patients who

18   are undergoing puberty-blocking agents;

19   right?

20        A.   Correct.

21        Q.   Okay.  And you mentioned

22   cross-sex hormones.  You know what those

23   are; right?

# DEPOSITION OF PATRICK LAPPERT, M.D.

Page 214

```
 1        A.    Yes.
 2        Q.    For transgender women, estrogen
 3    is a hormone that's typically prescribed;
 4    right?
 5        A.    Yes.
 6        Q.    For transgender men,
 7    testosterone is the hormone that's
 8    typically prescribed; right?
 9        A.    Right.
10        Q.    You've never prescribed
11    cross-sex hormones for treatment of
12    gender dysphoria to anyone; correct?
13        A.    Correct.
14        Q.    You have no firsthand experience
15    with advising your patients about
16    potential risks and benefits of cross-sex
17    hormones when used for treatment of
18    gender dysphoria; correct?
19        A.    Correct.
20        Q.    You personally don't know what
21    doctors who do prescribe estrogen or
22    testosterone to their patients for gender
23    dysphoria tell those patients about the
```

# DEPOSITION OF PATRICK LAPPERT, M.D.

Page 215

```
 1      risks and benefits of that treatment;
 2      correct?
 3              MR. KNEPPER:  Objection, form.
 4         A.   I would answer that question as
 5      we did earlier, that my expectation would
 6      be that they would cover the -- the risks
 7      and benefits of that -- of that
 8      particular therapy and that the
 9      exploration of potential risks would
10      include the major points that are
11      contained in the package insert and
12      whatever particular risks that the
13      patient may have because of their
14      underlying conditions, medical conditions
15      that may impinge upon them.  That would
16      be my expectation.
17         Q.   Okay.  So for testosterone and
18      estrogen when used to treat gender
19      dysphoria, you would generally expect
20      doctors to at least give the warning
21      about -- that's in the labeling and
22      potentially give additional warnings
23      outside of that as well; fair?
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 216

1          MR. KNEPPER:  Objection to form.

2      A.    That would be my -- that would

3  be my expectation.

4      Q.    All right.  We started talking

5  about off-label use, so let's circle back

6  to that.  So in your report, you

7  criticize Dr. Brown and Dr. Schechter for

8  not disclosing that the FDA has not

9  approved these hormones for treatment of

10  gender dysphoria.  Do you recall that?

11     A.    Yes.  My testimony, yes, I do

12  recall that.

13     Q.    All right.  Off-label use is

14  when a doctor prescribes a drug outside

15  of its FDA-approved indication; correct?

16     A.    Correct.

17     Q.    And we touched earlier on

18  whether it's proper or improper to

19  prescribe drugs on an off-label basis.

20  There are circumstances where it is

21  appropriate to prescribe a drug on an

22  off-label basis; correct?

23     A.    Yes.

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 217

```
 1        Q.   It's a case-by-case decision;
 2   right?
 3             MR. KNEPPER:  Objection, form.
 4        A.   Yes.
 5        Q.   It's a case-by-case decision
 6   that's made between the doctor and their
 7   patient; right?
 8             MR. KNEPPER:  Objection, form.
 9        A.   Right.
10        Q.   You're not expressing the
11   opinion that doctors should not be
12   prescribing drugs on an off-label basis
13   ever; right?
14        A.   I'm expressing the opinion that
15   -- that drugs that have massive potential
16   side effects should not be off-label
17   prescribed unless those risks warrant --
18   I mean, those risks are warranted given
19   the underlying condition of the patient
20   and that the patient is being treated as
21   a -- as a -- as a trial or an
22   experimental patient with ethics
23   monitoring and all the rest of it that
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 218

```
 1    attends.
 2          The reason why off-label use is
 3    problematic is because it doesn't have a
 4    body of proven scientific evidence that
 5    the FDA has made use of in order to -- to
 6    warrant the use of the drug.  So if
 7    you're going to go off label, again, the
 8    risks have to be low.  If the condition
 9    you're treating makes -- makes the risks
10    high, then that's where you have to get
11    into ethics panels and experimental
12    trials and things like that.  I think
13    that's at the heart of this issue.
14          We're dealing with a condition
15    where the application of these drugs is
16    not proven and the risks are very high,
17    and that's where my concern lay.
18       Q.   Do you think that off-label use
19    of prescription drugs is, by definition,
20    investigational?
21       A.   To the extent that very often
22    the -- the use of -- the off-label use of
23    drugs begins on the basis of anecdotal
```

1    reports.  So anecdotal reports, again,

2    are categorized as level 5 evidence.  And

3    -- and so when those reports are

4    published and -- and the risks are seen

5    as low, then other physicians may begin

6    the off-label use of those drugs.

7            But generally, one wants to

8    progress to a more definitive scientific

9    evidence, like level 4 evidence where

10   there's a pre-application test, the use

11   of the drug, and a post-application test,

12   or level 3 where you're looking at

13   longitudinal data to confirm not only the

14   safety but the efficacy of the

15   application of the drug.

16           In the case of the use of

17   puberty blockade and cross-sex hormones,

18   it doesn't exist beyond level 5 evidence

19   even though the treatment has now been

20   going on off-label for more than a

21   decade, if not approaching twenty years.

22       Q.   All right.  You mentioned

23   doctors are prescribing on an off-label

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 220

1  basis after there's case reports. It

2  does happen that doctors prescribe drugs

3  on an off-label basis based on nothing

4  more than case reports; right?

5  A. That's how it always begins,

6  yeah.

7  Q. Yeah. The FDA doesn't say

8  that's not permissible, do they?

9  A. No, they don't.

10  Q. Okay.

11  A. I don't know. I don't know what

12  the FDA -- if there's a published policy

13  about that. I would suspect not, given

14  the history in my lifetime of people

15  off-label using, for example, asthma

16  medications for the treatment of breast

17  implant encapsulation, that kind of

18  stuff. That's an example of a very

19  benign drug being used off-label to treat

20  a surgical condition of breast implant

21  encapsulation. So that's my personal

22  experience. I suspect there isn't an FDA

23  policy that utterly prohibits it. I

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 221

1    would agree, yeah.

2        Q.    Okay.   The FDA is the federal

3    agency that regulates prescription drugs;

4    correct?

5        A.    Food and drugs, yes.

6        Q.    And they decide whether a

7    particular drug can be marketed for a

8    particular indication; correct?

9        A.    Right.

10            MR. KNEPPER:  Form.

11       Q.    And one of the areas of

12   oversight the FDA has is the safety of

13   prescription drugs; right?

14       A.    Right.

15       Q.    Before forming your opinions in

16   this case, did you investigate what

17   position the FDA takes on off-label use

18   of drugs?

19       A.    No, I did not.

20       Q.    Sitting here today, do you know

21   what that position is?

22       A.    I do not, no.

23       Q.    Do you know whether the expert

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 222

1    opinions you're expressing about

2    off-label use of drugs are consistent or

3    inconsistent with what the -- what the

4    FDA has said about off-label use?

5            MR. KNEPPER:  Objection, form.

6        A.   I remember when the controversy

7    about the use of Singulair in breast

8    implant capsules came up.  That was

9    discussed at an ASPS meeting and then

10   some articles that came out.  And I think

11   I recall from those -- either the

12   conference or the article that the FDA

13   takes a permissive attitude where risk is

14   low.

15       Q.   You think the FDA only allows

16   off-label use of prescription drugs when

17   the risk is low?

18       A.   I don't know that for a fact.

19       Q.   All right.

20       A.   I would -- I would hope.  I

21   would hope low risk/high benefit.  So --

22   so again, it's an equation, it's not just

23   a one-sided thing.  So it isn't just the

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 223

1    risk but also the potential benefits.

2    And the potential benefits have to be

3    very high.  The higher the risk is, the

4    higher the benefit has to be.  And that's

5    kind of a general principle of the

6    medical care.  You know, before all else,

7    do no harm.  That's what informs all

8    medical care, and I would hope that's

9    what informs the FDA policy, whatever

10   that may be.

11       Q.   Okay.  Well, let's look at the

12   policy.

13       A.   Okay.

14       Q.   I'm going to introduce another

15   exhibit.  Okay.  This is going to be

16   Exhibit 11.  Let me know when you have

17   it.

18   (Exhibit 11 was marked for identification

19   and is attached.)

20       A.   Okay.

21       Q.   Have you ever seen this document

22   before?

23       A.   I have not.

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 224

1      Q.    Do you know what the Federal
2   Register is?
3      A.    It's a -- it's a federal list of
4   regulations pertaining to things like
5   this.
6      Q.    Yeah.  It's the
7   official publication --
8      A.    Federal code.
9      Q.    -- of federal rules, proposed
10  rules, and notices for federal agencies;
11  right?
12     A.    Yeah.  Right.
13     Q.    I see this is dated at the top
14  November 18, 1994.  See that?
15     A.    Yes.
16     Q.    Page 1, middle column, see it
17  says, "Agency: Food and Drug
18  Administration, HHS"?
19     A.    Let's see.  "Agency: Food and
20  Drug Administration, HHS."  Yes.
21     Q.    It says, "Action."  It says,
22  "Notice; request for comments."  Do you
23  see that?

## DEPOSITION OF PATRICK LAPPERT, M.D.

1      A.    Yes.

2      Q.    All right.  Go to page 2.

3      A.    Okay.

4      Q.    In the column all the way to the

5      right, you see there's a section II, and

6      it's titled, "FDA Policy on Promotion of

7      Unapproved Uses."  Do you see that?

8      A.    I do.

9      Q.    All right.  The first paragraph

10     says, "Over a decade ago, the FDA Drug

11     Bulletin informed the medical community

12     that 'once a [drug] product had been

13     approved for marketing, a physician may

14     prescribe it for uses or in treatment

15     regimens of patient populations that are

16     not included in approved labeling.'"  Do

17     you see that?

18     A.    I do.

19     Q.    What do you understand that to

20     mean?

21     A.    That --

22           MR. KNEPPER:  Objection.

23     A.    I apply that to mean that --

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 226

1      that the -- that the FDA does not -- does
2      not intend to weigh in on off-label use,
3      you know, without restriction, I guess.
4      The sense I get of it is that they're --
5      they're declining to prohibit the
6      off-label use in -- in other patients at
7      this time, I would -- I would guess.  I
8      suppose that if they started to see
9      complications, they might weigh in.  This
10     has been the history, for example, with
11     nausea medicines and things like that
12     that created problems after use.
13          Q.   At that time at least, the FDA
14     was telling the medical community that
15     doctors may prescribe drugs for uses
16     outside of FDA-approved indications;
17     correct?
18          A.   Yes.  I would say that --
19               MR. KNEPPER:  Objection, form.
20          A.   -- in 1994, the FDA declined to
21     -- to -- I don't know what they've done
22     subsequently.  I -- but -- but in 1994,
23     they -- they -- off-label use was not

## DEPOSITION OF PATRICK LAPPERT, M.D.

1    prohibited.

2        Q.   Well, actually --

3        A.   They finally --

4        Q.   Sorry, finish.

5        A.   No, go ahead.

6        Q.   Well, you see this actually

7    says, "The publication further stated,"

8    and then there's a quote.  And after the

9    quote, there's a Footnote 4.

10         Before we get to that, do you

11    see it says -- it cites to the FDA Drug

12    Bulletin from 1982.

13        A.   Right.

14        Q.   Right?

15        A.   Right.

16        Q.   So that original guidance came

17    from a 1982 FDA position; right?

18        A.   Right.

19        MR. KNEPPER:  Objection, form.

20        Q.   And you say that you read this

21    and you don't think that the FDA has

22    taken a position, but let's see what else

23    that quote says.  You see the quoted

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 228

1    language starting with "The publication

2    further stated"?  Do you see that?

3         A.   That starts with the word

4    "unapproved"?

5         Q.   Yeah.  It says, "'unapproved'

6    or, more precisely, 'unlabeled' uses may

7    be appropriate and rational in certain

8    circumstances, and may, in fact reflect

9    approaches to drug therapy that have been

10   extensively reported in medical

11   literature."  Do you see that?

12        A.   I do.

13        Q.   You understand what that means;

14   right?

15             MR. KNEPPER:  Objection to form.

16        A.   Yes.  Yes.

17        Q.   Off-label use -- strike that.

18             The FDA has recognized as early

19   as 1982 that off-label use may be based

20   on medical literature, not published

21   indications; right?

22        A.   Right.

23        Q.   And then it says, "Valid new

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 229

1    uses for drugs already on the market are
2    often first discovered through
3    serendipitous observations and
4    therapeutic innovations, subsequently
5    confirmed by well-planned and executed
6    clinical investigations."  Right?
7        A.   Yeah.  That's -- that's kind of
8    a -- just a restating of what I related
9    to you about, for example, the use of
10   Botox and hyperhidrosis, as I have done.
11   Yeah, I would totally agree with that.
12       Q.   And then it says, "The agency
13   and its representatives have restated
14   this policy on numerous occasions."  Do
15   you see that?
16       A.   I do.
17       Q.   Do you understand that for
18   decades, for three decades at least, the
19   FDA has taken the position that
20   physicians are allowed to prescribe drugs
21   on an off-label basis?
22           MR. KNEPPER:  Objection, form.
23       A.   Yes.

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 230

1      Q.   Your report doesn't acknowledge
2   this longstanding position from the FDA,
3   does it?
4      A.   My report does not -- no, it
5   does not.
6      Q.   And I mean, I know I just heard
7   you say, well, maybe this is from the
8   '80s.  Let me show you what the FDA says
9   today.
10      A.   Okay.
11      Q.   I'm going to introduce another
12   exhibit.  This is Exhibit 12.  Let me
13   know when you get it.
14   (Exhibit 12 was marked for identification
15   and is attached.)
16      A.   Okay.  All right.  I've got it.
17      Q.   All right.  You see that this is
18   a printout from fda.gov, the official
19   website of the FDA; right?
20      A.   Right.
21      Q.   The title is "Understanding
22   Unapproved Use of Approved Drugs 'Off
23   Label.'"  Right?

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 231

1      A.    Right.

2      Q.    Go to page 2.

3      A.    Okay.

4      Q.    Toward the bottom, it says in

5   bold, "Why might an approved drug be used

6   for an unapproved use?"  Do you see that?

7      A.    I do.

8      Q.    Then it says, "From the FDA

9   perspective, once the FDA approves a

10  drug, healthcare providers generally may

11  prescribe the drug for an unapproved use

12  when they judge that it is medically

13  appropriate for their patient."  Do you

14  see that?

15     A.    I do.

16     Q.    And then skipping one sentence,

17  it says, "One reason is that there"

18  may -- "might not be an approved drug to

19  treat your disease or medical condition."

20  Right?

21     A.    Right.

22     Q.    So the FDA -- the position that

23  the FDA takes is off-label use may be

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 232

```
 1       medically appropriate for patients;
 2       right?
 3            A.    Right.
 4            Q.    That's a position they've taken
 5       for thirty years plus; right?
 6            A.    Right.
 7                  MR. KNEPPER:  Objection, form.
 8            Q.    All right.  And we talked
 9       earlier about, you know, is off-label use
10       experimental or investigational.  Before
11       forming those opinions, did you look to
12       see what the FDA says on that point?
13            A.    How the FDA classifies
14       experimental or investigational?
15            Q.    Do you know what position the
16       FDA takes on whether off-label use is
17       considered investigational?
18            A.    I don't know what their official
19       position is, no.
20            Q.    All right.  Let's look at that.
21       All right.  This is going to be Exhibit
22       13.  Let me know when you have it.
23       (Exhibit 13 was marked for identification
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 233

```
 1      and is attached.)
 2           A.    I have it.
 3           Q.    This is a guidance document from
 4      the FDA from 1998.  Generally, are you
 5      aware that the FDA issues guidance
 6      documents?
 7           A.    Generally, yes, I am aware.
 8           Q.    Have you ever seen an FDA
 9      guidance document before today?
10           A.    I've heard them referred to, but
11      I've never read one, no.
12           Q.    Okay.  All right.  Well, this
13      one's titled "'Off-Label' and
14      Investigational Use of Marketed Drugs,
15      Biologics, and Medical Devices."  You see
16      that?
17           A.    I do.
18           Q.    Okay.  All right.  The first
19      paragraph, second sentence says, "If
20      physicians use a product for an
21      indication not in the approved labeling,
22      they have the responsibility to be well
23      informed about the product, to base its
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 234

1    use on firm scientific rationale and on

2    sound medical evidence, and to maintain

3    records of the product's use and

4    effects."  You see that?

5        A.   I do.

6        Q.   All right.  The next sentence

7    says, "Use of a marketed product in this

8    manner when the intent is the 'practice

9    of medicine' does not require the

10   submission of an Investigational New Drug

11   Application, Investigational Device

12   Exemption or review by an Institutional

13   Review Board."  Do you see that?

14       A.   I do.

15       Q.   I understand that what this is

16   saying, according to the FDA, when a

17   doctor prescribes a drug on an off-label

18   basis, that is not necessarily an

19   investigational use of that drug; right?

20            MR. KNEPPER:  Objection, form.

21       A.   I would disagree, because as it

22   says there, when they're -- when they're

23   prescribing in that manner, they have a

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 235

1   responsibility not only to be informed

2   about the product but to do the

3   recordkeeping of its effects, which is

4   really the initial phase of

5   investigation.  So in a sense, they are

6   -- they are part of the investigative

7   process now because a new application of

8   the medication has been proposed, and

9   safety and efficacy have -- have to be

10  documented in some measure.

11          So the FDA is giving you room to

12  broaden the application of the drug, but

13  they're also placing upon you the burden

14  of documenting so that its effects and

15  benefits can be characterized because

16  that's being -- obviously, it's being

17  investigated.  That's the point of their

18  wanting the recordkeeping, so --

19      Q.   Do you know what the

20  Institutional Review Board is?

21      A.   Yes.

22      Q.   Clinical trials have to be

23  cleared by IR- -- IRBs; right?

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 236

```
1        A.    Right.
2        Q.    And this says you don't actually
3    have to apply for approval by an IRB when
4    you're prescribing a drug on an off-label
5    basis; right?
6             MR. KNEPPER:  Objection, form.
7        A.    It says that it's not of
8    necessity, so they're not making a
9    blanket requirement.  I would imagine
10   that that might be modified in particular
11   cases.
12       Q.    Yeah.  Because this is saying
13   that when you're prescribing a drug on an
14   off-label basis, that doesn't mean you're
15   starting up a clinical trial; right?
16       A.    It doesn't necessarily mean
17   you're starting a clinical trial, that's
18   right.  It doesn't exclude the necessity
19   for a clinical trial.  It just says
20   you're not necessarily starting a
21   clinical trial.
22       Q.    Yeah.  And when this says --
23   when it says doctors should maintain
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 237

1    records of the product's use and effects,
2    it's not telling them that they're
3    enrolling their patients in a clinical
4    trial by starting -- by prescribing a
5    drug on an off-label basis; right?
6            MR. KNEPPER:  Objection, form.
7        A.   Right.  But what it -- what it
8    probably is inferring is that if they
9    start seeing complications, then the
10   further application of the drug in that
11   circumstance might be required -- might
12   require an IRB.  So yeah.  So it's --
13   what they're saying is it doesn't require
14   an IRB of necessity.  It does require
15   recordkeeping.  And I would expect that
16   if they were to see complications,
17   problems, lack of efficacy, that -- and
18   the desire for its continued use might
19   require an IRB.  In fact, I would -- I
20   would hope it would require an IRB.
21   Yeah.
22       Q.   Yeah.  A clinical trial down the
23   line is a "this might be nice to have,"

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 238

1     but it's not a requirement for a doctor

2     to prescribe a drug on an off-label use

3     basis.  That's what this says; right?

4          MR. KNEPPER:  Objection, form.

5       A.   That's what that says, yeah.

6       Q.   Yeah.  You don't cite this

7     guidance in your report obviously; right?

8       A.   I don't think it's --

9          MR. KNEPPER:  Objection, form.

10      A.   I don't think it's germane to my

11    report.  No.

12      Q.   All right.  You've also offered

13    opinions on whether it's proper to

14    prescribe drugs on an off-label basis to

15    children and adolescents; right?

16      A.   I've only offered it in the case

17    of this particular therapy.  I haven't

18    offered it generally, only in the case of

19    puberty blockade and cross-sex hormones

20    for the purposes of transitioning a child

21    to the appearance of the other sex.

22    That's all I've offered it as an opinion.

23      Q.   All right.  Do you know what the

# DEPOSITION OF PATRICK LAPPERT, M.D.

Page 239

1      American Pediatrics Association is?

2          A.   Yes.

3          Q.   Before forming your opinions,

4      did you look to see what the APA says

5      about off-label use of drugs in children

6      and adolescents?

7          A.   No.

8          Q.   Sitting here today, you don't

9      know the APA's position on this -- on

10     this topic; correct?

11              MR. KNEPPER:   Objection, form.

12         A.   Correct.

13         Q.   Let's look at that next.   Okay.

14     This is going to be Exhibit 14, and let

15     me know when you have it.

16     (Exhibit 14 was marked for identification

17     and is attached.)

18         A.   Okay.   I have it.

19         Q.   You understand this is a policy

20     statement from the APA?

21         A.   I'm reading it now.   I see that

22     it is a policy statement from the

23     American Academy of Pediatrics.

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 240

1      Q.   It's a policy statement

2    entitled, "Off-Label Use of Drugs in

3    Children."  Right?

4      A.   Yes.  Yes.

5      Q.   Look at the introduction section

6    toward the bottom of the page.

7      A.   Okay.

8      Q.   It says that, "The purpose of

9    this statement is to further define and

10   discuss the status of off-label use of

11   medic- -- medications in children."  And

12   then it talks about a publication of a

13   2002 statement.  You see that?

14     A.   Yes.

15     Q.   All right.  So the FDA -- APA

16   has taken a position on off-label use of

17   drugs in children since at least 2002;

18   right?

19          MR. KNEPPER:  Objection, form.

20     A.   I'm reading it now.  It appears

21   to be that, yeah.

22     Q.   All right.  Look at the abstract

23   towards the top.

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 241

```
1         A.    Okay.
2         Q.    Second sentence says, "However,
3    off-label drug use remains an important
4    public health issue for infants,"
5    childrens, and" -- "children, and
6    adolescents, because an overwhelming
7    number of drugs still have no information
8    in the labeling for use in pediatrics."
9    Do you see that?
10        A.    I do.
11        Q.    Okay.  And then it says, "The
12   purpose of off-label use is to benefit
13   the individual patient."  Right?
14        A.    Yes.
15        Q.    And then it says, "Practitioners
16   use their professional judgment to
17   determine these uses."  Correct?
18        A.    Yes.
19        Q.    And then it says, "As such, the
20   term 'off-label' does not imply an
21   improper, illegal, contraindicated, or
22   investigational use."  Right?
23        A.    That's what it says there, yes.
```

# DEPOSITION OF PATRICK LAPPERT, M.D.

Page 242

```
 1        Q.   Yeah.   The APA also takes the
 2     position that off-label use does not
 3     imply investigational use; correct?
 4             MR. KNEPPER:   Objection to form.
 5        A.   It does not de facto imply
 6     off-label use, that's right, yeah.   It
 7     does not imply, right.
 8        Q.   And it does not imply that
 9     off-label use is de facto improper or
10     illegal or contraindicated; right?
11        A.   Right.
12             MR. KNEPPER:   Objection, form.
13        Q.   All right.   Go to page 2.
14        A.   Okay.
15        Q.   Look at the left column, the
16     very bottom paragraph.
17        A.   Okay.
18        Q.   It says:   "The absence of
19     labeling for a specific age group or for
20     a specific disorder does not necessarily
21     mean that the drug's use is improper for
22     that age or disorder.   Rather, it only
23     means that the evidence required by law
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 243

1    to allow inclusion in the label has not
2    been approved by the FDA.  Additionally,
3    in no way does a lack of labeling signify
4    that therapy is unsupported by clinical
5    experience or data in children."
6              Do you see that?
7         A.   I do.
8         Q.   This is the APA recognizing that
9    even in the absence of FDA approval for a
10   particular indication, that use may still
11   be supported by clinical experience and
12   data; right?
13             MR. KNEPPER:  Objection, form.
14        A.   Yeah.  I would -- I would say
15   also that the APA recognizes that -- that
16   there's a poverty of evidence.  The
17   poverty of evidence is one of the
18   characteristics of off-label use.  And
19   that's -- that's what the nature of my
20   expert opinion was about, that the
21   poverty of evidence is what makes the
22   off-label use an issue, and in this case,
23   poverty of evidence for off-label use in

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 244

1    a situation where the harms -- potential

2    harms are great.  That's what the concern

3    was, not -- obviously, I use -- I've

4    off-label used drugs in my own practice,

5    as I said before.

6            I don't have an objection

7    without qualification that -- that the

8    off-label use of drugs is somehow a

9    crime.  I'm saying that in this

10   particular instance of this particular

11   application, that the off-label use tells

12   us that there's a poverty of scientific

13   evidence to support its application that

14   way.  Clearly, there's anecdotal reports;

15   otherwise, doctors wouldn't be using it.

16   But there's a poverty of evidence, and

17   what we're dealing with here is not a

18   potential trivial complication but

19   potentially permanently life-altering

20   complications.

21           That was the issue that I was

22   addressing in my concern about the

23   off-label use, that there's a standard

## DEPOSITION OF PATRICK LAPPERT, M.D.

1    of -- of caution that's required when you

2    go off-label.  And that caution isn't

3    being demonstrated by the -- for the

4    persons who are prescribing or applying

5    these drugs in this way.  That was my

6    concern.

7        Q.   All right.  You think that

8    before these drugs are to be prescribed,

9    they should first be supported by results

10   from clinical trials; right?

11           MR. KNEPPER:  Objection, form.

12       A.   That's the beginning.

13       Q.   That's the beginning.

14       A.   Yeah.

15       Q.   The absolute minimum to

16   prescribe these drugs; right?

17           MR. KNEPPER:  Objection, form.

18       A.   Well, no.  No, I -- I didn't say

19   that.  As I said, it begins with

20   anecdotal evidence, not clinical trials.

21   So somebody somewhere sees an effect.  As

22   it said in that FDA document, it's

23   oftentimes serendipitous.  A clinician

## DEPOSITION OF PATRICK LAPPERT, M.D.

1    will see an effect, and then -- and then

2    they'll, based on that, they'll hopefully

3    check out the potential risks to the

4    patient and then begin that off-label

5    use.

6         So it begins actually with

7    anecdotal reports, maybe case

8    collections, maybe a number of providers'

9    case collections, maybe it's a -- it's

10   a -- it's an institutional experience.

11   But that leads to clinical trials and the

12   IRB and all the rest of it.  So that's

13   just the beginning of it.

14   Q.   It may be appropriate for a

15   doctor to prescribe a drug on an

16   off-label basis without having the

17   results from a clinical trial; correct?

18   A.   Yeah, I would -- I would hope

19   that after thirty years of doing this,

20   that we would beyond -- be beyond

21   institutional or personal experience,

22   that those trials would have already been

23   done.  This isn't -- we're not just at

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 247

1    the beginning of puberty blockade and
2    cross-sex hormones.  We're well into this
3    now, to the point where the European
4    literature is now vehemently rejecting
5    that.
6           That's -- these things have
7    changed.  In the last three years, it's
8    all changed.  With respect to this
9    off-label application of puberty blockade
10   and cross-sex hormones, it's changed
11   utterly.  So these general statements
12   about off-label use are important to
13   understand, certainly, when you see a
14   serendipitous result and you consider
15   applying the drug.  But we are so far
16   beyond that at this point in the history
17   of transgender therapy, this is where
18   we're concerned.  We're concerned with
19   the continued off-label use, the
20   continued absence of clinical trials.  We
21   should have been beyond that years ago.
22   And this is what the European literature
23   is now showing us, that the application

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 248

1    of those drugs by -- which is approved by

2    the APA, is now being rejected by the

3    medical services in Great Britain, in

4    Sweden, in Finland, in Holland.  And this

5    is where we as American providers have to

6    get.

7         Q.   All right.  We'll -- we'll

8    definitely come back to those --

9         A.   Okay.

10        Q.   -- studies.  I promise.

11        A.   Okay.

12        Q.   Let's finish this document

13   first, though.  All right.  Go to page 3.

14   All right.

15        A.   Okay.

16        Q.   Look at the left column.

17        A.   Okay.

18        Q.   It says:  "Therapeutic

19   decision-making should always be guided

20   by the best available evidence and the

21   importance of the benefit for the

22   individual patient.  Practitioners are in

23   agreement regarding the importance of

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 249

```
 1     practicing evidence-based medicine.
 2     However, for the pediatric population,
 3     gold standard clinical trials are often
 4     not available, so practitioners must rely
 5     on either less definitive information,
 6     such as expert opinion for the age group
 7     that they are treating, or use evidence
 8     from a different population to guide
 9     practice."
10             You see that?
11     A.    I do.  And I would agree with
12     that, that particularly in pediatric
13     patients, the clinical trial approach
14     oftentimes is -- is not available because
15     of the nature of the condition and so on.
16     But in the -- in this case, there's a --
17     it's not an all or none, it's got to be
18     clinical trials or -- or nothing.
19             There's longitudinal
20     population-based studies, long-term
21     results seen in a population that has
22     matured through this therapy, and looking
23     at, you know, cohort studies
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 250

1    longitudinally, cohort study, which is --
2    which is an alternative when -- when the
3    clinical trial is not available to you
4    for ethical reasons.  Like you wouldn't
5    do sham surgery on somebody.  That would
6    be ethically untenable.  But you can look
7    at population-based studies where you
8    have a cohort to compare.  And that's --
9    that's where we should be.  That's where
10   the European literature is now.
11          So I would agree with that
12   statement that -- that the APA is making
13   there, but I would qualify it by saying
14   that there's an alternative available
15   that brings you to a higher level of
16   evidence that may in fact bring it to
17   on-label use if they were to bother to do
18   it.
19       Q.   The APA recognizes that for the
20   pediatric population in particular,
21   results from clinical trials are often
22   not available; right?
23       A.   Right.

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 251

1          Q.   And the answer in those

2     situations is not to stop prescribing

3     these drugs altogether; right?

4               MR. KNEPPER:  Objection, form.

5          A.   Yeah.  The "altogether" would be

6     the qualifier there because there are

7     some circumstances where it would be -- I

8     mean, it wouldn't be good to stop its

9     prescription, but there would be others

10    that you would have to examine more

11    carefully because of the risk issue.

12         Q.   Yeah.  Instead, what the APA

13    says is that when clinical trial results

14    are not available, doctors have to rely

15    on less definitive -- definitive

16    information; right?

17         A.   That's what -- that's all you

18    have.  That's right.

19         Q.   Yeah.  The APA says it may be

20    appropriate for doctors to prescribe

21    drugs to pediatric patients on an

22    off-label basis even when that use is not

23    supported by randomized clinical trials;

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 252

```
 1      correct?
 2          A.    Right.
 3          Q.    Because the reality is that for
 4      a lot of conditions, in the pediatric
 5      population, there are no randomized
 6      clinical trial results available; right?
 7               MR. KNEPPER:  Objection, form.
 8          A.    Again, so you're holding out
 9      randomized clinical trial, or they're
10      holding out randomized clinical trial as
11      the only alternative to the lowest form
12      of evidence.  And I -- I agree that
13      randomized clinical trial are not always
14      available, and we have to have recourse
15      to perhaps lesser but nonetheless more
16      convincing forms of evidence to fall back
17      on rather than falling back to the lowest
18      form of evidence as is the case today
19      with the application of these drugs.
20          Q.    All right.  Look at the last
21      paragraph in the left column of this
22      page.
23          A.    Okay.
```

**DEPOSITION OF PATRICK LAPPERT, M.D.**

Page 253

1      Q.   It says:  "In most situations,
2   off-label use of medications is neither
3   experimentation nor research.  The
4   administration of an approved drug for a
5   use that is not approved by the FDA is
6   not considered research and does not
7   warrant special consent or review if it
8   is deemed to be in the individual
9   patient's best interest."  Do you see
10  that?
11     A.   I do.
12     Q.   If the physician deems an
13  off-label use to be in the individual
14  patient's best interest, that's not
15  experimental use, according to the APA;
16  right?
17          MR. KNEPPER:  Object to the
18  form.
19     A.   Well, according to the --
20  according to the APA, in most situations.
21     Q.   Yeah.
22     A.   So in that statement, it
23  acknowledges that there are some

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 254

1    situations where that would be

2    considered.  That's the implication in

3    that statement.  So "most" is the

4    qualifier, implying that there are

5    situations where it would be considered

6    experimental.

7        Q.    Okay.

8        A.    And that's what we propose in

9    our expert testimony, is that this is one

10   of those situations.  This is

11   experimental use.

12           MR. TISHYEVICH:  Now let's go

13   off the record.

14           THE VIDEOGRAPHER:  This is the

15   end of Media Unit No. 3.  We are off the

16   record at 12:30 p.m.

17               (Break taken.)

18           THE VIDEOGRAPHER:  This is the

19   start of Media Unit No. 4.  We are on the

20   record at 1:21 p.m.

21       Q.   (By Mr. Tishyevich) All right,

22   Doctor.  You know you're still under

23   oath; right?

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 255

```
 1          A.   Yes.
 2          Q.   Before lunch, we were talking
 3     about off-label use of prescription
 4     drugs.  Do you know how common or
 5     uncommon off-label use of prescription
 6     drugs is in the overall population?
 7          A.   I'm not familiar with that
 8     number, no.
 9          Q.   All right.  You don't know if
10     it's 5 percent or 10 percent or 50
11     percent of all drugs are prescribed off
12     label; right?
13          A.   I have no idea.
14          Q.   How about pediatrics
15     specifically?  Do you know how common or
16     uncommon off-label use is in the
17     pediatric population?
18          A.   I do not.
19          Q.   Let me introduce an exhibit.
20          MR. KNEPPER:  One second.
21          Dr. Lappert?
22          THE WITNESS:  Yes.
23          MR. KNEPPER:  Your camera has
```

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

**DEPOSITION OF PATRICK LAPPERT, M.D.**

Page 256

```
 1    moved accidentally, yeah.

 2           THE WITNESS:  It just allows me

 3    to look at the bottom of the other screen

 4    here so I can look at the exhibits.

 5           MR. KNEPPER:  Okay.  I think

 6    just for the video recording, we want to

 7    make sure that the camera stays on your

 8    face.

 9           THE WITNESS:  I'll go like this,

10    then.

11           MR. KNEPPER:  Perfect.

12       Q.   (By Mr. Tishyevich) So this is

13    going to be Exhibit 15.  Let me know when

14    you have it.

15    (Exhibit 15 was marked for identification

16    and is attached.)

17       A.   All right.  I have it.

18       Q.   All right.  This is a study from

19    2019 by Dr. Yackey, Y-A-C-K-E-Y, titled

20    "Off-label Medication Prescribing

21    Patterns in Pediatrics: An Update."  Do

22    you see that?

23       A.   I do.
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 257

```
1        Q.   All right.  And the objective is

2   "To describe the frequency of off-label

3   drug use in 2014 as defined by the

4   FDA-approved age ranges in patients 18 or

5   under 18 years of age."  Do you see that?

6        A.   I do.

7        Q.   All right.  Look at "Methods."

8   Do you see that section?

9        A.   I do.

10       Q.   It says, "This is a

11  retrospective cohort study of an

12  administrative database containing

13  inpatient resource use data from January

14  1, 2014, to December 31, 2014."  And do

15  you see that?

16       A.   I do.

17       Q.   Look at the "Results" section.

18       A.   Okay.

19       Q.   The first sentence says, "At

20  least 1 drug was prescribed off-label in

21  779,270 of 2,773,770 (28.1%) patient

22  visits during the study period."  Do you

23  see that?
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 258

1          A.    I do.

2          Q.    And skipping a sentence, then it

3    says:  "Off-label usage of certain

4    medications differed between care

5    settings.  Rates of off-label medication

6    use were higher in observational (45.5%),

7    inpatient (53.9%), and ambulatory (54.2%)

8    settings."  Do you see that?

9          A.    I do.

10         Q.    All right.  The study concluded

11   after reviewing 2.7 patient visits that

12   overall, 28.1 percent of patients were

13   prescribed an off-label -- prescribed a

14   drug on an off-label basis; right?

15         A.    Right.

16         Q.    And depending on the setting,

17   off-label prescriptions in the pediatrics

18   context can be as high as 45 to 54

19   percent; right?

20         A.    That's what the study shows.

21         Q.    All right.  The reality is that

22   prescribing drugs to children and

23   adolescents on an off-label basis is a

**DEPOSITION OF PATRICK LAPPERT, M.D.**

Page 259

1    fairly common practice; right?

2            MR. KNEPPER:  Objection to form.

3        A.   It appears to be, yes.

4        Q.   You did not know this before you

5    formed your expert opinions?

6        A.   I knew that it was more common

7    in children than in adults, and I knew

8    that it was, you know, fairly common,

9    having -- having prescribed off-label

10   myself to children, that it's -- it's

11   probably fairly common.  I didn't know

12   the exact numbers, though, until now.

13       Q.   Okay.

14       A.   Again, my -- my expert opinion

15   about this is not about does it happen.

16   It's about the particular case of the

17   transgendered person receiving an

18   off-label use of a -- of a fairly

19   problematic drug in light of the recently

20   changing evidence about its efficacy.  So

21   the issue of off-label use that I

22   presented was not about are drugs

23   prescribed off-label.  The issue was

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 260

1    these particular drugs in these
2    particular patients off-label in light of
3    the recent change in the world literature
4    about the risk/benefits of doing those
5    things.  And the evidence now is that
6    that whole position about puberty
7    blockade and cross-sex hormones, it's
8    falling apart in the last three years,
9    and there's a -- there's a growing wave
10   of evidence that says do not do this.
11   And in fact, that's where the Court
12   stepped in in Great Britain, and it's
13   where the Karolinska Institute stepped
14   in.
15          It's not that it's off-label
16   use.  It's that it's particularly
17   problematic in the case of these drugs in
18   these suffering patients.  That's what my
19   expert opinion was about.  It was not
20   about drug policy.  It was about these
21   patients, these problems, these drugs.
22   And the fact is that when you off-label
23   use, the responsibility falls much more

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 261

1    heavily on the provider.  When the FDA
2    approves it, the responsibility falls to
3    the shoulders of the approving authority.
4    But if you're going off-label, it's on
5    you as the provider to be certain that
6    you're doing good to the patient.  And up
7    until the last three years, the evidence
8    wasn't there.  Now it's there.  The
9    continued use of the drugs in this way
10   has become very problematic, and that's
11   -- that's what my expert opinion was
12   about, not about drug policy, but about
13   these drugs, these patients.
14        Q.   Doctor, there's actually no
15   question pending, so I'm going to ask
16   that you stick with listening to my
17   questions and then answering them instead
18   of making speeches.  Okay?
19             All right.  You -- we talked
20   earlier about the Botox injections that
21   you've done; right?
22        A.   Yes.
23        Q.   You told me you've been doing

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 262

1    Botox injections in the forehead for over

2    ten years; right?

3        A.    Correct.

4        Q.    You've told me that you've been

5    doing Botox injections for crow's feet

6    for over ten years; right?

7        A.    Yes.

8        Q.    Do you know when the FDA first

9    approved Botox for the use of treating

10   forehead wrinkles?

11       A.    Let's see.  I recall that it was

12   when I was the chief of plastics at

13   Portsmouth, Virginia, because we had been

14   using it for dystonias and things like

15   that in children.  And it got approved

16   for cosmetic use I'm going to say before

17   we moved to the new hospital, so it had

18   to have been around ninety- -- I want to

19   say '97, somewhere in there.  I'm just

20   ballparking it here.

21       Q.    So when you were using Botox to

22   do forehead injections, you think that

23   was an on-label FDA approved use for the

# DEPOSITION OF PATRICK LAPPERT, M.D.

Page 263

1    last ten years; right?

2        A.    Yeah.   When used in the

3    corrugator and procerus muscles, that's

4    the on-label use for cosmetic botulinum

5    toxin.

6        Q.    Let me introduce another

7    exhibit.   All right.   This is going to be

8    Exhibit 16, and let me know when you have

9    it.

10   (Exhibit 16 was marked for identification

11   and is attached.)

12       A.    All right.   I have it.

13       Q.    Top right corner, you see it

14   says, "Food and Drug Administration"?

15       A.    Yes.

16       Q.    Below that, do you see it says,

17   "Supplement Approval"?

18       A.    Yes.

19       Q.    You know what this is?

20       A.    It looks to be a -- a letter

21   from the FDA to the Allergan corporation,

22   to a particular Ph.D. there who is the

23   director of regulatory affairs.   And it's

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 264

```
 1    a supplemental -- I guess it's an
 2    amendment.  I haven't read it.  Can I
 3    have a moment to read it?
 4        Q.   I'll -- I'll point you to it.
 5    Don't worry.
 6        A.   All right.
 7        Q.   Allergan is a manufacturer of
 8    Botox; right?
 9        A.   Allergan, yes, uh-huh.
10        Q.   Go to page 3.
11        A.   Okay.
12        Q.   And you see there's a signature
13    line, and under that, it says,
14    "10/02/2017"?
15        A.   Correct.
16        Q.   You understand this was issued
17    on October 2, 2017; right?
18        A.   That's -- that's what the
19    document appears to show, yeah.
20        Q.   Go back to the first page.
21        A.   Okay.
22        Q.   First paragraph says, "Dear Dr.
23    Richmond:  Please refer to your
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 265

```
1       Supplemental Biologics License

2       Application, dated and received December

3       2, 2016."  Do you see that?

4            A.    I do.

5            Q.    The next paragraph says, "This

6       Prior Approval supplemental biologics

7       application proposes an additional

8       indication for the temporary improvement

9       in the appearance of moderate to severe

10      forehead lines associated with frontalis

11      muscle activity."

12           A.    Right.

13           Q.    Do you see that?

14           A.    I do.

15           Q.    All right.  Then the next

16      section says, "Approval & Labeling."

17      Right?

18           A.    Yes.

19           Q.    It says, "We have completed our

20      review of this supplemental application,

21      as amended.  It is approved, effective on

22      the date of this letter, for use as

23      recommended in the enclosed, agreed-upon
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 266

1       labeling text."  Do you see that?

2           A.    I do.

3           Q.    All right.  You understand that

4       Botox was not an FDA-approved treatment

5       for improvement in moderate to severe

6       forehead lines until October 3, 2017 --

7               MR. KNEPPER:  Objection --

8           Q.    -- right?

9               MR. KNEPPER:  -- to form.

10          A.    The sense I get of your question

11      is that you -- you're conflating the

12      injection of corrugator and procerus

13      muscles with the injection of the

14      frontalis muscles.  I consider all those

15      muscle groups to be forehead muscles

16      because they all animate the brow.  The

17      approval of Botox for the corrugator and

18      frontalis -- I mean, corrugator and

19      procerus muscle that goes way back is, I

20      thought, what you were -- you were asking

21      me about with ten years application to

22      the forehead.  So yeah.  So I consider

23      the -- the corrugator and procerus

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 267

1      muscles (indicating) forehead muscles.

2      Maybe others would call them glabellar,

3      but glabellar is the lesser-included

4      category.  So yeah.

5              So I was aware of the broadened

6      application, and I was aware that for

7      most of the time it's been on the market,

8      it has been limited, the approval been

9      limited to the corrugator and procerus.

10     And the frontalis marginal radicularis

11     was considered off-label use, as was its

12     use in hyperhidrosis, like we talked

13     about earlier.  Yeah.

14         Q.   You have prescribed Botox

15     cosmetic -- or strike that.

16             You have used Botox for

17     treatment of moderate to severe forehead

18     lines associated with frontalis muscle

19     activity before October 3, 2017; correct?

20         A.   Yes.

21             MR. KNEPPER:  Objection to form.

22         A.   Absolutely.

23         Q.   It's an off-label use; right?

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 268

1          A.   As we've talked about before,

2     yes, I've -- I've used it off-label.

3          Q.   And do you know when Botox

4     received this indication for treatment of

5     crow lines?

6          A.   I'm sorry.  Of?

7          Q.   Treatment of crow lines.

8          A.   Crow lines?

9          Q.   Yes.

10         A.   Oh, crow's feet (indicating).

11         Q.   Sorry, crow's feet.

12         A.   Yeah.  Yeah.  I don't know -- I

13    don't know the exact date of that.  I

14    just know that it's been broadened.

15         Q.   All right.  Before -- strike

16    that.

17              Before you first started using

18    Botox on an off-label basis, did you do a

19    literature search to see if there was a

20    randomized, double-blinded controlled

21    trial to demonstrate that this forehead

22    use was safe and effective?

23         A.   No.

# DEPOSITION OF PATRICK LAPPERT, M.D.

1          MR. KNEPPER:  Objection, form.

2     Q.    So you were using it without

3 having any idea if there was randomized

4 controlled clinical trials to demonstrate

5 the safety and effectiveness of that use;

6 correct?

7          MR. KNEPPER:  Objection, form.

8     A.    So the question is, was I using

9 it in other than the on-label purposes

10 before the approval was handed down by --

11 to the -- by the FDA?

12    Q.    No.  I already heard the answer

13 to that question.

14    A.    Oh, okay.

15    Q.    I'm asking you a different

16 question.

17    A.    Okay.

18    Q.    At the time you were using

19 Botox on --

20    A.    Oh.

21    Q.    -- an off-label basis --

22    A.    Right.

23    Q.    -- you were doing that without

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 270

1      having results from a randomized

2      controlled trial to demonstrate that this

3      off-label use was safe and effective;

4      correct?

5          A.    Correct.  Correct.

6              MR. KNEPPER:  Objection, form.

7          Q.    The same is true for respective

8      cohort studies; right?

9          A.    Correct.

10         Q.    The same is true for case

11     control studies; right?

12             MR. KNEPPER:  Objection, form.

13         A.    Right.  And that's an example of

14     what we were talking about earlier where

15     a low-risk application begins with

16     anecdotal experience, shared anecdotal

17     experience, and -- and the literature

18     that comes later leading to the

19     controlled trial that the Allergan

20     company may have done and it's then

21     subsequently approved by the FDA.  That's

22     right.  So this would fit into that

23     category.

## DEPOSITION OF PATRICK LAPPERT, M.D.

1      Q.   All right.  Let's talk more

2   about randomized controlled trials

3   outside of Botox.  If I call them RCTs

4   for short, you'll know what I'm referring

5   to; right?

6      A.   Yes.

7      Q.   An RCT typically involves two

8   groups, an experiment group and a control

9   group; right?

10     A.   Yes.

11     Q.   RCTs are typically

12   double-blinded; right?

13     A.   Well, in most cases.  But when

14   you're talking about things where there's

15   going to be an outward change in the

16   patient, it's -- it's difficult to blind

17   such studies.  You're essentially just --

18   for example, you couldn't have a

19   double-blinded study of a surgical

20   procedure, or you couldn't have a

21   double-blinded study of a -- of a medical

22   intervention where there's outward change

23   to the patient that would be evident to

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 272

1    both the experimenter and the subject.

2    So yeah.

3        Q.   Yeah.  So -- yeah, we'll get to

4    that in a minute.  Let me ask just some

5    more general questions first.

6        A.   Okay.

7        Q.   Because I want to figure out

8    your experience with RCTs.  You

9    personally have never been the lead

10   investigator for an RCT; correct?

11       A.   That's correct.

12       Q.   You personally -- strike that.

13            Have you ever been involved with

14   an RCT?

15       A.   Yes.  When I was a resident at

16   the University of California-San

17   Francisco working on the neurosurgical

18   trauma unit, we were doing a randomized

19   controlled trial of the medical

20   management of elevated intracranial

21   pressure, and I was -- because I was part

22   of the team, I was responsible for

23   gathering data in the critical care unit

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 273

```
1       and -- and working with the investigators
2       ensuring the integrity of the data.  So I
3       was not the lead investigator, obviously.
4       I was just one of the participants as one
5       of the treating physicians.
6           Q.   The only time you worked on a
7       randomized controlled trial was during
8       your surgery res- -- general surgery
9       residency; correct?
10              MR. KNEPPER:  Objection, form.
11          A.   I'm trying to think if there
12      were other instances here.  At UC-Davis
13      -- I'm trying to think.  Give me just a
14      moment.  I just want to --
15          Q.   Sure.
16          A.   -- make sure I'm not missing any
17      more.  I think that's the only one where
18      it was a randomized blinded study.
19      That's right, yeah.
20          Q.   And that residency was '87
21      through '91?
22          A.   That's right.
23          Q.   Okay.  You've never published
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 274

1    any articles in peer-reviewed journals

2    about RCTs; correct?

3        A.   That's correct.

4        Q.   You've personally never designed

5    an RCT; correct?

6        A.   That's correct.

7        Q.   You don't hold yourself out as

8    an expert in RCT design; right?

9            MR. KNEPPER:  Objection, form.

10       A.   Well, I would qualify that

11   answer by saying that part of my training

12   involves me being able to understand and

13   review published literature on the

14   subject even though I'm not the

15   investigator because of my training as a

16   plastic and reconstructive surgeon, as a

17   general surgeon.  As just a physician in

18   general, we're trained on how to

19   interpret the validity or the veracity of

20   the medical literature, including how to

21   interpret the randomized controlled trial

22   and -- and understand its validity, which

23   is -- what I'm testifying about is not my

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 275

1    personal experience.  It's my opinion of

2    the validity of the scientific data.  So

3    I -- so it's not that I -- that I can't

4    express an opinion on it.  It's just that

5    I haven't personally conducted one, but I

6    have been trained on how to interpret

7    them.

8        Q.    I understand that distinction

9    you're making.

10       A.    Thank you.

11       Q.    But when it comes to designing

12   RCT, you're not an expert in that aspect

13   of RCT?

14           MR. KNEPPER:  Objection, form.

15       A.    Well, again, part of the

16   evaluation of a randomized controlled

17   trial is to evaluate how the study was

18   designed.  That's one of the criteria

19   used for understanding the validity of a

20   published document like a RCT.  So you

21   always look at -- that's why it's such an

22   essential part of a -- of a RCT

23   publication is you look at the materials

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 276

1    and methods and you look at the study

2    design, and that's where, really, your

3    analysis begins if you're trying to

4    interpret the data.  Did they design the

5    study properly?  Does it have the power

6    of discrimination of what they claim that

7    it has?  And then you look at the actual

8    results, and it's on -- it's on your

9    shoulders as the -- as the professional,

10   whether you're a -- you know, a

11   researcher or somebody who's seeking to

12   apply it in his practice, you're

13   responsible for interpreting the data

14   quite apart from their interpretation of

15   it.

16           So an example of that would be

17   the Branström study, where they --

18   they -- they generated a good -- a

19   reasonable study design, but they

20   misinterpreted the data, and that's what

21   caused the retraction of the Branström

22   study, is that all the other people who

23   were not RCT investigators, but they were

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 277

1      all physicians, endocrinologists,
2      pediatricians, they looked at the data
3      and said, "You've misinterpreted the
4      study."
5              And that's really what we're
6      talking about here.  There are those who
7      perform the study, and then there's us
8      who have to live with it, and we have to
9      be able to understand what they're --
10     what they're purporting to.  So we have
11     to interpret the data even before reading
12     their conclusions.
13          Q.   Do you know what the CONSORT
14     criteria are?  C-O-N-S-O-R-T.
15          A.   I've read it sometime before.  I
16     can't -- I can't -- I can't quote it for
17     you, but it's -- it's germane to the
18     study design process?  I'm not sure.
19          Q.   Okay.  Can you describe for me
20     what the CONSORT criteria are in general
21     terms?
22          A.   I cannot.
23          Q.   All right.  How about cohort

# DEPOSITION OF PATRICK LAPPERT, M.D.

Page 278

```
1     studies?  You've personally never
2     designed a cohort study; correct?
3          A.   No, I have not.
4          Q.   You've personally never been an
5     investigator in a cohort study; correct?
6          A.   Well, so -- so, that experience
7     at -- at UC-San Francisco was a -- well,
8     so are you asking -- by cohort study, are
9     you talking about like a retrospective
10    study of a -- of a population cohort?  Is
11    that what you're asking me about?
12         Q.   Prospective or retrospective,
13    either -- either/or.
14         A.   I haven't designed any of those
15    studies, no.
16         Q.   Okay.  And outside the one
17    experience in your residency, have you
18    ever been involved with any prospective
19    or retrospective cohort study?
20         A.   No.
21         Q.   And how about case-control
22    studies?  Have you ever personally
23    designed a case-control study?
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 279

1          A.    No, I have not.

2          Q.    Have you ever been an

3     investigator in a case-control study?

4          A.    I'm just trying to think if the

5     -- if the head trauma investigation would

6     fit the category of a case control.  It

7     was a randomized study.  It had its own

8     internal controls.  So I guess I've

9     assisted in that investigation, but only

10    as a -- as a provider and a -- and a data

11    gatherer.

12         Q.    Outside of that one experience,

13    you have not been involved with any

14    prospective or retrospective cohort

15    study; right?

16         A.    No.

17         Q.    Or a case-control study?  Excuse

18    me.

19          Okay.  Let's go back to your

20    report, Exhibit 1, and go to page 13.

21         A.    Okay.  Okay.

22         Q.    You see there's a header that

23    says in capital letters, "Anecdotal

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 280

1    Patient Stories Are Not Data."  Do you

2    see that?

3        A.    I do.

4        Q.    And you write, "Drs Schechter

5    and Brown also failed to disclose and

6    properly discuss that Anecdotal Data

7    unverified patient reports without

8    control groups, randomized trials, or

9    other scientific protections for the

10   integrity of the medical system -- are

11   not reliable science."  Do you see that?

12       A.    I do.

13       Q.    And then you reference personal

14   patient stories, and you say, "This is

15   unreliable Anecdotal Data and it is not

16   credible, scientific information."  Do

17   you see that.

18       A.    I do.

19       Q.    All right.  You think that case

20   reports are anecdotal evidence; right?

21       A.    Yeah, they're --

22             MR. KNEPPER:  Objection.

23             THE WITNESS:  I'm sorry?

## DEPOSITION OF PATRICK LAPPERT, M.D.

```
 1            MR. KNEPPER:  Objection, form.
 2            Go ahead.
 3            THE WITNESS:  I'm sorry.
 4       A.   Yeah.  And so anecdotal data is
 5       personal experience of a -- of a
 6       practitioner, for example.  So -- so a
 7       surgeon reporting on five cases that he
 8       did would be considered anecdotal
 9       reporting, or case reports and things
10       like that, yeah.  That's anecdotal,
11       personal experience, a personal exper- --
12       Q.   And you think --
13       A.   I'm sorry?
14       Q.   Go ahead.  Sorry.
15       A.   Personal experience as distinct
16       from more stringent scientific evidence
17       like a longitudinal study or a cohort
18       study or something like that.  Or even --
19       even personal experience with pre- and
20       posttreatment testing rises to a higher
21       level than anecdotal.  So you can base --
22       you can base scientific evidence on that
23       next level, which would be anecdotal
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 282

```
 1      experience elevated to the next level by
 2      pretreatment and posttreatment testing.
 3      This is -- this is from the guidance that
 4      the American Society of Plastic Surgery
 5      puts out.
 6              So depending on the -- depending
 7      on the type of study, if it's a -- if
 8      it's a therapeutic study or a diagnostic
 9      study or a prognostic study, depending on
10      what you're looking at, if -- if you --
11      if you take it to that next level with
12      pre- and posttreatment testing with a
13      validated scientific instrument, you
14      know, a validated study even of
15      subjective reporting from the
16      psychiatric/psychological side of things,
17      that has more validity than the anecdotal
18      reports of a practitioner or even an
19      institution.
20      Q.   Do you think that a case report
21      that doesn't have this before and after
22      comparator that you describe is
23      essentially worthless from the --
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 283

```
1          A.   No.

2          Q.   -- scientific perspective?

3          A.   No, no.  Not worthless.  Not

4    worthless, but it's what's considered in

5    the -- in the -- in plastic surgery

6    circles, certainly, it's considered the

7    lowest form of evidence.  So for a number

8    of years now, the American Society of

9    Plastic Surgery has insisted that

10   publications -- if you're going to

11   publish a case series, for example, that

12   they have to be a sequential -- you can't

13   pick the cases you're reporting on.  It

14   has to be a sequential series of

15   patients, and you have to declare in the

16   publication, in your -- in your article,

17   the level of evidence that you're

18   presenting.

19          So if -- if it's merely a --

20   case reports, that would be level 5

21   evidence.  If you added to that a review

22   of the literature with a -- you know, a

23   definitive review of the literature
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 284

1    looking at the -- at where the weight of
2    evidence lies, then you raise it to the
3    next level.  But we're -- we're now
4    required when we're publishing in -- in
5    the ASPS journal, for example, to state
6    in the -- in the document level of
7    evidence.  So a case report is not zero
8    scientific evidence.  It's level 5
9    evidence.  It's the lowest form of -- of
10   evidence is what it is.
11       Q.   You personally would not rely on
12   a level 5 case report to decide if a
13   surgical technique is effective?
14       A.   It would be the beginning of my
15   interest in a particular technique.  As a
16   surgeon, we tend to be very conservative,
17   and we call upon our personal experience
18   very much and certainly upon our
19   training.  So if somebody proposes
20   something radically new and all they have
21   to support it is level 5 evidence,
22   generally -- there's a saying that I
23   learned in training is never be the first

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 285

1    or -- first one to do a procedure or the

2    last one to do a procedure.

3            And so, yeah, you know, surgeons

4    tend to not jump in early on -- on

5    low-quality evidence.  We tend to be

6    conservative about it.  And I would

7    number myself among them.

8       Q.   All right.  Let me ask the flip

9    side.

10      A.   Okay.

11      Q.   Do you think it's necessary for

12   a surgical procedure to be supported by

13   results from a level 5 RCT before it can

14   be considered effective?

15      A.   No.

16           MR. KNEPPER:  Objection to form.

17      A.   That would -- that would be one

18   of those circumstances where what is the

19   risk to the patient and -- and what's the

20   potential benefit to the patient.

21   That's -- that's what kind of would drive

22   my decision to act on a level 5 case

23   report, offering something like that to

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 286

1    one of my patients.

2        Q.   Do you think that a surgical

3    procedure has to be supported by a level

4    2 controlled study before that surgical

5    procedure can be considered

6    nonexperimental?

7        A.   Not necessarily.  It would

8    depend on what is -- what is -- what is

9    at risk here.  Certainly, we're much more

10   willing to -- to proceed with -- with

11   techniques and procedures that aren't

12   hugely supported if there's great risk to

13   the patient of not doing anything.  So

14   level of risk and what is at stake kind

15   of drives that and -- and yeah.

16            Did I answer that question?  Is

17   that what you were asking?

18       Q.   Yeah.  It's basically a

19   case-by-case decision; right?

20            MR. KNEPPER:  Objection, form.

21       A.   Well, I wouldn't say case by

22   case.  I would say, you know, you're

23   relying on -- on -- on a lifetime of

# DEPOSITION OF PATRICK LAPPERT, M.D.

1    experience possibly, and you're relying

2    also on -- on conversations with your

3    peers, your colleagues, what is their

4    experience in the area and how much of a

5    risk are you going to subject to the

6    patient -- subject the patient to in

7    order to achieve a result.  The greater

8    the risk, the greater the expectation of

9    a defined scientifically supported

10   outcome.

11          So in the case -- in the issue

12   at hand here, great risk of doing, for

13   example, a transition surgery, because

14   you're talking about permanent

15   sterilization, irreversible

16   sterilization, or the removal of the

17   breasts, permanent and irreversible loss

18   of the breasts, that's a huge stake, a

19   huge risk to the patient that the -- the

20   expected outcomes have to be consummately

21   much larger in order to justify something

22   like that if you don't have scientific

23   support.  If you're at low levels of

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 288

1    scientific evidence, then clearly, you

2    have an obligation to the patient not to

3    -- not to try something risky if you

4    don't have extensive and very valid

5    scientific -- and that's where we are

6    now.  We're at very low-level evidence

7    for these things.  That's kind of why

8    we're here today.

9        Q.   I guess I'm asking a more

10   specific question.  You're not taking the

11   position that in order to be considered

12   nonexperimental, a particular surgical

13   procedure has to be supported by at least

14   level 1 or level 2 evidence; right?

15            MR. KNEPPER:  Objection, form.

16       A.   Oh, okay.  So you're asking me

17   the definition of experimental.  Is

18   that -- do I understand you correctly?

19       Q.   Sure.

20       A.   Yes.  Am I saying that something

21   is nonexperimental once it reaches level

22   2 evidence or higher and not before?

23       Q.   Correct.

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 289

1      A.    I'm not saying that, no.

2      Q.    Okay.  How about level 3?  Are

3  you taking the position -- strike that.

4          Are you expressing the opinion

5  that a surgical procedure can only be

6  considered not experimental if it reaches

7  evidence level 3?

8      A.    Well, it's getting closer.  So

9  when you're -- when you're at level 3,

10 you're talking about a retrospective

11 study with a cohort.  And if we were

12 talking about some simple technique of

13 reconstructing, say, a wound on the face

14 for cancer therapy, then I certainly

15 wouldn't wait to try a new technique.  If

16 it promised to get a better result, I

17 wouldn't wait until I got to level 3

18 evidence.

19          But if you're talking about a

20 very drastic operation where I'm

21 amputating healthy parts, then yeah, I'm

22 going to want to go at least to level 3

23 before I consider that, because again,

## DEPOSITION OF PATRICK LAPPERT, M.D.

1    you're talk about tremendous risk to the

2    patient, permanently life-altering

3    changes.  You better have very strong

4    evidence that you're doing the patient

5    good because you're doing the patient a

6    great harm by, you know, removing their,

7    genitals, permanently sterilizing them,

8    removing their breasts.  So again, it's

9    -- it's not a case by case, but let's --

10    let's say broad categories of -- of

11    techniques or surgery.

12           If you're talking about

13    something small like reconstructing a

14    facial defect, then yeah, you don't need

15    to get to level 3.  But if you're talking

16    about something large and permanently

17    life-altering, then at least level 3.

18       Q.   All right.  We talked earlier a

19    while ago about some of the surgical

20    procedure you performed, and I think one

21    of the things you mentioned was breast

22    reductions.

23       A.   Yes.

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 291

1      Q.    Right?

2      A.    Yes.

3      Q.    You've done those; right?

4      A.    I have done so many of those.

5      Q.    All right.  You've done breast

6   reduction surgery without having the

7   results from a randomized controlled

8   clinical trial; right?

9      A.    I believe the -- the bulk of the

10  evidence in the therapeutic benefit of

11  breast reduction is primarily given to us

12  by a long-term longitudinal cohort study

13  that we actually get from the insurance

14  industry.  Because when you do breast

15  reduction surgery, one of the key issues

16  in a breast reduction is, is it going to

17  be efficacious in curing an orthopedic

18  problem.  So if you're talking about

19  breast reduction surgery as a quote,

20  unquote reconstructive procedure, then

21  really, it's being applied to an

22  orthopedic condition.

23              And the insurance companies have

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 292

1    a wealth of evidence about, for example,

2    the weight of the specimen that has to be

3    submitted in order to have a hope of

4    relieving the orthopedic complaint of

5    neck, back, and shoulder pain.

6            So -- and vir- -- and I can tell

7    you categorically, because I'm very

8    fastidious about this, that all of the

9    breast reduction operations that I've

10   ever done for the orthopedic condition of

11   neck, back, and shoulder pain have met

12   the criteria based upon this long-term

13   longitudinal cohort study that the

14   insurance companies have been running

15   since back in the '80s at least.

16       Q.   All right.  Doctor, again, I

17   need you to listen to my questions.  I

18   didn't ask about cohort studies.  I asked

19   about randomized clinical trial.

20       A.   Oh.

21       Q.   You have done -- you have done

22   breast reductions without having results

23   from a randomized controlled clinical

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 293

1    trial?

2        A.    Oh, forgive me.    I -- I

3    misunderstood the question, then.    No.

4    The -- I have not, no.    The industry --

5    the plastic surgery community does not

6    rely on a randomized trial for the -- the

7    operation to be merited.    That's correct.

8        Q.    Right.    Nobody in this industry

9    waits for results from a randomized

10   controlled trial before determining that

11   a particular surgical procedure is

12   nonexperimental; right?

13           MR. KNEPPER:    Objection, form.

14       A.    Well, this gets back to what we

15   were talking about before, what the --

16   what the level of evidence is, what's at

17   risk, and what are the potential

18   benefits.    So in the case of breast

19   reduction surgery, yes, we have not

20   relied on randomized controlled trials

21   because there was such an abundance of

22   level 3 evidence to justify the

23   procedure.    And so -- and level 3

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 294

1    evidence is sufficient to answer the

2    question, is this experimental or not?

3    This procedure doesn't rise to the level

4    of level 2 or level 1 in order to be

5    justified.  I believe there have been --

6    well, no, I can't say categorically, so I

7    won't.

8         So yeah, to answer your

9    question, breast reduction does not rely

10   on randomized trials.  It relies on level

11   3 evidence.

12   Q.  All right.  Let's take it out of

13   the realm of breast reduction in

14   particular.

15   A.  Okay.

16   Q.  It is not uncommon for plastic

17   surgeons to perform procedures that are

18   not supported by results from an RCT;

19   correct?

20        MR. KNEPPER:  Objection, form.

21   A.  As a general principle, plastic

22   surgeons are perhaps more innovative than

23   other surgeons, so we're inclined to try

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 295

1   new techniques.  And then, of course, you

2   have to exercise some significant

3   prudential judgment about what risk are

4   you placing the patient in before you get

5   experimental with them.  Yeah.  So yes,

6   we -- we do that all -- we're innovators,

7   as -- as a general principle.

8        Q.   And as a general principle,

9   plastic surgeons will often commonly

10  perform procedures that are not supported

11  by level 2 evidence; correct?

12           MR. KNEPPER:  Objection, form.

13       A.   Yes.

14       Q.   And as innovators, plastic

15  surgeons will often perform surgical

16  procedures that are not level 3 evidence;

17  right?

18           MR. KNEPPER:  Objection, form.

19       A.   Yeah.  They -- if you're talking

20  about small like technical improvements

21  in -- in low-risk procedures, then yeah,

22  we -- we do that very commonly.

23       Q.   Okay.  You know what the

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 296

1      Plastics and Reconstructive Surgery
2      journal is; right?
3          A.   Yes.
4          Q.   It's the official publication of
5      the ASPS; correct?
6          A.   Correct.
7          Q.   It's a peer-reviewed medical
8      journal; right?
9          A.   Correct.
10         Q.   It's published monthly; right?
11         A.   And plus supplements as well and
12     online.  Yes, sir.
13         Q.   One purpose of that journal is
14     to educate members about new surgical
15     techniques; right?
16         A.   Yes.
17         Q.   Would you agree that the journal
18     is the premier peer-reviewed source for
19     current information on reconstructive and
20     cosmetic surgery?
21         A.   I would.
22         Q.   All right.  Are you -- I know
23     that you're no longer a member.  Are you

## DEPOSITION OF PATRICK LAPPERT, M.D.

1    still subscribing to the journal?

2        A.   No, I'm not.  It's a -- it's for

3    members that you get the journal, so

4    yeah.  That's what my subscription relied

5    on, so -- all those years.

6        Q.   I understand.  So not -- you

7    haven't had access to it since 2018?

8        A.   Well, I -- no, I go online, and

9    I'll pay for access to particular

10   articles.  So yeah.  So it's not that

11   I've lost contact with it, it's just that

12   I do literature searches, and if an ASPS

13   citation comes up, I'll pay to look at

14   it.

15       Q.   I understand.  Sitting here

16   today, what percent of publications in

17   that journal do you think consist of

18   results from RCTs?

19           MR. KNEPPER:  Objection, scope,

20   form.

21       A.   Yeah, I'm -- I'm not sure I

22   could hazard a guess even.

23       Q.   Ballpark, do you think it's 10

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 298

```
 1    percent?  50 percent?
 2        A.   Of their published articles that
 3    are randomized controlled trials?
 4        Q.   Yes.
 5             MR. KNEPPER:  Objection to form,
 6    scope.
 7        A.   Gosh, I'm going to guess it's
 8    probably somewhere -- probably less than
 9    10 percent.
10        Q.   How about cohort studies?  If
11    you had to estimate, what percentage of
12    publications in that journal do you think
13    consist of results from cohort studies?
14             MR. KNEPPER:  Objection, form.
15        A.   Again, just ballparking here
16    after, you know, 35 years of reading that
17    article -- that journal for 35 years, I
18    would say that -- I don't -- I may be
19    guessing, but 15 percent maybe are -- are
20    cohorts that are usually single-center
21    studies.  There's a lot of those in
22    the -- in the White Journal.  There'll be
23    a single-center cohort study of -- of
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 299

1    some operation or technique, and they'll

2    usually report it as three or four

3    surgeons at a single center reporting a

4    -- a longitudinal cohort of, say, breast

5    cancer reconstructions with implants

6    versus breast reconstruction with

7    autologous flaps and comparing

8    satisfaction surveys and things like

9    that.  So I'm going to ballpark it at 15

10   percent, but I don't know.  I don't know

11   for a fact.

12       Q.   Let me introduce an exhibit.  So

13   this will be Exhibit 17, and let me know

14   when you get it.

15   (Exhibit 17 was marked for identification

16   and is attached.)

17       A.   Okay.  All right.  I have it.

18       Q.   All right.  This is a study from

19   2019 by Sugrue, S-U-G-R-U-E, titled

20   "Levels of Evidence in Plastic and

21   Reconstructive Surgery Research."  See

22   that?

23       A.   I do.

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 300

1      Q.    All right.  See there's a

2    "Summary" box on the first page?

3      A.    Yes.

4      Q.    The third sentence says, "The

5    aim of this study is to determine if the

6    quality of evidence in plastic surgery

7    research has improved over the past 10

8    years.  Systematic review of research

9    published in Plastics and Reconstructive

10   Surgery journal over the years, 10-year

11   period (2008, 2013, 2018), was

12   performed."  Do you see that?

13     A.    I do.

14     Q.    Now, you understand what this

15   study was trying to accomplish; right?

16     A.    Yeah.  They were measuring the

17   level of success that the American

18   Society of Plastic Surgery was having

19   after having applied those criteria we

20   talked about earlier, the -- this

21   requirement of reporting levels of

22   evidence, seeking the clarity on levels

23   of evidence.  And so I expect -- I

## DEPOSITION OF PATRICK LAPPERT, M.D.

1    haven't read this -- this article before,
2    but I guess that's what they're looking
3    at, is how successful have we been as a
4    professional society in publishing --
5        Q.    Yeah.
6        A.    -- these things.
7        Q.    And this references the levels
8    of evidence, LOE, metric; right?
9        A.    Yes.
10        Q.    And that's the same metric that
11    you referenced earlier, levels 1 through
12    5; right?
13        A.    Right.  Well, the levels 1
14    through 5 that I referenced includes
15    the -- sort of the subcategorizing,
16    depending on if it's a therapeutic trial
17    or a -- or a trial of risk or things like
18    that.  So the -- the document that the
19    ASPS published some years ago includes
20    risk studies and diagnostic studies, but
21    they're all ranked 1 through 5.  That's
22    right.
23        Q.    And you see a couple of

## DEPOSITION OF PATRICK LAPPERT, M.D.

1    sentences down, it says 884 studies were

2    included in the final analysis.  You see

3    that?

4        A.   Yes, I do.

5        Q.   Okay.  Go to page 2.

6        A.   Okay.

7        Q.   You see there's a Table 1?

8        A.   Yes, I do.

9        Q.   Table 1 is "Percentage of Each

10   Level of Evidence Published per Year."

11   Do you see that?

12       A.   I do.

13       Q.   And there's columns for 2008,

14   2013, and 2018; right?

15       A.   Yes.

16       Q.   All right.  Let's start with

17   level 1, and that's randomized control

18   trials or metaanalyses of those trials;

19   right?

20       A.   Right.

21       Q.   In 2018, only 2.1 percent of all

22   publications in the journal were level 1

23   evidence; right?

## DEPOSITION OF PATRICK LAPPERT, M.D.

1          A.    That's right.

2          Q.    And in 2008 and 2013, those

3     percentages were 0.3 and 1.7 percent

4     respectively; correct?

5          A.    Correct.

6          Q.    Not very common for the journal

7     to report on results of RCTs, according

8     to this summary; right?

9               MR. KNEPPER:  Objection, form.

10         A.    Yeah.  And it even goes along

11    with what -- my ballpark earlier, so I'm

12    surprised -- yes, it was less than 10

13    percent were -- were level 1 evidence and

14    somewhere around -- yeah, so those

15    numbers are consistent.  But yeah.

16              And the other thing to note

17    about it is that they appear to have been

18    successful in choosing what they publish

19    to support higher levels of evidence.  So

20    I guess they're to be commended for

21    having done this, yeah.

22         Q.    Okay.  All right.  Then level 2

23    are -- level 2 evidence includes

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 304

1    prospective cohort or comparative

2    studies; right?

3         A.    Yes.

4         Q.    With controls; right?

5         A.    Yeah.  There's a level of

6    randomization that -- that's there as

7    well --

8         Q.    Okay.

9         A.    -- in those prospective studies.

10   That's right.

11        Q.    And for that level 2 evidence,

12   only 13.6 percent of all publications in

13   the journal in 2018 consisted of that

14   evidence; right?

15        A.    Yes.  That's what it says there,

16   yes.

17        Q.    All right.  Level of evidence 4

18   is case series with a pre- or posttest or

19   only posttest; right?

20        A.    Right.

21        Q.    And in 2018, those amounted to

22   41.7 percent of all publications; right?

23        A.    Right.  It looks as though more

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 305

1      of those level 4 have been shifted up

2      into level 3, given that the level 5 has

3      declined.  So it looks like they're

4      pushing more of the level 4 up into level

5      5.  Yeah.

6          Q.    Yeah.  Much of the research on

7      which your field relies doesn't consist

8      of results from RCTs or controlled cohort

9      studies; right?

10         A.    Well, I wouldn't --

11             MR. KNEPPER:  Objection, form.

12         A.    I wouldn't say that based on

13     this.  I would say that much of the

14     published research in this journal is of

15     that -- of what you described, relying on

16     RCTs and so on.

17             This is a -- this is not a

18     document about what the profession is

19     doing.  This is a document about what

20     this journal is publishing.  And what

21     they're publishing is more papers of

22     higher value, for which they're to be

23     commended.  So this says nothing about

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 306

1    what people are investigating.  This says

2    about -- this says something about what

3    this journal is publishing.

4        Q.   Well, this is the journal for

5    the ASPS; right?

6        A.   Right.  With limited space for

7    publication.  So they're being,

8    apparently, more selective about what

9    they'll publish, that it's not just that

10   well, this is the chief of plastic

11   surgery at NYU, so we're going to publish

12   his paper.  It's the chief of plastic

13   surgery has a level 2 case.  Let's --

14   let's present -- let's publish that one.

15   I think that's what this is telling us,

16   that they're being more fastidious about

17   what they publish, whereas before, they

18   might have been more -- well, less

19   selective, let's say.

20       Q.   Have you ever been involved with

21   selecting articles to be published in

22   this journal?

23       A.   I've never been involved in --

# DEPOSITION OF PATRICK LAPPERT, M.D.

1    in journal publication staff or -- no, I

2    have not.

3        Q.   You don't know the process by

4    which they select what article to

5    publish; right?

6            MR. KNEPPER:  Objection, form.

7        A.   I have some idea, but I'm --

8    it's not my -- my area of professional

9    expertise.

10       Q.   Yeah.

11       A.   I merely read the journal, and

12   have for approaching forty years now.

13       Q.   Look at Table 2.

14       A.   Okay.

15       Q.   And look at the column under

16   2018.

17       A.   Yes.

18       Q.   The first two rows, "Systematic

19   review/meta analysis" and "Randomized

20   control trials," account for 3.2 plus 3.8

21   percent of all publications of the

22   journal in 2018.  Correct?

23       A.   Right.

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 308

1          MR. KNEPPER:  Objection.

2      Q.   Case series account for 26.3

3  percent; right?

4      A.   Right.

5      Q.   Okay.  Go to page 3 of this

6  exhibit.

7      A.   Okay.  I'm there.

8      Q.   All right.  First full

9  paragraph, first sentence says, "Case

10  series are the backbone of surgical

11  research."  Do you see that?

12     A.   I do.

13     Q.   You don't disagree that case

14  series can be helpful scientific

15  evidence; right?

16     A.   No.  As I -- as I testified

17  before, this is the beginning of

18  research.  It always begins with perhaps

19  a serendipitous discovery, then to case

20  reports, then to case series, single --

21  single-provider case series or multiple

22  providers in a -- in a -- an institution.

23  But that's the beginning of surgical

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 309

```
 1      research, yeah.  That's how it always
 2      begins.
 3          Q.   Well, it's a beginning, but
 4      sometimes it's also the end; right?
 5      Because look at the third sentence.  It
 6      says:  "The absence of a control group
 7      justifiably ranks this design at the
 8      lower end of the evidence pyramid.
 9      Despite this, case series are vital.
10      They may be the only feasible and ethical
11      study methodology obtainable, as seen
12      with craniofacial surgery."  You see
13      that?
14          A.   Yeah.  And to that -- to that
15      particular point, so I've got extensive
16      experience with craniofacial surgery, and
17      -- and it's -- this is one of those
18      procedures where the outward change to
19      the child can't be blinded.  You cannot
20      blind the investigator because,
21      obviously, he's doing the surgery, and
22      you can't blind the patient or the family
23      to it because the results are quite
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 310

1    obvious.  And that's what they're saying
2    here.  And obviously, they're not saying
3    that it's never useful or is never
4    necessary.  They're saying that in many
5    cases, you don't need to rise to that
6    level because you have evident benefit to
7    the patient and the risk is not only
8    manageable but -- but sufficiently low to
9    warrant the application of a particular
10   technique.
11           So that was certainly the case,
12   for example, when we introduced external
13   fixation devices for advancement of the
14   mid face in certain congenital
15   deformities.  Nobody had done a
16   randomized trial because you can't.
17   You've got this hardware sitting on the
18   patient's face.  So -- but yet, the --
19   the luminaries in craniofacial surgery
20   were able to demonstrate through a case
21   series that this was a valid technique,
22   and then the rest of us adopted it.  So
23   that's an example of how plastic surgery

## DEPOSITION OF PATRICK LAPPERT, M.D.

```
1    works.
2          Now, if the patient was at risk
3    of death because this technique was being
4    applied or if the patient was at risk of
5    permanent life-altering changes that
6    couldn't be reversed, then yeah, you
7    would have to proceed with much greater
8    caution, and you may be looking at
9    finding some way, longitudinal
10   study-wise, to -- to quantify the benefit
11   of using your technique over using
12   established techniques.
13       Q.   There are some areas in plastic
14   surgery and reconstructive surgery where
15   case series are basically as good as it
16   gets in terms of scientific evidence;
17   right?
18          MR. KNEPPER:  Objection, form.
19       A.   Yeah.  I suppose in the newer --
20   at the newer end of techniques, that's
21   all you got for now until the technique
22   has been applied over a sufficiently long
23   time that you can look at a retrospective
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 312

1    cohort.

2          So for example, in the case of

3    gender transitioning surgery, the -- the

4    -- the surgeons have been at it now for

5    several decades.  And we should be

6    already at the level of level 3 evidence,

7    but -- but we're not.

8          Q.   Well, you --

9          A.   So I wouldn't put that in the

10   category of -- you're talking there about

11   a high-risk procedure that has a long

12   track record that can be examined.  And

13   -- and clearly, the examination of that

14   technique in the last three years, give

15   or take, has -- has shown us that that

16   this is in the category of those

17   operations that demand higher levels of

18   evidence than a case series, whether it's

19   single provider, single institution, or

20   even single nation.  You've got to --

21   you've got to look at the data now and --

22   and prove that you are doing something

23   good for the patient.

## DEPOSITION OF PATRICK LAPPERT, M.D.

```
 1              And quite frankly, it hasn't
 2      been proven in the -- in the American
 3      literature.  Certainly, WPATH hasn't
 4      proven that.  But in the European
 5      literature, they're looking at it and
 6      saying, gosh, you know, the -- the
 7      Swedish study shows us that if you only
 8      follow patients for five years at the
 9      most, you're not even going to see the
10      long-term effect of what you did to them.
11      And if you look at them eight years and
12      beyond, you'll see that you haven't
13      solved the suicidality, the self-harm,
14      the incarceration, psychiatric diagnosis
15      admissions, and things like that.
16              So -- so yeah, as far as what
17      we're talking about today, yeah, there's
18      a whole spectrum of what's acceptable
19      levels of evidence for a particular
20      procedure.  The higher the risk, the
21      higher the level of evidence is demanded.
22      And sometimes you have to wait to get to
23      that level of evidence if you're dealing
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 314

1    with something potentially

2    life-threatening.

3          Like certainly, the providers

4    were fully justified in considering this

5    because of the high suicide rate of

6    transgender patients.  Case series,

7    totally valid reason given that the life

8    of the patient is at risk here, totally

9    valid to go with a case series as the

10    evidence by which you're consenting the

11    patient to surgery.  But we're now beyond

12    that.  We're now beyond that.  We're at

13    -- we're now -- the ethics demands that

14    we look at higher levels of evidence

15    because of the long-term risk to the

16    patient and the fact that the long-term

17    evidence doesn't support the indication

18    for surgery, which is lower suicide rate,

19    lower self-harm, lower drug abuse.

20    That's really what we're talking about

21    here.

22       Q.   I have some other questions.

23    You agree that -- strike that.

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 315

1              Do you agree that it is not
2      possible to perform RCTs for some
3      surgical procedure because you can't
4      blind the patient or the investigator to
5      what the procedure is?
6          A.    Absolutely agree, yeah.
7          Q.    So, let's take phalloplasty;
8      right?
9          A.    Okay.  Yeah.
10          Q.    When a surgeon performs a
11      phalloplasty on a patient, both the
12      surgeon and the patient are going to know
13      that the procedure was done; right?
14          A.    Yes.
15          Q.    It's not possible to have a RCT
16      for phalloplasty because you can't blind
17      the participant or the investigator;
18      right?
19          A.    Yeah.  That's typical of most
20      surgical interventions.  The only
21      exception to that would be intraabdominal
22      or intrathoracic surgeries or even
23      intracranial surgeries.  And -- and

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 316

1    that's considered sham surgery, which is
2    considered malpractice and ethical
3    violation of professional standards.  So
4    you can pretty much rule out most all
5    surgical procedures from the randomized
6    control trial category.  Correct.
7        Q.   And we agree that the same would
8    apply to metoidioplasty, for example;
9    right?
10       A.   Yes.
11       Q.   To all types of, again,
12   colloquially known as bottom surgery;
13   right?
14       A.   Correct.
15       Q.   All right.  Let's take
16   puberty-blocking hormones.
17       A.   Okay.
18       Q.   When patients with gender
19   dysphoria treatment start
20   puberty-blocking hormones, they're not
21   going to undergo puberty, basically;
22   right?
23       A.   Well, that's the intended use,

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 317

1    that's correct.
2        Q.    So there's going to be
3    observable physical effects of the
4    hormones that will be apparent to the
5    patient; right?
6        A.    Yes.  Within a year, that child
7    is going to look much smaller than his
8    peers.  He's going to be developmentally
9    delayed psychologically,
10   neurophysiologically.  His -- his
11   movements are not going to be as -- his
12   coordination is going to be less matured.
13   His higher executive functions will be
14   impaired.  So it will be very obvious
15   that this child is now different from his
16   peers.  So I would agree with you; you
17   couldn't find a way to blind such a study
18   because the evidence of effect is so
19   obvious within the first year that
20   everyone would know that they're taking
21   the -- the puberty-blocking
22   gonadotropin-releasing hormone agonist.
23       Q.    We agree that -- we agree that

**DEPOSITION OF PATRICK LAPPERT, M.D.**

1    it's not possible to do an RCT for

2    puberty-blocking hormones because of

3    these apparent physical effects; right?

4         MR. KNEPPER:  Objection, form.

5    A.   I -- I would agree, yes.

6    Q.   Okay.  Let's take cross-sex

7    hormones.

8    A.   And the -- the last question you

9    asked me, did you qualify that as you

10   couldn't do a double-blinded study using

11   puberty-blocking drugs in self-identified

12   transgender children?

13   Q.   Yes.

14   A.   Yeah.  Because if you're

15   applying the drug to other conditions

16   like precocious puberty, it -- it may be

17   possible.  It may be possible to -- I

18   don't know.  I'd have to think about that

19   but -- okay.  Sorry.

20   Q.   Let's take cross-sex hormones.

21   A.   Okay.

22   Q.   When somebody -- someone is

23   treated with estrogen or testosterone for

# DEPOSITION OF PATRICK LAPPERT, M.D.

1    gender dysphoria, there are also going to

2    be physical effects from those

3    treatments; correct?

4        A.   Yes.   Given that sex hormones

5    have such a profound effect on every body

6    system, then it's going to be impossible

7    to conceal the fact that the person is on

8    sex hormones because every -- every

9    function of the body is affected by sex

10   hormone levels, particularly at the age

11   of early adolescence.

12       Q.   And given these visible physical

13   effects, it's not possible to design a

14   double-blind RCT for cross-sex hormones

15   for gender dysphoria; correct?

16       A.   It would probably be an invalid

17   study, yes.

18       Q.   All right.   Let's go back to

19   your -- actually, you know what?   I'm

20   going to move to a different area.   It's

21   been about an hour.   Let's take a quick

22   break.

23            MR. TISHYEVICH:   Off the record.

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 320

```
 1            THE VIDEOGRAPHER:  This is the
 2      end of Media Unit No. 4.  We are off the
 3      record at 2:16 p.m.
 4                (Break taken.)
 5            THE VIDEOGRAPHER:  This is the
 6      beginning of Media Unit No. 5.  We are on
 7      the record at 2:24 p.m.
 8         Q.   (By Mr. Tishyevich) Let's go
 9      back to your report, Exhibit 1.
10         A.   Okay.
11         Q.   Go to page 21.
12         A.   Twenty-one.  Okay.
13         Q.   And you see there's a paragraph
14      starting with, "Failure to discuss the
15      failure to conduct"?
16         A.   Yes.
17         Q.   Okay.  So in the second line,
18      you reference the "unknown number and
19      percentage of patients who drop out of
20      transitioning or reverse the process
21      parentheses (Detransitioners)."
22         A.   Right.
23         Q.   You see that?
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 321

1          A.    I do.

2          Q.    All right.  You agree that the

3     number and percentage of patients with

4     gender dysphoria who drop out of

5     transitioning or who reverse the process

6     is currently unknown; right?

7          A.    Well, it depends on if you're

8     asking that question about the general

9     population or in a particular study.  So

10     in particular studies, that number is

11     known, but in the general population,

12     it's an unknown.

13          Q.    Yeah.

14          A.    And the reason -- the reason

15     it's unknown in the general population is

16     because the people doing the research

17     aren't following those patients.  That's

18     why we don't know.

19          Q.    In the overall population, the

20     number and percentage of patients who

21     drop out of transitioning or reverse the

22     process is unknown; agree?

23          A.    Yeah.  I would agree that's

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 322

```
 1    unknown, yeah.
 2        Q.   All right.  Given that,
 3    obviously, you're not offering any expert
 4    opinions on what that number or
 5    percentage is in the general population;
 6    right?
 7        A.   Yeah, I don't -- I don't think
 8    it's possible for anyone to break out the
 9    difference, for example, between somebody
10    who isn't followed up because they've
11    detransitioned or somebody who isn't
12    followed up because they've taken their
13    own life.  We have no way of knowing
14    because nobody's following up.
15        Q.   All right.  Look toward the
16    bottom of this page 21.  You cite a case
17    series from I believe it's Djordjevic,
18    D-J-O-R-D-J-E-V-I-C.  Do you see that?
19        A.   I do.
20        Q.   And you say, "More dramatically,
21    a surgical group prominently active in
22    the SRS field has published a report on a
23    series of seven male-to-female patients
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 323

```
 1        requesting surgery to transform their
 2        surgically constructed female genitalia
 3        back to their original male form."
 4        Right?
 5             A.    I see that, yes.
 6             Q.    Okay.  Now, this article was not
 7        an RCT, obviously; right?
 8             A.    Right, right.
 9             Q.    It was not a cohort study;
10        right?
11             A.    No.  This would be a case -- a
12        case series.
13             Q.    Yeah.  The lowest level of
14        evidence; right?
15             A.    No.  Actually, the lowest level
16        of evidence would be sort of single
17        patient -- well, it's sort of somewhere
18        between 4 and 5, I suppose.  I'd have to
19        look at the article again to see what the
20        -- what the denominator is, but --
21             Q.    Yeah.  Well, generally, you
22        think that anecdotal patient stories like
23        these are not reliable scientific
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 324

1    information; right?

2          MR. KNEPPER:  Objection, form.

3      A.    No.  They're the first clue to a

4    problem or the first clue to a solution.

5    That's exactly right.  So that -- that

6    sort of points to the controversial

7    nature of these therapies, is that -- is

8    that we don't have the answer.  We can't

9    explain why these detransitioners weren't

10   predicted preoperatively because we don't

11   have a test instrument to figure that

12   out.

13         So when you see a series like

14   this -- this is what we talked about

15   earlier, about the -- the history of

16   progression of levels of evidence.  You

17   start out with reports like this.  This

18   leads to further research.  And I'm just

19   trying to remember, when I read the

20   article, where that study was done.  I

21   don't have it in front -- I'm just trying

22   to remember what -- what country that was

23   done in.

**DEPOSITION OF PATRICK LAPPERT, M.D.**

Page 325

1      Q.   Yeah.  I'll -- I'll show it to

2   you.

3      A.   Okay.

4      Q.   Hold on.  Let me introduce it.

5      A.   Thank you.

6      Q.   You did read these -- this

7   article in full before you cited it;

8   right?

9      A.   Yeah.  That -- it was -- it was

10   probably about seven months ago, but yes,

11   I did.

12      Q.   Sure.

13      THE COURT REPORTER:  I didn't

14   hear anything.  So it's just --

15      THE WITNESS:  Okay.

16      THE COURT REPORTER:  We're

17   losing it in Zoom.  Thank you.

18      THE WITNESS:  Forgive me.  I'm

19   sorry.

20      THE COURT REPORTER:  No, that's

21   okay.  It's awkward.

22      Q.   (By Mr. Tishyevich) Okay.  This

23   is going to be Exhibit 18, and let me

## DEPOSITION OF PATRICK LAPPERT, M.D.

1        know when you have it.

2        (Exhibit 18 was marked for identification

3        and is attached.)

4            A.    Okay.  Okay.  Yeah, there it is.

5        Yes.  Yeah, right.  Okay.  It's coming

6        back to me now.  And this was published

7        out of the -- Amsterdam.  That's right.

8        Okay.  All right.  Yeah.

9            Q.    All right.  Let me ask you --

10       strike that.

11               Bottom of the page, there's a

12       section titled "Introduction."  You see

13       that?

14           A.    The bottom of the first page?

15           Q.    Yes.

16           A.    Yes, I see that.

17           Q.    Look at -- look to the column on

18       the right.

19           A.    Okay.

20           Q.    The last sentence says, "In

21       general, most researchers have reported

22       their patients are extremely satisfied

23       overall with their surgical outcomes,

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 327

```
 1      with a low rate of complications."  You
 2      see that?
 3           (Witness reviews document.)
 4       A.   Right.  I see -- I do see that,
 5      yes.
 6       Q.   Then it cites three footnotes, 5
 7      through 7; right?
 8       A.   Right.
 9       Q.   You don't acknowledge this
10      portion of the article in your report;
11      right?
12       A.   Well, it is in the discussion, I
13      think.  Well, actually, probably maybe in
14      the summary of the -- of the medical
15      evidence.  The -- I would put this in the
16      category of subjective reporting and
17      short -- subjective reporting and short
18      follow-up.  Right.  That's what --
19       Q.   Well, you --
20       A.   I'm sorry.  Go ahead.
21       Q.   No, no, go ahead.
22       A.   So I think the reason I included
23      this was to show that there are -- you
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 328

1    know, that there's a growing pool of

2    patients who are returning for reversal

3    surgery.  I don't think I discussed in

4    this part of my report -- yeah.  I'm just

5    talking about increasingly visible

6    community and patient -- increasing

7    number of patients requesting reversal

8    surgery.  And as an example of that,

9    again, going to a single-center case

10   collection as an example, early evidence,

11   we're starting to see this now as numbers

12   of patients who have surgically

13   transitioned increases, the numbers of

14   patients who regret is going to increase,

15   particularly in light of what these

16   authors speak about here.

17          Let me see if I -- yeah.  So in

18   the second sentence of the abstract in

19   the introduction, it says, "However,

20   misdiagnosed patients sometimes regret

21   their decisions."  And one of the reasons

22   for including this article is the fact

23   that misdiagnosis is not measured.  The

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 329

1    world literature doesn't present error

2    rates.  This would be what I would

3    consider an error rate, that an erroneous

4    diagnosis was acted upon surgically,

5    leading to this complication of regret

6    and a -- and a desire for reversal.

7    Yeah.

8         Q.   Your expert testimony is that

9    there's no data available on the

10   percentage of people who have received

11   treatment for gender dysphoria who

12   experience regret?

13        A.   Yeah.  It's very, very low --

14   low-level evidence right now.  It's

15   basically we're in the -- we're in the

16   case collection study, whereas actually

17   in the -- well, that's not regret.  But

18   -- but perhaps in the category of

19   misdiagnosis would be the -- the reports

20   out of Sweden, certainly the -- yeah, so

21   beginning with the Swede -- Swedish

22   studies by Cecilia Dhejne and others that

23   shows us a lack of efficacy.  Whether or

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 330

```
 1      not the patient presented for reversal is
 2      definitely an unknown number, definitely.
 3          Q.   All right.  That study doesn't
 4      quantify anything about patient regret;
 5      right?
 6          A.   The Swedish study does not.  It
 7      quantifies lack of -- of effect from the
 8      surgical interventions.  Lack of benefit,
 9      I should say.
10          Q.   Go to page -- PDF page 7 of this
11      document and look at the Conclusions --
12          A.   Okay.
13          Q.   -- section.
14          A.   All right.  Let's see that page.
15      Conclusions.  Okay.  I'm there.
16          Q.   The first sentence says, "The
17      vast majority of properly diagnosed
18      transsexual patients are satisfied with
19      their decision to undergo SRS, with only
20      a few coming to regret it."  Right?
21          A.   Right.  So this -- the other
22      reason why this study is useful to our
23      conversation is that this is the same
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

1    language and the same metrics that's used

2    to describe the success of cosmetic

3    surgery.  They don't include in here,

4    apart from the regret number that they're

5    actually publishing here -- not number

6    but the examples, I should say.  They

7    don't include in their -- in their

8    conclusions any statement about objective

9    quantifiable benefit from the surgery.

10   They talk about subjective reporting.

11          So this is an example of a -- of

12   a peer-reviewed journal article that

13   measures the efficacy of this surgery

14   based solely upon a satisfaction survey

15   of patients who have returned for

16   follow-up, so this would be an example of

17   that.  Yes, sir.

18      Q.   Do you know what metric was used

19   to measure satisfaction or

20   nonsatisfaction in these studies?

21      A.   I'd have to reread the -- the

22   methods and materials here, but I

23   would -- I would guess it was one of the

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 332

```
 1    approved instruments for measuring
 2    satisfaction.  There are a variety of
 3    test instruments used for -- in
 4    satisfaction surveys, particularly in the
 5    world of plastic surgery.
 6           Let's see.  They used the --
 7    these are the kind of things I don't keep
 8    in my long-term memory here for a
 9    particular article.  Okay.
10       (Witness reviews document.)
11    A.   Okay.  There's the outcomes
12    measures.  Forgive me for eating up your
13    time.
14    Q.   Let me -- let help you, Doctor.
15    Go to page --
16    A.   Okay.  There it is.
17    Q.   -- PDF page 5.
18    A.   Yeah.  Fif- -- yeah.
19    Q.   Yeah.
20    A.   Fifteen, right.
21    Q.   Question on the page --
22    A.   So there's a -- there's a test
23    instrument there.  Right.
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 333

1      Q.   Yeah.   There's a test instrument

2    that measures things like erectile

3    function, sexual desire, orgasmic

4    function, intercourse satisfaction, and

5    overall satisfaction; right?

6      A.   Right.

7      Q.   They don't just ask the patient,

8    "Hey, are you happy with the surgery?"

9    There's five criteria that are applied;

10   right?

11     A.   Right.

12     Q.   This is an approved instrument

13   for measuring this type of satisfaction

14   for surgery; right?

15         MR. KNEPPER:   Objection, form.

16     A.   This is -- this is -- yeah, it's

17   definitely a valuable instrument for

18   measuring things, but none of them are

19   the -- are the indication for surgery,

20   which is things like reduced suicidality,

21   reduced self-harm, reduced alcohol use,

22   all of those other things which are --

23   which are the reason, the indication for

**DEPOSITION OF PATRICK LAPPERT, M.D.**

Page 334

1    the operation.  So you generally try to

2    match the surgical procedure with the

3    indication for the surgery.

4         They're measuring things that

5    weren't involved in the indications for

6    surgery.  They didn't get, you know,

7    reconstructive surgical approval so that

8    they could achieve erections, for

9    example.  This was approved because of

10   the risk of self-harm, suicide, those

11   sorts of things.  Yeah.  But none of

12   those are measured.  They -- it is -- it

13   is they do have objective measures, and

14   this is one of the -- one of the values

15   of this study.  But I don't think they

16   report the complication rate in this

17   study, as I recall.

18       Q.    This -- this study specifically

19   did not purport to seek out anything

20   about suicidality or mortality or other

21   adverse outcomes of that nature; right?

22       A.    Let's see.  I'm trying to

23   remember in their introduction.

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 335

```
 1           (Witness reviews document.)
 2      A.   Yeah.  I think their indications
 3   used language that was more consistent
 4   with -- with aesthetic, aesthetic surgery
 5   rather than the reconstructive language.
 6   So yeah.
 7           (Witness reviews document.)
 8      A.   Yeah.  So --
 9      Q.   Yeah.  Here's --
10      A.   Yeah, I would --
11      Q.   Here's what I find interesting,
12   Doctor.
13      A.   Okay.
14      Q.   Your report cites this one case
15   series of seven patients to make the
16   point that there's this regret occurring
17   without even mentioning that there's
18   multiple case series that say the vast
19   majority of these patients end up being
20   satisfied with this type of surgery?
21      A.   No.  I don't think --
22      Q.   You don't think that's
23   appropriate to mention?
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

1        A.    No.   I -- actually, what I
2    present these examples to show, that --
3    that the literature in support of these
4    surgeries is characterized by very short
5    follow-up and subjective reporting.  So
6    this is an example of some objective
7    reporting, mostly subjective reporting.
8    And most of the articles, for example,
9    that you just asked me about involve
10   subjective reporting and short follow-up.
11   That's right, yeah.
12        Q.    All right.
13        A.    And in this case, you also --
14   I'm -- I'm pleased that they reported
15   that one, two, three, four, five, six,
16   seven -- so nearly half of their patients
17   had a surgical complication of a urethral
18   fistula, and if you have a urethral
19   fistula and you have a malleable
20   prosthesis, probably they went on to
21   remove the prosthesis as well.  But
22   that's -- I mean, I -- props for this --
23   this team that they reported their

**DEPOSITION OF PATRICK LAPPERT, M.D.**

1    complications.

2        Q.    Where -- what page is the

3    complications portion you're looking at?

4        A.    That's on -- just before you get

5    -- the last page before the -- the same

6    page as the conclusions.  There's a table

7    at the top, and they have the seven

8    patients, and you can see -- what's also

9    interesting here, too, is -- is that if

10   you look at the period after sex

11   reassignment surgery, that the -- that

12   the dissatisfaction level really kicks in

13   when you're beyond eight years.

14   Actually, if you look at even six years

15   beyond.

16        Initially, there's no patients

17   reporting dissatisfaction at anything

18   less than five years, and so this is

19   actually further evidence of the -- of

20   the inadequacy of the -- the papers that

21   are in the literature right now which

22   have follow-ups that are typically two to

23   three years.  So none of these patients

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 338

```
 1        would have been seen, with most of the
 2        literature that supports these
 3        techniques, as a way to, you know, avoid
 4        -- avoid dissatisfaction or -- or
 5        suicidality or drug use or anything else
 6        like that.  So that's an interesting -- I
 7        hadn't noticed that before, but yeah.
 8            Q.    Yeah.  Are you reading Table 1
 9        to say that these complications like
10        urethral fistula and stricture were from
11        the original surgery?
12            A.    Well, I'm -- I'm merely --
13            Q.    Or is it from the reversal
14        surgery that was being done later?
15            A.    So they're talking here about
16        flaps.  They're talking about
17        complications from the -- the -- the
18        surgeries.  Yeah.  So this --
19            Q.    Yeah.  This is --
20            A.    They're speaking about urethral
21        fistulas and strictures are the main
22        problem after total phalloplasty.  So
23        that's the construct of the counterfeit
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

1    phallus because of insufficient vascular
2    supply.  I also discuss that in my
3    complications section.  These are
4    characteristic complications of these
5    free flaps, radial forearm free flaps,
6    and you see those complications here.
7    And you even see them later in -- in the
8    case, so.  Some of them are step
9    procedures.  In fact, all of them are.
10       Q.   All right.  Let me -- let me
11   show you another study.
12       A.   Okay.
13       Q.   Let me reintroduce this with an
14   exhibit -- exhibit stamp.  Give me a
15   second.  All right.  I'm reintroducing
16   this as Exhibit 20.  Let me know when you
17   have it.
18   (Exhibit 20 was marked for identification
19   and is attached.)
20       A.   I just got Exhibit 19.  Is there
21   another?  There's a 20 to follow?
22       Q.   It -- it should load
23   momentarily.  Yeah.

## DEPOSITION OF PATRICK LAPPERT, M.D.

1      A.   Oh, I'm sorry.

2           MR. KNEPPER:  Are 19 and 20 the

3      same, just one's missing the little

4      stamp?

5           MR. TISHYEVICH:  Correct.

6           THE WITNESS:  Okay.  I'll just

7      go to 20, then, when it comes in.

8      Q.   Okay.  This is a study titled

9      "The Amsterdam Cohort of Gender Dysphoria

10     Study (1972-2015): Trends in Prevalence,

11     Treatment, and Regrets."  Do you see

12     that?

13     A.   I do.

14     Q.   And then it's by an author,

15     let's say Wiepjes, W-I-E-P-J-E-S.

16     A.   Yeah.

17     Q.   Right?

18     A.   I agree.

19     Q.   Have you seen this study before?

20     A.   I'm trying to gloss it to see if

21     I've read this before.  I -- I may have.

22     Give me just a moment, if that's okay.

23     Q.   Sure.

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 341

1              (Witness reviews document.)

2       A.    Yeah, this looks familiar.

3       Q.    I don't think I saw this in your

4    report, but tell me if you remember

5    otherwise.

6              (Witness reviews document.)

7       A.    Yeah, no.  I remember this being

8    evidence of the growing population of

9    self-reported transgender patients,

10   and it's a retro- --

11      Q.    Okay.  Let me --

12      A.    -- retrospective trial.  Yeah.

13      Q.    Yeah.  Let's go through this.

14      A.    Retrospective study, I should

15   say.

16      Q.    All right.  You see the

17   "Abstract" section on the first page?

18      A.    I do.

19      Q.    See the "Results" section?

20      A.    I do.

21      Q.    It says, "6,793 people (4,432

22   birth-assigned male, 2,361 birth-assigned

23   female) visited our gender identity

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 342

1    clinic from 1972 through 2015."  See

2    that?

3         A.    I do.

4         Q.    All right.  So you understand

5    that as part of this study, the authors

6    reviewed medical records of 6,793 people

7    who visited this gender identity clinic

8    from 1972 to 2015; right?

9         A.    I do.

10         Q.    All right.  And you see the

11    "Strengths and Limitations" section?

12         A.    Yes, I do.

13         Q.    And you understand that this

14    Dutch gender identity clinic treats more

15    than 95 percent of the transgender

16    population in the Netherlands; right?

17         A.    Right.

18         Q.    Pretty comprehensive study;

19    right?

20              MR. KNEPPER:  Objection, form.

21         A.    As of 2015, yes.  So it's a

22    7-year-old study, and it's -- it's

23    certainly large in numbers, that's for

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 343

1    sure.  So it's a retrospective chart
2    review of patients visiting the -- the
3    center in the Netherlands, and it's -- it
4    concludes in 2015.
5        Q.   This is certainly a better study
6    than that seven series case report that
7    you cited in your report; right?
8        A.   It's a different type of study.
9    Yes, it is.  Right.
10       Q.   Yeah.  This study reports on
11   6,793 people, whereas the case series on
12   which you rely has seven what you call
13   anecdotes; right?
14       A.   I wouldn't say I relied on that
15   study.  I merely presented it as an
16   example of -- of reporting on transgender
17   regret.  I didn't present it as a study
18   that I relied all my opinions on.
19   Certainly, there's other study types and
20   other studies in the literature that --
21   that one might rely more heavily on.
22       Q.   Well, let the --
23       A.   A retro- -- a retrospective

## DEPOSITION OF PATRICK LAPPERT, M.D.

```
 1     chart review, for example, might be more
 2     useful.
 3         Q.    Yeah.
 4         A.    But not -- not definitive.  And
 5     again, we've got to examine the fact that
 6     we're looking at old data here.
 7         Q.    Well, let's see what this
 8     30-year retrospective review found.  Look
 9     at the "Results" section.
10         A.    Scroll down.  Okay.
11         Q.    Look at the last two sentences.
12     "The percentage of people who underwent
13     gonadectomy within 5 years after starting
14     HT remained stable over time" --
15         A.    Right.
16         Q.    -- "(74.7% of transwomen and
17     83.8% of transmen).  Only 0.6% of
18     transwomen and 0.3% percent of transmen
19     who underwent gonadectomy were identified
20     as experiencing regret."  Do you see
21     that?
22         A.    I do.  And that has caused me to
23     want to look back and see -- okay.  So
```

**JA2336**

## DEPOSITION OF PATRICK LAPPERT, M.D.

1    they started with the 6,800, roughly, and
2    they report on 6,000 -- 7,000 almost.
3    Okay.  And clinic.  Okay.  And increase.
4            So I'm just trying to see if
5    they reported the average follow-up.
6    They're reporting when they underwent
7    gonadectomy after starting hormone
8    therapy, but they don't report the length
9    of follow-up, which is one of the key
10   reporting points there, because regret,
11   as we talked about earlier, is a -- tends
12   to be a function of time postsurgically.
13   So, let's just scroll down because it's
14   been a long time since I looked at this
15   article.  Transwomen, transmen total
16   underwent gonadectomy.
17           Yeah.  As I recall, they don't
18   report average follow-up time.  Every
19   five-year cohort.  So they're looking --
20   they -- they did look at when they
21   entered the system.  Prevalence and
22   treatment.  Confidence interval.
23           Yeah, as I -- yes.  So I think

## DEPOSITION OF PATRICK LAPPERT, M.D.

1    that's -- this is coming back to me now.

2    I think they didn't report the average

3    follow-up or the -- let's see if I'm

4    missing something here.  Age for each

5    year, so they did break them out in age

6    that they -- they entered the -- the

7    process, the years during which they

8    entered the process, age groups.  And

9    yeah, I think that's -- that was one of

10   the -- one of the issues.

11            And this is -- consonant with --

12   with a lot of the literature, is they

13   don't report the follow-up interval.  And

14   that's what the Swedish study is showing

15   us, that if -- if you don't have a handle

16   on the length of follow-up after sex

17   reassignment surgery, then you don't have

18   a -- you don't have any way to fully

19   understand the issue of lack of efficacy

20   or regret.

21            If you're asking the questions

22   is the surgery effective in correcting

23   the most calamitous problems that a

**DEPOSITION OF PATRICK LAPPERT, M.D.**

1    transgender person has, which is

2    suicidality, self-harm, and all those

3    things that we talked about earlier, then

4    you have to look at the interval

5    postsurgery in order to have a full

6    understanding of the efficacy of the

7    procedure.  And as I recall now, looking

8    it over again, this study does not report

9    on the follow-up period.  The median age

10    at first visit was younger, 25.  Yeah.

11    So they talk about age.  They talk about

12    the years in which they were cared for,

13    but they don't talk about the length of

14    the follow-up interval, so.

15        Q.    All right.  Let me move on --

16        A.    Okay.

17        Q.    -- to save time.

18        A.    All right.

19        Q.    Go to page 4 and where it says

20    "Regret."

21        A.    Okay.

22        Q.    You with me?

23        A.    I am.

**DEPOSITION OF PATRICK LAPPERT, M.D.**

Page 348

1       Q.   Third sentence says -- fourth

2    sentence says, "Reasons for regret were

3    divided into social regret, true regret,

4    or feeling non-binary."  You see that?

5       A.   I do.

6       Q.   And social regret -- strike

7    that.

8          It says, "Transwomen who were

9    classified as having social regret still

10   identified as women, but reported reasons

11   such as 'ignored by surroundings' or 'the

12   loss of relatives is a large sacrifice'

13   for returning to the male role."  Do you

14   see that?

15      A.   I do.

16      Q.   All right.  So some of the

17   persons who are being counted as

18   experiencing regret in the study did not

19   experience regret in the sense of they're

20   realizing they're not transgender; right?

21      A.   Realizing they're not

22   transgender?  I'm -- I'm trying to

23   understand your question here.  So you're

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 349

1      -- you're pointing me to the -- social

2      regret, true regret, feeling non-binary

3      is what's stated here.

4              "Transwomen who were classified

5      as having social regret still identified

6      as women, but reported reasons such as

7      'ignored by surroundings' or 'the loss of

8      relatives is a large sacrifice' for

9      returning to the male role."

10             Okay.  Yeah.  So -- so it's --

11     it's reporting without quantifying the

12     reasons for regret and the -- basically

13     all of them, subjective reporting again,

14     so -- okay.

15         Q.   Well -- well, let's go to page

16     6.

17         A.   That's the next page, isn't it?

18     Am I on the right page?

19         Q.   On page 6, it has a large

20     vertical table on the left side.

21         A.   Okay.  There we are.

22         Q.   And you may want to rotate it so

23     that you can see that table 6.

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 350

1      A.   When I got -- let's see.
2   There's a way to do that, isn't there?
3           THE COURT REPORTER:  Yeah.  If
4   you put your cursor over the document, a
5   black rectangle will come up at the
6   bottom.
7           THE WITNESS:  I see it now.
8   Yes.
9           THE COURT REPORTER:  There you
10  go.
11          THE WITNESS:  All right.  There
12  we are.
13      Q.   Table 4 is titled
14  "Characteristics of people with regret."
15      A.   Okay.
16      Q.   According to this table, out of
17  6,793 patients who received treatment, 14
18  of them reported regret of any type;
19  right?
20      A.   Okay.
21      Q.   And all the way on the right,
22  you see there's a "Reason for regret"
23  column; right?

**DEPOSITION OF PATRICK LAPPERT, M.D.**

Page 351

1      A.    Right.

2      Q.    And you're welcome to count it,

3    but by my count, only 7 of those 14

4    reported, quote, unquote, true regret;

5    right?

6      A.    Yeah.  And what's interesting

7    about that is that those are the same

8    criteria that were used to seek

9    transgender surgery to solve their

10   interior problems.  So many patients will

11   present for care because they feel

12   socially isolated and because they have,

13   you know, issues of -- well, for example,

14   being non-binary and so on, those --

15   those -- like social acceptance and

16   feeling non-binary is among the

17   indications for the procedure.  So it's

18   interesting to note also that time after

19   surgery, the regretters seem to favor --

20   postsurgical, you start to see them,

21   what, maybe 50 to 90 months out and a lot

22   of them, years -- ten years out.  Yeah.

23   So that -- that speaks to what we talked

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 352

1    about earlier, that you see these regrets

2    and these problems beyond five years.

3        Q.   All right.  Whatever criticism

4    you have of the methodology, what the

5    study reports is -- are rates of regret

6    that are below 1 percent; right?

7            MR. KNEPPER:  Objection, form.

8        A.   Yeah.  Again, so as we talked

9    about earlier, that's the problem with

10   this study, is that -- is that the -- the

11   denominator is a much larger number than

12   these 14 patients, and they don't address

13   the length of follow-up out of which they

14   extracted these 14 patients.  So it makes

15   it difficult to interpret the study, and

16   the claim that it's a small number is

17   hard to support by their own evidence

18   because they didn't follow them long

19   enough.  As their own data shows, you got

20   to follow them longer to see the regret

21   in most patients.  And they don't tell us

22   what that number is.

23       Q.   Are you aware that there are

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 353

1   studies on patient regret outside of the

2   treatment for gender dysphoria?

3       A.   Am I aware of -- of transgender

4   transition regret outside of --

5       Q.   No.  I'm going to ask -- I'm

6   going to ask this again.

7       A.   I'm sorry.

8       Q.   Are you aware there are studies

9   on rates of patient regret outside of

10   surgical treatment for gender dysphoria?

11       A.   Yes.  Absolutely, yeah.  So --

12       Q.   Okay.

13       A.   One of the -- one of the most

14   important --

15       Q.   Okay.  Let me ask -- yeah,

16   Doctor, let's -- this is going to be a

17   long day.  Just listen to my questions.

18           Did you do a literature search

19   to find out what the average rates of

20   patient regret are for other surgical

21   procedures compared to surgical treatment

22   for gender dysphoria?

23       A.   I did not.

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 354

1   Q.   Do you know if those rates are

2   higher, lower, or about the same as the

3   rates of regret for surgical treatment

4   for gender dysphoria?

5   A.   I would say there's no way of

6   knowing because we don't have the -- the

7   rate of regret in transgender regretters.

8   We don't have that number, so there's no

9   way to compare or to know which is the

10  higher number.

11  Q.   Okay.

12  A.   Like we talked about earlier, we

13  don't have this number.

14  Q.   Well, this one study I just

15  showed you showed a finding of 0.3

16  percent to 0.6 percent; right?

17  A.   Right.  And I -- and as I said,

18  this is -- this is -- it's difficult to

19  use this to compare to other regret cases

20  because of the poor quality of this

21  study.  So I can't use this to compare it

22  to the other studies on regret because

23  this is not -- not useful to that end.  I

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 355

1    mean, it's useful in seeing that 14 -- 14

2    regretters had these complications, 14

3    regretters had these -- these

4    explanations for their regret.

5              And so it's kind of like a case

6    collection, and retrospective reviews of

7    -- of patient records are helpful in

8    getting a sense of the size of the

9    problem.  Certainly, this study shows us

10   that there's an increasing patient pool

11   of people who self-identify as

12   transgender.  So in that regard, this

13   publication is very useful.  But in terms

14   of comparing the regret rate based on

15   this paper, I'd say this paper is

16   useless.

17       Q.   Okay.  Open Exhibit 21.

18   (Exhibit 21 was marked for identification

19   and is attached.)

20       A.   Okay.

21       Q.   Let me know when you have it.

22       A.   Okay.

23       Q.   All right.  This is a

## DEPOSITION OF PATRICK LAPPERT, M.D.

```
 1      publication from 2017 by Wilson,

 2      W-I-L-S-O-N, titled "Regret in Surgical

 3      Decision Making: a Systematic Review of

 4      Patient and Physician Perspectives."  See

 5      that?

 6          A.   I do.

 7          Q.   All right.  Look at the

 8      abstract.  You with me?

 9          A.   I'm -- I'm looking -- I'm just

10      reading it now.

11          Q.   The third sentence says, "We

12      performed a systematic review of the

13      literature focused on patient and

14      physician regret in the surgical

15      setting."  See that?

16          A.   I do.

17          Q.   Now look at "Results."  See

18      that?

19          A.   I'm there now, yes.

20          Q.   It says, "Of 889 studies

21      identified, 73 patient studies and 6

22      physician studies met inclusion

23      criteria."  Do you see that?
```

**DEPOSITION OF PATRICK LAPPERT, M.D.**

Page 357

1          A.    I'm reading it now, yes.

2          Q.    I understand this is a

3   systematic review of 73 patient studies

4   and 6 physician studies on regret and

5   surgical decision-making; right?

6          A.    That's what it says here, yes.

7          Q.    Then the third sentence of

8   "Results" says, "Interestingly

9   self-reported patient regret was

10  relatively uncommon with an average

11  prevalence across studies of 14.4%."

12  Right?

13         A.    Right.

14         Q.    And then "Conclusion" says,

15  "Self-reported decisional regret was

16  present in about 1 in 7 surgical

17  patients."  You see that?

18         A.    I do.

19         Q.    All right.  So according to this

20  systematic review, one out of seven

21  surgical patients, on average, report

22  having decisional regret; correct?

23              MR. KNEPPER:  Objection, form.

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 358

1      A.   Right.  So actually, I would go

2    a little deeper than that.  The first

3    thing to note about this study -- and

4    again, this is my first reading of it, so

5    I'm on the fly here.

6          The first thing to note about it

7    is that they looked at nearly 900

8    studies, of which only 73 qualified as

9    having sufficient validity to include in

10   their study.  So this -- this speaks to a

11   problem in the literature.  I'd have to

12   read lower to see what particular -- if

13   they even examined what kind of surgeries

14   were performed, because regret can happen

15   for a number of reasons, including

16   postsurgical complications and so on,

17   types of surgery.

18      Q.   We don't need --

19      A.   Yeah.

20      Q.   We don't need to dig into this

21   too deeply.  But, I mean, you don't

22   dispute that regret is not uncommon for

23   patients who have any kind of surgical

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 359

```
1     procedure; right?
2          MR. KNEPPER:  Objection to form.
3      A.   No.  You know, there's --
4     there's -- it's such a life-changing
5     event that the potential for regret is
6     very high, so that's why you have to be
7     careful in consenting the patient.
8      Q.   Okay.  Let me -- let's go back
9     to your report.
10     A.   Okay.
11     Q.   Because I hear you criticizing
12    all this evidence, and I want to see the
13    stuff that you're relying on.  Go to page
14    22.
15     A.   All right.
16     Q.   All right.  About halfway down
17    this paragraph, you say, "As reported by
18    one author in 2021, 60,000 testimonies of
19    personal de-transition can be found on
20    the Internet."
21     A.   Yeah, that's a typo.  That's a
22    typo.  That should have been 16, not 60.
23     Q.    Okay.  Well, I think it's more
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 360

```
 1     than that.
 2         A.    Okay.
 3         Q.    So we'll look at this in a
 4     second.
 5         A.    Sure, sure.
 6         Q.    And you cited this article from
 7     Pablo Exposito-Campos.
 8         A.    Yes.
 9         Q.    E-X-P-O-S-I-T-O, dash,
10     C-A-M-P-O-S.  Right?  That's what you
11     rely on; right?
12         A.    Not relying.  I'm basically just
13     putting that out there as an example of a
14     growing number of patients regretting
15     transitioning, yeah.
16         Q.    Well, no.  What you say in your
17     report is that according to this
18     publication, you can find 60,000 -- or
19     let's call it 16,000 testimonies of
20     personal de-transition on the Internet;
21     right?  That's the point you're making?
22         A.    Sixteen thousand, right.  Yeah.
23         Q.    Let's look at what that article
```

**DEPOSITION OF PATRICK LAPPERT, M.D.**

1      actually says.

2          A.   Okay.

3          Q.   Okay.  This is going to be

4      Exhibit 22.  And let me know when you get

5      it.

6          A.   Doesn't seem to be coming

7      through.

8          Q.   Yeah, it may be stuck on my end.

9      Okay.  Just went through, so you should

10     see it shortly.

11     (Exhibit 22 was marked for identification

12     and is attached.)

13         A.   There it is.  Okay.  Right.

14         Q.   All right.  This is the article

15     that you're citing in your report; right?

16         A.   Uh-huh.

17         Q.   All right.  So before we get

18     there, you know that what this author was

19     talking about was a Reddit website;

20     right?

21         A.   Yeah.  That was -- that was

22     their data source, yeah.  Right.

23         Q.   Reddit is not a peer-reviewed

# DEPOSITION OF PATRICK LAPPERT, M.D.

Page 362

```
 1      publication, obviously; right?
 2          A.    Clearly.
 3                MR. KNEPPER:  Objection.
 4          A.    Yeah.
 5          Q.    Right?
 6          A.    Yes.  It's not a peer-reviewed.
 7          Q.    It's a social website that
 8      anyone can access; right?
 9          A.    Right.  Correct.
10          Q.    Anyone can post -- can register
11      an account on Reddit and post whatever
12      they want; right?
13          A.    Right.
14          Q.    A post on Reddit is not
15      something that you would consider
16      reliable scientific evidence, I assume;
17      right?
18          A.    Yeah, no.
19                MR. KNEPPER:  Objection, form.
20          A.    I would -- I would put that as
21      self-reporting anecdotal-level evidence,
22      that's right.  So it's -- it's not
23      definitive, but it's suggestive of an
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

1    area in need of examination.  And that's
2    the reason I include it here, is not as
3    definitive evidence of a particular level
4    of problem but the -- the presence of a
5    problem that needs to be addressed.  So
6    the substance of my testimony there where
7    I call this study up is to show that
8    there's a growing body of patients, as we
9    talked about earlier, a growing body of
10   patients who regret their transition and
11   are seeking reversal.  So that's what
12   this is about.
13        It's not a quantification of the
14   phenomenon.  It's not a level 3 evidence
15   of the phenomenon.  It's a level 5,
16   self-reported, anecdotal stuff that --
17   that is basically just calling us to look
18   more carefully at what promises to be a
19   controversial area of medical care.  So
20   this is just part -- part of the
21   controversy is what we're looking at
22   here.  We're not looking at a definitive
23   scientific document, so.

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 364

```
 1        Q.   It's not even level 5 because at
 2   least a case report that's published in a
 3   peer-reviewed journal has someone looking
 4   at that case report to figure out if it's
 5   a real thing; right?
 6        A.   Right.
 7             MR. KNEPPER:  Objection, form.
 8        A.   What we have here is a clinical
 9   psychologist who's looking at something
10   going on online, and the clinical
11   psychologist is -- is reporting this,
12   that's right.
13        Q.   Go to page 4 of this article.
14        A.   One, two, three, four.  Okay.
15        Q.   See there's a second paragraph
16   under "Further clarifications"?
17        A.   Yes, I do.
18        Q.   All right.  And it references
19   this Reddit/detrans subreddit; right?
20        A.   Right.
21        Q.   And it says it's "a subreddit
22   for detransitioners to share their
23   experiences with more than 16,000
```

**DEPOSITION OF PATRICK LAPPERT, M.D.**

Page 365

```
 1      members."
 2          A.    That's correct.
 3          Q.    Right?
 4          A.    Uh-huh.
 5          Q.    Then it says, "one can find
 6      several stories of people who call their
 7      transgender status into question."  You
 8      see that?
 9          A.    Right.
10          Q.    All right.  This author is not
11      saying that there's 16,000 separate
12      testimonies of people tran- --
13      detransitioning on that subreddit; right?
14          A.    I think the author is saying
15      that there's a pool of 16,000 people
16      among whom are evidence of regret or
17      cessation of transition.  That's what --
18      I think that's what the author's saying.
19          Q.    Well, let's be more specific,
20      because what he actually says is "one can
21      find several stories."  Right?
22          A.    Right.
23          Q.    There's a very big difference
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 366

1      between, quote, several stories and

2      16,000 stories of detransitioning; right?

3          A.   I think what the author is

4      saying is that -- that there are -- let's

5      see.  Subreddit -- detran- --

6      experiences -- more than 16- -- one can

7      find several stories of a particular kind

8      of transgender -- persons who call their

9      transgender status into question after

10     stopping transition.

11          So the several stories have to

12     do with people who call their transgender

13     status into question.  Not people who

14     regret the surgery, but these are people

15     who regret the diagnosis.  So he's

16     talking about several stories of

17     regretters of the diagnosis.  It doesn't

18     speak about regretters of the transition.

19     He doesn't address that in that.

20          Q.   All right.  A bunch of posts on

21     a social website is not scientifically

22     reliable evidence to show the number of

23     different people who actually

# DEPOSITION OF PATRICK LAPPERT, M.D.

```
 1      detransition; right, Doctor?
 2            MR. KNEPPER:  Form.
 3       A.    Yeah.  As we said before, we
 4      have no way of -- at present, of knowing
 5      the number of people.
 6       Q.    Okay.  Go back to your report.
 7       A.    Okay.
 8       Q.    Go to page 40.
 9       A.    All right.  Okay.
10       Q.    All right.  Your first paragraph
11      at the top of this page says, "A
12      currently unknown percent-" --
13      "percentage and number of patients
14      reporting gender dysphoria are being
15      manipulated by a -- peer group, social
16      media, YouTube role modeling, and/or
17      parental -- social contagion and social
18      pressure processes."  Right?
19       A.    That's right.
20       Q.    I take it you're not aware of
21      any peer-reviewed studies that quantifies
22      the number of people with gender
23      dysphoria that are being, quote, unquote,
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 368

1    manipulated by social contagion or social

2    pressure; right?

3        A.    Again, as I said before, we

4    don't know the numbers because that's not

5    -- it's not adequately reported in the

6    literature.  But what we do know is that

7    the social -- Lisa Littman's article, for

8    example, in 2017 shows us that there's a

9    significant factor in this new

10   demographic of self-reported transgender

11   patients, the new demographic being

12   adolescent to young adult females without

13   prior history of gender dysphoria or

14   gender discordance suddenly reporting

15   transgender self-identification.

16            And -- and what it shows us,

17   what Lisa -- Lisa Littman's publication

18   from Brown University shows us is that

19   underlying these outbreaks is peer group

20   networks of people online, peer groups

21   online, social media, a modeled speech, a

22   rehearsed speech, and -- and these --

23   these sudden outbreaks of -- of

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 369

1      self-identified transgender patients.

2              So we know it's there, but we

3      can't quantify it yet.  It's just it's --

4      but it's -- we have at present no other

5      explanation for why the demographic of

6      self-reported transgender patients has

7      suddenly shifted from virtually all young

8      boys to 50 to 60 percent of the new cases

9      being adolescent to young adult females.

10     And that's -- that's what we're -- what

11     we're talking about here.  This just

12     speaks to the controversial nature of

13     this -- medical and surgical

14     interventions is that we don't even

15     understand the origin of that phenomenon.

16     And -- and what that Littman article

17     shows us is precisely these things:  that

18     there's an element of social contagion,

19     that there's peer pressure, there's

20     rehearsed speech, online networks that

21     cause these outbreaks of these new kind

22     of patients, adolescent young adult

23     females who previously had no

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 370

1    self-reporting of trans- -- cross-sex

2    self-identification.

3         MR. TISHYEVICH:  This is not

4    responsive to my question, and I move to

5    strike it.

6      Q.   Here's my question, Doctor.  You

7    are not aware of any peer-reviewed study

8    that quantifies the number of people with

9    gender dysphoria who are being

10   manipulated by social contagion or social

11   pressure; correct?

12     A.   No.  We're at the -- we're at

13   the level of level 4/5 evidence now.

14   Lisa Littman's article is a level 5,

15   possibly 4.  A level 5.  So --

16     Q.   It's not a -- you're also not

17   aware of any peer-reviewed study that

18   quantifies the percentage of people with

19   gender dysphoria who are being

20   manipulated by social contagion or social

21   pressure; correct?

22     A.   No.  That's part of the -- part

23   of the problem with the literature.

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 371

```
1      Exactly right.
2         Q.    Yeah.
3         A.    Exactly right.
4         Q.    Given this lack of reliable
5      studies, do you agree that this
6      phenomenon of social contagion is
7      currently hypothetical?
8              MR. KNEPPER:  Objection, form.
9         A.   I would not agree with that.
10     It's not hypothetical.
11        Q.   Do you -- did you read the
12     response from Lisa -- from Littman to the
13     criticisms to that article?
14        A.    I did.  And -- and I also noted
15     that the -- the -- the organization under
16     which she published that article put
17     considerable pressure on her.  But she
18     can't retract her data.  She can retract
19     her conclusions, but she can't retract
20     her data, and she can't retract the
21     findings in the paper itself that show
22     the rehearsed speech, that show the
23     networks that are involved, that showed
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

1  the -- the character of the -- the

2  rehearsed speech, like, you know, if

3  you're talking to the psychologist, tell

4  them you've been thinking about suicide;

5  if you're talking to the endocrinologist,

6  tell them you feel better now that you're

7  started on T, that sort of stuff.  So --

8  so it's not hypothetical, it's actual.

9         The -- the size of the

10  phenomenon can only be compared to the

11  change in the demographic.  Why are 60

12  percent of patients fitting into that

13  category suddenly, whereas before, only

14  20 percent of patients were females?

15      Q.   Do you remember --

16      A.   That's what --

17      Q.   Okay.  Do you remember the part

18  of the correction from Ms. Littman where

19  she said that this is a

20  hypothesis-generating article?

21      A.   Hypothesis as to -- as to

22  mechanism of -- of action, and some of

23  the hypotheses are what's listed there:

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 373

```
 1      social network peer -- media -- I'm
 2      sorry -- peer pressure, social media,
 3      role modeling, social contagion.  So she
 4      admits that is a -- it is not understood.
 5      She admits that those phenomena are
 6      there, but it -- at present, we're
 7      hypothesizing about the actual cause.
 8      And this speaks again to the
 9      controversial nature of even the
10      diagnosis, much less the treatment.
11           Q.   Go back to your report.
12           A.   Okay.
13           Q.   Page 40.
14           A.   I'm there.
15           Q.   Toward the bottom, you say, in
16      capital letters, "Not Generally
17      Accepted."  You see that?
18           A.   I do.
19           Q.   And you say, "Affirmation
20      medical treatments -- hormones and
21      surgery -- for gender dysphoria and
22      transitioning have not been accepted by
23      the relevant scientific communities."  Do
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 374

1      you see that?

2          A.    I do.

3          Q.    It's your expert opinion that

4      it's generally accepted that puberty

5      blockers are not medically necessary;

6      right?

7          A.    No.

8               MR. KNEPPER:  Objection, form.

9          A.    I would say puberty blockers in

10     the setting of a self-identified

11     transgender is not medically necessary,

12     but puberty blockers are often medically

13     necessary, just not in that particular

14     patient population.

15         Q.    Is it also your expert opinion

16     that it's generally accepted that hormone

17     treatment for gender dysphoria is not

18     medically necessary?

19         A.    Well, the scientific evidence

20     now shows that it is -- is not useful.

21     That's what I said --

22         Q.    Answer my question.  Is it your

23     expert opinion that it's generally

1     accepted that hormone treatment for
2     gender dysphoria is not medically
3     necessary?
4         A.   Yes.
5         Q.   Is it also your expert opinion
6     that it's generally accepted that
7     gender-affirming surgery for gender
8     dysphoria is not medically necessary?
9         A.   Yes.  I would say so, yeah.  I
10    can't put a number on it, but yeah.
11        Q.   All right.  Let me -- let me
12    show you another document.  Okay.  Let me
13    introduce this.  Okay.  This is going to
14    be Exhibit 23.  And let me know when you
15    get it.
16    (Exhibit 23 was marked for identification
17    and is attached.)
18        A.   Okay.  All right.  I'm there.
19        Q.   Okay.  Top of the page says,
20    "BlueCross BlueShield of North Carolina."
21    Right?
22        A.   Correct.
23        Q.   You know what Blue Cross and

# DEPOSITION OF PATRICK LAPPERT, M.D.

1    Blue Shield is; right?

2        A.    Right.

3        Q.    It's a healthcare insurer;

4    right?

5        A.    Yes.

6        Q.    Are you aware that Blue Cross

7    Blue Shield is the largest private

8    insurer in the state of North Carolina?

9        A.    I am now.

10        MR. KNEPPER:   Objection, form.

11        Q.    All right.   This document is

12    titled "Corporate Medical Policy,"

13    "Gender Affirmation Surgery and Hormone

14    Therapy."   Right?

15        A.    Right.

16        Q.    Do you know what this is?

17        A.    Do I know what what is?

18        Q.    Do you know what this document

19    is?

20        A.    It appears to be an insurance

21    company document concerning the coverage

22    of certain services.   I would have to

23    read it to know what it is specifically,

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 377

1      but I think it's probably a policy

2      statement about what is covered and what

3      is not covered and what the diagnostic

4      criteria are.

5          Q.    Yeah.

6          A.    What the policy of the company

7      is.  Yeah.  So, shall I read it or?

8          Q.    I'll walk you through it.

9          A.    Okay.

10         Q.    You see it says "Last Review"

11     near the top?

12         A.    Right.

13         Q.    It's 3/2021.  That's March 2021;

14     right?

15         A.    Yes.

16         Q.    All right.  You understand this

17     policy was a -- strike that.

18              In your report, you cite a

19     number of articles that you say Dr. Brown

20     and Dr. Schechter overlooked, like a

21     bunch of 2020 articles; right?

22         A.    Right.

23         Q.    You understand this was

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 378

1    published -- updated after all those

2    studies that you cited were published;

3    right?

4         A.   It appears to be.

5         Q.   Okay.  Go to page 7.  You see it

6    says "Scientific Background and Reference

7    Sources"?

8         A.   Right.

9         Q.   You understand this section of

10   the policy provides some of the

11   scientific background on which the policy

12   is based; right?

13        A.   I see that, yes.

14        Q.   And if you go to page -- the

15   next page, page 8, you see there's a

16   bunch of references to Specialty Matched

17   Consultant Advisory Panel; right?

18        A.   I see that, yeah.

19        Q.   And there's some references to

20   sen- -- Senior Medical Director reviews;

21   right?

22        A.   I see that, yeah, from 2016.

23        Q.   Yeah.  Well, if you keep

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 379

```
 1      looking, there's a bunch from 2020;
 2      right?
 3          A.   I see medical director review in
 4      2020.  Yes, I do.  I see that.
 5          Q.   And then including a medical
 6      director review in March 2021; right?
 7          A.   I see it.  That's probably what
 8      generated this document.  Am I right?
 9          Q.   Yeah.  Good guess.  Now,
10      obviously --
11          A.   That's why they pay me the big
12      bucks.  Sorry.
13          Q.   Obviously, you had no
14      involvement with the development of this
15      policy from BlueCross BlueShield of North
16      Carolina; right?
17          A.   Correct.
18          Q.   You have no idea how BlueCross
19      BlueShield of North Carolina came to
20      decide what gender affirmation surgeries
21      or hormone therapy they're going to cover
22      or not; right?
23          A.   Wrong.  I -- I have now some
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 380

1      idea of what they used because you've

2      listed -- or they've listed the

3      scientific background and reference

4      sources for coming to their company

5      policy.  And what I would point you to is

6      the fact that every one of the documents,

7      the scientific documents that support

8      their decision-making, I think the most

9      recent one is 2014.  You've got some that

10     go back to the year 2000.  So you've got

11     21-year-old DSM-4 characterizations.

12     You've got 2001 Harry Benjamin Gender

13     Dysphoria Association publications.  The

14     most recent thing is a -- is a -- well,

15     that's actually an advisory panel.  So

16     the most recent medical article is the

17     Cohen-Kettenis Hembree article from 2016.

18     So what's used to support a March 2021

19     document is essentially six-year-old

20     information.  And as we talked about

21     earlier, it hasn't -- it's changed a lot.

22     It's changed a lot since then.

23              The fact that Blue Cross Blue

## DEPOSITION OF PATRICK LAPPERT, M.D.

1    Shield is slow off the mark would be
2    troublesome to the shareholders, I
3    suppose.  But as far as what I'm here to
4    talk about, the scientific basis for
5    this, the scientific basis is old data.
6        Q.   Doctor, you don't know whether
7    this is an exhaustive list of every
8    scientific resource that Blue Cross Blue
9    Shield considered in making the March
10   2021 update; right?  You have no idea?
11       MR. KNEPPER:  Objection, form.
12       A.   I can only go by what they've
13   disclosed.
14       Q.   Right.
15       A.   And what they've disclosed --
16   which I would assume they would be
17   leading with their best information
18   rather than their worst -- I would call
19   that -- the scientific support of low
20   quality because of the -- the
21   better-quality data that's now available
22   in the last three years.
23       Q.   You don't know personally

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 382

1    whether Blue Cross Blue Shield considered

2    any of the articles that you've cited

3    when they're making this policy change in

4    2021; right?  You don't know that?

5        A.    I have no way of knowing how --

6        Q.    Yeah.

7        A.    -- that committee worked.  I

8    only -- I only assume that they would

9    have put out their best scientific

10   support rather than their weakest.

11       Q.    Yeah.  Bottom of this page, by

12   the way, see there's a section that says,

13   "Policy Implementation/Update

14   Information"?

15       A.    Yes, I see that.

16       Q.    And it says, "7/19/11" --

17       A.    Yeah.

18       Q.    -- "New policy developed."

19   Right?

20       A.    Right.

21       Q.    You understand that Blue Cross

22   Blue Shield has had some form of this

23   policy for gender affirmation surgery

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 383

1    since July 2011?

2          MR. KNEPPER:  Objection, form.

3      A.   I can see that they have had a

4    policy, according to their own reporting,

5    since July of 2011.

6      Q.   All right.  So, let's look at

7    what Blue Cross Blue -- Blue Cross Blue

8    Shield thinks about whether these

9    procedures are medically necessary.  Go

10   to page 5.

11     A.   Let's see.  So we're at page 8.

12   We're going up to page 5?  Okay.  Okay.

13     Q.   Give me a second.  Actually, let

14   me start you on page 1.  You see there's

15   a description of -- let me know when you

16   get there.

17     A.   I'm there.

18     Q.   Okay.  Now, the beginning says,

19   "Gender Dysphoria is the formal diagnosis

20   used by professionals to describe persons

21   who experience significant gender

22   dysphoria (discontent with their

23   biological sex and/or birth gender)."

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 384

```
 1    Right?
 2        A.   Yes, I see that.
 3        Q.   All right.  You understand what
 4    this policy is addressing; right?
 5        A.   Yeah.  It's addressing a
 6    psychiatric classification, not medically
 7    classified as a medical illness.  So
 8    they're -- yeah.
 9        Q.   Okay.  Go to page 2.
10        A.   Can you give me just a moment to
11    reread that sentence for just a second.
12         (Witness reviews document.)
13        A.   Okay.  Yeah.  So that's
14    boilerplate.  I'm sorry.  Sorry for
15    slowing you down here.
16        Q.   That's fine.  Go to page 2.
17        A.   Okay.
18        Q.   Top of the page says, "Policy."
19    Right?
20        A.   Correct.
21        Q.   And it says, "Services for
22    gender affirmation surgery and hormone
23    therapy may be considered medically
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

1   necessary when the criteria below are

2   met."  You see that?

3       A.   Right.  So that's -- that's

4   language that insurance companies use.

5   If you're not in the category of medical

6   necessity, there's no insurance coverage.

7   So whether or not one could classify it

8   as a medical diagnosis is not at issue.

9   What's at issue is, is the insurance

10   company going to cover this -- this

11   benefit.

12       Q.   Yeah.  Because insurers

13   typically are not in the business of

14   covering services that are not medically

15   necessary; right?

16       A.   No.  I wouldn't --

17           MR. KNEPPER:  Objection, form.

18       A.   -- characterize it that way.

19           THE WITNESS:  I'm sorry.

20       A.   I wouldn't characterize it that

21   way.  Insurance companies are in the

22   business of -- certainly, they're in the

23   business of -- of paying for covered

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 386

1  benefits.  But that's the problem with
2  the insurance industry, is their primary
3  fiduciary duty is to their investors.
4  And so the question of coverage has more
5  to do with are we going to make an
6  insurance policy that earns us money or
7  are we going to be paying for something
8  and not seeing the money.  Okay?  Does
9  that make sense?
10     Q.   Doctor, you --
11     A.   I think that's what -- that's
12  what this language here is talking about
13  is -- is medical necessity is the
14  language that's used when an insurance
15  company will cover.  They will not cover
16  cosmetic surgery, but they're -- they're
17  proposing to cover transgender surgery
18  beginning by attempting to define it as a
19  medical diagnosis.  That's what's at
20  stake here is.
21     Q.   No.  What -- what this policy
22  says is that when certain criteria are
23  met --

## DEPOSITION OF PATRICK LAPPERT, M.D.

1     A.   Right.

2     Q.   -- gender affirmation surgery

3  and hormone therapy may be considered

4  medically necessary; right?  That's what

5  it says in black and white.

6         MR. KNEPPER:  Objection, form.

7     A.   Yeah, again, so medically

8  necessary from the standpoint of an

9  insurance company is if you meet these

10  criteria, we'll pay for it; if you don't

11  meet these criteria, we won't pay for it.

12  That's -- that's --

13     Q.   Right.  And the difference is

14  whether the surgery is considered to be

15  medically necessary or not; right?

16         MR. KNEPPER:  Objection, form.

17     A.   Well, again, so medically

18  necessary in this case is has the

19  insurance company decided that they're

20  going to cover this benefit.  It says

21  nothing about the scientific support for

22  the efficacy of the procedure.  They

23  haven't said anything in that about it.

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 388

```
 1      They've just called it medically
 2      necessary.
 3          Q.   All right.  Let's -- let's go
 4      off the record.
 5          A.   Okay.
 6               THE VIDEOGRAPHER:  This is the
 7      end of Media Unit No. 5.  We are off the
 8      record at 3:25 p.m.
 9                  (Break taken.)
10               THE VIDEOGRAPHER:  This is the
11      beginning of Media Unit No. 6.  We are on
12      the record at 3:36 p.m.
13          Q.   (By Mr. Tishyevich) All right.
14      I'm going to introduce another exhibit,
15      Doctor.
16          A.   Okay.
17          Q.   It's being slow on my end.  Bear
18      with me.  Okay.  This will be Exhibit 24.
19      Let me know when you have it.
20      (Exhibit 24 was marked for identification
21      and is attached.)
22          A.   I will.  Okay.  I've got it.
23          Q.   Okay.  You've seen this study
```

**DEPOSITION OF PATRICK LAPPERT, M.D.**

Page 389

```
 1      before; right?
 2           A.   Yes, I have.
 3           Q.   How do you pronounce the lead
 4      author's name?
 5           A.   That's the subject of great
 6      debate, but I think it's Dhejne or -- I
 7      think it's Dhejne, Cecilia Dhejne, but
 8      I -- I -- I'm not -- I'm not a
 9      Swissophone.
10           Q.   I'll use Dhejne as well.
11           A.   Okay.
12                MR. TISHYEVICH:  And for the
13      court reporter, it's D-H-E-J-N-E.
14           Q.   Okay.  This is a study from
15      2011; right?
16           A.   Yes.
17           Q.   And you cited this study in
18      several places in your report --
19           A.   I do.
20           Q.   -- right?
21                And one of the points for which
22      you cite this study is to say that
23      Swedish patients who underwent
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 390

1    gender-affirming surgery had a 19.1 times

2    greater suicide rate than the control

3    group; right?

4        A.    Yeah.  The hazard ratio for --

5    well, for all reassigned persons is 19.1,

6    and they further break out the -- that

7    into subgroups of female-to-male and

8    male-to-female.

9        Q.    Yeah.  And you understand how

10    the control group in this study was

11    defined; right?

12        A.    Yes.

13        Q.    The control group did not

14    consist of patients with gender dysphoria

15    who did not undergo gender-affirming

16    surgery; correct?

17        A.    Correct.

18        Q.    The control group consisted of

19    patients without gender dysphoria; right?

20        A.    Yeah.  That's kind of the point

21    of the -- of the research, yes.  That's

22    right.

23        Q.    Yeah.  What this Dhejne study

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 391

```
 1      compared was the suicide rate for
 2      patients who underwent gender-affirming
 3      surgery against the general Swedish
 4      population; right?
 5          A.   Right.
 6          Q.   And you know there's many
 7      studies that find that patients with
 8      gender dysphoria, as a population, have a
 9      higher risk of suicide compared to the
10      general population; right?
11          A.   Very much accepted fact, yes.
12          Q.   Yeah.  All right.  We'll go to
13      page 7.
14          A.   Let's see here.
15          Q.   You see there's a "Strengths and
16      limitations of the study" section?
17          A.   Two, three, four, five, six,
18      seven.  Yes, I'm there.
19          Q.   All right.  Look at the third
20      full paragraph in that column.
21          A.   Okay.
22          Q.   All right.  Second sentence
23      says:  "The caveat with this design is
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 392

```
 1      that transsexual persons before sex
 2      reassignment might differ from healthy
 3      controls (although this bias can be
 4      statistically corrected for by adjusting
 5      for baseline differences).  It is
 6      therefore important to note that the
 7      current study is only informative with
 8      respect to transsexual persons health
 9      after sex reassignment; no inferences can
10      be drawn as to the effectiveness of sex
11      reassignment as a treatment for
12      transsexualism."
13              You see that?
14          A.   Right.  Yeah.
15          Q.   Then it says:  "In other words,
16      the results should not be interpreted
17      such as sex reassignment per se increases
18      morbidity and mortality.  Things might
19      have been even worse without sex
20      reassignment."  Correct?
21          A.   Yeah.  It's -- the -- let's see.
22      The -- yeah, so -- and I don't think I
23      ever make the claim that the surgery
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

1    increases the risk of morbidity and

2    mortality.  Yeah, I -- I would agree with

3    that.

4        Q.   Yeah, no --

5        A.   But I would -- I would also

6    wonder on what basis they -- there's

7    nothing to support that it might have

8    been worse either.  It's for the same

9    reason.

10        Q.   Yeah.  This study does not

11    support the conclusion that sex

12    reassignment surgery by itself increases

13    risk of suicide; correct?

14        A.   That's what they -- they say,

15    yes.

16        Q.   And they also say that this

17    study does not support the conclusion

18    that surgical procedure for gender

19    dysphoria by themselves increase risk of

20    morbidities other than suicide; right?

21        A.   Right.

22        Q.   Okay.  All right.  Let me -- you

23    mentioned that -- in your report the 2020

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 394

1      Finland guidelines.  You recall that?

2          A.    I do.

3          Q.    Let me ask you a couple of

4      questions on those.

5          A.    Okay.

6          Q.    So I'll introduce another

7      exhibit.  This will be Exhibit 25, and

8      let me know when you get it.

9      (Exhibit 25 was marked for identification

10     and is attached.)

11         A.    Okay.

12         Q.    Let me ask you before we get

13     into this, look at page 46 of your

14     report.

15         A.    Okay.

16         Q.    Near the top, there's a "2020 -

17     Finland" reference.  You see that?

18         A.    I see that, yeah.

19         Q.    You say, "This new Finnish

20     guidance prioritizes psychological

21     therapy over treatment with hormones or

22     surgery and suggests different care plans

23     for early-onset vs late-onset childhood

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 395

1   gender dysphoria."  You see that?

2       A.   I do.

3       Q.   And then you say in the last

4   sentence, "The Finland National

5   Guidelines appear quite contrary to the

6   opinions of Drs Brown and Schechter and

7   WPATH."  Do you see that?

8       A.   I do.

9       Q.   Is it your opinion that the

10  WPATH guidelines recommend that children

11  who experience gender dysphoria should

12  transition to a different gender role?

13           MR. KNEPPER:  Objection, form.

14      A.   No.  I would say that the WPATH

15  guidelines essentially leaves us with

16  affirmation care only, that it does -- it

17  does, you know, recom- -- recommend all

18  of the psychological support but all of

19  it in support of transition.  I would say

20  that.  Yeah.

21      Q.   Yeah.  The WPATH guidelines do

22  not recommend that children with gender

23  dysphoria automatically be put on puberty

## DEPOSITION OF PATRICK LAPPERT, M.D.

1    blockers; right?

2         A.   They don't make that

3    recommendation, no.  They don't state

4    that recommendation, no.

5         Q.   Yeah.  Let's look at what they

6    actually say.

7         A.   Okay.

8         Q.   I'm going to introduce one more

9    exhibit.

10        A.   So we're going to leave the

11   Finland article for now and go to --

12        Q.   Yeah.  We'll come back to it.  I

13   want to show you the WPATH --

14        A.   Okay.

15        Q.   -- Standards of Care Version 7

16   first.

17        A.   Uh-huh.

18        Q.   All right.  This will be Exhibit

19   26.  Let me know when you have it.

20   (Exhibit 26 was marked for identification

21   and is attached.)

22        A.   Okay.

23        Q.   This is a larger file, so this

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 397

```
1      may take an extra minute or so.
2          A.   Okay.  I've got it.
3          Q.   Okay.  These are the WPATH
4      Standards of Care Version 7; right?
5          A.   Yes.
6          Q.   Turn to page 23.
7          A.   Okay.
8          Q.   All right.  There's a section
9      titled "Social Transition in Early
10     Childhood."  You see that?
11         A.   I must be on the wrong page.
12     Did you say page 23?
13         Q.   It's PDF page 23, which is going
14     to be page 17 in the standards.
15         A.   Oh, I'm sorry.  Okay.  Let's go
16     back, then.  Page 17.  Okay.  I'm there.
17     Right.  "Social Transition in Early
18     Childhood."
19         Q.   All right.  It says:  "Some
20     children state that they want to make a
21     social transition to a different gender
22     role long before puberty.  For some
23     children, this may reflect an expression
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 398

1        of their gender identity.  For others,

2        this could be motivated by other forces."

3               You see that?

4        A.    I do.

5        Q.    And then a couple of sentences

6        down, it says:  "This is a controversial

7        issue, and divergent views are held by

8        health professionals.  The current

9        evidence base is insufficient to predict

10       the long-term outcomes of completing a

11       gender role transition during early

12       childhood."  You see that?

13       A.    I do.

14       Q.    All right.  The WPATH Standards

15       of Care Version 7 is not making any

16       clinical recommendations encouraging

17       children in early childhood to go through

18       gender transition roles; correct?

19       A.    Yeah, I would -- yes.  I would

20       add to that that they're also not

21       offering any clinical guidance on how to

22       distinguish who might or who might not be

23       suitable for transition.  Right.

## DEPOSITION OF PATRICK LAPPERT, M.D.

1      Q.   Do you know whether that's

2    explored somewhere else in this Standards

3    of Care Version 7?

4      A.   Yeah.  I think it's discussed.

5      Q.   Okay.

6      A.   But -- but it's -- but I --

7    yeah.  So what's -- what's important, I

8    think, in what you cite here is that the

9    current evidence base is insufficient to

10   predict the long-term outcome.  Yes.

11      Q.   Okay.  Go to the next page.

12      A.   Okay.

13      Q.   Page 18, PDF page 24.

14      A.   Okay.

15      Q.   There's a section titled

16   "Physical Interventions for Adolescents."

17      A.   Right.

18      Q.   Right?

19      A.   Yes.

20      Q.   You understand that adolescents

21   are different than children; right?

22        MR. KNEPPER:  Objection, form.

23      A.   Well, yeah.  So, adolescents are

## DEPOSITION OF PATRICK LAPPERT, M.D.

1    treated in pediatric clinics, but they're

2    different from prepubertal children, yes.

3        Q.   Yeah.  This section does not

4    provide any clinical recommendations for

5    hormone therapy in prepubescent children;

6    right?

7        A.   Let's see.  I've just got to

8    refresh my memory here on the verbiage.

9           (Witness reviews document.)

10       A.   Yeah.  So it -- it addresses the

11   important issue of gender fluidity in

12   adolescents, potential for shift to

13   conformity and -- that may not persist.

14   Yeah.  Right.

15       Q.   Okay.  And this section also

16   does not provide any clin- -- clinical

17   recommendations for surgical intervention

18   in prepubescent children; right?

19       A.   This section doesn't address

20   prepubescent children.  It addresses

21   adolescents.

22       Q.   Yeah, exactly.  And you don't

23   know of any other section in these

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 401

```
1       Standards of Care Version 7 that provide

2       those guidelines for prepubescent

3       children; right?

4            A.   No.

5            Q.   Okay.  Go to the next page, PDF

6       page 25, page 19 in the document.

7            A.   Okay.

8            Q.   And you see there's a section

9       that says, "Criteria for

10      Puberty-Suppressing Hormones"?

11           A.   Yes.

12           Q.   It says, "In order for

13      adolescents to receive

14      puberty-suppressing hormones, the

15      following minimum criteria must be met."

16      You see that?

17           A.   Yes.

18           Q.   And then there's four items;

19      right?

20           A.   Yes.

21           Q.   Number 4 says, "The adolescent

22      has given informed consent and,

23      particularly when the adolescent has not
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 402

1    reached the age of medical consent, the

2    parents or other caretakers or guardians

3    have consented to the treatment and are

4    involved in supporting the adolescents

5    throughout the treatment process."

6         You see that?

7     A.   Yeah.  That -- in fact, that was

8    one of the most troubling things I read

9    when I reviewed this whole document from

10    the WPATH guidelines, is that -- yeah,

11    that using those words in the same

12    sentence, an adolescent giving informed

13    consent, is a -- is a non sequitur

14    because I -- I don't think -- in all my

15    years of practice as a surgeon, which

16    amounts to greater than 35, the idea of

17    obtaining consent from an adolescent was

18    never accepted by the surgical community

19    or the medical community, to my

20    understanding.

21     Q.  Well, this also talks about

22    getting informed consent from the parents

23    or other caretakers or guardians; right?

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 403

1        A.   Yeah.  So in their role
2     supporting the adolescent's decision.  It
3     doesn't say -- yeah.  So the parents or
4     other caregivers have consented in
5     support.  Right.
6        Q.   Yeah.  What the guidelines
7     contemplate is that it's not just the
8     adolescent that's going to give an
9     informed consent, it's also the parents
10    or other caretakers or guardians; right?
11       A.   Yeah.  But again, that's the
12    problem I have with it, because that's --
13    the introductory sentence has -- has no
14    meaning -- or the introductory part of
15    the one sentence has no meaning.  If the
16    beginning point of the process is
17    adolescent consent, that's -- that's not
18    an ethical thing to do because --
19       Q.   Yeah.
20       A.   -- because an adolescent can't
21    grasp -- they don't have enough executive
22    function or development, particularly if
23    they have been through a period of

## DEPOSITION OF PATRICK LAPPERT, M.D.

1    puberty suppression before they begin the

2    period of cross-sex hormones, that it's

3    -- it's already quite evident that these

4    patients, these children do not have

5    enough -- and it's just known in society

6    at large that adolescent children don't

7    have the capacity for long-term reckoning

8    of things like risk and outcomes and

9    neither do they have the executive

10   capacity in their brains to make an

11   informed consent decision.  So that part

12   of it is meaningless to me.  Yeah.

13       Q.   Yeah.  But you understand

14   there's two components to this

15   requirement; one is informed consent by

16   the adolescent, and two is informed

17   consent by parents or other caretakers or

18   guardians.  Right?

19       A.   Yes.

20       Q.   Okay.

21       A.   That's what it says.

22       Q.   All right.  Let's now go back to

23   the Finland guidelines.  It's Exhibit 25.

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 405

```
1        A.    Okay.

2        Q.    And go to PDF page 9 which has

3    Section 8, "Summary" -- "Summary of the

4    Recommendations."  Let me know when you

5    get there.

6        A.    Okay.

7        Q.    All right.  This page provides

8    recommendations for treatment of minors

9    with gender dysphoria in Finland; right?

10       A.    Yes.

11       Q.    All right.  Look at number 2 at

12   the bottom.

13       A.    At the bottom.  Okay.  Okay.

14       Q.    All right.  So it starts with,

15   "If a child is diagnosed prior to the

16   onset of puberty with a persistent

17   experience of identifying as the other

18   sex and shows symptoms of gender-related

19   anxiety, which increases in severity in

20   puberty."  You see that?

21       A.    Yes, I do.

22       Q.    All right.  And then next

23   sentence says, "Based on these
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 406

1     assessments, puberty suppression

2     treatment may be initiated on a

3     case-by-case basis after careful

4     consideration and appropriate diagnostic

5     examinations if the medical indications

6     for the treatment are present and there

7     are no contraindications."

8            Do you see that?

9       A.   I do.

10      Q.   All right.  You understand that

11    these Finland guidelines do not

12    categorically prohibit the use of

13    puberty-blocking agents in minors;

14    correct?

15           MR. KNEPPER:  Objection, form.

16      A.   Right.  They don't

17    categorically, but what they do is they

18    express uncertainty about the data that

19    -- that's been used to support the use of

20    those drugs in children.

21      Q.   Yeah.  But -- but despite that

22    data, what the guidelines recognize is

23    that puberty-blocking treatment may still

## DEPOSITION OF PATRICK LAPPERT, M.D.

1    be initiated for some minor patients in

2    certain circumstances.

3        A.    Right.

4        Q.    Right?

5        A.    Agree.

6            MR. KNEPPER:  Objection, form.

7        Q.    All right.  Let's go back to

8    your report.  Go to page 46.

9        A.    I'm there.

10       Q.    So in your discussion of these

11   Finland guidelines, you cite something

12   called -- it's a website,

13   genderreport.ca.

14       A.    Correct.

15       Q.    Do you see that?

16       A.    I do.

17       Q.    And I saw at least two other

18   references to this source in your report.

19   All right.  This is -- genderreport is

20   not a peer-reviewed publication, Doctor;

21   right?

22       A.    No.  It's a data collection

23   site.  Yeah.

**DEPOSITION OF PATRICK LAPPERT, M.D.**

Page 408

1      Q.   It's a data collection site?

2      A.   I think that's what the -- so,

3  let me just review what I wrote here.

4          (Witness reviews document.)

5      A.   All right.  Okay.  Yeah.  Okay.

6  Yeah, no.  I agree they're not

7  peer-reviewed to my knowledge, no.

8      Q.   It's a blog; right?

9      A.   Right.  It's on -- it's online,

10  exactly.

11     Q.   Blogs are not generally

12  considered reliable scientific evidence,

13  I take it.  Right?

14         MR. KNEPPER:  Objection, form.

15     A.   No, they're not.

16     Q.   Okay.  Do you know who started

17  this genderreport blog?

18     A.   I do not.

19     Q.   Do you know this person was a

20  doctor?

21     A.   I don't know the person, no.

22     Q.   You don't know they're a

23  scientist?

# DEPOSITION OF PATRICK LAPPERT, M.D.

Page 409

```
1         A.    I'm sorry?
2         Q.    You don't know whether they're a
3    scientist; right?
4         A.    I don't know.
5         Q.    Did you know that this blog was
6    started by a parent who was upset that
7    her daughter was told in school that
8    girls are not real and who filed a
9    lawsuit about it?
10             MR. KNEPPER:  Objection, form.
11        A.    I did not know those details,
12   no.
13        Q.    Assuming that's true, do you
14   think this is an unbiased, objective
15   resource?
16             MR. KNEPPER:  Objection to form.
17        A.    I -- I don't know.  I don't know
18   the answer to that question.
19        Q.    Do other experts in your field
20   rely on blogs like this one to support
21   their opinions?
22             MR. KNEPPER:  Objection, form.
23        A.    And I don't, and neither did I
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 410

1    rely on this as sole support for my

2    opinion.  This -- again, this is just

3    evidence of -- of controversy that exists

4    out in the literature, or that exists out

5    in the -- in the greater world, I should

6    say, in this case because this is not

7    medical literature, but in the wider

8    world.

9        Q.   Well, as I read this, your page

10   46, you're -- you're citing this gender

11   report for your analysis of the 2020

12   Finland guidelines.

13           MR. KNEPPER:  Objection, form.

14       Q.   Right?

15       A.   I think I'm using the Finland

16   guidelines as a standalone and just

17   referencing this gender report as

18   evidence of events in Finland rather than

19   scientific support for the conclusions of

20   the Finland review.

21       Q.   Okay.  Another article you cite

22   is the Carmichael 2021 study.

23       A.   Right.

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 411

1      Q.   Let's look at that one.  I'll

2   introduce it as Exhibit 27.  Let me know

3   when you have that.

4   (Exhibit 27 was marked for identification

5   and is attached.)

6      A.   Okay.  Okay.  I have it.

7      Q.   Okay.  This is titled,

8   "Short-Term outcomes of pubertal

9   suppression in a selected cohort of 12 to

10   15 year old young people with persistent

11   gender dysphoria in the UK."

12      A.   Right.

13      Q.   Right?

14      A.   Yeah.

15      Q.   All right.  Look at the -- on

16   page 1, you see there's an abstract?

17      A.   Yes.

18      Q.   Under "Methods," it says, "We

19   undertook an uncontrolled prospective

20   observational study."  Right?  Do you see

21   that?

22      A.   Right.

23      Q.   All right.  This is not a

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 412

```
 1      randomly controlled clinical trial;
 2      right?
 3          A.    Right.
 4          Q.    Not a cohort study --
 5          A.    Right.
 6          Q.    -- right?
 7          A.    Right.
 8          Q.    There's no control group; right?
 9          A.    Correct.
10          Q.    You don't mention any of that in
11      your report even though you spend a lot
12      of time discussing the limitations of
13      other studies.  Why is that?
14              MR. KNEPPER:  Objection, form.
15          A.    I -- we include this to one to
16      show the raging controversy in the world
17      of transgender medicine, and this is an
18      example of that, the -- the evidence of
19      uncertain result or no result, no change
20      from baseline effect.
21              Let's see.  Let me just review
22      because I've reviewed so many of these
23      articles lately.
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 413

1          (Witness reviews document.)

2      A.   Right.  Yeah.  So -- yeah.  So

3   that's right.  So they were unable to

4   quantify benefit or harm from puberty

5   suppression.

6      Q.   Go to page 21.  See there's a

7   "Strength and Limitations" section?

8      A.   I see it.  Yes, I do.

9      Q.   The second sentence says:  "The

10  study size and uncontrolled design were

11  key limitations.  The small sample size

12  limited our ability to identify small

13  changes in outcomes.  This was an

14  uncontrolled observational study and thus

15  cannot infer causality."  See that?

16     A.   I do.

17     Q.   Again, you don't acknowledge any

18  of these limitations in your report;

19  right?

20          MR. KNEPPER:  Objection, form.

21     A.   Right.  I believe I made

22  reference to this in terms of it's

23  evidence of -- of controversy in the

## DEPOSITION OF PATRICK LAPPERT, M.D.

1    literature, that they could not see a

2    benefit from it.  So again, at lower

3    levels of evidence, evidence of benefit

4    would suggest further study.  This shows

5    that further study is needed because, at

6    the observational level, you don't see

7    effect.

8        Q.   All right.  Another study -- not

9    a study, a review that you cite is this

10   Cochrane 2020 --

11       A.   Yes.

12       Q.   -- review; right?

13       A.   Right.

14            MR. TISHYEVICH:  And for the

15   court reporter, that's C-O-C-H-R-A-N-E.

16       Q.   I'm going to introduce that one

17   next.

18       A.   Okay.

19       Q.   All right.  I'm introducing this

20   as Exhibit 28, and let me know when you

21   get it.

22   (Exhibit 28 was marked for identification

23   and is attached.)

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 415

```
 1          A.    I will.  Okay.
 2          Q.    Okay.  This is from the Cochrane
 3    Library.  This is the review that you
 4    cite in your report; right?
 5          A.    Right.
 6          Q.    Go to page 2.
 7          A.    Okay.
 8          Q.    All right.  You see there's the
 9    section titled, "Authors' Conclusions"?
10          A.    Okay.  Yes, I do.
11          Q.    All right.  Toward the end, do
12    you see it says, "We will include
13    non-controlled cohort studies in the next
14    iteration of this review, as our review
15    has shown that such studies provide the
16    highest quality evidence currently
17    available in the field."  You see that?
18          A.    Yes, I do.
19          Q.    All right.  So the Cochrane
20    review is not saying they're just going
21    to ignore all those studies going
22    forward; right?
23          A.    Right.
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 416

1          MR. KNEPPER:  Objection, form.

2      Q.   They rec- -- they recognize that

3  those noncontrolled studies currently

4  represent the best available evidence;

5  right?

6          MR. KNEPPER:  Objection, form.

7      A.   Well, yeah.  Before they say

8  best available evidence, they speak about

9  the level of the evidence now.  And

10  what's -- what's interesting about this

11  Cochrane review, because it's a worldwide

12  review of the literature on the subject

13  of cross-sex hormones and hormone

14  blockade in transwomen, is that they

15  found over a thousand references, and by

16  the time they got through qualifying

17  those references for suitability, they

18  got down to thirteen studies.  And when

19  they fully screened the text, they got

20  down to a single study.  And that's --

21  that's kind of characteristic of -- of

22  the data used to support hormonal

23  transitioning.

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 417

1          And so yeah, they -- they have

2     to -- they have to backpedal in order to

3     get any data because what they have in

4     hand now is -- is not supportive of -- of

5     the use of cross-sex hormones in

6     transwomen, so.

7          Q.   All right.   Let me introduce

8     another exhibit.

9               MR. TISHYEVICH:   Can we go off

10    the record?

11              THE VIDEOGRAPHER:   We are off

12    the record at 4:07 p.m.

13                   (Break taken.)

14              THE VIDEOGRAPHER:   We are back

15    on the record at 4:20 p.m.

16         Q.   (By Mr. Tishyevich) All right.

17    Doctor, let me ask you about what

18    experience you have with the individual

19    plaintiffs in this case specifically.

20         You personally did not meet with

21    any of the plaintiffs in this case;

22    correct?

23         A.   No.   I did a review of their

# DEPOSITION OF PATRICK LAPPERT, M.D.

1    charts and nothing more.  Yeah.

2        Q.    All right.  You've personally

3    never spoken with any of the plaintiffs;

4    correct?

5        A.    I have not.

6        Q.    You obviously were not present

7    in any meetings that any of these

8    plaintiffs may have had with their mental

9    health professionals; right?

10       A.    I was not.

11       Q.    And you don't know specifically

12   what was said or not said during those

13   meetings; correct?

14       A.    The only information I have

15   about those meetings was what's entered

16   in the medical record that was given to

17   me to review.

18       Q.    Yeah.  You were also not present

19   in any meetings any of the plaintiffs may

20   have had with their endocrinologists;

21   right?

22       A.    Correct.

23       Q.    And outside of reading medical

# DEPOSITION OF PATRICK LAPPERT, M.D.

Page 419

1    records, you don't know what was said or

2    not said during those meetings; correct?

3        A.    Correct.

4        Q.    And finally, for plaintiffs who

5    had undergone surgical procedures, you

6    were also not present in any meetings

7    between these plaintiffs and their

8    surgeons; correct?

9        A.    Correct.

10       Q.    And outside of medical records,

11   again, you don't know what was said or

12   not said during those meetings; correct?

13       A.    Correct.

14       Q.    Okay.  You should see a new

15   exhibit pop up, Exhibit 29.

16       A.    Okay.

17   (Exhibit 29 was marked for identification

18   and is attached.)

19       Q.    And if you can go to PDF page

20   54.

21       A.    PDF page 54.  Okay.

22       Q.    First of all, you understand

23   what this document is; right?

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 420

1      A.    I didn't get to see the header
2    on it.  I haven't seen this before, I
3    don't think.
4      Q.    Oh, feel free -- yeah, feel free
5    to go back to the first page if you want
6    to.
7      A.    Okay.
8        (Witness reviews document.)
9      Q.    All right.  This is the --
10     A.    Okay.  Okay.  So it's --
11     Q.    Yeah.
12     A.    -- a benefits booklet for the
13    State health plan.  Is that right?
14     Q.    For North Carolina, right.
15     A.    Yes.  The teachers union --
16    teachers and employ- -- and State
17    employees, right.  Okay.
18     Q.    You know what a benefit plan is;
19    right?
20     A.    Yes, uh-huh.
21     Q.    At a high level, it sets out
22    what the insurer is going to cover or not
23    cover; right?

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 421

1      A.    Correct.

2      Q.    Among other things.  Okay.  And

3   earlier, we talked about medical

4   necessity.  You recall that?

5      A.    Yes.

6      Q.    All right.  Go to -- now go back

7   to PDF page 54 of this plan.

8      A.    Okay.  I'm there.

9      Q.    You see at the top, it says,

10  "What is not Covered?"  And it's a list

11  of items?

12     A.    Am I on the right page?  I'm

13  on -- on PDF page 54?

14     Q.    Yeah.

15     A.    That's the -- the -- oh, I'm

16  sorry.

17     Q.    Plan page 46, so that's --

18     A.    Plan page 46.  Let me back up

19  real quickly here.  Sorry.  Okay.  I'm

20  there.

21     Q.    At the top or near the top, it

22  says, "What is not Covered?"  You see

23  that?

# DEPOSITION OF PATRICK LAPPERT, M.D.

Page 422

```
1        A.    I do.
2        Q.    There's a list of items
3    alphabetically.  See that?
4        A.    Yes.
5        Q.    And under M, it says, "Services
6    or supplies deemed not medically
7    necessary."  "Medically necessary" is in
8    bold; right?
9        A.    Right.
10       Q.    All right.  Let's look at that
11   definition.  Go to PDF page 89, which is
12   page 81 of the plan.
13       A.    Okay.
14       Q.    All right.  At the bottom, you
15   see there's a definition of "Medically
16   Necessary (or Medical Necessity"; right?
17       A.    Yes.
18       Q.    And it says, "those covered
19   services or supplies that are: a)
20   Provided for the diagnosis, treatment,
21   cure, or relief of a health condition,
22   illness, injury, or disease; and, except
23   for clinical trials as described under
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 423

```
1     this health benefit plan, not for
2     experimental, investigational, or
3     cosmetic purposes."  Right?
4        A.   Okay.
5        Q.   I understand that as part of
6     determining what the benefit plan is
7     going to consider medically necessary,
8     whether or not the treatment is
9     experimental is one of the factors;
10    right?
11       A.   As would be defined -- so all of
12    the definitions here are determined by
13    the insurance provider.  So they've
14    defined these listed necessities as
15    covered under their plan, yes.
16       Q.   Yeah.  So under this definition,
17    if a treatment is experimental, it is
18    likely not going to be covered under the
19    plan; right?
20       A.   Right.  According to their
21    definition, it doesn't appear they would
22    cover experimental surgery or cosmetic
23    surgery.
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 424

1  Q. Conversely, if a treatment is
2  not experimental, it may be covered by
3  the plan in some circumstances; right?
4  A. It would seem --
5  MR. KNEPPER: Objection, form.
6  Q. Yeah. And I showed you earlier
7  a policy from BlueCross BlueShield of
8  North Carolina from March 2021 that says
9  that gender-affirming hormone and
10 surgical treatment is considered
11 medically necessary; right?
12 MR. KNEPPER: Objection, form.
13 A. Yeah, no. As we talked about
14 before, these are definitions formulated
15 by the insurance company to define
16 coverage, not medical definitions in
17 terms of medical care. This is strictly
18 coverage by insurance. Yeah.
19 Q. Well, one of the factors that
20 goes into that consideration is whether
21 or not that treatment in question is
22 experimental; right?
23 MR. KNEPPER: Objection, form.

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 425

1    A.   Right.  The plan excludes

2    experimental or investigational or

3    cosmetic procedures.

4    Q.   Okay.  All right.  We're talking

5    about BlueCross BlueShield of North

6    Carolina.  Let me ask you about another

7    insurer, Aetna, A-E-T-N-A.  You've heard

8    of Aetna; right?

9    A.   Yes.

10   Q.   Are you aware that Aetna is one

11   of the five largest health insurance --

12   insurers in the U.S.?

13   A.   It would not surprise me to

14   learn that.

15        MR. KNEPPER:  Form.

16   Q.   Do you have any idea whether

17   Aetna considers gender-affirming surgery

18   and hormone therapy to be medically

19   necessary?

20        MR. KNEPPER:  Objection, form,

21   scope.

22   Q.   Would it surprise you if Aetna

23   --

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 426

```
 1            THE COURT REPORTER:  I'm sorry.
 2    I didn't hear the answer over the
 3    objection.
 4            THE WITNESS:  I haven't answered
 5    yet.
 6            THE COURT REPORTER:  Okay.
 7            THE WITNESS:  Sorry.
 8        A.   So as to the size of Aetna or
 9    the -- that they cover --
10        Q.   Yeah, let me just ask -- I'll
11    ask the question again.
12        A.   Okay.
13        Q.   Do you have any idea whether
14    Aetna considers gender-affirming surgery
15    and hormone therapy to be medically
16    necessary?
17            MR. KNEPPER:  Objection, form,
18    scope.
19        A.   I don't.
20        Q.   Well, let me show you.  I'm
21    going to introduce another exhibit.
22    Okay.  This is going to be Exhibit 30.
23    Let me know when you have it.
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 427

```
 1      (Exhibit 30 was marked for identification
 2      and is attached.)
 3           A.    Okay.  All right.  I have it.
 4           Q.    All right.  This is a policy
 5      from Aetna titled "Gender Affirming
 6      Surgery."  You see that?
 7           A.    I do.
 8           Q.    You see there's a "Policy
 9      History" on the right?
10           A.    Yes.
11           Q.    Under "Last Review," it says
12      January 12th, 2021; right?
13           A.    Yes.
14           Q.    So you understand this was
15      revised within this year; right?
16           A.    Yes.
17           Q.    And under Policy, it says,
18      "Aetna considers gender affirming surgery
19      medically necessary when all of the
20      following criteria are met."  Right?
21           A.    Right.
22               MR. KNEPPER:  Form.
23           Q.    All right.  So according to this
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

1    policy, in Aetna's view, gender-affirming

2    surgery is medically necessary, therefore

3    nonexperimental; right?

4         MR. KNEPPER:  Objection, form.

5    A.    Yeah, Aetna's definition of what

6    is medically necessary appears to allow

7    for gender-affirming surgery.

8         Q.    Okay.  Go to page 3.

9         A.    Okay.

10        Q.    Look at the bottom of the page.

11        A.    Okay.

12        Q.    The second to the last paragraph

13    says, "Aetna considers

14    gonadotropin-releasing hormone medically

15    necessary to suppress puberty in trans

16    identified adolescents if they meet World

17    Professional Association for Transgender

18    Health (WPATH) criteria."  Do you see

19    that?

20        A.    I do.

21        Q.    Okay.  According to Aetna,

22    puberty-blocking hormones are medically

23    necessary to suppress puberty in

# DEPOSITION OF PATRICK LAPPERT, M.D.

Page 429

```
 1      trans-identified adolescents if they meet
 2      the WPATH criteria; right?
 3              MR. KNEPPER:  Objection, form.
 4        A.    That -- that's what it states
 5      there, yes.
 6        Q.    By the way, look at the next
 7      paragraph.  See it says, "Aetna considers
 8      reversal of gender affirming surgery for
 9      gender dysphoria not medically
10      necessary."
11              MR. KNEPPER:  Objection.
12        Q.    Do you see that?
13        A.    I do.
14        Q.    Okay.  We talked about Blue
15      Cross Blue Shield, talked about Aetna.
16      Do you know what Cigna is?
17        A.    Yeah.  It's one of the largest
18      health insurance providers.
19        Q.    Do you know what position Cigna
20      takes on whether gender dysphoria
21      treatment is medically necessary?
22              MR. KNEPPER:  Objection, form,
23      scope.
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 430

1      A.    I have not read their policies.

2      Q.    You don't know; right?

3      A.    Correct.

4      Q.    Let me show you that policy.

5      A.    Okay.

6      Q.    All right.  This is going to be

7  Exhibit 31.  Let me know when you have

8  it.

9  (Exhibit 31 was marked for identification

10  and is attached.)

11      A.    Okay.  Okay.  I have it.

12      Q.    All right.  This is a Cigna

13  medical coverage policy titled "Treatment

14  of Gender Dysphoria."  Do you see that?

15      A.    Yes, I do.

16      Q.    On the right top, it says

17  "Effective Date," May 18th, 2021; right?

18      A.    Yes.

19      Q.    Also recently updated; right?

20      A.    Yes.

21      Q.    Go to page 2.  Under "Coverage

22  Policy," look at the third paragraph in

23  bold.  It says, "Medically necessary

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 431

1    treatment for an individual with gender

2    dysphoria may include any of the

3    following services, when services are

4    available in the benefit plan."  Do you

5    see that?

6         A.   I do.

7         Q.   All right.  And then there's

8    five different bullets of different

9    categories of services; right?

10        A.   One, two, three, four, five.

11   Yes.

12        Q.   Number two is "Hormonal therapy,

13   including but not limited to androgens,

14   anti-androgens, Gn-" -- "GnRH analogues,

15   estrogens, and progestins."  Right?

16        A.   Yes.

17        Q.   That's a medically necessary

18   benefit in Cigna's view; right?

19             MR. KNEPPER:  Objection, form.

20        A.   It is a -- medically necessary

21   as defined by a insurance company for

22   purposes of a policy.

23        Q.   Yeah.

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 432

```
1        A.    Yes.
2        Q.    And the last bullet point says,
3   "Gender reassignment and related surgery
4   (see below)."  Do you see that?
5        A.    I do.
6        Q.    According to this policy, in
7   Cigna's view, gender reassignment and
8   related surgery is a medically necessary
9   service; right?
10            MR. KNEPPER:  Objection, form.
11        A.    Again, so -- so the insurance
12   company makes a distinction between
13   medically necessary, meaning things that
14   they will cover, versus not medically
15   necessary, meaning things they won't
16   cover.  It's not based on an actual
17   medical diagnosis but a -- a managerial
18   diagnosis, because if it's not medically
19   necessary, it's not covered by insurance.
20   So if they choose to cover it, they will
21   call that medically necessary.  And
22   that's what they're detailing here, what
23   they will cover and what they won't
```

**DEPOSITION OF PATRICK LAPPERT, M.D.**

```
 1     cover.
 2          Q.    Okay.
 3          A.    And they call what they will
 4     cover medically necessary.
 5          Q.    Let me show you one last policy.
 6     Do you know -- strike that.
 7               You know what UnitedHealthcare
 8     is; right?
 9          A.    Yes, I do.
10          Q.    It's another health insurer;
11     right?
12          A.    Yes.
13          Q.    They're the largest health
14     insurer in the country; right?
15          A.    I don't know that for a fact.
16     I'll assume if you're telling me so.
17          Q.    All right.  Well, do you have
18     any idea whether United considers
19     gender-affirming surgery and hormone
20     treatment to be medically necessary for
21     gender dysphoria?
22          A.    I have a dawning suspicion that
23     they do.
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

1    Q.   Yeah.   I think you can probably
2    tell where this is heading at this point;
3    right?
4    A.   Sure.   The insurance industry
5    likes these services.
6    Q.   Let me introduce this next
7    exhibit.   This is going to be Exhibit 32.
8    All right at the top it says, "United
9    Healthcare."   You see that?
10   (Exhibit 32 was marked for identification
11   and is attached.)
12   A.   I don't have it yet.
13   Q.   Oh, I apologize.
14   A.   That's okay.
15   Q.   Let me know when.
16   A.   Okay.   Yes.
17   Q.   All right.   Top right says
18   "United Healthcare" -- "Healthcare
19   Commercial Medical Policy."   Right?
20   A.   Yes.
21   Q.   Under that, it says, "Gender
22   Dysphoria Treatment."   Right?
23   A.   Yes.

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 435

1    Q.   See there's an effective date of
2    April 1, 2021; right?
3    A.   Yes.
4    Q.   Also fairly recently updated;
5    right?
6    A.   Yes.
7    Q.   Okay.  And then you see there's
8    a bunch of bullet points setting forth
9    criteria for the services on page 1;
10   right?
11   A.   Yeah.  Yes.
12   Q.   Then go to page 2.
13   A.   Okay.
14   Q.   And the first full paragraph
15   says, "When the above criteria are met,
16   the following surgical procedures to
17   treat Gender Dysphoria are medically
18   necessary and covered as a proven
19   benefit."  Do you see that?
20   A.   I do.
21   Q.   Okay.  So United also covers --
22   also considers this treatment to be
23   medically necessary; right?

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 436

```
 1          MR. KNEPPER:  Objection to form.
 2      A.   Yeah, again, so the interesting
 3   thing about this that I'm just reading --
 4   because, again, this is the first time
 5   I've seen this -- is that the same policy
 6   declares that the policy does not apply
 7   to individuals with objectively ambiguous
 8   genitalia or disorders of sexual
 9   development.  So that's an example of the
10   insurance company choosing what to call
11   medically necessary based upon an
12   insurance definition rather than a
13   medical definition.  Because under, you
14   know, plastic surgical/general medical
15   wisdom, ambiguous genitalia and disorders
16   of sexual development are objective
17   medical surgical -- well, medical
18   conditions, at least, that would be
19   covered -- would be considered medically
20   necessary to treat, you know, because
21   disorders of sexual development can
22   include emergencies like adrenal
23   hyperplasia.  So that's a -- you've given
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 437

1    an example of how insurance companies

2    make their own definitions for the sake

3    of distinguishing what they will cover

4    and what they will not cover.

5        Q.    Go to page 9.

6        A.    Okay.

7        Q.    You see there's a section toward

8    the bottom that says, "Benefit

9    Considerations"?

10        A.    Yes.

11        Q.    Third paragraph says, "Unless

12    otherwise specified, if a plan covers

13    treatment for Gender Dysphoria, coverage

14    includes psychotherapy, cross-sex hormone

15    therapy, puberty suppressing medications

16    and laboratory testing to monitor the

17    safety of hormone therapy."  Do you see

18    that?

19        A.    I do.

20        Q.    You understand that United

21    considers not just surgery but all these

22    other services, including cross-sex

23    hormone therapy and puberty suppressing

## DEPOSITION OF PATRICK LAPPERT, M.D.

```
1      medications, to be medic- -- medically
2      necessary for the treatment of gender
3      dysphoria; right?
4              MR. KNEPPER:  Objection, form,
5      scope.
6          A.   Yeah, again, the same -- same
7      issues of definition.  So they -- they
8      can define it any way they choose for the
9      sake of the business of insuring people,
10     yeah.  So they -- they definitely have
11     defined all of the services associated
12     with gender dysphoria as covered
13     benefits.
14         Q.   And not just as covered
15     benefits, as medically necessary; right?
16         A.   Again --
17             MR. KNEPPER:  Objection, form
18     and scope.
19         A.   Again, they use -- the use of
20     the word "medically necessary" is defined
21     by the insurance company to distinguish
22     covered benefits from not covered
23     benefits, and it's not based in medical
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

1    evidence of efficacy or anything else.

2    It's just an internal definition for the

3    sake of their business model.

4        Q.   You think that insurers do not

5    look at scientific literature in deciding

6    whether or not to cover something?

7            MR. KNEPPER:  Objection, form.

8        Q.   Is that really what you think?

9        A.   Your -- your first example that

10   we've gone through is a -- is an example

11   of the level of literature they've been

12   using, and that example showed that the

13   most recent paper that they used to

14   support it was 2016.  So in my mind, it's

15   in doubt.  I don't know for a fact what

16   this particular policy used as

17   references.  All I have is what you've

18   shown me on that particular policy.  And

19   the evidence there was they're not

20   current in the -- in the literature.  But

21   they're still doing good business,

22   apparently, because they continue even

23   after reviewing.

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 440

1      Q.    Okay.  Go to page 10.

2      A.    Okay.  All right.

3      Q.    See there's a section at the

4   bottom that says, "Clinical Evidence"?

5      A.    Yes.

6      Q.    Do you know what that means?

7      A.    Yes, I do.

8      Q.    You see then the first thing

9   that's said -- cited is a study from 2019

10  and the second thing is a study from

11  2019, the third thing is a study from

12  2019.  You see that?

13     A.    I do.

14         MR. KNEPPER:  Objection, form.

15     Q.    Do you under- -- do you

16  understand what this section represents?

17         MR. KNEPPER:  Objection, form.

18     A.    Permit me to just look at the

19  particular names and the particular cited

20  articles, if I could.

21       (Witness reviews document.)

22     A.    Sorry.  I just wanted to see if

23  there were any -- and then they go to --

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 441

1    okay.  Okay.  Could I ask you to ask your

2    question again?  I'm sorry to have to do

3    that.  I just wanted to see what you were

4    referring to.

5        Q.   Yeah.  You understand that this

6    "Clinical Evidence" section provides an

7    overview of some of the scientific

8    evidence on which United based its

9    policy; right?

10           MR. KNEPPER:  Objection, form.

11       A.   Yes.  They -- they have listed

12   some of the scientific evidence available

13   in the literature.

14       Q.   Including studies as recently as

15   2019 --

16       A.   Yes.

17       Q.   -- right?

18       A.   Right.

19       Q.   And because you weren't involved

20   with writing this policy or updating for

21   United, you don't know what else they may

22   have considered outside of this policy;

23   right?

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 442

1      A.    I have no way of knowing what
2    they would have considered.    That's
3    right.
4      Q.    Okay.  All right.  Let's shift
5    gears a little bit.  You've heard the
6    term "Christian anthropology."  Right?
7      A.    Yes, I have.
8      Q.    You've used that term yourself;
9    right?
10      A.    Yes, I have.
11      Q.    The view that Christian
12    anthropology takes is that the -- a
13    person's sex assigned at birth is
14    intrinsic and unchangeable; correct?
15      A.    No.
16            MR. KNEPPER:  Objection, form,
17    scope.
18      A.    I would not say that.
19      Q.    What would you -- how would you
20    describe it?
21      A.    Well, your use of the term "sex
22    assigned at birth" is not -- is not
23    contained within Christian anthropology.

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 443

```
 1        Q.    Let me try this --
 2        A.    By the -- by the way, I don't --
 3   I don't use definitions in Christian
 4   anthropology to confect my expert
 5   opinion.  My opinion is based in the
 6   scientific literature, my review of that
 7   literature, and my 30-plus years'
 8   experience as a reconstructive surgeon.
 9        Q.    I understand.  The view that
10   Christian -- to use your words, the view
11   that Christian anthropology takes is that
12   a person's biologic sex is intrinsic and
13   unchangeable; right?
14        A.    Yes.
15              MR. KNEPPER:  Objection, form,
16   scope.
17        Q.    You think that people with
18   gender dysphoria should be welcomed, but
19   they should be told that they're
20   biological sex cannot be changed; right?
21              MR. KNEPPER:  Objection, form,
22   scope.
23        A.    Yeah.  So, persons who
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 444

1    self-identify as transgender are to be

2    welcomed and are to be cared for because

3    they suffer greatly, and they -- they

4    deserve, in justice -- they deserve, out

5    of justice, I should say, our -- our care

6    and support.  But that care and support

7    must always be rooted in the truth of the

8    nature of the human person, the nature of

9    the biology that informs our

10   understanding of that, because that has

11   to drive our medical and surgical

12   decision-making.

13          So that's why my -- my expert

14   opinion is based in the objective

15   scientific evidence.  I don't make

16   reference to my -- any faith statements

17   when I'm -- when I'm developing my expert

18   opinion on transgender medicine and

19   surgery.

20      Q.   In your expert report, you refer

21   to plaintiff Julie -- Dr. Julie McKeown;

22   right?

23      A.   Could you walk me to where I

# DEPOSITION OF PATRICK LAPPERT, M.D.

Page 445

```
 1    speak about her?
 2        Q.   Yeah.  Go to -- go to page 54 of
 3    your report.
 4        A.   Fifty-four.  Thank you.
 5             MR. TISHYEVICH:  And the
 6    spelling is M-C-K-E-O-W-N.
 7        A.   Fifty-four.  Okay.  I'm there.
 8        Q.   Give me a second.  Yeah.  This
 9    is -- this is you discussing one of the
10    plaintiffs; right?
11        A.   Yes.  Yes.  I'm on page 53, 54.
12        Q.   Yeah.  And the second full
13    paragraph on page 54, you refer to Dr.
14    McKeown as a he; right?
15             (Witness reviews document.)
16        A.   Am I looking at the right -- oh,
17    yes.  Okay.  I'm sorry.  Right at the
18    very beginning.  Yes.
19        Q.   Page 48 of your report, this is
20    you discussing minor plaintiff CB; right?
21        A.   Right.
22        Q.   And you refer to minor plaintiff
23    as a she; right?
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 446

```
 1         A.    Correct.
 2         Q.    Go to page 51.
 3         A.    Fifty-one?
 4         Q.    Five one.
 5         A.    Okay.  All right.
 6         Q.    This is you talking about
 7    plaintiff Connor Thonen-Fleck; right?
 8         A.    Let me go to the preceding page
 9    because I've got to see where the names
10    -- oh, I only used the initials.  Yes.
11    CT-F, yes.
12         Q.    It's T-H-O-N-E-N, dash,
13    F-L-E-C-K.  And you refer to him as a
14    she; right?
15         A.    Yes.
16         Q.    Now, you personally do not
17    believe that a person's sex assigned at
18    birth can ever be changed?
19              MR. KNEPPER:  Objection.
20         Q.    Sorry, let me -- let me use your
21    terms.  You personally do not believe
22    that a person's biological sex can ever
23    be changed; right?
```

**DEPOSITION OF PATRICK LAPPERT, M.D.**

Page 447

1        MR. KNEPPER:  Objection, form.

2     A.    A person's biological sex can

3    never be changed, yes.

4     Q.    Do you know what the term

5    "misgendering" is?

6     A.    It's a -- it's a political term,

7    yes.  It's a political, cultural term, I

8    should say.  Political, cultural term.

9     Q.    Misgendering means referring to

10   a person in a way that doesn't align with

11   their gender; right?

12        MR. KNEPPER:  Objection, form.

13    A.    In -- within their hearing, I

14   could see a problem with that.  But from

15   the standpoint of offering medical

16   evidence, I'm obliged to honor objective

17   biological realities when I speak about

18   an examination of their medical record.

19        There's so many things at stake

20   relating to the sex of the patient that

21   impinge upon the effects of drugs, the

22   effects of time, the effects of hormones

23   that I -- I cannot incorrectly report the

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 448

```
 1      sex of the patient when I'm talking about
 2      objective medical care.
 3              Now, speaking with the patients
 4      themselves, I wouldn't do that.  As we
 5      talked about earlier, I have a number of
 6      transgender patients, and I don't
 7      misgender them.  We're talking here about
 8      something that's not within their hearing
 9      or I assume they -- I assume that they
10      wouldn't be reading this.  We're speaking
11      as a professional to a professional
12      review of this stuff, among other
13      experts.  So I think it's essential that
14      we stick to the biological reality that
15      -- that biological sex is immutable.
16          Q.   In your expert report, you are
17      misgendering several of the individual
18      plaintiffs in this case; correct?
19              MR. KNEPPER:  Objection, form.
20          A.   I would say incorrect, because
21      misgendering is something that's done to
22      the person themselves or is something
23      that they're going to read or hear or
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 449

1    see.  And that's an abuse of the person's

2    right to their name, and I don't do that

3    to people.  I don't misgender people.

4         Q.   Well, in this report at least,

5    you are referring to several of these

6    plaintiffs, including a minor, in a way

7    that does not align with their gender;

8    right?

9         A.   I would be --

10             MR. KNEPPER:  Objection, form.

11        A.   Again, I would be concerned to

12   not do that if it was going to be

13   something they were going to read or

14   hear.  But this expert testimony, in my

15   understanding, is for the Court and for

16   the other experts to review, in which

17   case, I insist upon the -- the prevailing

18   necessity of sticking to objective truths

19   when talking about medical opinions,

20   scientific opinions.

21             Again, I -- I'm not in the habit

22   of -- of offending people or using names

23   that they haven't chosen, because, again,

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 450

```
 1        I treat transgender patients and I don't
 2        subject them to that kind of abuse.  But
 3        when reviewing medical and biological
 4        realities like this, I have to insist
 5        upon it because medical care is not
 6        served by incorrectly naming biological
 7        realities and confusing people.  I can
 8        give you an example if you like.
 9            Q.   That's all right.
10            A.   Of a --
11            Q.   That's all right.
12            A.   Okay.
13            Q.   You've used the phrase before,
14        "You can't heal an interior wound with
15        external surgery."  Right?
16            A.   Yes, I have.
17            Q.   Do you remember giving a
18        presentation at the Gospel of Life
19        conference in Denver in 2018?
20            A.   Yes.
21            Q.   And that presentation was titled
22        "Transgender Surgery & Christian
23        Anthropology."  Right?
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 451

1          A.   Yes.

2          Q.   All right.  Let me introduce an

3     exhibit.  This will be Exhibit 33.  Let

4     me know when you have it.

5     (Exhibit 33 was marked for identification

6     and is attached.)

7          A.   Okay.  Yes, I have it.

8          Q.   Go to page 2.

9          A.   Okay.

10          Q.   These are slides you prepared;

11     right?

12          A.   Yes.

13          Q.   On the bottom left corner,

14     there's a red logo for Courage

15     International.  You see that?

16          A.   I do.

17          Q.   Why did you include that logo in

18     this presentation?

19               MR. KNEPPER:  Objection, form,

20     scope.

21          A.   This was a presentation for the

22     Archdiocese of Denver, the Catholic

23     Archdiocese of Denver, and it was to an

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 452

1    audience of pastors, teachers, school
2    administrators, and so on.  And I was
3    there representing my position in the
4    Catholic apostolate of courage, and so
5    making a presentation to a church group,
6    I wanted them to understand the resource
7    so that they could investigate it
8    themselves if they wanted to.  So I put
9    that up there for their benefit.
10       Q.   Well, some of the topics you
11   covered also included your views on what
12   the scientific evidence on these issues
13   is; right?
14       A.   Yeah.  The -- the talk is a
15   combination of both the scientific
16   evidence and the historic Catholic
17   teachings on the nature of the human
18   person.
19       Q.   For example, go to page -- go to
20   page 87, for example.
21       A.   Okay.  Let me hustle down there.
22   Boy, no wonder people get bored when I
23   give this talk.  It's so long; right?

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 453

```
 1      Let's see.  87.  Here we are.  Is that --
 2      let's see.  This is -- I want to make
 3      sure I'm on the same page as you are.
 4      It's of the --
 5           Q.   It's titled "The Swedish
 6      Study" --
 7           A.   Yes.
 8           Q.   -- at the top.
 9           A.   Yes, yes.
10           Q.   And go to the next page.
11           A.   Okay.  Yeah.
12           Q.   You cite from the abstract on
13      that study; right?
14           A.   Yes.  Well, I -- I'm not citing
15      it.  I'm showing them what this study
16      looks like if they search for it online.
17           Q.   So part of the talk was your
18      recitation of what you think the
19      scientific evidence on these issues
20      shows; right?
21                MR. KNEPPER:  Objection, form,
22      scope.
23           A.   Yeah, I was asked to talk on
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 454

1    this -- on -- on both subjects, as I said

2    earlier, both the -- the teaching in

3    human anthropology as well as the

4    scientific evidence that's used to

5    support these services of transgender

6    medicine and surgery.  That's right.

7        Q.   Courage International is an

8    organization that offers support for

9    persons who experience same-sex

10   attraction; right?

11       A.   Yes.

12            MR. KNEPPER:  Objection, form,

13   scope.

14       Q.   Courage International says that

15   people should not act on same sex

16   attraction and should strive for chastity

17   instead; right?

18            MR. KNEPPER:  Objection, form,

19   scope.

20       A.   Actually, it's broader than

21   that.  So, Courage addresses chastity as

22   something that's required of everyone.

23   But it -- it particularly addresses the

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 455

```
 1      struggles that persons who experience
 2      same-sex attraction experience in trying
 3      to maintain the same chastity that all of
 4      us are called to.  So it's not an
 5      exceptional case; it's a particular
 6      apostolate to a particular group of
 7      people.
 8          Q.    There's a chapter of Courage
 9      International in Birmingham, Alabama;
10      right?
11          A.    That's correct.
12              MR. KNEPPER:  Objection, form,
13      scope.
14          Q.    And their website lists you as
15      the main contact for that chapter; right?
16          A.    I'm not only the contact, I'm
17      the chaplain for that chapter.
18          Q.    Okay.  Go to page 3 of this
19      presentation.
20          A.    Okay.
21          Q.    Let me know when you get there.
22          A.    Okay.  Two, three.  Yes.  The
23      Challenge?
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 456

```
1        Q.    It's titled "The Challenge"?

2        A.    Yeah.

3        Q.    The first bullet says, "'Male

4   and female He created them.'"  Right?

5        A.    Right.

6        Q.    That's a quote from Genesis;

7   right?

8        A.    Correct.

9        Q.    The capitalized "He" refers to

10  God; right?

11       A.    Yes.

12       Q.    And this bullet reflects the

13  church's position that God has created

14  each individual as either a man or a

15  woman; right?

16       A.    Well, actually, so this -- these

17  slides serve as jumping-off points for a

18  discussion that I have at each slide.  In

19  this case, the point of the discussion

20  was to disabuse the audience of the idea

21  that they can rely on scripture when

22  addressing this problem because the

23  majority of the people that are seeking
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 457

1   to serve do not speak in Biblical

2   language.  So the point of this slide is

3   to -- is to encourage them to understand

4   that they have to learn a new language in

5   order to be able to speak effectively to

6   people suffering from gender discordance

7   and to speak to their families on this

8   same issue.  That's what this slide is

9   about.  It's not a -- it's not a

10  declaration about what God has said.

11  It's a -- it's an explanation of the

12  problem they're going to have if they're

13  going to seek to serve people who

14  experience same-sex -- I'm sorry, who

15  experience cross-sex identification.

16       Q.   All right.  You say, "'Male and

17  female He created them' has been replaced

18  by a confusion of exceptional cases."

19  Right?

20       A.   Yes.

21       Q.   And by the phrase "confusion of

22  exceptional cases," one of the things

23  you're referring to are patients with

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 458

```
1      gender dysphoria; right?
2              MR. KNEPPER:  Objection, form,
3      scope.
4          A.   Right.  I'm referring to the --
5      the recently growing list of exceptional
6      cases that is enumerated in the -- the
7      acronyms of -- of this topic, LGBTQ add a
8      plus and so on, which can be very
9      confusing to people who are trying to
10     help.  And so I'm acknowledging that the
11     -- the likelihood that they may be
12     confused by those terms, and I'm also
13     acknowledging the sources of those
14     confusing terms.  And the point of the
15     slide, again, is to help them understand
16     there's a language they need to learn and
17     to not be daunted by the confusion that
18     they may experience when they first look
19     into this topic.  Yeah.  That's what this
20     is.
21         Q.   Go to slide 11.  It's titled
22     "Human Nature."
23         A.   So slide 11, Human Nature, yes.
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 459

```
 1      Okay.
 2          Q.   So the first two bullets say,
 3      "Why must we consider first the nature of
 4      the human person?"  Then it says,
 5      "Defines the 'end' of medical and
 6      surgical care."
 7          A.   Yes.
 8          Q.   What does it mean that it
 9      "defines the 'end' of medical and
10      surgical care"?
11              MR. KNEPPER:  Objection, form,
12      scope.
13          A.   Okay.  So that's a -- that's a
14      term that dates back to Aristotelian
15      philosophy.  And what it has to do is
16      what is the purpose or what is the
17      ultimate arc of a particular thing.  So
18      the "end" meaning what are you seeking to
19      accomplish, what is the final goal of
20      that -- of that medical or surgical
21      treatment.
22              So -- and the examples I use are
23      you have to have an understanding, for
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 460

1    example, of normal blood pressure in

2    order to know when to treat it and why

3    normalizing blood pressure is important.

4    Or we have to know that, you know, the

5    human person has two legs, and if he has

6    a poverty of legs, he has a poverty of

7    human flourishing.  And so in the one

8    case, I might be treating with blood

9    pressure medicine, and in the other case,

10   I might be fitting him for a prosthesis.

11   But the point is we have an objective

12   understanding of the nature of the human

13   person, which defines the goals of

14   treatment, whether you're talking about

15   orthopedics or transgender medicine.

16       Q.   Yeah.  You think this concept

17   also applies to the concept of treatment

18   for gender dysphoria; right?

19       A.   It does.  Yes, it does.

20            MR. KNEPPER:  Objection, form,

21   scope.

22       Q.   All right.  Go to slide 23.

23       A.   Okay.  Okay.

## DEPOSITION OF PATRICK LAPPERT, M.D.

1     Q.   The top left says, "Shaping the

2    Conversation, & Grooming a Generation."

3     A.   Right.

4     Q.   You see that?

5     A.   Right.

6     Q.   What do you mean by "grooming a

7    generation"?

8     A.   Grooming is a -- is a process by

9    which ideas are introduced that make

10   subsequent actions possible, so that's

11   what -- that's what grooming is, yeah.

12    Q.   Grooming is sometimes used to

13   refer to preparing to -- strike that.

14     Grooming is sometimes used as

15   preparing children for sexual abuse.

16   Isn't that true?

17    A.   That's one of the --

18     MR. KNEPPER:  Objection, form,

19   scope.

20    A.   That's one of the uses of

21   grooming, yeah, but it's not exclusive

22   use of grooming.  Yeah.  And I discuss

23   this in this -- in this slide.  Yes, I

# DEPOSITION OF PATRICK LAPPERT, M.D.

Page 462

```
 1    do.
 2        Q.   And you think that discussing
 3    gender identity issues with children
 4    means sexualizing them; right?
 5        A.   Yes, I do.  Absolutely, I do.
 6            MR. KNEPPER:  Objection, form,
 7    scope.
 8        Q.   And you think that discussing
 9    gender identity issues with children
10    means grooming them for potential later
11    sexual abuse; right?
12            MR. KNEPPER:  Objection, form,
13    scope.
14        A.   No.  No.  What we're talking
15    about here is grooming them for -- for
16    future -- what's the word I would want to
17    choose carefully?  It's preparing them
18    for these interventions is what it does.
19    It lays the groundwork for it by
20    sexualizing their thoughts in a way
21    that's -- is not consonant with their
22    best interest.  That's what this slide is
23    about, so --
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 463

1      Q.   Let me introduce another

2  exhibit.

3      A.   Okay.

4      Q.   This will be Exhibit 34.

5  (Exhibit 34 was marked for identification

6  and is attached.)

7      A.   Could I back up to that last

8  one?  Would that be all right?

9      Q.   Sure.

10      A.   Before we -- before we press on.

11  One of the things I'm just recalling, the

12  -- the -- the urgency of having that

13  particular slide there is that when

14  people take care of transgender persons,

15  children in particular, we always -- but

16  including adults.  But -- but children

17  and adults, one always has to be on the

18  lookout for signs of sexual abuse because

19  it's a very -- it's a very commonly

20  reported comorbidity in persons who

21  experience these self-identifications.

22  It's not uncommon to discover that

23  they've suffered some form of abuse that

## DEPOSITION OF PATRICK LAPPERT, M.D.

1    may be sexual but not necessarily sexual.

2    And so this is -- one of the things I

3    talk about in that slide is -- is for the

4    people who are care providers,

5    counselors, school administrators, to be

6    alert to that possibility.

7              So I'm sorry, we were going to

8    move on to the next one.

9        Q.   Do you have the next exhibit?

10       A.   And that is Exhibit 34?

11       Q.   Yeah.

12       A.   Okay.

13       Q.   All right.  This is a printout

14   from LifeSite, and the title is "Plastic

15   surgeon: Sex-change operation 'utterly

16   unacceptable' and a form of 'child

17   abuse.'"  Right?

18       A.   Yes.

19       Q.   And it says, "Dr. Patrick

20   Lappert, a Catholic deacon in Alabama,

21   says changing a person's sex is a lie and

22   also a moral violation for a physician."

23   Right?

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 465

1       A.   Yes.

2       Q.   And you hold those views --

3       A.   I do.

4       Q.   -- correct?

5       A.   I do.

6            MR. KNEPPER:   Objection, form,

7       scope.

8       Q.   Go to page 2.

9       A.   Okay.

10      Q.   This was published in September

11      2019; right?

12      A.   Yes.

13      Q.   This is reporting on you

14      appearing on a broadcast of something

15      called the "Relevant Radio's Trending

16      With Timmerie."

17      A.   Yes.

18      Q.   Right?

19      A.   Yes.

20      Q.   You made that appearance; right?

21      A.   On the radio, yes.

22      Q.   Okay.   Look -- look to the fifth

23      paragraph on page 2.

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 466

```
 1        A.    Okay.
 2        Q.    It says, "He called it 'utterly
 3   unacceptable' on moral grounds for a
 4   plastic surgeon, because it disregards
 5   the surgeon's call to balance respect for
 6   both form and function of the body in his
 7   or her work."
 8        A.    Right.
 9        Q.    Right?
10        A.    Yes, sir.
11        Q.    You don't deny saying that;
12   right?
13        A.    Right.  You should understand,
14   though, that the use of the term "moral
15   grounds" here is strictly from the
16   standpoint of my training as a plastic
17   surgeon.  I'm not using this as a
18   platform for a religious discussion.
19   Speaking -- I'm speaking about form and
20   function, which are both very crucial to
21   an understanding of what plastic surgery
22   means.
23             And again, that speaks to the
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

1    end of plastic surgery, which is -- when

2    you're speaking about reconstructive

3    surgery, it's the restoration of form and

4    function.  And these operations lack

5    moral basis precisely because they

6    destroy essential human functions for the

7    sake of achieving a cosmetic result,

8    which is morally unacceptable.  And I say

9    that without reference to any religious

10   teaching.  This is strictly my training

11   as a plastic surgeon, morally

12   unacceptable.  And from the first moments

13   of my training as a reconstructive

14   surgeon, that was drilled into me, that

15   if you're planning a reconstructive

16   operation and it involves the movement of

17   tissue on the patient's body, you never

18   do something that's going to compromise

19   or destroy an essential human function.

20         You may challenge that function

21   a little bit, as you do, for example, in

22   a radial forearm flap, the same flap

23   that's used to recon- -- to construct a

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 468

1    phalloplasty.  I've used that flap many
2    times to reconstruct head and neck cancer
3    defects, the same neurotized vascular
4    flap.  And I would never dream of using
5    that flap, for example, if I was going to
6    compromise hand function.  So it obliges
7    me to be careful, to make sure that when
8    I raise the flap, I don't harm the blood
9    supply to the hand.  That's an example of
10   that.
11            In the example of transgender
12   surgery, by definition, you're destroying
13   fertility for life, which is an immoral
14   act in the eyes of plastic surgery as I
15   learned it through 30-plus years of
16   training.
17        Q.   I understand.  Let me just ask
18   you about the next two paragraphs --
19        A.   Okay.
20        Q.   -- of this article.
21        A.   Okay.
22        Q.   Then it says:  "Regarding
23   children, Lappert said, sexualizing them

## DEPOSITION OF PATRICK LAPPERT, M.D.

1    at a young age with these ideas is

2    grooming them for later abuse.  'It's

3    atrocious,' he said.  'And no one even

4    knows how that's going to play out.

5    There's no body of scientific evidence to

6    even support the safety of doing that to

7    children.  But it's being done.'"  Right?

8         MR. KNEPPER:  Objection, form,

9    scope.

10        A.    Okay.  So, let's go through

11   that.  So in this case -- we talked about

12   multiple uses of the word "grooming."  In

13   this case, the abuse that they're -- it's

14   grooming them for is the abuse we just

15   finished discussing, what I consider to

16   be the abuse of transgender medicine and

17   surgery and what it does to the life of

18   that child.  So that's the abuse I'm

19   referring to here.  I'm not speaking

20   about this in terms of sexual abuse, I'm

21   speaking about in terms of

22   medical/surgical abuse of a child.  So if

23   you get a child -- if you sexualize a

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 470

1    child's thinking and encourage them to

2    believe, for example, if -- if -- if I --

3    and I don't want to take up your

4    remaining time, but we can go into it in

5    more detail if you wish.  But the point

6    I'm making here is this is grooming them

7    for medical and surgical abuse.

8        Q.    Okay.

9            MR. TISHYEVICH:  We can go off

10    the record.

11            THE VIDEOGRAPHER:  This is the

12    end of Media Unit 6.  We are off the

13    record at 5:07 p.m.

14                (Break taken.)

15            THE VIDEOGRAPHER:  This is the

16    beginning of Media Unit No. 7.  We are on

17    the record at 5:14 p.m.

18        Q.    (By Mr. Tishyevich) Doctor,

19    that's all the questions I have for you

20    today.  Thanks for your time.

21        A.    Thank you.  This was my first

22    ever deposition, and you were very kind

23    to me.  Thank you for that.

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 471

```
 1        Q.    Okay.
 2              MR. TISHYEVICH:  All right.
 3    Mr. Knepper?
 4              MR. KNEPPER:  Yeah, I'm ready to
 5    go.  I'm sorry.  I actually had you
 6    turned down, because when I put you on
 7    mute, I could still hear Lane and Andrew.
 8    I thought I saw their lips moving.
 9              THE COURT REPORTER:  Yeah, he
10    said he was finished asking questions.
11              MR. KNEPPER:  Oh, I'm sorry.  I
12    didn't hear that.  I'm sorry, Dmitriy.  I
13    apologize.  I had -- you know, Lane
14    and -- and Andrew were talking to one
15    another, and so I was -- I had to turn
16    down my speaker.
17              So I guess why don't we -- why
18    don't we take a -- I've got 4:15.  Why
19    don't we take a 15-minute break, and then
20    I'll see if I have anything on redirect,
21    and we'll come back at I guess it would
22    be 6:30 your time, Dmitriy?
23              MR. TISHYEVICH:  Yeah.
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 472

1          MR. KNEPPER:  Okay.

2          MR. TISHYEVICH:  Sounds good.

3          THE VIDEOGRAPHER:  We are off

4     the record at 5:15.

5               (Break taken.)

6          THE VIDEOGRAPHER:  We are back

7     on the record at 5:29 p.m.

8

9     EXAMINATION BY MR. KNEPPER:

10         Q.   Dr. Lappert, I wanted to ask you

11    a couple of questions about your CV and

12    your biography.

13         A.   Okay.

14         Q.   On your biography, you identify

15    yourself as the Specialty Leader for

16    Plastic and Reconstructive Surgery, the

17    Office of the Surgeon General - United

18    States Navy, from 1997 to 2002.  Could

19    you describe what that position involved?

20         A.   Yeah.  So I advised the Surgeon

21    General, first of all, with regard to the

22    selection of physicians for advanced

23    training in plastic surgery.  I also

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 473

1    advised the Office of the Surgeon General

2    on policy matters pertaining to the

3    movement of patients and the availability

4    of services in the various treatment

5    facilities.  I also advised him on policy

6    relating to coverage of particular

7    medical problems versus sending them out

8    into the community for care or declining

9    care.

10          So part of it was resource

11   management, part of it was personnel

12   management, and part of it was financial

13   management.  And all the time, it

14   required to review the state of the

15   literature regarding reconstructive

16   surgery for combat-injured and as well as

17   medically retired personnel and other

18   retired people.

19        Q.   And I -- I note that also in

20   your resumé is that from 1996 to 2002,

21   you were the Chairman of the Department

22   of Plastic and Reconstructive Surgery at

23   Naval Hospital Portsmouth.  Could you

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 474

```
 1      describe that -- that facility and its

 2      role within the United States military?

 3          A.    Okay.  Well, that -- as

 4      department head, I was -- I had a five --

 5      five staff plastic surgeons working for

 6      me.  I had I think seventeen hospital

 7      corpsmen working for me.  And we provided

 8      services, reconstructive surgical

 9      services on a referral basis from --

10      essentially from the eastern

11      Mediterranean all the way to Appalachia

12      and from North Carolina -- I'm sorry,

13      from -- from Maryland all the way down to

14      Florida.  So all persons requiring

15      reconstructive surgery, including

16      combat-injured or other, would be

17      referred to us, people with congenital

18      deformities, peop- -- you know, pediatric

19      patients and -- and adults.  And this was

20      in a -- in the facility which at the time

21      was the largest medical treatment

22      facility in -- I think in the world,

23      certainly in -- in the American purview.
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 475

```
 1          I also -- I also established and
 2    ran congenital craniofacial deformity
 3    treatment.  We ran a limb salvage
 4    treatment that involved a great deal of
 5    microvascular reconstructive surgery for
 6    wounds, cancer, that sort of thing.  We
 7    also established the -- the wound care
 8    center for that facility, and that --
 9    again, we served that large catchment
10    area with advanced wound care services.
11          Q.    Dr. Lappert, you served as a --
12    as a plastic and reconstructive surgeon
13    for the United States Navy.  Is that
14    correct?
15          A.    Correct.
16          Q.    And you also served as a plastic
17    and reconstructive surgeon in private
18    practice.  Is that correct?
19          A.    Correct.
20          Q.    Could you describe the -- or
21    contrast or describe the similarities and
22    differences in those two practices.
23          A.    Certainly.  Well, so both
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

1   practices involved both reconstructive

2   surgery and aesthetic cosmetic surgery.

3   But the difference is that in the

4   military, because of the nature of the

5   requirements, the experience level grows

6   much more rapidly in the military than it

7   does in the civilian world. So within

8   the first couple of years of my practice

9   as a reconstructive surgeon in the Navy,

10  I was doing the most advanced

11  reconstructive procedures, such as the

12  mi- -- the neurotized microvascular flap

13  operations that are often used, for

14  example, in the phalloplasties of

15  transgender surgery, or the perineal

16  vaginal reconstruction for cancer, same

17  operations that are used in the

18  vaginoplasty for transgender

19  self-identified persons. So a very

20  advanced complexity.

21          In fact, when I sat for my

22  boards, my oral boards, we had to present

23  ten selected cases that the board

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 477

```
 1     selected, and both of my examiners were
 2     startled at the level of complexity for a
 3     second-year person out of training, doing
 4     craniofacial surgery, free flap
 5     operations, massive limb salvage surgery.
 6     So that's the distinct difference, what
 7     you get in civilian versus what you get
 8     in the military.  But both of them
 9     involved reconstructive as well as
10     aesthetic cosmetic surgery.
11          Q.   Sure.  Now earlier, you were
12     asked about whether you had performed
13     certain procedures in the context of
14     transgender surgery.  Is that correct?
15          A.   Yes, sir.
16          Q.   And your answer was that you had
17     not.  Is that correct?
18          A.   That's correct.
19          Q.   Have you done those procedures
20     in the context of your practice of
21     plastic surgery?
22          A.   I have.
23          Q.   Could you describe that --
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 478

1      those -- those circumstances.

2          A.   Well, as an example, a -- a very

3      memorable case, a patient with what's

4      called Fournier's gangrene, where

5      essentially, they had a massive

6      uncontrollable infection of the perineum

7      that destroyed the scrotum, destroyed

8      major portions of the penis, required

9      what amounts to a reconstructive

10     phalloplasty/scrotoplasty to reconstitute

11     them after a long period of wound care.

12     But the -- the operations to reconstruct

13     the urethra is the same operation that's

14     used to construct the urethra in a

15     phalloplasty or construct the urethra in

16     a metoidioplasty, same operations

17     involving local flaps, mucosal grafts,

18     tubularized flap operations.  All of

19     those are the same.  Just the indication

20     for the surgery is reconstructive rather

21     than the surgeries for transgender.

22              Same thing with the

23     vaginoplasty.  Again, often --

## DEPOSITION OF PATRICK LAPPERT, M.D.

1    oftentimes, reconstruction for radiation

2    injuries secondary to management of

3    vagineal -- vaginal perineal malignancies

4    that require removal of large areas of

5    soft tissue, again reconstruction of the

6    -- the perineum, the external genitalia,

7    the vaginal introitus, the vaginal canal,

8    same operations using flaps, grafts to

9    reconstruct as are used in the

10    transgender surgery world.

11        Q.   So, do you feel that your

12    professional experience and

13    qualifications allow you to comment on

14    the -- the medical operations involved in

15    surgery for a transgender individual?

16        A.   Yes.   I'm -- I'm very familiar

17    with all of those operations.

18        Q.   And -- and you've performed

19    those operations?

20        A.   Yes, I have.

21        Q.   Okay.   Just not in the context

22    of gender transition?

23        A.    That's correct.

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 480

1      Q.    Okay.  There was a -- there was
2    a brief question, and -- and we didn't
3    get back to it, about one of the articles
4    on your CV on breast reconstruction.  Is
5    that -- is that correct?
6      A.    Right.  Yeah, that's one of my
7    listed articles.  That's right.
8      Q.    Great.  Did you want to -- did
9    you want to say more about that article?
10     A.    Yeah.  So, that's -- was really
11   my entrance into the breast
12   reconstruction world.  That actually
13   started when I was still a general
14   surgeon and I was collaborating with a
15   plastic surgeon, and we examined the
16   surgical planning for mastectomy in the
17   setting of breast cancer or other causes
18   and -- and the surgeon's role in
19   designing those operations to get the
20   best possible outcome.  And it was
21   actually a seminal article, up until
22   recently was the most quoted article in
23   the literature on breast reconstruction.

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 481

1       And that was actually the first article

2       that spoke about conservation surgery in

3       surgical planning for the treatment of

4       breast malignancies or other breast

5       problems.

6          Q.   Dr. Lappert, you were asked

7       questions about the policy or position

8       statements of several professional

9       organizations.  Do you recall those

10      questions?

11         A.   I do.

12         Q.   Did those exhibits or any of the

13      questions change your opinion that

14      affirmative hormonal treatment and

15      surgery remains unproven and

16      experimental?

17         A.   It has not changed my opinion.

18         Q.   You were asked questions about

19      the evidence supporting the provision of

20      hormonal therapy and surgical

21      interventions for the treatment of gender

22      dysphoria.  Is that correct?

23         A.   Yes.

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 482

1      Q.  Were any of the questions or any

2    of the studies that were presented to

3    you, did they change your opinion that

4    the existing medical evidence supporting

5    those interventions is of very low

6    quality and has methodological defects?

7      A.  That did not change my opinion

8    about those, no.

9      Q.  And just to clarify, what is

10   your opinion about the -- about the

11   current state of the evidence supporting

12   hormonal therapy for treatment of gender

13   dysphoria?

14     A.  My opinion is that all of these

15   published studies that are used to

16   support or to justify the use of puberty

17   blockade, cross-sex hormones, or

18   transgender -- gender-affirming surgery

19   are of the lowest quality scientific

20   evidence and are not sufficient to

21   support care and interventions that have

22   such far-reaching and lifelong effects on

23   the patient.

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 483

```
1         Q.    Are your opinions on that -- on
2    that issue in this case based on anything
3    other than your review of the scientific
4    and medical literature and your training
5    as a -- as a physician?
6         A.    No, they're not.
7         Q.    Dr. Lappert, you were asked
8    about off-label use of Botox for certain
9    muscle -- muscle groups.  Is that
10   correct?
11        A.    Yes, I was.
12        Q.    And you -- and you described --
13   and you stated that you've actually used
14   Botox off label for treatment of those
15   muscle groups before that was approved by
16   the FDA.  Is that correct?
17        A.    That's correct.
18        Q.    But you have also said that you
19   believe that it is significant and -- and
20   relevant to this case that the use of
21   hormone and puberty blockers for
22   treatment of gender dysphoria is
23   off-label.  Is that correct?
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

1      A.   Yes.

2      Q.   Could you disting- --

3    distinguish between why you hold the view

4    that off-label uses of some

5    pharmaceuticals is acceptable by a -- by

6    a physician and when you consider that to

7    be unacceptable by a physician?

8      A.   Right.  So, the off-label use of

9    medications when there's a low risk to

10   the patient or that the -- the possible

11   adverse effect may be brief and that a

12   favorable result is likely where risk is

13   low, then that's justifiable to go off

14   label with medications.  But when you're

15   -- when you're talking about significant

16   risk to the patient and irreversible

17   changes, that the off-label use places a

18   tremendous burden on the practitioner to

19   -- to have scientific evidence to support

20   his decision to do that.  And to not have

21   sufficient evidence when doing that is a

22   -- is a -- is a great difficulty in terms

23   of consent and in terms of just general

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 485

1    medical/surgical decision-making.

2        So the distinction is the

3    risk/benefit equation.  How much risk are

4    you placing the patient under, is it

5    irreversible, and is the benefit so great

6    that it's worth taking the risk.

7    Q.   Sure.  Just to follow up, and

8    these are going to be my final questions,

9    is it your view that there are no -- and

10   does it continue to be your view that

11   there are no -- currently no competent --

12   competently conducted long-term,

13   peer-reviewed, reliable, and valid

14   research studies documenting the number

15   or percentage of patients who receive

16   gender-affirming medical interventions

17   who are helped by such procedures?

18   A.   It's still my position that --

19   that the medical literature does not

20   support those interventions of medical

21   and surgical treatment for

22   self-identified transgender persons.

23   Q.   Is it still your view that there

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 486

1    are no published, reliable, and valid
2    research studies that document a valid or
3    reliable biological, medical, surgical,
4    radiological, psychological, or other
5    objective assessment of a -- of a
6    patient's gender identity or gender
7    dysphoria?
8        A.   Yes.  It's still my position
9    that there are no tests that will confirm
10   or refute the diagnosis of transgender, a
11   diagnosis made by the patient.  There's
12   no way to test for that.
13       Q.   All right.  Is it still your
14   view, after the evidence and the
15   questions that you've been presented,
16   that an unknown percentage of patients
17   who present with gender dysphoria also
18   suffer from mental illnesses that
19   complicate and may distort their
20   judgments and perceptions of gender
21   identity?
22       A.   Yes.  The -- the world
23   literature demonstrates a consistent and

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 487

1     significant level of comorbidities,

2     including severe anxiety, major

3     depression, self-harm.  The patient is

4     very likely to be on the autism spectrum.

5     Suicidal ideation.  And -- and the world

6     literature supports that.  So -- and

7     those are -- those are serious issues,

8     not only in terms of decision-making, but

9     even on the question of consent and

10     competence for consent.

11       Q.   Just one -- one more thing I

12     wanted to follow up with.  Your testimony

13     -- we didn't cover this, but I want to

14     make sure that it's still your view that

15     medical treatments may differ

16     significantly by sex according to your

17     chromosomal assessment but not based on

18     your gender identity and that

19     misinforming physicians of a patient's

20     biological sex could have deleterious

21     effects on treatment for medical

22     conditions?

23       A.   Yes, that's correct.  And when

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 488

1    we discuss the issue of misgendering,

2    that's what we were talking about.  We

3    were talking about placing the patient at

4    risk.  If you're having a -- a discussion

5    or conversation about medical

6    decision-making, you have to distinguish

7    between biological male and female

8    because you run -- there -- there are

9    illnesses that predominate in females

10   that don't exist in males; there are

11   conditions that affect males that do not

12   affect females, and you have to know that

13   if you're going to offer care.  But

14   again, that hasn't been changed by -- by

15   what I've seen or heard here today.

16   That's still -- is still the case.

17       Q.   Okay.  And it's still your view

18   that the use of hormones and surgery to

19   treat gender dysphoria is not supported

20   by the relevant scientific communities as

21   discerned by your literature review and

22   your training as a physician in

23   reconstructive and plastic surgery?

# DEPOSITION OF PATRICK LAPPERT, M.D.

Page 489

```
1        A.   Yes.
2             MR. KNEPPER:  Those are my
3    questions.  I don't think I have anything
4    else.  Did you have follow-ups you
5    wanted, Dmitriy?
6             MR. TISHYEVICH:  Very, very
7    briefly.
8             MR. KNEPPER:  Okay.
9
10   EXAMINATION BY MR. TISHYEVICH:
11       Q.   Doctor, you were just asked
12   about your views on why it's okay to use
13   Botox off-label but you have a different
14   view of puberty blockers.  Do you recall
15   that?
16       A.   I do.
17       Q.   And one of your considerations
18   is the risk/benefit profile of Botox;
19   right?
20       A.   Right.
21       Q.   Do you know what a black box
22   warning is, Doctor?
23       A.   Yes.
```

## DEPOSITION OF PATRICK LAPPERT, M.D.

Page 490

1      Q.   It's the strongest warning that
2   the FDA can require; right?
3      A.   That's -- that's right.
4      Q.   And that warning is typically
5   only used if studies indicate that the
6   drug carries a significant risk of
7   serious or even life-threatening adverse
8   effects; right?
9      A.   Yes.
10      Q.   Do you know that Botox has a
11   black box warning?
12      A.   Yes, I do.
13      Q.   It's for distant spread of toxin
14   effect; right?
15      A.   Yes.
16      Q.   And the use of Botox has -- has
17   resulted in reports of life-threatening
18   injuries and death; right?
19      A.   I'm even familiar with the case
20   reports that reported that.  Yes, sir.
21      Q.   Okay.  That's all I've got for
22   you.
23           MR. KNEPPER:  Okay.  Thank you,

Page 491

1    Dr. Lappert.

2              THE WITNESS:  Thank you.

3              MR. KNEPPER:  We're finished

4    with your testimony.

5              Thank you, Dimitry.  Thank you,

6    Lane.  Thank you, Andrew.

7              We can go off the record.

8              THE VIDEOGRAPHER:  This is the

9    end of Media Unit No. 7.  We are off the

10   record at 5:47 p.m. Thursday, September

11   30th, 2021, and this concludes today's

12   testimony given by Dr. Patrick Lappert.

13

14              END OF DEPOSITION

15                 (5:47 p.m.)

16

17

18

19

20

21

22

23

Page 492

```
 1              C E R T I F I C A T E
 2       STATE OF ALABAMA      )
 3       COUNTY OF JEFFERSON )
 4              I hereby certify that the above
 5       and foregoing proceeding was taken down
 6       by me by stenographic means, and that the
 7       content herein was produced in transcript
 8       form by computer aid under my
 9       supervision, and that the foregoing
10       represents, to the best of my ability, a
11       true and correct transcript of the
12       proceedings occurring on said date at
13       said time.
14              I further certify that I am
15       neither of counsel nor of kin to the
16       parties to the action; nor am I in
17       anywise interested in the result of said
18       case.
19              /s/ Lane C. Butler
20              LANE C. BUTLER, RPR, CRR, CCR
21              CCR# 418 -- Expires 9/30/22
22              Commissioner, State of Alabama
23              My Commission Expires:  2/11/25
```

Page 493

1    John G. Knepper, Esquire

2    john@knepperllc.com

3                      October 13, 2021

4    RE:    Kadel, Et Al v. Folwell

5        9/30/2021, Patrick Lappert, M.D. (#4814384)

6        The above-referenced transcript is available for

7    review.

8        Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12       The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   erratas-cs@veritext.com

16

17    Return completed errata within 30 days from

18   receipt of transcript.

19     If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22                    Yours,

23                    Veritext Legal Solutions

24

25

```
                                              Page 494
  1    Kadel, Et Al v. Folwell

  2    Patrick Lappert, M.D. (#4814384)

  3                E R R A T A   S H E E T

  4    PAGE_____ LINE_____ CHANGE_____

  5    _____

  6    REASON_____

  7    PAGE_____ LINE_____ CHANGE_____

  8    _____

  9    REASON_____

 10    PAGE_____ LINE_____ CHANGE_____

 11    _____

 12    REASON_____

 13    PAGE_____ LINE_____ CHANGE_____

 14    _____

 15    REASON_____

 16    PAGE_____ LINE_____ CHANGE_____

 17    _____

 18    REASON_____

 19    PAGE_____ LINE_____ CHANGE_____

 20    _____

 21    REASON_____

 22

 23    _____    _____

 24    Patrick Lappert, M.D.                        Date

 25
```

Page 495

1    Kadel, Et Al v. Folwell

2    Patrick Lappert, M.D. (#4814384)

3                    ACKNOWLEDGEMENT OF DEPONENT

4        I, Patrick Lappert, M.D., do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____    _____

12   Patrick Lappert, M.D.                    Date

13   *If notary is required

14                        SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                        _____ DAY OF _____, 20____.

16

17

18                        _____

19                        NOTARY PUBLIC

20

21

22

23

24

25

## &

**&** 2:7 3:11 10:15 265:16 450:22 461:2

## 0

**0.3** 303:3 344:18 354:15
**0.6** 344:17 354:16
**08/02/2021** 4:17

## 1

**1** 4:13 9:18 12:3,6 22:14,15 25:23 31:9 34:11 43:8 79:3 173:9 224:16 257:14,20 279:20 288:14 294:4 301:11,13,21 302:7,9,17,22 303:13 320:9 338:8 352:6 357:16 383:14 411:16 435:2,9
**1.7** 303:3
**10** 5:8 6:10 110:9 171:7,11 255:10 297:23 298:9 300:7,10 303:12 440:1
**10/02/2017** 264:14
**100** 3:12 142:1
**10017** 2:9
**1005** 2:21
**105** 2:14
**108** 5:2
**10:19** 115:11
**10:21** 115:14
**10th** 55:16
**11** 4:4 5:11 43:12 110:6 223:16,18 458:21,23

**11-2** 63:16
**116** 5:5
**11:06** 166:17
**11:16** 166:21
**12** 4:13 5:13 7:20 230:12,14 411:9
**120** 2:20
**127** 5:7
**12:30** 254:16
**12th** 427:12
**13** 5:16 232:22,23 279:20 493:3
**13.6** 304:12
**14** 5:20 239:14,16 350:17 351:3 352:12,14 355:1,1 355:2
**14.4** 357:11
**15** 6:1 7:20 119:18 138:18 256:13,15 298:19 299:9 411:10 471:19
**158** 2:14
**16** 6:4 56:15 263:8 263:10 359:22 366:6
**16,000** 360:19 364:23 365:11,15 366:2
**17** 6:6 57:1,17 299:13,15 397:14 397:16
**171** 5:8
**1720** 3:6
**18** 5:12 6:11 42:6 58:1 224:14 257:4 257:5 325:23 326:2 399:13
**18th** 430:17
**19** 6:16 339:20 340:2 401:6

**19.1** 390:1,5
**1920s** 72:17
**1972** 342:1,8
**1972-2015** 6:19 340:10
**1979** 182:22
**1982** 227:12,17 228:19
**1987** 134:12
**1990** 106:19
**1991** 106:18,19
**1992** 31:12
**1993** 136:11
**1994** 5:12 224:14 226:20,22
**1995** 132:22
**1996** 131:11 473:20
**1997** 23:5 30:10 129:6 472:18
**1998** 129:8 233:4
**19th** 2:20
**1:19** 1:7 10:2
**1:21** 254:20

## 2

**2** 4:14 27:9,14 28:16 64:4 110:4 166:16 225:2 231:2 242:13 264:17 265:3 286:4 288:14,22 294:4 295:11 302:5 303:22,23 304:11 306:13 307:13 384:9,16 405:11 415:6 430:21 435:12 451:8 465:8,23
**2,361** 341:22
**2,773,770** 257:21

**2.1** 302:21
**2.7** 258:11
**2/11/25** 492:23
**20** 6:17 339:16,18 339:21 340:2,7 372:14 495:15
**2000** 380:10
**2001** 380:12
**2002** 31:17,20 32:3 32:5 136:22 137:2 137:23 139:16 240:13,17 472:18 473:20
**2005** 139:11,17
**2006** 140:18
**2007** 184:11,12
**2008** 23:8 30:11 300:11 302:13 303:2
**2009** 200:14
**2010** 139:8,13
**2011** 185:17 186:4 383:1,5 389:15
**2012** 183:4 185:16
**2013** 189:23 300:11 302:14 303:2
**2014** 85:8 202:14 257:3,14,14 380:9
**2015** 342:1,8,21 343:4
**2016** 265:3 378:22 380:17 439:14
**2017** 6:20 8:3 84:8 84:11 89:18 93:6 98:6 101:18 171:16 196:8,18 197:18,22 198:2 198:21 199:13,17 200:2,4,21 264:17 266:6 267:19

356:1 368:8
**2017-10-02**  6:5
**2018**  6:17 23:16,20
25:18 297:7
300:11 302:14,21
304:13,21 307:16
307:22 450:19
**2019**  6:6 25:2
100:13 148:22
149:1 256:19
299:19 440:9,11
440:12 441:15
465:11
**2020**  7:12,23 25:11
139:4,8 141:13,17
142:5 148:20
149:1 377:21
379:1,4 393:23
394:16 410:11
414:10
**2021**  1:21 5:5 7:6
9:10,17 25:10
38:5,11,16 55:17
108:15 109:3
110:6 115:23
359:18 377:13
379:6 380:18
381:10 382:4
410:22 424:8
427:12 430:17
435:2 491:11
493:3
**21**  6:20 38:11
320:11 322:16
355:17,18 380:11
413:6
**22**  5:12 7:1 359:14
361:4,11
**223**  5:11
**23**  7:5 129:11,15
130:18 375:14,16

397:6,12,13
460:22
**230**  5:13
**232**  5:16
**239**  5:20
**24**  7:7 388:18,20
399:13
**25**  7:12 108:15
171:16 347:10
394:7,9 401:6
404:23
**256**  6:1
**25th**  109:2 115:2
**26**  7:15 396:19,20
**26.3**  308:2
**263**  6:4
**27**  4:14 7:17 411:2
411:4
**27101**  3:13
**272**  1:7 10:2
**28**  7:23 414:20,22
**28.1**  257:21 258:12
**29**  8:2 35:11
419:15,17
**299**  6:6
**2:16**  320:3
**2:24**  320:7
**2nd**  38:5

| 3 |
| --- |

**3**  4:15 29:8 30:12
34:7 41:10,12,12
41:16 42:5 64:14
111:7 128:17
166:20 219:12
248:13 254:15
264:10 266:6
267:19 289:2,7,9
289:17,22 290:15
290:17 293:22,23
294:11 295:16
305:2 308:5 312:6

363:14 428:8
455:18
**3.2**  307:20
**3.8**  307:20
**3/2021**  377:13
**30**  1:21 8:4 344:8
426:22 427:1
443:7 468:15
493:17
**30030**  2:15
**30th**  9:9,17 491:11
**31**  8:6 257:14
430:7,9
**32**  8:9 434:7,10
**326**  6:11
**33**  8:12 451:3,5
**339**  6:17
**34**  4:15 8:14 463:4
463:5 464:10
**35**  298:16,17
402:16
**355**  6:20
**361**  7:1
**37**  4:16
**375**  7:5
**38**  36:1
**388**  7:7
**394**  7:12
**396**  7:15
**3:25**  388:8
**3:36**  388:12

| 4 |
| --- |

**4**  4:16 37:23 73:19
73:19 79:7 124:7
128:22 143:17
158:15 171:21,22
193:19 194:2
219:9 227:9
254:19 304:17
305:1,4 320:2
323:18 347:19

350:13 364:13
370:15 380:11
401:21
**4,432**  341:21
**4/5**  370:13
**40**  367:8 373:13
**41.7**  304:22
**411**  7:17
**414**  7:23
**418**  492:21
**419**  8:2
**427**  8:4
**430**  8:6
**434**  8:9
**45**  258:18
**45.5**  258:6
**451**  8:12
**46**  394:13 407:8
410:10 421:17,18
**463**  8:14
**472**  4:5
**48**  445:19
**4814384**  493:5
494:2 495:2
**489**  4:7
**4:07**  417:12
**4:15**  471:18
**4:20**  417:15

| 5 |
| --- |

**5**  4:18 35:1 43:10
55:9,12 59:14
73:7,13,16,17,20
124:1 189:18,20
189:23 190:12,17
191:8,14,19 192:1
192:9,22 193:15
194:2 219:2,18
255:10 283:20
284:8,12,21
285:13,22 301:12
301:14,21 305:2,5

320:6 323:18 327:6 332:17 344:13 363:15 364:1 370:14,15 383:10,12 388:7
**50** 255:10 298:1 351:21 369:8
**51** 446:2
**53** 445:11
**53.9** 258:7
**54** 258:18 419:20 419:21 421:7,13 445:2,11,13
**54.2** 258:7
**55** 4:18
**59** 5:11
**590** 3:6
**5:07** 470:13
**5:14** 470:17
**5:15** 472:4
**5:29** 472:7
**5:47** 491:10,15

### 6

**6** 4:20 40:23 41:14 62:19 172:2,3 349:16,19,23 356:21 357:4 388:11 470:12
**6,000** 345:2
**6,793** 341:21 342:6 343:11 350:17
**6,800** 345:1
**60** 17:10,12 359:22 369:8 372:11
**60,000** 359:18 360:18
**600** 3:12
**62** 4:20
**63** 35:12
**6:30** 471:22

### 7

**7** 5:2 7:16 38:21 108:7 115:6 183:2 183:9 184:5,8,18 185:4 187:3,9,13 187:19 188:1,7,16 327:7 330:10 342:22 351:3 357:16 378:5 391:13 396:15 397:4 398:15 399:3 401:1 470:16 491:9
**7,000** 345:2
**7/19/11** 382:16
**70/30** 8:2
**73** 356:21 357:3 358:8
**74.7** 344:16
**779,270** 257:21

### 8

**8** 5:5 116:2 174:3 185:22 188:21,23 189:10 378:15 383:11 405:3
**80** 142:1 161:8
**80s** 230:8 292:15
**81** 422:12
**82001** 3:7
**83.8** 344:17
**87** 129:7 273:20 452:20 453:1
**884** 302:1
**889** 356:20
**89** 422:11
**8:30** 9:8
**8:31** 9:16

### 9

**9** 5:7 127:16,17 158:16 405:2 437:5
**9/30/2021** 493:5
**9/30/22** 492:21
**90** 161:19 351:21
**900** 358:7
**90s** 100:21 161:12
**91** 31:14 273:21
**92** 31:14,14 69:17 101:13,16
**93** 101:14 102:22
**94** 69:17,18
**95** 101:7 342:15
**97** 102:6 262:19
**98** 129:20
**9:33** 79:4
**9:44** 79:8

### a

**a.m.** 9:8,16 79:4,8 115:11,14 166:17 166:21
**abandon** 122:18
**abdominal** 121:23
**abdominoplasties** 142:20
**ability** 413:12 492:10
**able** 11:15 66:18 174:13,17 274:12 277:9 310:20 457:5
**abplasticsurgery...** 4:14
**abps** 27:22 28:8,19 28:23 29:12,23 30:10,13,15 31:3
**abreast** 69:12

**absence** 242:18 243:9 247:20 309:6
**absolute** 245:15
**absolutely** 43:19 60:19 61:12 114:12 267:22 315:6 353:11 462:5
**abstract** 240:22 328:18 341:17 356:8 411:16 453:12
**abundance** 293:21
**abuse** 8:17 70:17 120:13 314:19 449:1 450:2 461:15 462:11 463:18,23 464:17 469:2,13,14,16,18 469:20,22 470:7
**academy** 5:20 239:23
**acceptable** 313:18 484:5
**acceptance** 351:15
**accepted** 43:17 60:23 117:14 373:17,22 374:4 374:16 375:1,6 391:11 402:18
**access** 102:2 113:9 297:7,9 362:8
**accessible** 74:8,9
**accidentally** 256:1
**accomplish** 300:15 459:19
**account** 51:13 307:20 308:2 362:11

accuracy 493:9
accurately 28:18
28:23
accuse 127:13
achieve 66:15
287:7 334:8
achieving 467:7
acknowledge
230:1 327:9
413:17
acknowledgement
495:3
acknowledges
253:23
acknowledging
458:10,13
acknowledgment
493:12
acne 140:2 145:14
145:22 146:14
152:21 153:1
acneiform 145:13
acronyms 458:7
act 285:22 454:15
468:14
acted 329:4
acting 9:3
action 1:7 10:1
172:15 207:6
224:21 372:22
492:16
actions 461:10
active 24:23 26:5
26:20 100:16
137:11 140:8
171:19 322:21
actively 54:22
activity 265:11
267:19
actual 50:20
168:22 276:7

372:8 373:7
432:16
acute 134:13
135:10
adamant 71:12
add 62:11 398:20
458:7
added 283:21
addition 78:5
additional 13:14
215:22 265:7
additionally 243:2
additions 495:6
address 352:12
366:19 400:19
addressed 363:5
addresses 400:10
400:20 454:21,23
addressing 244:22
384:4,5 456:22
adequately 368:5
adf 79:11,15 80:21
80:22,23 81:5
82:17 83:3,11
84:4 98:7
adf's 81:11
adjusting 392:4
adjustments
212:20
administration
95:18,19 224:18
224:20 253:4
263:14
administrative
257:12
administrator
11:1
administrators
452:2 464:5
admissions 313:15

admit 112:9
admits 373:4,5
admitting 24:10
24:14
adolescence 161:8
205:3 319:11
adolescent 368:12
369:9,22 401:21
401:23 402:12,17
403:8,17,20 404:6
404:16
adolescent's 403:2
adolescents 36:19
51:5 157:19 158:9
161:1 162:14
238:15 239:6
241:6 258:23
399:16,20,23
400:12,21 401:13
402:4 428:16
429:1
adopt 49:3
adopted 114:9
310:22
adopting 51:13
adrenal 436:22
adult 368:12 369:9
369:22
adulthood 161:11
adults 157:23
158:5 259:7
463:16,17 474:19
advanced 472:22
475:10 476:10,20
advancement
310:13
adverse 202:19
334:21 484:11
490:7
advice 77:6 160:22
161:3

advise 210:3
advised 183:19,23
197:8 472:20
473:1,5
advising 204:19
214:15
advisory 378:17
380:15
advocacy 113:17
116:9 117:22
advocate 113:8
advocates 105:12
aesthetic 66:11
67:14 68:4,6,7
335:4,4 476:2
477:10
aesthetically
144:11,12
aetna 8:4 425:7,8
425:10,17,22
426:8,14 427:5,18
428:13,21 429:7
429:15
aetna's 428:1,5
affairs 263:23
affect 121:10
488:11,12
affiliated 59:8
96:6
affiliations 10:11
affirmation 5:3
43:14 51:4 109:18
110:8 149:10
151:15 373:19
376:13 379:20
382:23 384:22
387:2 395:16
affirmative 481:14
affirming 8:4 35:5
36:18,22 39:4
40:4 41:7,18 44:1

51:23 54:10 57:12
63:14 77:18 78:19
107:12,20 111:6
111:18 112:21
114:9 115:19
117:15 126:10
127:4 130:3
131:16 132:18
133:16 134:3,17
137:4,10,18
151:13 164:15
168:12,17,17
175:20 177:22
375:7 390:1,15
391:2 424:9
425:17 426:14
427:5,18 428:1,7
429:8 433:19
482:18 485:16
**afternoon** 97:17
**age** 242:19,22
249:6 257:4,5
319:10 346:4,5,8
347:9,11 402:1
469:1
**agencies** 30:17
224:10
**agency** 221:3
224:17,19 229:12
**agents** 201:2
203:16 204:17
211:10 212:14
213:18 406:13
**ago** 15:2,16,20
24:3,15,23 44:14
99:21,23 100:1
103:18 123:1
129:11 130:18
170:9,10 196:6
202:7,11,14
206:16 225:10

247:21 290:19
301:19 325:10
**agonist** 317:22
**agonists** 201:8
**agree** 22:6 36:8
42:18 111:17
112:20 113:3,4,5
128:11 135:13
179:2,6 221:1
229:11 249:11
250:11 252:12
296:17 314:23
315:1,6 316:7
317:16,23,23
318:5 321:2,22,23
340:18 371:5,9
393:2 407:5 408:6
**agreed** 265:23
**agreement** 248:23
**ahead** 126:6 227:5
281:2,14 327:20
327:21
**aid** 492:8
**aim** 300:5
**aimed** 68:6
**al** 1:9,14 9:21,22
493:4 494:1 495:1
**alabama** 4:20,23
9:3,7 10:5 24:18
62:5,10,23 63:2,5
63:11,18 76:4,6
109:23 110:15,22
117:7 138:12,14
455:9 464:20
492:2,22
**alarm** 71:15
**alcohol** 333:21
**alert** 464:6
**align** 111:10
447:10 449:7

**allergan** 263:21
264:7,9 270:19
**alliance** 79:11
**allotted** 493:20
**allow** 32:18 243:1
428:6 479:13
**allowed** 179:16
180:7 229:20
**allows** 222:15
256:2
**alphabetically**
422:3
**altering** 244:19
290:2,17 311:5
**alternative** 250:2
250:14 252:11
**altogether** 251:3,5
**ama** 47:5,7,14
48:5
**ambiguous** 436:7
436:15
**ambulatory** 258:7
**amend** 18:19 19:3
**amended** 265:21
**amendment** 264:2
**amer** 26:11
**america** 123:21
**american** 5:9,20
26:13,16 27:13
30:8 32:9,10,17
43:1,2 44:18 45:2
45:14,15 46:1,7,23
47:8 48:10,15,18
49:6 72:3 89:14
89:19 99:16 100:5
100:18 102:20
108:11 123:23
124:12 128:12,13
169:7 171:12
185:14 190:5
239:1,23 248:5

282:4 283:8
300:17 313:2
474:23
**amid** 109:14
**amount** 169:19
**amounted** 304:21
**amounts** 402:16
478:9
**amputating**
289:21
**amsterdam** 6:17
326:7 340:9
**analogues** 431:14
**analysis** 86:13,14
276:3 302:2
307:19 410:11
**andre** 86:6
**andrew** 3:20 10:5
471:7,14 491:6
**androgen** 146:18
**androgens** 431:13
431:14
**anecdotal** 218:23
219:1 244:14
245:20 246:7
270:16,16 279:23
280:6,15,20 281:4
281:8,10,21,23
282:17 323:22
362:21 363:16
**anecdotes** 343:13
**anesthesia** 142:22
**angle** 132:17
**animal** 135:11
**animate** 266:16
**anorexic** 74:23
**answer** 18:19 19:4
83:1 110:21
124:17 125:23
126:5,8,19,21
127:1 150:20

164:7,11 181:4
186:16 215:4
251:1 269:12
274:11 286:16
294:1,8 324:8
374:22 409:18
426:2 477:16
**answered** 126:14
426:4
**answering** 261:17
**answers** 4:18
55:14 104:19
**antacids** 122:6
**anthropology**
442:6,12,23 443:4
443:11 450:23
454:3
**anti** 431:14
**antibiotics** 122:6
**anticipated** 80:13
186:18
**anxiety** 154:10
155:6 165:16
405:19 487:2
**anxious** 160:19
**anybody** 205:9
**anywise** 492:17
**apa** 49:2 190:8
191:18 192:19
194:11 239:4,20
240:15 242:1
243:8,15 248:2
250:12,19 251:12
251:19 253:15,20
**apa's** 239:9
**apart** 189:3 260:8
276:14 331:4
**apologies** 18:23
**apologize** 434:13
471:13

**apostolate** 452:4
455:6
**appalachia** 474:11
**apparent** 317:4
318:3
**apparently** 39:13
40:22 43:20 56:1
117:9 306:8
439:22
**appear** 201:11
303:17 395:5
423:21
**appearance** 10:11
60:6 61:6,10
71:13 144:13
154:18 238:21
265:9 465:20
**appearing** 465:14
**appears** 39:19
240:20 259:3
264:19 376:20
378:4 428:6
**appended** 495:7
**applicable** 493:8
**application** 205:13
205:16 218:15
219:10,11,15
234:11 235:7,12
237:10 244:11,13
247:9,23 252:19
265:2,7,20 266:21
267:6 270:15
310:9
**applied** 148:13
206:10 291:21
300:19 311:4,22
333:9
**applies** 460:17
**apply** 225:23
236:3 276:12
316:8 436:6

**applying** 245:4
247:15 318:15
**appointment**
207:12
**appreciation**
56:20
**approach** 249:13
**approaches**
105:23 228:9
**approaching**
83:21 219:21
307:12
**appropriate** 26:3
26:7 40:5 41:19
44:3 61:11 216:21
228:7 231:13
232:1 246:14
251:20 335:23
406:4
**approval** 6:5
236:3 243:9
263:17 265:6,16
266:17 267:8
269:10 334:7
**approved** 5:14
63:12 216:9,15
225:13,16 226:16
230:22 231:5,18
233:21 243:2
248:1 253:4,5
257:4 262:9,15,23
265:21 266:4
270:21 332:1
333:12 334:9
483:15
**approves** 231:9
261:2
**approving** 261:3
**approximately** 9:8
**april** 109:10 435:2

**apt** 20:3
**arc** 459:17
**archdiocese**
451:22,23
**area** 173:13 178:5
178:20 200:17
201:21 203:18
205:5 287:4 307:8
319:20 363:1,19
475:10
**areas** 104:1
210:11 221:11
311:13 479:4
**aristotelian**
459:14
**arizona** 62:14,14
80:1 93:3
**arkansas** 33:6,10
36:16 37:4 38:5
39:11 51:23 52:11
52:22 54:9 61:17
63:7 72:19 99:7
109:22 117:6
**arrived** 44:9,9
**article** 20:18 62:22
67:5 134:20
135:14 186:4
222:12 283:16
298:17 301:1
307:4 323:6,19
324:20 325:7
327:10 328:22
331:12 332:9
345:15 360:6,23
361:14 364:13
368:7 369:16
370:14 371:13,16
372:20 380:16,17
396:11 410:21
468:20 480:9,21
480:22 481:1

**articles** 12:21 21:7
74:12 129:3
222:10 274:1
297:10 298:2
306:21 336:8
377:19,21 382:2
412:23 440:20
480:3,7
**aside** 92:13 132:16
181:22
**asked** 73:18,21
79:19 91:7 99:2
122:23 126:14,15
152:1 155:5 180:2
183:21 292:18
318:9 336:9
453:23 477:12
481:6,18 483:7
489:11
**asking** 97:4 104:8
134:22 144:20
155:1 180:1
198:16 205:8
266:20 269:15
278:8,11 286:17
288:9,16 321:8
346:21 471:10
**aspect** 275:12
**aspects** 92:10
**asps** 5:2,5 101:10
101:15 102:8,10
102:17,23 103:6
103:21 105:10,11
106:1,20 107:12
111:5,8,16 112:7
112:13,20 113:7
113:16,18,19
114:8,14 115:1,5
115:17,23 116:8
169:10,18,22
170:8,13,23

171:19 174:18
176:9,14 177:9
179:4 180:8,15,18
180:21 181:9
222:9 284:5 296:5
297:12 301:19
306:5
**asps's** 117:4
**assert** 28:1
**assessment** 486:5
487:17
**assessments** 406:1
**assigned** 341:22
341:22 442:13,22
446:17
**assistance** 59:3
**assisted** 279:9
**associated** 265:10
267:18 438:11
**association** 40:3
40:17 43:2 45:14
46:23 49:7 182:9
190:6 239:1
380:13 428:17
**associations** 51:10
**assume** 155:7
169:21 208:19
362:16 381:16
382:8 433:16
448:9,9
**assuming** 409:13
**asthma** 220:15
**atrocious** 469:3
**attached** 8:20 12:7
27:10 34:8 38:1
55:10 62:20 108:8
116:3 127:18
171:8 223:19
230:15 233:1
239:17 256:16
263:11 299:16

326:3 339:19
355:19 361:12
375:17 388:21
394:10 396:21
411:5 414:23
419:18 427:2
430:10 434:11
451:6 463:6
493:11
**attaches** 70:23
**attempting** 110:7
386:18
**attempts** 116:20
**attended** 94:15,15
**attending** 133:6
**attends** 218:1
**attention** 89:11
109:14
**attitude** 222:13
**attorney** 91:19
92:6 493:13
**attraction** 454:10
454:16 455:2
**audience** 90:5
452:1 456:20
**augmentation**
142:10
**august** 25:10 38:5
141:13
**author** 133:2,5,7
340:14 359:18
361:18 365:10,14
366:3
**author's** 365:18
389:4
**authority** 261:3
**authors** 191:7
328:16 342:5
415:9
**autism** 487:4

**autologous** 142:8
142:9 299:7
**automatically**
395:23
**availability** 473:3
**available** 99:4
160:18 177:1
183:1 185:18
196:21 248:20
249:4,14 250:3,14
250:22 251:14
252:6,14 329:9
381:21 415:17
416:4,8 431:4
441:12 493:6
**avenue** 2:8,14 3:6
**average** 345:5,18
346:2 353:19
357:10,21
**avoid** 338:3,4
**avoided** 165:19
**aware** 17:14,23
19:12,13,14 20:17
37:8,16 42:1,15,21
43:6 54:7 78:11
127:12 149:9
170:13 171:3
181:9 182:20
193:19 201:3
211:8 233:5,7
267:5,6 352:23
353:3,8 367:20
370:7,17 376:6
425:10
**awkward** 325:21

| b |
|---|

**b** 4:10 20:23 33:2
58:2
**back** 14:14 18:23
19:3 21:12 26:12
30:12 31:9 43:7

53:20 72:16 73:1
100:21 101:7
106:18 115:13
119:16 143:10,16
148:15 157:4
158:13,15 166:1
200:21 202:13
207:8 216:5 248:8
252:16,17 264:20
266:19 279:19
292:5,11,15
293:14 319:18
320:9 323:3 326:6
344:23 346:1
359:8 367:6
373:11 380:10
396:12 397:16
404:22 407:7
417:14 420:5
421:6,18 459:14
463:7 471:21
472:6 480:3
**backbone** 308:10
**background** 378:6
378:11 380:3
**backpedal** 417:2
**backwards** 131:10
**bad** 92:11
**baker** 3:20 10:6
**balance** 466:5
**ballpark** 297:23
299:9 303:11
**ballparking**
262:20 298:15
**ban** 37:11 54:9
57:11 58:16 63:6
76:4,7,22 109:22
109:23,23 117:6,7
117:7
**bans** 36:16 52:5,23
54:23 61:20,22

76:16
**base** 120:7 233:23
281:21,22 398:9
399:9
**based** 71:22
117:21 124:3
140:12,13,13
161:4 177:7 178:1
185:10 220:3
228:19 246:2
249:1,20 250:7
292:12 305:12
331:14 355:14
378:12 405:23
432:16 436:11
438:23 441:8
443:5 444:14
483:2 487:17
**baseline** 392:5
412:20
**basically** 21:7 35:8
46:4 124:2 159:1
159:13,17 286:18
311:15 316:21
329:15 349:12
360:12 363:17
**basing** 119:21
**basis** 45:21 49:12
69:8 81:19 216:19
216:22 217:12
218:23 220:1,3
229:21 234:18
236:5,14 237:5
238:3,14 246:16
251:22 258:14,23
268:18 269:21
381:4,5 393:6
406:3 467:5 474:9
**battle** 77:23
**bcbs** 7:5

**bear** 388:17
**becoming** 19:19
20:11
**beginning** 79:7
91:15 166:20
245:12,13 246:13
247:1 284:14
308:17,23 309:3
320:6 329:21
383:18 386:18
388:11 403:16
445:18 470:16
**begins** 218:23
220:5 245:19
246:6 270:15
276:3 308:18
309:2
**behavior** 118:5
**behavioral** 77:22
**believe** 34:2 86:7
86:15 96:7 97:9
140:17 148:21
151:19 208:1
291:9 294:5
322:17 413:21
446:17,21 470:2
483:19
**believes** 111:9
112:13
**bell** 3:11
**belldavispitt.com**
3:14
**bells** 71:15
**beneficial** 150:12
**benefit** 70:23
82:22 206:12,20
206:23 222:21
223:4 241:12
248:21 285:20
291:10 310:6
311:10 330:8

331:9 385:11
387:20 413:4
414:2,3 420:18
423:1,6 431:4,18
435:19 437:8
452:9 485:3,5
489:18
**benefits** 8:3
204:21 207:19
208:14 214:16
215:1,7 223:1,2
235:15 260:4
293:18 386:1
420:12 438:13,15
438:22,23
**benign** 144:10
220:19
**benjamin** 380:12
**best** 97:5 122:14
124:20 125:19
248:20 253:9,14
381:17 382:9
416:4,8 462:22
480:20 492:10
**better** 71:14
119:12 289:16
290:3 343:5 372:6
381:21
**beyond** 69:11
125:11 210:3
219:18 246:20,20
247:16,21 313:12
314:11,12 337:13
337:15 352:2
**bias** 392:3
**biblical** 457:1
**big** 185:17 365:23
379:11
**bigger** 176:22
**bill** 4:20 62:23
63:12,20 64:2,11

USCA4 Appeal: 22-1721      Doc: 41-5      Filed: 08/31/2022      Pg: 619 of 705

billroth 123:11
binary 348:4
　349:2 351:14,16
biography 472:12
　472:14
biologic 443:12
biological 383:23
　443:20 446:22
　447:2,17 448:14
　448:15 450:3,6
　486:3 487:20
　488:7
biologics 5:18
　233:15 265:1,6
biology 444:9
birmingham
　455:9
birth 341:22,22
　383:23 442:13,22
　446:18
bit 93:12 97:2
　99:15 101:20
　442:5 467:21
black 350:5 387:5
　489:21 490:11
blanche 104:21
blanket 236:9
blind 271:16
　309:20,22 315:4
　315:16 317:17
　319:14
blinded 268:20
　271:12,19,21
　273:18 309:19
　318:10
blockade 161:16
　162:19 165:9
　219:17 238:19
　247:1,9 260:7
　416:14 482:17

blocker 201:3
blockers 36:21
　84:23 161:2,6
　163:12 203:21
　204:21 205:2
　207:20 208:15
　211:22 213:6
　374:5,9,12 396:1
　483:21 489:14
blocking 63:13
　81:23 162:16
　164:4 166:8 201:2
　201:19 203:15
　204:17 207:13
　211:10 212:14
　213:18 316:16,20
　317:21 318:2,11
　406:13,23 428:22
blog 408:8,17
　409:5
blogs 408:11
　409:20
blood 211:11
　212:2,18 213:17
　460:1,3,8 468:8
blue 375:23 376:1
　376:6,7 380:23,23
　381:8,8 382:1,1,21
　382:22 383:7,7,7,7
　429:14,15
bluecross 375:20
　379:15,18 424:7
　425:5
blueshield 375:20
　379:15,19 424:7
　425:5
board 22:20 23:4
　23:10,13,15,20
　25:4,13,17 26:1,13
　26:17,19 27:13
　28:10 29:12 30:8

30:9,10 31:7,11,23
32:3,9,10,17,19,20
100:6,7,16,23
101:2 102:5 128:7
128:12,13 234:13
235:20 476:23
boards 476:22,22
bodies 30:16,16
　47:9 66:15,22
　111:11
body 67:19,23
　68:22 69:4,20
　70:7,11 73:6,23
　74:14,22 75:1,10
　142:12 154:5,7
　218:4 319:5,9
　363:8,9 466:6
　467:17 469:5
boilerplate 384:14
bold 27:17 231:5
　422:8 430:23
bones 130:9
book 72:12
booklet 8:3 420:12
bored 452:22
borelli 2:12
bother 179:7
　250:17
botox 6:4 139:21
　140:19 141:1
　206:15 229:10
　261:20 262:1,5,9
　262:21 264:8
　266:4,17 267:14
　267:16 268:3,18
　269:19 271:3
　483:8,14 489:13
　489:18 490:10,16
bottom 28:16
　41:14 56:19 57:3
　57:17,19 64:7,8

119:21 128:17
168:8 171:15
231:4 240:6
242:16 256:3
316:12 322:16
326:11,14 350:6
373:15 382:11
405:12,13 422:14
428:10 437:8
440:4 451:13
botulinum 263:4
box 300:2 489:21
　490:11
boy 452:22
boys 165:13 369:8
brains 404:10
brandt 4:15,16
　33:2,16,23 34:19
　36:10,15 42:17
　43:4 51:21 88:16
　99:7
branström 276:17
　276:21
break 79:5 115:12
　115:16 143:23
　166:18 254:17
　319:22 320:4
　322:8 346:5 388:9
　390:6 417:13
　470:14 471:19
　472:5
breast 44:15,23
　142:10,19 147:15
　149:3 220:16,20
　222:7 290:21
　291:5,11,14,16,19
　292:9,22 293:18
　294:9,13 299:4,6
　480:4,11,17,23
　481:4,4

breasts 287:17,18
290:8
brief 480:2 484:11
briefer 96:21
briefly 489:7
bring 185:15
250:16
bringing 83:11
brings 250:15
britain 53:19
248:3 260:12
broad 131:22
290:10
broadcast 465:14
broaden 235:12
broadened 267:5
268:14
broader 454:20
broadly 88:14,18
152:5
brow 130:16
266:16
brown 216:7
280:5 368:18
377:19 395:6
brown's 18:22
bucks 379:12
built 95:13
bulk 124:14 291:9
bullet 28:22 29:8
116:19 117:1
432:2 435:8 456:3
456:12
bulletin 225:11
227:12
bullets 431:8
459:2
bunch 366:20
377:21 378:16
379:1 435:8

burden 235:13
484:18
business 125:17
385:13,22,23
438:9 439:3,21
butler 9:1 10:8
492:19,20
bylaws 101:6

**c**

c 2:1 9:1 16:16
256:19 277:14
322:18 360:10
414:15,15 445:6
446:13 492:1,1,19
492:20
calamitous 346:23
calendar 14:15
california 103:19
272:16
call 49:14 98:23
182:19 267:2
271:3 284:17
343:12 360:19
363:7 365:6 366:8
366:12 381:18
432:21 433:3
436:10 466:5
called 12:18 79:11
99:1 102:3 120:8
138:11 143:4
186:10 388:1
407:12 455:4
465:15 466:2
478:4
calling 60:21
76:15 363:17
camera 255:23
256:7
campos 7:1 360:7
canal 479:7

cancer 142:14,14
143:1 178:19
289:14 299:5
468:2 475:6
476:16 480:17
cancers 143:5,6
144:14,15
capacity 183:20
184:1 197:9 404:7
404:10
capital 182:14
279:23 373:16
capitalized 456:9
capsules 222:8
care 7:15 40:4
41:7,18 53:8 54:2
63:14 72:23 77:18
109:13,18 113:10
113:20 116:7
122:11,14 124:23
132:8 138:1 139:3
150:17 151:13
152:11,12 154:23
157:4 165:18
182:16,19 183:2,9
184:5 186:10,11
189:11 196:14
199:7 213:2,11
223:6,8 258:4
272:23 351:11
363:19 394:22
395:16 396:15
397:4 398:15
399:3 401:1
424:17 444:5,6
448:2 450:5 459:6
459:10 463:14
464:4 473:8,9
475:7,10 478:11
482:21 488:13

cared 347:12
444:2
career 28:18 95:22
129:2 137:16
careful 359:7
406:3 468:7
carefully 202:13
251:11 363:18
462:17
caregivers 403:4
caretakers 402:2
402:23 403:10
404:17
carey 3:6
carmichael 7:17
35:18 410:22
carolina 1:2 3:13
10:1,20,23 11:1
375:20 376:8
379:16,19 420:14
424:8 425:6
474:12
carries 490:6
carrying 109:15
carte 104:21
case 11:20 12:11
16:6,17 17:2,15
18:1 22:10 33:1,5
33:8,14,16,23
34:17,19 35:9,22
36:10,12,15 37:4,9
37:11 39:12,16,22
42:17 43:4 45:22
46:16,20 48:17
51:21 53:18 57:22
58:6,12 72:19
77:19 88:16,16
98:19 99:7 114:7
118:12 122:12,17
170:19,22 180:7
189:5 196:23

204:11 206:21
209:1,10 217:1,1,5
217:5 219:16
220:1,4 221:16
238:16,18 243:22
246:7,9 249:16
252:18 259:16
260:17 270:10
278:21,23 279:3,6
279:17 280:19
281:9 282:20
283:11,20 284:7
284:12 285:22
286:19,19,21,22
287:11 290:9,9
293:18 304:18
306:13 308:2,9,13
308:19,20,21
309:9 310:11,20
311:15 312:2,18
314:6,9 322:16
323:11,12 328:9
329:16 335:14,18
336:13 339:8
343:6,11 355:5
364:2,4 387:18
406:3,3 410:6
417:19,21 448:18
449:17 455:5
456:19 460:8,9
469:11,13 478:3
483:2,20 488:16
490:19 492:18
**cases** 40:12 92:23
124:8 143:12
145:20 209:7
211:15 236:11
271:13 281:7
283:13 310:5
354:19 369:8
457:18,22 458:6

476:23
**catchment** 475:9
**categorically**
292:7 294:6
406:12,17
**categories** 144:6
290:10 431:9
**categorized** 219:2
**category** 66:22
106:3 122:9 146:3
267:4 270:23
279:6 312:10,16
316:6 327:16
329:18 372:13
385:5
**catholic** 64:19
65:2 451:22 452:4
452:16 464:20
**causality** 413:15
**cause** 9:11 154:18
210:10 369:21
373:7
**caused** 81:23
121:21 150:10
276:21 344:22
**causes** 480:17
**caution** 245:1,2
311:8
**caveat** 391:23
**cb** 445:20
**ccr** 492:20,21
**cecilia** 186:5
329:22 389:7
**center** 96:5 298:20
298:23 299:3
328:9 343:3 475:8
**central** 9:9
**certain** 62:14 86:2
146:23 206:8
209:7 228:7 258:3
261:5 310:14

376:22 386:22
407:2 477:13
483:8
**certainly** 26:15
27:3 31:5 40:14
102:14,19 105:19
137:3 152:11
153:2 176:23
247:13 283:6
284:18 286:9
289:14 310:11
313:3 314:3
329:20 342:23
343:5,19 355:9
385:22 474:23
475:23
**certificate** 23:10
23:16,20,23 25:4
32:20
**certification** 23:4
24:7 26:5,20
27:18 28:1,4,12,19
29:1,10,11,12
30:14 31:8,12,16
100:8,17
**certifications** 23:2
**certified** 22:21
25:13,17 26:1,19
28:3,10 30:8,10
31:23 32:3,19
100:6 101:2 102:5
128:8
**certify** 9:4 492:4
492:14
**cessation** 365:17
**chairman** 95:9,11
473:21
**challenge** 36:16
83:12 455:23
456:1 467:20

**change** 8:14 60:3
186:2 194:1,21
260:3 271:15,22
309:18 372:11
382:3 412:19
464:15 481:13
482:3,7 494:4,7,10
494:13,16,19
**changed** 107:15
110:21 122:22
123:2,18 186:6
247:7,8,10 380:21
380:22 443:20
446:18,23 447:3
481:17 488:14
**changes** 81:22
290:3 311:5
413:13 484:17
493:10 495:6
**changing** 67:23
71:12 119:22
125:1,20 259:20
359:4 464:21
**chaplain** 455:17
455:17
**chapter** 455:8,15
455:17
**character** 372:1
**characteristic**
339:4 416:21
**characteristics**
165:15 243:18
350:14
**characterizations**
380:11
**characterize** 81:10
82:17 118:22
132:5 385:18,20
**characterized**
68:2 74:6 235:15
336:4

characterizes
124:1
chart 343:1 344:1
charts 418:1
chastity 454:16,21
455:3
check 212:19
246:3
cherry 3:12
chest 167:19 178:4
cheyenne 3:7
chief 121:19
262:12 306:10,12
child 8:17 82:6
161:5 165:5 166:6
209:10 238:20
309:19 317:6,15
405:15 464:16
469:18,22,23
child's 470:1
childhood 394:23
397:10,18 398:12
398:17
children 5:23
76:10 77:19 94:7
157:19 158:9,18
159:4,9,12 160:19
160:23 162:13
163:6,8,11,17,19
205:19 238:15
239:5 240:3,11,17
241:5 243:5
258:22 259:7,10
262:15 318:12
395:10,22 397:20
397:23 398:17
399:21 400:2,5,18
400:20 401:3
404:4,6 406:20
461:15 462:3,9
463:15,16 468:23

469:7
childrens 241:5
chimed 46:4
choose 432:20
438:8 462:17
choosing 303:18
436:10
chosen 449:23
christian 442:6,11
442:23 443:3,10
443:11 450:22
chromosomal
487:17
chronological
15:15
church 452:5
church's 456:13
cigna 8:6 429:16
429:19 430:12
cigna's 431:18
432:7
circle 20:15 216:5
circles 283:6
circumstance
237:11
circumstances
210:8 216:20
228:8 251:7
285:18 407:2
424:3 478:1
citation 297:13
cite 13:9 108:18
109:5 238:6
322:16 377:18
389:22 399:8
407:11 410:21
414:9 415:4
453:12
cited 13:15 325:7
343:7 360:6 378:2
382:2 389:17

440:9,19
cites 227:11 327:6
335:14
citing 361:15
410:10 453:14
civil 1:7 9:5 10:1
civilian 476:7
477:7
claim 29:11 45:16
276:6 352:16
392:23
clarifications
364:16
clarify 482:9
clarity 300:22
classification
384:6
classified 348:9
349:4 384:7
classifies 232:13
classify 385:7
clearance 206:18
cleared 205:12
235:23
clearer 73:20
clearly 82:20
150:13 152:22
244:14 288:1
312:13 362:2
clin 400:16
clinic 138:1,4,17
139:3,20 140:6,13
152:12 342:1,7,14
345:3
clinical 73:9
120:10 229:6
235:22 236:15,17
236:19,21 237:3
237:22 243:4,11
245:10,20 246:11
246:17 247:20

249:3,13,18 250:3
250:21 251:13,23
252:6,9,10,13
269:4 291:8
292:19,23 364:8
364:10 398:16,21
400:4,16 412:1
422:23 440:4
441:6
clinician 245:23
clinics 138:6 400:1
closed 185:9 187:5
195:13
closer 289:8
clue 324:3,4
cme 69:22
cochrane 7:23
35:17 414:10
415:2,19 416:11
code 5:8 169:11,14
169:22 170:8,13
170:23 171:12
173:12 174:19
176:9 179:4,8
180:8,15,18,21
181:7,9,16 195:5,8
224:8
cognitive 77:21
cohen 380:17
cohort 6:18 7:10
7:20 249:23 250:1
250:8 257:11
270:8 277:23
278:2,5,8,10,19
279:14 281:17
289:11 291:12
292:13,18 298:10
298:13,23 299:4
304:1 305:8 312:1
323:9 340:9
345:19 411:9

412:4 415:13
cohorts 298:20
coincidental 19:16
collaborating
480:14
colleagues 287:3
collected 124:8
collection 328:10
329:16 355:6
407:22 408:1
collections 246:8,9
colloquially 168:8
316:12
column 224:16
225:4 242:15
248:16 252:21
307:15 326:17
350:23 391:20
columns 302:13
combat 473:16
474:16
combination
452:15
come 45:10 72:10
73:13,15 79:19
98:18 99:6 105:21
107:1 145:12
146:1 149:2
154:15 160:17
181:15 185:23
199:9 201:8 207:8
248:8 350:5
396:12 471:21
comes 270:18
275:11 297:13
340:7
coming 47:21 90:3
148:4 326:5
330:20 346:1
361:6 380:4

commencing 9:8
commended
303:20 305:23
comment 479:13
comments 187:17
191:18 199:11
224:22
commercial
434:19
commission
492:23
commissioner
492:22
committee 4:19
45:19 47:4 49:2
55:16 63:11,19,21
65:7,15 185:9,18
189:1 194:8,15,23
382:7
committees 45:8
46:11
committing 67:15
121:6 126:11,12
127:5
common 19:19
20:14 142:3,6,19
145:15 146:17,19
148:7 255:4,15
259:1,6,8,11 303:6
commonly 20:11
21:19,22 22:2
60:23 147:23
201:13 295:9,22
463:19
communicated
16:6 56:2 208:6
communicating
59:9
communication
56:11 77:1

communities
373:23 488:20
community 43:18
45:7 225:11
226:14 293:5
328:6 402:18,19
473:8
comorbidities
487:1
comorbidity
463:20
companies 291:23
292:14 385:4,21
437:1
companion 63:20
company 67:10
206:17 270:20
376:21 377:6
380:4 385:10
386:15 387:9,19
424:15 431:21
432:12 436:10
438:21
comparable 94:18
comparative
304:1
comparator
282:22
compare 250:8
354:9,19,21
compared 89:13
353:21 372:10
391:1,9
comparing 299:7
355:14
competence
487:10
competent 120:8
485:11
competently
485:12

complaint 12:19
292:4
complete 11:16
495:8
completed 265:19
493:17
completely 118:19
completing 398:10
complex 121:23
143:11
complexity 476:20
477:2
compliance 29:22
30:3 170:23
complicate 486:19
complication
244:18 329:5
334:16 336:17
complications
176:18 177:1,4
178:9,15 226:9
237:9,16 244:20
327:1 337:1,3
338:9,17 339:3,4,6
355:2 358:16
complies 180:14
comply 169:14
components
404:14
comports 31:2
comprehensive
342:18
compromise
467:18 468:6
compromised
119:8
computer 492:8
conceal 319:7
concept 460:16,17
concern 44:16
70:21 118:22

218:17 244:2,22
245:6
**concerned** 180:17
181:23 206:1
247:18,18 449:11
**concerning** 376:21
**concerns** 119:4
180:5
**conclude** 180:6
**concluded** 258:10
**concludes** 343:4
491:11
**concluding** 36:3
**conclusion** 38:11
357:14 393:11,17
**conclusions**
277:12 330:11,15
331:8 337:6
371:19 410:19
415:9
**condition** 72:22
114:2 122:5
150:16 151:9
157:7 194:12
205:14 211:1
217:19 218:8,14
220:20 231:19
249:15 291:22
292:10 422:21
**conditions** 66:4
74:18 75:9,15
144:16,18 145:13
154:2 155:13,15
157:10 210:9
215:14,14 252:4
318:15 436:18
487:22 488:11
**conduct** 211:7
320:15
**conducted** 185:4
187:2,12 198:7

275:5 485:12
**conducts** 119:14
**confect** 443:4
**conference** 8:12
69:23 79:17 81:15
92:15 103:22
104:4,16 222:12
450:19
**conferences** 69:9
103:15 106:22
107:7 188:5,11,14
192:6,7 200:1,2,8
**confidence** 345:22
**confident** 59:2
**confirm** 156:9
157:2 219:13
486:9
**confirmation**
116:21
**confirmed** 229:5
**conflating** 266:11
**conflicts** 199:5
**conformity** 400:13
**confused** 76:9
458:12
**confusing** 450:7
458:9,14
**confusion** 457:18
457:21 458:17
**congenital** 310:14
474:17 475:2
**connection** 61:22
**connor** 446:7
**consen** 49:13
**consensus** 41:3,22
41:23 42:13,14
44:8,11,20 45:5
46:7,12,12,17
47:12,14,21 48:5
48:16 49:3,14,14
50:10 112:17

**consent** 68:19
119:1,2,7 208:22
209:1,3 211:7
253:7 401:22
402:1,13,17,22
403:9,17 404:11
404:15,17 484:23
487:9,10
**consented** 402:3
403:4
**consenting** 314:10
359:7
**conservation**
481:2
**conservative**
284:16 285:6
**consider** 13:19
60:16 92:22
102:10 150:15
151:22 152:10
161:20 181:20
182:5 203:17
247:14 266:14,22
289:23 329:3
362:15 423:7
459:3 469:15
484:6
**considerable**
109:14 169:4,19
213:10 371:17
**consideration** 38:9
406:4 424:20
**considerations**
437:9 489:17
**considered** 232:17
253:6 254:2,5
267:11 281:8
283:4,6 285:14
286:5 288:11
289:6 316:1,2
381:9 382:1

384:23 387:3,14
408:12 424:10
436:19 441:22
442:2
**considering** 61:19
63:6 106:7 161:1
166:7,8 314:4
**considers** 113:19
425:17 426:14
427:18 428:13
429:7 433:18
435:22 437:21
**consist** 297:17
298:13 305:7
390:14
**consisted** 304:13
390:18
**consistent** 114:3
128:11 222:2
303:15 335:3
486:23
**consonant** 112:16
346:11 462:21
**consort** 277:13,20
**construct** 338:23
467:23 478:14,15
**constructed** 323:2
**consultant** 378:17
**consultation** 162:5
166:9 208:2
**consultations**
140:1 158:22
159:23 160:9
163:4
**consulted** 144:6
158:17 163:20
164:19 187:9
**consummately**
287:20
**contact** 297:11
455:15,16

contacted 58:23
98:20,22 99:13
contagion 367:17
368:1 369:18
370:10,20 371:6
373:3
contained 215:11
442:23
containing 257:12
contains 12:9
13:17
contemplate 403:7
content 492:7
contest 77:17
context 258:18
477:13,20 479:21
continue 113:7
439:22 485:10
continued 98:6
237:18 247:19,20
261:9
continuing 100:7
contouring 142:12
contradictory
114:1
contraindicated
241:21 242:10
contraindications
406:7
contrary 39:11,14
39:20 40:10 42:9
118:11,19 395:5
contrast 475:21
contributed 56:21
191:7
control 52:8,10
270:11 271:8
278:21,23 279:3,6
279:17 280:8
302:17 307:20
309:6 316:6 390:2

390:10,13,18
412:8
controlled 268:20
269:4 270:2,19
271:2 272:19
273:7 274:21
275:16 286:4
291:7 292:23
293:10,20 298:3
305:8 412:1
415:13
controls 279:8
304:4 392:3
controversial
324:6 363:19
369:12 373:9
398:6
controversy 44:14
125:3,6 222:6
363:21 410:3
412:16 413:23
conversation 14:6
15:3,22 48:20
56:13 87:12 92:1
165:19,20 330:23
461:2 488:5
conversations
12:14,22 14:10
87:15 104:16
120:3 287:2
conversely 424:1
convey 88:11
163:10
convincing 252:16
coordination
317:12
copies 15:6 493:14
copy 88:7 127:22
core 116:13
corner 171:15
263:13 451:13

corporate 7:5
376:12
corporation
263:21
corpsmen 474:7
correct 11:21
12:11 23:5,6,8,9
23:11,12,17,18
24:22 25:14,15,18
25:19,22 28:12
29:23 30:4 31:13
31:21,23 32:1,4
33:3,7 34:1 36:19
36:23 48:3 52:2
63:7 65:4 75:12
75:23 76:1,4
109:6 112:22
114:12 128:14
129:9,10,16,17
130:4 132:19
133:17 136:23
137:1,6,8,12,15,19
137:20 138:2
149:5 150:6,23
152:7 153:7,8,12
153:16,19,22
158:8,12 163:1,3
167:5,6,11,12
168:9,10,14,19
174:22 175:6,8,11
175:15,18,22
176:17 178:22
183:2,3,13 184:1,5
184:6,19 187:3
188:8,11,18
189:18,21 190:1
190:10,19 191:5,8
191:9,14,16,20,22
192:2,4 193:10,13
197:4,7,10,11,14
197:15,19 198:3,4

198:8,10 200:4,6
200:15,18,22,23
204:4,5,7 207:14
208:7 213:20
214:12,13,18,19
215:2 216:15,16
216:22 221:4,8
226:17 239:10,12
241:17 242:3
246:17 252:1
262:3 264:15
267:19 269:6
270:4,5,5,9 272:10
272:11 273:9
274:2,3,5,6 278:2
278:5 288:23
293:7 294:19
295:11 296:5,6,9
303:4,5 307:22
316:6,14 317:1
319:3,15 340:5
357:22 362:9
365:2 370:11,21
375:22 379:17
384:20 390:16,17
392:20 393:13
398:18 406:14
407:14 412:9
417:22 418:4,13
418:22 419:2,3,8,9
419:12,13 421:1
430:3 442:14
446:1 448:18
455:11 456:8
465:4 475:14,15
475:18,19 477:14
477:17,18 479:23
480:5 481:22
483:10,16,17,23
487:23 492:11
495:8

**corrected** 392:4
**correcting** 346:22
**correction** 372:18
**corrections** 495:6
**correctly** 288:18
**corresponded**
  77:5
**correspondence**
  56:6
**corrugator** 263:3
  266:12,17,18,23
  267:9
**cosmetic** 6:4 45:1
  71:3 262:16 263:4
  267:15 296:20
  331:2 386:16
  423:3,22 425:3
  467:7 476:2
  477:10
**counsel** 9:20 10:10
  12:15,23 99:13
  492:15 493:14
**counseling** 157:15
  157:18,18,23
  158:5 159:17
**counselors** 464:5
**count** 42:5 351:2,3
**counted** 348:17
**counterfeit** 60:6
  61:6,9 338:23
**country** 104:1
  324:22 433:14
**county** 492:3
**couple** 14:13 15:1
  15:16 63:8 93:23
  146:2 196:5,12
  301:23 394:3
  398:5 472:11
  476:8
**courage** 451:14
  452:4 454:7,14,21

455:8
**course** 16:4,5,17
  18:20 71:15 73:2
  75:1 92:1 99:18
  146:23 165:2
  295:1
**court** 1:1 9:1,23
  10:8,12 16:11
  33:6 38:9 39:10
  43:4 53:20 182:13
  260:11 325:13,16
  325:20 350:3,9
  389:13 414:15
  426:1,6 449:15
  471:9
**courts** 54:1
**cover** 215:6
  379:21 385:10
  386:15,15,17
  387:20 420:22,23
  423:22 426:9
  432:14,16,20,23
  433:1,4 437:3,4
  439:6 487:13
**coverage** 8:6
  376:21 385:6
  386:4 424:16,18
  430:13,21 437:13
  473:6
**covered** 377:2,3
  385:23 421:10,22
  422:18 423:15,18
  424:2 432:19
  435:18 436:19
  438:12,14,22,22
  452:11
**covering** 385:14
**covers** 435:21
  437:12
**coveted** 121:18

**cranial** 133:13
**craniofacial**
  309:12,16 310:19
  475:2 477:4
**create** 60:6
**created** 226:12
  456:4,13 457:17
**credentialing**
  30:16
**credentials** 172:12
**credible** 123:3
  280:16
**credits** 69:23
**crestwood** 24:17
**cretella** 94:23
**crime** 244:9
**criminal** 109:17
**criminalize** 4:21
  63:1 110:7 116:20
**criminally** 52:11
**criteria** 70:6,13
  71:4,8 72:9 73:22
  275:18 277:14,20
  292:12 300:19
  333:9 351:8
  356:23 377:4
  385:1 386:22
  387:10,11 401:9
  401:15 427:20
  428:18 429:2
  435:9,15
**critical** 213:2,11
  272:23
**criticism** 352:3
**criticisms** 371:13
**criticize** 216:7
**criticizing** 49:19
  183:10 359:11
**cross** 36:22 82:1
  94:1 161:10 164:9
  213:7,22 214:11

214:16 219:17
  238:19 247:2,10
  260:7 318:6,20
  319:14 370:1
  375:23 376:6
  380:23 381:8
  382:1,21 383:7,7
  404:2 416:13
  417:5 429:15
  437:14,22 457:15
  482:17
**crow** 268:5,7,8
**crow's** 141:4
  262:5 268:10,11
**crr** 492:20
**crucial** 466:20
**cs** 493:15
**ct** 446:11
**culpable** 127:11
**cultural** 447:7,8
**cure** 422:21
**curing** 291:17
**current** 28:11
  32:20 50:8 51:1
  79:21 99:19
  196:13,17 296:19
  392:7 398:8 399:9
  439:20 482:11
**currently** 24:10
  25:13 31:22 32:23
  43:15 61:18
  137:23 139:21
  189:11 321:6
  367:12 371:7
  415:16 416:3
  485:11
**cursor** 350:4
**cv** 1:7 10:2 30:5,7
  127:20,21,22
  135:23 136:15
  472:11 480:4

## d

**d** 4:1 20:23 33:2
203:4 322:18,18
389:13
**dale** 1:14 10:21
**damage** 119:22
**danger** 132:7
**dash** 360:9 446:12
**data** 86:12,13,13
161:23 212:8
219:13 243:5,12
257:13 272:23
273:2 275:2 276:4
276:13,20 277:2
277:11 279:10
280:1,6,15 281:4
312:21 329:9
344:6 352:19
361:22 371:18,20
381:5,21 406:18
406:22 407:22
408:1 416:22
417:3
**database** 7:23
257:12
**date** 9:4 93:7
108:21,22 185:21
186:8 190:3 196:7
265:22 268:13
430:17 435:1
492:12 494:24
495:12
**dated** 38:5 55:16
108:14 109:4,9
224:13 265:2
**dates** 459:14
**dating** 72:16
**daughter** 409:7
**daunted** 458:17
**davis** 3:11 273:12

**dawning** 433:22
**day** 9:9 104:5
153:23,23 189:17
189:17 353:17
495:15
**days** 18:22 493:17
**de** 2:14 194:11,22
195:7 242:5,9
359:19 360:20
**deacon** 64:19 65:2
464:20
**deal** 475:4
**dealing** 76:14
218:14 244:17
313:23
**dear** 264:22
**death** 311:3
490:18
**debate** 389:6
**decade** 219:21
225:10
**decades** 229:18,18
312:5
**decatur** 2:15 9:7
10:5 64:10 138:14
138:22 139:11
140:11 160:14
**december** 257:14
265:2
**deceptive** 172:13
172:19
**decide** 23:19 100:2
221:6 284:12
379:20
**decided** 37:12
49:2,13 146:22
166:9 387:19
**deciding** 439:5
**decision** 6:21 47:5
53:23 121:11
131:20 177:9

217:1,5 248:19
285:22 286:19
330:19 356:3
357:5 380:8 403:2
404:11 444:12
484:20 485:1
487:8 488:6
**decisional** 357:15
357:22
**decisions** 208:16
328:21
**deck** 88:4,7
**declaration** 4:15
22:17 33:23 34:12
35:2,12 36:2
457:10
**declare** 283:15
495:4
**declared** 53:22
**declares** 436:6
**declined** 100:7
226:20 305:3
**declining** 226:5
473:8
**dee** 10:23
**deemed** 253:8
422:6 495:6
**deems** 253:12
**deeper** 358:2
**deeply** 358:21
**defect** 71:6 290:14
**defective** 120:7
**defects** 468:3
482:6
**defendant** 22:10
**defendants** 1:15
3:1 10:19 11:20
33:9,13,15
**defending** 11:2
79:11

**defense** 2:13,19
**definable** 71:18
**define** 240:9
386:18 424:15
438:8
**defined** 173:12
257:3 287:9
390:11 423:11,14
431:21 438:11,20
**defines** 173:22
459:5,9 460:13
**definitely** 71:23
87:10 143:10
248:8 330:2,2
333:17 438:10
**definition** 45:17
174:3,7,16 218:19
288:17 422:11,15
423:16,21 428:5
436:12,13 438:7
439:2 468:12
**definitions** 423:12
424:14,16 437:2
443:3
**definitive** 157:4
219:8 249:5
251:15,15 283:23
344:4 362:23
363:3,22
**deformities**
310:15 474:18
**deformity** 71:18
475:2
**degeneration**
44:18
**delayed** 133:11
317:9
**deleterious** 487:20
**demand** 199:3
312:17

demanded 313:21
demands 314:13
demographic
  368:10,11 369:5
  372:11
demonstrate
  268:21 269:4
  270:2 310:20
demonstrated
  245:3
demonstrates
  486:23
demonstrating
  130:8
denominator
  323:20 352:11
denver 8:12
  450:19 451:22,23
deny 64:22 466:11
department 95:12
  473:21 474:4
depend 286:8
depending 258:16
  282:6,6,9 301:16
depends 321:7
deponent 493:13
  495:3
deposed 14:19
  17:16 18:2
deposing 493:13
deposition 1:19
  9:19 10:3 11:3
  12:16 13:13 14:23
  15:8,11 17:19
  18:5,6,12 19:2
  181:8 470:22
  491:14
depressed 154:15
depression 154:10
  154:17,19 155:6
  487:3

derive 176:13
  177:8
dermatologist
  143:3
describe 72:22
  94:5 158:22 257:2
  277:19 282:22
  331:2 383:20
  442:20 472:19
  474:1 475:20,21
  477:23
described 73:16
  130:17 305:15
  422:23 483:12
description 73:20
  383:15
descriptions 29:13
deserve 444:4,4
deserves 150:17
design 274:8 276:2
  276:4,19 277:18
  309:7 319:13
  391:23 413:10
designed 274:4
  275:18 278:2,14
  278:23
designing 275:11
  480:19
desire 194:10,20
  237:18 329:6
  333:3
desistance 161:5
  161:23
desisting 161:9
despite 309:9
  406:21
destroy 119:23
  467:6,19
destroyed 478:7,7
destroying 468:12

destruction
  178:20
detail 65:18 84:1
  470:5
detailing 432:22
details 37:18
  82:11 90:9 160:16
  163:17 210:18,21
  409:11
determine 241:17
  300:5
determined
  423:12
determining
  293:10 423:6
detran 366:5
detrans 364:19
detransition 7:2
  367:1
detransitioned
  322:11
detransitioner
  86:18 87:3,4
  151:4
detransitioners
  320:21 324:9
  364:22
detransitioning
  147:16,19 149:2
  151:7 365:13
  366:2
develop 165:14
developed 165:15
  188:16 189:12
  190:5 193:15
  200:13,21 382:18
developing 187:13
  187:18 190:17
  191:14,19 198:7
  199:12 444:17

development
  133:11 184:4
  188:6 190:12
  191:8 192:8,22
  197:13,17 200:3
  379:14 403:22
  436:9,16,21
developmental
  82:6
developmentally
  317:8
device 234:11
devices 5:19
  130:11 233:15
  310:13
devoted 104:6
dhejne 7:7 186:5,5
  329:22 389:6,7,7
  389:10 390:23
diag 72:8
diagnose 69:3,20
  73:22 153:6 154:1
  155:6,14 157:10
  195:4
diagnosed 156:2,8
  205:14 330:17
  405:15
diagnoses 155:20
  194:14
diagnosing 66:3
  73:5 74:14,17
  75:9 155:12
diagnosis 22:3
  68:2 155:23 156:9
  156:11 157:2
  194:21,22 313:14
  329:4 366:15,17
  373:10 383:19
  385:8 386:19
  422:20 432:17,18
  486:10,11

**diagnostic** 70:6,12
71:8 72:8 194:16
195:5,8,8 282:8
301:20 377:3
406:4
**dialogues** 106:22
**differ** 392:2
487:15
**differed** 258:4
**difference** 94:8
135:14 322:9
365:23 387:13
476:3 477:6
**differences** 392:5
475:22
**different** 42:6
43:21 88:13 114:8
144:5 155:2
184:17 188:1,5
190:16,21 191:7
191:13 192:1,6
199:17 203:14
249:8 269:15
317:15 319:20
343:8 366:23
394:22 395:12
397:21 399:21
400:2 431:8,8
489:13
**difficult** 67:2
124:16 271:16
352:15 354:18
**difficulty** 44:7
47:23 91:2 92:2
102:18 104:10
105:4 112:6
484:22
**dig** 358:20
**dimitry** 491:5
**diocese** 64:20

**diplomates** 27:23
28:2,23 29:9
**direction** 165:9
**directly** 16:8,18
133:18
**director** 263:23
378:20 379:3,6
**disabuse** 456:20
**disagree** 234:21
308:13
**disagrees** 40:17
42:23
**disappeared** 96:10
**discerned** 488:21
**disciplinary**
172:14
**disclose** 280:5
**disclosed** 210:5
381:13,15
**disclosing** 14:5
216:8
**discomfort** 194:18
**discontent** 383:22
**discordance**
158:19 368:14
457:6
**discounted** 101:23
**discourage** 26:22
162:18,22
**discover** 463:22
**discovered** 67:12
229:2
**discovery** 308:19
**discrimination**
276:6
**discuss** 92:7 188:6
192:8 240:10
280:6 320:14
339:2 461:22
488:1

**discussed** 154:5
175:3 180:19
192:13 200:3,4
222:9 328:3 399:4
**discussing** 119:1
153:11 412:12
445:9,20 462:2,8
469:15
**discussion** 72:18
87:14 90:8,13,20
91:1 93:14 327:12
407:10 456:18,19
466:18 488:4
**disease** 156:3
231:19 422:22
**disorder** 67:19
68:1,23 69:4,21
70:7,12 73:6,23
74:15,22 75:11
154:6,8 193:20
242:20,22
**disorders** 192:18
192:21 436:8,15
436:21
**disparity** 89:18
**displaced** 131:6
**dispute** 358:22
**disregards** 466:4
**dissatisfaction**
337:12,17 338:4
**dissatisfied** 67:1
**distant** 490:13
**distinct** 281:15
477:6
**distinction** 275:8
432:12 485:2
**disting** 484:2
**distinguish** 398:22
438:21 484:3
488:6

**distinguishing**
437:3
**distort** 486:19
**distressed** 162:7
**district** 1:1,2 9:22
9:23
**disturbance** 70:15
**disturbances**
67:22 68:20
**disturbed** 120:3
**divergent** 398:7
**divided** 348:3
**djordjevic** 6:15
322:17
**dmitriy** 2:6 10:14
114:18 126:14
471:12,22 489:5
**doctor** 11:10 27:8
34:6 49:18 55:8
61:1,11 69:16
79:9 108:6 115:16
117:13 126:19
127:16 153:5
166:22 209:20
210:2 213:2
216:14 217:6
234:17 238:1
246:15 254:22
261:14 292:16
332:14 335:12
353:16 367:1
370:6 381:6
386:10 388:15
407:20 408:20
417:17 470:18
489:11,22
**doctorate** 86:16
**doctors** 26:18
32:12,18 36:17
51:22 52:12 53:23
78:18 81:6 118:3

118:16 121:6
122:18 155:11
156:5 214:21
215:20 217:11
219:23 220:2
226:15 236:23
244:15 251:14,20
**document** 13:23
26:23 27:2 50:20
55:12 108:14
112:7 114:23
115:4,22 174:11
184:22 185:15,19
185:20 186:9,11
186:12 189:2
223:21 233:3,9
245:22 248:12
264:19 275:20
284:6 301:18
305:18,19 327:3
330:11 332:10
335:1,7 341:1,6
350:4 363:23
375:12 376:11,18
376:21 379:8
380:19 384:12
400:9 401:6 402:9
408:4 413:1
419:23 420:8
440:21 445:15
486:2
**documented**
235:10
**documenting**
235:14 485:14
**documents** 12:18
187:6 233:6 380:6
380:7
**doing** 25:2 85:5
98:16 106:10,14
123:7 124:20

125:19 141:14
176:8 178:12
246:19 260:4
261:6,23 262:5
269:23 272:18
286:13 287:12
290:4,5 305:19
309:21 312:22
321:16 439:21
469:6 476:10
477:3 484:21
**dose** 145:3
**double** 268:20
271:12,19,21
318:10 319:14
**doubt** 439:15
**dozen** 94:18
146:13 147:11
**dr** 9:19 11:2 14:18
15:8 16:6,9,15,20
16:22 17:1,4,6
18:7,11,21 19:10
19:10 33:12,13,18
33:20 34:12 39:15
39:15,21,21 40:11
40:11 42:10,10,19
42:20 43:23,23
57:21 58:5,11
60:13 64:9 67:7
72:2 78:5,5,6
81:17 85:10,13,15
85:20 86:3,6
92:13 94:23 114:6
114:6 216:7,7
255:21 256:19
264:22 377:19,20
444:21 445:13
464:19 472:10
475:11 481:6
483:7 491:1,12

**drafting** 185:4
187:3,9
**drafts** 188:1 192:1
199:17
**dramatically**
322:20
**drastic** 289:20
**drawn** 392:10
**dreaded** 181:14,18
**dream** 468:4
**drill** 210:18
**drilled** 467:14
**drive** 285:21
444:11
**drives** 286:15
**drop** 320:19 321:4
321:21
**dropping** 24:3
**drs** 280:4 395:6
**drug** 201:11
202:21 205:11,16
205:17,19 207:13
209:23 210:5
216:14,21 218:6
219:11,15 220:19
221:7 224:17,20
225:10,12 227:11
228:9 231:5,10,11
231:18 234:10,17
234:19 235:12
236:4,13 237:5,10
238:2 241:3
246:15 247:15
253:4 257:3,20
258:14 259:19
260:20 261:12
263:14 314:19
318:15 338:5
490:6
**drug's** 242:21

**drugs** 5:15,18,22
119:5 162:16
201:3,19 203:15
206:10 209:20
216:19 217:12,15
218:15,19,23
219:6 220:2 221:3
221:5,13,18 222:2
222:16 226:15
229:1,20 230:22
233:14 238:14
239:5 240:2,17
241:7 244:4,8
245:5,8,16 248:1
251:3,21 252:19
255:4,6,11 258:22
259:22 260:1,17
260:21 261:9,13
318:11 406:20
447:21
**dsm** 72:12 73:7,13
73:16,17,19,20
74:1,6 189:15,18
189:20,23 190:12
190:17 191:8,14
191:19 192:1,9,22
193:15,19 194:2,2
380:11
**dtishyevich** 2:10
**duly** 11:6
**duration** 15:23
**dutch** 342:14
**duty** 76:8 154:19
386:3
**dysmorphic** 67:19
68:1,22 69:4,20
70:7,12 73:6,23
74:15,22 75:10
154:5,7
**dysphoria** 6:18
7:22 8:8,10 22:4

41:6,20 49:16
65:10 80:19 84:19
85:7 111:10 130:4
131:2,17 132:19
133:17 134:4,18
146:21 150:6,23
151:2,6 152:3,7
153:7,12 157:20
158:1,6,10 162:15
163:1 193:21
200:15 205:15
214:12,18,23
215:19 216:10
316:19 319:1,15
321:4 329:11
340:9 353:2,10,22
354:4 367:14,23
368:13 370:9,19
373:21 374:17
375:2,8 380:13
383:19,22 390:14
390:19 391:8
393:19 395:1,11
395:23 405:9
411:11 429:9,20
430:14 431:2
433:21 434:22
435:17 437:13
438:3,12 443:18
458:1 460:18
481:22 482:13
483:22 486:7,17
488:19
**dysphoric** 195:18
**dystonias** 262:14

**e**

**e** 2:1,1 4:1,10
16:21,21 20:23
59:1,3,4 98:11,16
203:8,11 256:19
299:19 322:18

340:15,15 360:9
389:13,13 414:15
425:7 445:6
446:12,13 492:1,1
494:3,3,3
**earlier** 46:9 57:8
76:12 78:4 110:1
112:19 152:1
154:5 169:6
180:19 181:17
189:14 204:15
215:5 216:17
232:9 261:20
267:13 270:14
290:18 300:20
301:11 303:11
324:15 345:11
347:3 352:1,9
354:12 363:9
380:21 421:3
424:6 448:5 454:2
477:11
**early** 97:16 205:2
228:18 285:4
319:11 328:10
394:23 397:9,17
398:11,17
**earns** 386:6
**ears** 105:20
**easier** 16:14
**eastern** 474:10
**eating** 332:12
**ectopic** 133:11
**ed** 76:3
**edgerton** 106:8
125:8
**editor** 135:16
136:9
**editors** 135:21
136:16

**eds** 76:15
**educate** 296:14
**education** 2:13,19
**educator** 87:7
**effect** 43:5 146:15
146:17 245:21
246:1 313:10
317:18 319:5
330:7 412:20
414:7 484:11
490:14
**effective** 41:4
116:7 265:21
268:22 270:3
284:13 285:14
346:22 430:17
435:1
**effectively** 457:5
**effectiveness**
269:5 392:10
**effects** 81:21,22
82:5 205:17,18
217:16 234:4
235:3,14 237:1
317:3 318:3 319:2
319:13 447:21,22
447:22 482:22
487:21 490:8
**efficacious** 291:17
**efficacy** 219:14
235:9 237:17
259:20 329:23
331:13 346:19
347:6 387:22
439:1
**efficient** 116:8
**efforts** 54:16 78:7
78:14 83:18
110:18 113:7
116:9

**eight** 45:23 313:11
337:13
**eighteen** 43:21
52:2
**eighty** 141:23
**either** 93:8 144:11
222:11 249:5
278:13,13 393:8
456:14
**electronic** 88:7
**element** 369:18
**elevated** 272:20
282:1
**eligible** 100:23
**emcee** 91:22
**emergencies**
436:22
**emery** 2:7 10:15
**emotional** 152:13
**emotionally** 119:8
**emphasized**
209:17
**employ** 420:16
**employees** 10:21
420:17
**enact** 76:7
**enactment** 57:11
**encapsulation**
220:17,21
**enclosed** 265:23
**encounters** 159:5
**encourage** 103:7
103:12 162:12,13
177:14 457:3
470:1
**encouraged** 95:6
165:21
**encouraging** 107:8
398:16
**endo** 195:16

**endocrine** 195:16 196:22 197:3,9,21 198:7,19 199:11 200:13,20
**endocrinol** 81:19
**endocrinologic** 81:19
**endocrinological** 81:21 156:2
**endocrinologist** 86:9 153:15 156:10 157:1 205:23 207:12 372:5
**endocrinologists** 149:19 198:16 203:22 204:1 207:18 208:13 277:1 418:20
**endocrinology** 81:18 204:3,7,10 213:1
**endocrinopathies** 162:21 213:9
**endoscopic** 129:22 130:8,17
**enforcement** 30:17
**enforcing** 37:11
**engaged** 83:11
**engine** 21:2,6
**england** 35:16
**enrolling** 237:3
**ensure** 116:6
**ensuring** 273:2
**enter** 153:1 176:19
**entered** 208:8 345:21 346:6,8 418:15
**entire** 46:14 95:22

**entirely** 104:6
**entitled** 240:2
**entrance** 480:11
**entry** 124:4
**enumerate** 209:7
**enumerated** 209:5 209:22 458:6
**equation** 206:12 222:22 485:3
**erectile** 333:2
**erections** 334:8
**errata** 493:11,13 493:17
**erratas** 493:15
**erroneous** 329:3
**error** 329:1,3
**erythromycin** 123:12
**esophagoplasty** 133:20 136:12
**esophagus** 133:23
**esq** 2:6,12,18 3:4 3:10
**esquire** 493:1
**essential** 275:22 448:13 467:6,19
**essentially** 44:21 112:2,9,12 146:15 161:13 165:21 271:17 282:23 380:19 395:15 474:10 478:5
**established** 311:12 475:1,7
**esthesia** 68:7
**estimate** 17:8,12 146:8 147:12 160:1 298:11
**estrogen** 214:2,21 215:18 318:23

**estrogens** 431:15
**et** 1:9,14 9:21,21 493:4 494:1 495:1
**ethical** 131:20 177:7,9 250:4 309:10 316:2 403:18
**ethically** 250:6
**ethics** 5:8 169:11 169:15,22 170:8 170:13 171:1,12 174:19 176:10,12 179:4,9 180:8,15 180:18,21 181:8,9 181:16,19 182:1,3 217:22 218:11 314:13
**europe** 123:5
**european** 89:12,14 89:20 124:13 247:3,22 250:10 313:4
**evaluate** 275:17
**evaluation** 72:7 275:16
**evening** 14:13,16
**event** 359:5
**events** 165:2 202:19 410:18
**everybody** 211:2
**evidence** 6:7 39:6 46:6 70:14,17,18 70:19 71:10 88:21 89:21 120:9 123:4 123:20,22 124:1 186:7 218:4 219:2 219:9,9,18 234:2 242:23 243:16,17 243:21,23 244:13 244:16 245:20 248:20 249:1,7

250:16 252:12,16 252:18 259:20 260:5,10 261:7 280:20 281:16,22 283:7,17,21 284:2 284:7,8,9,10,21 285:5 288:1,6,14 288:22 289:7,18 290:4 291:10 292:1 293:16,22 294:1,11 295:11 295:16 299:20 300:6,22,23 301:8 302:10,23 303:13 303:19,23 304:11 304:14,17 308:15 309:8 311:16 312:6,18 313:19 313:21,23 314:10 314:14,17 317:18 323:14,16 324:16 327:15 328:10 329:14 337:19 341:8 352:17 359:12 362:16,21 363:3,14 365:16 366:22 370:13 374:19 398:9 399:9 408:12 410:3,18 412:18 413:23 414:3,3 415:16 416:4,8,9 439:1,19 440:4 441:6,8,12 444:15 447:16 452:12,16 453:19 454:4 469:5 481:19 482:4,11,20 484:19,21 486:14
**evidencing** 145:12

evident  89:17
  271:23 310:6
  404:3
evolution  82:13
  181:18
exact  196:6 259:12
  268:13
exactly  15:2,17,18
  15:20 42:14 56:12
  77:3 114:4 156:22
  324:5 371:1,3
  400:22 408:10
examination  4:3
  9:11 11:9 70:16
  119:12,13 312:13
  363:1 447:18
  472:9 489:10
examinations
  406:5
examine  165:22
  251:10 344:5
examined  11:7
  312:12 358:13
  480:15
examiners  477:1
examining  71:16
example  44:13
  45:13 71:9 77:20
  81:17,23 83:22
  103:17 104:3,20
  121:15 130:15
  136:8 140:14
  155:18 156:1,14
  156:23 178:4
  205:10,11 206:15
  206:23 207:23
  220:15,18 226:10
  229:9 270:13
  271:18 276:16
  281:6 283:11
  284:5 287:13

292:1 310:12,23
  312:2 316:8 322:9
  328:8,10 331:11
  331:16 334:9
  336:6,8 343:16
  344:1 351:13
  360:13 368:8
  412:18 436:9
  437:1 439:9,10,12
  450:8 452:19,20
  460:1 467:21
  468:5,9,11 470:2
  476:14 478:2
examples  142:3
  331:6 336:2
  459:22
exception  154:4
  165:7 315:21
exceptional  455:5
  457:18,22 458:5
exchanges  98:11
exclude  236:18
excludes  425:1
exclusive  461:21
excuse  279:17
executed  229:5
executive  10:23
  317:13 403:21
  404:9
exemption  234:12
exercise  295:2
exhaustive  210:15
  381:7
exhbiit  6:11
exhibit  4:13,14,15
  4:16,18,20 5:2,5,7
  5:8,11,13,16,20
  6:1,4,6,16,16,17
  6:20 7:1,5,7,12,15
  7:17,23 8:2,4,6,9
  8:12,14 12:3,6

22:15 27:6,9 34:5
  34:7 37:22,23
  43:8 55:7,9,12
  62:17,19 108:5,7
  114:15 115:6
  116:2 127:15,16
  127:17 170:11
  171:5,7,11 223:15
  223:16,18 230:12
  230:12,14 232:21
  232:23 239:14,16
  255:19 256:13,15
  263:7,8,10 279:20
  299:12,13,15
  308:6 320:9
  325:23 326:2
  339:14,14,16,18
  339:20 355:17,18
  361:4,11 375:14
  375:16 388:14,18
  388:20 394:7,7,9
  396:9,18,20
  404:23 411:2,4
  414:20,22 417:8
  419:15,15,17
  426:21,22 427:1
  430:7,9 434:7,7,10
  451:3,3,5 463:2,4
  463:5 464:9,10
exhibits  8:20 15:7
  256:4 481:12
exist  219:18
  488:10
existing  482:4
exists  410:3,4
expect  21:21 34:22
  47:11 61:2 71:19
  122:16 154:11
  173:6 211:17
  215:19 237:15
  300:23

expectation
  154:14 196:13
  209:19 215:5,16
  216:3 287:8
expected  206:13
  209:9 287:20
expend  24:6
expensive  23:23
  102:1
exper  281:11
experience  73:10
  93:19 94:4 121:18
  124:3 132:8
  136:21 148:16
  159:18 162:14
  168:16,22 169:5
  173:11,14,23
  178:2,17 181:1,12
  204:18,19 211:20
  212:1,17 213:10
  214:14 220:22
  243:5,11 246:10
  246:21 270:16,17
  272:8 275:1 278:6
  278:17 279:12
  281:5,11,15,19
  282:1 284:17
  287:1,4 309:16
  329:12 348:19
  383:21 395:11
  405:17 417:18
  443:8 454:9 455:1
  455:2 457:14,15
  458:18 463:21
  476:5 479:12
experienced  94:1
experiences
  364:23 366:6
experiencing
  158:19 162:3
  344:20 348:18

**experiment** 271:8
**experimental** 35:6
43:15 112:22
113:2 117:16
120:5 161:16
217:22 218:11
232:10,14 253:15
254:6,11 288:17
289:6 294:2 295:5
423:2,9,17,22
424:2,22 425:2
481:16
**experimentation**
253:3
**experimenter**
272:1
**expert** 4:13 11:20
11:23 17:9 18:12
22:15 29:21 31:2
31:9 33:1,15,22
40:2,16 50:14
57:22 58:5,12
75:8 86:12 90:15
91:3,8,11,13 92:16
92:20,22 98:19
126:8 127:2
170:15,18 171:2
172:6,21 173:10
174:13,17,22
176:7,17 177:19
180:22 181:10
188:15 189:10
193:14 200:12,20
203:13,18 204:7
204:10 221:23
243:20 249:6
254:9 259:5,14
260:19 261:11
274:8 275:12
322:3 329:8 374:3
374:15,23 375:5

443:4 444:13,17
444:20 448:16
449:14
**expertise** 65:8,16
66:3 74:16 75:14
193:11 200:18
201:22 204:3,12
307:9
**experts** 18:1 22:10
33:14 38:19 187:8
198:12,14,20
199:9 203:19
205:5 409:19
448:13 449:16
**expired** 23:16 25:4
28:4 29:9 31:16
**expires** 492:21,23
**explain** 324:9
**explained** 100:8
**explanation**
159:14 369:5
457:11
**explanations**
355:4
**exploration** 215:9
**explored** 399:2
**exposito** 7:1 360:7
**express** 56:20
275:4 406:18
**expressing** 92:14
92:19 217:10,14
222:1 289:4
**expression** 397:23
**expulsion** 172:15
**extensive** 90:8
107:6 288:4
309:15
**extensively** 228:10
**extent** 51:12 127:9
155:22 209:14
211:15 218:21

**external** 310:12
450:15 479:6
**extra** 397:1
**extracted** 352:14
**extremely** 326:22
**extremities** 142:16
**eyes** 105:20
468:14

### f

**f** 174:5 203:8
446:11,13 492:1
**face** 71:20 131:1
142:9,15 143:7
256:8 289:13
310:14,18
**faces** 146:5 195:1
**facial** 130:9
145:13 146:1
147:5 152:9
166:23 167:3,7
175:4,9 290:14
**facilities** 473:5
**facility** 474:1,20
474:22 475:8
**fact** 40:15,19 44:2
46:15 54:21 59:2
68:18 114:13
118:2 137:9
161:18 166:3
179:13 181:15
222:18 228:8
237:19 250:16
260:11,22 299:11
314:16 319:7
328:22 339:9
344:5 380:6,23
391:11 402:7
433:15 439:15
476:21
**facto** 242:5,9

**factor** 368:9
**factors** 423:9
424:19
**factual** 37:15
128:4
**failed** 280:5
**fails** 493:19
**failure** 320:14,15
**fair** 34:15 74:18
78:16,21,21 114:5
136:17 148:1
149:4 160:4
162:16 168:11,15
189:12,13 193:16
193:18 203:16
215:23
**fairly** 22:8 59:2
75:2 90:20 91:1
131:21 159:6
259:1,8,11,18
435:4
**faith** 444:16
**fall** 252:16
**fallback** 53:12
**falling** 252:17
260:8
**falls** 260:23 261:2
**false** 172:13,19
**familiar** 50:8
76:10 79:10,14
127:9 178:8,9
203:1,2,6,10
211:15 212:6
213:4,8 255:7
341:2 479:16
490:19
**familiarity** 212:22
**families** 81:4
97:20 158:18
159:1,7 164:18
205:1,21 457:7

**family** 82:4 93:23 94:6 209:2 210:20 309:22
**famous** 85:22
**far** 22:7 144:8 178:12 185:6 247:15 313:16 381:3 482:22
**fastidious** 292:8 306:16
**fat** 44:15,22 142:8 142:9
**favor** 64:10 105:12 351:19
**favorable** 63:15 484:12
**fda** 5:13,16 6:4 80:17,20 205:12 206:18 207:2 216:8,15 218:5 220:7,12,22 221:2 221:12,17 222:4 222:12,15 223:9 225:6,10 226:1,13 226:16,20 227:11 227:17,21 228:18 229:19 230:2,8,19 231:8,9,22,23 232:12,13,16 233:4,5,8 234:16 235:11 240:15 243:2,9 245:22 253:5 257:4 261:1 262:8,23 263:21 266:4 269:11 270:21 483:16 490:2
**fda.gov** 230:18
**fear** 95:10 162:9
**feasible** 309:10

**february** 108:15 109:2 115:2
**federal** 5:11 9:5 33:5 221:2 224:1 224:3,8,9,10
**feel** 54:3 104:9 351:11 372:6 420:4,4 479:11
**feeling** 348:4 349:2 351:16
**feelings** 68:7,8
**feels** 114:14 194:19
**fees** 100:11
**feet** 141:4 262:5 268:10,11
**felt** 195:3
**female** 6:12 322:23 323:2 341:23 390:7,8 456:4 457:17 488:7
**females** 368:12 369:9,23 372:14 488:9,12
**feminization** 130:15 166:23 167:4 175:9
**fensolvil** 203:7
**fertility** 468:13
**fetal** 131:11,12 136:8
**fiduciary** 386:3
**field** 21:19 22:3 61:1 132:11 212:4 305:7 322:22 409:19 415:17
**fif** 332:18
**fifteen** 332:20
**fifth** 465:22

**fifty** 445:4,7 446:3
**figure** 272:7 324:11 364:4
**file** 396:23
**filed** 9:22 409:8
**final** 302:2 459:19 485:8
**finalized** 188:2 192:2 199:18
**finally** 134:11 147:14 227:3 419:4
**financial** 109:16 199:5 473:12
**find** 21:15,23 51:6 51:19 53:21 72:11 72:14 77:16,23 104:18 113:11 179:19,19 180:2 317:17 335:11 353:19 360:18 365:5,21 366:7 391:7
**finding** 39:10 91:3 311:9 354:15
**findings** 37:16 38:12 371:21
**fine** 19:4 97:5 384:16
**finish** 227:4 248:12
**finished** 469:15 471:10 491:3
**finland** 35:16 248:4 394:1,17 395:4 396:11 404:23 405:9 406:11 407:11 410:12,15,18,20
**finnish** 7:12 394:19

**fired** 95:16
**firm** 10:6 234:1
**firmly** 111:8 112:13
**first** 11:6 28:22 38:8 59:22 63:10 84:8,15 85:9 86:1 86:4 89:1 91:19 94:9 95:1 96:3 97:1 101:9 107:3 109:12 111:8 116:5 127:19 129:6 130:7,7 170:12 172:10 192:18 202:12 225:9 229:2 233:18 245:9 248:13 257:19 262:8 264:20,22 268:17 272:5 284:23 285:1 300:2 307:18 308:8,9 317:19 324:3,4 326:14 330:16 341:17 347:10 358:2,4,6 367:10 396:16 419:22 420:5 435:14 436:4 439:9 440:8 456:3 458:18 459:2,3 467:12 470:21 472:21 476:8 481:1
**firsthand** 49:20 51:9 193:14 204:19 214:14
**fistula** 336:18,19 338:10
**fistulas** 178:16 338:21

**fit** 77:4 270:22
279:6
**fitting** 372:12
460:10
**five** 51:3 122:4
123:1,5 138:21
139:10 143:19
160:2,3 184:12
196:16 202:11
281:7 313:8 333:9
336:15 337:18
345:19 352:2
391:17 425:11
431:8,10 446:4
474:4,5
**fixation** 129:23
130:11 310:13
**flags** 71:21
**flap** 142:20 178:3
178:4,10,10,15,16
467:22,22 468:1,4
468:5,8 476:12
477:4 478:18
**flaps** 143:1 299:7
338:16 339:5,5
478:17 479:8
**fleck** 446:7
**flip** 285:8
**flood** 123:3
**floor** 2:20
**florida** 474:14
**flourishing** 460:7
**fluid** 134:13 135:9
**fluidity** 400:11
**fly** 358:5
**focus** 5:2 65:5
116:8 137:21
172:9 174:15
**focused** 356:13
**focusing** 145:5

**folder** 115:5
**follow** 7:7 28:17
143:15 146:22
161:11 164:17
208:20 209:12
313:8 327:18
331:16 336:5,10
337:22 339:21
345:5,9,18 346:3
346:13,16 347:9
347:14 352:13,18
352:20 485:7
487:12 489:4
**followed** 164:22
169:22 322:10,12
**following** 9:12
38:12 321:17
322:14 401:15
427:20 431:3
435:16
**follows** 11:7
**folwell** 1:14 9:21
10:21 493:4 494:1
495:1
**food** 221:5 224:17
224:19 263:14
**footnote** 41:10,12
41:12,16 42:5,8
227:9
**footnotes** 327:6
**forbidding** 44:22
**force** 51:17
**forces** 398:2
**forearm** 339:5
467:22
**foregoing** 492:5,9
495:5
**forehead** 130:10
130:12 131:7
140:22 262:1,10
262:22 265:10

266:6,15,22 267:1
267:17 268:21
**forgive** 293:2
325:18 332:12
**form** 8:16 21:14
21:20 22:5,12
26:6,21 28:13
29:7,15,19 30:1,22
31:4 32:14,21
34:20 36:13 37:5
39:18 40:21 41:21
42:12 47:6 48:7
49:23 50:6 52:6
52:14,19 53:1
54:13 55:3 57:14
58:17 60:20 62:1
65:17 73:14 74:19
76:18 77:13 78:8
78:20 81:8 83:6
83:15 88:17 89:3
90:17 91:16 92:17
96:18 97:12,23
98:8 99:8 102:12
103:10 107:22
110:3 111:20
112:23 113:21
114:11 117:3,10
117:19 118:6,20
120:20 126:13
127:7 128:15
135:18 136:18
137:13 148:2
149:14,18 151:14
154:3 155:16
157:12 158:7,11
162:17 163:2
166:12 168:20
173:5 175:1,7,12
175:14,17,23
176:11 179:5,18
180:9,16 181:2,13

184:20 187:4,14
187:20 188:12
190:18,23 191:4
191:10,15,21
192:3,10,23 193:9
193:17 198:9,23
199:15,21 200:5
200:10,16 204:14
204:22 206:7
207:16,21 208:18
211:13 212:5,21
215:3 216:1 217:3
217:8 221:10
222:5 226:19
227:19 228:15
229:22 232:7
234:20 236:6
237:6 238:4,9
239:11 240:19
242:4,12 243:13
245:11,17 251:4
252:7,11,18
253:18 259:2
266:9 267:21
269:1,7 270:6,12
273:10 274:9
275:14 281:1
283:7 284:9
285:16 286:20
288:15 293:13
294:20 295:12,18
297:20 298:5,14
303:9 305:11
307:6 311:18
318:4 323:3 324:2
333:15 342:20
352:7 357:23
359:2 362:19
364:7 367:2 371:8
374:8 376:10
381:11 382:22

383:2 385:17 387:6,16 395:13 399:22 406:15 407:6 408:14 409:10,16,22 410:13 412:14 413:20 416:1,6 424:5,12,23 425:15,20 426:17 427:22 428:4 429:3,22 431:19 432:10 436:1 438:4,17 439:7 440:14,17 441:10 442:16 443:15,21 447:1,12 448:19 449:10 451:19 453:21 454:12,18 455:12 458:2 459:11 460:20 461:18 462:6,12 463:23 464:16 465:6 466:6,19 467:3 469:8 492:8

**formal** 69:10,19 383:19

**formality** 96:23

**formally** 75:5

**format** 87:13 93:17

**formed** 170:18 259:5

**former** 107:18 179:14 181:19

**forming** 196:23 221:15 232:11 239:3

**forms** 70:20 131:19 144:9 252:16

**formulated** 424:14

**forth** 435:8

**forty** 307:12

**forward** 105:21 415:22

**found** 53:18 122:5 344:8 359:19 416:15

**foundational** 93:14

**four** 14:9 58:14 73:12 97:2 103:17 202:11 299:2 336:15 364:14 391:17 401:18 431:10 445:4,7

**fournier's** 478:4

**fourth** 57:16,18,19 348:1

**fracture** 129:22 131:6

**francisco** 86:14 272:17 278:7

**frankly** 313:1

**free** 178:10 339:5 339:5 420:4,4 477:4

**freedom** 79:11

**frequency** 257:2

**friend** 67:7

**friends** 48:18 49:1 104:3 151:18

**front** 324:21

**frontal** 129:21 133:12

**frontalis** 265:10 266:14,18 267:10 267:18

**full** 4:23 11:12 51:17 63:2 83:17 94:16 97:15

100:23 101:2 102:4 113:9 308:8 325:7 347:5 391:20 435:14 445:12

**fuller** 159:14

**fully** 314:4 346:18 416:19

**function** 319:9 333:3,4 345:12 403:22 466:6,20 467:4,19,20 468:6

**functions** 47:7 119:23 317:13 467:6

**fund** 2:13,19

**further** 38:9 172:18 227:7 228:2 237:10 240:9 324:18 337:19 364:16 390:6 414:4,5 492:14

**future** 159:3,11 462:16

**g**

**g** 3:4,5,10 16:16 299:19 493:1

**gained** 109:14

**gangrene** 478:4

**gary** 80:11

**gatherer** 279:11

**gathering** 272:23

**gears** 99:15 182:8 442:5

**gender** 5:3 6:18 7:2,22 8:4,7,10 22:4 35:5 36:18 36:22 39:4 40:4 41:6,7,18,20 44:1 49:16 51:4,23

54:10 57:12 60:16 60:21 61:4 63:14 65:10 76:9 77:18 78:19 80:19 81:20 84:18 85:7 107:12 107:20 109:18 110:8 111:6,10,18 112:21 114:9 115:19 116:20 117:15 126:10 127:4 130:3,3 131:2,16,16 132:18,19 133:16 133:17 134:3,3,17 134:17 137:4,10 137:18 146:21 149:10 150:5,23 151:2,13 152:3,7 153:6,12 154:6,6 157:19 158:1,5,10 158:19 162:15 163:1 164:15 168:12,17 175:20 177:22 178:13 192:17,20 193:20 193:21 195:18,18 200:15 205:15 214:12,18,22 215:18 216:10 312:3 316:18 319:1,15 321:4 329:11 340:9 341:23 342:7,14 353:2,10,22 354:4 367:14,22 368:13 368:14 370:9,19 373:21 374:17 375:2,7,7 376:13 379:20 380:12 382:23 383:19,21 383:23 384:22

387:2 390:1,14,15
390:19 391:2,8
393:18 395:1,11
395:12,22 397:21
398:1,11,18
400:11 405:9,18
410:10,17 411:11
424:9 425:17
426:14 427:5,18
428:1,7 429:8,9,20
430:14 431:1
432:3,7 433:19,21
434:21 435:17
437:13 438:2,12
443:18 447:11
449:7 457:6 458:1
460:18 462:3,9
479:22 481:21
482:12,18 483:22
485:16 486:6,6,17
486:20 487:18
488:19
**genderreport**
407:19 408:17
**genderreport.ca.**
407:13
**general** 106:5
121:17 122:2
123:10 165:1
208:11 209:13,19
210:12 213:1
223:5 247:11
272:5 273:8
274:17,18 277:20
294:21 295:7,8
321:8,11,15 322:5
326:21 391:3,10
436:14 472:17,21
473:1 480:13
484:23

**generally** 43:16
92:20 117:14
136:4 163:15,16
211:2,6 213:7
215:19 219:7
231:10 233:4,7
238:18 284:22
323:21 334:1
373:16 374:4,16
374:23 375:6
408:11
**generated** 276:18
379:8
**generates** 46:11
**generating** 50:13
199:7 372:20
**generation** 461:2
461:7
**generic** 201:11
**genesis** 456:6
**genetic** 201:10
**genital** 178:5,20
**genitalia** 323:2
436:8,15 479:6
**genitals** 290:7
**georgia** 2:15
**germane** 13:20,22
51:3 238:10
277:17
**getting** 119:2
208:22 289:8
355:8 402:22
**girls** 409:8
**give** 11:16 68:19
82:14 88:22
104:21 111:21
121:14 123:12
142:3 150:19
157:4 160:23
161:6 215:20,22
273:13 312:14

339:14 340:22
383:13 384:10
403:8 445:8 450:8
452:23
**given** 13:6 34:21
53:22 54:5,5 85:1
122:2 165:11
176:3 177:15
185:20 196:16
209:9 217:18
220:13 291:11
305:2 314:7 319:4
319:12 322:2
371:4 401:22
418:16 436:23
491:12 495:9
**giving** 63:15,15
86:18 94:4 97:7
159:16 235:11
402:12 450:17
**glabellar** 267:2,3
**glasses** 41:11
**gleaned** 195:12
**gloss** 340:20
**glossary** 173:12,21
173:22
**glossed** 13:19
**gn** 431:14
**gnrh** 431:14
**go** 16:13 19:3
26:12 27:14 31:8
35:1,11 36:1,7
38:21 43:10 56:15
57:1 58:1 59:14
64:4,14 71:16
72:13 74:11,11
78:23 87:15 110:4
111:7 115:8
116:16 119:16,16
119:18 126:6
128:17 129:18

143:16,17 149:22
154:11 158:13
166:4 171:21
174:3 188:19
202:12 207:3
210:2 218:7 225:2
227:5 231:2
242:13 245:2
248:13 254:12
256:9 264:10,20
279:19,20 281:2
281:14 289:22
297:8 302:5 308:5
314:9 319:18
320:8,11 327:20
327:21 330:10
332:15 340:7
341:13 347:19
349:15 350:10
358:1 359:8,13
364:13 367:6,8
373:11 378:5,14
380:10 381:12
383:9 384:9,16
388:3 391:12
396:11 397:15
398:17 399:11
401:5 404:22
405:2 407:7,8
413:6 415:6 417:9
419:19 420:5
421:6,6 422:11
428:8 430:21
435:12 437:5
440:1,23 445:2,2
446:2,8 451:8
452:19,19 453:10
455:18 458:21
460:22 465:8
469:10 470:4,9
471:5 484:13

USCA4 Appeal: 22-1721      Doc: 41-5      Filed: 08/31/2022      Pg: 639 of 705

491:7
**goal** 206:13
459:19
**goals** 460:13
**god** 456:10,13
457:10
**goes** 36:4 266:19
303:10 424:20
**going** 9:16 15:14
17:12 27:5 31:1
37:4 46:11 55:6
73:1 102:9 121:11
123:14 125:23
131:10 156:17
180:2 185:23
218:7 219:20
223:14,15 230:11
232:21 239:14
256:13 261:4,15
262:16 263:7
271:15 283:10
287:5 289:22
291:16 298:7
299:9 306:11
313:9 315:12
316:21 317:2,7,8
317:11,12 319:1,6
319:20 325:23
328:9,14 353:5,6
353:16 361:3
364:10 375:13
379:21 383:12
385:10 386:5,7
387:20 388:14
396:8,10 397:13
403:8 414:16
415:20,21 420:22
423:7,18 426:21
426:22 430:6
434:7 448:23
449:12,13 457:12

457:13 464:7
467:18 468:5
469:4 485:8
488:13
**gold** 249:3
**gonadectomy**
344:13,19 345:7
345:16
**gonadotropin**
201:7,9 317:22
428:14
**gonzalez** 2:18
**good** 9:15 11:10
11:11 52:16 87:11
92:10 124:23
133:21 135:6,6,6
164:1 251:8 261:6
276:18 290:5
311:15 312:23
379:9 439:21
472:2
**gorney** 67:7 72:2
**gosh** 170:9 186:15
202:10 298:7
313:6
**gospel** 450:18
**gotten** 124:10
**government** 77:4
**grabs** 123:2
**grafting** 44:15,23
142:8,10
**grafts** 478:17
479:8
**grand** 67:8
**grasp** 403:21
**great** 53:19 56:9
89:16,18 104:5,10
105:3 106:9
161:20 177:12
244:2 248:3
260:12 286:12

287:12 290:6
389:5 475:4 480:8
484:22 485:5
**greater** 287:7,8
311:7 390:2
402:16 410:5
**greatest** 122:1
**greatly** 68:3 444:3
**griffin** 35:17
**grooming** 461:2,6
461:8,11,12,14,21
461:22 462:10,15
469:2,12,14 470:6
**grounds** 466:3,15
**groundwork**
462:19
**group** 45:11 88:12
192:18,21 193:3
242:19 249:6
271:8,9 309:6
322:21 367:15
368:19 390:3,10
390:13,18 412:8
452:5 455:6
**groups** 184:17
190:16,21 191:13
192:7 266:15
271:8 280:8 346:8
368:20 483:9,15
**grow** 121:14
**growing** 109:15,20
260:9 328:1 341:8
360:14 363:8,9
458:5
**grows** 476:5
**growths** 144:10
**guardians** 402:2
402:23 403:10
404:18
**guess** 12:18 69:5
74:21 83:19 93:16

127:20 152:8
160:15 176:16,21
226:3,7 264:1
279:8 288:9
297:22 298:7
301:2 303:20
331:23 379:9
471:17,21
**guessing** 98:3
142:1,18 298:19
**guidance** 28:8
29:22 31:3 32:8
128:12 227:16
233:3,5,9 238:7
282:3 394:20
398:21
**guide** 249:8
**guided** 248:19
**guideline** 186:12
186:14
**guidelines** 7:12
27:17 28:17 73:12
195:17 196:15,22
197:14,17 200:14
200:22 394:1
395:5,10,15,21
401:2 402:10
403:6 404:23
406:11,22 407:11
410:12,16
**guy** 125:8
**gynecomastecto...**
148:11

| h |
|---|

**h** 4:10 16:12,16,16
55:20 182:13
389:13 414:15
446:12 494:3
**habit** 449:21
**hair** 139:22 146:1
146:5 147:5

151:12 152:9,17 153:2
**half** 25:20 146:13 147:10 336:16
**halfway** 359:16
**hampshire** 111:1
**hand** 16:9 77:15 176:21 287:12 417:4 468:6,9
**handed** 269:10
**handle** 54:21 346:15
**happen** 220:2 259:15 358:14
**happened** 102:6 164:23 186:3
**happening** 60:4 61:5
**happens** 185:9
**happy** 333:8
**hard** 352:17
**hardware** 310:17
**harm** 67:4 70:18 162:9 223:7 290:6 313:13 314:19 333:21 334:10 347:2 413:4 468:8 487:3
**harms** 244:1,2
**harry** 380:12
**hazard** 297:22 390:4
**head** 109:8 131:5 279:5 468:2 474:4
**headed** 4:22 63:2 165:8
**header** 279:22 420:1
**heading** 434:2
**heal** 450:14

**health** 10:20 11:2 21:3 40:7 63:11 65:12 66:4 74:17 75:9,15,18,22 82:6 111:13 116:7 149:16 154:2,12 155:8,12,14 157:7 157:10 182:10,17 241:4 392:8 398:8 418:9 420:13 422:21 423:1 425:11 428:18 429:18 433:10,13
**healthcare** 7:4 8:9 57:12 80:18 149:12 153:21 231:10 376:3 434:9,18,18
**healthy** 120:1 289:21 392:2
**hear** 47:3 49:18 54:19 159:13 160:13 325:14 359:11 426:2 448:23 449:14 471:7,12
**heard** 14:20 17:17 37:6,13 50:15 63:19 73:12 85:2 96:9,14 98:13 102:22 160:11 230:6 233:10 269:12 425:7 442:5 488:15
**hearing** 38:11,16 38:19 63:20 65:14 71:15 162:8 447:13 448:8
**heart** 90:1 218:13
**heartache** 105:9 108:2

**heartbreaking** 95:21
**heartburn** 177:11
**heavily** 185:13 261:1 343:21
**held** 37:9 398:7
**help** 68:16 111:10 112:10 172:19 332:14 458:10,15
**helped** 485:17
**helpful** 83:2 308:14 355:7
**helping** 145:14
**hembree** 380:17
**hereto** 495:7
**hey** 333:8
**hhs** 224:18,20
**high** 88:10,22 116:13,16 117:4 145:3 158:23 161:17 166:4 206:20 218:10,16 222:21 223:3 258:18 312:11 314:5 359:6 420:21
**higher** 103:5 223:3,4 250:15 258:6 281:20 288:22 303:19 305:22 312:17 313:20,21 314:14 317:13 354:2,10 391:9
**highest** 415:16
**historic** 452:16
**historically** 72:1
**history** 70:15,17 220:14 226:10 247:16 324:15 368:13 427:9

**hold** 75:8 189:9 204:6 274:7 325:4 465:2 484:3
**holding** 252:8,10
**holland** 248:4
**home** 63:5
**honor** 447:16
**hope** 98:16 179:21 211:16 222:20,21 223:8 237:20 246:18 292:3
**hoped** 104:2
**hopefully** 246:2
**hoping** 124:23
**hopkins** 106:11 125:10
**hormonal** 416:22 431:12 481:14,20 482:12
**hormone** 84:23 159:20 164:4,9 201:7,10 212:19 212:23 214:3,7 317:22 319:10 345:7 374:16 375:1 376:13 379:21 384:22 387:3 400:5 416:13 424:9 425:18 426:15 428:14 433:19 437:14,17,23 483:21
**hormones** 36:22 82:1 213:7,22 214:11,17 216:9 219:17 238:19 247:2,10 260:7 316:16,20 317:4 318:2,7,20 319:4,8 319:14 373:20

394:21 401:10,14
404:2 416:13
417:5 428:22
447:22 482:17
488:18
**hospital**   24:11,14
24:16,17,21 95:18
140:12 142:17,21
262:17 473:23
474:6
**hospitals**   24:1,3
**hour**   15:5 16:1,2
87:20 319:21
**hours**   17:7,10,13
**house**   63:18
**hruz**   14:18 16:7,9
17:1 33:12,13
39:15,21 40:11
42:10,19 43:23
57:20,21 78:5
81:17 85:10 86:3
87:10 92:13 114:6
**hruz's**   15:8
**ht**   344:14
**huge**   147:13
287:18,19
**hugely**   286:12
**huh**   264:9 361:16
365:4 396:17
420:20
**human**   131:23
132:2,6,15 134:13
444:8 452:17
454:3 458:22,23
459:4 460:5,7,12
467:6,19
**hundreds**   121:1
**huntsville**   24:17
**hustle**   452:21
**hyperfunctioning**
156:8,12

**hyperhidrosis**
206:17 229:10
267:12
**hyperplasia**
436:23
**hypotheses**   372:23
**hypothesis**   372:20
372:21
**hypothesizing**
373:7
**hypothetical**
371:7,10 372:8

**i**

**idea**   48:4,14 49:12
52:17 159:12
177:13 188:9
192:12 255:13
269:3 307:7
379:18 380:1
381:10 402:16
425:16 426:13
433:18 456:20
**ideas**   461:9 469:1
**ideation**   487:5
**identification**   12:6
27:9 34:7 37:23
55:9 62:19 94:1
108:7 116:2
127:17 161:10
171:7 223:18
230:14 232:23
239:16 256:15
263:10 299:15
326:2 339:18
355:18 361:11
368:15 370:2
375:16 388:20
394:9 396:20
411:4 414:22
419:17 427:1
430:9 434:10

451:5 457:15
463:5
**identifications**
463:21
**identified**   145:1
145:21 318:11
344:19 348:10
349:5 356:21
369:1 374:10
428:16 429:1
476:19 485:22
**identify**   136:1
355:11 413:12
444:1 472:14
**identifying**   405:17
**identity**   154:6
192:17,20 193:20
341:23 342:7,14
398:1 462:3,9
486:6,21 487:18
**idiosyncratic**   22:8
**ignore**   415:21
**ignored**   348:11
349:7
**ii**   35:4 123:11
225:5
**illegal**   241:21
242:10
**illness**   384:7
422:22
**illnesses**   486:18
488:9
**imagine**   46:10
198:15 236:9
**immoral**   124:18
468:13
**immutable**   448:15
**impaired**   317:14
**imperative**   66:17
**impinge**   82:20
132:10 215:15

447:21
**impinges**   68:3
**implant**   148:8
220:17,20 222:8
**implants**   299:5
**implementation**
382:13
**implementing**
198:21
**implication**   254:2
**implications**   7:3
**imply**   28:2 241:20
242:3,5,7,8
**implying**   254:4
**importance**
248:21,23
**important**   93:20
162:1 213:3 241:3
247:12 353:14
392:6 399:7
400:11 460:3
**impossible**   319:6
**impression**   46:14
**improper**   206:5
216:18 241:21
242:9,21
**improve**   40:6
111:12
**improved**   6:9
300:7
**improvement**
66:16 265:8 266:5
**improvements**
295:20
**improving**   152:13
**inadequacy**
337:20
**inappropriate**
111:19
**incarceration**
313:14

incisions  134:7
inclined  294:23
include  38:12
  144:9 209:3,4
  215:10 331:3,7
  358:9 363:2
  412:15 415:12
  431:2 436:22
  451:17
included  72:17
  107:9 210:13
  225:16 267:3
  302:2 327:22
  452:11
includes  301:14,19
  303:23 437:14
including  36:21
  145:16 172:12,15
  173:14 274:20
  328:22 358:15
  379:5 431:13
  437:22 441:14
  449:6 463:16
  474:15 487:2
inclusion  243:1
  356:22
incongruent
  195:18
inconsistent  176:9
  179:3 222:3
incorrect  46:5
  150:16 448:20
incorrectly  447:23
  450:6
increase  328:14
  345:3 393:19
increases  328:13
  392:17 393:1,12
  405:19
increasing  328:6
  355:10

increasingly  328:5
incredible  86:20
incumbent  68:10
indicate  490:5
indicated  112:5
indicating  267:1
  268:10
indication  216:15
  221:8 233:21
  243:10 265:8
  268:4 314:17
  333:19,23 334:3
  478:19
indications  226:16
  228:21 334:5
  335:2 351:17
  406:5
individual  13:4
  17:14 241:13
  248:22 253:8,13
  417:18 431:1
  448:17 456:14
  479:15
individually  36:8
  188:20
individuals  41:5
  41:19 436:7
industry  19:8
  20:20 21:11 22:2
  291:14 293:4,8
  386:2 434:4
infants  241:4
infection  478:6
infectious  178:19
infer  199:1 413:15
inferences  392:9
inferring  237:8
inflection  122:20
  185:17
inform  209:21

informal  164:20
information  55:15
  57:9 58:15,20
  74:10 77:6,7,10
  123:6 194:10
  241:7 249:5
  251:16 280:16
  296:19 324:1
  380:20 381:17
  382:14 418:14
informative  392:7
informed  68:19
  119:2 209:1,2
  225:11 233:23
  235:1 401:22
  402:12,22 403:9
  404:11,15,16
informs  176:12
  223:7,9 444:9
inherent  113:23
initial  156:11
  235:4
initially  196:1
  337:16
initials  446:10
initiated  406:2
  407:1
injectables  140:1
injection  266:12
  266:13
injections  140:23
  261:20 262:1,5,22
injured  473:16
  474:16
injuries  178:6
  479:2 490:18
injury  422:22
innovations  229:4
innovative  294:22
innovators  295:6
  295:14

inpatient  257:13
  258:7
input  128:4 134:8
  198:17
insert  202:2,6
  206:3 209:6,9
  210:14 215:11
inserts  210:16
insist  449:17 450:4
insisted  283:9
instance  244:10
instances  273:12
institute  21:3
  53:20 260:13
institution  282:19
  308:22 312:19
institutional
  234:12 235:20
  246:10,21
instrument  140:17
  282:13 324:11
  332:23 333:1,12
  333:17
instruments  332:1
  332:3
insufficient  339:1
  398:9 399:9
insurance  291:13
  291:23 292:14
  376:20 385:4,6,9
  385:21 386:2,6,14
  387:9,19 423:13
  424:15,18 425:11
  429:18 431:21
  432:11,19 434:4
  436:10,12 437:1
  438:21
insurer  376:3,8
  420:22 425:7
  433:10,14

**insurers** 385:12
425:12 439:4
**insuring** 438:9
**intake** 70:20
**integrity** 273:2
280:10
**intend** 12:10 226:2
**intended** 316:23
**intensifies** 5:4
**intent** 234:8
**intentional** 60:5
60:17,22
**interchange** 56:14
**intercourse** 333:4
**interest** 81:3 92:15
199:5 253:9,14
284:15 462:22
**interested** 82:18
122:10 492:17
**interesting** 125:8
335:11 337:9
338:6 351:6,18
416:10 436:2
**interestingly**
357:8
**interim** 4:19 55:16
**interior** 67:21
351:10 450:14
**internal** 130:10
279:8 439:2
**international**
451:15 454:7,14
455:9
**internet** 359:20
360:20
**interpret** 274:19
274:21 275:6
276:4 277:11
352:15
**interpretation**
212:23 276:14

**interpreted**
392:16
**interpreting** 212:7
276:13
**interval** 345:22
346:13 347:4,14
**intervention**
106:21 112:4
124:6 271:22
400:17
**interventions**
89:22 90:7 104:12
145:16 315:20
330:8 369:14
399:16 462:18
481:21 482:5,21
485:16,20
**intraabdominal**
315:21
**intracranial**
272:20 315:23
**intrathoracic**
315:22
**intrinsic** 442:14
443:12
**introduce** 27:5
37:21 55:6 62:16
95:20 108:4
114:15 127:14
170:11 171:5
223:14 230:11
255:19 263:6
299:12 325:4
375:13 388:14
394:6 396:8 411:2
414:16 417:7
426:21 434:6
451:2 463:1
**introduced** 110:9
310:12 461:9

**introducing**
414:19
**introduction**
184:22 240:5
326:12 328:19
334:23
**introductory**
87:16 91:14
403:13,14
**introitus** 479:7
**invalid** 319:16
**investigate** 221:16
452:7
**investigated** 118:4
118:16 120:12
235:17
**investigating**
306:1
**investigation**
118:23 119:11
235:5 279:5,9
**investigational**
5:17 218:20
232:10,14,17
233:14 234:10,11
234:19 241:22
242:3 423:2 425:2
**investigations**
229:6
**investigative**
235:6
**investigator**
272:10 273:3
274:15 278:5
279:3 309:20
315:4,17
**investigators**
273:1 276:23
**investors** 386:3
**invitation** 80:8

**invite** 84:15
**invited** 79:16,18
80:4 81:16
**involve** 149:15
336:9
**involved** 56:8
58:19 78:6,13
98:18 99:6 110:22
143:7 184:4,18
190:12,16 197:12
197:16,21 272:13
278:18 279:13
306:20,23 334:5
371:23 402:4
441:19 472:19
475:4 476:1 477:9
479:14
**involvement** 54:15
78:10 379:14
**involves** 36:15
51:21 271:7
274:12 467:16
**involving** 478:17
**ir** 235:23
**irb** 236:3 237:12
237:14,19,20
246:12
**irbs** 235:23
**irrelevant** 186:1
**irreversible** 119:6
287:15,17 484:16
485:5
**isolated** 129:21
351:12
**isolation** 70:19
71:11
**issue** 47:14 56:9
65:9 67:18 77:15
89:17 92:8 95:8
95:10 106:17
114:14 163:21

177:13 194:17
218:13 241:4
243:22 244:21
251:11 259:21,23
287:11 346:19
385:8,9 398:7
400:11 457:8
483:2 488:1
**issued** 264:16
**issues** 53:16 66:12
66:13 82:7,8,19
85:6 92:11 119:10
123:9 199:6 213:3
233:5 291:15
346:10 351:13
438:7 452:12
453:19 462:3,9
487:7
**italicized** 59:19
**items** 401:18
421:11 422:2
**iteration** 415:14
**iv** 172:4,5,6

**j**

**j** 322:18,18 340:15
389:13
**january** 141:20
257:13 427:12
**jeff** 91:20,23
**jefferson** 492:3
**john** 3:4,5,8 10:17
493:1,2
**johns** 106:11
125:9
**join** 101:9
**joined** 101:11
**joint** 4:19 55:15
**jones** 10:23
**journal** 12:21
102:2 135:17
284:5 296:2,8,13

296:17 297:1,3,17
298:12,17,22
300:10 302:22
303:6 304:13
305:14,20 306:3,4
306:22 307:1,11
307:22 331:12
364:3
**journals** 128:19
129:4 274:1
**judge** 37:9,15 38:4
179:12,21 180:2,4
231:12
**judge's** 42:4
**judgment** 241:16
295:3
**judgments** 486:20
**julie** 444:21,21
**july** 7:6 33:23 37:8
38:11,16 141:15
141:20 383:1,5
**jump** 285:4
**jumping** 456:17
**june** 55:16
**justice** 77:3 444:4
444:5
**justifiable** 484:13
**justifiably** 309:7
**justified** 294:5
314:4
**justify** 287:21
293:22 482:16

**k**

**k** 256:19 445:6
446:13
**kadel** 1:9 9:21
12:23 493:4 494:1
495:1
**karolinska** 260:13
**keep** 69:12 88:4
332:7 378:23

**kept** 37:3
**kettenis** 380:17
**kevin** 3:10
**key** 71:8 291:15
345:9 413:11
**kicks** 337:12
**kin** 492:15
**kind** 20:15 32:12
52:4 54:23 76:22
81:6 82:12 87:9
91:22 98:16
110:18 119:11
125:10 150:4
153:21 154:2
164:14 168:12
175:4,9,20 176:5
179:17 185:2
186:6 187:1,7,11
187:16 191:11,17
198:6,11,14
199:10 201:19
208:2 220:17
223:5 229:7
285:21 286:14
288:7 332:7 355:5
358:13,23 366:7
369:21 390:20
416:21 450:2
470:22
**kinds** 52:9 208:23
**kitchen** 131:4
**knepper** 3:4,5 4:5
10:17,18 14:3,23
15:4 21:14,20
22:5,12 26:6,21
28:13 29:7,15,19
30:1,22 31:4
32:14,21 34:20
36:13 37:2,5
39:18 40:21 41:21
42:12 44:5 47:6

47:16 48:7 49:23
50:6 51:15 52:6
52:14,19 53:1
54:13 55:3 57:14
58:17 60:20 62:1
65:17 73:14 74:19
76:18 77:13 78:8
78:20 80:2 81:8
83:6,15 88:17
89:3 90:17 91:16
92:17 96:18 97:12
97:23 98:8,20
99:8 102:12
103:10 107:22
110:3 111:20
112:23 113:21
114:11,18 115:9
117:3,10,18 118:6
118:20 120:20
126:3,6,13,20
127:7 128:15
135:18 136:18
137:13 148:2
149:14,18 151:14
154:3 155:16
157:12 158:7,11
162:17 163:2,14
166:12 168:20
173:5 175:1,7,12
175:14,17,23
176:11 179:5,10
179:18 180:9,16
181:2,13 184:20
187:4,14,20
188:12 190:18,23
191:4,10,15,21
192:3,10,23 193:6
193:9,17 198:9,23
199:15,21 200:5
200:10,16 204:14
204:22 206:7

| | | | |
|---|---|---|---|
| 207:16,21 208:18 | 425:15,20 426:17 | 136:5 141:23 | 277:13 282:14 |
| 211:13 212:5,21 | 427:22 428:4 | 142:2 145:12,16 | 283:22 285:3 |
| 215:3 216:1 217:3 | 429:3,11,22 | 146:12 148:8 | 286:22 290:6 |
| 217:8 221:10 | 431:19 432:10 | 156:17 159:19 | 295:23 296:22 |
| 222:5 225:22 | 436:1 438:4,17 | 160:7,8,15 163:8 | 298:16 299:10,10 |
| 226:19 227:19 | 439:7 440:14,17 | 164:3,6,8,11,13 | 299:13 307:3 |
| 228:15 229:22 | 441:10 442:16 | 165:12 166:23 | 313:6 315:12 |
| 232:7 234:20 | 443:15,21 446:19 | 167:7,13 169:10 | 317:20 318:18 |
| 236:6 237:6 238:4 | 447:1,12 448:19 | 169:13,17 170:21 | 319:19 321:18 |
| 238:9 239:11 | 449:10 451:19 | 171:6 173:21 | 326:1 328:1 |
| 240:19 242:4,12 | 453:21 454:12,18 | 176:20 180:13,20 | 331:18 334:6 |
| 243:13 245:11,17 | 455:12 458:2 | 180:21 182:8,15 | 338:3 339:16 |
| 251:4 252:7 | 459:11 460:20 | 184:7,14,15,16 | 351:13 354:1,9 |
| 253:17 255:20,23 | 461:18 462:6,12 | 185:2 187:1,6,7,11 | 355:21 359:3 |
| 256:5,11 259:2 | 465:6 469:8 471:3 | 187:16,23 188:4 | 361:4,18 368:4,6 |
| 266:7,9 267:21 | 471:4,11 472:1,9 | 189:20 190:2,4,15 | 369:2 372:2 |
| 269:1,7 270:6,12 | 489:2,8 490:23 | 190:20 191:6,11 | 375:14,23 376:16 |
| 273:10 274:9 | 491:3 493:1 | 191:17,23 192:5 | 376:17,18,23 |
| 275:14 280:22 | **knepperllc.com** | 192:19 193:2,5,11 | 381:6,23 382:4 |
| 281:1 285:16 | 3:8 493:2 | 193:23 194:9 | 383:15 388:19 |
| 286:20 288:15 | **knew** 259:6,7 | 195:16,20,23 | 391:6 394:8 |
| 293:13 294:20 | **know** 12:4 14:18 | 196:3,6 197:20,23 | 395:17 396:19 |
| 295:12,18 297:19 | 15:17,18 19:20,21 | 198:1,5,11,18 | 399:1 400:23 |
| 298:5,14 303:9 | 19:22 20:5,13,14 | 199:10,16 200:7 | 405:4 408:16,19 |
| 305:11 307:6 | 20:22 26:11,13,16 | 201:12 202:2,12 | 408:21,22 409:2,4 |
| 308:1 311:18 | 27:7 33:20 34:5 | 202:15 203:20 | 409:5,11,17,17 |
| 318:4 324:2 | 38:18,20 43:3,6 | 205:15,17 207:17 | 411:2 414:20 |
| 333:15 340:2 | 47:13 50:2 51:11 | 208:5,12 211:8 | 418:11 419:1,11 |
| 342:20 352:7 | 55:7,20,22 56:10 | 213:22 214:20 | 420:18 426:23 |
| 357:23 359:2 | 61:18 62:7,17 | 220:11,11 221:20 | 429:16,19 430:2,7 |
| 362:3,19 364:7 | 65:21 68:10,15 | 221:23 222:18 | 433:6,7,15 434:15 |
| 367:2 371:8 374:8 | 70:9 78:9,12,15 | 223:6,16 224:1 | 436:14,20 439:15 |
| 376:10 381:11 | 83:17 84:14 88:3 | 226:3,21 230:6,13 | 440:6 441:21 |
| 383:2 385:17 | 93:16 96:1 98:10 | 232:9,15,18,22 | 447:4 451:4 |
| 387:6,16 395:13 | 99:16 100:9 102:6 | 235:19 238:23 | 455:21 460:2,4,4 |
| 399:22 406:15 | 104:13 107:11 | 239:9,15 249:23 | 471:13 474:18 |
| 407:6 408:14 | 108:5 111:11 | 254:22 255:4,9,15 | 488:12 489:21 |
| 409:10,16,22 | 114:16,20 119:11 | 256:13 259:4,8,11 | 490:10 |
| 410:13 412:14 | 120:17,22 121:3 | 262:8 263:8,19 | **knowing** 104:13 |
| 413:20 416:1,6 | 124:20 125:8,16 | 268:3,12,13,14 | 205:10 322:13 |
| 424:5,12,23 | 127:15 131:8 | 271:4 276:10 | 354:6 367:4 382:5 |

Case 1:19-cv-00272-LCB-LPA   Document 209-3   Filed 02/02/22   Page 532 of 577

**JA2522**

442:1
**knowledge** 47:17
  47:19 48:8,22
  49:4,20 51:9
  68:14 80:16 83:5
  86:19 121:10
  131:8,9 156:21
  170:1 177:8
  193:15 209:14,18
  408:7
**known** 102:15
  168:8 177:1
  316:12 321:11
  404:5
**knows** 185:22
  188:22 189:3
  205:18 469:4
**kwilliams** 3:14

**l**

**l** 2:12 16:21 203:8
  203:8,11 356:2
  446:13
**lab** 211:11
**label** 5:15,16,22
  6:1 119:5 205:13
  205:16 206:4,8,10
  207:1,3 216:5,13
  216:19,22 217:12
  217:16 218:2,7,18
  218:22 219:6,20
  219:23 220:3,15
  220:19 221:17
  222:2,4,16 226:2,6
  226:23 228:17,19
  229:21 230:23
  231:23 232:9,16
  233:13 234:17
  236:4,14 237:5
  238:2,14 239:5
  240:2,10,16 241:3
  241:12,20 242:2,6

242:9 243:1,18,22
  243:23 244:4,8,11
  244:23 245:2
  246:4,16 247:9,12
  247:19 250:17
  251:22 253:2,13
  255:3,5,12,16
  256:20 257:2,20
  258:3,5,13,14,17
  258:23 259:9,18
  259:21,23 260:2
  260:15,22 261:4
  262:23 263:4
  267:11,23 268:2
  268:18 269:9,21
  270:3 483:8,14,23
  484:4,8,14,17
  489:13
**labeling** 209:23
  210:3,6 215:21
  225:16 233:21
  241:8 242:19
  243:3 265:16
  266:1
**laboratory** 212:8
  437:16
**labs** 212:2,7,18
**lack** 21:17 120:10
  237:17 243:3
  329:23 330:7,8
  346:19 371:4
  467:4
**lambda** 2:13,19
**lambdalegal.com**
  2:16,22
**lane** 9:1 10:8
  471:7,13 491:6
  492:19,20
**language** 59:18
  74:9 78:2 112:1,3
  194:22 228:1

331:1 335:3,5
  385:4 386:12,14
  457:2,4 458:16
**lapper** 9:10
**lappert** 1:20 4:13
  4:15 5:7 8:12 9:19
  11:5,14 22:18
  34:12 57:4 60:11
  60:14 64:9 137:23
  138:11,16 139:3,6
  140:5 255:21
  464:20 468:23
  472:10 475:11
  481:6 483:7 491:1
  491:12 493:5
  494:2,24 495:2,4
  495:12
**lappert's** 11:3
**lapse** 99:21 100:3
**lapsed** 100:11
**large** 9:3 95:12
  121:3 290:16
  342:23 348:12
  349:8,19 404:6
  475:9 479:4
**larger** 287:21
  352:11 396:23
**largest** 376:7
  425:11 429:17
  433:13 474:21
**laser** 139:22,23
  142:11 145:19
  146:2,4 147:4
  151:11 152:9,17
  153:2
**lasted** 97:11
**late** 394:23
**lately** 19:19
  412:23
**latest** 183:1
  196:21

**law** 3:5 30:17
  36:16 51:22 52:5
  53:13 242:23
**lawsuit** 409:9
**lawsuits** 83:12
**lay** 45:20 218:17
**lays** 462:19
**lcb** 1:7 10:2
**lead** 133:4,7 272:9
  273:3 389:3
**leader** 472:15
**leaders** 72:3
**leading** 270:18
  329:5 381:17
**leads** 246:11
  324:18
**learn** 425:14 457:4
  458:16
**learned** 122:15
  125:18 284:23
  468:15
**learning** 70:1
**leave** 396:10
**leaves** 395:15
**left** 137:22 171:15
  242:15 248:16
  252:21 349:20
  451:13 461:1
**legal** 2:13,19 10:6
  10:9 83:8,19
  99:12 493:23
**legislation** 77:11
  109:15,21,22
  110:7 117:6
**legislative** 54:16
  77:2 78:7 110:18
  113:15,17
**legislators** 54:8
  76:7
**legislature** 4:18
  57:10 58:15,21

59:8,13
**legislatures** 76:16
113:8
**legs** 460:5,6
**length** 345:8
346:16 347:13
352:13
**lengthy** 159:6
**leon** 2:14
**lesser** 252:15
267:3
**letter** 6:5 135:16
136:9 263:20
265:22
**letters** 27:17
135:21 136:1,16
279:23 373:16
**level** 56:11 88:10
88:22 124:1,4,7,11
158:23 219:2,9,12
219:18 250:15
281:21,23 282:1
282:11 283:17,20
284:3,6,8,12,21
285:13,22 286:3
286:14 288:6,14
288:14,21 289:2,7
289:9,17,22
290:15,17 293:16
293:22,23 294:3,4
294:4,10 295:11
295:16 300:17
302:10,17,22
303:13,22,23
304:5,11,17 305:1
305:2,2,4,4 306:13
310:6 312:6,6
313:21,23 323:13
323:15 329:14
337:12 362:21
363:3,14,15 364:1

370:13,13,14,15
414:6 416:9
420:21 439:11
476:5 477:2 487:1
**levels** 6:6 212:19
212:23 287:23
299:20 300:21,22
301:7,11,13
303:19 312:17
313:19 314:14
319:10 324:16
414:3
**levine** 16:20,23
17:5,6 19:10
33:19,20 39:15,22
40:12 42:10,20
43:23 58:2,5 78:5
85:13,16 114:7
**lgbtq** 458:7
**liability** 67:11
**library** 415:3
**license** 265:1
**licensed** 153:20
**licensing** 30:16
**lie** 464:21
**lies** 284:2
**life** 67:2 68:9
71:11,14 119:22
152:13 156:3
182:2 244:19
290:2,17 311:5
314:2,7 322:13
359:4 450:18
468:13 469:17
490:7,17
**lifelong** 482:22
**lifesite** 464:14
**lifesitenews.com**
8:18
**lifetime** 220:14
286:23

**light** 97:15 139:22
140:14 145:17
181:15 259:19
260:2 328:15
**likelihood** 161:7,9
161:17 458:11
**likes** 72:2 434:5
**liking** 104:23
105:2
**limb** 475:3 477:5
**limit** 172:19
**limitation** 173:14
**limitations** 342:11
391:16 412:12
413:7,11,18
**limited** 29:9 66:5,5
66:7 68:13 96:21
143:15 148:15
152:5 267:8,9
306:6 413:12
431:13
**line** 30:2 237:23
264:13 320:17
494:4,7,10,13,16
494:19
**lines** 143:19
158:16 166:2
265:10 266:6
267:18 268:5,7,8
**lipoplasty** 142:12
**lips** 471:8
**lisa** 368:7,17,17
370:14 371:12
**list** 41:16 62:11
110:11,16 111:3
116:10 136:4,15
172:22 210:15
224:3 381:7
421:10 422:2
458:5

**listed** 112:19
133:1 135:20
372:23 380:2,2
423:14 441:11
480:7
**listen** 292:17
353:17
**listening** 261:16
**lists** 42:6 128:23
455:14
**literature** 12:21
13:8 45:9 46:19
47:20 50:3,8,11,12
51:2,12,17,19
69:13 72:14,16
86:20,22 89:8,12
89:14,15,19,20
117:22 124:13,14
127:10,12 129:15
135:12 161:4
177:2,3,16 185:3
185:14 186:2
187:2 191:12
194:6 198:6 205:4
228:11,20 247:4
247:22 250:10
260:3 268:19
270:17 274:13,20
283:22,23 297:12
313:3,5 329:1
336:3 337:21
338:2 343:20
346:12 353:18
356:13 358:11
368:6 370:23
410:4,7 414:1
416:12 439:5,11
439:20 441:13
443:6,7 473:15
480:23 483:4
485:19 486:23

487:6 488:21

**litigation** 90:15
176:20

**little** 15:5 16:14
93:12 97:2 101:20
142:20,23 340:3
358:2 442:5
467:21

**littman** 369:16
371:12 372:18

**littman's** 368:7,17
370:14

**live** 38:15,19 277:8

**lives** 66:17

**living** 71:11

**llc** 3:5

**llp** 10:16

**load** 339:22

**lobbied** 54:22

**local** 30:15 64:20
142:20 178:10
478:17

**located** 10:4
138:13

**loe** 301:8

**logo** 101:3 451:14
451:17

**long** 7:7 15:3,21
41:16 85:5 87:20
88:4 89:10 90:20
91:1 97:10 101:5
102:8 124:11
138:3,16 164:22
202:14 206:15
249:20 291:12
292:12 311:22
312:11 313:10
314:15,16 332:8
345:14 352:18
353:17 397:22
398:10 399:10

404:7 452:23
478:11 485:12

**longer** 24:8 47:2
122:7 125:7 165:3
166:3 296:23
352:20

**longitudinal**
124:12 219:13
249:19 281:17
291:12 292:13
299:4 311:9

**longitudinally**
250:1

**longstanding**
230:2

**look** 14:15 17:11
22:14 27:20 28:15
30:12 34:4 38:23
40:1,23 41:1 43:7
57:16 64:6,16
110:4 111:5,22
113:6 119:20
125:10 136:7
152:9 159:11
173:8 174:2
223:11 232:11,20
239:4,13 240:5,22
242:15 248:16
250:6 252:20
256:3,4 257:7,17
275:21,23 276:1,7
297:13 307:13,15
309:5 311:23
312:21 313:11
314:14 317:7
322:15 323:19
326:17,17 330:11
337:10,14 344:8
344:11,23 345:20
347:4 356:7,17
360:3,23 363:17

383:6 391:19
394:13 396:5
405:11 411:1,15
422:10 428:10
429:6 430:22
439:5 440:18
458:18 465:22,22

**looked** 201:23
202:5 277:2
345:14 358:7

**looking** 106:6
107:3 110:15
160:20 173:20
176:15 202:13
219:12 249:22
282:10 284:1
301:2 311:8 313:5
337:3 344:6
345:19 347:7
356:9 363:21,22
364:3,9 379:1
445:16

**lookout** 463:18

**looks** 263:20
304:23 305:3
341:2 453:16

**lose** 170:5

**losing** 325:17

**loss** 178:15 287:17
348:12 349:7

**lost** 95:22 297:11

**lot** 24:3 36:9 56:6
56:7 96:12 104:4
105:9 108:2 143:3
143:11 144:7
148:7,10 165:11
252:4 298:21
346:12 351:21
380:21,22 412:11

**low** 120:9 206:19
218:8 219:5

222:14,17,21
270:15 285:5
287:23 288:6
295:21 310:8
327:1 329:13,14
381:19 482:5
484:9,13

**lower** 309:8
314:18,19,19
354:2 358:12
414:2

**lowest** 252:11,17
283:7 284:9
323:13,15 482:19

**lpa** 1:7 10:2

**luminaries** 310:19

**lump** 156:6

**lunch** 97:15 255:2

**lupron** 201:5,13
201:15 202:6
205:11

**m**

**m** 16:16 20:23
360:10 422:5
445:6

**m.d.** 1:20 9:10
11:5 57:4 58:2,9
60:11 493:5 494:2
494:24 495:2,4,12

**madison** 138:12
138:18,19,21
139:7 140:10

**mail** 59:1,3,4
98:11,16

**main** 23:22 338:21
455:15

**maintain** 24:7
195:7 234:2
236:23 455:3

**maintained** 21:2

maintaining 23:23
24:9
major 40:2,16
95:11 210:22
215:10 478:8
487:2
majority 330:17
335:19 456:23
maker 131:3
making 6:21 45:16
53:23 121:11
131:20 177:9
236:8 248:19
250:12 261:18
275:9 356:3 357:5
360:21 380:8
381:9 382:3
398:15 444:12
452:5 470:6 485:1
487:8 488:6
male 6:12 148:15
322:23 323:3
341:22 348:13
349:9 390:7,8
456:3 457:16
488:7
males 488:10,11
malignancies
479:3 481:4
malignancy
144:10
malignant 44:17
malleable 336:19
malpractice 66:23
316:2
man 71:9 95:21
456:14
man's 71:20
manage 53:8
67:10 112:14
145:14,19

manageable 310:8
management
145:22 147:4
213:11 272:20
473:11,12,13
479:2
managerial
432:17
managers 54:2
managing 53:16
178:18,18,19
mandate 27:22
mandatory 173:3
manipulated
367:15 368:1
370:10,20
manner 234:8,23
manufacturer
264:7
march 377:13
379:6 380:18
381:9 424:8
marginal 267:10
mark 67:7 72:2
381:1
marked 4:12 12:6
27:9 34:7 37:23
55:9 62:19 108:7
116:2 127:17
171:7 223:18
230:14 232:23
239:16 256:15
263:10 299:15
326:2 339:18
355:18 361:11
375:16 388:20
394:9 396:20
411:4 414:22
419:17 427:1
430:9 434:10
451:5 463:5

market 229:1
267:7
marketed 5:18
221:7 233:14
234:7
marketing 225:13
marks 21:12
maryland 474:13
masculine 130:16
masculinization
167:8 175:5
massive 60:1
217:15 477:5
478:5
mastectomy 134:7
480:16
match 334:2
matched 378:16
material 131:13
materials 275:23
331:22
matter 9:21 10:19
16:9 34:22 88:19
96:13 105:3
117:21 208:12
matters 68:12
83:21 473:2
matured 249:22
317:12
maxwell 1:9
mccaleb 80:11
mcdermott 2:7
10:15
mchugh 16:15
19:11 58:9,11
78:6 85:20
mchugh's 18:8,11
mckeown 444:21
445:14
md 22:18

mean 66:8 88:19
92:19 179:23
217:18 225:20,23
230:6 236:14,16
242:21 251:8
266:18 336:22
355:1 358:21
459:8 461:6
meaning 122:10
122:13 403:14,15
432:13,15 459:18
meaningless
404:12
means 29:5,18
30:21 117:1 173:2
173:6 228:13
242:23 440:6
447:9 462:4,10
466:22 492:6
meant 50:23
measure 63:22
235:10 331:19
measured 328:23
334:12
measures 331:13
332:12 333:2
334:13
measuring 300:16
332:1 333:13,18
334:4
mechanism 195:2
372:22
media 9:18 79:3,7
166:16,20 254:15
254:19 320:2,6
367:16 368:21
373:1,2 388:7,11
470:12,16 491:9
median 347:9
medic 240:11
438:1

**medical** 5:19 7:5
8:6,9 13:3 39:5
40:2,16 41:3,17
42:6,16 43:22
45:14 46:23 52:1
54:2,10 64:23
65:8,15 86:13,19
86:21 104:14
112:8 114:1
115:18 122:5
128:19 129:4
144:16 159:15
161:18 194:14
208:9,21 215:14
223:6,8 225:11
226:14 228:10,20
231:19 233:15
234:2 248:3
271:21 272:19
274:20 280:10
296:7 327:14
342:6 363:19
369:13 373:20
376:12 378:20
379:3,5 380:16
384:7 385:5,8
386:13,19 402:1
402:19 406:5
410:7 418:16,23
419:10 421:3
422:16 424:16,17
430:13 432:17
434:19 436:13,14
436:17,17 438:23
444:11 447:15,18
448:2 449:19
450:3,5 459:5,9,20
469:22 470:7
473:7 474:21
479:14 482:4
483:4 485:1,16,19

485:20 486:3
487:15,21 488:5
**medically** 40:5,19
41:19 44:2 103:8
105:13 107:13,20
111:7,19 112:5
113:9,20 114:10
144:5 231:12
232:1 374:5,11,12
374:18 375:2,8
383:9 384:6,23
385:14 387:4,7,15
387:17 388:1
422:6,7,15 423:7
424:11 425:18
426:15 427:19
428:2,6,14,22
429:9,21 430:23
431:17,20 432:8
432:13,14,18,21
433:4,20 435:17
435:23 436:11,19
438:1,15,20
473:17
**medication** 6:1
235:8 256:20
258:5
**medications** 63:13
145:18 220:16
240:11 253:2
258:4 437:15
438:1 484:9,14
**medicine** 64:18
79:22 81:2 82:4
89:6 132:11
151:22 234:9
249:1 412:17
444:18 454:6
460:9,15 469:16
**medicines** 226:11

**mediterranean**
474:11
**meet** 14:7 95:6
163:7 387:9,11
417:20 428:16
429:1
**meeting** 84:15,17
84:21 85:10,11,14
85:18 86:1,5,6,8
89:1 90:14 91:6
91:10,15 93:3,10
93:21 94:9,15
95:1,2,3 96:2,16
97:1,8,11,20 98:4
103:18 222:9
**meetings** 14:13
80:1 84:1,3,6 98:5
102:9 153:4,10
165:10 188:5,10
192:6,13 200:1,8
418:7,13,15,19
419:2,6,12
**member** 45:2
46:22 48:11 49:8
65:7 99:19 100:4
101:12 169:17,18
171:19 190:8
296:23
**members** 48:18
93:23 102:14,15
103:7 105:18,21
169:13 170:14
171:1 172:11,21
173:9 180:22
181:10 189:4
190:21 193:2,7
194:15 296:14
297:3 365:1
**membership**
45:17,22 46:4,14
99:20 100:3,9,11

100:12,22 101:1,3
101:22 102:4
108:3 177:12
**memorable** 478:3
**memory** 56:9
332:8 400:8
**men** 67:9 214:6
**mental** 40:7 65:11
66:4 74:17 75:9
75:14,18,22
111:13 149:15
153:20 154:1,12
155:8,12,14 157:7
157:10 418:8
486:18
**mention** 66:23
68:18 118:9
335:23 412:10
**mentioned** 14:1
15:15 20:10 72:9
97:18 213:21
219:22 290:21
393:23
**mentioning**
335:17
**merely** 46:19
283:19 307:11
338:12 343:15
**merited** 293:7
**message** 163:11
**met** 14:2 17:1,6
85:15,19 94:23
95:1 96:1 292:11
356:22 385:2
386:23 401:15
427:20 435:15
**meta** 307:19
**metaanalyses**
302:18
**meter** 86:10

methodo 120:6
methodological 482:6
methodologically 120:7
methodology 309:11 352:4
methods 257:7 276:1 331:22 411:18
metoidioplasty 168:4 175:16 316:8 478:16
metric 301:8,10 331:18
metrics 331:1
mi 476:12
microvascular 178:2 475:5 476:12
mid 161:8 310:14
middle 1:2 9:23 27:16 224:16
midwest 95:12
military 136:22 137:2,5,11,17,22 474:2 476:4,6 477:8
milton 106:8 125:7
mind 184:23 439:14
mine 67:7 87:21
minimum 245:15 401:15
minor 407:1 445:20,22 449:6
minors 4:22 7:13 40:5 54:11 55:14 57:12 63:2,14 78:19 84:23 405:8

406:13
minus 44:10
minute 27:7 115:8 210:21 272:4 397:1 471:19
misconduct 118:5 118:17 120:12 121:7 126:12 127:6
misdiagnosed 328:20
misdiagnosis 328:23 329:19
misgender 448:7 449:3
misgendering 447:5,9 448:17,21 488:1
misinforming 487:19
misinterpreted 276:20 277:3
mislead 172:20
misleading 172:14 172:20
misrepresentation 60:1
misrepresents 30:14
missing 273:16 340:3 346:4
mississippi 111:2
missouri 111:2
mistake 128:10 138:20
misunderstanding 44:7 45:12
misunderstood 293:3
model 135:11 439:3

modeled 368:21
modeling 367:16 373:3
moderate 265:9 266:5 267:17
modern 149:9
modification 71:10 75:2 130:11
modified 134:7 236:10
modify 66:14,22
mohs 143:4
mol 86:7
moment 91:12 111:22 264:3 273:14 340:22 384:10
moment's 92:4
momentarily 339:23
moments 467:12
money 24:6 386:6 386:8
monitor 437:16
monitored 211:11 211:16,17,18 213:5,17
monitoring 211:20 217:23
montana 111:1
month 25:7 84:12 141:15
monthly 296:10
months 110:6 141:22 166:1 325:10 351:21
moody 38:4
moral 81:5,12,12 82:18,19,23 92:10 151:22 464:22 466:3,14 467:5

morally 467:8,11
morbidities 393:20
morbidity 392:18 393:1
morning 9:15 11:10,11 97:15
morph 88:5
mortality 334:20 392:18 393:2
mother 93:22
motivated 398:2
motivators 67:17
move 186:21 194:21 319:20 347:15 370:4 464:8
moved 256:1 262:17
movement 467:16 473:3
movements 317:11
moving 54:6 114:19 207:6 471:8
mucocele 133:12 133:14,14
mucosal 478:17
multidisciplinary 149:11 150:4,14
multiple 308:21 335:18 469:12
murky 97:2 101:20
muscle 265:11 266:15,19 267:18 483:9,9,15
muscles 263:3 266:13,14,15 267:1,1

**mute** 105:17 471:7
**mutilation** 60:5,17
  60:22
**mwe.com** 2:10

**n**

**n** 2:1 4:1 16:21
  33:2 202:16 203:8
  277:14 356:2
  389:13 414:15
  425:7 445:6
  446:12,12
**name** 10:5,17
  11:12 30:3 57:16
  57:18,19 58:1,8
  68:5 80:6 86:9
  87:5 91:19,21
  92:2 94:21 95:5
  96:1,3 138:13,15
  201:4,11 203:5,9
  389:4 449:2
**names** 56:10 92:3
  106:9 122:1 201:9
  201:13 440:19
  446:9 449:22
**naming** 185:6
  450:6
**nation** 312:20
**national** 21:3
  35:15 395:4
**natural** 119:23
**nature** 56:13
  88:20 159:2,10
  168:23 243:19
  249:15 324:7
  334:21 369:12
  373:9 444:8,8
  452:17 458:22,23
  459:3 460:12
  476:4
**nausea** 226:11

**naval** 473:23
**navy** 130:20
  139:19 472:18
  475:13 476:9
**nc** 7:5
**near** 59:15 377:11
  394:16 421:21
**nearly** 107:2
  336:16 358:7
**nebraska** 138:15
**necessarily** 234:18
  236:16,20 242:20
  286:7 464:1
**necessary** 24:8
  40:6,19 103:9
  105:13 107:13,21
  111:7 113:9,20
  114:10 285:11
  310:4 374:5,11,13
  374:18 375:3,8
  383:9 385:1,15
  387:4,8,15,18
  388:2 422:7,7,16
  423:7 424:11
  425:19 426:16
  427:19 428:2,6,15
  428:23 429:10,21
  430:23 431:17,20
  432:8,13,15,19,21
  433:4,20 435:18
  435:23 436:11,20
  438:2,15,20 495:6
**necessities** 423:14
**necessity** 49:15
  114:2 115:18
  199:8 236:8,18
  237:14 385:6
  386:13 421:4
  422:16 449:18
**neck** 156:6 292:5
  292:11 468:2

**necrosis** 178:16
**need** 36:7 90:14
  106:12 126:16,17
  134:8 143:14
  290:14 292:17
  310:5 358:18,20
  363:1 458:16
**needed** 142:22
  143:14 195:3
  212:20 414:5
**needs** 363:5
**neither** 253:2
  404:9 409:23
  492:15
**netherlands**
  342:16 343:3
**network** 373:1
**networks** 368:20
  369:20 371:23
**neurologic** 121:21
**neurophysiologi...**
  317:10
**neurosurgical**
  272:17
**neurotized** 468:3
  476:12
**never** 16:18 17:6
  45:1,4 91:11,12
  148:6 149:2 150:3
  150:22 151:1
  152:2,6,20 153:3,9
  157:17,22 167:3
  167:10,16,23
  168:3,7,11 169:1
  170:1 176:1
  178:21,23 182:3
  183:15,17,19,21
  183:23 197:5,8
  201:15,17,18
  204:16 207:11,15
  214:10 233:11

  272:9 273:23
  274:4 278:1,4
  284:23 306:23
  310:3,3 402:18
  418:3 447:3
  467:17 468:4
**new** 2:9,9,21,21
  105:20,22,23
  111:1 228:23
  234:10 235:7
  262:17 284:20
  289:15 295:1
  296:14 368:9,11
  369:8,21 382:18
  394:19 419:14
  457:4
**newer** 311:19,20
**nice** 237:23
**night** 15:4
**nine** 184:23
**nineteen** 32:6
**ninety** 262:18
**nobody's** 322:14
**nodule** 156:9,12
**non** 348:4 349:2
  351:14,16 402:13
  415:13
**noncontrolled**
  416:3
**nonexperimental**
  286:6 288:12,21
  293:12 428:3
**nonresponsive**
  186:22
**nonsatisfaction**
  331:20
**nonsurgical** 144:7
**normal** 71:18
  114:20 205:19
  212:3 460:1

normalizing   460:3
north   1:2 3:12,13
    9:23 10:19,22
    11:1 375:20 376:8
    379:15,19 420:14
    424:8 425:5
    474:12
northwest   62:8
nose   71:10,13
notary   9:2,3
    495:13,19
note   303:16
    351:18 358:3,6
    392:6 473:19
    493:10
noted   56:21 120:9
    371:14 495:7
notice   92:4 224:22
noticed   338:7
notices   224:10
notify   30:15
november   5:12
    25:9 224:14
number   6:16
    17:11 61:18 103:3
    120:22 121:2,3
    125:17 147:13
    160:4 164:2 173:9
    184:22 197:23
    213:4 241:7 246:8
    255:8 283:7 285:7
    320:18 321:3,10
    321:20 322:4
    328:7 330:2 331:4
    331:5 352:11,16
    352:22 354:8,10
    354:13 358:15
    360:14 366:22
    367:5,13,22 370:8
    375:10 377:19
    401:21 405:11

431:12 448:5
    485:14
numbered   171:23
numbers   259:12
    303:15 328:11,13
    342:23 368:4
numerous   229:14
nyu   306:11

                 o

o   203:4,8 277:14
    277:14 322:18
    356:2 360:9,9,10
    414:15 445:6
    446:12
oath   254:23
object   44:5 119:4
    253:17
objection   21:14,20
    22:5,12 26:6,21
    28:13 29:7,15,19
    30:1,22 31:4
    32:14,21 36:13
    37:2,5 39:18
    40:21 41:21 42:12
    47:6,16 48:7
    49:23 50:6 51:15
    52:6,14,19 53:1
    54:13 55:3 57:14
    58:17 62:1 65:17
    65:20 73:14 74:19
    76:18 77:13 78:8
    78:20 80:2 81:8
    81:12 83:6,15
    88:17 89:3 90:17
    91:16 92:17 96:18
    97:12,23 98:8
    99:8 102:12
    103:10 107:22
    110:3 111:20
    112:23 113:21
    114:11 117:3,10

117:18 118:6,20
    120:20 126:13
    127:7 128:15
    135:18 136:18
    137:13 148:2
    149:14,18 151:14
    154:3 155:16
    157:12 158:7,11
    162:17 163:2,14
    166:12 173:5
    175:1,7,12,14,17
    175:23 176:11
    179:5,10,18 180:9
    180:16 181:2,13
    184:20 186:19
    187:4,14,20
    188:12 190:18,23
    191:4,10,15,21
    192:3,10,23 193:6
    193:9,17 198:9,23
    199:15,21 200:5
    200:10,16 204:14
    204:22 206:7
    207:16,21 208:18
    211:13 212:5,21
    215:3 216:1 217:3
    217:8 222:5
    225:22 226:19
    227:19 228:15
    229:22 232:7
    234:20 236:6
    237:6 238:4,9
    239:11 240:19
    242:4,12 243:13
    244:6 245:11,17
    251:4 252:7 259:2
    266:7 267:21
    269:1,7 270:6,12
    273:10 274:9
    275:14 280:22
    281:1 285:16

286:20 288:15
    293:13 294:20
    295:12,18 297:19
    298:5,14 303:9
    305:11 307:6
    308:1 311:18
    318:4 324:2
    333:15 342:20
    352:7 357:23
    359:2 362:3,19
    364:7 371:8 374:8
    376:10 381:11
    383:2 385:17
    387:6,16 395:13
    399:22 406:15
    407:6 408:14
    409:10,16,22
    410:13 412:14
    413:20 416:1,6
    424:5,12,23
    425:20 426:3,17
    428:4 429:3,11,22
    431:19 432:10
    436:1 438:4,17
    439:7 440:14,17
    441:10 442:16
    443:15,21 446:19
    447:1,12 448:19
    449:10 451:19
    453:21 454:12,18
    455:12 458:2
    459:11 460:20
    461:18 462:6,12
    465:6 469:8
objections   81:5,13
    95:17 126:17,18
    160:14
objective   81:13,22
    82:8,19,22 257:1
    331:8 334:13
    336:6 409:14

436:16 444:14
447:16 448:2
449:18 460:11
486:5
**objectively** 71:17
436:7
**obligation** 288:2
**obliged** 447:16
**obliges** 468:6
**observable** 317:3
**observational**
258:6 411:20
413:14 414:6
**observations**
229:3
**obtain** 149:3
**obtainable** 309:11
**obtaining** 119:7
402:17
**obviate** 199:4
**obvious** 75:3
310:1 317:14,19
**obviously** 131:2
235:16 238:7
244:3 273:3
309:21 310:2
322:3 323:7 362:1
379:10,13 418:6
**occasion** 144:23
211:5
**occasions** 229:14
**occur** 136:3
**occurring** 335:16
492:12
**october** 264:17
266:6 267:19
493:3
**offending** 449:22
**offer** 12:10 65:16
66:11,21 72:4,5
176:18 177:19,20

181:5 205:22,23
208:23 488:13
**offered** 35:9 39:12
39:16 67:6 68:17
77:6 89:9,11
112:17 140:15
159:8 238:12,16
238:18,22
**offering** 34:17,18
36:10,11 39:22
40:12 42:11,20
88:15 107:6 114:7
118:12 122:14
123:10 130:14
140:20 150:11,15
154:23 159:17
176:7 179:2,9,17
180:7,22 181:10
204:9 285:23
322:3 398:21
447:15
**offers** 454:8
**office** 3:5 138:11
138:18,19,21,22
138:23 140:10,13
142:7,13 159:6
211:5 472:17
473:1
**official** 224:7
230:18 232:18
296:4
**oftentimes** 132:13
149:21 245:23
249:14 479:1
**ogonzalez** 2:22
**oh** 19:13 80:22
95:3 108:22,22
135:4 146:12
170:9 171:23
202:17,22 212:6
268:10 269:14,20

288:16 292:20
293:2 340:1
397:15 420:4
421:15 434:13
445:16 446:10
471:11
**ohio** 96:7
**okay** 12:8 14:5
16:3 17:23 18:17
19:6 21:17 22:14
26:10 27:5 31:1,6
31:10 36:1 37:20
38:3 39:2 43:7,9
43:11 56:18 57:2
62:12,17 63:10
64:5,15 78:16
80:15 93:2 97:6
98:5,21 99:15
102:7 108:9,9
109:11 111:4,22
114:15 116:18
119:17 126:22
133:19 135:4,13
136:20 143:13,18
143:19,23 144:21
145:7 146:14
147:3,14 149:9
151:3 154:9 155:3
165:6 166:6,13
170:17 171:6,9,11
173:2 174:2,4,10
174:12,16 179:23
185:2 189:6,14
197:2 199:10
201:1 202:8 203:7
207:10 212:15
213:15,21 215:17
220:10 221:2
223:11,13,15,20
225:3 230:10,16
231:3 233:12,18

239:13,18 240:7
241:1,11 242:14
242:17 248:9,11
248:15,17 252:23
254:7 256:5
257:18 259:13
261:18 264:11,21
269:14,17 272:6
273:23 277:19
278:16 279:19,21
279:21 285:10
288:16 289:2
294:15 295:23
299:17 302:5,6
303:22 304:8
307:14 308:5,7
315:9 316:17
318:6,19,21
320:10,12,17
323:6 325:3,15,21
325:22 326:4,4,5,8
326:19 330:12,15
332:9,11,16
335:13 339:12
340:6,8,22 341:11
344:10,23 345:3,3
347:16,21 349:10
349:14,21 350:15
350:20 353:12,15
354:11 355:17,20
355:22 359:8,10
359:23 360:2
361:2,3,9,13
364:14 367:6,7,9
372:17 373:12
375:12,13,18,19
377:9 378:5
383:12,12,18
384:9,13,17 386:8
388:5,16,18,22,23
389:11,14 391:21

393:22 394:5,11
394:15 396:7,14
396:22 397:2,3,7
397:15,16 399:5
399:11,12,14
400:15 401:5,7
404:20 405:1,6,13
405:13 408:5,5,16
410:21 411:6,6,7
414:18 415:1,2,7
415:10 419:14,16
419:21 420:7,10
420:10,17 421:2,8
421:19 422:13
423:4 425:4 426:6
426:12,22 427:3
428:8,9,11,21
429:14 430:5,11
430:11 433:2
434:14,16 435:7
435:13,21 437:6
440:1,2 441:1,1
442:4 445:7,17
446:5 450:12
451:7,9 452:21
453:11 455:18,20
455:22 459:1,13
460:23,23 463:3
464:12 465:9,22
466:1 468:19,21
469:10 470:8
471:1 472:1,13
474:3 479:21
480:1 488:17
489:8,12 490:21
490:23
**oklahoma**  111:1
**old**  7:20 67:8
342:22 344:6
380:11,19 381:5
411:10

**older**  196:18
**oldest**  134:11
**omar**  2:18
**once**  225:12 231:9
288:21
**one's**  69:6 133:10
233:13 340:3
**ones**  13:5,21 142:6
**ongoing**  69:5,8
**online**  296:12
297:8 364:10
368:20,21 369:20
408:9 453:16
**onset**  394:23,23
405:16
**op**  76:3,15
**open**  12:4 105:20
106:1 355:17
**opening**  138:7
171:10
**operate**  130:9
138:6
**operated**  138:3
**operating**  123:21
**operation**  8:15
106:13 123:11
148:10,12,17
176:19 178:21
289:20 293:7
299:1 334:1
464:15 467:16
478:13
**operations**  60:2
122:3 168:23
169:3 177:5,7,15
178:7,13,14 292:9
312:17 467:4
476:13,17 477:5
478:12,16,18
479:8,14,17,19
480:19

**operatory**  140:9
**opinion**  13:22 35:8
42:4 44:11 45:10
67:23 81:1 88:20
88:21 95:23
117:20,20 120:15
126:9 127:2
176:13,17 177:17
177:20 183:21
194:14 217:11,14
238:22 243:20
249:6 259:14
260:19 261:11
275:1,4 289:4
374:3,15,23 375:5
395:9 410:2 443:5
443:5 444:14,18
481:13,17 482:3,7
482:10,14
**opinions**  12:10
22:9 34:16,18
35:21 36:3,9,11
39:11,15,21 40:11
42:9,19 44:8,12
45:21 65:16 78:17
88:15 111:18
112:17,21 114:6
118:11 124:3
170:19,22 176:7
177:21 179:3,9,17
181:11 196:23
204:10 221:15
222:1 232:11
238:13 239:3
259:5 322:4
343:18 395:6
409:21 449:19,20
483:1
**oppose**  117:5
**opposed**  136:1

**opposing**  116:19
**optional**  173:3
**options**  153:12
165:23
**oral**  9:11 476:22
**order**  4:16 15:15
24:2 37:15 38:4
40:16 60:6 66:15
100:4 129:19
155:21 195:5
199:3 209:3 218:5
287:7,21 288:11
292:3 294:4 347:5
401:12 417:2
457:5 460:2
**ordinary**  145:22
**organization**
42:16,22 79:10
83:4,8 102:11,20
103:12 104:11
107:18,19 111:17
118:1 177:14
179:14,15 207:7
371:15 454:8
**organizations**  41:4
41:17 42:3,7
43:22 47:10 49:19
49:21 53:15 54:21
83:20 112:2,18
481:9
**organized**  84:4
**organs**  120:1
**orgasmic**  333:3
**origin**  369:15
**original**  129:14
135:15 136:2,17
197:13 200:14
227:16 323:3
338:11
**originally**  23:3
69:7

originated  19:22
  19:23
orthopedic  291:17
  291:22 292:4,10
orthopedics
  460:15
outbreaks  368:19
  368:23 369:21
outcome  287:10
  399:10 480:20
outcomes  7:18
  89:10 90:10
  287:20 326:23
  332:11 334:21
  398:10 404:8
  411:8 413:13
outer  129:21
outlaw  63:13
outright  44:22
outside  52:22
  61:20 69:15 74:13
  75:10 86:3 152:17
  155:20 156:16
  187:8 198:12,14
  198:19 199:4,9
  204:11 208:10
  215:23 216:14
  226:16 271:3
  278:16 279:12
  353:1,4,9 418:23
  419:10 441:22
outward  67:23
  271:15,22 309:18
overall  82:5 92:6
  111:13 255:6
  258:12 321:19
  326:23 333:5
overlap  34:16,23
  36:9
overlooked  134:22
  377:20

overreaching
  105:15
overrepresentation
  67:13
oversight  221:12
overview  441:7
overwhelm  210:19
overwhelming
  241:6

**p**

p  2:1,1 20:23
  55:20,20,20
  182:13 203:4
  340:15 360:9,10
p.m.  254:16,20
  320:3,7 388:8,12
  417:12,15 470:13
  470:17 472:7
  491:10,15
pablo  360:7
pace  54:6
package  202:1,2,6
  206:2 209:6,8
  210:14,16 215:11
packet  77:8,12
pagan  2:18,22
page  4:3 22:14
  25:23 27:13,14,16
  28:16 29:8 30:12
  31:9 34:11 35:1
  35:11 36:1 38:21
  40:23 41:14 43:10
  56:15,19 57:1,3,17
  58:1 59:14 64:4
  64:14 108:10
  110:4 111:7 115:4
  119:18 127:19
  128:7,17,18,22
  143:17 158:13,15
  171:21,22 172:2,3
  174:3 224:16

225:2 231:2 240:6
  242:13 248:13
  252:22 264:10,20
  279:20 300:2
  302:5 308:5
  320:11 322:16
  326:11,14 330:10
  330:10,14 332:15
  332:17,21 337:2,5
  337:6 341:17
  347:19 349:15,17
  349:18,19 359:13
  364:13 367:8,11
  373:13 375:19
  378:5,14,15,15
  382:11 383:10,11
  383:12,14 384:9
  384:16,18 391:13
  394:13 397:6,11
  397:12,13,14,16
  399:11,13,13
  401:5,6,6 405:2,7
  407:8 410:9
  411:16 413:6
  415:6 419:19,21
  420:5 421:7,12,13
  421:17,18 422:11
  422:12 428:8,10
  430:21 435:9,12
  437:5 440:1 445:2
  445:11,13,19
  446:2,8 451:8
  452:19,20 453:3
  453:10 455:18
  465:8,23 494:4,7
  494:10,13,16,19
pages  36:6
pain  292:5,11
pancreatitis
  134:14 135:10

panel  378:17
  380:15
panels  218:11
paper  130:8,18
  131:22 132:2,17
  134:23 135:10
  306:12 355:15,15
  371:21 439:13
papers  72:21 74:4
  185:7 305:21
  337:20
paragraph  27:20
  35:12,15 38:8
  39:1,4 41:1 43:12
  59:23 63:10 64:6
  64:16 65:6 108:20
  110:5 116:6
  119:21 158:16
  172:10 225:9
  233:19 242:16
  252:21 264:22
  265:5 308:9
  320:13 359:17
  364:15 367:10
  391:20 428:12
  429:7 430:22
  435:14 437:11
  445:13 465:23
paragraphs
  468:18
parent  409:6
parental  367:17
parentheses
  320:21
parents  97:19
  160:7,23 162:1,3,7
  163:5,18 165:5,20
  166:7 209:2 402:2
  402:22 403:3,9
  404:17

**part** 27:2 37:14 44:6 50:13 67:19 87:23 102:7,13,23 112:11 120:4 150:4 174:16 183:13,15,17 185:4 187:3,13,18 188:13 191:13 192:21 194:11 195:6 197:2,5 199:12 235:6 272:21 274:11 275:15,22 328:4 342:5 363:20,20 370:22,22 372:17 403:14 404:11 423:5 453:17 473:10,11,12

**participant** 315:17

**participants** 92:21 96:15 273:4

**participate** 91:8 150:13

**particular** 27:1 80:6,7 89:11 103:13 105:22 108:20 124:5,5 145:20 160:15,16 168:23 173:16 174:18 177:4 185:6,15 186:4 209:10,11,15,16 210:10,10 212:17 215:8,12 221:7,8 236:10 238:17 243:10 244:10,10 250:20 259:16 260:1,2 263:22 284:15 288:12 293:11 294:14 297:9 309:15

310:9 313:19 321:9,10 332:9 358:12 363:3 366:7 374:13 439:16,18 440:19 440:19 455:5,6 459:17 463:13,15 473:6

**particularly** 51:2 104:19 131:19 142:15 146:18 162:8 249:12 260:16 319:10 328:15 332:4 401:23 403:22 454:23

**particulars** 90:9 99:11

**parties** 199:4 492:16

**parts** 289:21

**party** 195:6

**pass** 76:16

**passed** 54:23

**passing** 52:22 61:20

**pastors** 452:1

**patch** 133:20 136:12

**pathologies** 144:2 144:2,7,8 145:2,8 146:9

**pathologize** 194:11,22 195:7

**pathology** 156:15 194:20

**patient** 6:22 12:19 13:2 60:4 61:4 68:8 70:13 71:16 74:23 82:22 112:12 120:13

123:12 124:10 130:23 145:6 149:2,22 150:5,22 151:1 152:3,6,14 153:5,6,10 154:9 154:11 155:4 156:17 157:1,6 160:16 162:2 167:5,11,17,21 168:1,5,9 175:22 194:18 207:14 208:6 209:11 210:9,19,20,23 215:13 217:7,19 217:20,22 225:15 231:13 241:13 246:4 248:22 257:21 258:11 261:6 271:16,23 280:1,7,14 285:19 285:20 286:13 287:6,6,19 288:2 290:2,4,5 295:4 309:22 310:7 311:2,4 312:23 314:8,11,16 315:4 315:11,12 317:5 323:17,22 328:6 330:1,4 333:7 353:1,9,20 355:7 355:10 356:4,13 356:21 357:3,9 359:7 374:14 447:20 448:1 478:3 482:23 484:10,16 485:4 486:11 487:3 488:3

**patient's** 253:9,14 310:18 467:17 486:6 487:19

**patients** 51:5 67:1 67:14 68:15,18,22 80:18 81:3 111:10 120:4 131:12 136:21 137:19 142:22 143:5 145:1,10,11,23 146:2,7,7,21 147:11,16,17,20 148:20 150:11 154:21 155:12 162:13 168:13,18 169:1 179:2 195:3 204:20,23 207:19 208:13 209:21 211:9,20 212:13 212:16 213:6,11 213:17 214:15,22 214:23 226:6 232:1 237:3 249:13 251:21 257:4 258:12 260:2,18,21 261:13 283:15 286:1 313:8 314:6 316:18 320:19 321:3,17,20 322:23 326:22 328:2,7,12,14,20 330:18 331:15 335:15,19 336:16 337:8,16,23 341:9 343:2 350:17 351:10 352:12,14 352:21 357:17,21 358:23 360:14 363:8,10 367:13 368:11 369:1,6,22 372:12,14 389:23 390:14,19 391:2,7 404:4 407:1 448:3

448:6 450:1 457:23 473:3 474:19 485:15 486:16

**patrick** 1:20 9:10 9:19 11:5,14 22:18 34:12 57:4 60:11 64:9 464:19 491:12 493:5 494:2,24 495:2,4 495:12

**pattern** 134:21

**patterns** 6:2 256:21

**paul** 57:20 58:8 87:10

**pay** 195:6 297:9 297:13 379:11 387:10,11

**payers** 195:6

**paying** 385:23 386:7

**pdf** 330:10 332:17 397:13 399:13 401:5 405:2 419:19,21 421:7 421:13 422:11

**peace** 66:16

**peculiar** 178:10 210:23

**pediatric** 43:1,1 45:15 48:10,15,19 51:5 86:8 133:12 249:2,12 250:20 251:21 252:4 255:17 400:1 474:18

**pediatricians** 43:2 203:23 277:2

**pediatrics** 5:21 6:3 239:1,23 241:8

255:14 256:21 258:17

**peer** 20:18 128:18 129:4,14 187:11 274:1 296:7,18 331:12 361:23 362:6 364:3 367:15,21 368:19 368:20 369:19 370:7,17 373:1,2 407:20 408:7 485:13

**peers** 287:3 317:8 317:16

**penalties** 109:17

**pending** 33:5 261:15

**penis** 478:8

**peop** 474:18

**people** 7:21 20:15 40:7 53:9 56:7,11 64:19 65:1 66:14 74:8,9 85:23 90:21 91:2,6 93:18 94:14 119:8 122:11 124:18,22 125:13,15 145:14 145:21 146:3 148:18 151:17 154:15 155:21 160:12,18 162:4 182:17 188:23 189:4 194:7 195:11 197:20 220:14 276:22 306:1 321:16 329:10 341:21 342:6 343:11 344:12 350:14 355:11 365:6,12 365:15 366:12,13

366:14,23 367:5 367:22 368:20 370:8,18 411:10 438:9 443:17 449:3,3,22 450:7 452:22 454:15 455:7 456:23 457:6,13 458:9 463:14 464:4 473:18 474:17

**percent** 102:22 161:9,19 255:10 255:10,11 258:12 258:19 297:16 298:1,1,9,19 299:10 302:21 303:3,13 304:12 304:22 307:21 308:3 342:15 344:18 352:6 354:16,16 367:12 369:8 372:12,14

**percentage** 161:12 298:11 302:9 320:19 321:3,20 322:5 329:10 344:12 367:13 370:18 485:15 486:16

**percentages** 303:3

**perception** 112:11

**perceptions** 486:20

**perfect** 256:11

**perfectly** 120:1

**perform** 103:7 105:19 277:7 294:17 295:10,15 315:2

**performed** 24:20 55:14 117:16

141:11,19 142:4 147:17,20,23 167:3,10,16,20,23 168:3,7,12 169:1 173:16 174:20 175:4,20 176:1,4 290:20 300:12 356:12 358:14 477:12 479:18

**performing** 25:8 81:6 120:19 126:10 127:3 140:4 168:17

**performs** 315:10

**perineal** 476:15 479:3

**perineum** 178:3 478:6 479:6

**period** 257:22 300:11 337:10 347:9 403:23 404:2 478:11

**peritoneal** 134:13 135:9

**permanent** 287:14 287:17 311:5

**permanently** 244:19 290:2,7,16

**permissible** 220:8

**permissive** 222:13

**permit** 440:18

**persist** 123:7 400:13

**persistent** 7:21 405:16 411:10

**person** 65:10 70:11,22 75:17 80:7 85:22 148:14 259:17 319:7 347:1 408:19,21 444:8 447:10

USCA4 Appeal: 22-1721   Doc: 41-5   Filed: 08/31/2022   Pg: 659 of 705

448:22 452:18 459:4 460:5,13 477:3

**person's** 60:3 442:13 443:12 446:17,22 447:2 449:1 464:21

**personal** 47:17,19 48:8,22,22 78:17 87:1 93:19 94:4 94:10,12 97:19 124:3 150:8 159:5 209:17 220:21 246:21 275:1 280:13 281:5,11 281:11,15,19 284:17 359:19 360:20

**personally** 47:13 55:22 150:3,21 152:2,20 153:3 175:3,19 176:4 184:3 187:1 190:11 197:12,16 198:5 207:17 208:12 213:16 214:20 272:9,12 274:4 275:5 278:1 278:4,22 284:11 381:23 417:20 418:2 446:16,21

**personnel** 473:11 473:17

**persons** 7:8 66:19 67:20 83:14 93:23 104:17 122:10,12 131:23 132:2,7,13 195:19 245:4 348:17 366:8 383:20 390:5 392:1,8 443:23

454:9 455:1 463:14,20 474:14 476:19 485:22

**perspective** 79:20 82:5 87:2 231:9 283:2

**perspectives** 6:23 356:4

**pertaining** 224:4 473:2

**pertains** 212:10

**pertinent** 12:21 13:19

**ph.d.** 263:22

**phalloplasties** 476:14

**phalloplasty** 315:7 315:11,16 338:22 468:1 478:10,15

**phallus** 339:1

**pharmaceuticals** 484:5

**phase** 235:4

**phases** 94:3

**phenomena** 373:5

**phenomenon** 363:14,15 369:15 371:6 372:10

**philosophy** 459:15

**phrase** 21:10,13 61:9 450:13 457:21

**physical** 40:6 67:4 70:16 317:3 318:3 319:2,12 399:16

**physician** 6:23 30:14 67:10 86:15 119:14 206:1 225:13 253:12 274:17 356:4,14 356:22 357:4

464:22 483:5 484:6,7 488:22

**physicians** 67:10 67:14 122:13 132:4 210:17 219:5 229:20 233:20 273:5 277:1 472:22 487:19

**pick** 283:13

**picture** 176:23

**pieces** 110:6

**pin** 25:6

**pitt** 3:11

**pizza** 131:3

**place** 14:11 91:4

**places** 389:18 484:17

**placing** 235:13 295:4 485:4 488:3

**plaintiff** 9:20 173:17 444:21 445:20,22 446:7

**plaintiffs** 1:10 2:3 4:12 10:16 13:4 17:15 207:23 208:11 417:19,21 418:3,8,19 419:4,7 445:10 448:18 449:6

**plan** 8:2 10:20 11:2 420:13,18 421:7,17,18 422:12 423:1,6,15 423:19 424:3 425:1 431:4 437:12

**planned** 229:5

**planning** 134:9 204:9 467:15 480:16 481:3

**plans** 394:22

**plastic** 5:9 6:7 8:14 22:21 23:2,4 23:13,15 25:3,3,13 25:17 26:2,14,17 27:14 28:10 31:6 32:9 44:13,19 45:3 46:2 47:8 64:10 66:9,18,20 66:21 67:9,15 68:3,10 69:7,16 72:4 73:2 79:20 90:6 95:4,7,11 96:12 99:17 100:5 100:17,19 102:20 102:22 103:19 106:9 108:11 111:9 120:18,23 122:20 123:16,20 123:23 128:8,13 134:8 138:10,11 138:17 139:6 140:5 149:21 154:16,20 155:19 159:3,18 160:13 169:7 171:13 189:3 198:17 274:16 282:4 283:5,9 293:5 294:16,21 295:9 295:14 299:20 300:6,18 306:10 306:12 310:23 311:13 332:5 436:14 464:14 466:4,16,21 467:1 467:11 468:14 472:16,23 473:22 474:5 475:12,16 477:21 480:15 488:23

**plastics** 262:12
296:1 300:9
**platform** 466:18
**play** 469:4
**please** 181:6
264:23
**pleased** 336:14
**plus** 140:16
161:19 232:5
296:11 307:20
443:7 458:8
468:15
**point** 19:2 25:21
27:3 57:8 122:20
123:16 156:22
185:17 232:12
235:17 247:3,16
264:4 309:15
335:16 360:21
380:5 390:20
403:16 432:2
434:2 456:19
457:2 458:14
460:11 470:5
**pointing** 349:1
**points** 215:10
324:6 345:10
389:21 435:8
456:17
**policies** 430:1
**policy** 5:5,21 7:6
8:5,7,10 109:12
115:23 137:10
182:6 220:12,23
223:9,12 225:6
229:14 239:19,22
240:1 260:20
261:12 376:12
377:1,6,17 378:10
378:11 379:15
380:5 382:3,13,18

**382:23 383:4**
384:4,18 386:6,21
424:7 427:4,8,17
428:1 430:4,13,22
431:22 432:6
433:5 434:19
436:5,6 439:16,18
441:9,20,22 473:2
473:5 481:7
**political** 447:6,7,8
**poll** 45:6
**polled** 45:2,4
**ponce** 2:14
**pool** 328:1 355:10
365:15
**poor** 354:20
**poorly** 186:13
**pop** 92:2,4 419:15
**pops** 184:23
**population** 76:9
120:14 145:6
147:6 249:2,8,20
249:21 250:7,20
252:5 255:6,17
278:10 321:9,11
321:15,19 322:5
341:8 342:16
374:14 391:4,8,10
**populations**
225:15
**portion** 17:19 18:5
59:22 97:20,22
98:2 327:10 337:3
**portions** 15:11
18:21 478:8
**portman** 53:19
**portsmouth**
262:13 473:23
**position** 40:18
41:18 50:16 51:10
51:14,18 53:12

65:2 80:20 81:11
107:11,14,19
111:5 112:3 114:8
115:17 221:17,21
227:17,22 229:19
230:2 231:22
232:4,15,19 239:9
240:16 242:2
260:6 288:11
289:3 429:19
452:3 456:13
472:19 481:7
485:18 486:8
**positions** 42:2
49:22
**positive** 80:12
87:8 148:22
**positively** 107:16
**possibilities**
210:17
**possibility** 464:6
**possible** 20:8
315:2,15 318:1,17
318:17 319:13
322:8 461:10
480:20 484:10
**possibly** 118:23
132:4 287:1
370:15
**post** 219:11
362:10,11,14
**posts** 366:20
**postsurgery** 347:5
**postsurgical**
351:20 358:16
**postsurgically**
345:12
**posttest** 304:18,19
**posttreatment**
281:20 282:2,12

**potential** 57:11
58:16 61:22 70:23
118:5 153:11
204:20 206:20
208:14 209:5
210:4 214:16
215:9 217:15
223:1,2 244:1,18
246:3 285:20
293:17 359:5
400:12 462:10
**potentially** 75:10
126:11 127:5
215:22 244:19
314:1
**pouring** 123:4
**poverty** 90:20
243:16,17,21,23
244:12,16 460:6,6
**power** 71:2 276:5
**ppo** 8:2
**practice** 24:9 25:1
69:6 119:15
137:22 140:9
143:21 148:5
151:22 154:1
189:17 234:8
244:4 249:9 259:1
276:12 402:15
475:18 476:8
477:20
**practices** 475:22
476:1
**practicing** 249:1
**practitioner** 23:22
67:3 206:11 281:6
282:18 484:18
**practitioners**
53:16 241:15
248:22 249:4

pre 219:10 281:19 282:12 304:18
precautions 210:13
precedes 159:21
preceding 446:8
precisely 68:4 132:12 228:6 369:17 467:5
precocious 162:20 318:16
predict 398:9 399:10
predicted 324:10
predominate 488:9
prefer 53:3 54:20
preference 53:7 76:13
premarked 12:3
premier 296:18
preoperative 134:9
preoperatively 324:10
prepare 12:15 14:23 27:1 128:5
prepared 11:23 128:2,3 451:10
preparing 13:13 14:3 461:13,15 462:17
prepubertal 400:2
prepubescent 400:5,18,20 401:2
prerequisite 100:18
prescribe 214:21 216:19,21 220:2 225:14 226:15 229:20 231:11

238:2,14 245:16 246:15 251:20
prescribed 201:15 201:18 203:21 204:16 207:13 211:9 214:3,8,10 217:17 245:8 255:11 257:20 258:13,13 259:9 259:23 267:14
prescribes 209:20 216:14 234:17
prescribing 6:2 208:16 217:12 219:23 234:23 236:4,13 237:4 245:4 251:2 256:20 258:22
prescription 203:14 218:19 221:3,13 222:16 251:9 255:3,5
prescriptions 258:17
presence 363:4
present 3:17 81:1 85:10,13,23 89:6 152:15 156:17 182:4 195:13 208:3,16 211:4 306:14 329:1 336:2 343:17 351:11 357:16 367:4 369:4 373:6 406:6 418:6,18 419:6 476:22 486:17
presenta 96:16
presentation 8:13 87:19,20 88:1,12 88:14,23 90:1

97:8 148:15 450:18,21 451:18 451:21 452:5 455:19
presentations 87:14 96:17,21 103:15 104:5 105:22 160:12
presented 82:9 259:22 330:1 343:15 482:2 486:15
presenter 79:18 82:7
presenting 283:18
presents 70:14 71:9 75:1 157:6
press 463:10
pressure 162:4,6 165:12 272:21 367:18 368:2 369:19 370:11,21 371:17 373:2 460:1,3,9
pressured 165:13
pretreatment 282:2
pretty 185:13 205:20 207:6 316:4 342:18
prevailing 449:17
prevalence 340:10 345:21 357:11
previous 182:2
previously 140:11 369:23
primacy 53:22
primarily 291:11
primary 386:2
principle 223:5 294:21 295:7,8

printout 27:12 230:18 464:13
prior 265:6 368:13 405:15
priorities 5:6 116:1,13,13,14,16 117:5
prioritizes 394:20
private 143:21 376:7 475:17
privileged 189:2
privileges 24:2,11 24:14
privy 194:9
probably 32:15 59:3 71:7 94:17 101:13 105:1,14 143:9 146:12 152:12 156:3 185:17 201:5 202:10,11,14 237:8 259:11 298:8,8 319:16 325:10 327:13 336:20 377:1 379:7 434:1
problem 78:1 82:23 112:4,11,15 119:7 123:20 152:22 194:23 291:18 324:4 338:22 352:9 355:9 358:11 363:4,5 370:23 386:1 403:12 447:14 456:22 457:12
problematic 144:12 218:3 259:19 260:17 261:10

**problems** 66:20 89:16 121:21 140:2 156:21 226:12 237:17 260:21 346:23 351:10 352:2 473:7 481:5
**procedure** 9:5 141:11 147:23 148:7 161:18 173:16 174:18,20 175:21 271:20 285:1,2,12 286:3,5 288:13 289:5 290:20 291:20 293:11,23 294:3 312:11 313:20 315:3,5,13 334:2 347:7 351:17 359:1 387:22 393:18
**procedures** 55:13 104:15 105:12,18 107:8 119:2 126:11 127:4 140:13 141:14,18 142:13 150:10 162:23 163:13 164:15 176:2,5 177:23 179:1 286:11 294:17 295:10,16,21 309:18 316:5 339:9 353:21 383:9 419:5 425:3 435:16 476:11 477:13,19 485:17
**proceed** 10:13 286:10 311:7
**proceeding** 492:5

**proceedings** 9:12 492:12
**procerus** 263:3 266:12,19,23 267:9
**process** 48:21 50:13 82:13 156:19 184:13 208:20 235:7 277:18 307:3 320:20 321:5,22 346:7,8 402:5 403:16 461:8
**processes** 367:18
**produced** 188:14 492:7
**produces** 206:18
**product** 45:7,19 185:11 188:14 225:12 233:20,23 234:7 235:2
**product's** 234:3 237:1
**profession** 305:18
**professional** 42:6 42:16,22 43:21 45:6 47:9,10 53:4 53:15 54:20 65:12 75:18,22 76:13 83:3 95:23 104:10 107:17 109:16 111:16 112:1,18 117:23 118:10,18 124:2 127:6 129:2 153:23 154:12 155:8 158:3 177:14 179:14,15 181:19 182:9 199:6 208:21 241:16 276:9 301:4 307:8 316:3

428:17 448:11,11 479:12 481:8
**professionals** 56:21 383:20 398:8 418:9
**profile** 489:18
**profound** 319:5
**progestins** 431:15
**prognostic** 282:9
**program** 95:13 121:12
**programs** 95:15 106:6 107:10 149:10
**progress** 219:8
**progression** 324:16
**prohibit** 226:5 406:12
**prohibited** 37:10 227:1
**prohibition** 46:3
**prohibits** 51:22 180:22 181:10 220:23
**prominently** 322:21
**promise** 248:10
**promised** 289:16
**promises** 363:18
**promote** 44:17 77:17,19 104:12
**promotion** 225:6
**pronounce** 389:3
**proper** 216:18 238:13
**properly** 120:11 145:17 276:5 280:6 330:17
**propose** 254:8

**proposed** 54:8 224:9 235:8
**proposes** 265:7 284:19
**proposing** 386:17
**proprietary** 201:12
**props** 336:22
**prosecute** 52:12
**prospective** 278:12,18 279:14 304:1,9 411:19
**prosthesis** 336:20 336:21 460:10
**protect** 76:8
**protections** 280:9
**prove** 312:22
**proven** 144:13 218:4,16 313:2,4 435:18
**provide** 15:6,10 41:7 112:8 137:10 137:17 158:4 170:15 171:1 174:13,17 400:4 400:16 401:1 415:15
**provided** 17:18 18:4 157:17,22 422:20 474:7
**provider** 153:4,10 153:21 261:1,5 279:10 308:21 312:19 423:13
**providers** 7:4 149:12 231:10 246:8 248:5 308:22 314:3 429:18 464:4
**provides** 378:10 405:7 441:6

providing 36:17
51:23 57:9 58:14
58:20 78:18 80:17
104:17 137:3
151:11,13,17
157:14 195:2
provision 109:17
481:19
provisional 101:21
provisions 170:18
prudential 295:3
psych 156:4,7
psychiatric 49:7
66:13,20 68:2,14
72:6 159:16 190:5
282:16 313:14
384:6
psychiatrist 65:22
153:17 154:22
psychiatrists
189:21
psychiatry 75:5
psychological
66:13 67:22 68:14
68:16,20 70:14
72:6 77:21 82:8
112:10,14 282:16
394:20 395:18
486:4
psychologically
71:1 317:9
psychologist
154:22 364:9,11
372:3
psychology 75:6
psychotherapy
157:15,18,23
158:4 437:14
pubertal 7:18
411:8

puberty 36:21
63:13 81:23 161:2
161:6,15 162:16
162:19,20 163:12
165:9 166:8 201:2
201:3,19 203:15
203:21 204:17,21
205:2,3 207:13,20
208:15 211:10,21
212:14 213:6,18
219:17 238:19
247:1,9 260:6
316:16,20,21
317:21 318:2,11
318:16 374:4,9,12
395:23 397:22
401:10,14 404:1
405:16,20 406:1
406:13,23 413:4
428:15,22,23
437:15,23 482:16
483:21 489:14
public 9:2 63:19
85:4,6 160:11
187:17 191:18
199:11 241:4
495:19
publication 130:2
131:1 133:15
134:12 136:11
182:18 190:2
224:7 227:7 228:1
240:12 275:23
283:16 296:4
306:7 307:1
355:13 356:1
360:18 362:1
368:17 407:20
publications 12:22
85:3 106:23
128:18,23 135:20

136:6,14 283:10
297:16 298:12
302:22 304:12,22
307:21 380:13
publicly 125:5
183:1
publish 46:18
50:20 283:11
303:18 306:9,11
306:14,17 307:5
published 46:13
46:17 72:21 76:3
84:18,22 129:3,13
135:16 183:4
185:16 186:3
189:23 196:1
219:4 220:12
228:20 273:23
274:13 275:20
296:10 298:2
300:9 301:19
302:10 305:14
306:21 322:22
326:6 364:2
371:16 378:1,2
465:10 482:15
486:1
publishes 182:16
publishing 76:15
182:21 284:4
301:4 305:20,21
306:3 331:5
pubmed 20:22
21:10
purport 334:19
purporting 277:10
purports 177:20
purpose 93:9
240:8 241:12
296:13 459:16

purposes 238:20
269:9 423:3
431:22
pursuant 9:4
pursuing 162:23
purview 474:23
pushing 305:4
put 122:8,8 136:5
312:9 327:15
350:4 362:20
371:16 375:10
382:9 395:23
452:8 471:6
puts 282:5
putting 107:5
360:13
pyramid 309:8

q
qualification
244:7
qualifications
29:14 172:13
479:13
qualified 65:11
75:18,22 358:8
qualifier 251:6
254:4
qualify 250:13
274:10 318:9
qualifying 416:16
quality 71:1 89:21
120:9 123:20
285:5 300:6
354:20 381:20,21
415:16 482:6,19
quantifiable 331:9
quantification
363:13
quantifies 330:7
367:21 370:8,18

**quantify** 311:10 330:4 369:3 413:4
**quantifying** 349:11
**quentin** 86:10
**question** 26:8 80:14 83:1 118:14 122:23 124:16 126:4,7,19,23 134:22 155:2 156:5 164:7,12 174:21 176:21 180:1 181:4,6 186:17,23 205:6 208:4 212:12 213:13 215:4 261:15 266:10 269:8,13,16 286:16 288:10 293:3 294:2,9 318:8 321:8 332:21 348:23 365:7 366:9,13 370:4,6 374:22 386:4 409:18 424:21 426:11 441:2 480:2 487:9
**questioned** 65:8
**questioning** 65:15
**questions** 55:15 56:7 134:21 135:2 188:20 261:17 272:5 292:17 314:22 346:21 353:17 394:4 470:19 471:10 472:11 481:7,10 481:13,18 482:1 485:8 486:15 489:3

**quick** 319:21
**quickly** 421:19
**quite** 178:8,8 276:14 309:23 313:1 395:5 404:3
**quotation** 21:12
**quote** 60:22 61:5 227:8,9,23 277:16 291:19 351:4 366:1 367:23 456:6
**quoted** 227:23 480:22
**quotes** 59:18,19

**r**

**r** 2:1 16:12 33:2 203:4,4,11,11 277:14 299:19 322:18 414:15 492:1 494:3,3
**radial** 339:5 467:22
**radiation** 479:1
**radically** 122:22 123:3 284:20
**radicularis** 267:10
**radio** 465:21
**radio's** 465:15
**radiological** 486:4
**raging** 125:6 412:16
**raise** 70:21 124:7 284:2 468:8
**raised** 65:20 119:4 119:10
**raising** 160:14
**ramifications** 213:9
**ran** 21:10 475:2,3
**randomization** 304:6

**randomized** 120:10 251:23 252:5,9,10,13 268:20 269:3 270:1 271:2 272:18 273:7,18 274:21 275:16 279:7 280:8 291:7 292:19,23 293:6,9 293:20 294:10 298:3 302:17 307:19 310:16 316:5
**randomly** 412:1
**ranges** 257:4
**ranked** 301:21
**ranks** 309:7
**rapidly** 125:2 476:6
**rate** 101:23 161:5 161:19 314:5,18 327:1 329:3 334:16 354:7 355:14 390:2 391:1
**rates** 258:5 329:2 352:5 353:9,19 354:1,3
**ratio** 390:4
**rational** 228:7
**rationale** 234:1
**rattled** 73:11
**rct** 271:7 272:10 272:14 274:5,8 275:12,13,20,22 276:23 285:13 294:18 315:15 318:1 319:14 323:7
**rcts** 271:3,11 272:8 274:2

297:18 303:7 305:8,16 315:2
**reach** 48:5 49:21 96:10 160:8 161:8
**reached** 125:2 402:1
**reaches** 288:21 289:6
**reaching** 482:22
**read** 18:14,16,21 37:17 42:7 101:6 101:7 111:21 174:7 181:16 182:6 197:1 202:17 206:2 207:22 208:1 227:20 233:11 264:2,3 277:15 301:1 307:11 324:19 325:6 340:21 358:12 371:11 376:23 377:7 402:8 410:9 430:1 448:23 449:13 493:9 495:5
**readily** 74:8,9 75:3
**reading** 117:13 184:21 185:11 194:6,7 195:11 206:6 239:21 240:20 277:11 298:16 338:8 356:10 357:1 358:4 418:23 436:3 448:10
**ready** 74:7 156:18 471:4
**real** 123:9 364:5 409:8 421:19

**realities** 82:10
447:17 450:4,7
**reality** 252:3
258:21 448:14
**realizing** 348:20
348:21
**really** 89:23 93:14
98:12 106:12
121:7 186:13
205:1 235:4 276:2
277:5 291:21
314:20 337:12
439:8 480:10
**realm** 294:13
**reason** 11:15,18
23:22 132:12
155:5 177:6,6
193:23 194:5
218:2 231:17
314:7 321:14,14
327:22 330:22
333:23 350:22
363:2 393:9
493:11 494:6,9,12
494:15,18,21
**reasonable** 276:19
**reasons** 100:8
105:4,7 108:1
177:10 180:18
250:4 328:21
348:2,10 349:6,12
358:15
**reassigned** 390:5
**reassignment** 6:14
7:9 59:16,23
60:16,21 61:4
337:11 346:17
392:2,9,11,17,20
393:12 432:3,7
**rec** 416:2

**recall** 15:21 56:4
56:12 58:22 69:11
70:2,4 80:6 92:14
93:1,21 96:11
97:1 98:14 99:11
101:5,19,21 102:4
111:2 115:19
149:7 169:8
216:10,12 222:11
262:11 334:17
345:17 347:7
394:1 421:4 481:9
489:14
**recalling** 463:11
**receipt** 493:18
**receive** 69:2
114:16 401:13
485:15
**received** 23:3
31:11 69:19
124:22 265:2
268:4 329:10
350:17
**receiving** 213:6
259:17
**recertified** 23:7
**recitation** 453:18
**reckoning** 404:7
**recognize** 66:18
154:20 406:22
416:2
**recognized** 228:18
**recognizes** 40:3
243:15 250:19
**recognizing** 74:23
243:8
**recoll** 84:5
**recollection** 97:5
110:17
**recom** 395:17

**recommend** 53:5
161:13,15 395:10
395:17,22
**recommendation**
41:3 72:1 118:23
396:3,4
**recommendations**
41:23 42:1 54:18
72:23 398:16
400:4,17 405:4,8
**recommended**
265:23
**recommending**
44:21
**recon** 142:8
467:23
**reconstitute**
478:10
**reconstruct** 468:2
478:12 479:9
**reconstructing**
289:13 290:13
**reconstruction**
44:16,23 133:23
142:15,23 167:19
169:4 178:3,4
299:6 476:16
479:1,5 480:4,12
480:23
**reconstructions**
142:21 178:11
299:5
**reconstructive** 6:8
44:19 46:2 142:23
143:8 274:16
291:20 296:1,19
299:21 300:9
311:14 334:7
335:5 443:8 467:2
467:13,15 472:16
473:15,22 474:8

474:15 475:5,12
475:17 476:1,9,11
477:9 478:9,20
488:23
**record** 9:16 10:12
11:13 79:1,4,8
86:13 115:8,11,14
166:14,17,21
176:23 189:9
207:23 208:9,9
254:13,16,20
312:12 319:23
320:3,7 388:4,8,12
417:10,12,15
418:16 447:18
470:10,13,17
472:4,7 491:7,10
**recorded** 10:4
**recording** 256:6
**recordkeeping**
235:3,18 237:15
**records** 12:20 13:2
13:3 208:1 234:3
237:1 342:6 355:7
419:1,10
**recourse** 53:12
252:14
**rectangle** 350:5
**red** 71:21 451:14
**reddit** 361:19,23
362:11,14 364:19
**redirect** 471:20
**reduced** 333:20,21
333:21
**reduction** 129:22
291:6,11,15,16,19
292:9 293:19
294:9,13
**reductions** 142:19
290:22 292:22

**reexamination** 4:6
**refer** 65:11 67:5
  75:17 155:7
  264:23 444:20
  445:13,22 446:13
  461:13
**reference** 50:21
  86:21 109:20
  144:1 280:13
  320:18 378:6
  380:3 394:17
  413:22 444:16
  467:9
**referenced** 301:11
  301:14 493:6
**references** 50:11
  72:15 301:7
  364:18 378:16,19
  407:18 416:15,17
  439:17
**referencing**
  410:17
**referral** 72:5
  474:9
**referred** 68:16
  233:10 474:17
**referring** 13:8
  144:3 145:9
  146:14 271:4
  441:4 447:9 449:5
  457:23 458:4
  469:19
**refers** 131:18
  456:9
**refined** 93:13
**reflect** 228:8
  397:23
**reflects** 456:12
**refresh** 110:16
  400:8

**refute** 486:10
**regard** 355:12
  472:21
**regarding** 248:23
  468:22 473:15
**regimens** 225:15
**register** 5:11
  224:2 362:10
**regret** 6:20 328:14
  328:20 329:5,12
  329:17 330:4,20
  331:4 335:16
  343:17 344:20
  345:10 346:20
  347:20 348:2,3,3,6
  348:9,18,19 349:2
  349:2,5,12 350:14
  350:18,22 351:4
  352:5,20 353:1,4,9
  353:20 354:3,7,19
  354:22 355:4,14
  356:2,14 357:4,9
  357:15,22 358:14
  358:22 359:5
  363:10 365:16
  366:14,15
**regretful** 6:12
**regrets** 340:11
  352:1
**regretters** 351:19
  354:7 355:2,3
  366:17,18
**regretting** 360:14
**regulates** 221:3
**regulations** 224:4
**regulatory** 263:23
**rehearsed** 368:22
  369:20 371:22
  372:2
**reintroduce**
  339:13

**reintroducing**
  339:15
**reject** 150:10
**rejected** 248:2
**rejecting** 247:4
**rejuvenation**
  142:9
**relate** 74:5 130:2,5
  131:15 132:18
  133:16 134:2,16
  205:20
**related** 85:6 145:2
  146:9,10 229:8
  405:18 432:3,8
**relating** 66:13
  447:20 473:6
**relationship**
  103:21 143:2
**relatively** 45:11
  357:10
**relatives** 348:12
  349:8
**releasing** 201:7,9
  317:22 428:14
**relevant** 43:17
  118:9,17 173:15
  373:23 465:15
  483:20 488:20
**reliable** 89:13 90:3
  180:3 280:11
  323:23 362:16
  366:22 371:4
  408:12 485:13
  486:1,3
**relied** 35:20,20
  50:3,18 293:20
  297:4 343:14,18
**relief** 422:21
**relies** 294:10
  305:7

**relieving** 292:4
**religious** 466:18
  467:9
**rely** 73:6,8,9
  203:18 249:4
  251:14 284:11
  293:6 294:9
  343:12,21 360:11
  409:20 410:1
  456:21
**relying** 125:18
  286:23 287:1
  305:15 359:13
  360:12
**remained** 344:14
**remaining** 470:4
**remains** 241:3
  481:15
**remarks** 87:17
  91:15
**remedy** 67:21
  154:16
**remember** 59:4,7
  59:11 65:18 77:1
  77:3 80:5 84:13
  85:19 86:4,6 87:5
  90:19,19 91:18,20
  93:7 94:20,23
  95:5,6,8,23 96:3,5
  97:7,14 99:14
  100:20 106:4,11
  106:16 109:8
  110:23 222:6
  324:19,22 334:23
  341:4,7 372:15,17
  450:17
**remembered**
  85:18,21
**remembering** 92:3
**remote** 1:18 2:3
  3:1,17 9:6 10:4

70:1 210:16
**removal** 139:22,23
143:4 146:1,5
151:12 152:9,18
153:2 287:16
479:4
**removals** 148:8
**remove** 336:21
**removing** 290:6,8
**renew** 23:20
**renewed** 31:19
**rep** 55:19
**repair** 130:12
131:12 133:22
136:8
**replaced** 457:17
**report** 4:13 12:1,9
13:9,16,17 17:9
18:18 19:6 22:15
25:23 29:21 31:2
31:9 43:7 56:22
59:14 63:15
108:18 109:6
117:13 119:16
143:17 158:15
177:19 183:8
206:6 216:6 230:1
230:4 238:7,11
279:20 282:20
284:7,12 285:23
299:2 303:7 320:9
322:22 327:10
328:4 334:16
335:14 341:4
343:6,7 345:2,8,18
346:2,13 347:8
357:21 359:9
360:17 361:15
364:2,4 367:6
373:11 377:18
389:18 393:23

394:14 407:8,18
410:11,17 412:11
413:18 415:4
444:20 445:3,19
447:23 448:16
449:4
**reported** 228:10
326:21 336:14,23
341:9 345:5
348:10 349:6
350:18 351:4
357:9,15 359:17
363:16 368:5,10
369:6 463:20
490:20
**reporter** 9:2 10:8
10:12 16:12
182:13 325:13,16
325:20 350:3,9
389:13 414:15
426:1,6 471:9
**reporting** 202:19
281:7,9 282:15
283:13 299:3
300:21 327:16,17
331:10 336:5,7,7
336:10 337:17
343:16 345:6,10
349:11,13 362:21
364:11 367:14
368:14 370:1
383:4 465:13
**reports** 19:11
120:2 135:15
194:7 219:1,1,3
220:1,4 244:14
246:7 280:7,20
281:9 282:18
283:20 308:20
324:17 329:19
343:10 352:5

490:17,20
**represent** 10:18
21:9 26:18 32:18
416:4
**representation**
26:4
**representations**
32:13
**representative**
55:23
**representatives**
229:13
**representing** 28:9
452:3
**represents** 440:16
492:10
**reputable** 102:11
102:16
**request** 59:3
151:21 224:22
**requesting** 323:1
328:7
**require** 234:9
237:12,13,14,19
237:20 479:4
490:2
**required** 24:1
66:10 169:14
237:11 242:23
245:1 284:4
454:22 473:14
478:8 495:13
**requirement** 24:4
236:9 238:1
300:21 404:15
**requirements**
172:23 476:5
**requires** 174:19
**requiring** 474:14
**reread** 331:21
384:11

**res** 273:8
**rescinded** 46:3,7
**research** 6:9
106:14 120:7,9
129:14 135:10,15
136:2,17 253:3,6
299:21 300:7,8
305:6,14 308:11
308:18 309:1
321:16 324:18
390:21 485:14
486:2
**researcher** 276:11
**researchers**
326:21
**residency** 69:8,11
69:16 73:3 95:15
100:21 101:12
106:6 107:9
121:12 122:3
125:14 273:9,20
278:17
**resident** 121:19
133:8,8 156:1
272:15
**residents** 101:22
**resource** 86:21
257:13 381:8
409:15 452:6
473:10
**respect** 59:10
125:22 145:9
247:8 392:8 466:5
**respective** 270:7
**respectively** 303:4
**response** 371:12
**responsibility**
233:22 235:1
260:23 261:2
**responsible** 53:17
272:22 276:13

**responsive** 126:1
370:4
**rest** 217:23 246:12
310:22
**restated** 229:13
**restating** 229:8
**restoration** 467:3
**restriction** 226:3
**result** 247:14
287:7 289:16
412:19,19 467:7
484:12 492:17
**resulted** 490:17
**results** 21:13,18
245:9 246:17
249:21 250:21
251:13 252:6
257:17 270:1
276:8 285:13
291:7 292:22
293:9 294:18
297:18 298:13
303:7 305:8
309:23 341:19
344:9 356:17
357:8 392:16
**resumé** 5:7 473:20
**retained** 11:19
33:8 174:22
**retired** 24:23
136:22 139:18
140:8 141:12
473:17,18
**retirement** 24:6
**retract** 371:18,18
371:19,20
**retraction** 276:21
**retro** 341:10
343:23
**retrospective**
257:11 278:9,12

278:19 279:14
289:10 311:23
341:12,14 343:1
343:23 344:8
355:6
**return** 493:13,17
**returned** 331:15
**returning** 328:2
348:13 349:9
**returns** 113:22,22
**reversal** 6:11
147:15 149:3
328:2,7 329:6
330:1 338:13
363:11 429:8
**reverse** 15:14
129:19 320:20
321:5,21
**reversed** 311:6
**revert** 148:14
**review** 6:22 13:6
45:9,22 70:15
89:7,9 93:15
135:11 170:17
177:3 183:8
187:12 191:12
196:20 198:6
199:3 234:12,13
235:20 253:7
265:20 274:13
283:21,23 300:8
307:19 343:2
344:1,8 356:3,12
357:3,20 377:10
379:3,6 408:3
410:20 412:21
414:9,12 415:3,14
415:14,20 416:11
416:12 417:23
418:17 427:11
443:6 448:12

449:16 473:14
483:3 488:21
493:7
**reviewed** 12:17,19
12:20 13:11,14,18
20:18 47:20 50:12
51:1 53:21 106:23
128:19 129:4,14
170:4,8 185:7
205:4 274:1 296:7
296:18 331:12
342:6 361:23
362:6 364:3
367:21 370:7,17
402:9 407:20
408:7 412:22
485:13
**reviewing** 212:2,7
212:18 258:11
439:23 450:3
**reviews** 8:1 35:16
35:17 96:22 120:8
174:11 327:3
332:10 335:1,7
341:1,6 355:6
378:20 384:12
400:9 408:4 413:1
420:8 440:21
445:15
**revise** 29:13
**revised** 196:4
427:15
**revision** 196:16
**revoked** 29:11
**rex** 55:19
**richmond** 264:23
**ridge** 130:16
**right** 12:1,13
14:19 16:3 17:2,7
17:16 18:17 19:8
20:12 21:4,7 22:4

22:11,13,16 24:21
25:12,21 26:14
27:15,21 28:7
29:5,14,18 30:6,20
30:21 31:17,20
32:7,23 33:6,10,16
33:19 34:4,10,11
34:13,19 35:3,6,9
35:22 36:12 37:14
37:19 38:22,23
39:7,12,16,22 40:8
40:13,20,23 41:20
42:11,20 43:18
44:3 47:1,5 48:6
48:12,16 49:10
51:14 52:5,12,13
52:17,23 57:6,13
57:22 58:3,6,9,12
58:16 59:12 60:11
60:14,18 61:7,14
61:16 62:22 64:2
64:12,13 65:3,5,16
65:23 66:4 68:21
68:23 69:1,18,21
70:4 73:7,13 74:2
75:11,15,19 76:2
76:17,19,20 77:14
78:7 79:12 80:1
81:7 83:4,9,14,23
84:6,7,9,23 88:22
90:16 91:8 93:2,4
93:5 99:17 102:8
102:11 103:2
107:21 108:12,15
108:18 110:1,2,12
111:4,19 113:20
114:10 115:15,22
117:1,8,17,20
118:1,5,12 120:15
120:19 123:17
125:14 127:14,19

| | | | |
|---|---|---|---|
| 127:23 128:9,10 | 207:8,20 208:17 | 273:19,22 274:8 | 354:16,17 355:23 |
| 128:23 129:1,4,5,6 | 209:23 210:6,11 | 277:23 279:15 | 356:7 357:5,12,13 |
| 129:11,12,18,19 | 211:22 212:4,20 | 280:19,20 285:8 | 357:19 358:1 |
| 129:23 131:2,15 | 213:19,23 214:4,8 | 286:19 288:14 | 359:1,15,16 |
| 133:2,5,23 135:7 | 214:9 216:4,13 | 290:18 291:1,3,5,8 | 360:10,11,21,22 |
| 135:21 136:9,10 | 217:2,7,9,13 | 292:16 293:8,12 | 361:13,14,15,17 |
| 136:12,13,19 | 219:22 220:4 | 294:12 295:17 | 361:20,22 362:1,5 |
| 137:5,7,21 138:1 | 221:9,13,14 | 296:2,8,10,15,22 | 362:8,9,12,13,17 |
| 139:5,9,12,14,22 | 222:19 224:11,12 | 299:17,18 300:1 | 362:22 364:5,6,12 |
| 139:23 140:3 | 225:2,5,9 227:13 | 300:15 301:8,12 | 364:18,19,20 |
| 141:5 144:19 | 227:14,15,17,18 | 301:13,22 302:14 | 365:3,9,10,13,21 |
| 146:16 147:1,2,7,8 | 228:14,21,22 | 302:16,19,20,23 | 365:22 366:2,20 |
| 147:9,22 149:16 | 229:6 230:16,17 | 303:1,8,22 304:2,4 | 367:1,9,10,18,19 |
| 149:23 150:1,18 | 230:19,20,23 | 304:10,14,17,19 | 368:2 371:1,3 |
| 153:14,15,18,21 | 231:1,20,21 232:2 | 304:20,22,23 | 374:6 375:11,18 |
| 154:2,13 155:9,15 | 232:3,5,6,8,20,21 | 305:9 306:5,6 | 375:21 376:1,2,4 |
| 155:22 157:2,3,7 | 233:12,18 234:6 | 307:5,23 308:3,4,8 | 376:11,14,15 |
| 157:11,15,16,20 | 234:19 235:23 | 308:15 309:4 | 377:12,14,16,21 |
| 157:21 158:1,2,6 | 236:1,5,15,18 | 311:17 315:8,13 | 377:22 378:3,8,12 |
| 158:10 166:10,14 | 237:5,7 238:3,7,12 | 315:18 316:9,13 | 378:17,21 379:2,6 |
| 167:1 168:13 | 238:15,23 240:3 | 316:15,22 317:5 | 379:8,16,22 |
| 169:15,19,23 | 240:15,18,22 | 318:3 319:18 | 381:10,14 382:4 |
| 171:19,20 172:7 | 241:13,22 242:6,7 | 320:22 321:2,6 | 382:19,20 383:6 |
| 173:4,8,20 174:7 | 242:10,11,13 | 322:2,6,15 323:4,7 | 384:1,3,4,19 385:3 |
| 175:2,10,13,16 | 243:12 245:7,10 | 323:8,8,10,14 | 385:15 387:1,4,13 |
| 176:3,10 180:15 | 245:16 248:7,13 | 324:1,5 325:8 | 387:15 388:3,13 |
| 182:7,15,17 183:5 | 248:14 250:22,23 | 326:5,7,8,9,18 | 389:1,15,20 390:3 |
| 183:6,7,12,16,20 | 251:3,16,18 252:2 | 327:4,7,8,11,18 | 390:11,19,22 |
| 184:9 185:5 187:9 | 252:6,20 253:16 | 329:14 330:3,5,14 | 391:4,5,10,12,19 |
| 187:13,21 188:2,7 | 254:21,23 255:9 | 330:20,21 332:20 | 391:22 392:14 |
| 188:17 189:15 | 255:12 256:17,18 | 332:23 333:5,6,10 | 393:20,21,22 |
| 190:3,9,13,17,22 | 257:1,7 258:10,14 | 333:11,14 334:21 | 396:1,18 397:4,8 |
| 191:3 192:9,11,14 | 258:15,19,21 | 336:11,12 337:21 | 397:17,19 398:14 |
| 192:15 193:8,12 | 259:1 261:19,21 | 339:10,15 340:17 | 398:23 399:17,18 |
| 195:15 196:9,20 | 262:2,6 263:1,7,12 | 341:16 342:4,8,10 | 399:21 400:6,14 |
| 197:3,6,18 198:13 | 263:13 264:6,8,17 | 342:16,17,19 | 400:18 401:3,19 |
| 199:19 200:9,19 | 265:12,15,17 | 343:7,9,13 344:15 | 402:23 403:5,10 |
| 201:1,16,20,23 | 266:3,8 267:23 | 347:15,18 348:16 | 404:18,22 405:7,9 |
| 202:3 203:13,20 | 268:15 269:22 | 348:20 349:18 | 405:11,14,22 |
| 203:22 204:2,12 | 270:8,11,13,22 | 350:11,19,21,23 | 406:10,16 407:3,4 |
| 204:15,21 206:5 | 271:1,5,9,12 | 351:5 352:3,6 | 407:7,19,21 408:5 |

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

[right - saying]                                                                Page 60

| | | | |
|---|---|---|---|
| 408:8,9,13 409:3 | 462:4,11 463:8 | **risky** 288:3 | **safe** 268:22 270:3 |
| 410:14,23 411:12 | 464:13,17,23 | **rocketcitynow.c...** | **safety** 219:14 |
| 411:13,15,20,22 | 465:11,18,20 | 5:1 | 221:12 235:9 |
| 411:23 412:2,3,5,6 | 466:8,9,12,13 | **role** 348:13 349:9 | 269:5 437:17 |
| 412:7,8 413:2,3,19 | 469:7 471:2 480:6 | 367:16 373:3 | 469:6 |
| 413:21 414:8,12 | 480:7 484:8 | 395:12 397:22 | **sake** 437:2 438:9 |
| 414:13,19 415:4,5 | 486:13 489:19,20 | 398:11 403:1 | 439:3 467:7 |
| 415:8,11,19,22,23 | 490:2,3,8,14,18 | 474:2 480:18 | **salem** 3:13 |
| 416:5 417:7,16 | **rights** 83:13 101:3 | **roles** 398:18 | **salvage** 475:3 |
| 418:2,9,21 419:23 | **rigorous** 39:7 | **room** 94:17 | 477:5 |
| 420:9,13,14,17,19 | **rise** 294:3 310:5 | 106:20 208:4 | **sample** 413:11 |
| 420:23 421:6,12 | **rises** 281:20 | 235:11 | **san** 86:14 272:16 |
| 422:8,9,10,14,16 | **risk** 41:5 67:11 | **rooted** 444:7 | 278:7 |
| 423:3,10,19,20 | 90:22 206:12,19 | **rosacea** 140:2 | **sanction** 177:15 |
| 424:3,11,22 425:1 | 206:19 207:4 | **rotate** 349:22 | **sanctions** 176:16 |
| 425:4,8 427:3,4,9 | 222:13,17,21 | **roughly** 15:21 | **sat** 153:3,9 207:11 |
| 427:12,15,20,21 | 223:1,3 251:11 | 84:12 97:11,21 | 476:21 |
| 427:23 428:3 | 260:4 270:15 | 101:15 139:7,13 | **satisfaction** 299:8 |
| 429:2 430:2,6,12 | 285:19 286:9,12 | 141:17 345:1 | 331:14,19 332:2,4 |
| 430:16,17,19 | 286:14 287:5,8,12 | **round** 87:14 | 333:4,5,13 |
| 431:7,9,15,18 | 287:19 290:1 | **route** 72:13 | **satisfactory** |
| 432:9 433:8,11,14 | 293:17 295:3,21 | 149:22 | 104:19 |
| 433:17 434:3,8,17 | 301:17,20 310:7 | **rows** 307:18 | **satisfied** 326:22 |
| 434:17,19,22 | 311:2,4 312:11 | **rpr** 492:20 | 330:18 335:20 |
| 435:2,5,10,23 | 313:20 314:8,15 | **rule** 173:3 316:4 | **save** 347:17 |
| 438:3,15 440:2 | 334:10 391:9 | **rules** 9:5 170:14 | **saved** 156:3 |
| 441:9,17,18,23 | 393:1,13,19 404:8 | 173:9 224:9,10 | **saw** 18:7 78:4 95:7 |
| 442:3,4,6,9 443:13 | 484:9,12,16 485:3 | **ruling** 38:10 53:21 | 106:7 341:3 |
| 443:20 444:22 | 485:3,6 488:4 | **run** 95:14 137:23 | 407:17 471:8 |
| 445:10,14,16,17 | 489:18 490:6 | 138:16 488:8 | **saying** 54:20 92:21 |
| 445:20,21,23 | **risks** 84:22 91:4 | **running** 292:14 | 124:17,19,19 |
| 446:5,7,14,23 | 177:21 204:20 | **rutledge** 33:2 | 209:15 234:16 |
| 447:11 449:2,8 | 205:2 206:14,22 | | 236:12 237:13 |
| 450:9,11,15,23 | 207:19 208:14 | **s** | 244:9 250:13 |
| 451:2,11 452:13 | 209:5,8,22 210:4 | **s** 2:1 4:10 55:20 | 274:11 284:22 |
| 452:23 453:13,20 | 210:10,22,22 | 202:16 203:8,11 | 288:20 289:1 |
| 454:6,10,17 | 214:16 215:1,6,9 | 277:14 299:19 | 310:1,2,4 313:6 |
| 455:10,15 456:4,5 | 215:12 217:17,18 | 340:15 356:2 | 365:11,14,18 |
| 456:7,10,15 | 218:8,9,16 219:4 | 360:9,10 492:19 | 366:4 415:20 |
| 457:16,19 458:1,4 | 246:3 | 494:3 | 466:11 |
| 460:18,22 461:3,5 | | **sacrifice** 348:12 | |
| | | 349:8 | |

**says** 22:17,20 26:1
27:16,22 28:15,16
28:22 29:8 30:13
34:11 38:8 39:4,9
40:2,8,9 41:2,2
52:11 55:19 56:20
57:3 59:23 60:10
63:10,18 64:9,17
65:7 104:22
108:10 109:12
110:5 111:8 113:7
115:4 116:6,19
128:7,18 171:1,15
172:11,18 173:9
174:23 179:15
224:17,21,21
225:10 227:7,11
227:23 228:5,23
229:12 230:8
231:4,8,17 232:12
233:19 234:7,22
236:2,7,19,22,23
238:3,5 239:4
240:8 241:2,11,15
241:19,23 242:18
248:18 251:13,19
253:1 257:10,19
258:3 260:10
263:14,16 264:13
264:22 265:5,16
265:19 279:23
300:4 302:1
304:15 305:23
306:1,2 308:9
309:6 326:20
328:19 330:16
341:21 347:19
348:1,2,8 356:11
356:20 357:6,8,14
361:1 364:21
365:5,20 367:11

375:19 377:10
378:6 382:12,16
383:18 384:18,21
386:22 387:5,20
391:23 392:15
397:19 398:6
401:9,12,21
404:21 405:23
411:18 413:9
415:12 421:9,22
422:5,18 424:8
427:11,17 428:13
429:7 430:16,23
432:2 434:8,17,21
435:15 437:8,11
440:4 454:14
456:3 459:4 461:1
464:19,21 466:2
468:22
**scarless** 131:11
136:8
**scarring** 145:20
**schechter** 216:7
280:4 377:20
395:6
**school** 165:12
166:4 409:7 452:1
464:5
**schools** 83:13
**science** 46:6 51:6
78:2 82:15 86:16
90:2,3 92:9,11,11
93:15 94:11
122:17 124:4
125:20 177:8
280:11
**scientific** 20:18
21:7 43:17 44:10
45:6,9,21 46:18
47:20 50:3,11
51:17,19 72:15

81:13 83:4 86:12
86:12 89:7,21
103:14 104:13
112:8 123:4,22
135:14,17 185:3
186:7 187:2
191:12 198:6
218:4 219:8 234:1
244:12 275:2
280:9,16 281:16
281:22 282:13
283:2 284:8
287:22 288:1,5
308:14 311:16
323:23 362:16
363:23 373:23
374:19 378:6,11
380:3,7 381:4,5,8
381:19 382:9
387:21 408:12
410:19 439:5
441:7,12 443:6
444:15 449:20
452:12,15 453:19
454:4 469:5
482:19 483:3
484:19 488:20
**scientifically**
44:10 287:9
366:21
**scientist** 408:23
409:3
**scope** 52:7,15,20
53:2 54:14 55:4
62:2 81:9 83:7,16
83:17,18 89:4
90:18 91:17 92:6
92:18 96:19 97:13
98:1,9 99:9
117:11,18 120:21
126:14 137:14

151:21 204:12
297:19 298:6
425:21 426:18
429:23 438:5,18
442:17 443:16,22
451:20 453:22
454:13,19 455:13
458:3 459:12
460:21 461:19
462:7,13 465:7
469:9
**score** 161:3
**scottsbluff** 138:15
138:23 139:16
**screen** 256:3
**screened** 416:19
**scripture** 456:21
**scroll** 344:10
345:13
**scrotoplasty**
478:10
**scrotum** 478:7
**se** 151:8 178:22
213:7 392:17
**search** 21:2,6,10
268:19 353:18
453:16
**searches** 297:12
**second** 39:3 58:1
64:6,8 70:22 93:3
93:10 94:9,15
95:2,3 96:2,15
97:8 110:5 119:20
134:20 233:19
241:2 255:20
320:17 328:18
339:15 360:4
364:15 383:13
384:11 391:22
413:9 428:12
440:10 445:8,12

477:3
**secondary** 165:14
479:2
**section** 35:4 36:3
59:15 116:17
172:4,5,6 225:5
240:5 257:8,17
265:16 326:12
330:13 339:3
341:17,19 342:11
344:9 378:9
382:12 391:16
397:8 399:15
400:3,15,19,23
401:8 405:3 413:7
415:9 437:7 440:3
440:16 441:6
**sections** 116:12
**see** 13:20 22:17,18
22:22 25:9 27:3,6
27:18 28:5,20
29:2,16 30:18
34:9 35:12,18
36:2 38:6,7,13
39:7 41:1,8,10,12
41:13,15 43:12
53:4 55:17,23
56:22 59:12,14,19
60:8 63:3,16,22
64:20 65:12 70:16
71:5,6,6,7,19
74:20 80:22 91:23
92:8,9 95:21
104:2 108:14,22
109:18 110:9
111:14 113:1,10
113:14 116:1,10
116:14,21 123:13
123:19 128:19
131:13 132:22
134:9,14 141:22

143:19 146:1
150:12 158:20
171:13,16 172:15
172:23 173:18
174:5 202:18
212:19,20 224:13
224:14,16,19,23
225:5,7,17 226:8
227:6,11,22,23
228:2,11 229:15
230:17 231:6,14
232:12 233:15
234:4,13 237:16
239:4,21 240:13
241:9 243:6 246:1
247:13 249:10
253:9 256:22
257:5,8,15,23
258:8 262:11
263:13,16 264:12
265:3,13 266:1
268:19 279:22
280:2,11,17
299:21 300:1,12
301:23 302:2,7,11
308:11 309:12
313:9,12 320:13
320:23 322:18
323:5,19 324:13
326:12,16 327:2,4
327:4 328:11,17
330:14 332:6
334:22 337:8
339:6,7 340:11,20
341:16,19 342:1
342:10 344:7,20
344:23 345:4
346:3 348:4,14
349:23 350:1,7,22
351:20 352:1,20
356:4,15,17,23

357:17 358:12
359:12 361:10
364:15 365:8
366:5 373:17
374:1 377:10
378:5,13,15,18,22
379:3,4,7 382:12
382:15 383:3,11
383:14 384:2
385:2 391:14,15
392:13,21 394:17
394:18 395:1,7
397:10 398:3,12
400:7 401:8,16
402:6 405:20
406:8 407:15
411:16,20 412:21
413:6,8,15 414:1,6
415:8,12,17
419:14 420:1
421:9,22 422:3,15
427:6,8 428:18
429:7,12 430:14
431:5 432:4,4
434:9 435:1,7,19
437:7,17 440:3,8
440:12,22 441:3
446:9 447:14
449:1 451:15
453:1,2 461:4
471:20
**seeing** 71:17
114:21 237:9
355:1 386:8
**seek** 66:14 334:19
351:8 457:13
**seeking** 67:20 71:9
74:10 132:8 146:4
152:14 154:16
165:9 276:11
300:22 363:11

456:23 459:18
**seen** 17:21 18:13
77:8,11 96:8
123:6 162:5 165:4
165:4 219:4
223:21 233:8
249:21 309:11
338:1 340:19
388:23 420:2
436:5 488:15
**sees** 245:21
**select** 307:4
**selected** 7:19
191:2 193:8 198:2
411:9 476:23
477:1
**selecting** 306:21
**selection** 472:22
**selective** 306:8,19
**self** 70:18 94:1
120:2 145:1
161:10 162:9
313:13 314:19
318:11 333:21
334:10 341:9
347:2 355:11
357:9,15 362:21
363:16 368:10,15
369:1,6 370:1,2
374:10 444:1
463:21 476:19
485:22 487:3
**seminal** 480:21
**sen** 378:20
**senate** 4:23 63:2
63:11
**send** 143:5 154:21
156:23 157:8
**sending** 473:7
**senior** 378:20

sense  24:4 66:15
66:16 80:23 81:14
117:12 152:15
206:5 226:4 235:5
266:10 348:19
355:8 386:9
sent  80:8 156:10
157:3 493:14
sentence  39:3 40:1
41:2 65:6 109:12
111:8 113:6 116:5
119:20 143:20
172:18 231:16
233:19 234:6
241:2 257:19
258:2 300:4 308:9
309:5 326:20
328:18 330:16
348:1,2 356:11
357:7 384:11
391:22 395:4
402:12 403:13,15
405:23 413:9
sentences  172:10
302:1 344:11
398:5
separate  365:11
separately  136:5
september  1:21
9:9,17 171:16
465:10 491:10
sequential  283:12
283:14
sequitur  402:13
serendipitous
229:3 245:23
247:14 308:19
series  283:11,14
304:18 308:2,10
308:14,20,21
309:9 310:21

311:15 312:18
314:6,9 322:17,23
323:12 324:13
335:15,18 343:6
343:11
serious  109:16
487:7 490:7
serve  189:4 456:17
457:1,13
served  194:8
450:6 475:9,11,16
service  151:17
432:9
services  95:17
104:18 111:9
140:15 195:2
248:3 376:22
384:21 385:14
422:5,19 431:3,3,9
434:5 435:9
437:22 438:11
454:5 473:4 474:8
474:9 475:10
serving  33:1,15
92:15 172:21
173:10
session  187:5
195:13
sets  420:21
setting  258:16
356:15 374:10
435:8 480:17
settings  258:5,8
seven  45:23 123:1
141:22 166:1
322:23 325:10
335:15 336:16
337:7 343:6,12
357:20 391:18
seventeen  474:6

severe  265:9 266:5
267:17 487:2
severity  405:19
sex  6:13 7:9 8:14
36:22 59:15,23
60:3,7 61:7 81:20
82:1 94:1 145:3
146:10 147:1
161:10 164:9
165:14 213:7,22
214:11,16 219:17
238:19,21 247:2
247:10 260:7
318:6,20 319:4,8,9
319:14 337:10
346:16 370:1
383:23 392:1,9,10
392:17,19 393:11
404:2 405:18
416:13 417:5
437:14,22 442:13
442:21 443:12,20
446:17,22 447:2
447:20 448:1,15
454:9,15 455:2
457:14,15 464:15
464:21 482:17
487:16,20
sexual  192:17,20
333:3 436:8,16,21
461:15 462:11
463:18 464:1,1
469:20
sexualize  469:23
sexualizing  462:4
462:20 468:23
sham  250:5 316:1
shaping  461:1
share  364:22
shared  270:16

shareholders
381:2
sheet  493:11
shield  376:1,7
381:1,9 382:1,22
383:8 429:15
shift  99:15 400:12
442:4
shifted  305:1
369:7
shipp  55:20 56:3
short  7:17 48:4
53:10 271:4
327:17,17 336:4
336:10 411:8
shortcut  188:21
shorter  150:20
shortly  361:10
shoulder  292:5,11
shoulders  261:3
276:9
show  37:19 114:13
230:8 264:19
325:1 327:23
336:2 339:11
363:7 366:22
371:21,22 375:12
396:13 412:16
426:20 430:4
433:5
showed  32:8 181:7
354:15,15 371:23
424:6 439:12
showing  90:4 92:9
247:23 346:14
453:15
shown  312:15
415:15 439:18
shows  122:17
258:20 313:7
329:23 352:19

355:9 368:8,16,18
369:17 374:20
405:18 414:4
453:20
**sic** 12:23
**side** 77:2,3 94:12
99:13 142:17
146:15,17 151:16
159:15 217:16
282:16 285:9
349:20
**sided** 222:23
**sign** 493:12
**signature** 264:12
**signed** 27:2 493:20
**significant** 206:22
207:4 295:2 368:9
383:21 483:19
484:15 487:1
490:6
**significantly**
487:16
**signify** 243:3
**signs** 463:18
**similar** 46:10
52:23 54:9 61:20
63:6 76:23 77:7
77:10 88:14,19
93:11,16 99:11
140:4
**similarities** 475:21
**simple** 289:12
**simply** 124:17
151:16
**single** 20:17 42:8
42:15 150:22
152:2,6 298:20,23
299:3 308:20,21
312:19,19,20
323:16 328:9
416:20

**singulair** 222:7
**sinus** 129:21
133:12
**sir** 11:11 18:16
31:15 32:5 34:23
35:10,13,19 36:5
39:9 40:9 42:14
48:1 64:3 76:19
77:9 118:14
119:19 120:16
133:3 174:23
296:12 331:17
466:10 477:15
490:20
**sit** 183:8
**site** 407:23 408:1
**sitting** 70:3,9
170:21 173:21
221:20 239:8
297:15 310:17
**situation** 179:20
244:1
**situations** 206:9
251:2 253:1,20
254:1,5,10
**six** 56:17,18
128:23 129:3
136:14 158:16
160:2,3 163:23
164:1 336:15
337:14 380:19
391:17
**sixteen** 56:16
360:22
**size** 355:8 372:9
413:10,11 426:8
**skin** 131:12 134:7
136:8 137:23
139:3,20 140:1,2
142:14,14 144:1,2
144:4,7,8,15,18

145:2,8,13 146:9
**skipping** 231:16
258:2
**slide** 88:3,7 456:18
457:2,8 458:15,21
458:23 460:22
461:23 462:22
463:13 464:3
**slides** 87:23
451:10 456:17
**slightly** 155:1
**slipped** 131:4
**slow** 161:14
165:22 207:6
381:1 388:17
**slowing** 384:15
**slowly** 114:20
**small** 20:15 45:8
45:11 290:13
295:20 352:16
413:11,12
**smaller** 317:7
**social** 70:19 71:11
348:3,6,9 349:1,5
351:15 362:7
366:21 367:15,17
367:17 368:1,1,7
368:21 369:18
370:10,10,20,20
371:6 373:1,2,3
397:9,17,21
**socially** 351:12
**societies** 53:5
76:14
**society** 5:9 44:18
45:3,15,18 46:1,7
47:8 48:11,15,19
72:3 99:16 100:5
100:19 103:19
104:22 108:11
118:10,18 123:23

169:7 171:12
181:19 182:1,3
195:16 196:22
197:3,6,9,21 198:7
198:19 199:11
200:13,20 282:4
283:8 300:18
301:4 404:5
**soft** 479:5
**sole** 410:1
**solely** 331:14
**solicited** 187:18
191:19 199:12
**solo** 23:21
**solution** 324:4
**solutions** 10:7,9
493:23
**solve** 351:9
**solved** 313:13
**somebody** 121:11
245:21 250:5
276:11 284:19
318:22 322:9,11
**sorrow** 194:18
**sorry** 57:18 77:9
108:20 138:19
142:11 144:18
163:16 170:5
172:2 201:10
212:9,11 227:4
268:6,11 280:23
281:3,13,14
318:19 325:19
327:20 340:1
353:7 373:2
379:12 384:14,14
385:19 397:15
409:1 421:16,19
426:1,7 440:22
441:2 445:17
446:20 457:14

464:7 471:5,11,12
474:12
**sort** 19:18 70:20
71:2 87:18 88:5
89:13 94:4 96:22
96:22 101:4,21,23
103:16,20 107:4
127:11 140:3
159:3,13,21 165:8
165:10,22 208:20
301:15 323:16,17
324:6 372:7 475:6
**sorts** 53:5 104:12
334:11
**sound** 22:11 76:10
170:5 194:13
196:9 202:23
203:2 234:2
**sounds** 22:13 84:9
190:3 203:5,9
472:2
**source** 74:1,3
296:18 361:22
407:18
**sources** 378:7
380:4 458:13
**space** 306:6
**speak** 14:7 79:19
81:16 82:11 87:1
87:6 96:13 161:21
163:16,17 328:16
366:18 416:8
445:1 447:17
457:1,5,7
**speaker** 82:3
471:16
**speakers** 81:16
**speaking** 20:1
85:4,6 93:18
107:16 126:17,18
338:20 448:3,10

**speaks** 73:3 95:9
351:23 358:10
369:12 373:8
466:23
**special** 253:7
**specialist** 74:16
75:13 87:18
155:22 156:20
**specialists** 149:16
206:2
**specialized** 66:2
204:2
**specialty** 155:21
156:16 378:16
472:15
**specific** 26:9 135:2
170:14 174:20
180:1 212:12
213:14 242:19,20
288:10 365:19
**specifically** 70:4
132:17 144:20
145:5 163:20
192:16 198:18
209:22 210:5
255:15 334:18
376:23 417:19
418:11
**specifics** 27:23
**specified** 437:12
**specimen** 292:2
**spectrum** 152:10
313:18 487:4
**speculating** 47:4
**speech** 368:21,22
369:20 371:22
372:2
**speeches** 261:18

**spell** 16:13
**spelling** 445:6
**spend** 135:3
412:11
**spent** 17:8
**spoke** 14:2,16,22
64:10 81:18,20
481:2
**spoken** 15:16 16:8
16:10,16,18,22
64:17,23 205:5,8
206:1 418:3
**spread** 490:13
**spring** 207:5
**srs** 322:22 330:19
**stable** 344:14
**staff** 13:1 56:3
98:23 99:1 307:1
474:5
**stage** 107:4 122:19
125:2
**stainless** 131:5
**stake** 286:14
287:18 386:20
447:19
**stamp** 339:14
340:4
**stand** 61:13
120:16
**standalone** 410:16
**standard** 183:2
209:13 244:23
249:3
**standards** 7:15
182:16,19,21
183:9 184:5 186:9
186:10,11 189:11
196:14 199:7
316:3 396:15
397:4,14 398:14
399:2 401:1

**standpoint** 194:17
387:8 447:15
466:16
**stands** 87:10
**start** 23:2 84:7
85:9 156:18
162:15 163:11,12
164:4,9 237:9
254:19 302:16
316:19 324:17
351:20 383:14
**started** 24:3 67:9
106:14 107:3
146:23 148:3
184:8 202:12
216:4 226:8
268:17 345:1
372:7 408:16
409:6 480:13
**starting** 106:16
143:20 161:1
165:14 166:8
228:1 236:15,17
236:20 237:4
320:14 328:11
344:13 345:7
**startled** 477:2
**starts** 228:3
405:14
**state** 5:2,5 9:2
10:10,20,21,22
11:1,12 27:23
28:2,19,23 33:9
37:10 51:22 52:5
53:8,10 54:4,7
57:10 58:15,21
59:8,13 63:5
76:16 78:14 79:21
81:1 82:15 89:6
90:2 96:8 113:8
115:23 116:8

284:5 376:8 396:3
397:20 420:13,16
473:14 482:11
492:2,22
**stated** 227:7 228:2
349:3 483:13
**statement** 5:21
44:20 45:16 46:8
46:15,20 47:15,22
48:6,16 49:3,15
105:15 113:12
114:1,3 239:20,22
240:1,9,13 250:12
253:22 254:3
331:8 377:2
**statements** 45:5
46:12,13,17 47:12
50:10,16 51:11,14
117:23 199:2
247:11 444:16
481:8
**states** 1:1 9:22
30:7 52:21 54:23
61:19,23 62:4
110:9,12,19 111:3
429:4 472:18
474:2 475:13
**stating** 27:17
**statistic** 102:21
**statistically** 392:4
**status** 27:18 29:1
30:15 240:10
365:7 366:9,13
**stay** 98:6
**stayed** 53:10
**stays** 256:7
**steel** 131:5
**stenographic**
492:6
**step** 53:8 339:8

**stephen** 58:2
**stepped** 260:12,13
**stepping** 54:1
105:9
**steps** 69:15
**sterilization**
287:15,16
**sterilizing** 290:7
**steroids** 145:3
146:9,10,16 147:1
**stick** 261:16
448:14
**sticking** 449:18
**stomach** 121:22
**stop** 251:2,8
**stopped** 25:8
**stopping** 366:10
**stories** 280:1,14
323:22 365:6,21
366:1,2,7,11,16
**story** 95:21
**street** 2:20 3:12
**strength** 413:7
**strengths** 342:11
391:15
**strictly** 424:17
466:15 467:10
**stricture** 338:10
**strictures** 338:21
**strike** 13:12 14:17
16:4 18:10 23:13
33:13 49:5 84:2
90:12 125:23
147:17 158:14
174:14 177:17
186:21 202:1
228:17 267:15
268:15 272:12
289:3 314:23
326:10 348:6
370:5 377:17

433:6 461:13
**stringent** 281:16
**strive** 454:16
**strong** 78:17 290:3
**strongest** 490:1
**strongly** 114:14
**struck** 106:13
131:4
**struggles** 455:1
**stuck** 361:8
**student** 101:11
**studies** 13:9,11,15
13:18 35:21
108:17 109:5,9
124:12 248:10
249:20,23 250:7
270:8,11 271:17
278:1,15,22
292:18 298:10,13
298:21 301:20,20
302:1 304:2,9
305:9 321:10
329:22 331:20
343:20 353:1,8
354:22 356:20,21
356:22 357:3,4,11
358:8 367:21
371:5 378:2 391:7
412:13 415:13,15
415:21 416:3,18
441:14 482:2,15
485:14 486:2
490:5
**study** 6:19 7:10
39:7 50:17 109:10
250:1 256:18
257:11,22 258:10
258:20 271:19,21
273:18 275:17
276:1,5,17,19,22
277:4,7,18 278:2,5

278:8,10,19,23
279:3,7,15,17
281:17,18 282:7,8
282:9,9,14 286:4
289:11 291:12
292:13 298:23
299:18 300:5,15
309:11 311:10
313:7 317:17
318:10 319:17
321:9 323:9
324:20 329:16
330:3,6,22 334:15
334:17,18 339:11
340:8,10,19
341:14 342:5,18
342:22 343:5,8,10
343:15,17,19
346:14 347:8
348:18 352:5,10
352:15 354:14,21
355:9 358:3,10
363:7 370:7,17
388:23 389:14,17
389:22 390:10,23
391:16 392:7
393:10,17 410:22
411:20 412:4
413:10,14 414:4,5
414:8,9 416:20
440:9,10,11 453:6
453:13,15
**stuff** 101:4 107:1
148:8 220:18
359:13 363:16
372:7 448:12
**subcategories**
74:21
**subcategorizing**
301:15

subcategory  154:7
subgroups  390:7
subject  20:2 34:21
    39:6 51:4 79:17
    82:3 88:19 104:17
    172:14 176:14
    205:21 272:1
    274:14 287:5,6
    389:5 416:12
    450:2
subjective  112:4
    114:2 282:15
    327:16,17 331:10
    336:5,7,10 349:13
subjects  87:21
    454:1
submission  234:10
submitted  33:22
    34:3 42:17 43:3
    55:19 292:3
subreddit  364:19
    364:21 365:13
    366:5
subscribed  495:14
subscribing  297:1
subscription  297:4
subscriptions
    100:10
subsection  174:5
subsequent  122:3
    185:22 461:10
subsequently  74:6
    226:22 229:4
    270:21
subset  68:15
subsidiary  103:21
subspecialty
    173:15
substance  14:6
    70:17 77:14,15
    363:6

substantive  98:12
    98:17 168:16,21
    173:11,23 181:1
    181:12
success  161:19
    300:17 331:2
successful  95:15
    301:3 303:18
succinctly  127:1
sudden  368:23
suddenly  368:14
    369:7 372:13
suffer  132:13
    444:3 486:18
suffered  463:23
suffering  41:6
    53:9 66:19 122:11
    122:13 151:5
    260:18 457:6
sufficient  294:1
    358:9 482:20
    484:21
sufficiently  310:8
    311:22
suggest  414:4
suggesting  118:2
suggestion  173:4
suggestive  362:23
suggests  394:22
sugrue  6:6 299:19
suicidal  487:5
suicidality  313:13
    333:20 334:20
    338:5 347:2
suicide  119:9
    162:9 314:5,18
    334:10 372:4
    390:2 391:1,9
    393:13,20
suitability  416:17

suitable  398:23
suite  2:14 3:6,12
summary  82:15
    88:23 89:5,5
    300:2 303:8
    327:14 405:3,3
supervision  492:9
supplement
    263:17
supplemental  4:16
    38:4 264:1 265:1
    265:6,20
supplements
    38:10 296:11
supplies  422:6,19
supply  339:2
    468:9
support  48:16
    49:13 51:18 52:4
    52:8 57:10 58:16
    64:1 72:6 77:21
    88:21 89:8,22
    103:14 104:11
    112:9 244:13
    284:21 287:23
    303:19 314:17
    336:3 352:17
    380:7,18 381:19
    382:10 387:21
    393:7,11,17
    395:18,19 403:5
    406:19 409:20
    410:1,19 416:22
    439:14 444:6,6
    454:5,8 469:6
    482:16,21 484:19
    485:20
supported  39:5
    45:17 50:10,17
    120:6 123:19
    186:14 243:11

245:9 251:23
    285:12 286:3,12
    287:9 288:13
    294:18 295:10
    488:19
supporting  46:18
    76:4,21 117:8
    402:4 403:2
    481:19 482:4,11
supportive  417:4
supports  46:15
    338:2 487:6
suppose  50:23
    53:11 226:8
    311:19 323:18
    381:3
supposed  28:9
supposedly  117:14
suppress  428:15
    428:23
suppressing
    401:10,14 437:15
    437:23
suppression  7:19
    404:1 406:1 411:9
    413:5
sure  15:2,20 32:15
    94:19 97:6 113:5
    115:9 118:13
    121:2 126:23
    139:1 181:4
    184:14,15 256:7
    273:15,16 277:18
    288:19 297:21
    325:12 340:23
    343:1 360:5,5
    434:4 453:3 463:9
    468:7 477:11
    485:7 487:14
surgeon  8:14 24:5
    64:10 66:18 95:4

| | | | |
|---|---|---|---|
| 95:7 106:5 119:14 | 358:13 379:20 | 189:3 250:5 273:8 | **surgery's** 159:19 |
| 121:16 123:10 | 478:21 | 273:8 282:4 283:5 | 159:21 |
| 130:20 133:6 | **surgery** 6:8,11,14 | 283:9 287:13 | **surgical** 6:21 |
| 154:20 155:19,19 | 7:10 8:5 22:21,22 | 290:11 291:6,15 | 24:23 65:1 104:15 |
| 159:18 160:13 | 23:3,4,15 25:3,14 | 291:19 293:5,19 | 105:12 112:3 |
| 174:19 198:17 | 25:17 26:2,14,17 | 296:1,20 299:21 | 117:15 121:18 |
| 213:2 274:16,17 | 27:14 28:11 30:9 | 300:6,10,18 | 126:10 127:4 |
| 281:7 284:16 | 31:7,8,12,23 32:3 | 306:11,13 309:12 | 134:8 140:9 |
| 315:10,12 402:15 | 32:10,11,17,19 | 309:16,21 310:19 | 141:11,18 142:13 |
| 443:8 464:15 | 36:23 44:13 45:1 | 310:23 311:14,14 | 144:8 154:23 |
| 466:4,17 467:11 | 45:3 46:2 47:8 | 312:3 314:11,18 | 159:15 162:23 |
| 467:14 472:17,20 | 60:1,17,22 61:5 | 316:1,12 323:1 | 163:13 164:14 |
| 473:1 475:12,17 | 64:18 66:11,21,21 | 328:3,8 331:3,9,13 | 174:18 175:21 |
| 476:9 480:14,15 | 67:9 68:4,5,6,6,17 | 332:5 333:8,14,19 | 176:5 177:21,22 |
| **surgeon's** 79:20 | 69:7,16 71:3 72:4 | 334:3,6 335:4,20 | 220:20 271:19 |
| 466:5 480:18 | 72:4 73:2 79:22 | 337:11 338:11,14 | 284:13 285:12 |
| **surgeons** 5:10 | 81:2,6 82:10,12,14 | 346:17,22 351:9 | 286:2,4 288:12 |
| 44:19 66:10 67:16 | 89:7 90:7 95:12 | 351:19 358:17 | 289:5 290:19 |
| 68:10 96:12 99:17 | 100:17 102:20 | 366:14 373:21 | 293:11 295:15 |
| 100:5,19 102:23 | 103:19 104:7 | 375:7 376:13 | 296:14 308:10,23 |
| 108:11 120:18,23 | 106:2,9,10,17 | 382:23 384:22 | 315:3,20 316:5 |
| 122:14 123:7,21 | 107:13,20 111:9 | 386:16,17 387:2 | 322:21 326:23 |
| 126:9 127:3 | 111:18 112:10,14 | 387:14 390:1,16 | 330:8 334:2,7 |
| 130:14 132:3,5 | 112:22 114:10 | 391:3 392:23 | 336:17 353:10,20 |
| 149:21 154:16 | 115:19 121:17,19 | 393:12 394:22 | 353:21 354:3 |
| 169:7 171:13 | 122:2,7,9,21 123:8 | 423:22,23 425:17 | 356:2,14 357:5,16 |
| 285:3 294:17,22 | 123:17,23 125:9,9 | 426:14 427:6,18 | 357:21 358:23 |
| 294:23 295:9,15 | 128:8,8,13,14 | 428:2,7 429:8 | 369:13 393:18 |
| 299:3 312:4 419:8 | 130:3,15 131:16 | 432:3,8 433:19 | 400:17 402:18 |
| 474:5 | 131:19 132:1,18 | 437:21 444:19 | 419:5 424:10 |
| **surgeries** 24:21 | 133:17 134:3,17 | 450:15,22 454:6 | 435:16 436:14,17 |
| 25:2,8 59:16 90:9 | 138:10,11,17 | 466:21 467:1,3 | 444:11 459:6,10 |
| 90:10,11 103:8,13 | 139:7 140:5 | 468:12,14 469:17 | 459:20 469:22 |
| 118:3 119:22 | 141:13 143:4 | 472:16,23 473:16 | 470:7 474:8 |
| 120:19,23 121:23 | 147:20 149:3 | 473:22 474:15 | 480:16 481:3,20 |
| 122:1 125:14 | 151:8,23 152:5 | 475:5 476:2,2,15 | 485:1,21 486:3 |
| 140:12 142:4 | 159:3 166:23 | 477:4,5,10,14,21 | **surgically** 144:4 |
| 143:8 147:15 | 167:4,8,14,20 | 478:20 479:10,15 | 151:2 152:4 323:2 |
| 148:11 176:8 | 168:8,13,18 175:5 | 481:2,15 482:18 | 328:12 329:4 |
| 177:4 315:22,23 | 175:10 176:22 | 488:18,23 | **surprise** 20:4,9 |
| 336:4 338:18 | 178:2 181:21 | | 21:23 32:16,22 |

103:4 196:11
425:13,22
**surprised** 303:12
**surprising** 21:15
113:12,15
**surroundings**
348:11 349:7
**survey** 331:14
**surveys** 299:8
332:4
**suspect** 26:23
151:5 196:18
220:13,22
**suspend** 140:8
**suspicion** 58:23
185:12 433:22
**suspicious** 144:13
144:14
**swear** 10:12
184:23
**swede** 329:21
**sweden** 7:11 35:16
248:4 329:20
**swedish** 313:7
329:21 330:6
346:14 389:23
391:3 453:5
**sweet** 131:3
**swissophone**
389:9
**switch** 182:8
**sworn** 11:6 495:14
**symptoms** 152:7
405:18
**system** 116:7
280:10 319:6
345:21
**systematic** 6:22
8:1 300:8 307:18
356:3,12 357:3,20

**t**

**t** 4:10 33:2 182:13
202:16 203:4,4,11
203:11 277:14
360:9 372:7 425:7
446:12 492:1,1
494:3,3
**table** 87:14 129:21
131:5 302:7,9
307:13 337:6
338:8 349:20,23
350:13,16
**take** 14:11 24:20
69:14 90:22
115:17 131:17
140:16 143:11
176:6 204:18
282:11 294:12
312:15 315:7
316:15 318:6,20
319:21 367:20
397:1 408:13
463:14 470:3
471:18,19
**taken** 9:20 40:18
41:17 42:2 51:12
79:5 115:12
166:18 227:22
229:19 232:4
240:16 254:17
320:4 322:12
388:9 417:13
470:14 472:5
492:5
**takes** 42:8 80:17
80:23 107:12,19
111:5 112:3
118:10,18 221:17
222:13 231:23
232:16 242:1
429:20 442:12

443:11
**talk** 23:1 31:7
35:15 83:23
118:15 136:20
163:5 201:2
210:21 271:1
290:1 331:10
347:11,11,13
381:4 452:14,23
453:17,23 464:3
**talked** 61:16,17
87:22 110:1,14
169:6 189:14
204:23 232:8
261:19 267:12
268:1 290:18
300:20 324:14
345:11 347:3
351:23 352:8
354:12 363:9
380:20 421:3
424:13 429:14,15
448:5 469:11
**talking** 13:3 20:15
68:21 109:21
115:16 144:5
159:7 166:3
206:21 212:13
216:4 255:2
270:14 271:14
277:6 278:9
287:14 289:10,12
289:19 290:12,15
291:18 293:15
295:19 312:10
313:17 314:20
328:5 338:15,16
361:19 366:16
369:11 372:3,5
386:12 425:4
446:6 448:1,7

449:19 460:14
462:14 471:14
484:15 488:2,3
**talks** 131:22
240:12 402:21
**tangential** 132:10
132:16
**tangentially** 130:5
**tara** 2:12
**tattoo** 139:23
**tavistock** 53:19
**tborelli** 2:16
**teachers** 10:20
420:15,16 452:1
**teaching** 121:13
454:2 467:10
**teachings** 452:17
**team** 149:11 150:5
150:14 272:22
336:23
**teams** 83:14 151:9
**technical** 82:11
295:20
**technique** 130:9
130:17 284:13,15
289:12,15 299:1
310:10,21 311:3
311:11,21 312:14
**techniques** 130:13
286:11 290:11
295:1 296:15
311:12,20 338:3
**telephonic** 192:7
200:1
**tell** 21:18 22:8
68:5 76:21 114:19
174:8 196:8
207:18 208:13
214:23 292:6
341:4 352:21
372:3,6 434:2

**telling** 12:13 59:13
226:14 237:2
306:15 433:16
**tells** 244:11
**temporary** 265:8
**ten** 23:11 46:8
86:2 138:20,21
139:7 140:16,20
140:23 141:7
262:2,6 263:1
266:21 351:22
476:23
**tend** 210:14
284:16 285:4,5
**tends** 345:11
**term** 7:7,17 18:18
19:7,11,17,19 20:3
20:6,19 21:18,19
21:22 22:2,7
61:11 89:10
119:12 124:11
141:5 164:22
193:20 241:20
249:20 291:12
292:12 313:10
314:15,16 332:8
398:10 399:10
404:7 411:8 442:6
442:8,21 447:4,6,7
447:8 459:14
466:14 485:12
**terminology** 60:23
194:13
**terms** 24:8 26:7
89:20 93:17
119:10 148:12
152:22 176:20
277:21 311:16
355:13 413:22
424:17 446:21
458:12,14 469:20

**469**:21 484:22,23
487:8
**test** 219:10,11
324:11 332:3,22
333:1 486:12
**testified** 11:7
38:19 64:1 91:11
91:13 308:16
**testify** 38:15 90:21
173:13
**testifying** 90:23
91:5 95:10 274:23
**testimonies** 359:18
360:19 365:12
**testimony** 1:19
11:16 17:20 18:6
50:14 63:19 97:19
170:15 171:2
172:7,11,12,20
174:14,17 177:2
180:3,6,14,23
182:5 216:11
254:9 329:8 363:6
449:14 487:12
491:4,12 493:9
495:8
**testing** 281:20
282:2,12 437:16
**testosterone** 214:7
214:22 215:17
318:23
**tests** 124:9 211:11
486:9
**texas** 62:5,7,11
76:20,22 77:5
78:10 110:15,22
**text** 266:1 416:19
**textbooks** 73:1
**thank** 10:13 19:5
98:15 133:15
275:10 325:5,17

**445**:4 470:21,23
490:23 491:2,5,5,6
**thanks** 470:20
**theirs** 196:13
**therapeutic** 229:4
248:18 282:8
291:10 301:16
**therapies** 52:9
105:23 106:21
110:8 147:4
150:15 208:22
324:7
**therapy** 77:22
124:5 139:22
140:14 145:17,19
159:20 163:17
164:5,10 215:8
228:9 238:17
243:4 247:17
249:22 289:14
345:8 376:14
379:21 384:23
387:3 394:21
400:5 425:18
426:15 431:12
437:15,17,23
481:20 482:12
**thing** 59:1 70:20
93:21 94:10 96:22
98:17 103:16
114:21 125:11
127:13 140:3
145:15 159:22
162:1 164:21
222:23 303:16
358:3,6 364:5
380:14 403:18
436:3 440:8,10,11
459:17 475:6
478:22 487:11

**things** 16:13 20:16
46:10 50:21 53:6
54:6 68:11 77:22
83:12 101:8 102:1
102:16 103:23
105:20 106:1
119:11 121:13
122:22 123:2
144:11,14 159:15
178:7,17 209:16
210:1 218:12
224:4 226:11
247:6 260:5
262:14 271:14
281:9 282:16
288:7 290:21
299:8 301:6,17
313:15 332:7
333:2,18,20,22
334:4,11 347:3
369:17 392:18
402:8 404:8 421:2
432:13,15 447:19
457:22 463:11
464:2
**think** 14:9,13,14
15:17 16:1 18:15
18:15 19:18,21
25:8 26:2 32:11
45:12 46:20 48:19
52:16,21 54:4,17
58:7 61:10 62:9
62:10 65:19,19
69:9 72:11,17,18
73:12,20 74:5
82:3 84:6,11 85:2
85:15 86:10,15
87:1,6,19 88:6
93:11,15,17,20
94:10,11,14,16,17
94:22 96:20 97:10

98:10,13 99:10
100:12 101:7,11
101:17,19 102:21
103:6,20 105:11
105:14 106:16
107:1,14 110:20
110:20,21 115:4
117:17 118:8,17
118:21 119:1,3,3
121:5,8,9 122:19
141:14,18 149:5,6
152:3 160:4,10
163:19 165:23
166:11 171:22
179:12 180:4
184:11,12 196:5
196:12 202:9,11
206:4 218:12,18
222:10,15 227:21
238:8,10 245:7
256:5 262:22
273:11,13,17
279:4 280:19
281:12 282:20
285:11 286:2
290:20 297:17,23
298:12 306:15
318:18 322:7
323:22 327:13,22
328:3 334:15
335:2,21,22 341:3
345:23 346:2,9
359:23 365:14,18
366:3 377:1 380:8
386:11 389:6,7
392:22 399:4,8
402:14 408:2
409:14 410:15
420:3 434:1 439:4
439:8 443:17
448:13 453:18

460:16 462:2,8
474:6,22 489:3
**thinking** 106:12
154:17 166:2
372:4 470:1
**thinks** 154:9 383:8
**third** 27:20 41:2
64:16 65:6 71:4
98:4 133:1 195:6
300:4 309:5 348:1
356:11 357:7
391:19 430:22
437:11 440:11
**thirteen** 416:18
**thirty** 107:2 195:6
232:5 246:19
**thonen** 446:7
**thought** 50:15
95:20 103:4
121:20 180:10,12
266:20 471:8
**thoughtful** 126:21
**thoughts** 462:20
**thousand** 360:22
416:15
**thousands** 120:18
**threaten** 67:3
**threatening** 119:9
314:2 490:7,17
**three** 10:18 14:9
15:19 19:17 24:5
51:3 73:11 103:17
110:6 116:12
122:21 123:17
124:15 125:12
138:22 160:6
165:1 174:21
175:5,22 176:6
229:18 247:7
260:8 261:7 299:2
312:14 327:6

336:15 337:23
364:14 381:22
391:17 431:10
455:22
**throttling** 143:10
**thursday** 9:17
491:10
**thyroid** 156:8,12
**thyroidectomy**
156:13
**time** 14:22 19:2
20:2 24:7,13 29:9
88:5 100:10 101:5
102:8 121:20
133:8 135:5 137:9
141:10 161:7
169:19,21 170:3,7
202:7 226:7,13
267:7 269:18
273:6 311:23
332:13 344:14
345:12,14,18
347:17 351:18
412:12 416:16
436:4 447:22
470:4,20 471:22
473:13 474:20
492:13 493:19
**timeframe** 493:8
**times** 13:1 14:7,9
29:1 159:6 206:10
390:1 468:2
**timing** 139:2
**timmerie** 465:16
**tipping** 123:16
**tishyevich** 2:6 4:4
4:7 10:14,15 11:9
15:19 16:11 78:23
79:9 114:22 115:7
115:15 125:22
126:16 166:13,22

182:12 186:20
254:12,21 256:12
319:23 320:8
325:22 340:5
370:3 388:13
389:12 414:14
417:9,16 445:5
470:9,18 471:2,23
472:2 489:6,10
**tissue** 467:17
479:5
**title** 230:21 464:14
**titled** 36:3 55:12
59:15 62:23
115:23 129:20
131:11 133:10,20
134:6,12 225:6
233:13 256:19
299:19 326:12
340:8 350:13
356:2 376:12
397:9 399:15
411:7 415:9 427:5
430:13 450:21
453:5 456:1
458:21
**today** 11:17 12:16
13:14 14:3 70:10
92:1 120:17
123:11 126:9
127:5 170:21
173:22 180:13
181:8 192:19
221:20 230:9
233:9 239:8
252:18 288:8
297:16 313:17
470:20 488:15
**today's** 491:11
**told** 48:20 165:17
261:23 262:4

409:7 443:19
**top** 58:2 59:15
  108:10 109:8
  128:7 130:14
  167:14 224:13
  240:23 263:13
  337:7 367:11
  375:19 377:11
  384:18 394:16
  421:9,21,21
  430:16 434:8,17
  453:8 461:1
**topic** 239:10 458:7
  458:19
**topics** 90:13
  180:23 181:11
  452:10
**total** 338:22
  345:15
**totally** 19:4 229:11
  314:7,8
**touch** 98:6
**touched** 216:17
**toxin** 263:5 490:13
**track** 312:12
**trade** 201:9 203:5
  203:9
**tradition** 8:2
**train** 106:6 155:7
  157:8
**trained** 68:11 75:5
  104:2 155:8 157:1
  157:9,14 211:6
  274:18 275:6
**training** 66:3,6,8,9
  66:12 67:20 69:3
  69:5,10,19 73:3
  74:4,13,16 75:14
  95:15 101:22
  107:7 121:12,16
  122:4,15 124:21

125:15 155:13
156:2 158:4 204:3
274:11,15 284:19
284:23 466:16
467:10,13 468:16
472:23 477:3
483:4 488:22
**trajectory** 152:23
**tran** 18:9 365:12
**trans** 145:21
  148:13 151:12
  370:1 428:15
  429:1
**transcript** 8:20
  15:12 18:7,11,12
  18:22 492:7,11
  493:6,18,20 495:5
  495:8
**transcripts** 17:19
  18:5
**transfeminine**
  167:13
**transform** 323:1
**transformative**
  71:2
**transgender** 4:22
  19:7 20:19 21:11
  22:1 40:4,7 55:13
  63:1 64:19 65:1
  79:17,21 81:2
  82:12 83:13 89:6
  95:17 104:6 106:2
  106:10,17 109:13
  122:9,12 123:7
  130:14 131:23
  132:7,11,12
  136:21 145:1,10
  146:7 147:5 151:9
  160:21 167:4,11
  167:17,21 168:1,4
  168:9,13,18 169:1

175:21 178:22
179:1 181:20
182:10,17 214:2,6
247:17 314:6
318:12 341:9
342:15 343:16
347:1 348:20,22
351:9 353:3 354:7
355:12 365:7
366:8,9,12 368:10
368:15 369:1,6
374:11 386:17
412:17 428:17
444:1,18 448:6
450:1,22 454:5
460:15 463:14
468:11 469:16
476:15,18 477:14
478:21 479:10,15
482:18 485:22
486:10
**transgendered**
  259:17
**transgenderism**
  194:16
**transition** 55:13
  113:10,19 153:1
  165:18 169:2
  176:22 287:13
  353:4 359:19
  360:20 363:10
  365:17 366:10,18
  395:12,19 397:9
  397:17,21 398:11
  398:18,23 479:22
**transitioned**
  148:14 328:13
**transitioning**
  82:13 94:3 146:4
  178:13 238:20
  312:3 320:20

321:5,21 360:15
373:22 416:23
**translation** 7:14
**transmen** 344:17
  344:18 345:15
**transsexual** 7:8
  330:18 392:1,8
**transsexualism**
  392:12
**transsexuals** 6:13
**transwomen**
  344:16,18 345:15
  348:8 349:4
  416:14 417:6
**trauma** 133:13
  143:1 178:18
  272:18 279:5
**traumatic** 178:6
**treasurer** 10:22
**treat** 65:9 131:22
  132:1 144:23
  151:7 215:18
  220:19 231:19
  435:17 436:20
  450:1 460:2
  488:19
**treatable** 122:6
**treated** 131:1
  132:14 144:1
  146:8 150:22
  151:1 152:2,6
  212:13 217:20
  318:23 400:1
**treating** 75:14
  136:21 146:21
  200:14 218:9
  249:7 262:9 273:5
  460:8
**treatment** 4:21 8:7
  8:11 19:7 20:19
  21:11 22:1,3 39:5

40:19 41:5 49:16
52:1 54:10 63:1
65:1 78:19 80:18
81:7 89:10 111:6
117:15 129:20
137:4,11,18
146:23 151:16
153:11 178:6
186:12,14 195:17
196:15 206:16
211:21 214:11,17
215:1 216:9
219:19 220:16
225:14 266:4
267:17 268:4,7
316:19 329:11
340:11 345:22
350:17 353:2,10
353:21 354:3
373:10 374:17
375:1 392:11
394:21 402:3,5
405:8 406:2,6,23
422:20 423:8,17
424:1,10,21
429:21 430:13
431:1 433:20
434:22 435:22
437:13 438:2
459:21 460:14,17
473:4 474:21
475:3,4 481:3,14
481:21 482:12
483:14,22 485:21
487:21
**treatments** 35:5
36:18 43:15 44:2
65:21 89:8 119:6
120:5 139:21
140:5 150:16
319:3 373:20

487:15
**treats** 342:14
**trelstar** 203:11
**tremendous** 70:23
162:4,6 165:16
290:1 484:18
**trend** 109:15,21
**trending** 465:15
**trends** 340:10
**trial** 217:21
236:15,17,19,21
237:4,22 246:17
249:13 250:3
251:13 252:6,9,10
252:13 268:21
270:2,19 272:19
273:7 274:21
275:17 291:8
292:19 293:1,6,10
301:16,17 310:16
316:6 341:12
412:1
**trials** 120:11
218:12 235:22
245:10,20 246:11
246:22 247:20
249:3,18 250:21
251:23 269:4
271:2 280:8
293:20 294:10
298:3 302:18,18
307:20 422:23
**tried** 96:10
**triptodur** 203:3
**trivial** 244:18
**troubled** 179:13
179:22
**troublesome** 381:2
**troubling** 179:20
402:8

**true** 17:4 30:5
33:18 151:19
196:11 270:7,10
348:3 349:2 351:4
409:13 461:16
492:11 495:8
**truth** 444:7
**truthful** 11:16
**truths** 449:18
**try** 16:12 69:12
288:3 289:15
294:23 334:1
443:1
**trying** 19:20 88:11
91:18,20 94:5,16
149:6 153:5
273:11,13 276:3
279:4 300:15
324:19,21 334:22
340:20 345:4
348:22 455:2
458:9
**tubularized**
478:18
**turn** 151:20 397:6
471:15
**turned** 150:8
471:6
**turns** 45:23
**twenty** 107:2
219:21 320:12
**twice** 165:5
**two** 25:20 84:3,5
98:11 99:23 100:1
136:15 139:17
144:5 147:21,22
148:18 172:10
271:7 307:18
336:15 337:22
344:11 364:14
391:17 404:14,16

407:17 431:10,12
455:22 459:2
460:5 468:18
475:22
**type** 202:21 282:7
333:13 335:20
343:8 350:18
**types** 36:17 203:14
316:11 343:19
358:17
**typical** 90:10
160:22 315:19
**typically** 50:17
149:10 165:2
203:21 207:18
211:10 214:3,8
271:7,11 337:22
385:13 490:4
**typo** 359:21,22
**typology** 7:1

**u**

**u** 16:12,16 20:23
203:4 299:19,19
**u.s.** 137:2 425:12
**uc** 86:14 273:12
278:7
**uh** 264:9 361:16
365:4 396:17
420:20
**uk** 7:22 411:11
**ulcer** 121:19,23
122:7 123:11
**ulcers** 121:20
**ultimate** 459:17
**ultimately** 53:17
156:13
**ultrasound** 142:11
**unable** 413:3
**unacceptable** 8:16
464:16 466:3
467:8,12 484:7

**unapproved** 5:14
225:7 228:4,5
230:22 231:6,11
**unbiased** 409:14
**unborn** 131:12
**uncertain** 412:19
**uncertainty**
406:18
**unchangeable**
442:14 443:13
**uncommon** 255:5
255:16 294:16
357:10 358:22
463:22
**uncontrollable**
478:6
**uncontrolled**
411:19 413:10,14
**undergo** 316:21
330:19 390:15
**undergoes** 61:4
**undergoing** 7:9
60:5 211:21
213:18
**undergone** 419:5
**underlying** 194:19
210:8 211:1
215:14 217:19
368:19
**underneath** 60:10
**underpinnings**
104:14
**understand** 26:8
28:7,14 29:4,17
30:20 99:3 100:14
116:23 143:16
156:15 159:2,8,10
162:2 182:7
225:19 228:13
229:17 234:15
239:19 247:13

264:16 266:3
274:12,22 275:8
277:9 288:18
297:6,15 300:14
342:4,13 346:19
348:23 357:2
369:15 377:16,23
378:9 382:21
384:3 390:9
399:20 404:13
406:10 419:22
423:5 427:14
437:20 440:16
441:5 443:9 452:6
457:3 458:15
466:13 468:17
**understanding**
5:13 21:5 33:17
83:10 90:6 149:20
150:2,9 160:20
184:10 195:9,14
230:21 275:19
347:6 402:20
444:10 449:15
459:23 460:12
466:21
**understands** 207:2
**understood** 14:1
118:13 130:21
133:10 195:15
373:4
**undertook** 411:19
**underwent** 344:12
344:19 345:6,16
389:23 391:2
**unethical** 118:4
120:12
**union** 420:15
**unit** 9:18 79:3,7
166:16,20 254:15
254:19 272:18,23

320:2,6 388:7,11
470:12,16 491:9
**united** 1:1 8:9 9:22
433:18 434:8,18
435:21 437:20
441:8,21 472:17
474:2 475:13
**unitedhealthcare**
433:7
**university** 95:13
95:19 96:8 272:16
368:18
**unknown** 320:18
321:6,12,15,22
322:1 330:2
367:12 486:16
**unlabeled** 228:6
**unofficial** 7:13
**unproven** 120:4
206:22 481:15
**unquote** 291:20
351:4 367:23
**unreliable** 280:15
**unsupported**
243:4
**untenable** 250:6
**untested** 120:4
**unusual** 106:13
**unverified** 120:2
280:7
**update** 6:3 7:6
31:1 256:21
381:10 382:13
**updated** 171:16
197:17 378:1
430:19 435:4
**updates** 197:22
198:2,8,21 199:13
199:18 200:2,4,21
**updating** 198:20
441:20

**ups** 337:22 489:4
**upset** 409:6
**urethra** 478:13,14
478:15
**urethral** 336:17
336:18 338:10,20
**urgency** 463:12
**urinary** 178:16
**usage** 258:3
**use** 5:14,17,22
18:18 19:7,11
44:15,22 61:11
64:18,23 73:22
84:22 87:23 101:3
112:13 119:5
130:8,10,16 145:2
145:18 161:15
162:18 189:18
194:12 205:13
206:4,8,9,9,10,18
207:1,3 216:5,13
218:2,5,6,18,22,22
219:6,10,16
221:17 222:2,4,7
222:16 226:2,6,12
226:23 228:17,19
229:9 230:22
231:6,11,23 232:9
232:16 233:14,20
234:1,3,7,19 237:1
237:18 238:2
239:5 240:2,10,16
241:3,8,12,16,22
242:2,3,6,9,21
243:10,18,22,23
244:3,8,11,23
246:5 247:12,19
249:7 250:17
251:22 253:2,5,13
253:15 254:11
255:3,5,16 257:3

257:13 258:6
259:18,21 260:16
260:23 261:9
262:9,16,23 263:4
265:22 267:11,12
267:23 268:22
269:5 270:3
316:23 333:21
338:5 354:19,21
385:4 389:10
406:12,19 417:5
438:19,19 442:21
443:3,10 446:20
459:22 461:22
466:14 482:16
483:8,20 484:8,17
488:18 489:12
490:16
**useful** 310:3
330:22 344:2
354:23 355:1,13
374:20
**useless** 355:16
**uses** 225:7,14
226:15 228:6
229:1 241:17
461:20 469:12
484:4
**usually** 88:2
145:23 149:15
162:6 210:14
298:20 299:2
**utah** 4:18 54:8,16
56:1,12 57:10
58:15,20 59:7
61:17,20 77:8,11
78:7 109:23
110:14,23 117:7
**utterly** 8:15
220:23 247:11
464:15 466:2

**uva** 106:7,9,10
125:9

**v**

**v** 1:12 9:21 16:21
33:2 202:16 203:8
322:18 493:4
494:1 495:1
**vaginal** 476:16
479:3,7,7
**vagineal** 479:3
**vaginoplasty**
168:1 175:13
476:18 478:23
**vague** 87:9
**valid** 23:11 199:3
209:4 228:23
288:4 310:21
314:7,9 485:13
486:1,2
**validated** 282:13
282:14
**validity** 274:19,22
275:2,19 282:17
358:9
**valuable** 333:17
**value** 305:22
**values** 334:14
**van** 86:7,10
**vanderbilt** 2:8
**vantas** 202:15
**variation** 71:19
**variety** 145:15
201:8,12 332:2
**various** 13:1 36:17
94:2,2 144:9
160:12 208:23
473:4
**vascular** 339:1
468:3
**vast** 330:17 335:18

**vehemently** 247:4
**venues** 160:12
**veracity** 274:19
**verbiage** 185:12
400:8
**verify** 493:9
**veritext** 10:6,9
493:14,23
**veritext.com**
493:15
**version** 7:16 183:2
183:9 184:5,8,18
185:4 187:3,9,13
187:18 188:1,7,16
188:20,23 189:10
196:21 396:15
397:4 398:15
399:3 401:1
**versus** 77:18 92:11
135:15 299:6
432:14 473:7
477:7
**vertical** 349:20
**veterans** 137:7,12
**victory** 161:20
**video** 256:6
**videoconference**
1:18 2:4 3:2,18
9:7
**videographer** 3:20
9:15 10:7 79:2,6
115:10,13 166:15
166:19 254:14,18
320:1,5 388:6,10
417:11,14 470:11
470:15 472:3,6
491:8
**videorecorded**
9:18
**videotaped** 1:18

**view** 42:9 79:21
80:17 118:10,19
186:6 428:1
431:18 432:7
442:11 443:9,10
484:3 485:9,10,23
486:14 487:14
488:17 489:14
**views** 398:7
452:11 465:2
489:12
**violated** 170:2
171:3 182:3
**violating** 182:1
**violation** 179:8
182:5 316:3
464:22
**violence** 67:13,15
**vir** 292:6
**virginia** 262:13
**virtually** 102:14
369:7
**visible** 319:12
328:5
**visit** 347:10
**visited** 341:23
342:7
**visiting** 343:2
**visits** 257:22
258:11
**vital** 309:9
**vocal** 125:5
**vol** 5:11
**volume** 74:7
**vote** 63:16,21
**vs** 394:23
**vulnerable** 76:9
120:13

USCA4 Appeal: 22-1721      Doc: 41-5      Filed: 08/31/2022      Pg: 686 of 705

**w**

w 182:13 340:15
356:2 445:6
wait 289:15,17
313:22
waiting 77:20
waits 293:9
walk 377:8 444:23
wall 2:20
walter 11:14
wandered 186:15
want 15:1,19 19:3
72:13 80:11 90:12
101:13 126:23
135:1 150:13,19
151:18 172:9
181:3 210:19,21
256:6 262:18
272:7 273:14
289:22 344:23
349:22 359:12
362:12 396:13
397:20 420:5
453:2 462:16
470:3 480:8,9
487:13
wanted 82:10 90:5
95:19 159:2,7,9,12
159:13 194:12
440:22 441:3
452:6,8 472:10
487:12 489:5
wanting 159:19
235:18
wants 148:14
149:22 166:4
219:7
ward 156:4,7
warning 215:20
489:22 490:1,4,11

warnings 215:22
warrant 217:17
218:6 253:7 310:9
warranted 217:18
watchful 77:20
wave 260:9
way 38:15 54:3
73:1 88:13 132:10
134:19 151:9
171:4 181:21
206:19 225:4
243:3 244:14
245:5 261:9
266:19 311:9
317:17 322:13
338:3 346:18
350:2,21 354:5,9
367:4 382:5,12
385:18,21 429:6
438:8 442:1 443:2
447:10 449:6
462:20 474:11,13
486:12
we've 61:16,17
77:8,11 125:2,11
175:2 180:19
182:6 268:1 344:5
439:10
weak 51:6,19
weakest 382:10
wealth 292:1
web 27:13
website 230:19
361:19 362:7
366:21 407:12
455:14
wednesday 63:12
weeks 15:2,16,20
37:7 156:7
weigh 206:12
207:1 226:2,9

weight 284:1
292:2
weighted 185:13
welcome 351:2
welcomed 443:18
444:2
went 74:1,3 94:5,6
97:14 103:18,23
104:4 139:18
164:4,9,14 165:17
188:1 192:1 200:7
336:20 361:9
west 2:14
whatsoever 61:21
white 102:2
298:22 387:5
who've 145:12
widely 189:21
201:6
wider 410:7
wiepjes 6:17
340:15
williams 3:10
willing 90:21 91:7
96:13 286:10
wilson 6:20 356:1
winston 3:13
wisdom 436:15
wise 311:10
wish 470:5
withdrawn 108:3
177:12
witness 9:10 10:13
91:11,13 92:16,22
174:11,22 255:22
256:2,9 280:23
281:3 325:15,18
327:3 332:10
335:1,7 340:6
341:1,6 350:7,11
384:12 385:19

400:9 408:4 413:1
420:8 426:4,7
440:21 445:15
491:2 493:8,10,12
493:19
witnesses 90:15
91:3,8 92:20
172:21 173:10
woman 456:15
woman's 156:3
women 151:12
152:15 214:2
348:10 349:6
wonder 393:6
452:22
wondered 134:21
word 176:15,17
228:3 438:20
462:16 469:12
words 60:13 61:13
209:16 392:15
402:11 443:10
work 45:7,18
61:21 76:21
184:17 191:13
192:18,21 193:3
198:2 211:12
212:2,18 213:17
466:7
worked 110:17
273:6 382:7
working 16:5,17
17:2,8 143:2
156:20 184:8,18
190:16,21 192:7
272:17 273:1
474:5,7
works 48:21 311:1
world 117:22
121:14 123:16
125:1 161:4

USCA4 Appeal: 22-1721   Doc: 41-5   Filed: 08/31/2022   Pg: 687 of 705

177:16 182:9
260:3 329:1 332:5
410:5,8 412:16
428:16 474:22
476:7 479:10
480:12 486:22
487:5
**worldwide** 416:11
**worry** 135:8 264:5
**worse** 392:19
393:8
**worst** 381:18
**worth** 485:6
**worthless** 282:23
283:3,4
**wound** 289:13
450:14 475:7,10
478:11
**woundedness**
67:21
**wounds** 475:6
**wpath** 7:15 182:8
182:16 183:13,16
183:18,19,23
184:8,17 185:3,22
187:2,8,12,17
188:6,16 189:5,10
313:3 395:7,10,14
395:21 396:13
397:3 398:14
402:10 428:18
429:2
**wpath's** 184:4
**wrinkles** 262:10
**write** 144:22 280:4
**writing** 185:19
441:20
**writings** 195:11
**written** 130:19
**wrong** 43:23 62:10
184:11,13 379:23

397:11
**wrote** 183:7 408:3
**wyoming** 3:7

**x**

**x** 4:1,10 360:9

**y**

**y** 256:19,19
**yackey** 6:1 256:19
**yeah** 18:15 22:1,7
22:13 32:16 41:22
42:5,23 48:2
51:20 54:19 65:19
69:14 73:17 78:12
83:2,18 84:5,9,11
91:23 92:5,12
96:20 97:4 99:5
99:21 100:1,15
101:4,9,17,19
102:13,14,21
103:1,5 105:5
107:10,17,23
108:3 109:1,4,7
110:20 111:23
113:3,4,5,11,13,14
114:4,4,23 118:15
119:3 128:1,10
130:22 133:9
135:9,12 143:9
144:17,19 145:4
146:18 147:2,13
148:3,5,6,21 149:5
150:21 151:10
152:16 153:2
154:23 155:1
156:22 157:5
160:3 162:10,12
162:18 163:7,9
164:1,7,21 166:11
171:4,20 179:19
179:23 185:23

186:8,18 188:15
189:7 195:21
196:19 205:7,9
208:2,5,9 211:3,19
212:10 213:12,13
220:6,7 221:1
224:6,12 228:5
229:7,11 236:12
236:22 237:12,21
237:22 238:5,6
240:21 242:1,6
243:14 245:14
246:18 251:5,12
251:19 253:21
256:1 263:2
264:19 266:22
267:4,13 268:12
268:12 272:2,3,3
273:19 280:21
281:4,10 285:3
286:15,18 289:21
290:14 294:8
295:5,19,21 297:4
297:10,21 300:16
301:5 303:10,14
303:15,21 304:5
305:5,6 307:10
309:1,14 311:6,19
313:16,17 315:6,9
315:19 318:14
321:13,23 322:1,7
323:13,21 325:1,9
326:4,5,8 328:4,17
329:7,13,20
332:18,18,19
333:1,16 334:11
335:2,6,8,9,10
336:11 338:7,8,18
338:19 339:23
340:16 341:2,7,12
341:13 343:10

344:3 345:17,23
346:9 347:10
349:10 350:3
351:6,22 352:8
353:11,15 358:19
359:21 360:15,22
361:8,21,22 362:4
362:18 367:3
371:2 375:9,10
377:5,7 378:18,22
378:23 379:9
382:6,11,17 384:5
384:8,13 385:12
387:7 390:4,9,20
390:23 391:12
392:14,21,22
393:2,4,10 394:18
395:20,21 396:5
396:12 398:19
399:4,7,23 400:3
400:10,14,22
402:7,10 403:1,3,6
403:11,19 404:12
404:13 406:21
407:23 408:5,6
411:14 413:2,2
416:7 417:1 418:1
418:18 420:4,11
421:14 423:16
424:6,13,18
426:10 428:5
429:17 431:23
434:1 435:11
436:2 438:6,10
441:5 443:23
445:2,8,12 452:14
453:11,23 456:2
458:19 460:16
461:11,21,22
464:11 471:4,9,23
472:20 480:6,10

**year**  7:20 24:15,19
24:22 34:1 37:9
57:9 63:7 76:3
117:5 138:5 139:3
143:11 148:4
184:7,12 196:16
300:10 302:10
317:6,19 342:22
344:8 345:19
346:5 380:10,11
380:19 411:10
427:15 477:3
**years**  6:10 23:11
24:2,5 25:20 32:6
44:14 46:1,8 51:3
63:9 69:9 72:21
95:14 97:3 99:21
99:23 100:1
102:17 103:17
106:2,20 107:2
122:4,21 123:1,5
123:18 124:15
125:12,17 129:11
129:15 130:18
138:19,20,21,22
138:23 139:7,10
140:16,20,23
141:8 148:9 160:5
165:1 170:9,9
174:21 175:6,22
176:6 181:17
196:6,12 202:11
213:4 219:21
232:5 246:19
247:7,21 257:5
260:8 261:7 262:2
262:6 263:1
266:21 283:8
297:5 298:16,17
300:8,10 301:19
307:12 312:14

313:8,11 337:13
337:14,18,23
344:13 346:7
347:12 351:22,22
352:2 381:22
402:15 443:7
468:15 476:8
**yesterday**  14:12
14:19,21
**york**  2:9,9,21,21
**young**  7:21 161:11
368:12 369:7,9,22
411:10 469:1
**younger**  142:22
347:10
**youtube**  367:16

**z**

**z**  16:12
**zantac**  123:13
**zero**  21:12 284:7
**zoom**  10:4 325:17

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

# EXHIBIT 3

USCA4 Appeal: 22-1721    Doc: 41-5    Filed: 08/31/2022    Pg: 693 of 705

- **+About Us**
  - **Mission Statement**
  - **Plastic Surgery**
  - **Purpose**
  - **History**
  - **Officers & Directors**
    - **Welcome New Directors**
  - **Advisory Council & Sponsoring Orgs**
  - **Policies**
  - **Statistics**
  - **Contact the Board**
  - **Fee Schedule**
  - **ABPS 75th History Presentation 2012**
  - **Publications & Requirements**

- **+Residents**
  - **Written & Oral Exam Processes**
  - **Important Dates & Deadlines**
  - **Training Requirements**
  - **Resident Registration & Evaluation of Training**
  - **Entering the Examination Process**
  - **Quick Reference Tips & FAQs: Residents**

- **+Candidates**
  - **+Written Examination**
    - **Written Examination Process & Requirements**
    - **Quick Reference Tips: Written Exam Candidates**
  - **+Oral Examination**
    - **Oral Examination Process & Requirements**
    - **Quick Reference Tips: Oral Exam Candidates**
  - **Important Dates & Deadlines**
  - **Examination Content**
  - **Reapplication Information**
  - **Logo Use**
  - **Written Exam Tutorial**

- **+Diplomates**
  - **+Continuous Certification (CC) Program**
    - **Overview of CC Program**
    - **CC Exam Process & Requirements**
    - **CC Activities Process & Requirements**
    - **Quick Reference Tips & FAQs**
    - **Important Dates & Deadlines**
    - **Continuous Certification: Examination Content**

- **CME resources**

Exhibit
0002
9/30/2021
Dr. Lappert

JA2569

USCA4 Appeal: 22-1721    Doc: 41-5      Filed: 08/31/2022      Pg: 694 of 705

- **Hand Surgery Exam (HSE)**
    - **HSE Initial Certification Process & Requirements**
    - **Quick Reference Tips: HSE Candidates**
    - **Important Dates & Deadlines**
    - **Hand Surgery Exam Content**
    - **Hand Surgery Exam Tutorial**
    - **HSE Recertification Process & Requirements**

- **Logo Use**
- **Newsletter to Diplomates**
- **Guidelines for Stating Certification Status**

- **+Program Directors**
    - **Reference for Program Directors**
    - **Resident Tracking website**

- **+Public**
    - **Verify Certification**
    - **FAQs**
    - **What is Certification?**
    - **What is Continuous Certification?**
    - **American Board of Medical Specialties**
    - **Federation of State Medical Boards**

- **Contact Us**
    [Login]

# HOME >> Diplomates >> Guidelines for Stating Certification Status

## GUIDELINES FOR STATING CERTIFICATION STATUS

The American Board of Plastic Surgery (ABPS) is very proud of its diplomates who have achieved Board Certification, Hand Surgery subspecialty certification or recertification and those who are participating in the Continuous Certification in Plastic Surgery Program.

Many diplomates include information about their certification status on letterhead, business cards and other materials. Board certification is an important marker of your competence and skill, and the ABPS encourages you to showcase this accomplishment with your patients, your colleagues and the public.

ABPS does not mandate the specifics of how diplomates state their certification, except to assert that diplomates should not state or imply that they are certified if their certification has expired. If you have multiple certifications by ABMS member boards and allow one of them to lapse, you should revise your public materials (letterhead, business cards, advertisements, websites, etc.) to reflect those certifications that are currently valid.

We ask that you follow these guidelines throughout your career to accurately state your ABPS certification.

- Diplomates of ABPS must accurately state their certification status at all times. This includes descriptions in Curriculum Vitae, advertisements, publications, directories, letterhead and websites.

JA2570

9/27/21, 5:31 PM

- Diplomates with expired time-limited certification or those whose certification is revoked may not claim Board certification by ABPS and must revise all descriptions of their qualifications accordingly.

When a physician misrepresents certification status, ABPS may notify local credentialing bodies, licensing bodies, law enforcement agencies and others.

**Note: The Board does not allow the use of its trademarked logo on diplomate or candidate websites or for any other commercial purposes.**

**Examples of accurate statements of certification:**

Once you have successfully passed your initial certification examination or renewed your certification through the Continuous Certification program, you may represent that you are "ABPS Board Certified in Plastic Surgery (with a sub-specialty certification in Hand Surgery – if applicable)" or a "Diplomate of the American Board of Plastic Surgery":

- **John Doe, M.D., ABPS Board Certified in Plastic Surgery**

or

- **John Doe, M.D., a Diplomate of the American Board of Plastic Surgery**

Important: Please be sure to correctly state your certification status in your Medical Licensing Board Profile. In addition, pay close attention to your group practice listings. A blanket statement that everyone in a group is Board certified may be misleading if multiple specialties are listed and some group members are certified in certain specialties and others are not currently certified. ABPS expects that certifications will be listed individually or stated in a way that is not misleading. Aside from accuracy and ABPS requirements, inaccurate statements of certification may create embarrassment or legal issues. ABPS understands that maintaining currency in stating the certification status of groups of physicians may not be easy. We encourage you to work with your colleagues to be sure the certifications you represent to the public are current and accurate.

Refer to the Board's **Advertising Policy**.

**Feel free to contact ABPS whenever you have a question about stating your certification.**

**Call the Board Office at 215-587-9322, or send an e-mail to info@abplasticsurgery.org.**

Seven Penn Center
1635 Market Street, Suite 400
Philadelphia, PA 19103-2204

**Tech Support**

Copyright ©2021
The American Board of Plastic Surgery, Inc.

3/3

https://www.abplasticsurgery.org/diplomates/guidelines-for-stating-certification-status/

JA2571

# EXHIBIT 4

Case 1:19-cv-00272-LCB-LPA    Document 209-5    Filed 02/02/22    Page 1 of 10

# CODE OF ETHICS OF THE AMERICAN SOCIETY OF PLASTIC SURGEONS

(PLEASE NOTE: All complaints regarding possible ethical misconduct must be in writing and sent to:
EthicsComplaints@plasticsurgery.org or
ASPS Ethics Committee, 444 East Algonquin Road, Arlington Heights, IL 60005.)

## PREAMBLE

As stated in its Bylaws, the American Society of Plastic Surgeons (ASPS) is organized:

To benefit humanity by advancing the art and science of plastic and reconstructive surgery; to promote the highest standard of professional skill and competence among plastic surgeons; to promote the exchange of information among plastic surgeons; to promote the highest standard of personal and professional conduct among plastic surgeons and other Members; to provide the public with information about the scientific progress in plastic and reconstructive surgery; to promote the purpose and effectiveness of plastic surgeons as is consistent with the public interest.

Membership in ASPS is granted to those surgeons who are competent practitioners of the art and science of plastic surgery. Competence in plastic surgery involves attainment and maintenance of high standards of medical and ethical conduct. Medical competence is fostered by successful completion of the examinations of the American Board of Plastic Surgery, The Royal College of Physicians and Surgeons in Canada and/or the Corporation Professionelle des Médecins du Québec. Ethical competence is fostered by the adoption and enforcement of a Code of Ethics, adherence to which is prerequisite for admission to and maintenance of membership in ASPS. Members are expected to act in accord with the General and Specific Principles of the Code of Ethics of ASPS in all their contacts with patients, peers and the general public. Further, Members are individually responsible and accountable for their actions and words, as well as the use of their names, by any individual or entity. Members shall be subject to disciplinary action, including expulsion, for violation of any of the General or Specific Principles of this Code.

Section 1: General Principles

I. The principal objective of the medical profession is to render services to humanity with full respect for human dignity. Members should merit the confidence of patients entrusted to their care, rendering to each a full measure of service and devotion.

II. Members should strive continually to improve medical knowledge and skill, and make available to their patients and colleagues the benefits of their professional achievements. Members have an affirmative duty to disclose new medical advances to patients and colleagues.

III. Members should practice a method of healing founded on a scientific basis, and should not voluntarily associate professionally with anyone who violates this principle.

IV. Members should observe all laws, uphold the dignity and honor of the profession, and accept its self-imposed disciplines. They should expose, without hesitation, illegal or unethical conduct of fellow Members of the profession.

Exhibit
0010
9/30/2021
Dr. Lappert

V.   Members may choose whom to serve.  In emergency situations, however, Members should render service to the best of their ability.  Having undertaken the care of a patient, a Member may not neglect the patient; and until the patient has been discharged, a Member may discontinue services only after giving adequate notice.

VI.   Members should provide services under the terms and conditions which permit the free and complete exercise of sound medical judgment and skill.

VII.   A Member should seek consultation upon request, in doubtful or difficult cases or whenever it appears that the quality of medical service may be enhanced thereby.

VIII.   A Member may not reveal a patient's confidence, any observed characteristics of the patient, or any information obtained from the patient in a professional capacity, without such patient's consent or unless required to do so by law or unless it becomes necessary in order to protect the welfare of the patient or of the community.

IX.   The honored ideals of the medical profession imply that the responsibilities of the Member extend not only to the patient, but also to society.  Activities, which have the purpose of improving both the health and well-being of the patient and the community, deserve the interest and participation of the Member.

X.   To assist the public in obtaining medical services, Members are permitted to make known their services through advertising.  Advertising, however, entails the risk that the Member may employ practices that are false, fraudulent, deceptive, or misleading.  Regulation is, therefore, necessary and in the public interest.  Subsection II of the Specific Principles permits public dissemination of truthful information about medical services, while prohibiting false, fraudulent, deceptive or misleading communications, and restricting direct solicitation.

XI.   In their public and private communications with or concerning patients and colleagues made in a professional capacity or environment, Members shall strive to use accurate and respectful language and images.

Section 2:  Specific Principles

I.   Each Member may be subject to disciplinary action, including expulsion, if:

A.   The member's right to practice medicine is limited, suspended, terminated, or otherwise affected in any state, province, or country for violation of a medical practice act or other statute or governmental regulation or the Member is disciplined by any medical licensing authority.

B.   The Member fails to inform ASPS that the member's right to practice medicine has been limited, suspended, terminated, or otherwise affected in any state, province, or country for violation of a medical practice act, other statute or governmental regulation or, the Member has been disciplined by any medical licensing authority.

C.   The Member is convicted of (or pleads guilty to) a felony or any crime relating to or arising out of the practice of medicine or involving moral turpitude.

Updated September 25, 2017                         2
CHICAGO/#2820866.1

D.    The Member engages in sexual misconduct in the practice of medicine.

E.    The Member is involved in improper financial dealings including, but not limited to:

    1.    Dividing a fee for medical service with another person licensed to practice medicine who is not a partner or associate of his or hers, unless

        (a)    The patient consents to employment of the other person licensed to practice medicine under a full disclosure that a division of fees will be made; and

        (b)    A division is made in proportion to the services actually performed and responsibility assigned to each; and

        (c)    The total fee charged by all persons licensed to practice medicine is not increased solely by reason of provision for the division of fees.

    2.    Payment and/or acceptance of rebates or referral fees to or from any person, including agents and employees of the member, in exchange for the referral of patients.  Nothing in this Principle shall be construed to prohibit a Member from participating in a referral service, in which the member's paid participation is disclosed, where permitted by state law.

    3.    Charging exorbitant fees, particularly of a non-contractual nature (e.g., emergency care).  Fees, whether for professional fees or associated with the use facilities owned in whole or in part by the Member, are exorbitant when they are wholly disproportionate to the services rendered and care provided.  The reasonableness of fees depends upon the novelty and difficulty of the procedures involved; the skill required to provide proper care; the time and labor required; the fee charged for similar services by similarly situated peers; and whether or not the patient had agreed in advance to the fee.  Members are responsible for ensuring the reasonableness and appropriateness of fees charged to patients and payors on such Member's behalf either directly or through third party billing services.

    4.    Except in instances of emergencies or urgent and life threatening disease or injury, nothing in this Principle shall be construed to prohibit a Member from requiring prepayment of professional fees for all elective surgical operations.

    5.    Nothing contained in this provision shall be construed to limit price competition among Members.

F.    The Member uses, participates in or promotes the use of any form of public communication (as defined in Glossary to the Code) or private communication (as defined in the Glossary to the Code) containing a false, fraudulent, deceptive, or misleading statement or claim, including a statement or claim which:

    1.    Contains a misrepresentation of fact, or fails to state any fact that is necessary to make the statement not deceptive or misleading, when considered as a whole.

Updated September 25, 2017                    3
CHICAGO/#2820866.1

2. Omits facts or information of which the public ought to reasonably be informed before selecting a qualified plastic surgeon.

3. Contains photographs, images, or facsimiles of persons that falsely or deceptively portray a physical or medical condition, injury, disease, including obesity, or recovery of relief therefrom.

4. Contains photographs, images, or facsimiles of persons who have received the services advertised, but who have experienced results that are not typical of the results obtained by the average patient, without clearly and noticeably disclosing that fact.

5. Contains photographs, images, or facsimiles of persons before and after receiving services, which use different light, poses, or photographic techniques to misrepresent the results achieved by the individual.

6. Contains a testimonial or endorsement pertaining to the quality of the member's medical care if the experience of the endorser does not represent the typical experience of other patients or if, due to the infrequency and/or complexity of such care, results in other cases cannot be predicted with any degree of accuracy.

7. Contains a testimonial or endorsement pertaining to the quality of the member's medical care or the member's qualifications if the endorser has been compensated by the Member or a third party retained by the Member for making such testimonial or endorsement.

8. Is intended or is likely to create false or unjustified expectations of favorable results.

9. Contains a representation or statement of opinion as to the superior quality of professional services which is not susceptible to verification by the public or contains a statement representing that the Member possesses skills or provides services superior to those of other physicians with similar training unless such representation can be factually substantiated.

10. Appeals primarily to layperson's fears, anxieties, or emotional vulnerabilities.

11. Contains, in reference to any matter material to a patient's decision to utilize a member's services, a representation of fact or implication that is likely to cause an ordinary prudent person to misunderstand or be deceived, or fails to contain reasonable warnings or disclosures necessary to make a representation or implication not deceptive.

12. Contains a guarantee that satisfaction or a cure will result from the performance of the member's services.

13. States or implies that a Member is a board-certified specialist unless the Member is certified by a board recognized by the American Board of Medical Specialties, The

Updated September 25, 2017                                    4
CHICAGO/#2820866.1

Royal College of Physicians and Surgeons in Canada and/or the Corporation Professionelle des Médecins du Québec.

14.     Is not identified as a paid advertisement or solicitation unless it is apparent from the context that it is a paid advertisement or solicitation.

15.     Is intended or is likely to attract patients by use of exaggerated claims.

G.     The Member performs an unjustified surgical operation or a surgical operation that is not calculated to improve or benefit the patient.

H.     The Member performs a surgical operation or operations (except on patients whose chances of recovery would be prejudiced by removal to another hospital) under circumstances in which the responsibility for diagnosis or care of the patient is delegated to another who is not qualified to undertake it.

I.     The Member participates in a charity raffle, fund raising event, contest or other promotion in which the prize is any procedure, or an integral component of a procedure (e.g. breast implants), as defined in the Glossary to the Code.

J.     The Member seeks or obtains a patent for any invention or discovery of a method or process for performing a surgical procedure or employs trade secrets, confidentiality agreements or other methods to limit the availability of medical procedures and the dissemination of medical knowledge.

K.     The Member engages in unprofessional conduct in violation of the General Principles of the Code.

II.     Advertising

A.     Subject to the limitations of Section 2, I, F, a Member may advertise, including advertising through public communications media (as defined in the Glossary of the Code).

B.     A Member shall not compensate or give anything of value directly or indirectly to a representative of the press, radio, television, or other public communication media in anticipation of or return for recommending the member's services. A Member shall approve all advertisements before dissemination or transmission, and shall retain a copy or record of all such advertisements in their entirety for one year after its dissemination. A Member shall be held personally responsible for any violation of the Code of Ethics incurred by a public relations, advertising or similar firm which he or she retains, or any entity that advertises on the member's behalf.

C.     A Member may use photographs of models in his or her advertisements or other promotional materials. If photographs of models who have not received the services advertised are displayed in a manner that would suggest the model received the services advertised, the advertisement or other promotional material shall clearly and conspicuously state that the model has not received the advertised services.

Updated September 25, 2017            5
CHICAGO/#2820866.1

III.   Solicitation

    A.   A Member shall refrain from engaging in systematic verbal solicitation (as defined in the Glossary of the Code) of patients in person, by telephone, or through agents.

    B.   A Member shall not initiate contact with a prospective patient knowing that the physical, emotional, or mental state or degree of education of the person solicited is such that the person could not exercise reasonable judgment in employing a member.

    C.   A Member who has given unsolicited, in-person advice to a layperson that the individual should have medical or health care shall not accept employment resulting from that advice if:

        1.   The advice embodies or implies a statement or claim that is false, fraudulent, deceptive or misleading within the meaning of Article I, Section F.

        2.   The advice involves the use by the Member of undue influence, coercion, duress, harassment, intimidation, unwarranted promises of benefits, over-persuasion, overreaching, or pressure for immediate response.

        3.   The Member has been given notice that the individual non-patient does not want to receive a communication from the member.

IV.   Expert Testimony

    It is in the public interest that medical expert testimony be readily available, objective and unbiased.  Members have an obligation to testify as expert witnesses when appropriate.  However, Members may not accept compensation contingent upon the outcome of the litigation, nor agree to testify in any case where the Member has a conflict of interest (including, without limitation, where the Member is or has been the treating physician for the patient at issue or where the physician has a personal or professional relationship with the patient or plaintiff in the case).  Members whose testimony, including testimony as to credentials or qualifications, is false, deceptive, or misleading may be subject to disciplinary action, including expulsion.  Further to help limit false, deceptive and/or misleading testimony, Members serving as expert witnesses must:

        1.   Have recent and substantive experience (as defined in the Glossary of the Code) in the area in which they testify, including, without limitation, experience in the relevant subspecialty or the particular procedure performed on the plaintiff;

        2.   Thoroughly review the medical facts and testify to their content fairly, honestly, and impartially;

        3.   Be familiar with the standards of practice prevailing at the time of the occurrence,

        4.   Provide evidence-based testimony regarding the standard of care, citing peer-reviewed plastic surgery literature where possible and identifying personal opinion as such;

5. Demonstrate (or be prepared to demonstrate) a causal relationship between an alleged substandard practice and a medical outcome;

6. Neither condemn performance that clearly falls within the standard of care in the community nor endorse or condone performance that clearly falls outside of such standard of care; and

7. Not testify that a maloccurence is malpractice.

V. Conflicts of Interest

A Member's clinical judgment and practice must not be affected by economic interest in, commitment to, or benefit from professionally related commercial enterprises or other actual or potential conflicts of interest. Disclosure of professionally-related commercial interests and any other interests that may influence clinical decision-making is required in communications to patients, the public, and colleagues. When a Member's interest conflicts so greatly with the patient's interest as to be incompatible, the Member should make alternative arrangements for the care of the patient.

In the context of Member ownership interest in a commercial venture, the Member has an obligation to disclose the ownership interest to the patient or referring colleagues prior to utilization; the Member's activities must be in strict conformance with the law; and the patient should have free choice to use the Member's facility or therapy or to seek the needed services elsewhere.

VI. Enforcement

Any Member charged with a violation of any ethical standard set forth herein may be subject to disciplinary measures, including censure, suspension or expulsion, as described in Article XXII of the Society's Bylaws.

VII. Glossary

For purposes of this Code and unless the context otherwise requires,

A. "Electronic Media" includes websites, social media forums, blogs, video streams, discussion boards, digital platforms and any means of communication over the internet or similar virtual technology or networks.

B. "Private communication" includes any information, written or otherwise, that is disseminated by a Member and not made known to the general public or nor intended to be made known to the general public at the time it was made.

C. "Procedure" for the purposes of Section 2, Article I(I) of the Code, is defined as a medical service that requires an incision. Examples of services that require an incision include, but are not limited to, facelift, breast augmentation, blepharoplasty and liposuction. Examples of medical services that would not be considered procedures for purposes of Section 2, Article I(I) include, but are not limited to, injections (botulinum toxin, hyaluronic acid), microdermabrasion and other skin surface treatments.

Updated September 25, 2017                                    7
CHICAGO/#2820866.1

D.    "Public communication" includes any information transmitted orally, in writing, or through Electronic Media, the primary purpose of which is to communicate with the public, or a segment thereof.

E.    "Public communications media" includes, but is not limited to, Electronic Media, television, radio, recorded video or motion picture, telephone, written correspondence, electronic mail/e-mail (other than those which are which are Private Communications), print (i.e. newspaper, magazine, book), marketing materials and branding (i.e. directory, business card, professional announcement card, office sign, letterhead, telephone directory listing or professional notice).

F.    "Recent and substantive experience" means that the Member is familiar with the practice of plastic surgery and the particular procedure performed at the time of the occurrence that is the subject of legal action, was engaged in the practice of plastic surgery for a period of not less than three (3) years prior to the date of the occurrence and has performed the specific procedure in question within three (3) years of the date of being retained as an expert witness.

G.    "Solicitation" is a communication to a specific individual to attract him or her as a patient.

**STATEMENT OF PRINCIPLE OF INFORMED CONSENT**

The American Society of Plastic Surgeons recognizes the Member-patient relationship as one of shared decision-making. Through a process of communication and dialogue the Member provides information that allows a patient and/or the patient's authorized representative to make individual choices about his or her medical treatment.

Shared decision-making is at the heart of the doctor-patient relationship and is based on the ethical principles of respect for individual autonomy and dignity.

The process by which Members and patients make decisions together is informed consent. For any surgical operation or treatment, relevant information must be provided, discussed, and understood by the patient and/or the patient's authorized representative. Relevant information for proper informed consent for any procedure may include, but is not limited to:

- Nature of the surgery or treatment

- Indications for the operation

- Expected benefits

- Consequences and side effects of the operation

- Potential risks and adverse outcomes with their probability and severity

- Alternatives to the procedure being considered, and their benefits, risks, and consequences

- Outcome anticipated

- Whether the operation or treatment is experimental or being applied in a manner not approved by the relevant regulatory authorities (e.g. an off-label use or without approval of an Institutional Review Board)

The patient and/or the patient's legally authorized representative(s) should sign a written consent form before any surgical procedures are performed.

CHICAGO/#2820866