No. 22-1721

IN THE

# United States Court of Appeals for the Fourth Circuit

_____

**MAXWELL KADEL; JASON FLECK; CONNOR THONEN-FLECK; JULIA MCKEOWN; MICHAEL D. BUNTING, JR.; C.B., by his next friends and parents; SAM SILVAINE; and DANA CARAWAY,**

*Plaintiffs-Appellees,*

v.

**DALE FOLWELL, in his official capacity as State Treasurer of North Carolina; and DEE JONES, in her official capacity as Executive Administrator of the North Carolina State Health Plan for Teachers and State Employees,**

*Defendants-Appellants,*

and

**NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES; and STATE OF NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY,**

*Defendants.*

_____

On Appeal from the U.S. District Court for the Middle District of North Carolina
No. 1:19-cv-00272-LCB-LPA

_____

### PLAINTIFFS-APPELLEES' RESPONSE BRIEF
_____

*Counsel for Plaintiffs-Appellees listed on following page.*

Amy E. Richardson
Lauren E. Snyder
HWG LLP
1919 M Street, NW, 8th Floor
Washington, DC 20036
(202) 730-1300

Michael W. Weaver
MCDERMOTT WILL & EMERY
444 W. Lake St., Suite 4000
Chicago, IL 60606
(312) 984-5820

Dmitriy G. Tishyevich
Warren Haskel
MCDERMOTT WILL & EMERY
One Vanderbilt Avenue
New York, NY 10017-3852
(212) 547-5534

Tara L. Borelli
Carl S. Charles
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
1 West Court Square, Ste. 105
Decatur, GA 30030
(404) 897-1880

Omar Gonzalez-Pagan
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
(212) 809-8585

David P. Brown
Ezra Cukor
TRANSGENDER LEGAL DEFENSE &
EDUCATION FUND, INC.
520 8th Avenue, Ste. 2204
New York, NY 10018
(646) 862-9396

*Counsel for Plaintiffs-Appellees*

## <u>DISCLOSURE STATEMENTS</u>

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by all parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. <u>22-1721</u>          Caption: <u>Kadel, et al. v. Folwell, et al.</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>Maxwell Kadel</u>
(name of party/amicus)

_____

who is _____<u>Appellee</u>_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?      ☐YES ☑NO


2.      Does party/amicus have any parent corporations?                              ☐YES ☑NO
        If yes, identify all parent corporations, including all generations of parent corporations:



3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                        ☐YES ☑NO
        If yes, identify all such owners:

- 1 -

4.     Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?     ☐YES ☑NO
If yes, identify entity and nature of interest:

5.     Is party a trade association? (amici curiae do not complete this question)     ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.     Does this case arise out of a bankruptcy proceeding?     ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.     Is this a criminal case in which there was an organizational victim?     ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Amy E. Richardson         Date: September 30, 2022

Counsel for: Appellee

- 2 -

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by all parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. <u>22-1721</u>    Caption: <u>Kadel, et al. v. Folwell, et al.</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>Julia McKeown</u>
(name of party/amicus)

who is <u>Appellee</u>, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑ NO
      If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?     ☐YES ☑ NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)     ☐YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?     ☐YES ☑ NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.      Is this a criminal case in which there was an organizational victim?     ☐YES ☑ NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Amy E. Richardson          Date: September 30, 2022

Counsel for: Appellee

- 4 -

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by all parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No.   22-1721      Caption: Kadel, et al. v. Folwell, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Jason Fleck
(name of party/amicus)


who is            Appellee            , makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.     Is party/amicus a publicly held corporation or other publicly held entity?     ☐YES ☑ NO




2.     Does party/amicus have any parent corporations?                ☐YES ☑ NO
       If yes, identify all parent corporations, including all generations of parent corporations:




3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                ☐YES ☑ NO
       If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?                ☐YES ☑ NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)      ☐YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?                ☐YES ☑ NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.      Is this a criminal case in which there was an organizational victim?      ☐YES ☑ NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Amy E. Richardson                     Date: September 30, 2022

Counsel for: Appellee

- 6 -

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by all parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. ___22-1721___     Caption: <u>Kadel, et al. v. Folwell, et al.</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>Connor Thonen-Fleck</u>
(name of party/amicus)

_____

who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑ NO

2.    Does party/amicus have any parent corporations?              ☐YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                              ☐YES ☑ NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑ NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑ NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Amy E. Richardson                    Date: September 30, 2022

Counsel for: Appellee

- 8 -

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by all parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No.   22-1721    Caption: Kadel, et al. v. Folwell, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Michael D.Bunting, Jr
(name of party/amicus)

who is             Appellee            , makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☒ NO

2.    Does party/amicus have any parent corporations?               ☐YES ☒ NO
       If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                 ☐YES ☒ NO
       If yes, identify all such owners:

- 9 -

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?                    ☐YES ☑ NO
        If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)     ☐YES ☑ NO
        If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑ NO
        If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.      Is this a criminal case in which there was an organizational victim?     ☐YES ☑ NO
        If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Amy E. Richardson                         Date: September 30, 2022

Counsel for: Appellee

- 10 -

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by all parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No.   22-1721      Caption: Kadel, et al. v. Folwell, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

C.B., by his next friend and parents, Michael D. Bunting, Jr. and Shelley Bunting
(name of party/amicus)


who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?      ☐YES ☑ NO




2.      Does party/amicus have any parent corporations?                                ☐YES ☑ NO
        If yes, identify all parent corporations, including all generations of parent corporations:




3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                      ☐YES ☑ NO
        If yes, identify all such owners:

4.     Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?     ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.     Is party a trade association? (amici curiae do not complete this question)     ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.     Does this case arise out of a bankruptcy proceeding?     ☐ YES ☑ NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.     Is this a criminal case in which there was an organizational victim?     ☐ YES ☑ NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Amy E. Richardson            Date: September 30, 2022

Counsel for: Appellee

- 12 -

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by all parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No.    <u>22-1721</u>    Caption: <u>Kadel, et al. v. Folwell, et al.</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>Sam Silvaine</u>
(name of party/amicus)

_____

who is _____<u>Appellee</u>_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑ NO

2. Does party/amicus have any parent corporations?          ☐YES ☑ NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?          ☐YES ☑ NO
   If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?               ☐YES ☑ NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)      ☐YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?               ☐YES ☑ NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.      Is this a criminal case in which there was an organizational victim?      ☐YES ☑ NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Amy E. Richardson                         Date: September 30, 2022

Counsel for: Appellee

- 14 -

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by all parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No.  22-1721  Caption: <u>Kadel, et al. v. Folwell, et al.</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>Dana Caraway</u>
(name of party/amicus)


who is  Appellee , makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑ NO




2.  Does party/amicus have any parent corporations?  ☐YES ☑ NO
    If yes, identify all parent corporations, including all generations of parent corporations:




3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑ NO
    If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?        ☐YES ☑ NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?        ☐YES ☑ NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?        ☐YES ☑ NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Amy E. Richardson                    Date: September 30, 2022

Counsel for: Appellee

- 16 -

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ........................................................................... 1

STATEMENT OF THE ISSUES ........................................................ 3

STATEMENT OF THE CASE .......................................................... 4

I.     STATEMENT OF FACTS. ....................................................... 4

       A.     The Parties. ............................................................... 4

II.    PROCEDURAL HISTORY. .................................................... 14

SUMMARY OF ARGUMENT .......................................................... 16

ARGUMENT ................................................................................. 18

I.     STANDARD OF REVIEW. .................................................... 18

II.    THE EXCLUSION FACIALLY DISCRIMINATES BASED ON SEX. .... 18

       A.     The District Court Properly Applied *Grimm*. ................. 19

       B.     *Geduldig* is Inapplicable. .......................................... 25

       C.     The District Court's References to *Bostock v. Clayton County* as
              Persuasive Authority Do Not Create Reversible Error. ...... 31

       D.     Plaintiffs Are Similarly Situated to Cisgender Plan Participants. .... 34

III.   The District Court's Injunction Is Not Impermissibly Vague. ...... 38

IV.    The District Court Did Not Err By Considering an AmicUS Brief in
       Ruling on Summary Judgment. ............................................. 44

V.     The District Court Was Well Within Its Broad Discretion to Exclude
       Certain Expert Opinions from Drs. Hruz, Lappert, and Robie. ..... 48

       A.     The District Court Applied Rule 702 Correctly. ............... 49

       B.     The District Court Did Not Err By Requiring Defendants' Experts to
              Have Relevant Experience. ........................................ 51

       C.     The District Court Did Not Mischaracterize Dr. Hruz's Credentials. 54

D.    The District Court Correctly Excluded Dr. Robie's Opinion on Chromosomal Sex. ..................................................................56

CONCLUSION ..........................................................................57

REQUEST FOR ORAL ARGUMENT ....................................................57

CERTIFICATE OF SERVICE .............................................................61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Choate*,
   469 U.S. 287 (1985)............................................................24

*Belville v. Ford Motor Co.*,
   919 F.3d 224 (4th Cir. 2019) ....................................18, 49

*Bostic v. Schaefer*,
   760 F.3d 352 (4th Cir. 2014) .....................................29, 33

*Bostock v. Clayton County*,
   140 S.Ct. 1731 (2020)...........................................31, 32, 33

*Boyden v. Conlin*,
   341 F. Supp. 3d 979 (W.D. Wisc. 2018) ..................21, 26

*Brandt by & through Brandt v. Rutledge*,
   47 F.4th 661 (8th Cir. 2022) ...............................20, 33, 35

*Brandt v. Rutledge*,
   551 F. Supp. 3d 882 (E.D. Ark. 2021)...........................30

*Bray v. Alexandria Women's Health Clinic*,
   506 U.S. 263 (1993)................................................27, 30

*Bryte ex rel. Bryte v. Am. Household, Inc.*,
   429 F.3d 469 (4th Cir. 2005) .........................................55

*Buckman Co. v. Plaintiffs' Legal Comm.*,
   531 U.S. 341 (2001)........................................................44

*Burgess v. Goldstein*,
   997 F.3d 541 (4th Cir. 2021) .........................................47

*Butler v. Drive Auto. Indus. Of Am., Inc.*,
   793 F.3d 404 (4th Cir. 2015) .........................................18

*Christian Legal Soc'y Chapter of the Univ. of California, Hastings Coll. of the Law v. Martinez*,
561 U.S. 661 (2010)................................................................28

*City of Los Angeles, California v. Patel*,
576 U.S. 409 (2015)................................................................36

*Cooper v. Smith & Nephew, Inc.*,
259 F.3d 194 (4th Cir. 2001) ..............................................54

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993)........................................................14, 49

*Dobbs v. Jackson Women's Health Org.*,
142 S.Ct. 2228 (2022)......................................................16, 25

*Eknes-Tucker v. Marshall*,
No. 2:22-cv-184, 2022 WL 1521889 (M.D. Ala. May 13, 2022) .....................29

*Fain v. Crouch*,
No. 3:20-cv-0740, 2022 WL 3051015 (S.D.W.Va. Aug. 2, 2022) ........23, 25, 27

*Flack v. Wis. Dep't of Health Servs.*,
328 F. Supp. 3d 931 (W.D. Wis. 2018) ................................20, 21, 23

*Flaming v. Univ. of Texas Med. Branch*,
2016 WL 727941 (S.D. Tex. Feb. 24, 2016) ....................................37

*Fletcher v. Alaska*,
443 F. Supp. 3d 1024 (D. Alaska 2020) ........................................20

*Franciscan All., Inc. v. Burwell*,
227 F. Supp. 3d 660 (N.D. Tex. 2016) ...........................................7

*Frontiero v. Richardson*,
411 U.S. 677 (1973)...........................................................29

*Gann v. Schramm*,
606 F. Supp. 1442 (D. Del. 1985)..............................................36

*Geduldig v. Aiello*,
417 U.S. 484 (1974)......................................................*passim*

*Glenn v. Brumby*,
    663 F.3d 1312 (11th Cir. 2011) ....................................................27, 34

*Grayson O Co. v. Agadir Int'l LLC*,
    856 F.3d 307 (4th Cir. 2017) ......................................................22, 46

*Grimm v. Gloucester Cty. Sch. Bd.*,
    972 F.3d 586 (4th Cir. 2020) ....................................................*passim*

*Kadel v. N.C. State Health Plan for Tchrs. & State Emps.*,
    12 F.4th 422 (4th Cir. 2021) .................................................15, 42, 56

*Lange v. Houston County, Georgia*,
    499 F. Supp. 3d 1258 (M.D. Ga. 2020) ...........................................30

*Lawrence v. Texas*,
    539 U.S. 558 (2003)........................................................................28

*Loving v. Virginia*,
    388 U.S. 7 (1967)...........................................................................36

*McMain v. Peters*,
    No. 2:13-cv-01632-AA, 2018 WL 3732660 (D. Or. Aug. 2, 2018)...................37

*Memorial Hospital v. Maricopa County*,
    415 U.S. 250 (1974).........................................................................2

*Meyer v. Brown & Root Constr. Co.*,
    661 F.2d 369 (5th Cir.1981) .............................................................42

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
    No. CV 01-640RE, 2005 WL 878602 (D. Or. Apr. 8, 2005) ............................45

*Naumovski v. Norris*,
    934 F.3d 200 (2d Cir. 2019) .............................................................33

*Nyquist v. Mauclet*,
    432 U.S. 1 (1977)...........................................................................24

*Oncale v. Sundowner Offshore Servs., Inc.*,
    523 U.S. 75 (1998)........................................................................32, 33

*Pashby v. Delia*,
709 F.3d 307 (4th Cir. 2013) .......................................................40, 41

*Peltier v. Charter Day Sch., Inc.*,
37 F.4th 104 (4th Cir. 2022) ................................................24

*Perry v. Schwarzenegger*,
704 F. Supp. 2d 921 (N.D. Cal. 2010) ................................36

*Personnel Administrator of Massachusetts v. Feeney*,
442 U.S. 256 (1979) .............................................................31

*Peters v. Aetna, Inc.*,
2 F.4th 199 (4th Cir. 2021) ..................................................45

*Reed v. Reed*,
404 U.S. 71 (1971) ...............................................................29

*Reliance Ins. Co. v. Mast Const. Co.*,
159 F.3d 1311 (10th Cir. 1998) ...........................................42

*Rice v. Cayetano*,
528 U.S. 495 (2000) .............................................................23

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
141 S.Ct. 63 (2020) ..............................................................45

*Salama v. Holder*,
355 F. App'x 761 (4th Cir. 2009) ........................................46

*Sardis v. Overhead Door Corp.*,
10 F.4th 268 (4th Cir. 2021) ...........................................18, 57

*Stout Risius Ross, Inc. v. People Care Holdings, Inc.*,
No. 15 C 9298, 2016 WL 4593824 (N.D. Ill. Sept. 2, 2016) .............................46

*Students for Fair Admissions v. President & Fellows of Harvard Coll.*,
No. 14-cv-14176, 2018 WL 9963511 (D. Mass. Oct. 3, 2018).........................45

*Toomey v. Arizona*,
No. CV-19-00035, 2019 WL 7172144 (D. Ariz. Dec. 23, 2019)...........21, 23, 27

*In re Union Pac. R.R. Emp. Pracs. Litig.*,
   479 F.3d 936 (8th Cir. 2007) ...............................................................24

*United States v. Virginia*,
   518 U.S. 515 (1996)...................................................................28, 43

*Varnum v. Brien*,
   763 N.W.2d 862 (Iowa 2009) ..............................................................36

*Wagafe v. Biden*,
   No. 17-CV-00094-LK, 2022 WL 457983 (W.D. Wash. Feb. 15,
   2022) ....................................................................................................45

*Walker v. Azar*,
   480 F. Supp. 3d 417 (E.D.N.Y. 2020) ....................................................8

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
   858 F.3d 1034 (7th Cir. 2017) ..............................................................33

*Williams v. Kincaid*,
   45 F.4th 759 (4th Cir. 2022) .........................................................12, 34

**Statutes**

28 U.S.C. § 1292(a)(1)................................................................................14

Civil Rights Act of 1964 Title VII, 42 U.S.C. § 2000e, et seq........................*passim*

N.C. Gen. Stat. § 58-3-200(b)....................................................................10

N.C. Gen. Stat. § 135-48.30, 135-48.23(c2)..............................................10

**Other Authorities**

81 Fed. Reg. 31,375, 31,471-72 (May 18, 2016)........................................7

American Psychiatric Association's *Diagnostic and Statistical
   Manual of Mental Disorders-5th edition*................................................12

Fed. R. App. P. 32(f)..................................................................................59

Fed. R. App. P. 32(g)(1).............................................................................59

Fed. R. Civ. P. 65 ............................................................3, 17, 38, 39, 42

Fed. R. Evid. 702 ...................................................................49, 50, 52, 56

Local Civil Rule 7.5 ...........................................................................14

*Standards of Care for the Health of Transgender, Transsexual, and Gender-Nonconforming People* ...........................................................12

# INTRODUCTION

This case seeks to vindicate the right of North Carolina state employees and their dependents to health coverage free from sex discrimination. Plaintiffs are current and former public servants for the State of North Carolina ("State") and their children. Plaintiffs include state employees who have contributed to the North Carolina university system through teaching or technology and administrative support; and a corrections officer with the state's Department of Public Safety. Two Plaintiffs are children of employees who receive coverage as dependents.[1]

As part of compensation for employment, the State provides health coverage to approximately 740,000 employees and dependents through North Carolina State Health Plan for Teachers and State Employees ("NCSHP"). JA3927. Some employees, however, receive less compensation than others: those denied coverage for the gender-affirming care that transgender people require, when the same treatments are provided to cisgender employees. NCSHP contains a sweeping exclusion of this care, categorically denying coverage for "sex changes or modifications" (the "exclusion"). JA3833-3880. Defendants thus deny equal treatment to employees who are transgender or have transgender dependents, and harm employees' transgender family members who depend on them for health

---

[1] Unless otherwise noted, all emphasis has been added, and all citations and internal quotation marks have been omitted. "Br." refers to Appellants' opening brief.

1

coverage. Contrary to Defendants' claims, which are unsupported by the record, the exclusion targets transgender people and transgender people only.

Although Defendants emphasize budgetary concerns, a state may not "protect the public fisc by drawing an invidious distinction," *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 263 (1974), and NCSHP admits the exclusion would not resolve budgetary concerns regardless. As NCSHP Executive Administrator Dee Jones conceded while testifying as NCSHP's Rule 30(b)(6) designee, "*the cost of this benefit is not going to break the Plan, never was, never will*." JA3958. The numbers tell the same story. NCSHP's consultant studied this care in advance of 2017 and predicted the cost would be negligible—and it was.

Plaintiffs' claim is not that NCSHP must "cover all medically necessary treatments," Br. 1, but rather that NCSHP must cover care without discrimination based on sex or transgender status. That is the promise of the Fourteenth Amendment, and the district court correctly found that the exclusion violates it. Plaintiffs respectfully request that this Court affirm.

## STATEMENT OF THE ISSUES

1.     Whether the district court correctly found that *Geduldig v. Aiello*, 417 U.S. 484 (1974), which analyzed the condition of pregnancy rather than an expressly sex-based classification, is inapplicable to the healthcare exclusion here relating to "*sex* changes or modifications."

2.     Whether the district court correctly applied intermediate scrutiny because the exclusion discriminates based both on sex and transgender status.

3.     Whether the district court correctly concluded that transgender plan participants are similarly situated in every relevant way to cisgender plan participants where both "seek similar or identical treatments."

4.     Whether the district court's injunction complies with Federal Rule of Civil Procedure 65.

5.     Whether the district court properly exercised its discretion to consider an *amicus curiae* brief submitted by the nation's preeminent medical and behavioral health organizations.

6.     Whether the district court properly exercised its discretion to exclude certain portions of Defendants' expert testimony.

3

## STATEMENT OF THE CASE

### I.    STATEMENT OF FACTS.

#### A.    The Parties.

Two Plaintiffs are employees whose transgender children are denied gender-affirming care, and the others are current or former transgender employees denied coverage solely because they are transgender.  All transgender Plaintiffs have been diagnosed with gender dysphoria, JA4091-4105, JA4119-4122, and denied care under NCSHP's exclusion of coverage for "[t]reatment or studies leading to or in connection with sex changes or modifications and related care."  JA3833-3880.  All Plaintiffs have an ongoing need for care.  JA345; JA379; JA4038-4039; JA455-456.

Plaintiff Connor Thonen-Fleck ("Connor") is the son of Plaintiff Jason Fleck and is enrolled in NCSHP as Mr. Fleck's dependent.  JA344.  Mr. Fleck is a University of North Carolina-Greensboro employee.  JA349.  Prior to transition, Connor experienced increasing anguish.  JA342-JA343.  Beginning hormone therapy and obtaining chest reconstruction surgery to masculinize his chest was "life-changing."  JA4013-4014; JA4020; JA343; JA345.  But based on the exclusion, Connor has been denied coverage for endocrinologist appointments, testosterone, and chest reconstruction surgery.  JA4011-4012; JA351-352.  The denials invoked only the exclusion for treatment of gender dysphoria, and no other exclusions.  JA351.

4

Plaintiff Julia McKeown is a 45-year-old transgender woman, and a professor with North Carolina State University enrolled in NCSHP. JA376-377. Until she began her transition, she experienced significant distress. JA376-JA377; JA4025-4026. By 2018, Dr. McKeown's medical provider referred her for vaginoplasty, and she requested preauthorization for the surgery. JA377-JA378. The request was denied based on the exclusion for treatment of gender dysphoria and no other exclusions. JA378; JA384; JA386.

Plaintiff C.B. is an adolescent transgender boy enrolled in NCSHP as a dependent of Plaintiff Michael D. Bunting, Jr., a University of North Carolina-Chapel Hill retiree. JA391-JA392; JA395; JA411; JA389. Before his transition, C.B. experienced distress associated with his birth-designated sex. JA390-JA392; JA4035; JA396; JA410-411. In 2017, C.B. was diagnosed with gender dysphoria and was later prescribed puberty-delaying medication. JA391; JA397; JA411. C.B.'s gender-affirming treatment has reduced his anxiety and brought him much-needed relief. JA4031; JA391-392; JA397; JA411. But C.B.'s parents were forced to obtain additional coverage for C.B. to be able to afford C.B.'s puberty-delaying medication. JA4036-4037; JA398-399; JA413. C.B. has also been prescribed testosterone, which the Plan will not cover. JA399-400.

Plaintiff Dana Caraway is a transgender woman and Department of Public Safety employee. JA450-451. Before her transition she grew increasingly isolated

and distressed.  JA451-452.  Treating her gender dysphoria was so important that she obtained surgery in 2020 by drawing down her retirement savings.  JA454-455. Blue Cross and Blue Shield of North Carolina ("BCBSNC") denied coverage, citing only the exclusion.  JA455; JA460-461.[2]

Plaintiffs sued two plan administrators in their official capacities: State Treasurer and Chair of NCSHP Board of Trustees (the "Board") Dale Folwell, and NCSHP Executive Administrator Dee Jones.  JA51-52.

### B.    The State Health Plan Structure.

"The opportunity to enroll in [NCSHP] is a part of the compensation package provided to state employees."  JA3807.  NCSHP provides health insurance to more than 740,000 state employees, retirees, and their dependents.   JA3883; JA3927. NCSHP is self-funded, JA3926, and "determines what health benefits are available." JA3985.

NCSHP offers an 80/20 PPO Plan and a 70/30 PPO Plan (collectively, the "Plan").  JA3833-3880.  Covered services include medically necessary pharmacy benefits and medical care.  JA3833-3880.  BCBSNC serves as the third-party administrator and CVS Caremark ("CVS") administers pharmacy coverage.

---

[2] Mr. Kadel and Mr. Silvaine's Equal Protection claims are moot because they no longer work for the state; their claims under the Affordable Care Act remain pending at the district court.

JA1011; JA156.  Only medically necessary care is covered by the Plan, and that is all that is at issue in this case.  *See, e.g.*, JA3609; JA3838.

The categorical exclusion in the Plan, JA3833-3880, bars the same treatments that are covered for cisgender participants, including hormone therapy, JA3791, JA3810; puberty-delaying hormone treatment, JA3810; and surgery, such as mammoplasty and breast reconstruction, JA3791, JA3810-3811; vaginoplasty, JA3791; and hysterectomy, JA3792.  Because of the exclusion, transgender people are denied the opportunity to make the same individualized showing of medical necessity as cisgender people are permitted to make.  JA3833-3880.

### C.    NCSHP Eliminates the Exclusion for the 2017 Plan Year.

In 2010, Congress enacted Section 1557 of the Affordable Care Act ("ACA"), 42 U.S.C. § 18116 ("Section 1557"), to protect patients from discrimination on the basis of, *inter alia*, sex.  On May 18, 2016, the U.S. Department of Health and Human Services ("DHHS") promulgated a final rule prohibiting "categorical coverage exclusion[s] or limitation[s] for all health services related to gender transition."  Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,375, 31,471-72 (May 18, 2016).[3]  In response to this rule, NCSHP staff concluded

---

[3] Defendants claim that the nondiscrimination requirement protecting transgender people was "enjoined" and "never actually went into effect," Br. 3 n.1, 12-13, 41 n.11.  That misstates the law.  The narrow injunction prohibiting DHHS from enforcing that rule, *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 696 (N.D.

that NCSHP needed to eliminate the exclusion and requested a cost estimate from its consultant.  JA3929; JA4638-4640.  Segal Consulting advised NCSHP that it likely needed to eliminate the exclusion under the ACA and estimated a cost of $350,000 and $850,000, or 0.011% to 0.027% of the Plan's annual premium. JA4642-4643.  Segal's estimate was accurate:  NCSHP's cost for gender-affirming care in 2017 was $404,609.26, at the lower end of Segal's estimate—and a negligible amount compared to NCSHP's positive cash balance of over $1 billion in August 2018.  JA3799; JA3812-3813; JA3907-3908; JA3918.

NCSHP staff recommended that the Board remove the exclusion to provide "medically necessary services for the treatment of gender dysphoria."  JA4676; JA3930-3931.  NCSHP's Medical Director educated the Board about "gender dysphoria diagnostic criteria and standards of care," noting that the American Medical Association ("AMA"), American College of Physicians, and American College of Obstetricians and Gynecologists endorse coverage for this care.  JA4684. The Medical Director also explained that "elements of care for transgender people [are] a 'medical necessity'" and "[d]elaying treatment for [gender dysphoria] can

---

Tex. 2016), left untouched private parties' right to enforce Section 1557.  Later attempts to undo the rule's protections for transgender people through new regulations were enjoined.  *See Walker v. Azar*, 480 F. Supp. 3d 417, 420 (E.D.N.Y. 2020).  Regardless, none of these cases regarding administrative rules challenged— let alone, leave without force—Section 1557's statutory command.

cause and/or aggravate additional serious and expensive health problems, such as stress-related physical illnesses, depression, and substance abuse problems ….” JA4659.  The Medical Director explained that the World Professional Association for Transgender Health has “established internationally accepted Standards of Care” for this treatment, and noted that the AMA recognizes it as a “medical necessity.” JA4657-4659.

NCSHP’s Legal Counsel advised that if NCSHP covered this care, it would “adopt the [BCBSNC] medical policy … which includes the requirements in support of medical necessity.”  JA4685; JA3936-3937; *see also* JA4706-4174 (BCBSNC medical policy).  NCSHP staff recommended that the Board “remov[e] the blanket exclusion to provide “medically necessary services for the treatment of gender dysphoria.”  JA4676.

A Board member moved to eliminate the exclusion, and another amended the motion to apply for 2017 only.  JA4685-4686; JA3938-3939.  The amendment limited coverage to a single year for one reason: because of litigation challenging the ACA’s regulations and the Board’s view that the law “may change over time.” JA4686.  The amended motion was approved.  JA4686.  The Board never revisited its decision.  JA3943.  Mr. Folwell subsequently released a statement that “[u]ntil the court system, a legislative body or voters tell us that we ‘have to,’ ‘when to,’ and ‘how to’ spend taxpayers’ money on sex change operations,” he would deny

coverage.  JA4734.  Defendants Folwell and Jones approved health plan contracts for 2018 through 2021 excluding coverage for gender-affirming health care. JA3833-3880; JA3939; N.C. Gen. Stat. § 135-48.30, 135-48.23(c2).

As NCSHP participants began appealing denials of hormone therapy coverage after 2017, BCBSNC—which handled the appeals—emailed NCSHP staff to complain that CVS was inaccurately denying the coverage in the first instance based on a lack of medical necessity, when it should instead be "based on the Plan's benefits, not based on lack of medical necessity."  JA4737.  The email noted that "the services associated with the treatment of gender dysphoria generally meet the statutory definition of medical necessity" in N.C. Gen. Stat. § 58-3-200(b).  JA4737.

### D.    Third Party Administrator Implementation of the Exclusion.

Defendants emphasize that the third-party administrators for the Plan, BCBSNC and CVS, "do not identify whether a participant is transgender" or "consider a patient's sex."  Br. 9; *see id.* 10-11.  But there is no need—the exclusion does that for them.  Both BCBSNC and CVS use "the Plan booklet" to determine what is covered, and it instructs that gender-affirming care is excluded.  Br. 9; JA3833-3880.[4]  *See also* Br. 11 (CVS considers "only … whether the drug is covered"); JA188 (BCBSNC "will not approve a claim … not covered by the Plan").

---

[4] The third-party administrators implement the Plan's exclusions through the use of diagnostic codes.  JA185.  When BCBSNC receives a claim, "automated claims

As NCSHP staff began preparing to reinstate the exclusion after 2017, BCBSNC asked to be indemnified for having to enforce it. JA4723 (BCBSNC email explaining that NCSHP would need to "sign a hold harmless if the plan decided not to cover gender dysphoria"). BCBSNC informed NCSHP again in December 2017 that it would need to sign an indemnification agreement before BCBSNC would make the necessary coding changes. JA4730-4732. The exclusion was "reinstated on January 1, 2018" by "operation of law." JA3797.

## B.    The Standard of Care for Treatment of Gender Dysphoria.

Although Defendants refer to gender dysphoria as a "mental illness" and "psychiatric condition," Br. 3, 6, being transgender is a normal variation of human development and "not a matter of choice." JA4402; JA4462; *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 594 (4th Cir. 2020).

Gender identity is a person's internal sense of one's sex. JA4080-4081; JA4385; JA4542; JA4461. Although most people are cisgender, meaning their gender identity matches their birth-assigned sex, transgender people have a gender identity that differs from their birth-assigned sex. 4080-4081; JA4385; *Grimm*, 972 F.3d at 594. Left untreated, the dissonance between one's gender identity and

---

systems review[] the claim to determine whether it is for a benefit covered by the Plan." JA186; *see also* JA189-JA190 (BCBSNC denies requests with diagnostic codes for "Transsexualism" or "Personal history of sex reassignment").

birth-assigned sex can be associated with clinically significant distress or significant impairment of functioning.    JA4070-4071; JA4244; JA4374; JA4449-4450; JA4534-4535; JA4081-4082; JA4252; JA4386; JA4389; JA4546.    The medical diagnosis for that incongruence and the attendant distress or impairment is gender dysphoria.    JA4386; JA4543; *Grimm*, 972 F.3d at 594-95.    This medical condition is codified as "gender incongruence" in the *International Classification of Diseases* (World Health Org. 11th revision).    JA4386; JA4463, and "gender dysphoria" in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders-5th edition* ("DSM-5").    JA4081-4082; JA4386.[5]

The World Professional Association for Transgender Health ("WPATH") has maintained *Standards of Care for the Health of Transgender, Transsexual, and Gender-Nonconforming People* ("WPATH Standards") since 1979.    JA4084-4085; JA4253; JA4389; JA4543.    The WPATH Standards "represent the consensus approach of the medical and mental health community … and have been recognized by various courts, including this one, as the authoritative standards of care."    *Grimm*, 972 F.3d at 595; JA4158; JA4253-4254; JA4389-4390; JA4544; JA4464.    In addition, the Endocrine Society has published Guidelines for Endocrine Treatment

---

[5] *Cf. Williams v. Kincaid*, 45 F.4th 759, 769 (4th Cir. 2022) ("DSM-5's diagnosis of gender dysphoria … affirms that a transgender person's medical needs are just as deserving of treatment and protection as anyone else's.").

of Gender-Dysphoric/Gender-Incongruent Persons ("Endocrine Society Guidelines"). JA4084-4085.

The AMA and other major health organizations recognize the WPATH Standards and Endocrine Society Guidelines as authoritative. JA4158; JA4390; JA4464; JA4544. BCBSNC relies on the WPATH Standards and the Endocrine Society Guidelines in its medical policy for gender dysphoria. JA4159; JA4746. No "competing, evidence-based standards [] are accepted by any nationally or internationally recognized medical professional groups." *Grimm*, 972 F.3d at 595-96.

Under the WPATH Standards, treatment for gender dysphoria may involve counseling, hormone therapy, and surgery. JA4085; JA4390-4391; JA4544-4545. Medically necessary surgical procedures treat gender dysphoria by bringing a person's body into better alignment with their gender identity, JA4252-4253; JA4471, and are similar to surgical procedures performed for other diagnoses. JA4257-4258.

"The American Medical Association [], the Endocrine Society, the American Psychiatric Association, and the American Psychological Association all agree that medical treatment for gender dysphoria is medically necessary and effective." JA4084; *see also* JA4255; JA4392; JA4394. Accordingly, the "denial of gender

affirming care is harmful to transgender people, as it exacerbates gender dysphoria and leads to negative health outcomes." JA4397; *see also* JA4546.[6]

## II.    PROCEDURAL HISTORY.

This appeal involves Plaintiffs' Fourteenth Amendment Equal Protection claim against Defendants Folwell and Jones in their official capacities.  After discovery closed, the parties filed summary judgment motions, and Plaintiffs moved to exclude testimony from Defendants' experts.  JA3673.

The AMA and seven additional leading medical and behavioral health organizations sought leave to file an *amici curiae* brief supporting Plaintiffs, pursuant to the district court's Local Civil Rule 7.5.  JA95-105; JA3539-3562.  The district court, over Defendants' objection, granted leave to *amici curiae*. JA3535-3538.

The district court granted Plaintiffs summary judgment, found that the exclusion violates Equal Protection, and permanently enjoined Defendants Folwell and Jones from enforcing it.  JA3734.  Defendants appealed pursuant to 28 U.S.C. § 1292(a)(1).  In the same opinion and order, the district court ruled on Plaintiffs' motions to exclude Defendants' experts under *Daubert v. Merrell Dow*

---

[6] Defendants claim that many treatments "identified" by Plaintiffs are cosmetic—referencing procedures such as "shoulder shaping" that no Plaintiff has sought.  Br. 10.  But Plaintiffs' claim is clear: they simply seek as a matter of Equal Protection the same treatment covered for others.

*Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny, excluding one expert and limiting others to substantiated areas of expertise.  JA3674-3699.  Defendants did not challenge the testimony of any of Plaintiffs' experts on summary judgment.

Plaintiffs' other claims remain pending before the district court, including a Section 1557 claim against the Plan.[7]  One plaintiff also brought a claim against her employer and the Plan under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.  The district court found the plaintiff's employer liable and reserved damages for trial.  JA3631.

---

[7] Defendants' motion to dismiss this claim was denied and after Defendants appealed, this Court affirmed the district court's ruling that Defendants had waived sovereign immunity by accepting federal funds. *Kadel v. N.C. State Health Plan for Tchrs. & State Emps.*, 12 F.4th 422 (4th Cir. 2021), as amended (Dec. 2, 2021) *cert. denied*, 142 S. Ct. 861 (2022).  The district court has reserved ruling on that claim. JA3726-3727; JA3734.

## SUMMARY OF ARGUMENT

The district court reached a straightforward conclusion: the Plan's explicit exclusion of coverage for "*sex* changes or modifications" is a facial classification based on sex. JA3703-3704. There was no need to ferret out any hidden intent since it is plain on the face of the policy. And the classification does what it says—it expressly imposes unequal treatment based on sex and transgender status by prohibiting medical coverage only when transgender people require it for gender-affirming care.

The district court carefully analyzed the multiple ways the exclusion facially discriminates based on sex and transgender status. JA3701-3705. In addition to making a sex-based distinction on its face, the exclusion also entrenches sex-based stereotypes that people should not align their bodies with a sex different than the one assigned at birth. JA3704-3705. Even if one views the exclusion as simply discriminating against individuals with gender dysphoria, that also is facially and inherently sex-based. JA3706-3707.

Each of these reasons independently supports the district court's conclusion that other cases involving facially neutral restrictions, such as *Geduldig v. Aiello* and *Dobbs v. Jackson Women's Health Organization*, are inapplicable to the facial discrimination here. The Supreme Court found in those cases that pregnancy and abortion restrictions are not facially or inherently tied to sex, and those decisions

instead examine when facially neutral restrictions might nonetheless be found to involve impermissible sex discrimination. As multiple courts have concluded, that analysis is not applicable to an exclusion such as this one, where sex discrimination appears in explicit terms on its face.

Defendants claim that Plaintiffs are not similarly situated to their cisgender colleagues who receive the same kinds of treatments denied to Plaintiffs, arguing that Plan members must be compared by diagnosis instead. This reasoning is circular. Plaintiffs' gender dysphoria diagnosis directly correlates with the fact that they are transgender. That is not a basis to find Plaintiffs differently-situated where they seek coverage for the same kinds of treatments their cisgender peers receive as a matter of course.

Defendants assert the district court's injunction—mandating that Defendants remove the exclusion and reinstate medically necessary coverage for gender dysphoria—violates Federal Rule of Civil Procedure 65 because it is "impermissibly vague." In short, Defendants claim they have no idea what is excluded under their own exclusion. Despite this claim, Defendants understood how to provide this coverage in 2017, and are doing so now in compliance with the injunction.

Finally, Defendants argue the district court abused its discretion on two evidentiary issues. First, whether the district court improperly relied upon an *amicus curiae* brief, and, second, whether the district court improperly excluded one of

Defendants' experts and certain portions of other experts' testimony.  On both counts, the district court properly applied its discretion as it used *amici* to provide atmospheric, background information, which was already well-established by other testimony in the record, and it excluded unqualified and irrelevant expert testimony. Neither ruling created reversible error.

## ARGUMENT

## I.    STANDARD OF REVIEW.

A district court's grant of summary judgment is reviewed *de novo*.  *Butler v. Drive Auto. Indus. Of Am., Inc.*, 793 F.3d 404, 407 (4th Cir. 2015).  "To overcome a motion for summary judgment," "the nonmoving party may not rely merely on allegations or denials in its own pleading but must set out specific facts showing a genuine issue for trial."  *Id.* at 408 (cleaned up).

Courts of appeal "review a district court's decision to admit expert testimony for an abuse of discretion."  *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 280 (4th Cir. 2021).  "A district court abuses its discretion if it makes an error of law or clearly erroneous factual finding," neither of which is present here.  *Belville v. Ford Motor Co.*, 919 F.3d 224, 232 (4th Cir. 2019).

## II.    THE EXCLUSION FACIALLY DISCRIMINATES BASED ON SEX.

As the district court correctly found, a policy that expressly prohibits coverage for "sex changes or modifications" classifies on its face based on sex.  JA3703-3705. By its own terms, the exclusion "distinguishes between medically necessary[]

treatments that align with the member's" sex assigned at birth and "medically necessary treatments—often the *same* medically necessary treatments—that do not align with his sex" assigned at birth. JA3703-3704 (emphasis in original). That is facial discrimination based on sex and transgender status. JA3703-3705.[8] Defendants object on two grounds. First, they argue that the Court's conclusion "rests on a misapplication of *Grimm v. Gloucester County School Board*." Br. 22. Second, Defendants claim that *Geduldig v. Aiello* forecloses a finding of facial discrimination. Br. 21-28. Neither is correct.[9]

## A.    The District Court Properly Applied *Grimm*.

Defendants claim the district court held that "government policies that reference gender or sex in any way are automatically subject to intermediate scrutiny," but that is a mischaracterization. Br. 22. The district court hewed closely

---

[8] In addition to its sex discrimination ruling, the district court found independently that the exclusion "transparently discriminates against its transgender members." JA3705. The district court observed that transgender status discrimination must be carefully scrutinized under *Grimm*'s finding that governmental discrimination against "transgender individuals" constitutes "a quasi-suspect class[ification]." JA3705. Defendants do not appear to contest this finding, which is an independent reason the exclusion must be subjected to heightened scrutiny.

[9] Defendants also complain that the district court erred in citing *Washington v. Seattle School District No. 1*, 458 U.S. 457 (1982), in its discussion of facial discrimination. Br. 23 n.5. But the district court applied the same standard Defendants invoke. *Compare* JA3702 (district court examined whether the exclusion "deals in explicitly … gendered terms") (cleaned up) *with* Br. 21 (Defendants' argument that a facial classification must "explicitly classify" based on sex) (cleaned up).

to *Grimm*, observing that, like the restroom policy challenged there, the exclusion "'necessarily rests on a sex classification' because it cannot be stated or effectuated 'without referencing sex.'" JA3704 (quoting *Grimm*, 972 F.3d at 608). Other courts have applied the same analysis. As the Eighth Circuit explained while examining a statute prohibiting "gender transition procedures" for minors, such an exclusion means that "medical procedures that are permitted for a minor of one sex are prohibited for a minor of another sex," because a "minor born as a male may be prescribed testosterone or have breast tissue surgically removed … but a minor born as a female is not permitted to seek the same medical treatment." *Brandt by & through Brandt v. Rutledge*, 47 F.4th 661, 669 (8th Cir. 2022) (affirming preliminary injunction of the challenged statute). It is "the minor's sex at birth [that] determines whether or not the minor can receive certain types of medical care under the law," which "discriminates on the basis of sex." *Id.*

So too here. Connor, for example, is categorically denied coverage for testosterone because his sex assigned at birth was female; had it been male, he would be eligible for coverage. *See, e.g.*, *Fletcher v. Alaska*, 443 F. Supp. 3d 1024, 1030 (D. Alaska 2020) (finding facial discrimination because surgical exclusion treated transgender plaintiff "differently because of her natal sex"); *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 948 (W.D. Wis. 2018) (transgender plaintiffs

20

have been "denied coverage because of their natal sex, which would appear to be a straightforward case of sex discrimination").

Second, the district court properly applied *Grimm*'s sex stereotyping analysis, which independently requires a finding of sex discrimination. JA3704. "The Plan expressly … prohibits coverage for treatments that 'change or modify' physiology to conflict with assigned sex," while covering the same treatments for participants seeking care congruent with their birth-assigned sex. JA3704. This kind of policy "punish[es] transgender persons for gender non-conformity, thereby relying on sex stereotypes." *Grimm*, 972 F.3d at 608; *see also Boyden v. Conlin*, 341 F. Supp. 3d 979, 997 (W.D. Wisc. 2018) (the exclusion "entrenches" the sex-stereotyped "belief that transgender individuals must preserve the genitalia and other physical attributes of their [birth-assigned] sex"); *Toomey v. Arizona*, No. CV-19-00035, 2019 WL 7172144, at *5-6 (D. Ariz. Dec. 23, 2019) ("Discrimination based on the incongruence between natal sex and gender identity—which transgender individuals, by definition, experience and display—implicates … gender stereotyping"); *Flack,* 328 F. Supp. 3d at 951 ("the Challenged Exclusion feeds into sex stereotypes by requiring all transgender individuals … to keep … sex characteristics consistent with their natal sex no matter how painful and disorienting it may prove for some").

21

As *Grimm* held, this kind of sex stereotyping is an "independent reason[] … that the [Plan's] policy constitutes sex-based discrimination … and is subject to intermediate scrutiny."  972 F.3d at 609.  Defendants' brief does not even mention this theory, let alone argue that the district court's ruling was incorrect.  Defendants have thus waived this argument, which independently requires that the district court's decision be affirmed.  *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017).

Nonetheless, *Grimm* is different, Defendants insist, because the policy there "expressly … dictated which restrooms the students could use" by directing them to restrooms "after considering their sex."  Br. 22-23.  The exclusion does the same thing: it dictates which Plan members have coverage after considering how the care relates to a transgender person's sex.  Defendants argue that *Grimm* is inapposite because the exclusion here "does not distinguish between biological male and biological female participants," suggesting that is as far as *Grimm* goes.  Br. 23.  But *Grimm*'s holding is not so cramped.  *Grimm* ruled for the transgender plaintiff not merely because the school distinguished between male and female students by providing separate restrooms to them, but specifically because the policy excluded the plaintiff as a transgender boy from the restrooms other boys could use.  972 F.3d at 608.  Similarly, the district court found sex discrimination specifically because of the way the exclusion bars transgender participants from coverage.  JA3705.

Defendants also argue that the exclusion cannot discriminate based on sex because not all transgender people suffer from gender dysphoria. But the "overarching goal of treatment for gender dysphoria is to eliminate clinically significant distress by aligning an individual patient's body and presentation with their internal sense of self." JA4396; JA4083-4084. The fact that some transgender people receive care for gender dysphoria and no longer experience symptoms does not change the fact that they are transgender. JA207;[10] *see also Rice v. Cayetano*,

---

[10] Defendants' suggestion that cisgender people can be diagnosed with gender dysphoria is contrary to the evidence. *See, e.g.*, Br. 3, 23 n.6. There is no dispute— let alone a material one—that the gender-affirming care actually singled out by the exclusion's "sex changes" language is care that only transgender people seek. *See Fain v. Crouch*, No. 3:20-cv-0740, 2022 WL 3051015, at *8 (S.D.W.Va. Aug. 2, 2022) ("[o]nly individuals who identify as transgender would seek 'transsexual surgery'"); *Toomey*, 2019 WL 7172144, at *6 (finding that similar exclusion "singles out transgender individuals for different treatment" because "transgender individuals are the only people who would ever seek gender reassignment surgery"); *Flack*, 328 F. Supp. 3d at 950 ("expressly *singles out and bars* a medically necessary treatment solely for transgender people") (emphasis in original).

Although Defendants repeatedly cite Plaintiffs' expert, Dr. Randi Ettner, they ignore this testimony from her:

> Q: Are all individuals suffering from gender dysphoria transgender?
> A: Yes.

JA207. Defendants cite only two sources for their unfounded suggestion that cisgender people may experience gender dysphoria, JA204-205; JA209-211—but those sources merely explain that not everyone experiencing gender dysphoria might "identify" as transgender. JA205. As Plaintiffs' expert elaborated, there also "can be people who have same-sex attraction, but don't identify as … lesbian or bisexual." JA205. Just as a ban on marriage equality only affects same-sex couples, a ban on gender-affirming care only affects transgender people regardless of any particular individual's identity.

528 U.S. 495, 516-17 (2000) ("Simply because a class … does not include all members of [a] race does not suffice to make the classification race neutral."); *Nyquist v. Mauclet*, 432 U.S. 1, 8 (1977) (rejecting argument that law was facially neutral because it discriminated against only a subset of non-citizen residents); *cf. Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104, 125 (4th Cir. 2022) (en banc) ("the agreement of some parents to the sex-based classification of the skirts requirement is irrelevant"; no "parent can nullify the constitutional rights of other parents' children").

Finally, Defendants claim that the proper comparison is between medical benefits, not "the policyholder's identity." Br. 24. But the exclusion itself imposes differential treatment based on transgender status by ensuring that the same treatments cisgender people receive are barred when transgender people require them for gender-affirming care. JA3791-3792; JA3810-3811. That is entirely different from Defendants' cited authorities, where benefits were excluded for *all* members, and thus the distinctions were between procedures covered for everyone versus no one—rather than procedures made available to some but not all, as the exclusion does here. *See In re Union Pac. R.R. Emp. Pracs. Litig.*, 479 F.3d 936, 938 (8th Cir. 2007) (Title VII challenge involving health plans that "exclude[d] *both* male and female contraceptive methods"); *Alexander v. Choate*, 469 U.S. 287, 302 (1985) (Rehabilitation Act challenge involving Medicaid's reduction of in-patient

24

hospital days covered for all participants). It is undisputed that the care at issue here is provided to cisgender participants, but not transgender participants and the district court was correct to focus on that comparison. JA3791-3792; JA3810-3811.

### B. *Geduldig* is Inapplicable.

As Defendants concede, a facially discriminatory classification is one that explicitly classifies based on sex. Br. 21. That is what the exclusion does by barring care for "*sex* changes or modifications," as explained above. JA3833-3880. In contrast, *Geduldig* considered not a facial classification, but rather what it viewed as a facially-neutral pregnancy exclusion, and in which circumstances such a proxy can constitute sex discrimination. This is the first of several reasons that *Geduldig* and *Dobbs v. Jackson Women's Health Org.*, 142 S.Ct. 2228 (2022), are inapplicable here: they do not speak to the kind of explicit sex classification found in the exclusion.

Defendants claim that the district court "sidestep[ped] *Geduldig* rather than [] obey it," Br. 29, by finding that pregnancy "can be explained" in neutral terms "without reference to sex, gender, or transgender status." JA3709. But that was the majority's holding in *Geduldig*. The Court found that "pregnancy is an *objectively* identifiable physical condition with unique characteristics," and accordingly does not "involv[e] discrimination based upon gender as such." *Geduldig*, 417 U.S. at 496 n.20. The exclusion here does. *See Fain v. Crouch*, No. 3:20-cv-0740, 2022

WL 3051015, at *8 (S.D.W. Va. Aug. 2, 2022) (*Geduldig* "reasoned that pregnancy was a physical condition divorced from gender"; rejecting the argument that exclusion of treatment for gender dysphoria is facially neutral under *Geduldig*); *Boyden*, 341 F. Supp. 3d at 999-1000.  While Defendants try to connect *Geduldig* to the exclusion by claiming that pregnancy too is explicitly defined with reference to sex, Br. 29, that view did not prevail and is found in the dissent, not the majority. *Compare* 417 U.S. at 496 n.20 (discussing pregnancy as a facially neutral—which the Court termed "objectively identifiable"—condition) *with* 417 U.S. at 205 (Brennan, J., dissenting) (arguing that pregnancy is a legislative classification that "turn[s] on gender").

Second, *Geduldig* is inapplicable because Defendants admitted that cisgender participants receive the same kinds of treatments denied transgender people for gender-affirming care.  JA3791-3792; JA3810-3811.  After finding that pregnancy is a facially-neutral condition rather than an express gender-based classification, *Geduldig* examined alternatively whether sex discrimination can be found on the basis that "only women can become pregnant."  417 U.S. at 496 n.20.[11]  This was not sufficient, the Court held, when no one else received more favorable treatment.  *Id.* at 496-97 (there is "no risk from which men are protected and women are not,"

---

[11] Plaintiffs accept the premise for the sake of argument, although some transgender men can and do become pregnant.

or "from which women are protected and men are not"). Again, the exclusion is different. "Here, the nonsuspect class—those not seeking surgical treatment for gender dysphoria—are treated more favorably, as their materially same surgeries are covered." *Fain*, 2022 WL 3051015, at *8; JA3791-3792; JA3810-3811.

Third, the more relevant precedent is *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 273-274 (1993), not *Geduldig*. As *Bray* explained, "[s]ome activities may be such an irrational object of disfavor that, if they are targeted, and if they also happen to be engaged in exclusively or predominantly by a particular class of people, an intent to disfavor that class can readily be presumed. A tax on wearing yarmulkes is a tax on Jews." 506 U.S. at 270. This describes the exclusion. As the district court found, "[d]iscrimination against individuals suffering from gender dysphoria is also discrimination based on sex and transgender status." JA3706. No cisgender person transitions and lives as a sex different than the one assigned at birth. *Fain*, 2022 WL 3051015, at *8 (in the context of a similar exclusion, observing that "[o]nly individuals who identify as transgender would seek 'transsexual surgery'"); *Toomey*, 2019 WL 7172144, at *6 ("No cisgender person would seek, or medically require, gender reassignment. Therefore, as a practical matter, the exclusion singles out transgender individuals for different treatment."); *cf. Glenn v. Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011) ("The very acts that define transgender people as transgender are those that contradict stereotypes of

27

gender-appropriate appearance and behavior.") (cleaned up). Just as a tax on wearing yarmulkes is a tax on Jewish people, an exclusion of care for gender dysphoria is an exclusion of transgender people. *See Christian Legal Soc'y Chapter of the Univ. of California, Hastings Coll. Of the Law v. Martinez*, 561 U.S. 661, 689 (2010) ("Our decisions have declined to distinguish between status and conduct in this context."); *Lawrence v. Texas*, 539 U.S. 558, 583 (2003) (O'Connor, J., concurring).

For this reason, *Geduldig*'s observation that there is "lack of identity" between pregnancy and sex because both men and women can be nonpregnant is not instructive here. Br. 23; 417 U.S. at 496 n.20. Gender dysphoria, in contrast, is exclusively identified with transgender people. The analysis does not change simply because not all transgender people have gender dysphoria at any given time, as Defendants suggest. Br. 23 ("Transgender Plan members are in both the group that suffers from gender dysphoria … and the group that does not suffer from gender dysphoria"). Otherwise, any exclusion could be reformulated that way to evade review. For example, *United States v. Virginia* assumed "that most women would not choose [the Virginia Military Institute's] adversarial method," such that women were in the group that wanted to attend and the group that did not. 518 U.S. 515, 542 (1996). Not all lesbians and gay men want to marry, and they are therefore in both the group that wants to marry a same-sex spouse and the group that does not.

28

*See e.g., Bostic v. Schaefer*, 760 F.3d 352 (4th Cir. 2014). Merely recasting an exclusion this way does not erase the sex-based classification for those who are excluded. *See also Eknes-Tucker v. Marshall*, No. 2:22-cv-184, 2022 WL 1521889, at *10 (M.D. Ala. May 13, 2022) (finding similar argument did not apply where the category of people penalized consists entirely of transgender people).

Finally, even if one accepts the notion that this Court must examine the exclusion for intent to treat transgender people differently, such intent is plain to see. After all, *Geduldig* did not hold that pregnancy-based classifications *never* violate the Equal Protection Clause, instead concluding more narrowly that not every pregnancy classification is an explicit sex-based classification "like those considered in" *Reed v. Reed*, 404 U.S. 71 (1971), and *Frontiero v. Richardson*, 411 U.S. 677 (1973). *Geduldig*, 417 U.S. at 496 n.20. Where facial discrimination is not present (as it is here), a court would examine whether "distinctions … are mere pretexts designed to effect an invidious discrimination against the members of one sex or the other." *Id.* That is the case here.[12] The exclusion was designed to categorically bar

---

[12] Defendants' argument is belied by a record replete with admissions that Defendants knew the exclusion treats transgender people differently, lifted it for one year to afford equal treatment, and provided for reinstatement after concluding (incorrectly) that the law no longer required equal treatment. *See, e.g.*, JA4654-4677 (slides presented to the Board as it considered lifting the exclusion for 2017 include the term "transgender" 10 times); *see also* JA4668 (explaining that ACA regulation "makes clear … that blanket exclusions of transgender services" are outmoded); JA4642-4643 ("Transgender Cost Estimate" memorandum from Segal Consulting);

gender-affirming care "which is only sought by transgender individuals." *Brandt v. Rutledge*, 551 F. Supp. 3d 882, 889 (E.D. Ark. 2021), *aff'd sub nom. Brandt by & through Brandt v. Rutledge*, 47 F.4th 661 (8th Cir. 2022). This is what *Geduldig* and *Bray* clarify is prohibited: a pretextual classification designed to impose differential treatment.[13]

The district court did not, as Defendants claim, create "an artificial and inconsequential distinction" between medical "conditions" and "treatments." Br. 28. Rather the district court distinguished *Geduldig* because it involved a condition not facially linked to sex, while the exclusion here bars all treatments *if and when* they relate to a transgender person's sex. JA3709 (holding that the Plan "does not merely exclude one 'objectively identifiable'" condition; "rather, it excludes treatments that lead or are connected to *sex changes* or modifications") (emphasis altered).

Finally, even if the exclusion is treated as intentional rather than facial discrimination, Defendants are not correct that only a "jury" may make such a determination. Br. 29, 32. The Plan staff's recommendation to eliminate the

---

JA4734 (Defendant Folwell's statement that he would not provide coverage for "sex change operations" until "the court system" … "tells us that we 'have to'").

[13] For all of these reasons, *Lange v. Houston County, Georgia*, 499 F. Supp. 3d 1258, 1275 (M.D. Ga. 2020), finding a similar exclusion facially neutral, is an outlier that fails to persuade.

exclusion for transgender people, the board's agreement to do so for one year only, and Defendants' annual approval since then of discriminatory plans with the exclusion are not contested.  Nor is Defendant Folwell's statement that Defendants will not permit coverage of "sex change operations" until a court tells "us that we 'have to.'"  JA4734.  Nothing further is needed to determine that Defendants' actions to exclude gender-affirming care are purposeful and intentional, not accidental or inadvertent.[14]

### C.    The District Court's References to *Bostock v. Clayton County* as Persuasive Authority Do Not Create Reversible Error.

Defendants make much of the fact that the district court cited *Bostock v. Clayton County*, 140 S.Ct. 1731 (2020), as persuasive authority.  Br. 29-32.  But the district court's analysis correctly relies on this Court's Equal Protection guidance in *Grimm*.  Nothing about the district court's supplemental references to *Bostock* is improper.

For perspective, the district court referred to *Bostock* four times in its Equal Protection discussion, and generally only after relying on *Grimm*'s Equal Protection analysis.  *See, e.g.*, JA3704 ("First, like in *Grimm*, this exclusion …"); JA3704-3705

---

[14] This case is not analogous to *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256 (1979).  *Feeney* found that mere disparate impact from a gender-neutral veterans' hiring preference—for which both women and men could qualify—is not sufficient on its own to establish intent.  *Id.* at 275.  That is different from Defendants' deliberate elimination of gender-affirming care for transgender people.

(relying first on *Grimm* to find that the exclusion is premised on sex stereotyping); JA3707 (relying first on *Grimm* while discussing gender dysphoria). Although *Bostock* was decided under Title VII, nothing suggests that the Court's understanding of transgender people and discrimination against them is specific to that context—nor did the Court "expressly limit[]" its holding as Defendants suggest. Br. 30. After all, *Bostock*'s observation that an employer may not "intentionally penalize[] a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth" applies just as much to the state of North Carolina as to Aimee Stephens' private employer. *Bostock*, 140 S.Ct. at 1741-42.

Defendants nonetheless object on two specific grounds. First, they note that "Congress made a policy choice in the Title VII statute when it commanded that … sex is not relevant" to employment considerations, while the "Supreme Court did not hold that the drafters and ratifiers of the Fourteenth Amendment made the same policy choice." Br. 30 (cleaned up). But it is beyond peradventure that sex discrimination is barred by the Fourteenth Amendment, and Defendants cite nothing supporting the notion that transgender people are strangers to its protections.[15]

---

[15] Defendants cite the Supreme Court's observation that "statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils," but that does not support their argument. Br. 30 (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998)). Instead *Oncale* explained why Title VII encompasses

Second, Defendants suggest that the district court relied on *Bostock* to "reduce the controlling effect of *Geduldig*." Br. 29. Not true. Instead, the district court observed that "even if the Court credited Defendant's characterization of the Plan as applying only to diagnoses of gender dysphoria," that still discriminates based on sex because "one cannot explain gender dysphoria 'without referencing sex' or a synonym." JA3706 (quoting *Grimm*, 972 F.3d at 608). This holding does not import an inapplicable Title VII standard—it *quotes and applies* Equal Protection guidance from *Grimm*. JA3706-3707. Other circuit courts have applied the same standard in the Fourteenth Amendment context. *See Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017) (an exclusion of transgender students from school restrooms "cannot be stated without referencing sex"); *Brandt*, 47 F.4th at 669-70 (same). The district court's additional reference to an illustrative hypothetical from *Bostock* does not change its faithful application of Equal Protection principles. JA3706-3707.

In any event, federal courts' analysis of disparate treatment sex discrimination claims under the Equal Protection Clause often mirrors Title VII analysis. *See*, *e.g.*, *Naumovski v. Norris*, 934 F.3d 200, 212 (2d Cir. 2019) (stating that equal protection

---

forms of discrimination the drafters might not have anticipated. *Id.* at 79-80. That is true of the Equal Protection Clause as well. *Bostic v. Schaefer*, 760 F.3d 352, 384 (4th Cir. 2014) (finding that Equal Protection requires access to marriage for same-sex couples).

"discrimination claims parallel Title VII discrimination claims in many respects");
*Glenn*, 663 F.3d at 1316-20 (citing Title VII case law).

### D.    Plaintiffs Are Similarly Situated to Cisgender Plan Participants.

Defendants claim that the district court erred in finding Plaintiffs similarly situated to cisgender participants, but this is not a difficult issue.  Br. 32-35.  Like their cisgender counterparts, Plaintiffs are state employees or dependents and contribute the same premiums for their coverage.  JA353; JA377; JA400; JA453.  Defendants admit the same treatments Plaintiffs seek are covered by the Plan for cisgender participants.  JA3791-3792; JA3810-3811.  For example, it is undisputed that after cancer treatment cisgender women can obtain surgery to reconstruct a feminine chest contour, but transgender women cannot.  Br. 4; JA3791.  Similarly, cisgender men who require testosterone because their body does not produce enough can obtain it under the Plan, but transgender men cannot.  JA3791.

Defendants claim that the similarly situated analysis must reduce to the underlying diagnosis.  Br. 32-33.  But all that does is insist that the only proper measuring stick is the comparator groups' one difference: that Plaintiffs are transgender.  As the district court found, discrimination based on "gender dysphoria" *is* "discrimination based on … transgender status."  JA3706; *see also Williams v. Kincaid*, 45 F.4th 759, 772 (4th Cir. 2022) (observing that gender dysphoria is "closely connected to transgender identity") (cleaned up).  Discrimination based on

34

gender dysphoria also *is* discrimination based on sex, since gender dysphoria cannot be diagnosed without reference to one's sex assigned at birth. *See* JA4386 (gender dysphoria is the distress resulting "from the incongruence between a person's gender identity and the sex assigned to them at birth"); JA4082. Nor does the exclusion merely "distinguish[] between medically necessary treatments." Br. 27 (cleaned up). *See Brandt*, 47 F.4th at 669 ("Arkansas's characterization of the Act as creating a distinction on the basis of medical procedure rather than sex is unpersuasive.").

As in *Brandt*, a rule that uses sex assigned at birth to "distinguish[] between those who may receive certain types of medical care and those who may not" discriminates based on sex and is "therefore subject to heightened scrutiny." *Id.* at 670. That is what the exclusion does. If the care is for the purpose of "chang[ing]" one's sex assigned at birth, the exclusion bars it. JA3833-3880; *see also Grimm*, 972 F.3d at 610 (declining to use "biological" characteristics as the measure of a transgender boy's similarity to others because such an argument "privileges sex-assigned-at-birth over [Plaintiffs'] medically confirmed, persistent and consistent gender identity").

Defendants argue on the one hand that all Plan members are eligible for treatments for other diagnoses, such as cancer; and argue on the other that gender-affirming care is denied to everyone, transgender or cisgender. Br. 23, 34. That the Plan does not discriminate against its transgender members in *every* aspect, such as

denying a transgender man a hysterectomy for cervical cancer, does not absolve Defendants of the sex discrimination they *do* inflict on their transgender participants.[16]

Defendants' other argument—that gender-affirming care is denied to everyone—is reminiscent of the discredited argument that marriage bans for same-sex couples did not discriminate because gays and lesbians could still marry someone of a different sex. *See*, *e.g.*, *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 969 (N.D. Cal. 2010); *Varnum v. Brien*, 763 N.W.2d 862, 885 (Iowa 2009); *cf. Loving v. Virginia*, 388 U.S. 7 (1967). "The proper focus … is the group for whom the law is a restriction"—*i.e.*, transgender people—"not the group for whom the law is irrelevant." *City of Los Angeles, California v. Patel*, 576 U.S. 409, 418 (2015) (cleaned up).

Defendants' authorities do not suggest otherwise. Br. 33, 35. In *Gann v. Schramm*, "the Plaintiffs [] made no showing that Gann was a member of any 'identifiable group' singled out for different treatment under the laws." 606 F. Supp. 1442, 1447 (D. Del. 1985). Neither of the other cases Defendants cite involve allegations of sex discrimination or transgender people. *See McMain v. Peters*, No.

---

[16] Defendants' analogy to a decision about whether to cover hysterectomy or orchiectomy procedures for all Plan members is different from a case like this one, where the same procedures are covered for some members but not all. Br. 34.

2:13-cv-01632-AA, 2018 WL 3732660, at *1 (D. Or. Aug. 2, 2018), *aff'd*, 773 F.

App'x 997 (9th Cir. 2019) (involving claims by an incarcerated *pro se* litigant

seeking hormone therapy for bipolar disorder and post-traumatic stress disorder);

*Flaming v. Univ. of Texas Med. Branch*, 2016 WL 727941, at *9 (S.D. Tex. Feb. 24,

2016) (involving claim that prison doctors discriminated in denying pain medication

to non-cancer patients).

Defendants also argue that the testimony of one of their experts "creates a

material issue of fact" about whether treatment for gender dysphoria is "ever"

medically necessary. Br. 36 (citing testimony of Dr. Stephen Levine). This

mischaracterizes the evidence. Notably, Defendants have not challenged the court's

evidentiary ruling on Dr. Levine's testimony. Br. 50-57. The district court found

that "Levine does not testify that medical and surgical care for gender dysphoria is

categorically inappropriate." JA3695; *see also* JA3696 (Levine "does not advocate

for 'denying endocrine treatment or surgical treatment' to all transgender people, a

position he calls 'draconian'"; he states he is "not advocating denying endocrine

treatment or surgical treatment"; "I did not say that gender affirming treatment in

general should be stopped. I've never said that.").

As they did unsuccessfully below, Defendants point again "to Dr. Levine's

testimony to argue that these treatments are categorically ineffective," but "that is

not Levine's testimony." JA3712. While he expresses concerns about the quality

of the current research, he "repeatedly and emphatically testifies that this lack of high-level research is *not* reason to justify withholding treatment from all gender dysphoric patients." JA3712. "Rather," the district court recognized, "he testifies that *doctors and patients* … should decide if medicine or surgery is necessary *as he does in his own practice.* This is Plaintiffs' request: that they and their doctors, not their sex or transgender status, determine when their treatments are appropriate." JA3712 (emphasis in original). The district court was correct to find no material dispute of fact on this record.[17]

## III.   THE DISTRICT COURT'S INJUNCTION IS NOT IMPERMISSIBLY VAGUE.

Defendants raise several arguments under the guise that the district court's injunction is not compliant with Federal Rule of Civil Procedure 65(d) because it is "impermissibly vague." Br. 37-46.

First, Defendants argue that the district court failed to "specifically" identify the coverage exclusion at issue. Br. 39. But Rule 65(d)(1)(C) simply requires that the court "describe in reasonable detail" the "acts restrained." *Id.* The injunction does so. No reasonable question can exist as to the exclusion enjoined from

---

[17] Defendants cite Dr. Levine's opinion about how often gender-affirming care reduces "negative mental outcomes," Br. 35, but the primary goal of gender-affirming care is to treat gender dysphoria rather than other mental health conditions. JA4084-4085. Dr. Levine "concedes that he *does not know* how often" this care "alleviate[s] symptoms of gender dysphoria" and does not opine "as to the portion of these procedures that are necessary and unnecessary." JA3696.

enforcement, which the district court's Memorandum Opinion and Order identifies specifically and discusses exhaustively.

Relatedly, Defendants argue that they are uncertain about the "precise definition" of the phrase "medically necessary services for the treatment of gender dysphoria." Br. 40-42. This rings hollow. As set forth in the injunction, medically necessary services are defined by North Carolina statute.[18] JA3667 (quoting N.C. Gen. Stat. § 58-3-200(b)). When NCSHP lifted the Exclusion in 2017, it was able to provide "medically necessary services for the treatment of gender dysphoria." *See, e.g.*, JA4685 (Board removed the Exclusion "resulting in the provision of medically necessary services for the treatment of gender dysphoria"). Further, prior to filing its opening brief, Defendants issued a press release stating their (belated) intention to comply with the district court's order, which had already been in effect

---

[18] Defendants also claim the district court's use of the phrase "medically necessary services for the treatment of gender dysphoria" impermissibly refers to another document. Br. 39-40. Rule 65(d)(1)(C) requires an injunction to provide "reasonable detail" of "the act or acts restrained or required" without "referring to the complaint or other document." Here, the district court provided reasonable detail of the act to be restrained—the enforcement of the Plan's exclusion allowing for the reinstatement of coverage for "medically necessary services of treatment for gender dysphoria." JA3729. The district court did not refer to another document, instead it incorporated the definition of "medically necessary services" from the relevant statute. JA3667 (quoting N.C. Gen. Stat. § 58-3-200(b)).

for a month.[19]  In the press release, Defendants clearly understand that the district court's Order requires them to "not enforce the Plan's benefit exclusion regarding treatment or studies leading to or in connection with sex transition or modifications and related care." *Id.*  On the same day, Defendant Folwell stated at the NCSHP Board meeting that, after consulting with counsel, he had determined that as long as the injunction is "in force, I must comply"; that "the Executive Administrator and Plan staff are directed to not enforce the specified benefit exclusion, and to provide benefits in compliance with the court's order"; and that Plan documents would be amended accordingly.[20]  Neither in the press release, nor during the Board Meeting, did Defendant Folwell (or any Board member) raise any concerns around how the injunction should be understood.

Nor does Defendants' reliance on *Pashby v. Delia*, 709 F.3d 307 (4th Cir. 2013), support their cause.  The *Pashby* plaintiffs challenged stricter eligibility requirements for in-home personal care services ("PCS") in legislation referred to as Policy 3E.  *Id.* at 313.  The district court preliminarily enjoined implementation of Policy 3E.  *Id.*  However, Policy 3E included a range of provisions unrelated to the

---

[19] Press Release, North Carolina Department of State Treasurer, Federal Judge Orders State Health Plan Board of Trustees to Use Taxpayer Funds to Pay for Sex Transition Operations (July 13, 2022), https://perma.cc/5RYM-3DYH.

[20] NC State Health Plan, *State Health Plan Board of Trustees Meeting–July 13, 2022*, YouTube (July 13, 2022), https://www.youtube.com/watch?v=FTQS3xmN_t0, at 19:30-25:02.

eligibility requirements. *Id*. at 331. The Fourth Circuit found the injunction lacked "reasonable detail" because while the district court only focused on the eligibility requirements of Policy 3E, the actual injunction prohibited the complete implementation of Policy 3E, which, as the Fourth Circuit noted, might include other provisions. *Id*. As a result, while the Fourth Circuit found plaintiffs "established the need for a preliminary injunction," it remanded the case for further clarification. *Id*. at 332.

The exclusion, unlike Policy 3E, does not contain multiple provisions unrelated to the specific requirement sought to be enjoined. Instead, the exclusion is a categorical prohibition of coverage for the treatment of gender dysphoria. Period. Unlike *Pashby*, the enjoined conduct here is identified in reasonable detail, *i.e.*, end the categorical prohibition of medically necessary services for the treatment of gender dysphoria.

Defendants next contend that the district court's use of "medically necessary services for treatment of gender dysphoria" is a "potentially boundless phrase" giving no guidance "short of a contempt hearing" on what is covered by the injunction. Br. 41-42; *see also* Br. 42-44.[21]  But the injunction does not need to

---

[21] Defendants attempt to sow additional doubt by claiming that Plaintiffs' expert identified a series medically necessary procedures not covered in 2017. Br. 42-43. But the expert merely identified procedures accepted under the Standards of Care,

identify a complete list of treatments for gender dysphoria.  *See, e.g.*, *Kadel v. N.C. State Health Plan for Tchrs. & State Emps.*, 12 F.4th 422, 428 (4th Cir. 2021) ("The 2017 Plans did not mandate coverage for all gender-affirming care.  They simply allowed claims for gender-affirming care to be reviewed under the same criteria and in the same manner as claims for any other medical, mental health, or pharmacy benefits.").    Removing the categorical prohibition allows NCSHP (and the Defendants) in conjunction with its third-party administrators to "evaluate[] whether the billed medical procedure corresponds to a covered diagnosis."  JA586; JA3619 ("NCSHP's third-party administrators, Blue Cross and CVS, appear able to distinguish between medically necessary and unnecessary treatments.").  NCSHP does this on a daily basis for its 740,000 members, and did so on its own accord for its transgender members in 2017.  *See, e.g.,* JA4685 (Board minutes reflecting that for 2017 the Plan "would adopt" BCBSNC's "medical policy" for treatment of gender dysphoria).  Defendants do not need more information than that already included in the injunction to do so again.  *See Reliance Ins. Co. v. Mast Const. Co.*, 159 F.3d 1311, 1316 (10th Cir. 1998) ("Rule 65(d) requires only that the enjoined conduct be described in reasonable, not excessive, detail ….."); *Meyer v. Brown & Root Constr. Co.*, 661 F.2d 369, 373 (5th Cir.1981) ("The specificity requirement is

---

JA4255-4256, and Plaintiffs have made clear that their claims seek access to the same kinds of care covered for others without sex discrimination.

not unwieldy ....  An injunction must simply be framed so that those enjoined will know what conduct the court has prohibited.").

Finally, Defendants claim that other exclusions in the plan also purportedly bar coverage for gender-affirming care, citing "surgery for psychological or emotional reasons," and medications "not approved by the Food and Drug Administration for the applicable diagnosis."  Br. 8-9; *see also id.* 44-46.  This is unfounded and appears to be "invented *post hoc* in response to litigation."  *United States v. Virginia*, 518 U.S. 515, 533 (1996).

First, when approving gender-affirming care in 2017, the Board neither discussed nor acted on these other exclusions, let alone suspended them. *See, e.g.,* JA3935; JA4673.  The only exclusion removed to facilitate coverage of gender-affirming care in 2017 was the exclusion for "sex changes or modifications." JA4684-4685; JA4673; JA513-519.

Second, the Plan used BCBSNC's policy for gender-affirming care, which does not even reference the exclusions Defendants invoke.  JA4706-4714.  Indeed, BCBSNC testified that it "has never implemented the portion of the Plan's benefit booklets that excludes 'surgery for psychological or emotion[al] reasons.'"  JA1019. Further, off-label usage is approved by the Food and Drug Administration ("FDA"),

is commonplace, and has been covered by NCSHP previously in this and other contexts.[22]

Third, when Plaintiffs were denied care, it was pursuant to the exclusion for "sex changes or modifications."  *See, e.g.*, JA378, JA384; JA351; JA359; JA414-415, JA420-448; JA455; JA460-461.  Despite Defendants' newly-discovered concern about other exclusions purportedly implicated by gender-affirming care, they have only applied one exclusion to deny it.

## IV.    THE DISTRICT COURT DID NOT ERR BY CONSIDERING AN AMICUS BRIEF IN RULING ON SUMMARY JUDGMENT.

Defendants take the position that the district court abused its discretion when it "explicitly relied upon factual assertions—scientific and medical assertions made in an amicus curiae brief—outside of the discovery process."[23]  Br. 46.  Contrary to

---

[22] Not only are medications commonly "used 'off label' across all domains of medicine," JA4492, NCSHP covered this care in 2017, and has covered other non-approved applications of medications.  *See* JA310 n.7 (NCSHP covered COVID care, which was not FDA-approved until many months after).  For at least three decades, the FDA has provided that physicians may prescribe drugs off-label.  *See, e.g.*, JA4600-4609; *see also Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 351 (2001) ("off-label use is generally accepted").

[23] The brief at issue was filed by eight leading medical, mental health, and other health care organizations representing hundreds of thousands of physicians, nurses and mental-health professionals, including specialists in family medicine, mental health, internal medicine, endocrinology, obstetrics and gynecology.  They include the AMA, the American Academy of Pediatrics, American College of Obstetricians and Gynecologists, the American Psychiatric Association, the Endocrine Society, the North American Society for Pediatric and Adolescent Gynecology, National

Defendants' claim, the district court did not make a "radical" decision and rely upon "extra-record facts" when resolving the legal issues raised on summary judgment.[24] Br. 48.  It did what courts do on a regular basis—cite an amicus brief as additional support and context for atmospheric, background facts already in the record.  *See, e.g., Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 63, 78 (2020) (Breyer, J. dissenting) (citing scientific information from amicus brief); *Peters v. Aetna, Inc.,* 2 F.4th 199, 234 (4th Cir. 2021) ("This interpretation is bolstered by the brief of *amici*, the American Medical Association"); *see also Wagafe v. Biden*, No. 17-CV-00094-LK, 2022 WL 457983, at *2 (W.D. Wash. Feb. 15, 2022) ("the 'classic role' of amicus briefing … is to assist the Court in cases of general public interest" and "supplement the efforts of counsel"); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv*., No. CV 01-640RE, 2005 WL 878602, at *4 (D. Or. Apr. 8, 2005) ("[Defendant], however, asserts what appears to a hard-and-fast rule that amici may not present evidence …. The court, however, has found no authority supporting such a broad proposition.").

---

Association of Nurse Practitioners in Women's Health, and the Society of OB/GYN Hospitalists.

[24] Defendants rely upon *Students for Fair Admissions v. President & Fellows of Harvard Coll.*, No. 14-cv-14176, 2018 WL 9963511 (D. Mass. Oct. 3, 2018), to support their argument.  Left unsaid in Defendants' brief is that the district court permitted amici to *participate* in trial, including providing opening and closing statements as well as present four witnesses.  That is not what happened here.

Here, the district court referenced the brief to support atmospheric, background facts such as "[e]very person has a gender identity" or to identify available treatments for gender dysphoria. This is no different than this Court's consideration of a similar amicus curiae brief in *Grimm*.

The relevant portions of the amicus curiae brief in *Grimm* are substantially identical to the brief submitted here (filed by some of the same *amici*) and provided the same contextual information: namely, what it means to be transgender and the standard of care for treatment of gender dysphoria. This Court included discussion of the brief over several pages in the Background section of its opinion, including quotations to material from the brief. 972 F.3d at 594-96. The district court, when granting amici's motion for leave to file a brief, noted as much. JA3536.

Despite Defendants' broad argument, Defendants identify only two purported "extra-record facts" used by the district court.[25] However, these statements simply articulated the potential methods of treatment, *e.g.*, counseling, medications, and/or surgery, for gender dysphoria. Br. 47 (quoting JA3665); JA3670. The district court

---

[25] Defendants' "*see generally*" citation, Br. 47, to the district court's "Scientific Background" is insufficient to challenge any other purported "extra-record fact." *See Grayson O Co.*, 856 F.3d at 316. Nor can Defendants properly expand this argument in their forthcoming reply brief. *Stout Risius Ross, Inc. v. People Care Holdings, Inc.*, No. 15 C 9298, 2016 WL 4593824, at *1 (N.D. Ill. Sept. 2, 2016) ("Delaying the presentation … of an argument until the reply brief … is not only unfair to one's opponent—it is a form of 'sandbagging,' [citation]—it is unfair to the court."); *see also Salama v. Holder*, 355 F. App'x 761, 765 (4th Cir. 2009).

did not use the amicus curiae brief to contradict Dr. Levine's testimony about the efficacy of treatment for gender dysphoria. Br. 47 (citing JA3698 n.3). Instead, the district court referred to the testimony of the parties' experts regarding the efficacy of such treatments. *See* JA3671 ("[Plaintiffs' experts] testify that these are 'safe and effective treatment[s] for gender dysphoria' that are governed by 'well-established community standards.'") *compare to id.* (discussing Defendants' expert testimony).

Moreover, these two purported "extra-record facts" cited by the district court are not actually outside the record. Every single expert put forth by Plaintiffs established the treatments available for gender dysphoria. JA4085; JA4390-4391; JA4468-4471; JA4544; JA4252-4253. As such, Plaintiffs' experts and the information provided in the amicus curiae brief overlap in many ways and do not exceed the scope of the arguments raised by the parties, and nothing cited from the amicus brief exceeds the scope of the expert testimony in the case.[26] As a result, Defendants are unable to show how any such reliance on these two facts created reversible error. *Burgess v. Goldstein*, 997 F.3d 541, 561 (4th Cir. 2021) ("[T]he test for harmlessness is whether we can say with fair assurance, after pondering all

---

[26] Of note, the source material for these two statements is the WPATH Standards, which this Court has found "represent the consensus approach of the medical and mental health community … and have been recognized by various courts, including this one, as the authoritative standards of care." *Grimm*, 972 F.3d at 595.

that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.").

## V.    THE DISTRICT COURT WAS WELL WITHIN ITS BROAD DISCRETION TO EXCLUDE CERTAIN EXPERT OPINIONS FROM DRS. HRUZ, LAPPERT, AND ROBIE.

Defendants retained five experts below: (1) Dr. Paul R. McHugh, a psychiatrist; (2) Dr. Stephen B. Levine, another psychiatrist; (3) Dr. Paul Hruz, a pediatric endocrinologist; (4) Dr. Patrick W. Lappert, a retired plastic surgeon; and (5) Dr. Peter Robie, a primary care physician.

Many of these purported experts attack the entire concept of gender dysphoria treatment. Among other things, they contend that this treatment is experimental and unproven. They argue, falsely, that a so-called "Transgender Treatment Industry" is running roughshod over legitimate scientific debate as to the risks and benefits of such treatment. They challenge the credibility and efficacy of the DSM-5 and the WPATH Standards. They also contend that the many medical associations that support gender dysphoria treatment—because it is medically appropriate and indeed necessary for persons with gender dysphoria—are apparently all wrong, in the pocket of the "Transgender Treatment Industry," or both. *See* JA3671-3674.

Defendants' fifth expert—Dr. Robie—is a member of the NCSHP Board who provided medical knowledge during the Board's deliberations. JA3678. In his expert capacity, the only opinion Dr. Robie offered is that "physicians must know

the chromosomal sex of patients" to be able to provide competent medical care. JA3678.

None of the opinions from these five experts satisfied Rule 702, so Plaintiffs moved to exclude them. JA1092-3129. In a detailed 25-page ruling, the district court excluded the "chromosomal sex" opinions from Dr. Robie in full, and excluded some—but not all—of the opinions from Defendants' other four experts. JA3674-3699.

On appeal, Defendants do not challenge the district court's exclusion of opinions by Drs. McHugh and Levine. As to Drs. Hruz, Lappert, and Robie, Defendants contend that the district court "applied the wrong standard" in its *Daubert* rulings; accuse the district court of "mischaracteriz[ing] the qualifications" of certain of those experts; and argue that the district court "misconstrued the relevance of Dr. Robie's testimony." Br. 19, 50, 55. Even if true (and they are not), none of this comes close to showing reversible error—particularly given the "broad discretion" that Rule 702 affords district courts. *See Belville.*, 919 F.3d at 233.

## A. The District Court Applied Rule 702 Correctly.

Defendants argue that the district court got its Rule 702 analysis wrong for two reasons—because: (1) "expert testimony may rest on knowledge, skill, experience, training, or education," and that these five prongs are "disjunctive"; and (2) the "district court's gatekeeping role 'is not intended to serve as a replacement

for the adversary system.'"  Br. 51-52 (underlining in original).  Neither attack can be squared with the district court's actual ruling.

First, the district court plainly knew that a witness can be qualified as an expert under any of the above five prongs—it specifically said so.  JA3675 ("a person may qualify to render expert testimony in *any one of the five ways listed* by the Rule …") (cleaned up).  Defendants fail to show that the district court somehow neglected to apply the very standard that it set forth.

Second, the district court also knew full well that "Rule 702 'is not intended to serve as a replacement for the adversary system'"—having quoted the same language from the same case on which Defendants rely.  Br. 52 (quoting *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prod. Liab. Litig. (No. II)*, 892 F.3d 624, 631 (4th Cir. 2018); JA3677 (quoting same).

But the district court also said that it "takes seriously its gatekeeping role to protect lay jurors from 'powerful and quite misleading' expert testimony."  JA3677-3678 (quoting *Daubert*, 509 U.S. at 595).  Far from error, this was consistent with this Court's instruction just last year that "a court cannot 'abandon the gatekeeping function' by deferring its responsibility to the jury."  JA3677 (quoting *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021)); *see also* JA3674 ("Rule 702 was amended specifically to affirm the trial courts' role as gatekeeper") (quoting *Sardis*, 10 F.4th at 282).).  The district court did not supplant the adversary system;

50

it did its gatekeeping job properly by ensuring that jurors are not misled by unreliable and irrelevant opinions from Defendants' experts.

## B.    The District Court Did Not Err By Requiring Defendants' Experts to Have Relevant Experience.

Defendants next complain that the district court got it wrong by excluding certain portions of opinions from Drs. Hruz and Lappert by supposedly relying on "the view of a small minority of courts, outside the Fourth Circuit, that 'an expert's qualifications must be within the same technical area as the subject matter of the expert's testimony.'"  Br. 52.  This, too, cannot be squared with what the district court actually said.

First, Defendants cite three cases to suggest that the district court erred by relying on out-of-circuit caselaw.  Br. 52 (citing *Martinez v. Sakurai Graphic Sys. Corp.*, No. 04-C-1274, 2007 WL 2570362 at *2 (N.D. Ill. Aug. 30, 2007); *O'Conner v. Commonwealth Edison Co.*, 807 F. Supp. 1376 (C.D. Ill. 1992); *Lebron v. Sec. of Fla. Dept. of Children and Families*, 772 F.3d 1352 (11th Cir. 2014)).  Setting aside the obvious fact that courts are permitted to consider out-of-circuit case law as persuasive authority, these citations are inexplicable because the district court *did not cite* the first two cases at all.  JA3674-3699.  And it cited the third case just once and for a different point.  JA3677 (quoting *Lebron* for the proposition that "an expert opinion is considered unreliable and inadmissible under *Daubert* where the expert

has developed the opinions expressly for purposes of testifying in the case") (cleaned up).

Worse, in attacking this strawman, Defendants ignore multiple Fourth Circuit cases on which the district court actually *did* rely, and which say the same thing as the supposed "minority" view—*i.e.*, that experts should stay in their lane rather than offer testimony outside of their area of expertise:

> However, the expert must be qualified to testify on the issue for which the opinion is proffered. *Kopf* [*v. Skyrm*], 993 F.2d [374,] 377 [(4th Cir. 1993)]. General knowledge, skill, experience, training, or education is insufficient to qualify an expert, and an expert qualified in one field may be unqualified to testify in others. *Cooper* [*v. Lab'y Corp. of Am. Holdings*], 150 F.3d [376,] 380-81 [(4th Cir. 1998)] (finding that a witness who had "a general knowledge of chemistry" and "experience with breath alcohol testing" was not an expert in "the field of urine alcohol testing"); *see Zellers v. NexTech Ne., LLC*, 533 F. App'x 192, 199 (4th Cir. 2013) (finding that a Ph.D.-holding neuropsychologist and neurotoxicologist was "not a medical doctor and therefore was not qualified to diagnose the cause of [plaintiff's] alleged symptoms"); *see also Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 391 (D. Md. 2001) ("The fact that a proposed witness is an expert in one area, does not *ipso facto* qualify him to testify as an expert in all related areas.") (collecting cases).

JA3675 (cleaned up). The district court's Rule 702 analysis was thus plainly supported by Fourth Circuit precedent, to which Defendants have no answer—and indeed, do not even acknowledge.

Next, Defendants contend that "a multitude of medical specialties—including, but not limited to, endocrinology and surgery—affect the treatment of transgender individuals." Br. 53. But having some remote connection to a team that treats

individuals with gender dysphoria certainly does not give an endocrinologist like Dr. Hruz *carte blanche* to opine about any topic that has any connection to gender dysphoria whatsoever. *See, e.g.*, JA3681-3682 (district court excluding Dr. Hruz's opinions on "the diagnosis of gender dysphoria" and "the efficacy of mental health treatments" because he "is not a psychiatrist, psychologist or mental healthcare professional," has "never diagnosed a patient with gender dysphoria" or "treated gender dysphoria," and has never "published any scientific, peer-reviewed literature on gender dysphoria").

Finally, Defendants are wrong in contending that the district court erred by excluding certain opinions from Drs. Lappert and Hruz because they "did not specialize in the treatment of transgender patients" and "have not performed certain narrowly-defined medical procedures or published in specific journals." Br. 52. The district court did not impose any such requirement. To the contrary, even though Dr. Lappert (a plastic surgeon) admitted that he has never treated a patient for gender dysphoria and has never performed any surgical procedures to treat gender dysphoria (JA1909-1910), the district court nonetheless concluded that he is "qualified as an expert in plastic surgery" and is "thus qualified to opine on the risks associated with surgery used to treat gender dysphoria." JA3689; JA3694 (allowing Dr. Lappert to testify about "the risks associated with the surgeries at issue in this case").

53

## C.     The District Court Did Not Mischaracterize Dr. Hruz's Credentials.

Defendants next accuse the district court of "mischaracteriz[ing] the qualifications" of Dr. Hruz by finding that he has "not conducted any original research about gender dysphoria diagnoses or its causes" and has "never treated a transgender patient."  Br. 19, 53-55.

Defendants fail to support their serious charge.  They contend that "as the head of a fellowship program at a teaching hospital," Dr. Hruz "*supervises* two fellows who are directly engaged in primary research" on gender dysphoria.  Br. 54; *compare* JA1236 ("My experience [with] primary research is limited to my role as associate or assistant fellowship program director in supervising my fellows, two of whom are doing what we would—what you would define as primary research.").  But serving as a "fellowship program director" and supervising two students—which primarily consisted of an oversight role assisting the fellows to "select mentors," who are not Dr. Hruz—is a far cry from conducting independent research on gender dysphoria. *Id.*  Regardless, Defendants ignore multiple admissions from Dr. Hruz that he has *not* "conducted any original research about transgender people or gender dysphoria." JA1199 (collecting citations from Dr. Hruz's deposition testimony on this point). Worse, "[t]he proponent of [expert] testimony must establish its admissibility by a preponderance of proof," *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th

Cir. 2001), and Defendants did not make this argument before the trial court and have thus waived it. *See* JA3142-43.

Nor do Defendants show that there was anything wrong about the district court's finding that Dr. Hruz has never "treated a transgender patient," JA3681, let alone that this was a "clearly erroneous factual finding." *See Bryte ex rel. Bryte v. Am. Household, Inc.*, 429 F.3d 469, 475 (4th Cir. 2005). Defendants contend that Dr. Hruz has treated patients *that had* gender dysphoria—even though he admitted he treated them for conditions *other than* gender dysphoria. Br. 55 ("I have treated them, but not to address dysphoria. But, rather, the complications that have occurred in association with that treatment.").

And in any event, the district court did take Dr. Hruz's experience (or lack thereof) with treating patients into account. The district court allowed Dr. Hruz (an endocrinologist) "to testify to the risks associated with puberty blocking medication and hormone therapy," based on his "long career treating patients and conducting academic research on the effects of hormone treatments." JA3682. Conversely, it did not allow Dr. Hruz to, *inter alia*, "testify to the risks associated with surgery" because he is "not a surgeon and has no experience with surgery for gender dysphoria." JA3682-3683.

### D.    The District Court Correctly Excluded Dr. Robie's Opinion on Chromosomal Sex.

The sole opinion from Dr. Robie that Defendants challenge on appeal is that "physicians must know the chromosomal sex of patients" to provide competent medical care.  JA3678.  The district court questioned whether this opinion was relevant, but then ultimately excluded it because "Robie's failure to submit an expert report or to provide any basis for his opinion other than a vague reference to his years of practice precludes this Court from finding that his expert opinion is based on a reliable methodology under Rule 702."  JA3679.

Defendants provide zero basis to reverse this exclusion.  They argue that the district court "misconstrued the relevance of Dr. Robie's testimony," Br. 55, but the district court did no such thing.  As it explained, this opinion was not relevant in light of the district court's finding that "heightened scrutiny is appropriate in this case because the *Plan* discriminates based on sex on its face, not because Plaintiffs' medical providers considered their sexes."  JA3678-3679 (emphasis in original). Defendants offer no response.  Br. 56-57.  Defendants fail to explain how this is relevant to this insurance coverage dispute, where NCSHP itself allows members to update gender markers upon request, JA168-170, Br. 9 n.2, and by Defendants' own admission the third-party administrators do not consider sex when reviewing claims. Br. 9-12.

Finally, relevance aside, Defendants failed to establish below that Dr. Robie's opinions are reliable, JA3679, and they do not challenge that finding on appeal. Because expert testimony must be both relevant *and* reliable to be admitted, there is no basis to reverse here even if Defendants were to prevail on their relevance point. *See, e.g.*, *Sardis*, 10 F.4th at 281 (requiring district courts "to ensure that an expert's testimony both rests on a *reliable* foundation and is *relevant* to the task at hand") (emphases in original).

## CONCLUSION

Plaintiffs respectfully request that this Court affirm the district court's order.

## REQUEST FOR ORAL ARGUMENT

Plaintiffs-Appellees respectfully request oral argument on the issues presented herein because this appeal concerns significant issues regarding the application of Equal Protection jurisprudence.

Dated: September 30, 2022

Respectfully submitted,

/s/ Amy E. Richardson
Amy E. Richardson
Lauren E. Snyder
HWG LLP
1919 M Street, NW, 8th Floor
Washington, DC 20036
(202) 730-1300

Tara L. Borelli
Carl S. Charles
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
1 West Court Square, Ste. 105
Decatur, GA 30030
(404) 897-1880

Michael W. Weaver
MCDERMOTT WILL & EMERY
444 W. Lake St., Suite 4000
Chicago, IL 60606
(312) 984-5820

Dmitriy G. Tishyevich
Warren Haskel
MCDERMOTT WILL & EMERY
One Vanderbilt Avenue
New York, NY 10017-3852
(212) 547-5534

Omar Gonzalez-Pagan
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
(212) 809-8585

David P. Brown
Ezra Cukor
TRANSGENDER LEGAL DEFENSE &
EDUCATION FUND, INC.
520 8th Avenue, Ste. 2204
New York, NY 10018
(646) 862-9396

*Counsel for Plaintiffs-Appellees*

# CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that the foregoing filing complies with the relevant type-volume limitation and typeface requirements of the Federal Rules of Appellate Procedure and Federal Circuit Rules.

1.    Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 12,993 words.

2.    The brief has been prepared in proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font.  As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

Dated:  September 30, 2022              /s/ Amy E. Richardson

Amy E. Richardson
Lauren E. Snyder
HWG LLP
1919 M Street, NW, 8th Floor
Washington, DC 20036
(202) 730-1300

Michael W. Weaver
MCDERMOTT WILL & EMERY
444 W. Lake St., Suite 4000
Chicago, IL 60606
(312) 984-5820

Tara L. Borelli
Carl S. Charles
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
1 West Court Square, Ste. 105
Decatur, GA 30030
(404) 897-1880

Omar Gonzalez-Pagan
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
(212) 809-8585

Dmitriy G. Tishyevich
Warren Haskel
MCDERMOTT WILL & EMERY
One Vanderbilt Avenue
New York, NY 10017-3852
(212) 547-5534

David P. Brown
Ezra Cukor
TRANSGENDER LEGAL DEFENSE &
EDUCATION FUND, INC.
520 8th Avenue, Ste. 2204
New York, NY 10018
 (646) 862-9396

## CERTIFICATE OF SERVICE

I hereby certify that on September 30, 2022, I filed the foregoing document through the Court's CM/ECF system, which will serve an electronic copy on all registered counsel of record.

/s/ Amy E. Richardson

Amy E. Richardson
Lauren E. Snyder
HWG LLP
1919 M Street, NW, 8th Floor
Washington, DC 20036
(202) 730-1300

Michael W. Weaver
MCDERMOTT WILL & EMERY
444 W. Lake St., Suite 4000
Chicago, IL 60606
(312) 984-5820

Dmitriy G. Tishyevich
Warren Haskel
MCDERMOTT WILL & EMERY
One Vanderbilt Avenue
New York, NY 10017-3852
(212) 547-5534

Tara L. Borelli
Carl S. Charles
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
1 West Court Square, Ste. 105
Decatur, GA 30030
(404) 897-1880

Omar Gonzalez-Pagan
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
(212) 809-8585

David P. Brown
Ezra Cukor
TRANSGENDER LEGAL DEFENSE &
EDUCATION FUND, INC.
520 8th Avenue, Ste. 2204
New York, NY 10018
 (646) 862-9396