# 22-1721

## United States Court of Appeals
## for the Fourth Circuit

---

MAXWELL KADEL; JASON FLECK; CONNOR THONEN-FLECK; JULIA MCKEOWN;
MICHAEL D. BUNTING, JR.; C.B., by his next friends and parents;
SAM SILVAINE; DANA CARAWAY,

*Plaintiffs-Appellees,*

v.

DALE FOLWELL, in his official capacity as State Treasurer of North Carolina;
DEE JONES, in her official capacity as Executive Administrator of the
North Carolina State Health Plan for Teachers and State Employees,

*Defendants-Appellants,*

NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES;
STATE OF NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY,

*Defendants.*

---

On Appeal from the United States District Court
for the Middle District of North Carolina
No. 1:19-cv-00272

---

**BRIEF FOR STATES OF NEW YORK, CALIFORNIA, COLORADO,
DELAWARE, HAWAI'I, ILLINOIS, MAINE, MARYLAND,
MASSACHUSETTS, MINNESOTA, NEVADA, NEW JERSEY,
NEW MEXICO, OREGON, RHODE ISLAND, VERMONT,
AND WASHINGTON, AND THE DISTRICT OF COLUMBIA
AS AMICI CURIAE IN SUPPORT OF APPELLEES**

---

BARBARA D. UNDERWOOD
 *Solicitor General*
ESTER MURDUKHAYEVA
 *Deputy Solicitor General*
DANIEL S. MAGY
ANDREA W. TRENTO
 *Assistant Solicitors General*
 *of Counsel*

*(Counsel listing continues on signature pages.)*

LETITIA JAMES
 *Attorney General*
 *State of New York*
28 Liberty Street
New York, New York 10005
(212) 416-6073

Dated: October 7, 2022

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES................................................................ii

INTERESTS OF AMICI CURIAE ........................................................ 1

ARGUMENT .................................................................................. 2

POINT I

AMICI PROTECT ACCESS TO GENDER-AFFIRMING HEALTHCARE
BASED ON WELL-ACCEPTED MEDICAL STANDARDS ............................... 2

    A.   Discrimination Against Transgender People in Access
         to Healthcare Significantly Harms Amici and Their
         Residents. ...................................................................... 3

    B.   Amici's Laws and Policies Promote Access to Gender-
         Affirming Medical Care Based on Established Medical
         Standards. ...................................................................... 6

    C.   Amici's Laws and Policies Have Improved Health
         Outcomes for Transgender People at a Negligible
         Cost to the States. ......................................................... 14

POINT II

THE DISCRIMINATORY COVERAGE EXCLUSION VIOLATES THE
EQUAL PROTECTION CLAUSE ....................................................... 16

CONCLUSION ............................................................................. 23

i

# TABLE OF AUTHORITIES

**Cases**                                                                   **Page(s)**

*Bostock v. Clayton County*,
    140 S. Ct. 1731 (2020)......................................................16-17, 19-20

*City of Cleburne v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985)...................................................................... 20

*Geduldig v. Aiello*,
    417 U.S. 484 (1974).......................................................................19

*Grimm v. Gloucester County School Board*,
    972 F.3d 586 (4th Cir. 2020) .................................................16-18, 20

*Loving v. Virginia*,
    388 U.S. 1 (1967).....................................................................17-18

*Memorial Hosp. v. Maricopa Cnty.*,
    415 U.S. 250 (1974).......................................................................20

**Laws & Regulations**

*Colorado*

3 Colo. Code Regs. § 702-4:4-2-62 ................................................ 12

*California*

Cal. Code Regs. tit. 10, § 2561.2.................................................... 8

*Hawaiʻi*

Haw. Rev. Stat. Ann.
    § 431:10A-118.3.....................................................................9
    § 432:1-607.3 ........................................................................9
    § 432D-26.3 ..........................................................................9

*Illinois*

Ill. Admin. Code tit. 50, § 2603.35 .............................................9

| Laws & Regulations | Page(s) |
|---|---|

*Maine*

Me. Rev. Stat. Ann.
    tit. 5, § 285 ................................................................... 9
    tit. 24-A, § 4320-L ...................................................... 9

*Maryland*

Md. Code Ann., Ins. § 15-1A-22 ................................... 9

*New Jersey*

N.J. Stat. Ann.
    § 17B:26-2.1ii ............................................................. 9
    § 17B:27-46.1oo ......................................................... 9
    § 26:2J-4.40 ............................................................... 9
    § 52:14-17.29x ........................................................... 9

*New York*

N.Y. Ins. Law
    § 2607 ........................................................................ 7
    § 3243 ........................................................................ 7
    § 4330 ........................................................................ 7

11 N.Y.C.R.R. § 52.72 ................................................... 7

18 N.Y.C.R.R. § 505.2 ................................................... 7

*Washington*

Wash. Rev. Code Ann. § 48.43.0128 ....................... 10, 13

Wash. Admin. Code § 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 ........................... 10

*District of Columbia*

D.C. Code § 31-2231.11 ............................................... 9

## Miscellaneous Authorities                              **Page(s)**

Amy E. Green et al., *Association of Gender-Affirming Hormone Therapy with Depression, Thoughts of Suicide, and Attempted Suicide Among Transgender and Nonbinary Youth*, 70 J. Adolescent Health 643 (2021), https://www.jahonline.org/article/S1054-139X(21)00568-1/fulltext ....... 15

Ann P. Haas et al., Am. Found. for Suicide Prevention & Williams Inst., *Suicide Attempts Among Transgender and Gender Non-Conforming Adults: Findings of the National Transgender Discrimination Survey* (2014), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-GNC-Suicide-Attempts-Jan-2014.pdf ......... 3-4

Arjee Restar et al., *Gender Affirming Hormone Therapy Dosing Behaviors Among Transgender and Nonbinary Adults*, Humans. & Soc. Scis. Commc'ns, Sept. 7, 2022, https://www.nature.com/articles/s41599-022-01291-5 ...................... 14

Bloomberg L., *CalPERS Says It Will Add Coverage for Transgender Medical Services* (July 2, 2013), https://news.bloomberglaw.com/employee-benefits/calpers-says-it-will-add-coverage-for-transgender-medical-services ............ 10

California Dep't of Ins., File No. REG-2011-00023, Economic Impact Assessment: Gender Nondiscrimination in Health Insurance (Apr. 13, 2012), https://tinyurl.com/3sv2fuju .................................. 4, 15

California Dep't of Ins., Legal Op., Permissibility of Denial of Coverage Based Solely on Age for Female-to-Male Chest Reconstruction Surgery as Part of a Treatment for Gender Dysphoria (Dec. 30, 2020), https://tinyurl.com/5fvfwepy .................. 12

California Pub. Emps.' Ret. Sys., *About CalPERS: Facts at a Glance for Fiscal Year 2020-21*, https://www.calpers.ca.gov/docs/forms-publications/facts-about.pdf ............................................. 10

**Miscellaneous Authorities**                                   **Page(s)**

Centers for Disease Control & Prevention,
  *HIV and Transgender People* (Apr. 2022),
  https://www.cdc.gov/hiv/pdf/group/gender/transgender/cdc-
  hiv-transgender-factsheet.pdf ............................................................... 4

Department of Vt. Health Access, Medical Policy, Gender
  Affirmation Surgery for the Treatment of Gender Dysphoria
  (last reviewed Nov. 1, 2019), https://tinyurl.com/mry2eww8 ............. 9

District of Columbia Dep't of Ins., Sec. & Banking, Bulletin
  13-IB-01-30/15, Prohibition of Discrimination in Health
  Insurance Based on Gender Identity or Expression
  (revised Feb. 27, 2014), https://tinyurl.com/45brcr62 ............... 9, 12-13

Emily Newfield et al., *Female-to-Male Transgender Quality of Life*,
  15 Quality of Life Rsch. 1447 (2006),
  https://www.ncbi.nlm.nih.gov/pubmed/16758113 ............................... 4

Erin Digitale, *Better Mental Health Found Among Transgender
  People Who Started Hormones as Teens*, Stanford Med.
  News Ctr. (Jan. 12, 2022), https://tinyurl.com/369mhmth ............... 14

Gabriel R. Murchison et al., *School Restroom and Locker
  Room Restrictions and Sexual Assault Risk Among
  Transgender Youth*, Pediatrics, June 2019,
  https://publications.aap.org/pediatrics/article/143/6/e2018290
  2/76816/School-Restroom-and-Locker-Room-Restrictions-and ........... 6

Illinois Dep't of Hum. Rts. et al., *Guidance Relating to
  Nondiscrimination in Healthcare Services in Illinois*
  (June 26, 2020), https://tinyurl.com/ujwfyezn ..................................... 9

Illinois Dep't of Ins., Bulletin 2020-16, Health Insurance
  Coverage for Transgender, Nonbinary, and Gender
  Nonconforming Individuals, and for Individuals of All
  Sexual Orientations (June 15, 2020),
  https://insurance2.illinois.gov/cb/2020/CB2020-16.pdf ........................ 9

**Miscellaneous Authorities**         **Page(s)**

Jack L. Turban et al., *Access To Gender-Affirming Hormones During Adolescence and Mental Health Outcomes Among Transgender Adults*, PLOS One, Jan. 12, 2022, https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0261039 ................................................................................ 15

Letter from Mike Kreidler, Wash. Ins. Comm'r, to Health Ins. Carriers (June 25, 2014), https://www.insurance.wa.gov/sites/default/files/documents/gender-identity-discrimination-letter.pdf ............................................ 10

Louise Morales-Brown, *What to Know About Mental Health Among Transgender Individuals*, Med. News Today (May 20, 2021), https://www.medicalnewstoday.com/articles/transgender-mental-health ................................................................................................ 4

Massachusetts Off. of Consumer Affs. & Bus. Regul., Div. of Ins., Bulletin 2014-03, Guidance Regarding Prohibited Discrimination on the Basis of Gender Identity or Gender Dysphoria Including Medically Necessary Transgender Surgery and Related Health Care Services (June 20, 2014), https://tinyurl.com/mu4dxa2v ............................................................. 9

Massachusetts Off. of Consumer Affs. & Bus. Regul., Div. of Ins., Bulletin 2021-11, Continuing Applicability of Guidance Regarding Prohibited Discrimination on the Basis of Gender Identity or Gender Dysphoria Including Medically Necessary Gender Affirming Care and Related Services (Sept. 9, 2021), https://tinyurl.com/4d7jt4r7 ........................................................... 9, 12

Maximus Ctr. for Health Dispute Resolution, Appeal Determination in File No. MN2014-0075 (Aug. 11, 2014), https://www.outfront.org/sites/default/files/Dept%20of%20Commerce%20external%20review.pdf ................................................. 11

**Miscellaneous Authorities**                                                     **Page(s)**

Michelle M. Johns et al., *Transgender Identity and Experiences
    of Violence Victimization, Substance Use, Suicide Risk, and
    Sexual Risk Behaviors Among High School Students -
    19 States and Large Urban School Districts, 2017*,
    68 Morbidity & Mortality Wkly. Rep. 67 (2019),
    https://www.cdc.gov/mmwr/volumes/68/wr/pdfs/mm6803a3-H.pdf .... 5

Minnesota Dep't of Com., Admin. Bulletin 2015-5, Gender Identity
    Nondiscrimination Requirements (Nov. 24, 2015),
    https://mn.gov/commerce-stat/pdfs/bulletin-insurance-2015-5.pdf ... 11-12

Morning Consult & The Trevor Project, *How COVID-19 Is Impacting
    LGBTQ Youth* (2020), https://www.thetrevorproject.org/wp-
    content/uploads/2020/10/Trevor-Poll_COVID19.pdf ...................... 3, 6

Movement Advancement Project & GLSEN, *Separation and
    Stigma: Transgender Youth and School Facilities* (2017),
    https://www.glsen.org/sites/default/files/2019-
    11/Separation_and_Stigma_2017.pdf ................................................ 5

Movement Advancement Project, *Healthcare Laws and Policies:
    Nondiscrimination in Private Insurance and Bans on
    Transgender Exclusions* (updated June 22, 2022),
    https://www.lgbtmap.org/img/maps/citations-nondisc-insurance.pdf ...... 7

New Mexico Off. of Superintendent of Ins., Bulletin 2018-013,
    Transgender Non-Discrimination in Health Insurance
    Benefits (Aug. 23, 2018), https://www.osi.state.nm.us/wp-
    content/uploads/2019/06/Bulletin2018-013.pdf ................................... 9

New York State Dep't of Civ. Serv., *Empire Plan Report* (Oct. 2019),
    https://tinyurl.com/yckwhdjx .......................................................... 10

New York State Dep't of Civ. Serv., *New York State Health
    Insurance Program*, https://www.cs.ny.gov/nyship/ ......................... 10

**Miscellaneous Authorities**                                   **Page(s)**

New York State Dep't of Fin. Servs., Ins. Circular Letter No. 7,
    Health Insurance Coverage for the Treatment of
    Gender Dysphoria (Dec. 11, 2014),
    https://www.dfs.ny.gov/insurance/circltr/2014/cl2014_07.htm ...... 7, 12

New York State Dep't of Fin. Servs., Ins. Circular Letter No. 8,
    Discrimination Based on Sexual Orientation, Gender Identity
    or Expression, or Transgender Status (July 23, 2019),
    https://www.dfs.ny.gov/industry_guidance/circular_letters/cl2019_08 .... 8

New York State Off. of Mental Health, Mem. to Plan Adm'rs,
    Clinical Review Criteria for the Treatment of Gender
    Dysphoria (Mar. 18, 2020),
    https://omh.ny.gov/omhweb/bho/docs/clinical_review_criteria
    _for_the_treatment_of_gender_dysphoria.pdf ................................... 11

Office for C.R., U.S. Dep't of Educ., *Education in a Pandemic:
    The Disparate Impacts of COVID-19 on America's Students* (2021),
    https://www2.ed.gov/about/offices/list/ocr/docs/20210608-impacts-of-
    covid19.pdf ........................................................................ 6

Oregon Health Auth., *Prioritized List: Guideline for Gender
    Dysphoria, Frequently Asked Questions* (last updated Mar. 2019),
    https://www.oregon.gov/oha/HPA/DSI-HERC/FactSheets/Gender-
    dysphoria.pdf .................................................................... 12

Press Release, Cal. Dep't of Ins., *Commissioner Lara Takes
    Proactive Step to Ensure Transgender Youth Have Access
    to Gender-Affirming Medical Care for Gender Dysphoria*
    (Dec. 30, 2020), https://www.insurance.ca.gov/0400-
    news/0100-press-releases/2020/release140-2020.cfm ................... 13-14

Press Release, Colo. Dep't of Regul. Agencies, *Division of
    Insurance Announces a New Resource for LGBTQ Coloradans*
    (June 1, 2020), https://doi.colorado.gov/press-release/division-
    of-insurance-announces-a-new-resource-for-lgbtq-coloradans .......... 12

## Miscellaneous Authorities                              Page(s)

Press Release, GLBTQ Legal Advocs. & Defs., *EqualityMaine, Maine Transgender Network, GLAD and Maine Women's Lobby Announce Health Coverage for Transgender Individuals Under MaineCare* (Oct. 3, 2019), https://tinyurl.com/3bycvbtx ............................................................. 12

Press Release, N.Y. State Dep't of Fin. Servs., *NYS Office of Mental Health and Department of Financial Services Announce NY Insurance Carriers Complying with State Requirements to Provide Coverage for All Gender-Affirming Treatments* (June 29, 2021), https://www.dfs.ny.gov/reports_and_publications/press_releases/pr202106292 ......................................................................................... 8

Rhode Island Off. of the Health Ins. Comm'r, Health Ins. Bulletin 2015-3, Guidance Regarding Prohibited Discrimination on the Basis of Gender Identity or Expression (Nov. 23, 2015), https://tinyurl.com/y3a22dk9 ............... 13

Sandy E. James et al., *The Report of the 2015 U.S. Transgender Survey* (Nat'l Ctr. For Transgender Equal. 2016), http://www.transequality.org/sites/default/files/docs/usts/USTS%20Full%20Report%20-%20FINAL%201.6.17.pdf ......................... 3

Transgender Legal Def. & Educ. Fund, *State Employee Health Plans: States with No Exclusions*, https://transhealthproject.org/resources/state-employee-health-plans/views/no-exclusions/ ...................................................... 10

Vermont Dep't of Fin. Regul., Ins. Bulletin 174, Guidance Regarding Prohibited Discrimination on the Basis of Gender Identity Including Medically Necessary Gender Dysphoria Surgery and Related Health Care (revised June 12, 2019), https://dfr.vermont.gov/sites/finreg/files/regbul/dfr-bulletin-insurance-174-gender-dysphoria-surgery.pdf ....................................... 9

**Miscellaneous Authorities**                    **Page(s)**

William V. Padula et al., *Societal Implications of Health Insurance Coverage for Medically Necessary Services in the U.S. Transgender Population: A Cost-Effectiveness Analysis*, 31 J. Gen. Internal Med. 394 (2016), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4803686/pdf/11606_2015_Article_3529.pdf ............................................................ 16

World Pro. Ass'n for Transgender Health, *Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People* (ver. 7, 2012), https://www.wpath.org/media/cms/Documents/SOC%20v7/SOC%20V7_English2012.pdf?_t=1613669341 ..................................... 11

## INTERESTS OF AMICI CURIAE

The States of New York, California, Colorado, Delaware, Hawaiʻi, Illinois, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Jersey, New Mexico, Oregon, Rhode Island, Vermont, and Washington, and the District of Columbia file this brief as amici curiae in support of appellees. Amici strongly support the right of transgender people to live with dignity, be free from discrimination, and have equal access to healthcare. Accordingly, amici have adopted laws and policies aimed at combatting discrimination against transgender people who seek access to healthcare—including policies that guarantee nondiscriminatory insurance coverage of gender-affirming medical care. Amici are also committed to supporting their transgender employees and the transgender family members of their employees. To that end, amici's state employee healthcare plans uniformly cover medically necessary, gender-affirming care.

Amici have a strong interest in this case. Among other things, amici recognize that discrimination based on transgender status—especially in access to healthcare—causes tangible economic, emotional, and health harms to valued members of our communities. Amici also have a substantial interest in ensuring that the Equal Protection Clause is properly

applied to protect transgender Americans from stigma and discrimination. Amici's experience demonstrates that protecting access to gender-affirming care improves health outcomes for our transgender residents at little cost to the public fisc.

## ARGUMENT

### POINT I

#### AMICI PROTECT ACCESS TO GENDER-AFFIRMING HEALTHCARE BASED ON WELL-ACCEPTED MEDICAL STANDARDS

Amici's laws protect their transgender residents by increasing their access to healthcare, not by denying it. Lack of access to healthcare for transgender individuals results in devastating and tangible economic, emotional, and health consequences. Accordingly, many of the amici have worked to ensure that their residents have access to gender-affirming healthcare and to allow doctors to practice medicine in adherence both to well-accepted medical standards and to our anti-discrimination laws. In amici's experience, these laws and policies protect state residents without harm to the public fisc and without the administrability challenges suggested by appellants.

A.    **Discrimination Against Transgender People in Access to Healthcare Significantly Harms Amici and Their Residents.**

Transgender people face significant barriers to receiving both routine and transition-related care, including lack of adequate insurance coverage, provider ignorance about the health needs of transgender people, and outright denial of services.[1] Denial of access to medically necessary care has serious consequences for transgender residents and public health generally. Transgender people with gender dysphoria often suffer from severe distress due to the stigma associated with their gender identity.[2] Among transgender people, there are higher rates of suicidal thoughts and attempts than in the overall U.S. population.[3] The risks are

---

[1] Sandy E. James et al., *The Report of the 2015 U.S. Transgender Survey* 93 (Nat'l Ctr. For Transgender Equal. 2016) (internet); *see also* Morning Consult & The Trevor Project, *How COVID-19 Is Impacting LGBTQ Youth* slide 25 (2020) (internet). (For sources available online, full URLs appear in the Table of Authorities. All URLs were last visited on October 7, 2022.)

[2] *See* James et al., *supra*, at 103.

[3] Ann P. Haas et al., Am. Found. for Suicide Prevention & Williams Inst., *Suicide Attempts Among Transgender and Gender Non-Conforming Adults: Findings of the National Transgender Discrimination Survey* 2 (2014) (internet).

3

especially high among transgender youth.[4] If unaddressed, gender dysphoria can impact quality of life, cause fatigue, and trigger decreased social functioning.[5] Those suffering from gender dysphoria have an increased risk of HIV and AIDS due to inadequate access to care.[6]

Access to gender-affirming healthcare and other medical interventions that improve mental health are especially important to transgender and nonbinary minors, who already experience additional stresses stemming from discrimination, harassment, and stigma experienced in their daily lives.[7] The Centers for Disease Control and Prevention has

---

[4] *See, e.g.*, *id.*; Cal. Dep't of Ins., File No. REG-2011-00023, Economic Impact Assessment: Gender Nondiscrimination in Health Insurance 10 (Apr. 13, 2012) (internet) ("A recent systematic review of largely American samples gives a suicide attempt rate of approximately one in every three individuals with higher rates found among adolescents and young adults.").

[5] *See* Emily Newfield et al., *Female-to-Male Transgender Quality of Life*, 15 Quality of Life Rsch. 1447 (2006) (internet).

[6] *See* Ctrs. for Disease Control & Prevention, *HIV and Transgender People* (Apr. 2022) (internet).

[7] "People who identify as transgender have higher rates of mental health complications than those in the general population due to stigma and discrimination. In addition to a higher prevalence of mental health issues, transgender people typically experience barriers to healthcare, such as refusal of care, violence, and a lack of provider knowledge. This suggests that these experiences, and not being transgender itself, may predict and contribute towards mental health difficulties." Louise

(*continued on the next page*)

found that transgender students are more likely to report feeling unsafe at or going to and from school, being bullied at school, being threatened or injured with a weapon at school, being forced to have sex, and experiencing physical and sexual dating violence.[8] About 23.8 percent of transgender students reported being threatened or injured with a weapon at school, for example, compared with 6.4 percent of cisgender boys and 4.1 percent of cisgender girls.[9] Transgender students who experienced higher levels of victimization due to their gender identity were three times more likely to have missed school in a given month than other students.[10] Transgender youth whose restroom and locker room use was restricted were more likely to experience sexual assault compared with

_____

Morales-Brown, *What to Know About Mental Health Among Transgender Individuals*, Med. News Today (May 20, 2021) (<u>internet</u>).

[8] Michelle M. Johns et al., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students — 19 States and Large Urban School Districts, 2017*, 68 Morbidity & Mortality Wkly. Rep. 67, 69 (2019) (<u>internet</u>).

[9] *Id.*

[10] Movement Advancement Project & GLSEN, *Separation and Stigma: Transgender Youth and School Facilities* 4 (2017) (<u>internet</u>).

those without restrictions.[11] These harms have been further exacerbated by the COVID-19 pandemic and the limited availability of healthcare resources.[12] Indeed, about 34 percent of transgender and nonbinary youth reported that the pandemic has been "[m]uch more stressful" compared with 20 percent of cisgender heterosexual youth.[13]

**B.    Amici's Laws and Policies Promote Access to Gender-Affirming Medical Care Based on Established Medical Standards.**

Given the significant adverse consequences described above, amici have enacted laws and regulations explicitly prohibiting insurers from discriminating against medically necessary, transition-related care in their insurance policies. These protections increase access to healthcare for transgender individuals by barring discriminatory health insurance coverage that contravenes both best medical practice and legal standards prohibiting discrimination on the basis of gender identity.

---

[11] Gabriel R. Murchison et al., *School Restroom and Locker Room Restrictions and Sexual Assault Risk Among Transgender Youth*, Pediatrics, June 2019, at 1 (internet).

[12] *See* Off. for C.R., U.S. Dep't of Educ., *Education in a Pandemic: The Disparate Impacts of COVID-19 on America's Students* iv, 27-30 (2021) (internet).

[13] Morning Consult & The Trevor Project, *supra*, at slide 20.

Since 2012, at least 24 States and the District of Columbia have prohibited health insurance discrimination against transgender people.[14] In New York, for example, laws and regulations ensure that transgender patients are not denied or limited coverage for care that is ordinarily available.[15] In 2014, the New York State Department of Financial Services (NYDFS) confirmed that New York law prohibits health plans subject to its jurisdiction from denying "medically necessary treatment otherwise covered by a health insurance policy or contract . . . solely on the basis that the treatment is for gender dysphoria."[16] In 2019, NYDFS reconfirmed that "New York state law prohibits discrimination based on sexual

---

[14] Movement Advancement Project, *Healthcare Laws and Policies: Nondiscrimination in Private Insurance and Bans on Transgender Exclusions* (updated June 22, 2022) (internet).

[15] *See, e.g.*, N.Y. Ins. Law §§ 2607 (prohibiting issuers from refusing to issue insurance policy or contract, or cancel or decline to renew such policy or contract, because of the sex of the applicant or policyholder, and defining sex to include transgender status), 3243, 4330 (prohibiting discrimination in health insurance policies or contracts because of sex, and defining sex to include transgender status); 11 N.Y.C.R.R. § 52.72 (same); 18 N.Y.C.R.R. § 505.2(*l*) (expanding Medicaid coverage for gender-affirming care).

[16] NYDFS, Ins. Circular Letter No. 7, Health Insurance Coverage for the Treatment of Gender Dysphoria (Dec. 11, 2014) (internet).

orientation, gender identity or expression, or transgender status."[17] And in 2021, NYDFS announced that insurance carriers in New York, including some that previously excluded some or all gender-affirming treatments, were complying with the new requirements to provide coverage for all gender-affirming treatments for gender dysphoria.[18]

Likewise, in 2012, the California Insurance Commissioner adopted regulations prohibiting private insurers from denying coverage for medically necessary "services related to gender transition . . . including but not limited to hormone therapy" if the same services are available when unrelated to gender transition.[19] And in 2014, the Massachusetts Division of Insurance issued guidance stating that "denial of coverage for medically necessary treatment based on an individual's gender identity or gender dysphoria by any [insurance] Carrier is sex discrimination that is prohi-

---

[17] NYDFS, Ins. Circular Letter No. 8, Discrimination Based on Sexual Orientation, Gender Identity or Expression, or Transgender Status (July 23, 2019) (internet).

[18] Press Release, NYDFS, *NYS Office of Mental Health and Department of Financial Services Announce NY Insurance Carriers Complying with State Requirements to Provide Coverage for All Gender-Affirming Treatments* (June 29, 2021) (internet).

[19] Cal. Code Regs. tit. 10, § 2561.2(a)(4)(A), (b).

bited under Massachusetts law."[20] Many other States' laws, regulations, and guidance likewise prohibit insurers from gender identity discrimination in healthcare.[21]

---

[20] Mass. Off. of Consumer Affs. & Bus. Regul., Div. of Ins., Bulletin 2014-03, Guidance Regarding Prohibited Discrimination on the Basis of Gender Identity or Gender Dysphoria Including Medically Necessary Transgender Surgery and Related Health Care Services 1 (June 20, 2014) (internet). The Massachusetts Division of Insurance reaffirmed this guidance in 2021. *See* Mass. Off. of Consumer Affs. & Bus. Regul., Div. of Ins., Bulletin 2021-11, Continuing Applicability of Guidance Regarding Prohibited Discrimination on the Basis of Gender Identity or Gender Dysphoria Including Medically Necessary Gender Affirming Care and Related Services (Sept. 9, 2021) (internet).

[21] *See, e.g.*, **District of Columbia**: D.C. Code § 31-2231.11(c); D.C. Dep't of Ins., Sec. & Banking, Bulletin 13-IB-01-30/15, Prohibition of Discrimination in Health Insurance Based on Gender Identity or Expression (revised Feb. 27, 2014) (internet). **Hawai'i**: Haw. Rev. Stat. Ann. §§ 431:10A-118.3(a), 432:1-607.3, 432D-26.3. **Illinois**: Ill. Admin. Code tit. 50, § 2603.35; Ill. Dep't of Hum. Rts. et al., *Guidance Relating to Nondiscrimination in Healthcare Services in Illinois* (June 26, 2020) (internet); Ill. Dep't of Ins., Bulletin 2020-16, Health Insurance Coverage for Transgender, Nonbinary, and Gender Nonconforming Individuals, and for Individuals of All Sexual Orientations (June 15, 2020) (internet). **Maine**: Me. Rev. Stat. Ann. tit. 5, § 285(9)(G); Me. Rev. Stat. Ann. tit. 24-A, § 4320-L. **Maryland**: Md. Code Ann., Ins. § 15-1A-22(d). **New Jersey**: N.J. Stat. Ann. §§ 17B:26-2.1ii, 17B:27-46.1oo, 26:2J-4.40, 52:14-17.29x. **New Mexico**: N.M. Off. of Superintendent of Ins., Bulletin 2018-013, Transgender Non-Discrimination in Health Insurance Benefits (Aug. 23, 2018) (internet). **Vermont**: Vt. Dep't of Fin. Regul., Ins. Bulletin 174, Guidance Regarding Prohibited Discrimination on the Basis of Gender Identity Including Medically Necessary Gender Dysphoria Surgery and Related Health Care (revised June 12, 2019) (internet); Dep't of Vt.

(continued on the next page)

Consistent with their support of transgender rights, many amici's state employee healthcare plans include coverage for medically necessary, gender-affirming healthcare.[22] For example, the New York State Health Insurance Program, which serves more than 1.2 million state and local government employees, retirees, and their families,[23] covers medically necessary, gender-affirming surgery and other associated procedures.[24] The California Public Employees' Retirement System (CalPERS), which provides health coverage to the more than 1.5 million members and their families,[25] covers these procedures as well.[26]

---

Health Access, Medical Policy, Gender Affirmation Surgery for the Treatment of Gender Dysphoria (last reviewed Nov. 1, 2019) (internet). **Washington**: Wash. Rev. Code Ann. § 48.43.0128(3); Wash. Admin. Code § 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; Letter from Mike Kreidler, Wash. Ins. Comm'r, to Health Ins. Carriers (June 25, 2014) (internet).

[22] *See* Transgender Legal Def. & Educ. Fund, *State Employee Health Plans: States with No Exclusions* (internet).

[23] N.Y. State Dep't of Civ. Serv., *New York State Health Insurance Program* (internet).

[24] N.Y. State Dep't of Civ. Serv., *Empire Plan Report* (Oct. 2019) (internet).

[25] CalPERS, *About CalPERS: Facts at a Glance for Fiscal Year 2020-21* (internet).

[26] Bloomberg L., *CalPERS Says It Will Add Coverage for Transgender Medical Services* (July 2, 2013) (internet).

Amici's laws and policies are rooted in well-established medical standards recognizing that medical necessity determinations are properly grounded in evidence-based medicine.[27] For example, the New York State Office of Mental Health issued a memorandum in 2020 requiring New York–regulated insurance policies to develop evidence-based and peer-reviewed criteria to be used when making medical necessity determinations for the treatment of gender dysphoria, and to submit those criteria to the Office of Mental Health for review and approval.[28] The Minnesota Department of Commerce applies to insurers the medical standards set forth by the World Professional Association for Transgender Health (WPATH), an international professional association that provides evidence-based standards of care for transgender people.[29] A California opinion

---

[27] *See* World Pro. Ass'n for Transgender Health, *Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People* 14 (ver. 7, 2012) (internet).

[28] N.Y. State Off. of Mental Health, Mem. to Plan Adm'rs, Clinical Review Criteria for the Treatment of Gender Dysphoria (Mar. 18, 2020) (internet).

[29] *See* Maximus Ctr. for Health Dispute Resolution, Appeal Determination in File No. MN2014-0075 (Aug. 11, 2014) (internet); *see also* Minn. Dep't of Com., Admin. Bulletin 2015-5, Gender Identity Nondiscrimination Requirements 2 (Nov. 24, 2015) (internet) ("Determination of
(*continued on the next page*)

letter about coverage for transgender minors expressly cites to the WPATH standards as well.[30] Massachusetts similarly recommends insurance carriers "consult the most up-to-date medical standards set forth by nationally recognized medical experts in the transgender health field, including but not limited to those issued by the" WPATH.[31]

Many other amici similarly follow established medical standards.[32] The District of Columbia, for example, has instructed that determina-

---

medical necessity and prior authorization protocols for gender dysphoria-related treatment must be based on the most recent, published medical standards set forth by nationally recognized medical experts in the trans-gender health field.").

[30] Cal. Dep't of Ins., Legal Op., Permissibility of Denial of Coverage Based Solely on Age for Female-to-Male Chest Reconstruction Surgery as Part of a Treatment for Gender Dysphoria 4-5 (Dec. 30, 2020) (internet).

[31] Mass. Off. of Consumer Affs. & Bus. Regul., Bulletin 2021-11, *supra*, at 2.

[32] *See, e.g.*, **Colorado**: 3 Colo. Code Regs. § 702-4:4-2-62; Press Release, Colo. Dep't of Regul. Agencies, *Division of Insurance Announces a New Resource for LGBTQ Coloradans* (June 1, 2020) (internet). **District of Columbia**: D.C. Dep't of Ins., Sec. & Banking, Bulletin 13-IB-01-30/15, *supra*, at 3-4. **Maine**: Press Release, GLBTQ Legal Advocs. & Defs., *EqualityMaine, Maine Transgender Network, GLAD and Maine Women's Lobby Announce Health Coverage for Transgender Individuals Under MaineCare* (Oct. 3, 2019) (internet). **Minnesota**: Minn. Dep't of Com., Admin. Bulletin 2015-5, *supra*, at 2. **New York**: NYDFS, Ins. Circular Letter No. 7, *supra*. **Oregon**: Or. Health Auth., *Prioritized List: Guideline for Gender Dysphoria, Frequently Asked Questions* (last updated
*(continued on the next page)*

tions of "medical necessity" for insurance coverage purposes "must also be guided by providers in communication with individual patients" in accordance with established standards.[33] Washington forbids insurers from "deny[ing] or limit[ing] coverage for gender affirming treatment" when it is medically necessary and "prescribed in accordance with accepted standards of care."[34] California encourages health insurance companies to evaluate coverage criteria for gender-affirming care "to avoid needlessly delaying and interfering with medical care recommended by a patient's doctor."[35]

Taken together, these laws and policies reflect amici's core commitment to protecting the equality of all people, regardless of their gender

---

Mar. 2019) (internet). **Rhode Island**: R.I. Off. of the Health Ins. Comm'r, Health Ins. Bulletin 2015-3, Guidance Regarding Prohibited Discrimination on the Basis of Gender Identity or Expression 1 (Nov. 23, 2015) (internet).

[33] D.C. Dep't of Ins., Sec. & Banking, Bulletin 13-IB-01-30/15, *supra*, at 4.

[34] Wash. Rev. Code Ann. § 48.43.0128(3)(a).

[35] Press Release, Cal. Dep't of Ins., *Commissioner Lara Takes Proactive Step to Ensure Transgender Youth Have Access to Gender-Affirming Medical Care for Gender Dysphoria* (Dec. 30, 2020) (internet).

13

identity, and ensuring that people with gender dysphoria are not denied necessary healthcare.

## C. Amici's Laws and Policies Have Improved Health Outcomes for Transgender People at a Negligible Cost to the States.

Amici's laws and policies have improved health outcomes for transgender people at negligible cost to States. The benefits of access to healthcare coverage for transgender people include, among other things, reduced suicide risk, lower rates of substance use, and increased adherence to HIV treatment.[36] And studies overwhelmingly show that mental health for transgender minors especially improves when they have access to early treatment. A 2021 survey of nearly 12,000 transgender and nonbinary youth found that, for youth under the age of 18, use of gender-affirming

---

[36] *See id.*; Erin Digitale, *Better Mental Health Found Among Transgender People Who Started Hormones as Teens*, Stanford Med. News Ctr. (Jan. 12, 2022) (internet) ("Transgender adults who started gender-affirming hormone therapy as teens had better mental health than those who waited until adulthood or wanted the treatment but never received it . . . ."); Arjee Restar et al., *Gender Affirming Hormone Therapy Dosing Behaviors Among Transgender and Nonbinary Adults*, Humans. & Soc. Scis. Commc'ns, Sept. 7, 2022, at 1, 2 (internet) ("[H]ormone use has been shown to significantly improve psychological functioning and quality of life, reduce suicidal attempts and ideations, promote body satisfaction, and decrease gender dysphoria and is therefore considered medically necessary for many trans people.").

hormone therapy was associated with 39 percent lower odds of recent depression and 38 percent lower odds of attempting suicide in the past year compared to youth who wanted, but did not receive, such therapy.[37]

At the same time, an economic impact analysis of California's 2012 regulation found that removing transgender exclusions had an "immaterial" effect on premium costs, leading the California Department of Insurance to conclude that "the benefits of eliminating discrimination far exceed the insignificant costs."[38] Similarly, in 2016, a study supported by the Massachusetts Group Insurance Commission found that the benefits of gender-affirming medical treatment outweigh the costs, noting that "these

---

[37] Amy E. Green et al., *Association of Gender-Affirming Hormone Therapy with Depression, Thoughts of Suicide, and Attempted Suicide Among Transgender and Nonbinary Youth*, 70 J. Adolescent Health 643, 643 (2021) (underline) (internet); *see also* Jack L. Turban et al., *Access To Gender-Affirming Hormones During Adolescence and Mental Health Outcomes Among Transgender Adults*, PLOS One, Jan. 12, 2022, at 1, 8 (internet) ("After adjusting for demographic and potential confounding variables, access to [gender-affirming hormones] during adolescence (ages 14–17) was associated with lower odds of past-month severe psychological distress . . . , past-year suicidal ideation . . . , past-month binge drinking . . . , and lifetime illicit drug use . . . when compared to access to [gender-affirming hormones] during adulthood.").

[38] Cal. Dep't of Ins., Economic Impact Assessment, *supra*, at 8-9.

additional expenses hold good value for reducing the risk of negative endpoints—HIV, depression, suicidality, and drug abuse."[39]

## POINT II

### THE DISCRIMINATORY COVERAGE EXCLUSION VIOLATES THE EQUAL PROTECTION CLAUSE

The district court correctly determined that the North Carolina State Health Plan for Teachers and State Employees (Plan) violates the Equal Protection Clause because it denies medically necessary, gender-affirming care on the basis of sex. As the district court explained, the exclusion "facially discriminate[s] based on sex and transgender status," and is therefore subject to heightened scrutiny, because it "necessarily rests on a sex classification." (Mem. Op. & Order (Op.) at 16-17, 42 (Aug. 10, 2022), Dist. Ct. ECF No. 261 (quotation marks omitted).) The Supreme Court in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), and this Court in *Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020), have found that discrimination based on transgender status is necessarily

---

[39] William V. Padula et al., *Societal Implications of Health Insurance Coverage for Medically Necessary Services in the U.S. Transgender Population: A Cost-Effectiveness Analysis*, 31 J. Gen. Internal Med. 394, 394 (2016) (internet).

sex discrimination "because it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex," *Bostock*, 140 S. Ct. at 1741; *accord Grimm*, 972 F.3d at 616. Here, the exclusion discriminates against transgender individuals because it fails to cover medically necessary treatments on the sole basis that those services relate specifically to the person's transgender status or are treatment for a gender dysphoria diagnosis. The exclusion also "overtly discriminates against members for 'failing to conform to the sex stereotype propagated by the [Plan]" by denying coverage on the basis of sex. (Op. at 42.)

Harkening back to "'a limited view of the Equal Protection Clause which has not withstood analysis in the subsequent decisions of'" the Supreme Court, *Loving v. Virginia*, 388 U.S. 1, 10 (1967) (quoting *McLaughlin v. Florida*, 379 U.S. 184, 188 (1964)), appellants' argument boils down to the assertion that the Plan does not discriminate on the basis of sex or transgender status because its "coverage exclusion applies to all Plan members" (Br. for Appellants (Br.) at 23). But that is not the relevant inquiry. For example, Virginia's ban on interracial marriage in *Loving* applied equally to all Virginians. Yet the Supreme Court struck

it down because even if it applied equally, it impermissibly and unjustifiably "rest[ed] solely upon distinctions drawn according to race." *Loving*, 388 U.S. at 10-11. Similarly, the school board in *Grimm* argued that its policy requiring students to use restrooms that match their biological gender did not violate equal protection because it "applie[d] to everyone equally." 972 F.3d at 609. The Court rejected this argument, reasoning that it was like "saying that racially segregated bathrooms treated everyone equally, because everyone was prohibited from using the bathroom of a different race." *Id.*

The reasoning of *Loving* and *Grimm* directly applies here. As the district court explained, while the coverage exclusion may exist for all Plan members, the only individuals impacted by the coverage exclusion are transgender members. (Op. at 43.) This is clear from the plain language of the exclusion, which speaks in gendered terms, excluding "[t]reatments or studies leading to or in connection with *sex* changes or modifications and related care." (*Id.* at 41-42 (quotation marks omitted).) The exclusion therefore draws an invidious distinction based on sex that must survive heightened scrutiny. *See Grimm*, 972 F.3d at 608 (explaining that

18

heightened scrutiny applied to policy that could not "be stated without referencing sex" (quotation marks omitted)).

The Supreme Court's decision in *Geduldig v. Aiello*, 417 U.S. 484 (1974), does not alter this conclusion. In *Geduldig*, the Supreme Court held that a disability insurance program did not discriminate based on sex "by not paying insurance benefits for disability that accompanies normal pregnancy and childbirth." *Id.* at 492, 494. Unlike in *Geduldig*, the Plan does not make distinctions based on conditions or diagnoses but based on "*treatments* that lead to or are connection to *sex* changes or modifications." (Op. at 47.) The exclusion of pregnancy as a compensable disability is not the same as the exclusion of a medically necessary treatment solely on the grounds that it is gender-affirming when the same treatment is approved for cisgender members. As explained above, the latter exclusion is transgender discrimination, which the Supreme Court has held is necessarily sex discrimination. *See Bostock*, 140 S. Ct. at 1741. Because the exclusion here specifically excludes coverage for treatment that is medically necessary for transgender individuals when it approves

such coverage for cisgender plan members,[40] it discriminates on the basis of transgender status, and therefore on the basis of sex. *See id.*; *see also Grimm*, 972 F.3d at 608.

Because the Plan's coverage exclusion is subject to heightened scrutiny, appellants were required to establish that the exclusion is "substantially related to a sufficiently important government interest." *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 441 (1985). As the district court also correctly determined, they failed to do so. Putting aside that a State may not "protect the public fisc by drawing an invidious distinction between classes of its citizens," *Memorial Hosp. v. Maricopa Cnty.*, 415 U.S. 250, 263 (1974), the exclusion does not provide the Plan with any significant cost savings (*see* Op. at 48 (explaining that the "estimated $300,000–$900,000 saved by the exclusion per year pales in comparison to [the Plan's] billion-dollar cash balance and saves each of

---

[40] For example, as the district court explained, "puberty suppressing medication may be covered if medically necessary" but "a transgender boy will not receive coverage for such medication—even if medically necessary—because, in the language of the Plan, it would 'change or modify' his physiology in a way that does not match his female biological sex." (Op. at 42 (citing Third Suppl. Decl. of Amy Richardson at 4-22 (Feb. 2, 2022), Dist. Ct. ECF No. 201-1).)

the Plan's 740,000 members about one dollar each")). This accords with amici's experience in funding medically necessary, gender-affirming healthcare for their own state employees and their dependents.

Nor did appellants show that the coverage exclusion was justified because it protects the public from purportedly ineffective medical treatments. The district court correctly excluded the bulk of appellants' proposed expert testimony on this point as unreliable or irrelevant, and appellants' remaining evidence was insufficient to meet their burden at summary judgment. (Op. at 49.) As explained above, amici's overwhelming experience shows that gender-affirming healthcare improves healthcare outcomes among transgender people with minimal cost to the state. See *supra* at 14-16. And as the district court observed, the Plan may tailor concerns about medically unnecessary or harmful treatments by denying coverage only for such care. (Op. at 51.) There is no justification for the Plan's blanket refusal to cover medically necessary, gender-affirming healthcare.

Finally, the Court should also reject appellants' argument that the district court's permanent injunction is impermissibly vague. The district court enjoined appellants "from enforcing the Plan's exclusion" and

21

ordered them to "reinstate coverage for 'medically necessary services for the treatment of gender dysphoria.'" (*Id.* at 67, 72.) There is nothing vague about this language, and the administrators of amici's state employee health plans would have no difficulty in interpreting it. Indeed, as already noted, amici already offer coverage for medically necessary services for the treatment of gender dysphoria. See *supra* at 7-10. In any event, the district court's order explains clearly what is required of appellants— because the Plan covered medically necessary treatment for gender dysphoria in 2017, which was the last uncontested status between the parties, the district court directed appellants to "reimpos[e] the 2017 rule." (Op. at 67.) Appellants cannot explain how the Plan is unable to offer the same coverage that it did in 2017. As appellants concede (Br. at 9), coverage decisions under the Plan are made by the Plan's third-party administrator and pharmacy benefit manager, who both were able to make the necessary coverage decisions in 2017 (*see* Op. at 66).

# CONCLUSION

The Court should affirm the decision below.

Dated:  New York, New York
        October 7, 2022

                                    Respectfully submitted,

                                    LETITIA JAMES
                                      *Attorney General*
                                      *State of New York*

                              By:   */s/ Andrea W. Trento*
                                    ANDREA W. TRENTO
                                    Assistant Solicitor General

BARBARA D. UNDERWOOD              28 Liberty Street
  *Solicitor General*            New York, NY 10005
ESTER MURDUKHAYEVA               (212) 416-6073
  *Deputy Solicitor General*
DANIEL S. MAGY
ANDREA W. TRENTO
  *Assistant Solicitors General*
      *of Counsel*

*(Counsel listing continues on the next page.)*

23

ROB BONTA
  *Attorney General*
  *State of California*
1300 I Street
Sacramento, CA 95814

PHILIP J. WEISER
  *Attorney General*
  *State of Colorado*
1300 Broadway, 10th Floor
Denver, CO 80203

KATHLEEN JENNINGS
  *Attorney General*
  *State of Delaware*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801

HOLLY T. SHIKADA
  *Attorney General*
  *State of Hawai'i*
425 Queen Street
Honolulu, HI 96813

KWAME RAOUL
  *Attorney General*
  *State of Illinois*
100 West Randolph Street
Chicago, IL 60601

AARON M. FREY
  *Attorney General*
  *State of Maine*
6 State House Station
Augusta, ME 04333

BRIAN E. FROSH
  *Attorney General*
  *State of Maryland*
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202

MAURA HEALEY
  *Attorney General*
  *Commonwealth of Massachusetts*
One Ashburton Place
Boston, MA 02108

KEITH ELLISON
  *Attorney General*
  *State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King
  Jr. Blvd.
St. Paul, MN 55155

AARON D. FORD
  *Attorney General*
  *State of Nevada*
100 North Carson Street
Carson City, NV 89701

MATTHEW J. PLATKIN
  *Attorney General*
  *State of New Jersey*
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625

HECTOR BALDERAS
  *Attorney General*
  *State of New Mexico*
P.O. Drawer 1508
Santa Fe, NM 87504

ELLEN F. ROSENBLUM
  *Attorney General*
  *State of Oregon*
1162 Court Street NE
Salem, OR 97301

PETER F. NERONHA
  *Attorney General*
  *State of Rhode Island*
150 South Main Street
Providence, RI 02903

SUSANNE R. YOUNG
  *Attorney General*
  *State of Vermont*
109 State Street
Montpelier, VT 05609

ROBERT W. FERGUSON
  *Attorney General*
  *State of Washington*
P.O. Box 40100
Olympia, WA 98504

KARL A. RACINE
  *Attorney General*
  *District of Columbia*
400 6th Street, NW, Suite 8100
Washington, D.C. 20001

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Kelly Cheung, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 4,492 words and complies with the typeface requirements and length limits of Rules 29 and 32(a)(5)-(7) and the corresponding local rules.

*/s/ Kelly Cheung*