No. 22-1721

# In the United States Court of Appeals for the Fourth Circuit

MAXWELL KADEL; JASON FLECK; CONNOR THONEN-FLECK; JULIA MCKEOWN; MICHAEL D. BUNTING, JR.; C.B., *by his next friends and parents*; SAM SILVANE; and DANA CARAWAY,

*Appellees*,

*v.*

DALE FOLWELL, *in his official capacity as State Treasurer of North Carolina*; and DEE JONES, *in her official capacity as Executive Administrator of the North Carolina State Health Plan for Teachers and State Employees*,

*Appellants*.

On Appeal from the United States District Court for the Middle District of North Carolina Case No. 1:19-cv-00272-LCB-LPA

## Appellants' Motion for Stay of Injunction Pending Appeal

John G. Knepper
LAW OFFICE OF JOHN G. KNEPPER, LLC
1720 Carey Ave. Suite 590
Cheyenne, WY 82001
Telephone: (307) 632-2842
Facsimile: (866) 499-6894
john@knepperllc.com

Kevin G. Williams
Mark A. Jones
BELL, DAVIS & PITT, P.A.
100 N. Cherry St. Suite 600
Winston-Salem, NC 27101
Telephone: (336) 722-3700
Facsimile: (336) 722-6558
kwilliams@belldavispitt.com
mjones@belldavispitt.com

*Counsel for Appellants*

October 18, 2022

## INTRODUCTION

The district court issued an injunction against Dale Folwell (in his official capacity as State Treasurer of North Carolina) and Dee Jones (in her official capacity as the Executive Administrator of the North Carolina State Health Plan for Teachers and State Employees (the "***State Health Plan***" or "***Plan***")) (collectively "***Appellants***"), that both (1) prohibits them from enforcing one of the Plan's multiple coverage exclusions impacting coverage for the treatment of gender dysphoria and (2) requires them to provide health benefits coverage "for medically necessary services for the treatment of gender dysphoria" through the Plan. JA3734. Pursuant to Federal Rule of Appellate Procedure 8(a)(1), Appellants request a stay of this injunction pending appeal because they are likely to succeed on the merits, because they will be irreparably harmed by the injunction, and because a stay would benefit the public interest without harming other parties to the case. *See Long v. Robinson*, 432 F.2d 977, 979 (4th Cir. 1970).

## BACKGROUND

As relevant here, Appellees' underlying complaint asserts that the State Health Plan's coverage exclusion for certain medical treatments

violates the Equal Protection Clause. JA80-91. Appellees moved for summary judgment, and Appellants moved for partial summary judgment. JA106-107; JA 278-279. The district court granted partial summary judgment to Appellees on their equal protection claims, holding that "Folwell and Jones, in their official capacities, are permanently enjoined from enforcing the Plan's exclusion and are ordered to reinstate coverage for 'medically necessary services for the treatment of gender dysphoria.'" JA3734 (cleaned up).[1]

Appellants timely noted this appeal.[2] JA3642-3643. In the meantime, Appellants sought to determine whether Folwell and Jones had authority to implement the injunction under state law, and whether

---

[1] The district court's order initially indicated that the Plan itself was also subject to this injunction, in violation of *Ex Parte Young*, 209 U.S. 123 (1908). The district court granted the Plan's motion to correct the order. *See* JA3645-3648; JA3649-3654; JA3658-3662; JA3663-3735. Accordingly, this Court granted the State Health Plan's motion to voluntarily dismiss its interlocutory appeal of the injunction. See *Kadel v. N. Carolina State Health Plan for Tchrs. & State Emps.*, No. 22-1730 (4th Cir. Aug. 11, 2022) (Doc. Nos. 33, 34).

[2] This Court also previously held that the Plan had waived sovereign immunity against Appellees' claims under the Affordable Care Act. *Kadel v. N. Carolina State Health Plan for Tchrs. & State Emps.*, 12 F.4th 422 (4th Cir. 2021) (No. 20-1409), *as amended* (Dec. 2, 2021), *cert. denied*, 142 S. Ct. 861 (2022).

the Plan itself or the members of its Board of Trustees could be required to do so, given that they were not subject to the injunction or even parties to the instant case, respectively. Appellants also sought to determine the scope of the injunction in light of the ambiguities discussed in Section II(A) below. For example, the district court's order did not provide clear instructions as to whether the Plan must reinstate coverage for the specific treatments it briefly covered in 2017, provide coverage for all treatments that its third-party administrators deem medically necessary, or provide coverage for any treatment that any Appellee considers to be medically necessary. Out of an abundance of caution and judicial deference, the Board ultimately authorized Appellants to attempt to implement the injunction, and the challenged coverage exclusion is currently not in effect.

On July 27, 2022, Appellants moved the district court to stay its injunction pending this appeal, pursuant to Fed. R. App. P. 8(a)(1). *Kadel v. Folwell*, No. 1:19-cv-00272-LCB-LPA (Doc. Nos. 256, 257). That motion has been fully briefed since August 31, 2022, but the district court has taken no action. *See id.* at Doc. Nos. 265, 266. Accordingly, Appellants respectfully submit that the district court has "failed to afford the relief

requested," such that this motion is properly before this Court pursuant to Fed. R. App. P. 8(a)(2)(A).

## ARGUMENT

### I.  Legal Standard

"[A] federal court can stay the enforcement of a judgment pending the outcome of an appeal." *Scripps-Howard Radio, Inc. v. FCC*, 316 U.S. 4, 10 (1942). To obtain a stay, Appellants must show "(1) that [they] will likely prevail on the merits of the appeal, (2) that [they] will suffer irreparable injury if the stay is denied, (3) that other parties will not be substantially harmed by the stay, and (4) that the public interest will be served by granting the stay." *Long v. Robinson*, 432 F.2d 977, 979 (4th Cir. 1970). The stay factors contemplate "individualized judgments in each case, [so] the formula cannot be reduced to a set of rigid rules." *Hilton v. Braunskill*, 481 U.S. 770, 777 (1987).

District courts in the Fourth Circuit continue to follow *Long*, which holds that a movant for a stay pending appeal need not affirmatively satisfy all four requirements.[3] *See Ohio Valley Env't Coal., Inc. v. U.S.*

---

[3]  Because this Court's holding in *The Real Truth About Obama, Inc. v. FEC*, 607 F.3d 355 (4th Cir. 2010), was decided in the context of a preliminary injunction, not a stay pending direct appeal, it does

*Army Corps of Eng'rs*, 890 F.Supp.2d 688, 692 (S.D. W. Va. 2012) ("[T]he factors are balanced, such that a stronger showing on some of these prongs can make up for a weaker showing on others."); *see also Arkansas Best Corp. v. Carolina Freight Corp.*, 60 F.Supp.2d 517, 519 (W.D.N.C. 1999) ("Failure to meet one factor may be excused in light of a particularly strong showing with respect to another factor.").

## II. Appellants have established "a substantial case on the merits" sufficient to justify a stay of the injunction.

The first *Long* factor requires Appellants to show that "[they] will likely prevail on the merits of the appeal." *Long*, 432 F.2d at 979. After *Long*, the Supreme Court has held that this first requirement can be satisfied if a movant demonstrates "a substantial case on the merits." *Hilton*, 481 U.S. at 778. In this case, the district court made three core errors, each of which demonstrates that Appellants have presented "a substantial case on the merits," *id.* at 778, upon which they are likely to prevail on appeal.

---

not alter the application of these factors. Given that this Court has not definitively addressed the standard for a stay pending appeal, Appellants respectfully submit that it should apply its own binding precedent in *Long*.

This Court's analysis of Appellants' arguments on the merits must incorporate the relevant appellate standard of review. "Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 568 (4th Cir. 2015). Therefore, the question before this Court is not whether it is "more likely than not" that the district court's conclusions in favor of the injunction are correct. Rather, the evidence for any factual conclusion must be evaluated "in the light most favorable" to Appellants, and "all reasonable inferences" must be drawn in Appellants' favor. *Harris v. Pittman*, 927 F.3d 266, 272 (4th Cir. 2019). "To the extent that the [d]istrict [c]ourt's injunction relied upon weighing evidence or credibility determinations, then [Appellants] will prevail on appeal." *Jacobs*, 780 F.3d at 569.

## A.   The district court's injunction is impermissibly vague, in violation of Fed. R. Civ. P. 65.

Injunctions must not be "founded upon a decree too vague to be understood." *Gunn v. Univ. Comm. to End War in Viet Nam*, 399 U.S. 383, 389 (1970). "[B]asic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). Accordingly, the Federal Rules of Civil

Procedure require all injunctions to specifically state the reasons for an injunction, specifically state the terms of the injunction, and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d).

"The specificity provisions of Rule 65(d) are no mere technical requirements." *CPC Int'l, Inc. v. Skippy Inc.*, 214 F.3d 456, 459 (4th Cir. 2000) (quoting *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974)) (internal punctuation omitted). "Compliance is mandatory and [the requirements] must be observed in every instance." *Id.* Without such specificity, "appellate review of an injunctive order is greatly complicated, if not made impossible," and the defendants face "the possible founding of a contempt citation on a decree too vague to be understood." *Id.* "[A]n order challenged on appeal should be set aside if it fails to comply with the rule." Charles A. Wright *et al.*, 11A Federal Practice and Procedure § 2955 (3d ed. 2005).

Here, the district court's injunction does not comply with Rule 65(d). The injunction consists of one prohibitive command and one mandatory command. The first part of the injunction does not "specifically" identify the singular coverage exclusion that Appellants

cannot enforce. Fed. R. Civ. P. 65(d). *See* JA3640-3641. Regardless of whether Appellants could infer the district court's intention, the injunction's failure to comply with the "mandatory" obligations of Rule 65(d) renders it invalid and likely to be reversed on appeal. *CPC Int'l*, 214 F.3d at 459. Likewise, the district court's second command is flatly forbidden by Rule 65. The injunction's quotation marks around the phrase "medically necessary services for the treatment of gender dysphoria" indicate that the district court is referring to another document. This is impermissible, even when the quoted language has a clear citation. Fed. R. Civ. P. 65(d)(1)(C).

More troubling, however, is the uncertainty as to what the second portion of the injunction actually requires. Because the district court mandated that Appellants provide "medically necessary" services without any definition of that dispositive term, the injunction is impermissibly vague for the same reasons present in *Pashby v. Delia*, 709 F.3d 307, 331 (4th Cir. 2013). The district court's failure to provide detailed instructions on the precise extent and scope of "medically necessary" care creates unanswerable questions regarding the application of the injunction, such as who decides whether a service is

"medically necessary," and whether the Plan must defer to the specific medication prescribed for a patient on the basis that it is medically necessary (as opposed to a generic substitute).

The district court's rationale for the injunction creates further ambiguity. In its opinion, the district court dismissed the hardship of its injunction on Appellants, "particularly given that [Appellants] and their third-party administrators were able to identify and cover medically necessary care in 2017." JA3634. Rule 65 forbids such a delegation to Appellants to determine how to "identify and cover medically necessary care." This was "one of the principal abuses of the pre-federal rules practice," when courts imposed "injunctions that were so vague that [a] defendant was at a loss to determine what he had been restrained from doing." 11A FEDERAL PRACTICE AND PROCEDURE § 2955.

Moreover, the district court's opinion implies that it is simply restoring the "last uncontested status between the parties [that] existed during 2017." JA3635. But Appellees do not agree that the "medically necessary services for treatment of gender dysphoria" are limited to only those procedures that the Plan briefly covered in 2017 (under threat of a now-rescinded federal regulation). Appellants are left without sufficient

guidance, short of a contempt hearing, about how to precisely identify "medically necessary" treatments for which coverage must be provided.

Finally, and perhaps most significantly, <u>other</u> facially neutral exclusions currently exist that affect coverage and payments for treatment of gender dysphoria. *See* JA117. More specifically, the Plan excludes "surgery for psychological or emotional reasons." *Id*. And the Plan also excludes "any medication or device not approved by the Food and Drug Administration (FDA) for the applicable diagnosis or treatment," unless the medication is for cancer treatment and has been FDA approved to treat a different type of cancer. *Id*. At 9 & n.3. These exclusions are facially neutral because they make no reference to biological sex, gender, or gender dysphoria, but they still operate to exclude nearly all coverage for Appellees' desired gender dysphoria treatments and prescriptions. *See* JA3385-3387 (no prescription drugs are FDA-approved for treatment of gender dysphoria).[4]

---

[4]    Crucially, the treatments excluded by these coverage limitations can be identified "without comparing the member's biological sex before the treatment to how it might be impacted by the treatment." JA3610.

The district court provides no guidance as to how these facially neutral exclusions should be applied in light of the injunction. Under the injunction, Appellants are unable to differentiate between medically necessary treatments that must be covered <u>in the absence of</u> the challenged exclusion, and medically necessary treatments that are not covered <u>regardless of</u> the challenged exclusion. Appellants are therefore left without "explicit notice of precisely what conduct is outlawed." *Schmidt*, 414 U.S. at 476. The district court's failure to provide the required detail in its injunction is reversible error.

### B. The district court's order disregards binding Supreme Court precedent in *Geduldig v. Aiello.*

The district court's injunction also rests on a misapplication of Supreme Court precedent. The district court held that the Plan's decision to not cover "[t]reatment or studies leading to or in connection with sex changes or modifications and related care" is a <u>facially</u> discriminatory classification, "between medically necessary treatments that align with the member's sex" and "medically necessary treatments . . . that do not." JA3609-3610. The Supreme Court's equal protection caselaw simply does not permit this approach to heightened scrutiny. A facially discriminatory classification must "explicitly classif[y] people based on

sex." *Adkins v. Rumsfeld*, 464 F.3d 456, 468 (4th Cir. 2006); *see also Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.,* 499 U.S. 187, 199 (1991) (holding that facial discrimination depends "on the explicit terms of the discrimination.").

The district court erroneously concluded that the coverage exclusion at issue "cannot be stated or effectuated without referencing sex." JA3610. But the mere fact that a policy can "only be stated or effectuated [by] referencing sex," JA3610, does not necessarily trigger heightened scrutiny. The Supreme Court specifically reached this conclusion in *Geduldig v. Aiello*, 417 U.S. 484 (1974), and reaffirmed it less than a month ago in *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022). "The regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny unless the regulation is a 'mere pretext designed to effect an invidious discrimination against members of one sex or the other.'" *Dobbs*, 142 S. Ct. at 2245–46 (quoting *Geduldig*, 417 U.S. at 496 n.20).

When the Government distinguishes among individuals using their membership in a protected class, then it is using a facial classification. *See Nguyen v. INS*, 533 U.S. 53, 56–57 (2001). In contrast, when the

Government distinguishes "between medically necessary treatments," JA3609, that distinction is subject to rational-basis review, even when the excluded benefit is only valuable to members of a protected class. *See Lange v. Houston Cnty., Georgia*, 2022 WL 1812306, at *7–8 (M.D. Ga. June 2, 2022). Such a distinction merely "relates to the asserted underinclusiveness of the set of risks that the State has selected [to] insure." *Geduldig*, 417 U.S. at 494. Absent evidence that Appellants <u>intended</u> to harm Appellees based on their transgender identities, the equal protection clause has nothing to say about the actuarial or otherwise discretionary decisions made by the State Health Plan.[5]

To avoid confronting *Geduldig*, the district court created an artificial distinction between "conditions" (such as normal pregnancy in *Geduldig*) and "treatments" (such as those requested by Appellees in connection with medical condition of gender dysphoria). JA3614. This distinction rests on a misunderstanding of *Geduldig*. The insurance plan at issue there provided coverage for "conditions" rather than "treatments" because it was a short-term disability plan, not a health

---

[5]    The district court did not perform such an analysis at the summary judgment stage. *See* JA3608 (noting that "[n]o inquiry into legislative purpose is necessary" for facial classifications).

benefits plan. *Id.* at 486. In *Geduldig*, the Supreme Court instructed that the relevant question is whether there is discrimination in "benefit eligibility" among Plan members. 417 U.S. at 496 n.20. The State is entitled to decide "not to create a more comprehensive insurance program" through its "selection of the risks insured by the program." *Id.* at 496. Heightened scrutiny does not apply so long as "[t]here is no risk from which men are protected and women are not," and "there is no risk from which women are protected and men are not." *Id.* at 496–97. The same is true here: there is no risk from which cisgender plan members are covered and transgender plan members are not, and *vice versa*.

The district court also attempted to semantically distinguish *Geduldig* by suggesting that the status of being pregnant can be described without consideration of one's biological sex. JA3615 ("Pregnancy can be described without reference to sex, gender, or transgender status."). This is an unpersuasive attempt to distinguish *Geduldig* rather than give it the necessary deference. Regardless of the fact that only people with a female biological sex can become pregnant, the *Geduldig* Court explicitly defined pregnancy with "reference to sex" ("only women can become pregnant") and held that this connection does

not have constitutional significance: "it does not follow that every legislative classification concerning pregnancy is a sex-based classification." 417 U.S. at 496 n.20. "Absent a showing that distinctions involving pregnancy are mere pretexts designed to effect an invidious discrimination against the members of one sex or the other, lawmakers are constitutionally free to include or exclude pregnancy from the coverage of legislation such as this on any reasonable basis, <u>just as with respect to any other physical condition</u>." *Id.*

Finally, the district court incorrectly relied on *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731 (2020), to conclude that "one cannot explain gender dysphoria without referencing sex or a synonym." JA3612. *Bostock* only applies in the statutory context of Title VII—not in the context of constitutional rights. *See* 140 S. Ct. at 1754. The *Bostock* Court held that Congress made a policy choice in Title VII when it commanded that "[a]n individual employee's sex is 'not relevant to the selection, evaluation, or compensation of employees.'" *Id.* at 1741 (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 239 (1989) (plurality)). But the Supreme Court has "never held that the constitutional standard for adjudicating claims of invidious racial [or

gender] discrimination is identical to the standards applicable under Title VII." *Washington v. Davis*, 426 U.S. 229, 239 (1976).

Instead, purposeful discrimination under the Constitution "requires more than intent as volition or intent as awareness of consequences." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (quoting *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)). Appellees must prove that the Plan has undertaken a course of action "because of, not merely in spite of, the action's adverse effects upon an identifiable group." *Id.* at 677. This, in turn, requires the inquiry into discriminatory intent that the district court's summary judgment ruling preempted. *See* JA3608 (noting that "[n]o inquiry into legislative purpose is necessary" for facial classifications). Accordingly, the district court's equal protection analysis is likely to be reversed on appeal as an impermissible misapplication of *Geduldig* and *Bostock*, contrary to the limiting language found in those very decisions.

## C.    The district court's order improperly analyzes the requirement that Appellees must prove they are "similarly situated" for purposes of the Equal Protection Clause.

Appellants have also raised "a substantial case on the merits" regarding the district court's erroneous assumption of Appellees'

obligation to "demonstrate that [they have] been treated differently from others with whom [they are] similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). This is a foundational requirement of equal protection jurisprudence. *See*, *e.g.*, *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

The district court ignored Appellees' burden of proof on this point. Instead, it held that the Plan's exclusion for treatment or studies "leading to or in connection with sex changes or modifications and related care" is a facial classification because "transgender members are classified as seeking to 'change or modify' their gender or sex while cisgender members are not." JA3611. But coverage decisions by the Plan and every other insurance carrier are based on medical diagnoses, not patient identities. JA119. Thus, the district court's assertion that transgender Plan members are categorically denied coverage for medically necessary treatments is flatly incorrect. The disputed exclusion refers to treatments provided in connection with a specific <u>condition</u>—gender dysphoria—so it is incorrect to a compare a transgender patient receiving testosterone

for gender dysphoria with a cisgender patient receiving testosterone for a different diagnosis entirely.

Instead, a similarly situated person must be a Plan member who is equivalent to Appellees in all material respects <u>except for</u> the specific condition of gender dysphoria. For example, a cisgender woman with a family history of breast cancer would theoretically be eligible for coverage for breast reduction surgery, and a transgender man would theoretically be entitled to the same coverage, for the same medical treatment, offered for the same purposes, irrespective of his transgender identity. Likewise, neither individual would be eligible for coverage for breast reduction surgery offered for the purpose of treating gender dysphoria. By focusing too broadly on coverage for <u>all</u> "medically necessary" healthcare, the district court failed to correctly identify how the Plan provides or denies coverage based on specific diagnoses, not patient identities.

Critically, the Plan's coverage distinctions do not amount to a mere pretext for discrimination against transgender people. Multiple experts in this case testified that both transgender and cisgender people suffer from gender dysphoria, JA587-588, JA1032-1034, JA1036-1037, and that many transgender people do not suffer from gender dysphoria at all,

JA1030, JA1032-1034. Appellees are not entitled to argue their case on the basis of factfinding from other cases, and Appellants are likely to succeed with this claim on appeal.

## III. Appellants will suffer irreparable injury if the stay is denied.

The second requirement prescribed in *Long* is that Appellants will "suffer irreparable injury if the stay is denied." *Long*, 432 F.2d at 979. This Court has interpreted this prong to consider "both the extent of injury and the consequences over the long term," not merely whether the injury "cannot be wholly recompensed or eradicated." *City of Alexandria v. Helms*, 719 F.2d 699, 700 (4th Cir. 1983). In their official capacities, Appellants work with the Plan's Board of Trustees to allocate limited public funds to provide the most effective possible healthcare for Plan beneficiaries. If the district court's injunction is enforced throughout the appeal, it will irreparably damage Appellants' ability to carry out this responsibility in two related ways.

The first injury is practical. The Plan does not provide or prescribe healthcare services; instead, it reimburses its 750,000 beneficiaries for those services using its finite resources. Appellants have repeatedly stated that their "fiduciary responsibility to cover basic health" needs

with limited dollars requires that they focus on coverage for illnesses that affect many Plan members (such as diabetes, rheumatoid arthritis, and cancer), not benefits for small "niche groups" (including not only treatments for gender dysphoria, but also benefits such as adult hearing aids, special infant formula, and acupuncture). JA569.

The injunction requires Appellants to provide additional coverage to Plan beneficiaries at a time when the Plan is already experiencing significant financial stress, distorting the Plan's policy determinations on how to allocate finite resources to their most efficient use. Each taxpayer dollar that is diverted to the uncertain costs of gender-affirming healthcare is a dollar that can no longer be directed to medical treatments ranging from major, such as chemotherapy, to mundane, like routine antibiotic prescriptions. Plan beneficiaries whose coverage is restricted because of the inevitable cost constraints imposed by the injunction will be forced to pay for these treatments themselves or forgo them entirely. That damage is irreversible.

The second injury is structural. The injunction jeopardizes Appellants' ability to make discretionary policy decisions as stewards of the Plan's state-allocated resources. As discussed above, the scope of

treatments covered by the injunction is unclear, and the potential total cost of those treatments even more unclear.[6] Accordingly, the injunction leaves Appellants without sufficient information to triage among competing costs, allocate funds to the maximum benefit of North Carolina employees, and generally fulfill their role as fiduciaries of public funds.

The harm is not only that the Plan now has <u>less</u> money to spend; the harm is that the Plan no longer <u>knows</u> how much money it may spend, given its categorical obligation to provide coverage for an ever-expanding catalog of gender-affirming care. This is not a harm that can remedied with damages or restitution, so the specific dollar amount involved is irrelevant. North Carolina taxpayers have tasked the Plan and its administrators with allocating limited resources among countless coverage options—each affordable individually, but impossibly costly in

---

[6]    The list of medical services Appellees demand as "gender affirming care" has significantly grown since the initiation of this lawsuit. Furthermore, early cost projections in this case were limited in scope and failed to account for this continually expanding class of services or account for the increase in the number of individuals identifying as transgender or non-gendered. Accordingly, these rudimentary cost projections are of limited value in assessing the financial impact of this Court's decision on the Plan.

the aggregate. By limiting the Plan's ability to make informed tradeoffs among these competing priorities, the injunction irreparably undermines the state administrative process. These severe long-term consequences strongly support a stay under the second *Long* factor.

## IV. The interests of other parties and of the public support a stay of the injunction.

To satisfy the third prong identified in *Long*, Appellants must show "that other parties will not be substantially harmed by the stay." *Long*, 432 F.2d at 979. The evidence in the record indicates that Appellees will be unharmed by a stay of the injunction pending appeal. The district court held that Appellees "do not have funds available to pay for treatments and then be reimbursed through monetary damages," JA3634, but this conclusion was not supported by the record. Appellees have acknowledged that they have already obtained their desired treatments. What they seek now is reimbursement. In considering the injunction, this Court must not conclude that Appellees' <u>need for money</u> is proof that monetary damages are inadequate and that immediate injunctive relief is necessary.

Moreover, Appellees have not provided any financial statements or other evidence of the costs incurred for these treatments. In their

affidavits, Maxwell Kadel, Connor Thonen-Fleck, Julia McKeown, Shelley K. Bunting, and Dana Caraway merely make conclusory assertions that they might seek further gender-affirming treatments in the future. JA326; JA344; JA378; JA414; JA455-456. The other Appellees make no reference to future treatments at all. *See* JA348-352; JA388-391; JA394-399; JA402-405. These allegations do not identify the specific symptoms that merit medical intervention, the specific medical procedures to be applied, or the specific timeframe and costs of such treatments. Without this information, this Court cannot determine whether Appellees have been "substantially harmed." Therefore, the third *Long* factor favors a stay.

The fourth prong of the *Long* analysis requires Appellants to show that "the public interest will be served by granting the stay." 432 F.2d at 979. The district court stated that "an injunction is likely to cost the public substantially less than awarding damages after-the-fact, since [the Plan] can negotiate lower prices than individual members can negotiate while paying out of pocket." JA3634-3635. This reasoning attempts to disguise a factual assumption as a conclusion. To the contrary, Appellants respectfully submit that the public will benefit from

allocation of North Carolina taxpayer dollars by the proper authorities, unless and until the validity of the injunction is confirmed on appeal. As discussed with regards to the second *Long* factor above, the public interest is best served by avoiding the potential misapplication of cost constraints and fiscal uncertainty imposed by the injunction.

This is not a class action case, and the "public interest" includes <u>all</u> members of the broader community, not just Plan members with gender dysphoria. Otherwise, the third and fourth *Long* factors involve essentially the same considerations. In that light, the people of North Carolina have a strong interest in their limited public funds being administered by the policy experts to which they were entrusted through the democratic process. This is a meaningful consideration, separate and aside from the state's internal interest in financial solvency. Therefore, the fourth *Long* factor supports staying the injunction.

## <u>CONCLUSION</u>

For the foregoing reasons, Appellants respectfully request that this Court stay the district court's injunction pending this appeal.

Respectfully submitted this the 18th day of October, 2022.


*/s/ John G. Knepper*

John G. Knepper

Wyo. Bar No. 7-4608

LAW OFFICE OF JOHN G. KNEPPER, LLC

1720 Carey Ave. Suite 590

Cheyenne, WY 82001

Telephone: (307) 632-2842

john@knepperllc.com

*/s/ Kevin G. Williams*

Kevin G. Williams

N.C. Bar No. 25760

*/s/ Mark A. Jones*

N.C. Bar No. 36215

BELL, DAVIS & PITT, P.A.

100 N. Cherry St. Suite 600

Winston-Salem, NC 27101

Telephone: (336) 722-3700

Facsimile: (336) 722-8153

kwilliams@belldavispitt.com

mjones@belldavispitt.com

## <u>CERTIFICATE OF WORD COUNT</u>

The foregoing complies with the type-volume limitation of Federal Rule of Appellate Procedure Rule 27(d)(2) because it contains less than 5,200 words, excluding those parts of the motion exempted by Federal Rule of Appellate Procedure 32(f). The motion complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5), (6) because it has been prepared in a proportionately spaced typeface using Microsoft Word 2019 in Century Schoolbook 14-point font.

This the 18th day of October, 2022.


*/s/ John G. Knepper*
John G. Knepper
Wyo. Bar No. 7-4608
LAW OFFICE OF JOHN G. KNEPPER, LLC
1720 Carey Ave. Suite 590
Cheyenne, WY 82001
Telephone: (307) 632-2842
john@knepperllc.com

*/s/ Kevin G. Williams*
Kevin G. Williams
N.C. Bar No. 25760

*/s/ Mark A. Jones*
N.C. Bar No. 36215
BELL, DAVIS & PITT, P.A.
100 N. Cherry St. Suite 600
Winston-Salem, NC 27101
Telephone: (336) 722-3700
Facsimile: (336) 722-8153
kwilliams@belldavispitt.com
mjones@belldavispitt.com

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing document through the Court's CM/ECF system, which will serve an electronic copy on all registered counsel of record.

This the 18th day of October, 2022.


*/s/ John G. Knepper*

John G. Knepper
Wyo. Bar No. 7-4608
LAW OFFICE OF JOHN G. KNEPPER, LLC
1720 Carey Ave. Suite 590
Cheyenne, WY 82001
Telephone: (307) 632-2842
john@knepperllc.com

*/s/ Kevin G. Williams*

Kevin G. Williams
N.C. Bar No. 25760

*/s/ Mark A. Jones*

N.C. Bar No. 36215
BELL, DAVIS & PITT, P.A.
100 N. Cherry St. Suite 600
Winston-Salem, NC 27101
Telephone: (336) 722-3700
Facsimile: (336) 722-8153
kwilliams@belldavispitt.com
mjones@belldavispitt.com