No. 22-1721

# In the United States Court of Appeals for the Fourth Circuit

---

Maxwell Kadel; Jason Fleck; Connor Thonen-Fleck; Julia McKeown; Michael D. Bunting, Jr.; C.B., *by his next friends and parents*; Sam Silvane; and Dana Caraway,

*Appellees,*

*v.*

Dale Folwell, *in his official capacity as State Treasurer of North Carolina*; and Dee Jones, *in her official capacity as Executive Administrator of the North Carolina State Health Plan for Teachers and State Employees*,

*Appellants.*

---

On Appeal from the United States District Court
for the Middle District of North Carolina
Case No. 1:19-cv-00272-LCB-LPA

---

## Reply Brief of Appellants

---

John G. Knepper
Law Office of John G. Knepper, LLC
1720 Carey Ave. Suite 590
Cheyenne, WY 82001
Telephone: (307) 632-2842
Facsimile: (866) 499-6894
john@knepperllc.com

Kevin G. Williams
Mark A. Jones
Bell, Davis & Pitt, P.A.
100 N. Cherry St. Suite 600
Winston-Salem, NC 27101
Telephone: (336) 722-3700
Facsimile: (336) 722-6558
kwilliams@belldavispitt.com
mjones@belldavispitt.com

*Counsel for Appellants*

October 21, 2022

# **TABLE OF CONTENTS**

Table of Authorities ................................................................. iii

Introduction ........................................................................... 1

Argument ............................................................................... 6

I.    The district court erroneously applied intermediate scrutiny
      to the Plan's coverage exclusions. ..................................... 6

II.   The Plan's coverage exclusion for "sex changes or
      modifications" is not a facial classification. ..................... 16

III.  The evidence in the record does not support Plaintiffs' claims
      that the Plan provides "gender confirming" treatments for
      cisgender Plan members but refuses these treatments for
      transgender Plan members. ............................................. 19

      A.    Courts may not go beyond the record, as Plaintiffs
            desire, to find additional information to sustain their
            judgments. ............................................................. 19

      B.    The evidence in the record does not support Plaintiffs'
            claims that the Plan's lack of coverage has a
            discriminatory effect on transgender individuals. .............. 21

      C.    The evidence in the record does not support Plaintiffs'
            claims that they are denied medical treatments that are
            provided to other Plan members. ............................. 23

IV.   The district court did not find that the Plan acted with a
      discriminatory motive, as Plaintiffs appear to concede. ............... 27

V.    The district court's injunction is impermissibly vague, in
      violation of Rule 65 ..................................................... 30

Conclusion ........................................................................... 32

Certificate of Word Count ...................................................... 33

Certificate of Service .................................................................34

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Brandt by & through Brandt v. Rutledge*, 47 F.4th 661
  (8th Cir. 2022) .................................................................25

*Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993)
  ........................................................................ 13, 14, 15

*City of Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985) ............9

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).......5

*Dobbs v. Jackson Women's Health*, 142 S. Ct. 2228 (2022) ..............15, 16

*Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954
  (4th Cir. 1996) .................................................................27

*G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709
  (4th Cir. 2016) .................................................................20

*Geduldig v. Aiello*, 417 U.S. 484 (1974) ......................................... passim

*Gen. Elec. Co. v. Gilbert*, 429 U.S. 125 (1976) ...........................10, 11, 12

*Maher v. Roe*, 432 U.S. 464  (1977).......................................................26

*Maher v. Roe*, 432 U.S. 464 (1977) .......................................................27

*Nashville Gas Co. v. Satty*, 434 U.S. 136 (1977)................................11, 12

*Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C.*,
  462 U.S. 669 (1983) ...............................................................12, 13

*Ohio Bell Tel. Co. v. Pub. Utilities Comm'n of Ohio*, 301 U.S. 292
  (1937) ................................................................................19

*U.S. v. Reveron Martinez*, 836 F.2d 684 (1st Cir. 1988) .........................25

*Univ. of Texas v. Camenisch*, 451 U.S. 390 (1981) .................................20

## Rules

Fed. R. Civ. P. 56 ............................................................3, 19

Fed. R. Civ. P. 65 ..........................................................30, 31

## Statutes

42 U.S.C. § 2000e(k) ..........................................................13

N.C. Gen. Stat. § 135-48.50(7) ...........................................24

N.C. Gen. Stat. § 58-51-62(b) .............................................24

Pregnancy Discrimination Act of 1978, Pub. L. No. 95-555 (1978)........12

## Other Authorities

Bryan A. Garner *et al.*, THE LAW OF JUDICIAL PRECEDENT (2016)..........25

J. Moore *et al.*, MOORE'S FEDERAL PRACTICE (2d ed. 1985).....................25

MERRIAM-WEBSTER ONLINE DICTIONARY .................................................17

## INTRODUCTION

In their response brief, Plaintiffs / Appellees (hereinafter "***Plaintiffs***") spend significant effort defending a different decision than the one the district court issued, citing facts and making inferences that were not decided below. On appeal, Defendants / Appellants Folwell and Jones (hereinafter the "***Plan Defendants***") are not asking this Court to rule that they have prevailed. Instead, the request is for regular order. The Plan Defendants seek the opportunity to present the information developed through discovery at trial, where disputed questions of fact are to be resolved.

The Plan Defendants do not restrict Plaintiffs from seeking any procedures that they desire or their doctors recommend. Nor does the North Carolina State Health Plan for Teachers and State Employees (hereinafter the "***State Health Plan***" or the "***Plan***") restrict or limit Plaintiffs from seeking any procedures that they desire or that their doctors recommend. The conflict in this case arises because the Plan declines to provide benefits coverage and payments for services that Plaintiffs assert are medically necessary to treat their specific illness, just as it denies coverage for medically necessary treatments for other

illnesses. The Supreme Court has explained repeatedly that when citizens challenge how a State spends its own money, the State is not required to subsidize all requested benefits. That rule holds true here.

*Geduldig* was the first of a line of Supreme Court cases that acknowledges that coverage exclusions, such as the ones at issue in this case, receive rational basis review, not the heightened scrutiny applied by the district court below. *Geduldig v. Aiello*, 417 U.S. 484, 495 (1974). The Supreme Court has concluded that benefits must be available to all participants at the same price, but insurance programs—and health benefit programs like the Plan—do not provide "less compensation" to Plaintiffs, Resp. Br. (ECF No. 47) at 1, because of the "underinclusiveness of the set of risks that the State has selected to insure," *Geduldig*, 417 U.S. at 494.

The Plan Defendants do not dispute that if Plaintiffs prove the Plan's coverage exclusion has been adopted to further a discriminatory motive, then the Plan's otherwise permissible distinctions are potentially problematic. Here, however, the Plan has supplied ample evidence that its Board of Trustees acted for non-discriminatory purposes: financial stress on the Plan, regulatory uncertainty, and medical uncertainty. As

Plaintiffs appear to concede, the district court did not determine that the Plan's exclusion is based on an impermissible motive or discriminatory intent. Even so, the district court issued a mandatory injunction that seemingly requires the Plan to disregard other coverage restrictions that all parties concede are facially neutral.

This is not an appeal from a preliminary injunction, where the district court can rely upon inadmissible evidence to support its decision. Summary judgment must be based on citation to admissible materials placed "in the record" by the Parties. Fed. R. Civ. P. 56(c)(1). This Court cannot go beyond the record, as Plaintiffs desire, to find additional information to sustain the judgment below.

Specifically, at least three critical facts have not been resolved. First, there is a lack of identity between the suspect classes put forward by Plaintiffs—either sex or transgender identity—and the Plan's coverage restrictions. Thus, the evidence in the record does not support Plaintiffs' assertion that the Plan's coverage exclusion "targets transgender people." Resp. Br. at 2. Second, Plaintiffs make assertions about Plan coverage for "gender affirming care" that are flatly incorrect. Neither Plaintiffs nor the lower court define "gender affirming care," and

the Plan does not cover "gender affirming care" for anyone. For specific procedures and prescriptions, Plaintiffs make broad assertions that are not supported by the Plan's actual coverage rules. For example, Plaintiffs assert the Plan covers testosterone for cisgender men whose "body does not produce enough." Resp. Br. at 34. The testosterone coverage criteria are in the appellate record. JA987-990. The Plan covers testosterone for both men and women for specific diagnoses, but "age-related hypogonadism"—presumably what Plaintiffs refer to when they refer to cisgender men in need of "gender confirming" care—is not an approved diagnosis. JA989. Third, Plaintiffs assert that hormonal and surgical treatments provide a medical benefit to those suffering from the mental illness of gender dysphoria. The Plan does not cover any medically unnecessary procedures, and in this case there is a genuine dispute whether Plaintiffs' desired treatments are medically necessary. This dispute needs to be resolved by the appropriate factfinder (a jury). Absent a jury's conclusion that these treatments are medically necessary, the Equal Protection Clause does not require the Plan to cover Plaintiffs' desired services.

In response to these disputed facts, Plaintiffs cite the conclusions of other courts and statements by professional organizations. Resp. Br. at 44-45. At summary judgment, these are not evidence. Facts decided in other cases with other parties have no precedential value, and the primary lesson of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), is that science changes and the Rules of Evidence do not permit the federal courts to defer to "accepted" scientific views.[1]

The district court's failure to resolve many of the factual disputes at the heart of Plaintiffs' claims led to more egregious errors. Faced with conflicting scientific testimony about medical necessity, the district court went outside of the record to consider scientific evidence and articles that neither party provided. And critically, the district court's failure to evaluate precisely which treatments are medically necessary, while at the same time ordering the Plan to provide coverage for all such treatments, has left Plan Defendants without guidance as to which treatments the Plan must cover. The Court's injunction instead leaves it

---

[1]    Plaintiffs incorrectly state that the Plan Defendants have not contested the testimony of Plaintiffs' experts. Resp. Br. at 15. The Plan Defendants' motion *in limine* to exclude Plaintiffs' experts was filed before, and was thus pending when, the district court issued its opinion on summary judgment. JA42-43.

to the Plan—or potentially delegates this decision to a non-party—to determine how to satisfy Plaintiffs' demands. This is flatly forbidden by the Federal Rules of Civil Procedure.

The Plan Defendants did not seek summary judgment on Plaintiffs' equal protection claims, recognizing that claims of improper motive and discriminatory intent are generally inappropriate for resolution without the finder of fact. By imposing an improper level of scrutiny, the district court evaded its obligation to conduct a trial on the parties' disputed factual issues. This Court should vacate the injunction against the Plan Defendants and remand for a trial on the merits.

## ARGUMENT

## I.     The district court erroneously applied intermediate scrutiny to the Plan's coverage exclusions.

The Supreme Court has repeatedly considered claims of discrimination in insurance programs and has held that the Equal Protection Clause requires rational basis review of a state's determination of the benefits it voluntarily chooses to provide. For almost fifty years, the Supreme Court has followed a consistent approach when evaluating insurance and programs intended to "function essentially in accordance with insurance concepts" such as the State Health Plan.

*Geduldig v. Aiello*, 417 U.S. 484, 492 (1974). If a benefits plan imposes different conditions on membership based on a prohibited characteristic, then the plan unlawfully discriminates. However, the Supreme Court has recognized that entities like the State Health Plan must balance the benefits they provide with the contributions required from participants. In doing so, the Court has held that the Equal Protection Clause does not require the Plan to protect against specific health risks, even when a particular risk is exclusively experienced by individuals in a protected class. Such limitations are constitutional "so long as the line drawn by the State is rationally supportable," *Geduldig*, 417 U.S. at 495, and the exclusion is not a "pretext[ ] designed to effect an invidious discrimination," *id.* at 496 n.20.

In this case, remarkably, the district court dismissed *Geduldig* as inapplicable, holding that an exclusion for "sex changes and modifications" is a sex-based classification. This interpretation is not supported by the facts and does not reflect a faithful interpretation of *Geduldig* and its progeny.

*Geduldig v. Aiello* involved a mandatory short-term disability plan operated by the State of California. 417 U.S. 484, 486-87 (1974). Private employers were required to either enroll employees in the California plan (which was funded by workers' premiums) or obtain alternative coverage. Disabled employees received a small payment for each week that they could not work, but the California Plan specifically excluded disability benefits for female employees who could not work because of pregnancy (either before or after the birth of the child). *Id.* at 490.

The Supreme Court's decision acknowledged that premium levels and coverage determinations are linked. Under the California Plan—as with the State Health Plan—policymakers determine "the benefit level deemed appropriate," "the risks selected to be insured under the program," and "the contribution rate chosen to maintain the solvency of the program." *Id.* at 494. These are tradeoffs. Additional benefits require higher premiums, and the "essential issue" in *Geduldig*, *id.* at 494, was whether the Equal Protection Clause informs this analysis for programs that "function essentially in accordance with insurance concepts" like the State Health Plan, *id.* at 492. The Court concluded that these tradeoffs are lawful so long as they are rational.

The Supreme Court first noted that the California Plan did not discriminate "with respect to the persons or groups which are eligible for disability insurance protection under the program." *Id.* The same is true for the North Carolina State Health Plan. *Geduldig* found that the discriminatory classification "relates to the asserted underinclusiveness of the set of risks that the State has selected to insure." *Id.* Even though California protected against "most risks of employment disability, it has not chosen to insure all such risks, and this decision is reflected in the level of annual contributions exacted from participating employees." *Id.* at 494-95. "There is nothing in the Constitution, however, that requires the State to subordinate or compromise its legitimate interests solely to create a more comprehensive social insurance program than it already has." *Id.* at 496. *See also City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440 (1985) ("When social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude, and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes.") (internal citations omitted). Coverage decisions made by the Plan—including its decision not to

provide the benefit at issue here—are the product of the same weighing that *Geduldig* protects.

*Geduldig* accepted that the burden of the coverage exclusion in that case fell exclusively on women, but the Court noted that there was a "lack of identity" between the coverage exclusion and the asserted sex-based classification. Not all women are pregnant, and the fiscal and actuarial benefits of the exclusion—such as the premium rate charged to all members—accrued to members of both sexes. *Id.* at 496 n.20.

A similar claim came before the Supreme Court two years later, when General Electric employees challenged that company's disability insurance plan, which also excluded coverage for disabilities arising from pregnancy. *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 127 (1976). Though *Gilbert* arose under Title VII, it cites *Geduldig* as a "useful starting point." *Id. Gilbert* reiterated that "exclusion of pregnancy from a disability-benefits plan providing general coverage is not a gender-based discrimination at all." *Id.* at 136.

Even under the Title VII effects test, *Gilbert* did not analyze whether a particular exclusion (*i.e.*, the exclusion of pregnancy) affected only members of a protected class. Rather, for discriminatory effects,

*Gilbert* directed courts to consider whether "the selection of risks covered by the Plan" <u>as a whole</u> discriminate against women. *Id.* at 138. Unless Plaintiffs could show that "the financial benefits of the Plan worked to discriminate against any definable group or class <u>in terms of the aggregate risk protection derived by that group or class</u> from the program," there was no violation of Title VII. *Id.* (quoting *Geduldig*, 417 U.S. at 496 n.20) (emphasis added). "For all that appears, pregnancy-related disabilities constitute an additional risk, unique to women, and the failure to compensate them for this risk does not destroy the presumed parity of the benefits." *Id.* at 139.

The next year, the Court's decision in *Nashville Gas Co. v. Satty* reinforced the Court's unwillingness to parse every benefit exclusion separately for discriminatory effect. 434 U.S. 136 (1977). In *Satty*, the employer required employees to take time off from work when they were about to give birth. The employer imposed two additional consequences: the pregnant employee did not receive paid sick leave while out, <u>and</u> she lost all of her seniority. *Id.* at 138. The Court concluded that the loss of seniority violated Title VII because it was a "burden" that only women suffered. Exclusion of pregnancy from paid sick leave, however, was

lawful. The policy was a "refus[al] to extend to women a benefit that men cannot and do not receive." *Id.* at 142. Again, the plaintiffs could only prevail with evidence that "the financial benefits of the Plan 'worked to discriminate against any definable group or class in terms of the <u>aggregate risk protection</u> derived by that group or class from the program.'" *Id.* at 144 (quoting *Gilbert*, 434 U.S. at 138) (emphasis added).

*Gilbert* was overturned through legislation. See Pregnancy Discrimination Act of 1978, Pub. L. No. 95-555 (1978) (amending Title VII to state that discrimination "because of pregnancy" is discrimination "because of sex"). Nevertheless, the Court's underlying analysis of benefits exclusions remained consistent. Exclusions that fall disproportionately, or even exclusively, on a protected class are not themselves discriminatory unless motivated by discriminatory intent.

The Supreme Court revisited *Gilbert* in 1983, holding that in passing the Pregnancy Discrimination Act of 1978, Congress had overruled *Gilbert*'s holding and reasoning. *Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C.*, 462 U.S. 669 (1983). A health insurance plan that covered pregnancy benefits for female employees but not for spouses

of male employees violates Title VII.[2] "Congress' rejection of the premises of *General Electric v. Gilbert* forecloses any claim that an insurance program excluding pregnancy coverage for female beneficiaries and providing complete coverage to similarly situated male beneficiaries does not discriminate on the basis of sex." *Id.* at 685.

The next time the Supreme Court returned to *Geduldig*, it made clear that its overruling of *Gilbert* did not alter *Geduldig's* Equal Protection analysis. In *Bray v. Alexandria Women's Health Clinic*, the Court considered the plaintiff's claim that "since voluntary abortion is an activity engaged in only by women, to disfavor it is *ipso facto* to discriminate invidiously against women as a class." 506 U.S. 263, 271 (1993). The Court flatly rejected this statement. "'While it is true,' we said [in *Geduldig*], 'that only women can become pregnant, it does not follow that every legislative classification concerning pregnancy is a sex-based classification.'" *Id.* at 271 (quoting *Geduldig*, 417 U.S. at 496 n.20). When

---

[2]    The Court did not need to address whether the exclusion was facially discriminatory or had a discriminatory effect because the text of the Pregnancy Discrimination Act declared that discrimination "because of sex" or "on the basis of sex" includes, but is not limited to, discrimination "because of" or "on the basis of" pregnancy, childbirth, or related medical conditions. 42 U.S.C. § 2000e(k).

the classification does not make the distinction between protected classes in the statutory text, Plaintiffs must prove discriminatory intent. *Id.*

The Court acknowledged that *Geduldig*'s analysis had been discussed at length in *Gilbert* and the subsequent Title VII cases, with the dissenting *Bray* justices arguing that *Geduldig* had been narrowed as a result. *Id.* at 317. As the Plaintiffs here reargue, the *Bray* dissent asserted that "[a] classification based on pregnancy is a sex-based classification, just as, to use the Court's example, a classification based on the wearing of yarmulkes is a religion-based classification." *Id.* "The yarmulke tax would not become less of a tax on Jews if the taxing authorities really did wish to burden the wearing of yarmulkes." *Id.* at 326 n.23. "As the capacity to become pregnant is a characteristic necessarily associated with one sex, a classification based on the capacity to become pregnant is a classification based on sex." *Id.* at 323 n.19.

The *Bray* majority expressly rejected the dissent's, and now Plaintiffs', interpretation of *Geduldig*. The *Bray* majority held that the "cases . . . put[ ] forward to confirm this revisionist reading of *Geduldig v. Aiello* in fact confirm the opposite." *Id.* at 272 n.3. Thus the Supreme

Court made clear that "sex-based discriminatory intent is something beyond sexually discriminatory effect." *Id.*

Plaintiffs repeatedly cite *Bray* in support of their position, Resp. Br. at 27, but they misinterpret the Court's opinion. *Bray* acknowledged that "[s]ome activities may be such an irrational object of disfavor that, if they are targeted, and if they also happen to be engaged in exclusively or predominantly by a particular class of people, an intent to disfavor that class can readily be presumed." *Id.* at 270. This does not create an exception to a plaintiffs' burden of proving discriminatory intent. Rather, this is an uncontroversial acknowledgement that intent can sometimes be inferred from an individual's actions. Jurors routinely do exactly this. *Bray* was neither authorization nor an invitation for the district court to take factual and credibility issues away from the jury and assess, on its own, the credibility of the Plan Defendants and their facially neutral policy choices.

The continuing validity of *Geduldig* is not in dispute. The Supreme Court reaffirmed *Geduldig* less than four months ago in *Dobbs v. Jackson Women's Health*, 142 S. Ct. 2228 (2022). "The regulation of a medical procedure that only one sex can undergo does not trigger heightened

constitutional scrutiny unless the regulation is a 'mere pretex[t] designed to effect an invidious discrimination against members of one sex or the other.'" 142 S. Ct. at 2245-46.

Under *Geduldig*, rational basis review applies, and the lower court's decision to apply intermediate scrutiny reflects an error of law.

## II. The Plan's coverage exclusion for "sex changes or modifications" is not a facial classification.

Plaintiffs attempt to find facial discrimination by parsing the text of one of the Plan's coverage exclusions, which states that—even if medically necessary—the Plan does not cover "[t]reatments or studies leading to or in connection with sex changes or modifications." JA181. This is not a sex-based classification. The exclusion itself applies equally to all individuals.

Concluding that the Plan's coverage limitation is "based on sex" because the word "sex" is used, or is otherwise necessary to understand and implement the exclusion, improperly twists the meaning of the word "sex" as used by the exclusion. The word "sex" can be a noun or a verb, and it has various meanings. As a noun, "sex" can refer to the binary state of a species, distinguished by whether the individual donates ("male") or receives ("female") genetic material during the reproductive process.

MERRIAM-WEBSTER ONLINE DICTIONARY, *available at* bit.ly/2K62Vm5. The noun can refer more broadly to characteristics that distinguish between male and female. *Id.* The noun can refer to the "state of being male or female" (as in "discrimination based on sex"). *Id.* The noun can refer to males or females as a group ("the male sex' or 'the female sex"). The noun can refer to sexually motivated behavior. *Id.* Or, as here, the noun can refer to "genitalia." *Id.*

The district court concluded that *Geduldig* was inapplicable because "pregnancy" could "be explained without reference to sex, gender, or transgender status," but that the Plan's exclusion could not. JA3709. This is false. The challenged exclusion can be restated without the word "sex" at all. The challenged exclusion could have stated that the Plan will not pay to alter a participant's breasts or genitalia in the absence of physical injury or disease. This language has the same effect and can be implemented without using or referencing "sex, gender, or transgender status."

The district court's contrary conclusion is also unfaithful to the Supreme Court's decisions. Neither *Geduldig* (1974) and *Bray* (1993), nor the Title VII cases in the interim, suggest that a classification based on

pregnancy is not sex-based because one can describe and understand pregnancy without reference to gender. Rather, the Court concluded that because the connection required an inference—that only women could become pregnant—the restriction was not itself a sex-based classification. The same holds true here. Even if "sex changes or modifications" are disproportionately sought by transgender individuals—<u>a fact that is not established in the record below</u>, *see* Opening Br. (ECF No. 44) at 7—these are not sex-based classifications. A biological male who seeks coverage for the modification of genitalia or breasts without injury or disease will be denied. A biological female who seeks coverage for the modification of genitalia or breasts without injury or disease will be denied. A transgender man who seeks coverage for the modification of genitalia or breasts without injury or disease will be denied. A transgender woman who seeks coverage for the modification of genitalia or breasts without injury or disease will be denied.

Plaintiffs' objection is that the exclusion harms transgender individuals because it disproportionately denies coverage to them. The key holding of *Geduldig*, and of *Bray*, is that such a limit or restriction is not a sex-based classification under the Constitution even if it has a

sexually discriminatory effect. Rational basis review still applies. For the Plaintiffs to prevail, they must prove to a jury that the Plan acted with the intent to harm transgender individuals in its adoption of the coverage exclusions at issue, and they have not done so.

III. **The evidence in the record does not support Plaintiffs' claims that the Plan provides "gender confirming" treatments for cisgender Plan members but refuses these treatments for transgender Plan members.**

A. *Courts may not go beyond the record, as Plaintiffs desire, to find additional information to sustain their judgments.*

Summary judgment must be based on facts in the record. Fed. R. Civ. P. 56. This is not only a requirement of the Federal Rules of Civil Procedure; the Constitution's guarantee of due process includes the right to a fair hearing where participants have "suitable opportunity through evidence and argument" to challenge the facts considered by the tribunal. *Ohio Bell Tel. Co. v. Pub. Utilities Comm'n of Ohio*, 301 U.S. 292, 306 (1937) (rejecting reliance on statistics generated by the tribunal and not provided to litigants until the agency's decision).

Plaintiffs' arguments to this Court rely upon numerous factual assertions that are not in the record. Both the district court and Plaintiffs cite facts from other cases, non-judicial sources, and facts provided by an

*amicus* brief submitted on disputed scientific issues that are subject to trial.

In the preliminary injunction context, courts increasingly rely upon affidavits and information submitted by non-parties. In that context, however, evidentiary standards are relaxed. *See*, *e.g.*, *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ("a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."). This Court recently held that "although admissible evidence may be more persuasive than inadmissible evidence in the preliminary injunction context, it was error for the district court to summarily reject [a party's] proffered evidence because it may have been inadmissible at a subsequent trial." *G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709, 725 (4th Cir. 2016), *vacated on other grounds*, 137 S. Ct. 1239 (2017).

At summary judgment, however, reliance on inadmissible evidence is reversible error. Several key statements and assumptions, in both the district court's opinion and Plaintiffs' brief, reflect inadmissible evidence. The remedy is for this Court to reverse and remand for a trial.

**B.**    **The evidence in the record does not support Plaintiffs'
claims that the Plan's lack of coverage has a
discriminatory effect on transgender individuals.**

Not all transgender people suffer from gender dysphoria.
JA204-205, JA209-211. Every single expert in this case agrees with that
statement. If an individual does not suffer from this diagnosed mental
illness, Resp. Br. at 12, then they have no reason to seek payment for
medical treatment from the State Health Plan.

The Plaintiffs have no evidence about how many transgender
individuals suffer from gender dysphoria. JA213. Critically—and despite
Plaintiffs', *amici*, and others' protestations to the contrary—the evidence
established through the discovery in <u>this</u> case and in <u>this</u> record is that
not all individuals with gender dysphoria are transgender. JA204-205,
JA209-211.

As the Supreme Court noted in *Gelduldig*, the "lack of identity
between the excluded disability and gender" is evidence that the Plan's
exclusion does not "exclude anyone from benefit eligibility" but rather
removes one medical condition from coverage. 417 U.S. at 496 n.20. This
case presents an even clearer application of the principles articulated in
*Geduldig* than did the facts in that case, where the coverage exclusion

affected exclusively members of one sex. Here, the evidence is that <u>only some</u> transgender persons suffer from gender dysphoria, and <u>only some</u> individuals with gender dysphoria are transgender. JA204-205, JA209-211.

Plaintiffs want a different record on summary judgment. In their response brief, Plaintiffs cite a rebuttal expert who asserts that <u>only</u> transgender individuals suffer from gender dysphoria. Resp. Br. at 23 n.10. This information is irrelevant. All disputed questions of fact must be resolved in favor of Plan Defendants, so the Plan Defendants' "two sources" that claim otherwise—one of whom is the Plaintiffs' own expert—must be believed. *Id.*

Further, as *Geduldig* notes, even claims of discriminatory effect require more than just proof that a specific coverage exclusion has a disproportionate impact on a protected class. The unit of analysis is the "aggregate risk protection derived by that group or class from the program" as a whole. *Geduldig*, 417 U.S. at 496. Plaintiffs have made no attempt to make such a showing. On this basis alone, the record does not support Plaintiffs' claims of discrimination.

### C.  The evidence in the record does not support Plaintiffs' claims that they are denied medical treatments that are provided to other Plan members.

Plaintiffs have never defined "gender affirming care," and no evidence in the record shows that the Plan provides such care to anyone, whether cisgender or transgender. Plaintiffs nonetheless revive their assertions that the Plan provides such care only to cisgender individuals, despite the fact that such claims played no part in the district court's analysis.

Plaintiffs assert that testosterone is approved for individuals when the prescription is "congruent with one's gender," but not for transgender individuals. This is false. The CVS/Caremark criteria for testosterone were provided at summary judgment. The Plan covers testosterone prescriptions for both men and women. JA989. For men, the Plan covers testosterone to treat primary hypogonadism, which is "testicular failure" because of a condition causing damage to the testes. JA988. The Plan also covers hypogonadotrophic hypogonadism, which occurs when the pituitary gland or other hormone glands in the body fail to instruct the testes to create testosterone. *Id.* Diminished testosterone levels, as a general condition, are not covered. Indeed, the Plan criteria state that

testosterone for "age-related hypogonadism" has not been shown to be safe or effective. *Id.* Thus, it is factually inaccurate to cite testosterone as proof that the Plan provides gender affirming care to cisgendered plan members.

The same failure of proof applies to another of Plaintiffs' examples: removal of breast tissue. Resp. Br. at 20. Under North Carolina law, reconstructive breast surgery after a mastectomy "shall be covered" by the Plan. N.C. Gen. Stat. § 135-48.50(7). Nothing in this provision, nor in the cross-referenced statutory definitions, excludes the same benefit for transgender individuals. The only necessary predicate, for every patient, is that the mastectomy involved "removal of all or part of a breast as a result of breast cancer or breast disease." N.C. Gen. Stat. § 58-51-62(b)(1). Individuals of both sexes can suffer from breast cancer, and the covered "[r]econstructive breast surgery" is defined only as surgery to "reestablish symmetry between the two breasts." N.C. Gen. Stat. § 58-51-62(b)(2) . The term "symmetry" would include reconstruction of a male chest for a transgender woman with breast cancer. The "creation of a new breast mound" (a specifically covered procedure) would apply equally to transgender women with breast cancer and to cisgender women.

In support of the decision below, Plaintiffs rely upon opinions by other courts discussing transgender health. Resp. Br. at 20-21 (citing, *e.g.*, *Brandt by & through Brandt v. Rutledge*, 47 F.4th 661 (8th Cir. 2022)). Statements in other court decisions about medicine or medical treatment are statements of fact, not law, and they are not in the record. They have no weight at summary judgment. "Precedents wield authority and power only to the extent that they establish or reinforce a legal rule or principle." Bryan A. Garner *et al.*, THE LAW OF JUDICIAL PRECEDENT 382 (2016). "Stare decisis has no application to findings of fact or to mixed questions of fact and law." *Id.* "[T]he facts of each successive case must be determined by the evidence adduced at trial." *U.S. v. Reveron Martinez*, 836 F.2d 684, 691 (1st Cir. 1988) (quoting 1B J. Moore *et al.*, MOORE'S FEDERAL PRACTICE ¶ 0.401 at 3 (2d ed. 1985)).

The Plan also contests the conclusion that Plaintiffs' desired treatments are medically necessary. The district court reached this conclusion only after misconstruing the testimony of Dr. Levine, one of the Plan's experts.[3] Dr. Levine opined unconditionally that he did not

---

[3]     As part of its intermediate scrutiny analysis, the district court considered only whether the refusal to pay for medically unnecessary / ineffective treatments was a potentially significant

believe that medical science supports the efficacy of these treatments for patients. JA 2986-2987, JA 3253. Dr. Levine also testified that he has not supported a complete ban on such treatments. JA3008-3009. Contrary to the district court's characterization, Dr. Levine's testimony was simply not that Plaintiffs' desired treatments are medically necessary, but instead that he does not support a complete legislative ban. Opposition to a complete ban by a legislature, which would prevent even experimental treatments or treatments with uncertain effect, is not the same as the affirmative conclusion that Plaintiffs' requested procedures are medically necessary. The two views are not contradictory. The law has long recognized the distinction between the State using the police power to forbid certain actions and the State's use of its Treasury to provide some benefits while withholding others. *E.g. Maher v. Roe*, 432 U.S. 464, 473-74 (1977) (An individual may have a constitutionally protected interest "in making certain kinds of important decisions" but the State's refusal to fund these decisions "places no obstacles absolute or otherwise" in the individual's path.) Plaintiffs' financial resources

---

government interest. In doing so, the district court improperly shifted the burden of proof on this disputed factual issue to the Plan Defendants.

"may make it difficult and in some cases, perhaps, impossible" for them to receive the treatments they desire, but this difficulty "is neither created nor in any way affected" by the Plan. *Id.* at 474.

This case is not about a ban on the treatments sought by Plaintiffs. The State Health Plan does not ban any treatments. Rather, Plaintiffs' assertion is that the Plan must pay for these treatments because they are "necessary" for their health. Dr. Levine testified that scientific evidence does not support this claims.

## IV. The district court did not find that the Plan acted with a discriminatory motive, as Plaintiffs appear to concede.

This Court has repeatedly stated that questions of motive are for trial, not summary judgment. Courts "must take special care when considering a motion for summary judgment in a discrimination case because motive is often the critical issue." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 958 (4th Cir. 1996). In this case, the district court did not rely upon motive when ruling against the Plan below.

The Plan has supplied significant evidence of the Plan's nondiscriminatory motives for the coverage exclusions, but perhaps the most salient is the statement by the Treasurer of North Carolina that Plaintiffs themselves cite.

In their response brief, Plaintiffs selectively quote a statement issued by Treasurer Folwell in October 2018, approximately 10 months after the coverage exclusion returned to effect. *See*, *e.g.*, Resp. Br. at 8-9. The alleged discriminatory motivation that Plaintiffs infer is difficult to reconcile with their admission that the coverage exclusion became effective in 2018 "by operation of law" rather than through an affirmative action by Treasurer Folwell or the Plan's Board of Trustees. Resp. Br. at 11.

Nevertheless, the Treasurer's full statement expresses three reasons for the coverage exclusion, none of which are based on the effect on Plaintiffs or other transgender individuals:

> The State Health Plan's policy of not covering sex change operations as a benefit, is the same now as it was during the entire eight years of Treasurer Janet Cowell's administration and all previous North Carolina Treasurers.
>
> The legal and medical uncertainty of this elective, non-emergency procedure has never been greater.
>
> Until the court system, a legislative body or voters tell us that we "have to," "when to," and "how to" spend taxpayers money on sex change operations, I will not make a decision that has the potential to discriminate against those who desire other currently uncovered elective, non-emergency procedures.

> We empathize with all members' health conditions, but cannot provide them all with every elective, non-emergency procedure they want.

JA4734. The Treasurer's concerns have remained constant throughout this litigation: financial stress on the plan, regulatory uncertainty, and medical uncertainty. The Treasurer acknowledged that the Plan does not cover other procedures and that fairness would require that the Plan cover those procedures as well. Critically, the Treasurer has made clear that his concern centers on the use of taxpayer money—the Plan "cannot provide all [members] with every elective, non-emergency procedure they want"—not on the decision by individual Plan beneficiaries to seek these treatments with their own resources.

Further, because the district court did not identify an impermissible motive, the Plan's other facially neutral coverage exclusions continue to apply lawfully. The Plan's exclusion of "surgery for psychological or emotional reasons" prevents coverage for surgery for gender dysphoria, just as it does for surgical treatment for any other mental illness. JA117. The Plan's exclusion for "any medication or device not approved by the Food and Drug Administration (FDA) for the applicable diagnosis or treatment" would encompass treatment for

gender dysphoria, as to prescription drugs that are not approved for its treatment. JA3385-3387.

Plaintiffs continue to assert that the Plan acted with discriminatory intent, but their responsibility is to gather this information and present it to the jury at a trial. Resp. Br. at 30-31. Plaintiffs must persuade the finder of fact that the underlying exclusion results from animus against transgender individuals or those who depart from sex stereotypes. That requires a trial, and this Court should reverse the decision below and require one.

## V. The district court's injunction is impermissibly vague, in violation of Rule 65.

As noted in the opening brief, the district court's injunction is impermissibly vague and violates Rule 65. In particular, the district court commands the Plan Defendants to provide "medically necessary services for the treatment of gender dysphoria." But like the district court, Plaintiffs are unable to specifically identify which services meet these criteria. Nor are the Plan Defendants' good faith efforts at compliance with the district court's order—while simultaneously seeking a stay based on its ambiguity—proof that the injunction is lawful. Resp. Br. at 17. Rather, such efforts reflect respect for the rule of law

The injunction is vague because—absent trial evidence—the lower court had no basis to evaluate which of the Plaintiffs' desired services are medically necessary to treat gender dysphoria. The injunction is also impermissibly broad because it orders the Plan Defendants to now provide services for which Plaintiffs have not sued. Plaintiffs claim that they have been seeking coverage for only those procedures that the Plan would cover when medically necessary to treat an entirely different disease. Resp. Br. at 41-42 n.21. But Plaintiffs' recent description of their lawsuit cannot be squared with the text of the injunction, which contains no such limiting language.

Recognizing that there is factual disagreement about which treatments qualify, Plaintiffs now suggest the injunction unambiguously orders the Plan to either (1) provide whatever coverage was available in 2017, or (2) prospectively adopt the medical policy of its current third-party administrator. Resp. Br. at 41-42. Both possibilities equally violate Rule 65(d)(1)(C)'s command that the order "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts . . . required." The district court, and not a non-party, must

identify the procedures it believes are "medically necessary services for the treatment of gender dysphoria."

## CONCLUSION

For the foregoing reasons and for those set forth in the opening brief (ECF No. 44), the Plan Defendants respectfully request that this Court vacate the injunction against the Plan Defendants and remand for a trial on the merits.

Respectfully submitted this the 21st day of October, 2022.

/s/ John G. Knepper
John G. Knepper
Wyo. Bar No. 7-4608
LAW OFFICE OF JOHN G. KNEPPER, LLC
1720 Carey Ave. Suite 590
Cheyenne, WY 82001
Telephone: (307) 632-2842
john@knepperllc.com

/s/ Kevin G. Williams
Kevin G. Williams
N.C. Bar No. 25760

/s/ Mark A. Jones
N.C. Bar No. 36215
BELL, DAVIS & PITT, P.A.
100 N. Cherry St. Suite 600
Winston-Salem, NC 27101
Telephone: (336) 722-3700
Facsimile: (336) 722-8153
kwilliams@belldavispitt.com
mjones@belldavispitt.com

## CERTIFICATE OF WORD COUNT

The foregoing complies with the type-volume limitation of Federal Rule of Appellate Procedure Rule 32(a)(7) because it contains less than 6,500 words, excluding those parts of the motion exempted by Federal Rule of Appellate Procedure 32(f). The motion complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5), (6) because it has been prepared in a proportionately spaced typeface using Microsoft Word 2019 in Century Schoolbook 14-point font.

This the 21st day of October, 2022.


*/s/ John G. Knepper*
John G. Knepper
Wyo. Bar No. 7-4608
LAW OFFICE OF JOHN G. KNEPPER, LLC
1720 Carey Ave. Suite 590
Cheyenne, WY 82001
Telephone: (307) 632-2842
john@knepperllc.com

*/s/ Kevin G. Williams*
Kevin G. Williams
N.C. Bar No. 25760

*/s/ Mark A. Jones*
N.C. Bar No. 36215
BELL, DAVIS & PITT, P.A.
100 N. Cherry St. Suite 600
Winston-Salem, NC 27101
Telephone: (336) 722-3700
Facsimile: (336) 722-8153
kwilliams@belldavispitt.com
mjones@belldavispitt.com

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing document through the Court's CM/ECF system, which will serve an electronic copy on all registered counsel of record.

This the 21st day of October, 2022.

/s/ *John G. Knepper*

John G. Knepper
Wyo. Bar No. 7-4608
LAW OFFICE OF JOHN G. KNEPPER, LLC
1720 Carey Ave. Suite 590
Cheyenne, WY 82001
Telephone: (307) 632-2842
john@knepperllc.com

/s/ *Kevin G. Williams*

Kevin G. Williams
N.C. Bar No. 25760

/s/ *Mark A. Jones*

N.C. Bar No. 36215
BELL, DAVIS & PITT, P.A.
100 N. Cherry St. Suite 600
Winston-Salem, NC 27101
Telephone: (336) 722-3700
Facsimile: (336) 722-8153
kwilliams@belldavispitt.com
mjones@belldavispitt.com