# Exhibit A

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| L.W. et al., | ) | |
| *by and through her parents and next* | ) | |
| *friends, Samantha Williams and Brian* | ) | |
| *Williams* | ) | NO. 3:23-cv-00376 |
| | ) | JUDGE RICHARDSON |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JONATHAN SKRMETTI et al., | ) | |
| | | |
| Defendants. | | |

## **MEMORANDUM OPINION**

Pending before the Court is Plaintiffs' motion for a preliminary injunction (Doc. No. 21, "Motion"), which is accompanied by a memorandum in support (Doc. No. 33). Defendants filed a response (Doc. No. 112), and Plaintiffs filed a reply (Doc. No. 146). For the reasons stated herein, the Motion will be granted in part and denied in part. A corresponding order will be entered separately.

## BACKGROUND FACTS[1]

On March 2, 2023, the Governor of Tennessee signed into law Senate Bill 1 (hereinafter "SB1" or "the law"), codified at Tenn. Code Ann. § 68-33-101 *et seq.* (Doc. No. 33 at 11). SB1 will go into effect on July 1, 2023. (*Id.* at 7). SB1 prohibits any minor in Tennessee from receiving

---

[1] The majority of the facts contained in this section are undisputed, and therefore, the Court treats these facts as true. As for facts in this section that are disputed, the Court has found an adequate basis in the record to treat these facts as true for the purposes of the instant Motion.

certain medical procedures[2] if the purpose of receiving those procedures is to enable that minor to live with a gender identity[3] that is inconsistent with that minor's sex at birth. Therefore, SB1 does not completely ban any medical treatments but rather bans specified medical treatments administered for a particular purpose.[4]

Specifically, SB1 sets forth bans as follows:

**68-33-103. Prohibitions.**

(a)(1) A healthcare provider shall not knowingly perform or offer to perform on a minor, or administer or offer to administer to a minor, a medical procedure if the performance or administration of the procedure is for the purpose of:

> (A) Enabling a minor[5] to identify with, or live as, a purported identity inconsistent with the minor's sex[6]; or
> (B) Treating purported discomfort or distress from a discordance between the minor's sex and asserted identity.

---

[2] SB1 defines "medical procedure" as "surgically removing, modifying, altering, or entering into tissues, cavities, or organs of a human being" and "prescribing, administering, or dispensing any puberty blocker or hormone to a human being." Tenn. Code Ann. § 68-33-102(5)(A)–(B).

[3] SB1 does not define the term "identity," and it does not use the term "gender identity." However, it appears undisputed that the term "gender identity" refers to a person's understanding of belonging to a particular gender. (Adkins Decl. at 4). Everyone has a gender identity. (*Id.*). Those whose gender identity aligns with their sex at birth are cisgender. (*Id.*). Those whose gender identity is different from their sex at birth are transgender. (*Id.*).

Plaintiffs do not discuss what it is that accounts for a person's understanding that he or she belongs to a particular gender. Presumably, such understanding would be based on the person's particular beliefs about the defining characteristics of that gender—and the person's belief that his or her own characteristics match the gender's defining characteristics such that the person must belong to that gender. But the Court need not delve into this topic.

[4] Although SB1 bans medical procedures only when used for a particular specified purpose, for the sake of conciseness the Court hereinafter refers to the medical procedures that are banned if used for a particular specified purpose as simply being banned; such references will omit any qualification reflecting that the medical procedures are banned only if used for a particular specified purpose.

[5] SB1 defines "minor" as an individual who is under eighteen years of age. Tenn. Code Ann. § 68-33-102(6).

[6] SB1 defines "sex" as "a person's immutable characteristics of the reproductive system that define the individual as male or female, as determined by anatomy and genetics existing at the time of birth." Tenn. Code Ann. § 68-33-102(9).

> (2) Subdivision (a)(1) applies to medical procedures that are:
>     (A) Performed or administered in this state; or
>     (B) Performed or administered on a minor located in this state,
>     including via telehealth, as defined in§ 63-1-155.

Tenn. Code Ann. § 68-33-103(a)(1)–(2). Although SB1 becomes effective on July 1, 2023, the law permits minors who were receiving the medial procedures banned by SB1 before July 1, 2023, to continue to receive them until March 31, 2024. *See id.* § 68-33-103(b)(1)(B) (hereinafter, the "continuing care exception"). If such a minor would like to continue receiving these procedures until March 31, 2024, then the minor's treating physician must certify in writing that "in the physician's good-faith medical judgment, based upon the facts known to the physician at the time, ending the medical procedure would be harmful to the minor." *Id.* at § 68-33-103(b)(3). The certification must also include findings supporting the certification and must be made part of the minor's medical record. *Id.*

SB1 specifies that knowingly performing or offering to perform a medical procedure on a minor does not violate the law if the "medical procedure is to treat a minor's congenital defect, precocious puberty, disease, or physical injury." *Id.* § 68-33-103(b)(1)(A). "Disease" does not include "gender dysphoria, gender identify disorder, gender incongruence, or any mental condition, disorder disability, or abnormality." *Id.* § 68-33-103(b)(2). Therefore, SB1 permits administration of medical procedures as defined in the law if the purpose of the procedures is to resolve a congenital defect or precocious puberty but prohibits the administration of such procedures if the purpose is to enable a minor to live with a gender identity that is different from that minor's sex at birth.

Plaintiffs L.W., John Doe, and Ryan Roe ("Minor Plaintiffs") are transgender minors who all suffer from the condition of gender dysphoria. (Doc. No. 33 at 14–17 (citing Doc. Nos. 22 (Declaration of L.W.); 23 (Declaration of Samantha Williams); 25 ("Jane Doe Decl."); 24

(Declaration of John Doe); 26 (Declaration of Ryan Roe); 27 (Declaration of Rebecca Roe))). Plaintiffs Brian and Samantha Williams, James and Jane Doe, and Rebecca Roe are the parents of L.W., John Doe, and Ryan Roe, respectively. (Doc. Nos. 23; 25; 27). Plaintiff Dr. Lacy is a physician practicing in Memphis, Tennessee and has been treating patients for gender dysphoria since 2016. (Doc. No. 28 (Declaration of Dr. Susan N. Lacy) at 1–2).

Gender dysphoria is a common condition for transgender people. It arises from the incongruence that transgender people experience between their gender identity and their sex at birth. (Doc. Nos. 33 at 8–9 (citing Doc. No. 29 at 5 ("Adkins Decl.")); 113-7 at 13 ("Laidlaw Decl."). Gender dysphoria can be treated through medical intervention. (Adkins Decl. at 1; Laidlaw Decl. at 14–15). The goal of gender dysphoria treatment (sometimes called "gender-affirming treatment,"[7] "gender transition," "transition-related care," or "gender-affirming care") is to enable individuals receiving the treatment to live in alignment with their gender identity. (Adkins Decl. at 7; Laidlaw Decl. at 15). When a minor receives treatment for gender dysphoria, the goals of the treatment will always be to "enable [that] minor to identify with, or live as, a purported identity inconsistent with [that] minor's sex" and to treat "purported discomfort or distress from a discordance between [that] minor's sex and asserted identity." Tenn. Code Ann. § 68-33-103(a)(1)(A)–(B). Therefore, SB1 in effect bans minors from receiving all treatment for gender dysphoria.

On April 20, 2023, Plaintiffs filed a complaint alleging, among other things, that SB1 violates the United States Constitution. (Doc. No. 1). The complaint includes a prayer for relief for a state-wide preliminary injunction. (*Id.*). The following day, Plaintiffs filed a motion for a

---

[7] The term "gender-affirming treatment" is used by both Plaintiffs' and Defendants' experts herein to describe the procedures used to treat gender dysphoria and/or to permit an individual to live in a manner that is consistent with the gender with which they identify at the time that the individual seeks treatment, and so at times the Court herein uses the same term to mean the same thing.

preliminary injunction requesting that the Court enjoin Defendants from enforcing any provision of SB1 during the pendency of this litigation. (Doc. No. 21). As noted above, Defendants filed a response (Doc. No. 112), and Plaintiffs filed a reply (Doc. No. 146). For the reasons discussed below, the Motion will be granted in part and denied in part.

<u>PRELIMINARY INJUNCTION STANDARD</u>

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2003). "The party seeking a preliminary injunction bears a burden of justifying such relief, including showing irreparable harm and likelihood of success." *Kentucky v. U.S. ex rel. Hagel*, 759 F.3d 588, 600 (6th Cir. 2014) (quoting *Michigan Cath. Conf. & Cath. Fam. Servs. v. Burwell*, 755 F.3d 372, 382 (6th Cir. 2014)).

Those seeking a preliminary injunction must meet four requirements.[8] They must show a likelihood of success on the merits; irreparable harm in the absence of the injunction; that the balance of equities favors them; and that public interest favors an injunction. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *Sisters for Life, Inc. v. Louisville-Jefferson County*, 56 F.4th 400, 403 (6th Cir. 2022). Plaintiffs seeking a preliminary injunction may not merely rely on unsupported allegations, but rather must come forward with more than "scant evidence" to substantiate their allegations. *See, e.g.*, *Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 417 (6th Cir. 2014); *Cameron v. Bouchard*, 815 F. App'x 978, 986 (6th Cir. 2020) (vacating

---

[8] Some published Sixth Circuit cased stands unmistakably for the proposition that these four items are *factors* rather than *requirements,* except that irreparable harm is a requirement (and, if it exists and thus keeps the possibility of a TRO alive, thereafter becomes a factor to be balanced along with the other three factors). *See, e.g.*, *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 326–27 (6th Cir. 2019). Alas, this case law is inconsistent with more recent Sixth Circuit case law and with Supreme Court case law (including the two cases cited above) describing these as all being requirements. The Court believes that it is constrained the follow the latter line of cases.

preliminary injunction when plaintiffs made no evidentiary showing on some elements of their claim, but instead made mere allegations regarding the treatment of Covid-19 in prisons); *McNeilly v. Land*, 684 F.3d 611, 614 (6th Cir. 2012) (upholding denial of preliminary injunction when plaintiff made only a "small showing" of evidence); *United States v. Certain Land Situated in City of Detroit*, No. 95-1118, 1996 WL 26915, *1 n.1 (6th Cir. Jan. 23, 1996) (noting a lack of evidence to support speculative allegations); *Boulding v. Corr. Med. Servs.*, No. 1:06-CV-811, 2008 WL 2095390, at *1 (W.D. Mich. Feb. 11, 2008), *report and recommendation adopted*, No. 1:06-CV-811, 2008 WL 2095387 (W.D. Mich. May 15, 2008) ("Plaintiff did not marshal any evidence in support of his motion [for a preliminary injunction]. Plaintiff's unsupported allegations do not suffice." (citations omitted)). In deciding a motion for preliminary injunction, a court may consider the entire record, including affidavits and other hearsay evidence. *Sterling v. Deutsche Bank Nat'l Tr. Co.,* 368 F. Supp. 3d 723, 725 (S.D.N.Y. 2019); *J.S.R. by & through J.S.G. v. Sessions*, 330 F. Supp. 3d 731, 738 (D. Conn. 2018). In conducting the preliminary injunction analysis, the Court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is appropriate given the character and objectives of the injunctive proceeding. *Express Franchise Servs., L.P. v. Impact Outsourcing Sols., Inc.*, 244 F. Supp. 3d 1368, 1379 (N.D. Ga. 2017); *Action NC v. Strach*, 216 F. Supp. 3d 597, 629 (M.D.N.C. 2016) (explaining that district courts may look to, and indeed in appropriate circumstances rely on, hearsay or other inadmissible evidence when deciding whether a preliminary injunction is warranted). *See also Ohio State Conf. of N.A.A.C.P. v. Husted*, 768 F.3d 524, 535 (6th Cir. 2014), *vacated on other grounds*, No. 14-3877, 2014 WL 10384647 (6th Cir. Oct. 1, 2014).

DISCUSSION

Plaintiffs bring a facial challenge alleging that SB1 is unconstitutional.[9] According to Plaintiffs, SB1 violates the Due Process Clause of the Fourteenth Amendment because it interferes with the right of a minor's parents to direct the medical care of their children. (Doc. No. 33 at 26). Plaintiffs further contend that SB1 violates the Equal Protection Clause of the Fourteenth Amendment because the law imposes disparate treatment on the bases of transgender status and sex and is not substantially related to an important state interest.

As for the requested remedy, Plaintiffs' Motion indicates that Plaintiffs request a state-wide injunction of SB1 in its entirety. (Doc. No. 21 at 1) (requesting an injunction restraining Defendants from enforcing "any provision" of SB1); (Doc. No. 33 at 31). In their reply, however, Plaintiffs state that their proposed relief does not encompass the private right of action codified at Tenn. Code Ann. § 68-33-105. (Doc. No. 146 at 9). Therefore, the Court construes Plaintiffs' requested relief as an injunction to enjoin all provisions of SB1, *except* the private right of action codified at § 68-33-105. Furthermore, as discussed immediately below, Plaintiffs do not have standing to challenge SB1's ban on "surgically removing, modifying, altering, or entering into

---

[9] The Court discusses below whether Plaintiffs have succeeded on their facial challenge.

"In an as-applied challenge, the plaintiff contends that application of the statute in the particular context in which he has acted, or in which he proposes to act, would be unconstitutional." *Doe #1 v. Lee*, 518 F. Supp. 3d 1157, 1179 (M.D. Tenn. 2021) (quoting *Ada v. Guam Soc'y of Obstetricians and Gynecologists*, 506 U.S. 1011, 1012 (1992) (Scalia, J., dissenting), *denying cert. to* 962 F.2d 1366 (9th Cir. 1992)). When a plaintiff succeeds in an as-applied challenge, the law may not be applied to the plaintiff, but may continue to be enforced "in circumstances where it is constitutional." *Doe v. Rausch*, 461 F. Supp. 3d 747, 769 (E.D. Tenn. 2020). By contrast, a plaintiff that challenges a law "on its face" attempts "to invalidate the law in each of its applications, to take the law off the books completely." *Green Party of Tennessee v. Hargett*, 791 F.3d 684, 691 (6th Cir. 2015) (quoting *Speet v. Schuette*, 726 F.3d 867, 871 (6th Cir. 2013)). The Court notes, however, that the effect on a law invalidated pursuant to a facial challenge is that it becomes unenforceable, not that it literally gets deleted from code books. *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1585 (2020) (Thomas, J., concurring).

tissues, cavities, or organs of a human being" when the purpose of such procedures is to "enable a minor to identify with, or live as, a purported identity inconsistent with the minor's sex" or to treat "purported discomfort or distress from a discordance between the minor's sex and asserted identity." Tenn. Code Ann. §§ 68-33-103(a)(1)(A)–(B); 68-33-102(5)(A)–(B). Accordingly, any relief provided Plaintiff pursuant to the Motion will not impact SB1's ban on such surgeries.[10]

## 1. STANDING

Before addressing the merits of the Motion, the Court first addresses two standing issues. To have Article III standing, a plaintiff must establish "(1) an injury in fact, meaning an invasion of a legally protected interest [that] is (a) concrete and particularized and (b) 'actual or imminent, not "conjectural" or "hypothetical"; (2) "a causal connection between the injury and the conduct complained of, i.e., the injury complained of must be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court"; and "(3) that it is likely, as opposed to merely speculative, that the injury will be 'redressed by a favorable decision." *Phillips v. DeWine*, 841 F.3d 405, 414 (6th Cir. 2016) (internal quotation marks omitted).

Defendants argue that Dr. Lacy does not have standing to assert the rights of her patients and of the parents of her patients. (Doc. No. 112 at 21). But "[w]hen one party has standing to bring a claim, the identical claims brought by other parties to the same lawsuit are justiciable." *See Knight v. Montgomery Cnty. Tenn.*, 592 F. Supp. 3d 651, 671 (M.D. Tenn. 2022) (internal quotation marks omitted). So "in a multiple-plaintiff case, a court need not consider the standing of other plaintiffs once one plaintiff is determined to have standing." *Id.*; *see also Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 710 (6th Cir. 2015) ("A plaintiff must have standing for each claim

---

[10] For conciseness, the Court hereinafter refers to this ban as a ban on surgeries as treatment for gender dysphoria.

pursued in federal court. [] However, only one plaintiff needs to have standing in order for the suit to move forward.") (internal citation omitted). Dr. Lacy and the other Plaintiffs bring the same claims under the Equal Protection Clause and Due Process Clause. Defendants do not contest that the other Plaintiffs have standing for their due process claim and equal protection claim, and the Court is satisfied that they do in fact have standing for these claims. Because Plaintiffs other than Dr. Lacy have standing for the same claims as those brought by Dr. Lacy, the Court need not determine whether Dr. Lacy also has standing.[11]

Defendants also contend that no Plaintiff in this action has standing to challenge SB1's ban on surgeries as treatment for gender dysphoria. (Doc. No. 112 at 21); Tenn. Code Ann. §§ 68-33-102, 68-33-103. The Court agrees. As Defendants point out, no Plaintiff alleges that a prohibition on surgery will affect his or her treatment for gender dysphoria. Perhaps this is to be expected, given that the medical guidelines recommend surgeries involving gonadectomy or hysterectomy only once an individual has reached eighteen years of age. (Doc. No. 113-10 ("Endocrine Society Guidelines") at 27) ("We suggest that clinicians delay gender-affirming genital surgery. . . until the patient is at least 18 years old . . . ."). Regardless of the reason, however, the fact is that none of Minor Plaintiffs express a desire or plan to receive surgery for their treatment of gender dysphoria, and Dr. Lacy does not contend that SB1's prohibition on these surgeries inhibits her ability to treat patients. In their reply, Plaintiffs do nothing to counter Defendants' argument. Plaintiffs have therefore not demonstrated a likelihood that they will suffer a concrete and particularized injury due to enforcement of SB1's ban on surgeries as treatment for gender

---

[11] The Court notes that its finding below that Plaintiffs do not have standing to challenge SB1's ban on surgeries does not affect its analysis as to Dr. Lacy. Plaintiffs have standing in all other respects for their due process and equal protection claims, and therefore the Court need not concern itself with whether Dr. Lacy also has standing.

dysphoria. Therefore, the Court finds that Plaintiffs have not established standing to challenge this provision of the law at the instant preliminary-injunction stage and thus are not entitled to a preliminary injunction with respect to that provision. *See Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 386 (6th Cir. 2020) (noting that although the plaintiff's failure to establish a likelihood of standing on a motion for a preliminary injunction does not require dismissal of claims, it does require denial of the motion for a preliminary injunction associated with such claims); *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 255 n.3 (6th Cir. 2018) (same). *Cf. K.C. v. Individual Members of Medical Licensing Board of Ind.*, 1-23-cv-595, 2023 WL 4054086, at *7 (S.D. Ind. June 16, 2023) (finding that plaintiffs did not have standing to challenge surgery provisions of Indiana law banning gender-affirming treatment because it was undisputed that no plaintiff could receive such surgeries regardless of the law in question).[12]

The Court's analysis below thus focuses on whether Plaintiffs are substantially likely to succeed on their argument that the remaining portions of SB1 (*i.e.*, SB1 to the extent that it bans other kinds of "medical procedure[]") that Plaintiffs challenge violate the Equal Protection and Due Process clauses.

### 2. LIKELIHOOD OF SUCCESS ON THE MERITS

#### A. Due Process Claim

##### i. Infringement on a Fundamental Right

The Due Process Clause of the Fourteenth Amendment states that no state shall "deprive any person of life, liberty, or property without due process of law." U.S. Const. Amend. XIV, § 1. "Substantive due process is [t]he doctrine that governmental deprivations of life, liberty or

---

[12] The Court declines to opine herein gratuitously on the extent to which its constitutional analysis might be different with respect to surgery than it is with respect to the other banned medical procedures (as set forth below).

property are subject to limitations regardless of the adequacy of the procedures employed." *Johnson v. City of Saginaw, Mich.*, 980 F.3d 497, 514 (6th Cir. 2020) (internal quotation marks omitted). "These limitations are meant to provide heightened protection against government interference with certain fundamental rights and liberty interests." *Does v. Munoz*, 507 F.3d 961, 964 (6th Cir. 2007) (internal quotation marks omitted). As the undersigned put it decades ago, "a substantive due process violation occurs when the government deprives a person of a protectable interest . . . under unconstitutional criteria." Eli J. Richardson, *Eliminating Double-Talk from the Law of Double Jeopardy*, 22 Fla. St. U. L. Rev. 119, 163 (1994).

Plaintiffs allege that SB1 infringes on a parent's fundamental right to direct the medical care of his or her child. (Doc. No. 33 at 26). "The existence of a fundamental right means that [g]overnment actions that burden the exercise of [the right] are subject to strict scrutiny, and will be upheld only when they are narrowly tailored to a compelling governmental interest." *Kanuszewski v. Michigan Dep't of Health and Human Services*, 927 F.3d 396, 419 (6th Cir. 2019) (internal quotation marks omitted).

According to Defendants, Plaintiffs' reliance on a parent's fundamental right to direct the medical care of his or her child is flawed because Plaintiffs describe the right with excessive generality. (Doc. No. 112 at 8–9). Defendants further argue that no right of a parent to have the medical treatments banned by SB1 be administered on that parent's child existed at the time of ratification of the Fourteenth Amendment, and therefore such a right is not fundamental for the purposes of the Due Process Clause. (*Id.*).

The Court certainly grasps Defendants' argument. But the Sixth Circuit's decision in *Kanuszewski* stands in direct contradiction to Defendants' argument. In *Kanuszewski*, the Sixth Circuit assessed whether the Michigan Newborn Screening Program ("NSP") violated the Due

Process Clause of the Fourteenth Amendment. *See Kanuszewski*, 927 F.3d at 403–404. The NSP involved the mandatory collection of blood samples from newborns to test for diseases, and these blood samples would then be stored by the Michigan Neonatal BioBank for future use by the state. *See id.* The parents of minor children who had been part of the NSP sued, alleging that the program violated their fundamental right to direct the medical care of their children. *See id.* at 413.

On appeal from the district court's dismissal of the complaint, the Sixth Circuit was faced with the plaintiffs' assertion of two alleged fundamental rights, one against the *collection* of the blood samples and one against the *retention* of the blood samples. As for the alleged violation of the asserted right against collection of blood samples under the NSP, the court found that the defendants were entitled to qualified immunity because it was not yet clearly established that parents had a right to control their children's medical care. *See id.* at 415.

The court then turned to whether the plaintiffs had stated a claim under the Due Process Clause based on Defendants' *retention* of the blood sample under the NSPs. *See id.* at 418.[13] The court explained that the Supreme Court in *Troxel v. Granville*, 530 U.S. 57 (2000) found that parents have a fundamental right to make decisions regarding the "care, custody, and control of their children, [] which would seem to naturally include the right to direct their children's medical care." *See id.* (internal quotation marks omitted). The court therefore found that "[p]arents possess a fundamental right to make decisions concerning the medical care of their children." *See id.* Returning to the issue of the constitutionality of the defendants' retention of the blood samples, the court found that "[d]efendants' actions constitute a denial of the parents' fundamental right to

---

[13] Because the plaintiffs sought prospective relief for this claim, the defendants were not entitled to qualified immunity. *See Kanuszewski*, 927 F.3d at 418. The Court therefore did not need to determine whether the right in question was clearly established.

direct the medical care of their children, and their actions must survive strict scrutiny." *See id.* at 420.

The court in *Kanuszewski* therefore defined the fundamental right at issue at the same level of generality as Plaintiffs do in this case. Contrary to Defendants' suggestion, the court in *Kanuszewski* did not find that the parents had a fundamental right specifically to not have their children's blood samples stored by the state and potentially used later. Instead, the court found that parents have a fundamental right more broadly to direct the medical care of their children, which encompassed the right to refuse to have their children's blood stored under the NSP. The Court therefore rejects Defendants' claim that Plaintiffs define the parents' fundamental right at too high a level of generality.

Defendants argue that the Court should decline to rely on *Kanuszewski* because it involved whether the parents had a right to *refuse* the drawing of the blood samples and long-term storage of the samples, whereas the issue in this case is a parent's right for their children to *receive* certain procedures. (Doc. No. 112 at 9). This distinction, between what may be considered a "negative" right and a "positive" right, is certainly cognizable; it is one thing to have a right against a non-consensual invasion of the body, and another thing to have a right to have affirmative treatment of the body (invasive or otherwise). But the distinction ultimately is inconsequential here. The court in *Kanuszewski* gave no indication that its analysis of the parents' due process claim turned on the fact that the parents were seeking to refuse rather than receive medical treatment for their children—*i.e.*, were asserting a negative right rather than a positive (affirmative) right. The court in *Kanuszewski* could have said that the parents had a right to refuse medical care for their children, but it did not do so; instead, it chose to define the recognized right as a right of the parent to *direct* the medical care of their children. Absent any court-provided limitation on the term, the right to

"direct" care would naturally include the right to refuse certain treatments *and* the right to request provision of certain treatments. For this reason also, Defendants' reliance on *Washington v. Glucksberg*, 521 U.S. 702 (1997), is unavailing. True, in *Washington*, the Court said that the right to refuse unwanted medical treatment is not equal to "a right to assistance in committing suicide." *See id.* at 725–26. This point by the Court, however, has no import here where the Sixth Circuit—several years after *Washington*—has plainly found that parents have a fundamental right to direct the medical care of their children without indicating that the right pertains only to the *refusal* of certain medical treatments.

The Court therefore agrees with Plaintiffs that under binding Sixth Circuit precedent, parents have a fundamental right to direct the medical care of their children, which naturally includes the right of parents to request certain medical treatments on behalf of their children.

The Court is not alone in finding the existence of such a right, as three other district courts to assess laws almost identical to SB1 have done likewise. *See Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131 (M.D. Ala. 2022) (finding that the right of parents to make decisions concerning the care, custody, and control of their children includes the right to seek care for their children); *Brandt v. Rutledge*, 551 F. Supp. 3d 882, 892–893 (E.D. Ark. 2021) ("The Court finds that the Parent Plaintiffs have a fundamental right to seek medical care for their children and, in conjunction with their adolescent child's consent and their doctor's recommendation, make a judgment that medical care is necessary."), *affirmed* 47 F.4th 661 (8th Cir. 202)[14]; *Doe v. Ladapo*,

---

[14] The Court further notes that on June 20, 2023, Judge Moody of the Eastern District of Arkansas rendered the final judgment in *Brandt v Rutledge*. *See Brandt*, 4-21-cv-450, 2023 WL 4073727 (E.D. Ark. June 20, 2023). Following a bench trial, Judge Moody found that the Arkansas law banning gender transition procedures for minors was unconstitutional because it violated the Equal Protection Clause of the Fourteenth Amendment, Due Process Clause of the Fourteenth Amendment, and Free Speech Clause of the First Amendment as incorporated into the Fourteenth Amendment. *See id.* Based on his rulings, Judge Moody entered a permanent injunction. *See id.* Although this decision plainly reflects final judgment in that

4-23-cv-114, 2023 WL 3833848 (N.D. Fla. June 6, 2023) (finding that plaintiffs were substantially likely to succeed on the merits for their claim that Florida's ban violated parents' rights under the Due Process Clause). Given that SB1 infringes on a parent's fundamental right to direct the medical care of that parent's child by banning medical treatments given for particular purposes, SB1 must survive strict scrutiny.

### ii.    Application of Strict Scrutiny

A law that infringes on a fundamental right must be narrowly tailored to advance a compelling state interest (*i.e.*, it must survive strict scrutiny). *See Carey v. Wolnitzek*, 614 F.3d 189, 200 (6th Cir. 2010). "If a law does too much, or does too little, to advance the [state's] objectives, it will fail." *Id.* at 201. The state bears the burden of demonstrating that the law at issue survives strict scrutiny. *See Reform America v. City of Detroit, Michigan*, 37 F.4th 1138, 1156 (6th Cir. 2022). As discussed in detail below, the Court finds that Defendants have not met their burden of showing that SB1 is substantially related to an important government interest as to survive intermediate scrutiny. It necessarily follows that SB1 does meet the more demanding requirements of strict scrutiny. Plaintiffs have therefore demonstrated a substantial likelihood of success on the merits of their due process claim.

### B.   Equal Protection Claim

The Equal Protection Clause provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. "The Equal Protection Clause provides that all persons similarly situated should be treated alike." *Green Party of Tenn. v. Hargett*, 791 F.3d 684, 692 (6th Cir. 2015) (internal quotation marks omitted). "To prevail on

---

case, the Court herein relies primarily on Judge Moody's opinion on the plaintiffs' motion for a preliminary injunction. The reason being that the analysis in the preliminary injunction opinion is more apt for the Court's discussion on the instant motion, as it was provided under the same standard as the Court applies here.

an equal protection claim, a plaintiff must prove that the government (i) treated the plaintiff disparately as compared to similarly situated persons, and (ii) that the disparate treatment either burdens a fundamental right, targets a suspect [or quasi-suspect] class, or has no rational basis." *Pratt Land & Development, LLC v. City of Chattanooga*, 581 F. Supp. 3d 962, 977 (E.D. Tenn. 2022).

Plaintiffs argue that SB1 violates the Equal Protection Clause because SB1 treats transgender minors differently from non-transgender minors, and that in doing so, SB1 targets the quasi-suspect class of transgender persons[15] and the quasi-suspect classification of sex.[16] (Doc. No. 33 at 22). In Plaintiffs' view, because SB1 targets a quasi-suspect class and reflects a quasi-

---

[15] Below, the court refers to class-based disparate treatment of transgender persons as disparate treatment "based on transgender status," with the understanding that the reference is (as just indicated) to disparate treatment of members of the class of transgender persons.

[16] The Court acknowledges the distinction between a "quasi-suspect *class*" and a "quasi-suspect *classification*." Though courts often use the term "class" and "classification" interchangeably in the equal-protection context, the terms undoubtedly have distinct meanings. The latter refers to a *categorization* of persons into multiple (usually two) groups (for example, categorization of persons as male or female), whereas the former refers to *one group* of individuals thus categorized (for example, females). Under the Equal Protection Clause, both quasi-suspect *classes* and quasi-suspect *classifications* are cognizable bases for the application of intermediate scrutiny. *See U.S. v. Virginia*, 518 U.S. 515 (1996) (finding that sex-based classifications are subject to intermediate scrutiny); *37712, Inc. v. Ohio Dep't of Liquor Control*, 113 F.3d 614 (6th Cir. 1997) (explaining that the "legislation uniquely affect[ing]" quasi-suspect classes of "gender" or "illegitimacy" requires application of intermediate scrutiny); *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 325 (1976) (describing "women" and "illegitimates" as quasi-suspect classes) (Marshall J., dissenting). *Cf. City of Cleburne, Tex v. Cleburne Living Center*, 473 U.S. 432 (1985) (declining to recognize persons with intellectual disabilities as a "quasi-suspect class"). Without going into more detail than necessary here, the Court notes that in some cases the distinction makes a real difference in whether a particular plaintiff can succeed in having the law at issue subjected to something more stringent than rational-basis review. But the Court further notes, again without more ado than is necessary here, that with respect to SB1, Plaintiffs would achieve such success even if the Court were to view SB1 as raising an issue of quasi-suspect class rather than quasi-suspect classification—a view the Court declines to take because the real cognizable concern about SB1 is not that it makes a *classification* (of persons into the groups of transgender and cisgender) that needs to be justified by the state, but rather that it is directed at a particular *class* of persons and thus needs to be justified by the state.

suspect classification, intermediate scrutiny applies.[17] Defendants, on the other hand, contend that mere rational basis-review is applicable. (Doc. No. 112 at 10). As discussed in detail immediately below, the Court finds that intermediate scrutiny applies to SB1 for Plaintiffs' equal protection claim.

### i. Disparate Treatment Based on Transgender Status

To show that a law violates the Equal Protection Clause based on transgender status or sex, "[g]enerally, a plaintiff must show that [] [the] policy. . . had discriminatory intent. But such a showing is unnecessary when the policy tends to discriminate on its face." *Fain v. Crouch*, 618 F. Supp. 3d 313, 326 (S.D. W. Va. 2022). "The Court looks to the language of the policy to determine whether it is facially neutral or whether it explicitly references gendered or sex-related terms." *Id.*; *Kadel v. Folwell*, 620 F. Supp. 3d 339, 375 (M.D.N.C. 2022) ("A facial inquiry is what it sounds like: a review of the language of the policy to see whether it is facially neutral or deal[s] in explicitly racial [or gendered] terms.") (internal quotation marks omitted).

SB1 bans a medical procedure if (and only if) the purpose of the procedure is either (i) to enable a minor to live consistently with his or her gender identity if that identity is inconsistent with the minor's sex, or (ii) to treat discomfort from a discordance between the minor's sex and the minor's gender identity. As discussed above, transgender individuals are those whose gender identity is inconsistent with their sex at birth. Gender dysphoria is a condition that results from this incongruence.

According to Plaintiffs, SB1 facially discriminates based on transgender status. (Doc. No. 33 at 18). The court's analysis in *Crouch*, is instructive on this issue. In that case, the court had to

---

[17] Although Plaintiffs do not use the term "intermediate scrutiny" in their briefs, they contend that SB1 must be "substantially related to a sufficiently important governmental interest" (Doc. No. 33 at 18 (internal quotation marks omitted)), which is the test applied to a law when so-called "intermediate scrutiny" is warranted.

determine whether West Virginia's policy of denying healthcare coverage for "transexual surgery" violated the Equal Protection Clause by discriminating based on transgender status. *See id*. at 319. The court noted that "inherent in a gender dysphoria diagnosis is a person's identity as transgender. In other words, a person cannot suffer from gender dysphoria without identifying as transgender." *See id.* at 324–325. With this principle in mind, the court found that the exclusion "targets transgender people because they are transgender." *See id.* at 325.

The analysis in *Crouch* applies with equal force to SB1. Although SB1 does not use the word "transgender," the law plainly proscribes treatment for gender dysphoria—and Defendants do not contest that only transgender individuals suffer from gender dysphoria. The Court therefore agrees with Plaintiffs that SB1 expressly and exclusively targets transgender people. *See also Eknes-Tucker*, 603 F. Supp. 3d at 1138 (finding that Alabama law preventing minors from accessing medical procedures performed "for the purpose of attempting to alter the appearance of or affirm the minor's perception of his or her gender or sex, if that appearance or perception is inconsistent with the minor's sex as defined in this act" "prohibits transgender minors—and only transgender minors—from taking transitioning medications due to their gender nonconformity.").

Defendants' argument that SB1 does not discriminate based on transgender status is unpersuasive. According to Defendants, not all transgender individuals want the medical procedures banned by SB1, and therefore SB1 does not discriminate on the basis of transgender status. (Doc. No. 112 at 13). Defendants' argument, however, improperly characterizes the group of people that are affected by SB1. The relevant class is not "individuals who want to receive the medical procedures that are banned by SB1." Instead, the relevant group is transgender minors. Confronting the exact same argument in *Eknes-Tucker*, the court in that case explained that the "fundamental flaw in this argument is that the first category [*i.e.* transgender minors who want the

procedures] consists entirely of transgender minors." *See Eknes-Tucker*, 603 F. Supp. 3d at 1147. In other words, *only* transgender minors were affected by the law at issue in *Eknes-Tucker*, even if not necessarily *all* transgender minors were affected by the law. The same is true of SB1.

It does not take much creative thinking to understand why Defendants' argument holds no weight. Imagine a law that said that "no Black individuals can attend graduate school." Under Defendants' logic, the law would not discriminate based on race, and thus strict scrutiny would not apply, because there are Black individuals who do *not* want to attend graduate school as well as Black individuals who do want to attend graduate school. But applying a standard other than strict scrutiny would be preposterous because the law clearly prescribes disparate treatment on the basis of race; under the law, *no* Black individuals could ever attend graduate school whereas individuals from other races potentially could do so. Therefore, the relevant class would be Black individuals, *not* "Black individuals who want to attend graduate school." Likewise in the present case. Under SB1, the only group of individuals that are denied treatment are transgender persons (in particular, transgender minors). It is not relevant that some transgender persons (transgender minors) may not seek out these procedures, just as it would not have been relevant in the example that some Black individuals may not want to go to graduate school.[18]

Defendants' reliance on a footnote from *Geduldig v. Aiello*, 417 U.S. 484 (1974) also gets them nowhere. In *Geduldig*, the Supreme Court held that a California disability insurance system administered by the state that excluded coverage for disabilities resulting from pregnancy did not

---

[18] Defendants also briefly reference *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), in support of their argument that SB1 does not discriminate based on transgender status. (Doc. No. 112 at 13). According to Defendants, *Dobbs* confirms that regulation of procedures pertaining only to one sex are not necessarily subjected to intermediate scrutiny. As the Court has noted repeatedly, SB1's prohibitions on certain procedures do not merely involve transgender status; they are directly and exclusively targeted at minors who are transgender. Therefore, Defendants' analogy to *Dobbs* is not persuasive.

violate the Equal Protection Clause. *See id.* In assessing whether the system violated the Equal Protection Clause, the Supreme Court explained that pregnancy was an "objectively identifiable physical condition with unique characteristics," and therefore classifications based on pregnancy could not automatically be understood as improper sex-based discrimination. *See id.* at 496 n.20. The Supreme Court also observed that because there are both men and women who can receive benefits under the system (as long as they were not seeking pregnancy-related disability benefits), the system did not discriminate on the basis of sex. The idea seems to be that a disability insurance system can exclude coverage for an "objectively identifiable physical condition with unique characteristics" because such a system really is geared towards the *physical condition* rather than any class of *persons*, even if the condition is one that happens to be associated only with one particular class of persons.

Defendants' *Geduldig*-based argument is not original. In rejecting the same argument very recently in *Ladapo*, Judge Hinkle explained that California's system treated men and women the same because under that system "nobody had health coverage for pregnancy," whereas under the law at issue in *Ladapo* "transgender and cisgender individuals are not treated the same." *Ladapo*, 2023 WL 3833848, at *10. Judge Hinkle's rationale applies equally to SB1.[19]

Additionally, the court in *Kadel* considered whether North Carolina's state healthcare plan that excluded certain treatments for gender transformation and in connection with sex changes or modifications violated the Equal Protection Clause. 620 F. Supp. 3d at 378. In rejecting the defendants' analogy to *Geduldig*, the court explained that the unlike the system in *Geduldig*—which excluded benefits based on an "objectively identifiable physical condition with unique

---

[19] Although the Court does not necessarily embrace Judge Hinkle's opinion in all respects, and certainly realizes that it need not follow this non-binding opinion, the Court finds persuasive every aspect of that opinion upon which the Court relies herein.

characteristics"—North Carolina's plan could not be explained without reference to sex, gender, or transgender status. *See id*; *Crouch*, 618 F. Supp. 3d at 317 (rejecting analogy to *Geduldig* because West Virginia's state Medicaid program treated non-transgender individuals more favorably by allowing them to access the same surgeries that were otherwise banned under the program's policy); *K.C.*, 2023 WL 4054086, at *8 (distinguishing *Geduldig* on the ground that Indiana law prohibiting procedures when used for gender transition turned on "sex-based classification," whereas pregnancy "is not "necessarily a proxy for sex."). For the reasons expressed in *Ladapo* and *Kadel*, the Court declines to find that *Geduldig* supports Defendants' argument that SB1 does not impose disparate treatment based on transgender status.

Having found that the law subjects individuals to disparate treatment based on transgender status, the Court must next determine whether doing so requires the Court to evaluate SB1 under intermediate scrutiny, as would be the case if transgender individuals constituted a so-called quasi-suspect class.[20] The Supreme Court considers four factors to determine whether a class (such as transgender persons as a group) is quasi-suspect, such that disparate treatment of members of that class is subjected to intermediate scrutiny:

> (1) whether the class has been historically "subjected to discrimination," *Lyng v. Castillo*, 477 U.S. 635, 638, 106 S. Ct. 2727, 91 L. Ed. 2d 527 (1986); (2) whether the class has a defining characteristic that "frequently bears no relation to ability to perform or contribute to society," *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440-41, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985); (3) whether the class exhibits "obvious, immutable, or distinguishing characteristics that define them as a discrete group," *Lyng*, 477 U.S. at 638, 106 S. Ct. 2727; and (4) whether the class is "a minority or politically powerless," *id.*

*Ray v. McCloud*, 507 F. Supp. 3d 925, 936–937 (S.D. Ohio 2020).

---

[20] As for the implication of the term that something is to a degree "suspect," it bears mentioning that what is "suspect" are not the class members, but rather the *disparate treatment* of those class members.

"There is no binding precedent from the United States Supreme Court or the Sixth Circuit regarding whether transgender people are a quasi-suspect class."[21] *See id.* at 937. The overwhelming majority of courts to consider the question, however, have found that transgender individuals constitute a quasi-suspect class for the purposes of the Equal Protection Clause. *See, e.g.*, *Ray*, 507 F. Supp. 3d at 937 (holding that transgender individuals constitute a quasi-suspect class); *Bd. of Educ. Of the Highland Local School District v. United States Dep't of Educ.*, 208 F.

---

[21] The Court finds unavailing Defendants' reliance on *Ondo v. City of Cleveland*, 795 F.3d 597 (6th Cir. 2015) to support their argument that transgender individuals do not constitute a quasi-suspect class. (Doc. No. 112 at 12). In *Ondo*, the Sixth Circuit declined to recognize homosexuals as a quasi-suspect class. *See Ondo*, 795 F.3d at 608. In arriving at this conclusion, the Sixth Circuit noted that the Supreme Court has recognized a particular class or classification as suspect only when "the trait [associated with the particular class or classification] is definitively ascertainable at the moment of birth . . .." *See id.* As explained by the Sixth Circuit, the Supreme Court so far has recognized only illegitimacy as a quasi-suspect class and sex as a quasi-suspect classification. Defendants argue that the Court should follow the reasoning of *Ondo* and decline to recognize transgender individuals as a quasi-suspect class because transgender individuals do not (according to Defendants) have a "definitively ascertainable [characteristic] at birth."

Defendants' argument, however, would require the Court to make a logical leap. Although the Supreme Court to date has recognized quasi-suspect classes (and classifications) only where the distinguishing trait can be ascertained at birth (assuming that it in fact can be ascertained at birth), it does not necessarily follow that a group with a distinguishing trait that *cannot* be ascertained at the moment of birth cannot be either a quasi-suspect class or subject to a quasi-suspect classification. The four prongs used by the Supreme Court to identify suspect classes that warrant heightened scrutiny say nothing about whether the distinguishing characteristics of a class can be ascertained by a third party at the moment of birth. The Court therefore declines to defer to what is most likely dicta in *Ondo* in lieu of binding Supreme Court precedent. In short, until the Sixth Circuit or the Supreme Court rules on whether transgender individuals constitute a quasi-suspect class, the four prongs set forth by the Supreme Court govern the analysis.

As an aside, the undersigned queries whether the Sixth Circuit's reasoning in *Ondo* rests on solid grounds. For example, presumably the Sixth Circuit was not implying that being homosexual is something like a choice that is made later in life rather than a characteristic that a person is born with. Instead, it seems that what the Sixth Circuit in *Ondo* meant was that for a class to be quasi-suspect class, the trait associated with that class must be ascertainable based on criteria that are immediately observable at the time of birth. So sex would fit neatly into that category because most of the time, a person's sex (if designated by external genitalia as it is in Tennessee) is immediately ascertainable at birth regardless of whether that person is yet aware of their sex. But the undersigned is not persuaded that the same can be said for illegitimacy, which is the second quasi-suspect class identified by the Supreme Court. Indeed, there is nothing regarding a baby's physical appearance that indicates (*i.e.*, makes it ascertainable) that it was conceived or born out of wedlock. Presumably, a third party could ascertain this only from the say-so of the mother or father or perhaps to on-point state records to which the third party has access. Therefore, the undersigned is skeptical of *Ondo*'s identification of the common thread among the two classes that the Supreme Court has determined to be suspect classes.

Supp. 3d 850, 873 (S.D. Ohio 2016) (holding that transgender individuals constitute a quasi-suspect class both because discrimination on the basis of transgender status is discrimination based on sex and because transgender individuals as a group fulfill the four prongs used by the Supreme Court to define a quasi-suspect class); *Grimm v. Gloucester Cnty. School Bd.*, 972 F.3d 586, 610 (4th Cir. 2020) (holding that transgender individuals constitute a quasi-suspect class); *Brandt by and through Brandt v.* Rutledge, 47 F.4th 661, 670 n.4 (8th Cir. 2022) (finding that the district court did not commit clear error when it found that transgender individuals constituted a quasi-suspect class); *M.A.B. v. Bd. of Educ. Of Talbot Cnty.*, 286 F. Supp. 3d 704, 719–720 (D. Md. 2018) (finding that all four prongs of the quasi-suspect class test justify treating transgender people as a quasi-suspect class); *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 952–953 (W.D. Wisc. 2018) (holding that the plaintiffs had made a strong showing that transgender individuals are a quasi-suspect class); *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1145 (D. Idaho 2018) (finding that transgender people bear "all of the characteristics of a quasi-suspect class. . ."); *Evancho v. Pine-Richland School Dist.*, 237 F. Supp. 3d 267, 288 (W.D. Pa. 2017) (finding that transgender individuals fulfill all four prongs of the quasi-suspect-class test); *Norsworthy*, 87 F. Supp. 3d at1120 ("[T]he Court concludes that discrimination based on transgender status independently qualifies as a suspect classification under the Equal Protection Clause because transgender persons meet the indicia of a "suspect" or "quasi-suspect classification" identified by the Supreme Court."); *Adkins v. City of New York*, 143 F. Supp. 3d 134, 139 (S.D.N.Y. 2015) (holding that transgender people are a quasi-suspect class).

The Court is satisfied that current precedent supports the finding that transgender individuals constitute a quasi-suspect class under the Equal Protection Clause. As the court in *Ray* explained, "there is not much doubt that transgender people have historically been subject to

discrimination including in education, employment, housing, and access to healthcare." *See, e.g.*, *Ray*, 507 F. Supp. 3d at 937 (internal quotation marks omitted); *Adkins*, 143 F. Supp. 3d at 139 (finding that "transgender people have suffered a history of persecution and discrimination"); *Bd. of Educ. of the Highland Local School Dist.*, 208 F. Supp. 3d at 873 (finding that transgender individuals have been historically subject to discrimination).[22] Transgender individuals are also "no less capable of contributing value to society than"[23] non-transgender individuals. *See, e.g.*, *Ray*, 507 F. Supp. 3d at 937. Transgender individuals have "obvious immutable, or distinguishing characteristics that define them as a discrete group," namely the distinguishing characteristic that their respective gender identities do not align with their respective sexes at birth.[24] *See, e.g.*, *id.* Finally, transgender individuals are both a minority and lack political power. *See, e.g.*, *id.* (explaining that less than 1% of the adult population in the United States are transgender); *Windsor v. U.S.*, 699 F.3d 169, 184 (2d Cir. 2012) (explaining that whether a group is "politically powerless" focuses on whether the group has "strength to politically protect [itself]," for example

---

[22] On this point, the current record in this case is not fulsome. If Defendants wish to attempt to create such doubt at later stages of this case via presentation of evidence on point, they are free to do so. Though the Court notes that even if Defendants are able to persuade the Court that transgender individuals are not a quasi-suspect class under the four prongs provided by the Supreme Court, the scrutiny applied to the Court's analysis of Plaintiffs' constitutional claims may not change. Indeed, the Court has provided two alternative bases for the application of intermediate scrutiny herein—that SB1 contains a sex-based classification because it explicitly delineates its prohibitions based on sex, and that SB1 imposes disparate treatment based on sex because it imposes disparate treatment based on transgender status.

[23] The Court feels compelled to note, as an aside, that it feels presumptive to present oneself as an arbiter of what constitutes "value to society" and of who does and does not "contribute" to such "value." These are patently subjective and value-laden determinations. But under applicable law, it falls to the Court to call it like it sees it, and it makes the above-referenced call without difficulty.

[24] That is not to say that a transgender person's gender identity could never change so that it aligns with their sex at birth, thus rendering the person no longer transgender. In other words, the Court's view is not categorically, "once a transgender person, always a transgender person." However, even if transgender status is not "obviously immutable" for all transgender persons, transgender status is a "distinguishing characteristic" that defines persons with such status as a distinct group.

by achieving relative equal representation in political bodies), *affirmed,* 570 U.S. 744 (2013).[25] Given that transgender individuals fulfill all four prongs, the Court finds that transgender individuals constitute a quasi-suspect class. Therefore, SB1 must survive intermediate scrutiny.[26]

### ii.    Disparate Treatment Based on Sex

Satisfied that SB1 imposes disparate treatment on the basis of transgender status, and that transgender individuals constitute a quasi-suspect class, the Court could end here its analysis of what scrutiny applies. The Court, however, finds it prudent to address, additionally and alternatively, Plaintiffs' argument that SB1 is subject to intermediate scrutiny because it imposes disparate treatment on the basis of sex. (Doc. No. 33 at 18). And as discussed below, over Defendants' opposition, the Court finds that SB1 discriminates on the basis of sex, which in turn provides an alternative basis for the application of intermediate scrutiny.

### a)  Sex-Based Classification

Several courts have found that laws similar to SB1 (*i.e.* those that deny access or healthcare coverage to medical procedures if the purpose is to allow the minor to live inconsistently with that minor's sex at birth) impose disparate treatment on the basis of sex. *See Ladapo*, 2023 WL 3833848, at *8 (finding that Florida's ban discriminates based on sex because to know how the

---

[25] From *Windsor's* description, it appears that for purposes of this factor, a group can be deemed to lack political power even if it has a substantial voice in the media, substantial support in the non-profit and public-interest sector, and the support of a substantial number of elected representatives or executive-branch officials. In making this observation, the Court does not mean to imply that these examples apply to transgender individuals as a group; the Court's point is only that even if these examples did apply, that would not by itself suffice to show an absence of political power.

The Court notes additionally that here it is making the reasonable assumption that when the challenge is to a state law, the focus should be on the group's political power specifically within the state at issue.

[26] Defendants fail to acknowledge the weight of (non-binding) authority supporting the finding that transgender individuals constitute a quasi-suspect class; by not even dealing with such authority, Defendants lose an opportunity to show the Court why transgender persons are not a quasi-suspect class.

ban applied, one must know the sex of the person); *Fletcher v. Alaska*, 443 F. Supp. 3d 1024, 1030 (D. Alaska 2020) ("AlaskaCare covers vaginoplasty and mammoplasty surgery if it reaffirms an individual's natal sex, but denies coverage for the same surgery if it diverges from an individual's natal sex. That is discrimination because of sex and makes defendant's formal policy, as expressed in the provisions of AlaskaCare, facially discriminatory."); *Kadel*, 620 F. Supp. 3d at 376 (finding that North Carolina's denial of healthcare coverage for treatments leading to or in connection with sex changes or modifications and related care discriminated on the basis of sex because "[i]t is impossible to determine whether a particular treatment is connected to "sex changes or modifications and related care"—and thus, whether the exclusion applies—without comparing the member's biological sex before the treatment to how it might be impacted by the treatment."); *K.C.*, 2023 WL 4054086, at *8–*9 (explaining that although Indiana law banning gender-affirming treatment for minors "prohibit[ed] both male and female minors from using puberty blockers and cross-sex hormones for gender transition," it reflected a sex-based classification because under the law it was "impossible for a medical provider to know whether a treatment is prohibited without knowing the patient's sex."). And as the court in *Kadel* explained, "[a] policy that uses racial or gendered terms 'falls into an inherently suspect [or-quasi-suspect] category' even if it creates classifications that are not 'obviously pernicious.'" *See Kadel*, 620 F. Supp. 3d at 375 (quoting *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 485 (1982)).

SB1 prohibits a minor from receiving medical procedures if the purpose is to enable the minor to live as an "identity inconsistent" with the minor's sex. *See* Tenn. Code Ann. 68-33-103(a)(1)(A). SB1 also prohibits these medical procedures if the purpose is to treat discomfort arising from discordance between the minor's sex and identity. *Id.* at § 68-33-103(a)(1)(B). Whether a medical procedure is banned by SB1—a case-specific question that must be asked on a

minor-by-minor basis—therefore requires a comparison between the minor's sex at birth and the minor's (gender) identity; that is, it requires the ascertainment of whether the minor's sex at birth is consistent with that minor's (gender) identity. So if a minor's sex is female at birth and that minor wants to access hormone therapies[27] to enable her to conform her gender identity to her sex at birth (*i.e.* she wants to live as a girl), SB1 would allow this minor to access such care. However, if a minor's sex at birth is male and that minor wanted access the same treatment for the same purpose (*i.e.* live as a girl), SB1 would deny that minor access to the treatment. These disparate outcomes under SB1 are due to the fact that the minors had sexes at birth different from one another. Therefore, contrary to Defendants' assertion (which is not frivolous) that SB1 merely "implicat[es]" sex, the Court finds that SB1 demarcates its ban(s) based on a minor's sex. The Court is therefore persuaded that SB1 creates a sex-based classification on its face, and thus imposes disparate treatment on the basis of sex.

The Court's finding is also supported by the recent decision from Judge Hinkle in *Ladapo* to enjoin a Florida statute's general ban (hereinafter, "Florida's ban") on the use of puberty blockers or hormones to "affirm a person's perception of his or her sex if that perception is inconsistent with the person's [natal] sex." Fla. Stat. § 456.001(9)(a)1 & 2. In *Ladapo*, the court employed virtually identical reasoning in finding that Florida's ban discriminated based on sex:

> Consider an adolescent, perhaps age 16, that a physician wishes to treat with testosterone. Under the challenged statute, is the treatment legal or illegal? To know the answer, one must know the adolescent's sex. If the adolescent is a natal male, the treatment is legal. If the adolescent is a natal female, the treatment is illegal. This is a line drawn on the basis of sex, plain and simple. *See Brandt*, 47 F.4th at 669 ("Because the minor's sex at birth determines whether or not the minor can receive certain types of medical care under the law, [the law] discriminates on the basis of sex."); *Adams*, 57 F.4th at 801 (applying intermediate scrutiny to a policy under which entry into a designated bathroom was legal or not depending on the entrant's natal sex).

---

[27] By "hormone therapies," the Court refers to the dispensing of puberty blockers or of cross-sex hormones.

*See Ladapo*, 2023 WL 3833848, at *8. The Court agrees with the point made here and rejects Defendants' argument (Doc. No. 112 at 10) that SB1 treats minors of all sexes the same. As the Court has demonstrated above, when two individuals want the same procedure under SB1 for the same purpose, whether they respectively can access that procedure will depend on their respective sexes. As many courts have found with respect to materially similar laws to SB1, this constitutes disparate treatment based on sex.[28]

On this point, Defendants' argument suffers from a major inconsistency. On the one hand, Defendants assert that minors of both sexes are treated equally under SB1, but they then invoke the Supreme Court's rationale in *Dobbs* for the proposition that the fact that only one sex can receive a medical treatment does not necessarily trigger heightened scrutiny. By thus analogizing to *Dobbs*, however, the state suggests that only one sex can receive the medical procedures described in SB1, which is directly contrary to Defendants' argument that SB1 treats all sexes equally.[29]

---

[28] The Court acknowledges that the sex-based classification contained in SB1 may not be characteristic of what many would consider a sex-based classification. For example, unlike sex-based classifications in some other contexts, SB1 does not state that only females or only males are subject to SB1's ban on medical procedures. And it is true that in one sense, both males and females are equally affected by SB1 if they seek treatment to live inconsistently with their sex at birth. However, as demonstrated above, it is plain that under SB1, a healthcare provider must know a prospective patient's sex in order to determine whether the patient can access care under SB1. The Court is satisfied that this is a form of disparate treatment based on sex (*i.e.* a sex-based classification). The Court's finding is also supported by the Court's reasoning in *Bostock* (albeit it provided in a different context), that a sex-based classification exists when one cannot "writ[e] out instructions" on who is affected by a law or policy "without using the words man, woman, or sex (or some synonym)." *See Bostock v. Clayton Cnty*, 140 S. Ct. 1731, 1746 (2020).

[29] The Court is also not persuaded by Defendants' reliance on *Dobbs*. Writing for the majority in *Dobbs*, Justice Alito explained that the Supreme Court's precedent had made it clear that regulation of abortion is not a sex-based classification. 142 S. Ct. 2228, 2245–2246 (2022). Unlike SB1, laws regulating pregnancy generally do not make explicit sex-based classifications. Therefore, the Court does not find *Dobbs* instructive in determining whether SB1 discriminates on the basis of sex.

For these reasons, the Court finds that SB1 contains a sex-based classification on its face, and therefore intermediate scrutiny is warranted.[30]

### b) Disparate Treatment Based on Transgender-Status is a Form of Imposing Disparate Treatment Based on Sex

Although the Court has found that SB1 on its face subjects individuals to disparate treatment on the basis of sex, the Court also agrees with Plaintiffs that SB1 subjects individuals to disparate treatment on the basis of sex because it imposes disparate treatment based on transgender status.[31] In support of their argument that SB1 imposes disparate treatment on the basis of sex,

---

[30] The Court is able to conclude that intermediate scrutiny applies to this sex-based classification without any need to apply the four-factor test to determine whether the classification is a quasi-suspect classification (and thus subject to intermediate scrutiny *on that basis*). The Supreme Court has made clear, even without using the terms "quasi-suspect classification" or "intermediate scrutiny," that classifications based on sex are subject to the above-referenced test that applies to laws subject to "intermediate scrutiny." *See U.S. v. Virginia*, 518 U.S. 515, 524 (1996).

[31] There is a subtle, though potentially not a practically consequential, distinction between (a) finding that SB1 contains a sex-based classification because it explicitly delineates based on sex and (b) a finding that SB1 contains a sex-based classification because it imposes disparate treatment based on transgender status. The first finding may be thought of as a finding of a "directly" sex-based classification, and the latter finding may be thought of as a finding of an "indirectly" sex-based classification

A finding that SB1 makes a directly sex-based classification is appropriate because as demonstrated in Section (2)(B)(ii)(a), the Court could draw its conclusion that SB1 makes a sex-based classification without ever using the word "transgender." Indeed, one would not even have to know what "transgender" means to be able to determine that SB1 contains a sex-based classification. For example, § 6-33-103(a)(1)(A) bans medical procedures if they are used to enable "a minor to identify with, or live as, a purported identity inconsistent with the minor's sex." Tenn. Code Ann. § 68-33-103(a)(1)(A). Even without any knowledge of what it means to be transgender or of the condition of gender dysphoria, one would know, based on the text of SB1, that it is a minor's sex in relation to the minor's gender identity that determines whether the minor is subject to ban under SB1. One would also understand that if the minor's gender identity was not different from that minor's sex at birth—and thus was consistent with his or her sex at birth—that treatment would be available. This is an explicit (*i.e.,* direct) sex-based classification.

A finding that SB1 makes an indirectly sex-based classification is slightly different. Rather than relying primarily on the text of SB1, this finding hinges on the definition of the term "transgender": incongruence between a person's sex at birth and the person's gender identity. To determine whether to find that SB1 indirectly makes a sex-based classification, the Court first must determine whether SB1 in fact imposes disparate treatment on the basis of transgender status, and, if so, then determine whether disparate treatment on the basis of transgender status necessarily entails disparate treatment on the basis of

Plaintiffs rely on the rationale of the Court in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020) and of the Sixth Circuit in *Smith v. City of Salem*, 378 F.3d 566 (6th Cir. 2004). Both of these cases involved the question of whether discrimination based on *transgender status* necessarily constitutes discrimination on the basis of sex.

In *Bostock*, the Court had to determine whether Title VII's proscription against discrimination "because of such individual's . . . sex" encompassed discrimination on the basis of an individual's status as transgender. *See* 140 S. Ct. 1731 (2020). Writing for the majority, Justice Gorsuch explained that "it is impossible to discriminate against a person for being [] transgender without discriminating against that individual based on sex." *See id.* 140 S. Ct. at 1741. As the Court explained,

> [T]ake an employer who fires a transgender person who was identified as a male at birth but who now identifies as a female. If the employer retains an otherwise identical employee who was identified as female at birth, the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth. Again, the individual employee's sex plays an unmistakable and impermissible role in the discharge decision.

*See id.* 140 S. Ct. at 1741–1742.[32] Although *Bostock* was a Title VII case, the Court finds that its rationale is applicable to Plaintiffs' equal protection claim. As discussed above, SB1 bans any

---

sex, *i.e.*, a sex-based classification. Therefore, whether SB1 contains a sex-based classification on the grounds that it may impose disparate treatment based on transgender-status is a separate (though undoubtedly related inquiry) as to whether SB1 contains a sex-based classification due to an explicit delineation based on sex. The Court finds it valuable to discuss the arguments for (and against) each of these two potential findings.

[32] Defendants argue that (unlike in the employment context involved in *Bostock*) in medical-related contexts like the ones implicated by SB1, the physical differences between the sexes legitimately can be taken into account. The Court does not agree with Defendants, however, that this distinction weighs against the application of *Bostock*'s rationale to this case; this is because Justice Gorsuch's reasons for why discrimination based on transgender status is discrimination based on sex were not at all affected by or specific to the Title VII-related context implicated in *Bostock*; his reasons were general in nature rather than context-specific. And the Court notes that "inherent differences" between the sexes is one of the primary bases on which the Supreme Court has relied to justify the imposition of intermediate, rather than strict, scrutiny. *See U.S. v. Virginia*, 518 U.S. 515, 533–534 (1996) (explaining that something less than strict

minor from accessing certain medical procedures if their purpose is either to allow the minor to live inconsistently with the minor's sex at birth or to treat gender dysphoria. Both of these bans affect only transgender minors. The Court need not rehash (and declines to second-guess) the reasoning of *Bostock* here; suffice it to say that discordance between a person's sex at birth and gender identity is what makes the person transgender. Indeed, if the person's sex at birth had been different than it actually was (and thus was not discordant with the person's gender identity), the person would not be transgender despite having the same gender identity. Therefore, in the Equal Protection context, disparate treatment based on being transgender is disparate treatment based on sex. *See Eknes-Tucker*, 603 F. Supp. 3d at 1147 (relying on *Bostock* to support conclusion that discrimination based on transgender status in the equal protection context constitutes discrimination based on sex); *Brandt*, 551 F. Supp. 3d at 889 (citing *Bostock* in support of finding that heightened scrutiny applied to the plaintiffs' equal protection claim that the law at issue discriminated on the basis of transgender status).

In arguing that the rationale of *Bostock* does not apply in this case, Defendants assert that disparate treatment based on transgender status cannot be disparate treatment based on sex because in the decades after ratification of the Fourteenth Amendment, laws prohibiting cross-dressing were common. (Doc. No. 112 at 10). This argument suffers from several problems.

The mere existence of these laws does not mean that they were constitutional. As Justice Thomas very recently noted: "'Standing alone,' . . . 'historical patterns cannot justify contemporary violations of constitutional guarantees,' *Marsh v. Chambers*, 463 U. S. 783, 790 (1983), even when the practice in question 'covers our entire national existence and indeed predates it,' *Walz v. Tax*

---

scrutiny applies to sex-based classification because "[p]hysical differences between men and women" are "enduring" and "inherent").

*Comm'n of City of New York*, 397 U.S. 664, 678 (1970)." *United States ex rel. Polansky v.*

*Executive Health Resources, Inc.*, 143 S. Ct. 1720 at 1740–1741 (2023) (Thomas, J., dissenting).[33]

---

[33] The Court does not fault Defendants for drawing the Court's attention to laws passed after the ratification of the Fourteenth Amendment to support their argument that SB1 does not unlawfully impose disparate treatment based on sex due to its targeting of transgender individuals. Defendants' approach here, with its focus on events close to the time that the Fourteenth Amendment was originally added to the U.S. Constitution (upon ratification), may seem to reflect some form of originalist interpretation of the Constitution. Indeed, those who subscribe to "original public meaning" originalism have in the past looked to post-ratification practices to determine the original public meaning of constitutional provisions. *See, e.g., New York State Rifle Assoc., Inc. v. Bruen*, 142 S. Ct. 2111, 2136 (2022) (explaining that the Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008) found that evidence of how the Second Amendment was interpreted immediately after its ratification was a "critical tool of constitutional interpretation"). However, as Justice Thomas recently explained in writing for the majority in *Bruen*, the use of post-ratification practices as evidence of original public meaning has some serious limitations. As Justice Thomas explained, "we must guard against giving postenactment history more weight than it can rightly bear." *See Bruen*, 142 S. Ct. at 2136–37. Justice Thomas went on to explain that "where a governmental practice has been *open, widespread, and unchallenged* since the early days of the Republic, the practice should guide our interpretation of an ambiguous constitutional provision." *See id.* (internal quotation marks omitted) (emphasis added). Defendants' references to laws passed at the time of the ratification of the Fourteenth Amendment, without more, do not meet the standard set forth in *Bruen* as to when a court can rely on post-ratification practices.

Without attempting or purporting to give a general primer on originalism, the Court further notes that original public meaning originalism, though likely the most prominent form of originalism as of late, is not the only type of originalism that exists. There are multiple forms of originalism, and more forms are conceived of and discussed by scholars over time. A *See* Lawrence B. Solum, *Originalism Versus Living Constitutionalism: The Conceptual Structure of the Great Debate*, 113 Nw. U. L. Rev. 1243, 1296 (2019) (listing the four primary types of originalism as 1) "public meaning," 2) "intentionalism," 3) "original methods," and 4) "original law."); Lorianne Updike Toler et. al., *Pre-"Originalism,"* 36 Harv. J.L. & Pub. Pol'y 277, 290 (2013) ("Originalism has evolved, much like the Reformation, in a near-linear ideological succession until, in recent years, it has spawned a myriad of ideological streams. These camps include Intentionalism, first Framers' Intentionalism and then Ratifiers' Intentionalism, and Original Public Meaning--whose variants include Semantic Originalism, Original Expected Application Originalism, and Original Methods Originalism."). Although (as just discussed) original public meaning originalism finds some value—albeit in limited circumstances—in post-ratification practices, not all originalists place such emphasis on laws passed (or informal practices that were common) close in time to the enactment of certain provisions of the Constitution.

For some schools of originalist thought, reliance on post-Fourteenth Amendment ratification practices is inappropriate. One early school of originalism, for example, posits that "the meaning of the Fourteenth Amendment reposes in the intentions of its congressional drafters, rather than in those of its state legislative ratifiers" (or, it follows, in the acts of state legislature in the decades following ratification). *See* Michael J. Klarman*, Brown, Originalism, and Constitutional Theory: A Response to Professor McConnell*, 81 Va. L. Rev. 1881, 1934 (1995) (setting forth the author's view of the kind of originalism embraced by Professor (later Circuit Judge) and now-again Professor Michael McConnell). Under this

And a plurality of the Supreme Court has outright rejected the historical approach urged by Defendants. *See Frontiero v. Richardson*, 411 U.S. 677 (1973) (finding statute that discriminated based on sex violated the Equal Protection Clause despite numerous laws passed in the 19th century that discriminated against women) (plurality).[34] Moreover, the Court does not write on a blank slate in finding that *Bostock*'s rationale applies to the equal-protection context. The Sixth Circuit has already found that a rationale similar to that provided in *Bostock* under Title VII applies to equal protection claims.[35]

In *Smith v. City of Salem Ohio*, the Sixth Circuit considered whether Jimmie Smith, a former lieutenant of the Salem Fire Department, had stated a Title VII claim and equal protection claim based on sex discrimination after being pressured to resign and ultimately suspended due to being transgender. 378 F.3d 566 (6th Cir. 2004). In addressing the Title VII claim, the court found that Smith had stated a claim for impermissible sex-stereotyping because the complaint pled facts that Smith had suffered adverse actions due to non-conformance to Smith's sex at birth. *See id.* at 575. Relying on *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), the court explained that an employer who discriminates against a person (like Smith) whose sex is female a birth because the

---

school of originalism, the Fourteenth Amendment should not be interpreted based on the laws passed thereafter by state legislatures.

[34] Although the plurality's analysis in *Frontiero* is not binding, the Court finds it persuasive and therefore affords it significant weight.

[35] Similarly unpersuasive is Defendants' reliance on *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318 (6th Cir. 2021), for the proposition that *Bostock*'s rationale is necessarily limited to the Title VII context. True, in *Pelcha*, the Sixth Circuit found that *Bostock*'s reasoning under Title VII did not govern the outcome of the plaintiffs' ADEA claim. In arriving at this conclusion, however, the Sixth Circuit noted that there was binding precedent from the Supreme Court on the ADEA-related issue before the court, and therefore it need not defer to *Bostock*. *See id.* at 324. By contrast, in this case, there is no binding precedent to dictate the outcome on whether disparate treatment based on transgender status constitutes disparate treatment based on sex for purposes of the Equal Protection Clause. True, in the present context, *Bostock* is not binding, and the Court does not treat it as such. The Court, however, does find the rationale of *Bostock* to be analytically applicable.

person does not "wear dresses or makeup," is culpable of "engaging in sex discrimination because the discrimination would not occur but for the victim's sex."[36] *See Smith*, 378 F.3d at 574. The court went on to find that "sex stereotyping based on a person's gender non-conforming behavior is impermissible discrimination, irrespective of the cause of that behavior; a label, such as 'transsexual,' is not fatal to a sex discrimination claim where the victim has suffered discrimination because of his or her gender non-conformity." *See id.* at 575.

Turning then to Smith's equal protection claim, the court found that the facts pled by Smith in support of a Title VII claim "easily constitute a claim of sex discrimination grounded in the Equal Protection Clause of the Constitution." *See id.* at 577. The court therefore viewed its Title VII analysis as applying to the equal protection claim. Furthermore, in finding that Smith had stated an equal protection claim, the court did not concern itself with laws passed following the ratification of the Fourteenth Amendment that also may have discriminated based on sex. Although the reasoning under Title VII was slightly different in *Bostock* than in *Smith*, the court's analysis in *Smith* demonstrates that when it comes to discrimination based on sex, reasoning used to analyze a claim under Title VII can be applied with relative ease to a claim under the Equal Protection Clause based on the same facts (and that the Sixth Circuit has endorsed this approach on at least one occasion). The analysis of the court in *Smith*, coupled with the rejection of the historical

---

[36] It makes perfect sense that a person whose sex is female at birth does not have to conform with traditional (or purportedly traditional) notions of how females are to act; as the expression goes, this is a free country, after all, and persons do not have to conform to traditional or stereotypical notions of how a female or male is supposed to act or appear. *Smith* stands for the proposition that there are multiple ways females may act or appear. That being so, one might ask what it means to have a "female" gender identity, since being "female" can mean multiple things—different things to different people. But a person born male who is transgender is transgender because they self-identify as "female," irrespective of *why* the person identifies as female and what exactly the person believes it means to be "female." Likewise, a person born female who is transgender is transgender because they self-identify as "male," irrespective of why they identify as male and what exactly the person believes it means to be "male."

approach by the plurality *Frontiero*, clearly militates against Defendants' argument that *Bostock*'s rationale cannot be extended to the present case.[37]

In summary, the Court finds that SB1 imposes disparate treatment based on sex due to the fact that the law on its face includes a sex-based classification. In the alternative, the Court also finds that SB1 imposes disparate treatment based on sex because it treats similarly-situated individuals differently based on transgender status. For these reasons, in addition to the Court's finding that SB1 discriminates based on transgender status and that transgender individuals constitute a quasi-suspect class, SB1 must survive intermediate scrutiny. The Court now turns to whether the record supports Defendants' contention that SB1 is substantially related to an important state interest.

    *iii.* *Weight of Defendants' Expert Testimony*[38]

At the outset, the Court agrees with Plaintiffs that the testimony of Dr. Cantor and Dr. Hruz is minimally persuasive[39] given that neither of them state that they have ever diagnosed or treated a minor with gender dysphoria. This apparent deficiency in their experience as to the topics to which they testify is relevant given that Plaintiffs present several experts that have diagnosed and treated hundreds of individuals with gender dysphoria. This diminution of their testimony is consistent with the findings of other courts on this issue. For example, in assessing whether Dr. Hruz could testify as an expert, the court in *Kadel* found that

> Hruz is not qualified to offer expert opinions on the diagnosis of gender dysphoria, the DSM, gender dysphoria's potential causes, the likelihood that a patient will

---

[37] Having provided three alternative bases for the application of intermediate scrutiny, the Court need not decide whether SB1 also discriminates based on sex due to sex-based stereotyping.

[38] In referring to the parties' "experts," the Court means only that the parties wish these individuals to be treated as experts by the Court. These individuals have not been certified as experts.

[39] Notably, the Court here is concerned with the relative persuasiveness of the two sides' experts based on the current record, and not with declaring which side's experts ultimately are in the right.

"desist," or the efficacy of mental health treatments. Hruz is not a psychiatrist, psychologist, or mental healthcare professional. He has never diagnosed a patient with gender dysphoria, treated gender dysphoria, treated a transgender patient, conducted any original research about gender dysphoria diagnosis or its causes, or published any scientific, peer-reviewed literature on gender dysphoria.

*See Kadel*, 620 F. Supp. 3d at 364; *see also Eknes-Tucker*, 603 F. Supp. 3d at 1142–1143 (giving Dr. Cantor's testimony "very little weight" because he had never provided care to a transgender minor under the age of sixteen). Most recently, Judge Hinkle commented that Dr. Hruz's testimony was that of a "deeply biased advocate, not [] an expert sharing relevant evidence-based information and opinions," which then led Judge Hinkle to credit Hruz's testimony only insofar as it was consistent with that of other defense experts. *Ladapo*, 2023 WL 3833848, at *2 n.8. The undersigned sees no current need or basis to accuse Dr. Hruz of being a deeply biased advocate posing as an expert, but he does discern the need to discount Dr. Hruz's testimony somewhat for the reasons mentioned.

Although research may be a reasonable basis on which to form conclusions, ultimately individuals who have never administered the medical procedures banned by SB1 or sought to mitigate the risks lack real-world experience regarding the negative side effects allegedly associated with these treatments.[40]

---

[40] The Court also notes that the testimony of both Dr. Laidlaw and Dr. Levine, on topics virtually identical to those on which they testify on behalf of Defendants in this case, has been treated by courts with a dose of skepticism. *See Edmo v. Idaho Dep't of Correction*, 358 F. Supp. 3d 1103, 1125–1126 (D. Idaho) ("Dr. Levine is considered an outlier in the field of gender dysphoria and does not ascribe to the WPATH Standards of Care. []. His training materials do not reflect opinions that are generally accepted in the field of gender dysphoria."), *affirmed in relevant part by* 935 F.3d 757 (9th Cir. 2019); *C.P. by and through Pritchard v. Blue Cross Blue Shield of Ill.*, 3-20-cv-06145, 2022 WL 17092846 (W.D. Wash. Nov. 21, 2022) (allowing Dr. Laidlaw to testify as an expert but finding that it is a "close question" given that "[l]ess than five percent of his patients are under the age of 18 and he has treated two patients with gender dysphoria. []. He has done no original research on gender identity and bases his opinions on his general experience as an endocrinologist and a review of literature."). The Court need not decide at present whether it shares the same kind of skepticism, and instead notes that it understands these courts' concerns but also does not treat a person's status as a so-called "outlier" as *per se* dispositive of whether the person's testimony should be excluded or discounted.

The Court acknowledges that typically credibility determinations in resolving a motion for a preliminary injunction can be made only where a court has held an evidentiary hearing. *See Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 553 (6th Cir. 2007). The Court, however, provided the parties with an opportunity to have an evidentiary hearing that included testimony from the parties' respective experts, but the parties did not indicate to the Court that they found such a hearing necessary before the resolution of the present Motion.[41] Therefore, in the Court's view, the parties have waived any argument that the Court cannot make credibility findings based on the written evidence of the parties' experts.

### iv.    WPATH and Endocrine Society Guidelines

Next, the Court finds it necessary to evaluate the parties' arguments regarding the reliability of the WPATH and Endocrine Society guidelines. WPATH is the leading association of medical and mental health professionals in the treatment of transgender individuals. (Adkins Decl. at 3). The Endocrine Society is an organization representing more than 18,000 endocrinologists. (*Id.* at 6). The Endocrine Society and WPATH have published widely accepted guidelines for treating gender dysphoria. (*Id.* at 6). The guidelines are based on scientific research and clinical experience. (*Id.*). The guidelines have been endorsed by the American Academy of Pediatrics ("AAP"), which is an association representing more than 67,000 pediatricians. (*Id.*). AAP, WPATH, and the Endocrine Society are the largest professional associations in these fields of medicine in the United States. (*Id.*). On behalf of Plaintiffs, Dr. Adkins has testified that the "[t]he Endocrine Society Guideline for treatment of gender dysphoria is comparable to other clinical practice guidelines that I follow as a pediatric endocrinologist to treat other medical conditions

---

[41] The transcript of the Court's conversation with the parties on this issue is available at Doc. No. 125.

such as those practice guidelines for Congenital Adrenal Hyperplasia (CAH) and Polycystic Ovary Syndrome (PCOS)." (*Id.* at 8).

Defendants attempt to discredit the WPATH and Endocrine Society guidelines by pointing out that the conclusions contained therein are based on "low-quality evidence." (Doc. No. 112 at 15). The Court does not begrudge Defendants trying to make hay out of this, but ultimately Defendants' argument is not persuasive. As explained by Dr. Antommaria, the Grading of Recommendations Assessment, Development, and Evaluation ("GRADE") system permits conclusions to be drawn based on what is considered "low-quality evidence." (Doc. No. 142 (Rebuttal Declaration of Dr. Armand H. Matheny Antommaria) at 6). And as Dr. Antommaria demonstrated, the WPATH and Endocrine Society guidelines, to the extent that they rely on what is considered "low-quality evidence," are not unique in this respect. For example, 20% of the American Heart Association's Guideline for Pediatric Basic and Advanced Life Support include strong recommendations based on evidence of similar quality. (*Id.*). That portions of the Endocrine Society and WPATH guidelines are based on "low-quality evidence" as determined by the GRADE system is therefore not itself a reason to find the guidelines unreliable. The court in *Ladapo*, in assessing the argument regarding "low quality evidence," arrived at the same conclusion:

> [T]he fact that research-generated evidence supporting these treatments gets classified as "low" or "very low" quality on the GRADE scale does not mean the evidence is not persuasive, or that it is not the best available research-generated evidence on the question of how to treat gender dysphoria, or that medical treatments should not be provided consistent with the research results and clinical evidence. It is commonplace for medical treatments to be provided even when supported only by research producing evidence classified as "low" or "very low" on this scale

2023 WL 3833848, at *11. The Court finds further support for its reliance on information contained in the guidelines in the fact that several courts in cases similar to this have relied on

these guidelines. *See, e.g.*, *id.* (finding that WPATH and Endocrine Society guidelines represent the well-established standards of care for treatment of gender dysphoria); *Eknes-Tucker*, 603 F. Supp. 3d at 1138 (relying on WPATH guidelines and explaining that "[t]he American Medical Association, the American Pediatric Society, the American Psychiatric Association, the Association of American Medical Colleges, and at least eighteen additional major medical associations endorse these guidelines as evidence-based methods for treating gender dysphoria in minors."); *Edmo v. Corizon Inc.*, 935 F.3d 757, 769 (9th Cir. 2019) (noting that most courts agree that the WPATH guidelines are the international recognized guidelines for treatment of individuals with gender dysphoria); *Crouch*, 618 F. Supp. 3d at 329–330 (explaining that the Endocrine Society has published "a clinical practice guideline providing protocols for the medically necessary treatment of gender dysphoria."). The Court thus evaluates Defendants' evidence in light of the prevailing standards of care and conclusions contained in the WPATH and Endocrine Society guidelines, as well as compared to the testimony of Plaintiffs' experts.

> *v.    Important State Interest*

When a law contains a quasi-suspect classification or treats individuals differently based on their membership in a quasi-suspect class, the law must survive intermediate scrutiny. The Supreme Court has stated that intermediate scrutiny requires that the law be supported by an "exceedingly persuasive justification."[42] *See, e.g.*, *Bd. of Educ. of the Highlocal Local School*

---

[42] The undersigned notes that the crux of the Equal Protection Clause is protection against differential treatment for individuals who are similarly situated. Therefore, unlike in a substantive due process claim, in an equal protection claim challenging a regulation of or ban on certain activity, the assertion is not that the state cannot impose the regulation or ban. Instead, the assertion is that the state is (improperly) treating *a particular class of persons differently* with respect to the regulation or ban—meaning, in the instant case, imposing a ban on specific activities upon a particular class of persons while allowing those outside that class to engage in that activity. Naturally, if a state cannot persuade a court that it has an important interest banning specific activity *at all* (i.e.*, for anyone)*, then the court need not turn to whether the differential

*Dist.*, 208 F. Supp. 3d at 871 (explaining that the Supreme Court has consistently found that a party seeking to defend "discriminatory classifications on the basis of sex must offer" an exceedingly persuasive justification). But the Supreme Court has also stated more specifically that to meet this burden, the state must demonstrate that the law is substantially related to an important state interest. *See id.* The state interest must be real rather than speculative. *See id.* The Court will rely on the specific test for intermediate scrutiny, rather than the ultimately unhelpful characterization that intermediate scrutiny requires an "exceedingly persuasive justification." *See United States v. Virginia*, 518 U.S. 515, 573 (1996) (Scalia, J., dissenting) (criticizing the majority opinion finding Virginia Military Institute's exclusion of women from citizen-solider training violative of the Equal Protection Clause, on the ground that it is supported "[o]nly by the amorphous 'exceedingly persuasive justification' phrase, and not the standard elaboration of intermediate scrutiny.").

Defendants assert that the state has an important interest in protecting minors from the risks associated with the medical procedures banned by SB1 because ultimately the risks outweigh the benefits. (Doc. No. 112 at 14–21). Unsurprisingly, Plaintiffs argue the inverse—that the state does not have an important interest, because (according to Plaintiffs) the benefits outweigh the risks associated with these procedures.

The Court finds it prudent to make a few initial observations about what some may expect the effects to be of the medical procedures banned by SB1. It is feasible that one might assume

---

treatment (*i.e.*, banning the activity only for a particular class of persons) is justified. To be sure, these issues can bleed together in an equal-protection analysis.

With regard to SB1, the Court finds it prudent to assess whether the state has demonstrated an important interest in banning certain medical procedures. The Court also discusses whether the state has justified differential treatment under the Equal Protection Clause.

that because these procedures are intended to have the treated minor's body do something that it otherwise would not do (rather than allow the body to function in a purportedly "natural" manner), the procedure must be "bad" or "harmful" to the minor. But assumptions are not a sufficient evidentiary basis on which to resolve a motion for a preliminary injunction. And unlike individuals that may base their conclusions about the effects of the procedures banned under SB1 on mere assumptions, the Court fortunately has a voluminous (albeit still preliminary) evidentiary record on which to base its current conclusions. Thus, the Court can, must, and does base its current conclusions on the record to date, without resort to any unsupported, bare medical assumptions.

### a) Defendants' Allegations of Harms Caused by the Medical Procedures Banned by SB1

According to Defendants, the negative side effects from the medical procedures banned by SB1 include risk of "delayed development, permanent sterilization, loss of sexual function, decreased bone density, increased risk of cardiovascular disease and cancer, negative psychological consequences, and a lifetime dependence on these drugs." (Doc. No. 112 at 14). In making these allegations, Defendants rely on the testimony of Drs. Cantor, Hruz, Levine and Laidlaw. As noted above, the Court finds Dr. Cantor and Hruz's testimony minimally persuasive based on the current record. The Court addresses each possible negative side effect in turn in light of the record.[43]

---

[43] The Court does not find it necessary to address in detail Defendants' allegation that the medical procedures banned by SB1 may lead to a lifetime dependence on certain medications. Defendants do not explain why such dependence should itself be considered a negative side effect. The Court, however, can infer that generally speaking, having to take medications every day is an inconvenience. To the extent that this is what Defendants mean when referring to the drawback of a lifetime of dependence, the Court is confident that helping individuals avoid this inconvenience is not an important government interest. Moreover, however severe this inconvenience may be, Minor Plaintiffs do not indicate that such inconvenience would dissuade them from pursuing their treatment. Unlike the purported *medical risks*— which the Court acknowledges may not be disregarded in the Court's analysis solely because Minor

As for causing delayed development (a reference, the Court presumes, to brain development), Defendants rely on the testimony of Dr. Cantor. (Doc. No. 112 at 15). A review of his testimony on this topic reveals that Dr. Cantor does not provide a conclusion that treatment for gender dysphoria has a negative impact on brain development. (Doc. No. 113-3 ("Cantor Decl.") at 98) (explaining that there have been no "substantial studies to identify such impacts" and that the only two existing studies had "conflicting results"). By contrast, Dr. Adkins, who has treated hundreds of transgender "youth,"[44] testified that "[t]here is no research suggesting that treatment has negative impact on brain development or executive functioning and I have not seen this in my practice at all." (Doc. No. 141 ("Adkins Rebuttal Decl.") at 7). In light of the weaknesses in Dr. Cantor's testimony and the support for Dr. Adkins' conclusion provided by her experience with treating transgender youth, the Court is not persuaded that the medical procedures banned by SB1 pose a risk of delayed development.

The risk discussed perhaps most extensively by Defendants' experts is the risk that a patient can experience infertility as a result of the procedures banned by SB1. (Doc. Nos. 113-5 ("Levine Decl.") at 70, Laidlaw Decl. at 21). However, the evidence of record overwhelmingly demonstrates that many individuals receiving puberty blockers or cross-sex hormones will remain fertile for procreation purposes, and that the risk of negative impacts on fertility can be mitigated.

---

Plaintiffs are willing to bear them—*inconvenience* occasioned by dependence on medications seems like a matter of interest solely to the individual who is inconvenienced.

To the extent that Defendants instead mean that a lifetime of dependence is bad because it exposes the patient to the medical risks associated with the medications, the Court believes that it has herein adequately accounted for these risks in its analysis.

[44] Dr. Adkins does not define the term "youth," but the Court infers that at least a portion of, if not all, the individuals that Dr. Adkins considers "youth" are minors.

In her declaration, Dr. Adkins testified that "[m]any transgender individuals conceive children after undergoing hormone therapy. Pregnancy among trans men after undergoing testosterone therapy is very common." (Adkins Rebuttal Decl. at 12); Doc. No. 30 ("Antommaria Decl.") at 19 ("[T]ransgender men and women are also capable of producing eggs and sperm respectively both during and after the discontinuation of gender-affirming hormone treatment")). Indeed, as explained by Dr. Adkins, "a recent eight-year study found that four months after stopping testosterone treatment, transgender men had comparable egg yields to non-transgender women." (Adkins Rebuttal Decl. at 12). Dr. Adkins also acknowledged that patients who move directly from puberty blockers to cross-sex hormones (referred to by Dr. Adkins as "gender-affirming hormones") may have their fertility impacted. (*Id.*). For these patients, fertility preservation options are available. (*Id.*). For example, as Dr. Janssen has explained, he has had adolescent transgender patients "who chose to preserve their sperm and or eggs for future assisted reproduction by stopping puberty suppression briefly before initiating gender-affirming hormones [*i.e.* cross-sex hormones]." (Doc. No. 31 ("Janssen Decl.") at 16).

The testimony of Plaintiffs' experts is consistent with the information provided by the WPATH and Endocrine Society guidelines. Indeed, the WPATH guidelines explain that "there is evidence that fertility is still possible for individuals taking estrogen and testosterone." (Doc. No. 113-9 ("WPATH Guidelines") at 90).[45] Though the record does reflect that the procedures banned

---

[45] The guidelines also recommend that healthcare providers take measures to ensure that any patients facing risk of harm to fertility provide informed consent for procedures giving rise to this risk. For example, the WPATH guidelines also state that physicians should "discuss the potential impact of hormone therapy on fertility prior to initiation. This discussion should include fertility preservation options . . . ." (WPATH Guidelines at 90). The Endocrine Society guidelines contain very similar guidance. (Endocrine Society Guidelines at 4 ("We recommend that clinicians inform and counsel all individuals seeking gender-affirming medical treatment regarding options for fertility preservation prior to initiating puberty suppression in adolescents and prior to treating with hormonal therapy of the affirmed gender in both adolescents and adults.").

by SB1 pose some risk to fertility, it also demonstrates that not all individuals will experience this negative side effect of the treatments and that there are fertility preservation measures available to those who have concerns about fertility. The Court is therefore not convinced that possible negative impacts on fertility warrant an outright ban on procedures used to treat gender dysphoria in minors.

Defendants' expert Dr. Levine contends that some individuals who have received puberty blockers and then received cross-sex hormones will experience a "diminished sexual response."[46] (Levine Decl. at 70–71). Notably, Dr. Levine neither cites studies or research in support of these contentions nor defines in any way what he means by "some" individuals. Without additional detail, the Court is left in the dark as to what Levine believes the prevalence of this risk to be in individuals who receive the described treatment. Dr. Levine, seemingly without a basis, also speculates that physicians and parents are likely too "uncomfortable" to discuss this side effect with patients. (*Id.* at 71).

Moreover, the guidelines tell a different story on all fronts. The Endocrine Society guidelines state that "genital sexual responsivity and other aspects of sexual function are usually preserved" even following genital-affirming surgery.[47] (Endocrine Society Guidelines at 26). The WPATH guidelines, while acknowledging the risk of negative effects on sexual function, also state that "gender affirming care can help [transgender individuals] improve their sexual function and

---

[46] Though Dr. Levine does not define "sexual response," the Court infers that he is referring to the ability of an individual to participate in sexual intercourse free of abnormal obstacles.

[47] The Court acknowledges that the content of the Endocrine Society and WPATH guidelines is hearsay to the extent that it sets forth *assertions* that are cited *for the truth of the matter asserted* (as opposed to, for example, *recommendations*, which are not assertions at all). The Court, however, can rely on hearsay in resolving the instant Motion. *See Doe #11*, 609 F. Supp. 3d at 592. Furthermore, Defendants are the ones who put the guidelines in the record. Therefore, Defendants have exposed themselves to the Court's present reliance the guidelines, including aspects of the guidelines that constitute hearsay.

increase their sexual pleasure and satisfaction." (WPATH Guidelines at 170). The guidelines also recommend that physicians discuss with patients possible adverse consequences on sexual function.[48] For the reasons stated, the Court does not find Dr. Levine's testimony on this subject persuasive, particularly in light of the conclusions contained in the guidelines that contradict his findings.

Dr. Levine also testified to the concerns of bone density problems in connection with the administration of puberty blockers. (Levine Decl. at 66). Although Dr. Levine testified that the treatment cannot be considered "safe," he also admits that the "available evidence remains limited and conflicting" and that some "studies have found less-concerning effects on bone density." (*Id.*). And Dr. Adkins' testimony reveals that studies have shown "no changes in bone mineralization" among patients who received puberty blockers for a period of three to five years for precocious puberty. (Adkins Rebuttal Decl. at 6–7). Dr. Adkins also explains that the longest her patients receive puberty blockers is three years.[49] (*Id.* at 8). Given that Dr. Levine's testimony itself contains the above-discussed inconsistencies and illogical inferences, and in light of the testimony of Dr. Adkins, the Court is not persuaded that puberty blockers pose a serious risk to a patients' bone density. The Court also notes that it is not alone in observing that Dr. Levine's testimony includes illogical inferences that undermine his conclusions. *See Norsworthy v. Beard*, 87 F. Supp.

---

[48] (WPATH Guidelines at 167 ("We recommend health care professionals who provide care to transgender and gender diverse people discuss the impact of gender-affirming treatments on sexual function, pleasure, and satisfaction.")). The Court further notes that Dr. Laidlaw's testimony regarding loss of sexual function is equally as unpersuasive as Dr. Levine's testimony on the subject. In discussing the potential impact of gender-affirming treatment on sexual function, Dr. Laidlaw relies on the presentation of an individual who appeared on a reality TV show. (Laidlaw Decl. at 22).

[49] The Court further notes that the record does not reflect that puberty blockers are administered for more than five years when used to treat gender dysphoria.

3d 1164, 1188 (N.D. Cal. 2015) (giving Dr. Levine's opinions "very little weight" given that his report "contains illogical inferences").

Relying on the testimony of Dr. Laidlaw and Levine, Defendants allege that the procedures banned by SB1 also increase the risk of cardiovascular disease. Dr. Levine's testimony on this topic is not persuasive. Levine explains that although there may be an increased risk of cardiovascular issues with the use of cross-sex hormones, he agrees with the Endocrine Society committee that there is insufficient evidence to conclude that these procedures have the outcome of increased risk of cardiovascular disease and that more research is necessary. (Levine Decl. at 71).

Dr. Laidlaw's testimony regarding an increased risk of cardiovascular disease appears to rest on firmer ground than that of Dr. Levine, but it ultimately falls short in light of the additional evidence in the record pertaining to this subject. (Laidlaw Decl. at 31–35). Beginning with Dr. Adkins' rebuttal declaration, based on treating over 600 "youth" for gender dysphoria, Dr. Adkins testified that an increased risk of cardiovascular disease in transgender women is "usually only present when a patient is denied care and self-administers the treatment without appropriate clinical supervision." (Adkins Rebuttal Decl. at 9–10). Dr. Adkins further stated that "[t]ransgender men do not have more cardiovascular disease like stroke or heart attack than cisgender men," and that risks of cardiovascular disease in transgender women (which Adkins explains can be present when the patient is taking older formulations of estrogen) can be ameliorated through being closely monitored by a physician. (*Id.* at 10).[50]

---

[50] The Court recognizes that not all transgender individuals receive hormone therapy. Although Dr. Adkins at times refers to individuals experiencing certain side effects as "transgender men" or "transgender women," her declaration indicates that she is referring specifically to individuals who do in fact receive hormone therapy.

Dr. Adkins' testimony is also consistent with the WPATH and Endocrine Society guidelines. For example, the WPATH guidelines state that primary care physicians can mitigate against the risk of cardiovascular disease during hormone therapy by "providing a timely diagnosis and treatment of risk conditions and by tailoring their management in a way that supports ongoing gender-affirming interventions." (WPATH Guidelines at 150); (Endocrine Society Guidelines at 24 ("Clinicians should manage cardiovascular risk factors as they emerge according to established guidelines.")).[51] The weight of the evidence, including the testimony of Defendants' own expert (Dr. Levine), supports the conclusion that any increased risk of cardiovascular disease in patients receiving treatment for gender dysphoria is either speculative or, to the extent that such risk exists, it can be mitigated by the treating physician.

Finally, the Court turns to Defendants' allegation that treatment for gender dysphoria increases the risk of cancer. In support of this allegation, Defendants cite relevant portions of Drs. Cantor, Hruz, and Laidlaw's declarations, all of whom aver that hormone treatment may lead to an increased risk of certain cancers. (Cantor Decl. at 102, Doc. No. 113-4 (Declaration of Dr. Hruz) at 41, Laidlaw Decl. at 31–32). Dr. Adkins, by contrast, testified that in her clinical experience,

---

[51] The WPATH guidelines' observation that these risks "can" and "should" be mitigated does not speak to how successful, or how often successful, mitigation measures are. But from the observation that risks "can" be mitigated, it is inferable that mitigation has been shown to be possible; the observation thus constitutes evidence (albeit underwhelming evidence standing alone) to the effect that mitigation is possible.

The Court acknowledges that the record at this stage does not support a conclusion regarding the degree of effectiveness of the mitigation techniques discussed in the guidelines and by Plaintiffs' experts in lessening the chance and severity of negative side effects caused by the treatments banned under SB1. Nonetheless, the fact that the Court cannot gauge how effective the mitigation strategies are at this juncture does not prevent it from reaching its conclusion that Defendants have not met their burden of showing that the state has an important interest in banning the procedures under SB1. The Court finds it sufficient at this stage (in which the Court's findings are preliminary) that the record reflects that mitigation techniques are available, and that they—by the virtue of being "mitigation" techniques—assist in addressing the risks posed by the procedures. As this litigation progresses, however, the Court urges the parties to provide evidence on the degree of effectiveness on mitigation techniques.

she has "rarely seen" the side effect of an increased risk of cancer in her patients. (Adkins Rebuttal Decl. at 9). Dr. Adkins' observation based on clinical experience—which neither Dr. Cantor nor Dr. Hruz has—is consistent WPATH and Endocrine Society guidelines. For example, the WPATH guidelines note that "the risk of cancer in individuals seeking gender-affirming breast augmentation or mastectomy is similar to that in the general population (even in the setting of hormone use)" and therefore "existing screening guidelines need to be followed." (WPATH Guidelines at 134); (Endocrine Society Guidelines at 25) (discussing the risk of cancer in transgender population and explaining that studies have not suggested an increased risk of breast cancer, prostate cancer, or endometrial cancer though acknowledging that some cases of ovarian cancer have been reported). Though a close question, ultimately the weight of the evidence of record does not support Defendants' allegation that the medical procedures banned by SB1 increase an individual's risk of certain cancers.

The Court is not of the mind that the medical procedures banned by SB1 pose no risk to the patients receiving them. Indeed, as with virtually all medical procedures, treatment for gender dysphoria carries with it the risk of negative side effects. The Court also acknowledges that evaluating and weighing the competing views of the parties' experts and conclusions in the guidelines is not a perfect science. As in many cases, the Court is forced to make a judgment call on what position is best supported by the record. In doing so, the Court has not turned a blind eye to the risks associated with the medical procedures banned by SB1. To the contrary, the Court has reviewed the relevant evidence on the record and has found that ultimately Defendants' allegations of these harms and their prevalence is not supported by the record.[52] Instead, the record reflects

---

[52] The Court notes that Defendants' allegations of harm focus solely on the *medical* risks associated with gender-affirming treatment. Defendants do not rely on other harms or risks to support their argument that the state has an important interest in banning the procedures under SB1. For example, Defendants do not

that there is at best conflicting evidence as to whether the relevant procedures increase a person's likelihood of experiencing certain illnesses, and that even if there is an increased risk, that it can be mitigated.[53]

The Court's analysis would also not be complete without evaluating the evidence suggesting that the medical procedures banned by SB1 confer certain benefits on the recipients (*i.e.* the patients). *See Ladapo*, 2023 WL 3833848, at *12 ("that there are risks does not end the inquiry."). Certainly, whether a medical procedure is beneficial affects whether the state has an important interest in banning that procedure. Therefore, having evaluated the evidence regarding

---

make a policy argument that gender-affirming treatment is undesirable because gender-transitions are undesirable. Defendants also do not rely on any purported ability of SB1 to resolve various concerns expressed in the very text of the law itself, including but not limited to: (a) a concern that pharmaceutical companies are seeking to profiteer off of minors via the administration of drugs and devices that is banned by the law; and (b) a concern that healthcare providers are seeking to profiteer off of minors via the performance on minors of the surgeries that is banned by the law. *See* Tenn. Code Ann. § 68-33-101(i) & (j). The Court therefore has focused its analysis on the medical risks asserted by Defendants.

[53] Defendants' reliance on the practices of European countries regarding treatment for gender dysphoria in support of SB1 is also unpersuasive. As of the date of this opinion, the Southern District of Indiana is the most recent court to reject analogies to practices of European countries in support of laws that outright ban treatment for gender dysphoria. *See K.C.*, 2023 WL 4054086, at *11. As Judge Hanlon explained with respect to the defendants in *K.C.*, "[m]ost detrimental to [defendants'] position is that no European country that conducted a systematic review responded with a ban on the use of puberty blockers and cross-sex hormones. . ..." *See id.*; *Ladapo*, 2023 WL 3833848, at *14 ("the treatments are available in appropriate circumstances in all the countries cited by the defendants, including Finland, Sweden, Norway, Great Britain, France, Australia, and New Zealand"). The observations of Judge Hanlon and Judge Hinkle are directly applicable here. Indeed, the Court agrees that Defendants' reliance on the practices of European nations is not an apt analogy where none of these countries have gone so far as to ban hormone therapy entirely. The Court further notes that Defendants do not attempt to persuade the Court that the bases (clinical or otherwise) of certain European practices are highly persuasive. Defendants instead point merely to the practices themselves as evidence that the medical procedures under SB1 are unsafe.

Then there is the additional problem that the Court can put only so much weight on the practice of other nations. After all, the Court cannot outsource to European nations the task of preliminarily determining, for purposes of the instant Motion, the extent to which the treatments at issue are safe. Ultimately, the most the Court at present could properly say about the practices of European nations is that they reflect a caution that *might* ultimately prove prudent and *might* be supported by particular studies. But the Court lacks a basis to conclude anything from the mere existence of particular European practices that are purportedly supported by studies the Court cannot assess based on the limited information about them Defendants have put in the record.

Defendants' allegations of the risks associated with treatment for gender dysphoria, the Court now turns to the purported benefits of the procedures.

### b) Benefits of the Medical Procedures Banned by SB1

Plaintiffs contend that the medical procedures banned by SB1 confer important benefits on patients. (Doc. No. 33 at 12). Based on its review of the record, the Court agrees. Dr. Adkins has testified that "[a]ll of [her] patients who have received medical treatment for gender dysphoria have benefitted from clinically appropriate treatment." (Adkins Decl.at 5). As explained by Adkins, "many individuals with gender dysphoria have high rates of anxiety, depression[,] and suicidal ideation. I have seen in my patients that without appropriate treatment this distress impacts every aspect of life." (*Id.* at 5). Dr. Adkins also noted in her testimony that "[f]or some individuals, this treatment can eliminate or reduce the need for surgical treatment." (*Id.* at 14–15).

Consistent with Dr. Adkins' observations based on her clinical experience, Dr. Antommaria has testified that "the available evidence indicates that gender-affirming care improves, rather than worsens, psychological outcomes." (Antommaria Decl. at 20–21). His conclusion is consistent with the findings contained in the WPATH and Endocrine Society guidelines. (WPATH Guidelines at 39) (explaining that recent longitudinal studies suggest that "mental health symptoms experienced by" transgender individuals "tend to improve following" receipt of gender-affirming treatment"); (Endocrine Society Guidelines at 15 (explaining that a study from the Netherlands showed a decrease in depression and an improvement in general mental health during pubertal suppression and a steady improvement in psychological function following cross-sex hormone treatment and gender reassignment surgery)). Furthermore, as pointed out by Dr. Adkins, with regard to suicidal ideations

> In a 2020 study published in Pediatrics, the official journal of the American Academy of Pediatrics, researchers concluded that "[t]reatment with pubertal

> suppression among those who wanted it was associated with lower odds of lifetime suicidal ideation when compared with those who wanted pubertal suppression but did not receive it. Suicidality is of particular concern for this population because the estimated lifetime prevalence of suicide attempts among transgender people is as high as 40%."

(Adkins Decl. at 16). Defendants' assertion that gender-affirming treatment does not improve mental health outcomes relies solely on the testimony of Dr. Cantor, who seems never to have treated an individual for gender dysphoria. But the weight of evidence in the record suggests the contrary—that treatment for gender dysphoria lowers rates of depression, suicide, and additional mental health issues faced by transgender individuals. And at the risk of sounding like a broken record, the Court notes that several courts, based on the respective records in those cases, have found the same. *See Brandt*, 551 F. Supp. 3d at 891 ("Every major expert medical association recognizes that gender-affirming care for transgender minors may be medically appropriate and necessary to improve the physical and mental health of transgender people."); *Ladapo*, 2023 WL 3833848, at *5 (crediting expert testimony that denial of gender-affirming treatment will "increase anxiety, depression, and risk of suicide."); *Eknes-Tucker*, 603 F. Supp. 3d at 1150 ("The record shows that, without transitioning medications, Minor Plaintiffs will suffer severe medical harm, including anxiety, depression, eating disorders, substance abuse, self-harm, and suicidality."); *Fain*, 618 F. Supp. 3d at 330 (finding that "[t]he medical treatments for gender dysphoria have been studied extensively, and have been shown to improve "quality of life and measures of mental health" for patients. . ."). The Court therefore finds that the benefits of the medical procedures banned by SB1 are well-established by the existing record.

### c) Defendants Have Not Met Their Burden of Demonstrating an Important State Interest

To summarize the Court's findings on the alleged harms and benefits of the medical procedures banned under SB1, the Court ultimately finds that the weight of the evidence at this

stage in the proceedings does not support Defendants' allegations that either puberty blockers or cross-sex hormones pose serious risks to the minors receiving these treatments for gender dysphoria. As discussed in detail above, the record suggests that either 1) the risks identified by Defendants are not more prevalent in transgender individuals receiving the procedures banned by SB1 than in individuals not receiving these procedures; 2) to the extent that individuals receiving these procedures experience the negative side effects raised by Defendants, that the prevalence of these effects is low, or 3) the risk of negative side effects resulting from the use of such medical procedures banned by SB1 can be mitigated. And the fact that some pediatric treatments may pose certain risks is not sufficient, in the Court's view, to support a finding that the state has an important interest in banning these treatments. *See Ladapo*, 2023 WL 3833848, at *13 (finding that the risks attendant to gender-affirming treatment for minors did not satisfy intermediate scrutiny such that would warrant taking away the decision for treatment from patients, doctors, and parents and instead allowing the state to make the decision). *Cf. Eknes-Tucker*, 603 F. Supp. 3d at 1146 (finding that the fact that pediatric treatments involve risks does not justify transferring power or decision-making authority from parents to the state). Indeed, a conclusion to the contrary would leave several pediatric treatments targeting something other than gender dysphoria vulnerable to severe limitations on access.

The Court acknowledges that the state feels strongly that the medical procedures banned by SB1 are harmful to minors. The medical evidence on the record, however, indicates otherwise. It is undisputed that every major medical organization to take a position on the issue, which includes the AAP, American Medical Association, American Psychiatric Association, American Psychological Association, and American Academy of Child Adolescent Psychiatry, agrees that puberty blockers and cross-sex hormone therapy are appropriate and medically necessary

treatments for adolescents when clinically indicated. (Janssen Decl. at 10). It is of little surprise, therefore, that all major medical organizations oppose outright bans on gender-affirming medical care for adolescents with gender dysphoria. (Doc. No. 32 ("Turban Decl.") at 4); *see also Brandt*, 551 F. Supp. 3d at 891 ("[e]very major expert medical association recognizes that gender-affirming care for transgender minors may be medically appropriate and necessary to improve the physical and mental health of transgender people."). The opinions of major medical organizations as they exist at any one time are not necessarily correct merely by the virtue of being the opinion of a major medical organization—which is why they have been known to change on a particular topic over time—and the Court does not herein find conclusively that the opinions here are correct. But they certainly are entitled to weight in a context like the present one.

As illustrated by the discussions above, the Court finds that at this juncture, SB1 is not supported by an important state interest. In other words, for the purposes of determining whether Plaintiffs are entitled to the preliminary relief they seek, the Court is not persuaded that Defendants have met their burden in showing that SB1 survives intermediate scrutiny. It follows that Plaintiffs have met their burden of showing that they are substantially likely to succeed on the merits of their equal protection claim. Of course, the Court recognizes that at summary judgment or trial, Defendants potentially could provide additional evidence that suffices to meet their burden.

Though the Court has already found that Defendants have failed to demonstrate an important interest based on the current record, and therefore could end its analysis here, the Court finds it prudent to address whether SB1 is substantially related to the state's purported interest.

### vi.    *Substantial Relation Requirement*

Even where a law reflects an important state interest, the law survives intermediate scrutiny only if the law in question is substantially related to that interest. *Tyler v. Hillsdale Cnty. Sheriff's*

*Dep't*, 837 F.3d 678, 693 (6th Cir. 2016). The Sixth Circuit has found that a law is "substantially related" to an important state interest where there is a "reasonable fit between the challenged regulation and the asserted objective." *See id.* (internal quotation marks omitted). Unlike strict scrutiny, which requires a law to be narrowly tailored, intermediate scrutiny imposes the less burdensome requirement that the scope of the law in question be in proportion to the state's interest. *See id.* The Court is aware that the term "related to" is subjective and amorphous. *See, e.g.*, *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1033–34 (2021) (Alito, J., concurring). *Cf. Dubin v. United States*, No. 22-10, 2023 WL 3872518, at *6 (June 8, 2023) (noting likewise with respect to term "in relation to"). The same can be said for "substantially" and "in proportion." The application of such terms often is in the eye of the beholder. But here, it has fallen to the undersigned to be the beholder, and therefore, he must call it like he sees it.

At this stage in the litigation, the Court finds that Defendants have not demonstrated that SB1 is substantially related to the state's asserted interest. Defendants' argument is that the state has an important interest in protecting minors from allegedly dangerous medical procedures. Yet, the medical procedures banned by SB1 because they are purportedly unsafe to treat gender dysphoria in minors (which, as discussed above, necessarily means treatment for transgender minors) are not banned when provided to treat other conditions. Indeed, SB1 explicitly permits the very medical procedures that it bans for treatment of gender dysphoria, if those procedures are being used to "treat a minor's congenital defect, precocious puberty, disease [excluding gender dysphoria], or physical injury." Tenn. Code Ann. § 68-33-103(b)(1)(A). The record reflects that the same treatments received by minors for gender dysphoria are received by minors also for different conditions. (Adkins Decl. at 17–18) (explaining that cisgender girls with delayed puberty

are treated with estrogen, and cisgender girls with polycystic ovarian syndrome ("PCOS") are treated with testosterone suppression).

True, all that is required under intermediate scrutiny is a "reasonable fit" between the state's interest and the challenged law. However, in the Court's view, the difference in treatment under SB1 between gender dysphoria and other conditions is not "reasonable"; it is instead in all likelihood arbitrary. Consider the following example involving a hypothetical minor who is diagnosed with precocious puberty at the age of eight years old (meaning that the minor has started puberty at eight years of age). The minor's parents agree with a doctor to place the minor on puberty blockers to delay puberty until the proper age. Under SB1, this treatment would be permissible. A few years pass by, and the minor realizes that he is in fact a transgender boy, and he exhibits symptoms of gender dysphoria. Around this time is when he would also stop receiving puberty blockers for precocious puberty. The minor and his parents make an appointment with a doctor who treats gender dysphoria. The doctor decides that the proper treatment for the minor's gender dysphoria for his age is the use of puberty blockers. Under SB1, although the minor was lawfully on puberty blockers for several years to treat precocious puberty and is slated to come off of them for this treatment, SB1 would not allow him to continue to take the *exact same* drugs for treatment of his gender dysphoria.

The only evidence in the record that Defendants identify to justify this disparate treatment (evidently in an attempt to meet the substantial-relationship requirement) is that the Food and Drug Administration ("FDA") has approved the use of certain hormone therapies for precocious puberty but has not yet done the same for gender dysphoria. (Doc. No. 112 at 16). However, as explained by Dr. Turban, "[p]rescribing FDA approved medications without specific FDA indications for the condition being treated is common in medicine generally and particularly in pediatrics. It is

referred to as 'off-label' prescribing." (Turban Decl. at 5). Dr. Turban went on to clarify that as "[t]he American Academy of Pediatrics has explained, it is important to note that the term 'offlabel' does not imply an improper, illegal, contraindicated, or investigational use." (*Id.*) (internal quotation marks omitted). Therefore, the record reflects that off-label use of medications does not itself indicate that there are greater risks associated with those uses than when used for the purpose that is approved by the FDA—or that the FDA has even considered any such risks. Therefore, while understanding why Defendants would seek to score metaphorical points from the fact that the FDA has yet to approve certain hormone therapies for gender dysphoria, the Court declines to draw from that fact a negative inference regarding the risks of gender-affirming treatment.

In short, the Court agrees with Judge Hinkle's observation in finding "[t]hat the FDA has not approved these drugs for treatment of gender dysphoria says precisely nothing about whether the drugs are safe and effective when used for that purpose. Off-label use of drugs is commonplace and widely accepted across the medical profession. . . ." *Ladapo*, 2023 WL 3833848, at *15.[54] As Judge Hinkle went onto explain, [t]he FDA approval goes no further—it does not address one way or the other the question of whether using these drugs to treat gender dysphoria is as safe and effective as on-label uses." *See id.* Although FDA approval of the mediations to treat gender dysphoria could have benefited Plaintiffs' argument that the medications are safe when used for this purpose, the fact that the FDA has not yet given this approval does not advance Defendants'

---

[54] Judge Hinkle's comments here relate to off-label prescribing as a general matter. Perhaps a specific instance of off-label prescribing would be problematic based on the particular circumstances involved—for example, hypothetically, if it resulted not from a wholly independent medical judgment of the prescribing physician, but rather from undue influence from a pharmaceutical sales representative. But Defendants point to nothing indicating any circumstances that indicate any such troubling circumstances associated with the off-label nature of the prescribing of drugs for treatment of gender dysphoria.

argument that use of the medications for this purpose is unsafe. Defendants do not even suggest that pharmaceutical companies have applied for FDA approval or are planning to do so. The Court is therefore not persuaded that the fact of the FDA's silence on the approval of the medical procedures banned under SB1 for treatment of gender dysphoria somehow indicates that these treatments are unsafe when used for that purpose.[55]

SB1 is not alone in suffering from the fatal defect of falling short on the substantial-relation requirement. The court in *Brandt* discussed essentially the same issue plaguing the defendants' defense of a very similar law in that case. In finding that the law in that case was not substantially related to protecting minors from the risks of gender transition procedures, the court observed that

> If the State's health concerns were genuine, the State would prohibit these procedures for all patients under 18 regardless of gender identity. The State's goal in passing Act 626 was not to ban a treatment. It was to ban an outcome that the State deems undesirable. In other words, Defendants' rationale that the Act protects children from experimental treatment and the long-term, irreversible effects of the treatment, is counterintuitive to the fact that it allows the same treatment for cisgender minors as long as the desired results conform with the stereotype of their biological sex.

*See Brandt*, 551 F. Supp. 3d at 891. The Court breaks ranks with *Brandt* insofar as *Brandt* afforded significance to the state's sincerity (or lack thereof) in its expression of concerns for the health of minors. The Court declines to opine on the state's sincerity of such expression in this case, since what matters here is not the state's sincerity (a subjective matter) but rather the degree of reasonableness of the fit between such concerns and the ban imposed by SB1 (an objective matter). On the (objective matter) at issue here, the Court finds on the present record that SB1 is not

---

[55] Having been provided no scientific basis, or otherwise supported policy reason, for this disparate treatment, the Court is left to draw the conclusion that Defendants perceive gender dysphoria to be a condition less worthy of treatment than conditions like PCOS. Indeed, Defendants' assertion that these procedures are so dangerous that the state should be permitted to ban them entirely for treatment of gender dysphoria rings hollow when the state has no such qualms with minors receiving these procedures to treat other conditions.

proportionate to the state's interest of protecting children from allegedly dangerous medical treatments. Instead, SB1 objectively is severely underinclusive in terms of the minors it protects from the alleged medical risks of the banned procedures; it bans these procedures for a tiny fraction of minors, while leaving them available for all other minors (who would be subjected to the very risks that the state asserts SB1 is intended to eradicate). For these reasons, the Court finds that SB1 likely is not substantially related to the state's asserted interest. SB1 therefore likely fails intermediate scrutiny, even assuming arguendo (contrary to the Court's finding above) that the state interest was deemed likely to be an important interest.

In light of the evidence on the record, and the Court's discussion above, the Court finds that SB1 is unlikely to survive intermediate scrutiny. Specifically, the Court finds that the record does not support a finding that Defendants are likely to succeed on their position that SB1 is substantially related to an important state interest. It follows that Plaintiffs are substantially likely to succeed on their claim that SB1 violates the Equal Protection Clause to the extent that it prohibits medical procedures other than surgery. The Court now turns to whether Plaintiffs have fulfilled the remaining requirements necessary to issue a preliminary injunction.[56]

### 3. IRREPARABLE HARM

To be successful in a request for a preliminary injunction, a plaintiff must demonstrate irreparable harm. "A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 56, 578 (6th Cir. 2002). To constitute irreparable harm (meaning, as just indicated, irreparable harm in the absence of a preliminary injunction), the harm must be "actual and

---

[56] Although Plaintiffs contend that SB1 also would fail under rational basis review, the Court need not reach this issue in light of its conclusion that intermediate scrutiny applies to Plaintiffs' equal protection claim.

imminent harm rather than harm that is speculative or unsubstantiated." *See Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006).

Plaintiffs in this case have demonstrated irreparable harm. As the Sixth Circuit has acknowledged, "a plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights." *See Overstreet*, 305 F.3d at 578. The Court has found that Plaintiffs are substantially likely to succeed on their claims that SB1 violates the Equal Protection Clause and the Due Process Clause. Therefore, a denial of the requested injunction (and enforcement of SB1) would cause irreparable harm by infringing on Plaintiffs' constitutional rights.

Looking beyond this basis for demonstrating irreparable harm, the Court also agrees that Minor Plaintiffs likely[57] will suffer actual and imminent injury in the form of emotional and psychological harm as well as unwanted physical changes if they are deprived access to treatment of their gender dysphoria under SB1.[58] Indeed, each Minor Plaintiff has submitted a declaration that details the negative consequences they expect to endure as a result of SB1 becoming effective.[59] (Doc. Nos. 22, 24, 26). These expectations are not mere conjecture but instead are

---

[57] Courts have not always been ideally clear (or consistent) about the degree of certainty required for the plaintiff-movant's mandatory showing of irreparable harm. However, the Supreme Court has stated that the plaintiff movant "'must establish [among other things] . . . that he is likely to suffer irreparable harm in the absence of preliminary [injunctive] relief.'" *Ramirez v. Collier*, 142 S. Ct. 1264, 1268 (2022) (quoting *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008)).

[58] Because all Plaintiffs seek the same relief, the demonstration of irreparable harm on the part of just the Minor Plaintiffs (rather than all Plaintiffs) shows irreparable harm sufficient to support issuance in its entirety of the preliminary injunction requested collectively by all Plaintiffs. The Court also notes that irreparable harm in the form of infringement of constitutional rights affects all Plaintiffs.

[59] Contrary to Defendants' argument, the fact that Minor Plaintiffs merely *expect* to suffer (rather than have suffered, or are guaranteed to suffer) these negative effects does not render their harms speculative. There is substantial evidence on the record from Plaintiffs' experts that denial of treatment for gender dysphoria results in significant harms to patients. And Minor Plaintiffs themselves have provided declarations explaining the fear they have of the negative repercussions of enforcement of SB1. Although Minor

supported by the medical evidence on the record. (Adkins Decl. at 5) (explaining that leaving gender dysphoria untreated can result in severe anxiety, depression, self-harm, and suicidal ideation). Several courts have found similar imminent harms to satisfy the irreparable harm requirement. *See Eknes-Tucker*, 603 F. Supp. 3d at 1150 (finding suffering of anxiety, depression, and suicidality as a result of inability to access gender-affirming care constituted irreparable harm); *Brandt*, 551 F. Supp. 3d at 892 (finding that plaintiffs met the irreparable harm requirement because denial of access to gender-affirming care will cause physical and psychological harm); *Ladapo*, 2023 WL 3833848, at *16 (finding irreparable harm requirement met where denial of gender-affirming care will cause "unwanted and irreversible onset and progression of puberty in [the plaintiffs'] natal sex. . .").

Defendants' arguments that Plaintiffs have not met the irreparable-harm requirement are unavailing. Defendants argue that Plaintiffs' harms are not irreparable because although SB1 becomes effective on July 1, 2023, Plaintiffs can continue to receive treatment until March 31, 2024 under the continuing-care exception, codified at Tenn. Code Ann. § 68-33-103(b)(1)(B). (Doc. No. 112 at 22). In doing so, Defendants ignore two key points. First, the continuing care exception comes with constraints. With respect to irreparable harm, the most significant constraint is that a minor receiving care under this exception cannot receive treatment that is different from

---

Plaintiffs do not themselves use terms like "anxiety" and "depression," they very clearly outline the physical and psychological consequences they expect to suffer as a result of SB1. Minor Plaintiffs are laypersons, not doctors, and the Court will not fault them for using laymen terms in their declarations rather than medical terminology.

On the other hand, the Court questions the relevance, to the irreparable-harm analysis, of what Minor Plaintiffs expect to endure, where (as here) there is medical evidence on the record that supports a finding of irreparable harm. After all, Minor Plaintiffs, though understandably concerned about the impact of SB1, are not as well-positioned as medical experts to comment on the risk of various harms (including physical changes) they face as a result of no longer being able to access their treatments for gender dysphoria. Of course, Minor Plaintiffs' testimony on the harms they face do not hurt their case. But in the Court's view, the testimony of the medical experts have more impact on the irreparable-harm issue than the expectations of Minor Plaintiffs.

that which was received prior to July 1 if the change in treatment is to treat gender dysphoria. *See* Tenn. Code Ann. § 68-33-103(b)(4). So for example, a minor who was receiving puberty blockers on July 1 could not proceed to receiving cross-sex hormones, even if that change was the safe and proper treatment plan for that minor. Without the ability to make appropriate adjustments, whatever those changes may be, Plaintiffs' treatment would be devoid of necessary flexibility and thus likely will be severely impacted even under the continuing-care exception.

Second, and perhaps even more importantly, the record demonstrates undisputedly that the continuing care exception will cause doctors to titrate down their minor patients' medications. (Doc. No. 113-1 at 111 (page from Declaration of Dr. Cassandra Brady); Doc. No. 140 (Rebuttal Declaration of Dr. Susan N. Lacy) at 1; Jane Doe Decl. at 1). Titrating down (meaning decreasing the dosages) the treatments for gender dysphoria will lead to physical changes that are consistent with the patients' sex at birth (*i.e.* inconsistent with their current gender identity), which will have the follow-on effect of worsening the patients' dysphoria. (Adkins Rebuttal Decl. at 14). And although SB1 does not explicitly refer to any requirement to "wean off" or "titrate down" in the lead up to March 31, 2024, the record reflects that the natural consequence of the continuing care exception is that physicians will be winding down care for patients beginning on July 1, 2023. And, of course, this was to be expected given that the exception explicitly forbids changes in treatment that would further combat gender dysphoria. Plaintiffs have therefore demonstrated that they likely would suffer actual and imminent harm beginning on July 1, 2023.

Defendants further contend that Vanderbilt University Medical Center ("VUMC") has announced that it will not provide care under the continuing care exception and will not resume any care, even if an injunction is granted, given a fear of civil liability under the private-cause-of-action provision (codified at Tenn. Code Ann. § 68-33-105) of SB1 (which Plaintiffs do not seek

to enjoin). (Doc. No. 112 at 23–24).[60] It is true that VUMC has decided that it will cease all care that is banned under SB1 after July 1, 2023. (Doc. No. 113-1 at 107 (page from Declaration of Dr. C. Wright Pinson)). However, Defendants' contention that VUMC will not change its decision regarding cessation of care *even in the event of a preliminary injunction* stands in direct contradiction to the record. Dr. Pinson, the Deputy Chief Executive Officer and Chief Health System Officer at VUMC, has testified that "[s]hould enforcement of [SB1's] provisions *prohibiting Hormone Therapy* be *deferred, delayed*, or enjoined, VUMC would continue to provide Hormone Therapy consistent with the prevailing standards of care for persons with gender dysphoria to those minor patients of VUMC. . . ." (Doc. No. 113-1 at 108) (emphasis added).

Dr. Pinson's declaration clearly indicates two related things. First, contrary to Defendants' argument that VUMC will not continue treatment following an injunction, Pinson plainly states that VUMC would continue treatment if there is a deferral or delay in the enforcement of SB1. A preliminary injunction would serve both to defer and to delay enforcement of SB1. Second, Pinson's declaration plainly states that VUMC will continue care as long as the provisions of SB1 prohibiting hormone therapies are enjoined. Contrary to Defendants' position, Pinson does not indicate that VUMC will abstain from providing care, due to fear of civil liability, even if a preliminary injunction has been entered and is in effect. A preliminary injunction therefore *will* (preliminarily) address Plaintiffs' harms because Plaintiffs will then be able to resume care at VUMC. For this reason, and those stated above, the Court finds that Plaintiffs have met the irreparable harm requirement.[61]

---

[60] The record reflects that Minor Plaintiffs all receive treatment for their gender dysphoria at VUMC. (Doc. Nos. 22, 25, 26).

[61] The Court notes that it does *not* base its finding of irreparable harm in any way on the specific implication that some parents of transgender children will, absent relief, be forced "to flee the State." (Doc. No. 1 at

## 4. BALANCE OF EQUITIES & PUBLIC INTEREST

"The third and fourth [requirements] of the preliminary injunction analysis—harm to others and the public interest—merge when the Government is the opposing party."[62] *Does #1–9 v. Lee*, 574 F. Supp. 3d 558, 563 (M.D. Tenn. 2021). On the one hand, the Court recognizes that a state suffers harm when a statute that was passed using democratic processes is enjoined. *See Doe #11 v. Lee*, 609 F. Supp. 3d 578, 617 (M.D. Tenn. 2022). This principle, however, plainly does not extend to statutes that are substantially likely to be unconstitutional. As the Sixth Circuit has explained, "no cognizable harm results from stopping unconstitutional conduct, so it is always in the public interest to prevent violation of a party's constitutional rights." *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021). Given that the Court here has found it substantially likely that SB1 is unconstitutional, the Court is satisfied that the merged-third-and-fourth requirements for a preliminary injunction have been met.

---

¶ 6). This implication strikes the Court as hyperbolic, to the extent that it conjures up images of Plaintiffs having to make a run for the state border prior to July 1 to avoid persecution. But the notion that Plaintiffs, absent an injunction, would have to go outside Tennessee to obtain treatment is not hyperbolic and supports the finding of irreparable injury.

[62] The Court notes that there are different formulations even within the Sixth Circuit of the third requirement of a preliminary injunction. As illustrated, sometimes this requirement is referred to balancing equities, and sometimes it is referred to as the harm that a defendant will face if the requested injunction is issued. Whichever formulation is chosen, the job of the Court is essentially the same—to determine whether an injunction is equitable in light of harms that it may cause.

      The Court also notes that the quoted text to which this footnote is appended uses the term "Government," which is typically used in federal judicial opinions to refer to the federal government. But the quoted text would be equally valid were "the Government" replaced by "a state official with relevant statutory enforcement authority."

**5. SCOPE OF THE REMEDY**

Having determined that all requirements for a preliminary injunction are met, the Court must determine the scope of the injunction warranted. As discussed at the outset of the opinion, any injunction will not affect the private right of action under SB1 or SB1's ban on surgeries.

"A preliminary injunction must be no more burdensome than necessary to provide a plaintiff complete relief, and a district court abuses its discretion in ordering an overly broad injunction." *Sony/ATV Publishing, LLC v. Marcos*, 651 Fed. App'x 482, 487 (6th Cir. 2016). Even considering this demanding standing, the Court agrees that a state-wide injunction of SB1 is necessary to redress Plaintiffs' injuries. As Plaintiffs point out, it is far-fetched that healthcare providers in Tennessee would continue care specifically for Minor Plaintiffs when they cannot do so for any other individual to whom SB1 applies. (Doc. No. 146 at 18). Indeed, it seems highly unlikely that VUMC for example would continue treating Minor Plaintiffs in particular for gender dysphoria, while keeping the rest of the practice shuttered as to any other minors seeking treatment for gender dysphoria.

Moreover, Plaintiffs have met their burden of demonstrating that SB1 is most likely unconstitutional on its face—indeed, the Court has not had to defer to the individual facts of Plaintiffs in drawing its conclusions that SB1 likely fails intermediate scrutiny—and a state-wide injunction is typically an appropriate remedy in such circumstances. *See, e.g.*, *Eknes-Tucker*, 603 F. Supp. 3d at 1151 (granting state-wide preliminary injunction of Alabama's ban on gender-affirming care for minors due to the substantial likelihood that it is unconstitutional); *Brandt by and through Brandt*, 47 F.4th at 672 (finding that district court did not abuse discretion in granting state-wide injunction of Arkansas' ban on gender-affirming care for minors based on its conclusion that it likely failed intermediate scrutiny); *Hecox v. Little*, 479 F. Supp. 3d 930 at 988–989 (D.

Idaho 2020) (granting state-wide injunction of Idaho law excluding transgender women from participating in women's sports teams because the law was likely unconstitutional); *K.C.*, 2023 WL 4054086, at \*14 (granting state-wide injunction based on finding that Indiana law banning procedures for gender transitioning were likely unconstitutional); *Friends of George's, Inc. v. Tenn.*, No. 2-23-cv-02176, 2023 WL 2755238 (W.D. Tenn. Mar. 31, 2023) (granting state-wide temporary restraining order of enforcement of Tennessee law that likely violated the First Amendment).

Defendants argue that Plaintiffs have not met the standard for showing that SB1 is unconstitutional on its face. (Doc. No. 112 at 29). As Defendants point out, in *United States v. Salerno*, 481 U.S. 739 (1987), the Court explained that a plaintiff has made a successful facial challenge when the plaintiff has established that "no set of circumstances exists under which" the law would be valid. *Id.* at 746. Seemingly contrary to this guidance, however, the Supreme Court has also instructed that "[i]n determining whether a law is facially invalid, [a court] must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' case." *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442 (2008). Yet, this is exactly what Defendants ask the Court to do here. Defendants provide hypotheticals in which they believe SB1 could be constitutionally applied. Though the Court concedes that the standard from *Salerno* would invite such an argument, more recent precedent clearly counsels against considering these hypotheticals. More importantly, the Supreme Court has explained in its jurisprudence since *Salerno*, that "[t]he proper focus of the constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant. . .." *See City of Los Angeles, Calif v. Patel*, 576 U.S. 409, 418 (2015). Defendants' examples raise the issue of hypothetical individuals to whom SB1 would be inapplicable because these individuals could not access the procedures

banned under SB1 for reasons entirely separate from the restrictions imposed by the law. SB1 would therefore have no application to these individuals. Given that the Supreme Court has stated that a court should not consider hypotheticals in its application of *Salerno* and that the proper focus for a facial challenge is the group of individuals affected by the given law, the Court does not agree with Defendants that their hypotheticals demonstrate that SB1 is constitutional in some circumstances.

Despite the Court's rejection of Defendants' hypotheticals as irrelevant, it is still incumbent on Plaintiffs to show why they have succeeded under *Salerno*'s standard. In other words, Defendants do not bear the burden under *Salerno*. But the Court finds that Plaintiffs have carried that burden here. The Court has concluded that SB1 is most likely unconstitutional. In arriving at this conclusion, the Court relied on the words of the law itself and did not have to turn to the individual circumstances of Plaintiffs. The Court has therefore found that SB1 is unconstitutional on its face, which necessarily means that it is unconstitutional in all of its applications.

The Court's finding is supported by the discussion provided by the Tenth Circuit in *Doe v. City of Albuquerque*, 667 F.3d 1111 (10th Cir. 2012). In *Doe*, the Tenth Circuit found that *Salerno* does not provide an additional test for determining whether a statute is unconstitutional on its face. *Id.* at 1127. Instead, "where a statute fails the relevant constitutional test [], it can no longer be constitutionally applied to anyone—and thus there is no set of circumstances in which the statute would be valid. The relevant constitutional test, however, remains the proper inquiry." *See id.* Although the Sixth Circuit has not yet endorsed this approach to *Salerno*, the Court finds that it is the only logical application of the "no set of circumstances" standard when a court has found that a law fails the relevant constitutional test without reliance on the circumstances of individual plaintiffs. As noted, here, the Court has found that SB1 on its face likely fails intermediate scrutiny,

meaning that the Court relied on the text of SB1 to arrive at its conclusion rather than relying on the facts pertaining to Plaintiffs. It necessarily follows that SB1 is likely unconstitutional in all of its applications.

Defendants' reliance on *Salerno*, and in particular its "no set of circumstances" language, is understandable. After all, Defendants are invoking the actual words used by the Supreme Court. But Defendants' argument regarding *Salerno* raises the question of whether the "no set of circumstances" language of *Salerno* has been rendered a dead-letter by more recent Supreme Court jurisprudence. The Supreme Court itself has criticized the case and has offered a significantly more lenient test for facial challenges. *See U.S. v. Stevens*, 559 U.S. 460, 473 (2010) (explaining that a plaintiff can succeed on a facial challenge where he demonstrates that the statute lacks any "plainly legitimate sweep. . ."). Furthermore, as the Tenth Circuit has pointed out, "the [Supreme] Court has repeatedly considered facial challenges simply by applying the relevant constitutional test to the challenged statute without attempting to conjure up whether or not there is a hypothetical situation in which application of the statute might be valid[, though the latter practice would seem otherwise crucial to any *Salerno* analysis]." *See Doe*, 667 F.3d at 1124. Even assuming that *Salerno* remains the relevant precedent, however, the Court finds that for the reasons discussed above, Plaintiffs have shown that there is likely no set of circumstances in which SB1 could be constitutionally applied because SB1 likely fails intermediate scrutiny based on the text of the statute and without regard to the individual circumstances of Plaintiffs. The Court therefore finds that a state-wide injunction of SB1 during the pendency of this litigation—subject to the exceptions delineated above—is warranted.

**6. SECURITY**

Plaintiffs request that the Court waive any bond requirement in this case on the grounds that Defendants are unlikely to sustain any costs or damages as a result of the preliminary injunction. (Doc. No. 21). Defendants do not appear to oppose this request, which in the Court's experience is routinely made and granted when a state statute is preliminarily enjoined. The Court therefore finds that a security bond under Federal Rule of Civil Procedure 65 is unnecessary in this case.

<u>CONCLUSION</u>

The Court realizes that today's decision will likely stoke the already controversial fire regarding the rights of transgender individuals in American society on the one hand, and the countervailing power of states to control certain activities within their borders and to use that power to protect minors.

The Court, however, does not stand alone in its decision. As repeatedly emphasized above, several federal courts across the country have been confronted with laws that mirror SB1 in material respects. To the Court's knowledge, every court to consider preliminarily enjoining a ban on gender-affirming care for minors has found that such a ban is likely unconstitutional. And at least one federal court has found such a ban to be unconstitutional at final judgment. Though the Court would not hesitate to be an outlier if it found such an outcome to be required, the Court finds it noteworthy that its resolution of the present Motion brings it into the ranks of courts that have (unanimously) come to the same conclusion when considering very similar laws.

The Court also acknowledges that it must tread carefully when enjoining from enforcement a law that was enacted through a democratic process. The Court does not take providing such relief lightly. The legislative process, however, is not without constraints. If Tennessee wishes to

regulate access to certain medical procedures, it must do so in a manner that does not infringe on the rights conferred by the United States Constitution, which is of course supreme to all other laws of the land. With regard to SB1, Tennessee has likely failed to do just this.

Even though the Court's findings are preliminary, the Court is aware that many will be disappointed by the ruling on Plaintiffs' Motion, and still, many others will be pleased. It borders on the obvious, however, to say that Defendants retain the right to seek to change the Court's mind about the constitutionality of SB1 and to receive a final judgment that is favorable to them. The Court's job is to evaluate the parties' arguments and evidence in light of precedent, relevant case law, and the then-existing record and make a proper determination on the matter immediately at hand. The Court is confident that it has done so in the resolution of the present Motion.

In light of the Court's findings provided herein, the Motion at Doc. No. 21 will be granted in part and denied in part. A corresponding order will be entered separately.


_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE