# Exhibit B

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

JANE DOE 1 et al.,[1]                                                              Plaintiffs,

v.                                                              Civil Action No. 3:23-cv-230-DJH

WILLIAM C. THORNBURY, JR., MD, in
his official capacity as the President of the
Kentucky Board of Medical Licensure et al.,                     Defendants,

and

COMMONWEALTH OF KENTUCKY,
ex rel. Attorney General Daniel Cameron,                        Intervening Defendant.

\* \* \* \* \*

## MEMORANDUM OPINION AND ORDER

This lawsuit challenges the constitutionality of Kentucky Senate Bill 150, which was enacted over the governor's veto on March 29, 2023. Plaintiffs—seven transgender minors and their parents—sued the state officials responsible for enforcing SB 150, alleging that the law's prohibition on the use of puberty-blockers and hormones violates the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment. (Docket No. 2) They seek a preliminary injunction to prevent the law from taking effect on June 29, 2023. (D.N. 17) Defendants William C. Thornbury, Jr., MD (as President of the Kentucky Board of Medical Licensure); Audria Denker, RN (as President of the Kentucky Board of Nursing); and Eric Friedlander (as Secretary for the Cabinet of Health and Family Services) do not oppose the requested injunction; indeed, Denker and Thornbury note that "it would behoove KBML/KBN-licensees and their patients for the Court

---

[1] Plaintiffs move for leave to proceed pseudonymously. (Docket No. 1) The Commonwealth does not oppose the motion, subject to certain conditions more appropriately addressed in the discovery context. (*See* D.N. 48) The Court will therefore grant Plaintiffs' motion and refer the case to a magistrate judge for management of discovery and entry of any appropriate protective order.

1

to grant the injunction and maintain the status quo pending final ruling on the merits of the suit, to avoid potentially unnecessary cost, time, and harmful exposure should Plaintiffs be successful." (D.N. 41, PageID.478-79; *see* D.N. 42)  Attorney General Daniel Cameron, who was permitted to intervene on behalf of the Commonwealth of Kentucky (D.N. 38), maintains that injunctive relief is not warranted.  (D.N. 47)

The parties agree that the motion for preliminary injunction presents primarily legal questions, and thus no evidentiary hearing is necessary.[2]  *See Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 552 (6th Cir. 2007) (observing that "[the Sixth Circuit's] Rule 65 jurisprudence indicates that a hearing is only required when there are disputed factual issues, and not when the issues are primarily questions of law" (collecting cases)).  The Court will therefore decide the motion on the current record, which consists of the briefs submitted by the parties and various amici curiae, as well as the statement of the United States filed under 28 U.S.C. § 517.[3]  (*See* D.N. 19-2; D.N. 37; D.N. 49-2; D.N. 51-1)

After careful consideration, the Court finds that Plaintiffs have shown a strong likelihood of success on the merits of their constitutional challenges to SB 150 and otherwise meet the requirements for preliminary injunctive relief.  The Court will therefore grant the motion for the reasons explained below.

---

[2] Plaintiffs "d[id] not believe there should be any factual disputes" but nevertheless requested a hearing based on their "anticipat[ion]" that the Commonwealth's response to the motion "likely w[ould] present factual disputes" (D.N. 43, PageID.483); the Commonwealth, however, agreed that no hearing was necessary.  (D.N. 44)  Thornbury, Denker, and Friedlander likewise did not request a hearing.  (D.N. 41; D.N. 42)
[3] Several organizations move for leave to file amicus briefs.  (D.N. 19; D.N. 49; D.N. 51)  The Court will grant these motions, which no party has opposed.

# I.

The minor plaintiffs are three transgender boys and four transgender girls who live in Kentucky. (D.N. 2, PageID.25-29) Six are "currently receiving" treatments that would be banned under SB 150 (*id.*, PageID.13-15), while the seventh "anticipates needing to receive" those treatments when she begins puberty (*id.*, PageID.16), which could occur "at any time." (*Id.*, PageID.29) The parent plaintiffs also reside in Kentucky. (*See id.*, PageID.25-29)

Plaintiffs challenge § 4(2)(a) and (b) of SB 150. (*Id.*, PageID.12 n.2) Under those provisions,

> a health care provider shall not, for the purpose of attempting to alter the appearance of, or to validate a minor's perception of, the minor's sex, if that appearance or perception is inconsistent with the minor's sex, knowingly:
> (a) Prescribe or administer any drug to delay or stop normal puberty;
> (b) Prescribe or administer testosterone, estrogen, or progesterone, in amounts greater than would normally be produced endogenously in a healthy person of the same age and sex[.]

S.B. 150 § 4(2), 2023 Reg. Sess. (Ky. 2023). The use of puberty-blockers or hormones in minors for other purposes is not restricted. *See* § 4(3). The relevant licensing or certifying agency must "revoke the . . . licensure or certification" of any healthcare provider found to have violated subsection (2). § 4(4). SB 150 also permits a "civil action to recover damages for injury suffered as a result of a violation" of the treatment ban to be brought by age 30 or within three years of discovery "that the injury or damages were caused by the violation." § 4(5).

Plaintiffs allege that SB 150 violates the Equal Protection Clause by "singl[ing] out transgender minors and prohibit[ing] them from obtaining medically necessary treatment based on their sex and transgender status." (D.N. 2, PageID.31) The parent plaintiffs additionally allege that SB 150 violates their right "to make decisions 'concerning the care, custody, and control of their children'" under the Due Process Clause of the Fourteenth Amendment. (*Id.*, PageID.30

3

(quoting *Troxel v. Granville*, 530 U.S. 57, 66 (2000)))  In briefing on the motion for preliminary injunction, each side submitted expert declarations, with Plaintiffs' experts generally opining that the drugs in question are safe, effective, and necessary, and the Commonwealth's experts raising various concerns as to their use.[4]

Based on the evidence submitted, the Court finds that the treatments barred by SB 150 are medically appropriate and necessary for some transgender children under the evidence-based standard of care accepted by all major medical organizations in the United States.  (*See* D.N. 19-2 (amicus brief of more than twenty organizations including the American Academy of Pediatrics, the American Academy of Child & Adolescent Psychiatry, the American Medical Association, the Endocrine Society, the Pediatric Endocrine Society, the Society for Adolescent Health and Medicine, and the World Professional Association for Transgender Health))  These drugs have a long history of safe use in minors for various conditions.  It is undisputed that puberty-blockers and hormones are not given to prepubertal children with gender dysphoria.

With these facts in mind, the Court turns to the preliminary-injunction inquiry.

## II.

In deciding whether to issue a preliminary injunction, the Court balances four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction."  *Foresight Coal Sales, LLC v. Chandler*, 60 F.4th 288, 294 (6th Cir.

---

[4] The Commonwealth seeks leave to file "rebuttal declarations" addressing the declarations attached to Plaintiffs' reply. (D.N. 54)  In the interest of completeness, the Court will allow the rebuttal declarations.  In granting the motion, the Court does not accept the Attorney General's position that Plaintiffs' attachment of new declarations to their reply was in any way improper. (*See* D.N. 60)

4

2023) (quoting *Union Home Mortg. Corp. v. Cromer*, 31 F.4th 356, 365-66 (6th Cir. 2022)). Of these, "the likelihood of success on the merits is often the determinative factor," particularly when a constitutional violation is alleged. *Id.* (citing *Dahl v. Bd. of Trs. of W. Mich. Univ.*, 15 F.4th 728, 735 (6th Cir. 2021) (per curiam)); *see Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (quoting *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009))). Here, as explained below, Plaintiffs have demonstrated a strong likelihood of success as to each of their claims.

**A.     Likelihood of Success on the Merits**

**1.     Equal Protection**

The parties dispute what level of scrutiny applies to Plaintiffs' claims. As to their equal-protection claim, Plaintiffs maintain that SB 150 discriminates on the basis of sex and is therefore subject to heightened scrutiny. (D.N. 17, PageID.128-30) According to the Commonwealth, however, the Court need only apply rational-basis review. (D.N. 47, PageID.505) The Court agrees with Plaintiffs both that heightened scrutiny applies and that SB 150 cannot survive it.

SB 150 prohibits the use of puberty-blockers or hormones "for the purpose of attempting to alter the appearance of, or to validate a minor's perception of, the minor's sex, if that appearance or perception is inconsistent with the minor's sex." § 4(2). It defines "sex" as "the biological indication of male and female as evidenced by sex chromosomes, naturally occurring sex hormones, gonads, and nonambiguous internal and external genitalia present at birth." § 4(1)(b). In other words, "the minor's sex at birth determines whether or not the minor can receive certain types of medical care under the law." *Brandt v. Rutledge*, 47 F.4th 661, 669 (8th Cir. 2022). SB 150 therefore "discriminates on the basis of sex," and heightened scrutiny is required.[5] *Id.*; *see*

---

[5] In light of this conclusion, the Court need not address Plaintiffs' alternative argument that transgender individuals are a quasi-suspect class. (*See* D.N. 17, PageID.130-32)

5

*United States v. Virginia*, 518 U.S. 515, 524 (1996); *see also Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1741 (2020) ("[I]t is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex."); *Smith v. City of Salem*, 378 F.3d 566, 577 (6th Cir. 2004) (holding that discrimination based on transgender status "easily" constitutes sex discrimination for purposes of the Equal Protection Clause).

The Commonwealth offers a number of superficial arguments to the contrary, none of which are persuasive. First, the Commonwealth attempts to distinguish *Bostock*'s reasoning as limited to the Title VII context. (D.N. 47, PageID.500 (citing *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021))) But the Sixth Circuit found nearly two decades ago that discrimination based on transgender status "easily" constitutes sex discrimination for purposes of the Equal Protection Clause, *see Smith*, 378 F.3d at 577, and in any event, the analysis under Title VII and the Equal Protection Clause is the same. *Id.* The case the Commonwealth cites in support did not involve sex discrimination and does not undermine *Smith* in any way. *See Pelcha*, 988 F.3d at 324 (declining to extend *Bostock*'s interpretation of Title VII's "because of" language to the Age Discrimination in Employment Act).

The Commonwealth's attempt to distinguish *Smith* on the ground that the challenged provisions "have nothing to do with sex 'stereotype[s]'" also fails. (D.N. 47, PageID.501 (alteration in original) (citation omitted)) SB 150 prohibits the use of puberty-blockers and hormones only to support an "appearance or perception" of sex that "is inconsistent with the minor's [natal] sex"—i.e., where the appearance or perception does not match the stereotype associated with the minor's natal sex. § 4(2). Regardless of its stated purpose, then, SB 150 would have the effect of enforcing gender conformity. *See Doe v. Ladapo*, No. 4:23cv114-RH-MAF, 2023 U.S. Dist. LEXIS 99603, at *25 (N.D. Fla. June 6, 2023) (finding that similar law

6

discriminated on the basis of gender nonconformity where "the statute prohibit[ed] [puberty-blockers] only for transgender children, not for anyone else" (citing *Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011))). And "[s]ex stereotyping based on a person's gender non-conforming behavior"—here, by barring access to certain medical treatment only to those for whom the treatment is intended to result in non-stereotypical appearance—"is impermissible discrimination" for purposes of the Equal Protection Clause. *Smith*, 378 F.3d at 575; *see id.* at 577.

That SB 150 applies equally to boys and girls (*see* D.N. 47, PageID.499) does not change the fact that "[t]he biological sex of the minor patient is the basis on which the law distinguishes between those who may receive certain types of medical care and those who may not." *Brandt*, 47 F.4th at 670. The abortion and pregnancy cases cited by the Commonwealth (*see* D.N. 47, PageID.499-500, 502) are inapposite: in those cases, unlike this one, the law or policy at issue did not bar access to treatment for some patients but not others depending on the patient's sex. *See Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2245-46 (2022) (citing *Geduldig v. Aiello*, 417 U. S. 484, 496, n.20 (1974)). For all of these reasons, the Court concludes—as has every other federal court to consider this question—that heightened scrutiny applies to Plaintiffs' equal-protection claim. *See Brandt*, 47 F.4th at 670; *K.C. v. Individual Members of the Med. Licensing Bd. of Ind.*, No. 1:23-cv-00595-JPH-KMB, 2023 U.S. Dist. LEXIS 104870, at *20-*25 (S.D. Ind. June 16, 2023); *Ladapo*, 2023 U.S. Dist. LEXIS 99603, at *23-*25; *Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131, 1147 (M.D. Ala. 2022).

To survive heightened scrutiny, "a party seeking to uphold government action based on sex must establish an 'exceedingly persuasive justification' for the classification." *Virginia*, 518 U.S. at 524 (quoting *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982)). Under this standard,

7

the Commonwealth "must show 'at least that the classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives.'" *Id.* (quoting *Miss. Univ. for Women*, 458 U.S. at 724). "The justification must be genuine, not hypothesized or invented post hoc in response to litigation." *Id.* at 533.

As set out in the Commonwealth's response brief, the stated justifications for SB 150 are protecting children; "protecting vulnerable groups . . . from abuse, neglect, and mistakes"; and "protecting the integrity and ethics of the medical profession." (D.N. 47, PageID.505 (citations omitted)) The Commonwealth fails to show that the ban imposed by SB 150 is "substantially related to the achievement of those objectives," however. *Virginia*, 518 U.S. at 524 (quoting *Miss. Univ. for Women*, 458 U.S. at 724). First, there is no evidence of any "abuse, neglect, [or] mistakes" protected against by SB 150. (D.N. 47, PageID.505; *see generally id.*) Nor is the protection of children in general a sufficiently persuasive justification given that the statute allows the same treatments for cisgender minors. *See* § 4(3)(a)-(b); *Brandt v. Rutledge*, 551 F. Supp. 3d 882, 893 (E.D. Ark. 2021) (finding stated justification for similar law to be "pretextual because [the law] allows the same treatments for cisgender minors that are banned for transgender minors as long as the desired results conform with the stereotype of the minor's biological sex").

The Commonwealth's purported concern for "the integrity and ethics of the medical profession" is likewise unpersuasive. (D.N. 47, PageID.505 (citations omitted)) Underpinning this argument is the Attorney General's characterization of puberty-blockers and hormones as "huge money makers" based on a news article from Tennessee containing that phrase. (*Id.*, PageID.491 (citing Kimberlee Kruesi, *Social media posts spark calls to investigate Tenn.'s VUMC*, Associated Press (Sept. 21, 2022), https://perma.cc/KV5A-MLL9.); *see also id.*, PageID.506 (arguing that alternative treatments "would mean those who reap the financial benefits

8

of prescribing puberty blockers and cross-sex hormones—'huge money makers'—would have to stop injecting them in children with gender dysphoria . . . . [a]nd that would mean no more lifelong patients who must continuously take these profitable drugs'")) But the quote in question was from "a video of one [Vanderbilt University Medical Center] doctor in 2018 saying these 'types of *surgeries* bring in a lot of money' and later saying that female-to-male *bottom surgeries* are 'huge money makers.'" Kruesi, *supra* (emphasis added). As acknowledged in the final paragraph of the Commonwealth's response brief (in unnecessarily inflammatory language), surgical procedures are not at issue in this case. (D.N. 47, PageID.515; *see* D.N. 2, PageID.12 n.2) The Commonwealth offers no evidence that Kentucky healthcare providers prescribe puberty-blockers or hormones primarily for financial gain as opposed to patients' well-being, and the Court makes no such presumption.[6]

Nor do the quoted studies from "some European countries" questioning the efficacy of the drugs (D.N. 47, PageID.507), or anecdotes from a handful of "detransitioners" (*id.*, PageID.508), support banning the treatments entirely, as SB 150 would do. Doctors currently decide, based on the widely accepted standard of care, whether puberty-blockers or hormones are appropriate for a particular patient. Far from "protecting the integrity and ethics of the medical profession" (*id.*, PageID.505 (citation omitted)), SB 150 would prevent doctors from acting in accordance with the applicable standard of care. The Commonwealth's "goal of ensuring the ethics of [Kentucky]

---

[6] The Attorney General's reference to an assumed "ideological takeover" of the major medical organizations (D.N. 47, PageID.510) is similarly baseless. "The overwhelming majority of doctors are dedicated professionals whose first goal is the safe and effective treatment of their patients[, and t]here is no reason to believe [that] the doctors who adopted these standards were motivated by anything else." *Ladapo*, 2023 U.S. Dist. LEXIS 99603, at *39 ("[I]t is fanciful to believe that all the many medical associations who have endorsed gender-affirming care, or who have spoken out or joined an amicus brief supporting the plaintiffs in this litigation, have so readily sold their patients down the river.").

9

Case 3:23-cv-00230-DJH   Document 61   Filed 06/28/23   Page 10 of 15 PageID #: 2308

healthcare providers is not attained by interfering with the patient-physician relationship, unnecessarily regulating the evidence-based practice of medicine[,] and subjecting physicians who deliver safe, legal, and medically necessary care to civil liability and loss of licensing." *Brandt*, 551 F. Supp. 3d at 891.

In sum, the Commonwealth has not shown that SB 150's discrimination on the basis of sex "serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Virginia*, 518 U.S. at 524 (citation omitted). The ban therefore fails heightened scrutiny, *see id.*, and Plaintiffs thus have a strong likelihood of success on the merits of their equal-protection claim.

### 2. Due Process

The parent plaintiffs allege that SB 150 violates their right "to make decisions 'concerning the care, custody, and control of their children'" under the Due Process Clause of the Fourteenth Amendment. (D.N. 2, PageID.30 (quoting *Troxel*, 530 U.S. at 66)) This right "includes the right to direct their children's medical care," as the Commonwealth acknowledges. (D.N. 47, PageID.495 (quoting *Kanuszewski v. Mich. HHS*, 927 F.3d 396, 419 (6th Cir. 2019)). The Commonwealth further acknowledges parents' fundamental right "to make the ultimate decision from a list of available medical treatments," "to make medical decisions for a child from a list of legally[]permissible treatments," or to "choos[e] [among] several available options"; however, it asserts that the right is limited when the desired treatments "are banned . . . for a particular purpose." (*Id.*, PageID.495-96; *see also id.*, PageID.497 ("Parents may have a general right to make, from a list of *legally available* options, a particular healthcare choice. But there is no fundamental right to obtain for their children particular drugs for a particular *prohibited* use." (citation omitted) (emphasis added))) But this argument presupposes that SB 150's prohibition is

10

lawful—the precise question at issue in this case. *Cf. U.S. Citizens Ass'n v. Sebelius*, 705 F.3d 588, 599 (6th Cir. 2013) (observing in dicta that "most federal courts have held that a patient does not have a constitutional right to obtain a particular type of treatment . . . if the government *has reasonably prohibited* that type of treatment" (emphasis added) (quoting *Mitchell v. Clayton*, 995 F.2d 772, 775 (7th Cir. 1993))). Unless and until SB 150 goes into effect, puberty-blockers and hormones are available, legally permissible treatments for gender dysphoria; indeed, all but one of the minor plaintiffs are already receiving them. (D.N. 2, PageID.13-16) Thus, the Commonwealth effectively concedes that the parent plaintiffs have a fundamental right under the Due Process Clause to choose those treatments for their children. (*See* D.N. 47, PageID.495-96)

The bulk of the Commonwealth's argument is directed at a claim Plaintiffs have not made, namely that parents have "a fundamental right to obtain whatever drugs they want for their children, without restriction." (*Id.*, PageID.495; *see also id.* ("There is no fundamental right of a parent to obtain for a child whatever drugs the parent—much less, the child—desires, no matter what.") ("There is no limitless right of a parent to obtain drugs for a child.") ("[T]h[e] general right to make the ultimate decision from a list of available medical treatments does not translate into some sort of affirmative, limitless right to obtain whatever drugs the parent wants for his or her child, carte blanche.")) Plaintiffs do not allege a "limitless right to obtain whatever drugs the parent wants for his or her child" (*id.*), but rather "the right to obtain established medical treatments to protect their children's health and well-being." (D.N. 2, PageID.30) And the evidence attached to Plaintiffs' motion and reply makes clear that the puberty-blockers and hormones barred by SB 150 are established medical treatments essential to the well-being of many transgender children: every major medical organization in the United States agrees that these treatments are safe, effective, and appropriate when used in accordance with clinical guidelines. (*See* D.N. 19-

11

2) This case is therefore distinguishable from those cited by the Commonwealth in which plaintiffs claimed a right to access treatment for themselves that was not already available or accepted. *See Washington v. Glucksberg*, 521 U.S. 702, 725–26 (1997) (assisted suicide); *Pickup v. Brown*, 740 F.3d 1208, 1222 (9th Cir. 2014) (conversion therapy for homosexuality); *Abigail Alliance for Better Access to Developmental Drugs v. Von Eschenbach*, 495 F.3d 695, 697 (D.C. Cir. 2007) (en banc) ("experimental drugs that . . . ha[d] not been proven safe and effective"). Moreover, the Commonwealth's contention that "Plaintiffs frame their asserted right at too 'high [of a] level of generality'" (D.N. 47, PageID.497 (alteration in original) (quoting *Dobbs*, 142 S. Ct. at 2258)), is puzzling given its acknowledgment of parents' "substantive due process right . . . to direct their children's medical care." (*Id.*, PageID.495 (quoting *Kanuszewski*, 927 F.3d at 419))

Because this right is fundamental, "[g]overnment actions that burden the exercise of [the right] are subject to strict scrutiny, and will be upheld only when they are narrowly tailored to a compelling governmental interest." *Kanuszewski*, 927 F.3d at 419 (alterations in original) (quoting *Seal v. Morgan*, 229 F.3d 567, 574-75 (6th Cir. 2000)). While "[t]his does not mean that parents' control over their children is without limit, *id.* (citing *Schall v. Martin*, 467 U.S. 253, 265 (1984)), and "limitations on parents' control over their children are particularly salient in the context of medical treatment," *id.* (citations omitted), "the fact that a pediatric treatment 'involves risks does not automatically transfer the power' to choose that treatment 'from the parents to some agency or officer of the state.'" *Eknes-Tucker*, 603 F. Supp. 3d at 1145 (quoting *Parham v. J.R.*, 442 U.S. 584, 603 (1979)). Here, the record shows that the puberty-blockers and hormones barred by SB 150 are "well-established, evidence-based treatments for gender dysphoria in minors." *Id.* And as discussed above, the restrictions imposed by SB 150 are not designed to serve the stated government interests. *See supra* part II.A.1. Nor does the Commonwealth even attempt to show

12

that SB 150 "employs the 'least restrictive means' necessary to achieve its purpose." *Eknes-Tucker*, 603 F. Supp. 3d at 1146 (quoting *Holt v. Hobbs*, 574 U.S. 352, 364 (2015)); *see also Brandt*, 551 F. Supp. 3d at 893. Plaintiffs thus also have a strong likelihood of success on their due-process claim.

**B.      Irreparable Injury, Harm to Others, and Public Interest**

"When constitutional rights are threatened or impaired, irreparable injury is presumed." *Husted*, 697 F.3d at 436 (citing *ACLU of Ky. v. McCreary Cnty.*, 354 F.3d 438, 445 (6th Cir. 2003)). Moreover, Plaintiffs have submitted declarations stating that the treatments have significantly improved the minor plaintiffs' condition and that eliminating access to those treatments in Kentucky would cause serious consequences, including severe psychological distress and the need to move out of state. (D.N. 17-6, PageID.288; *see* D.N. 17-4; D.N. 17-5; D.N. 17-7)

The Commonwealth argues that the minor plaintiffs and other children who receive gender-affirming care will suffer as a result. (D.N. 47, PageID.514) As set out above, however, the evidence before the Court shows otherwise. If allowed to take effect, SB 150 would eliminate treatments that have already significantly benefited six of the seven minor plaintiffs and prevent other transgender children from accessing these beneficial treatments in the future. It should go without saying that enjoining enforcement of SB 150 will not result in any child being forced to take puberty-blockers or hormones; rather, the treatments will continue to be limited to those patients whose parents and healthcare providers decide, in accordance with the applicable standard of care, that such treatment is appropriate.

Finally, because "it is always in the public interest to prevent the violation of a party's constitutional rights," this factor also weighs in favor of injunctive relief. *Dahl*, 15 F.4th at 736

13

(quoting *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994)).

**C.      Scope of Injunction**

The Commonwealth suggests that any injunction should be limited in scope to cover only those plaintiffs who are already taking the drugs in question. (D.N. 47, PageID.514-15) But the fact "that some minors experiencing gender dysphoria may choose not to pursue the gender transition procedures covered by the Act and therefore would not be harmed by its enforcement" does not mean that a facial injunction would be overbroad. *Brandt*, 47 F.4th at 672; *see id.* ("The proper focus of the [facial] constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." (alteration in original) (quoting *City of Los Angeles v. Patel*, 576 U.S. 409, 418-19 (2015))). The Commonwealth notably "fail[s] to offer a more narrowly tailored injunction that would remedy Plaintiffs' injuries," *id.*, and as Plaintiffs point out, it would be virtually impossible to fashion one. (*See* D.N. 52, PageID.1678-79) A facial injunction is therefore appropriate.

**III.**

Plaintiffs have shown a strong likelihood of success on the merits of their constitutional challenges to SB 150, and the remaining factors likewise support preliminary injunctive relief. Accordingly, and the Court being otherwise sufficiently advised, it is hereby

**ORDERED** as follows:

(1)      Plaintiffs' motion to proceed pseudonymously (D.N. 1) is **GRANTED**.

(2)      The motions for leave to file amicus briefs (D.N. 19; D.N. 49; D.N. 51) are **GRANTED**. The Clerk of Court is **DIRECTED** to file the tendered briefs (D.N. 19-2; D.N. 49-2; D.N. 51-1) in the record of this matter.

14

(3)     The Commonwealth's motion for leave to file rebuttal declarations (D.N. 54) is **GRANTED**.

(4)     Plaintiffs' motion for preliminary injunction (D.N. 17) is **GRANTED**. Defendants and Intervening Defendant and their agents, employees, servants, attorneys, successors, and any other person in active concert or participation with them are **ENJOINED**, pending final judgment, from enforcing, threatening to enforce, or otherwise requiring compliance with SB 150 § 4(2)(a) and (b).

(5)     Because the Commonwealth has not requested that Plaintiffs be required to post security under Federal Rule of Civil Procedure 65(c), and in light of the "strength of [Plaintiffs'] case and the strong public interest involved," the security requirement is **WAIVED**. *Moltan Co. v. Eagle-Picher Indus.*, 55 F.3d 1171, 1176 (6th Cir. 1995).

(6)     Pursuant to 28 U.S.C. § 636(b)(1)(A), this matter is hereby **REFERRED** to U.S. Magistrate Judge Regina S. Edwards for resolution of all litigation planning issues, entry of scheduling orders, consideration of amendments thereto, and resolution of all non-dispositive matters, including discovery issues.

June 28, 2023

David J. Hale, Judge
United States District Court