# Exhibit C

# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA TALLAHASSEE DIVISION

AUGUST DEKKER et al.,

      Plaintiffs,

v.                            CASE NO.  4:22cv325-RH-MAF

JASON WEIDA et al.,

      Defendants.

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

For many years, Florida's Medicaid system paid for medically necessary treatments for gender dysphoria. Recently, for political reasons, Florida adopted a rule and then a statute prohibiting payment for some of the treatments: puberty blockers, cross-sex hormones, and surgeries. This case presents a challenge to the rule and statute. The controversy is live only for puberty blockers and cross-sex hormones; no plaintiff currently seeks surgery. This order sets out the court's findings of fact and conclusions of law following a bench trial.

USCA4 Appeal: 22-1721    Doc: 108-4    Filed: 07/07/2023    Pg: 3 of 55
Case 4:22-cv-00325-RH-MAF   Document 246   Filed 06/21/23   Page 2 of 54

Page 2 of 54

## I. Background: the parties and claims

The plaintiffs are two transgender adults, August Dekker and Brit Rothstein, and two transgender minors who are proceeding under pseudonyms, Susan Doe and K.F. The minors are suing through their parents, Jane and John Doe for Susan Doe and Jade Ladue for K.F. "Susan Doe" is the same pseudonym, but the plaintiff here is not the same person, as the plaintiff identified by that pseudonym in *Doe v. Ladapo*, No. 4:23cv114-RH-MAF (N.D. Fla. June 6, 2023).

The defendants are Jason Weida, in his official capacity as Secretary of the Florida Agency for Health Care Administration ("AHCA"), and AHCA itself.

In count I of the first amended complaint, all the plaintiffs assert a claim against Mr. Weida under 42 U.S.C. § 1983 and the Fourteenth Amendment's Equal Protection Clause. In count II, all the plaintiffs assert a claim against AHCA under the Affordable Care Act's prohibition of discrimination based on sex, 42 U.S.C. § 18116. In count III, the minor plaintiffs and Mr. Rothstein, who is over age 18 and thus an adult but under age 21, assert a claim against Mr. Weida under § 1983 and the Medicaid Act's requirement for early and periodic screening, diagnostic, and treatment services for beneficiaries under age 21, 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(43)(C), 1396d(a)(4)(B), and 1396d(r)(5). In count IV, all plaintiffs assert a claim against Mr. Weida under § 1983 and the Medicaid Act's comparability requirement, 42 U.S.C. § 1396a(a)(10)(B)(i), under which

USCA4 Appeal: 22-1721    Doc: 108-4    Filed: 07/07/2023    Pg: 4 of 55
Case 4:22-cv-00325-RH-MAF    Document 246    Filed 06/21/23    Page 3 of 54

Page 3 of 54

assistance to an eligible individual cannot be less in "amount, duration, or scope" than assistance available to other Medicaid beneficiaries.

The order granting a preliminary injunction in *Doe* was based in large part on the record compiled in this case. The *Doe* parties had stipulated that this record would be considered there. Many of this order's findings and conclusions have been cut and pasted from the *Doe* order, with any appropriate modifications. Same record, same findings and conclusions.

## II.  Gender identity is real

With extraordinarily rare exceptions not at issue here, every person is born with external sex characteristics, male or female, and chromosomes that match. As the person goes through life, the person also has a gender identity—a deeply felt internal sense of being male or female.[1] For more than 99% of people, the external sex characteristics and chromosomes—the determinants of what this order calls the person's natal sex—match the person's gender identity.[2]

For less than 1%, the natal sex and gender identity are opposites: a natal male's gender identity is female, or vice versa.[3] This order refers to such a person who identifies as female as a transgender female and to such a person who

---

[1] Trial Tr., ECF No. 226 at 23–24; Trial Tr., ECF No. 238 at 72–73.
[2] Trial Tr., ECF No. 227 at 222.
[3] *Id.*; *see also* Trial Tr., ECF No. 226 at 23–24; Trial Tr., ECF No. 228 at 29–31.

USCA4 Appeal: 22-1721    Doc: 108-4    Filed: 07/07/2023    Pg: 5 of 55
Case 4:22-cv-00325-RH-MAF    Document 246    Filed 06/21/23    Page 4 of 54

Page 4 of 54

identifies as male as a transgender male. This order refers to individuals whose
gender identity matches their natal sex as cisgender.

The elephant in the room should be noted at the outset. Gender identity is
real. The record makes this clear. The defendants, speaking through their attorney,
have admitted it. At least one defense expert also has admitted it.[4] That expert is
Dr. Stephen B. Levine, the only defense expert who has actually treated a
significant number of transgender patients. He addressed the issues
conscientiously, on the merits, rather than as a biased advocate.

Despite the defense admissions, there are those who believe that cisgender
individuals properly adhere to their natal sex and that transgender individuals have
inappropriately *chosen* a contrary gender identity, male or female, just as one
might choose whether to read Shakespeare or Grisham. Many people with this
view tend to disapprove all things transgender and so oppose medical care that
supports a person's transgender existence.[5] In this litigation, the defendants have
explicitly acknowledged that this view is wrong and that pushing individuals away
from their transgender identity is not a legitimate state interest.[6]

Still, an unspoken suggestion running just below the surface in some of the
proceedings that led to adoption of the rule and statute at issue—and just below the

---

[4] *See* Trial Tr., ECF No. 239 at 10–11, 31–32, 80–81.
[5] *See id.* at 129–31.
[6] Trial Tr., ECF No. 242 at 97–98.

USCA4 Appeal: 22-1721    Doc: 108-4    Filed: 07/07/2023    Pg: 6 of 55
Case 4:22-cv-00325-RH-MAF    Document 246    Filed 06/21/23    Page 5 of 54

Page 5 of 54

surface in the testimony of some of the defense experts and AHCA consultants—is that transgender identity is not real, that it is made up.[7] And so, for example, one of the defendants' experts, Dr. Paul Hruz, joined an amicus brief in another proceeding asserting transgender individuals have only a "false belief" in their gender identity—that they are maintaining a "charade" or "delusion."[8] An AHCA consultant, Dr. Patrick Lappert—a surgeon who has never performed gender-affirming surgery—said in a radio interview that gender-affirming care is a "lie," a "moral violation," a "huge evil," and "diabolical."[9] State employees or consultants suggested treatment of transgender individuals is either a "woke idea" or profiteering by the pharmaceutical industry or doctors.[10]

Any proponent of the challenged rule and statute should put up or shut up: do you acknowledge that there are individuals with actual gender identities opposite their natal sex, or do you not? Dog whistles ought not be tolerated.

---

[7] *See, e.g.*, Pls.' Exs. 284 & 285, ECF Nos. 182-21 & 182-22; *see also* Pls.' Ex. 304, ECF No. 183-6.

[8] Trial Tr., ECF No. 238 at 194–95. Dr. Hruz fended and parried questions and generally testified as a deeply biased advocate, not as an expert sharing relevant evidence-based information and opinions. I do not credit his testimony. I credit other defense experts only to the extent consistent with this opinion.

[9] Trial Tr., ECF No. 239 at 129–31.

[10] Pls.' Ex. 304, ECF No. 183-6; Pls.' Exs. 284 & 285, ECF Nos. 182-21 & 182-22.

USCA4 Appeal: 22-1721    Doc: 108-4    Filed: 07/07/2023    Pg: 7 of 55
Case 4:22-cv-00325-RH-MAF    Document 246    Filed 06/21/23    Page 6 of 54

Page 6 of 54

## III.  Medicaid

Medicaid is a jointly funded federal-state program that provides medical care for patients of limited economic means. *See Garrido v. Dudek*, 731 F.3d 1152, 1153–54 (11th Cir. 2013); *see also Harris v. James*, 127 F.3d 993, 996 (11th Cir. 1997) (quoting *Silver v. Baggiano*, 804 F.2d 1211, 1215 (11th Cir. 1986)). Federal law makes some services mandatory but allows states to "place appropriate limits" based on "such criteria as medical necessity or on utilization control procedures." 42 C.F.R. § 440.230(d); *see also Garrido*, 731 F.3d at 1154; *Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1232–33 (11th Cir. 2011); *Rush v. Parham*, 625 F.2d 1150, 1156 (5th Cir. 1980). States may "set reasonable standards" for "medical necessity." *Garrido*, 731 F.3d at 1154.

Exercising this authority, Florida has long limited Medicaid coverage to services that are "medically necessary." *See* Fla. Stat. § 409.905. Florida provides coverage for, among other things, "services and procedures" rendered "by, or under the personal supervision of," a licensed physician, when "medically necessary for the treatment of an injury, illness, or disease." Fla. Stat. § 409.905(9). This does not, however, extend to services that are "clinically unproven, experimental, or for purely cosmetic purposes." *Id.*

For Medicaid beneficiaries under age 21, Florida also covers "all services determined by [AHCA] to be medically necessary for the treatment, correction, or

USCA4 Appeal: 22-1721   Doc: 108-4   Filed: 07/07/2023   Pg: 8 of 55   Case 4:22-cv-00325-RH-MAF   Document 246   Filed 06/21/23   Page 7 of 54

Page 7 of 54

amelioration of" any "physical and mental problems and conditions." *Id.*
§ 409.905(2). This provision does not explicitly exclude clinically unproven,
experimental, or purely cosmetic services, but as both sides apparently agree, they
are excluded here, just as in § 409.905(9). *See Moore*, 637 F.3d at 1234. This
coverage tracks with 42 U.S.C. § 1396d(a)(4)(B) and (r), which require states to
cover "early and periodic screening, diagnostic, and treatment services" for
Medicaid beneficiaries under age 21. *See Moore*, 637 F.3d at 1233–35.

By rule, AHCA has said that to be "medically necessary," a treatment must
be, among other things, "consistent with generally accepted professional medical
standards as determined by the Medicaid program, and not experimental or
investigational."[11] The rule says a drug is "experimental" or "investigational" in
four circumstances.[12] The first is when any required approval has not been given
by the Food and Drug Administration. The second is when the drug is undergoing
phase I, II, or III clinical trials or is under study to determine safety or efficacy "as
compared to the standard means of treatment or diagnosis." The third is when the
consensus among experts is that further studies are needed to determine the drug's
safety or efficacy. The fourth is when the drug is used for a purpose not approved

---

[11] Fla. Admin. Code r. 59G-1.01(2.83); Pls.' Ex. 22, ECF No. 175-22 at 8.
[12] Fla. Admin. Code r. 59G-1.01(2.46); Pls.' Ex. 22, ECF No. 175-22 at 5.

USCA4 Appeal: 22-1721    Doc: 108-4    Filed: 07/07/2023    Pg: 9 of 55
Case 4:22-cv-00325-RH-MAF    Document 246    Filed 06/21/23    Page 8 of 54

Page 8 of 54

by the FDA, meaning the use is not listed in one of three compendia of off-label

uses or supported by peer-reviewed literature. *Id.* r. 59G-1.01(2.46).[13]

## IV.  The challenged rule and statute

When AHCA considers Medicaid coverage for a type of medical treatment

for the first time, it sometimes prepares a report on whether the treatment is

consistent with generally accepted professional medical standards—a "GAPMS

report."[14]

In 2016, AHCA prepared a GAPMS report on puberty blockers for

transgender adolescents. The report concluded Medicaid payment should be

available when appropriate based on an individualized assessment of medical

necessity for the specific patient. The report noted that "the risks of not treating" an

adolescent with puberty blockers "may be worse than" treatment.[15]

In 2017, AHCA staff prepared a GAPMS report, never formally adopted, on

treatment of transgender individuals with cross-sex hormones. The report

concluded the treatment was "consistent with generally accepted professional

medical standards" and met the requirements for Medicaid coverage.[16]

---

[13] *Id.* at 5; *see also* AHCA 30(b)(6) Dep., ECF No. 235-1 at 53–55.
[14] *See* Pls.' Ex. 238, ECF No. 181-2; *see also* Trial Tr., ECF No. 227 at 165.
[15] Pls.' Ex. 240, ECF No. 181-4 at 9.
[16] Pls.' Ex. 243, ECF No. 181-7 at 1, 11.

Consistent with the 2016 and 2017 GAPMS reports, AHCA approved Medicaid payment for puberty blockers, including for Susan Doe and K.F., and cross-sex hormones, including for Mr. Dekker and Mr. Rothstein.[17]

In 2022, however, the Executive Office of the Governor directed AHCA to conduct a new analysis of Medicaid coverage of gender-affirming care.[18] AHCA's practice is to prepare a GAPMS report only when first considering a treatment, but here, apparently for the first time ever, AHCA elected to prepare another report for these already-approved treatments.[19] AHCA ordinarily prepares reports internally, without retaining consultants, but here, AHCA retained consultants.[20] AHCA retained only consultants known in advance for their staunch opposition to gender-affirming care.

The new GAPMS process was, from the outset, a biased effort to justify a predetermined outcome, not a fair analysis of the evidence.[21] The report concluded that gender-affirming medical care—puberty blockers, cross-sex hormones, and surgery—were not supported by generally accepted medical standards and were

---

[17] Trial Tr., ECF No. 228 at 106–08, 129, 161, 196–97.
[18] AHCA 30(b)(6) Dep., ECF No. 235-1 at 87.
[19] Trial Tr., ECF No. 227 at 171–74, 185–86; *see also* Pls.' Ex. 30, ECF No. 175-30.
[20] Trial Tr., ECF No. 227 at 178–79.
[21] The AHCA employee who drafted the report testified he did not know the preferred outcome. I do not credit the testimony.

USCA4 Appeal: 22-1731    Doc: 108-4    Filed: 07/07/2023    Pg: 11 of 55
Case 4:22-cv-00325-RH-MAF   Document 246   Filed 06/21/23   Page 10 of 54

Page 10 of 54

instead experimental. The conclusion was not supported by the evidence and was contrary to generally accepted medical standards.

Based in part on the flawed GAPMS report, AHCA proposed a rule barring Medicaid payment for these procedures. AHCA conducted a well-choreographed public hearing that was an effort not to gather facts but to support the predetermined outcome. Afterward, AHCA adopted Florida Administrative Code rule 59G-1.050(7), barring Medicaid payment for gender-affirming puberty blockers, hormones, and surgery.

That was where things stood when the plaintiffs filed this action. Later, though, the Florida Legislature adopted Florida Statutes § 286.31(2). The statute prohibits expenditure of state funds—this includes Medicaid payments—for "sex reassignment prescriptions or procedures" as defined in Florida Statutes § 456.001(9). This includes "puberty blockers" to "stop or delay normal puberty," "hormones or hormone antagonists," and any "medical procedure, including a surgical procedure," "to affirm a person's perception of his or her sex if that perception is inconsistent with the person's [natal] sex." Fla. Stat. § 456.001(9)(a)1–3. There are narrow exceptions, but they do not apply here.

The plaintiffs amended their complaint to challenge the statute as well as the rule. The plaintiffs in *Doe* challenged another part of the same legislation—a part that made providing these services to minors a crime and grounds for terminating a

healthcare practitioner's license. *See id.* § 456.52(1) & (5). This followed the

adoption of rules by the Florida Board of Medicine and the Florida Board of

Osteopathic Medicine that prohibited the Boards' licensed practitioners from

treating "gender dysphoria in minors" with "[p]uberty blocking, hormone, or

hormone antagonist therapies." Fla. Admin. Code r. 64B8-9.019(1)(b); Fla. Admin

Code r. 64B15-14.014(1)(b).

## V. Standing

In *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992), the Supreme

Court said the "irreducible constitutional minimum of standing contains three

elements." First, the plaintiff "must have suffered an injury in fact—an invasion of

a legally protected interest which is (a) concrete and particularized, and (b) actual

or imminent, not conjectural or hypothetical." *Id.* (internal quotation marks and

citations omitted). Second, "there must be a causal connection between the injury

and the conduct complained of—the injury has to be fairly traceable to the

challenged action of the defendant, and not the result of the independent action of

some third party not before the court." *Id.* (internal quotation marks, ellipses, and

brackets omitted). Third, "it must be likely, as opposed to merely speculative, that

the injury will be redressed by a favorable decision." *Id.* (internal quotation marks

omitted). A court must address standing even when not contested by the parties.

### A. Puberty blockers and cross-sex hormones

The minor plaintiffs are currently treated with puberty blockers. They were on track to start cross-sex hormones soon. The adult plaintiffs are currently treated with cross-sex hormones.

The loss of Medicaid payment for the needed treatments is an injury in fact; it is concrete and particularized; and it is actual or imminent, not conjectural or hypothetical. The injury is traceable to the challenged rule and statute, either of which, standing alone, would require the plaintiffs to forgo or pay out-of-pocket for the needed treatment, or move out of Florida. The injury will be redressed by a favorable decision.

The plaintiffs thus have standing. This is so despite the statute and rules prohibiting physicians from providing these services to minors. First, the statute and rules do not apply to adults and thus do not affect the adult plaintiffs' standing. Second, at least as of now, Florida law allows minors to continue with treatments they are already receiving, so the statute and rules do not affect the minor plaintiffs' standing to challenge the ban on payment for puberty blockers.[22] Third, as *Doe* held, the statute and rules prohibiting the provision of these services to

---

[22] *See* Fla. Stat. § 456.52(1)(a); Fla. Admin. Code r. 64B8-9.019(2); Fla. Admin. Code r. 64B15-14.014(2).

USCA4 Appeal: 22-1731    Doc: 108-4    Filed: 07/07/2023    Pg: 14 of 55
Case 4:22-cv-00325-RH-MAF    Document 246    Filed 06/21/23    Page 13 of 54

Page 13 of 54

minors are unconstitutional—the minor plaintiffs can receive the treatments, if only they can find a way to pay for them.

In sum, the minor plaintiffs have standing to challenge Florida's denial of Medicaid payment for puberty blockers, and all the plaintiffs have standing to challenge the denial of Medicaid payment for cross-sex hormones.

### B. Surgery

The result is different for gender-affirming surgery. None of the plaintiffs are currently seeking surgery. The minor plaintiffs have never sought such surgery and are too young even to consider it. Each adult plaintiff has had a mastectomy, and neither seeks further surgery, at least at this time. No plaintiff faces an actual or imminent injury from the denial of Medicaid coverage for gender-affirming surgery.

This is so even though, when this action was filed, Mr. Rothstein was seeking a mastectomy. He had standing at that time to pursue the surgery claim. But he has since had the surgery, paid for through GoFundMe. Past exposure to illegal conduct, without more, does not give a plaintiff standing to pursue prospective relief against a repeat of the illegal conduct, absent a sufficient likelihood that the plaintiff will again be a victim of the illegal conduct. *See, e.g.*, *City of Los Angeles v. Lyons*, 461 U.S. 95, 102, 111 (1983) (holding that a person who had been subjected to a chokehold in the past had no standing to seek

injunctive relief against the city's practice of using chokeholds because there was not a "sufficient likelihood that he will again be wronged in a similar way"); *Malowney v. Fed. Collection Deposit Grp.*, 193 F.3d 1342, 1346 (11th Cir. 1999).

To be sure, Mr. Rothstein asserts a claim for nominal damages based in part on the denial of Medicaid coverage for the surgery he now has had. A nominal-damages claim can be sufficient to establish standing. *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021). But the Eleventh Amendment bars retrospective relief under § 1983 that would be payable from the state treasury. *See, e.g.*, *Edelman v. Jordan*, 415 U.S. 651 (1974). This principle applies to nominal as well as actual damages. *See Simmons v. Conger*, 86 F.3d 1080, 1086 (11th Cir. 1996). The nominal-damages claim thus does not present a live controversy over Medicaid coverage of gender-affirming surgery.

The surgery claim cannot go forward on the merits.

## VI.  The Law of the Circuit: *Rush v. Parham*

In *Rush v. Parham*, 625 F.2d 1150 (5th Cir. 1980), a Medicaid beneficiary challenged Georgia's refusal to pay for gender-affirming surgery. The state said the surgery was experimental and thus not medically necessary. The district court ruled that the surgery was necessary because the plaintiff's physician said so—that the state was bound by the physician's opinion. Not surprisingly, the Fifth Circuit disagreed.

The Fifth Circuit remanded the case to the district court to determine two things: first, whether Georgia had a policy prohibiting payment for experimental services when it first rejected the plaintiff's application; and second, if it did, "whether its determination that transsexual surgery is experimental is reasonable." *Id*. at 1157. The court said this second question—whether the state's determination "is" reasonable, would be controlled on remand by "current medical opinion, regardless of the prevailing knowledge at the time of plaintiff's application." *Id*. at 1157 n.13; *see also Moore*, 637 F.3d at 1259 (stating that Congress could have but did not give the state the role of "final arbiter" over medical necessity).

*Rush* is binding authority in the Eleventh Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc). The remand instructions were the Fifth Circuit's square holding. The case dealt only with surgery, not puberty blockers or cross-sex hormones, but the same principles apply. The decision thus sets out a roadmap for deciding the issue now before this court—the same roadmap the district court was required to follow in *Rush*.

The first issue *Rush* directed the district court to address on remand is easily answered here. The State of Florida prohibited Medicaid payment for experimental services when the plaintiffs submitted their applications. The second question thus is controlling: whether, based on current medical knowledge, the State's determination that these treatments are experimental is reasonable. It is not.

USCA4 Appeal: 22-1721    Doc: 108-4    Filed: 07/07/2023    Pg: 17 of 55
Case 4:22-cv-00325-RH-MAF    Document 246    Filed 06/21/23    Page 16 of 54

Page 16 of 54

## VII.  The standards of care

Transgender individuals suffer higher rates of anxiety, depression, suicidal ideation, and suicide than the population at large.[23] Some suffer gender dysphoria, a mental-health condition recognized in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-5"). The diagnosis applies when specific criteria are met. Among other things, there must be a marked incongruence between one's experienced gender identity and natal sex for at least six months, manifested in specified ways, and clinically significant distress or impairment.[24]

There are well-established standards of care for treatment of gender dysphoria. These are set out in two publications: first, the Endocrine Society Clinical Practice Guidelines for the Treatment of Gender Dysphoria; and second, the World Professional Association for Transgender Health ("WPATH") Standards of Care, version 8.[25] I credit the abundant testimony in this record that these standards are widely followed by well-trained clinicians.[26] The standards are used

---

[23] Trial Tr., ECF No. 226 at 108.
[24] Pls.' Ex. 33, ECF No. 175-33 at 2–3; *see also* Trial Tr., ECF No. 226 at 25–26; Trial Tr., ECF No. 238 at 71.
[25] Defs.' Exs. 16 & 24, ECF Nos. 193-16 & 193-24.
[26] Trial Tr., ECF No. 226 at 31 (psychiatrist); *id.* at 198 (pediatric endocrinologist); Trial Tr., ECF No. 227 at 50–52 (surgeon); *id.* at 106, 112–14 (pediatrician, bioethicist, medical researcher); Trial Tr., ECF No. 228 at 15 (physician specializing in pediatrics and adolescent medicine).

by insurers[27] and have been endorsed by the United States Department of Health and Human Services.[28]

Under the standards, gender-dysphoria treatment begins with a comprehensive biopsychosocial assessment.[29] In addition to any appropriate mental-health therapy, there are three types of possible medical intervention, all available only to adolescents or adults, never younger children.[30]

First, for patients at or near the onset of puberty, medications known as GnRH agonists can delay the onset or continuation of puberty and thus can reduce the development of secondary sex characteristics inconsistent with the patient's gender identity—breasts for transgender males, whiskers for transgender females, changes in body shape, and other physical effects.[31] GnRH agonists are colloquially known as puberty blockers.

Second, cross-sex hormones—testosterone for transgender males, estrogen for transgender females—can promote the development and maintenance of characteristics consistent with the patient's gender identity and can limit the development and maintenance of characteristics consistent with the patient's natal

---

[27] Trial Tr., ECF No. 227 at 243–44.
[28] *See* Defs.' Ex. 2, ECF No. 193-2.
[29] *See* Trial Tr., ECF No. 226 at 42–43.
[30] Trial Tr., ECF No. 238 at 72 & 74–75; *see also* Trial Tr., ECF No. 228 at 14; Trial Tr., ECF No. 226 at 36 & 176.
[31] *See* Trial Tr., ECF No. 226 at 194–97; Trial Tr., ECF No. 228 at 27–28.

USCA4 Appeal: 22-1721    Doc: 108-4    Filed: 07/07/2023    Pg: 19 of 55
Case 4:22-cv-00325-RH-MAF    Document 246    Filed 06/21/23    Page 18 of 54

Page 18 of 54

sex.[32] For patients treated with GnRH agonists, use of cross-sex hormones typically begins when use of GnRH agonists ends.[33] Cross-sex hormones also can be used later in life, regardless of whether a patient was treated with GnRH agonists.

Third, for some patients, surgery can align physical characteristics with gender identity, to some extent.[34] The most common example: mastectomy can remove a transgender male's breasts. Perhaps 98% of all such surgeries are performed on adults, not minors.[35]

## VIII. General acceptance of the standards of care

The overwhelming weight of medical authority supports treatment of transgender patients with GnRH agonists and cross-sex hormones in appropriate circumstances. Organizations who have formally recognized this include the American Academy of Pediatrics, American Academy of Child and Adolescent Psychiatry, American Academy of Family Physicians, American College of Obstetricians and Gynecologists,  American College of Physicians, American Medical Association, American Psychiatric Association, and at least a dozen

---

[32] Trial Tr., ECF No. 226 at 217–26, 228.
[33] *See* Trial Tr., ECF No. 228 at 87–90.
[34] *See* Trial Tr., ECF No. 227 at 42.
[35] *See id.* at 43.

more.[36] The record also includes statements from hundreds of professionals supporting this care.[37] At least as shown by this record, not a single reputable medical association has taken a contrary position.

These medications—GnRH agonists, testosterone, and estrogen—have been used for decades to treat other conditions. Their safety records and overall effects are well known. The Food and Drug Administration has approved their use, though not specifically to treat gender dysphoria.[38]

GnRH agonists are routinely used to treat patients with central precocious puberty—children who have begun puberty prematurely—as well as, in some circumstances, endometriosis and prostate cancer.[39] Central precocious puberty presents substantial health risks and ordinarily should be treated. GnRH agonists are an appropriate treatment, even though GnRH agonists have attendant risks.[40] So, too, gender dysphoria presents substantial health risks and ordinarily should be treated.[41] For some patients, GnRH agonists are an appropriate treatment, even

---

[36] *See* Pls.' Exs. 36–43, 45–48, ECF Nos. 175-36 through 176-8 (omitting ECF No. 176-4); *see also* Amicus Brief of American Academies and Health Organizations, ECF No. 192-1.

[37] *See* Amicus Brief of American Academies and Health Organizations, ECF No. 192-1; Bruggeman et al., *We 300 Florida health care professionals say the state gets transgender guidance wrong* (Apr. 27, 2022), ECF No. 11-1 at 11–32.

[38] *See* Trial Tr., ECF No. 226 at 183; *see also* Trial Tr., ECF No. 239 at 54–56.

[39] Trial Tr., ECF No. 226 at 183–84, 200–02.

[40] *Id.*

[41] *Id.*

though, just as with their use to treat central precocious puberty and other conditions, GnRH agonists have attendant risks.[42]

The defendants say the risks attendant to use of GnRH agonists to treat central precocious puberty or to treat gender dysphoria are not identical, and that may be so. But it is still true that for gender dysphoria, just as for central precocious puberty, GnRH agonists are an effective treatment whose benefits can outweigh the risks.

The same is true for cross-sex hormones. Testosterone and estrogen are routinely used to treat cisgender patients in appropriate circumstances.[43] The medications are an effective treatment for conditions that should be treated, even though the medications have attendant risks.[44] That is so for cisgender and transgender patients alike. For some transgender patients, cross-sex hormones are an appropriate treatment.

Even the defendants' expert Dr. Levine testified that treatment with GnRH agonists and cross-sex hormones is sometimes appropriate.[45] He would demand appropriate safeguards, as discussed below, but he would not ban the treatments.[46] These plaintiffs qualify for treatment under Dr. Levine's proposed safeguards.

_____

[42] *Id.* at 201–16.
[43] *Id.* at 216.
[44] *Id.* at 218–29.
[45] Trial Tr., ECF No. 239 at 81–83.
[46] *Id.* at 91–94.

## IX. Clinical evidence supporting the standards of care

The record includes testimony of well-qualified doctors who have treated thousands of transgender patients with GnRH agonists and cross-sex hormones over their careers and have achieved excellent results. I credit the testimony of Dr. Dan Karasic (psychiatrist), Dr. Daniel Shumer (pediatric endocrinologist), Dr. Aron Janssen (child and adolescent psychiatrist), Dr. Johanna Olson-Kennedy (specialist in pediatrics and adolescent medicine), and Dr. Armand Antommaria (pediatrician and bioethicist). I credit their testimony that denial of this treatment will cause needless suffering for a substantial number of patients and will increase anxiety, depression, and the risk of suicide.

The clinical evidence would support, though certainly not mandate, a decision by a reasonable patient and parent, in consultation with properly trained practitioners, to use GnRH agonists at or near the onset of puberty and to use cross-sex hormones later, even when fully apprised of the current state of medical knowledge and all attendant risks. There is no rational basis for a state to categorically ban these treatments or to exclude them from the state's Medicaid coverage.

The record includes no evidence that these treatments have caused substantial adverse clinical results in properly screened and treated patients.

USCA4 Appeal: 22-1731    Doc: 108-4    Filed: 07/07/2023    Pg: 23 of 55
Case 4:22-cv-00325-RH-MAF   Document 246   Filed 06/21/23   Page 22 of 54

Page 22 of 54

## X. The plaintiffs' history and medical care

### A. *August Dekker*

August Dekker is a Medicaid-eligible, 28-year-old transgender man.[47] He identified as male from a young age but suffered without disclosing the situation to his family or others. He repeatedly attempted suicide in high school.[48] He began cutting his hair short at age 18, began using a male name and pronouns at age 20, and came out to his family at age 22. He still experienced gender dysphoria. After eight months of therapy and evaluation by a multidisciplinary team, he began treatment with a cross-sex hormone, testosterone.[49] His mental health markedly improved.[50]

A romantic partner convinced him to discontinue testosterone. His mental health deteriorated. He resumed the treatment, and his mental health again improved.[51]

In 2022, with approval from his long-term treating psychiatrist, Mr. Dekker had a mastectomy at the University of Florida.[52] His mental health improved again.

---

[47] Trial Tr., ECF No. 228 at 142 & 145–46.
[48] *Id.* at 150.
[49] *Id.* at 154–55.
[50] *Id.* at 156–57.
[51] *Id.* at 159.
[52] *Id.* at 162. The defendants note that, after a single meeting, a mental-health intern wrote a letter supporting the surgery. Neither a single meeting nor an intern's opinion, standing alone, would support a decision to proceed with surgery.

Mr. Dekker believes that had he not received these treatments—cross-sex hormones and surgery—he would by now have died from suicide, substance abuse, or other self-destructive behavior.[53] Instead, he is thriving.

Medicaid paid for all his treatment, including the cross-sex hormones and surgery. But now, the challenged rule and statute, unless enjoined, will make it impossible for him to continue the hormone treatment, which is still medically necessary.

### B. Brit Rothstein

Brit Rothstein is a Medicaid-eligible, 20-year-old transgender man. He is a full-time student at a major research university.[54] He began experiencing gender dysphoria as early as age 8 but did not begin to "put words to feelings" until about age 12.[55] He came out to his peers and family at age 13.

After extensive therapy and then evaluation by a pediatric endocrinologist at a major children's hospital, a recommendation was made for treatment with GnRH agonists and cross-sex hormones. Mr. Rothstein's mother objected. Mr. Rothstein's father obtained a court order giving him medical decisionmaking authority, and the

---

Here, though, the long-term treating psychiatrist recommended surgery, and the surgeon performed it. They were not interns. The surgery has been performed and is no longer at issue.

[53] *Id.* at 167.

[54] *Id.* at 113–15.

[55] *Id.* at 115.

treatments went forward.[56] Medicaid paid for the treatments. Mr. Rothstein's mental health improved.

Mr. Rothstein still bound his chest every day. He eventually consulted a surgeon at the University of Miami and decided to go forward with a mastectomy. The surgery was precleared for Medicaid payment, and a date was set.[57] But the challenged rule was adopted, Medicaid approval was withdrawn, and the surgery was canceled. While this lawsuit was pending, Mr. Rothstein obtained crowd funding through GoFundMe, and he had the surgery. He is very pleased with the results. He remains on cross-sex hormones, which are medically necessary.

### C. Susan Doe

Susan Doe is a Medicaid-eligible 13-year-old transgender girl.[58] Her parents, John and Jane Doe, adopted her from medical foster care at age 2. Susan told her mother she was a girl at age 3, and she has consistently behaved that way. Her mother, who was previously unaware of transgender issues, attempted to react neutrally and sought professional advice on how best to care for Susan. Susan began seeing a therapist at age 6.[59] She has identified as a girl at school since second grade.[60]

---

[56] *Id.* at 122–23.
[57] *Id.* at 133–34.
[58] *Id.* at 94–96.
[59] *Id.* at 98.
[60] *Id.* at 100.

USCA4 Appeal: 22-1721    Doc: 108-4    Filed: 07/07/2023    Pg: 26 of 55
Case 4:22-cv-00325-RH-MAF    Document 246    Filed 06/21/23    Page 25 of 54

Page 25 of 54

Susan began GnRH agonists three years ago at age 10.[61] She has had excellent results and is ready to begin hormone therapy. Her treatment has been paid for to this point by Medicaid, but that will stop unless the challenged rule and statute are enjoined.

### D. K.F.

K.F. is a Medicaid-eligible 13-year-old transgender boy.[62] At age 7, he told his grandparents, and soon after his parents, that he was a boy.[63] This was consistent with how he had behaved.

K.F. received an extensive psychiatric evaluation followed by five years of therapy at Boston Children's Hospital.[64] He started on puberty blockers. He moved with his family to Florida and continued his treatment here. He had an appointment with a pediatric endocrinologist at the Johns Hopkins gender clinic in St. Petersburg to consider transition to cross-sex hormones, but the appointment was canceled when the State prohibited the treatment.[65]

He has achieved excellent results with his treatment to date. Medicaid paid for it, first in Massachusetts, then in Florida.

---

[61] *Id.* at 102.
[62] *Id.* at 174,176.
[63] *Id.* at 177.
[64] *See id.* at 184–91.
[65] *Id.* at 195–98.

USCA4 Appeal: 22-1731    Doc: 108-4    Filed: 07/07/2023    Pg: 27 of 55
Case 4:22-cv-00325-RH-MAF   Document 246   Filed 06/21/23   Page 26 of 54

Page 26 of 54

### E. Findings on appropriate treatment

I find, based on the record now before the court, that the plaintiffs have obtained appropriate medical care to this point, that qualified professionals have properly evaluated their medical conditions and needs in accordance with the well-established standards of care, and that the plaintiffs, in consultation with their treating professionals and, for the minors, their parents, have determined that the benefits of the treatment they seek—GnRH agonists or cross-sex hormones—will outweigh the risks. I find that the ability of the adult plaintiffs to evaluate the benefits and risks of the treatment far exceeds the ability of the State of Florida to do so. I find that the ability of the minor plaintiffs and their parents to evaluate the benefits and risks of the treatment far exceeds the ability of the State of Florida to do so. I find that the adult plaintiffs' motivation is their desire to achieve the best possible medical treatment for their gender dysphoria. I find that the minor plaintiffs' parents' motivation is love for their children. I find that the motivation of the minor plaintiffs and their parents is the desire to achieve the best possible medical treatment for the minor plaintiffs' gender dysphoria. This is not the State's motivation.

## XI.  Equal Protection

The ban on treating minors with puberty blockers and cross-sex hormones violates the Fourteenth Amendment's Equal Protection Clause. The only circuit

that has addressed the issue agrees. In *Brandt ex rel. Brandt v. Rutledge*, 47 F.4th

661 (8th Cir. 2022), the Eighth Circuit affirmed a preliminary injunction against

enforcement of an Arkansas statute identical in relevant respects to the Florida

statute banning these treatments. The decision is on point, well-reasoned, and

should be followed. But as an Eighth Circuit decision, it is not binding.

District court opinions also are not binding. But they have consistently reached the

same result. *See Brandt v. Rutledge*, No. 4:21-cv-450, 2023 WL 4073727 (E.D.

Ark. June 20, 2023) (holding after an eight-day bench trial that a state law banning

gender-affirming care was unconstitutional); *K.C. v. Individual Members of Med.*

*Licensing Bd. of Ind.*, No. 1:23-cv-595, 2023 WL 4054086 (S.D. Ind. June 16,

2023) (granting preliminary injunction against Indiana statute banning puberty

blockers and cross-sex hormones for minors); *Doe v. Ladapo*, No. 4:23-cv-114-

RH-MAF, 2023 WL 3833848 (N.D. Fla. June 6, 2023) (granting preliminary

injunction against Florida statute and rules banning puberty blockers and cross-sex

hormones for minors); *Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131 (M.D. Ala.

2022) (granting preliminary injunction against Alabama statute banning puberty

blockers and cross-sex hormones for minors).

 Florida's denial of Medicaid coverage for GnRH agonists and cross-sex

hormones also violates the Equal Protection Clause. Other district courts have

reached this same result. *See Fain v. Crouch*, 618 F. Supp. 3d 313 (S.D. W. Va.

USCA4 Appeal: 22-1731    Doc: 108-4    Filed: 07/07/2023    Pg: 29 of 55
Case 4:22-cv-00325-RH-MAF   Document 246   Filed 06/21/23   Page 28 of 54

Page 28 of 54

2022) (holding state Medicaid plan's exclusion of gender-affirming care violated the Medicaid Act, Affordable Care Act, and Equal Protection Clause); *Flack v. Wis. Dep't of Health Servs.*, 395 F. Supp. 3d 1001 (W.D. Wis. 2019) (holding state Medicaid plan's exclusion of gender-affirming care violated the Medicaid Act, Affordable Care Act, and Equal Protection Clause); *see also Kadel v. Folwell*, 620 F. Supp. 3d 339 (M.D.N.C. 2022) (holding state employee insurance plan's categorical exclusion of gender-affirming care violated the Equal Protection Clause, Affordable Care Act, and Title VII); *Boyden v. Conlin*, 341 F. Supp. 3d 979 (W.D. Wis. 2018) (holding state employee insurance plan's exclusion of gender-affirming care violated Title VII, the Affordable Care Act, and the Equal Protection Clause).

### A. *Introduction to levels of scrutiny*

Equal-protection analysis often starts with attention to the appropriate level of scrutiny: strict, intermediate, or rational-basis.

There was a time when the Supreme Court seemed to treat strict scrutiny and rational basis as exhaustive categories of equal-protection review. A leading commentator said that in some situations the first category was "'strict' in theory and fatal in fact" while the second called for "minimal scrutiny in theory and virtually none in fact." Gerald Gunther, *The Supreme Court, 1971 Term—*

*Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection*, 86 Harv. L. Rev. 1, 8 (1972).

But in the decades since, the Supreme Court has applied *intermediate* scrutiny in many circumstances. And rational-basis review no longer means virtually no review. *See, e.g.*, *Romer v. Evans*, 517 U.S. 620, 632 (1996) (striking down, for lack of a legitimate rational basis, a state law restricting local ordinances protecting gays: "[E]ven in the ordinary equal protection case calling for the most deferential of standards, we insist on knowing the relation between the classification adopted and the object to be attained."); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 447–50 (1985) (striking down, for lack of a legitimate rational basis, an ordinance requiring group-care facilities for the mentally handicapped, but not other facilities with multiple occupants, to obtain land-use permits); *Hooper v. Bernalillo Cnty. Assessor*, 472 U.S. 612, 623 (1985) (striking down, for lack of a legitimate rational basis, a tax exemption for Vietnam War veterans limited to those who resided in the state on May 8, 1976); *United States Dep't of Agric. v. Moreno*, 413 U.S. 528 (1973) (striking down, for lack of a legitimate rational basis, a statute denying food stamps to members of a household with unrelated members).

In short, regardless of the level of scrutiny, there is no substitute for careful, unbiased, intellectually honest analysis. Still, the level of scrutiny matters, so this order addresses it.

### B. Intermediate scrutiny applies here

The plaintiffs say the challenged rule and statute discriminate on the basis of sex and transgender status and that either alone would be sufficient to trigger intermediate scrutiny. The defendants say only rational-basis scrutiny applies. The plaintiffs have the better of it.

### 1. Sex

It is well established that drawing lines based on sex triggers intermediate scrutiny. *See, e.g.*, *United States v. Virginia*, 518 U.S. 515, 533 (1996); *Adams v. St. Johns Cnty.*, 57 F.4th 791, 801 (11th Cir. 2022) (en banc). If one must know the sex of a person to know whether or how a provision applies to the person, the provision draws a line based on sex. *See, e.g.*, *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1737 (2020); *Adams*, 57 F.4th at 801. The defendants do not deny this; instead, they say the challenged statute does not draw a line based on sex.

But it does. Consider an adolescent Medicaid patient, perhaps age 16, that a physician wishes to treat with testosterone. Under the challenged rule and statute, is the treatment covered by Medicaid? To know the answer, one must know the adolescent's sex. If the adolescent is a natal male, the treatment is covered. If the

USCA4 Appeal: 22-1731    Doc: 108-4    Filed: 07/07/2023    Pg: 32 of 55
Case 4:22-cv-00325-RH-MAF    Document 246    Filed 06/21/23    Page 31 of 54

Page 31 of 54

adolescent is a natal female, the treatment is not covered. This is a line drawn on the basis of sex, plain and simple. *See Brandt*, 47 F.4th at 669 ("Because the minor's sex at birth determines whether or not the minor can receive certain types of medical care under the law, [the law] discriminates on the basis of sex."); *Adams*, 57 F.4th at 801 (applying intermediate scrutiny to a policy under which entry into a designated bathroom was legal or not depending on the entrant's natal sex).

In asserting the contrary, the defendants note that the reason for the treatment—the diagnosis—is different for the natal male and natal female. Indeed it is. But this does not change the fact that this is differential treatment based on sex. The *reason* for sex-based differential treatment is the purported *justification* for treating the natal male and natal female differently—the justification that must survive intermediate scrutiny. One can survive—but cannot avoid—intermediate scrutiny by saying there is a good reason for treating a male and female differently.

### 2. *Gender nonconformity*

Drawing a line based on gender nonconformity—this includes transgender status—also triggers intermediate scrutiny. *See Glenn v. Brumby*, 663 F.3d 1313, 1316 (11th Cir. 2011). Although the defendants deny it, the rule and statute at issue draw lines based on transgender status. *See Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131, 1147 (M.D. Ala. 2022) (citing *Glenn*, 663 F.3d at 1317).

USCA4 Appeal: 22-1731   Doc: 108-4   Filed: 07/07/2023   Pg: 33 of 55
Case 4:22-cv-00325-RH-MAF   Document 246   Filed 06/21/23   Page 32 of 54

Page 32 of 54

To confirm this, consider a Medicaid-eligible child that a physician wishes to treat with GnRH agonists to delay the onset of puberty. Is the treatment covered? To know the answer, one must know whether the child is cisgender or transgender. The treatment is covered if the child is cisgender but not if the child is transgender, because the rule and statute exclude coverage of GnRH agonists only for transgender children, not for anyone else. The theoretical but remote-to-the-point-of-nonexistent possibility that a child will be identified as transgender before needing GnRH agonists for the treatment of central precocious puberty does not change the essential nature of the distinction.

Adverse treatment of transgender individuals should trigger intermediate scrutiny for another reason, too. In *United States v. Carolene Products Co.*, 304 U.S. 144, 152 n.4 (1938), the Court suggested heightened scrutiny might be appropriate for statutes showing "prejudice against discrete and insular minorities." Courts have continued to apply the discrete-and-insular-minority construct. *See, e.g.*, *Foley v. Connelie*, 435 U.S. 291, 294–95 (1978) (citing *Carolene Products* and noting that "close scrutiny" applies to equal-protection claims of resident aliens, who lack access to the political process); *Estrada v. Becker*, 917 F.3d 1298, 1310 (11th Cir. 2019) (citing *Carolene Products*; recognizing that, under *Foley*, heightened scrutiny applies to resident aliens; but declining to afford the same

treatment to illegal immigrants). Transgender individuals are a discrete and insular minority.

The Supreme Court further explained this basis for heightened scrutiny in *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985). There the Court declined to extend strict or even intermediate scrutiny to intellectually disabled individuals—those with very limited mental ability. But the Court gave two explanations that support a different result for transgender individuals.

First, *City of Cleburne* noted that strict scrutiny applies when the characteristic at issue is almost never a legitimate reason for governmental action. Race is the paradigm—leaving aside affirmative action as a remedy for prior discrimination, it is almost never appropriate to parcel out government benefits or burdens based on race. Transgender status is much the same. Transgender status is rarely an appropriate basis on which to parcel out government benefits or burdens.

Second, *Carolene Products* and *Foley* both referred to a minority's lack of political voice as a basis for heightened scrutiny. *City of Cleburne* noted that the class of intellectually disabled individuals had garnered considerable public and political support—that this was not a class lacking political access. The same is not true of transgender individuals, who continue to suffer widespread private opprobrium and governmental discrimination, notably in the rule and statute now under review. This is precisely the kind of government action, targeted at a discrete

and insular minority, for which heightened scrutiny is appropriate. *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 607 (4th Cir. 2020) (holding transgenders are a quasi-suspect class); *Karnoski v. Trump*, 926 F.3d 1180, 1201 (9th Cir. 2019) (same). *But see Adams*, 57 F.4th at 803 n.5 (noting that whether transgender status is a quasi-suspect class was not at issue there but, in dictum, expressing "grave doubt").

In any event, *City of Cleburne* is important for another reason, too. The Court applied rational-basis scrutiny, but it was *meaningful* rational-basis scrutiny. The Court did not blindly accept a proffered reason for the city's action that did not withstand meaningful analysis. The defendants' proffered reasons here, like those in *City of Cleburne*, do not withstand meaningful analysis. *See Brandt ex rel. Brandt v. Rutledge*, 47 F.4th 661 (8th Cir. 2022) (affirming a preliminary injunction and holding the plaintiffs were likely to prevail on their equal-protection challenge to an Arkansas statute banning gender-affirming care for minors).

### 3. Cases involving identical, not different, treatment of classes

In opposing heightened scrutiny, the defendants cite *Geduldig v. Aiello*, 417 U.S. 484 (1974), for the proposition that heightened scrutiny does not apply when there are members of the allegedly disfavored class on both sides of the challenged classification. *Geduldig* held that exclusion of pregnancy from state employees' health coverage was not sex discrimination. Some women become pregnant, some

USCA4 Appeal: 22-1721    Doc: 108-4    Filed: 07/07/2023    Pg: 36 of 55
Case 4:22-cv-00325-RH-MAF    Document 246    Filed 06/21/23    Page 35 of 54

Page 35 of 54

do not. The defendants say this is why the challenged provision did not discriminate based on sex—there were women on both sides. Note, though, that men and women were treated the same: nobody had health coverage for pregnancy. When men and women are treated the same, the Court reasoned, it is not intentional sex discrimination, even if the challenged provision has a disparate impact.

The situation is different here. Transgender and cisgender individuals are not treated the same. Cisgender individuals can be and routinely are treated with GnRH agonists, testosterone, or estrogen, when they and their doctors deem it appropriate, and the treatments are covered by Medicaid. Not so for transgender individuals—the challenged rule and statute prohibit it. To know whether treatment with any of these medications is covered, one must know whether the patient is transgender. And to know whether treatment with testosterone or estrogen is covered, one must know the patient's natal sex.

The defendants also invoke *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022). There the Court rejected a due-process challenge to an abortion statute, but the Court also said that the statute did not deny equal protection: "The regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny unless the regulation is a 'mere pretex[t] designed to effect an invidious discrimination against members of

USCA4 Appeal: 22-1731    Doc: 108-4    Filed: 07/07/2023    Pg: 37 of 55
Case 4:22-cv-00325-RH-MAF   Document 246   Filed 06/21/23   Page 36 of 54

Page 36 of 54

one sex or the other.'" *Id.* at 2245–46 (quoting *Geduldig*, 417 U.S. at 496 n.20). The Court said abortion laws thus "are governed by the same standard of review as other health and safety measures." *Dobbs*, 142 S. Ct. at 2246.

The case at bar, in contrast, does not involve a medical treatment that only one sex can undergo, or that only cisgender or transgender patients can undergo. Instead, the case involves treatments that all individuals can undergo; the state has simply chosen to make the treatment legal for some and illegal for others, depending on sex or transgender status. The *Dobbs* statement about procedures only one sex can undergo is simply inapplicable—and would not help the defendants anyway, because this case involves invidious discrimination against transgenders.

In short, the challenged rule and statute impose differential treatment based on sex and transgender status. *Geduldig* and *Dobbs* are not to the contrary. Intermediate scrutiny applies.

### C. Applying the proper level of scrutiny

To survive intermediate scrutiny, a state must show that its classification is substantially related to a sufficiently important interest. *Adams*, 57 F.4th at 801 (cleaned up); *see also Glenn*, 663 F.3d at 1316. To survive rational-basis scrutiny, a state must show a rational relationship to a legitimate state interest. *Romer*, 517 U.S. at 631. The challenged rule and statute survive neither level of scrutiny.

USCA4 Appeal: 22-1721    Doc: 108-4    Filed: 07/07/2023    Pg: 38 of 55
Case 4:22-cv-00325-RH-MAF    Document 246    Filed 06/21/23    Page 37 of 54

Page 37 of 54

The record establishes that for some minors, including Susan Doe and K.F., a treatment regimen of mental-health therapy followed by GnRH agonists and eventually by cross-sex hormones is the best available treatment. They and their parents, in consultation with their doctors and multidisciplinary teams, have rationally chosen this treatment. The State of Florida's decision to ban payment for GnRH agonists and cross-sex hormones for transgender individuals is not rationally related to a legitimate state interest.

Dissuading a person from conforming to the person's gender identity rather than to the person's natal sex is not a legitimate state interest. The defendants apparently acknowledge this.[66] But the State's disapproval of transgender status— of a person's gender identity when it does not match the person's natal sex—was a substantial motivating factor in enactment of the challenged rule and statute.

Discouraging individuals from pursuing their gender identities, when different from their natal sex, was also a substantial motivating factor. In a "fact sheet," the Florida Department of Health asserted social transitioning, which involves no medical intervention at all, should not be a treatment option for children or adolescents.[67] Nothing could have motivated this remarkable intrusion into parental prerogatives other than opposition to transgender status itself.

---

[66] Trial Tr., ECF No. 242 at 97–98.
[67] Defs.' Ex. 5, ECF No. 193-5 at 1; *see also* Pls.' Ex. 19, ECF No. 175-19 at 2.

State action motivated by purposeful discrimination, even if otherwise

lawful, violates the Equal Protection Clause. *See Adams*, 57 F.4th at 810

(recognizing that an otherwise neutral law still violates the Equal Protection Clause

when it is "motivated by 'purposeful discrimination'") (citing *Pers. Adm'r of*

*Mass. v. Feeney*, 442 U.S. 256, 274 (1979)); *see also Greater Birmingham*

*Ministries v. Sec'y of State for Ala.*, 992 F.3d 1299, 1321–22 (11th Cir. 2021). The

rule and statute at issue were motivated in substantial part by the plainly

illegitimate purposes of disapproving transgender status and discouraging

individuals from pursuing their honest gender identities. This was purposeful

discrimination against transgenders.

## XII.   The pretextual justifications for the rule and statute

In support of their position, the defendants have proffered a laundry list of

purported justifications for the rule and statute. The purported justifications are

largely pretextual and, in any event, do not call for a different result.

### A.   *"Low quality" evidence*

A methodology often used for evaluating medical studies—for evaluating

research-generated evidence on the safety and efficacy of any given course of

treatment—is known as Grading of Recommendations, Assessment, Development,

and Evaluation ("GRADE"). The defendants stridently assert that the evidence

supporting the treatments at issue is "low" or "very low" quality as those terms are

USCA4 Appeal: 22-1731    Doc: 108-4    Filed: 07/07/2023    Pg: 40 of 55
Case 4:22-cv-00325-RH-MAF    Document 246    Filed 06/21/23    Page 39 of 54

Page 39 of 54

used in the GRADE system. But the evidence on the other side—the evidence purportedly showing these treatments are ineffective or unsafe—is far weaker, not just of "low" or "very low" quality. Indeed, evidence suggesting these treatments are ineffective is nonexistent.

The choice these plaintiffs face is binary: to use GnRH agonists and cross-sex hormones, or not. It is no answer to say the evidence on the yes side is weak when the evidence on the no side is weaker or nonexistent. There is substantial and persuasive, though not conclusive, research showing favorable results from these treatments.[68] A decision for the patients at issue cannot wait for further or better research; the treatment decision must be made now.

Moreover, the fact that research-generated evidence supporting these treatments gets classified as "low" or "very low" quality on the GRADE scale does not mean the evidence is not persuasive, or that it is not the best available research-generated evidence on the question of how to treat gender dysphoria, or that medical treatments should not be provided consistent with the research results and clinical evidence.

It is commonplace for medical treatments to be provided even when supported only by research producing evidence classified as "low" or "very low"

_____

[68] *See, e.g.*, Trial Tr., ECF No. 228 at 41–42.

USCA4 Appeal: 22-1731    Doc: 108-4    Filed: 07/07/2023    Pg: 41 of 55
Case 4:22-cv-00325-RH-MAF   Document 246   Filed 06/21/23   Page 40 of 54

Page 40 of 54

on this scale.[69] The record includes unrebutted testimony that only about 13.5% of accepted medical treatments across all disciplines are supported by "high" quality evidence on the GRADE scale.[70] The defendants' assertion that treatment should be banned based on the supporting research's GRADE score is a misuse of the GRADE system.

We put band-aids on cuts to keep dirt out not because there is "high" quality research-generated evidence supporting the practice but because we know, from clinical experience, that cuts come with a risk of infection and band-aids can reduce the risk.

Gender dysphoria is far more complicated, and one cannot know, with the same level of confidence, how to treat it. But there is now extensive clinical experience showing excellent results from treatment with GnRH agonists and cross-sex hormones. If these treatments are prohibited or Medicaid payment is unavailable, many patients will suffer needlessly.[71] The extensive clinical evidence is important and indeed persuasive evidence, even if the supporting research has produced only "low" or "very low" quality evidence on the GRADE scale.

When facing a binary decision to use or not use GnRH agonists or hormones, a reasonable decisionmaker would consider the evidence on the yes

_____

[69] *See* Trial Tr., ECF No. 227 at 98–101.
[70] Trial Tr., ECF No. 226 at 68–69.
[71] Trial Tr., ECF No. 226 at 64; Trial Tr., ECF No. 238 at 97–98.

USCA4 Appeal: 22-1721    Doc: 108-4    Filed: 07/07/2023    Pg: 42 of 55
Case 4:22-cv-00325-RH-MAF    Document 246    Filed 06/21/23    Page 41 of 54

Page 41 of 54

side, as well as the weaker evidence on the no side. Calling the evidence on the yes side "low" or "very low" quality would not rationally control the decision.

### B. Risks attendant to treatment

The defendants assert there are risks attendant to treatment with GnRH agonists and cross-sex hormones. Indeed there are. There are legitimate concerns about the effect on bone density; this calls for appropriate monitoring. There are legitimate concerns about fertility and sexuality that a child entering puberty is not well-equipped to evaluate and for which parents may be less-than-perfect decisionmakers. There is a risk of misdiagnosis, though the requirement in the standards of care for careful analysis by a multidisciplinary team should minimize the risk. There is a risk that a child later confronted with the bias that is part of our world will come to believe it would have been better to try to pass as cisgender.

There also are studies suggesting not that there *are* but that there *may be* additional medical risks. An unreplicated study found that sheep who took GnRH agonists became worse at negotiating a maze, at least for a time. Another study showed a not-statistically-significant but nonetheless-concerning decrease in IQ among cisgender children treated for central precocious puberty with GnRH agonists. These and other studies cited by the defendants would surely be rated low or very-low quality on the GRADE scale and, more importantly, are not very persuasive. The latter study has not led to a ban on the use of GnRH agonists to

treat central precocious puberty. One cannot know from these studies whether treating transgender adolescents with GnRH agonists will cause comparable adverse results in some patients. But the risk that they will is a risk a decisionmaker should reasonably consider.

That there are risks does not end the inquiry. There are also substantial benefits for the overwhelming majority of patients treated with GnRH agonists and cross-sex hormones. And there are risks attendant to *not* using these treatments, including the risk—in some instances, the near certainty—of anxiety and depression and even suicidal ideation. The challenged rule and statute ignore the benefits that many patients realize from these treatments and the substantial risk posed by foregoing the treatments—the risk from failing to pursue what is, for many, the most effective available treatment of gender dysphoria. Mr. Dekker attempted suicide four times before beginning successful treatment with cross-sex hormones; he is now thriving.[72]

If the plaintiffs do not continue appropriate treatments, the likelihood is very high that they will suffer attendant adverse mental-health consequences. If, on the other hand, they *do* continue appropriate treatments, they will avoid some of the adverse consequences. They also will face attendant risks.

---

[72] Trial Tr., ECF No. 228 at 150 & 166–67.

USCA4 Appeal: 22-1731   Doc: 108-4   Filed: 07/07/2023   Pg: 44 of 55
Case 4:22-cv-00325-RH-MAF   Document 246   Filed 06/21/23   Page 43 of 54

Page 43 of 54

Risks attend many kinds of medical treatment, perhaps most. Ordinarily it is the patient, in consultation with the doctor, who weighs the risks and benefits and chooses a course of treatment. Florida's Medicaid program routinely covers treatments with greater risks than those involved here. What is remarkable about the challenged rule and statute is not that they address medical treatments with both risks and benefits but that they arrogate to the State the right to make the decision. And worse, the rule and statute make the same decision for everybody, without considering any patient's individual circumstances. The rule and statute do this in contravention of widely accepted standards of care.

That there are risks of the kind presented here is not a rational basis for denying patients the option to choose this treatment and to have Medicaid cover the cost.

### C. Bias in medical organizations

The defendants say the many professional organizations that have endorsed treatment of gender dysphoria with GnRH agonists and hormones all have it wrong. The defendants say, in effect, that the organizations were dominated by individuals who pursued good politics, not good medicine.

If ever a pot called a kettle black, it is here. The statute and the rule were an exercise in politics, not good medicine.

This is a politically fraught area. There has long been, and still is, substantial bigotry directed at transgender individuals. Common experience confirms this, as does a Florida legislator's remarkable reference to transgender witnesses at a committee hearing as "mutants" and "demons."[73] And even when not based on bigotry, there are those who incorrectly but sincerely believe that gender identity is not real but instead just a choice. This is, as noted above, the elephant in the room.

Where there is bigotry, there are usually—one hopes, always—opponents of bigotry. It is hardly surprising that doctors who understand that transgender identity can be real, not made up—doctors who are willing to provide supportive medical care—oppose anti-transgender bigotry.

It sometimes happens that opponents of bigotry deem opposing viewpoints bigoted even when they are not. And it sometimes happens that those with opposing viewpoints are slow to speak up, lest they be accused of bigotry. These dynamics could affect a medical association's consideration of transgender

---

[73] *Hearing on Facility Requirements Based on Sex*, CS/HB 1521 2023 Session (Fla. Apr. 10, 2023), https://www.myfloridahouse.gov/VideoPlayer.aspx?eventID=8804 (time stamp 2:30:35 to 2:34:10). Representative Webster Barnaby said to transgender Florida citizens who spoke at the hearing that they were "mutants living among us on Planet Earth." He raised his voice and said, "[T]his is Planet Earth, where God created men, male and women, female!" He continued: "[T]he Lord rebuke you Satan and all of your demons and imps that come parade before us. That's right I called you demons and imps who come and parade before us and pretend that you are part of this world." Finally, he said, you can "take [him] on" but he "promises [he] will win every time."

treatment. The record suggests these dynamics *have* affected the tone and quality of debate within WPATH. It is entirely possible that the same dynamics could have affected the tone and quality of debate within other associations.

Even so, it is fanciful to believe that all the many medical associations who have endorsed gender-affirming care, or who have spoken out or joined an amicus brief supporting the plaintiffs in this litigation, have so readily sold their patients down the river. The great weight of medical authority supports these treatments. The widely accepted standards of care require competent therapy and careful evaluation by a multidisciplinary team before use of GnRH agonists and cross-sex hormones for treatment of gender dysphoria. But the widely accepted standards of care support their use in appropriate circumstances. The standards have been unanimously endorsed by reputable medical associations, even though not unanimously endorsed by all the members of the associations.

The overwhelming majority of doctors are dedicated professionals whose first goal is the safe and effective treatment of their patients. There is no reason to believe the doctors who adopted these standards were motivated by anything else.

### D. International views

The defendants have asserted time and again that Florida now treats GnRH agonists and cross-sex hormones the same as European countries. The assertion is false. And no matter how many times the defendants say it, it will still be false. No

USCA4 Appeal: 22-1731   Doc: 108-4   Filed: 07/07/2023   Pg: 47 of 55
Case 4:22-cv-00325-RH-MAF   Document 246   Filed 06/21/23   Page 46 of 54

Page 46 of 54

country in Europe—or so far as shown by this record, anywhere in the world—entirely bans these treatments or refuses to pay for them. *See also Brandt v. Rutledge*, No. 4:21-cv-450, 2023 WL 4073727, at *30 (E.D. Ark. June 20, 2023) (rejecting the apparently identical assertion that a ban on gender-affirming care for minors was consistent with "nations around the world" and finding the evidence showed no other identified nation took that position).

To be sure, there are countries that ban gays and lesbians and probably transgender individuals, too. One doubts these treatments are available in Iran or other similarly repressive regimes. But the treatments are available in appropriate circumstances in all the countries cited by the defendants, including Finland, Sweden, Norway, Great Britain, France, Australia, and New Zealand.[74] Some or all of these insist on appropriate preconditions and allow care only in approved facilities—just as the Endocrine Society and WPATH standards insist on appropriate preconditions, and just as care in the United States is ordinarily provided through capable facilities. Had Florida truly joined the international consensus—making these treatments available in appropriate circumstances or in approved facilities—these plaintiffs would qualify, and this lawsuit would not be necessary.

---

[74] *See* Trial Tr., ECF No. 226 at 78–79; *see also* Trial Tr., ECF No. 227 at 134; Trial Tr., ECF No. 228 at 61–62.

### E. Malpractice

The defendants assert, with no real evidentiary support, that GnRH agonists and cross-sex hormones have sometimes been provided in Florida without the appropriate mental-health therapy and evaluation by a multidisciplinary team.

If that were true, the solution would be to appropriately regulate these treatments, not to ban them. And there are, of course, remedies already in place in Florida for deficient medical care. AHCA is entitled to review any individual Medicaid claim and to pay only for medically necessary treatment. There is no evidence that this kind of care is routinely provided so badly that it should be banned outright.

Along the same lines, the defendants say gender dysphoria is difficult to diagnose accurately—that gender identity can be fluid, that there is no objective test to confirm gender identity or gender dysphoria, and that patients treated with GnRH agonists or cross-sex hormones have sometimes come to regret it. But the defendants ignore facts that do not support their narrative. Fluidity is common prior to puberty but not thereafter. Regret is rare; indeed, the defendants have offered no evidence of any Florida resident who regrets being treated with GnRH agonists or cross-sex hormones. And the absence of objective tests to confirm gender dysphoria does not set it apart from many other Medicaid-covered mental-

USCA4 Appeal: 22-1731    Doc: 108-4    Filed: 07/07/2023    Pg: 49 of 55
Case 4:22-cv-00325-RH-MAF   Document 246   Filed 06/21/23   Page 48 of 54

Page 48 of 54

health conditions that are routinely diagnosed without objective tests and treated with powerful medications.

The difficulty diagnosing a patient calls for caution. It does not call for a one-size-fits-all refusal to cover widely accepted medical treatment.[75] It does not call for the State to make a binary decision not to cover the treatment even for a properly diagnosed patient.

### F. Continuation of treatment

The defendants note that 98% or more of adolescents treated with GnRH agonists progress to cross-sex hormones. That is hardly an indictment of the treatment; it is instead consistent with the view that in 98% or more of the cases, the patient's gender identity did not align with natal sex, this was accurately determined, and the patient was appropriately treated first with GnRH agonists and later with cross-sex hormones. An advocate who denies the existence of genuine transgender identity or who wishes to make everyone cisgender might well fear progression to cross-sex hormones, but the defendants have denied that this is a basis for their current reference to this progression.

The defendants say, instead, that the high rate of progression rebuts an argument in support of GnRH agonists: that GnRH agonists give a patient time to

---

[75] *See* Trial Tr., ECF No. 239 at 91–94 (defense expert Dr. Levine explaining that medical intervention such as puberty blockers and hormones should be carefully prescribed and monitored but not banned).

USCA4 Appeal: 22-1721    Doc: 108-4    Filed: 07/07/2023    Pg: 50 of 55
Case 4:22-cv-00325-RH-MAF   Document 246   Filed 06/21/23   Page 49 of 54

Page 49 of 54

reflect on the patient's gender identity and, if still convinced of a gender identity opposite the natal sex, to reflect on whether to go forward socially in the gender identity or natal sex. But if that is a goal of treatment with GnRH agonists, it is certainly not the treatment's *primary* goal. The primary goal is to delay and eventually avoid development of secondary sex characteristics inconsistent with the patient's gender identity—and thus to avoid or reduce the attendant anxiety, depression, and possible suicidal ideation.

The high rate of progression from GnRH agonists to cross-sex hormones is not a reason to ban or refuse to cover the treatments.

### G. Off-label use of FDA-approved drugs

The defendants note that while the Food and Drug Administration has approved GnRH agonists and the hormones at issue as safe and effective, the agency has not addressed their use to treat gender dysphoria. Quite so. Use of these drugs to treat gender dysphoria is "off label."

That the FDA has not approved these drugs for treatment of gender dysphoria says precisely nothing about whether the drugs are safe and effective when used for that purpose. Off-label use of drugs is commonplace and widely

accepted across the medical profession.[76] Florida Medicaid routinely covers such use.[77] The defendants' contrary implication is divorced from reality.

Obtaining FDA approval of a drug is a burdensome, expensive process.[78] A pharmaceutical provider who wishes to market a new drug must incur the burden and expense because the drug cannot be distributed without FDA approval. Once a drug has been approved, however, the drug can be distributed not just for the approved use but for any other use as well. There ordinarily is little reason to incur the burden and expense of seeking additional FDA approval.

That the FDA approved these drugs at all confirms that, at least for one use, they are safe and effective.[79] This provides some support for the view that they are safe when properly administered and that they effectively produce the intended results—that GnRH agonists delay puberty and that testosterone and estrogen have masculinizing or feminizing effects as expected. The FDA approval goes no further—it does not address one way or the other the question whether using these drugs to treat gender dysphoria is as safe and effective as on-label uses.

---

[76] Trial Tr., ECF No. 227 at 121–23.

[77] *See* AHCA 30(b)(6) Dep., ECF No. 235-1 at 35, 53–56.

[78] Trial Tr., ECF No. 226 at 182–84; Trial Tr., ECF No. 227 at 120–23; Trial Tr., ECF No. 239 at 54–55.

[79] Trial Tr., ECF No. 226 at 182–84; Trial Tr., ECF No. 227 at 120–23.

That use of GnRH agonists and cross-sex hormones to treat gender dysphoria is "off-label" is not a reason to ban or refuse to cover their use for that purpose.

## XIII.  Ruling on the claims

What remains is to match the findings of fact and conclusions of law as set out above to the specific claims asserted in the first amended complaint.

Count I asserts a claim against Mr. Weida under 42 U.S.C. § 1983 and the Fourteenth Amendment's Equal Protection Clause. The plaintiffs are entitled to prevail because the denial of Medicaid coverage for transgender patients for the same drugs covered for others survives neither intermediate nor rational-basis scrutiny.

Count II asserts a claim against AHCA under the Affordable Care Act's prohibition of discrimination based on sex, 42 U.S.C. § 18116. The plaintiffs are entitled to prevail on this claim, just as on the Equal Protection claim.

Count III asserts a § 1983 claim for Mr. Rothstein, Susan Doe, and K.F. against Mr. Weida based on the Medicaid Act's requirement for early and periodic screening, diagnostic, and treatment services for beneficiaries under age 21, 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(43)(C),1396d(a)(4)(B), and 1396d(r)(5). The plaintiffs are entitled to prevail because the treatments at issue comport with the

standards of care for their medical conditions and there are no alternative, equally effective treatments.

Count IV asserts a § 1983 claim against Mr. Weida based on the Medicaid Act's comparability requirement, 42 U.S.C. § 1396a(a)(10)(B)(i), under which assistance to an eligible individual cannot be less in "amount, duration, or scope" than assistance available to other Medicaid beneficiaries. The plaintiffs are entitled to prevail because cisgender Medicaid beneficiaries are covered for the same puberty blockers and hormones at issue. That cisgender patients receive the drugs for a different diagnosis does not make the different treatment permissible. Quite the contrary: federal law prohibits a state from denying or reducing a Medicaid-eligible patient's required services "solely because of the diagnosis, type of illness, or condition." 42 C.F.R. § 440.230(c); *see also Rush*, 625 F.2d at 1156 n.12. Indeed, denying coverage for an illness suffered only or primarily by a disfavored group is the very paradigm of prohibited discrimination based on diagnosis.

## XIV.  Conclusion

Gender identity is real. Those whose gender identity does not match their natal sex often suffer gender dysphoria. The widely accepted standard of care calls for evaluation and treatment by a multidisciplinary team. Proper treatment begins with mental-health therapy and is followed in appropriate cases by GnRH agonists and cross-sex hormones. Florida has adopted a rule and statute that prohibit

USCA4 Appeal: 22-1731    Doc: 108-4    Filed: 07/07/2023    Pg: 54 of 55
Case 4:22-cv-00325-RH-MAF    Document 246    Filed 06/21/23    Page 53 of 54

Page 53 of 54

Medicaid payment for these treatments even when medically appropriate. The rule and statute violate the federal Medicaid statute, the Equal Protection Clause, and the Affordable Care Act's prohibition of sex discrimination.

These plaintiffs are Medicaid beneficiaries who are entitled to payment, as a matter of medical necessity, for puberty blockers or cross-sex hormones as appropriately determined by their multidisciplinary teams of providers.

IT IS ORDERED:

1. It is declared that Florida Statutes § 286.31(2) and Florida Administrative Code rule 59G-1.050(7) are invalid to the extent they categorically ban Medicaid payment for puberty blockers and cross-sex hormones for the treatment of gender dysphoria.

2. The defendants Jason Weida, in his official capacity, and the Florida Agency for Health Care Administration (a) must approve Medicaid payment for services rendered from this date forward for the evaluation, diagnosis, and treatment of the plaintiffs August Dekker, Brit Rothstein, Susan Doe, and K.F. for gender dysphoria, including with puberty blockers and cross-sex hormones, as recommended by their multidisciplinary teams, and (b) must not take any steps to prevent the administration of cross-sex hormones to August Dekker or Brit Rothstein or to prevent the administration of puberty blockers or cross-sex hormones to Susan Doe or K.F. But this injunction does not preclude the

defendants from applying the professional standards that would apply to use of the same substances to treat patients with other medical conditions.

3. This injunction binds the defendants and their officers, agents, servants, employees, and attorneys—and others in active concert or participation with any of them—who receive actual notice of this injunction by personal service or otherwise.

4. The clerk must enter judgment and close the file.

5. Jurisdiction is retained to award costs and attorney's fees.

SO ORDERED on June 21, 2023.

s/Robert L. Hinkle                      
United States District Judge