RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0221p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

L. W., by and through her parents and next friends, Samantha Williams and Brian Williams; SAMANTHA WILLIAMS; BRIAN WILLIAMS; JOHN DOE, by and through his parents and next friends, Jane Doe and James Doe; JANE DOE; JAMES DOE; RYAN ROE, by and through his parent and next friend, Rebecca Roe; REBECCA ROE; SUSAN N. LACY, on behalf of herself and her patients,

*Plaintiffs-Appellees,*

*v.*

JONATHAN THOMAS SKRMETTI, in his official capacity as the Tennessee Attorney General and Reporter, et al.,

*Defendants-Appellants,*

UNITED STATES OF AMERICA,

*Intervenor-Appellee.*

No. 23-5600

─────────────────────────────

JANE DOE 1, et al.,

*Plaintiffs-Appellees,*

*v.*

WILLIAM C. THORNBURY, JR., M.D., in his official capacity as the President of the Kentucky Board of Medical Licensure, et al.,

*Defendants,*

COMMONWEALTH OF KENTUCKY *ex rel*. DANIEL CAMERON, Attorney General of the Commonwealth of Kentucky,

*Intervenor-Appellant.*

No. 23-5609

No. 23-5600 On Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:23-cv-00376—Eli J. Richardson, District Judge.

No. 23-5609 On Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 3:23-cv-00230—David J. Hale, District Judge.

Argued:  September 1, 2023

Decided and Filed:  September 28, 2023

Before:  SUTTON, Chief Judge; WHITE and THAPAR, Circuit Judges.

_____

**COUNSEL**

**ARGUED:**  Clark L. Hildabrand, OFFICE OF THE TENNESSEE ATTORNEY GENERAL &
REPORTER, Nashville, Tennessee, for Tennessee Appellants.  Barbara Schwabauer, UNITED
STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Intervenor-Appellee.  Chase
Strangio, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, for
L. W. Appellees.  Matthew F. Kuhn, OFFICE OF THE KENTUCKY ATTORNEY GENERAL,
Frankfort, Kentucky, for Intervenor-Appellant.  Stephanie Schuster, MORGAN, LEWIS &
BOCKIUS, LLP, Washington, D.C., for Jane Doe I Appellees.

**ON BRIEF:**  Clark L. Hildabrand, Steven J. Griffin, Brooke A. Huppenthal, OFFICE OF THE
TENNESSEE ATTORNEY GENERAL & REPORTER, Nashville, Tennessee, Adam K.
Mortara, LAWFAIR LLC, Nashville, Tennessee, Cameron T. Norris, Tiffany H. Bates,
CONSOVOY MCCARTHY PLLC, Arlington Virginia, for Tennessee Appellants.  Barbara
Schwabauer, Bonnie I. Robin-Vergeer, Jonathan L. Backer, UNITED STATES DEPARTMENT
OF JUSTICE, Washington, D.C., for Intervenor-Appellee.  Joshua A. Block, Chase Strangio,
James D. Esseks, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New
York, Stella Yarbrough, Lucas Cameron-Vaughn, ACLU FOUNDATION OF TENNESSEE,
Nashville, Tennessee, Sruti J. Swaminathan, LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC., New York, New York, Tara Borelli, LAMBDA LEGAL
DEFENSE AND EDUCATION FUND, INC., Decatur, Georgia, Christopher J. Gessner, David
Bethea, AKIN GUMP STRAUSS HAUER & FELD LLP, Washington, D.C., Dean L. Chapman,
Jr., AKIN GUMP, New York, New York, for L. W. Appellees.  Victor B. Maddox, Matthew F.
Kuhn, Alexander Y. Magera, OFFICE OF THE KENTUCKY ATTORNEY GENERAL,
Frankfort, Kentucky, for Intervenor-Appellant.  Corey Shapiro, Heather Gatnarek, Crystal
Fryman, Kevin Muench, ACLU OF KENTUCKY FOUNDATION, Louisville, Kentucky,
Stephanie Schuster, MORGAN, LEWIS & BOCKIUS LLP, Washington, D.C., Shannon Minter,
Christopher F. Stoll, NATIONAL CENTER FOR LESBIAN RIGHTS, San Francisco,
California, for Jane Doe I Appellees.  Christopher Mills, SPERO LAW LLC, Charleston, South

Carolina, Kara Dansky, WOMEN'S DECLARATION INTERNATIONAL USA, Washington, D.C., Andrew M. Nussbaum, NUSSBAUM GLEASON, Colorado Springs, Colorado, Mary E. McAlister, CHILD & PARENTAL RIGHTS CAMPAIGN, INC., Johns Creek, Georgia, Edmund G. LaCour, Jr., A. Barrett Bowdre, OFFICE OF THE ALABAMA ATTORNEY GENERAL, Montgomery, Alabama, Jonathan F. Mitchell, MITCHELL LAW PLLC, Austin, Texas, Gene P. Hamilton, AMERICA FIRST LEGAL FOUNDATION, Washington, D.C., John J. Bursch, ALLIANCE DEFENDING FREEDOM, Washington, D.C., Jacob P. Warner, ALLIANCE DEFENDING FREEDOM, Scottsdale, Arizona, Joshua K. Payne, CAMPBELL MILLER PAYNE, PLLC, Dallas, Texas, David E. Fowler, ALLIANCE FOR LAW AND LIBERTY, Franklin, Tennessee, Eli Savit, WASHTENAW COUNTY PROSECUTING ATTORNEY, Ann Arbor, Michigan, D. Jean Veta, Cortlin Lannin, William Isasi, Emily Mondry, Yuval Mor, COVINGTON & BURLING, LLP, Washington, D.C., Anna Rich, OFFICE OF THE CALIFORNIA ATTORNEY GENERAL, Oakland, California, Tricia R. Herzfeld, Benjamin A. Gastel, HERZFELD, SUETHOLZ, GASTEL, LENISKI & WALL, PLLC, Nashville, Tennessee, Kathleen Hartnett, Julie Veroff, Zoe Helstrom, COOLEY LLP, San Francisco, California, Katelyn Kang, COOLEY LLP, New York, New York, Elizabeth F. Reinhardt, COOLEY LLP, Washington, D.C., Carmine D. Boccuzzi, Jr., Howard S. Zelbo, JD Colavecchio, Lindsay Harris, Allison Caramico CLEARY GOTTLIEB STEEN & HAMILTON LLP, New York, New York, Gabriel Arkles, Sydney Duncan, Seran Gee, TRANSGENDER LEGAL DEFENSE & EDUCATION FUND, INC., New York, New York, Chasel Lee, JENNER & BLOCK LLP, San Francisco, California, Jocelyn A. Sitton, JENNER & BLOCK LLP, Chicago, Illinois, Adam G. Unikowsky, JENNER & BLOCK LLP, Washington, D.C., Andrew Rhys Davies, WILMER CUTLER PICKERING HALE and DORR LLP, New York, New York, Barbara Schwabauer, Bonnie I. Robin-Vergeer, Jonathan L. Backer, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amici Curiae.

SUTTON, C.J., delivered the opinion of the court in which THAPAR, J., joined. WHITE, J. (pp. 42–73), delivered a separate dissenting opinion.

---

**OPINION**

---

SUTTON, Chief Judge. At issue in these two cases is whether the United States Constitution prohibits Kentucky and Tennessee from limiting certain sex-transition treatments for minors experiencing gender dysphoria.

I.

A.

Before gender dysphoria had a name, the medical profession offered a variety of treatments for individuals suffering from a lack of alignment between their biological sex and perceived gender. In the 1960s and 1970s, cross-sex hormones and sex-reassignment surgeries emerged as "the option of choice" to treat the condition. Walter O. Bockting & Eli Coleman, *A Comprehensive Approach to the Treatment of Gender Dysphoria*, 5 J. Psych. & Hum. Sexuality 131, 132 (1992). A 1979 study, however, concluded that these treatments did not alleviate the mental distress caused by the condition, prompting care centers to pull back on these forms of care. *See* Jeremi M. Carswell et al., *The Evolution of Adolescent Gender-Affirming Care: An Historical Perspective*, 95 Hormone Rsch. Paediatrics 649, 652 (2022). Given the "irreversibility of hormonal and surgical sex reassignment," many providers instead prioritized more holistic approaches that explored a range of options—including therapy and living as the desired gender—before considering physical interventions. Bockting & Coleman, *supra*, at 136; *id.* at 134, 143.

In 1979, the Harry Benjamin Society, now called the World Professional Association for Transgender Health, published the first standards of care for treating gender dysphoria. *Standards of Care: The Hormonal and Surgical Sex Reassignment of Gender Dysphoric Persons* (1st ed. 1979). In line with the prevailing caution practiced by healthcare providers, the standards permitted hormonal and surgical interventions only for adults and only after the patients received other types of care. *Id.* §§ 4.3.4, 4.14.4, 4.15.1. Because hormone treatments have "some irreversible effects," they were not permitted until an individual received therapy and lived as the desired gender for three months. *Id.* §§ 4.4.2, 5.1.1, 5.1.2, 5.1.3. Invasive surgery required more. Non-genital surgeries required three months of therapy and at least six months of living as the desired gender, while genital surgeries required therapy and a full year of living comfortably as the desired gender. *Id.* §§ 5.1.2, 5.1.3, 5.2.2, 5.2.3, 5.3.4.

In 1980, the American Psychiatric Association first classified gender dysphoria as a medical condition, initially calling it "gender identity disorder" and describing it as a "persistent

sense of discomfort" with one's biological sex.  Ky. R.47-11 at 10; DSM-III 261 (3d ed. 1980).
The diagnostic criteria for adults and minors were similar but not identical.  *Id.* at 261–66.
Without specifying appropriate treatments for either condition, the Association cautioned that the
"long-term" effects of surgery remain "unknown."  *Id.* at 262.

Over the next two decades or so, various medical organizations, most prolifically the
World Professional Association for Transgender Health, offered new standards of care.
Throughout this period, the Association expressed caution about using medical interventions that
would alter the secondary characteristics of an individual's biological sex.  The standards also
recognized various non-physical treatments for gender dysphoria, including support groups,
participation in recreational activities of the desired sex, cross-dressing, dressing unisexually,
hair removal or application, vocal therapy, changes in grooming, breast binding, and prostheses.
*See Standards of Care for Gender Identity Disorders* 21, 23, 26, 30, 35 (5th ed. 1998).  During
these twenty years, the Association's standards of care continued to support hormonal and
surgical treatments only for adults and not for minors.  *See, e.g.*, *Standards of Care: The
Hormonal and Surgical Sex Reassignment of Gender Dysphoric Persons* § 4.14.4 (4th ed. 1990).
Such treatments, the guidelines explained, are "extensive in [their] effects," "invasive to the
integrity of the human body," and "are not, or are not readily, reversible."  *Id.* § 4.1.1.

What the medical profession has come to call gender-affirming care was not available for
minors until just before the millennium.  In the late 1990s, healthcare workers in the Netherlands
began using puberty blockers—designed to slow the development of male and female physical
features—to treat gender dysphoria in minors.  Carswell et al., *supra*, at 652–53.  The "Dutch
Protocol" permitted puberty blockers for minors during the early stages of puberty, allowed
hormone therapy at 16, and allowed genital surgery at 18.  *Id.* at 652–53.

In 1998, the World Professional Association for Transgender Health revised its standards
to endorse the Dutch Protocol.  *See Standards of Care for Gender Identity Disorders* 19 (5th ed.
1998).  The standards permitted puberty blockers, considered "reversible," at the onset of
puberty when taken in conjunction with psychotherapy.  *Standards of Care for Gender Identity
Disorders* 10 (6th ed. 2001).  They permitted cross-sex hormones, a "partially reversible"

treatment, for those 16 or older but only after six months of therapy.  *Id.*  And they permitted "irreversible" surgical interventions only after the individual had lived for at least two years as the desired gender and only after they turned 18.  *Id.* at 11.

In 2012, the World Professional Association for Transgender Health relaxed these guidelines further.  The new standards permitted cross-sex hormones for adults and minors, including minors under the age of 16.  *See Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People* 19–20 (7th ed. 2012); Wylie C. Hembree et al., *Endocrine Society Clinical Practice Guideline*, 102 J. Clinical Endocrinology & Metabolism 3869, 3883 (2017).  Around this time, some American doctors began using these treatments for children.  Ky. R.17-3 at 15.

Today, these guidelines permit the use of puberty blockers *or* cross-sex hormones from the early stages of pubertal development.  *See Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. of Transgender Health S1, S64–65 (2022) ("*2022 WPATH Guidelines*"); *Endocrine Society Clinical Practice Guideline*, *supra*, at 3880, 3883.  Therapy or time spent living as the desired gender is no longer required before or along with such treatments.  *2022 WPATH Guidelines*, *supra*, at S48.  Many surgical treatments initially restricted to adults have become available to minors in the past six years, often without any prerequisites for therapy or cross-sex hormone treatments.  *See Endocrine Society Clinical Practice Guideline*, *supra*, at 3894; *2022 WPATH Guidelines*, *supra*, at § 6.12, S66.  On the whole, the standards of care for minors "have become less restrictive over the course of time so that fewer procedures require mental health evaluation, fewer recommendation letters are required, and more types of professionals are viewed as capable of providing such evaluations." Tonia Poteat et al., *History and Prevalence of Gender Dysphoria, in* Transgender Medicine 1, 14–15 (eds. Leonid Poretsky & Wylie C. Hembree, 2019).

In the last few years, the number of doctors prescribing sex-transition treatments and the number of children seeking them have grown.  *See 2022 WPATH Guidelines*, *supra*, at S43.  The number of private clinics that specialize in hormonal and surgical treatments, for example, has "grown from just a few a decade ago to more than 100 today."  Ky. R.47-3 at 1.  The percentage

of youth identifying as transgender has doubled from 0.7% of the population to 1.4% in the past few years, while the percentage of adults (0.5% of the population) has remained constant. Carswell et al., *supra*, at 653. By one account, 2021 saw three times more diagnoses of gender dysphoria among minors than 2017 did.

### B.

In addition to sharing a border, Kentucky and Tennessee share an interest in regulating the medical treatments offered to children suffering from gender dysphoria. Tennessee was the first of the two States to regulate the treatments.

*Tennessee.* On March 2, 2023, Tennessee enacted the Prohibition on Medical Procedures Performed on Minors Related to Sexual Identity. Tenn. Code Ann. § 68-33-101. Seeking to "protect[] minors from physical and emotional harm," *id.* § 68-33-101(m), the legislature identified several concerns about recent treatments the medical profession offers to children with gender dysphoria. The legislature appreciated that gender dysphoria is a medical condition involving "distress from a discordance between" a person's perceived gender and biological sex. *Id.* § 68-33-101(c). But it was concerned that some treatments for this condition "can lead to the minor becoming irreversibly sterile, having increased risk of disease and illness, or suffering adverse and sometimes fatal psychological consequences." *Id.* § 68-33-101(b). It was concerned that the long-term harms of these treatments, some potentially irreversible, remain unknown and outweigh any near-term benefits because the treatments are "experimental in nature and not supported by high-quality, long-term medical studies." *Id.* And it noted that other helpful, less risky, and non-irreversible treatments remain available. *See id.* § 68-33-101(c).

These findings convinced the legislature to ban certain medical treatments for minors with gender dysphoria. A healthcare provider may not "administer or offer to administer" "a medical procedure" to a minor "for the purpose of" either "[e]nabling a minor to identify with, or live as, a purported identity inconsistent with the minor's sex" or "[t]reating purported discomfort or distress from a discordance between the minor's sex and asserted identity." *Id.* § 68-33-103(a)(1). Prohibited medical procedures include "[s]urgically removing, modifying, altering, or entering into tissues, cavities, or organs" and "[p]rescribing, administering, or

dispensing any puberty blocker or hormone." *Id.* § 68-33-102(5).  The Act does not restrict these procedures for Tennesseans 18 and over.  *Id.* § 68-33-102(6).

The Act contains two relevant exceptions.  It permits the use of puberty blockers and hormones to treat congenital conditions, precocious puberty, disease, or physical injury.  *Id.* § 68-33-103(b)(1)(A).  And it has a continuing care exception until March 31, 2024, which permits healthcare providers to continue administering a long-term treatment, say hormone therapy, that began before the Act's effective date, July 1, 2023.  *Id.* § 68-33-103(b)(1)(B).

The Act authorizes the Tennessee Attorney General to enforce these prohibitions.  *Id.* § 68-33-106(b).  It permits the relevant state regulatory authorities to impose "professional discipline" on healthcare providers that violate the Act.  Tenn. R.1 ¶ 56; *see* Tenn. Code Ann. § 68-33-107.  It creates a private right of action, enabling an injured minor or nonconsenting parent to sue a healthcare provider for violating the law.  Tenn. Code Ann. § 68-33-105(a)(1)–(2).  And it extends the statute of limitations for filing such lawsuits to 30 years after the minor reaches 18.  *Id.* § 68-33-105(e).

Three transgender minors, their parents, and a doctor sued several Tennessee officials, claiming the Act violated the United States Constitution's guarantees of due process and equal protection.  L.W. is 15 years old, was born a biological male, and for several years has identified as a girl.  A therapist diagnosed L.W. with gender dysphoria in December 2020, and a specialist prescribed puberty blockers in August 2021 and estrogen hormone therapy in September 2022.  John Doe is 12 years old, was born a biological female, and has identified as a boy for many years.  A therapist diagnosed Doe with gender dysphoria in 2020, and, after enduring considerable anxiety about going through puberty, Doe received puberty blockers in February 2021.  Ryan Roe is 15, was born a biological female, identifies as a boy, and has suffered serious anxiety about going through puberty as a female.  A specialist began prescribing testosterone for Roe at 14.  All three adolescents say that this care has provided considerable comfort to them.

The plaintiffs challenged the Act's bans on puberty blockers, hormone therapy, and sex-transition surgery for children.  They moved for a preliminary injunction to prevent those features of the Act from going into effect on July 1, 2023.

On June 28, the district court granted the motion in part. It concluded that the challengers lacked standing to contest the ban on surgeries but could challenge the ban on hormones and puberty blockers. As to due process, the court found that the Act infringes on the parents' "fundamental right to direct the medical care of their children." Tenn. R.167 at 14. As to equal protection, the court reasoned (1) that the Act improperly discriminates on the basis of sex and that transgender persons constitute a quasi-suspect class and (2) that the State could not satisfy the heightened scrutiny that comes with such regulations. The district court concluded that the Act was facially unconstitutional (with the exception of the surgery and private enforcement provisions), and it issued a statewide injunction against its enforcement. Tennessee appealed. This court stayed the injunction pending appeal. *L.W. ex rel. Williams v. Skrmetti*, 73 F.4th 408 (6th Cir. 2023).

*Kentucky.* On March 29, 2023, the Kentucky General Assembly overrode Governor Andy Beshear's veto to pass "An Act Relating to Children." *See* 2023 Ky. Acts 775 (codified at Ky. Rev. Stat. Ann. § 311.372). The law followed extended public debate before legislative committees on the potential risks of sex-transition treatments. *See Hearing on H.B. 470 Before the Kentucky House Judiciary Committee* (Mar. 2, 2023), https://tinyurl.com/vvsfuw25; *Hearing on H.B. 470 Before the Kentucky Senate Families & Children Committee* (Mar. 14, 2023), https://tinyurl.com/352xh2f9. Stemming from many of the same concerns undergirding the Tennessee law, the Kentucky law shares many features with it.

Under the Kentucky Act, a medical provider may not offer certain types of care "for the purpose of attempting to alter the appearance of, or to validate a minor's perception of, the minor's sex, if that appearance or perception is inconsistent with the minor's sex." Ky. Rev. Stat. Ann. § 311.372(2). The provider may not use drugs "to delay or stop normal puberty" or to increase a patient's hormone levels above what would be expected for a person of the patient's age and sex. *Id.* § 311.372(2)(a)–(b). The provider also may not perform "sterilizing" surgeries on children. *Id.* § 311.372(2)(c)–(e). The law does not restrict these treatment options for individuals over 17. *Id.* § 311.372(1)(a).

The Act contains two exceptions.  It allows these treatments for minors with certain sexual developmental disorders and for minors who seek care for injuries caused by procedures that the Act prohibits.  *Id.* § 311.372(3)(a)–(c).  And it allows a minor to continue an existing course of treatment for a period "during which the minor's use of the drug or hormone is systematically reduced."  *Id.* § 311.372(6).

The Act provides two methods of enforcement.  A regulatory agency "shall revoke" the license or certification of a provider who violates the Act.  *Id.* § 311.372(4).  And the Act extends the statute of limitations—to three years after the person "reasonably should have discovered" an injury or until the person reaches the age of 30, whichever is later—to file lawsuits for damages caused by violations of the Act.  *Id.* § 311.372(5).

Seven transgender minors and their parents sued various Kentucky officials, claiming that the Act violated their federal constitutional rights to due process and equal protection.  Much like the Tennessee children, the Kentucky children have experienced gender dysphoria and have found (or anticipate finding) puberty blockers and hormones to be helpful treatments for it.  All of these plaintiffs fear the return of their gender dysphoria, depression, and other illnesses if they cannot access these treatments.  They challenged the Act's ban on puberty blockers and hormone therapy, but they did not challenge its regulation of surgical procedures.  They sought a preliminary injunction to prevent those features of the Act from going into effect on June 29, 2023.

On June 28, the district court granted a preliminary injunction.  As to the due process claim, the court held that the Act infringed on the fundamental right of parents to obtain medical treatment for their children.  As to the equal protection claim, it concluded that the Act discriminates based on sex and that the State could not meet the rigorous scrutiny that comes with such regulations.  The court concluded that the Act's ban on drug and hormone therapy was facially unconstitutional and issued a statewide injunction.

Kentucky appealed and moved for a stay of the injunction.  The district court granted the stay, and we declined to lift it, *Doe 1 v. Thornbury*, 75 F.4th 655, 656–57 (6th Cir. 2023) (per

curiam). We consolidated the appeals, expedited them, and agreed to resolve them by the end of September 2023.

## II.

A preliminary injunction is "an extraordinary remedy." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Courts may grant one only if the plaintiffs present "a clear showing" that they are likely to prevail on the merits, that they face irreparable harm without an injunction, that the balance of equities favors them, and that the public interest supports an injunction. *Id.* As is often the case in a constitutional challenge, the likelihood-of-success inquiry is the first among equals. *Roberts v. Neace*, 958 F.3d 409, 416 (6th Cir. 2020) (per curiam). In this instance, it is largely dispositive. While we assess the trial court's "ultimate decision" whether to grant a preliminary injunction for "abuse of discretion," we assess its legal determinations with "fresh eyes." *Arizona v. Biden*, 40 F.4th 375, 381 (6th Cir. 2022).

## III.

The claimants face several initial headwinds in obtaining relief. *First*, they do not argue that the original fixed meaning of the due process or equal protection guarantees covers these claims. That prompts the question whether the people of this country ever agreed to remove debates of this sort—over the use of innovative, and potentially irreversible, medical treatments for children—from the conventional place for dealing with new norms, new drugs, and new public health concerns: the democratic process. Life-tenured federal judges should be wary of removing a vexing and novel topic of medical debate from the ebbs and flows of democracy by construing a largely unamendable Constitution to occupy the field.

*Second*, while the challengers do invoke constitutional precedents of the Supreme Court and our Court in bringing this lawsuit, not one of them resolves these claims. In each instance, they seek to extend the constitutional guarantees to new territory. There is nothing wrong with that, to be certain. But this reality does suggest that the key premise of a preliminary injunction—a showing of a likelihood of success on the merits—is missing. Constitutionalizing new areas of American life is not something federal courts should do lightly, particularly when

"the States are currently engaged in serious, thoughtful" debates about the issue. *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997).

*Third*, the States are indeed engaged in thoughtful debates over this issue, as the recent proliferation of legislative activity across the country shows. By our count, nineteen States have laws similar to those in Tennessee and Kentucky, all of recent vintage. *See* Ala. Code § 26-26-4; Ark. Code Ann. § 20-9-1502(a); Fla. Admin. Code Ann. R.64B8-9.019; Ga. Code Ann. § 31-7-3.5; Idaho Code § 18-1506C; Ind. Code § 25-1-22-13; Iowa Code § 147.164; La. Stat. Ann. § 40:1098 (effective Jan. 1, 2024); Miss. Code Ann. § 41-141-1-9; Mo. Rev. Stat. Ann. § 191.1720; S.B. 99, 68th Leg., 2023 Sess. (Mont. 2023); Neb. Rev. Stat. § 72-7301-07; H.B. 808, 2023 Sess. (N.C. 2023); N.D. Cent. Code. § 12.1-36.1-02; Okla. Stat. tit. 63, § 2607.1; H.B. 1080, 98th Leg. Sess. (S.D. 2023); S.B. 14, 88th Leg. Sess. (Tex. 2023); Utah Code Ann. § 58-68-502(1)(g); W. Va. Code § 30-3-20 (effective Jan. 1, 2024). At least fourteen other States, meanwhile, provide various protections for those seeking treatments for gender dysphoria, all too of recent vintage. *See* Ariz. Exec. Order No. 2023-12; Cal. Penal Code § 819; Colo. Rev. Stat. § 12-30-121(1)(d); Conn. Gen. Stat. §§ 52-571n, 54-155b; 735 Ill. Comp. Stat. 40/28-10; Mass. Gen. Laws ch. 12, § 11 et seq.; Md. Exec. Order No. 01.01.2023.08; Minn. Stat. § 260.925; N.J. Exec. Order No. 326; N.M. Stat. Ann. § 24-34-4; N.Y. Educ. § 6531-b(2); H.B. 2002, 82nd Leg., 2023 Reg. Sess. (Or. 2023); Vt. Stat. Ann. tit. 15, § 150; Wash. Rev. Code § 7.002.002.

Most of this legislative activity occurred within the last two years. Failure to allow these laws to go into effect would start to grind these all-over-the-map gears to a halt. Given the high stakes of these nascent policy deliberations—the long-term health of children facing gender dysphoria—sound government usually benefits from more rather than less debate, more rather than less input, more rather than less consideration of fair-minded policy approaches. To permit legislatures on one side of the debate to have their say while silencing legislatures on the other side of the debate under the Constitution does not further these goals. That is all the more critical in view of two realities looming over both cases—the concept of gender dysphoria as a medical condition is relatively new and the use of drug treatments that change or modify a child's sex characteristics is even more recent. Prohibiting citizens and legislatures from

offering their perspectives on high-stakes medical policies, in which compassion for the child points in both directions, is not something life-tenured federal judges should do without a clear warrant in the Constitution.

IV.

As doctors, legislators, and citizens work through the risks and benefits of various treatments for children with gender dysphoria, lawyers and litigants debate the right standard for reviewing such constitutional challenges. Sometimes the Constitution is neutral about an issue, say whether a state should embrace policies that lean conservative or progressive, regulatory or deregulatory, fiscally tight or lax, republican or democratic. Other times the Constitution is not neutral about an issue, say over free speech, voting, and race discrimination. When the Constitution is neutral about an issue, legislatures have considerable discretion to regulate the matter. In that setting, the key premise of a democracy prevails—that the people's electoral representatives will identify the strengths and weaknesses of any policy and presumptively be allowed to enact it, the antidote for mistakes being the passage of time and the good sense and self-interest of election-tenured public officials to fix them. When the Constitution is not neutral about the issue, skeptical judicial review applies to the law from the start.

The threshold question is whether the Constitution is neutral about legislative regulations of new and potentially irreversible medical treatments for minors. The plaintiffs claim that it is not neutral on this issue under the due process and equal protection guarantees. We consider each theory in turn.

A.

*Due process.* "No State," the Fourteenth Amendment says, shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The claimants, as noted, do not claim that the original, procedure-based meaning of the guarantee covers these claims. But that does not end the inquiry. The provision over time has come to secure more than just procedural rights. It also requires heightened scrutiny for substantive protections "against government interference with certain fundamental rights and liberty interests." *Glucksberg*, 521 U.S. at 720. Courts identify such rights by looking for norms that

are "deeply rooted in this Nation's history and tradition." *Id.* at 721 (quotation omitted). Before starting down this road, it is well to remember that the most deeply rooted tradition in this country is that we look to democracy to answer pioneering public-policy questions, meaning that federal courts must resist the temptation to invoke an unenumerated guarantee to "substitute" their views for those of legislatures. *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2277 (2022) (quotation omitted). Aptly mindful of the reality that substantive due process is "a treacherous field," *Moore v. City of E. Cleveland*, 431 U.S. 494, 502 (1977), and appreciative of the risk that comes with it—loss of democratic control over public policies that the people never delegated to the judiciary—the federal courts have become ever more "reluctant to expand the concept of substantive due process" to new areas, *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992).

No such expansion is warranted here. This country does not have a "deeply rooted" tradition of preventing governments from regulating the medical profession in general or certain treatments in particular, whether for adults or their children. Quite to the contrary in fact. State and federal governments have long played a critical role in regulating health and welfare, which explains why their efforts receive "a strong presumption of validity." *Heller v. Doe*, 509 U.S. 312, 319 (1993); *see Kottmyer v. Maas*, 436 F.3d 684, 690 (6th Cir. 2006). State governments have an abiding interest "in protecting the integrity and ethics of the medical profession," *Glucksberg*, 521 U.S. at 731, and "preserving and promoting the welfare of the child," *Schall v. Martin*, 467 U.S. 253, 265 (1984) (quotation omitted). These interests give States broad power, even broad power to "limit[] parental freedom," *Prince v. Massachusetts*, 321 U.S. 158, 167 (1944); *see Parham v. J.R.*, 442 U.S. 584, 605–06 (1979), when it comes to medical treatment, *cf. Watson v. Maryland*, 218 U.S. 173, 176 (1910).

This opening presumption of legislative authority to regulate healthcare gains strength in areas of "medical and scientific uncertainty." *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007); *see also Marshall v. United States*, 414 U.S. 417, 427 (1974); *cf. Collins v. Texas*, 223 U.S. 288, 297–98 (1912). In that setting, courts face two risks of error, not just one—first, that they will assume authority over an area of policy that is not theirs to regulate and, second, that

they will impose a constitutional straightjacket on legislative choices before anyone knows how that "medical and scientific uncertainty" will play out.

Confirming all of this is the reality that we have developed substantial regulatory bodies designed to approve and regulate new drugs and medical treatments. At the federal level, the Food and Drug Administration determines when new drugs are safe for public use. Neither doctors, adults, nor their children have a constitutional right to use a drug that the FDA deems unsafe or ineffective. *See Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 703, 706 (D.C. Cir. 2007) (en banc). That is true even if the FDA bars access to an experimental drug that a doctor believes might save a terminally ill patient's life. *Id.* at 701, 711; *see also id.* at 710 & n.18 (collecting similar cases). Nor is it unusual for the FDA to permit drugs to be used for some purposes but not others, or to allow some drugs to be used by adults but not by children. *See, e.g.*, 21 C.F.R. § 201.23(a) (requiring separate pediatric studies for certain drugs already in off-label use); *id.* § 201.57(c)(9)(iv)–(v) (providing labeling requirements for approved FDA pediatric and geriatric uses); *cf. In re Celexa & Lexapro Mktg. & Sales Pracs. Litig.*, 915 F.3d 1, 8–9 (1st Cir. 2019) (describing how the FDA has limited approval for antidepressants by age).

At the local level, we have more of the same. There is a long tradition of permitting state governments to regulate medical treatments for adults and children. So long as a federal statute does not stand in the way and so long as an enumerated constitutional guarantee does not apply, the States may regulate or ban medical technologies they deem unsafe. *See Wyeth v. Levine*, 555 U.S. 555, 574–75, 581 (2009) (vaccine labels); *Vacco v. Quill*, 521 U.S. 793, 808–09 (1997) (assisted suicide); *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485–86 (1996) (pacemaker design); *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 281–82 (1990) (withdrawal of life support).

*Washington v. Glucksberg* puts a face on these points. 521 U.S. 702. Harold Glucksberg claimed that Washington State's ban on physician-assisted suicide violated his patients' due process rights. *Id.* at 707–08. The Court disagreed. It allowed the State to prohibit individuals from receiving the drugs they wanted and their physicians wished to provide, all despite the "personal and profound" liberty interests at stake and all despite the reality that the drugs at issue

often could be used for other purposes. *Id.* at 725–26. The Court reasoned that there was no "deeply rooted" tradition of permitting individuals or their doctors to override contrary state medical laws. *Id.* at 727. The right to refuse medical treatment in some settings, it reasoned, cannot be "transmuted" into a right to obtain treatment, even if both involved "personal and profound" decisions. *Id.* at 725–26. Nor did the observation that some rights under the Due Process Clause arose from concern over "personal autonomy" lead to the conclusion that "any and all important, intimate, and personal decisions are so protected." *Id.* at 727. Even as Glucksberg lost his challenge to the Washington law, the Court's decision did not curtail the nationwide "earnest and profound debate about the morality, legality, and practicality of physician-assisted suicide." *Id.* at 735. Rather, its decision "permit[ted] this debate to continue, as it should in a democratic society." *Id.*

*Abigail Alliance* hews to this path. The claimant was a public interest group that maintained that terminally ill patients had a constitutional right to use experimental drugs that the FDA had not yet deemed safe and effective. 495 F.3d at 697. As these "terminally ill patients and their supporters" saw it, the Constitution gave them the right to use experimental drugs in the face of a grim health prognosis. *Id.* at 697–701. How, they claimed, could the FDA override the liberty of a patient and doctor to make the cost-benefit analysis of using a drug for themselves given the stark odds of survival the patient already faced? *Id.* at 700–01. In a thoughtful en banc decision, the D.C. Circuit rejected the claim. The decision invoked our country's long history of regulating drugs and medical treatments, concluding that substantive due process has no role to play. "Our Nation's history and traditions," the decision explained, "have consistently demonstrated that the democratic branches are better suited to decide the proper balance between the uncertain risks and benefits of medical technology, and are entitled to deference in doing so." *Id.* at 713; *see id.* at 710–11 & n.18 (collecting similar cases); *see also Dent v. West Virginia*, 129 U.S. 114, 121–24 (1889) (explaining how regulation of medical and other professions was a power of the States "from time immemorial"); *Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 534–35 (6th Cir. 2021) (explaining that Congress continued to "leave[] the regulation of doctors to the states" following the Fourteenth Amendment).

As in these cases, so in this one, indeed more so in this one. "The state's authority over children's activities is broader than over like actions of adults." *Prince*, 321 U.S. at 168. A parent's right to make decisions for a child does not sweep more broadly than an adult's right to make decisions for herself. *See Whalen v. Roe*, 429 U.S. 589, 604 (1977); *Doe ex rel. Doe v. Pub. Health Tr.*, 696 F.2d 901, 903 (11th Cir. 1983) (per curiam); *see Doe ex rel. Doe v. Governor of New Jersey*, 783 F.3d 150, 156 (3d Cir. 2015) (rejecting "a right of parents to demand that the State make available a particular form of treatment"). Libertarian and non-libertarian approaches to government all appreciate the distinct capacities of adults and children to look after their long-term interests. *See* Thomas Hobbes, *Leviathan* 127 (Michael Oakeshott ed., Collier Books 1962) (1651); John Locke, *Two Treatises of Government* 147, 208 (Thomas I. Cook ed., Hafner Publ'g Co. 1947) (1689); John Stuart Mill, *On Liberty* 13–14 (Batoche Books 2001) (1859).

*Parental rights do not alter this conclusion because parents do not have a constitutional right to obtain reasonably banned treatments for their children.* Plaintiffs counter that, as parents, they have a substantive due process right "to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality opinion). At one level of generality, they are right. Parents usually do know what's best for their children and in most matters (where to live, how to live, what to eat, how to learn, when to be exposed to mature subject matter) their decisions govern until the child reaches 18. But becoming a parent does not create a right to reject democratically enacted laws. The key problem is that the claimants overstate the parental right by climbing up the ladder of generality to a perch—in which parents control all drug and other medical treatments for their children—that the case law and our traditions simply do not support. Level of generality is everything in constitutional law, which is why the Court requires "a 'careful description' of the asserted fundamental liberty interest." *Glucksberg*, 521 U.S. at 721 (quotation omitted).

So described, no such tradition exists. The government has the power to reasonably limit the use of drugs, as just shown. If that's true for adults, it's assuredly true for their children, as also just shown. This country does not have a custom of permitting parents to obtain banned medical treatments for their children and to override contrary legislative policy judgments in the

process.  Any other approach would not work.  If parents could veto legislative and regulatory policies about drugs and surgeries permitted for children, every such regulation—there must be thousands—would come with a springing easement:  It would be good law until one parent in the country opposed it.  At that point, either the parent would take charge of the regulation or the courts would.  And all of this in an arena—the care of our children—where sound medical policies are indispensable and most in need of responsiveness to the democratic process.

*Kanuszewski v. Michigan Department of Health & Human Services* does not alter this conclusion.  927 F.3d 396 (6th Cir. 2019).  A Michigan law required healthcare organizations to collect blood samples from newborns and to store the samples for future use, all without parental consent and all without any explanation why the law advanced the health of the babies.  *Id.* at 403–04.  This compulsory storage program, we held, violated nonconsenting parents' rights "to make decisions concerning the medical care of their children."  *Id.* at 418.  But there is a night and day difference between that program and this one.  The Michigan program *compelled* medical care, while the Tennessee and Kentucky laws *restrict* medical care.  It is one thing for the State to impose a procedure on someone; it is quite another to deem it unsafe and prohibit it.  All of this explains why the laws at issue here, in marked contrast to the Michigan law, rest on the legislative judgment that they will protect "the health of the child."  *Id.*, 927 F.3d at 421; *see* Tenn. Code Ann. § 68-33-101(b); *Hearing on H.B. 470 Before the Kentucky Senate Families & Children Committee*, *supra*.  While our longstanding traditions may give individuals a right to refuse treatment, there is no historical support for an affirmative right to specific treatments.  *See Glucksberg*, 521 U.S. at 725–26.

Other courts have drawn the same sensible line, noting a material distinction between the State effectively sticking a needle in someone over their objection and the State prohibiting the individual from filling a syringe with prohibited drugs.  The cases simply do not support the claimants' position.  They "reject[] arguments that the Constitution provides an affirmative right of access to particular medical treatments reasonably prohibited by the Government."  *Abigail All.*, 495 F.3d at 710 & n.18 (collecting cases); *see U.S. Citizens Ass'n v. Sebelius*, 705 F.3d 588, 599 (6th Cir. 2013); *Nat'l Ass'n for Advancement of Psychoanalysis v. Cal. Bd. of Psych.*, 228 F.3d 1043, 1050 (9th Cir. 2000); *Sammon v. N.J. Bd. of Med. Exam'rs*, 66 F.3d 639, 645 & n.10

(3d Cir. 1995); *Rutherford v. United States*, 616 F.2d 455, 457 (10th Cir. 1980); *see also Lambert v. Yellowley*, 272 U.S. 581, 596 (1926) (rejecting affirmative right to prescribe a drug even when physician attests that the use of that treatment is "both advisable and necessary"). In some situations, it is true, governments may impose medical treatments on unwilling patients, but the exceptional settings of these cases confirm their limited scope. *See Jacobson v. Massachusetts*, 197 U.S. 11, 27–32 (1905) (permitting municipal health authorities to require vaccination in the face of threats to public health); *Sell v. United States*, 539 U.S. 166, 179–80 (2003) (allowing the government to administer antipsychotics against a patient's wishes so that he could stand trial on "serious criminal charges").

*Parham v. J. R.* does not help the claimants either. 442 U.S. 584. Georgia empowered parents to commit their children to state mental institutions. *Id.* at 587, 605. Several minors sued, claiming that their "liberty interest in not being confined" cut back on any parental right to make decisions for a child. *Id.* at 600. The claim was resolved on procedural, not substantive, due process grounds. *See id.* at 599–600, 620 n.23. Recognizing that States possess "constitutional control over parental discretion," the Court held that States must provide "some kind of inquiry"—a classic procedural due process form of relief—to guard against "the risk of error inherent in the parental decision to have a child institutionalized for mental health care." *Id.* at 603, 606. This traditional due process ruling does not support today's untraditional request for relief under substantive due process. Nothing in *Parham* supports an affirmative right to receive medical care, whether for a child or an adult, that a state reasonably bans. *See Cruzan*, 497 U.S. at 286–87 (noting that *Parham* "allowed" a state to credit parents' health decisions but did not create "a constitutional requirement" that a state "recognize such decisionmaking").

The plaintiffs insist that these treatments are not new and do not involve experimental care. Even if that were true, that alone does not give parents a fundamental right to acquire them. As long as it acts reasonably, a state may ban even longstanding and nonexperimental treatments for children. It is difficult, at any rate, to maintain that these treatments have a meaningful pedigree. It has been about a decade since the World Professional Association for Transgender Health, the key medical organization relied upon by the plaintiffs, first said that hormone treatments could be used by all adolescents, no matter how young. And some of the

same European countries that pioneered these treatments now express caution about them and have pulled back on their use. How in this setting can one maintain that long-term studies support their use—and that the Constitution requires it? Until more time has passed, it is difficult to gauge the risks to children—whether by physically transitioning as a child or not—making it reasonable for accountable democracies to consider, reconsider, and if need be reconsider again the best approach to these issues.

What about the reality that the best time to treat gender dysphoria, according to some doctors and some parents, may be before a child goes through puberty? The nature of the condition, the plaintiffs urge, turns on a lack of alignment between a child's biological sex and perceived gender, a mismatch that will increase during puberty and a mismatch that could make surgery more likely if the condition persists. We see the point. But we also see why this concern gets to the nub of the regulatory challenge, one illustrated by the shifting standards of care over the last two decades and one confirmed by the accepted reality that these drug treatments come with "both risks and benefits." *See* Cal. Amicus Br. 15. Changing the sex characteristics of a child's body, in short, carries material risks in either direction. States may reasonably exercise caution in these circumstances, with some States focusing on the near-term risk of increasing the symptoms of gender dysphoria and other States focusing on the irreversible risks of providing such care to a minor. The Due Process Clause does not resolve this regulatory debate.

*Invocation of medical associations and other experts in the medical community does not alter this conclusion.* The plaintiffs separately frame their claim as the right of parents "to obtain established medical treatments" for their children, emphasizing the many medical organizations that now support this treatment for adults and minors. Ky. R.2 ¶ 80. At least three problems stand in the way of accepting this argument. One is that the plaintiffs never engage with, or explain how they meet, the "crucial" historical inquiry to establish this right. *Glucksberg*, 521 U.S. at 721. There is, to repeat, no such history or tradition. Grounding new substantive due process rights in historically rooted customs is the only way to prevent life-tenured federal judges from seeing every heart-felt policy dispute as an emerging constitutional right.

A second problem is that the relevant medical and regulatory authorities are not of one mind about the cost-benefit tradeoffs of this care. Consider the work of the Food and Drug Administration, an agency whose existence is premised on a form of medical expertise of its own. Under a highly reticulated process that requires considerable long-range testing, the FDA determines when new drugs are safe for public use, including use by minors, and when new drugs are safe for certain purposes but not others. In making these decisions, the Constitution rarely has a say over the FDA's work. *Abigail All.*, 495 F.3d at 703. Gender-transitioning procedures often employ FDA-approved drugs for non-approved, "off label" uses. Kentucky and Tennessee decided that such off-label use in this area presents unacceptable dangers. *See* Ky. Rev. Stat. Ann. § 311.372(2)(a)–(b); Tenn. Code Ann. § 68-33-101(b), (e), (g). Many medical professionals and many medical organizations may disagree. But the Constitution does not require these two States to view these treatments in the same way as the majority of experts or to allow drugs for all uses simply because the FDA approved them for others. *Cf. Planned Parenthood Cincinnati Region v. Taft*, 444 F.3d 502, 505 (6th Cir. 2006) (explaining that off-label use is legal "[a]bsent state regulation"). It is difficult to maintain that the medical community is of one mind about the use of these hormones for gender dysphoria when the FDA is not prepared to put its credibility and testing protocols behind the use. What is new, evolving, and conflicting often prompts change and eventually leads to different best practices, something the Constitution facilitates rather than handcuffs. Also diverse are the practices of other nations, so much so that amicus States on both sides claim support in foreign approaches, with one group emphasizing that the European countries who initiated these treatments are having second thoughts and raising the bar for using them, with the other group emphasizing that these countries have not yet completely banned the treatments. *Compare* Ala. Amicus Br. 21–24, *with* Cal. Amicus Br. 20 & n.39.

The third problem is the absence of judicially manageable standards for ascertaining whether a treatment is "established" or "necessary." *Cf. Rucho v. Common Cause*, 139 S. Ct. 2484, 2498 (2019). One of the *amicus curiae* briefs in the case, in supporting the plaintiffs, forthrightly invokes three goals of the medical profession—"autonomy," "beneficence," and "justice"—as a source of guidance in the area. Bioethics Br. 16. Useful as these principles may

be to the medical profession and accurate as they may be in describing how judges would assess the validity of these laws under the plaintiffs' approach, they do not offer meaningful guidance in determining whether to invalidate such laws. Even the most unwieldy and subjective balancing tests offer more guidance than these generalized principles.

Recognizing such a right also would mean that the state and federal legislatures would lose authority to regulate the healthcare industry whenever the subject of regulation—the medical profession and drug companies—found such regulation unnecessary or otherwise inconsistent with autonomy, beneficence, and justice. *See EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 438–39 (6th Cir. 2019) (rejecting a similar argument). Put to the side the risks of placing the subjects of regulation in charge of regulation, how would judges know when these rights came into existence? The best evidence of the correct standard of care, plaintiffs say, comes from the standards adopted by the World Professional Association for Transgender Health. *See* L.W. Appellees' Br. 4–5; Doe Appellees' Br. 7–8. But the Kentucky and Tennessee laws largely mirror those standards of care—at least they did so for most of the time gender dysphoria has been a diagnosable condition. Not until 2012, remember, did the Association remove any age limits on hormone treatments. *Compare Standards of Care for Gender Identity Disorders* 10 (6th ed. 2001) (setting threshold of "as early as age 16"), *with Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People* 20 (7th ed. 2012) (removing age limit).

What if past is precedent—and this association and others change course in the future? Would the States' authority reappear at that point? What is it in the Constitution, moreover, that entitles experts in a given field to overrule the wishes of elected representatives and their constituents? Is this true in other areas of constitutional law? Must we defer to a consensus among economists about the proper incentives for interpreting the impairment-of-contracts or takings clauses of the Constitution? Or to a consensus of journalists about the meaning of free speech? Or even to a consensus of constitutional scholars about the meaning of a constitutional guarantee?

Question after question arises under plaintiffs' approach. And answer after answer confirms that expert consensus, whether in the medical profession or elsewhere, is not the North Star of substantive due process, lest judges become spectators rather than referees in construing our Constitution. *See Dobbs*, 142 S. Ct. at 2267 (criticizing use of "the 'position of the American Medical Association'" to indicate "the meaning of the Constitution"); *Gonzales v. Raich*, 545 U.S. 1, 27–28 (2005) (explaining that Congress may prohibit marijuana use even when doctors approve its use for medical purposes); *EMW Women's*, 920 F.3d at 439 (reasoning that a state's "authority to regulate" does not turn on consistency with the "views of certain medical groups"); *Otto v. City of Boca Raton*, 981 F.3d 854, 869 (11th Cir. 2020) (explaining that the "institutional positions [of medical associations] cannot define the boundaries of constitutional rights"). The plaintiffs are not likely to establish a due process violation.

B.

*Equal protection—statutory classifications.* "No state," the Fourteenth Amendment says, "shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Under this guarantee, laws ordinarily are valid if they are rationally related to a legitimate state interest. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 55 (1973). Laws premised on classifications based on age or medical condition receive deferential review. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 442–46 (1985) (mental disability); *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312–14 (1976) (per curiam) (age). Laws premised on protected classifications, such as sex or race, receive heightened review. *See United States v. Virginia*, 518 U.S. 515, 531–33 (1996); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 222 (1995). Through it all, a law that treats individuals "evenhandedly"—that treats like people alike—does not trigger heightened review. *Vacco*, 521 U.S. at 800.

The Tennessee and Kentucky laws treat similarly situated individuals evenhandedly. And that is true however one characterizes the alleged classifications in the law, whether as premised on age, medical condition, or sex. Consider each possibility.

A key distinction in the laws turns on age. Adults may use drugs and surgery to transition from one gender to another. But children may not. That classification is eminently

reasonable and does not trigger heightened review. Even those who disagree with the policies behind these laws can appreciate that laws distinguishing between adults and children are not unusual. It is the rare drug, for example, that does not have separate rules for children and adults, whether by lowering the dosage for children or banning it altogether for children. This distinction readily satisfies the deferential review that applies to age-based classifications. *See Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 84 (2000); *Gregory v. Ashcroft*, 501 U.S. 452, 470 (1991).

A second key distinction in both laws turns on the medical condition at issue: gender dysphoria. The problem underlying the condition turns on the physical mismatch between the child's perceived gender and biological sex. The answer according to both States is to treat the condition without physical interventions, including irreversible and potentially irreversible treatments, until the patient reaches 18. This reasonable approach—waiting to use potentially irreversible treatments until the child becomes an adult—also satisfies the deferential review that applies in this setting. A state may reasonably conclude that a treatment is safe when used for one purpose but risky when used for another, especially when, as here, the treatment is being put to a relatively new use. *See Cleburne*, 473 U.S. at 445–46; *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 369–70 (2001).

The third potential classification in both laws, and the one on which plaintiffs train their arguments, turns on sex. This kind of classification, it is true, receives heightened review. *See Virginia*, 518 U.S. at 532–33. But no such form of discrimination occurs in either law. The laws regulate sex-transition treatments for all minors, regardless of sex. Under each law, no minor may receive puberty blockers or hormones or surgery in order to transition from one sex to another. Tenn. Code Ann. § 68-33-103(a)(1); Ky. Rev. Stat. Ann. § 311.372(2). Such an across-the-board regulation lacks any of the hallmarks of sex discrimination. It does not prefer one sex over the other. *See Reed*, 404 U.S. at 73, 76 (preferring male executors). It does not include one sex and exclude the other. *See Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 729 (1982) (denying entry to men); *Virginia*, 518 U.S. at 519–20 (denying entry to women); *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 140 (1994) (excluding potential jurors based on sex). It does not bestow benefits or burdens based on sex. *See Michael M. v. Super. Ct.*, 450 U.S. 464,

466 (1981) (plurality opinion) (making "men alone criminally liable" for statutory rape); *Orr v. Orr*, 440 U.S. 268, 271 (1979) (requiring men, but not women, to pay alimony).  And it does not apply one rule for males and another for females.  *See Sessions v. Morales-Santana*, 582 U.S. 47, 58 (2017) (setting one immigration "rule for mothers, another for fathers"); *Craig v. Boren*, 429 U.S. 190, 192 (1976) (allowing women under 21 to buy beer but not men under 21).  By guarding against the risks of physically invasive, often irreversible, changes to a child's secondary sex characteristics until the individual becomes an adult, the law does not trigger any traditional equal-protection concerns.  And by limiting access to sex-transition treatments to "all" children, the bans do not "constitute[] a denial of 'the equal protection of the laws.'"  *Palmer v. Thompson*, 403 U.S. 217, 226 (1971); *accord Vacco*, 521 U.S. at 800; *Geduldig v. Aiello*, 417 U.S. 484, 496–97 (1974).  There thus is no reason to apply skeptical, rigorous, or any other form of heightened review to these laws.

   *References to a child's biological sex in the laws does not alter this conclusion.*  Not so quick, the plaintiffs counter.  They point out that the statutes treat minors differently based on sex because a boy with abnormally low testosterone levels could receive a testosterone booster in adolescence, but a girl could not receive testosterone to transition.  Likewise, a girl could receive estrogen to remedy a genetic condition, but a boy could not receive estrogen to transition.  In this way, the plaintiffs claim, the availability of cross-sex hormone treatments implicates the minor's sex.

   We accept the premise but not the conclusion.  It is true that, by the nature of their biological sex, children seeking to transition use distinct hormones for distinct changes.  But that confirms only a lasting feature of the human condition, not that any and all lawmaking in the area is presumptively invalid.  One year ago, and nearly fifty years ago, the Supreme Court explained that laws regulating "medical procedure[s] that only one sex can undergo" ordinarily do not "trigger heightened constitutional scrutiny." *Dobbs*, 142 S. Ct. at 2245–46; *see Geduldig*, 417 U.S. at 496 n.20 ("While it is true that only women can become pregnant it does not follow that every legislative classification concerning pregnancy is a sex-based classification . . . . Absent a showing that distinctions involving pregnancy are mere pretexts designed to effect an invidious discrimination against the members of one sex or the other, lawmakers are

constitutionally free to include or exclude pregnancy from the coverage of legislation."). Just so with the banned hormone treatments. Testosterone transitions a minor from female to male, never the reverse. That means only females can use testosterone as a transition treatment. Estrogen transitions a minor from male to female, never the reverse. That means that only males can use estrogen as a transition treatment. These treatments, by biological necessity, are "medical procedure[s] that only one sex can undergo." *Dobbs*, 142 S. Ct. at 2245. If a law restricting a medical procedure that applies only to women does not trigger heightened scrutiny, as in *Dobbs* and *Geduldig*, these laws, which restrict medical procedures unique to each sex, do not require such scrutiny either.

Another flaw accompanies this argument. It assumes that any administration of these hormones is one treatment. That's not so. Using testosterone or estrogen to treat gender dysphoria (to transition from one sex to another) is a different procedure from using testosterone or estrogen to treat, say, Kleinfelter Syndrome or Turner Syndrome (to address a genetic or congenital condition that occurs exclusively in one sex). These distinct uses of testosterone and estrogen stem from different diagnoses and seek different results. Because the underlying condition and overarching goals differ, it follows that the cost-benefit analysis does too, permitting States to legislate in the area without the assumption that they have presumptively violated the Constitution. States may permit varying treatments of distinct diagnoses, as the "Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same." *Tigner v. Texas*, 310 U.S. 141, 147 (1940); *see Vacco*, 521 U.S. at 808.

The Acts mention the word "sex," true. But how could they not? The point of the hormones is to help a minor transition from one gender to another, and laws banning, permitting, or otherwise regulating them all face the same linguistic destiny of describing the biology of the procedures. If any reference to sex in a statute dictated heightened review, virtually all abortion laws would require heightened review. *See Dobbs*, 142 S. Ct. at 2285–2300 (listing numerous laws regulating abortion that refer to sex). Skeptical review also would extend to statutes that regulate medical procedures defined by sex. *See, e.g.*, 18 U.S.C. § 116(a)(1) (criminalizing "female genital mutilation"); Tenn. Code Ann. § 7-51-201(d)(1) (testicular cancer); *id.* § 56-7-

2354(a) (prostate cancer); *id.* § 68-58-101 (breastfeeding); Ky. Rev. Stat. Ann. § 61.315(11)(b) (death benefits for prostate cancer, testicular cancer, and cervical cancer); *id.* § 218A.274 (pregnancy); *id.* § 205.617(1)(c) (cervical cancer); *id.* § 304.17A-145 (insurance coverage for vaginal deliveries and Cesarean sections); *id.* § 304.17A-647 (mandatory coverage for annual pap smear); *cf. id.* § 311.715(2) (regulating in-vitro fertilization). None of these laws is presumptively unconstitutional.

One simply cannot define, or create, a protected class *solely* by the nature of a denied medical benefit: in this instance childhood treatment for gender dysphoria. Else every medical condition, procedure, and drug having any relation to biological sex could not be regulated without running the gauntlet of skeptical judicial review. Far from "command[ing] 'dissimilar treatment for [boys] and [girls] who are similarly situated,'" *Frontiero*, 411 U.S. at 688 (quotation omitted), the States treat boys and girls exactly the same for constitutional purposes—reasonably limiting potentially irreversible procedures until they become adults.

What is true for the word "sex," if plaintiffs' and the federal government's arguments were accepted, also would be true for the word "gender." That would mean that any State that opted to address treatments for "gender dysphoria," whether in a permissive or less permissive way, would trigger heightened review. Recall the fourteen States that statutorily permit some treatments in this area. One of them requires medical insurance companies to cover treatments for gender dysphoria if the patient is 16 or older. Would heightened review apply just because the words sex or gender appear in the law? Would courts then have the final say over whether the cut-off should be 14 or 15? For equal protection purposes, as opposed to conversational purposes, a law does not "*classif[y]* based on sex" whenever it "uses sex-related language." *Eknes-Tucker v. Governor of Ala.*, __ F.4th __, 2023 WL 5344981, at *19 (11th Cir. Aug. 21, 2023) (Brasher, J., concurring). In this instance, the legally relevant classifications turn on presumptively valid age and medical conditions.

States may not permit sex-based discrimination, we appreciate, on the assumption that men as a group and women as a group would be disadvantaged to a similar degree. Separate after all is inherently unequal even if all people might superficially experience the same

segregation. *Brown v. Bd. of Educ.*, 347 U.S. 483, 495 (1954). That's because the Fourteenth Amendment "protect[s] *persons*, not *groups*." *Adarand Constructors*, 515 U.S. at 227. And that's why allowing sex-based peremptory challenges violates equal protection even though the jury system ultimately may not favor one sex over the other. *J.E.B.*, 511 U.S. at 140–42, 146. Even so, the Court has never "equat[ed] gender classifications, for all purposes, to classifications based on race." *Virginia*, 518 U.S. at 532. When laws on their face treat both sexes equally, as these laws do, a challenger must show that the State passed the law because of, not in spite of, any alleged unequal treatment. *Pers. Adm'r v. Feeney*, 442 U.S. 256, 274 (1979). By contrast, "racial classifications" always receive strict scrutiny "even when they may be said to burden or benefit the races equally." *Johnson v. California*, 543 U.S. 499, 506 (2005). "Mechanistic classification of all [gender] differences as stereotypes would operate to obscure those misconceptions and prejudices that are real." *Tuan Anh Nguyen v. INS*, 533 U.S. 53, 73 (2001).

The key to the constitutionality of today's laws, moreover, has nothing to do with groups; it's that they do not disadvantage "persons" based on their sex. The availability of testosterone, estrogen, and puberty blockers does not turn on invidious sex discrimination but on the age of the individual and the risk-reward assessment of treating this medical condition (as opposed to another) with these procedures. Confirming the point is the remedy the plaintiffs seek. They do not ask the States to equalize treatment options by making a procedure given to one sex available to the other. They want both sexes to receive the same gender-transitioning care. In other words, the outcome is that both sexes get a type of care or neither one does. The plaintiffs in this case, in contrast to the plaintiffs in the jury cases or for that matter the race-based-exclusion cases, do not claim a sex-discrimination right to hormones if it is denied for all children for all treatments. *See Eknes-Tucker*, ___ F.4th at ___, 2023 WL 5344981, at *20 (Brasher, J., concurring) (observing that an injunction against a similar law would "not require the government to treat boys and girls the same" but would force the State "to *either* ban puberty blockers and hormones for all purposes *or* allow them for all purposes").

Plaintiffs' sex-classification argument, moreover, does not work on its own terms. Recall that the States prevent minors from taking cross-sex hormones *and* puberty blockers for the purpose of transitioning. In contrast to cross-sex hormones, puberty blockers involve the same

drug used equally by gender-transitioning boys and girls.  *See 2022 WPATH Guidelines*, *supra*, at S113 (recommending the use of gonadotropin releasing hormone agonists (GnRHa) as puberty blockers, and explaining how GnRHa blocks puberty in boys and girls); Tenn. R.113-4 at 18–19 ("Even the dosing is the same for males and females . . . .").  That shows that plaintiffs' only remedial request—the elimination of bans on cross-sex hormones *and* puberty blockers—does not match their sex-classification theory.  And that raises the risk that acceptance of this sex-classification theory would (1) sidestep the conventional discretion given to legislatures that draw distinctions based on age and medical condition or (2) create a new suspect class (more on this later) by other means.

What of language in the cases saying that "all" sex-based classifications receive heightened review?  *Virginia*, 518 U.S. at 555 (quoting *J.E.B.*, 511 U.S. at 136); *see Hogan*, 458 U.S. at 724–25.  The laws in those cases used sex classifications to bestow unequal treatment on men and women.  *See Virginia*, 518 U.S. at 519 (excluding female applicants); *Hogan*, 458 U.S. at 719 (excluding male applicants).  Those cases show only that the government cannot classify individuals by sex when doing so perpetuates invidious stereotypes or unfairly allocates benefits and burdens.  *J.E.B.*, 511 U.S. at 131, 137 (striking potential jurors "based on gender stereotypes").

But those harms, and the necessity of heightened review, will not be present every time that sex factors into a government decision.  As we have already shown, heightened review does not apply in the context of laws that regulate medical procedures unique to one sex or the other.  *See Dobbs*, 142 S. Ct. at 2245–46; *Geduldig,* 417 U.S. at 496 n.20.  Likewise, the government does not trigger heightened review when it houses men and women separately at a prison without making distinctions in funding or programming available to members of each sex.  *Cf. Women Prisoners of D.C. Dep't of Corrs. v. District of Columbia*, 93 F.3d 910, 926 (D.C. Cir. 1996).  The same is true of a sex-based decision to place urinals only in men's rooms.  So too with these laws.  Their necessary references to "enduring" differences between men and women do not trigger heightened review.  *Virginia*, 518 U.S. at 533.

If plaintiffs and the federal government were correct that the only material question in a heightened review case is whether a law contains a reference to sex or gender, the Court would have said so in invalidating bans on same-sex marriage in *Obergefell v. Hodges*, 576 U.S. 644 (2015). But it did not. The Court indeed did not even apply heightened review to the laws. *Id.* at 663–76. Mere appearance of the words sex or gender in a law does not by itself require skeptical review under the Constitution.

*Bostock does not alter this conclusion.* Moving from constitutional to statutory cases, the plaintiffs and the federal government invoke a Title VII case, *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020). The Court concluded that Title VII's prohibition on employment discrimination "because of . . . sex" covers gay and transgender individuals. *Id.* at 1743; 42 U.S.C. § 2000e-2(a)(1). But that text-driven reasoning applies only to Title VII, as *Bostock* itself and many subsequent cases make clear. *Bostock*, 140 S. Ct. at 1753 (declining to "prejudge" other discrimination laws); *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021) (refusing to apply *Bostock* to the Age Discrimination in Employment Act); *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021) (reasoning that Title VII analysis does not apply to Title IX).

Differences between the language of the statute and the Constitution supply an initial reason why one test does not apply to the other. Title VII focuses on but-for discrimination: It is "unlawful . . . for an employer . . . to discriminate against any individual . . . because of . . . sex." 42 U.S.C. § 2000e-2(a)(1). The Equal Protection Clause focuses on the denial of equal protection: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "That such differently worded provisions"—comparing the Constitution and Titles VI and VII—"should mean the same thing is implausible on its face." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141, 2220 (2023) (Gorsuch, J., concurring) (distinguishing the Equal Protection Clause from Title VI); *see id.* at 2209 (concluding that Title VI and Title VII's terms are "essentially identical"); *see Eknes-Tucker*, __ F.4th at __, 2023 WL 5344981, at *16 (majority op.) ("Because *Bostock* therefore concerned a different law (with materially different language) and a different factual context, it bears minimal relevance to the instant case."). All of this explains

why Title VII covers disparate impact claims, *Griggs v. Duke Power Co.*, 401 U.S. 424, 429–30 (1971), and the Fourteenth Amendment does not, *see Washington v. Davis*, 426 U.S. 229, 238–39 (1976).

Importing the Title VII test for liability into the Fourteenth Amendment also would require adding Title VII's many defenses to the Constitution: bona fide occupational qualifications and bona fide seniority and merit systems, to name a few. *See* 42 U.S.C. §§ 2000e-1, 2000e-2. Plaintiffs never explain how, when, or whether these defenses, all tailored to employment settings, would apply to constitutional cases and the medical setting of this dispute. "[W]e must never forget that it is a constitution," not a statute, "we are expounding." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 407 (1819).

Even aside from the differences in language between this statute and the Constitution, there is a marked difference in application of the anti-discrimination principle. In *Bostock*, the employers fired adult employees because their behavior did not match stereotypes of how adult men or women dress or behave. In this case, the laws do not deny anyone general healthcare treatment based on any such stereotypes; they merely deny the same medical treatments to all children facing gender dysphoria if they are 17 or under, then permit all of these treatments after they reach the age of majority. A concern about potentially irreversible medical procedures for a child is not a form of stereotyping.

Plaintiffs object to this conclusion on several grounds. They counter that two cases show that these different texts have the same meaning. The first says only that cases interpreting the Equal Protection Clause "are a useful starting point in interpreting [Title VII]." *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 134 (1976). That point does little for the plaintiffs who try to use Title VII in the other direction—to interpret the Constitution. What is more, Congress ultimately disagreed with the Court's observation, amending Title VII to negate *Gilbert*'s extension of equal protection precedent. *See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 88–89 (1983).

The second case—*Smith v. City of Salem*—does little more in word or deed. 378 F.3d 566 (6th Cir. 2004). It briefly and inconclusively *says* that claims under the Equal Protection Clause and Title VII involve the "same elements." *Id.* at 577 (quoting *Lautermilch v. Findlay*

*City Sch.*, 314 F.3d 271, 275 (6th Cir. 2003)). But *Smith* never addresses the textual differences between these documents—or the different stakes of broadly reading a statute versus broadly reading a largely unamendable constitution. All of the cases pre-date *Bostock*. And nearly all concern workers with overlapping employment-discrimination claims under Title VII and the Equal Protection Clause. *See, e.g.*, *Lautermilch*, 314 F.3d at 275. But a case about potentially irreversible medical procedures available to children falls far outside Title VII's adult-centered employment bailiwick.

What the *Smith* decision *does* has even fewer parallels to today's case. Jimmie Smith, a transgender firefighter, began "expressing a more feminine appearance" at work. *Smith*, 378 F.3d at 568. Smith was fired soon after. Smith "alleged that his failure to conform to sex stereotypes concerning how a man should look and behave was the driving force behind [the decision]." *Id.* at 572. Based on this sex-stereotyping theory, the court found that Smith alleged violations of Title VII and the Equal Protection Clause. *See id.* at 577. That holding was not the watershed plaintiffs make of it. *Smith* did not purport to break new ground, *see id.* at 571, or to create a new rule for transgender discrimination, *id.* at 570. Our subsequent cases have largely taken the hint, refusing to extend *Smith* beyond claims about discrimination over dress or appearance—something the Kentucky and Tennessee laws do not regulate. *See Chisholm v. St. Mary's City Sch. Dist. Bd. of Educ.*, 947 F.3d 342, 352 (6th Cir. 2020); *Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 764 (6th Cir. 2006).

All told, *Smith* tells us nothing about whether a state may regulate medical treatments for minors facing gender dysphoria. Recognizing and respecting biological sex differences does not amount to stereotyping—unless Justice Ginsburg's observation in *United States v. Virginia* that biological differences between men and women "are enduring" amounts to stereotyping. 518 U.S. at 533. Any other approach to *Smith* would nullify *Dobbs* and *Geduldig*, which to repeat make clear that legislative references to biological differences do not by themselves require heightened review. *See Dobbs*, 142 S. Ct. at 2245–46. The Eleventh Circuit recently, and correctly, reached this precise conclusion in distinguishing a similar stereotyping case. *See Eknes-Tucker*, __ F.4th at __, 2023 WL 5344981, at *17 (11th Cir. 2023) (reasoning that

Alabama's ban on sex-transition procedures "does not further any particular gender stereotype" and "simply reflects biological differences").

## C.

*Equal protection—suspect class.* The plaintiffs and the federal government separately invoke a distinct theory of equal protection—that the Act violates the rights of a suspect class: transgender individuals. But neither the Supreme Court nor this Court has recognized transgender status as a suspect class. Until that changes, rational basis review applies.

The bar for recognizing a new suspect class is a high one. The Supreme Court "has not recognized any new constitutionally protected classes in over four decades, and instead has repeatedly declined to do so." *Ondo*, 795 F.3d at 609; *see City of Cleburne*, 473 U.S. at 442 (mental disability is not a suspect class); *Murgia*, 427 U.S. at 313–14 (age is not a suspect class); *Rodriguez*, 411 U.S. at 28–29 (poverty is not a suspect class); *see also Obergefell*, 576 U.S. 644 (declining to address whether gay individuals qualify as a suspect class).

That hesitancy makes sense. Regulation of treatments for gender dysphoria poses fraught line-drawing dilemmas, not unlike the problem facing regulations premised on wealth, age, and disability, including laws designed to allocate benefits on these grounds. Plenty of challenges come to mind in the context of medical treatments for childhood gender dysphoria. Counseling versus drugs. Puberty blockers versus hormone treatments. Hormone treatments versus surgeries. Adults versus minors. One age cutoff for minors (16) versus another (18). And that's just the line-drawing challenges that accompany treatments for gender dysphoria. What of other areas of regulation that affect transgender individuals? Bathrooms and locker rooms. Sports teams and sports competitions. Others are sure to follow.

Even when accompanied by judicial tiers of scrutiny, the U.S. Constitution does not offer a principled way to judge these lines. Removing these trying policy choices from fifty state legislatures to one Supreme Court will not solve them and in truth runs the risk of making them harder to solve. Instead of the vigorous, sometimes frustrating, "arena of public debate and legislative action" across the country and instead of other options provided by fifty governors and fifty state courts, we would look to one judiciary, suddenly delegated with authority to

announce just one set of rules. *Glucksberg*, 521 U.S. at 720. That is not how a constitutional democracy is supposed to work—or at least works best—when confronting evolving social norms.

Other considerations that the Court has highlighted when recognizing a new suspect class do not improve plaintiffs' chances of success.

*Not an immutable group*. To establish a new classification, plaintiffs must show that transgender individuals "exhibit obvious, immutable, or distinguishing characteristics that define them as a discrete group." *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987) (quotation omitted). It is difficult to see, at least at this stage of the case, how transgender identity fits that description. Unlike existing suspect classes, transgender identity is not "definitively ascertainable at the moment of birth." *Ondo*, 795 F.3d at 609. It is not necessarily immutable, as the stories of "detransitioners" indicate and as plaintiffs do not dispute. *See* Detransitioners' Amicus Br. 19–25. Instead of defining a "discrete group," *Bowen*, 483 U.S. at 602, "transgender" can describe "a huge variety of gender identities and expressions," *2022 WPATH Guidelines*, *supra*, at S15.

*Not a politically powerless group*. Concerns about a "political[ly] powerless[]" group and a dysfunctional political process also do not supply a reason for heightened review. *Rodriguez*, 411 U.S. at 28. Whatever may have been true in the past about our society's treatment of individuals with gender dysphoria, some of it surely lamentable, it is difficult to maintain that the democratic process remains broken on this issue today. The President of the United States and the Department of Justice support the plaintiffs. A national anti-discrimination law, Title VII, protects transgender individuals in the employment setting. Fourteen States have passed laws specifically allowing some of the treatments sought here. Twenty States have joined an amicus brief in support of the plaintiffs. The major medical organizations support the plaintiffs. And the only large law firms to make an appearance in the case all entered the controversy in support of the plaintiffs. These are not the hallmarks of a skewed or unfair political process—and they offer no explanation for inviting a greater political dysfunction

problem: the difficulty of amending the Constitution if the federal courts err in choosing to occupy the field.

     *Not an animus-driven law.* Plaintiffs also have not made the case that animus toward transgender individuals as a class drives this law. Assessing legislative "motives or purposes" is "a hazardous matter," and it's not the point of the inquiry. *United States v. O'Brien*, 391 U.S. 367, 383 (1968). Instead of asking judges to read the hearts and minds of legislators, the inquiry asks whether the law at issue is "inexplicable by anything but animus." *Trump v. Hawaii*, 138 S. Ct. 2392, 2421 (2018). The key problem is that a law premised only on animus toward the transgender community would not be limited to those 17 and under. The legislature plainly had other legitimate concerns in mind. A fair-minded legislature could review the evidence in the area and call for a pause, demanding more proof that these procedures are safe before continuing on the path the plaintiffs propose. Neither risk aversion nor a fair-minded policy dispute about the best way to protect children shows animus.

     The novelty of these treatments also undercuts any claim of animus. Physicians began offering specialized care for transgender minors only in the 1990s, and the first clinic to treat transgender youth in America opened around 2007. American doctors began using puberty blockers and hormones to treat gender dysphoria around the same time. A similar timeline applies to the guidelines from the World Professional Association for Transgender Health. Its guidance documents from 1979 to 2000 generally disfavored using puberty blockers or hormones for minors, and only in 2012 did it abandon age limits for cross-sex hormones. *Compare, e.g.*, *1998 Standards of Care*, *supra*, at 6–7, *with 2012 Standards of Care*, *supra*, at 14. Even today, it notes the "limited data" on "the long-term physical, psychological, and neurodevelopmental outcomes in youth." *2022 WPATH Guidelines*, *supra*, at S65. Abroad, several European nations, including the ones who paved the way for early drug-related and surgical treatments, have since limited these medical interventions for minors. At home, the FDA has not approved these relatively new uses for puberty blockers and hormones.

     *The laws do not draw constitutionally irrational lines.* Even under deferential review, the challengers contend, they should prevail because banning puberty blockers and hormones for

some purposes and not for other purposes is irrational.  Confirming the point, they say, is the Court's determination that it was irrational for states to deny contraception to single individuals but not to married couples.  *See Eisenstadt v. Baird*, 405 U.S. 438, 447–53 (1972).  The analogy does not hold.  Marital status by itself has nothing to do with the risks associated with pregnancy, which doomed the *Eisenstadt* law.  *See id.*  Not so with the dividing line here.  A legislature could conclude that treating congenital conditions with puberty blockers and hormones carries less risk than using these drugs to treat gender dysphoria for the purpose of changing an individual's secondary sex characteristics.  Drawing such lines "is peculiarly a legislative task." *Murgia*, 427 U.S. at 314.  The States also could be concerned that some adolescents, say a 13-year-old, lack the capacity to consent to such a significant and potentially irreversible treatment.

The unsettled, developing, in truth still experimental, nature of treatments in this area surely permits more than one policy approach, and the Constitution does not favor one over the other.  This ongoing debate provides "persuasive evidence" that Kentucky and Tennessee could choose fair-minded caution and their own approach to child welfare, just as other jurisdictions could rationally adopt another path.  *Trump*, 138 S. Ct. at 2421.

The challengers rely on the district courts' endorsements of their position and evidence to question the States' interests.  But recall that each district court ruled that heightened review applied to these classifications.  As shown, that would require an extension of existing Supreme Court and Sixth Circuit precedent, an extension not justified in this setting.  Rational basis review applies, and it requires deference to legislatures, not to medical experts or trial court findings.  At any rate, no such deference applies to a written record like this one and the dueling affidavits that accompany it.  *See Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1381 (6th Cir. 1995) ("[I]n a case such as this, where the district court's decision was made on the basis of a paper record, without a[n] evidentiary hearing, we are in as good a position as the district judge to determine the propriety of granting a preliminary injunction." (quotation omitted)).

Plenty of rational bases exist for these laws, with or without evidence. Rational basis review requires only the possibility of a rational classification for a law. *FCC v. Beach Commc'ns*, 508 U.S. 307, 313 (1993). It does not generally turn on after-the-fact evidentiary debates. *Id.* at 315. But even if we account for the evidence submitted at the preliminary injunction hearing, Kentucky and Tennessee offered considerable evidence about the risks of these treatments and the flaws in existing research. Administering puberty blockers to prevent pubertal development can cause diminished bone density, infertility, and sexual dysfunction. Introducing high doses of testosterone to female minors increases the risk of erythrocytosis, myocardial infarction, liver dysfunction, coronary artery disease, cerebrovascular disease, hypertension, and breast and uterine cancer. And giving young males high amounts of estrogen can cause sexual dysfunction and increases the risk of macroprolactinoma, coronary artery disease, cerebrovascular disease, cholelithiasis, and hypertriglyceridemia.

The challengers disagree, citing experts of their own. But no one disputes that these treatments carry risks or that the evidence supporting their use is far from conclusive. *See Eknes-Tucker*, __ F.4th at __, 2023 WL 5344981, at *7–8, *13; Doe Appellees' Br. 44–45; L.W. Appellees' Br. 35–36. The Endocrine Society's guidelines recognize that puberty blockers can cause "adverse effects on bone mineralization" and "compromised fertility," along with "unknown effects on brain development." *Endocrine Society Clinical Practice Guideline*, *supra*, at 3882. The World Professional Association for Transgender Health likewise cautions that hormone therapy can impair fertility, and it notes the "major gaps in knowledge" in this area. *2022 WPATH Guidelines*, *supra*, at S103, S118. At bottom, the challengers simply disagree with the States' assessment of the risks and the right response to those risks. That does not suffice to invalidate a democratically enacted law on rational-basis grounds.

V.

The preliminary injunctions suffer from another merits-related problem: their scope. Each one rests on a facial invalidation of each Act, as opposed to an as-applied judgment, and each one applies to every individual in the state. Each premise is mistaken.

The challengers claim that the Tennessee and Kentucky laws facially violate the Constitution. But litigants raising "a facial challenge to a statute normally 'must establish that *no set of circumstances* exists under which the [statute] would be valid.'" *United States v. Hansen*, 143 S. Ct. 1932, 1939 (2023) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). That's a "strict standard" that we have no authority to "dilute[]." *Dobbs*, 142 S. Ct. at 2275. We have many cases adhering to the *Salerno* test. *See, e.g.*, *Oklahoma v. United States*, 62 F.4th 221, 231 (6th Cir. 2023); *United States v. Fields*, 53 F.4th 1027, 1038 (6th Cir. 2022); *Green Party of Tenn. v. Hargett*, 700 F.3d 816, 826 (6th Cir. 2012); *Warshak v. United States*, 532 F.3d 521, 529 (6th Cir. 2008) (en banc); *Aronson v. City of Akron*, 116 F.3d 804, 809 (6th Cir. 1997). Under this standard, plaintiffs must rule out every potentially valid application, say with respect to individuals too young to consent to a regimen of hormone treatments or with respect to some physically invasive drug treatments in particular, before we may declare a law facially invalid. Yet they have not tried to meet this standard, and that by itself undercuts the preliminary injunctions.

Turn to the nature of the injunctions. District courts "should not issue relief that extends further than necessary to remedy the plaintiff's injury." *Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023). One injunction prohibits Tennessee from enforcing its law against the nine challengers *and* against the other seven million residents of the Volunteer State. The other injunction prohibits Kentucky from enforcing its law against seven minors and their parents *and* against the other 4.5 million residents of the Bluegrass State. Absent a properly certified class action, these individuals do not represent every citizen of their States. And it is doubtful that the nature of federal judicial power—or for that matter Article III—permits such sweeping relief without the existence of a properly certified class or an extraordinary reason for ignoring these normal limits on the federal judicial power. Article III confines the "judicial power" to "Cases" and "Controversies." U.S. Const. art. III, § 2. Federal courts may not issue advisory opinions or address statutes "in the abstract." *California v. Texas*, 141 S. Ct. 2104, 2115 (2021) (quotation omitted). They instead must operate in a party-specific and injury-focused manner. *See id.*; *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018). A court order that goes beyond the injuries of a particular plaintiff to enjoin government action against nonparties exceeds the norms of judicial

power.  *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see, e.g.*, *Trump v. Hawaii*, 138 S. Ct. at 2424–29 (Thomas, J., concurring); *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 599–601 (2020) (mem.) (Gorsuch, J., concurring); *see also Doster v. Kendall*, 54 F.4th 398, 439 (6th Cir. 2022); Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 457–82 (2017).

Even if courts in some instances may wield such power, the district courts likely abused their discretion by deploying it here.  *See, e.g.*, *Biden*, 57 F.4th at 557; *see also United States v. Texas*, 143 S. Ct. 1964, 1985–86 (2023) (Gorsuch, J., concurring) (considering the systemic harms of overbroad injunctions as part of abuse-of-discretion review).  Neither order offers any meaningful reason for imposing such broad relief.

Plaintiffs argue on appeal that statewide relief is necessary to remedy their injuries. Medical providers, they point out, could choose not to treat the minor plaintiffs if they cannot also treat other minors.  Such "speculation" about third-party behavior will not do.  *Biden*, 57 F.4th at 557.  Plaintiffs add that an injunction confined to the minors in this case "would also force those who proceeded pseudonymously to reveal their identities in order to obtain care." L.W. Appellees' Br. 58.  Plaintiffs did not argue the point below.  And even if they had, plaintiffs cite no authority that privacy interests alone could justify statewide relief.  Besides, a statewide injunction is not the only path to privacy.  Medical providers are no strangers to patient confidentiality.  Through each variation on these themes, plaintiffs fail to explain why a class action would not solve these problems.

We leave for the district courts on remand to consider one other issue:  standing, more specifically redressability.  *See Arizona*, 40 F.4th at 383 (noting that, at the preliminary injunction phase, Article III standing goes to the "likelihood of success" on the merits).  Before reaching the final injunction stage of the case, the parties may wish to introduce evidence about whether any of the plaintiff doctors plan to offer these treatments in the future if they succeed on these constitutional claims.  As a factual and legal matter, the point is undeveloped and potentially knotty.

VI.

The other preliminary injunction factors largely favor the States as well. If the injunction remains in place, Tennessee and Kentucky will suffer harm from their inability to enforce the will of their legislatures, to further the public-health considerations undergirding the laws, and to avoid health risks to their children.

As for harm to others, Tennessee permits the challengers to continue their existing treatments until March 31, 2024, Tenn. Code Ann. § 68-33-103(b)(1)(B), and Kentucky permits an indefinite period of treatment to "systematically reduce[]" the use of drugs or hormones, Ky. Rev. Stat. Ann. § 311.372(6). These features of the laws lessen the harm to those minors who wish to continue receiving treatment. But we appreciate that they do not answer the concerns of those who might wish to continue treatment beyond what these States allow or of those minors who might seek treatment for the first time in the future. That creates an irreversible problem of its own, one that lies at the crux of the case. Both sides have the same fear, just in opposite directions—one saying the procedures create health risks that cannot be undone, the other saying the absence of such procedures creates risks that cannot be undone. This choice in this instance is not for judges to make. Elected representatives, as it happens, made these precise cost-benefit decisions and did not trigger any reason for judges to second-guess them.

As for the public interest, Tennessee and Kentucky's interests in applying these laws to their residents and in being permitted to protect their children from health risks weigh heavily in favor of the States at this juncture.

\*\*\*

No one in these consolidated cases debates the existence of gender dysphoria or the distress caused by it. And no one doubts the value of providing psychological and related care to children facing it. The question is whether certain additional treatments—puberty blockers, hormone treatments, and surgeries—should be added to the mix of treatments available to those age 17 and under. As to that, we return to where we started. This is a relatively new diagnosis with ever-shifting approaches to care over the last decade or two. Under these circumstances, it is difficult for anyone to be sure about predicting the long-term consequences of abandoning age

limits of any sort for these treatments. That is precisely the kind of situation in which life-tenured judges construing a difficult-to-amend Constitution should be humble and careful about announcing new substantive due process or equal protection rights that limit accountable elected officials from sorting out these medical, social, and policy challenges.

For these reasons, we reverse the preliminary injunctions issued in these cases and remand them for further proceedings consistent with this decision.

———————————

## DISSENT

———————————

HELENE N. WHITE, Circuit Judge, dissenting.    The statutes we consider today discriminate based on sex and gender conformity and intrude on the well-established province of parents to make medical decisions for their minor children.    Despite these violations of the Equal Protection and Due Process Clauses of the Fourteenth Amendment, the majority concludes that the statutes are likely constitutional and reverses district court orders enjoining the statutes.    I respectfully dissent.

### I.

We consider whether to uphold injunctions against the enforcement of Tennessee and Kentucky statutes insofar as they ban the use of puberty suppressants and hormone therapy to treat minors who are diagnosed with gender dysphoria.

### A.

At birth, an infant is assigned a sex, either male or female.    An assignment is usually based on the appearance of external genitalia, although the term *sex*, as used in the medical community, also comprises other things, such as internal reproductive organs, chromosomes, hormones, and secondary sex characteristics.    *Gender identity*, in contrast, "is the medical term for a person's internal, innate sense of belonging to a particular sex."  No. 23-5609, R. 17-1, PID 148.    Assigned sex and gender identity match for most individuals, but for transgender individuals, they do not align.

For a small segment of the population, incongruity between assigned sex and gender identity can result in *gender dysphoria*, a medical condition characterized by significant psychological distress or impairment in social, occupational, or other important areas of functioning.    The condition is listed in the Diagnostic and Statistical Manual, Version 5 (DSM-5), the diagnostic and coding compendium for mental-health professionals, and can arise during

childhood, adolescence, or adulthood.  If untreated, gender dysphoria may result in severe anxiety and depression, eating disorders, substance-use issues, self-harm, and suicidality.

The World Professional Association for Transgender Health (WPATH) and the Endocrine Society have published clinical-practice guidelines on how best to treat gender dysphoria.  The WPATH is the leading association of medical and mental-health professionals with expertise in treating gender dysphoria, and the Endocrine Society is an organization representing more than 18,000 endocrinologists.  The groups are the largest professional associations in the United States in their respective fields.  The first set of guidelines dates to 1979, and the organizations have revised the guidelines several times since.

The goal of treatment for gender dysphoria is to reduce distress and improve functioning by enabling an affected person to live in conformity with the person's gender identity, and the process of undergoing such treatment is often called *gender transition* or *gender-affirming care*.  The precise treatment for gender dysphoria depends on an individual's medical and mental-health circumstances and age—whether the individual is a pre-pubescent child, an adolescent, or an adult.

Transition typically starts with a series of steps known as *social transition*.  Those steps often include using a name and pronouns, wearing clothes, and practicing grooming habits associated with the person's gender identity.  Beginning with adolescence, a healthcare provider may recommend medical interventions, including prescription medications.  Minors often experience intensification of gender dysphoria when entering adolescence due to the development of secondary sex characteristics, such as facial and body hair for males and breasts for females.  Providers do not consider these interventions until the onset of puberty.

Under the WPATH and the Endocrine Society guidelines, an adolescent may receive medical interventions only if the adolescent:  (1) has gender incongruence that is both marked and sustained over time; (2) meets the diagnostic criteria for gender dysphoria; (3) demonstrates sufficient emotional and cognitive maturity to provide informed consent for the treatment; (4) actually provides such consent with the adolescent's parents after being informed of the potential reproductive and other side effects; and (5) has no mental-health concerns that may

interfere with diagnosis or treatment. The guidelines "recommend health care professionals involve the relevant disciplines, including mental health . . . professionals, to reach a decision about whether" gender-affirming care is "appropriate and remain[s] indicated throughout the course of treatment until the transition is made to adult care." No. 23-5600, R. 113-9, PID 1792.[1]

Treatment may consist of puberty-suppressing medications and hormone therapy. Pubertal suppression prevents the worsening of gender dysphoria by limiting the development of secondary sex characteristics and is appropriate only if the adolescent's gender dysphoria has worsened with the onset of puberty. Hormone therapy—testosterone for adolescent transgender boys and testosterone suppression and estrogen for adolescent transgender girls—also reduces distress by facilitating physiological changes consistent with the adolescent's gender identity and on a similar timeline as the adolescent's non-transgender peers.

A substantial body of evidence—including cross-sectional and longitudinal studies as well as decades of clinical experience—shows that these medical interventions work. Gender-affirming care improves short- and long-term outcomes for adolescents with gender dysphoria by reducing rates of depression, anxiety, self-harm, and suicidality, and brings their mental health into alignment with their peers. Adverse side effects, moreover, are infrequent, and healthcare providers can easily manage them. Providers have used puberty suppressants to treat precocious (or early) puberty for decades, and suppressants have no long-term effects on fertility or sexual functioning. Suppression is also reversible; if treatment ceases, endogenous puberty normally resumes. Hormone therapy likewise is safe and poses a low risk of side effects or adverse consequences. The percentage of individuals who later come to regret undergoing such care is low—only about one percent.

The WPATH and the Endocrine Society guidelines constitute the prevailing standard of care for individuals with gender dysphoria. They are based on the same quality of evidence as

---

[1]Because "not all patients and families are in the position or in a location to access multidisciplinary care, the lack of available disciplines should not preclude a young person from accessing needed care in a timely manner," but "[w]hen disciplines are available," the guidelines "recommend[] efforts be made to include the relevant providers." No. 23-5600, R. 113-9, PID 1792.

other clinical-practice guidelines.  And every professional association for medical and mental-health providers in the United States—including the American Medical Association, American Academy of Pediatrics, and the American Psychiatric Association—has endorsed the guidelines.

B.

Tennessee Plaintiffs are transgender adolescents L.W., John Doe, and Ryan Roe (Tennessee Minor Plaintiffs), their parents Samantha and Brian Williams, Jane and James Doe, and Rebecca Roe (Tennessee Parent Plaintiffs), and Dr. Susan Lacy (Tennessee Physician Plaintiff), a physician licensed to practice medicine in Tennessee.  All Tennessee Minor Plaintiffs were undergoing gender-affirming care when Tennessee's statute took effect.  All have benefitted from their care.

L.W., a fifteen-year-old transgender girl, first began to question her gender identity when she was ten years old.  She felt like she was "trapped" or "drowning" and found it hard to focus in school or connect with her friends.  No. 23-5600, R. 22, PID 196–97.  She started getting sick at school and routinely developed urinary tract infections because she was not using the restroom out of distress with the sex-separated facilities.  L.W. saw a therapist, who diagnosed her with gender dysphoria.  L.W. began puberty at age thirteen, and the prospect of changes like a deeper voice and facial hair terrified her.  Thus, her physician at Vanderbilt Children's Hospital (VCH) discussed treatment options, including puberty suppressants and, later, hormone therapy.  L.W. and her parents decided that treatment was right for her.  Now, L.W. is a happy, confident, and outgoing teenager.

Ryan Roe is a fifteen-year-old transgender boy.  By the time he entered the fifth grade, he had begun puberty and became depressed and anxious.  He had a panic attack when he had his first period.  In the sixth grade, Ryan often vomited from anxiety in the morning before school, and his distress persisted despite treatment with anti-anxiety medication.  Ryan's peers bullied him.  He stopped talking in public because of the sound of his voice and began engaging in self-harm.  Two years of psychotherapy provided Ryan minimal benefit, and after the seventh grade, his therapist diagnosed him with gender dysphoria.  Ryan and his parents consulted with an endocrinologist at VCH, and after months of weighing the benefits and risks of treatment, Ryan

elected to undergo hormone therapy.  Treatment transformed Ryan's life:  he has returned to his vocal, outgoing self, raises his hand in school, and willingly joins in family photographs.

John Doe is a twelve-year-old transgender boy.  He knew that he was a boy beginning when he was two or three years old.  When John was three or four years old, he adopted a typically male name and began telling his friends that he was a boy.  Participating in sex-separated activities with girls made him miserable; he was upset playing on an all-girls soccer team, and he asked his mother why he could not wear the boy's outfit or dance the boy's part in his dance classes and recitals.  During first grade, John started seeing a therapist, who diagnosed him with gender dysphoria.  When John was nine, his mom gave him the female version of *The Care and Keeping of You*, a book designed to teach children about the changes that their bodies undergo in adolescence.  John became mortified of the prospect of female puberty.  His pediatrician referred him to an endocrinologist to explore treatment options.  The endocrinologist monitored John for years, and once John began puberty, John and his parents decided that puberty suppression was the best course for John.  Because of treatment, John has "finally" arrived at a "healthy, happy place," and when the time is right, he hopes to begin hormone therapy.  No. 23-5600, R. 24, PID 212–13.

Dr. Lacy, the Tennessee Physician Plaintiff, is board-certified in obstetrics and gynecology and licensed to practice medicine in Tennessee.  At her practice in Memphis, she treats both cisgender and transgender patients, including twenty minor transgender patients with gender dysphoria.  Dr. Lacy has seen first-hand how integral such care is to her patients' well-being.  No patient has expressed to Dr. Lacy any regret from treatment.

Kentucky Plaintiffs are three transgender boys and four transgender girls (Kentucky Minor Plaintiffs) and their parents (Kentucky Parent Plaintiffs).  At the time Kentucky's statute took effect, six of the Kentucky Minor Plaintiffs were undergoing gender-affirming care under the supervision of their medical providers and with the consent of their parents.  The remaining Kentucky Minor Plaintiff, who is nine years old, anticipates needing care once she begins puberty.

Gender-affirming care has benefited the Kentucky Minor Plaintiffs tremendously.  John Minor Doe 1 (JM1), for example, is a twelve-year-old transgender boy whose mental health deteriorated when he began menstruating.  His parents hospitalized him when he became suicidal.  After consultations with therapists, psychiatrists, a pediatric nurse practitioner, and an endocrinologist, JM1 was diagnosed with gender dysphoria.  He later began gender-affirming care and experienced an immediate improvement in his wellbeing; his suicidality abated, and he returned to the happy child he was before his first period.  The stories of John Minor Doe 2, Jane Minor Doe 3, and John Minor Doe 5 are similar—they received diagnoses of gender dysphoria after consultations with their healthcare providers and saw noticeable improvements in their wellbeing after starting gender-affirming care.  Their parents fear that their children will revert to their prior distressed states if the care ceases.[2]

## C.

Tennessee and Kentucky passed statutes this year prohibiting the use of puberty suppressants and hormone therapy "for the purpose of" providing gender-affirming care to minors.[3]  Tennessee's statute set forth an effective date of July 1, 2023.  *See* 2023 Tenn. Pub. Acts ch. 1.  Kentucky's legislature overrode the governor's veto, enacting its statute on March 29, 2023, with an effective date of June 29, 2023.  *See* Ky. Acts 775–79.

Tennessee's statute prohibits a healthcare provider from performing, administering, or offering to perform or administer on a minor "any puberty blocker or hormone to a human being," Tenn. Code Ann. § 68-33-102(5)(B), "for the purpose of" either (1) "[e]nabling a minor to identify with, or live as, a purported identity inconsistent with the minor's sex" or (2) "[t]reating purported discomfort or distress from a discordance between the minor's sex and

---

[2]*See also generally* Brief of Amici Curiae Elliott Page and Fifty-Six Other Individuals (detailing personal triumphs and societal contributions of transgender individuals across myriad industries, many of whom benefited from gender-affirming care as minors or later in life and "describe it as crucial to their wellbeing and even survival").

[3]In addition to restricting use of puberty blockers and hormone therapy, the statutes restrict certain surgeries, but Kentucky Plaintiffs do not challenge those restrictions, *see* Kentucky Appellees Br. 16 n.1, and Tennessee Plaintiffs do not appeal the district court's ruling that they do not have standing to challenge the surgery restrictions, *see L.W. ex rel. Williams v. Skrmetti*, No. 23-CV-00376, 2023 WL 4232308, at *5 (M.D. Tenn. June 28, 2023).

asserted identity," *id.* § 68-33-103(a). The statute exempts from the prohibition any treatment for a "congenital defect, precocious puberty, disease, or physical injury," *id.* § 68-33-103(b)(1), but forbids treatment for "gender dysphoria, gender identity disorder, gender incongruence, or any mental condition, disorder, disability, or abnormality," *id.* § 68-33-102(1). Minors who began treatment before July 1, 2023, may phase out medication until March 31, 2024, if their providers certify that "ending the medical procedure would be harmful." *Id.* § 68-33-103(b)(1)(B), (b)(3).

Under Kentucky's statute, a healthcare provider may not, "for the purpose of attempting to alter the appearance of, or to validate a minor's perception of, the minor's sex, if that appearance or perception is inconsistent with the minor's sex, knowingly" provide certain forms of care. Ky. Rev. Stat. § 311.372(2). Prohibited care includes "[p]rescrib[ing] or administer[ing] any drug to delay or stop normal puberty" or "testosterone, estrogen, or progesterone, in amounts greater than would normally be produced endogenously in a healthy person of the same age and sex." *Id.* § 311.372(2)(a)–(b). The statute exempts treatment for certain minors from the ban:

> (a) A minor born with a medically verifiable disorder of sex development, including external biological sex characteristics that are irresolvably ambiguous;
>
> (b) A minor diagnosed with a disorder of sexual development, if a health care provider has determined, through genetic or biochemical testing, that the minor does not have a sex chromosome structure, sex steroid hormone production, or sex steroid hormone action, that is normal for a biological male or biological female; or
>
> (c) A minor needing treatment for an infection, injury, disease, or disorder that has been caused or exacerbated by any action or procedure prohibited by [the statute].

*Id.* § 311.372(3).

Both statutes authorize licensing sanctions for healthcare providers. *See* Tenn. Code Ann. § 68-33-107; Ky. Rev. Stat. § 311.372(4). Tennessee's statute further authorizes its Attorney General to bring a civil action against healthcare providers. *See* Tenn. Code Ann. § 68-33-106. And both statutes include mechanisms for private civil enforcement, *see* Tenn. Code Ann. § 68-33-105; Ky. Rev. Stat. § 311.372(5), though Plaintiffs do not challenge the constitutionality of these mechanisms.

### D.

Plaintiffs sought preliminary injunctions to enjoin enforcement of these statutes, arguing that the statutes discriminate based on sex and transgender status in violation of the Equal Protection Clause and deprive Parent Plaintiffs of their fundamental right to make medical decisions for their children in violation of the Due Process Clause.[4]

The district courts in both cases issued statewide preliminary injunctions, concluding that the statutes are likely unconstitutional on due-process and equal-protection grounds. *See L.W. ex rel. Williams v. Skrmetti*, 2023 WL 4232308, at *6; *Doe 1 v. Thornbury*, No. 23-CV-230, 2023 WL 4230481, at *1 (W.D. Ky. June 28, 2023). The Tennessee district court reasoned that the state's statute infringed Parent Plaintiffs' fundamental right to make medical decisions for their children and that the state failed to establish a compelling interest supporting the law and show that the law was narrowly tailored in support of any asserted interest. *See* 2023 WL 4232308, at *6–8. The court also reasoned that the statute discriminated based on sex and transgender status, which the court found to be a semi-suspect class. *See id.* at *9–19. The Kentucky district court followed the same analysis regarding Kentucky's statute but concluded that it did not need to decide whether transgender persons are a semi-suspect class. *See* 2023 WL 4230481, at *3 n.5.

State officials in both cases brought emergency motions to stay these preliminary injunctions, which this panel considered in July. The majority stayed the Tennessee preliminary injunction over my dissent, becoming the first court in this country to find that such restrictions on gender-affirming care for transgender youth are likely constitutional. *See L.W. ex rel. Williams v. Skrmetti*, 73 F.4th 408, 422 (6th Cir. 2023).[5] However, the majority emphasized: "These initial views, we must acknowledge, are just that: initial. We may be wrong. It may be that the one week we have had to resolve this motion does not suffice to see our own mistakes."

---

[4]Kentucky Plaintiffs sought a preliminary injunction against the presidents of the state medical and nursing boards, whom the Kentucky statute tasked with enforcement of the treatment ban, but the presidents had "no objection to" the injunction and agreed "it would behoove [licensed physicians and nurses] and their patients for the Court to grant the injunction and maintain the status quo pending final ruling on the merits of the suit." No. 23-5609, R. 41, PID 478–7. The Kentucky Attorney General intervened.

[5]I recognize that *Eknes-Tucker v. Governor of Alabama*, — F.4th —, 2023 WL 5344981 (11th Cir. Aug. 21, 2023), followed our decision and upheld Alabama's statute.

*Id.* The majority later upheld the Kentucky district court's stay of its own preliminary injunction, again over my dissent. *See Doe 1 v. Thornbury*, 75 F.4th 655, 657 (6th Cir. 2023).

We now hear these cases to reach a merits decision whether to affirm the district courts' preliminary injunctions. Plaintiffs reiterate their arguments that the statutes are unconstitutional under the Equal Protection Clause because they discriminate based on sex, gender conformity, and transgender status and the Due Process Clause because they deny parents the fundamental right to make medical decisions for their children.

## II.

"We review a district court's grant of a preliminary injunction for an abuse of discretion," reviewing its "legal conclusions *de novo* and its factual findings for clear error." *Obama for Am. v. Husted*, 697 F.3d 423, 428 (6th Cir. 2012). "The injunction will seldom be disturbed unless the district court relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard." *Id.* (quoting *Mascio v. Pub. Emps. Ret. Sys. of Ohio*, 160 F.3d 310, 312 (6th Cir. 1998)).

"Courts reserve the extraordinary remedy of a preliminary injunction for those cases where it is necessary to preserve the status quo pending a final determination of the merits." *La.-Pac. Corp. v. James Hardie Bldg. Prod., Inc.*, 928 F.3d 514, 517 (6th Cir. 2019). "In deciding whether to issue an injunction, a district court weighs four factors: '(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction.'" *Id.* (quoting *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017)). "As long as a plaintiff demonstrates *some* likelihood of success on the merits, a court should balance rather than tally these factors," although "our cases warn that a court must not issue a preliminary injunction where the movant presents no likelihood of merits success." *Id.*

III.

I start by evaluating Plaintiffs' likelihood of success on the merits and conclude that the statutes are likely unconstitutional under the Fourteenth Amendment's Equal Protection and Due Process Clauses.

A.

"'[O]ur Nation has had a long and unfortunate history of sex discrimination,' . . . a history which warrants the heightened scrutiny we afford all gender-based classifications today." *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 136 (1994) (quoting *Frontiero v. Richardson*, 411 U.S. 677, 684 (1973) (plurality opinion)). "[T]he party seeking to uphold a statute that classifies individuals on the basis of their gender must carry the burden of showing an 'exceedingly persuasive justification' for the classification." *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982) (quoting *Kirchberg v. Feenstra*, 450 U.S. 455, 461 (1981)). "The burden is met only by showing at least that the classification serves 'important governmental objectives and that the discriminatory means employed' are 'substantially related to the achievement of those objectives.'" *Id.* (quoting *Wengler v. Druggists Mutual Ins. Co.*, 446 U.S. 142, 150 (1980)). This standard is known as "intermediate scrutiny." *Clark v. Jeter*, 486 U.S. 456, 461 (1988).

Contrary to the majority, I conclude that Tennessee's and Kentucky's statutes cannot pass constitutional muster. First, the statutes trigger heightened scrutiny because they facially discriminate based on a minor's sex as assigned at birth and on a minor's failure to conform with societal expectations concerning that sex. Second, Tennessee and Kentucky do not show an exceeding persuasive justification or close means-ends fit for their classifications.[6]

---

[6]Plaintiffs also argue that transgender persons are a suspect or semi-suspect class and that the statutes impermissibly discriminate based on transgender status, but it is unnecessary to resolve this question today. According to this argument: "Transgender people satisfy all the indicia of a suspect class: (1) they have historically been subject to discrimination; (2) they have a defining characteristic that bears no relation to their ability to contribute to society; (3) they may be defined as a discrete group by obvious, immutable, or distinguishing characteristics; and (4) they are a minority group lacking political power." Kentucky Appellees Br. 40–42 (citing *Windsor v. United States*, 699 F.3d 169, 181 (2d Cir. 2013)); *see also* Tennessee Appellees Br. 30–32. Although Plaintiffs present weighty arguments, the complex questions involved need not be resolved here because the statutes clearly discriminate based on sex.

1.

Equal-protection jurisprudence is clear:  When a "challenged [statute] expressly discriminates among [persons] on the basis of gender, it is subject to scrutiny under the Equal Protection Clause of the Fourteenth Amendment."  *Hogan*, 458 U.S. at 723 (citing *Reed v. Reed*, 404 U.S. 71, 75 (1971)).  Express discrimination, or a facial classification, exists if the statutory language requires reference to a person's sex to determine whether some activity is permitted or prohibited.  *See Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 485 (1982) (noting that a law is not "facially unrelated to race" because it "dealt in explicitly racial terms").  "A showing of discriminatory intent is not necessary when the equal protection claim is based on an overtly discriminatory classification."  *Wayte v. United States*, 470 U.S. 598, 608 n.10 (1985) (citing *Strauder v. West Virginia*, 100 U.S. 303 (1880)).  Put simply, if a statute facially "provides that different treatment be accorded to [persons] on the basis of their sex," the statute necessarily "establishes a classification subject to scrutiny under the Equal Protection Clause."  *Reed v. Reed*, 404 U.S. 71, 75 (1971); *see also Latta v. Otter*, 771 F.3d 456, 480 (9th Cir. 2014) (Berzon, J., concurring) ("A law that facially dictates that a man may do X while a woman may not, or vice versa, constitutes, without more, a gender classification.").

It is just as clear that a classification based on gender stereotypes triggers heightened scrutiny.  *See J.E.B.*, 511 U.S. at 138 (concluding that the government's use of peremptory jury strikes based on the presumption that the potential jurors' views corresponded to their sexes was unconstitutional under intermediate scrutiny).  And this court held nearly twenty years ago that differential treatment because a person "fails to act and/or identify with his or her gender" is "[s]ex stereotyping," *Smith v. City of Salem*, 378 F.3d 566, 575 (6th Cir. 2004), and "easily constitute[s] a claim of sex discrimination grounded in the Equal Protection Clause of the Constitution," *id.* at 577.  Further, just three years ago, the Supreme Court confirmed that if the government treats differently "a person identified as male at birth for traits or actions that it tolerates in a[] [person] identified as female at birth," or vice versa, the person's "sex plays an unmistakable . . . role."  *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1741–42 (2020).

Tennessee's and Kentucky's statutes classify based on a minor's sex as assigned at birth. Tennessee prohibits medical procedures when sought to "[e]nabl[e] a minor to identify with, or live as, a purported identity inconsistent with the minor's sex" or to "[t]reat[] purported discomfort or distress from a discordance between the minor's sex and asserted identity." Tenn. Code Ann. § 68-33-103(a). Kentucky likewise prohibits procedures "for the purpose of attempting to alter the appearance of, or to validate a minor's perception of, the minor's sex, if that appearance or perception is inconsistent with the minor's sex." Ky. Rev. Stat. § 311.372(2). Thus, "medical procedures that are permitted for a minor of one sex are prohibited for a minor of another sex." 73 F.4th at 422 (White, J., concurring in part and dissenting in part) (quoting *Brandt ex rel. Brandt v. Rutledge*, 47 F.4th 661, 669 (8th Cir. 2022)). "[A] person identified male at birth could receive testosterone therapy to conform to a male identity," for example, "but a person identified female at birth could not." *Id.*; *see also Adams ex rel. Kasper v. Sch. Bd.*, 57 F.4th 791, 801 (11th Cir. 2022) (en banc) ("The School Board's bathroom policy requires 'biological boys' and 'biological girls'—in reference to their sex determined at birth—to use either bathrooms that correspond to their biological sex or sex-neutral bathrooms. This is a sex-based classification."); *A.C. ex rel. M.C. v. Metro. Sch. Dist.*, 75 F.4th 760, 772 (7th Cir. 2023) (similar).

The statutes also condition the availability of procedures on a minor's conformity with societal expectations associated with the minor's assigned sex. Each law bars treatment when sought "for the purpose of" inducing physiological changes, like secondary sex characteristics, that are "inconsistent with" how society expects boys and girls to appear. Tenn. Code Ann. § 68-33-103(a); *see also* Ky. Rev. Stat. § 311.372(2) (prohibiting procedures "to alter the *appearance* of, or to validate a minor's *perception* of, the minor's sex, *if that appearance or perception is inconsistent with* the minor's sex" (emphasis added)). A minor assigned the male sex at birth cannot, for example, obtain puberty suppressants or estrogen to attain a feminine appearance, but a minor assigned the male sex at birth and born with intersex traits may obtain treatments to induce changes "consistent with" maleness. *See* Tenn. Code Ann. § 68-33-103(a) (exempting treatment for a "congenital defect"); Ky. Rev. Stat. § 311.372(3)(a) (exempting treatment for "[a] minor born with a medically verifiable disorder of sex development, including

external biological sex characteristics that are irresolvably ambiguous"). Classifications like these—motivated by perceptions of "typically male or typically female 'tendencies'"—are the kind of "generalizations" at which courts must "take a 'hard look.'" *United States v. Virginia* (*VMI*), 518 U.S. 515, 541 (1996) (citation omitted).

The statutes accordingly "penalize[]" treatment for a minor "identified as male at birth" but "tolerate[]" the same treatment for a minor "identified as female at birth," *Bostock*, 140 S. Ct. at 1741, and vice versa. That is a facial classification, pure and simple.

2.

Since sex and gender conformity each "play[] an unmistakable . . . role," *Bostock*, 140 S. Ct. at 1742, in determining the legality of a medical procedure for a minor, these statutes should raise an open-and-shut case of facial classifications subject to intermediate scrutiny. Yet the majority concludes otherwise.

The majority first reasons that "no [classification] occurs in either law" because the statutes "regulate sex-transition treatments for all minors, regardless of sex," and "[u]nder each law, no minor may receive puberty blockers or hormones or surgery in order to transition from one sex to another." Maj. Op. 24. This reasoning invokes an "equal application" principle, which was once acceptable in the Supreme Court's equal-protection jurisprudence, *see Pace v. Alabama*, 106 U.S. 583, 585 (1883) (upholding a statutory scheme that punished interracial fornication and adultery more severely than intra-racial fornication and adultery because "[t]he punishment of each offending person, whether white or black, is the same"), *overruled by McLaughlin v. Florida*, 379 U.S. 184 (1964). But the Court has since rejected that principle—emphatically and repeatedly.

In *Loving v. Virginia*, the Court held unconstitutional anti-miscegenation laws that applied to black and white persons alike. In so doing, the Court "reject[ed] the notion that the mere 'equal application' of a statute containing racial classifications is enough to remove the classifications from the Fourteenth Amendment's proscription of all invidious racial discriminations." 388 U.S. 1, 8 (1967). The key, the Court said, was that "[t]he statutes proscribe generally accepted conduct if engaged in by members of different races." *Id.* at 11.

Because the statutes "rest[ed] . . . upon distinctions drawn according to race," "the Equal Protection Clause demand[ed] that [the] classifications . . . be subjected to the 'most rigid scrutiny.'" *Id.* (citation omitted). Just as the illegality of a marriage under the statutes in *Loving* hinged on a person's race, so too here does the legality of medical procedures hinge on a person's sex.

The Supreme Court has confirmed in numerous post-*Loving* cases, moreover, that laws that classify on suspect lines do not escape heightened scrutiny despite "evenhandedly" classifying all persons. In *Powers v. Ohio*, the Court "reject[ed] . . . the view that race-based peremptory challenges survive equal protection scrutiny because members of all races are subject to like treatment," namely, "that white jurors are subject to the same risk of peremptory challenges based on race as are all other jurors." 499 U.S. 400, 410 (1991). "The suggestion that racial classifications may survive when visited upon all persons," the Court stated, "is no more authoritative today than the case which advanced the theorem." *Id.* (citing *Plessy v. Ferguson*, 163 U.S. 537 (1896)). "This idea has no place in our modern equal protection jurisprudence. It is axiomatic that racial classifications do not become legitimate on the assumption that all persons suffer them in equal degree." *Id.*; *see also J.E.B.*, 511 U.S. at 146 (extending the holding of *Powers* to "discrimination in jury selection on the basis of gender").

The Court in *Johnson v. California* again rejected the notion that a classification escapes heightened review if the classification applies "equally" to all. There, the Court considered a state department of corrections' policy of temporarily segregating new prisoners based on race to allow assessment of a prisoner's danger predicated on the risk of interracial violence between race-based gangs. *See* 543 U.S. 499, 502 (2005). The department argued "that its policy should be exempt from" strict scrutiny "because it is 'neutral'—that is, it 'neither benefits nor burdens one group or individual more than any other group or individual.' In other words, strict scrutiny should not apply because all prisoners are 'equally' segregated." *Id.* at 506 (citation omitted). The Court disagreed, noting its "repeated command that 'racial classifications receive close scrutiny even when they may be said to burden or benefit the races equally'" and its rejection of "the notion that separate can ever be equal—or 'neutral'—50 years ago in *Brown v. Board of Education*." *Id.* (citations omitted).

The majority also reasons that statutes "regulating 'medical procedure[s] that only one sex can undergo' ordinarily do not 'trigger heightened constitutional scrutiny.'"  Maj Op. 25 (alteration in original) (quoting *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2245–46 (2022)).  The majority invokes "distinctions involving pregnancy," which do not trigger heightened scrutiny unless shown to be "mere pretexts designed to effect an invidious discrimination against the members of one sex or the other."  *Id.* (quoting *Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974)).  "Testosterone transitions a minor from female to male," and "[e]strogen transitions a minor from male to female, never the reverse," the majority says, and "[i]f a law restricting a medical procedure that applies only to women does not trigger heightened scrutiny, as in *Dobbs* and *Geduldig*, laws that restrict these medical procedures unique to each sex do not require such scrutiny either."  *Id.* at 26.

This contention misreads *Geduldig* and *Dobbs*, which merely reiterated *Geduldig*'s language.  At issue in *Geduldig* was a state disability-insurance program that excluded coverage for "any injury or illness caused by or arising in connection with pregnancy."  417 U.S. at 489. The Court determined that "[n]ormal pregnancy is an objectively identifiable physical condition with unique characteristics," thus the program "d[id] not exclude anyone from benefit eligibility because of gender but merely remove[d] one physical condition—pregnancy—from the list of compensable disabilities."  *Id.* at 496 n.20.  The Court also rejected the argument that a facial classification based on pregnancy was necessarily a proxy for sex- or gender-based discrimination.  *See id.*

The statutes here, by contrast, expressly reference a minor's sex and gender conformity— and use these factors to determine the legality of procedures.  Further, discrimination based on inconsistency between gender identity and sex as assigned at birth can be seen as a proxy for discrimination against transgender individuals, which "necessarily" is discrimination "because of sex," *Bostock*, 140 S. Ct. at 1744—just like "[a] tax on wearing yarmulkes is a tax on Jews," *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993); *see also Rice v. Cayetano*, 528 U.S. 495, 514–15 (2000) (treating discrimination on the basis of Hawaiian ancestry as a facial race classification because "ancestry [was] a proxy for race"); *Castaneda v. Partida*, 430 U.S. 482, 495 (1977) (concluding discrimination in jury procedure based on "Spanish

surnames" was "not racially neutral with respect to Mexican-Americans"); *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 689 (2010) ("[Supreme Court] decisions have declined to distinguish between status and conduct in th[e] context [of sexual orientation discrimination].").

To further support the majority's contention that heightened review does not apply, the majority gives as an example that the government may "house[] men and women separately at a prison" if it does not "mak[e] distinctions in funding or programming available to members of each sex." Maj. Op. 29. I do not read *Women Prisoners of the District of Columbia v. District of Columbia* as supporting the majority's position. There, the D.C. Circuit considered an equal-protection challenge to the District of Columbia offering fewer programs to its female than its male inmates, not the separation of inmates based on sex. *See* 93 F.3d 910, 923–24 (D.C. Cir. 1996). The court did not address what level of scrutiny applied, or whether the programming survived scrutiny, because the resolution of the case depended on the "[t]he threshold inquiry" whether the female and male inmates were "similarly situated." *Id.* at 924. The court said the inmates were not, noting in particular "the striking disparities between the sizes of the prison populations." *Id.* at 925. "It is hardly surprising, let alone evidence of discrimination, that the smaller correctional facility" where the women were housed "offered fewer programs than the larger one" where the men were housed. *Id.* at 925. Indeed, the court favorably cited its earlier precedent, *Pitts v. Thornburgh*, *see id.* at 926, which held that "heightened scrutiny," not the deferential rational-basis review, applied when reviewing the incarceration of female inmates at facilities significantly farther from the District than similarly situated male inmates, 866 F.2d 1450, 1453 (D.C. Cir. 1989).

The majority also argues that, "in invalidating bans on same-sex marriage in *Obergefell v. Hodges*," the Supreme Court "would have said"—but "did not" say—that laws with sex- or gender-based conditions trigger heightened scrutiny if such scrutiny did, in fact, apply. Maj. Op. 30. True, the Court did not specify in *Obergefell* the appropriate degree of judicial scrutiny. But the Court's silence is just that—silence. We should be wary of reading much (if anything) into the Court's resolution of the issues presented there without discussion of the applicable level of scrutiny. The Court held that laws prohibiting same-sex marriage were unconstitutional under

the Equal Protection Clause all the same. *See* 576 U.S. 644, 675 (2015). Laws restricting marriage to opposite-sex relationships include notable similarities to the laws at issue here—they condition the availability of something (marriage versus medical procedures) based on a person's sex. And the Court subsequently clarified in *Bostock* that "it is impossible to discriminate against a person for being homosexual . . . without discriminating against that individual based on sex," 140 S. Ct. at 1741, despite, for example, Justice Kavanaugh's contention in dissent that, in *Obergefell* and other cases, "the Court never suggested that sexual orientation discrimination is just a form of sex discrimination," *id.* at 1832 (Kavanaugh, J., dissenting).

The majority further concludes that decisions under Title VII of the Civil Rights Act, like *Bostock*, do not control today's decision. Its reasoning rests on "[d]ifferences [in] the language"—Title VII makes it "unlawful . . . for an employer . . . to discriminate against any individual . . . because of . . . sex," while the Equal Protection Clause bars a state from "deny[ing] to any person within its jurisdiction the equal protection of the laws." Maj. Op. 30 (first quoting 42 U.S.C. § 2000e-2(a)(1), then quoting U.S. Const. amend. 14, § 1).

To be sure, Title VII and the Equal Protection Clause are not identical. The former forbids sex- or gender-based discrimination (subject to certain defenses), for example, while the latter allows such discrimination if the classification satisfies heightened scrutiny. *Cf. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141, 2220 (2023) (Gorsuch, J., concurring) (distinguishing Title VI's categorical bar on discrimination based on race, color, or national origin and the Equal Protection Clause's requirement of strict scrutiny).

But the majority does not explain why or how any difference in language requires different standards for determining whether a facial classification exists in the first instance. Indeed, Supreme Court decisions under Title VII and the Equal Protection Clause imply the opposite, often citing one another. *See, e.g.*, *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 133–34 (1976) (noting that "court decisions construing the Equal Protection Clause . . . are a useful

starting point" for Title VII "concepts of discrimination" given "the similarities between [Title VII] and some of those decisions" in extending *Geduldig* to the Title VII context).**7**

Our decision in *Smith v. City of Salem* also forecloses the majority's position. Plaintiff "Smith—biologically and by birth a male—[wa]s a transsexual and ha[d] been diagnosed with Gender Identity Disorder ('GID')," an earlier name for gender dysphoria. 378 F.3d at 568. "After being diagnosed with GID, Smith began 'expressing a more feminine appearance on a full-time basis'—including at work [at a municipal fire department]—in accordance with international medical protocols for treating GID." *Id.* That feminine appearance, Smith alleged, led to adverse employment action. *See id.* at 569. This court concluded that Smith had a viable Title VII claim: "[D]iscrimination against a plaintiff who is a transsexual—and therefore fails to act and/or identify with his or her gender—is no different from the discrimination directed against [a woman], who, in sex-stereotypical terms, did not act like a woman." *Id.* at 575 (discussing *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)). And these facts in support Smith's "claims of gender discrimination pursuant to Title VII easily constitute[d] a claim of sex discrimination grounded in the Equal Protection Clause." *Id.* at 577; *see also Boxx v. O'Grady*, 935 F.3d 510, 520 (6th Cir. 2019) ("We review § 1983 discrimination claims brought under the Equal Protection Clause using the same test applied under Title VII.").

The majority's attempts to distinguish *Smith* are unpersuasive. "*Smith* never addresses the textual differences between these documents—or the different stakes of broadly reading a statute versus broadly reading a largely unamendable constitution"—the majority says. Maj Op. 32. For reasons already discussed, neither the "textual differences" nor "the different stakes" affect the preliminary question whether a facial classification exists. And regardless whether the majority's "arguments" about the persuasiveness of *Smith*'s reasoning "have merit," *Smith*

---

**7**The majority also suggests that "[i]mporting the Title VII test for liability into the Fourteenth Amendment also would require adding Title VII's many defenses to the Constitution: bona fide occupational qualifications and bona fide seniority and merit systems, to name a few." Maj. Op. 31. But no one suggests that the "test for liability" is the same under Title VII and the Equal Protection Clause, only that the standard for determining the existence of a facial classification is the same. And the majority itself acknowledges implicitly that separate provisions of Title VII codify those defenses, *see id.* (citing 42 U.S.C. §§ 2000e-1, 2000e-2), thus belying any notion that those defenses must apply in equal-protection cases were we to conclude that a facial classification under Title VII is also a facial classification under the Equal Protection Clause. Instead, those considerations factor into the heightened-scrutiny balancing analysis.

"remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the . . . decision." *Dingle v. Bioport Corp.*, 388 F.3d 209, 215 (6th Cir. 2004) (citation omitted).

The majority next says that "[a]ll of the cases [that *Smith* relied on] pre-date *Bostock*," "[a]nd nearly all concern workers with overlapping employment-discrimination claims under Title VII and the Equal Protection Clause," while "a case about [medical treatments] available to children falls far outside Title VII's adult-centered employment bailiwick." Maj Op. 32. Why does the vintage of the authorities that *Smith* cites or the employment-versus-medical context matter for determining whether a facial classification exists at all? The majority does not explain. And if anything, *Bostock* reinforces the validity and applicability of *Smith*.

Then, the majority asserts that "[o]ur subsequent cases have largely taken the hint, refusing to extend *Smith* beyond claims about discrimination over dress or appearance," citing *Chisholm v. St. Mary's City School District* and *Vickers v. Fairfield Medical Center* in support. *Id.* The majority misapprehends both cases. *Chisholm* concluded that a coach's comments that athletes were "pussies" and not tough enough did not constitute "sex stereotyping." 947 F.3d 342, 351 (6th Cir. 2020). "Toughness, while sometimes celebrated in men, is certainly not discouraged in women, especially in a professional or team setting." *Id.* at 352. And the coach "was not offering a commentary on whether [the athletes] were exemplars of their sex"; in his "somewhat boorish mind, a 'pussy' was a wimp or coward, perhaps a 'snowflake' in the current lexicon, but, critically, not a feminine individual." *Id.* *Vickers* held that the plaintiff's "claim fail[ed] because [he] has failed to allege that he did not conform to traditional gender stereotypes in any observable way at work." 453 F.3d 757, 764 (6th Cir. 2006). "[T]he harassment [at issue] [wa]s more properly viewed as harassment based on [his] perceived homosexuality, rather than based on gender non-conformity." *Id.* at 763. After *Bostock*, however, that conclusion is dubious. *See* 140 S. Ct. at 1741 ("[I]t is impossible to discriminate against a person for being homosexual . . . without discriminating against that individual based on sex.").

Finally, the majority asserts that "*Smith* tells us nothing about whether a State may regulate medical treatments for minors facing gender dysphoria." Maj. Op. 32. "Recognizing

and respecting biological sex differences does not amount to stereotyping—unless Justice Ginsburg's observation in *United States v. Virginia* that biological differences between men and women 'are enduring' amounts to stereotyping." *Id.* (quoting 518 U.S. at 533). But the existence of "enduring" "[p]hysical differences between men and women," 518 U.S. at 533, bears on whether a sex- or gender-based classification *survives* scrutiny—it cannot render a facial classification sex- or gender-neutral. *See id.* (mentioning "enduring" differences in explaining that "[t]he heightened review standard our precedent establishes does not make sex a proscribed classification"); *Nguyen v. INS*, 533 U.S. 53, 64 (2001) (subjecting a classification that "takes into account a biological difference between" mothers and fathers to intermediate scrutiny).

3.

Because Tennessee's and Kentucky's statutes facially classify based on sex and gender conformity, they are subject to intermediate scrutiny. Under that standard, the "burden . . . rests entirely on the" government to come forward with an "exceedingly persuasive" justification for the classification. *VMI*, 518 U.S. at 533. The government satisfies its burden "only by showing at least that the classification serves 'important governmental objectives and that the discriminatory means employed' are 'substantially related to the achievement of those objectives.'" *Hogan*, 458 U.S. at 724 (quoting *Wengler*, 446 U.S. at 150). "If the State's objective is legitimate and important," the question is "whether the requisite direct, substantial relationship between objective and means is present." *Id.* at 725. "The purpose of requiring that close relationship is to assure that the validity of a classification is determined through reasoned analysis rather than through the mechanical application of traditional, often inaccurate, assumptions about the proper roles of men and women." *Id.* at 725–26.

The statutes fail intermediate scrutiny. To start, they lack an exceedingly persuasive justification. "The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation." *VMI*, 518 U.S. at 533. "[T]he mere recitation of a benign . . . purpose is not an automatic shield which protects against any inquiry into the actual purposes underlying a statutory scheme." *Weinberger v. Wiesenfeld*, 420 U.S. 636, 648 (1975); *see also Sessions*

*v. Morales-Santana*, 582 U.S. 47, 69–70 (2017) (rejecting that the government's proffered justification actually motivated the challenged sex-based classification).  Here, Tennessee's statute includes legislative findings proclaiming the state's "interest in encouraging minors to appreciate their sex, particularly as they undergo puberty."  Tenn. Code Ann. § 68-33-101(m).  And both statutes' texts effectively reveal that their purpose is to force boys and girls to *look* and *live* like boys and girls.  Statutes, like these, that "rely on overbroad generalizations about" how "males and females" should appear and behave, *VMI*, 518 U.S. at 533, cannot survive scrutiny.

Even taking Tennessee's and Kentucky's word that their purpose is solely to protect minors, *see* Tennessee Appellants Br. 44; Kentucky Appellants Br. 3, the states still fail to show that "the requisite direct, substantial relationship between objective and means is present," *Hogan*, 458 U.S. at 725 (quoting *Wengler*, 446 U.S. at 150).  In each lawsuit, the district court made robust factual findings based on an extensive record, and neither court found that banning these treatments is beneficial to minors, nor has any district court confronting similar laws outside this circuit.  I defer to these factual findings and, on my review of the record, see no error, clear or otherwise.

Gender-affirming care is well accepted as treatment for gender dysphoria.  The WPATH and the Endocrine Society, the two most prominent organizations in transgender healthcare, have promulgated widely accepted clinical-practice guidelines for treatment.  Tennessee and Kentucky try to discredit these guidelines by noting that the conclusions therein are based on "low-quality evidence" under the Grading of Recommendations Assessment, Development, and Evaluation (GRADE) system, a formal process for assessing the quality of scientific evidence. *See* Tennessee Appellants Br. 14; Kentucky Appellants Br. 4.  But "[r]ecommendations for pediatric care made by professional associations in guidelines are seldom based on well-designed and conducted randomized controlled trials due to their rarity."  No. 23-5600, R. 30, PID 293**.**  And, in any event, the GRADE system permits drawing conclusions based on "low-quality evidence," and doing so is neither novel nor uncommon.  For example, about twenty percent of the American Heart Association's recommendations in its Guideline for Pediatric Basic and Advanced Life Support are strong recommendations based on evidence of similar quality.

Other courts have relied on these guidelines. *See, e.g.*, *Edmo v. Corizon, Inc.*, 935 F.3d 757, 769 (9th Cir. 2019) (noting that "[m]ost courts agree" that WPATH guidelines "are the internationally recognized guidelines for the treatment of individuals with gender dysphoria" and collecting cases). And, as the Ninth Circuit noted in *Edmo*, the medical profession does as well:

> [M]any of the major medical and mental health groups in the United States—including the American Medical Association, the American Medical Student Association, the American Psychiatric Association, the American Psychological Association, the American Family Practice Association, the Endocrine Society, the National Association of Social Workers, the American Academy of Plastic Surgeons, the American College of Surgeons, Health Professionals Advancing LGBTQ Equality, the HIV Medicine Association, the Lesbian, Bisexual, Gay and Transgender Physician Assistant Caucus, and Mental Health America—recognize the [guidelines] as representing the consensus of the medical and mental health communities regarding the appropriate treatment for transgender and gender dysphoric individuals.

*Id.*

The record also supports that, over the short- and long-term, gender-affirming care benefits adolescents with gender dysphoria. It reduces rates of depression, anxiety, self-harm, and suicidality. Further, providers have used puberty suppressants and hormone therapy for years to treat other conditions, so the side effects are well known—as well as infrequent and easily managed.

In short, the "actual state purposes" undergirding the statutory classifications here, *VMI*, 518 U.S. at 535, rested on improper generalizations about boys and girls. And "[a] purpose genuinely to" protect children "is not served by" the classifications, *id.* at 539–40. "That is not *equal* protection." *Id.* at 540.

## B.

"The Due Process Clause guarantees more than fair process, and the 'liberty' it protects includes more than the absence of physical restraint." *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997). "The Clause also provides heightened protection against government interference with certain fundamental rights and liberty interests." *Id.* at 720. This protection encompasses "two categories of substantive rights": "rights guaranteed by the first eight Amendments" and "a

select list of fundamental rights that are not mentioned anywhere in the Constitution." *Dobbs*,
142 S. Ct. at 2246. "In deciding whether a right falls into either of these categories, the Court
has long asked whether the right is 'deeply rooted in [our] history and tradition' and whether it is
essential to our Nation's 'scheme of ordered liberty.'" *Id.* (quoting *Timbs v. Indiana*, 139 S. Ct.
682, 686 (2019)). The "substantive component" of due process "forbids the government to
infringe [recognized] 'fundamental' liberty interests *at all*, no matter what process is provided,
unless the infringement" satisfies strict scrutiny—that is, the infringement "is narrowly tailored
to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 302 (1993).

Unlike the majority, I conclude that Tennessee's and Kentucky's statutes violate the Due
Process Clause because they prohibit Parent Plaintiffs from deciding whether their children may
access medical care that the states leave available to adults. The statutes thereby infringe on
their fundamental right to control medical choices for their children, a right deeply rooted in this
nation's history and protected as a matter of Supreme Court and binding circuit precedent.

1.

"Substantive due process" is "a treacherous field." *Dobbs*, 142 S. Ct. at 2247 (quoting
*Moore v. East Cleveland*, 431 U.S. 494, 503 (1977) (plurality opinion)). As cautioned in *Dobbs*,
courts "must guard against the natural human tendency to confuse what [the Fourteenth]
Amendment protects with [their] own ardent views about the liberty that Americans should
enjoy." *Id.* Accordingly, "the Court has long been 'reluctant' to recognize rights that are not
mentioned in the Constitution." *Id.* (quoting *Collins v. Harker Heights*, 503 U.S. 115, 125
(1992)).

Despite this hesitancy, the Court has found clarity in some areas. "[T]he interest of
parents in the care, custody, and control of their children . . . is perhaps the oldest of the
fundamental liberty interests recognized by [the] Court." *Troxel v. Granville*, 530 U.S. 57, 65
(2000) (plurality opinion); *see also Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27 (1981) ("[It
is] plain beyond the need for multiple citation that a parent's desire for and right to 'the
companionship, care, custody and management of his or her children' is an important interest
that 'undeniably warrants deference and, absent a powerful countervailing interest, protection.'"

(quoting *Stanley v. Illinois*, 405 U.S. 645, 651 (1972))); *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) ("It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder."); *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 535 (1925) ("[T]hose who nurture [the child] and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations.").

Thus, we have squarely held that "[p]arents possess a fundamental right to make decisions concerning the medical care of their children." *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 418 (6th Cir. 2019). In *Kanuszewski*, we considered a Michigan program under which the state collected and stored blood samples from newborns to test for diseases. *See id.* at 404. We concluded that qualified immunity shielded state employees from the parent plaintiffs' claims regarding the initial collection, *see id.* at 415–16, but that the ongoing storage without informed consent violated the parents' fundamental right to direct the medical care of their children, *see id.* at 418–21.

*Kanuszewski* flows naturally from the Court's parental-autonomy decisions. "[O]ur constitutional system long ago rejected any notion that a child is 'the mere creature of the State' and, on the contrary, asserted that parents generally 'have the right, coupled with the high duty, to recognize and prepare [their children] for additional obligations.'" *Parham v. J.R.*, 442 U.S. 584, 602 (1979) (second alteration in original) (quoting *Pierce*, 268 U.S. at 535). "Surely," the Supreme Court has noted, "this includes a 'high duty' to recognize symptoms of illness and to seek and follow medical advice." *Id.* "The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions," *id.*, and "historically it has recognized that natural bonds of affection lead parents to act in the best interests of their children," *id.* (citing 1 W. Blackstone, Commentaries; 2 J. Kent, Commentaries on American Law). Here, no one can seriously doubt whether Parent Plaintiffs and others like them are motivated by "natural bonds of affection" and their children's "best interests."

In *Parham*, the petitioner "sought a declaratory judgment that Georgia's voluntary commitment procedures for children under the age of 18 . . . violated the Due Process Clause of the Fourteenth Amendment and requested an injunction against their future enforcement." *Parham*, 442 U.S. at 588. The Court applied its balancing test from *Mathews v. Eldridge*, 424 U.S. 319 (1976), for procedural due-process claims, concluding that "the risk of error inherent in the parental decision to have a child institutionalized for mental health care is sufficiently great that some kind of inquiry should be made by a 'neutral factfinder' to determine whether the statutory requirements for admission are satisfied" and that Georgia's procedures were constitutional. 442 U.S. at 606 (quoting *Goldberg v. Kelly*, 397 U.S. 254, 271 (1970)).

Much of the Court's analysis focused on the rights and role of parents in American society as caretakers for their children. "[A] state is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized," but "[t]he statist notion that governmental power should supersede parental authority in *all* cases because *some* parents abuse and neglect children is repugnant to American tradition." *Parham*, 442 U.S. at 603. "Simply because the decision of a parent . . . involves risks does not automatically transfer the power to make that decision from the parents to some agency or officer of the state. The same characterizations can be made for a tonsillectomy, appendectomy, or other medical procedure." *Id.* Ultimately, "[p]arents *can and must make those judgments*." *Id.* (emphasis added).

Applying these principles, Tennessee's and Kentucky's statutes plainly intrude on parental autonomy in violation of Parent Plaintiffs' substantive due-process rights. Although this case presents issues at the center of political controversies, the legal analysis on this point is rather simple. "Parents possess a fundamental right to make decisions concerning the medical care of their children." *Kanuszewski*, 927 F.3d at 418. Tennessee's and Kentucky's statutes prohibit parents from deciding whether medical treatment otherwise available to adults is appropriate for their minor children. And given that the statutes fail intermediate scrutiny, they fail strict scrutiny as well.

2.

The majority thinks differently, finding that Tennessee's and Kentucky's statutes do not intrude on any deeply rooted right of Parent Plaintiffs.

The majority begins by framing the issue as whether "[t]his country [has] a 'deeply rooted' tradition of preventing governments from regulating the medical profession in general or certain treatments in particular" and concludes "[q]uite to the contrary." Maj. Op. 14. It notes that "governments have long played a critical role in regulating health and welfare," *id.*, including "the integrity and ethics of the medical profession," *id.* (quoting *Glucksberg*, 521 U.S. at 731), and "medical treatment," *id.*, and that such regulations "receive 'a strong presumption of validity,'" *id.* (quoting *Heller v. Doe*, 509 U.S. 312, 319 (1993)). Accordingly, the majority reasons, "[t]he government has the power to reasonably limit the use of drugs," and "[i]f that's true for adults, it's assuredly true for their children." *Id.* at 17. "A parent's right to make decisions for a child does not sweep more broadly than an adult's right to make decisions for herself." In short, "[t]his country does not have a custom of permitting parents to obtain banned medical treatments for their children and to override contrary legislative policy judgments in the process." *Id.* at 17–18.

The majority's focus on the government's power over medical treatment in general misses the mark.[8]  It is true, as the majority says, that the government has wide latitude to

---

[8]In discussing the historical practice of governments regulating medical treatment, the majority posits that it is not "unusual for the [Food and Drug Administration (FDA)] to permit drugs to be used for some purposes but not others, or to allow some drugs to be used by adults but not by children." Maj. Op. 15. The majority misapprehends the significance of the regulations it cites. The FDA does not permit a drug for some uses and not others or allow a drug for use by adults but not children. "The Food, Drug and Cosmetic Act [(FDCA)] forbids pharmaceutical manufacturers from marketing or selling a drug until the Food and Drug Administration [(FDA)] has approved it as safe and effective for its intended use or uses (the drug's 'indications')." *United States ex rel. Polansky v. Pfizer, Inc.*, 822 F.3d 613, 615 (2d Cir. 2016). The FDCA "does not go further by regulating a doctor's practice of medicine." *Ass'n of Am. Physicians & Surgeons v. U.S. FDA*, 13 F.4th 531, 534 (6th Cir. 2021). Thus, the FDA "[can]not prohibit doctors from prescribing an FDA-approved drug (say, a chemotherapy drug approved to treat leukemia) for an 'off-label' use (say, treatment of other cancers)." *Id.* A doctor prescribing a drug approved for adult use to a child is just one example of off-label use, which is "commonplace in the medical community," *Ironworkers Local Union 68 v. AstraZeneca Pharms., LP*, 634 F.3d 1352, 1356 (6th Cir. 2011). Some of the authorities the majority cites, *see* Maj. Op. 15, discuss this distinction. *See, e.g.*, *Ass'n of Am. Physicians & Surgeons v. U.S. FDA*, 226 F. Supp. 2d 204, 206 (D.D.C. 2002) (noting that a "a drug that has been tested and approved" by the FDA "for adult use" may "be prescribed by a physician for her pediatric patients"). The regulations the majority cites simply permit the FDA to require a manufacturer to submit studies on the safety and

regulate the public's access to medical treatments or providers without having to go through the wringer of strict scrutiny. *See, e.g.*, *Glucksberg*, 521 U.S. at 723–27 (holding that there is no fundamental right to physician-assisted suicide); *Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 703 (D.C. Cir. 2007) (en banc) (holding that there is no "fundamental right of access for the terminally ill to experimental drugs"); *see also Gonzales v. Carhart*, 550 U.S. 124, 163 (2007) ("The Court has given state and federal legislatures wide discretion to pass legislation in areas where there is medical and scientific uncertainty."). But Tennessee and Kentucky did not ban treatment for adults and minors alike; they banned treatment for minors *only*, despite what minors or their parents wish. Thus, the issue is not the *what* of medical decision-making—that is, any right to a *particular* treatment or a *particular* provider. Rather, the issue is the *who*—who gets to decide whether a treatment otherwise available to an adult is right or wrong for a child? Do parents have the right to make that call, or does the government get to decide for itself, notwithstanding the parents' determinations of what is in their children's best interests?

Once the issue is properly framed, the answer becomes clear: parents have, in the first instance, a fundamental right to decide whether their children should (or should not) undergo a given treatment otherwise available to adults, and the government can take the decision-making reins from parents only if it comes forward with a sufficiently convincing reason to withstand judicial scrutiny. That conclusion is faithful to our holding in *Kanuszewski* that "[p]arents possess a fundamental right to make decisions concerning the medical care of their children." 927 F.3d at 418. And it comports with the Supreme Court's admonition that "parents generally 'have the right, coupled with the high duty, . . . to recognize symptoms of illness and to seek and follow medical advice." *Parham*, 442 U.S. at 602 (quoting *Pierce*, 268 U.S. at 535).

The majority's reasoning to the contrary is unconvincing. It says that "there is a night and day difference between th[e] program" in *Kanuszewski* and the statutes here because "[t]he Michigan program *compelled* medical care, while the Tennessee and Kentucky laws *restrict* medical care. It is one thing for the State to impose a procedure on someone; it is quite another

---

efficacy of a drug in pediatric populations, *see* 21 C.F.R. § 201.23(a), develop a pediatric formulation for a drug, *see id.*, and include information relevant to uses in pediatric populations in the drug label, *see id.* § 201.57(c)(9)(iv).

to deem it unsafe and prohibit it." Maj. Op. 18. The court in *Kanuszewski* never framed the right as solely to deny unwanted care. Yet it very easily could have. After all, the court noted elsewhere in its analysis that a competent person has a separate "constitutionally protected liberty interest in refusing unwanted medical treatment," 927 F.3d at 414 (quoting *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 277 (1990)), and that any such right for minors "devolve[s] upon the parents or legal guardians of the children," *id.* at 415, since "[c]hildren, by definition, are not assumed to have the capacity to take care of themselves," *id.* at 414–15 (quoting *Schall v. Martin*, 467 U.S. 253, 265 (1984)). But instead of framing the parental right as one to refuse unwanted care for the child, the court said that "[p]arents possess a fundamental right to make decisions concerning the medical care of their children," 927 F.3d at 418—period. It makes little sense to read the right as nothing more than a veto of forced treatment.

The majority further says that "*Parham v. J. R.* does not help [Parent Plaintiffs] either" because at issue in *Parham* were the minor plaintiffs' "procedural, not substantive, due process" rights. Maj. Op. 19. However, the Court said, in no uncertain terms, that a parent has the "right" and "'high duty' to recognize symptoms of illness and to seek and follow medical advice" on behalf of the child. 442 U.S. at 602. This language concerning a parent's "right" and "high duty," moreover, was a quote from *Pierce v. Society of the Sisters of the Holy Names of Jesus and Mary*, a substantive due-process decision on the parental right to send a child to a private instead of a public school, *see* 268 U.S. at 534–36. In fact, every other case cited in that paragraph of *Parham* was a substantive due-process decision. *See* 442 U.S. at 602 (citing *Wisconsin v. Yoder*, 406 U.S. 205, 213 (1972); *Prince*, 321 U.S. at 166; *Meyer*, 262 U.S. at 400). Clearly, the Court in *Parham* was expounding the substantive due-process right of parents to direct their children's medical care, although the discussion was in the context of addressing the minor plaintiffs' procedural due-process claims.

To be sure, none of this is to say "that parents' control over their children is without limit." *Kanuszewski*, 927 F.3d at 419. As noted, "a state is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized." *Parham*, 442 U.S. at 603. The state may, therefore, prohibit a parent from submitting a child to a genuinely harmful treatment. *See, e.g.*, *Pickup v. Brown*, 740 F.3d 1208,

1223, 1232, 1235–36 (9th Cir. 2014) (concluding that parents had no fundamental right to give children a "treatment that the state has *reasonably* deemed harmful" given "the well-documented" and "overwhelming consensus" "of the medical and psychological community that" sexual orientation change efforts therapy "was harmful and ineffective" (emphasis added)), *abrogated on other grounds by Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018); *Doe ex rel. Doe v. Governor of N.J.*, 783 F.3d 150, 156 (3d Cir. 2015) (adopting *Pickup*'s holding); *cf. Abay v. Ashcroft*, 368 F.3d 634, 638 (6th Cir. 2004) ("[F]emale genital mutilation is extremely painful, permanently disfigures the female genitalia, and exposes the girl or woman to the risk of serious, potentially life-threatening complications, including bleeding, infection, urine retention, stress, shock, psychological trauma, and damage to the urethra and anus." (cleaned up)).

But a state cannot simply deem a treatment harmful to children without support in reality and thereby deprive parents of the right to make medical decisions on their children's behalf. Allowing the state to do so is tantamount to saying there is no fundamental right. *Cf. Schall*, 467 U.S. at 265 ("[*I*]*f* parental control falters, the State must play its part as parens patriae." (emphasis added)); *Prince*, 321 U.S. at 166 (noting "that the custody, care and nurture of the child reside *first* in the parents" (emphasis added)). A fundamental right backed up by strict scrutiny demands more. "Of course [judges] are not scientists, but neither may [they] abandon the field when government officials . . . infringe a constitutionally protected liberty. The whole point of [heightened] scrutiny is to test the government's assertions." *S. Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 718 (2021) (statement of Gorsuch, J.). Our nation's constitutional history teaches that, when a treatment option remains otherwise available to the public, legislatures should not decide whether that treatment is right or wrong for minor children; parents should make these decisions.

IV.

"In constitutional cases," such as this one, the other factors governing the issuance of a preliminary injunction tend to fall to the wayside because "the first factor"—likelihood of success on the merits—"is typically dispositive." *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir.

2021).    Still, those additional factors favor upholding the district courts' injunctions. "A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages.  When constitutional rights are threatened or impaired, irreparable injury is presumed."  *Husted*, 697 F.3d at 436 (cleaned up).  Minor Plaintiffs' injuries are all the more irreparable because progressing through adolescence untreated leads to daily anguish and makes adult treatment more complicated.  "The two remaining preliminary injunction factors—whether issuing the injunction would harm others and where the public interest lies—merge when," as is true here, "the government is the defendant."  *Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023).  "[N]o cognizable harm results from stopping unconstitutional conduct, so 'it is always in the public interest to prevent violation of a party's constitutional rights.'"  *Vitolo*, 999 F.3d at 360 (citation omitted).

V.

The last question is the scope of district courts' preliminary injunctions.  On review of Tennessee's emergency motion to stay the district court's injunction of its statute, I agreed with the majority "that the district court abused its discretion in granting a statewide preliminary injunction" while reiterating "the majority's caveat that today's decision is preliminary only."  73 F.4th at 423 (White, J., concurring in part and dissenting in part).  With the benefit of more time, I now conclude that the district courts properly issued statewide injunctions.

"[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."  *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Although such relief generally should not run "in favor of persons other than" the plaintiffs to an action, "district courts are not categorically prohibited from granting injunctive relief benefitting an entire class in an individual suit."  *Warshak v. United States*, 532 F.3d 521, 531 (6th Cir. 2008) (quoting *Sharpe v. Cuerton*, 319 F.3d 259, 273 (6th Cir. 2003)).  The reason is simple: "the scope of injunctive relief is dictated by the extent of the violation established."  *Yamasaki*, 442 U.S. at 702.

Here, the district courts did not abuse their discretion in concluding that enjoining all enforcement was necessary to afford complete relief to Plaintiffs.  As the district court in the

Tennessee case noted, "it is far-fetched that healthcare providers . . . would continue care specifically for Minor Plaintiffs when they cannot do so for any other individual to whom [the statute] applies." 2023 WL 4232308, at *34. This reasoning reflects the pragmatic realities of the treatment bans, which operate directly on third parties—healthcare providers—rather than patients, and of the practice of medicine. *See Bresgal v. Brock*, 843 F.2d 1163, 1171 (9th Cir. 1987) (upholding injunction requiring Secretary of Labor to apply Migrant and Seasonal Agricultural Worker Protection Act to non-plaintiff forestry workers because "labor contractors," not workers, "are most directly affected by the injunction" and "[t]he Act cannot be enforced only against those contractors who have dealings with named plaintiffs, or against those contractors only insofar as they have dealings with named plaintiffs"); *Husted*, 697 F.3d at 437 (upholding injunction requiring a state to offer the same early in-person voting hours to military and non-military voters, including to non-military voters who were not plaintiffs to the suit).

I do not agree with the majority that the effect on Minor Plaintiffs' ability to obtain treatment if they alone are able to undergo treatment, while treatment is prohibited for all others throughout Tennessee and Kentucky, is "speculation." Maj. Op. 39 (quoting *Biden*, 57 F.4th at 557). It is not. "The court is not required either to wear blinders or to leave common sense out of the equation." *United States v. West*, 799 F. App'x 322, 328 (6th Cir. 2020) (quoting *United States v. Miller*, 478 F.3d 48, 52 (1st Cir. 2007)). "Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017) (per curiam). The district courts here exercised their discretion appropriately.

## VI.

As the majority notes, the heated political debate over gender-affirming care has yielded varying laws in Tennessee, Kentucky, and throughout our country. In the normal course, the Constitution contemplates the states acting as laboratories of democracies to resolve the controversies of the day differently. *See New State Ice Co v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting).

But when a fundamental right or freedom from discrimination is involved, experimentation has no place. "The very purpose of" our constitutional system "was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts." *W. Va. St. Bd. of Ed. v. Barnette*, 319 U.S. 624, 638 (1943). Our "fundamental rights may not be submitted to vote; they depend on the outcome of no elections." *Id.* Similarly, "[n]o plebiscite can legalize an unjust discrimination." *Lucas v. Forty-Fourth Gen. Assemb.*, 377 U.S. 713, 736 n.29 (1964) (citation omitted).

Tennessee's and Kentucky's laws tell minors and their parents that the minors cannot undergo medical care because of the accidents of their births and their failure to conform to how society believes boys and girls should look and live. The laws further deprive the parents—those whom we otherwise recognize as best suited to further their minor children's interests—of their right to make medical decisions affecting their children in conjunction with their children and medical practitioners. For these reasons, I dissent.