

TARA L. BORELLI, SENIOR COUNSEL
EMAIL: TBORELLI@LAMBDALEGAL.ORG
WRITER'S DIRECT LINE: (470) 225-5341

September 16, 2025

The Honorable Nwamaka Anowi, Clerk of Court
U.S. Court of Appeals for the Fourth Circuit
1100 East Main Street, Suite 501
Richmond, Virginia 23219

Re:   *Kadel v. Folwell*, No. 22-1721
      Response to Defendants-Appellants' Correspondence of September 11, 2025

Dear Clerk Anowi:

Plaintiffs-Appellees ("Plaintiffs") respectfully respond to Defendants-Appellants' ("Defendants") September 11, 2025 correspondence urging this Court to "promptly" vacate the permanent injunction below, remand to the district court, and instruct that summary judgment be denied on Plaintiffs' Equal Protection Clause claim—all with no merits briefing or opportunity for Plaintiffs to be heard. Defs.' Ltr., ECF No. 141.  The Court should deny this request.  Plaintiffs provide preliminary responses to Defendants' arguments but, should the Court consider vacating the injunction below, Plaintiffs request the opportunity to present more fulsome briefing on the reasons that *United States v. Skrmetti*, 145 S.Ct. 1816 (2025), does not change the outcome on Plaintiffs' equal protection claim.

Defendants ask this Court to—without any further process—"vacate the district court's injunction" in "light of the Supreme Court's order" granting certiorari, vacating this Court's decision, and remanding for further proceedings ("GVR order").  This misunderstands the purpose and effect of a GVR order.  A "GVR does not indicate, nor even suggest, that the lower court's decision was erroneous." *Communities for Equity v. Michigan High Sch. Athletic Ass'n*, 459 F.3d 676, 680 (6th Cir. 2006).  Nor does it even "necessarily signal a disagreement with the panel's reasoning or result." *Vincent v. Bondi*, 127 F.4th 1263, 1264 n.1 (10th Cir. 2025).  Indeed, "a healthy proportion of GVR'd judgments are, *wholly appropriately,* reinstated on remand." Aaron-Andrew P. Bruhl, *The Remand Power and the Supreme Court's Role,* 96 Notre Dame L. Rev. 171,220 (2020).  A GVR order is simply "an efficient way for the Supreme Court to obtain the views of the lower courts on the effect of a new decision, whatever those views might





be." *Klikno v. United States*, 928 F.3d 539, 544 (7th Cir. 2019). Accordingly, the GVR order supplies no basis to vacate the district court's injunction.

Neither does *Skrmetti* require vacatur of the injunction in this case or an order that summary judgment be entered in favor of Defendants, let alone without affording an opportunity to provide fulsome briefing. *Skrmetti* is limited in scope, turning on the specific context, facts, and arguments before the Court, and providing no basis for disturbing this Court's well-founded conclusions. First, *Skrmetti* emphasized that the narrow nature of its ruling, focusing the entirety of its analysis on care involving adolescents, not adults. *See, e.g.*, 145 S.Ct. at 1829 ("SB1 prohibits healthcare providers from administering puberty blockers and hormones to *minors* for certain *medical uses*, regardless of a minor's sex"); *id.* at 1859 (Alito, J., concurring) (for the legislation at issue in the case, "the law's restrictions apply only to the treatment available to *minors*"; "the law imposes no restrictions" for adults). The Exclusion here has no age restrictions and largely affects adults.

Second, by its plain terms, the Exclusion at issue here expressly classifies based on sex. *Skrmetti* found that Tennessee's ban on medical care for minors classifies on the bases of "age" and "medical use," which are subject to rational basis. *Skrmetti* determined that Tennessee's ban merely referenced sex, which was not enough on its own to constitute a sex-based classification. The categorical Exclusion at issue here, however, relies on sex as the determining value for classification. The Exclusion bars all coverage for "sex changes or modifications," and says nothing about age, medical condition, or diagnosis. JA3833-3880. Rather the Exclusion uses the expressly *sex-based purpose* of the care—a "sex change[]"—to exclude coverage. *Id*. The Exclusion's reliance on this sex-based conduct is neither incidental, nor necessary to describe a medical condition or use. Additionally, Defendants repeatedly described their efforts to strip this care from plan members in sex-based terms. *See* JA4734 (a public statement by former Treasurer Folwell about this litigation used the phrase "sex change" three times, including in the title). Just as discrimination based on religious conversion is religious discrimination, "discrimination 'because of sex' inherently includes discrimination against employees because of a change in their sex." *Equal Emp. Opportunity Comm'n v. R.G. &. G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 575 (6th Cir. 2018), *aff'd sub nom. Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644 (2020).



Page | 3

Contrary to Defendants' suggestion, neither this Court nor the one below found the Exclusion discriminates based solely on "mere reference to sex." Defs.' Ltr., ECF No. 141 at 2. Although *Skrmetti* clarifies that a mere reference, standing alone, is not sufficient to prove sex discrimination, the Exclusion goes much further. *Id.* at 1829. The Exclusion uses sex to draw a bright line, affording treatment to those who conform to an approved sex-based purpose (e.g., cisgender men who require additional testosterone to be in the normal male range), and denying it to those who do not (transgender men who require testosterone to be in the normal male range).

Third, *Skrmetti* supports, rather than undermines, this Court's sex stereotyping analysis. Defendants claim that Plaintiffs' sex stereotyping theory does not survive *Skrmetti* (Defs.' Ltr., ECF No. 141 at 1-2), but *Skrmetti* affirms that "classifications rest[ing] on impermissible stereotype" are subject to heightened scrutiny. 145 S.Ct. at 1832. Employing a fact-bound analysis to the record and minor plaintiffs in that case, *Skrmetti* found that Tennessee's specific legislative findings did not evince sex stereotyping. *See id.* (finding no impermissible stereotyping in the legislature's interest in "kids" purportedly "benefit[ing] from additional time to 'appreciate their sex' *before* embarking on body-altering paths" (emphasis added)). That analysis does not apply to this unique record or the sweeping Exclusion here, which "conditions access" to care for plan members regardless of age, based "on whether the [care] will better align the patient's gender presentation with their sex assigned at birth." *Kadel v. Folwell*, 100 F.4th 122, 154 (4th Cir. 2024), *cert. granted, judgment vacated*, No. 24-99, 2025 WL 1787687 (U.S. June 30, 2025). When, for example, chest surgery is available to both birth-assigned males and birth-assigned females, but only birth-assigned males receive coverage to masculinize their chest, the "difference in coverage is rooted in a gender stereotype: the assumption that people who have been assigned female at birth are supposed to have breasts, and that people assigned male at birth are not." *Id.* This "is a policy based on gender stereotypes," *id.*, and *Skrmetti* does not disturb this Court's prior analysis.

Fourth, the Exclusion also discriminates based on transgender status, which requires heightened scrutiny both in its own right, and as a form of sex discrimination. *Skrmetti* declined to rule on whether Tennessee's "prohibitions are mere pretexts designed to effect an invidious discrimination against transgender individuals," in significant part because the plaintiffs did not raise the argument. 145 S.Ct. at 1833-34. That argument was raised here (Pls.' Br. at 29-30, ECF No. 47) and thoroughly considered by this Court, which recognized that gender


transition (*i.e.*, a "sex change") "aim[s] at addressing incongruity between sex assigned at birth and gender identity." *Kadel*, 100 F.4th at 146. This is "the very heart of transgender status." *Id*. Just as "[a] tax on wearing yarmulkes is a tax on Jews," *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993), an exclusion of "sex changes" is an exclusion of transgender people.[1] *Skrmetti* itself concedes that "only transgender individuals seek treatment for gender dysphoria," *id.* at 1833, and the Court should "decline[] to distinguish between status and conduct" in this context. *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 689 (2010).

Moreover, "[i]n *Skrmetti*, the Supreme Court acknowledged that, just as some gender-specific terms might be permissible, certain gender-neutral wording might 'mask discrimination that is unlawful.'" *L.B. v. Premera Blue Cross*, No. C23-0953 TSZ, 2025 WL 2326966, at *2 (W.D. Wash. Aug. 12, 2025) (quoting *Skrmetti*, 145 S.Ct. at 1829). The unique record here leaves no doubt that this Exclusion is intended to deny participants care because they are transgender. In response to the enactment of Section 1557 of the Affordable Care Act ("ACA"), 42 U.S.C. § 18116 ("Section 1557"), the staff of the North Carolina State Health Plan ("NCSHP") concluded that the Exclusion must be removed and requested a cost estimate from their consultant. JA3929; JA4638-4640. When the staff recommended removal of the Exclusion to NCSHP's Board of Trustees, their slides included the term "transgender" 10 times to describe the population and care at issue. JA4654-4677; *see also* JA4668 (explaining that ACA regulation "makes clear … that blanket exclusions of transgender services" are outmoded); JA4642-4643 (the cost estimate prepared by the plan's consultant was itself entitled "Transgender Cost Estimate"); JA4734 (Defendant Folwell's statement that he would not provide coverage for "sex change operations" until "the court system" … "tells us that we 'have to'").

For these reasons, *Kadel* was correct to find that *Geduldig v. Aiello*, 417 U.S. 484 (1974), does not apply, and *Skrmetti* does not change the analysis. *Kadel*, 100 F.4th at 145. *Skrmetti* explained that the Tennessee law before it, like "the law at issue in *Geduldig*," simply "regulates certain medical treatments." 145 S.Ct. at

---

[1] *See also Rice v. Cayetano*, 528 U.S. 495, 514 (2000) (treating ancestry discrimination as facial race discrimination where ancestry was a proxy for race); *Casteneda v. Partida*, 430 U.S. 482, 486 (1977) (treating Spanish surname as a proxy for Mexican-American ancestry).



1834 n.3.  That is "different from" a law regulating "a class of *persons* identified on the basis of a specified characteristic," such as those who "menstruate" (or here, those who undergo "sex changes").  145 S.Ct. at 1834 n.3.  As *Skrmetti* clarified, "[n]either our analysis nor *Geduldig* speaks to a law that classifies on such a basis."  *Id*.

Finally, the district court has already granted Plaintiffs summary judgment under Section 1557 of the ACA, a statutory claim, which incorporates Title IX's antidiscrimination guarantee and is not implicated by the limited equal protection ruling in *Skrmetti*.  Because Plaintiffs sought a permanent injunction under the ACA as well, Defendants' discriminatory healthcare exclusion should remain enjoined once the district court has an opportunity to issue an order on remedies. *See Doe v. South Carolina*, No. 25-1787, 2025 WL 2375386, at *10 (4th Cir. Aug. 15, 2025) (Diaz, C.J., concurring) ("*Skrmetti* said nothing whatsoever to cause doubt as to the vitality of *Grimm*'s Title IX holding.") (citing *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 594 (4th Cir. 2020), as amended (Aug. 28, 2020)), *stay denied*, No. 25A234, 2025 WL 2610400, at *1 (U.S. Sept. 10, 2025).

For the reasons above, the Court should reject Defendants' request to vacate the district court's injunction enjoining enforcement of the Exclusion without any opportunity for merits briefing.

Best regards,

*Tara Borelli*

Tara L. Borelli
Senior Counsel

CC: All Counsel of Record, served via CM/ECF.